Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiff BMA LLC

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC,<br><br>Plaintiff,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,<br><br>Defendants. | Case No.  3:20-cv-3345<br><br>**COMPLAINT FOR CONSPIRACY TO CONDUCT AND CONDUCTING ENTERPRISE'S AFFAIRS THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. §§ 1962(d) AND (c) (RICO), CRYPTOCURRENCY MARKET MANIPULATION IN VIOLATION OF 7 U.S.C. § 9(1) (USE OF DECEPTIVE OR MANIPULATIVE DEVICE), 7 U.S.C. §§ 9(3) AND 13(a)(2) (PRICE MANIPULATION), PRINCIPAL AGENT LIABILITY, AIDING AND ABETTING PRICE MANIPULATION IN VIOLATION OF 7 U.S.C. § 25(a)(1), NEGLIGENCE, FRAUD, CIVIL CONSPIRACY, UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ, UNJUST ENRICHMENT (RESTITUTION), CONSTRUCTIVE TRUST AND ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 1 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

**COMPLAINT**

Plaintiff, BMA LLC ("Plaintiff", "BMA"), by and through its undersigned attorneys, for its Complaint against Defendant HDR Global Trading Limited ("HDR"), Defendant ABS Global Trading Limited ("ABS"), Defendant Arthur Hayes ("Hayes"), Defendant Ben Delo ("Delo") and Defendant Samuel Reed ("Reed") (collectively "Defendants") alleges as follows:

**INTRODUCTION**

*"It just costs more to bribe them." Defendant Arthur Hayes (about U.S. authorities).*

1.      Plaintiff BMA is informed and believes and thereon alleges that popular cryptocurrency derivatives exchange platform BitMEX ("BitMEX" or "BitMEX platform") owned and operated by Defendants HDR, Hayes, Delo and Reed, and each of them, in a brazenly lawless manner, was deliberately designed from ground up with the purpose to engage in, facilitate, aid, abet, counsel, induce and/or procure a myriad of illegal activities including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c) (RICO), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq. (2012) and Commodity Futures Trading Commission ("CFTC") Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2018).  Defendants, and each of them, specifically designed BitMEX to financially benefit from the alleged racketeering activity and other unlawful conduct, earning Defendants billions of dollars in illicit profits.

2.      The sheer magnitude of Defendants' unlawful activity is truly staggering. "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  Moreover, Defendants' high volume business with numerous

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 2 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

residents of the United States and this District as alleged in detail below is vast and pervasive. Accordingly, Defendants were unquestionably on notice of the need to obtain a money transmission license in the United States, which Defendants willfully and deliberately failed to do. Therefore, according to Defendants' own data, Defendants' unlicensed money transmitting business admittedly processed, on average, $3 billion of illegal and unlicensed money transfers each day, all in violation of United States federal statute 18 U.S.C. § 1960(a), which is the record volume for such unlawful activity in the entire history of the monetary regulation in the United States.

3.      A combination of providing traders with extremely high trading leverage (up to 100x), using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges, enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations all make BitMEX an exquisite "designer" tool for unsavory actors to manipulate cryptocurrency markets. Because of the very high derivatives trading volume on BitMEX, the artificial prices caused by the BitMEX manipulations spread, like forest fires, from BitMEX to other exchanges wreaking havoc on the entire cryptocurency ecosystem, costing traders and investors billions of dollars in losses and resulting in a domestic injury in the United States ("Domestic Injury").

4.      Moreover, on April 30, 2018, after repeated denials, Defendants finally admitted that BitMEX operates its own for-profit trading desk controlled an employee of Defendant HDR Nick Andrianov ("Andrianov"). This desk trades against BitMEX's own customers on their own exchange, using BitMEX's inside information about its customers' existing trading positions, stop loss orders, liquidation prices and open orders and enjoys many other unfair advantages not available to other users of the BitMEX platform. While making money trading against BitMEX's own customers, this operation, which Defendants refer to as "anchor market maker," receives

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 3 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

many special trading privileges that are not available to other exchange users.  This creates even greater financial incentive for Defendants to manipulate cryptocurrency markets and financially benefit from the manipulations through the aforesaid for-profit trading desk operation.

5.      Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States and this District.  Defendant HDR's own website BitMEX.com lists San Francisco as the location of one of Defendant HDR's offices, where all the technology behind BitMEX has been and continues to be developed.  Defendants use United States – based Amazon, Inc. AWS infrastructure, with offices in northern California, for storing all of its customer and trading data and for executing its order matching system and its liquidation engine.  Moreover, Defendants use Redwood City, California – based SendGrid, Inc. for handling all their bulk email communications with its customers.  Finally, Defendants' website BitMEX.com is a commercial website, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants HDR, Hayes, Delo and Reed conduct high-volume derivatives trading business with numerous individuals and companies residing in the United States, State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

## NATURE OF ACTION

6.      This is an action for conspiracy to conduct and conducting enterprise's affairs through a pattern of racketeering activity, arising under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. (2012) and for cryptocurrency market manipulation arising under the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq. (2012).

## PARTIES

7.      Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-6 above as if fully set forth herein.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)      - 4 -      BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE No. 3:20-CV-3345

8.      Plaintiff BMA is a limited liability company duly formed and existing under the laws of the United States territory of Puerto Rico.

9.      Defendant HDR purports to be a Republic of Seychelles limited company (Ltd.), company number 148707, with a registered office at Suite 23, 1st Floor, Eden Plaza, Vistra Corporate Services Centre, Eden Island, Mahe, Seychelles.  Defendant HDR was organized by Defendants Hayes, Delo and Reed in or about 2014.  When asked about the reasons for incorporating Defendant HDR in the Republic of Seychelles, Defendant HDR's Chief Executive Officer (CEO) Defendant Hayes has publicly claimed that "Seychelles is cheaper to bribe than [the United States]" and when asked how much he had to pay Seychelles to register BitMEX there, he said "a coconut".

10.      Defendant HDR is controlled by Defendants Hayes, Delo and Reed, who all hold themselves out as co-founders of BitMEX.   In fact, name "HDR" is an abbreviation composed of first letters of last names of Defendants Hayes, Delo and Reed.  Defendant Hayes serves as the



CEO of Defendant HDR.  Defendant Reed serves as the Chief Technology Officer (CTO) of Defendant HDR.

11.      According to BitMEX's website (https://www.BitMEX.com) ("BitMEX website"), its owner HDR Global Trading Limited maintains three offices throughout the world, located in San Francisco, Hong Kong and Singapore. BitMEX's Terms of Service ("Terms of Service"), posted on the BitMEX website, provide that: "BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based trading platform that is wholly owned by HDR

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 5 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

Global Trading Limited."

12.     The San Francisco office of Defendant HDR is the largest of all three by both the employee headcount and technical staff headcount.  Its addresses are 301 Battery Street, 4th Floor, San Francisco, California 94111, 340 Brannan Street, 2nd Floor, San Francisco, California 94107 and/or 2 Embarcadero Center, 8th Floor, San Francisco, California 94111.

13.     Hong Kong office of Defendant HDR is located at 45/F, Cheung Kong Centre, 2 Queen's Road Central, Hong Kong Central, Hong Kong Island, Hong Kong Special Administrative Region of the People's Republic of China.  The employee headcount in the Hong Kong office of Defendant HDR is about half of the headcount in Defendant HDR's San Francisco office.  Singapore office of Defendant HDR is the smallest of all three.

14.     Defendant HDR operates in the United States and this District by and through its California-based wholly owned subsidiary and alter ego, co-Defendant ABS.  Defendant ABS purports to be a Delaware corporation, Delaware Secretary of State file number 6393256, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810. Defendant ABS was organized by Defendants Hayes, Delo and Reed on or about April 27, 2017. Defendant Hayes asserted that Defendant HDR owns the entire issued share capital of Defendant ABS, and that Defendant ABS has an office in San Francisco, California.

15.     Specifically, Defendant ABS, which is a United State-based alter ego of Defendant HDR, has two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California.  Defendants Hayes, Delo and Reed continue to control Defendant ABS with Defendant Hayes serving as the President, CEO, Secretary and Chief Financial Officer thereof and Defendant Reed serving as a Chief Technology Officer of Defendant ABS.

16.     Plaintiff BMA is informed and believes and thereon alleges that Defendant HDR dominates and controls every aspect of Defendant ABS' operations and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations. In particular, Defendant ABS provides development, software engineering, containerized application

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)     - 6 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE No. 3:20-cv-3345

deployment, site reliability and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions take place.

17.     Plaintiff BMA is informed and believes and thereon alleges that Defendant HDR funds all of Defendant ABS operations, including paying for all of its employees, overhead, and lease and rent obligations, and is Defendant ABS' sole source of income.

18.     Defendants Hayes, Delo and Reed, collectively own a controlling interest in Defendant ABS through their ownership of Defendant HDR, which wholly owns Defendant ABS. Defendant Hayes is the sole director, president, secretary, and treasurer of Defendant ABS, and executes agreements on its behalf.  Defendant Hayes runs Defendant ABS's activities without regard to its corporate form and for the sole benefit of Defendant HDR.

19.     Defendants Hayes, Delo and Reed have created Defendant ABS as a false "shell" company as part of a broader United State federal and state law, regulation and tax dodge designed to tell regulators and tax authorities that BitMEX has no California or United States operations or investors. However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations.

20.     Defendant HDR is the sole and exclusive owner of BitMEX brand, as evidenced, for example, by the Terms of Service and by numerous trademark filings for the protection of this brand made by Defendant HDR in the United States and throughout the world.

21.     Defendant Hayes is an individual, who is a United States citizen and who resides in Hong Kong Special Administrative Region of the People's Republic of China. Defendant Hayes is sued as *sui juris*.

22.     Defendant Delo is an individual, who is a citizen of United Kingdom, and who resides in Hong Kong Special Administrative Region of the People's Republic of China. Defendant Delo is sued as *sui juris*.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 7 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

23.     Defendant Reed is an individual, who is a United States citizen and who lives in Hong Kong Special Administrative Region of the People's Republic of China.  Defendant Reed is sued as *sui juris*.  Despite living in Hong Kong, Defendant Reed subjectively considers himself to be a United States resident, as evidenced by his own professional profile on LinkedIn professional



network, where he continues to list the United States as his country of residence.

24.     Plaintiff BMA is informed and believes and thereon alleges that each of the individual Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency.

## DEFENDANTS' EXTENSIVE CONTACTS WITH THE UNITED STATES AND THIS DISTRICT

25.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-24 above as if

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 8 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

fully set forth herein.

26.     Defendant ABS is qualified to do business in California and has appointed an agent for service of process in this State.  Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States, State of California and this District.

27.     Corporate Defendants HDR and ABS were established by individual Defendants Hayes, Delo and Reed due to seed funding provided by at least two United States-based entities – Ohio-based RGB COIN LTD. and a startup accelerator SOSV with offices in San Francisco and New York.

28.     Defendant HDR is managed by Defendants Hayes, Delo and Reed with advice of an advisory board consisting of 12 members, three of which are located in the United States.

29.     Due to his role as the President, CEO, Secretary and Chief Financial Officer of Defendant ABS and his CEO position with Defendant HDR, Defendant Hayes manages and directs operations of both Defendants HDR and ABS in the United States and in this District.

30.     On the most recent California Secretary of State Statement of Information form filed by Defendant ABS with the State of California on or about August 22, 2019, Defendant

| Names and Complete Addresses of the Following Officers (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.) | | | | |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/          ADDRESS<br>ARTHUR  HAYES      340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | | STATE | ZIP CODE |
| 8.  SECRETARY                         ADDRESS<br>ARTHUR  HAYES      340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | | STATE | ZIP CODE |
| 9.  CHIEF FINANCIAL OFFICER/          ADDRESS<br>ARTHUR  HAYES      340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | | STATE | ZIP CODE |

Hayes's address in the State of California is listed as: 340 Brannan Street, 2nd Floor, San Francisco, California 94107.

31.     Due to his role as the CTO of both Defendants HDR and ABS and his supervisory involvement in the software development of the BitMEX platform, Defendant Reed manages and directs operations of both Defendants HDR and ABS in the United States and in this District, where the majority of the software developers and engineers working on the BitMEX platform are located.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)     - 9 -     BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

32.     As evidenced by BitMEX website, on or about April 27, 2018, Defendant Reed stated: "We serve customers all over the world, in five languages, and have become the premier platform for Bitcoin price discovery and liquidity" (emphasis added).  This statement constitutes an admission that Defendants knowingly serve customers in the United States and the State of California.

33.     BitMEX website www.BitMEX.com/careers/ lists San Francisco as the location of



one of the Defendant HDR's offices, where all the technology behind BitMEX is being



CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 10 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

developed. Defendant HDR actively recruited individuals for this office using recruiting websites such as GlassDoor.com, Angel.co and LinkedIn.com. According to professional network LinkedIn, BitMEX's owner Defendants HDR has at least 74 current and former employees in the United States, most of which are residents of this District.

34.     In a publicly released and publicly available video first aired on CNBC news channel, Defendant Hayes can be seen broadcasting from the aforesaid San Francisco office of Defendant HDR located at 2 Embarcadero Center, 8th Floor, San Francisco, California, 94111, on



or about July 19, 2018.

35.     United States residents can freely trade on BitMEX platform from the United States because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using widely available and inexpensive virtual private network (VPN) software that masks trader's geographical location.

36.     Defendant HDR uses United States – based Amazon, Inc.'s Amazon Elastic Kubernetes Service ("Amazon EKS"), which combines Amazon Web Services ("Amazon AWS") with managed high-availability Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data. Amazon AWS has offices in San Francisco, California.   San Francisco office of Defendant HDR

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 11 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

employs at least five Kubernetes engineers who interact with Amazon AWS in this District on a daily basis.



CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 12 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345



37.     Moreover, the recent email data leak of BitMEX has shown that Defendant HDR

```
Received: by
filter0531p1iad2.sendgrid.net with SMTP
id filter0531p1iad2-4029-5DBBDCE6-6
        2019-11-01 07:21:10.616650033
+0000 UTC m=+26944.349590420
Received: from ODk1MzUzNw
(135-180-78-178.fiber.dynamic.sonic.net
[135.180.78.178]) by
ismtpd0001p1sjc2.sendgrid.net (SG) with
HTTP id frqfqjARTVqlHIKEaRFB-g Fri, 01
Nov 2019 07:21:10.387 +0000 (UTC)
Content-Transfer-Encoding: quoted-
printable
Content-Type: text/html; charset=UTF-8
Date: Fri, 01 Nov 2019 07:21:18 +0000
(UTC)
From:  BitMEX  <noreply@bitmex.com>
```

uses Redwood City, California – based SendGrid, Inc., with offices at 889 Winslow St., Redwood

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 13 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

City, California 94063, United States, for handling all of its bulk email communications with its customers.

38.     Defendants use ReCAPTCHA service provided by Google, Inc., headquartered in this District to provide human verification for the users of the BitMEX's platform.

39.     Defendants further use YubiKey device and YubiCloud service provided by Palo Alto-based YubiKey, located in this District, to provide 2-factor authentication capability to the users of BitMEX's platform.

40.     Defendants further use service operated by Jumio Netverify, based in Palo Alto, California, through which Jumio collects personal data from BitMEX users directly, including photos of user's faces and ID documents and performs identity verification of the users for BitMEX platform.

41.     Defendants further use Freshdesk service provided by Palo Alto-based FreshWorks, headquartered in this District, for handling all customer support queries, notes and replies associated with the BitMEX platform.

42.     Defendants further use segment.io service provided by San-Francisco based Segment.io, Inc., and Google Analytics service provided by Google, Inc., both of which are headquartered in this District, for gathering data collected on BitMEX.com servers and generating visitor statistics for BitMEX platform.

43.     Defendants further use services provided by San Francisco-based Functional Software, Inc. (Sentry.io), San Francisco-based Pagerduty and Austin, Texas-based Solarwinds (Papertrail) to monitor all site and service issues associated with the BitMEX platform.

44.     Defendants further use services provided by Google Firebase and Amazon SNS platforms, operated by Google, Inc. and Amazon Web Services, Inc., respectively, both of which are headquartered in this District, to deliver mobile push notifications to all user devices.

45.     The above-alleged facts clearly show that the vast majority of the vital services used by BitMEX platform are provided by United States vendors located in this District and that without such services of United States and California origin, BitMEX platform would not have

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 14 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

existed in its present form.  Therefore, BitMEX is able to operate its platform only due to its connections with the service providers located in the United States and this District.

| | Service Provider to BitMEX | Services Provided to Bitmex | Service Provider Location |
|---|---|---|---|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 3. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 4. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 5. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 6. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 7. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 8. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |

46.     Furthermore, Plaintiff BMA is informed and believes and thereon alleges that San Francisco, California-based quant trading firm Galois Capital freely trades on BitMEX from this District generating millions of dollars of business for Defendant HDR.  This trading is done with the knowledge, permission, approval, assistance and encouragement of Defendants.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 15 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

47.     Defendants knowingly and willfully permitted United States citizens and residents of this District as well as United States based companies to freely trade on the BitMEX exchange because of the lucrative business relationships between Defendants and the aforesaid individuals and companies, which financially benefitted Defendants.

