# EXHIBIT 6

1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Andrew Levine, Esq. (SBN: 278246)
       levine@braunhagey.com
3  Tracy Zinsou, Esq. (SBN: 295458)
       zinsou@braunhagey.com
4  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
5  San Francisco, CA 94104
   Telephone: (415) 599-0210
6  Facsimile: (415) 276-1808

7  ATTORNEYS FOR PLAINTIFFS
   FRANK AMATO, RGB COIN LTD.,
8  and ELFIO GUIDO CAPONE on behalf
   of the G AND M CAPONE TRUST

9

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                       **COUNTY OF SAN FRANCISCO**

13

14

| | |
|---|---|
| 15 FRANK AMATO, RGB COIN LTD.,<br>and ELFIO GUIDO CAPONE on behalf<br>16 of the G AND M CAPONE TRUST,<br>17     Plaintiffs,<br>18         v.<br>19 HDR GLOBAL TRADING LIMITED, d/b/a<br>BITMEX; ARTHUR HAYES; ABS<br>20 GLOBAL TRADING LIMITED; and DOES<br>1-10,<br>21     Defendants. | Case No. CGC-19-581267<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1) FRAUD; (2) BREACH OF CONTRACT;**<br>**(3) BREACH OF COVENANT OF GOOD**<br>**FAITH AND FAIR DEALING; (4)**<br>**QUANTUM MERUIT AND/OR UNJUST**<br>**ENRICHMENT; (5) NEGLIGENT**<br>**MISREPRESENTATION; and**<br>**(6) PROMISSORY ESTOPPEL**<br><br>**JURY TRIAL DEMANDED** |

22

23

24

25

26

27

28

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco

04/27/2020
Clerk of the Court
BY: ERNALYN BURA
Deputy Clerk

Plaintiffs Frank Amato, RGB Coin Ltd. ("RGB Coin"), and Elfio Guido Capone on behalf of the G and M Capone Trust (together, for convenience, "Plaintiffs") bring this action for fraud and related causes of action against Defendants HDR Global Trading Limited d/b/a BitMEX ("BitMEX" or "HDR Global"), Arthur Hayes, and ABS Global Trading Limited ("ABS Global") (collectively, "Defendants"), and allege as follows:

**SUMMARY OF CLAIMS**

1.     Plaintiffs Frank Amato and Elfio Guido Capone were the first and second seed investors of what is now the world's largest cryptocurrency trading platform, Defendant BitMEX. Their investments were promised to automatically convert into equity upon BitMEX's first fundraising event under a California-governed Simple Agreement for Future Equity (the "Amato SAFE" and the "Capone SAFE", respectively). However, Defendants' representations before and after the transaction turned out to be false. After raising multiple rounds of new funding, launching offices in the San Francisco Bay Area, and hiring hundreds of employees, BitMEX and its owners misled Plaintiffs and concealed information to deny their equity rights, conservatively estimated to be worth in excess of $90,000,000.

2.     Plaintiffs' investments were made at the very beginning of BitMEX's existence in 2015 to help Defendants sustain operations when they had few resources and no other sources of funding. Defendants' founder and CEO, defendant Arthur Hayes, repeatedly pitched Plaintiffs to invest in BitMEX's struggling digital exchange platform. He promised that their investment would convert to equity a short time later. BitMEX needed money to pay engineers, procure equipment, develop the necessary algorithms, and to help promote the platform. Defendants had been unable to raise money from traditional investors and the platform was at risk of failing. Because such investments are risky, Plaintiffs were promised a substantial premium in return for the high risk that the business might fail.

3.     Just a few months after Plaintiffs' investments, Defendants received a qualifying $30,000 investment for 5% of the enterprise at a $600,000 valuation from startup accelerator SOSV. SOSV is a multi-stage venture capital investor with offices in San Francisco and New York. Defendants knew that SOSV's investment triggered Plaintiffs' equity conversion but

1 withheld that information and took efforts to conceal it from Plaintiffs. When Mr. Amato asked

2 about the SOSV investment and subsequent Equity Events in 2018, Defendants provided false

3 information to him about those events and the status of his equity. Defendants also misled Mr.

4 Capone, first telling him that his percentage "ownership" in the company was vested, only to later

5 renege on that representation.

6     4.     BitMEX is now the largest and most liquid Bitcoin-to-USD derivative market in the

7 world, trading roughly $121.23 billion in value through its platform every month, and over $1.22

8 trillion dollars in the last year alone. Despite taking on the incredible risk and becoming BitMEX's

9 first outside investors, Defendants cynically seek to deny Plaintiffs their rights or returns.

10 BitMEX's executives, especially Defendant Hayes, also have taken other actions, including

11 violating state securities laws, that undermine and depress the value of Plaintiffs' ownership.

12     5.     Through this action, Plaintiffs accordingly seek (a) damages representing the value

13 of their equity interest in BitMEX, which is conservatively estimated, jointly, to exceed

14 $90,000,000, (b) damages from the failure to pay Plaintiffs' dividends during the period, and (c)

15 punitive damages in an amount to be determined, but in excess of $450,000,000. Plaintiffs also

16 seek injunctive relief and other remedies, together with their attorneys' fees and costs.

17 **PARTIES**

18 **A.**     **Plaintiffs**

19     6.     Plaintiff FRANK AMATO is an investment professional who resides in Akron,

20 Ohio.

21     7.     Plaintiff RGB COIN LTD. is a limited liability corporation organized in Ohio. RGB

22 Coin holds a 5% interest in the SAFE through assignment, as expressly permitted under the SAFE.

23 Member interests in RGB Coin are held by Plaintiffs and another member, who is a citizen of

24 Portugal.

25     8.     Plaintiff ELFIO GUIDO CAPONE, who brings this action on behalf of the G and M

26 Capone Trust, is a trustee of the G and M Capone Trust and a signatory on its behalf of the July 16,

27 2015 SAFE agreement between it and HDR Global Trading Limited. Mr. Capone resides in

28 Adelaide, South Australia.

### B. Defendants

9. Defendant HDR GLOBAL TRADING LIMITED ("HDR Global" or "BitMEX"), is a business that operates in all jurisdictions, including California, under the trade name "BitMEX" and by and through its California-based wholly owned subsidiary and alter ego, co-defendant ABS Global Trading Limited. BitMEX's San Francisco Bay Area operations are run from two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California.

10. Defendant ABS GLOBAL TRADING LIMITED ("ABS Global") is a California-headquartered, wholly owned subsidiary of co-defendant HDR Global and its United States-based alter ego. ABS Global has two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California.

11. Defendant ARTHUR HAYES is a United States citizen and CEO and founder of BitMEX. Mr. Hayes regularly and systematically conducts business in California and the United States on behalf of BitMEX and ABS Global, including by managing and directing BitMEX's San Francisco Bay Area-based operations, with offices at 301 Battery St., 4th Fl., San Francisco, CA, 94111 and/or 340 Brannan Street, 2nd Floor, San Francisco, California.

12. Defendants DOES 1 THROUGH 10 are agents or principals of Defendants who, on information and belief, aided and abetted Defendants in the making of the fraudulent statements or omissions to Plaintiff. The true names and capacities of the defendants named herein as Does 1 through 10 are unknown to Plaintiffs, who therefore sue them under these fictitious names. Plaintiffs will amend this Complaint to add their true names and capacities when they become known.

### C. Defendant HDR Global and Its Alter Ego ABS Global

13. Defendant HDR Global d/b/a BitMEX is a private closely-held entity that wholly owns the BitMEX website and cryptocurrency exchange and derivative trading platform.

14. In California, BitMEX conducts business under its trade name BitMEX through its alter ego ABS Global, which is headquartered in San Francisco. BitMEX funds all of ABS Global's operations, including paying for all of its employees, overhead, and lease and rent

obligations, and is ABS Global's sole source of income. On information and belief, Defendants directly or indirectly used Plaintiffs' investments to help develop technology and retain talent in this State from which to run BitMEX's operations.

15. BitMEX dominates and controls every aspect of ABS Global's operations and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations. In particular, ABS Global provides development, software engineering, and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions occur.

