# EXHIBIT 1

Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC, Yaroslav Kolchin and Vitaly Dubinin

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

BMA LLC, Yaroslav Kolchin and Vitaly Dubinin,

Plaintiffs,

v.

HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,

Defendants.

Case No. 3:20-cv-03345-WHO

**PLAINTIFF'S VITALY DUBININ CORRECTED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT HDR GLOBAL TRADING LIMITED (NOs. 1-80)**

PROPOUNDING PARTY: Plaintiff Vitaly Dubinin ("DUBININ" or "PLAINTIFF DUBININ")

RESPONDING PARTY: Defendant HDR Global Trading Limited (A.K.A. BitMEX)

SET: ONE (1)

In accordance with Rule 34 of the Federal Rules of Civil Procedure and applicable Local Rules of the United States District Court for the Northern District of California, Plaintiff Vitaly Dubinin asks Defendant HDR Global Trading Limited to provide a verified response and produce the documents requested herein within 30 days of service, in accordance with the following Instructions and Definitions. As stated in the Instructions below, all trade and order data mush be produced in text/XML data format in accordance with data field definitions posted on BitMEX API explorer web page: https://www.bitmex.com/api/explorer/, which specifies response data formats for various BitMEX API trade data queries, including queries for: Pricing Data; Trade Data; OrderBook Data; Settlement Data and Exchange Statistics. The trade and order data requested in the below Requests for Production shall be produced in electronic formats consistent with data formats specified in that web page and in text/XML form. Information sufficient to identify the corresponding trader account or accounts shall be provided for all trades and fully or partially executed or unexecuted orders. The responsive RECORDS shall be produced in the same electronic data format as posted on the above web page and contain the unique identification of the corresponding trader account(s). Records of trades or orders for LEADERBOARD ACCOUNTS shall be produced in separate files or separate directories for each such LEADERBOARD ACCOUNT. Other electronically stored information must be produced electronically in a native file format, or as otherwise specified in the STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION FOR STANDARD LITIGATION of the Northern District of California negotiated and entered into by the Parties.

## INSTRUCTIONS

A. Duplicate copies of documents that are responsive to more than one request need not be produced more than once provided that the specific are designated as responsive to each such request.

B. Whenever appropriate, the singular form of a word shall be interpreted in the plural or vice versa; verb tenses shall be interpreted to include past, present, and future tenses, the

terms "and" as well as "or" shall be construed either conjunctively or disjunctively, as necessary, to bring within the: scope of these requests any documents that might otherwise be considered outside their purview; and words imparting the masculine include the feminine and vice versa.

C.      The documents requested herein specifically include, but are not limited to, those documents in your possession, custody or control, or the possession, custody or control of your agents, representatives, attorneys, accountants, auditors, affiliates, advisers, consultants, and any other person or entity acting, or who has acted, on your behalf.

D.      If any of the documents requested below are claimed to be privileged or are otherwise withheld, set forth with respect to each such document facts of sufficient specificity to permit the Court to make a full determination as to whether the claim of privilege is valid, including:

(1)      the author of the document(s);

(2)      the addressee, if any, and those persons, if any, specified in the document(s) to receive a copy thereof;

(3)      the type of document(s) (e.g., memorandum, letter);

(4)      in summary, the nature and subject matter thereof.

E.      Each itemized request that follows is to be construed independently and not limited by reference to any other itemized request.

F.      Except when stated otherwise expressly, each itemized request calls for all documents described, regardless of the time or date prepared.

G.      Web page https://www.bitmex.com/api/explorer/ specifies response data formats for various BitMEX API trade data queries, including queries for: Pricing Data; Trade Data; OrderBook Data; Settlement Data and Exchange Statistics.  The trade and order data requested in the below Requests for Production shall be produced in electronic formats consistent with data formats specified in that web page and preferably in text/XML format.  Information sufficient to identify the corresponding trader account or accounts shall be provided for all trades and executed or unexecuted orders.  For example, trade data format in response to GET /trade BitMEX API call

is the following:

```
<?xml version="1.0"?>
<Inline Model>
  <timestamp>1970-01-01T00:00:00.001Z</timestamp>
  <symbol>string</symbol>
  <side>string</side>
  <size>1.1</size>
  <price>1.1</price>
  <tickDirection>string</tickDirection>
  <trdMatchID>string</trdMatchID>
  <grossValue>1.1</grossValue>
  <homeNotional>1.1</homeNotional>
  <foreignNotional>1.1</foreignNotional>
</Inline Model>
```

The responsive RECORDS shall be produced in the same electronic data format and contain the identification of the corresponding trader account(s) as specified in the above web page.

H. Records of trades or orders for LEADERBOARD ACCOUNTS shall be produced in separate files or separate directories for each such LEADERBOARD ACCOUNT.

I. ESI other than trade or order data must be produced electronically in native file format, or as otherwise specified in the STIPULATION AND ORDER REGARDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION FOR STANDARD LITIGATION entered in this action.

**DEFINITIONS**

1. The terms "or" and "and" shall be understood to include each other and "and" whenever necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed as outside its scope. The terms "all", "every", "any", and "each" shall include one another whenever necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed as outside its scope.

2. The term "ATTORNEY" includes attorneys (both in-house and outside counsel), paralegals, and their secretaries and other support staff whenever necessary to bring within the

scope of the Interrogatory all responses that might otherwise be construed as outside its scope.

