Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC,
Yaroslav Kolchin and Vitaly Dubinin

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin and Vitaly Dubinin,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,<br><br>Defendants. | Case No.  3:20-cv-3345-WHO<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**<br><br>Hon. William H. Orrick<br>Date: November 11, 2020<br>Time: 2:00 PM<br>Crtrm.: 2, 17th Floor<br><br>**Discovery Cutoff: None Set**<br>**Pretrial Conference Date: None Set**<br>**Trial Date: None Set** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on November 11, 2020, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the Courtroom 2, 17th Floor of the Honorable William H. Orrick, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs BMA LLC, Yaroslav Kolchin and Vitaly Dubinin ("Plaintiffs") will and hereby do move, pursuant to Fed. R.

Civ. P. 15(a)(2), for for leave to file the attached Third Amended Complaint ("TAC"), Ex. A.

Plaintiffs' motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities; all other pleadings and papers on file in this action; any matters of which this Court may take judicial notice; and such further evidence and argument as may be presented at or before the hearing on this matter.

The parties met and conferred on the matters in this Motion on October 5, 2020, and at times thereafter. Defendants have not consented to this amendment.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Statement Of The Issues To Be Decided

1. Whether leave to file the attached Third Amended Complaint should be granted to Plaintiffs in this action.

### Procedural Background

Plaintiffs filed the original Complaint, Dkt. No. 1, on May 16, 2015, alleging that Defendants engaged in racketeering in violation of 18 U.S.C. §§ 1962(d) and (c) ("RICO") and cryptocurrency market manipulation in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 et seq, as well as state causes of action. Two days later, on May 18, 2020 Plaintiff filed an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A), Dkt. No. 6, with minor corrections of typographical errors and no substantive changes. On July 14, 2020, parties stipulated to waiver of service of process, filing of a Second Amended Complaint ("SAC") and set a briefing schedule. Court has granted this stipulation, Dkt. No. 31, and Plaintiffs filed the SAC on July 14, 2020, Dkt. No. 32. Defendats filed their Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) on September 14, 2020, Dkt. No. 42. Plaintiffs' opposition to said Motion is due on October 29, 2020.

During the time period between July 14, 2020, when the SAC was filed and the present time, Plaintiffs discovered multitude of additional evidence, critical to Plaintiffs' claims, which is reflected in the proposed TAC. In addition, on October 1, 2020, Defendants Hayes, Delo and Reed were indicted by United States Department of Justice ("DOJ") for violating the Bank

Secrecy Act by willfully evading U.S. anti-money laundering requirements, Ex. B. On the same day, the Commodity Futures Trading Commission ("CFTC") announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging Defendants HDR, ABS, Hayes, Delo and Reed with operating an unregistered trading platform and violating multiple CFTC Regulations, including failing to implement required anti-money laundering procedures, Ex. C. Defendant Reed was arrested in Boston, Massachusetts. Defendants Hayes and Delo remain at large. Relevant facts relating to the aforesaid govermnent actions are also reflected in the proposed TAC.

**Statement Of The Relevant Facts**

The key facts of this case are rather simple and easy to understand. In 2014, Defendants launched a bitcoin derivatives trading platform called BitMEX, which enables traders to place bets on direction of cryptocurrency prices. In designing their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer (KYC) or anti-money laundering (AML) checks what so ever, Ex. D, SAC ¶ 215. In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked. SAC ¶¶ 211-213.

In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way. SAC ¶¶ 211-213. The entire account registration and funding process takes about 10 minutes and no documents are even looked at. Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, Ex. D. A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader, Ex. E.[1,2]

---

[1] Of course, such business model would be illegal, and even criminal under 18 U.S.C. § 1960(a), if only Defendants had United States traders on their BitMEX platform, especially in view of the fact that more than two thirds of Defendants' employees and almost entire technical team behind the BitMEX platform are located in this District.

