Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC, Yaroslav Kolchin and Vitaly Dubinin

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

BMA LLC, Yaroslav Kolchin and Vitaly Dubinin,

                Plaintiffs,

                v.

HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,

                Defendants.

Case No.  3:20-cv-03345-WHO

**PLAINTIFF'S VITALY DUBININ FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANT HDR GLOBAL TRADING LIMITED (NOs. 1-15)**

      PROPOUNDING PARTY:     Plaintiff Vitaly Dubinin ("DUBININ" or "PLAINTIFF DUBININ")

      RESPONDING PARTY:     HDR Global Trading Limited (A.K.A. BitMEX)

      SET:             ONE (1)

      In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure and

applicable Civil L.R. 33 of the United States District Court for the Northern District of California, Plaintiff Vitaly Dubinin requests Defendant HDR Global Trading Limited (A.K.A. BitMEX) to provide verified answers to the following Interrogatories within 30 days of service, in accordance with the following Instructions and Definitions.

## INSTRUCTIONS

A.      These Interrogatories are intended to elicit as much information as possible concerning the issues, and to the extent any Interrogatory could be interpreted in more than one way, you should employ the interpretation of the Interrogatory most likely to encompass and  elicit the greatest amount of information possible.

B.      If YOU refuse to disclose any of the information requested in any of these Interrogatories on the basis of a privilege or other protection, please so state, and further state the basis of the privilege or other protection claim with sufficient specificity to permit the Court and counsel to evaluate and test the privilege or protection claimed.

C.      To the extent documents are produced in lieu of answering any of these Interrogatories, please produce such documents as kept in the ordinary course, see Fed.  R.  Civ. P. 34, and without any rearrangement.  In addition, please provide the documents in such a way that they can be correlated to the Interrogatory or Interrogatories to which the documents are responsive, and identify the Bates number for all such documents in your Interrogatory response.

D.      Defendants are under a continuing obligation to respond to the Interrogatories set forth herein.  Accordingly, if YOU subsequently gain additional information called for in any of the Interrogatories set forth herein, YOU should promptly produce such information to PLAINTIFF.

E.      Unless otherwise indicated, the relevant time period for each request shall be January 1, 2017 to the present ("RELEVANT PERIOD").

## DEFINITIONS

1.      The terms "or" and "and" shall be understood to include each other and "and" whenever necessary to bring within the scope of the Interrogatory all responses that might

otherwise be construed as outside its scope. The terms "all", "every", "any", and "each" shall include one another whenever necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed as outside its scope.

2.  The term "ATTORNEY" includes attorneys (both in-house and outside counsel), paralegals, and their secretaries and other support staff whenever necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed as outside its scope.

3.  The terms "COMMUNICATION", "COMMUNICATED", and "COMMUNICATIONS" shall mean, in addition to their customary and usual meanings, any transmission of letters, numbers, images, symbols, data, or other information by any means, including any oral, written, or electronic means.

4.  The term "RECORD" or "DOCUMENT" (used interchangeably) is defined broadly to encompass the full scope of the term as contemplated by Rule 34 of the Federal Rules of Civil Procedure and to encompass the full scope of the terms "writings" and "recordings" as defined by Rule 1001 of the Federal Rules of Evidence, and shall include any original (or a copy when an original is not available), each non-identical copy thereof (including those which are non-identical by reason of notations or markings), and any other written, printed, typed, punched, taped, graphic matter, or recorded or tangible thing, of whatever description, however produced or reproduced, and shall include all attachments to and enclosures with any requested item, and each draft thereof. The term "document" shall include, but not be limited to, order records, settlement records, pricing records, statistical records, trading records, account registration records, funds transfer records, cryptocurrency transfer records, emails, chats, correspondence, telegrams, memoranda, communications, minutes or records of meetings and conferences, lists of persons attending meetings or conferences, summaries, records of conversations, drafts, notes, notebooks, logs, invention records and disclosures, translations, drawings, graphs, charts, photographs, sound recordings, images, data compilations, computer records or printouts, specifications, reports, opinions, summaries, agreements, forecasts, plan drawings, mask works, engineering drawings, expressions or statements of policy, consultations, brochures, pamphlets,

advertisements, publications, circulars, trade letters, press releases, and drafts of any of the foregoing, whether printed, recorded, written by hand, or stored in some tangible medium of expression from which the information can be retrieved, perceived, or understood. Document shall also include ESI.

5. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" is defined broadly to encompass the full scope of the term as contemplated by Rule 34 of the Federal Rules of Civil Procedure, and refers to all computer or electronically stored or generated data and information, and shall include, but not be limited to, all attachments to and enclosures with any requested item, and all drafts thereof. Electronically stored information includes information stored in any format and on any storage media, including hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable. Electronically stored information includes, but is not limited to, spreadsheets, database records, data files, XML files, word-processing documents, electronic spreadsheets, electronic presentation documents, email messages, image files, sound files, and material or information stored in a database or accessible from a database. Electronically stored information also includes all associated metadata that is maintained or saved, which includes, but is not limited to, document title or name, file name, data and time of creation, data and time of last edit, identify of author, identify of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information. Electronically stored information further includes, but is not limited to, correspondence, telegrams, memoranda, communications, minutes or records of meetings and conferences, lists of persons attending meetings or conferences, summaries, records of conversations, drafts, notes, notebooks, logs, invention records and disclosures, translations, drawings, graphs, charts, photographs, sound recordings, images, data compilations, computer records or printouts, specifications, reports, opinions, summaries, agreements, forecasts, plan drawings, mask works, engineering drawings, expressions or statements of policy, consultations, brochures, pamphlets, advertisements, publications, circulars, trade letters, press releases, and drafts of any of the

foregoing.

6.      The term "IDENTIFY" shall mean: (a) when referring to documents or electronically stored information, to state the author(s) or maker(s) of the document or electronically stored information, the date of the document or electronically stored information, the type of document or electronically stored information (e.g., whether it is a letter, a memorandum, a photograph, etc.), the general subject matter(s) of the document or electronically stored information, the person to whom the original document or electronically stored information was addressed, and all copy recipients, and the document's or electronically stored information's last known location and custodian; if the document or electronically stored information was, but is no longer in your possession or custody or subject to your control, identify the person who decided upon the disposition and state what disposition was made of it; (b) when referring to a person, to state the person's full name, present or last known title or business description, present or last known employer or name of business, present or last known business address and telephone number, present or last known email address and phone number, and present or last known residence address and telephone number; once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that person; (c) when referring to an organization or entity, to state the organization's or entity's full name and present or last known address, and to fully describe the business or activity in which the organization or entity is engaged; (d) when referring to things, to state the product number, model number, serial number, type number, or other designation customarily used by you or others in the trade to designate such thing and to distinguish it from others made by the same or a different producer; and (e) when referring to a place or location, to state the complete physical and mailing address and telephone number.

7.      The term "INCLUDING" shall mean including but not limited to.

8.      The term "MATERIALS" shall mean any document, electronically stored information, or thing as these terms are defined herein.

9.      The term "PERSON" shall mean any natural person, entity, agency, association,

firm, individual, joint venture, partnership, trust, corporation, proprietorship, governmental body, or organization.

10.     The terms "RELATE", "RELATING", "REFER", "REFERRING", "CONCERNING", "CONCERN", "CONSISTING OF", and "REFLECTING" shall be construed in the broadest sense to include, in addition to their customary and usual meanings, computing, containing, discussing, describing, embodying, evidencing, including, indicating, mentioning, pertaining, showing, or constituting in whole or in part.

11.     The term "STATEMENT" shall mean (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by the person as a substitute for oral or written expression.

12.     The term "HDR Global Trading Limited", "YOU", "YOUR", "HDR", "HDR GROUP" and "BitMEX", mean, without limitation, Defendant HDR Global Trading Limited, 100x Group, and any and all predecessors, affiliated entities, parents, subsidiaries, sister companies, alter egos, principals, owners, partners, employees, attorneys, agents, representatives, consultants, or others acting or purporting to act on behalf of HDR Global Trading Limited.

