Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC,
Yaroslav Kolchin and Vitaly Dubinin

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin and Vitaly Dubinin,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,<br><br>Defendants. | Case No.  3:20-cv-3345-WHO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Hon. William H. Orrick**<br>**Date: December 16, 2020**<br>**Time: 2:00 PM**<br>**Crtrm.: 2, 17th Floor**<br><br>**Discovery Cutoff: None Set**<br>**Pretrial Conference Date: None Set**<br>**Trial Date: None Set** |

Consensus Law
CryptoCurrency
Attorneys

Plaintiffs' Opposition to Defendants' Motion to Dismiss.   - i -   BMA LLC et al. v. HDR et al.   Case No. 3:20-cv-3345-WHO

1
2

**<u>TABLE OF CONTENTS</u>**

3
4

Plaintiff BMA ................................................................................................................ 1

5

Procedural Background .................................................................................................. 1

6

Statement Of The Relevant Facts .................................................................................. 2

7
8

The Leaderboard Fiasco And Hasty "User Verification Programme"............................. 6

9

Defendant Reed's Perjury At CFTC Deposition And Mr. Hibbard's Untruthful Statements To

10

Courts With Respect To The Same Facts ....................................................................... 7

11
12

Defendants' Motions to Dismiss And Stay Are Laced With Untruthful Statements....... 8

13

Defendants' CEA Extraterritoriality Arguments Are Baseless...................................... 12

14
15

Defendants' RICO Extraterritoriality Arguments Are Equally Groundless .................. 14

16

Defendants' Lack Of Standing Arguments Are Similarly Groundless........................... 16

17

SAC Satisfies Heightened Pleading Standard Under Rule 9(b) Where It Applies ........ 22

18
19

Defendants' Lumping Argument Is Laughable ............................................................. 24

20

SAC Adequately Alleges Two RICO Predicate Offenses For Each RICO Defendant.... 24

21
22

Defendants' Remaining Arguments Are Equally Meritless .......................................... 25

23

Conclusion ................................................................................................................... 25

24
25
26
27
28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

1

**TABLE OF AUTHORITIES**

2

3

**CASES**

4

*Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388 (9th Cir. 1988) .......................................... 26

5

*Anderson News, LLC v. American Media, Inc.*, 680 F. 3d 162 (2d Cir. 2012) ............................. 23

6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................ 25

7

*Commodity Futures Trading Com'n v. McDonnell*, 287 F.Supp.3d 213 (E.D.N.Y. 2018) ........... 28

8

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp.3d 122 (S.D.N.Y. Nov 26, 2018) ............... 20, 22

9

*Foman v. Davis*, 371 U.S. 178, 182 (1962) ................................................................................. 28

10

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F.Supp.3d 581 (S.D.N.Y. 2015) ........ 21

11

*In re London Silver Fixing, Ltd., Antitrust Litig.* No. 14-MD-2573 (VEC), 213 F.Supp.3d 530,

12

    (S.D.N.Y. Oct. 3, 2016) ....................................................................................................... 22, 25

13

*In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005) .................................... 25

14

*In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) ......................................... 26, 27

15

16

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474 (S.D.N.Y.

17

    2002) .................................................................................................................................... 25

18

*Kraft Foods Grp., Inc., 153 F. Supp. 3d 996 (N.D. Ill. 2015)* ...................................................... 24

19

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991) ................ 26

20

*Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2020 WL 5077186 (S.D.N.Y. Aug. 27,

21

22

    2020) .................................................................................................................................... 14

23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................................. 19, 24

24

*Robins v. Spokeo, Inc.*, 867 F.3d 1108 (2017) ........................................................................... 19

25

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ......................................................................... 19

26

27

*Sullivan v. Barclays PLC*, 13-cv-2811 (PKC) 2017 WL 685570 (S.D.N.Y. Feb 21, 2017).... 20, 25

28

*Wash. Envtl. Council v. Belton*, 732 F.3d 1131 (9th Cir. 2013) ..................................... 23

*United States v. Faiella, 39 F. Supp. 3d 544 (S.D.N.Y. 2014)* ....................................... 5

*United States v. Klein, 6:17-cr-03056 (W.D.Mo. 2017)* ................................................. 5

**STATUTES**

18 U.S.C. § 1343 ............................................................................................... 16, 24

18 U.S.C. § 1952 ..................................................................................................... 24

18 U.S.C. § 1956 ...................................................................................... 4, 5, 6, 16

18 U.S.C. § 1956(a) ......................................................................................... 11, 24

18 U.S.C. § 1957 ............................................................................... 4, 5, 6, 11, 16

18 U.S.C. § 1957(a) ............................................................................................... 24

18 U.S.C. § 1960 ..................................................................................................... 16

18 U.S.C. § 1960(a) .............................................................................. 5, 6, 10, 11, 24

18 U.S.C. § 2314 ............................................................................................ 11, 16, 24

18 U.S.C. §§ 1962(c) ............................................................................................... 1

18 U.S.C. §§ 1962(d) ............................................................................................... 1

31 U.S.C. §§ 5311 et seq. ......................................................................................... 1

7 U.S.C § 1a(47)(a)(IV), ....................................................................................... 16

7 U.S.C. § 13 ............................................................................................................ 25

7 U.S.C. § 25(a)(1)(D), ......................................................................................... 16

7 U.S.C. § 25 ............................................................................................................ 10

7 U.S.C. § 9 .............................................................................................................. 10

7 U.S.C. § 9(1) ......................................................................................................... 25

7 U.S.C. §§ 1 et seq. ................................................................................................. 1

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS.   **- iv -**   BMA LLC ET AL. V. HDR ET AL.   CASE NO. 3:20-cv-3345-WHO

**RULES**

Fed. R. Civ. P. 11 ......................................................................................................... 9

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 8

Fed. R. Civ. P. 9(b) ......................................................................................... 22, 23, 24

**REGULATIONS**

Regulation 180.1 ......................................................................................................... 23

Regulation 180.2 ......................................................................................................... 23

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, Art. III, § 2 .................................................................................... 18

**Plaintiff BMA**

At the outset, early on in the case, Plaintiffs' counsel offered Defendants' attorney Mr. Hibbard to provide full information on the ownership and membership of Plaintiff BMA in exchange for the ownership information of Defendant HDR.  Mr. Hibbard, of course, flatly refused and is now crying crocodile tears to the Court about his perceived lack of transparency in Plaintiff BMA in his every paper, Ex. A.  He could have also easily served just one discovery request and received this information months ago.  This is what discovery is for.  Yet, he failed to take any of these trivial steps and now tries to score points with the Court using his own lapse of diligence.  Therefore, his disingenuous quibbles about Plaintiff BMA must be summarily rejected.

