# EXHIBIT C

1 | J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
2 | Andrew Levine, Esq. (SBN: 278426)
    levine@braunhagey.com
3 | BRAUNHAGEY & BORDEN LLP
  | 351 California Street, Tenth Floor
4 | San Francisco, CA 94104
  | Telephone:  (415) 599-0210
5 | Facsimile:  (415) 599-0210

6 | Douglas Curran, Esq. (*pro hac vice*)
    curran@braunhagey.com
7 | BRAUNHAGEY & BORDEN LLP
  | 7 Times Square, Twenty-Seventh Floor
8 | New York, NY 10036
  | Telephone:  (646) 829-9403
9 | Facsimile:  (646) 829-9403

10 | ATTORNEYS FOR PLAINTIFFS
   | FRANK AMATO, RGB COIN LTD.,
11 | and ELFIO GUIDO CAPONE on behalf
   | of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
**BY: YOLANDA TABO-RAMIREZ**
**Deputy Clerk**

13 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14 | **COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| 16 FRANK AMATO, RGB COIN LTD.,<br>and ELFIO GUIDO CAPONE on behalf<br>17 of the G AND M CAPONE TRUST,<br><br>18     Plaintiffs,<br><br>19     v.<br><br>20 HDR GLOBAL TRADING LIMITED, d/b/a<br>BITMEX; ARTHUR HAYES; ABS<br>21 GLOBAL TRADING LIMITED; and DOES<br>1-10,<br><br>22     Defendants. | Case No: CGC-19-581267<br><br>**DECLARATION OF FRANK AMATO IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER**<br><br>**Hearing**<br>**Date:** Monday, October 26, 2020<br>**Time:** 9:15 a.m.<br>**Dept.:** 304<br>**Judge:** The Hon. Anne-Christine Massullo<br><br>**Complaint filed:** Dec. 4, 2019<br>**FAC filed:** April 27, 2020<br>**SAC filed:** August 18, 2020<br><br>**Trial Date:** None Set<br><br>**REDACTED** |

Case No. CGC-19-581267

I, Frank Amato, declare:

1.      I am a Plaintiff in the above-captioned matter.

2.      I make this declaration based on personal knowledge.  If called as a witness, I would and would testify competently to the facts stated herein.

3.      I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies.  As an "angel" investor, I have made capital contributions to several business start-ups over the years.  An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial stage when most other financial institutions and investors are not prepared to back these businesses.

4.      I became acquainted with Defendant Arthur Hayes ("Hayes") on August 18, 2014 when he wrote to me via a LinkedIn message that he was seeking equity investors for BitMEX, a cryptocurrency derivatives trading platform.

5.      Hayes and his co-founders Sam Reed and Ben Delo created and operate an online cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the largest trading platforms of its type in the world, with billions of dollars in trades taking place daily.  BitMEX publicly posts its daily, monthly, and yearly trading volume on its website, found at www.bitmex.com.

6.      Beginning on September 11, 2014 and through April 16, 2015, Hayes communicated with me repeatedly to solicit my investment in BitMEX.  Having read later interviews with Hayes, including the interview available at https://www.cryptoglobe.com/latest/2018/09/800-billion-the-story-of-crypto-derivatives-exchange-bitmex-and-its-ceo-arthus-hayes/, I now know that BitMEX was struggling greatly at the time, with Hayes calling the Platform's trading volumes "pathetic."

7.      During our initial communications, I was told that I would receive 0.50% of BitMEX for a $50,000 investment.  For example, on March 20, 2015, Hayes wrote to me to "make sure we are on the same page," saying that he was "looking to sell common equity shares, so you will have same right as us [the founders]."  After I requested that I lower my investment, I was told

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

1 that I would receive 0.50% of BitMEX for $30,000.  I was told that my investment would be made

2 pursuant to a Republic of Seychelles Share Purchase Agreement.

