# EXHIBIT G

J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Andrew Levine, Esq. (SBN: 278426)
    levine@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

Douglas Curran, Esq. (*pro hac vice*)
    curran@braunhagey.com
BRAUNHAGEY & BORDEN LLP
7 Time Square, Twenty-Seventh Floor
New York, NY 10036
Telephone: (646) 829-9403
Facsimile: (646) 829-9403

ATTORNEYS FOR PLAINTIFFS
FRANK AMATO, RGB COIN LTD.,
and ELFIO GUIDO CAPONE on behalf
of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| FRANK AMATO, RGB COIN LTD., and ELFIO GUIDO CAPONE on behalf of the G AND M CAPONE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>HDR GLOBAL TRADING LIMITED, d/b/a BITMEX; ARTHUR HAYES; ABS GLOBAL TRADING LIMITED; and DOES 1-10,<br><br>Defendants. | Case No: CGC-19-581267<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'** *EX PARTE* **APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER**<br><br>**Hearing**<br><br>**Date:** Monday, October 26, 2020<br>**Time:** 9:15 a.m.<br>**Dept.:** 304<br>**Judge:** Hon. Anne-Christine Massullo<br><br>**Complaint filed:** Dec. 4, 2019<br>**FAC filed:** April 27, 2020<br>**SAC filed:** August 18, 2020<br>**Trial Date:** None Set<br><br>**REDACTED** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

      A.     Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights ................. 2

      B.     ███████████████████████████████████████

      C.     Simple Computation of Plaintiffs' Implied Dividends ........................................... 4

      D.     Plaintiffs' Attempts to Gather Information and Avoid Motion Practice ................ 5

ARGUMENT ................................................................................................................................ 6

I.     *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY .......................... 7

II.    PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY THE CCP'S GROUNDS FOR ATTACHMENT .................................................................. 10

      A.     Plaintiffs Have Established the Probable Validity of Their Claims ..................... 11

      B.     Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery ............ 14

      C.     Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted ................... 14

      D.     The Amount to Be Secured By the Attachment Is Greater than Zero .................. 15

III.   PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED DISCOVERY ................................................................................................................. 15

CONCLUSION ........................................................................................................................... 15

i                                                         Case No. CGC-19-581267

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

# **TABLE OF AUTHORITIES**

**CASES**

*Bank of Am. v. Salinas Nissan, Inc.*,
   207 Cal. App. 3d 260 (1989) .................................................................................................. 7

*CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*,
   115 Cal. App. 4th 537 (2004) ................................................................................................. 11

*Goldstein v. Barak Constr.*,
   164 Cal. App. 4th 845 (2008) ................................................................................................. 11

*Halstead v. Halstead*,
   72 Cal. App. 2d 832 (1946) .................................................................................................... 14

*Loeb & Loeb v. Beverly Glen Music, Inc.*,
   166 Cal. App. 3d 1110 (1985) ................................................................................................ 14

*Richman v. Hartley*,
   224 Cal. App. 4th 1182 (2014) ................................................................................. 12, 13, 14

ii     Case No. CGC-19-581267

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

# PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum in support of their request for an emergency temporary protective order ("TPO") and an order of attachment to ensure the availability of assets within the jurisdiction to secure a final judgment. Discovery very recently produced in this matter by one of Defendants' investors, SOSV, proves that Plaintiffs' Simple Agreements for Future Equity ("SAFEs") were triggered, that Plaintiffs' equity interests have vested, and that Plaintiffs are owed an easily calculable share of the more than ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Plaintiffs seek relief on an expedited basis to prevent irreparable harm and preserve the status quo. Defendants' principals were indicted by the U.S. DOJ just weeks ago on money-laundering charges. Defendant Hayes himself is now an international fugitive from the U.S. government, along with two of his co-defendants. Defendants have substantial offshore resources, accounts, property and other means by which to hide, transfer, other insulate assets. Despite repeated requests, Defendants have refused to provide concrete information or binding assurances regarding the status of California-based assets. Instead, Defendants have withheld evidence of their personal dividend payments and other transfers, the existence of which was only revealed in the last few weeks when SOSV was compelled to produce those documents after multiple court orders from a court in New Jersey.[1] Defendants' ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were made despite the pendency of CFTC and DOJ investigations of which Defendants appear to have been keenly aware.