48.     Moreover, Defendant's HDR website BitMEX.com is a commercial website, in English language, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants conduct substantial business with the residents of the United States, the State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).   Instead of performing a proper document check before allowing users to open an account on BitMEX.com, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.  Using the aforesaid commercial website operated by Defendants, residents of the United States, the State of California and this District are able to place binding trading orders of virtually unlimited monetary size, enter into binding derivative purchase and sale contracts, and transfer virtually unlimited amount of funds anywhere in the world.

49.     Moreover, Defendants deliberately made their commercial website BitMEX.com accessible from the United States even without using VPN software in violation of BitMEX's own Terms of Service ("Terms of Service") in order to entice United States residents to trade on the BitMEX's platform.  Specifically, BitMEX's Terms of Service provide: "[y]ou are not allowed to access or use the Services or the Trading Platform if you are located, incorporated or otherwise established in, or a citizen or resident of: (i) the United States of America… 'Services' means websites, applications and any services provided by any member of the HDR Group, including: a) … the BitMEX <u>Testnet</u> Platform."  However, BitMEX.com website specifically invites United States resident users to try BitMEX <u>Testnet</u> Platform in direct violation of the prohibition contained in its own Terms of Service.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 16 -      BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7

⊘ **Note on Restricted Jurisdictions**

At this time, BitMEX cannot serve customers in Puerto Rico. You may still create an account, but you will be unable to deposit or trade. If you wish to try simulated trading, please try our BitMEX Testnet. Access to the BitMEX Testnet is not for trading purposes, and is not intended as investment advice or as a solicitation to engage in any form of trading activity and should not be construed as such.

8       50.     Therefore, any and all provisions contained in the Terms of Service prohibiting

9    United States users from using the BitMEX's platform were in fact sham provisions and lacked

10   any meaningful enforcement by Defendants.  Defendants willfully and deliberately used IP

11   country blocking, which has been proven utterly ineffective for its intended purpose and easily

12   subverted, to leave a back door for the United States residents to trade on the BitMEX platform.

13      51.     Furthermore, Defendants purposefully invoked the benefits and protections of the

14   United States Federal laws when they filed for and obtained from the United States government

15   official Notices of Allowance for seven (7) United States trademark applications.

16      52.     For example, trademark applications serial Nos. 87856272 and 87607952, both for

17   mark "BITMEX" were filed by Defendants in connection with "[d]ownloadable software for

18   trading crypto-products and providing crypto-currency information" and "exchanging money,

19   financial management, futures brokerage, capital investment, electronic funds transfer, providing

20   financial information via a website, financing services, investment of funds, business liquidation

21   services, financial services, namely, operation and management of hedge funds, commodity pools

22   and other collective investment vehicles, and trading for others of cryptocurrency, decentralized

23   application tokens and protocol tokens, blockchain based assets and other cryptofinance and

24   digital assets, securities, options, futures, derivatives, debt instruments and commodities,"

25   respectively, which are BitMEX's core services.  Invoking benefits and protections of the United

26   States Federal laws clearly made it foreseeable for Defendants that they would end up in a United

27   States Court.

28      53.     In the aforesaid trademark filings with the United States Patent and Trademark

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 17 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

Current Search: **S2: (HDR GLOBAL TRADING)[OW]** docs: 7 occ: 21

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

Office, Defendant HDR swore, under penalty of perjury, that it "has a continued bona fide intention, and is entitled, to use the mark[s] in commerce [in the United States] on or in connection with all of the goods/services listed in the Notice of Allowance or as subsequently modified for this specific class."

54.     In a recent legal filing, Defendant Hayes swore that: "[i]n my capacity as CEO, I am advised by an advisory body currently comprised of twelve individuals responsible for different departments within the HDR Group. A majority of the HDR Group's advisory committee has always been located in Hong Kong, and nine of the twelve members currently on the committee are located outside of the United States." Therefore, three out of 12 members of the advisory committee of Defendant HDR are located in the United States.

55.     Professional network LinkedIn provides publicly available evidence of dozens individuals, who reside in the United States and in this District and who identify themselves as cryptocurrency derivative traders on the BitMEX platform. 31 examples of the Unites States resident BitMEX traders, who trade on BitMEX through the aforesaid commercial website BitMEX.com, are provided in the below table:

| | BitMEX Trader Name | BitMEX Trader Residence |
|---|---|---|
| 1. | Scrembo Paul | Los Angeles, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 18 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| 2. | Aaron Aloyan | Greater San Diego, California, Area |
|---|---|---|
| 3. | Christopher Smitherman | Atlanta, Georgia |
| 4. | Daniel Spivak | Greater Chicago Area |
| 5. | Harrison Davis | Greater New York City Area |
| 6. | Vesko P. | Greater Los Angeles Area |
| 7. | Matthew Wellman | Lexington, Kentucky |
| 8. | Uriel Scott | Chicago, Illinois |
| 9. | Sahand Akbari | Sacramento, California Area |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City Area |
| 14. | Andres Santana | Greater New York City Area |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |
| 17. | Phillip James | St. Cloud, Minnesota Area |
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell | Laguna Beach, California |
| 21. | Jiale (Etta) Qin | Cupertino, California |
| 22. | Bokmoon Jung | Boise, Idaho |
| 23. | Lionel Girardin | Greater Chicago Area |
| 24. | Arijit Santra | Berkeley, California |
| 25. | Sankha Banerjee | Greater New York City Area |
| 26. | Connor Van Dorpe | Madison, Wisconsin |
| 27. | Ryan Rim | San Francisco Bay Area |
| 28. | Gianny R. Banda | Miami, Florida |
| 29. | Michael Peterson | Syracuse, New York Area |
| 30. | Anthony Agrait | Tempe, Arizona |
| 31. | Dustin G. | Burlington, Vermont Area |

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 19 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

56.     Professional network LinkedIn as well as other Internet resources further provide evidence of at least nine companies, which are incorporated and based in the United States and which trade derivatives using Defendant's HDR commercial website BitMEX.com:

| | Name of U.S. Company Trading on BitMEX | Company Address |
|---|---|---|
| 1. | CMT Capital Markets Trading | 156 N Jefferson St., Suite 102, Chicago, IL 60661 |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY 12207 |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |
| 6. | Swing Trade Pros | 1600 S. Indiana Ave, Chicago, IL 60616 |
| 7. | FalconX | 66 Bovet Rd #380, San Mateo, CA 94402 |
| 8. | Cumberland DRW | 540 W Madison St Chicago, IL 60661 |
| 9. | Circle Partners | 1395 Brickel Avenue, Suite 913 Miami, FL 33131 |

57.     Adaptive Fund I, LP, which is a Delaware limited partnership, funded primarily by investors who are United States residents, as the result of market manipulation which took place on BitMEX's platform on or about March 13, 2020, lost 60% of its equity, or roughly $12,000,000.  These catastrophic monetary losses were suffered by numerous Unites States residents who invested in that fund.  In communications to investors following the losses, fund manager Murad Mahmudov admitted to personally executing trades on BitMEX's platform with United States investors' money.  Due to the high profile of the fund and fund managers involved,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 20 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

Defendants clearly knew of the United States origin of the money that the Adaptive Fund I, LP was trading on BitMEX platform and Defendants deliberately and willfully allowed such trading to proceed.

58.     Internet video portal YouTube is replete with video evidence of traders residing in the United States and in this District freely placing high dollar bets through Defendant's HDR commercial website BitMEX.com.  The following table identifies just 40 examples of such video evidence:

| | BitMEX Trader's YouTube Account User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United States | 02/25/2020 | How Wales Manipulate Bitcoin Using Spoofing on Bitmex (Live $400,000 Short Trade) |
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitcoin Leverage Trading - Afternoon Trading Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollbox + New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 6. | Scrembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutorial For Beginners Bitcoin |
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Binance Futures, Bybit, & Bitmex Bitcoin & Crypto |
| 8. | Crypto Gnome | United | 05/14/2019 | How to Automate Your Trades on |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 21 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| | | States | | Bitmex & Deribit |
|---|---|---|---|---|
| 9. | Crypto Gnome | United States | 09/25/2019 | Goat Alerts - TradingView Bot & Shadow Trading for Bybit & Bitmex |
| 10. | Crypto Gnome | United States | 08/12/2018 | How to Set a STOP LOSS on BitMEX |
| 11. | Crypto Gnome | United States | 11/29/2018 | How to use a Trailing Stop on BitMEX - MORE PROFITS! |
| 12. | Crypto Gnome | United States | 07/25/2018 | How to Short Bitcoin on Bitmex |
| 13. | Crypto Gnome | United States | 08/11/2018 | How to Save on Fees When Trading on BitMEX |
| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United States | 07/30/2018 | Free Profit Tracking Spreadsheet for Trading on Bitmex |
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On NinjaTrader; www.SlingshotFutures.com |
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL) - 22 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| 23. | Bitcoin Trading Challenge | United States | 01/08/2019 | Scalping Bitmex Liquidations |
|---|---|---|---|---|
| 24. | Digital Millionaire | United States | 10/31/2019 | BitMEX Tutorial For Beginners - How To LONG AND SHORT Bitcoin With LEVERAGE! |
| 25. | Patrick Corsino | United States | 01/13/2020 | Beginner Method: $100-$1000/Day Passive Cryptocurrency Trading 2020! Bitcoin Bitmex, Binance, Bybit |
| 26. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 27. | Crypto Corny | United States | 01/31/2019 | 70% DOWN, 9930% TO GO... 0.1 To 10 BITCOIN TRADING CHALLENGE – Bitmex |
| 28. | MiningTrades | United States | 01/23/2018 | My Algorithmic Trading BOT trades $XBT Bitcoin Futures LIVE! | BitMex Jan 23rd 2018 |
| 29. | Crypto Minds | United States | 09/07/2018 | How to Long and Short Bitcoin and Altcoins on Bitmex |
| 30. | Jaydn's Crypto Channel | California, United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 31. | Crypt0W1SE | Michigan, United States | 12/30/2018 | Live BitMEX trading!!! 1 to 100 btc challenge! |
| 32. | ORACLE CRYPTO AVENGER! | United States | 02/08/2020 | $100,000 1 DAY PROFIT LEVERAGE TRADING BITSEVEN BYBIT BITMEX |
| 33. | ORACLE CRYPTO AVENGER! | United States | 10/15/2018 | BITMEX WATCH A SHORT TRADE THE ENDED OVER 103% WIN! |
| 34. | ORACLE CRYPTO | United States | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER |

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 23 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| | | States | | 98% ROI -WHY YOU CAN'T DO THIS. |
|---|---|---|---|---|
| | AVENGER! | States | | 98% ROI -WHY YOU CAN'T DO THIS. |
| 35. | ORACLE CRYPTO AVENGER! | United States | 11/07/2018 | BCH MARKET MANIPULATION - MANIPULATE BITMEX TO PROFIT! |
| 36. | Alexander Lorenzo | Gainesville, FL, United States | 01/26/2019 | Scavenger Bot Bitmex SCAM |
| 37. | Swing Trade Pros | 1600 S. Indiana Ave. Chicago, IL 60616 | 03/09/2020 | Live Bitcoin Trading on Bitmex with Swing Trade Pros Indicators! |
| 38. | Sell The Spike | Burlington, Vermont Area | 07/03/2019 | How to use a TRAILING STOPLOSS on Bitmex |
| 39. | Sell The Spike | Burlington, Vermont Area | 06/09/2018 | Bitmex Tutorial - Placing Orders, Setting Stoplosses and Targets, Leverage and Margin, Walkthrough |
| 40. | Bitcoin for Beginners | United States | 12/22/2018 | How To Use BitMEX Exchange For Beginners! (BitMEX Tutorial) |

59.    "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  This number is consistent with the evidence available on YouTube and LinkedIn.

60.    YouTube is also replete with dozens of videos teaching how to access Defendant's HDR commercial website BitMEX.com from the United States using inexpensive and widely available VPN software to avoid Internet protocol (IP) address blocking.  Below are 11 examples of such videos:

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 24 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

| | BitMEX Trader's YouTube User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Crypto Gnome | United States | 08/09/2018 | How to Sign Up for BitMEX in the US |
| 2. | Bot Mentality | Atlanta United States | 03/22/2018 | How to use Bitmex in the United States |
| 3. | Jaydn's Crypto Channel | California United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 4. | CryptoJunkies | United States | 08/15/2019 | How To Trade Bitmex In America! |
| 5. | Crypto Guru | United States | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator |
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? \| Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |
| 9. | Casey Watkins | United States | 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | ***MEX Millionaire*** EVERYTHING You Must Know!- ***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 25 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

61.     Defendant HDR assigns a six-symbol alphanumeric affiliate codes to all BitMEX account holders and uses these affiliate codes to pay compensation to its users for enticing other users, including United States residents, to open accounts on BitMEX.com commercial website by posting a URL pointing to the BitMEX registration page and incorporating the aforesaid assigned affiliate code.   The so assigned affiliate code uniquely identifies the corresponding account holder and its BitMEX account.  Thus, presence of the affiliate code indicates that a person who invites others to register with Defendant's HDR commercial website by way of an affiliate link himself has a BitMEX account.  Table below provides 21 examples of BitMEX affiliate codes being assigned to the United States residents for receiving compensation for enticing other United States residents to join the BitMEX platform:

| | BitMEX Trader's Name or Alias | Trader Residence | BitMEX Assigned Affiliate Code (identifies trader's BitMEX account) |
|---|---|---|---|
| 1. | Tone Vays | United States | cMvHXg |
| 2. | Flood | United States | ir2Xqa |
| 3. | Crypto Corny | United States | 0rsCIx |
| 4. | Krown's Crypto Cave | United States | ou4vcl |
| 5. | Crypto Hippo Trading | United States | gZ0Y10 |
| 6. | Edward Ornelas | United States | kpdzGl |
| 7. | CryptoSailor | United States | AOIyp0 |
| 8. | MiningTrades | United States | i110zC |
| 9. | Crypto Minds | United States | OIv1fe |
| 10. | Moonin Papa | United States | GG2kor |
| 11. | Josh Olszewicz | United States | s7sqNI |
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | lf9P89 |
| 16. | ORACLE CRYPTO | United States | WXNej9 |

|  |  |  |  |
|---|---|---|---|
|  | AVENGER! |  |  |
| 17. | Swing Trade Pros | United States | G4cfM4 |
| 18. | Moonin Papa | United States | GG2kor |
| 19. | Bitcoin for Beginners | United States | 5i7rOb |
| 20. | Crypto Gnome | United States | EOsLBm |
| 21. | Sell The Spike | Burlington, Vermont Area | KO33NC |