16. Defendant Hayes and the other co-founders, majority shareholders, and key executives of BitMEX, Ben Delo and Samuel Reed, collectively own a controlling interest in ABS Global through their ownership of HDR Global, which wholly owns ABS Global. Defendant Hayes is the sole director, president, secretary, and treasurer of ABS Global, and executes agreements on its behalf. Defendant Hayes runs ABS Global's activities without regard to its corporate form and for the benefit of HDR Global and its insiders at the expense of Plaintiffs and other third parties.

17. BitMEX has created ABS Global as a false "shell" company as part of a broader securities law dodge designed to tell regulators that BitMEX has no California or United States operations or investors. However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations.

**D. Defendant ABS Global Aided and Abetted Defendants HDR Global and Hayes**

18. Defendant ABS Global aided and abetted, authorized, ratified and controlled Defendant HDR Global's tortious acts described herein.

19. Defendants HDR Global and Hayes relied upon their domestic agents, employees and affiliates, including without limitation ABS Global, to help implement and conceal the tortious acts alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed. Defendant ABS Global acted in the United States and abroad within the scope of its agency with

the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in carrying out the acts alleged herein.

20. Defendants are individually sued as principals, participants, agents, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from each Defendants' engagement in all or part of the tortious acts alleged herein.

21. Additional and other facts regarding Defendants' joint action, alter ego status and aiding and abetting of one another regarding the misconduct against Defendants is hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. Defendants have withheld this information despite repeated formal requests for production of this information by Plaintiffs. Plaintiffs accordingly reserve the right to supplement and amend these allegations if appropriate or necessary following completion of relevant fact discovery.

## SUBJECT MATTER JURISDICTION

22. The claims and amounts in controversy satisfy the jurisdictional limit for an unlimited civil case under the California Code of Civil Procedure.

23. Jurisdiction is proper in California in accordance with Cal. Civ. Pro. § 410.10 as Defendants have systematic contacts with the Bay Area, including, but not limited to, multiple office locations and dozens of employees in San Francisco County.

24. Jurisdiction is also proper as to Defendant Arthur Hayes in accordance with Cal. Civ. Pro. § 410.10 as Defendant Hayes directs BitMEX's operations in California, and regularly attends conferences in California relating to both BitMEX and cryptocurrencies.

25. Further, both the Amato SAFE and the Capone SAFE specifically provide that "[a]ll rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction." SAFE §5(f).

## DEFENDANTS' CONTINUOUS AND SUSTAINED CONTACTS
## WITH THE STATE OF CALIFORNIA

26. Defendants have continuous and sustained contacts with the State of California and the San Francisco Bay Area generally, as well as significant conduct related to this litigation.

27. Further evidence of Defendants' conduct is uniquely within their possession, custody and control. Plaintiffs reserve the right to supplement and amend these jurisdictional allegations, if necessary, upon the receipt of outstanding jurisdictional discovery which Defendants have withheld and avoided, including Requests for Production of Documents, Special Interrogatories, and Notices of Deposition.

**A. BitMEX Employs Dozens of Managers and Personnel in San Francisco**

28. BitMEX's Bay Area offices house its largest number of employees worldwide, according to the company's own LinkedIn demographics. On information and belief, Plaintiffs' investment capital was used, directly or indirectly, to fund the salaries and retention of one or more of these Bay Area employees. BitMEX's expansion, including into the Bay Area, would not have been possible without Plaintiffs' critical infusion of funds. These personnel, who call themselves "BitMEX" employees include, without limitation, the following roles:

a. BitMEX's Vice President and Head of Product.

b. Vice President and Head of BitMEX Ventures, a BitMEX subsidiary.

c. Vice President of Engineering.

d. Vice President and Head of Security.

e. Head of Development and Operations.

f. Head of Security Assurance & Technical Program Management.

g. Head of Data Science.

h. Head of User Experience.

i. Director of People.

j. Communications Director.

k. Security Engineering Manager of Application Security.

l. Senior Security Program Manager.

m. Lead Data Engineer.

n. Senior Systems Engineer.

o. Two Senior Software Engineers.

p. Senior Technical Investigator.

| | | |
|---|---|---|
| q. | Senior Product Manager. |
| r. | Security Engineering Manager. |
| s. | Engineering Manager. |
| t. | Senior Product Designer. |
| u. | Senior Visual Designer. |
| v. | IT Manager. |
| w. | Two Project Managers. |
| x. | Data Science Manager. |
| y. | Quality Assurance Manager. |
| z. | Senior Frontend Engineer. |
| aa. | Three Senior Software Engineers. |
| bb. | Senior Software Engineer for mobile devices. |
| cc. | Senior IT Support Engineer. |
| dd. | Two Talent Acquisition Specialists. |
| ee. | Four Security Engineers. |
| ff. | Platform Security Engineer. |
| gg. | Site Reliability Engineer. |
| hh. | Kubernetes program quality assurance pilot. |
| ii. | Two Kubernetes Engineers. |
| jj. | Product Engineer. |
| kk. | Automation Engineer. |
| ll. | IT Infrastructure Engineer. |
| mm. | Software Engineer. |
| nn. | Product, Design, and User-Interface Engineer. |
| oo. | Recruiting and Hiring Officer. |
| pp. | Information Technologies Specialist. |

FIRST AMENDED COMPLAINT

**B.  BitMEX Posts San Francisco Job Openings to Join "BitMEX"**

29.     BitMEX advertises job openings on its website at www.bitmex.com/careers for San Francisco, one of only three offices hiring worldwide, across six departments:



30.     BitMEX likewise lists available jobs on LinkedIn and angel.co.  Over half of the BitMEX jobs listed on these sites are for employment in the San Francisco office.

31.     As of March 26, 2020, the following job openings are listed across each of these websites for BitMEX's San Francisco location:

        a.     Site Reliability Engineer;

        b.     Technical Program Manager (DevOps SME);

        c.     Senior Software Engineer (API);

        d.     Senior Software Engineer (Mobile);

        e.     Senior Software Engineer (Web);

        f.     Director of Corporate Engineering;

        g.     IT Corporate Applications Engineer;

        h.     IT Support Engineer;

        i.     Technical Program Manager (IT);

        j.     Executive Assistant;

        k.     Senior Human Resources Business Partner;

l.      Global Physical Security Manager;

m.      Network Security Engineer;

n.      Security Engineer, Cryptography;

o.      Senior Application Security Engineer.

**C.      BitMEX Uses BitMEX Ventures to Invest in California-based Startups**

32.      BitMEX also does business in California as BitMEX Ventures, a corporate venture arm, through which it makes equity investments into other startup businesses.

33.      Upon information and belief, BitMEX Ventures also regularly and systematically conducts business in San Francisco.

**D.      BitMEX Uses San Francisco for Offsites**

34.      BitMEX conducts offsites for the entire company hosted at its San Francisco office location, at least one of which occurred in November of 2017, in which Defendant Hayes and the rest of BitMEX's employees globally came to San Francisco and the San Francisco office.

**E.      BitMEX Consolidated Its United States Offices in San Francisco**

35.      BitMEX closed its other United States offices and consolidated all of its United States personnel into one office location in San Francisco sometime in April of 2019, as confirmed by Defendant Hayes in an email to Mr. Capone answering why BitMEX's office in New York was shut, stating, "Consolidation of people in one office in SF."

**F.      BitMEX Uses San Francisco Vendors to Conduct Business**

36.      On information and belief, BitMEX uses Amazon, Inc.'s Amazon Web Services (AWS) infrastructure, a United States vendor with offices in San Francisco, California, for storing all of its customer and trading data, and for running virtual servers which execute BitMEX's order matching system and liquidation engine.

37.      On information and belief, BitMEX uses SendGrid, Inc., a customer communication platform and vendor, with offices located at 889 Winslow St., Redwood City, California 94063, for handling the bulk of BitMEX's email communications with its customers.

**G.      BitMEX's Use of United States Intellectual Property Registrations**

38.      BitMEX applied for and registered the mark "BitMEX" with the United States Patent and Trademark Office, on September 14, 2017, and April 23, 2019.