3.      The terms "COMMUNICATION", "COMMUNICATED", and "COMMUNICATIONS" shall mean, in addition to their customary and usual meanings, any transmission of letters, numbers, images, symbols, data, or other information by any means, including any oral, written, or electronic means.

4.      The term "RECORD" or "DOCUMENT" (used interchangeably) is defined broadly to encompass the full scope of the term as contemplated by Rule 34 of the Federal Rules of Civil Procedure and to encompass the full scope of the terms "writings" and "recordings" as defined by Rule 1001 of the Federal Rules of Evidence, and shall include any original (or a copy when an original is not available), each non-identical copy thereof (including those which are non-identical by reason of notations or markings), and any other written, printed, typed, punched, taped, graphic matter, or recorded or tangible thing, of whatever description, however produced or reproduced, and shall include all attachments to and enclosures with any requested item, and each draft thereof.  The term "document" shall include, but not be limited to, order records, settlement records, pricing records, statistical records, trading records, account registration records, funds transfer records, cryptocurrency transfer records, emails, chats, correspondence, telegrams, memoranda, communications, minutes or records of meetings and conferences, lists of persons attending meetings or conferences, summaries, records of conversations, drafts, notes, notebooks, logs, invention records and disclosures, translations, drawings, graphs, charts, photographs, sound recordings, images, data compilations, computer records or printouts, specifications, reports, opinions, summaries, agreements, forecasts, plan drawings, mask works, engineering drawings, expressions or statements of policy, consultations, brochures, pamphlets, advertisements, publications, circulars, trade letters, press releases, and drafts of any of the foregoing, whether printed, recorded, written by hand, or stored in some tangible medium of expression from which the information can  be retrieved, perceived, or understood.  Document shall also include ESI.

5.      The term "ELECTRONICALLY STORED INFORMATION" or "ESI" is defined

broadly to encompass the full scope of the term as contemplated by Rule 34 of the Federal Rules of Civil Procedure, and refers to all computer or electronically stored or generated data and information, and shall include, but not be limited to, all attachments to and enclosures with any requested item, and all drafts thereof. Electronically stored information includes information stored in any format and on any storage media, including hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable. Electronically stored information includes, but is not limited to, spreadsheets, database records, data files, XML files, word-processing documents, electronic spreadsheets, electronic presentation documents, email messages, image files, sound files, and material or information stored in a database or accessible from a database. Electronically stored information also includes all associated metadata that is maintained or saved, which includes, but is not limited to, document title or name, file name, data and time of creation, data and time of last edit, identify of author, identify of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information. Electronically stored information further includes, but is not limited to, correspondence, telegrams, memoranda, communications, minutes or records of meetings and conferences, lists of persons attending meetings or conferences, summaries, records of conversations, drafts, notes, notebooks, logs, invention records and disclosures, translations, drawings, graphs, charts, photographs, sound recordings, images, data compilations, computer records or printouts, specifications, reports, opinions, summaries, agreements, forecasts, plan drawings, mask works, engineering drawings, expressions or statements of policy, consultations, brochures, pamphlets, advertisements, publications, circulars, trade letters, press releases, and drafts of any of the foregoing.

6.      The term "IDENTIFY" or "IDENTIFYING" shall mean: (a) when referring to documents or electronically stored information, to state the author(s) or maker(s) of the document or electronically stored information, the date of the document or electronically stored information, the type of document or electronically stored information (e.g., whether it is a letter, a

memorandum, a photograph, etc.), the general subject matter(s) of the document or electronically stored information, the person to whom the original document or electronically stored information was addressed, and all copy recipients, and the document's or electronically stored information's last known location and custodian; if the document or electronically stored information was, but is no longer in your possession or custody or subject to your control, identify the person who decided upon the disposition and state what disposition was made of it; (b) when referring to a person, to state the person's full name, present or last known title or business description, present or last known employer or name of business, present or last known business address and telephone number, present or last known email address and phone number, and present or last known residence address and telephone number; once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that person; (c) when referring to an organization or entity, to state the organization's or entity's full name and present or last known address, and to fully describe the business or activity in which the organization or entity is engaged; (d) when referring to things, to state the product number, model number, serial number, type number, or other designation customarily used by you or others in the trade to designate such thing and to distinguish it from others made by the same or a different producer; and (e) when referring to a place or location, to state the complete physical and mailing address and telephone number.

7. The term "INCLUDING" shall mean including but not limited to.

8. The term "MATERIALS" shall mean any document, electronically stored information, or thing as these terms are defined herein.

9. The term "HDR Global Trading Limited", "HDR", "HDR GROUP", "BitMEX", "YOU", and "YOUR" shall mean, without limitation, Defendant HDR Global Trading Limited, 100x Group, and any and all predecessors, affiliated entities, parents, subsidiaries, sister companies, alter egos, principals, owners, partners, employees, attorneys, agents, representatives, consultants, or others acting or purporting to act on behalf of HDR Global Trading Limited.

10. The term "PERSON" shall mean any natural person, entity, agency, association,

firm, individual, joint venture, partnership, trust, corporation, proprietorship, governmental body, or organization.

11.    The terms "RELATE", "RELATING", "REFER", "REFERRING", "CONCERNING", "CONCERN", "CONSISTING OF", and "REFLECTING" shall be construed in the broadest sense to include, in addition to their customary and usual meanings, computing, containing, discussing, describing, embodying, evidencing, including, indicating, mentioning, pertaining, showing, or constituting in whole or in part.