[2] In reality, BitMEX is a California enterprise, having most of its employees in California and doing hundreds of bllions of dollars of business in the U.S. with U.S. traders, which uses a sham

But Defendants' wrongdoing does not stop there. Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from money laundering and market manipulation. It all has to do with anonymity, lack of trading limits, high leverage and how the index price for bitcoin derivatives is calculated. Defendants deliberately designed this index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges, SAC ¶ 214. Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, relatively small market orders will suffice. Therefore, a relatively small market order on a spot exchange results in a relatively large bitcoin index price move on the very liquid BitMEX, SAC ¶¶ 109, 214.

A money launderer (Defendant) would open two exchange accounts – a helper account on one or more exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and



offshore shell company HDR Global Trading Limited to dodge U.S. laws and regulations and to evade U.S. taxes.

BitStamp) and a winner account on BitMEX, SAC ¶ 110.  The money launderer would then enter into a large leveraged derivatives position on BitMEX and immediately execute market orders from the helper account with maximum slippage to move the index price in a favorable direction, Ex. F, G, H, SAC ¶ 214.   Due to disparity in liquidity between BitMEX and the spot exchanges, the aforesaid deliberate design of the index price by Defendants, and the cascading liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account is multiplied greatly and translates into outsized profit in the winner account on BitMEX, Ex. F, G, H, SAC ¶ 214.  Because BitMEX accounts are by design anonymous, the laundered money cannot be traced from the helper account to the winner account, SAC ¶ 215.  Thus, the money laundering proceeds in the winner account on BitMEX appear as legitimate trading gains and the money laundering scheme achieves its purpose, SAC ¶ 214.  The described money laundering and other nefarious acts are well documented and take place on BitMEX almost daily, Ex. F, G, H.   Moreover, to exacerbate the described price manipulations, BitMEX intentionally locks users out of their accounts during manipulation times and accepts trading orders only on one side of the market, falsely telling the users that their "system is overloaded," SAC ¶ 185.

BitMEX directly participates in and financially benefits from this illegal activity through its internal trading desk run by Ukrainian national Nick Andrianov, which orchestrates execution of the market orders from the helper accounts and indirectly, by collecting increased trading fees and also by liquidating users' accounts.  Specifically, BitMEX knowingly collects high trading fees for the above money laundering transactions, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from which it pays all its employees and even its attorneys (after currency conversion).  Thus, the salaries of all BitMEX employees as well as legal fees paid to its lawyers are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, SAC ¶ 214.

In the described money laundering scheme, the market manipulation gains realized by the launderer in the winner account and the funds confiscated by BitMEX as the result of liquidations

induced by the launderer are generated at the expense of Plaintiffs and other cryptocurrency traders like Plaintiffs, who traded on BitMEX itself as well as on Kraken exchange, which Defendants used to manipulate cryptocurrency prices, SAC ¶ 214.  Notably, BitMEX deposits proceeds from the user account liquidations into its so called "Insurance Fund," which has steadily grown over the years and now amounts to over $427,000,000 dollars, all misappropriated from traders, including Plaintiffs, SAC ¶¶ 145-149.

Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a).  This violation has been conclusively proven using BitMEX's own public Leaderboard, and without the benefit of discovery, which Defendants stonewalled, Ex. I.  Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. J.  The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty three times).  Consequently, all the funds that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).

Awash with large amounts of tainted cash and encouraged by perceived lack of any accountability, Defendants grew so brazen that they do not even hesitate to publicly admit to bribery and bank fraud, SAC ¶¶ 11, 13.  Despite the fact that the vast majority of Defendants'

personnel and managers are located in this District, to avoid being subject to United States laws, regulations and taxes, Defendants established 12 false shell companies, including Defendant ABS, with intent to create an appearance that Defendant HDR has no presence, operations or investors in regulated jurisdictions such as the United States, SAC ¶¶ 12, 24.

### The Leaderboard Fiasco And Hasty "User Verification Programme"

Defendants' initial strategy to deal with a mounting number of civil cases against them in the United States was to argue to Courts that Defendants were not subject to personal jurisdiction in this country due to a lack of minimum contacts with the U.S. and, specifically, due to "U.S. persons [being] expressly prohibited from trading on BitMEX platform."