13.     The term "LEADERBOARD ACCOUNTS" mean all trader accounts currently or formerly listed on BitMEX Leaderboard web page (https://www.bitmex.com/app/leaderboard) under the following trader names:

      a.     Rainbow-Narrow-Rider;

      b.     Mercury-Wood-Sprite;

      c.     Quick-Grove-Mind;

      d.     Heavy-Autumn-Wolf;

      e.     Silent-Plume-Otter;

      f.     coincidentcapitalltd;

      g.     Skitter-Peridot-Raven;

      h.     Honeysuckle-South-Rib;

i.      CSW is a fraud;

j.      Tree-Surf-Dragon;

k.      Roger-LeotankCapital;

l.      Jade-Platinum-Legs;

m.      Circle_Trade;

n.      Winter-Pink-Fang;

o.      daniel3;

p.      Cream-White-Ox;

q.      Disco-Solar-Fang;

r.      Roger_LeotankCapital;

s.      aoa;

t.      Ebony-Fair-Bat;

u.      Quill-Rift-Hoof;

v.      xorq;

w.      Brown-Peat-Myth;

x.      Jelly-Mint-Flier;

y.      Wheat-Storm-Speaker;

z.      Leaf-Long-Goat;

aa.      Silent-Hurricane-Guardian;

bb.      Paper-Feather-Stallion;

cc.      Sage-Tabby-Raver;

dd.      Leather-Metal-Razor;

ee.      Tree-Surf-Dragon;

ff.      Cedar-Spice-Fisher;

gg.    Big-Rift-Sting;

hh.    Linen;

ii.    Wave-Apple-Puma;

jj.    angelobtc;

kk.    AK is fraud;

ll.    Green-Sky-Whip;

mm.    Brave-Bramble-Skull; and

nn.    Denim-Sun-Speaker.

14.    The term "United States PERSON" mean a PERSON that is domiciled, located, incorporated or otherwise established in, or a citizen or resident, including, without limitation, a legal permanent resident, of the United States of America.

15.    The term "BITMEX PLATFORM" means an online digital asset trading platform called BitMEX.

## **INTERROGATORIES**

**INTERROGATORY NO. 1.**

State complete and current address of each and every office of HDR GROUP throughout the world.

**INTERROGATORY NO. 2.**

IDENTIFY each and every cryptocurrency exchange or other similar service, which was used by HDR GROUP or any of its members for conversion of bitcoin to fiat currency for its own needs during RELEVANT PERIOD.

**INTERROGATORY NO. 3.**

IDENTIFY each and every banking institution, which was used by HDR GROUP or any of its members for maintaining fiat currency deposit accounts for its own needs during

Consensus Law
CryptoCurrency
Attorneys

Vitaly Dubinin SROGs to HDR, Set 1 (Nos. 1-15)    - 8 -    BMA LLC et al. v. HDR et al.    Case No. 3:20-cv-3345-WHO

RELEVANT PERIOD.

**INTERROGATORY NO. 4.**

State any and all facts that demonstrate or tend to demonstrate that bitcoin that YOU converted to fiat currency during RELEVANT PERIOD was not obtained as a result of any illegal act.

**INTERROGATORY NO. 5.**

State any and all facts that demonstrate or tend to demonstrate that by converting bitcoin to fiat currency on YOUR behalf during RELEVANT PERIOD, cryptocurrency exchanges or other similar services used by YOU for this purpose, did not commit money laundering in violation of 18 U.S.C. §1956.

**INTERROGATORY NO. 6.**

State any and all facts that demonstrate or tend to demonstrate that by converting bitcoin to fiat currency on YOUR behalf during RELEVANT PERIOD, cryptocurrency exchanges or other similar services used by YOU for this purpose, did not engage in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S. Code §1957.

**INTERROGATORY NO. 7.**

State any and all facts that demonstrate or tend to demonstrate that YOUR acts of converting bitcoin to fiat currency during RELEVANT PERIOD did not constitute engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S. Code §1957.

**INTERROGATORY NO. 8.**

State any and all facts that demonstrate or tend to demonstrate that Exhibits 3, 4 and 5 attached hereto do not contain evidence (whether admissible or otherwise) of any illegal acts on BitMEX platform.

**INTERROGATORY NO. 9.**

State any and all facts that demonstrate or tend to demonstrate that BitMEX did not mislead any court about presence of U.S. PERSONS on BitMEX platform.

**INTERROGATORY NO. 10.**

State any and all facts that demonstrate or tend to demonstrate that illegal acts did not take place on BitMEX platform during RELEVANT PERIOD.

**INTERROGATORY NO. 11.**

Describe, in detail, any and all actions that you took to prevent BitMEX users from first entering into derivatives positions on BitMEX and then using helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**INTERROGATORY NO. 12.**

State any and all facts that demonstrate or tend to demonstrate that, during RELEVANT PERIOD, BitMEX users did not first enter into derivatives positions on BitMEX and then used helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**INTERROGATORY NO. 13.**

Describe, in detail, any and all investigations by YOU into allegations of BitMEX users first entering into derivatives positions on BitMEX and then using helper accounts on BitStamp, Kraken or Coinbase Pro to intentionally alter or otherwise manipulate any BitMEX index price.