**Procedural Background**

Plaintiffs filed the original Complaint, Dkt. No. 1, on May 16, 2020, alleging that Defendants engaged in racketeering in violation of 18 U.S.C. §§ 1962(d) and (c) ("RICO") and cryptocurrency market manipulation in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 et seq., as well as state causes of action.  Two days later, on May 18, 2020 Plaintiff filed an Amended Complaint, Dkt. No. 6, with minor corrections of typographical errors and no substantive changes.  On July 14, 2020, parties stipulated to waiver of service of process, filing of a Second Amended Complaint ("SAC") and set a briefing schedule.  Court has granted this stipulation, Dkt. No. 31, and Plaintiffs filed the SAC on July 14, 2020, Dkt. No. 32.  Defendants filed their Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) on September 14, 2020, Dkt. No. 42.  Plaintiffs filed a Motion for Leave to File Third Amended Complaint ("TAC", Dkt. No. 45) on October 8, 2020, which is set for hearing on November 10, 2020 before Judge Orrick, Dkt. No. 46, overcoming all of Defendants' arguments raised in their Motion to Dismiss.

On October 1, 2020, Defendants Hayes, Delo and Reed were indicted by the U.S. Department of Justice ("DOJ") on felony charges of violating the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 et seq., by willfully evading U.S. anti-money laundering ("AML") requirements, Ex. B.  On the same day, the Commodity Futures Trading Commission ("CFTC") filed a civil enforcement action in the U.S. District Court for the Southern District of New York charging

Defendants HDR, ABS, Hayes, Delo and Reed with operating an unregistered exchange and violating multiple CFTC Regulations, including failing to implement AML procedures, Ex. C.

In announcing the DOJ Indictment, Ex. B, Acting Manhattan U.S. Attorney Audrey Strauss said:

> With the opportunities and advantages of operating a financial institution in the United States comes the obligation for those businesses to do their part to help in driving out crime and corruption. As alleged, these defendants flouted that obligation and undertook to operate a purportedly 'off-shore' crypto exchange while willfully failing to implement and maintain even basic anti-money laundering policies. In so doing, they allegedly allowed BitMEX to operate as a platform in the shadows of the financial markets. Today's indictment is another push by this Office and our partners at the FBI to bring platforms for money laundering into the light.

FBI Assistant Director William F. Sweeney Jr. further stated:

> As we allege here today, the four defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements. One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time.

Defendant Reed was apprehended by the FBI in Boston, Massachusetts. Defendants Hayes and Delo remain at large and are currently fugitives wanted by the U.S. Government.

## Statement Of The Relevant Facts

The key facts of this case are rather simple and easy to understand. In 2014, Defendants launched a bitcoin derivatives trading platform called BitMEX, which enables traders to place bets on direction of cryptocurrency prices, SAC ¶¶ 117, 118. In designing their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer ("KYC") or AML checks what so ever, SAC ¶ 215, Ex. 1. In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked. SAC ¶¶ 211-213, Ex. 1.

In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way. SAC ¶¶ 211-213. The entire registration and funding process

takes about 10 minutes and no documents are even looked at.  Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, SAC Ex. 1.  A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader, Ex. D.[1]

But Defendants' wrongdoing does not stop there.  Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from money laundering and market manipulation, SAC ¶ 1.  It all has to do with anonymity, lack of trading limits, high leverage and how the index price for bitcoin derivatives is calculated.   Defendants deliberately designed this index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges, SAC ¶¶ 109, 119.  Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, relatively small market orders will suffice.  Therefore, a relatively small market order on a spot exchange results in a relatively large bitcoin index price move on the very liquid BitMEX, SAC ¶¶ 109, 119, 214.

A money launderer would open two exchange accounts – a helper account on one or more exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and BitStamp) and a winner account on BitMEX, SAC ¶ 110, 111, 119, 214.  The money launderer would then enter into a large leveraged derivatives position on BitMEX and immediately execute market orders from the helper account with maximum slippage to move the index price in a favorable direction, SAC ¶ 119, 214, Ex. 2, 3.   Due to disparity in liquidity between BitMEX and the spot exchanges, the aforesaid deliberate design of the index price by Defendants, and the cascading liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account is multiplied greatly and translates into outsized profit in the winner account on BitMEX, SAC ¶¶ 203, 214, Ex. 2, 3.  Because BitMEX accounts are by design anonymous, the laundered money cannot be traced from the helper account to the winner account, SAC ¶¶ 3, 184, 215.  Thus, the money laundering proceeds in the winner account on BitMEX appear as legitimate trading gains and the

---

[1] In reality, BitMEX is a California enterprise, having most of its employees in California and doing hundreds of billions of dollars of business in the U.S. with U.S. traders, which uses a sham offshore shell company HDR Global Trading Limited to dodge U.S. laws and regulations.

money laundering scheme achieves its purpose, SAC ¶ 214.  The described money laundering and other nefarious acts are well documented and take place on BitMEX almost daily, SAC ¶¶ 226, 261, 184, Ex. 2, 3.   Moreover, to exacerbate the price manipulations, BitMEX intentionally locks users out of their accounts during manipulation times and accepts trading orders only on one side of the market, falsely telling the users that their "system is overloaded," SAC ¶¶ 122, 185.

BitMEX directly participates in and financially benefits from this illegal activity through its internal trading desk, which orchestrates execution of the market orders from the helper accounts and indirectly, by collecting increased trading fees and also by liquidating users' accounts SAC ¶ 4.  Specifically, BitMEX knowingly collects high trading fees for the above money laundering transactions, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from



Mechanics of Bitcoin Market Manipulation and Money Laundering

which it pays all its employees and even its attorneys (after currency conversion).  Thus, the salaries of all BitMEX employees as well as legal fees paid to its lawyers are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, SAC ¶ 214, 229.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In the described money laundering scheme, the market manipulation gains realized by the launderer in the winner account and the funds confiscated by BitMEX as the result of liquidations induced by the launderer are generated at the expense of Plaintiffs and other cryptocurrency traders like Plaintiffs, who traded on BitMEX itself as well as on Kraken exchange, which Defendants used to manipulate cryptocurrency prices, SAC ¶¶ 125, 214.  Notably, BitMEX deposits proceeds from the user account liquidations into its so called "Insurance Fund," which has steadily grown over the years and now amounts to over $427,000,000 dollars, all misappropriated from traders, including Plaintiffs, SAC ¶¶ 145-149.

Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a).  This violation has been conclusively proven using BitMEX's own public Leaderboard, and without the benefit of discovery, which Defendants stonewalled, Ex. E.  Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. F.  In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiffs are aware of, without having any benefit of discovery, SAC ¶¶ 67-73.  The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty three times).  Consequently, all the funds that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering

in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).