3        8.      In May 2015, Hayes told me that instead of a Share Purchase Agreement, he wanted

4 me to invest through a "convertible financing structure" in which my investment would "convert to

5 preferred shares at [BitMEX's] next round of financing."  Hayes sent me a Simple Agreement for

6 Future Equity ("SAFE") pursuant to which I would invest in BitMEX.  Given the change, I

7 requested time to review the agreement and confirmed with Hayes that I was investing in the initial

8 round, "pre-Series A" financing round.  Hayes assured me that my "shares will convert at the next

9 financing round, which will be our first financing round."

10        9.      In response to my inquiry concerning the terms of the investment, Hayes wrote back

11 to me that "the relevant terms" are that "investment will convert to preference shares at our next

12 equity financing round," that "shares will convert at a 20% discount to the per share price," and

13 that "after converting your ownership stake is capped at 0.50% based on a $30,000 USD

14 investment."

15       10.     The SAFE contained a provision under which HDR was required to automatically

16 issue shares to me upon an "Equity Financing" event.  When such an event occurred, the SAFE

17 contained a formula for determining the number of shares HDR would issue, with a cap for my

18 ownership interests at 0.50% of the entity.

19       11.     Based on my experience as an angel investor, it is not unusual for SAFEs to be

20 triggered extremely quickly.

21       12.     Relying on Hayes's representations that my investment would convert into equity at

22 the next financing round which HDR was going to raise, I executed the SAFE on June 15, 2015 and

23 wired Hayes $30,000 on June 26, 2015. Attached hereto as **Exhibit 1** is a true and correct copy of

24 the SAFE that I executed with Defendant HDR on June 15, 2015.

25       13.     I later discovered that HDR was a 2015 participant in the Chinaccelerator program,

26 an accelerator program run by a venture capital investor called SOSV.  Participants in accelerator

27 programs like Chinaccelerator give equity to investors in exchange for capital investments.  After

28 discovering that HDR had participated in Chinaccelerator, in November 2018 I emailed Hayes to

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

1  inquire about my equity rights, as I believed that SOSV's investment into HDR should have

2  triggered my SAFE.  Hayes informed me that my SAFE had not converted into equity because "no

3  equity financing has occurred."

4      14.     Between November 2018 and February 2019, I repeatedly inquired about my equity

5  rights, but Hayes continued to invent new reasons why my equity rights had not triggered.  For

6  example, on January 2, 2019, Hayes told me that the reason why SOSV's investment into HDR had

7  not triggered was because SOSV did not give any money to HDR in exchange for HDR's equity.  I

8  only have very recently have discovered, though discovery from SOSV, that this representation

9  was false.

10     15.     I initiated this lawsuit on December 4, 2019 to hold Defendants to account for their

11 wrongful conduct.

12     16.     I understand that in the course of this lawsuit, SOSV was ordered by a New Jersey

13 Court to produce documents.  Under the Protective Order that I has been entered between the

14 parties in this case, I understand SOSV agreed to allow me and co-Plaintiff Mr. Capone to review

15 the documents that they produced.

16     17.     During my review of SOSV's production, I saw ██████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████

21     18.     ████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ██████

26     19.     ████████████████████████████████████████

27 ████████████████████████████████████

28

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

1  20. ██████████████████████████████████████████████

2  ███████████████████████████████████████████

3  ███████████████████████████████████████████████

4  ██████████████████████████████████████████

5  ████████████████

6  21. ████████████████████████████████████████

7  █████████████████████████████████████████

8  ███████████████████████████████  In other words, it appeared as if Mr. Capone

9  and I had never made any investment in HDR.

10  22. ███████████████████████████████████████

11  ████████████████████████████████████████████████

12  ██████████████████████████████████████████

13  █████████

14  23.  My equity rights in HDR have never been acknowledged, nor have I ever received a

15  dividend payment.

16  24.  I now know that ever since I invested in June of 2015, Hayes and BitMEX

17  embarked on a campaign to cheat me out of my ownership rights, including millions of dollars of

18  dividends that BitMEX has issued to its shareholders.

19  25.  Further, recent events concerning HDR and its founder Hayes have caused me

20  concern regarding my ability to collect the funds that HDR owes to me.