While attachment is an extraordinary remedy, Plaintiffs readily satisfy the CCP requirements for interim relief of a TPO and an *ex parte* attachment of assets in the amount of $4,006,806.19, representing the amount of dividends Plaintiffs should have been paid during the

---

[1] Defendants themselves have failed to produce any documents at all with information regarding dividend distributions, despite the fact that they go to the heart of the parties' dispute and Plaintiffs have repeatedly requested them. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*E.g.*, Declaration of J. Noah Hagey ("Hagey Decl.") Ex. 10, April 28, 2020 text from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (emphasis added))).

1            Case No. CGC-19-581267

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

period.  Plaintiffs also have identified numerous assets and bank accounts in California for which attachment can easily be made, and there is virtually no risk of prejudice to Defendants, whose business recently had hundreds of millions of dollars in cash on hand.

## BACKGROUND[2]

This case involves a fraudulent worldwide shell game that HDR Global Trading ("HDR"), ABS Global Trading Ltd. ("ABS"), and Hayes (collectively, "BitMEX") have been orchestrating at Plaintiffs' expense for more than five years.  Defendants created and operate an online cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the largest trading platforms of its type in the world, with billions of dollars in trades taking place daily.  (Amato Decl. ¶ 5.)  In 2015, Hayes solicited investments in BitMEX from Plaintiffs Amato and Capone, two private investors active in the cryptocurrency space.  (*Id*. ¶ 6; Capone Decl. ¶ 4.)  In exchange for their investments, BitMEX and Plaintiffs executed "SAFEs"—meaning a "Simple Agreement for Future Equity"—which permit so-called "angel investors" to make investments at an early stage when it is difficult to value a nascent company.  (Amato Decl. ¶ 3.)  Under the terms of the SAFEs, when a future triggering investment is secured, the SAFEs automatically convert into equity.  (*Id*. ¶ 1, Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a).)

Shortly after Plaintiffs made their investments in June and July 2015, BitMEX received triggering investments from third-party investor SOSV, as recently confirmed by documents SOSV produced.  (Amato Decl. ¶ 19.)  But despite SOSV's investments, Hayes and BitMEX embarked on a years-long campaign to cheat Plaintiffs out of the ownership rights they are entitled to—including millions in dividends—by repeatedly and fraudulently misrepresenting to Plaintiffs that their SAFEs had not converted, that SOSV had not invested money into BitMEX, and that Plaintiffs were not entitled to any ownership interest in the now multi-billion-dollar company.  (*Id*. ¶ 24.)

### A. Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights

---

[2] This application is presented upon the sworn declarations of Plaintiffs Frank Amato (the "Amato Decl.") and Guido Capone ("Capone Decl."), as well as respected industry expert Todd Antonelli (the "Antonelli Decl."), a leading financial and strategic advisor to companies in all stages of growth and an expert in venture capital, early-stage investing, and SAFE agreements.

1 | Plaintiff Amato executed a SAFE with HDR on June 15, 2015. (*Id*. ¶ 12, Ex. 1.) Plaintiff
2 | Capone executed a SAFE with HDR on July 16, 2015. (Capone Decl. Ex. 1.) Both SAFEs contain
3 | a provision under which HDR was required to automatically issue shares to Plaintiffs upon an
4 | "Equity Financing" event. (Amato Decl. ¶ 10, Ex. 1 § 1(a), Capone Decl. Ex. 1 § 1(a); Declaration
5 | of Todd Antonelli ("Antonelli Decl.") ¶¶ 10–11.) The SAFEs include a formula for determining
6 | the number of shares HDR would issue, with a percentage cap of HDR's outstanding share capital:
7 | 0.50% for Amato and 0.41% for Capone. (Amato Decl. ¶ 10, Ex. 1 § 1(a); Capone Decl. Ex. 1 §
8 | 1(a); Antonelli Decl. ¶¶ 10–11.) Both SAFEs define an "Equity Financing" event as "a bona fide
9 | transaction or series of transactions with the principal purpose of raising capital, pursuant to which
10 | [HDR] issues and sells Preferred Shares at a fixed pre-money valuation." (Amato Decl. Ex. 1 at 3;
11 | Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.)