62.     Professional network LinkedIn provides publicly available evidence of 74 individuals, who are United States residents and who identify themselves as present and former employees of Defendant HDR, located in the United States and in this District:

|  | LinkedIn Member Name | Position at BitMEX | Residence |
|---|---|---|---|
| 1. | Max Shapiro | Associate at BitMEX Ventures | New York, New York |
| 2. | Kumar Dandapani | Head of BitMEX Ventures | San Francisco Bay Area |
| 3. | Alena Gilevskaya | Senior Software Engineer at BitMEX | San Francisco, California |
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |
| 8. | Niroj Shankhadev | Web Developer at BitMEX | San Francisco, California |
| 9. | Samuel Reed | Co-Founder and CTO at BitMEX | United States |
| 10. | Eric Zinnikas | Security Engineer at BitMEX | San Francisco, California |
| 11. | Molly Lubow | Talent Acquisition Specialist at | San Francisco Bay Area, |

| | | | |
|---|---|---|---|
| | | BitMEX | California |
| 12. | Evan Ricketts | Senior Software Engineer at BitMEX | Milwaukee, Wisconsin |
| 13. | Michael Carlson | Security Engineering Manager, Application Security at BitMEX | San Francisco, California |
| 14. | Monzer Aldimassi | Technical Program Manager (TPM) at BitMEX | Campbell, California |
| 15. | Patrick Fiscina | Vice President Of Engineering at BitMEX | San Francisco Bay Area, California |
| 16. | Allison Sommers | Security Engineer at BitMEX | San Francisco Bay Area, California |
| 17. | Conner McNicholas | Data Engineering at BitMEX | San Francisco, California |
| 18. | Brandon Schlenker | Engineering Manager at BitMEX | San Francisco, California |
| 19. | Riley Hutchinson | Director, People at BitMEX | San Francisco, California |
| 20. | Benson Wong | Senior IT Support Engineer at BitMEX | San Carlos, California |
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |
| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX (Powering the world's largest cryptocurrency trading platform with Kubernetes, at the edge of financial and infrastructure technologies. Scaling BitMEX's | San Francisco, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 28 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

| | | | |
|---|---|---|---|
| | | infrastructure, culture and practices from 10 employees to 150 employees, from $1B to $11B traded daily, and 150x more trades.) | |
| 27. | Maus Stearns | Security Engineering Manager at BitMEX | San Francisco, California |
| 28. | Andrew MacPherson | Security Engineer - Detection and Response at BitMEX | San Francisco, California |
| 29. | Chris Gates | Director of Offensive Security at BitMEX | Washington, DC Metro Area |
| 30. | Supriya Premkumar | Software Engineer - Kubernetes at BitMEX (Working on building Kubernetes Infrastructure that can handle tens of thousands of low latency transactions per second at one of the world's largest crypto exchanges.) | San Francisco, California |
| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the world's highest volume Cryptocurrency exchange. Building a world class Security team to protect our customers, assets and | Palo Alto, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 29 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| | | brand.) | |
|---|---|---|---|
| 34. | Javier Marcos de Prado | Staff Security Engineer at BitMEX | San Francisco, California |
| 35. | Shivali Singh | Senior Manager Security Assurance at BitMEX | San Francisco, California |
| 36. | Felipe Loyola Andrade | Software Engineer at BitMEX | San Francisco, California |
| 37. | Felix Böhm | Senior Software Engineer at BitMEX (Tech lead for the institutional side of BitMEX) | San Francisco, California |
| 38. | Neel Patel | Engineering Leader, Lead Data Engineer at BitMEX | Burlingame, California |
| 39. | Taylor Hesselgrave | Senior Software Engineer at BitMEX | San Francisco, California |
| 40. | Alisa Isovic | Product Manager at Bitmex at BitMEX | San Francisco, California |
| 41. | Armando Cerna | Site Reliability Engineer at BitMEX (Primary on call in a high traffic production environment.) | San Francisco, California |
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |
| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |
| 46. | Jinny Wong | Product Designer at BitMEX | San Francisco, California |
| 47. | Claire F. | Information Technology Management at BitMEX | San Francisco, California |
| 48. | Can Selcik | Senior Software Engineer at BitMEX | San Francisco, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 30 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| 49. | Eoghan McKee | Threat Intelligence, Insider Threat, Incident Response at BitMEX | San Francisco, California |
|---|---|---|---|
| 50. | Lawson Kight | Head of User Experience at BitMEX | San Francisco, California |
| 51. | Shawhin M. | Project Manager at BitMEX | San Francisco, California |
| 52. | Ladi D. | Platform Security Engineer at BitMEX | San Francisco, California |
| 53. | Neil Eads | Quality Assurance (QA) Manager at BitMEX | San Francisco, California |
| 54. | Michael Curry | Vice President, Head of Product at BitMEX | Oakland, California |
| 55. | Joshua Philippe | Principal Visual Designer, User Experience at BitMEX | San Francisco, California |
| 56. | Tim L. | IT Infrastructure Engineer at BitMEX | San Francisco, California |
| 57. | Hunter Shaw | Communication Director and BitMEX | San Francisco, California |
| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |
| 63. | Uday Shankar | Product Manager at BitMEX (My average week at BitMEX involves product research, market research, data analysis, scouring through support tickets, | San Francisco, California |

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 31 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| | | | |
|---|---|---|---|
| | | watching social channels for opportunities in terms of new features and improvements to existing features collaborating with Engineering, Program, QA, Security, Legal and Compliance teams. I manage expectations across Design, Engineering and Management orgs and ensuring the product ideas and solutions are communicated, wireframed and pitched in the right fidelity to get all stakeholders onboard and scope our short term and long term roadmaps for each projects.) | |
| 64. | Victor Levasseur | Principal / Lead senior software engineer  at BitMEX focused on a product driven approach and with great business | San Francisco, California |
| 65. | Jason Bond Pratt | Former Executive Vice President of Product and Engineering ( Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a team of 40 during a period of 100x growth. (BitMEX was then and remains the largest crypto exchange, by volume, in the world.) | San Francisco, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 32 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

| | | | |
|---|---|---|---|
| | | • Grew product and engineering team from 1 to 40 across 5 operational groups, and hired or developed hiring managers for each of them.<br>• Established a culture that valued diversity, respect, inclusion and appreciation, emphasizing team-first principles and a humble, servant leadership ethic throughout our organization.<br>• Hired or developed global leads for Security, DevOps, Recruiting, IT, UX, Mobile, and API/Web Engineering, and led the first D&I initiatives at the company. Secured long term Class A space in the FiDi.<br>• Served on the global exec team and coordinated regularly with peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.) | |
| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and Business Development at BitMEX | New York, New York |
| 67. | Tim Tickel | Head of Security at BitMEX (Securing cryptocurrency exchange infrastructure) | San Mateo, California |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 33 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

| 68. | Chenqi 'Ashley' X. | Data Science Manager at BitMEX | San Francisco, California |
|---|---|---|---|
| 69. | Kev Zettler | Former Senior Software Engineer at BitMEX | Oakland, California |
| 70. | Cynthia P. | Former Art Director at BitMEX (Led a cross-functional rebrand project with Marketing, Product, and Brand collaborators to build the BitMEX brand for institutional and retail audiences. Deliverables included brand and style guidelines, visual assets, content strategy, digital and print editorial campaigns.) | New York, New York |
| 71. | Natalie Case | Technical Writer at BitMEX | Walnut Creek, California |
| 72. | Deb Baratz | Former Content Manager at BitMEX | New York, New York |
| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | Indianapolis, Indiana |

63.     Based on the publicly available LinkedIn data, while 74 of Defendant HDR

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 34 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

employees are located in the United States, only 34 are located in Hong Kong, which is the home for second largest Defendant HDR office.  Therefore, more than two thirds of Defendant HDR employees worldwide are residing in the United States and in this District.  Moreover, the vast majority of the 74 United States employees of Defendant HDR are engaged in software development and engineering, while in Hong Kong, there are only six software developers and engineers employed by Defendant HDR.  Therefore, the United States and, specifically, San Francisco is unquestionably the location where all the technology behind the BitMEX platform has been and continues to be developed.

64.    In addition, BitMEX website lists 17 job openings for Defendant HDR San Francisco office.  For comparison, the other two offices of Defendant HDR – Hong Kong and Singapore list 14 and two job openings, respectively.  Furthermore, out of 17 advertised job openings in Defendant HDR San Francisco office, 15 are openings in engineering and software development.  On the other hand, in Hong Kong office, only four job openings are in software development and engineering.  This fact further supports the conclusion that the United States and, specifically, San Francisco is the primary location where all the technology behind the BitMEX platform has been and continues to be developed.

## JURISDICTION AND VENUE

65.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-64 above as if fully set forth herein.

66.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 as well as 28 U.S.C. §§ 1331 and 1332(a).  Specifically, this action arises under RICO and CEA, both of which present a federal question.

67.    This Court has jurisdiction over the statutory and common law claims of violations under California law pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

68.    This Court has personal jurisdiction over Defendants, and each of them, pursuant to California long arm statute codified in Cal. Code Civ. Proc. § 410.10.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 35 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

69.     Defendant HDR conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

70.     Defendant ABS conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

71.     Defendant Hayes conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

72.     Defendant Delo conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

73.     Defendant Reed conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

74.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(1).  Venue is similarly proper pursuant to 7 U.S.C. § 25(c) in that this is a District wherein a defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.

## INTRADISTRICT ASSIGNMENT

75.     Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is the proper venue because substantial part of the events or omissions, which give rise to this action has occurred in San Francisco county, where Defendants' HDR and ABS principal offices are located.

## BACKGROUND - BITCOIN

76.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-75 above as if fully set forth herein.

77.     Bitcoin is form of cryptocurrency.  It is a trustless, decentralized digital currency without a central bank or single centralized administrator that can be sent from user to user on the peer-to-peer bitcoin network without the need for intermediaries or a trusted central authority.

78.     Bitcoin was invented in or about 2008 and described in a whitepaper entitled "Bitcoin: A Peer-to-Peer Electronic Cash System" authored by an unknown person or group of

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 36 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

people using the name Satoshi Nakamoto and started in 2009 when its source code was released

as an open-source software. Bitcoins are created as a reward for a process known as mining.

They can be exchanged for other currencies, products, and services.

79.    Bitcoin transactions are verified by a network of nodes through cryptography and

recorded in a public distributed ledger called a blockchain, which is maintained by multiple

bitcoin network nodes through the use of a consensus protocol. Every bitcoin transaction starting

from the very first one may be viewed and verified using the blockchain. The blockchain consists

of a chronologically ordered sequence of blocks holding records of bitcoin network transactions.

A new block is generated by miners every 10 minutes. The integrity of the blockchain is

maintained by including a hash of each block in to the subsequent block. This way, if any block

is altered (forged) after its creation, all the subsequent blocks would have to be also modified or

the hash discrepancy caused by the modification will be immediately detected by all the network

nodes.

80.    Bitcoins are traded for United States dollars, Euros and other fiat currencies and

cryptocurrncies on centralized online marketplaces called exchanges. Usually, transactions

taking place inside exchanges, such as executions of buy and sell orders are not recorded on the

public blockchain and, therefore, it is hard to independently verify them using the blockchain.

Most exchanges do not have internal protections against bitcoin price manipulation as well as

other fraudulent behavior, which is rampant due to low trading liquidity of the bitcoin market.

81.    Stablecoins are cryptocurrencies designed to minimize the volatility of the price of

the stablecoin, relative to some "stable" asset or basket of assets. The value of a stablecoin can be

pegged to a cryptocurrency, fiat money, or to exchange-traded commodities (such as precious

metals or industrial metals). Most frequently used stablecoins are those pegged to United States

dollar, including, without limitation, Tether (USDT), USDC and the like.

82.    Since at least 2015, the CFTC has maintained that bitcoin, and other virtual

currencies, fit the definition of a commodity primarily through administrative actions. In re

*Coinflip, Inc*., CFTC Docket No. 15-29, 2015 WL 5535736 at *3 (Sept. 17, 2015). *CFTC v.*

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 37 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

*McDonnell*, 287 F. Supp. 3d 213, *228* (E.D.N.Y. 2018) was the first time the CFTC's position was given judicial approval. The court noted that "[v]irtual currencies can be regulated by the CFTC as a commodity," because virtual currencies can be exchanged in a market for a uniform quality and value. The Court's reasoning makes clear that bitcoin and other virtual currencies fall within both the common law definition of commodity and the CEA's definition of a commodity.

## **BITCOIN PRICE MANIPULATION TECHNIQUES**

83.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-82 above as if fully set forth herein.

84.     On or about September 9, 2019, Chairman of the United States Security Exchange Commission ("SEC") Jay Clayton stated: "[i]n the trading area, it troubles me that people look on these venues and think it has got the same level of protection that you'd have on an equity market in the US NASDAQ and MYSZ. Nothing could be further from the truth, we have lengthy rulebooks, all sorts of protections to make sure that prices are not manipulated in the equity markets, I don't see those in the Crypto asset markets."

85.     Bitcoin futures and especially spot markets remain thinly traded making them particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms of market manipulation.  The primary beneficiaries of such illegal manipulation are the perpetrators, who are able to fill their orders at better than market prices at the expense of other traders, as well as cryptocurrency exchanges, such as BitMEX, which benefit through increased trading volumes as well as trader position liquidations.   This provides very strong financial incentive for exchanges to manipulate cryptocurrency markets.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 38 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

86.     Pump-and-dump is the fraudulent practice of perpetrators encouraging unwitting



investors to buy an asset, such as bitcoin, to inflate its price artificially, and then selling it when the price reaches a predetermined threshold.  Pumps-and-dumps are designed to deceive the inventors as to the state of market supply and demand for the asset by means of artificially increasing the price and trading volume of the asset that is designed to entice unwitting investors to join the hype, and to buy the asset at an artificially inflated price, which they would not have done otherwise. When the perpetrators behind the scheme sell (dump) their bitcoins and stop pumping it, the price plummets, and other investors are left holding the asset that is worth significantly less than they paid for it.   As the result, traders who bought the bitcoin on margin, may be subject to execution of stop losses as well as liquidations.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 39 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

87.     Bart patterns or simply "Barts" are a variety of pumps-and-dumps involving intense pumps or dumps occurring within a very short time frame causing price action to find a new high or low for a very short period, followed by equally violent return to the previous level.



Perpetrators using this manipulation tactic benefit by having their sell/buy orders filled, and causing the unwitting investors to open positions against the trend.

88.     Barts are created by perpetrators using Momentum Ignition Algorithms, which work by creating a sharp spike in buy or sell action within a market with the purpose of deceiving the market participants as to market-based forces of supply and demand for an asset and enticing unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed.  Barts are intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin futures at times, prices and quantities that they otherwise would likely not have traded. Additionally, unsuspecting traders will place buy orders above significant zones, to catch up trends, and short sellers will place stops losses in similar areas, these are effectively buy orders. In order for the malicious algorithm to be most effective it has to push price into these liquidity zones, triggering buys, and from there it can disengage.  Sometimes, several hours later, a floor of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 40 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

buy orders is removed, and a momentum ignition may be activated in the opposite direction causing a dump.

89.     Stop loss hunting is a type of market manipulation, when the perpetrators attempt to artificially move the price for an asset to a predetermined price value to force other market participants out of their positions.  This type of manipulation is performed by executing one or more buy or sell orders with the purpose to drive the price of an asset to a level where many market players have chosen to set their stop-loss orders.  Stop loss orders are orders that get automatically executed at market price should the price of bitcoin reach a predetermined price threshold.  The perpetrator buys or sells spot bitcoin or bitcoin derivative until the price threshold is reached.  When the stop loss orders are triggered due to a stop loss hunt manipulation, the trader's asset holdings are sold at prevailing market prices causing the market to be filled with a large number of market orders, which has the ability to move the asset price even further triggering more stop loss orders and can even result in liquidations.  The result is a cascading execution of a large number of market orders.  The perpetrators place their buy or sell orders such as to have them filled at the bottom or at the top of the resulting stop loss execution cascade at artificially below or artificially above market prices, respectively.  After the initial market move, the price of the asset sometimes recovers and perpetrators generate a profit due to their illicit actions.

90.     Liquidation cascade is an extreme case of the stop loss hunt, when the perpetrator pushes the price of the asset or derivative to reach position liquidations levels for multiple traders and the resulting multiple market liquidations take place in a very short time interval moving the price even further.   This triggers additional liquidations causing a cascading execution of a large number of liquidation orders.  Similarly to the stop loss hunt, the perpetrators place their buy or sell orders such as to have them filled at the bottom or at the top of the resulting liquidations cascade, at artificially below or artificially above market prices, respectively.

91.     The manipulative price actions alleged hereinabove perpetrated by culprits on one cryptocurrency spot or derivatives exchange quickly propagate to all other exchanges due to the

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 41 -      BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

widespread use of arbitrage bots, which are algorithms coded in software that take advantage of the price discrepancy between exchanges by buying or selling an asset in one market and simultaneously selling or buying it in another market at a more favorable price.  Thus, a manipulative price action on one cryptocurrency exchange results in a substantially similar price action on all other exchanges.

92.     Because cryptocurrency futures exchanges contracts are based heavily on bitcoin spot index price on a handful of relatively illiquid spot exchanges, a large bitcoin spot price move may be accomplished by executing relatively small market orders on the illiquid spot exchanges. For example, .BXBT index price used by Defendants for BitMEX's XBT perpetual futures contract is based substantially on Bitstamp, Coinbase and Kraken exchanges, which are much less liquid then BitMEX itself.

93.     Once initiated on Bitstamp, Coinbase and/or Kraken, the aforesaid price move spreads, through the aforesaid index, to order books of very liquid derivatives exchanges, such as BitMEX and causes massive, multimillion dollar instant liquidations of derivatives positions. Such liquidations provide a financial windfall to derivatives exchanges such as BitMEX due to the increased trading volume as well as confiscation by the exchanges of the residual collateral of the liquidated traders, if the exchange is able to close the traders' positions at prices better than bankruptcy price.  In BitMEX, the amount of funds so confiscated from liquidated traders exceeds 35,404.7394 bitcoins valued at $344,700,542.80.