39.      BitMEX also has successfully obtained Notices of Allowance for ten (10) trademarks in the United States from the United States Patent and Trademark Office.

**H.      Defendant Hayes's Contacts with California and the Bay Area**

40.      Defendant Arthur Hayes is a United States citizen and CEO of BitMEX. Defendant Hayes regularly and systematically conducts business in California and the United States on behalf of BitMEX, including by managing and directing BitMEX's San Francisco Bay Area-based operations, with offices at 301 Battery St., 4th Fl., San Francisco, CA, 94111 and/or 340 Brannan Street, 2nd Floor, San Francisco, California.

41.      Defendant Hayes also regularly attends, on information and belief, cryptocurrency-related conferences and speaking events in California and within the San Francisco Bay Area. By way of example, Defendant Hayes hosted and was a keynote speaker at the Distribution 2018 conference held in San Francisco in July 2018.

42.      In a publicly aired video on the CNBC news channel, Defendant Hayes can be seen broadcasting from what appears to be one of BitMEX's San Francisco office locations, on or about July 19, 2018.



43.     Defendant Hayes induced Plaintiffs to enter the SAFE under California law and intended to be bound by California's rules and procedures and, as such, personally and intentionally availed himself of the State's benefits and privileges.

**I.      Defendants' Invocation of California Law to Secure Plaintiffs' Investments**

44.     Defendants invoked and relied upon California's laws to govern the parties' SAFE agreements.  Doing so helped assure Plaintiffs that they would have a reliable legal system from which to hold Defendants accountable for their investment.

**J.      United States Traders on the BitMEX Platform**

45.     BitMEX openly allowed California and United States residents to trade on its platform in June and July of 2015, when Mr. Amato and Mr. Capone made their investments.

46.     In BitMEX's November 2016 Monthly Report, Defendant Hayes admitted that the United States was the largest source of traffic on the BitMEX platform, ahead of China.  And in 2019, "sources close to the company" revealed to journalists that the United States was a "major market," with United States persons accounting for a significant portion of the company's total user base.

47.     On information and belief, Defendants knowingly permit residents in the United States and California to freely trade on the BitMEX Platform in order to benefit from the highly lucrative trading volumes provided by United States and California residents, generating millions of dollars of fees and revenue for the Company.

48.     Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism.  Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a Virtual Private Network (VPN).  Defendants appear to have exploited this loophole to avail themselves of United States and California markets.  Defendant Hayes stated in a January 2019 interview that BitMEX users can mask their location using VPNs to assign their computer an IP-address from other countries, bypassing filters put in place.   Examples of United States-based

persons trading on the BitMEX platform from the United States have been cited in other legal actions and are uniquely within Defendants' possession, custody and control.

49.     In early April 2020, multiple class-action lawsuits were filed in the Southern District of New York against BitMEX, ABS Global, Defendant Hayes, and the other co-founders of BitMEX, alleging *inter alia* violations of applicable state and federal securities law.  The suit was filed on behalf of a class including United States-based persons, and both purported class representatives live in the United States and allegedly purchased instruments on the BitMEX Platform while in the United States.

50.     While Plaintiffs' investigation is ongoing, on information and belief, the following entities located in the United States freely trade on the BitMEX Platform, generating millions of dollars in revenue for Defendants:

        a.     Galois Capital, a San Francisco, California-based quant trading firm.

        b.     FalconX, an institutional digital asset brokerage firm headquartered in California.

        c.     Cumberland DRW, a specialized cryptoasset trading company with multiple office locations in the United States.

        d.     Circle Partners, an independent fund administrator that provides hedge fund, private equity, and other administration services, and with offices in the United States.

# FACTS

**A.     Defendants Struggle to Raise Outside Investment for BitMEX**

51.     Before Plaintiffs' investment, BitMEX was a novel idea – a global derivatives exchange for the growing bitcoin community.  Notwithstanding its eventual success, for some time after its launch the exchange lacked backers, funding or significant traffic.

52.     Defendant Hayes needed cash to help engineer the platform and pay for basic things like equipment and facilities.  Hayes had some experience in the financial industry, but a scant track record of launching or running a fintech business and almost no experience heading his own firm.  Hayes also had no major institutional backers and was unable to raise funding from traditional sources.

53.     Upon information and belief, Defendants had not raised any outside money at all, despite concerted efforts to obtain funding from different sources until Plaintiffs' investment.

**B.     Defendants Solicit Mr. Amato to Invest in BitMEX**

54.     In mid-2014, Defendant Hayes was introduced to Mr. Amato, an angel investor with experience in FinTech platforms.

55.     Over the next 11 months, Defendants actively and continuously solicited Mr. Amato's investment into BitMEX, which Defendants consistently referred to as an "equity" investment.

56.     From the outset, Defendants stated that they were seeking "equity investors." For example, on August 18, 2014, Defendants wrote to Mr. Amato via LinkedIn messenger, seeking to secure his funding and providing information concerning the timing of BitMEX's intended "equity financing", then purportedly set for September or October 2014.

57.     Beginning on September 11, 2014, and repeatedly thereafter, Defendants memorialized in emails their intention that Mr. Amato would receive equity of 0.5% in BitMEX in exchange for an early investment in the platform.

58.     Mr. Amato and Defendants continued to correspond over the next few months. On January 18, 2015, after the holidays, Defendant Hayes again reached out to Mr. Amato to ask if he was "still interested in making an investment in BitMEX" and noting that "[w]e are putting together a round of private investors currently."

59.     Later that month, at the Inside Bitcoins Singapore event on January 29-30, 2015, Defendant Hayes showed Mr. Amato a demonstration of the BitMEX trading platform and told him that the Company needed funding to further develop the platform's proprietary trading algorithm. Samuel Reed, a co-founder of BitMEX and its CTO, was present at these meetings.

60.     Defendants and Mr. Amato continued occasional correspondence over the subsequent few months. On March 20, 2015, Defendant Hayes wrote Mr. Amato to move their

discussion forward, again representing that Plaintiff would get equity shares for his investment on

the same terms as the BitMEX founders:

> **Arthur Hayes <arthur@bitmex.com>**                Mar 20, 2015, 7:42 AM
>
> to me
>
> This has been a long process. I am going to get the docs drawn up soon, but before I start the clock on lawyers just want to make sure we are on the same page. We are looking to sell common equity shares, so you will have same rights as us. Let me know if you have an issue with that. And are you still good for $50k USD?
>
> Regards,
>
> Arthur Hayes
> Co-Founder & CEO

61.     Mr. Amato confirmed his interest but also asked if he could instead invest at

$30,000, and sought confirmation regarding Defendants' initial valuation expectations, inquiring:

"What initial valuation will you have on the company? And will initial investors be capped at that

valuation?"

62.     In response, Defendants confirmed the valuation was $10 million dollars post

money (*i.e.*, including whatever value the current round of investments contribute to BitMEX).

63.     Mr. Amato thereafter inquired whether "capped" means "locked in at the initial

valuation," such that "initial investors [would] not be diluted in future funding rounds."  In

response, Defendants stated that the antidilution provisions to protect Mr. Amato's existing equity

in an initial financing "have not been finalized yet", but that Defendants Hayes was speaking with

BitMEX's attorneys and should have an answer for Mr. Amato next week.

64.     On March 25, 2015, Defendants told Mr. Amato that his investment would buy

0.5% of BitMEX's equity for $50,000, with the same rights as the two other founders of

BitMEX—which was consistent with Defendant Hayes's March 20, 2015 email.  Further,

Defendant Hayes assured Mr. Amato that he would not be diluted in future funding rounds because

he could buy more shares to retain an equivalent ownership stake in BitMEX "in our next round of financing":

> Hi,
>
> After speaking with the lawyers, this is how we would like to proceed:
>
> 1. The offering will be common stock with no special rights attached. Basically you own the same type and class of equity that myself and the other two founders have. There will be no anti-dilution provision. However, in our next round of financing we will be looking towards existing investors and you will have the opportunity to invest to retain your % ownership of the company.
>
> 2. If that is agreeable we will get the Share Purchase Agreement drawn up. This will outline the share sale in the Seychelles entity. You will be buying 0.50% of the Seychelles entity for $50,000.