12.    The term "STATEMENT" shall mean (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by the person as a substitute for oral or written expression.

13.    The term "MANIPULATION TIMES" mean the aggregate of the following time periods:

    a.    7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;

    b.    12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018;

    c.    4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018;

    d.    4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020;

    e.    12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019;

    f.    2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019;

    g.    7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;

    h.    4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;

    i.    4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020.

    j.    9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and

    k.    12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020.

14.    The term "LEADERBOARD ACCOUNTS" mean all trader accounts currently or formerly listed on BitMEX Leaderboard web page (https://www.bitmex.com/app/leaderboard)

under the following trader names:

      a.     Rainbow-Narrow-Rider;

      b.     Mercury-Wood-Sprite;

      c.     Quick-Grove-Mind;

      d.     Heavy-Autumn-Wolf;

      e.     Silent-Plume-Otter;

      f.     coincidentcapitalltd;

      g.     Skitter-Peridot-Raven;

      h.     Honeysuckle-South-Rib;

      i.     CSW is a fraud;

      j.     Tree-Surf-Dragon;

      k.     Roger-LeotankCapital;

      l.     Jade-Platinum-Legs;

      m.     Circle_Trade;

      n.     Winter-Pink-Fang;

      o.     daniel3;

      p.     Cream-White-Ox;

      q.     Disco-Solar-Fang;

      r.     Roger_LeotankCapital;

      s.     aoa;

      t.     Ebony-Fair-Bat;

      u.     Quill-Rift-Hoof;

      v.     xorq;

      w.     Brown-Peat-Myth;

x.      Jelly-Mint-Flier;

y.      Wheat-Storm-Speaker;

z.      Leaf-Long-Goat;

aa.     Silent-Hurricane-Guardian;

bb.     Paper-Feather-Stallion;

cc.     Sage-Tabby-Raver;

dd.     Leather-Metal-Razor;

ee.     Tree-Surf-Dragon;

ff.     Cedar-Spice-Fisher;

gg.     Big-Rift-Sting;

hh.     Linen;

ii.     Wave-Apple-Puma;

jj.     angelobtc;

kk.     AK is fraud;

ll.     Green-Sky-Whip;

mm.     Brave-Bramble-Skull; and

nn.     Denim-Sun-Speaker.

15.     The term "United States PERSON" mean a PERSON that is domiciled, located, incorporated or otherwise established in, or a citizen or resident, including, without limitation, a legal permanent resident, of the United States of America.

16.     Unless otherwise stated herein, ALL DOCUMENTS requested are for the period commencing on January 1, 2017 and continuing up to and including the present date ("RELEVANT PERIOD").

**REQUESTS FOR PRODUCTION**

**REQUEST NO. 1.**

Any and all DOCUMENTS RELATED TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 2.**

Any and all BITMEX PLATFORM account registration DOCUMENTS RELATING TO each LEADERBOARD ACCOUNT.

**REQUEST NO. 3.**

Any and all DOCUMENTS RELATED TO identity of each PERSON associated with each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 4.**

Lists of all names, addresses and email addresses of all PERSONS associated with each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 5.**

Any and all DOCUMENTS RELATED TO COMMUNICATIONS with PERSONS associated with each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 6.**

RECORDS of any and all trades RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 7.**

RECORDS of any and all cryptocurrency transfers RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 8.**

RECORDS of any and all trading orders RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 9.**

RECORDS of any and all fully or partially executed trading orders RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 10.**

RECORDS of any and all unexecuted trading orders RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 11.**

RECORDS of any and all cancelled trading orders RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 12.**

RECORDS of any and all trading profits RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 13.**

RECORDS of any and all trading volume RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 14.**

RECORDS of any and all YOUR trading fees RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 15.**

RECORDS of any and all rebates RELATING TO each of the LEADERBOARD ACCOUNTS.

**REQUEST NO. 16.**

Any and all DOCUMENTS RELATING TO YOUR efforts to obtain or verify identity of PERSONS associated with LEADERBOARD ACCOUNTS.

**REQUEST NO. 17.**

Any and all DOCUMENTS RELATING TO YOUR efforts to investigate actual or potential market manipulation by PERSONS associated with LEADERBOARD ACCOUNTS.

**REQUEST NO. 18.**

Any and all DOCUMENTS RELATING TO YOUR efforts to prevent actual or potential market manipulation by PERSONS associated with LEADERBOARD ACCOUNTS.

**REQUEST NO. 19.**

Any and all DOCUMENTS RELATING TO YOUR efforts to verify that PERSONS associated with LEADERBOARD ACCOUNTS are not United States PERSONS.

**REQUEST NO. 20.**

Any and all DOCUMENTS demonstrating or tending to demonstrate that PERSONS associated with LEADERBOARD ACCOUNTS are not United States PERSONS.

**REQUEST NO. 21.**

Any and all DOCUMENTS showing or tending to show that each of the LEADERBOARD ACCOUNTS is not maintained by United States PERSONS.

**REQUEST NO. 22.**

Any and all DOCUMENTS RELATING TO United States PERSONS currently trading, or having traded in the past, on the BITMEX PLATFORM.

**REQUEST NO. 23.**

Any and all DOCUMENTS RELATING TO a number of United States PERSONS currently trading, or having traded in the past, on the BITMEX PLATFORM.