That defense strategy spectacularly imploded when, in early August, Plaintiff's counsel Pavel Pogodin stumbled upon Defendants' Leaderboard (https://www.bitmex.com/app/leaderboard, Ex. I) and discovered that, contrary to Defendants' denials, among top three Leaderboard traders, who meaningfully revealed their real names, all three turned out to be United States persons, generating over $70,000,000 in trading profits on Defendants' BitMEX platform. Plaintiffs' attorney put this stunning discovery into a CMC statement filed on August 11, 2020, Dkt. No. 33, which caused an angry response from Defendants's counsel.  Defendants' counsel first demanded that Plaintiffs remove this very damaging information from the CMC statement using a CMC statement page limit as an excuse. After receiving a negative response, Defendants' counsel bitterly refused to file Plaintiffs' exhibits to the CMC statement.

After Defendants and their counsel finally came to their senses and realized that the jurisdictional genie was out of the bottle and their plot to bamboozle U.S. Courts has been exposed, they hastily waived jurisdictional challenges in three United States civil cases against them and instituted a "User Verification Programme" on BitMEX[3], designed to create an appearance that Defendants somehow did not know before that most of their leaderboard was

---

[3] BitMEX operated for more than 5 years without any user verification what so ever.  The "User Verification Programme" was instituted less than 48 hours after Plaintiffs' counsel put discovered jurisdictional evidence into CMC statement, Dkt. No. 33.  This timing is not a coincidence.

filled with U.S. traders.[4]

**Legal Standard And Argument**

Federal Rule of Civil Procedure 15(a) allows a complaint to be amended after responsive pleadings have been filed when the amending party obtains "leave of the court." Fed. R. Civ. P. 15(a). Leave to amend is "freely granted when justice so requires" bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000) (en banc) (ellipses omitted). The policy in favor of leave to amend must not only be heeded, *Foman v. Davis*, 371 U.S. 178, 182 (1962), it must be applied with "extreme liberality*," Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 712 (9th Cir. 2001).

Generally, leave to amend will be always granted unless the weighing of several factors show that the amendment would be inappropriate. *United States ex rel. Lee v. SmithKline Beecham, Inc*., 245 F.3d 1048, 1052 (9th Cir. 2001). Specifically, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir.2008). The single most important factor is whether prejudice would result to the nonmovant as a consequence of the amendment. See *William Inglis & Sons Baking Co. v. ITT Continental Baking Co*., 668 F.2d 1014, 1053 (9th Cir. 1981), cert. denied 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). But "[a] trial court may deny such a motion if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990) (citing *Foman*, 371 U.S. at 182). "Prejudice to the opposing party is the most important factor." Id. See *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003). "Absent prejudice, or a strong showing of any of the remaining Foman factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." Id. (emphasis in original). Evaluation of

---

[4] The "User Verification Programme" was apparently instituted in order to avoid civil and criminal liability for knowingly operating an unlicensed money transmission business in the U.S. in violation of 18 U.S.C. § 1960(a), see fn. 1 above.

the Foman factors "should be performed with all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

Because Rule 15(a) favors a liberal policy, the non-moving party bears the burden of demonstrating why leave to amend should not be granted. See *Genentech, Inc. v. Abbott Laboratories*, 127 F.R.D. 529 (N.D.Cal. 1989). "The party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). A delay alone does not provide sufficient grounds for denying leave to amend, see *DCD Programs, Ltd.*, 833 F.2d at 186, the motion to amend must be granted. See *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973) ("Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion.").

Here, allowing Plaintiffs to file the Amended Complaint would serve justice and promote judicial efficiency. As detailed above, the Amended Complaint seeks to add three new Defendants that, along with the original Defendants, were significantly involved in planning and perpetrating the alleged racketeering and market manipulation scheme. Moreover, rather than waisting Court's time on a Motion to Dismiss hearing, Plaintiffs choose to resolve all the alleged issues that Defendants identified in their Motion to Dismiss by way of this amendment. This will conserve Court's valuable time and speed up the final resolution of this lawsuit on the merits.