**INTERROGATORY NO. 14.**

IDENTIFY a PERSON who placed at least 22 separate $2M orders on BitMEX on July 27, 2020, as shown in Exhibit 4.

**INTERROGATORY NO. 15.**

IDENTIFY, with specificity, each PERSON who traded on or accessed BITMEX

PLATFORM using each LEADERBOARD ACCOUNT.

Dated: August 22, 2020.                    CONSENSUS LAW

By: _____
            Pavel Pogodin, Esq.

Counsel for Plaintiffs
BMA LLC, Yaroslav Kolchin and
Vitaly Dubinin

# EXHIBIT 3

Story from **Markets** $\rightarrow$

# The Mechanics of Market Manipulation

Nov 30, 2019 at 09:10 UTC
Updated Dec 4, 2019 at 13:12 UTC





OPINION

*Marionette makers in the Federal Theatre Project's workshop in Washington, D.C., 1930s. Image via Library of Congress/Wikimedia Commons*

**Galen Moore**

**The levers are there to move hundreds of millions in crypto markets, and they're clearly labeled**

On May 17 of this year, bitcoin's price dropped suddenly. The action started on a single exchange: Bitstamp, domiciled in Luxembourg, where the dollar price of bitcoin

suddenly dropped more than 18 percent in a matter of minutes. The CoinDesk Bitcoin Price Index, a composite of several market feeds, recorded a 6 percent drop as a result.

Bitstamp was, at the time, one of three spot markets used as equal components in the bitcoin price index for BitMEX, a crypto derivatives exchange domiciled in the Seychelles that operates one of the most liquid bitcoin derivatives markets, the XBT/USD perpetual swap. BitMEX's other two bitcoin index components are Coinbase Pro and Kraken. Of the three, BitStamp's reported volumes are lowest.

The BitStamp price drop wasn't random. It was caused by a large bitcoin sell order, placed well below the market. The resulting downward pressure triggered auto-liquidations of long positions in the hundreds of millions of dollars on BitMEX. Traders with short positions on the exchange stood to benefit.

In this column, I'll provide a visual blow-by-blow of what happened May 17 on BitStamp, and a risk/return estimate: if it was manipulation, how much it cost, and how much the manipulators earned. I'll conclude with thoughts on the liquidity imbalance that caused it, and how it might happen again.

Before getting into that, I'll explain briefly how novel structures and thin markets could make such manipulation possible.

**Novel market structures**

In crypto markets, it's normal for investors to interact directly with the exchange – an ethos derived from bitcoin, which invites its users to transact pseudonymously, without intermediaries. On derivatives exchanges, accommodating this requires a rethinking of market structure.

On traditional derivatives exchanges, brokers and clearinghouses manage the risk that a large price move will bankrupt one side of a trade. All participants have an incentive to make good at settlement, so they can trade again tomorrow. On the largest crypto derivatives exchanges, it is possible to trade directly under one account today and another tomorrow. This unfettered access and

pseudonymity is part of the story of these exchanges' rise to become the most liquid markets in crypto.

To cover settlement risk, BitMEX and other large crypto derivatives exchange operators use auto-liquidiation. For example, if the index price drops far enough below an open long position, the exchange automatically liquidates that position, to settle the trade. Excess proceeds from auto-liquidations are stored in an insurance fund. If auto-liquidation falls short of settlement, the insurance fund kicks in. If the insurance fund's earmark falls short, auto-deleveraging occurs, unwinding both sides of the trade.

### Thin markets

Liquidity is a subjective term, meaning an investor's ability to move a reasonable volume of an asset, without an undue price shift. It is related to market depth, measured by the worst price an order will hit at a certain size limit.

In crypto, market depth is fragmented among dozens of the largest exchanges, and hundreds more in the long tail. Even in crypto's blue-chip assets, bitcoin and ether, pools of liquidity are scattered, which makes them more shallow. This situation may be worsening. Bitcoin's bid-ask spreads have widened on most of the largest exchanges in 2019, indicating decreasing market depth according to one tracker of composite data.