Awash with large amounts of tainted cash and encouraged by perceived lack of any accountability, Defendants grew so brazen that they do not even hesitate to publicly admit to bribery and bank fraud, SAC ¶¶ 11, 13.  Despite the fact that the vast majority of Defendants' personnel and managers are located in this District, to avoid being subject to U.S. laws, regulations and taxes, Defendants established 12 false shell companies, including Defendant ABS, with intent to create an appearance that Defendant HDR has no presence, operations or investors in regulated jurisdictions such as the United States, SAC ¶¶ 12, 24.

The sheer magnitude of Defendants' unlawful activity is truly staggering.   In addition to being recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license, which by itself conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendants, "[s]everal sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States, SAC ¶ 2.  Accordingly, Defendants were unquestionably on notice of the need to obtain a money transmission license in the United States and to comply with mandatory FinCEN regulations, which Defendants willfully and deliberately failed to do.  Therefore, according to Defendants' own data, Defendants' unlicensed money transmitting business admittedly processed, on average, $3 billion of illegal and unlicensed money transfers each day, all in violation of 18 U.S.C. § 1960(a), which is the record volume for such unlawful activity in the entire history of the monetary regulation in the United States, SAC ¶ 2.

### The Leaderboard Fiasco And Hasty "User Verification Programme"

Defendants' initial strategy to deal with a mounting number of civil cases against them in the United States was to argue to Courts that Defendants were not subject to personal jurisdiction in this country due to a lack of minimum contacts with the U.S. and, specifically, due to "U.S. persons [being] expressly prohibited from trading on BitMEX platform."

That defense strategy spectacularly imploded when, in early August, Plaintiff's counsel

Pavel Pogodin stumbled upon Defendants' Leaderboard

(https://www.bitmex.com/app/leaderboard, Ex. E) and discovered that, contrary to Defendants'

denials, among top three Leaderboard traders, who meaningfully revealed their real names, all

three turned out to be United States persons, generating over $70,000,000 in trading profits on

Defendants' BitMEX platform. Plaintiffs' attorney put this stunning discovery into a CMC

statement filed on August 11, 2020, Dkt. No. 33, which caused an angry response from

Defendants' counsel.  Defendants' counsel first demanded that Plaintiffs remove this very

damaging information from the CMC statement using a CMC statement page limit as an excuse.

After receiving a negative response, Defendants' counsel bitterly refused to file Plaintiffs'

exhibits to the CMC statement.  Moreover, in a phone call, which took place shortly thereafter,

conspicuously shaken Mr. Hibbard uncontrollably screamed at Plaintiffs' counsel in a grossly

unprofessional manner, shouting over the phone "shut your mouth."

      After Defendants and their counsel finally came to their senses and realized that the

jurisdictional genie was out of the bottle and their plot to mislead U.S. Courts has been exposed,

they hastily waived jurisdictional challenges in three United States civil cases against them and

instituted a "User Verification Programme"[2], designed to create an appearance that Defendants

somehow did not know before that most of their leaderboard was filled with U.S. traders,[3]

**Defendant Reed's Perjury At CFTC Deposition And Mr. Hibbard's Untruthful Statements To Courts With Respect To The Same Facts**

      As stated above, Defendants' strategy (or, more accurately, plot) to deal with civil

litigation against them in the U.S. was to falsely claim to Courts that, despite having more that

85,000 trader accounts with the U.S. nexus[4], Defendants were not subject to personal jurisdiction

in this country due to a lack of minimum contacts with the U.S.  In furtherance of this plot to

---

[2] BitMEX operated for more than 5 years without any user verification what so ever.  The "User Verification Programme" was instituted less than 48 hours after Plaintiffs' counsel put discovered jurisdictional evidence into CMC statement, Dkt. No. 33.
[3] The "User Verification Programme" was apparently instituted in order to avoid civil and criminal liability for knowingly operating an unlicensed money transmission business in the U.S. in violation of 18 U.S.C. § 1960(a).
[4] CFTC Complaint, Ex. C, p. 2-3, ¶ 3.

defraud U.S. Courts, Defendant Reed went as far as to commit perjury during his 2019 deposition before CFTC, by denying that BitMEX maintained reports identifying U.S. customers on its trading platform, see Indictment, Ex. B, p. 13, ¶ 27.  In reality, in December of 2018, Reed received a report showing trading revenue attributable to U.S. customers, see Indictment, Ex. B, p. 13, ¶ 27.

Pursuant to the same plot, Defendants' counsel Mr. Hibbard repeatedly untruthfully told San Francisco Superior Court Judge Schulman that BitMEX serves only non-U.S. traders and, therefore, California Courts lack jurisdiction over it, see Ex. G.  Yet again, pursuant to the same plot, Mr. Hibbard untruthfully tells Judge Orrick on page 3 of this very Motion, that "Plaintiffs do not allege that HDR engaged in any conduct in the United States at all."  This is false.  In reality, SAC ¶¶ 2, 5, 16, 17, 21, 25, 44, 46, 48, 57, 60, 61, 64, 65, 67, 68, 71, 73-81, 185, 186, 203, 206, 207, 303, 326, 344 and 368 allege <u>overwhelming</u> facts of HDR's extensive conduct in the U.S.

All these misrepresentations are parts of the same scheme to mislead U.S. and California Courts, which Defendants and their counsel continue to pursue even today in this very Motion.

### **Defendants' Motions to Dismiss And Stay Are Laced With Untruthful Statements**

After Defendants' jurisdictional defense fiasco due to Plaintiffs' counsel stumbling upon Defendants' Leaderboard riddled with United States traders, Mr. Hibbard turned his attention to misleading Judge Orrick into dismissing SAC on a groundless Rule 12(b)(6) motion. To this end, on September 14, 2020, Mr. Hibbard filed a Motion to Dismiss laced with numerous material misrepresentations.  [Dkt. No. 42].

Being unable to defend this lawsuit on the merits, Mr. Hibbard decided to utilize a tactic of last resort – shamelessly misrepresent allegations of the SAC to Judge Orrick.  Below are just three examples of blatant misrepresentations that Mr. Hibbard perpetuated in his Motion to Dismiss.  Defendants' Motion to Stay [Dkt. No. 43], contains substantially similar misstatements. Needless to say, Mr. Hibbard's conduct shamelessly violates Rule 11.