21  26.  I saw on twitter and online news sources on October 1, 2020 that Hayes and his co-

22  founders in BitMEX, Sam Reed and Ben Delo, and another BitMEX employee, Greg Dwyer, were

23  criminally indicted by the U.S. Department of Justice.  I understand that although Sam Reed was

24  arrested in the United States and then posted bail, the other two founders of BitMEX, Hayes and

25  Ben Delo, remain at large.

26  27.  I also saw that on the same day, the Commodity Futures Trading Commission had

27  launched a complaint against Defendants HDR, Hayes, and ABS, as well as other BitMEX-

28

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

affiliates and its founders, for a wide variety of regulatory violations.  I have reviewed the DOJ indictment and the CFTC complaint.

28.     Since I stay current on cryptocurrency- and BitMEX-related news sources and articles, I read various news reports, including the article accessible at https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/, which states that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX."

29.     Moreover, I also saw other news stories, including the article available at https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm, that disclosed that BitMEX's own funds, which I understand to consist mostly of bitcoin, were "held in multi[-signature] wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal."  In short, BitMEX's substantial cryptocurrency-based assets are accessible only by its founders who are facing criminal charges, two of whom remain at large.

30.     Such conduct is disturbing, especially in connection with Hayes's and HDR's apparent willingness to regularly disregard the law.  I saw a video showing a debate between Hayes and another guest concerning BitMEX's practices, dated July 15, 2019, titled "The Tangle in Taipei with Arthur Hayes and Nouriel Roubini," which is available at https://www.youtube.com/watch?v=qlZukhN_C6c&t=9m52s, in which Hayes was asked by a debate moderator how the Seychellois authorities compare to other global regulators. Hayes stated "it just costs more to bribe them," and, when pressed by the moderator about "that not being an answer," Hayes responded that "it is an answer" and that he pays "a coconut" to bribe the Seychellois authorities.

1    I swear under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3

4  Dated:  October 23, 2020                    By: _____

5                                                        Frank Amato

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

# EXHIBIT 1

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**HDR GLOBAL TRADING LIMITED**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by Frank Amato (the "**Investor**") of $30,000 USD (the "**Purchase Amount**") on or about June 15th, 2015, HDR Global Trading Limited, a limited liability corporation incorporated in the Republic of Seychelles (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's share capital, subject to the terms set forth below.

The "**Discount Rate**" is 80.0%.

See **Section 2** for certain additional defined terms.

1.  *Events*

    (a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.50% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

    In connection with the issuance of Safe Preferred Shares by the Company to the Investor pursuant to this Section 1(a)(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Shares, with appropriate variations for the Safe Preferred Shares if applicable, and

    (b) **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Shares equal to the Purchase Amount divided by the Liquidity Price, if the Investor fails to select the cash option.

    In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Shares equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the

Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Shares equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Share Capital by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of shares to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2. *Definitions*

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Discount Price**" means the price per share of the Standard Preferred Shares sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Shares Capital by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Shares payable in Common Shares, or the purchase or redemption of Share Capital by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Shares held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Share Capital in connection with the settlement of disputes with any shareholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Shares pursuant to a registration statement filed under the Securities Act.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to: the fair market value of the Common Shares at the time of the Liquidity Event, as determined by reference to the purchase price payable in connection with such Liquidity Event, multiplied by the Discount Rate.

"**Safe**" means an instrument containing a future right to shares of Share Capital, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Shares**" means the shares of a series of Preferred Shares issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Shares, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Discount Price; and (ii) the basis for any dividend rights, which will be based on the Discount Price.

"**Share Capital**" means the share capital of the Company, including, without limitation, the "**Common Shares**" and the "**Preferred Shares.**"

"**Standard Preferred Shares**" means the shares of a series of Preferred Shares issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3. *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default,

individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Share Capital issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5. *Miscellaneous*

(a) Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b) Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Share Capital for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a shareholder of the Company or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d) Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**HDR GLOBAL TRADING LIMITED**

By:
   Arthur Hayes
   Director

Address:
2/F, Capital City
Independence Ave,
P.O. Box 1008 Victoria
Mahe, Seychelles
Email: arthur@bitmex.com

**INVESTOR:**

By: [signature]

Name: FRANK ANATO

Title: INVESTOR

Address: ████████████████████

Email: ████████████████████