A triggering "Equity Financing" event occurred on July 18, 2015, when HDR entered a Stock Purchase Agreement with SOSV (the "SOSV SPA"). (Antonelli Decl. ¶¶ 15–22, Ex. 2.) HDR was selected to be a participant in SOSV's Chinaccelerator program, which provides early funding to startup companies in return for equity. (*Id*. ¶ 15.) █████████████████
████████████████████████████████████████████
████████████████████████ (*Id*. ¶ 21, Ex. 2 § 1(a).) ███
████████████████████████████████
Although labeled "Ordinary Shares" in the document, ████████████████
████████████████████████████████████████████
████ as do shares that are typically referred to as "preferred" within the industry. (*Id*. ¶¶ 16–
20.) In particular, ████████████████████████████████:

- ████████████████████████████████
  ████████████ (*Id*. ¶ 17 (quoting *id.* Ex. 2 § 2));
- ████████████████████████████████
  ████████████████████████████ (*Id*. ¶ 18
  (quoting *id*. Ex. 2 § 6)); and
- ████████████████████████████████
  ████████████████████████████████

3            Case No. CGC-19-581267
MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

████████████████████████████████████████
████████████████████████ (*Id.* ¶ 19 (quoting *id*. Ex. 2 § 8).)
According to Mr. Antonelli, who frequently advises companies regarding the use of, and analyzes financial instruments like SAFEs, anti-dilution and pro rata rights "are commonly associated with preferred shares." (*Id.* ¶¶ 17–18.) ████████████████████████████
████████████████████████████████████████████████ (*Id.* Ex. 2 § 8.) A liquidation preference is also "a hallmark benefit of preferred shares." (*Id.* ¶ 20.)

████████████████████████ that are equivalent to preferred shares at a specified price and in exchange for a specified ownership percentage was an "Equity Financing" event that triggered automatic issuance of Plaintiffs' shares. (*Id.*) But, to date, Defendants have refused to issue any shares to Plaintiffs at all. (Amato Decl. ¶ 23.)

**B.     Defendants Issued Millions in Dividend Payments, But None to Plaintiffs**

Plaintiffs discovered through the produced SOSV documents ████████████████
████████████████████████████████████████████████████████████
████████—all while the government investigations against it were pending. (Antonelli Decl. ¶ 30.) ████████████████████████████████████ (*Id.* Ex. 3 at 22; Ex. 5 at SOSV - 135.) ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ (*Id.* Ex. 4 at SOSV - 137.) ████████████████████████████████████████████
████████████████████████████ (*Id.* Ex. 7.) ████████████████████
████████████████████████████████████████ (*Id.* ¶ 28.)

**C.     Simple Computation of Plaintiffs' Implied Dividends**

Based on the information produced by SOSV, a simple calculation shows the *bare minimum* amount that Plaintiffs are entitled to recover from HDR in the form of unpaid dividends. This is to say nothing of Plaintiffs' other claims in this case or any other, presently unknown, distributions that HDR has made. The step-by-step calculation is as follows:

**Step 1:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (shown by SOSV documents).

**Step 2:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (shown by SOSV documents).

**Step 3:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Step 4:** Amato *should* have been issued ▮▮▮▮▮ of HDR (shown by the triggering of his SAFE, which entitles him to 0.50% of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

**Step 5:** Amato therefore was entitled to $2,201,542 in dividends (shown by ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

**Step 6:** Capone *should* have been issued ▮▮▮▮▮ of HDR (shown by the triggering of his SAFE, which entitles him to 0.41% of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

**Step 7:** Capone therefore was entitled to $1,805,264 in dividends (shown by ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

(*Id*. ¶¶ 28–29.) Adding together the minimum amounts that Amato and Capone should have received results in a total of **$4,006,806.19**, which is the amount that Plaintiffs now seek to attach.