94.     Pumps-and-dumps, Barts, stop loss hunts and liquidation cascades may be utilized by perpetrators for purposes of money laundering, especially when exchanges do not require any documents to open an account.  For example, in case of a liquidation cascade, a first person or entity may execute a relatively small market order to trigger the liquidation cascade and a second, separate, person or entity, acting from a separate exchange account, opened on the same or different exchange, may place large buy or sell orders, respectively, to have them filled at the artificially low or high (below or above market) prices caused by the liquidation cascade triggered by the actions of the first person or entity.  The first entity generally would book a loss, while the

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 42 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

second entity would book a profit.  The first entity may be officially located in a high tax jurisdiction, such as California, while the second entity may be incorporated in a tax-heaven jurisdiction, such as British Virgin Islands.  Furthermore, the first entity may execute the order on an illiquid spot exchange, such as Bitstamp, to amplify the effect of the initiating market order while the second entity may operate on a high liquidity derivatives exchange such as BitMEX, which uses the price of the spot exchange in calculating its index.

95.     In a criminal commodity futures market manipulation case *USA v. Smith et al.* (N.D. IL 2019), the United States Department of Justice (DOJ) took a position that placing orders for commodity futures contracts in a manner that was intended to deliberately trigger or deliberately avoid triggering a specific price-based event, such an option execution, is unlawful. Consistent with that position, the all above alleged price manipulation actions are also unlawful.

96.     In *SEC v. Shuang Chen et. al*. Civil Action: 1:19-cv-12127-WGY (D. MA 2019) "[t]he Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly traded stock. The Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price (hereinafter referred to as a "helper" account). Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper account(s). The Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts."  The illegal stock price manipulation technique alleged by SEC is identical to the techniques alleged hereinabove and used as well as aided and abetted by Defendants on a daily basis during the time period starting on January 1, 2017 and until now ("Relevant Period") to manipulate the prices of cryptocurrencies.  According to SEC, all those techniques are illegal.

97.     Spoofing is an unlawful practice of making buy or sell orders, called deceptive orders, with an intent to cancel them before execution.  The deceptive orders are used by perpetrators to inject false and misleading information about genuine supply and demand for

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 43 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin futures at times, prices and quantities that they otherwise would likely not have traded.

98.     Bitcoin price manipulation such as pumps-and-dumps, Barts, stop hunts, liquidation cascades, and spoofing, as well as numerous other forms of illicit market manipulation are generally believed to be the abuses that prevent SEC from approving numerous bitcoin Exchange Traded Fund (ETF) applications that have been filed throughout the years by various cryptocurrency industry players.

**BITMEX WAS DESIGNED FROM GROUND UP TO
BENEFIT FROM MANIPULATION**
*"Regulatory agencies can be bought." Defendant Arthur Hayes*

99.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-98 above as if fully set forth herein.

100.    BitMEX was launched in 2014 by Defendants Hayes, Delo and Reed. BitMEX was one of the first cyptocurrency exchanges that offered derivative products based on the price of bitcoin. At its inception, as Defendant Hayes described it, BitMEX was to serve Wall Street institutional investors "who were going to want the same type of products" they were used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform, including traders from Wall Street. Therefore, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" by offering "100X leverage" trades. Since then, its first-mover advantage has paid off: it is consistently among the largest cryptocurrency futures traders by volume and has been for years. It now frequently trades over $3 billion worth of transaction in a single day.

101.    In allowing retail customers to leverage their bets at the extraordinary ratio of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)     - 44 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

100:1—about twenty times higher than the common ratio in derivatives trading — BitMEX positioned itself to benefit consistently, significantly, and predictably from the combination of attracting overly hopeful investors and small price fluctuations on other exchanges. This structure creates substantial incentives for Defendants to surreptitiously cause such fluctuations.

102.    Implementing its business approach, Defendants deliberately based the index price of its futures on spot-market exchanges that have limited liquidity and are thus relatively easy to manipulate. BitMEX would then engage in manipulative trading on those exchanges to change the price of bitcoin or ether. Even if only temporary, these price changes would then affect the prices of the futures offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders.

103.    Automatically liquidating contracts that were out of the money, BitMEX would cover the trader's losses but would also take all of the trader's collateral. By setting the liquidation point higher than necessary to protect against the risk of a loss greater than the trader's collateral, BitMEX consistently profited from these liquidations. BitMEX would place these profits in its insurance fund ("Insurance Fund"), marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral. Despite its name, the Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars.

104.    BitMEX also acted on similar financial incentives by trading against its customers, a secret BitMEX kept as long as it could. BitMEX employed an undisclosed trading desk with special privileges and insights that allowed BitMEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As a desk with access to otherwise-hidden information, it was in a perfect position to enhance BitMEX's manipulation.

105.    BitMEX has compounded the effect of these manipulative schemes by routinely freezing its servers—which BitMEX blames on technical glitches and limitations—to profit during moments of high volatility. During these freezes, customers are unable to change their

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 45 -      BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

positions, but the market continues to operate and BitMEX trades. BitMEX would thus prevent its



customers from escaping positions until they fell to a level at which BitMEX could liquidate

those positions at a profit to itself.

106.    BitMEX's operations on March 13, 2020, are a recent and good example. During a

period in the day with high market volatility and crashing bitcoin prices (from nearly $8,000 to



$4,000 per bitcoin), resulting in a substantial sell-off, BitMEX's trading platform went offline for

twenty-five minutes. As a result of the outage, BitMEX did not dip into its Insurance Fund, but

rather liquated $800 million of its customers' highly leveraged positions for its own profit. This

server outage, in short, effectively protected BitMEX and the Insurance Fund from the cascading

effects of sell-offs of BitMEX's highly leveraged and volatile products.  It should be noted that

BitMEX' three Site Reliability Engineers are all located in this District and, therefore, the

deliberated and fraudulent outage on March 13, 2020 was perpetrated from this District.  To cover

up their fraud, Defendants first concocted a story of a hardware failure that allegedly caused the

BitMEX platform outage.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 46 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8
9
10
11

107.    However, Defendants soon realized that all hardware used by BitMEX platform was managed by Amazon EKS and not Defendants themselves and that such a fake excuse would clearly not hold up if Amazon is asked to investigate the alleged hardware issue.  Therefore, Defendants quickly changed their story and invented a fake distributed denial-of-service attack



**BitMEX** ✔
@BitMEXdotcom

We have identified the root cause of two DDoS attacks at 02:16 UTC and 12:56 UTC, 13 March 2020. For a full account of what happened and how we are responding, please refer to our blog: blog.bitmex.com/how-we-are-res...

2:35 AM · Mar 17, 2020 · Twitter Web App

12
13

(DDoS attack) as an excuse for deliberately shutting down their own trading platform to avoid severe financial losses to themselves.

14
15
16

108.    Defendants and each of them have thus manipulated the price of bitcoin and ether, harming Plaintiff and other traders who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25 (2012).

17
18
19
20
21

109.    BitMEX's founder and CEO, Defendant Hayes, is cryptocurrency's P.T. Barnum. Describing trading on cryptocurrency as "the entertainment business," he has embraced a role as showman and promoter for the "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market in a way that is profitable for BitMEX.

22
23
24
25

110.    Defendant Hayes repeatedly flaunts his wealth like this to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other cryptocurrencies. The implication of these types of promotion is clear: you too could live like this, if you trade on my platform.

26
27

111.    For example, when promoting BitMEX at a large conference in New York, Hayes flaunted his arrival in an exotic Lamborghini car.

28

112.    The BitMEX platform also has casino features built in. It promotes "winners" with

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 47 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

a leaderboard of successful traders, just like casinos showcase their successful players.  All these

features are designed to serve only one purpose - entice more gamblers to place even riskier bets.

113.    BitMEX also runs promotions for its products to promote gambling, providing

prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent

spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18)

contract gets the third prize."

114.    These promotions attract numerous retail investors and distract them from the fact

that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior.

115.    Since its inception, BitMEX has flouted financial regulators worldwide for

operating as an unregistered exchange, hiding behind its offshore status.

116.    In 2018, the financial regulator for the province of Quebec, Canada, ordered

BitMEX to close accounts linked to customers in Quebec because it was operating as an

unregistered exchange.

117.    In July 2019, according to reports, the CFTC opened an investigation to determine

whether the exchange is targeting and allowing United States traders to use the platform, after

numerous press reports detailed the lack of any "know your customer" practices at BitMEX and

the ease with which users can access the site from the United States - indeed one New York

journalist has detailed his use of BitMEX.

118.    Most recently, on March 3, 2020, the United Kingdom's Financial Conduct

Authority (FCA) issued a notice that BitMEX "is not authorised by us and is targeting people in

the UK. Based upon information we hold, we believe it is carrying on regulated activities which

require authorisation."

119.    BitMEX's flouting of financial regulators is consistent with the attitude of its

founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China

in order to take advantage of arbitrage opportunities in the price of bitcoin.

120.    BitMEX is not the only entity that offers swaps and futures products on bitcoin.

BitMEX, however, structures its products and operations with features more akin to a casino,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 48 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

focusing on products that expose customers to greater volatility and an increased risk of loss.

121.    One of BitMEX's earliest and still most popular products is the XBTUSD Perpetual Contract. This product, with features that resemble both a future and swap, allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar. If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin.

122.    Unlike a typical futures contract, XBTUSD has no set expiry date. Further, unlike a traditional futures product, the XBTUSD Perpetual Contract price closely tracks the price of the underlying asset, bitcoin. Put differently, in a traditional futures market, there are separate prices for the futures product and for the underlying asset. If ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. at $120 in three months might trade for $5. Instead, XBTUSD tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX. These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice-versa. The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate. The funding rate is exchanged directly peer-to-peer among contract holders. BitMEX does not charge a fee for it.

123.    Because BitMEX does not list bitcoin itself, it must look to other exchanges that do trade bitcoin to determine the price of bitcoin for products like XBTUSD. For BitMEX to function properly, the data from the other exchanges must be trustworthy. If the spot market for the underlying cryptocurrencies listed on those exchanges is thinly traded and illiquid, then the price of the cryptocurrency becomes susceptible to price manipulation, which in turn could affect the price of the products on BitMEX. BitMEX knows this. BitMEX's products are particularly sensitive to price manipulation because BitMEX allows traders to operate on substantial amounts of leverage. BitMEX allows traders to leverage their position up to 100 times the amount of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 49 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

collateral, or "margin," they post. Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses: if the price of the XBTUSD goes up, a buyer who is 100x leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs for very limited money.

124.    BitMEX's fees, however, are calculated based on the leveraged position, not on the underlying collateral. Thus, where BitMEX advertises a fee of 0.075 percent for bitcoin future perpetual contracts, that percentage refers to the amount of the unleveraged position. For a 100x leveraged future, BitMEX is effectively charging a fee of 7.5 percent.

125.    In a leveraged trade, BitMEX limits a trader's loss to solely the posted margin. In contrast, major derivatives exchanges, such as the Chicago Mercantile Exchange, expose traders to unlimited risk. When the unrealized loss of their position exceeds the posted margins, those exchanges will ask traders to post additional collateral to supplement their margin. This is known as a margin call. For example, if you had a $10,000 position supported by $100 of margin, and the position fell 1 percent to $9,900, it would trigger a margin call.

126.    To limit traders' losses to the posted margin, BitMEX uses a liquidation engine to close positions with unrealized losses close to the amount of the posted collateral and prevent losses greater than the collateral posted by the trader while ensuring that the winner receives their full profits. While the promise that a trader can only lose the minimal margin put up for a highly leveraged bet may be alluring to retail investors, in reality BitMEX uses this promise to lure them into a false sense of security. BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but takes their money in liquidations. Put differently, when BitMEX liquidates a position, there is going to be a winning trader and a losing trader, but even beyond receiving the transaction fees, BitMEX almost always takes a large part of one trader's collateral, allowing it to profit from the liquidation.

127.    BitMEX's model of encouraging its users to experience volatility disproportionate

to their collateral through substantial leveraging requires a mechanism that prevents those users from experiencing losses greater than they can handle—there is, after all, someone on the other end of the transaction that expects to get paid. BitMEX achieves this through the use of an automatic liquidation system. This system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

128.     Because BitMEX allows traders to make purchases with large amounts of leverage, there is a risk that that a trader may not be able to pay the winner for his position. In order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.4 This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is the automatic-liquidation system. BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, it liquidates when the collateral is worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some his losses, however, the trader receives nothing. Instead, BitMEX keeps that recovery for itself and puts it into the Insurance Fund.

129.     To use an example from BitMEX's own website, consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000. This trader is 100x leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 51 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

$3,960, as ether falling to that price would mean that the 1 bitcoin used as collateral would exactly cover the losses. Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a 0.5 percent "maintenance margin," such that the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of less than 1 percent in the price of bitcoin can result in an automatic liquidation. If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-bitcoin position to another customer, while covering the gains of and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the purchase as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000.

130.    It is possible for BitMEX to lose money in a liquidation if the market lacks sufficient liquidity to allow BitMEX to sell the liquidated position at the bankruptcy price. If, for example, the price of ether hits $3,980 but BitMEX is not able to find a purchaser to take over future at a price above $3,920, the 1 bitcoin used as collateral will not cover BitMEX's losses. Hypothetically, the Insurance Fund would be used to cover BitMEX's losses in this scenario.

131.    The profitability of the Insurance Fund is thus tied to the liquidity of the market— as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

132.    Despite being described as a mechanism intended "to help ensure winners receive their expected profits, while still limiting the downside liability for losing traders" by making sure that BitMEX always has cash on hand to pay off losing trades, BitMEX's Insurance Fund shows substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough. Despite its role as an insurance

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 52 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

backstop, it grows in value nearly every day: over the last 100 (volatile) days, it has begun only five of them with a balance less than it began with the day before. Its largest posted one-day loss in the last 100 days has been around 20 bitcoin. In fact, at the end of 2019, the Insurance Fund contained 33,491 bitcoin, representing 0.19 percent of the total bitcoin in circulation. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired) the portion of the Insurance Fund for that contract type is given to BitMEX as profit.

133.    BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. Even independent of how these automatic liquidations can be used with market manipulation, the structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to automatically liquidate. Defendants' ability to manipulate the prices on BitMEX for their own profit and at the expense of Plaintiff and other cryptocurrency traders was protected and enhanced by persistent issues BitMEX maintained in its server that locked out users at crucial times that enabled BitMEX to profit.

134.    BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes. This process, although sometimes completed quickly, supposedly causes BitMEX's servers to freeze on average between two and three times a day. During these server freezes, customers lose the ability to trade until the servers unfreeze.

135.    These server issues are not present in other exchanges that regularly handle far more transactions per second. While BitMEX has purposefully not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200,000,000 trades a week, purportedly taxing its system and leading to server shutdowns. This works out to an average load of around 330 trades a second. BitMEX has indicated that its peak

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 53 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in futures and derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze.

136.    When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the futures contracts are not frozen. Instead, they continue to move, processing some transactions while refusing to accept transactions from others. This means that a BitMEX trader can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they wished to transact is no longer available. They can also find that an offer they had made before the freeze but wished to retract during it has since been accepted. 103. Any trader with the ability to have its transactions prioritized over others during this period could reap substantial profits. The digital assets on which the BitMEX futures are based, such as bitcoin or the Tokens, continued to trade on other exchanges with functioning servers while BitMEX's remained frozen to most users. A privileged trader—such as those that operate BitMEX's internal trading desk—could see that the price of bitcoin had risen during a freeze and arbitrage on that information before the regular traders had the ability to react. Additionally, because most traders are unable to operate during these freezes, a trader who is able to act could survey all of the items on offer during the freeze and cherry-pick whichever seemed most appealing in light of the market's movements.

137.    The limitations of BitMEX's server also helps enable profitable automatic liquidations, because these liquidations continue to occur during the freeze. A customer who has a 100x leveraged position on one bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be heavily incentivized to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the capital. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of their capital when the price hits $3,980. Such a scenario profits BitMEX, which collects the capital.

138.    The timing of these freezes is not random. The most important and profitable time

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 54 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1    for BitMEX to freeze is during a period of high volatility. BitMEX's automatic liquidations

2    exacerbate the volatility of the derivatives that BitMEX markets, particularly in periods of high

3    volatility. Specifically, by automatically executing sell orders in response to a market decline,

4    BitMEX pushes prices even lower. This response could result in catastrophically cascading sell

5    orders during a period of a rapid decline—that is, a "flash crash." BitMEX does not disclose those

6    risks to retail investors and, instead, uses server freezes to protect its Insurance Fund and its

7    derivatives market as a form of undisclosed "circuit breaker."6

8         139.    Moreover, high volatility and rapidly changing prices allow more customers to be

9    liquidated. Indeed, an expert statistical analysis conducted of freeze periods reported on

10   BitMEX's website has revealed that these server freezes occur 80 percent more often during

11   periods of high volatility in bitcoin prices. This result is statistically significant at a 95 percent

12   confidence level. Moreover, the statistical analysis reveals that compared to periods without a

13   server incident, the volatility is 130 percent higher when there is a server incident. This result is

14   also statistically significant at 95 percent confidence level.

15        140.    BitMEX server freezes most often occurred during the highest periods of volatility

16   when BitMEX could effectively liquidate traders' positions.