65.     Defendants represented to Mr. Amato that they would immediately notify him of additional financing and capital raises in BitMEX so that he would have an opportunity to retain his ownership percentage.

66.     Defendant Hayes wrote Mr. Amato yet again on April 13, 2015 to confirm that he would invest in BitMEX, asking "Wanted to see where you are on the investment. Can I start to get paperwork drawn up?"

67.     Mr. Amato responded that he'd like to start the paperwork and lower his investment to $30,000.  Defendant Hayes informed Mr. Amato that he was "getting a Republic of Seychelles SPA [Sales and Purchase Agreement for the Shares] drawn up now."

68.     Two days later, on April 16, 2015, Defendants wrote again to confirm that there would be one upcoming round of investing, stating "[w]e have some additional interest and are going to try and roll this up into one round. Sorry for the back and forth. I'll keep you updated on how we are progressing."

69.     In May 2015, Defendants emailed Mr. Amato what they represented to be a slightly different set of proposed terms.  Instead of a purchase agreement for shares, Defendants proposed a "convertible financing structure", and reassured Mr. Amato that his "[i]nvestment in this structure will convert to preferred shares at [BitMEX's] next round of financing."

70.     Defendant Hayes followed up with the "relevant terms" a week later, again representing and reassuring Mr. Amato that his investment would convert to preferred shares at "our next equity financing round."

> The relevant terms are:
>
> 1. Investment will convert to preference shares at our next equity financing round
> 2. Shares will convert at a 20% discount to the per share price
> 3. After converting your ownership stake is capped at 0.50% based on a $30,000 USD investment.

71.     Defendant Hayes' repeated assurances that Mr. Amato would receive equity at the "next round of financing" was intended to assure and induce Mr. Amato into accepting a Simple Agreement for Future Equity instead of the Sales and Purchase Agreement for shares, in a manner indicating that they were not materially different instruments.

72.     Two days later, Defendant Hayes sent Mr. Amato the Amato SAFE, and Mr. Amato replied asking for a few days to go over it.  Soon thereafter, Mr. Amato confirmed with Defendant Hayes that he was investing in the initial round, "pre-Series A", inquired as to the current valuation of the company, and asked how the equity-cap works in terms of his ownership percentage of BitMEX.

73.     The SAFE includes a California law clause.  This provision gave Mr. Amato assurances that California's robust securities law and investor protections would apply to ensure the safety of his "SAFE" investment, as well as a reasonable forum to resolve the parties' differences.

74.     Mr. Amato assumed that BitMEX would be opening San Francisco offices with some of his capital, as this is where he believes that the world's best and most competent fin-tech engineers reside and work.

FIRST AMENDED COMPLAINT

75. Defendant Hayes responded the same day, confirming that Mr. Amato will own no more than 0.5% of BitMEX, and that his "shares will convert at the next financing round, which will be our first financing round."

> Your shares will convert at the next financing round, which will be our first financing round. We are targeting a $8-$9mm pre-money valuation for our next round. We are planning on attending an accelerator called China Accelerator, the goal is to use their China expertise to bring our product offering into the China market and greatly increase our user base and trading volumes. We plan to complete the round shortly after completion of the program, which ends in November.
>
> Your math is correct. Basically below a net valuation of $6mm (after the 20% discount), you are capped at owning no more than 0.50% of the company.
>
> Regards,

76. As discussed below, Defendants representations and repeated assurances that Mr. Amato's investment would entitle him to equity in BitMEX were either knowingly false, or were recklessly made to induce Mr. Amato to invest money that Defendants never intended to allow to become equity in the business.

77. In reliance on Defendants' representations, Mr. Amato executed the SAFE and then, on June 26, 2015, wired Defendants $30,000.

78. On information and belief, Defendants sought to use Mr. Amato's funds to retain and work with developers and engineers in the Bay Area.

**C.    Defendants Solicit Mr. Capone to Invest in BitMEX**

79. Around the same time as he was soliciting Mr. Amato, Defendant Hayes separately attempted to induce Mr. Capone to invest into the Company.

80. After connecting on LinkedIn near the beginning of January 2015, Defendant Hayes arranged a Skype conversation with Mr. Capone and sent an Investor Presentation .pdf to solicit Mr. Capone's potential investment in BitMEX.

81. The Investor Presentation document represented that "BitMEX is seeking an equity funding round $1 million." Defendant Hayes further represented to Mr. Capone that BitMEX was finalizing a valuation of the Company in connection with the equity raise "in the next couple days."

82. Subsequently, Defendant Hayes wrote to Mr. Capone to confirm a valuation of BitMEX at $10 million and that investors, like Mr. Capone, will hold 10% of the equity while the three founders of the Company, including Defendant Hayes, will own 90%.

83. Mr. Capone told Defendant Hayes that he was ready to invest and asked if he was the first investor to commit to the round. In response, Defendant Hayes represented that he already had commitment for another $150,000 to $200,000 from other investors and was engaging lawyers next week to draft the investment paperwork.

84. In March 2015, Defendant Hayes reiterated that BitMEX is looking to sell equity shares with the same rights as the founders and that he had Mr. Capone down for $50,000 at a valuation of $10,000,000. Defendant Hayes again said his lawyers were drawing up the documents next week.

85. Defendant Hayes assured Mr. Capone that he would be purchasing preference share that would convert 1:1 to common equity held by the founders.

86. As discussions continued, Mr. Capone expressed concern about the lack of a concrete business plan and requested that Defendants Hayes provide a business plan or prospectus and offering documents. Defendant Hayes, in an effort to appease Mr. Capone and to continue to induce his investment, indicated that he had "no issue" providing this information, but wanted to negotiate with Mr. Capone directly rather than "through lawyers."

87. On March 25, 2015, Defendant Hayes wrote to Mr. Capone to summarize their understanding of the terms of the investment:

> Hi,
>
> After speaking with the lawyers, this is how we would like to proceed:
>
> 1. The offering will be common stock with no special rights attached. Basically you own the same type and class of equity that myself and the other two founders have.
>
> 2. If that is agreeable we will get the Share Purchase Agreement drawn up. This will outline the share sale in the Seychelles entity. You will be buying 0.50% of the Seychelles entity for $50,000.

Defendant Hayes' email to Mr. Capone mirrored the email he separately sent that same day to Mr. Amato, containing the same terms.

88. In mid-April 2015, Defendant Hayes asked Mr. Capone where he was on his investment decision. Mr. Capone informed Defendant Hayes that he was deciding not to proceed, but "may in the future revisit it as an investment option." Over the next month or so, Defendant Hayes continued his sales pitch, telling Mr. Capone that changes in market conditions left BitMEX poised to increase its user base. BitMEX permitted California and United States residents trade on its platform at that time. Defendant Hayes represented that if Mr. Capone invested, his investment would convert to preference shares at BitMEX's next financing round.

89. On July 15, 2015, approximately a month after BitMEX had executed the Amato SAFE, Defendant Hayes unilaterally reached out to Mr. Capone again to solicit his $50,000 investment. He attached a proposed SAFE and again represented that BitMEX planned a financing round for the second half of 2015 at which time Mr. Capone's investment would convert to preferred shares.

90. Defendant Hayes' solicitations finally succeeded. In July 2015, Mr. Capone agreed to invest $25,000 in BitMEX.

91. Defendant Hayes sent Mr. Capone a copy of the SAFE, also governed by California law. When Mr. Capone noted it "was a bit legal" and asked for a "common man's version," Defendant Hayes explained the deal.

92. Hayes stated, "Basically you are getting a 20% discount to the next round's financing, subject to a cap on ownership." Defendant Hayes represented that BitMEX was "targeting a $9mm pre money valuation by end of November" 2015.