**REQUEST NO. 24.**

Any and all DOCUMENTS RELATING TO YOUR trading volume or trading revenue associated with United States PERSONS currently trading, or having traded in the past, on the

BITMEX PLATFORM.

**REQUEST NO. 25.**

Any and all internal DOCUMENTS of HDR GROUP RELATING TO United States PERSONS currently trading, or having traded in the past, on the BITMEX PLATFORM.

**REQUEST NO. 26.**

Any and all internal DOCUMENTS of HDR GROUP RELATING TO a number of United States PERSONS currently trading, or having traded in the past, on the BITMEX PLATFORM.

**REQUEST NO. 27.**

Any and all internal DOCUMENTS of HDR GROUP RELATING TO YOUR trading volume or trading revenue associated with United States PERSONS currently trading, or having traded in the past, on the BITMEX PLATFORM.

**REQUEST NO. 28.**

Any and all DOCUMENTS that support your contention that a number of United States PERSONS trading on BITMEX PLATFORM is negligible.

**REQUEST NO. 29.**

Any and all DOCUMENTS that YOU used to arrive at a conclusion that a number of United States PERSONS trading on BITMEX PLATFORM is negligible.

**REQUEST NO. 30.**

Any and all DOCUMENTS that support your contention that a number of United States PERSONS who have traded in the past on BITMEX PLATFORM is negligible.

**REQUEST NO. 31.**

Any and all DOCUMENTS RELATING TO YOUR efforts to prevent United States PERSONS from trading on BITMEX PLATFORM.

**REQUEST NO. 32.**

Any and all DOCUMENTS RELATING TO PERSONS named Coincidental Capital, Bryce Gilleland, Wen Hou, Sunil Shah, Leotank Capital and Roger Xu.

**REQUEST NO. 33.**

Any and all DOCUMENTS RELATING TO trading profits realized by PERSONS named Coincidental Capital, Bryce Gilleland, Wen Hou, Sunil Shah, Leotank Capital and Roger Xu on BITMEX PLATFORM.

**REQUEST NO. 34.**

Any and all DOCUMENTS RELATING TO trading volume generated by PERSONS named Coincidental Capital, Bryce Gilleland, Wen Hou, Sunil Shah, Leotank Capital and Roger Xu on BITMEX PLATFORM.

**REQUEST NO. 35.**

Any and all DOCUMENTS RELATING TO trading fees collected by YOU, which are associated with PERSONS named Coincidental Capital, Bryce Gilleland, Wen Hou, Sunil Shah, Leotank Capital and Roger Xu on BITMEX PLATFORM.

**REQUEST NO. 36.**

Any and all DOCUMENTS showing or tending to show that PERSONS named Coincidental Capital, Bryce Gilleland, Wen Hou, Sunil Shah, Leotank Capital and Roger Xu are not United States PERSONS.

**REQUEST NO. 37.**

Any and all DOCUMENTS RELATING TO LEADERBOARD ACCOUNTS under names coincidentcapitalltd, Roger-LeotankCapital and Roger_LeotankCapital.

**REQUEST NO. 38.**

Any and all DOCUMENTS RELATING TO trading profits associated with

LEADERBOARD ACCOUNTS under names coincidentcapitalltd, Roger-LeotankCapital and Roger_LeotankCapital.

**REQUEST NO. 39.**

Any and all DOCUMENTS RELATING TO trading volume associated with LEADERBOARD ACCOUNTS under names coincidentcapitalltd, Roger-LeotankCapital and Roger_LeotankCapital.

**REQUEST NO. 40.**

Any and all DOCUMENTS RELATING TO YOUR trading fees associated with LEADERBOARD ACCOUNTS under names coincidentcapitalltd, Roger-LeotankCapital and Roger_LeotankCapital.

**REQUEST NO. 41.**

Any and all DOCUMENTS showing or tending to show that LEADERBOARD ACCOUNTS under names coincidentcapitalltd, Roger-LeotankCapital and Roger_LeotankCapital were not maintained by United States PERSONS.

**REQUEST NO. 42.**

Any and all DOCUMENTS RELATING TO all fully or partially executed orders for XBTUSD and ETHUSD perpetual contracts on BITMEX PLATFORM during MANIPULATION TIMES.

**REQUEST NO. 43.**

Any and all DOCUMENTS RELATING TO all unexecuted orders for XBTUSD and ETHUSD perpetual contracts on BITMEX PLATFORM during MANIPULATION TIMES.

**REQUEST NO. 44.**

Any and all DOCUMENTS RELATING TO all cancelled orders for XBTUSD and ETHUSD perpetual contracts on BITMEX PLATFORM during MANIPULATION TIMES.

**REQUEST NO. 45.**

Any and all time and sales records for XBTUSD and ETHUSD perpetual contracts on BITMEX platform during MANIPULATION TIMES.

**REQUEST NO. 46.**

Any and all DOCUMENTS RELATING TO Anti-Money Laundering (AML) policies and procedures at HDR GROUP.

**REQUEST NO. 47.**

Any and all DOCUMENTS RELATING TO Know Your Customer (KYC) policies and procedures at HDR GROUP.

**REQUEST NO. 48.**

Any and all DOCUMENTS RELATING TO reporting of suspicious activity policies and procedures at HDR GROUP.

**REQUEST NO. 49.**

Any and all DOCUMENTS RELATING TO reports of suspicious activity at HDR GROUP.