There is no undue delay, bad faith, or dilatory motive by Plaintiffs. Plaintiffs seek to file the Third Amended Complaint even before the Court has set a deadline for amending the pleadings and it is supported by facts and information uncovered by Plaintiffs and contained in the DOJ Indictment, Ex. B, and CFTC Complaint, Ex. C, against Defendants.

Moreover, there will be no substantial or undue prejudice to the original Defendants. The issue of prejudice requires a court to focus on the hardship to the Defendants if the amendment were permitted; specifically, the court has to consider "whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton*, 252 F.3d 267, 272 (3d Cir. 2001) (affirming the district court's denial of a motion to

amend, made after summary judgment was directed in favor of the non-moving party, in part because "the proposed amendment would essentially force the [non-moving party] to begin litigating the case again"); cf. *Cardone Indus., Inc. v. Honeywell Int'l, Inc., Civil Action* No. 13-4484, 2014 U.S. Dist. LEXIS 94259, at *14-15 (E.D. Pa. July 11, 2014) (finding that no undue prejudice exists where the factual basis for the amendments were known to the non-moving party and discovery had not yet concluded). Here, Plaintiffs seek to amend the pleading to add three new Defendants known to and associated with the original Defendants. Given that Defendats are moving for a stay of discovery, the time is ripe for the parties to develop these facts and narrow the issues for litigation.

Finally, there will be no futility resulting from Plaintiffs' Amended Complaint. Specifically, by this amendment, Plaintiffs dispose of all Defendants' arguments made in the Motion to Dismiss:

1. TAC ¶¶ 5-11, 354-363, 376-381, 402-406 make causal connection between Defendants' conduct in violation of RICO and CEA and specific Plaitniffs' injuries sustained on specified domestic exchanges crystal clear. The same paragraphs as well as TAC ¶¶ 229-237 clearly allege plausible facts establishing that Plaintiffs suffered an "injury in fact" by reason of Defendants' conduct.

2. Tables in TAC ¶¶ 354-355 and diagram in TAC ¶ 9 clearly show, in great detail, exactly how Plaintiffs' injuries were caused by specific RICO and CEA overt acts perpetrated by specific Defendants.

3. Tables in TAC ¶¶ 351, 357 clearly show specific dates and times when Defendants engaged in the alleged overt acts in violation of both RICO and CEA.

4. TAC ¶¶ 229-237 specifically allege that Plaintiffs traded XBTUSD Perpetual Swap on BitMEX and Kraken, which meets the definition of "swap" under 7 U.S.C. § 1a(47)(a)(iv) and, therefore, is covered by the CEA private right of action under 7 USC § 25(a)(1)(D).

5. TAC ¶¶ 9, 354, 355 contain tables that clearly allege the exact place where each

Defendants' overt act in violation of RICO and CEA took place, establishing that both RICO and CEA vilations clearly occurred in the United States and refuting all RICO and CEA extraterritoriality arguments made by Defendants in their Motion to Dismiss.

6. TAC ¶ 361 contains a table providing excruciatingly detailed information of who, what, when, where, and how, with respect to the alleged overt acts by specific Defendants in violation of both RICO and CEA, which clearly satisfies the heightened pleading requirement of Fed. R. Civ. P. 9(b).

7. TAC ¶ 359 contains a table clearly describing an individual role of each Defendant in the alleged misconduct in violation of both RICO and CEA.

8. TAC ¶ 465 clearly alleges a pre-existing relationship between Plaintiffs and Defendants that gives a rise to a duty of Defendants to Plaintiffs BMA and Kolchin to maintain a functional cryptocurrency derivatives marketplace. Therefore, the negligence claim (COUNT VII) will clearly survive Defendants' attack.

Accordingly, for all the foregoing reasons, the TAC would clearly survive the Motion to Dismiss that Defendants filed and the proposed amendment is not futile.

## Conclusion

For these reasons, Plaintiffs respectfully request that the Court grant leave to file the attached Third Amended Complaint. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated: October 7, 2020

Respectfully submitted,

By:   /s/ Pavel I. Pogodin
          Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Ave Isla Verde, Suite 302
Carolina, PR 00979
United States of America
Email: pp@consensuslaw.io
Attorneys for Plaintiff BMA LLC