Exchanges that are part of price discovery infrastructure are thin enough that a large-ish order will move the price. And, as we will see below, derivatives markets can be far more liquid than the spot exchanges that help determine the price of their underlying assets.

### What happened May 17



The chart above presents a second-by-second account of what happened on the Bitstamp BTC/USD spot market in the early morning hours of May 17, UTC. Each point on the chart is the minimum, or best, ask price offered in each minute's snapshot of orderbook data, which is provided by CoinRoutes. The size of the point indicates the quantity of the order.

The action began at 3am UTC, with a sell order roughly 6 percent below the market price and hundreds of times larger than the norm on the exchange at that time. As that order fulfilled available bids, the ask price moved lower, dragging the market price down until it reached $6,276, at which point the selling stopped. A chronological calculation shows the sellers sold about 2,905.7 units of bitcoin, in aggregate at about $2.5 million below what they would have realized at a bitcoin market price of $7,700. At the same time, over $200 million in long positions were being liquidated on BitMEX, according to skew.com. If it was manipulation, it returned up to an 80X multiple over what the manipulators put at risk. The whole thing was over in about 10 minutes.

*Update: Trader and Crypto Twitter denizen Mike Komaransky pointed out that while the potential return of the May 17 flash crash's impact on the derivatives market was about 80X the capital apparently deployed into the underlying spot market, the profit to any manipulators involved in the crash would be more likely on the order of a 2X multiple, depending on their willingness to lever up on*

*BitMEX. I've left my not-very-thorough math as
is, above, and add Komaransky's math, below.*

 **Mike Komar...**   · Dec 3, 2019
Replying to @galenmoore
"If it was manipulation, it
returned up to an 80x multiple
over what the manipulators put
at risk." - @coindesk <-- This
upper bound is ridiculous; it
assumes the buyer bought all
#bitmex contracts at a price of 0.
Low on Bitmex of that day was
~6300.

 **Mike Komaransky**
@mkomaransky

More realistic:
1) Borrow $33M of BTC at 4:1
2) Use $10M of BTC margin at
bitmex to build $50M short at
7700
3) Push bitstamp down with 3k
BTC sell order, ave sale = 6866
4) Cover Bitmex and Bitstamp
shorts at 6700, earning $7M
This trade requires $8.3M in
capital and earns $7M.

2   1:24 PM - Dec 3, 2019

See Mike Komaransky's other
Tweets

**Conclusions**

Bitcoin's network security model is a fairly
straightforward bit of rational choice theory:
miners are rewarded for recording new
transactions. To earn the reward, they must
prove they have committed something of
value, i.e., energy. If a miner attempts to
manipulate the transaction record, other
miners will likely reject the contribution,
invalidating the reward. The cost of
manipulation and the likelihood of failure is
balanced against the reward for expected
behavior.

Bitcoin programmatically maintains that
balance, without recourse to identity
verification or trusted third parties. However,
the market structure that has evolved around

bitcoin has so far failed to achieve a similar equilibrium.

Not that folks haven't tried to patch the problem: BitMEX revised its bitcoin price index components in November, adding two new spot markets; Deribit, which at this writing operates the largest bitcoin options exchange, domiciled in the Netherlands, has promoted a different way of handling liquidations. As long as deep pools of liquidity remain dependent on shallow pools, bitcoin's market structure will be out of balance – and manipulators will have incentives to find ways around these patches.

## READ MORE ABOUT…

Market Manipulation

Price Manipulation

---

**DISCLOSURE**

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.

---



About

Masthead

Blog

Editorial Policy

Press

Jobs

Events

## Follow us



Sign up for our newsletter

✓  **Money Reimagined**

✓  **First Mover**

✓  **Crypto Long & Short**

✓  **Blockchain Bites**

*By signing up, you will receive emails about CoinDesk products and
you agree to our* <u>*terms & conditions*</u> *and* <u>*privacy policy*</u>

Enter your mail

SIGN UP

Terms & Conditions

Privacy Policy

Newsletters

© 2020 CoinDesk

**English** ▾

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a **strict set of editorial policies.** CoinDesk is an independent operating subsidiary of **Digital Currency Group**, which invests in cryptocurrencies and blockchain startups.

# EXHIBIT 4

**lowstrife**
@lowstrife

Sell 44 million over 22 separate orders on mex. Get into posision.

Then, market dump 1000 coins on Coinbase with max slippage to move index price.