For example, as stated above, on p. 3 of the Motion to Dismiss, Mr. Hibbard represented to Judge Orrick that: "Plaintiffs do not allege that HDR engaged in any conduct in the United

States at all." This representation is unquestionably false. In reality, SAC ¶¶ 2, 5, 16, 17, 21, 25, 44, 46, 48, 57, 60, 61, 64, 65, 67, 68, 71, 73-81, 185, 186, 203, 206, 207, 303, 326, 344 and 368 allege <u>overwhelming</u> facts of HDR's extensive conduct in the United States. Moreover, the table below summarizing allegations of the SAC clearly shows that all three components of the alleged market manipulation were all perpetrated by HDR in this District and the United States:

| Manipulation Component | Manipulative Conduct Involved | Place of Manipulative Conduct | SAC ¶¶ |
|---|---|---|---|
| Helper Component | Deliberately moving BitMEX index price by placing large market orders with maximum slippage from helper accounts on three illiquid exchanges | BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 109, 110, 203, Ex. 2, 3, 4 |
| | Liquidation cascades that resulted in some of Plaintiffs' damages takes place, directly and proximately caused by the deliberate index price move | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located and Kraken, also located in this District. | SAC ¶ 59, 74-78, 205, 295-301, Ex. 4 |
| Winner Component | Capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX. | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶¶ 59, 74-78, 203, 205, 214, 226, 295-300, Ex. 2, 3 |
| Facilitation Component | Freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶¶ 59, 74-78, 75, 122-124, 160, 185, 186, 203 |

As another example, on pp. 3-4 of the Motion to Dismiss, Mr. Hibbard further represented to Judge Orrick that "Plaintiffs do not allege how or when Defendants themselves purportedly engaged in any of those activities… In other words, Plaintiffs seek to hold Defendants liable because *other* individuals or entities allegedly have used techniques to manipulate the price of cryptocurrencies listed on *other* exchanges, which in turn impacts trading activity undertaken by *other* individuals or entities on BitMEX." This is again a patently false statement. Please refer to

SAC ¶¶ 3, 113 ("[t]he illegal stock price manipulation technique alleged by SEC is <u>identical</u> to the techniques alleged hereinabove and <u>used</u> as well as aided and abetted by Defendants on a <u>daily basis</u> during the time period starting on January 1, 2017 and until now ('Relevant Period') to manipulate the prices of cryptocurrencies"), 119 ("BitMEX would then engage in manipulative trading on those exchanges to change the price of bitcoin or ether. Even if only temporary, these price changes would then affect the prices of the futures offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders"), 122, 123, 124, 125, 183, 185, 186, 203, 206, 214 ("Plaintiffs BMA, Kolchin and Dubinin are informed and believe and thereon allege that <u>Defendants themselves launder funds</u>"… "In addition, the knowing, willful and deliberate effective transmissions of the winnings from market manipulation from the first helper account to the second winner account <u>perpetrated by Defendants on behalf of themselves</u> and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes unlicensed money transmission in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense"), 238, 243, 244, 250, 251, 260-263, 275-277, 281, 282, 295-300, 319-323, 337-341 and 360-364, which contain <u>overwhelming</u> and very detailed allegations of facts establishing <u>how</u> Defendants <u>themselves</u> manipulated cryptocuurrency markets on a <u>daily basis</u>.

Moreover, SAC ¶ 125 explicitly states: "<u>Defendants and each of them have thus manipulated the price of bitcoin and ether</u>, harming Plaintiff and other traders who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25 (2012)."

As a further example, SAC ¶ 203 states: "For example, Ex. 3, p. 4 describes how a helper account on BitStamp was used on May 17, 2019 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX. See also Ex. 2, pp. 2-3 describing a similar scheme that used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiffs, on Bitmex on July 15, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX. Plaintiffs BMA, Kolchin and Dubinin are informed and believe and thereon allege that

Defendants use this unlawful scheme on a regular basis using helper accounts on United States based cryptocurrency exchanges BitStamp, Kraken and Coinbase."

As yet further example, SAC ¶ 205 explicitly states: "For example, Plaintiffs BMA, Kolchin and Dubinin were financially injured when Defendants effectively transmitted funds, which was perpetrated willfully and deliberately by Defendants through their commercial website BitMEX.com, and with full knowledge of the nature and purpose of the funds involved in the transfer, in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314 between helper and winner accounts by way of using the helper accounts to perpetrate manipulation by pumping or dumping the cryptocurrency market, thereby causing a liquidation cascade affecting Plaintiffs' accounts, and using the winner accounts to capture the financial benefits of the aforesaid manipulation. As the result of the actions of the Defendants alleged in this Paragraph, the positions of Plaintiffs' were liquidated."

As yet further example, SAC ¶ 207 explicitly states: "Moreover, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts, which resulted in the injury to Plaintiffs, were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District."

As yet further example, SAC ¶¶ 260-261 provide:

Plaintiffs BMA, Kolchin and Dubinin are informed and believe and thereon allege that, during the Relevant Period, Defendants, and each of them, used wire signals to transmit various electronic orders to multiple cryptocurrency exchanges for the specific purpose of misleading traders and investors as to the cryptocurrency market's natural forces of supply and demand and for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives. … Plaintiffs BMA, Kolchin and Dubinin are informed and thereon allege that the alleged fraudulent electronic wire transmissions were performed by Defendants on a daily basis during the Relevant Period and were carried out from Defendants' offices located in San Francisco, California and Hong Kong Special Administrative Region of the People's Republic of China and to respective computer servers of Amazon EKS as well as computer serves of multiple other cryptocurrency exchanges that Defendants used to perpetrate their manipulative and fraudulent scheme alleged hereinabove. Plaintiffs BMA, Kolchin and Dubinin are informed and believe and thereon allege that each of Defendants HDR, ABS, Hayes, Delo and Reed issued the alleged fraudulent electronic wire transmissions on a daily basis during the Relevant Period, including May 17, 2019, June 26, 2019, July 14, 2019, and March 13, 2020

(emphasis added).

As one can clearly see, the above-cited portions of the SAC provide very extensive and very detailed allegations of "how or when Defendants themselves purportedly engaged in any of [manipulation] activities." Thus, Mr. Hibbard's above representation that "Plaintiffs do not allege how or when Defendants themselves purportedly engaged in any of those activities…" was a willful and deliberate untruth that Mr. Hibbard perpetrated on this Court.

As yet another example, on p. 6 of the Motion to Dismiss, Mr. Hibbard represented to Judge Orrick that "because Plaintiffs have already had multiple opportunities "to state actionable claims and fix deficiencies in their complaints" but have failed to do so, this Court should dismiss Plaintiffs' case with prejudice." This representation is also blatantly untrue. In reality, two of the three Plaintiffs were added to this lawsuit for the first time in the SAC. They did not get a chance to amend even once.

Accordingly, in view of multiple false statements in both Motions to Dismiss and Stay Discovery, Plaintiffs respectfully request the Court to issue an Order to Show Cause why sanctions should not be imposed on Defendants for filing papers with the Court containing numerous material misrepresentations with a clear aim to confuse and mislead Judge Orrick.