### D. Plaintiffs' Attempts to Gather Information and Avoid Motion Practice

Plaintiffs have taken steps to negotiate with Defendants a stipulated resolution to this matter, in an effort to avoid involving the Court. In particular, in the wake of the SOSV document production and the criminal and regulatory lawsuits filed by the government, Plaintiffs' counsel repeatedly asked Defendants' counsel for information regarding their clients' dissipation of assets. (Hagey Decl. ¶ 3.) But, as with nearly every other request in this case—whether through formal discovery or otherwise—Defendants' counsel has so far refused to provide any substantive information at all.[3] On October 15, Plaintiffs' counsel emailed questions to Defendants' counsel in an effort to determine whether Defendants were, in fact, expatriating assets. (*Id*. ¶ 6.) Plaintiffs wrote:

> Recently revealed information causes Plaintiffs substantial concern regarding their ability to collect upon final judgment. News reports and court documents show that HDR's principals, including Arthur Hayes, were indicted on October 1 by the U.S. Department of Justice and removed from their positions within [BitMEX] shortly thereafter. The company has also been sued by the CFTC for an array of regulatory violations. . . .
>
> In view of these developments, we pose the following questions regarding whether BitMEX and its agents are taking any steps to transfer assets outside of the jurisdiction or to otherwise dissipate those assets:

---

[3] Indeed, the information in question here likewise bears directly on HDR's ties to this forum, such that it should have been produced in connection with Plaintiffs' jurisdictional discovery requests that were served in February 2020.

(*Id.* Ex. 3 at 1.) The questions included requests for basic information like "Is Mr. Hayes presently making financial decisions on behalf of BitMEX?" and "Has anyone at HDR or its affiliated companies . . . taken any steps to remove assets from California, other than in the ordinary course of business?" and "Was BitMEX aware that it was the subject of government investigation prior to October 1?" (*Id.*) Defendants' counsel refused to provide answers promptly, and instead suggested the parties meet and confer about those matters on October 19, 2020. (Hagey Decl. ¶ 7.) But during that call, Defendants' counsel stated they were "not prepared" to discuss the issues, and claimed they needed additional time to confer with their clients. (*Id.* ¶ 8.) The parties conferred again on October 21; this time, defense counsel declared that the questions posed in Plaintiffs' October 15 email were "intrusive" and again failed to provide any substantive information. (*Id.* ¶ 9.) They claimed, though, that they would consider providing some unspecified information on October 23. (*Id.*) Plaintiffs then followed up on October 21 with an email that boils down to a single, basic request: "[P]lease provide a simple schedule or summary of all distributions of any sort – whether dividends or otherwise – that HDR made to its shareholders from June 2015 to the present, including the dates and amounts of those distributions." (*Id.* Ex. 4.) Defendants did not respond. (*Id.* ¶ 11.) Plaintiffs thereafter informed Defendants that their inability to provide even basic information about the movement of assets only added to Plaintiffs' well-founded concerns, and left them no choice but to seek this relief. (*Id.* ¶ 12.)

## **ARGUMENT**

California law permits a Court to issue a right to attach order on an *ex parte* basis if it finds that: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; (4) the property sought to be attached is not exempt from attachment; (5) the plaintiff will suffer great or irreparable injury if issuance of the order is delayed until the matter can be heard on notice; and (6) the amount to be secured by the attachment is greater than zero. § 485.220(a). Attachment can issue in connection with a contract claim, so

long as the claim is "a fixed or readily ascertainable amount," § 483.010(a)–(b), and it may issue regardless of "whether or not other forms of relief are demanded." § 483.010(d).[4]

The irreparable injury requirement is satisfied if a plaintiff offers facts showing that such injury would result if issuance of the attachment order were delayed until the matter could be heard on notice. §§ 485.010(a), 485.220. Such a showing is made if, "[u]nder the circumstances of the case, it may be inferred that there is a danger that the property sought to be attached would be concealed, . . . or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice." § 485.010(b)(1).

A plaintiff may also apply for a TPO at the time of applying for a right to attach order, § 486.010(a), which requires the same showing of great or irreparable harm. *Id*. Where a court finds that a TPO is more appropriate, it may grant the TPO and treat the *ex parte* application for attachment as one filed under noticed hearing procedure. § 486.030. Plaintiffs would not object to the Court proceeding in such a manner in these circumstances.