17        141.    These server freezes are not justifiably caused by transaction volume, which would

18   approximate server load. For example, on May 12, 2019, BitMEX announced a new record of

19   over $10 billion in transaction volume, with no server incidents reported that day.

20        142.    The interaction between BitMEX's server problems and its liquidation policy was

21   recently demonstrated on March 13, 2020, when the price of bitcoin fell from $7,200 to a 10-

22   month low of $5,678 in just 15 minutes. This sort of event is precisely why BitMEX claims to

23   maintain the Insurance Fund—a series of cascading liquidations in the face of such a rapid fall

24   could prevent BitMEX from selling the liquidated positions above their bankruptcy price, causing

25   losses that are designed to be covered by the Insurance Fund. Yet BitMEX's servers shut down in

26   the middle of the crash. BitMEX first blamed the server shut down on "a hardware issue with our

27   cloud service provider," before later claiming, without any support, that the server failure was the

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 55 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

result of an attack by a "botnet."

143.    When the servers were restored, bitcoin's price had stabilized, preventing the need for BitMEX to dip into its Insurance Fund. The traders who had hit their margins during the crash, however, were liquidated nonetheless. In short, a conveniently timed server outage turned a potentially catastrophic loss for BitMEX's Insurance Fund into a profit-item.

144.    BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from accepting any transactions during these freezes. Instead, BitMEX profits from the system it employs, either by having its for-profit trading desk manipulate the markets in such freezes, by selling the right to do so, or by profiting from liquidations that occur while customers are unable to escape increasingly unfavorable positions.

## BITMEX TRADES AGAINST ITS CUSTOMERS

145.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-144 above as if fully set forth herein.

146.    On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users." BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers." This proved to be false, and that its prior statements had been materially misleading.

147.    On April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." BitMEX also revealed that its trading desk had the monopoly on making a market in its bitcoin options product. BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management." Prior to April 30, 2018, BitMEX had never disclosed that it played a role on its exchange that extended beyond the management and administration of the exchange itself.

148.    BitMEX had never indicated that it took direct positions on the assets it was

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 56 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1   trading.  Traders, when traded on the BitMEX platform, had done so on the belief that the other

2   participants were on similar footing to them.  If traders knew that its counterparty could be

3   BitMEX itself, equipped with proprietary knowledge, they would have recognized the possibility

4   that they were participating in an unfair game.

5       149.    As an inside entity trading against its own customers, the BitMEX trading desk

6   enjoys a number of advantages. First, an internal BitMEX desk could have a higher trade priority

7   than other traders, allowing its trades to be processed first when the total number of trades

8   exceeds BitMEX's server capacity. Second, an internal BitMEX trading desk could potentially

9   view the leverage amounts for previously created positions and the price at which its liquidation

10  will be triggered. This information would make it easy to profitably manipulate the market. If, for

11  example, the trading desk sees that a number of short bitcoin futures are near their liquidation

12  point, it could enter a large buy order. This order would cause the price of bitcoin on the BitMEX

13  exchange to rise, triggering the liquidation of these futures. The liquidation would create a buy

14  order for the liquidated contract, further increasing the price. Once this chain of liquidations had

15  caused the price to rise far beyond the price at which the internal desk made its initial purchase, it

16  could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are

17  automatic, an inside desk could execute this trade very quickly and with a high confidence of

18  success.

19      150.    Even without placing trades that cause cascading liquidations, however, the

20  BitMEX desk helps create the liquidity that keeps the forced liquidations profitable, including

21  those that occur during server freezes. As BitMEX has admitted, it profits from each liquidation

22  as long as the bid-ask is smaller than the maintenance margin. By creating liquidity through

23  market-making, and freed from the possibility of being liquidated itself, BitMEX's desk helps

24  maintain an environment that keeps the liquidations profitable.

25      151.    The interaction between the Insurance Fund and the trading desk creates a

26  pernicious result when the desk serves as the purchaser of a liquidated position. When a customer

27  stakes $4,000 on a position only to have BitMEX liquidate it, sell it to its own desk at a price that

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 57 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

recovers $3,500 of that $4,000, and then keep the $3,500, the customer has essentially been robbed. BitMEX has walked away with both the position and the initial capital, leaving the customer with nothing.

152.    Nor is the trading desk the only inside entity trading on BitMEX. Defendant Hayes has admitted that he himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

153.    On information and belief, BitMEX has manipulated the price of the assets underlying the derivatives on the exchange in order to force liquidations of traders for the benefit of its Insurance Fund.

154.    Through 2019, BitMEX looked to a relatively limited number of exchanges to price bitcoin and ether for its derivative products. This made the exchange susceptible to price manipulation. In part of mid-2019, for example, BitMEX determined the price of ether by referring to just three exchanges: BitStamp, Coinbase, and Kraken.

155.    Any futures trader would have an incentive to manipulate the price of bitcoin or ether on those exchanges to cash in on their leverage trade. For example, a trader who was short bitcoin on BitMEX would be incentivized to go to BitStamp and suddenly drive down the price of bitcoin by selling it, making the future position more valuable. The trader's profitability would depend on the liquidity available at BitStamp for bitcoin and the details of the future positions on BitMEX. Lower liquidity in bitcoin trading would make it easy for the trader to move the price on BitStamp quickly and cheaply. A large, highly leveraged position at BitMEX would justify a large selloff of bitcoin below prevailing market prices. Moreover, this could be an ongoing process: as the price of bitcoin falls and the future positions become profitable, the trader could cash out some existing futures positions for more bitcoin and then continue to sell that new

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 58 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1

2

bitcoin on Bitstamp while opening additional futures short positions.

3

156.    Structurally, however, this kind of manipulation is more likely to succeed on short

4

positions rather than long, because BitMEX settles all of its futures in bitcoin. If the trader

5

attempts to manipulate the price of bitcoin up because of outstanding long positions, she would be

6

unable to continue the process after the initial "pump" because her futures contracts are all paid

7

out in bitcoin. She would have no way to buy additional bitcoin with those proceeds without

8

selling the proceeds—thus defeating the purpose of the pump. Thus, to pull off a manipulation

9

scheme when long on bitcoin, the trader would need a large reservoir of traditional currency with

10

which to buy bitcoin, and could not use any proceeds from the manipulation itself to continue

11

driving up the price of bitcoin. Nonetheless, throughout 2019, BitStamp was subject to numerous

12

pumps and dumps of bitcoin and ether including on days when Kraken was down for maintenance

13

and unavailable for pricing derivatives on BitMEX. For example, on April 2, 2019, there was a

14

massive pump on BitStamp's bitcoin price by nearly 20 percent. Then on May 17, 2019, bitcoin

15

lost 20 percent of its value on Bitstamp for about thirty minutes before recovering. Later, on July

16

14, 2019 when Kraken was down for maintenance—thus increasing the weight of Bitstamp on

17

BitMEX's futures' products—the price of ether dropped dramatically due to the sell order on

18

Bitstamp by a single user that accounted for over 15 percent of Bitstamp's entire volume for the

19

day, causing $164 million worth of liquidations on BitMEX.

20

157.    Of the possible manipulators, BitMEX is the best-positioned to take advantage of

21

the consequences of these schemes. First, BitMEX operates its own proprietary trading desk that

22

can take long and short positions and engage in a pump and dump scheme, like the hypothetical

23

trader described above. Second, beyond profiting from any positions it takes, BitMEX alone

24

profits greatly from liquidations, even during severe price movements. Third, BitMEX alone

25

knows the trading positions of its users and can precisely tailor its manipulation to generate mass

26

liquidations with minimal effort and risk. Fourth, as a large institution, BitMEX would be one of

27

the entities with sufficient resources to engage in pump schemes that require a lot of capital in

28

traditional currency to buy the underlying commodity.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 59 -     BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

158.     Unsurprisingly, for these reasons numerous commentators, including a tenured professor at NYU's Stern Business School, point to BitMEX as the culprit behind these price movements.

159.     On or about 11:00PM EDT on May 16, 2019, one or more perpetrators launched a trading software algorithm configured to sell about 3600 bitcoin, valued at the time at about $28 million on a Luxembourg-based bitcoin spot exchange Bitstamp.  The trading algorithm wiped the buy order book of Bitstamp from $7,838 all the way down to $6,178, sitting on the ask side of the aforesaid order book the entire time.  The artificial price move that resulted from the execution of the aforesaid malicious trading software algorithm brought bitcoin price on Bitstamp from $7,838 all the way down to $6,178.

160.     The hereinabove alleged artificial bitcoin price decline on Bitstamp, in turn, led to a liquidation of $250 million (about 10x times the size of the Bitstamp sell order) long positions on the BitMEX derivatives exchange, which further resulted in significant price declines on all other crypto exchanges throughout the world, including multiple exchanges in the United States, costing bitcoin traders and investors hundreds of millions of dollars.

161.     The above-alleged manipulation was repeated, almost perfectly, on Sunday, July 15, 2019, when a perpetrator or group of perpetrators collectively acted to crash the market by putting in a massive sell order of 15,000 ETH, valued a $4 million, on Bitstamp.  This made up 15% of its entire trading volume of Bitstamp on that Sunday – all in one trade.  This giant sell order immediately plunged the price of ETH on Bitstamp from $270 to $190, which is otherwise known as a "flash crash".

162.     Like a disease, the alleged flash crash spread to ETH futures contracts traded on BitMEX, which bases the futures contracts' price 33% on the Bitstmap's price.  As the result of the crash, $164 million of long futures contracts were liquidated on BitMEX in the blink of an eye and spread to bitcoin futures traded on BitMEX, again causing significant price declines on all other crypto exchanges throughout the world, including multiple exchanges in the United States, costing bitcoin traders and investors hundreds of millions of dollars.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 60 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

163.    Plaintiff BMA is informed and believes and thereon alleges that the alleged devastating manipulations were deliberately enabled by BitMEX.  Specifically, the aforesaid artificial price action were made possible by the fact that BitMEX deliberately designed its indexes based on price data for cryptocurrencies from just three exchanges – Bitstamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX.   This design was specifically intended to amplify any large price moves to increase the amount of liquidated traders on BitMEX.

164.    Plaintiff BMA is informed and believes and thereon alleges that the reason why BitMEX, the most liquid exchange, calculates its contracts index price based on other exchanges with way less liquidity is because BitMEX is the major financial benefactor of the catastrophic market manipulation events, such as May 16, 2019 and July 15, 2019 events alleged hereinabove.

165.    Plaintiff BMA is informed and believes and thereon alleges that, at times, trader liquidations account for up to half of BitMEX entire revenue.  When Defendants liquidate a trader, they take the remainder of funds left after paying the trade counterparty and deposit it into the Insurance Fund.  The Insurance Fund has been steadily growing throughout the years.

166.    Plaintiff BMA is informed and believes and thereon alleges that this trading desk is headed by Andrianov and it is the second major financial benefactor of the catastrophic market manipulation events, such as May 16, 2019 and July 15, 2019 events alleged hereinabove, which were in fact perpetrated by Andrianov in order to financially benefit Defendants.

167.    BitMEX enables the perpetrators of the alleged market manipulations to avoid detection by authorities by providing the perpetrators with the ability to open an unlimited number of anonymous document check-free trading accounts on BitMEX without any trading and withdrawal limits.

168.    Plaintiff BMA is informed and believes and thereon alleges that BitMEX further facilitates the market manipulation by using fraudulent "system overloads" excuse to accept some trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations with the purpose to financially benefit therefrom.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 61 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

169.     Plaintiff BMA is informed and believes and thereon alleges that the various specific acts perpetrated by Defendants to manipulate the prices of cryptocurrencies or to aid and abet such manipulation by other perpetrators, with the purpose to financially benefit from it, violate a number of United States federal criminal statutes, including, without limitation, 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1956(a) (money laundering); 18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity); 18 U.S.C. § 1960(a) (conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business) and 18 U.S.C. § 2314 (interstate transportation of stolen property).  These specific criminal acts alleged hereinbelow constitute predicate acts for purposes of RICO and were perpetrated by Defendants in course of conducting or conspiring to conduct affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(d) and (c).

170.     As a direct result of Defendants' manipulation of the market for their derivative products, including through the use of the server freezes and a (formerly concealed) internal trading desk to create profitable liquidations, Plaintiff have suffered significant damages in an amount to be proven at trial.

171.     While the precise measurement of the harm caused to Plaintiff by Defendants' actions is not calculable at this stage, an approximation can be found in the value of the Insurance Fund, which is filled with the profits of Defendants' liquidations. As of April 8, 2020, the Insurance Fund contained 35,292 bitcoins valued at $257,631,600.

## THE RAKETEERING ENTERPRISE

172.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-169 above as if fully set forth herein.

173.     Each of the Defendants HDR, ABS, Hayes, Delo and Reed are respective persons or entities capable of holding a legal or beneficial interest in property.

174.     Defendants HDR, ABS, Hayes, Delo and Reed are a union or group of entities and individuals associated in fact collectively constituting a continuing "enterprise" ("Enterprise")

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 62 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

within the meaning of RICO as defined in 18 U.S.C. § 1961.

175.    The activity of the Enterprise and the predicate acts of racketeering alleged hereinbelow affect interstate or foreign commerce.

176.    At various times during the Relevant Period each of the Defendants HDR, ABS, Hayes, Delo and Reed was employed in or associated with the Enterprise as alleged hereinabove.

177.    Plaintiff BMA is informed and believes and thereon alleges that individual Defendants Hayes, Delo and Reed are the masterminds behind the alleged Enterprise and the predicate criminal acts alleged hereinbelow.

## THE RAKETEERING CONSPIRACY AND RACKETEERING ACTIVITY

178.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-177 above as if fully set forth herein.

179.    Pursuant to 18 U.S.C. § 1961, "racketeering activity" for purposes of RICO means "any act which is indictable under any of the following provisions of title 18, United States Code: … section 1343 (relating to wire fraud) … section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), … section 1960 (relating to illegal money transmitters), … sections 2314 and 2315 (relating to interstate transportation of stolen property)."

180.    During the Relevant Period, the Defendants, and each of them, solely or together with other individuals, being persons employed by and associated with Enterprise they engaged in, and the activities of which affected interstate and foreign commerce, knowingly and intentionally, conspired to conduct and participate, directly and indirectly, and actually participated in conduct of the Enterprise's affairs through a pattern of racketeering activity, as that terms is defined in 18 U.S.C. § 1961, consisting of multiple acts, which are indictable under 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960 and 18 U.S.C. § 2314.

181.    It was a part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

182.    The purposes of the alleged racketeering conspiracy of the Defendants, and each of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 63 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1
2
3
4
5
6
7
8

them, included the following, among others: (1) maximizing profits and minimizing trading for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices; (2) concealing trading gains obtained through unlawful practices from tax authorities; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators: and (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

9

### OVERT ACTS IN FURTHERANCE OF RAKETEERING CONSPIRACY

10
11

183.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-182 above as if fully set forth herein.

12
13
14
15
16
17
18
19
20
21
22
23

184.    In furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in this District and elsewhere: 1) providing traders with extremely high trading leverage (up to 100x); 2) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 3) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 4) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; and 5) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by executing large market orders on illiquid spot exchanges in order to cause massive liquidations in traders' derivatives positions on BitMEX.

24
25
26

185.    In addition, in furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed, in this District and elsewhere, the acts, among others, as alleged in Paragraphs 236-249 of this Complaint.

27
28

186.    Plaintiff BMA was injured in its property by one or more of the foregoing and other overt acts in furtherance of the alleged racketeering conspiracy.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 64 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

**DEFENDANTS OPERATED AND CONTINUE TO OPERATE AN UNLICENSED
MONEY TRANSMITTING BUSINESS IN VIOLATION OF 18 U.S.C. § 1960**

187.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-186 above as if fully set forth herein.

188.    Bitcoins and other cryptocurrencies are funds.  *United States v. Murgio*, No. 15-cr-769, 2016 WL 5107128, at *4 (S.D.N.Y. Sep. 19, 2016); *United States v. Budovsky*, No. 15-cr-368, 2015 WL 5602853 (S.D.N.Y. Sep. 23, 2015); *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014).  Therefore, bitcoins are subject to all laws and regulations applicable to traditional currency ("fiat currency" or "fiat") monetary transactions.

189.    Plaintiff BMA is informed and believes and thereon alleges that during the Relevant Period, Defendants, and each of them, engaged in conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

190.    To use Defendant HDR's unlicensed money transmitting services, one creates an account by accessing the Defendant HDR's website BitMEX.com.  A user does not need to provide even the most basic identifying information such as date of birth, address, or other



identifiers. All that Defendant HDR requires is a name, password, and an email address.

191.    Unlike legitimate payment processors or digital currency exchangers, Defendant

HDR does not require its users to validate their identity information by providing official identification documents, given that Defendant HDR does not require an identity at all to open an account and start trading with up to 100x leverage.  For comparison, a legitimate U.S. cryptocurrency exchange Kraken requires email address, full name, date of birth, phone number, and physical address to open the most basic level account.