93. On July 16, 2015, Mr. Capone executed the Capone SAFE on behalf of the G and M Capone Trust, and shortly thereafter wired to Defendant Hayes' personal bank account in Hong Kong $25,000 USD. Defendant Hayes agreed that Mr. Capone could list himself as a "seed investor" in BitMEX on Mr. Capone's LinkedIn page.

94. Together, Plaintiffs' investments helped BitMEX pay its bills, purchase equipment and satisfy other startup costs necessary to keep the venture afloat.

95.    At the time of Plaintiffs' investment, no other investors had come forward, and Defendants' planned fundraising rounds had otherwise failed.  Defendants were running short of funds to continue to operate, and desperately needed liquidity to pay their bills.  As a result, BitMEX likely would not have been the platform it is today (or even exist) without Plaintiffs' generous funding.

**D.    The SAFEs Entitle Plaintiffs to Equity in BitMEX**

96.    The terms of the Amato SAFE and the Capone SAFE are virtually identical, except for the amounts invested and the discount rate.

97.    As the parties' negotiations make clear, Defendants repeatedly represented and Plaintiffs understood that they would have broad rights to be treated as equity holders based on Defendants' subsequent capital raise, which was planned at the time for late 2015.

98.    The SAFE memorialized this understanding.  Its preamble reads:

---

**HDR GLOBAL TRADING LIMITED**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by Frank Amato (the "**Investor**") of $30,000 USD (the "**Purchase Amount**") on or about June 15th, 2015, HDR Global Trading Limited, a limited liability corporation incorporated in the Republic of Seychelles (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's share capital, subject to the terms set forth below.

---

99.    The SAFE's "conversion" provision is further set forth in § 1(a) "Equity Financing", and reads as follows:

---

**1.    *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.50% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

---

"Equity Financing", in turn, is further defined under § 2 to "mean a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation."

100.     Paragraph 5(c) of the SAFE provides that Plaintiff's rights as a shareholder of the Company, e.g., notice, information, subscription, voting, consent, and other rights, are triggered automatically upon the occurrence of an Equity Financing.

101.     Paragraph 5(d) of the SAFE permits Plaintiff to assign his rights under the SAFE to any entity controlled by Plaintiff without the Company's consent.

102.     Paragraph 5(f) of the SAFE provides that "All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction."

103.     Importantly, the SAFE does not contain any integration clause because it was the parties' objective to ensure that their pre-contractual discussions would help guide the interpretation and enforcement of their contract.

104.     Mr. Amato and Mr. Capone were the first and second investors in BitMEX, respectively, as confirmed by Defendant Hayes.

105.     Based on their later conduct, Defendants never intended to convert either Plaintiffs' investment in BitMEX into equity in the Company. Instead, they intended to use Plaintiffs' investment to finance BitMEX's operations and development without compensating Plaintiffs in any way.

**E.     Plaintiffs' Investment Helps Fund Key Developments at BitMEX that Propel Its Success**

106.     Defendants told Mr. Amato that the purpose of his investment would be to facilitate the development of BitMEX's automated algorithm for trading on the platform, which allows traders to trade at up to 100x leverage while mitigating any risk to BitMEX. The availability of this high leverage trading is what drove the Company to its dizzying heights today. On information and belief, some of those funds ultimately were expended to retain engineers, including people residing or working in California.

107.     Based on Mr. Hayes' urgency, it appeared that BitMEX would not have had sufficient funds to invest in and develop BitMEX's high leverage trading function were it not for the investments in BitMEX made by Plaintiffs through the Amato and Capone SAFEs.

108.    Defendants extolled the importance of this feature to the Company's growth in BitMEX's November 3, 2015 "October Monthly Report": "This month we rolled out the world's first 100x leveraged daily expiring Bitcoin / USD futures contract.  It has become our most popular product, and driven a flood of customers to BitMEX."

109.    The number of traders using BitMEX as a trading platform *exploded* late 2015 as BitMEX first started to offer higher leverage.  And industry press attributed the platform's "turning point" and growth in market share to the introduction of increased leverage, which would not have been possible without Plaintiffs' investments in mid-June and July of 2015:

> Initially BitMEX struggled, as it failed to get enough liquidity to attract traders. For most of 2015, Hayes says, trade volumes on BitMEX were "pathetic", but he insists he never considered throwing in the towel. The turning point came in October 2015 when BitMEX raised its leverage limit from 3x to 100x, effectively allowing users to bet on the cryptocurrency with heavily leveraged positions. This gave BitMEX a much-needed liquidity boost and helped it gain market share.  (*"$800 Billion:  The Story of Crypto Derivatives Exchange BitMEX and Its CES Arthur Hayes*", CryptoGlobe.com, Sept. 15, 2018, available at https://www.cryptoglobe.com/latest/2018/09/800-billion-the-story-of-crypto-derivatives-exchange-bitmex-and-its-ceo-arthus-hayes/.)

**F.    Defendants Raise Additional Capital but Fraudulently Withhold that Information from Plaintiffs**

110.    On information and belief, Defendants entered into additional transaction(s) for the purpose of raising capital between July 1, 2015 and December 31, 2015, as well as at further times unknown to Plaintiffs because of Defendants' efforts to conceal.   Plaintiffs were unaware of these financings until just recently.

111.    Defendants failed to disclose these Equity Financings to Plaintiffs and have falsely denied that they trigger Plaintiffs' conversion right under the SAFEs, depriving Plaintiffs of their rights as a shareholder of the Company.

**1.    Defendants' Undisclosed Equity Financing With SOSV**

112.    On information and belief, sometime between July and December 2015, Defendants issued equity to SOSV (a multi-stage venture capital investment firm with offices in San Francisco) in exchange for funding and services provided by its venture fund accelerator program, Chinaccelerator, run by General Partner William Bao Bean.

113.    While Defendants failed to inform Plaintiffs of this Equity Financing and falsely deny to this day that SOSV's investment in BitMEX triggered Plaintiffs' conversion rights under the SAFE, other evidence shows that Defendants did in fact raise capital from SOSV and its Chinaccelerator program in exchange for equity in the Company.   Defendants representations to the contrary are false and designed to fraudulently induce Plaintiffs to refrain from exercising their rights as shareholders of the Company.

114.    By way of example, on or about February 1, 2019, Nick Plante, the Director of Technology at SOSV, disclosed that Chinaccelerator/SOSV incubated, accelerated, and provided office space for BitMEX back in 2015 and invested in BitMEX at an undisclosed valuation.

115.    Mr. Plante's representation is consistent with a medium.com blog post from Sean O'Sullivan, the Managing General Partner of SOSV, who wrote in May2018: "I am an investor in BitMEX[.]"

116.    Other online sources have likewise reported SOSV/Chinaccelerator's equity financing of BitMEX.  For example:

117.    As of October 8, 2019, Crunchbase lists another funding round of BitMEX that occurred after both the Amato SAFE and the Capone SAFE were executed: a July 18, 2015 "Seed Round" with SOSV and Chinaccelerator.

118.    As of October 8, 2019, the Wikipedia page for BitMEX states that "BitMEX completed a SAFE round of investment in July 2015 then shortly after was inducted into SOSV batch 8 china accelerator program where it sold equity in exchange for labour and financing."

119.    As of October 8, 2019, both the SOSV and Chinaccelerator websites list BitMEX as one of their portfolio companies in the "Growth Round" of fundraising.  (Sometime thereafter, both SOSV and Chinaccelerator changed their websites to categorize BitMEX as a company in their "Accelerator Round.")



120.    The Twittersphere also reflects SOSV's equity financing of BitMEX.  By way of example, on September 11, 2019, on information and belief, Juntao Zhu, the head trader at Hodlnaut, a startup based in Singapore whose business is to loan out cryptocurrencies to traders looking to borrow additional cryptocurrency funding, tweeted a picture of himself and Arthur Hayes, discussing the SOSV investment:



### 2. Defendants Also Raise Capital from Other Individuals and Entities Besides SOSV

121. On information and belief, other entities and individuals aside from Chinaccelerator/SOSV invested money into BitMEX for equity in 2015, which is consistent with Defendant Hayes' representations to Plaintiffs that the Company would complete its next fundraising round toward the end of 2015.