**REQUEST NO. 50.**

Any and all DOCUMENTS RELATING TO money transmission licenses issued for members of HDR GROUP.

**REQUEST NO. 51.**

Any and all DOCUMENTS RELATING TO FinCEN registration for members of HDR GROUP.

**REQUEST NO. 52.**

Any and all DOCUMENTS RELATING TO conversion of cryptocurrency to fiat currency for the internal needs of HDR GROUP.

**REQUEST NO. 53.**

Any and all DOCUMENTS RELATING TO conversion of cryptocurrency to fiat currency by HDR GROUP.

**REQUEST NO. 54.**

Any and all DOCUMENTS RELATING TO exchanges used by HDR GROUP for conversion of cryptocurrency to fiat currency for its own needs.

**REQUEST NO. 55.**

Any and all DOCUMENTS RELATING TO exchanges used by ABS Global Trading Limited for conversion of cryptocurrency to fiat currency.

**REQUEST NO. 56.**

Any and all DOCUMENTS RELATING TO BitMEX Insurance Fund including a list of bitcoin network wallet addresses for the BitMEX Insurance Fund holdings.

**REQUEST NO. 57.**

Any and all DOCUMENTS RELATING TO bitcoin deposits and withdrawals to and from the BitMEX Insurance Fund including a list of all corresponding bitcoin network transactions.

**REQUEST NO. 58.**

Any and all DOCUMENTS RELATING TO natural PERSON named Sean O'Sullivan.

**REQUEST NO. 59.**

Any and all DOCUMENTS RELATING TO Sean O'Sullivan's role or employment in the HDR GROUP.

**REQUEST NO. 60.**

Any and all DOCUMENTS RELATING TO agreements between Sean O'Sullivan and the HDR GROUP.

**REQUEST NO. 61.**

Any and all DOCUMENTS RELATING TO Sean O'Sullivan's equity interest in the HDR GROUP.

**REQUEST NO. 62.**

Any and all DOCUMENTS RELATING TO Sean O'Sullivan's compensation of any kind ever received from HDR GROUP.

**REQUEST NO. 63.**

Any and all DOCUMENTS RELATING TO SOSV's equity interest in the HDR GROUP.

**REQUEST NO. 64.**

Any and all DOCUMENTS RELATING TO any and all owners of the HDR GROUP.

**REQUEST NO. 65.**

Any and all DOCUMENTS RELATING TO any and all natural PERSON owners of the HDR GROUP.

**REQUEST NO. 66.**

Complete and current capitalization table of the HDR GROUP IDENTIFYING all PERSONS with ownership interest in HDR GROUP.

**REQUEST NO. 67.**

Any and all DOCUMENTS RELATING TO each and every cryptocurrency exchange or other similar service, which was used by HDR GROUP or any of its members for conversion of bitcoin to fiat currency for its own needs during RELEVANT PERIOD.

**REQUEST NO. 68.**

Any and all DOCUMENTS RELATING TO each and every banking institution, which was used by HDR GROUP or any of its members for maintaining fiat currency deposit accounts for its own needs during RELEVANT PERIOD.

**REQUEST NO. 69.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that bitcoin that YOU converted to fiat currency during RELEVANT PERIOD was not obtained as a result of any illegal act.

**REQUEST NO. 70.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that by converting bitcoin to fiat currency on YOUR behalf during RELEVANT PERIOD, cryptocurrency exchanges or other similar services used by YOU for this purpose, did not commit money laundering in violation of 18 U.S.C. §1956.

**REQUEST NO. 71.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that by converting bitcoin to fiat currency on YOUR behalf during RELEVANT PERIOD, cryptocurrency exchanges or other similar services used by YOU for this purpose, did not engage in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S. Code §1957.

**REQUEST NO. 72.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that YOUR acts of converting bitcoin to fiat currency during RELEVANT PERIOD did not constitute engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S. Code §1957.

**REQUEST NO. 73.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that Exhibits 3, 4 and 5 attached hereto do not contain evidence (whether admissible or otherwise) of any illegal acts on BitMEX platform.

**REQUEST NO. 74.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that BitMEX did not mislead any court about presence of U.S. PERSONS on BitMEX platform.

**REQUEST NO. 75.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that illegal acts did not take place on BitMEX platform during RELEVANT PERIOD.

**REQUEST NO. 76.**

Any and all DOCUMENTS RELATING TO any and all actions that you took to prevent BitMEX users from first entering into derivatives positions on BitMEX and then using helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**REQUEST NO. 77.**

Any and all DOCUMENTS that demonstrate or tend to demonstrate that, during RELEVANT PERIOD, BitMEX users did not first enter into derivatives positions on BitMEX and then used helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**REQUEST NO. 78.**

Any and all DOCUMENTS RELATING TO any and all investigations by YOU into allegations of BitMEX users first entering into derivatives positions on BitMEX and then using helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**REQUEST NO. 79.**

Any and all DOCUMENTS RELATING TO a PERSON who placed at least 22 separate $2M orders on BitMEX on July 27, 2020, as shown in Exhibit 4.

**REQUEST NO. 80.**

Any and all DOCUMENTS RELATING TO each PERSON who traded on or accessed BITMEX PLATFORM using each LEADERBOARD ACCOUNT.

Dated: August 22, 2020

CONSENSUS LAW

By: ______________________
Pavel Pogodin, Esq.