I think we just saw someone do some crazy shit and make a ton of money.

| | | |
|---|---|---|
| $ 10995.528 | $ 303K | |
| $ 11050.000 | $ 578K | |
| $ 11050.000 | $ 792K | |
| **$ 11050.000** | **$ 1M** | |
| $ 11130.400 | $ 2M | |
| $ 11134.415 | $ 2M | |
| $ 11147.799 | $ 2M | |
| $ 11148.130 | $ 2M | 6m |
| $ 11175.299 | $ 2M | |
| $ 11189.506 | $ 2M | 8m |
| $ 11187.119 | $ 2M | |
| $ 11194.526 | $ 2M | |
| $ 11198.477 | $ 2M | 9m |
| $ 11186.195 | $ 2M | |
| $ 11195.031 | $ 2M | |
| $ 11199.930 | $ 2M | 11m |
| $ 11226.956 | $ 336K | |
| $ 11208.624 | $ 2M | |
| $ 11205.137 | $ 2M | |

7:25 PM · Jul 27, 2020 · Twitter Web App

# EXHIBIT 5



  

.tech **Why Get a .TECH Domain for Your Next Idea?**

# Blatant Market Manipulation Highlights the Need for Provably Fair Exchanges

July 19th 2019

   





**@adam-todd**
**Adam Todd**

Adam Todd is the Founder and Developer of the Digitex Futures Exchange, a commission-free Bitcoin fu

Another week in crypto, another accusation of market manipulation. BitMEX finds itself in the spotlight once again for potentially being the orchestrator of a flash crash on Bitstamp that sent the entire market crashing. Let's be honest, the evidence against Arthur and his penchant for liquidating retail traders is piling up. Ever since it emerged that BitMEX actively trades against its customers you have to wonder what kind of ethics the company has in place.

## BitMEX Is the King of Futures

Hats off to BitMEX. There's no one who can deny BitMEX is the king of crypto futures and one of the most liquid exchanges on the market. But it's also becoming a dictator. This Seychelles domiciled exchange working out of Hong Kong's most expensive office space is doing something right. A lot of things actually--on June 26th, BitMEX hit a new all-time high for daily futures trading at an eye-watering $16 billion.

There are other competitors on the market and perhaps Binance will lend some additional credibility to the crypto derivatives space. Whatever your stance on Binance, it at least escaped the Bitwise report that 95% of trading volume is fake, alongside a handful of other exchange not accused of falsifying numbers, such as Coinbase Pro and Bitstamp.

Yet, despite CME, Binance, OKEx, and a handful of others, BitMEX still dominates the market. And as we've seen from the likes of Facebook, Google, and large financial institutions--market domination is not a good thing. It leads to people having less choice and being subjected to the practices of oligopoly companies in power.

## The case against BitMEX

Last Sunday 14th July, someone placed a sell order on Bitstamp for 15,000 ETH causing the price to plummet from $270 to $190 and leading to a flash crash on the exchange. Since Bitstamp is a far less liquid exchange than Binance or BitMEX, this dump made up around $3.5 million of ETH--some 15% of its entire ETH trading volume in just one trade.

You may wonder what this has to do with everyone's favorite futures exchange. Well, it doesn't take too long to put two and two together. You see, BitMEX pulls its price data for its contracts

from just three exchanges; Kraken, Coinbase Pro, and Bitstamp.

Since BitMEX contracts are based heavily on Bitstamp's price, this dump caused a mass of

instant liquidations--over $164 million worth that spread over to Bitcoin and lead to Sunday's plunge. Why would BitMEX do something like this? Simple. Because it makes money a lot of money out of liquidating its traders.

## The BitMEX Insurance Fund

The BitMEX Insurance Fund builds up ad infinitum with virtually no daily drawdowns of any significance over a period of years--even during periods of high volatility. In fact, you can see that the insurance fund balance has increased 99 days out of the last 100 days.

Liquidations on BitMEX in fact, at times, account for as much as HALF of all the exchange's revenue. Add this massive incentive to liquidate traders to the fact that the exchange has proprietary traders actively trading against its own customers for profit, and you've got a pretty hostile environment to trade in. Utterly cut-throat, unforgiving, and set up for traders to fail.