## **Defendants' CEA Extraterritoriality Arguments Are Baseless**

The market manipulation alleged in the SAC has three components: the helper component, the winner component and the facilitation component. The helper component involves deliberately moving BitMEX index price by placing large market orders with maximum slippage from helper accounts on illiquid U.S. based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken and, therefore, it takes place entirely in the U.S. as Coinbase Pro and Kraken are based in this District and BitStamp is based in New York, SAC ¶¶ 109, 203, Ex. 4.

The second, winner component of the market manipulation encompasses capturing multiplied manipulation profits using winner account(s) on BitMEX. In this regard, it is important to note that unlike traditional stock or commodity exchanges that have trading floors manned by brokers, BitMEX exist only in the Internet cloud, and does not have a single

centralized location where all the trading takes place.  Various pieces of software code and data used by BitMEX to enable trading are scattered among multiple cloud service providers, the vast majority of which are located in this District, SAC ¶ 59.  Moreover, the vast majority of BitMEX employees, the vast majority of engineering and software development team and the nerve center of BitMEX operations are also located in this District, SAC ¶¶ 74-78.  Therefore, of all the places in the world, this District is clearly the location where the center of gravity of BitMEX operations lies and, consequently, it is where the alleged winner component of the market manipulation takes place.

Finally, the facilitation component involves freezing BitMEX servers and accepting orders only on one side of the market to exacerbate the price moves during manipulation times.  This component again takes place entirely in this District, where all three site reliability engineers of BitMEX, who are responsible for the trading platform uptime and who perpetrated the server freezes, are located, SAC ¶¶ 74, 75, 185, 186.

Therefore, as the below table clearly shows, all three market manipulation components alleged in the SAC take place in the United States and, consequently, Defendants' baseless extraterritoriality arguments must be rejected.

| Manipulation Component | Manipulative Conduct Involved | Place of Manipulative Conduct | SAC ¶¶ |
|---|---|---|---|
| Helper Component | Deliberately moving BitMEX index price by placing large market orders with maximum slippage from helper accounts on three illiquid exchanges | BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 109, 110, 203, Ex. 2, 3, 4 |
| | Liquidation cascades that resulted in some of Plaintiffs' damages takes place, directly and proximately caused by the deliberate index price move | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located and Kraken, also located in this District. | SAC ¶ 59, 74-78, 205, 295-301, Ex. 4 |
| Winner Component | Capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of | SAC ¶¶ 59, 74-78, 203, 205, 214, 226, 295- |

| | | on BitMEX. | BitMEX is located | 300, Ex. 2, 3 |
| Facilitation Component | Freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶¶ 59, 74-78, 75, 122-124, 160, 185, 186, 203 |

Even if the Court concludes that BitMEX itself is based elsewhere, which it should not, based on the above facts, the undisputed location of the helper manipulation component in the United States is by itself sufficient to warrant application of the CEA and RICO to the alleged illegal conduct, which is clearly not "predominantly foreign." *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2020 WL 5077186, at *2 (S.D.N.Y. Aug. 27, 2020) . Likewise, the United States centric facilitation component also warrants the same conclusion.

**Defendants' RICO Extraterritoriality Arguments Are Equally Groundless**

A summary of RICO overt acts perpetrated by Defendants and alleged in SAC is provided in the table below. All of those overt acts take place either on U.S. based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken or on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District:

| RICO Overt Act | RICO Conduct Involved | Place of Conduct | SAC ¶¶ |
|---|---|---|---|
| 1 | Defendants transmitting electronic wire signals to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated (e.g. first leg of a Bart) | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74-78, 109, 259-268, Ex. 4 |
| | Some Plaintiffs on some occasions enter into unfavorable trading positions being mislead by false market forces information injected by Defendants | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located and Kraken, also located in | SAC ¶ 59, 74-78, 109, 205, 259-268, Ex. 4 |

| | | | |
|---|---|---|---|
| | | this District. | |
| 2 | Defendants electronically transfering (depositing) funds into helper account(s) | BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 109, 203, 226, Ex. 4 |
| 3 | Defendants transmitting electronic wire signals to deliberately move BitMEX index price by placing large market orders with maximum slippage from the helper accounts on three illiquid exchanges | BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 109, 203, Ex. 4 |
| Liquidation cascade that resulted in some of Plaintiffs' damages due to liquidation of Plaintiffs' positions takes place, directly and proximately caused by the deliberate index price move | | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶ 59, 74-78, 205, 295-300 |
| 4 | Defendants transmitting electronic wire signals to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶¶ 59, 74, 203, 205, 207, 214, 226, 295-300, Ex. 2 |
| 5 | Defendants transmitting electronic wire signals to freeze BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where all three site reliability engineers of BitMEX, who are responsible for the trading platform uptime and server freezes, are located | SAC ¶¶ 74-78, 122-124, 160, 185, 186 |
| 6 | Defendants electronically transfering (withdrawing) funds from winner account(s) into bitcoin wallet | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located | SAC ¶¶ 59, 74, 203, 226 |
| 7 | Defendants transmitting electronic wire signals to convert proceeds of market manipulation into fiat (legal tender) currencies | BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74, 109, 203, Ex. 4 |

Therefore, all the above RICO overt acts also take place entirely in the United States.

A summary of alleged RICO predicates perpetrated by Defendants is provided in the table below. All of those predicates also take place either on United States based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken and on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve

center of operations in this District, see SAC ¶¶ 59, 74, 109, Ex. 4:

| RICO Predicate | RICO Overt Acts | Place of Conduct | SAC ¶¶ |
|---|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2, 3, 4, 5, 6, 7 | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74-78, 109, 209-233, Ex. 4 |
| 18 U.S.C. § 1956 Money Laundering | 2, 3, 4, 5, 6, 7 | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74-78, 109, 203, 235-244, Ex. 4 |
| 18 U.S.C. § 1957 Money Laundering | 2, 3, 4, 5, 6, 7 | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74-78, 246-256, Ex. 4 |
| 18 U.S.C. § 1343 Wire Fraud | 1, 2, 3, 4, 5, 6, 7 | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 74-78, 185, 186, 259-268, Ex. 4 |
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | This District, where the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations of BitMEX is located; BitStamp, Coinbase Pro and Kraken, all located in the United States | SAC ¶¶ 59, 74-78, 274-282, Ex. 4 |

### **Defendants' Lack Of Standing Arguments Are Similarly Groundless**

Plaintiffs traded Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD on both U.S. based Kraken and U.S. based BitMEX exchanges.  Both of the above derivative contracts meet the definition of a "swap" under CEA, 7 U.S.C § 1a(47)(a)(IV), which defines "Swap" as:  "(iv) … an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap."  Defendants themselves specifically admitted that their XBTUSD contract is known to the trade as a "swap," thus meeting definition under CEA, Ex. 33.  Therefore, Plaintiffs can pursue their claims under CEA, 7 U.S.C. § 25(a)(1)(D), which specifically covers "swaps."