Plaintiffs' application satisfies each of these requirements, and a TPO and *ex parte* attachment relief is appropriate for the reasons set forth below.

## I. *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY

As an initial matter, Plaintiffs satisfy the statutory requirements for *ex parte* relief. As noted in the preceding section, such relief is appropriate where great or irreparable injury would result to the plaintiff if issuance of the order were delayed until the matter could be heard on notice. § 485.010(a). A TPO requires the same showing. § 486.010(a). The circumstances in this case warrant *ex parte* relief and issuance of a TPO, as Plaintiffs have legitimate concerns that Defendants will soon conceal, expatriate, or otherwise make unavailable the assets that Plaintiffs

---

[4] An *ex parte* application for a right to attach must also include the following, all of which are in the form application submitted herewith: (i) a statement that the attachment is sought to secure the recovery on a claim upon which an attachment may be issued, (ii) a statement of the amount to be secured, (iii) a statement that the attachment is not sought for a purpose other than the recovery on the claim, (iv) a statement that the applicant has no information or belief that the claim is subject to bankruptcy proceedings, (v) a description of the property to be attached, and (vi) a statement that the plaintiff is informed and believes that such property is subject to attachment. §§ 485.210, 484.020. For defendant corporations, a broad description such as "all corporate property which is subject to attachment" is a sufficient description. *Bank of Am. v. Salinas Nissan, Inc.*, 207 Cal. App. 3d 260, 267 (1989); § 484.020(e).

1 seek to attach—and ███████████████████████████████████████████████████████
2 ████████████████████████████████████████████████████.

3       On October 1, Defendant Hayes and other HDR co-founders were indicted by the DOJ in
4 the Southern District of New York for violations of and conspiracy to violate the Bank Secrecy
5 Act. (Hagey Decl. Ex. 1.) The indictment alleges that Hayes "willfully failed to establish,
6 implement, and maintain an adequate anti-money laundering ('AML') program, including an
7 adequate customer identification program, more commonly referred to as a know your customer
8 ('KYC') program, for BitMEX, in violation of the BSA." (*Id*. at 2). The same day, the CFTC filed
9 a civil enforcement action against Defendants for operating an unregistered futures trading platform
10 in the United States and failing to comply with AML regulations. (Hagey Decl. Ex. 2.)

11       Cryptocurrency news sources reported that "money began leaving the BitMEX exchange in
12 exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had
13 been withdrawn from BitMEX." (Amato Decl. ¶ 28) Moreover, BitMEX's own funds are
14 reportedly "held in multi[-signature] wallets that require a signature from multiple private keys in
15 order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three
16 partners must sign each withdrawal," meaning that BitMEX's substantial cryptocurrency assets are
17 accessible and controlled *solely* by its founders, all of whom are facing criminal charges, and two
18 of whom are fugitives. (*Id*. ¶ 29.)

19       Plaintiffs' fears are not speculative. Defendants are serial offenders when it comes to
20 disregard for the rule of law, as they have demonstrated both by their fraudulent misconduct in
21 their dealings with Plaintiffs and their brazen indifference towards the authority of courts and
22 regulators. For instance, when Mr. Capone inquired about his equity rights in September 2019,
23 HDR co-founder Ben Delo responded to him with an image of Hayes overlaid with text conveying
24 Defendants' belief that they could evade liability because they incorporated HDR as a Seychellois
25 shell company. (Capone Decl. ¶ 17; SAC ¶¶ 168–69.) Delo's email contained the following:

[Image: Meme of Arthur Hayes smiling, captioned "INCORPORATED IN SEYCHELLES" at top and "COME AT ME BRO" at bottom.]

Ben Delo's response to Mr. Capone came shortly after a July 3, 2019 statement made by Hayes, captured on video, in which he was asked by a debate moderator about the differences between various global regulatory authorities and the Seychellois regulatory authorities. Hayes stated "it just costs more to bribe them," and, when pressed by the moderator about "that not being an answer," Defendant Hayes responded, "it is an answer" and claimed he pays "a coconut" to pay off the Seychellois authorities. The DOJ included this same exchange in its indictment, alleging that Hayes "bragged in or about July 2019 that the Seychelles was a more friendly jurisdiction for BitMEX because it cost less to bribe Seychellois authorities - just 'a coconut' - than it cost to bribe regulators in the United States and elsewhere." (Hagey Decl. Ex. 1 ¶ 21.)