192.    Thus, a user can create and fund an HDR account with nothing more than an email address, which often has no relationship to the identity of the actual user. Accounts are therefore easily opened anonymously, including by customers in the United States within the Northern District of California.  Using such anonymous account, the user is able to make unlimited deposits, unlimited trades with up to 100x leverage, as well as unlimited withdrawals.  Instead of performing a proper document check before allowing users to open an account on BitMEX, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.

193.    Moreover, high leverage provided by Defendant HDR to all users enables users to launder unlimited funds from one account to another using market manipulation as alleged hereinabove.  For example, one helper account may dump a large amount of cryptocurrency on the market using margin, triggering a liquidation cascade and booking a loss, when a separate, second winner account may buy the cryptocurrency at an artificial below market price caused by the liquation cascade.  This way, unlimited amount of funds may be laundered from the first account to the second account virtually anonymously.  Defendant HDR enables uses to launder funds in the alleged manner by providing high levels of leverage up to 100x.

194.    At all times relevant to this complaint Defendant HDR had no anti-money laundering ("AML") and/or "Know-Your-Customer" ("KYC") processes and policies in place or the existing policies lacked any meaningful enforcement, as evidenced, for example, by apparent accepting the United States - based companies, including CMT Capital Markets Trading, Eastmore Group / Eastmore Management, LLC, Clerkenwell Asset Management LLC, Adaptive

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 66 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

Fund I, LP and Galois Capital as clients, despite claiming that BitMEX is closed to United States persons.  As alleged hereinabove, Defendant HDR collected and continues to collect virtually no customer data at all.  Nor did Defendant HDR ever register with FinCEN or perform the required AML and KYC functions.

195.    A user can fund a Defendant HDR account in numerous different ways.  One way involves funding a Defendant HDR account with a user's existing digital currency.  A user with existing digital currency, such as bitcoin, could fund an HDR account directly via bitcoin deposits. Defendant HDR users could also use market manipulation to launder funds from one account to another.  Plaintiff BMA is informed and believes and thereon alleges that this served as another conduit for money laundering as it allowed Defendant HDR's customers to withdraw funds from their HDR account and transfer them to other HDR users anonymously.

196.    18 U.S.C. § 1960(a) provides: "(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."

197.    Pursuant to 18 U.S.C. § 1960(b)(1), "the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree" and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

198.    18 U.S.C. § 1960 makes it a crime to operate an unlicensed money transmitting business. The term money transmitting includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 67 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE No. 3:20-cv-3345

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

wire, check, draft, facsimile, or courier."  This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a money transmitting business with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.  Moreover, FinCEN Ruling, FIN-2014-R002, at p. 4 provides:

199.    In addition, should the Company begin to engage as a business in the exchange of virtual currency against currency of legal tender (or even against other convertible virtual currency), the Company would become a money transmitter under FinCEN's regulations. Under such circumstances, the Company would have to register with FinCEN, implement an effective, risk-based anti-money laundering program, and comply with the recordkeeping, reporting, and transaction monitoring requirements applicable to money transmitters.

200.    FinCEN Ruling, FIN-2014-R002, at p. 4.  United States Federal District Court decision in  *U.S. v. Stetkiw,* No. 18-20579 (E.D. Mich. Feb. 1, 2019) relied on this Ruling as a basis for denying defendant's motion to dismiss and holding that defendant's alleged conduct of converting fiat money into virtual currency constituted money transmitting under 18 U.S.C. § 1960.  Thus, Defendant HDR is money transmitter under FinCEN's regulations and California law.

201.    The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  In addition, San Francisco based Galois Capital also acts as liquidity provider on BitMEX generating millions of dollars of business for Defendants.  Therefore, Defendant HDR is subject to the aforesaid federal and state money transmitter regulations due to its very substantial business in the United States. See 31 C.F.R. §§ 1010.100(ff)(5), 1022380(a)(2).

202.    Defendant HDR falls under the statutory definition of the "unlicensed money transmitting business" under all of 18 U.S.C. § 1960(b)(1)(A), (B) and (C).  Defendants' unlicensed money transmitting operation clearly affects interstate and foreign commerce, based at

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 68 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE No. 3:20-cv-3345

least on the high amounts (tens and even hundreds of millions of United States dollars) of funds involved in the money transmissions by Defendants.

203.    With respect to 18 U.S.C. § 1960(b)(1)(A), Defendant HDR's operates without an appropriate money transmitting license issued by the State of California and by any other State of the United States.  Cal. Fin. Code § 2003(q)(3) defines "money transmission" as "receiving money for transmission."  Defendant HDR clearly meets this definition.  Defendant HDR receives funds in a form of a cryptocurrency from its customers and then transmit cryptocurrency to a wallet address.  Cal. Fin. Code § 2030(a) requires persons engaged in money transmission to be licensed.  Finally, Cal. Fin. Code § 2152(b) provides that a "person that knowingly engages in an activity for which a license is required under this division without being licensed or exempt from licensure under this division is guilty of a felony."  Thus, Defendant HDR meets the definition set out in 18 U.S.C. § 1960(b)(1)(A).

204.    With respect to 18 U.S.C. § 1960(b)(1)(B), Defendant HDR failed to register with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.

205.    With respect to 18 U.S.C. § 1960(b)(1)(C), Defendant HDR facilitated and continues to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering.  By way of example and not by way of limitation, Defendants, and each of them, during the Relevant Period, transferred proceeds from illegal price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase, Kraken and Bitstamp.  Such transfers were performed by Defendants, and each of them on a daily basis during the Relevant Period.  Those proceeds were used by Defendants, and each of them, as well as third party perpetrators to perpetrate further market manipulations as alleged hereinabove.  In addition, Defendants transmitted funds between different exchange accounts by way of market manipulation as alleged hereinabove.

206.    Thus, Defendant HDR is clearly "unlicensed money transmitting business[es]" under 18 U.S.C. § 1960(b)(1) and, therefore, Defendants, and each of them, while being

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 69 -     BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

employed in or associated with the continuing Enterprise as alleged above, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce in violation of 18 U.S.C. § 1960(a), which constitute the predicate acts of the Defendants', and each of them, racketeering activity under RICO.

207.   It should be noted that the sheer magnitude of Defendants' unlicensed money transmitter operation is truly staggering.  According to Defendants' own data, Defendant HDR turnover averages over $2 billion per day.  Thus, Defendants illegally transmitted over $2 billion per day without the required state money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a).

208.   Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, charged their customers substantial fees for the unlicensed money transmissions generating substantial illegal income for Defendants.

209.   Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

210.   Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely over two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

211.   Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the income derived from their unlicensed money

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 70 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

transmission operations in violation of 18 U.S.C. § 1960 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

212.    Plaintiff BMA is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transmit money in violation of 18 U.S.C. § 1960 directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

## DEFENDANTS CONSPIRED TO LAUNDER, LAUNDERED AND CONTINUE TO LAUNDER FUNDS IN VIOLATION OF 18 U.S.C. § 1956

213.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-212 above as if fully set forth herein.

214.    18 U.S.C. § 1956 provides that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

215.    Plaintiff BMA is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 71 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-cv-3345

involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), as alleged hereinabove, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged hereinbelow.

216.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) as well as proceeds of unlawful cryptocurrency market manipulation.

217.    For example, Defendants, and each of them, transferred, on multiple occasions, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as proceeds from illegal bitcoin futures contracts price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase, Bitstamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity.  Those proceeds were in fact subsequently used by Defendants, and each of them, as well as third party perpetrators to perpetrate further market manipulation in violation of applicable laws.  Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

218.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1956, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

219.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 72 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

220. Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

221. Plaintiff BMA is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to launder funds between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1956, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

222. Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds derived from their money laundering operation in violation of 18 U.S.C. § 1956 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

## DEFENDANTS ENGAGED IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S.C. § 1957

223. Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-222 above as if fully set forth herein.

224. 18 U.S.C. § 1957 provides that "(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."

225. Pursuant to 18 USC § 1957(f)(3), the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in 18 U.S.C. § 1956.

226. Plaintiff BMA is informed and believes and thereon alleges that, during the

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 73 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

Relevant Period, Defendants, and each of them, willfully and knowingly attempted to engage and engaged in monetary transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged hereinbelow.

227.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged hereinbelow.

228.    For example, Defendants, and each of them, transferred, on a regular basis, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as illegal bitcoin futures contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase, Bitstamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity.  Those proceeds were in fact subsequently used by Defendants, and each of them, as well as third party perpetrators, to perpetrate further market manipulation in violation of applicable laws.  Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

229.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1957, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

230.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 74 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

231.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants, and each of them, is still ongoing.

232.    Plaintiff BMA is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transfer funds derived from specified unlawful activity between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1957, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

233.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds from their transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

## DEFENDANTS ENGAGED IN WIRE FRAUD IN VIOLATION OF 18 U.S.C. § 1343

234.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-233 above as if fully set forth herein.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 75 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

235.    18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both..."

236.    Plaintiff BMA is informed and believes and thereon alleges that during the Relevant Period, Defendants, and each of them, devised a scheme or artifice to defraud, namely a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin future contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin and to obtain money of other traders by way of injecting false information into markets in order to induce other traders to open highly leveraged positions on BitMEX and then cause their artificial liquidation in violation of 7 U.S.C. §§ 9(1), (3) and 13(a)(2).  This scheme was devised and intended to fraudulently benefit Defendants at the expense of retail traders by inducing artificial market price moves and using such price moves to force liquidations of traders' positions on the BitMEX platform, while simultaneously deliberately freezing BitMEX's platform to impede retail traders' efforts to salvage their funds.  The funds forcibly confiscated from traders as the result of the liquidations were deposited into the Insurance Fund maintained by Defendants.

237.    Plaintiff BMA is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, used wire signals to transmit various electronic orders to multiple cryptocurrency exchanges for the specific purpose of misleading traders and investors as to the cryptocurrency market's natural forces of supply and demand and for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives.  Those actions further constitute wire fraud in violation of 18 U.S.C. § 1343.

238.    Plaintiff BMA is informed and believes and thereon alleges that the alleged fraudulent electronic wire transmissions were performed by Defendants on a daily basis during

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 76 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345

the Relevant Period and were carried out from Defendants' offices located in San Francisco, California and Hong Kong Special Administrative Region of the People's Republic of China and to respective computer servers of Amazon EKS as well as computer serves of multiple other cryptocurrency exchanges that Defendants used to perpetrate their manipulative and fraudulent scheme alleged hereinabove.  Plaintiff BMA is informed and believes and thereon alleges that each of Defendants HDR, ABS, Hayes, Delo and Reed issued the alleged fraudulent electronic wire transmissions on a daily basis during the Relevant Period, including May 17, 2019, June 26, 2019 and March 13, 2020.

239.    Plaintiff BMA is informed and believes and thereon alleges that the alleged wire transmissions contained, without limitation, electronic orders designed to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  These alleged wire transmissions were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.  The false and misleading information injected by Defendants into the markets was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin futures or spot bitcoin at times, prices and quantities that they otherwise would likely not have traded.  Moreover, the alleged wire transmissions further contained, without limitation, electronic orders designed to induce artificial price moves in the cryptocurrency markets in order to force liquidations of traders' positions on the BitMEX exchange for the benefit of Defendants' Insurance Fund.  In addition, the electronic wire transmissions included Defendants' electronic commands to deliberately freeze servers of the BitMEX platform and Defendants' electronic commands to generate the fraudulent system overload messages alleged hereinabove.  Finally, the electronic wire transmissions included Defendants' fraudulent transmissions regarding the fake hardware failure in BitMEX's servers as well as the fake denial-of-service attack (DoS attack), which took place on or about March 13 and

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 77 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

1   13, 2020.

2       240.   Plaintiff BMA is informed and believes and thereon alleges that pumps and

3   dumps, Barts, liquidation cascades and spoofing alleged hereinabove are specific examples of the

4   conduct that was specifically designed by Defendants, and each of them, to mislead Plaintiff

5   BMA as well as other traders on the cryptocurrencies market.

6       241.   Plaintiff BMA as well as other traders were in fact mislead by Defendants', and

7   each of them, manipulative and fraudulent acts intended to mislead and defraud, including,

8   without limitation, by pumps and dumps, Barts and spoofing perpetrated by Defendants, and each

9   of them, and placed orders that they would not have otherwise placed.

10      242.   Plaintiff BMA, at the time of the alleged manipulative and fraudulent acts intended

11  to mislead and defraud, which were perpetrated by Defendants, and each of them, and at the time

12  Plaintiff BMA took the trades herein alleged, was ignorant of the manipulative and fraudulent

13  nature of conduct of the Defendants, and each of them, and believed that the apparent market

14  conditions were in fact dictated by market forces of supply and demand and not the result of false

15  information being injected into the markets by Defendants.

16      243.   Plaintiff BMA, at the time the alleged manipulative and fraudulent acts intended to

17  mislead and defraud were made by Defendants, and each of them, and at the time Plaintiff BMA

18  took the actions herein alleged, was ignorant of secret intentions of Defendants, and each of them,

19  to mislead and defraud Plaintiff BMA and other traders and Plaintiff BMA could not, in the

20  exercise of reasonable diligence, have discovered the secret intentions of Defendants, and each of

21  them.

22      244.   Had Plaintiff BMA known the actual facts, Plaintiff BMA would not have taken

23  such alleged actions.

24      245.   If Plaintiff BMA had known of the actual intention of Defendants, and each of

25  them, Plaintiff BMA would not have taken the alleged trades.  Plaintiff's BMA reliance on

26  fraudulent and manipulative conduct of Defendants, and each of them, was justified because

27  Plaintiff BMA rightfully assumed that the market conditions of spot bitcoin and bitcoin

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 78 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

derivatives markets were due to the actual market forces of supply and demand.

246.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

247.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

248.    Plaintiff BMA is informed and believes and thereon alleges that Defendants' hereinabove alleged use of the electronic wire signals to defraud Plaintiff BMA as well as other market participants in violation of 18 U.S.C. § 1343 directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

249.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds derived from wire fraud in violation of 18 U.S.C. § 1343 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

## DEFENDANTS ENGAGED IN INTERSTATE TRANSPORTATION OF STOLEN FUNDS IN VIOLATION OF THE NATIONAL STOLEN PROPERTY ACT 18 U.S.C. § 2314

250.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-249 above as if fully set forth herein.

251.    18 U.S.C. § 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud … [s]hall

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 79 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

be fined under this title or imprisoned not more than ten years, or both."

252.    Plaintiff BMA is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, willfully and knowingly transmitted and transferred in interstate or foreign commerce cryptocurrency, including, without limitation, bitcoin and stablecoins, knowing that the transferred cryptocurrency was converted or taken by fraud from Plaintiff BMA as well as other cryptocurrency traders as the result of fraudulent market manipulation as alleged hereinabove.

253.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, transferred, during the Relevant Period, on a daily basis, proceeds of the alleged illegal bitcoin futures contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase, Bitstamp and Kraken. Coinbase and Kraken are located in California, while Bitstamp is located in European Union. The transferred proceeds were converted or taken by fraud by Defendants from Plaintiff BMA as well as other cryptocurrency traders as the result of the fraudulent market manipulation as alleged hereinabove.

254.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 2314, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

255.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

256.    Plaintiff BMA is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18

Consensus Law
Cryptocurrency
Attorneys

Complaint for Violation of RICO (Demand for Jury Trial)    - 80 -    BMA LLC v. HDR Global Trading Limited et al.    Case No. 3:20-cv-3345

U.S.C. § 2314, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

257.    Plaintiff BMA is informed and believes and thereon alleges that Defendants', and each of them, alleged transfer of proceeds of the alleged illegal bitcoin futures contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase, Bitstamp and Kraken, in violation of 18 U.S.C. § 2314, enabling Defendants, and each of them, to engage in further market manipulation, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

258.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds derived from the interstate transportation of stolen funds in violation of 18 U.S.C. § 2314 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff BMA as alleged hereinbelow.

### COUNT I
**(Conduct Of Or Participation In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(c))**

259.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-258 above as if fully set forth herein.

260.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count I Defendants").

261.    During Relevant Period, Enterprise engaged in activities that affect interstate commerce. The Count I Defendants are employed by or associated with the Enterprise.

262.    The Count I Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as well as other cryptocurrency traders.  Specifically, Count I

1

2   Defendants engages in continuous pattern of racketeering activity involving, among other

3   unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. §

4   1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary

5   transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §

6   1957(a), wire fraud in violation 18 U.S.C. § 1343 and interstate transportation of stolen property

7   in violation 18 U.S.C. § 2314.  The alleged acts were perpetrated by Count I Defendants during

Relevant Period on a daily basis and continue to take place.