122. In fact, in October 2015, Defendant Hayes represented to Mr. Capone that "the plan is to raise money in late November early December still." In November 2015, Defendant Hayes asked Mr. Capone if he wanted to increase his stake in BitMEX in the November/December fundraising round. Mr. Capone declined.

123. On November 3, 2015, Defendant Hayes wrote in the October Monthly Report for BitMEX that, "On the back of these strong results and continued traction, we will be raising a Pre-Series A round of funding" and that "To further growth in the platform, we are raising $2 million. [. . .] If you are interested in participating or can introduce potential investors, please contact me for pricing and more details." Mr. Hayes also wrote in the same report, "Goals for November. Complete Pre-Series A fundraising round."

124. On December 7, 2015, Defendant Hayes sent the November Monthly Report to several addressees who, from Mr. Amato's perspective, were not included in previous Monthly Report emails, including the following individuals, William Bao Bean and Justin Wong of SOSV, Andrew Delo, Peter Burchhardt, and Plaintiff Capone.

*(Continued on next page.)*

Exemplar Prior Report Email Heading:     November Report Email Heading:



from: **Arthur Hayes** <arthur@bitmex.com>

to: Ben Delo <ben@bitmex.com>,
Samuel Reed <sam@bitmex.com>

cc: William Bao Bean
<william.bao.bean@sosventures.com>,
Justin Wong
<justin.wong@sosventures.com>,
Andrew Delo

Frank Amato

Peter Burchhardt

Guido Capone

date: Dec 7, 2015, 3:51 AM

subject: BitMEX November Monthly Report

mailed-by: bitmex.com

signed-by: bitmex.com



from: **Arthur Hayes** <arthur@bitmex.com>

to: Samuel Reed
<sam@bitmex.com>,
Ben Delo
<ben@bitmex.com>

bcc: frank████████████

date: Nov 2, 2015, 6:38 AM

subject: BitMEX October Report

mailed-by: bitmex.com

signed-by: bitmex.com

125.    In subsequent Monthly Reports emails, Defendants reverted to their past practice of hiding investor names in the bcc: line.

126.    On information and belief, the individuals copied on Defendant Hayes' December 7, 2015 email, along with others unknown to Plaintiffs, are equity investors in BitMEX, whose investment triggered the conversion of Plaintiffs' SAFE to equity in BitMEX. Plaintiffs do not know (and to this day, do not know) the details or timing of these transactions. As discussed below, Plaintiffs did not know (and could not reasonably have known) that Defendants breached the SAFE until just recently, which is what prompted Plaintiffs to file this action.

**G.    Plaintiffs Inquire Regarding the Status of Their Shares; Defendant Hayes Delays Responding and then Denies that the SAFE Ever Converted**

127.    Defendant Hayes deliberately and knowingly led Plaintiffs to believe that they were shareholders in BitMEX following their investment, and later fraudulently concealed and denied the existence of an Equity Financing to them.

128.     Defendant Hayes repeatedly and deliberately cultivated Mr. Capone's reasonable understanding that he was an equity-holder in BitMEX by, among other things, telling him that the Monthly Reports Mr. Capone received were "for investors only",  introducing him to BitMEX employees as "one or our investors and a passionate supporter of what we are doing at BitMEX", and referring to Mr. Capone as a shareholder.  Defendant Hayes also either ignored questions from Mr. Capone about the November 2015 equity raise or led him to believe that it had occurred.

129.     Defendant Hayes took no steps to indicate to Mr. Capone that he was not a shareholder in BitMEX, except until much later when Hayes finally admitted that his earlier representations about an equity financing in November / December 2015 were false.

130.     In November 2018, Mr. Capone followed up again with Defendant Hayes about his interest in BitMEX.  Defendant Hayes encouraged Mr. Capone to tear up the SAFE in exchange for $50,000.  When Mr. Capone expressed disbelief that he was not an equity holder as he believed and as Defendant Hayes had repeatedly represented, Defendant Hayes said that it was Mr. Capone's fault—had Mr. Capone invested additional amounts in BitMEX as part of the November / December 2015 fundraising round, that would have triggered the Capone SAFE and his $25,000 would have converted to equity at a discount.

131.     Defendant Hayes then told Mr. Capone that his SAFE will never trigger, because BitMEX is not going to raise equity; it is something that is "never discussed" because BitMEX does not need the money

132.     On November 9, 2018, Mr. Amato, independent from Mr. Capone, sent his own email to Defendant Hayes, which similarly reflects his reliance on Defendants' fraudulent concealment of the Equity Financings described above:

> I wanted to ask a question about my initial investment into Bitmex.  Because you never did issue shares and my funds are allocated to the SAFE until that time,  does that mean I did not participate in any of the amazing things you have done to grow the company? In other words, I had thought my capped ownership of 0.50% was a protective clause [to Bitmex] that will not allow me to own more than that 50 bps in the event you issued equity below a 6 mln valuation.

133. Defendant Hayes replied six minutes later, stating that the SAFE had not triggered to convert into equity and repeating his misrepresentation that "no equity financing has occurred":



**Arthur Hayes <arthur@bitmex.com>**

Nov 9, 2018,
2:16 PM

to Frank

About the SAFE, because to date no equity financing has occurred, your SAFE has not triggered to convert into equity.

134. Mr. Amato then asked whether the SAFE converts using the value of BitMEX as calculated at the time of the first purported financing, or the valuation of BitMEX at the time he invested, back in June of 2015. Defendant Hayes only replied, "It's on the valuation at the time of financing."

135. On November 11, 2018, Mr. Amato emailed Defendant Hayes to set up a short call that week or the next to discuss his investment. On November 12, 2018, Defendant Hayes delayed the call, stating that "legal" is looking at "our entire financing history" to determine "whether your SAFE converted or not." Defendant Hayes promised to setup a time to speak after legal had reviewed. Defendant Hayes sent a similar email that same day to Mr. Capone, stating that "our legal team is investigating all of your claims." Weeks passed and there was no follow-up or communication from Defendant Hayes to either Mr. Amato or Mr. Capone.

136. Two and a half weeks later, on November 28, 2018, Mr. Amato wrote again, asking if Defendant Hayes heard back from legal. Mr. Amato also inquired why his investment had not already converted to equity given that Defendant Hayes "mentioned that the equity would convert once you finished the China Accelerator program [around Nov 2015]." Similarly, on November 29, Mr. Capone wrote to ask if Defendant Hayes heard anything yet.

137. After several more emails and delay, Defendant Hayes scheduled a call with Mr. Amato and Mr. Capone, independently and separately, to discuss with them the opinion from BitMEX's California attorney regarding the SAFE conversion. At the last minute, Defendant Hayes canceled his scheduled call with Mr. Amato and set a new time for January 2, 2019.

138. On January 2, 2019, Defendant Hayes told Mr. Amato that BitMEX's attorney had concluded the SAFE had not converted. Defendant Hayes explained that although BitMEX completed the Chinaccelerator program in the Fall of 2015, and even though Chinaccelerator was given 5% equity in BitMEX, the SAFE stood unconverted because Chinaccelerator performed no valuation of BitMEX and did not invest any money into BitMEX. Defendant Hayes also confirmed that Mr. Amato was the very first investor into BitMEX.

139. Mr. Amato only recently discovered these representations were false and that, in fact, Defendants had received other cash from Chinaccelerator and/or SOSV.

140. On January 3, 2019, Defendant Hayes had a very similar phone conversation with Mr. Capone. In it, he also informed Mr. Capone that Hayes had received "an opinion back from legal" – an unnamed California lawyer – that Mr. Capone's SAFE had not converted since there was "no cash component" to SOSV's investment into BitMEX. He then attempted to induce Mr. Capone to void the contract for a second time, offering Mr. Capone "$125,000 to tear up the contract." Mr. Capone declined. No phone calls have occurred since between Mr. Hayes and Mr. Capone.

141. Defendant Hayes' statement conflicted with his earlier representations that SOSV put $500,000 to a previous equity round, at a valuation of $15 million, and had invested $50,000 via a convertible note.