Counsel for Plaintiffs
BMA LLC, Yaroslav Kolchin and
Vitaly Dubinin

# EXHIBIT 3

**To Plaintiff's Corrected Requests for Production of Documents**

Story from **Markets** →

# The Mechanics of Market Manipulation

Nov 30, 2019 at 09:10 UTC
Updated Dec 4, 2019 at 13:12 UTC

OPINION

*Marionette makers in the Federal Theatre Project's workshop in Washington, D.C., 1930s. Image via Library of Congress/Wikimedia Commons*

**Galen Moore**

**The levers are there to move hundreds of millions in crypto markets, and they're clearly labeled**

On May 17 of this year, bitcoin's price dropped suddenly. The action started on a single exchange: Bitstamp, domiciled in Luxembourg, where the dollar price of bitcoin

suddenly dropped more than 18 percent in a matter of minutes. The CoinDesk Bitcoin Price Index, a composite of several market feeds, recorded a 6 percent drop as a result.

Bitstamp was, at the time, one of three spot markets used as equal components in the bitcoin price index for BitMEX, a crypto derivatives exchange domiciled in the Seychelles that operates one of the most liquid bitcoin derivatives markets, the XBT/USD perpetual swap. BitMEX's other two bitcoin index components are Coinbase Pro and Kraken. Of the three, BitStamp's reported volumes are lowest.

The BitStamp price drop wasn't random. It was caused by a large bitcoin sell order, placed well below the market. The resulting downward pressure triggered auto-liquidations of long positions in the hundreds of millions of dollars on BitMEX. Traders with short positions on the exchange stood to benefit.

In this column, I'll provide a visual blow-by-blow of what happened May 17 on BitStamp, and a risk/return estimate: if it was manipulation, how much it cost, and how much the manipulators earned. I'll conclude with thoughts on the liquidity imbalance that caused it, and how it might happen again.

Before getting into that, I'll explain briefly how novel structures and thin markets could make such manipulation possible.

**Novel market structures**

In crypto markets, it's normal for investors to interact directly with the exchange – an ethos derived from bitcoin, which invites its users to transact pseudonymously, without intermediaries. On derivatives exchanges, accommodating this requires a rethinking of market structure.

On traditional derivatives exchanges, brokers and clearinghouses manage the risk that a large price move will bankrupt one side of a trade. All participants have an incentive to make good at settlement, so they can trade again tomorrow. On the largest crypto derivatives exchanges, it is possible to trade directly under one account today and another tomorrow. This unfettered access and

pseudonymity is part of the story of these exchanges' rise to become the most liquid markets in crypto.

To cover settlement risk, BitMEX and other large crypto derivatives exchange operators use auto-liquidiation. For example, if the index price drops far enough below an open long position, the exchange automatically liquidates that position, to settle the trade. Excess proceeds from auto-liquidations are stored in an insurance fund. If auto-liquidation falls short of settlement, the insurance fund kicks in. If the insurance fund's earmark falls short, auto-deleveraging occurs, unwinding both sides of the trade.

**Thin markets**

Liquidity is a subjective term, meaning an investor's ability to move a reasonable volume of an asset, without an undue price shift. It is related to market depth, measured by the worst price an order will hit at a certain size limit.

In crypto, market depth is fragmented among dozens of the largest exchanges, and hundreds more in the long tail. Even in crypto's blue-chip assets, bitcoin and ether, pools of liquidity are scattered, which makes them more shallow. This situation may be worsening. Bitcoin's bid-ask spreads have widened on most of the largest exchanges in 2019, indicating decreasing market depth according to one tracker of composite data.

Exchanges that are part of price discovery infrastructure are thin enough that a large-ish order will move the price. And, as we will see below, derivatives markets can be far more liquid than the spot exchanges that help determine the price of their underlying assets.

**What happened May 17**



The chart above presents a second-by-second account of what happened on the Bitstamp BTC/USD spot market in the early morning hours of May 17, UTC. Each point on the chart is the minimum, or best, ask price offered in each minute's snapshot of orderbook data, which is provided by CoinRoutes. The size of the point indicates the quantity of the order.

The action began at 3am UTC, with a sell order roughly 6 percent below the market price and hundreds of times larger than the norm on the exchange at that time. As that order fulfilled available bids, the ask price moved lower, dragging the market price down until it reached $6,276, at which point the selling stopped. A chronological calculation shows the sellers sold about 2,905.7 units of bitcoin, in aggregate at about $2.5 million below what they would have realized at a bitcoin market price of $7,700. At the same time, over $200 million in long positions were being liquidated on BitMEX, according to skew.com. If it was manipulation, it returned up to an 80X multiple over what the manipulators put at risk. The whole thing was over in about 10 minutes.

*Update: Trader and Crypto Twitter denizen Mike Komaransky pointed out that while the potential return of the May 17 flash crash's impact on the derivatives market was about 80X the capital apparently deployed into the underlying spot market, the profit to any manipulators involved in the crash would be more likely on the order of a 2X multiple, depending on their willingness to lever up on*

*BitMEX. I've left my not-very-thorough math as is, above, and add Komaransky's math, below.*



**Mike Komar…** · Dec 3, 2019
Replying to @galenmoore
"If it was manipulation, it returned up to an 80x multiple over what the manipulators put at risk." - @coindesk <-- This upper bound is ridiculous; it assumes the buyer bought all #bitmex contracts at a price of 0. Low on Bitmex of that day was ~6300.