Whether BitMEX was behind the massive flash crash on Bitstamp last weekend or not is somewhat of a moot point. I mean, I know where I'd place my bets, but it's not impossible that some other crypto whale or group of investors did it for other interests. Whatever the case, it comes down to centralized exchanges getting away with manipulating the market.

## But That Doesn't Mean We Need More Regulation

Of course, happenings like these in the crypto world and reports like the Bitwise one only give more ammunition to the regulators to ruin the party. Regulators who put their own multiple interests ahead of retail traders and the cryptocurrency industry. Calling on regulators to save us from the likes of BitMEX is not the answer.

Regulation, KYC, AML, for the most part, is in my opinion just one big scam. Centralized institutions and governments are fearful of cryptocurrency and try their best to keep it down. They impose exorbitant fees for supposedly preventing money laundering and crippling

They impose exorbitant fees for supposedly preventing money laundering and crippling cryptocurrency business at the same time. And worse, most of the regulators are easily bought or have their own agenda at heart. We are adding a layer of human incompetence, corruption, and greed where none is needed.

Exchanges like BitMEX need to be kept in check by tools that are better and more powerful than regulation. One of the distinguishing features behind Digitex Futures besides its non-custodial accounts and zero-fee trading is the fact that we will be provably fair.

We will use blockchain technology to ensure that our order book is transparent and overseen--not by human regulators who freeze out retail traders, charge fortunes, or make their own judgment calls--but by a trustless technology, transparent for anyone to see.

Unlike BitMEX or any other centralized exchange, we can't be accused of front-running, last look, queue jumping, or censorship since we will keep a tight order book transparent and public. This isn't just a good idea; this is better than regulation because it doesn't cost extra for traders and it's 100% transparent with blockchain technology.

## A Token Reallocation System to Reward Active Traders

Further, rather than have an incentive to liquidate traders like BitMEX, on the Digitex exchange, we will start with an insurance fund of 100 million DGTX (10% of total supply) and will maintain it at this level.

Any excess profits from liquidations will be reallocated to our automated market makers which will be programmed to lose those profits by tightening spreads and increasing their order size. This gives traders an additional incentive to come onto the exchange and compete for these market maker losses. They can even devise strategies that exclusively target our market makers. In other words, they have a mechanical edge built into the exchange in their favor, rather than against.

We want to create successful traders. We want more people to trade on the exchange. What we don't want is half our profits coming from the insurance fund or to be seen orchestrating flash crashes. We also won't be holding onto traders' funds since they will be in non-custodial

flash crashes. We also won't be holding onto traders' funds since they will be in non-custodial accounts and traders don't have to trust us with their money.

## Wrapping It Up

Die-hard anti-crypto economists like Roubini and regulators and politicians like Trump will always use these episodes as a chance to prepare their victory dance over crypto and clamor for tighter regulation.

If they understood the technology just a little bit, they would see that there's a better way to keep it in check. It's provably fair and written in code. And you can't write laws against bits and bytes.

Share this story 



**@adam-todd**
Adam Todd

**Read my stories**

**Adam Todd is the Founder and Developer of the Digitex Futures Exchange, a commission-free Bitcoin fu**

Comments

delivered at noon



## Visit Noonification ↗

https://noonification.com

promoted

Through Sheer Determination



#cryptocurrency

@adam-todd

**Adam Todd**

4min

11/11/19

# The Space Tech Startup Making Our Internet A

# Better Place With Lase...



#fundraising



@rachelminnlee

**Rachel Lee**

06/14/20

---

## Tags

**Help**   **About**   **Start Writing**   **Sponsor:**   Brand-as-Author   Sitewide Billboard
Ad by tag   Newsletter
Contact Us   Terms   Privacy   Cookies





Subscribe to get your daily round-up of top tech stories!

## What do you think?

0 Responses

 Upvote     LOL     Love     On fire     Meh     Clap

**Hacker Noon Comment Policy**

treat your internet friends with respect.



**0 Comments**    **Hacker Noon**    🔒 **Disqus' Privacy Policy**      1 **Login** ⌄

♡ **Recommend**    🐦 Tweet    f Share      Sort by Best ⌄



Start the discussion…

**LOG IN WITH**      **OR SIGN UP WITH DISQUS** ⑦

Name

Be the first to comment.

✉ Subscribe    ⚠ Do Not Sell My Data

---

## Related

```
Subscribe to Hacker Noon's
best tech stories,
```

```
Delivering Zero-Fee Trading
Through Sheer Determination
```