Consensus Law CryptoCurrency Attorneys

Plaintiffs' Opposition to Defendants' Motion to Dismiss.   - 16 -   BMA LLC et al. v. HDR et al.   Case No. 3:20-cv-3345-WHO

At ¶¶ 295-303, 316-326, 335-344, 351-364, SAC clearly alleges that Plaintiffs' damages were caused by liquidation of Plaintiffs' trading positions due to liquidation cascades. Liquidation cascades are like-domino events when numerous leveraged trader positions are liquidated during a short period of time, causing violent price moves.  Each subsequent liquidation pushes the price of the asset even further triggering even more liquidations in a nuclear chain reaction manner.  To trigger a liquidation cascade, Defendants moved the index price below or above a liquidation point of a first trader position, triggering its liquidation.  The so triggered liquidation moves the price even further and triggers one or more subsequent liquidations of other trader positions, just like a first toppled domino results in the toppling of the neighboring ones.

As SAC clearly alleges, Plaintiffs were harmed in clearly identified amounts of bitcoin during those catastrophic events, SAC ¶¶ 295-303, 316-326, 335-344, 351-364.  SAC further clearly alleges that those events were specifically caused by Defendants themselves, who acted on financial motives, when Defendants used helper accounts on U.S. based BitStamp, Coinbase Pro and Kraken to induce artificial index price moves specifically calculated to trigger those liquidation cascades, SAC ¶¶ 295-303, 316-326, 335-344, 351-364.  Defendants' use of the helper accounts on U.S. based BitStamp, Coinbase Pro and Kraken to artificially move the index price was the part of Defendants' market manipulation under CEA and also part of all RICO predicate offenses listed in the above tables and also part of the state law conduct.

Moreover, SAC alleges that Defendants themselves were the primary financial beneficiaries of the alleged liquidation cascades that harmed Plaintiffs, by way of confiscating the remaining collateral in Plaintiffs' liquidated accounts and placing it into their "Insurance Fund," SAC ¶¶ 149, 182, 295-303, 316-326, 335-344, 351-364.  Finally, SAC ¶¶ 295-303, 316-326, 335-344, 351-364, allege that the liquidation cascades caused by Defendants themselves took place on U.S. based exchanges.  Thus, the above allegations clearly establish causation and plausibility of all Plaintiffs' claims making the causation not only plausible, but in fact, crystal clear.

Defendants' argument that "BMA's failure to specify whether it is "seeking to vindicate

[its] own rights" or the rights of its purported members (and, if so, what rights)" is groundless. SAC ¶ 8 clearly alleges that "Plaintiff BMA is the real party in interest."  Defendants intentionally overlook this allegation and are trying to sow confusion with the Court.  Because Plaintiff BMA is the real party in interest, it clearly seeks to vindicate its own legal rights.

Article III of the Constitution extends the judicial "Power of the United States" to only "Cases" and "Controversies." U.S. Constitution, Art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing consists of three elements. Id. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); see also *Maya v. Centex Corp*., 658 F.3d 1060, 1067 (9th Cir. 2011). At the pleading stage, the plaintiff must clearly allege facts demonstrating each element. Id. at 1547. "The injury-in-fact requirement requires a plaintiff to allege an injury that is both `concrete and particularized' and `actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (citing *Lujan*, 504 U.S. at 560). Under the injury-in-fact requirement, particularity and concreteness are two separate inquires. *Robins v. Spokeo, Inc*., 867 F.3d 1108, 1111 (2017). An injury is concrete when it actually exists. *Spokeo*, 136 S. Ct. at 1548. Intangible injuries can be concrete. Id. at 1549. For an injury to be "particularized," as required for Article III standing, it "must affect the plaintiff in a personal and individual way." Id. at 1548.  The injury allegations of SAC clearly meet all of these requirements, see, for example, SAC ¶¶ 295-303, 316-326, 335-344, 351-364.

On the other hand, there is absolutely no legal requirement that, at the pleadings stage, Plaintiffs BMA and Kolchin [must] allege specific information sufficient for HDR to ascertain whether they ever traded on the BitMEX platform."  There is also absolutely no requirement for "Plaintiffs [to have] specified any user names or email addresses from which HDR could identify any accounts associated with Plaintiffs."  Obtaining information about specific trades of Plaintiffs is the subject matter of discovery and not Motion for Leave to Amend at the pleadings stage.  For

Consensus Law
CryptoCurrency
Attorneys

Plaintiffs' Opposition to Defendants' Motion to Dismiss.   - 18 -   BMA LLC et al. v. HDR et al.   Case No. 3:20-cv-3345-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

purposes of this Motion, all Plaintiffs' allegations are taken as true.  Such allegations are clearly

sufficient to satisfy both the constitutional and the statutory standing requirement.  For this

reason, Defendants' argument is laughable and must be rejected.

Notably, while attempting to mislead the Court with the above meritless arguments,

Defendants failed to cite a single market manipulation case resorting to cases containing very

general proclamations on the requirements for pleading a specific injury.  On the other hand,

multiple market manipulation cases on point from various courts directly contradict all of

Defendants' arguments.[5]

In *Dennis v. JPMorgan Chase & Co*., 343 F. Supp. 3d 122, 155 (S.D.N.Y. Nov 26, 2018),

in a market manipulation case, the Court held:

> Plaintiffs Dennis, Sonterra, and FrontPoint Event Driven here allege that defendants
> manipulated BBSW on days when these plaintiffs transacted in BBSW-Based Derivatives,
> thereby impacting the price of and/or periodic payments due on such derivatives and
> causing these plaintiffs to be either overcharged or underpaid. This alleged injury readily
> meets the "low threshold" for injury-in-fact. The harm of "pa[ying] too much" or
> "receiv[ing] too little" is a "classic economic injury-in-fact." In Gelboim v. Bank of
> America Corporation, for example, the Second Circuit considered an Article III challenge
> to plaintiffs who there alleged that they had been "harmed by receiving lower returns on
> LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR." The
> Circuit concluded that plaintiffs had "easily satisfied" the injury-in-fact requirement. …
> Accordingly, Dennis, Sonterra and FrontPoint Event Driven each sufficiently has alleged
> injury-in-fact.

Id. at 155.