Defendants are also no newcomers to shifting funds to evade potential liability. ███
███
███
███
███
███
███
███ And as the CFTC observed, Hayes and HDR's other founders "operate BitMEX's platform through a maze of corporate entities." (Hagey Decl. Ex. 12.)

Further, documents recently produced to Plaintiffs reveal that Defendants long began to spirit away their funds. Defendants knew by no later than January 2019 that they were under investigation by U.S. regulatory agencies because co-founder Reed was deposed by—and allegedly made false representations to—the CFTC. (Hagey Decl. Ex. 2 ¶ 27.) Around that same time, ███
███

1  ██████████████████████████████████████ (Hagey Decl. ¶ 13, Ex. 13.)  In
2  early 2019, after Reed's deposition, ████████████████████████████████████
3  ████████████████████████████████████ (Hagey Decl. Ex. 14 ██████████
4  ████████████████████████████████████████████████████████████████████
5  ██████████); Ex. 5 ████████████████████████████████████████████████
6  ████████████████████ ████████████████████████████████████████████
7  ████, only two months before the DOJ revealed its criminal indictments.  (Hagey Decl. Ex. 7.)

      Adding to the urgency of the motion and the indicia of obstructionism is Defendants' counsel's ongoing failure to provide even the most basic information about their clients' finances and movement of assets.  As set forth above in Part D of the Background section, in the wake of the SOSV document production and the federal lawsuits, Plaintiffs' counsel have repeatedly asked such basic questions as "Is Mr. Hayes presently making financial decisions on behalf of BitMEX?" and "Has anyone at HDR or its affiliated companies (collectively, 'BitMEX') taken any steps to remove assets from California, other than in the ordinary course of business?"  (Hagey Decl. Ex. 3.)  Defendants have stalled and stonewalled, repeatedly indicating that they would confer further with their clients and assuring Plaintiffs that information would be forthcoming.  But, to date, they have provided nothing.

      The bottom line is that, in total, ████████████████████████████████
████████████████████████████████ (Antonelli Decl. ¶ 28.) ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████ (*Id*. ¶ 30.)  It is imperative that they not be allowed to make off with more.  The Court should grant a TPO and *ex parte* relief to secure at least the approximately $4 million of dividend payments that should have been distributed to Plaintiffs.[5]

## II.    PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY THE CCP'S GROUNDS FOR ATTACHMENT

In addition to showing that they will suffer irreparable harm, Plaintiffs also readily satisfy the remaining statutory attachment requirements.  To start, Plaintiffs' claims are "claims upon

---

[5] Plaintiffs' request is narrowly tailored, as they seek to attach only a small amount of their overall claimed damages, limited to that amount that is "readily ascertainable" based on their present knowledge and information.

which attachment may be issued," *see* § 485.220(a), because they are contract claims seeking a "fixed or readily ascertainable" amount that is more than five hundred dollars and not secured by real property. § 483.010(a)–(b). A claimed amount meets this standard if it is "readily ascertainable by reference to the contract" and "the basis of the computation of [the attachment amount] appears to be reasonable and definite." *CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*, 115 Cal. App. 4th 537, 540 (2004).[6] Although "the contract sued on must furnish a standard by which the amount due may be clearly ascertained," "it is not necessary that the amount owed appear on the face of the contract." *Id.* Indeed, courts recognize that "it often happens that the amount due under a contract does not appear on the contract itself." *Id.*

Plaintiffs' claims here are based on Defendants' breaches of their SAFEs. (*See* SAC ¶¶ 235–40.) And the amounts Plaintiffs claim for attachment—$4,006,806.19 of unpaid dividends—are "readily ascertainable by reference to" those SAFEs, and the computation of the dividend amounts is both reasonable and definite. *See CIT Grp.*, 115 Cal. App. 4th at 540. The SAFEs "furnish a standard by which the amount due may be clearly ascertained" by explicitly enumerating Plaintiffs' ownership percentages in HDR. *Id.* The amount of dividend payments that Plaintiffs are owed is directly calculable ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As explained there, Amato was entitled to $2,201,542 in dividends, and Capone was entitled to $1,805,264. Adding these amounts together results in $4,006,806. (Antonelli Decl. ¶ 29.)