8           263.    Pursuant to and in furtherance of their fraudulent scheme, Count I Defendants

9   committed multiple related acts of operating an unlicensed money transmitting business in

10  violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging

11  in monetary transactions in property derived from specified unlawful activity in violation of 18

12  U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343 and interstate transportation of stolen

13  property in violation 18 U.S.C. § 2314.

14          264.    The acts of operating an unlicensed money transmitting business in violation of 18

15  U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary

16  transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §

17  1957(a), wire fraud in violation 18 U.S.C. § 1343 and interstate transportation of stolen property

18  in violation 18 U.S.C. § 2314 set forth above constitute a pattern of racketeering activity pursuant

19  to 18 U.S.C. § 1961(5).

20          265.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and

21  each of them, took part in directing the affairs of the alleged Enterprise by engaging in a

22  continuing pattern of racketeering activity involving, among other unlawful acts, operating an

23  unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in

24  violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from

25  specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C.

26  § 1343 and interstate transportation of stolen property in violation 18 U.S.C. § 2314.

27          266.    The Count I Defendants have directly and indirectly conducted and participated in

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 82 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

267.    Plaintiff BMA is informed and believes and thereon alleges that Count I Defendants, and each of them, (1) gave or took directions; (2) occupied a position in the "chain of command" through which the affairs of the Enterprise are conducted; (3) knowingly implemented decisions of upper management; and (4) was indispensable to the achievement of the alleged Enterprise's goals.

268.    Plaintiff BMA is informed and believes and thereon alleges that Count I Defendants, and each of them, conducted or participated in the conduct of the affairs of the alleged Enterprise engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343 and interstate transportation of stolen property in violation 18 U.S.C. § 2314.

269.    Plaintiff BMA is informed and believes and thereon alleges that Defendants, and each of them, participated in a pattern of racketeering activity, which included at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343 and at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314.   Count I Defendants, and each of them, committed the alleged predicate offenses as a part of conducting or participating in the Enterprise, and, therefore, is liable for the violation of the RICO, 18 U.S.C. § 1964(c).

270.    As a direct and proximate result of the Count I Defendants', and each of them, conduct of or participation in the long-running Enterprise, within the meaning of 18 U.S.C. §

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 83 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343 and interstate transportation of stolen property in violation 18 U.S.C. § 2314, Plaintiff BMA have been domestically injured in its business and property in the amount to be proven at trial.

271.    The aforesaid amount constitutes a concrete financial loss of the Plaintiff BMA.

272.    Therefore, Count I Defendants', and each of them, are liable, jointly and severally, to Plaintiff BMA under 18 U.S.C. §1964(c) for the violation of the RICO, 18 U.S.C. §1962(c) in the amount of triple of Plaintiff BMA's losses to be proven at trial.

## COUNT II
**(Conspiracy To Conduct Or Participate In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(d))**

273.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-272 above as if fully set forth herein.

274.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count II Defendants").

275.    As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically, Count II Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity alleged hereinabove in the interstate Enterprise (18 U.S.C. § 1962(a)); (2) acquire or maintain interests in the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(b)); and (3) conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(c)).

276.    The Count II Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 84 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1   racketeering activity alleged hereinabove, and conduct and participate in the conduct of the affairs

2   of the enterprise through a pattern of racketeering activity alleged hereinabove. The Count II

3   Defendants knew that their predicate acts were part of a pattern of racketeering activity alleged

4   hereinabove and agreed to the commission of those acts to further the schemes described above.

5   That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of

6   18 U.S.C. § 1962(d).

7       277.    Plaintiff BMA is informed and believes and thereon alleges that Count II

8   Defendants, and each of them, intended to further the operation of an unlicensed money

9   transmitting business in violation of 18 U.S.C. § 1960(a).

10      278.    Plaintiff BMA is informed and believes and thereon alleges that Count II

11  Defendants, and each of them, intended to further the money laundering endeavor in violation of

12  18 U.S.C. § 1956.

13      279.    Plaintiff BMA is informed and believes and thereon alleges that Count II

14  Defendants, and each of them, intended to further the transactions in property derived from

15  specified unlawful activity in violation of 18 U.S.C. § 1957.

16      280.    Plaintiff BMA is informed and believes and thereon alleges that Count II

17  Defendants, and each of them, intended to further the wire fraud in violation of 18 U.S.C. § 1343.

18      281.    Plaintiff BMA is informed and believes and thereon alleges that Count II

19  Defendants, and each of them, intended to further the interstate transportation of stolen property

20  in violation of 18 U.S.C. § 2314.

21      282.    Plaintiff BMA is informed and believes and thereon alleges that Count II

22  Defendants, and each of them, have been aware of the essential nature and scope of the alleged

23  Enterprise and intended to participate in it.

24      283.    Plaintiff BMA is informed and believes and thereon alleges that Count II

25  Defendants, and each of them, agreed to commit, or participate in, the violation of two predicate

26  offenses, namely at least two acts of operating an unlicensed money transmitting business in

27  violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C.

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 85 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE No. 3:20-CV-3345

§ 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343 and at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314.

284.    In addition, in furtherance of the alleged conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in this District and elsewhere: 1) providing traders with extremely high trading leverage (up to 100x); 2) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 3) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 4) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; and 5) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by executing large market orders on illiquid spot exchanges in order to cause massive liquidations in traders' derivatives positions on BitMEX.

285.    As direct and proximate result of the Count II Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff BMA has been injured in their business and property in the amount to be proven at trial.

286.    As a proximate result of the Count II Defendants', and each of them, conspiracy to conduct or participate in the long-running Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 86 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

least two acts as alleged in paragraph 218, Plaintiff BMA sustained concrete and certain monetary cryptocurrency trading losses in the amount to be proven at trial.

287.    The aforesaid amount constitutes a concrete financial loss of Plaintiff BMA.

288.    Therefore, Count II Defendants, and each of them, are liable, jointly and severally, to Plaintiff BMA under 18 U.S.C. §1964(c) for the violation of the RICO, 18 U.S.C. §1962(d) in the amount of triple of Plaintiff BMA's losses to be proven at trial.

## COUNT III
### (Use Of A Manipulative Or Deceptive Device Or Contrivance In Violation Of 7 U.S.C. § 9(1))

289.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-288 above as if fully set forth herein.

290.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count III Defendants").

291.    Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), makes it unlawful for "any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with ...a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." Regulation 180.1 makes it unlawful for "any person, directly or indirectly, in connections with any contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;... (3) engage, or attempt to engage, in any act practice or course of business, which operates or would operate as a fraud or deceit upon any person...."

292.    Count III Defendants, and each of them, intended to affect or acted recklessly with regards to affecting the prices of the bitcoin futures contracts and cash bitcoin and engaged in overt acts in furtherance of their intent.

293.    By the foregoing conduct, Count III Defendants, and each of them, intentionally or recklessly used or employed or attempted to use or employ a manipulative device or artifice to

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL) - 87 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.    CASE NO. 3:20-CV-3345

defraud and engaged in or attempted to engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA and Regulation 180.1.  Allegations of specific acts constituting fraud set forth in Paragraphs 236-249 above are incorporated as if fully set forth herein.

294.    Because the actions of Count III Defendants, and each of them, occurred within the scope of their employment, office, or agency with Defendant HDR, this Defendant is liable as a principal for their violations of Section 6(c)(1) and Regulation 180.1 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

295.    Each and every overt action in furtherance of the attempt to manipulate prices, and each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(1) of the CEA and Regulation 180.1.

296.    As direct and proximate result of the Count III Defendants, and each of them, use of a manipulative device or artifice to defraud as alleged herein, in violation of Section 6(c)(1) of the CEA and Regulation 180.1, including, without limitation, pumps and dumps, Barts, liquidation cascades and spoofing perpetrated by Count III Defendants, Plaintiff BMA has been domestically injured in its business and property in the amount to be proven at trial.  These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

297.    Plaintiff BMA traded (directly or indirectly) the spot bitcoin and/or bitcoin derivatives at the time the alleged artificial price existed due to the wrongful conduct of Count III Defendants and each of them.

298.    For example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about May 17, 2019, when artificial price existed due to a liquidation cascade, which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day, as alleged in Paragraphs 236-249 above.

299.    As a further example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about June 26, 2019, when artificial price existed due to a liquidation cascade,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 88 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day as alleged in Paragraphs 236-249 above.

300.     As a further example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about March 13, 2020, when artificial price existed due to a liquidation cascade, which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day as alleged in Paragraphs 236-249 above.

301.     The aforesaid amounts constitute a concrete financial loss of Plaintiff BMA.

302.     Therefore, Count III Defendants, and each of them, are liable, jointly and severally, to Plaintiff BMA under 7 U.S.C. § 25(a) in the amount to be proven at trial.

**COUNT IV**
**(Manipulation And Attempted Manipulation Of Bitcoin Futures And Cash Bitcoin In Violation Of 7 U.S.C. § 9(3) and 7 U.S.C. § 13(a)(2))**

303.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-302 above as if fully set forth herein.

304.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count IV Defendants").

305.     Section 6(c)(3) of the CEA, 7 U.S.C. § 9(3), makes it unlawful for "any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

306.     Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

307.     Regulation 180.2 makes it "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

308.     Count IV Defendants, and each of them, possessed an ability to influence market prices of spot bitcoin and bitcoin derivatives.  Specifically, as Count IV Defendants, and each of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 89 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

them, accumulated hundreds of millions of dollars in bitcoin.  With such a large amount of bitcoin available for trading, Count IV Defendants have had and continue to have the ability to move bitcoin market price very substantially.

309.    Plaintiff BMA is informed and believes and thereon alleges that Count IV Defendants, and each of them, acting in furtherance of the manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin future contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin caused an artificial price of spot bitcoin and bitcoin derivatives.  The artificial price was further caused by diminished investor confidence resulting from the abusive market conduct of Count IV Defendants.

310.    Allegations of specific acts constituting fraud set forth in Paragraphs 236-249 above are incorporated as if fully set forth herein.  These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

311.    Plaintiff BMA is informed and believes and thereon alleges that Count IV Defendants, and each of them, caused an artificial price of spot bitcoin and bitcoin derivatives in order to trigger a specific price-based market event, such as a liquidation cascade or execution of stop loss orders of other traders.

312.    Plaintiff BMA is informed and believes and thereon alleges that Count IV Defendants, and each of them, specifically intended to cause the alleged artificial price of spot bitcoin and bitcoin derivatives in order to trigger a specific price-based market event, such as a liquidation cascade or execution of stop loss orders of other traders.

313.    By the foregoing conduct, Count IV Defendants, and each of them, manipulated or attempted to manipulate the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of Sections 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2.

314.    Because the actions of Count IV Defendants, and each of them, occurred within

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 90 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

the scope of their employment, office, or agency with Defendant HDR, and Defendants HDR is liable as a principal for their violations of Sections 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

315.    Each and every overt action in furtherance of the attempt to manipulate prices, and each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2.

316.    Plaintiff BMA traded (directly or indirectly) the spot bitcoin and/or bitcoin derivatives at the time the alleged artificial price existed due to the wrongful conduct of Count IV Defendants and each of them.

317.    For example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about May 17, 2019, when artificial price existed due to a liquidation cascade, which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day, as alleged in Paragraphs 236-249 above.

318.    As a further example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about June 26, 2019, when artificial price existed due to a liquidation cascade, which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day as alleged in Paragraphs 236-249 above.

319.    As a further example, Plaintiff BMA sustained a domestic loss of at least 10 bitcoins on or about March 13, 2020, when artificial price existed due to a liquidation cascade, which, on information and belief of Plaintiff BMA, was caused by Count III Defendants' market manipulation on that day as alleged in Paragraphs 236-249 above.

320.    As a proximate result of the Count IV Defendants', and each of them, manipulation or attempted to manipulation of the price of certain cryptocurrency derivatives, including, without limitation, bitcoin future contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin, which caused an artificial price of spot bitcoin and bitcoin derivatives, Plaintiff sustained concrete monetary cryptocurrency

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 91 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

domestic injury in the amount to be proven at trial..

321.    The aforesaid amounts constitute a concrete financial loss of Plaintiff BMA.

322.    Therefore, Count IV Defendants, and each of them, are liable, jointly and severally, to Plaintiff BMA under 7 U.S.C. § 25(a) in the amount to be proven at trial.

## COUNT V
### (Principal Agent Liability Under CEA)

323.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-322 above as if fully set forth herein.

324.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count V Defendants").

325.    Each Count V Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

326.    Plaintiff BMA sustained and is entitled to actual damages for the violations of the CEA alleged herein.

## COUNT VI
### (Aiding and Abetting Manipulation Of Bitcoin Futures And Cash Bitcoin In Violation Of 7 U.S.C. § 25(a)(1))

327.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-326 above as if fully set forth herein.

328.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count VI Defendants").

329.    Count VI Defendants, and each of them, knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Andrianov and unknown third persons as alleged herein.  In addition, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Defendants HDR, Hayes, Delo and Reed.  Each Count VI Defendant did so with knowledge of other Defendants' and unknown third persons' manipulation of cryptocurrency prices through manipulative trades, and substantially and willfully intended to

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 92 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

assist these manipulations to cause artificial prices, during the Relevant Period, in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a) and 25(a)(1).  For example, Defendant HDR knowingly aided and abetted Andrianov and unknown third persons in violation of the CEA by enabling the price manipulators to open unlimited number of anonymous trading accounts on HDR exchange and thereby hindering detection of said manipulation.  Each of the Count VI Defendants HDR, Hayes, Delo, Reed was responsible for implementing this policy on the BitMEX exchange.  Moreover, Defendant HDR knowingly aided and abetted Andrianov and unknown third persons in violation of the CEA by providing high leverage, by deliberately designing BitMEX indexes based on price data for cryptocurrencies from just three exchanges – Bitstamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX and by using deliberate server freezes and fraudulent "system overloads" events to accept some trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations to benefit Defendants.  Moreover, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Defendants HDR, Hayes, Delo and Reed by furnishing to said Defendants software tools designed to cause deliberate server freezes alleged hereinabove using services of at least three Site Reliability Engineers: Jerry Aldrich, Scott H. and Armando Cerna.

330.    As a proximate result of the Count VI Defendants' actions as alleged herein, Plaintiff sustained concrete monetary cryptocurrency domestic injury in the amount to be proven at trial..

331.    Therefore, Count VI Defendants, and each of them, are liable, jointly and severally, to Plaintiff BMA under 7 U.S.C. § 25(a) in the amount to be proven at trial.

### COUNT VII
**(Negligence)**

332.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-331 above as if fully set forth herein.

333.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 93 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

VII Defendants").

334.   California law imposes a duty to prevent purely economic loss to third parties in financial transactions.  The foundational case on this subject outlines six factors for establishing a duty to protect against economic loss: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

335.   Count VII Defendants owed a duty to Plaintiff BMA to maintain a functional cryptocurrency derivatives marketplace.  *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders).  *Berk v. Coinbase*, Case No. 18-cv-01364-VC, Dkt. 75 (Judge Chhabria held that Coinbase owed duty to its traders to maintain a functional cryptocurrency trading marketplace).

336.   Moreover, Plaintiff BMA is informed and believes and thereon alleges that Count VII Defendants, and each of them, specifically intended to affect the prices of the bitcoin futures contracts and cash bitcoin in order to trigger specific market events as alleged above.  For example, Count VII Defendants, and each of them, intended to cause the price of bitcoin futures contracts or cash bitcoin to reach levels that would trigger liquidation cascades and execution of other traders' stop loss orders, as specifically alleged above.  Thus, Count VII Defendants, and each of them, specifically intended to affect traders like Plaintiff BMA, by causing their financial ruin by triggering liquidation of their positions or by causing triggering of execution of their stop loss orders.  Moreover, Count VII Defendants, and each of them, specifically intended to financially benefit from the financial ruin of other traders by buying spot bitcoin and bitcoin derivatives at artificially below market prices or by selling spot bitcoin and bitcoin derivatives at artificially above market prices.  In addition, Count VII Defendants, and each of them, specifically intended to financially benefit from the financial ruin of other traders by liquidating trading positions of such trades by way of inducing artificial price moves and forcibly

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 94 -   BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1   confiscating their collateral for the benefit of the Insurance Fund.

2       337.   Because of Count VII Defendants', and each of them, specific intent to trigger the

3   alleged market events, financial harm and even ruin to traders like Plaintiff was completely and

4   entirely foreseeable to Defendants, and each of them.  In fact, it was Defendants', and each of

5   them, specific intent to become unjustly enriched by reason of financially harming or ruining

6   traders like Plaintiff.

7       338.   By reason of Count VII Defendants', and each of them, breach of the legal duty to

8   prevent economic harm to traders like Plaintiff, imposed by California law, Plaintiff BMA

9   sustained ascertainable, concrete and certain monetary trading losses in the amount to be proven

10  at trial.