> The investor SOSV who runs the accelerator program that we are in, helped arrive at this valuation. They are also placing $500k into the round. For a growth company that is cash flow positive, a $15 million valuation to me is conservative. Also bigger exchanges that have similar volumes to ours, have raised >$10 million rounds at >$50mm valuations. So I would say BitMEX is quite cheap.

142. When Mr. Amato reached out to Defendant Hayes again on February 4, 2019, Defendant Hayes told Plaintiff he was unavailable until March and dismissed Mr. Amato's questions regarding the SAFE, telling Plaintiff that "if you have a contrary legal opinion please share it in writing and I can pass onto our legal team."

1    143.    Similarly, Defendant Hayes proceeded to ignore all other email and messaging

2  attempts by Mr. Capone, except to state that BitMEX was consolidating all of its United States

3  personnel into one office in San Francisco, California.

4    144.    When Mr. Amato asked Defendant Hayes for a copy of BitMEX's attorney's

5  conclusion that BitMEX's financing had not triggered Mr. Amato's conversion rights under the

6  SAFE, Defendant Hayes simply replied that he did not want to play "armchair lawyer":



7

8

9

10

11

12    145.    A month later, after the parties had ceased exchanging emails, Defendant Hayes

13  tweeted about BitMEX's recent success:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

146.     On September 13, 2019, after Defendant Hayes had stopped responding to Mr. Capone's emails, Mr. Capone wrote to Defendant Hayes, as well as the other two founders of BitMEX – Sam Reed and Ben Delo – asking why SOSV's investment of $30k for 5% equity of BitMEX did not constitute a triggering event under the terms of the SAFE.

147.     In reply, Ben Delo sent a meme image, cynically suggesting that, despite its vast presence in San Francisco, BitMEX could evade accountability simply by incorporating itself in the Seychelles:



148.     Ben Delo's response to Mr. Capone came shortly after a July 3, 2019 statement made by Defendant Hayes, captured on video, where he was asked by a debate moderator about the differences between various global regulatory authorities and the Seychellois regulatory authorities. Defendant Hayes stated "it just costs more to bribe them", and, when pressed by the moderator about "that not being an answer," Defendant Hayes responded, "it is an answer" and that he pays "a coconut" to bribe the Seychellois authorities.

149.     Defendants still have not converted Plaintiffs' investment in BitMEX into equity.

**H.**     **Defendants' Knowingly Permit Residents in the United States and California to Illegally Trade on the BitMEX Platform**

150.     Defendants' abuse of Plaintiffs' security interests under California law is not their only intransigence of the United States legal system.

151.     On information and belief, Defendants negligently and/or willfully permit residents of the United States and California to trade on the BitMEX Platform notwithstanding California's securities law prohibitions against the trading of many derivative products actively traded on the BitMEX Platform.

152.     These illegal transactions generate millions of dollars of fees and revenue for the Company but also place the Company at significant risk of regulatory enforcement actions in the United States and California.

153.     Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism.

154.     Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a Virtual Private Network (VPN). On information and belief, Defendants knowingly permit such trading in order to benefit from the highly lucrative trading volumes provided by United States and California residents on the BitMEX Platform that Defendants derive fees and revenue from.

155.     Indeed, BitMEX just recently advertised on LinkedIn a job opening for an AML (Anti-Money Laundering) Operations Manager to "build an effective due diligence and customer screening operations function." That BitMEX has been operating since November 2014, and purportedly stopped allowing traders in the United States after September 2015, yet it is just now hiring a manager to perform customer screening and due diligence raises significant regulatory risks and opens the Company up to substantial liability, both civil and criminal.

156.     Plaintiffs had no knowledge about these violations until very recently and would not have permitted Defendants to engage in such conduct if their shareholder rights had been respected.

157.     Defendant Hayes owed the Company and its investors and shareholders, including Plaintiffs, a fiduciary duty of care and loyalty.

1    158.    By allowing clients to trade on the BitMEX Platform without performing adequate

2    client due diligence to screen out those residing in jurisdictions that prohibit such transactions,

3    Defendant Hayes has breached his fiduciary duties to Plaintiffs and, upon information and belief,

4    diminished the value of Plaintiffs' equity interest in the Company.

5                                      **CAUSES OF ACTION**

6    159.    Defendants' conduct alleged in each of the following Causes of Action was part of a

7    joint conspiracy in which each Defendant aided and abetted the conduct of the other, acting as each

8    other's alter egos, agents and co-conspirators.  Further details regarding each Defendant's

9    participation and assistance in the conspiracy are uniquely within Defendants' possession, custody

10   and control.  Plaintiffs have made extensive and reasonable efforts to obtain this withheld

11   information, including through discovery in this action, which Defendants have withheld and

12   refused to produce.  Plaintiffs reserve the right, if appropriate or necessary, to supplement and

13   amend their allegations and supporting facts upon completion of fact discovery in this matter.

14                                    **First Cause of Action**

15                      **Fraudulent Misrepresentation and/or Concealment**

16                                        (All Defendants)

17   160.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

18   161.    Defendants made false statements of material facts concerning Plaintiffs' investment

19   in the Company and Plaintiffs' rights as equity-holders of BitMEX.

20   162.    Defendants made several misrepresentations regarding the nature of both Mr.

21   Amato's and Mr. Capone's investments in BitMEX and Defendants' intent to raise Equity

22   Financing, including but not limited to:

23   163.    Representations to Mr. Capone beginning in January 2015 that his investment would

24   buy equity in BitMEX.

25   164.    Representations to Mr. Amato, beginning in March 2015, that his investment would

26   buy equity in BitMEX.

27

28

165. Numerous representations to Mr. Amato in May and June 2015, that Mr. Amato's investment "will convert to preferred shares" in BitMEX and that BitMEX will undergo multiple, additional rounds of financing, including a Series A round.

166. Numerous representations to Mr. Capone in May and July 2015 that Mr. Capone's investment "would convert into preferred shares" and that BitMEX will undergo multiple, additional rounds of financing, including a Series A round.

167. Defendants also made several misrepresentations (and/or failed to disclose material facts) regarding the non-occurrence or occurrence of events that triggered Plaintiffs' equity conversion rights, including but not limited to:

      a. On November 5, 2018, Defendants falsely represented to Mr. Capone that "If / when we pay dividends, you are not entitled to them because your SAFE has not converted."

      b. On November 5, 2018, Defendants also falsely represented to Mr. Capone that BitMEX cancelled its plans for an equity raise in November / December 2015

      c. On November 9, 2018, Defendants falsely represented to Mr. Amato that "because to date no equity financing has occurred, your SAFE has not triggered to convert into equity."

168. On January 2, 2019, Defendants unequivocally represented to Mr. Amato that no other individual or entity, including SOSV, had contributed any money and received equity in the Company.

169. On January 3, 2019, Defendants unequivocally represented to Mr. Capone that no other individual or entity, including SOSV, had contributed any money and received equity in the Company.

170. On information and belief, Defendants statements above were knowingly false when made because (a) Defendants never intended to convert Plaintiffs' investment into equity and/or (b) SOSV, and other entities and individuals, did in fact make investments in the Company in return for equity in BitMEX.

171. Defendants knew, or recklessly disregarded that BitMEX had received financing, and that Plaintiffs' SAFEs ought to have converted into equity shares.

172. Defendants intended Plaintiffs to rely on their statements (or omissions of material fact) in order to induce him to refrain from demanding (a) their ownership stake in BitMEX under the terms of the SAFE, (b) past, ongoing, and future dividend payments that were owed, or would be owed, to them as an equity-holder in BitMEX, (c) information, voting, and subscription rights.

173. Plaintiffs did in fact rely on these representations to their detriment in that they have not had the benefit of their equity-holder benefits and have been unable to exercise their rights as equity-holders.

174. Having made numerous representations to Plaintiffs regarding BitMEX's plans for, and the status of, fundraising, upon which Defendants knew Plaintiffs would reasonably rely and upon which Plaintiffs did in fact rely, Defendants had a duty to provide truthful information regarding the status of such fundraising. Rather than provide such information, Defendants failed to notify Plaintiffs of subsequent fundraising and when asked about the status of fundraising, Defendants concealed the truth or made further misrepresentations.