 **Mike Komaransky**
@mkomaransky

More realistic:
1) Borrow $33M of BTC at 4:1
2) Use $10M of BTC margin at bitmex to build $50M short at 7700
3) Push bitstamp down with 3k BTC sell order, ave sale = 6866
4) Cover Bitmex and Bitstamp shorts at 6700, earning $7M
This trade requires $8.3M in capital and earns $7M.

2   1:24 PM - Dec 3, 2019

See Mike Komaransky's other Tweets

**Conclusions**

Bitcoin's network security model is a fairly straightforward bit of rational choice theory: miners are rewarded for recording new transactions. To earn the reward, they must prove they have committed something of value, i.e., energy. If a miner attempts to manipulate the transaction record, other miners will likely reject the contribution, invalidating the reward. The cost of manipulation and the likelihood of failure is balanced against the reward for expected behavior.

Bitcoin programmatically maintains that balance, without recourse to identity verification or trusted third parties. However, the market structure that has evolved around

bitcoin has so far failed to achieve a similar equilibrium.

Not that folks haven't tried to patch the problem: BitMEX revised its bitcoin price index components in November, adding two new spot markets; Deribit, which at this writing operates the largest bitcoin options exchange, domiciled in the Netherlands, has promoted a different way of handling liquidations. As long as deep pools of liquidity remain dependent on shallow pools, bitcoin's market structure will be out of balance – and manipulators will have incentives to find ways around these patches.

READ MORE ABOUT...

Market Manipulation

Price Manipulation

**DISCLOSURE**

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.

About

Masthead

Blog

Editorial Policy

Press

Jobs

Events

**Follow us**

Sign up for our newsletter

- **Money Reimagined**
- **First Mover**
- **Crypto Long & Short**
- **Blockchain Bites**

*By signing up, you will receive emails about CoinDesk products and you agree to our terms & conditions and privacy policy*

Enter your mail

SIGN UP

Terms & Conditions

Privacy Policy

Newsletters

© 2020 CoinDesk

English

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a **strict set of editorial policies**. CoinDesk is an independent operating subsidiary of **Digital Currency Group**, which invests in cryptocurrencies and blockchain startups.

# EXHIBIT 4

**To Plaintiff's Corrected Requests for Production of Documents**

**lowstrife**
@lowstrife

Sell 44 million over 22 separate orders on mex. Get into posistion.

Then, market dump 1000 coins on Coinbase with max slippage to move index price.

I think we just saw someone do some crazy shit and make a ton of money.

| Price | Size | Time |
|---|---|---|
| $ 10995.528 | $ 303K | |
| $ 11050.000 | $ 578K | |
| $ 11050.000 | $ 792K | |
| $ 11050.000 | $ 1M | |
| $ 11130.400 | $ 2M | |
| $ 11134.415 | $ 2M | |
| $ 11147.799 | $ 2M | |
| $ 11148.130 | $ 2M | 6m |
| $ 11175.299 | $ 2M | |
| $ 11189.506 | $ 2M | 8m |
| $ 11187.119 | $ 2M | |
| $ 11194.526 | $ 2M | |
| $ 11198.477 | $ 2M | 9m |
| $ 11186.195 | $ 2M | |
| $ 11195.031 | $ 2M | |
| $ 11199.930 | $ 2M | 11m |
| $ 11226.956 | $ 336K | |
| $ 11208.624 | $ 2M | |
| $ 11205.137 | $ 2M | |

7:25 PM · Jul 27, 2020 · Twitter Web App

# EXHIBIT 5

**To Plaintiff's Corrected Requests for Production of Documents**



  

.tech Why Get a .TECH Domain for Your Next Idea?

# Blatant Market Manipulation Highlights the Need for Provably Fair Exchanges

July 19th 2019

**@adam-todd**

**Adam Todd**

Adam Todd is the Founder and Developer of the Digitex Futures Exchange, a commission-free Bitcoin fu

Another week in crypto, another accusation of market manipulation. BitMEX finds itself in the spotlight once again for potentially being the orchestrator of a flash crash on Bitstamp that sent the entire market crashing. Let's be honest, the evidence against Arthur and his penchant for liquidating retail traders is piling up. Ever since it emerged that BitMEX actively trades against its customers you have to wonder what kind of ethics the company has in place.

**BitMEX Is the King of Futures**

Hats off to BitMEX. There's no one who can deny BitMEX is the king of crypto futures and one of the most liquid exchanges on the market. But it's also becoming a dictator. This Seychelles domiciled exchange working out of Hong Kong's most expensive office space is doing something right. A lot of things actually--on June 26th, BitMEX hit a new all-time high for daily futures trading at an eye-watering $16 billion.

There are other competitors on the market and perhaps Binance will lend some additional credibility to the crypto derivatives space. Whatever your stance on Binance, it at least escaped the Bitwise report that 95% of trading volume is fake, alongside a handful of other exchange not accused of falsifying numbers, such as Coinbase Pro and Bitstamp.

Yet, despite CME, Binance, OKEx, and a handful of others, BitMEX still dominates the market. And as we've seen from the likes of Facebook, Google, and large financial institutions--market domination is not a good thing. It leads to people having less choice and being subjected to the practices of oligopoly companies in power.

**The case against BitMEX**

Last Sunday 14th July, someone placed a sell order on Bitstamp for 15,000 ETH causing the price to plummet from $270 to $190 and leading to a flash crash on the exchange. Since Bitstamp is a far less liquid exchange than Binance or BitMEX, this dump made up around $3.5 million of ETH--some 15% of its entire ETH trading volume in just one trade.

You may wonder what this has to do with everyone's favorite futures exchange. Well, it doesn't take too long to put two and two together. You see, BitMEX pulls its price data for its contracts

from just three exchanges; Kraken, Coinbase Pro, and Bitstamp.

Since BitMEX contracts are based heavily on Bitstamp's price, this dump caused a mass of

instant liquidations--over $164 million worth that spread over to Bitcoin and lead to Sunday's plunge. Why would BitMEX do something like this? Simple. Because it makes money a lot of money out of liquidating its traders.

**The BitMEX Insurance Fund**

The BitMEX Insurance Fund builds up ad infinitum with virtually no daily drawdowns of any significance over a period of years--even during periods of high volatility. In fact, you can see that the insurance fund balance has increased 99 days out of the last 100 days.

Liquidations on BitMEX in fact, at times, account for as much as HALF of all the exchange's revenue. Add this massive incentive to liquidate traders to the fact that the exchange has proprietary traders actively trading against its own customers for profit, and you've got a pretty hostile environment to trade in. Utterly cut-throat, unforgiving, and set up for traders to fail.

Whether BitMEX was behind the massive flash crash on Bitstamp last weekend or not is somewhat of a moot point. I mean, I know where I'd place my bets, but it's not impossible that some other crypto whale or group of investors did it for other interests. Whatever the case, it comes down to centralized exchanges getting away with manipulating the market.

**But That Doesn't Mean We Need More Regulation**

Of course, happenings like these in the crypto world and reports like the Bitwise one only give more ammunition to the regulators to ruin the party. Regulators who put their own multiple interests ahead of retail traders and the cryptocurrency industry. Calling on regulators to save us from the likes of BitMEX is not the answer.

Regulation, KYC, AML, for the most part, is in my opinion just one big scam. Centralized institutions and governments are fearful of cryptocurrency and try their best to keep it down. They impose exorbitant fees for supposedly preventing money laundering and crippling

They impose exorbitant fees for supposedly preventing money laundering and crippling cryptocurrency business at the same time. And worse, most of the regulators are easily bought or have their own agenda at heart. We are adding a layer of human incompetence, corruption, and greed where none is needed.

Exchanges like BitMEX need to be kept in check by tools that are better and more powerful than regulation. One of the distinguishing features behind Digitex Futures besides its non-custodial accounts and zero-fee trading is the fact that we will be provably fair.

We will use blockchain technology to ensure that our order book is transparent and overseen--not by human regulators who freeze out retail traders, charge fortunes, or make their own judgment calls--but by a trustless technology, transparent for anyone to see.

Unlike BitMEX or any other centralized exchange, we can't be accused of front-running, last look, queue jumping, or censorship since we will keep a tight order book transparent and public. This isn't just a good idea; this is better than regulation because it doesn't cost extra for traders and it's 100% transparent with blockchain technology.

**A Token Reallocation System to Reward Active Traders**

Further, rather than have an incentive to liquidate traders like BitMEX, on the Digitex exchange, we will start with an insurance fund of 100 million DGTX (10% of total supply) and will maintain it at this level.

Any excess profits from liquidations will be reallocated to our automated market makers which will be programmed to lose those profits by tightening spreads and increasing their order size. This gives traders an additional incentive to come onto the exchange and compete for these market maker losses. They can even devise strategies that exclusively target our market makers. In other words, they have a mechanical edge built into the exchange in their favor, rather than against.

We want to create successful traders. We want more people to trade on the exchange. What we don't want is half our profits coming from the insurance fund or to be seen orchestrating flash crashes. We also won't be holding onto traders' funds since they will be in non-custodial

flash crashes. We also won't be holding onto traders' funds since they will be in non-custodial accounts and traders don't have to trust us with their money.

### Wrapping It Up

Die-hard anti-crypto economists like Roubini and regulators and politicians like Trump will always use these episodes as a chance to prepare their victory dance over crypto and clamor for tighter regulation.

If they understood the technology just a little bit, they would see that there's a better way to keep it in check. It's provably fair and written in code. And you can't write laws against bits and bytes.

Share this story    

@adam-todd

Adam Todd

Read my stories

Adam Todd is the Founder and Developer of the Digitex Futures Exchange, a commission-free Bitcoin fu

Comments

delivered at noon

Visit Noonification

https://noonification.com

@adam-todd

Adam Todd

4min

11/11/19

The Space Tech Startup Making Our Internet A Better Place With Lase...

@rachelminnlee

Rachel Lee

06/14/20

Tags

Help About Start Writing Sponsor: Brand-as-Author Sitewide Billboard
Ad by tag Newsletter
Contact Us Terms Privacy Cookies

Subscribe to get your daily round-up of top tech stories!

**What do you think?**

0 Responses

Upvote

LOL

Love

On fire

Meh

Clap

**Hacker Noon Comment Policy**

treat your internet friends with respect.

0 Comments
Hacker Noon
Disqus' Privacy Policy
1 Login
Recommend
Tweet
Share
Sort by Best
Start the discussion…
LOG IN WITH
OR SIGN UP WITH DISQUS ?
Name

Be the first to comment.

Subscribe   Do Not Sell My Data

Related

**Subscribe to Hacker Noon's best tech stories,**

**Delivering Zero-Fee Trading Through Sheer Determination**