In *Sullivan v. Barclays PLC*, 13-cv-2811 (PKC) (S.D.N.Y. Feb 21, 2017), the Court

stated:

> Defendants argue that plaintiffs do not have standing to bring claims directed to LIFFE
> futures and interest rate swaps because the Complaint does not specifically link the dates
> of defendants' individual Euribor manipulations with the dates that plaintiffs' settled their
> positions. (Def. Mem. at 8-9.)
> But the Complaint alleges a years-long conspiracy to secretly manipulate the Euribor, and
> asserts that defendants' misconduct occurred "on a daily basis. . . ." (Compl't ¶ 50.) True,
> the Complaint identifies certain specific dates where defendants allegedly communicated
> with one another about manipulating the Euribor, but those dates do not purport to be the
> universe of defendants' communications and misconduct. It ultimately is plaintiffs' burden

---

[5] It should be also noted that Plaintiffs' counsel shared the below cases with Defendants'
attorneys early on in the case, who chose not to cite them to the Court.

1
2
3
4

to prove that any unlawful manipulation of the Euribor resulted in injury. For the purpose of alleging a standing at the pleading stage, however, the plaintiffs have adequately alleged a traceable injury resulting from the defendants' alleged manipulation of the Euribor.

Defendants' motion to dismiss plaintiffs' claims directed to LIFFE Futures and Interest Rate Swaps for lack of standing is therefore denied.

5

Id. at 155.

6

Even pleading the specific exemplary trades, which Plaintiffs have done in SAC anyway,

7

is not required to establish both constitutional and statutory standing. *In re Foreign Exch.*

8

*Benchmark Rates Antitrust Litig.*, 74 F.Supp.3d 581, 595 (S.D.N.Y. 2015) (rejecting argument

9

that a complaint need "allege facts that, if proven, would establish ... actual harm in real trades in

10

specific currencies on particular days" (emphasis omitted)):

11
12
13

Defendants argue that the U.S. Complaint fails to "allege facts that, if proven, would establish ... actual harm in real trades in specific currencies on particular days." (emphases in original). Defendants contend that the U.S. Complaint does not adequately allege an injury in fact, a requisite for standing, because, absent such specifics, any allegation of harm is conclusory. Defendants' argument is rejected.

14
15
16
17
18
19

Plaintiffs "must have suffered an injury-in-fact, that is, the invasion of a `legally protected interest' in a manner that is `concrete and particularized' and `actual or imminent, not conjectural or hypothetical.'" Bhatia v. Piedrahita, 756 F.3d 211, 218 (2d Cir.2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The standing requirements ensure that judicial resources are "devoted to those disputes in which the parties have a concrete stake." Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Plaintiffs have demonstrated that they have a concrete stake in the present action. Each named Plaintiff claims that it was injured by having to pay supra-competitive prices as a result of Defendants' manipulation of the Fix.

20
21
22

Defendants conceded at oral argument, as they must, that any particular transaction that a particular Plaintiff entered into with a particular Defendant on a day that the Fix was manipulated to that Plaintiff's detriment would sufficiently demonstrate injury in fact as to that Plaintiff. Defendants' argument based on injury in fact, like their argument based on plausibility, ultimately amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.

23
24
25
26
27

Discovery may show that, for particular transactions, some Plaintiffs benefited instead of being harmed by the manipulation of the Fix, but "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." Ross v. Bank of America N.A., 524 F.3d 217, 222 (2d Cir.2008). The U.S. Complaint's plausible allegations about an overarching conspiracy among horizontal competitors to fix prices that resulted in Plaintiffs paying overcharges satisfy the injury-in-fact requirement at the pleading stage.

28

Id. at 595. See also *In re London Silver Fixing, Ltd., Antitrust Litig.* No. 14-MD-2573 (VEC),

213 F.Supp.3d 530, 559-60, 2016 WL 5794777, at *7 (S.D.N.Y. Oct. 3, 2016) (rejecting

argument that "buyers and sellers who traded at various times" lacked Article III standing

because "there is no way to conclude that Plaintiffs sustained any loss as a result of Defendants'"

manipulation).

Moreover, alleging each losing trade is not required for establishing standing and the

Court will not second-guess the alleged causation at the pleadings stage:

> Defendants' various arguments that a causal nexus between the alleged manipulation and
> each of plaintiffs' specific transactions is implausible fail as well. As an initial matter, the
> standard for Article III standing is not whether such the alleged injury is plausibly fairly
> traceable, but, rather, whether the injury is possibly fairly traceable. Moreover, the Court
> declines at this early stage of litigation to make assumptions about how enduring or short-
> lived the effect of the alleged misconduct might have been on a given BBSW-Based
> Derivative.  Finally, the dates identified in the amended complaint in any event "do not
> purport to be the universe of defendants' communications and misconduct" or of plaintiffs'
> transactions in BBSW-Based Derivatives.
> In John v. Whole Foods Market Group, Inc., the Second Circuit concluded that the
> plaintiff, a regular purchaser of certain items from Whole Foods Market, had Article III
> standing to sue Whole Foods in light of a report that Whole Foods had "systematically"
> and "routinely" overcharged for those products during the general period in which the
> plaintiff had made his purchases. Although Whole Foods does not directly control, it
> nonetheless weighs in favor of plaintiffs, who have asserted here that defendants engaged
> in systematic manipulation of BBSW and that the trades alleged in the amended complaint
> are only some examples of numerous transactions entered into by plaintiffs.

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. Nov 26, 2018).

Defendants' last resort argument that "the causal chain is too weak to support [Plaintiffs']

standing" due to the general susceptibility of the crypt market to manipulation is similarly

laughable.  *Wash. Envtl. Council v. Belton*, 732 F.3d 1131, 1142 (9th Cir. 2013) that Defendants

cite is simply inapplicable here as the causal chain alleged in the SAC does not involve many

"third parties whose independent decisions collectively have a significant effect on plaintiffs'

injuries."  SAC specifically alleges that Defendants themselves <u>directly</u> caused Plaintiffs' injuries,

without any required action by third parties, which allegation must be taken as true, SAC ¶¶ 3,

113, 119, 122, 123, 124, 125, 183, 185, 186, 203, 206, 214, 238, 243, 244, 250, 251, 260-263,

275-277, 281, 282, 295-301, 319-324, 337-342 and 360-368.

Moreover, "[t]he choice between two plausible inferences that may be drawn from factual

allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, LLC v. American Media, Inc.*, 680 F. 3d 162, 185 (2d Cir. 2012). The Court cannot dismiss a complaint that alleges "plausible version of the events merely because the court finds a different version more plausible." Id.

> Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. See generally Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]"). The choice between or among plausible inferences or scenarios is one for the factfinder, see id.….
> The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. "[F]act-specific question[s] cannot be resolved on the pleadings." Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir.2001) ("Todd"). A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.
> Rather, in determining whether a complaint states a claim that is plausible, the court is required to proceed "on the assumption that all the [factual] allegations in the complaint are true." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (emphasis added). Even if their truth seems doubtful, "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations," id. at 556, 127 S.Ct. 1955 (internal quotation marks omitted). Given that the plausibility requirement "does not impose a probability requirement at the pleading stage," the Twombly Court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Id. (internal quotation marks omitted).

Id. Thus, for all the forgoing reasons, the SAC adequately alleges facts establishing both constitutional and statutory standing and Defendants' laughable arguments must be rejected.

### SAC Satisfies Heightened Pleading Standard Under Rule 9(b) Where It Applies

Defendants falsely assert that all RICO predicate offenses and all causes of action under CEA must be plead pursuant to Rule 9(b) heightened pleading standard. Not only do Defendants fail to cite any authority for their expansive particularity requirement, but such a requirement is at odds with the principle that Article III requires only "general factual allegations of injury resulting from the defendant's conduct" at the pleading stage. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.")

Regarding Defendants' false assertion (again without any case citation) on page 11 of the Opposition that Rule 9(b) applies to all of the claims asserted, it is inaccurate to say the least. Rule 9(b) only applies to CEA market manipulation claims under CEA Section 6(c)(1) and Regulation 180.1 (Count III), but does not apply to claims for violations of CEA Sections 9(a)(2), 6(c)(3) and Regulation 180.2 (Count IV). Rule 9(b) applicability to various CEA claims was explained in *Kraft Foods Grp., Inc.,* 153 F. Supp. 3d 996, 1007. (N.D. Ill. 2015). Fraud is not part of cause of action for market manipulation under CEA Sections 9(a)(2), 6(c)(3) and Regulation 180.2 (Count IV) and, therefore, no heightened pleading standard is applicable.

Moreover, even when Rule 9(b) applies to a cause of action for market manipulation under CEA Section 6(c)(1) and Regulation 180.1 (Count III), "[d]espite the generally rigid requirement that fraud be pleaded with particularity, the Second Circuit has recognized that "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007) (citing *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002)). As a result, the heightened pleading standard under 9(b) "is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify `what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Silver*, 2016 WL 5794777, at *19 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007), quoting *In re Nat. Gas Commodity Litig*., 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)); see also *Sullivan v. Barclays*, 2017 WL 685570, at *30. SAC clearly meets this standard, see, for example, SAC ¶¶ 123-124, 203, 259-268, 295-301.

The heightened standard of Rule 9(b) also applies only to RICO claims alleging predicate acts involving fraud. See, e.g., *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist*., 940 F.2d 397, 405 (9th Cir.1991) (mail fraud); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392-93 (9th Cir. 1988) (mail and wire fraud). Thus, the heightened pleading standard under Rule 9(b)

is applicable only to RICO predicate offense under 18 U.S.C. § 1343.  It does not apply to RICO predicate offenses under 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a), 18 U.S.C. § 1956(a), 18 U.S.C. § 1952 and 18 U.S.C. § 2314.  Therefore, Defendants' arguments that the SAC fails to satisfy the heightened pleading standard under Rule 9(b) are also baseless.

But even with respect to the CEA market manipulation claims under CEA Section 6(c)(1) and Regulation 180.1 (Count III) and RICO predicate offense under 18 U.S.C. § 1343, SAC sufficiently alleges the requisite acts.  In the context of RICO, Rule 9(b) requires that a plaintiff "detail[s] with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 919 (C.D. Cal. 2011) (citing *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991))."

SAC easily satisfies this requirement, see, for example, SAC ¶¶ 123-124, 203, 259-268, 295-301, which contain various tables and diagrams providing excruciatingly detailed information of who, what, when, where, and how, with respect to each of the alleged overt acts by specific Defendants in violation of both RICO and CEA, which clearly satisfies the heightened pleading requirement of Fed. R. Civ. P. 9(b).  See also SAC ¶¶ 122-124, 160, 259-268, alleging with great specificity the elements of the wire fraud scheme perpetrated by Defendants.

### Defendants' Lumping Argument Is Laughable

A plaintiff may not simply lump together multiple defendants without specifying the role of each defendant in the fraud." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 919 (C.D. Cal. 2011).  SAC easily satisfies this requirement, see, for example, SAC ¶¶ 195, 196, which describe with great particularity the role of each Defendant in the alleged scheme.  Therefore, Defendants' lumping argument is baseless.

### SAC Adequately Alleges Two RICO Predicate Offenses For Each RICO Defendant

Defendants further argue that SAC fails to allege that each Defendant engaged in at least two predicate acts prohibited by RICO.  This is false, see SAC ¶¶ 200, 293, 315, 318, 259-268, 295-300, 319-323, 337-341 and 360-364.

### **Defendants' Remaining Arguments Are Equally Meritless**

At page 21 of their Motion, Defendants ineloquently argue that Plaintiffs do not allege that contracts at issue in their trades were not traded "on or subject to the rules of any registered entity" in connection with provisions of 7 U.S.C. § 9(1) of the CEA, which make it unlawful for any person to:

> use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or *for future delivery on or subject to the rules of any registered entity,* any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010 ... (emphasis added).

This argument is meritless.  The requirement "on or subject to the rules of any registered entity" applies only to contracts for "future delivery" and not to "contract[s] of sale of any commodity in interstate commerce" or XBTUSD and ETHUSD "swaps" that Plaintiffs traded.  This is especially clear from reading 7 U.S.C. § 13, which states: "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap…"  See also *Commodity Futures Trading Com'n v. McDonnell*, 287 F.Supp.3d 213, 228 (E.D.N.Y. 2018) (which did not apply "registered entity" requirement to the "contract[s] of sale of any commodity in interstate commerce" under the same 7 U.S.C. § 9(1)).  Thus, XBTUSD "swaps" traded by Plaintiffs are not subject to the registered entity requirement.  Accordingly, Defendants' argument is meritless.

### **Conclusion**[6]

For all the foregoing reasons, the Defendants' Motion to Dismiss must be denied in its entirety.  In addition, in view of the Ninth Circuit's clear direction and Rule 15(a)'s mandate that leave to amend be freely given, Plaintiffs respectfully request a leave to amend the Complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Additionally, Plaintiffs respectfully request the Court to issue an Order to Show Cause why Defendants should not be sanctioned for their bad faith litigation conduct and specifically their repeated attempts to mislead and confuse Judge Orrick.

---

[6] Plaintiffs also oppose all the remaining Defendants' arguments including those related to the state causes of action and reserve the right to cite any appropriate supporting authority during the oral argument on the Motion.

Dated:  October 26, 2020

Respectfully submitted,

By:    /s/ Pavel I. Pogodin
        Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io
Attorneys for Plaintiffs BMA LLC,
Yaroslav Kolchin and Vitaly Dubinin