### A. Plaintiffs Have Established the Probable Validity of Their Claims

The next statutory attachment requirement is that a plaintiff seeking attachment must establish "the probable validity of the claim upon which the attachment is based." § 492.030(a)(2). "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." § 481.190; *Goldstein v. Barak Constr.*, 164 Cal. App. 4th 845, 852 (2008). Plaintiffs readily meet this standard, as their claims against Defendants stem from Defendants' failure to perform their obligations under Plaintiffs' SAFEs. The elements to a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance of the

---

[6] All internal quotation marks and citations omitted unless otherwise noted.

contract or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damage to the plaintiff. *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

There is no question that contracts—the SAFEs—are valid and were executed by Plaintiffs and HDR. (*See* Amato Decl. Ex. 1; Capone Decl. Ex. 1.) Although Hayes fabricated a variety of false explanations for why Plaintiffs' equity rights never triggered, he has never disputed that the SAFEs are valid and enforceable. (Capone Decl. ¶¶ 15-16.) There is likewise no dispute that Plaintiffs each performed under their SAFEs: Plaintiff Amato wired $30,000 to Defendants on June 26, 2015 and Plaintiff Capone wired $25,000 to Defendant Hayes's personal bank account on July 16, 2015. (Amato Decl. ¶ 12; Capone Decl. ¶ 11.) There is also no question that Plaintiffs have been damaged because they have been deprived of the benefit of their investments: approximately 1% equity in the world's largest cryptocurrency derivatives platform ███████████, and millions of dollars in dividend payments, as explained in Part B of the Background section above.

Defendants' refusal to issue Plaintiffs their shares in HDR constitutes breach of Plaintiffs' SAFEs. Both SAFEs required HDR to "automatically issue to the Investor a number of shares" based on a set formula, "[i]f there is an Equity Financing" event. (Amato Decl. Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a); Antonelli Decl. ¶¶ 10-11.) Both SAFEs also define an "Equity Financing" as "a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation." (Amato Decl. Ex. 1 at 3; Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.) In other words, HDR was obligated to issue shares to Plaintiffs "once three conditions were satisfied: (1) there is a 'bona fide transaction or series of transactions with the principal purpose of raising capital'; (2) the transaction or series of transactions are transactions 'pursuant to which [HDR] issues and sells Preferred Shares'; and (3) HDR sells the shares 'at a fixed pre-money valuation.'" (Antonelli Decl. ¶ 14.)

████████████████████████████████████████████████████████

███████████ (*Id*. ¶¶ 15–20, Ex. 2.) This transaction satisfied all three conditions to trigger automatic issuance of Plaintiffs' shares, as the Declaration of Mr. Antonelli, an industry expert in the areas of venture capital, finance, early-stage investing, and SAFE agreements, readily demonstrates:

*First*, SOSV is a venture capital investor that runs an accelerator program called Chinaccelerator, a program through which startup companies (like HDR circa 2015) compete for funding. (*Id.* ¶ 15.) In SOSV and Chinaccelerator's own words, they "invested in BitMEX through Batch 8 which later became a Fintech unicorn." (*Id.* ¶ 15 n.1.) ██████████ ████████████████████████████████████ was therefore a bona fide transaction with the principal purpose of raising capital for HDR. (*Id.* ¶ 15.)

*Second*, ████████████████████████████████████████████████████████ ██████████ "Preferred Shares" is not a defined term in Plaintiffs' SAFEs, (*id.* ¶ 13), and Plaintiffs allege that Defendants leveraged this ambiguity to "deliberately structur[e] subsequent rounds of capital financing in order to avoid triggering the SAFEs"—for example, by labeling the shares HDR sold to raise funding as something other than "Preferred Shares." (SAC ¶ 245.) The SOSV documents confirm Plaintiffs' allegations: ████████████████████████ ████████████████████████████████████████ (Antonelli Decl. ¶ 16, Ex. 2 § 1(a).) ████████████████████████████████████████████ ██████████████████████████████ (*Id.* ¶ 16.) ████████████████████████████████████████████████████ ██████████████████████████, as set forth above in Part C of the Background section and explained in Mr. Antonelli's declaration. (*Id.* ¶¶ 17-19.) ██████████ ████████████████████████████████████████████████ (*Id.* Ex. 2 § 8.) ████████████████████████████████████████████ ██████████ (*Id.* ¶¶ 17-18.) ████████████████████████ ██████████████████ under a reasonable and commercially standard interpretation of that term as used in Plaintiffs' SAFEs." (*Id.* ¶ 20.)

1 ████████████████████████████████████████████████████

2 (*Id.* ¶ 21.) ████████████████████████████████████████

3 ████████████████████████████████████ (*Id.* Ex. 2 § 1(a).) ████

4 ████████████████████████████████████████ (*Id.*) ████

5 ████████████████████████████████████████

6 ██████ (*Id.*)

7 ████████████████████████████████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████ (*Id.* ¶ 22.) Today, more than

10 five years later, HDR has yet to issue any shares to Plaintiffs, which plainly breaches the SAFEs,

11 such that Plaintiffs will prevail on their breach of contract claim.

**B.  Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery**

Plaintiffs also satisfy the next statutory requirement of § 485.220(a) because they seek attachment in order to secure their recovery. The purpose of attachment "is to secure and insure the payment of any judgment that may be recovered in the successful prosecution of an action in order that the ends of successful litigation are not fruitlessly pursued or frustrated." *Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal. App. 3d 1110, 1118 (1985) (citing *Halstead v. Halstead*, 72 Cal. App. 2d 832, 836 (1946)). As discussed above in Part I of the Argument section, Defendants' years-long campaign to deprive Plaintiffs of their equity rights, liberal misuse of shell corporations, and the targeting of Defendants by government investigations, give rise to a legitimate concern that Defendants will attempt to frustrate judgment by expatriating or secreting funds. Plaintiffs seek attachment only to prevent such misconduct and secure their recovery. § 492.030(a)(5).

**C.  Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted**

Plaintiffs can also readily show that they will suffer irreparable injury if a temporary protective order is not issued, for the reasons set forth above in Part I of this Argument section. The bottom line is that if a TPO is not issued, Defendants would be free to continue expatriating and otherwise dissipating assets while a motion on ordinary notice is pending, such that Plaintiffs may never be able to recover the substantial funds owed to them.

### D. The Amount to Be Secured By the Attachment Is Greater than Zero

Plaintiffs likewise satisfy this final statutory requirement, as they seek attachment in an amount greater than zero. They seek $4,006,806.19 in dividend payments they were entitled to under their SAFEs, and there is no basis to reduce this amount. §§ 492.030(a)(6), 483.015(b).

## III. PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED DISCOVERY

Finally, to the extent the Court declines to grant a TPO or *ex parte* relief, it should order expedited discovery regarding all matters relating to asset expatriation and dissipation, including, at a minimum: (1) the amounts and dates of all distributions and/or transfers to shareholders; (2) all documents concerning amounts transferred following the filing of this lawsuit; and (3) Defendants' knowledge of the government investigations. For the reasons explained throughout, Plaintiffs have real and pressing concerns that Defendants are taking steps to impair their ability to collect the funds they are entitled to. Defendants' lack of candor on these matters to date, as set forth in Part D of the Background section, has only exacerbated Plaintiffs' concerns. Expedited discovery would permit Plaintiffs to obtain the information they need.[7]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an *ex parte* right to attach order, a writ of attachment against HDR Global Trading Limited, and a temporary protective order. Plaintiffs are prepared to file an undertaking for the writ, pursuant to § 489.210.

Dated: October 23, 2020

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: *s/ J. Noah Hagey*
      J. Noah Hagey

*Attorneys for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust*

---

[7] Plaintiffs reserve the right to seek additional attachment, as appropriate, following the production of such discovery.