11      339.   Count VII Defendants', and each of them, conduct, namely unlawful market

12  manipulation alleged above, was specifically intended to cause injury to traders like Plaintiff

13  BMA.

14      340.   Count VII Defendants', and each of them, conduct was clearly fraudulent,

15  unlawful and was motivated purely by personal greed.  Thus, a high degree of moral blame is

16  attached to the Count VII Defendants', and each of them, intentional spot bitcoin as well as

17  bitcoin derivatives market manipulation activities.

18      341.   The State of California has a strong policy of preventing future harm to traders like

19  Plaintiff BMA from unlawful and fraudulent conduct by Count VII Defendants, and each of them.

20      342.   Accordingly, under California law, Count VII Defendants, and each of them, owed

21  a legal duty to prevent economic harm to Plaintiff BMA.

22      343.   Count VII Defendants, and each of them, breached the alleged legal duty to

23  prevent economic harm to Plaintiff by recklessly or negligently taking offline the BitMEX

24  platform on or about March 13, 2020 and by recklessly or negligently manipulating the prices of

25  spot bitcoin and bitcoin derivatives and thereby causing an economic injury to Plaintiff BMA.

26      344.   As a factual (but for) and proximate (legal) result of the Count VII Defendants',

27  and each of them, negligent market manipulation activities, Plaintiff BMA sustained certain and

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 95 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

concrete monetary cryptocurrency trading losses in the amount to be proven at trial.

345.     The aforesaid amount constitutes a certain and concrete financial loss of the Plaintiff BMA factually (directly) and legally (proximately) caused by Count VII Defendants', and each of them, unlawful conduct.

## COUNT VIII
### (Fraud)

346.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-345 above as if fully set forth herein.

347.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count VIII Defendants").

348.     Pursuant to California law, "fraud may arise from conduct that is designed to mislead, and not only from verbal or written statements." *Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 839 [199 Cal.Rptr.3d 901].

349.     Allegations of specific acts constituting fraud set forth in Paragraphs 236-249 above are incorporated as if fully set forth herein.

350.     Count VIII Defendants', and each of them, market manipulation including, without limitation, pumps and dumps, Barts and spoofing, were the conduct that was specifically designed to mislead traders like Plaintiff BMA.  For example, as alleged hereinabove, pumps and dumps, Barts and spoofing were perpetrated by Count VIII Defendants, and each of them, with the specific purpose of deceiving other market participants as to market-based forces of supply and demand for an asset and enticing unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed.  Moreover, pumps and dumps, Barts and spoofing were intended by Count VIII Defendants, and each of them, to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin futures at times, prices and quantities that they otherwise would likely not have traded.

351.     Thus, pumps and dumps, Barts and spoofing were examples of the conduct that

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

1
2    was specifically designed by Count VIII Defendants, and each of them, to mislead Plaintiff BMA
     as well as other traders.
3
4        352.    Plaintiff BMA as well as other traders were in fact mislead by Count VIII
     Defendants', and each of them, manipulative and fraudulent acts intended to mislead and defraud,
5
     including, without limitation, by pumps and dumps, Barts and spoofing perpetrated by Count VIII
6
     Defendants, and each of them, and placed orders that they would not have otherwise placed.
7
         353.    Plaintiff BMA, at the time of the alleged manipulative and fraudulent acts intended
8
     to mislead and defraud, which were perpetrated by Count VIII Defendants, and each of them, and
9
     at the time Plaintiff BMA took the trades herein alleged, was ignorant of the manipulative and
10
     fraudulent nature of conduct of the Count VIII Defendants, and each of them, and believed that
11
     the market conditions were in fact dictated by market forces of supply and demand.
12
         354.    Plaintiff BMA, at the time the alleged manipulative and fraudulent acts intended to
13
     mislead and defraud were made by Count VIII Defendants, and each of them, and at the time
14
     Plaintiff BMA took the actions herein alleged, was ignorant of secret intentions of Count VIII
15
     Defendants, and each of them, to mislead and defraud Plaintiff BMA and other traders and
16
     Plaintiff BMA could not, in the exercise of reasonable diligence, have discovered the secret
17
     intentions of Count VIII Defendants, and each of them.
18
         355.    Had Plaintiff BMA known the actual facts, Plaintiff BMA would not have taken
19
     such alleged actions.
20
         356.    If Plaintiff BMA had known of the actual intention of Count VIII Defendants, and
21
     each of them, Plaintiff BMA would not have taken the alleged trades.  Plaintiff's BMA reliance
22
     on fraudulent and manipulative conduct of Count VIII Defendants, and each of them, was
23
     justified because Plaintiff BMA rightfully assumed that the market conditions of spot bitcoin and
24
     bitcoin derivatives markets were due to the actual market forces of supply and demand.
25
         357.    As a proximate result of fraud and deceit perpetrated by Count VIII Defendants,
26
     and each of them, and based on the facts herein alleged, Plaintiff BMA has been damaged in the
27
     amount to be proven at trial.
28

358.     In doing the wrongful acts herein alleged, Count VIII Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiff BMA is entitled to punitive damages in the amount to be proven at trial pursuant to Cal. Civ. Code § 3294.

## COUNT IX
### (Civil Conspiracy)

359.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-358 above as if fully set forth herein.

360.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count IX Defendants").

361.     At some time point during the Relevant Period, Count IX Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to defraud traders by perpetrating a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin future contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin.

362.     Count IX Defendants, and each of them, did the acts and things hereinabove alleged pursuant to, and in furtherance of, the conspiracy and hereinabove alleged agreement.

363.     Count IX Defendants, and each of them, furthered the alleged conspiracy by cooperation with, or by lending aid and encouragement to, or ratification and adoption of the acts of other Count IX Defendants, and each of them.

364.     Count IX Defendants, and each of them, were fully aware that the other Defendants, and each of them, planned to perpetrate fraud and deceit upon Plaintiff BMA and other traders.

365.     Count IX Defendants, and each of them, agreed with the other Count IX Defendants, and each of them, and intended that the alleged fraud and deceit be committed upon Plaintiff BMA and other traders.

366.     As a proximate result of the fraud and deceit perpetrated by Count IX Defendants, and each of them, and according to the facts herein alleged, Plaintiff BMA has been damaged in

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)    - 98 -     BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1   the amount to be proven at trial.

2       367.    In doing the wrongful acts herein alleged, Count IX Defendants, and each of them,

3   acted with oppression, fraud, and malice, and Plaintiff BMA is entitled to punitive damages in the

4   amount to be proven at trial pursuant to Cal. Civ. Code § 3294.

5                                    **COUNT X**

6   **(Unfair Business Practices In Violation Of Cal. Bus. & Prof. Code § 17200 et seq.)**

7       368.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-367 above as

8   if fully set forth herein.

9       369.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count

10  X Defendants").

11      370.    By reason of Count X Defendants', and each of them, fraudulent, deceptive,

12  unfair, and other wrongful conduct as herein alleged, said Count X Defendants, and each of them,

13  have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unlawful, unfair, and

14  fraudulent business practice, designed to deprive Plaintiff BMA of its bitcoin holdings.

15      371.    "The 'unlawful' practices prohibited by Cal. Bus. & Prof. Code § 17200 et seq. are

16  any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory,

17  regulatory, or court-made. *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, (C.D. Cal 2001) 178

18  F.Supp.2d 1099, 1120; *People v. McKale*, (1979) 25 Cal.3d 626.

19      372.    Count X Defendants', and each of them, unlawful practices for purposes of Cal.

20  Bus. & Prof. Code § 17200 et seq. include, without limitation, the hereinabove-alleged unlawful

21  acts perpetrated by Defendants, and each of them, which violate the following criminal statutes:

22      a.      18 U.S.C. § 1343 (wire fraud);

23      b.      18 U.S.C. § 1956(a) (money laundering);

24      c.      18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from

25  specified unlawful activity);

26      d.      18 U.S.C. § 1960(a) (conducting, controlling, managing, supervising, directing, or

27  owning all or part of an unlicensed money transmitting business);

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 99 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

e.      18 U.S.C. § 2314 (interstate transportation of stolen property);

f.      18 U.S.C. § 1962(c) (conducting or participating, directly or indirectly, in the conduct of enterprise's affairs through a pattern of racketeering activity);

g.      18 U.S.C. § 1962(d) (conspiracy to conduct or participate, directly or indirectly, in the conduct of enterprise's affairs through a pattern of racketeering activity); and

h.      Cal. Fin. Code § 2152(b) (engaging in unlicensed money transmission business in California).

373.    Count X Defendants', and each of them, 'unlawful' practices for purposes of Cal. Bus. & Prof. Code § 17200 et seq. further include, without limitation, the hereinabove-alleged unlawful acts perpetrated by Count X Defendants, and each of them, that violate the following civil statutes:

i.      7 U.S.C. § 9(1) (using a manipulative or deceptive device or contrivance in connection with bitcoin futures and cash bitcoin);

j.      7 U.S.C. § 9(3) (manipulation and attempted manipulation of bitcoin futures and cash bitcoin); and

k.      7 U.S.C. § 13(a)(2) (manipulation and attempted manipulation of bitcoin futures and cash bitcoin).

374.    Allegations of specific acts constituting fraud set forth in Paragraphs 236-249 above are incorporated as if fully set forth herein.  These acts constitute "fraudulent, deceptive, unfair" acts for purposes of Cal. Bus. & Prof. Code § 17200 et seq.

375.    Thus, by reason of the foregoing, Count X Defendants have violated. Bus. & Prof. Code § 17200 et seq. by consummating an unlawful, unfair, deceptive and fraudulent business practice, designed to deprive Plaintiff BMA of its bitcoin holdings.

376.    By reason of the foregoing and as a proximate result of Count X Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff BMA has been damaged in the amount to be proven at trial.

377.    Therefore, Plaintiff BMA is entitled to restitution from Count X Defendants, and

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 100 -     BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

each of them, in the amount to be proven at trial.

**COUNT XI**
**(Unjust Enrichment (Restitution))**

378.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-377 above as if fully set forth herein.

379.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count XI Defendants").

380.    As a result of the unlawful actions of c set forth hereinabove, Count XI Defendants, and each of them, have received a financial benefit at the expense of Plaintiff BMA.

381.    Count XI Defendants, and each of them, had knowledge of the alleged benefit.

382.    Count XI Defendants, and each of them, voluntarily accepted and retained the benefit obtained.

383.    The circumstances render Count XI Defendants' retention of the benefit inequitable unless Count XI Defendants, and each of them, pay to Plaintiff BMA the value of the benefit.

384.    Count XI Defendants, and each of them, have been unjustly enriched at the expense of Plaintiff BMA.

385.    Plaintiff BMA is entitled to damages as a result of Count XI Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Count XI Defendants, and each of them, from Plaintiff BMA.

386.    As a result of the actions of Count XI Defendants, and each of them, set forth hereinabove, Defendants, and each of them, because unjustly enriched, and as a result thereof, Plaintiff BMA entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of the Plaintiff BMA factually (directly) and legally (proximately) caused by Count XI Defendants', and each of them, unlawful conduct.

**COUNT XII**
**(Constructive Trust)**

387.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-386 above as

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL) - 101 -    BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

if fully set forth herein.

388.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count XII Defendants").

389.     By reason of the fraudulent and otherwise wrongful manner in which the Count XII Defendants, or any of them, obtained their alleged right, claim or interest in and to the property of Plaintiff BMA, Count XII Defendants and each of them, have no legal or equitable right, claim or interest therein, but, instead, Count XII Defendants, and each of them are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiff BMA with the duty to convey the same to Plaintiff BMA forthwith.

## COUNT XIII
### (Accounting)

390.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-389 above as if fully set forth herein.

391.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count XIII Defendants").

392.     As a result of the actions of Count XIII Defendants, and each of them, set forth hereinabove, Count XIII Defendants, and each of them, have received money, which is due to Plaintiff BMA from Count XIII Defendants, and each of them, as previously alleged.

393.     The amount of money due from Count XIII Defendants to Plaintiff BMA is unknown to Plaintiff BMA and cannot be ascertained without an accounting of the receipts and disbursements of Count XIII Defendants, and each of them, in connection with the alleged unlawful market manipulation by Count XIII Defendants.

394.     Plaintiff BMA has demanded an accounting of the aforementioned receipts and disbursements of Count XIII Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due, but Count XIII Defendants, and each of them, have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

1

## **PRAYER**

2    By reason of the foregoing, Plaintiff BMA respectfully requests that this Court:

3    (a)    enter a judgment that Defendants, and each of them, conducted or participated in

4    the conduct of enterprise's affairs through a pattern of racketeering activity in violation of 18

5    U.S.C. § 1962(c);

6    (b)    enter a judgment that Defendants, and each of them, conspired to conduct or

7    participate in the conduct of enterprise's affairs through a pattern of racketeering activity in

8    violation of 18 U.S.C. § 1962(d);

9    (c)    enter a judgment that Defendants, and each of them, have used deceptive or

10   manipulative device in connection with cryptocurrencies futures contracts, cryptocurrencies

11   swaps and cash cryptocurrencies in violation of 7 U.S.C. §§ 9(1);

12   (d)    enter a judgment that Defendants, and each of them, have manipulated prices of

13   cryptocurrencies futures contracts, cryptocurrencies swaps and cash cryptocurrencies in violation

14   of 7 U.S.C. §§ 9(3) and 13(a)(2);

15   (e)    enter a judgment that Defendants, and each of them, have aided and abetted

16   manipulation of prices of cryptocurrencies futures contracts, cryptocurrencies swaps and cash

17   cryptocurrencies by the other Defendants and third persons;

18   (f)    enter a judgment that Defendants, and each of them, have acted negligently;

19   (g)    enter a judgment that Defendants, and each of them, have perpetrated fraud upon

20   Plaintiff BMA;

21   (h)    enter a judgment that Defendants, and each of them, have conspired to perpetrate

22   fraud upon Plaintiff BMA;

23   (i)    enter a judgment that Defendants, and each of them, have engaged in unfair

24   business practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.;

25   (j)    preliminarily and permanently enjoin Defendants, and each of them, their officers,

26   subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in

27   active concert with them, from any further violation of Federal and California laws;

28   (k)    enter a judgment that Defendants, and each of them, because unjustly enriched at

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 103 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

the expense of Plaintiff BMA;

(l)     impose a constructive trust over Defendants, and each of them, for the benefit of Plaintiff BMA;

(m)     order an accounting of the alleged receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due to Plaintiff BMA;

(n)     enter judgment that Defendants, and each of them, acted with malice, fraud and oppression;

(o)     award compensatory damages to Plaintiff BMA and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial.

(p)     award treble damages to Plaintiff BMA and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial pursuant to 18 U.S.C. § 1964(c);

(q)     award reasonable attorney fees, costs and prejudgment interest to Plaintiff BMA and against all Defendants, and each of them, jointly and severally;

(r)     award Plaintiff BMA exemplary and punitive damages, pursuant to Cal. Civ. Code § 3294, against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial; and

(s)     award Plaintiff BMA such other relief as this Court deems just and proper.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 104 -   BMA LLC V. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-CV-3345

1

2    Dated:  May 16, 2020                              Respectfully submitted,

3                                                      By:    /s/ Pavel I. Pogodin
                                                              Pavel I. Pogodin
4
                                                       CONSENSUS LAW
5                                                      Pavel I. Pogodin, Ph.D., Esq.
                                                       5245 Av. Isla Verde
6                                                      Suite 302
                                                       Carolina, PR 00979
7                                                      United States of America
                                                       Telephone: (650) 469-3750
8                                                      Facsimile: (650) 472-8961
                                                       Email: pp@consensuslaw.io
9                                                      Attorneys for Plaintiff
                                                       BMA LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

1

## **DEMAND FOR JURY TRIAL**

2

3    Pursuant to Fed. R. Civ. P. 38, Plaintiff BMA demands trial by jury of all issues triable to a jury.

4

     Dated:  May 16, 2020                          Respectfully submitted,

5

6                                                  By:____/s/ Pavel I. Pogodin_____
                                                        Pavel I. Pogodin

7
                                                   CONSENSUS LAW
8                                                  Pavel I. Pogodin, Ph.D., Esq.
                                                   5245 Av. Isla Verde
9                                                  Suite 302
                                                   Carolina, PR 00979
10                                                 United States of America
                                                   Telephone: (650) 469-3750
11                                                 Facsimile: (650) 472-8961
                                                   Email: pp@consensuslaw.io
12                                                 Attorneys for Plaintiff
                                                   BMA LLC
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR VIOLATION OF RICO (DEMAND FOR JURY TRIAL)   - 106 -    BMA LLC v. HDR GLOBAL TRADING LIMITED ET AL.   CASE NO. 3:20-cv-3345