175. Plaintiffs have suffered damages, and will continue to suffer damages, by these representations and false statements alleged above by Defendants, in an amount to be proven at trial.

176. Defendants are guilty of recklessness, oppression, fraud, or malice. Defendants' conduct was intended to cause injury to Plaintiffs and was carried out with a willful and conscious disregard of Plaintiffs' rights.

177. As a direct result of Plaintiffs' reliance on Defendants' false representations (and/or omissions of material fact), Plaintiffs suffered damages in an amount to be proven at trial but which is believed to exceed $90,000,000, based on Defendants' multi-billion valuation. Plaintiffs also seek an injunction to preclude Defendants' ongoing misrepresentations and, in addition to actual damages, seek to recover punitive damages, attorneys' fees, costs and other relief, believed to be in excess of $450,000,000, necessary to remediate Defendants' frauds.

**<u>Second Cause of Action</u>**

**Breach of Contract**

(Defendant HDR Global Trading Limited)

178.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

179.    Plaintiff Frank Amato and HDR Global Trading Limited d/b/a BitMEX (and the alter ego of ABS Global) validly and consensually executed the Amato SAFE on or about June 15, 2015.

180.    Plaintiff Elfio Guido Capone on behalf of the G and M Capone Trust and HDR Global Trading Limited validly and consensually executed the Capone SAFE on or about July 16, 2015.

181.    Plaintiffs fully performed their obligations to HDR Global Trading Limited including, without limitation, under the Amato SAFE and Capone SAFE.

182.    Through the conduct alleged above, Defendants have breached their contractual obligations, by, *inter alia*, failing to issue to Plaintiffs a number of shares as calculated under the provisions of the parties' SAFEs.

183.    As a result of Defendants' intentional and ongoing breaches, Plaintiffs have suffered damages, and will continue to suffer damages, in an amount to be proven at trial.

**<u>Third Cause of Action</u>**

**Breach of Covenant of Good Faith and Fair Dealing**

(Defendant HDR Global Trading Limited)

184.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

185.    Plaintiff Frank Amato and HDR Global Trading Limited validly and consensually executed the Amato SAFE on or about June 15, 2015.

186.    Plaintiff Elfio Guido Capone on behalf of the G and M Capone Trust and HDR Global Trading Limited validly and consensually executed the Capone SAFE on or about July 16, 2015.

187.    Plaintiffs fully performed their obligations to HDR Global Trading Limited including, without limitation, under the parties' respective SAFEs.

188.     Through the conduct alleged above, HDR Global Trading Limited breached the implied covenant of good faith and fair dealing, by, *inter alia*: (i) deliberately structuring subsequent rounds of capital financing in order to avoid triggering the SAFEs; (ii) by failing to inform or notify Plaintiffs that the conditions for the triggering of the SAFE have been met; and (iii) by construing the term "Equity Financing" in the SAFEs in bad faith in order to avoid performing their obligations thereunder.

189.     Through the conduct alleged above, HDR Global Trading Limited unfairly and in bad faith interfered with Plaintiffs' right to receive the benefits of the SAFE as originally contemplated by the parties, and as a result, Plaintiffs have suffered damages, and will continue to suffer damages, in an amount to be proven at trial.

## Fourth Cause of Action

## Quantum Meruit and/or Unjust Enrichment

### (All Defendants)

190.     Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

191.     Defendants requested Plaintiffs to provide several benefits to them, including, as alleged above, their services and their investment into BitMEX.

192.     Defendants received these benefits conferred by Plaintiffs, including, but not limited to, Mr. Amato's $30,000 investment and Mr. Capone's $25,000 investment into BitMEX.

193.     Defendants' informed Mr. Amato, as alleged above, that the purpose of his investment would be to, among other things, continue the development of BitMEX's automated algorithm for trading at leverage, as well as pay its vendors and developers and grow the platform.

194.     According to Defendants' statements as alleged above, Mr. Amato and Mr. Capone were the first and second outside investors in BitMEX, respectively, at a time when it was struggling to attract any venture capitalists to invest into its platform.

195.     On information and belief, BitMEX would not have reached its soaring success today (or even exist), with over $1.10 trillion USD volume of trading on its platform, without Plaintiffs' generous and business-saving investment.

1  196.   Defendants have unjustly retained the benefits that Plaintiffs conferred at the

2  expense of Plaintiffs.

3  197.   Plaintiffs were fraudulently induced into conferring the benefits unto Defendants, as

4  Defendants' statements and conduct, as alleged above, led Plaintiffs to believe that they would be

5  equity-holders in BitMEX, and that their investment would grow in value as BitMEX's value grew.

6  198.   As a result of Defendants' unjust enrichment, Plaintiffs seek disgorgement in an

7  amount to be determined at trial.

8  **Fifth Cause of Action**

9  **Negligent Misrepresentation**

10  (All Defendants)

11  199.   Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

12  200.   Defendants negligently misrepresented to Plaintiffs that the SAFE stood

13  unconverted.

14  201.   Defendants were without grounds for believing the truth of such an assertion,

15  because they were aware that, on information and belief, SOSV and several other individuals and

16  entities had invested money into BitMEX and had received equity.

17  202.   Defendants had a duty to Plaintiffs because Defendants were in exclusive possession

18  of the knowledge of who invested in BitMEX when, and also because Plaintiffs had no practicable

19  way to ascertain the veracity of Defendants' statements.

20  203.   Defendants intended Plaintiffs to rely on their statements, in order to prevent

21  Plaintiffs from exercising their contractual rights under the SAFEs.

22  204.   Plaintiffs did in fact rely on Defendants' misrepresentations and refrained from

23  exercising their contractual rights under the SAFE, as well as from inquiring as to the veracity of

24  Defendants' statements.

25  205.   As a result of Defendants' negligent misrepresentations, Plaintiffs have suffered,

26  and continue to suffer, damages, in an amount to be proven at trial.

27  **Sixth Cause of Action**

28  **Promissory Estoppel**

1

2      206.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

3      207.    The promise by Defendant Hayes that the SAFE will convert because there will be

4  an equity event was clear and unambiguous.

5      208.    Plaintiffs Frank Amato and Elfio Guido Capone reasonably relied on the promise, to

6  their detriment, in executing the SAFE agreements, committing $30,000 and $25,000, respectively,

7  as capital for BitMEX to utilize for its growth and operations.  In committing the capital, Plaintiffs

8  reasonably and foreseeably relied on Arthur Hayes' and HDR Global Trading Limited's purported

9  performance under the promise.

10     209.    As a result of Plaintiffs' reliance, Plaintiffs will suffer unconscionable injury in

11  amounts to be proven at trial if the SAFE, or the promise, is not enforced, and Defendants will be

12  unjustly enriched if  allowed to retain the benefits of revenue and equity in BitMEX earned without

13  making payments to Plaintiff, or performing under the terms of the SAFE or the promise.

14                                    **PRAYER FOR RELIEF**

15     WHEREFORE, Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf

16  of the G and M Capone Trust pray that the Court issue the following relief:

17     A.     Monetary damages in an amount to be determined at trial, reasonably estimated to

18  exceed $90,000,000.

19     B.     Injunctive relief, including an award of Plaintiffs' rightful equity interests in

20  BitMEX.

21     C.     Damages representing the diminished value of Plaintiffs' interests in BitMEX

22  related to Defendants' violation of California securities laws and other illegal misconduct.

23     D.     Disgorgement.

24     E.     Constructive trust.

25     F.     Attorney's fees and costs.

26     G.     Punitive damages.

27     H.     All such other and further relief as the Court may deem just, proper, and equitable.

28

Dated:  April 27, 2020

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP


By: _s/ J. Noah Hagey_
       J. Noah Hagey

*Attorneys for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust*


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust hereby demand a jury trial of all claims and causes of action triable before a jury.

Dated:  April 27, 2020

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP


By: _s/ J. Noah Hagey_
       J. Noah Hagey

*Attorneys for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust*