Stephen D. Hibbard (State Bar No. 177865)
sdhibbard@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
Dennis F. Murphy, Jr. (State Bar No. 301008)
dennismurphy@jonesday.com
James M. Gross (Admitted *Pro Hac Vice*)
jgross@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:    (415) 626-3939
Facsimile:    (415) 875-5700

Attorneys for Defendants
HDR GLOBAL TRADING LIMITED and ABS
GLOBAL TRADING LIMITED

Peter I. Altman (State Bar No. 285292)
paltman@akingump.com
Marshall L. Baker (State Bar No. 300987)
mbaker@akingump.com
Jessica H. Ro (State Bar No. 329737)
jro@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Telephone: (310) 229-1000

Attorneys for Defendant
ARTHUR HAYES

Edward H. Takashima (State Bar No. 270945)
etakashima@bsfllp.com
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street
31st Floor
Los Angeles, CA  90017
Telephone:    (213) 629-9040
Facsimile:    (213) 629-9022

Attorneys for Defendant
BEN DELO

Douglas K. Yatter (State Bar No. 236089)
douglas.yatter@lw.com
LATHAM & WATKINS, LLP
885 Third Avenue
New York, NY  10022-4834
Telephone:  (212) 906-1200

Matthew Rawlinson (State Bar No. 231890)
matt.rawlinson@lw.com
LATHAM & WATKINS, LLP
140 Scott Drive
Menlo Park, CA  94025
Telephone:  (650) 328-4600

Attorneys for Defendants
SAMUEL REED, AGATA MARIA REED,
BARBARA A. REED, TRACE REED,
GRAPE PARK LLC, MARK SWEEP LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov, and Păun Gabriel-Razvan,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Grape Park LLC, Mark Sweep LLC, Unknown Exchange, Arthur Hayes, Ben Delo, Samuel Reed, Agata Maria Reed (A.K.A. Agata Maria Kasza), Barbara A. Reed, and Trace L. Reed,<br><br>Defendants. | Case No. 3:20-cv-03345-WHO<br><br>(Consolidated Case Nos. 3:20-cv-07140-WHO and 3:20-cv-08034-WHO)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      February 3, 2021<br>Time:     2:00 p.m.<br>Ctrm:    2 – 17th Floor<br>Judge:   Honorable William H. Orrick |

1

**NOTICE OF MOTION**

2      PLEASE TAKE NOTICE that at 2:00 p.m. on February 3, 2021, before the Honorable

3  William H. Orrick, in Courtroom 2, 17th Floor, San Francisco Courthouse, 450 Golden Gate

4  Avenue, San Francisco, California 94102, defendants HDR Global Trading Limited ("HDR"),

5  ABS Global Trading Limited ("ABS"), Arthur Hayes, Ben Delo, Samuel Reed, Grape Park LLC,

6  Mark Sweep LLC, Agata Maria Reed, Barbara A. Reed, and Trace L. Reed (together,

7  "Defendants"), will and hereby do move to dismiss the Consolidated Complaint (ECF No. 97)

8  pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds

9  stated below.

10      The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities

11  in support of this Motion, the Proposed Order filed concurrently herewith, the pleadings and

12  records on file in this action, and upon such other matters as may be presented to the Court at or

13  prior to the hearing on this Motion.

14

**RELIEF REQUESTED**

15      The Consolidated Complaint should be dismissed pursuant to Federal Rules of Civil

16  Procedure 12(b)(1) and 12(b)(6).

17

18  DATED:  December 23, 2020                Respectfully submitted,

19                                           JONES DAY

20

21  By:  */s/ Stephen D. Hibbard*
                                                Stephen D. Hibbard

22
                                           Counsel for Defendants
23                                         HDR GLOBAL TRADING LIMITED and
                                           ABS GLOBAL TRADING LIMITED

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP


By: /s/ Peter I. Altman
    _____
          Peter I. Altman

Counsel for Defendant
ARTHUR HAYES


BOIES SCHILLER FLEXNER LLP


By: /s/ Edward H. Takashima
    _____
          Edward H. Takashima

Counsel for Defendant
BEN DELO


LATHAM & WATKINS, LLP


By: /s/ Douglas K. Yatter
    _____
          Douglas K. Yatter
          Matthew Rawlinson

Counsel for Defendants
SAMUEL REED, AGATA MARIA REED,
BARBARA A. REED, TRACE REED,
GRAPE PARK LLC, MARK SWEEP LLC

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF THE ISSUES................................................................................. 3

III.    RELEVANT BACKGROUND .................................................................................... 3

    A.  Claims Against the Founders and Corporate Owners of the BitMEX Platform........................................................................................................... 3

    B.  Claims Against Grape Park, Mark Sweep, and the Reed Family Members .......... 5

    C.  Purported Damages ................................................................................................. 5

IV.     ARGUMENT ............................................................................................................... 6

    A.  Plaintiffs' Core Misconduct Allegations Are Implausible, Requiring Dismissal of the Complaint in Its Entirety................................................................. 7

    B.  Plaintiffs Lack Article III Standing to Pursue Their Claims................................ 10

        1.  Plaintiffs Lack Article III Standing Because They Have Not Plausibly Alleged That Defendants' Conduct Caused Their Purported Bitcoin Losses ...................................................................... 11

        2.  Plaintiff BMA Also Lacks Standing Because It Has Not Plausibly Suffered an "Injury In Fact."................................................................ 15

    C.  Plaintiffs Lack Statutory Standing to Pursue Their Federal Claims ................... 17

        1.  Plaintiffs Lack Standing to Assert Their RICO Claims ........................... 17

        2.  Plaintiffs Also Lack Standing to Assert Their CEA Claims .................... 18

    D.  Plaintiffs' Federal Claims Are Deficient in Multiple Additional Respects ......... 19

        1.  The Complaint Does Not Allege a Prima Facie RICO Claim ................. 19

        2.  The Complaint Does Not Allege a Prima Facie CEA Market Manipulation Claim ................................................................................ 26

        3.  The Complaint Also Fails to State a Claim for Aiding and Abetting Market Manipulation................................................................ 27

    E.  Plaintiffs' State Law Claims All Fail as a Matter of Law.................................... 29

        1.  Plaintiffs' Negligence Claim Fails.......................................................... 29

        2.  Plaintiffs Do Not Allege a Prima Facie Claim for Fraud........................ 32

        3.  Plaintiffs' Conclusory Conversion Claim Fails ....................................... 32

1

2

3        4.     Plaintiffs Do Not Allege Viable Aiding-And-Abetting Claims or a
              Violation of Cal. Pen. Code § 496 ........................................................ 33

4

5        5.     Plaintiffs' Remaining State Law Claims—and the Only Claims
              Asserted Against the Reed Family Members—Are Meritless ................. 34

6   V.   CONCLUSION ............................................................................................ 35

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3

CASES

4

5
*Allen v. Wright,*
    468 U.S. 737 (1984)............................................................................................................11

6

7
*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................... passim

8

9
*Astiana v. Hain Celestial Grp., Inc.,*
    783 F.3d 753 (9th Cir. 2015)...........................................................................................35

10

11
*B.R. v. Beacon Health Options,*
    No. 16-CV-04576, 2017 WL 5665667 (N.D. Cal. Nov. 27, 2017) ...........................................8

12

13
*Bass v. Facebook, Inc.,*
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) .................................................................................13

14
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................................... passim

15

16
*Bennett v. Spear,*
    520 U.S. 154 (1997)............................................................................................................11

17

18
*Berk v. Coinbase, Inc.,*
    No. 18-cv-01364, 2019 WL 3561926 (N.D. Cal. Aug. 6, 2019) .......................................31

19

20
*Bihari v. Cross Roads of the W. Gun Show,*
    No. SACV 16-0718, 2016 WL 11000618 (C.D. Cal. July 18, 2016) .......................................16

21

22
*Boyle v. United States,*
    556 U.S. 938 (2009)............................................................................................................21

23
*Canyon Cnty. v. Syngenta Seeds, Inc.,*
    519 F.3d 969 (9th Cir. 2008)...........................................................................................17

24

25
*CFTC v. Monex Credit Co.,*
    No. SACV 17-1868, 2020 WL 1625808 (C.D. Cal. Feb. 12, 2020)..................................18, 27

26

27
*Chagby v. Target Corp.,*
    No. 08-cv-4425, 2008 WL 5686105 (C.D. Cal. Oct. 27, 2008)..............................................21

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Christensen v. Super. Ct.*,
   54 Cal. 3d 868 (1991) ....................................................................................30

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
   235 F. Supp. 3d 1132 (E.D. Cal. 2017)....................................................21, 23

*Coppola v. Smith*,
   935 F. Supp. 2d 993 (E.D. Cal. 2013) ...........................................................32

*Crabhouse of Douglaston Inc. v. Newsday Inc.*,
   801 F. Supp. 2d 64 (E.D.N.Y. 2011) .......................................................21, 24

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010)............................................................................4

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) .......................................................................................17

*Democratic Nat'l Comm. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019)......................................................20, 22

*Dent v. Nat'l Football League*,
   968 F.3d 1126 (9th Cir. 2020) .......................................................................32

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014)..........................................................................18

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997)........................................................................34

*Fanaro v. Cnty. of Contra Costa*,
   No. 3:19-cv-03247, 2020 WL 95568 (N.D. Cal. Jan. 8, 2020)........................6

*Farrington v. A. Teichert & Son, Inc.*,
   59 Cal. App. 2d 468 (1943).............................................................................33

*Gibson v. Credit Suisse AG*,
   787 F. Supp. 2d 1123 (D. Id. 2011) ...............................................................17

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018)......................................................................17, 18

*Heffernan v. HSBC Bank USA*,
   No. 99-cv-7981, 2001 WL 803719 (E.D.N.Y. Mar. 29, 2001)........................21

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010) .................................................................................................17, 24, 26

*Henriks v. Moritz*,
  304 F. App'x 491 (9th Cir. 2008) ........................................................................................26

*Holmes v. SIPC*,
  503 U.S. 258 (1992) .............................................................................................................24

*In re Amaranth Nat'l Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008) .................................................................................29

*In re Amaranth Nat. Gas Commodities Litig.*,
  730 F.3d 170 (2d Cir. 2013) ................................................................................................27

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ..................................................................................12, 13, 18

*In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,
  756 F.3d 917 (6th Cir. 2014) .................................................................................................8

*In re Facebook Internet Tracking Litig.*,
  140 F. Supp. 3d 922 (N.D. Cal. 2015) .................................................................................16

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...............................................................................................6

*In re GlenFed, Inc. Sec. Litig.*,
  60 F.3d 591 (9th Cir. 1995) ..................................................................................................32

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  No. 19-md-02913, 2020 WL 6271173 (N.D. Cal. Oct. 23, 2020) ................................. passim

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods.*
  *Liab. Litig.*,
  826 F. Supp. 2d 1180 (C.D. Cal. Nov. 30, 2011).............................................................13, 24

*In re Worlds of Wonder Sec. Litig.*,
  694 F. Supp. 1427 (N.D. Cal. 1988) ......................................................................................8

*Instant Brands, Inc. v. DSV Sols., Inc*,
  No. EDCV 20-399, 2020 WL 5947914 (C.D. Cal. Aug. 20, 2020).........................................34

*Janis v. Cal. State Lottery Comm'n*,
  68 Cal. App. 4th 824 (1998) .................................................................................................35

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

*Johnson v. Honeywell Int'l Inc.*,
  179 Cal. App. 4th 549 (2009)..................................................................................32

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..................................................................................................11

*Mattel, Inc. v. MGA Ent., Inc.*,
  782 F. Supp. 2d 911 (C.D. Cal. 2011).....................................................................24

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011).............................................................................11, 12

*Mellow v. Josephine Cnty.*,
  No. 1:19-cv-01230, 2019 WL 3769950 (D. Or. Aug. 9, 2012) ...............................16

*Miller v. 4Internet, LLC*,
  433 F. Supp. 3d 1188 (D. Nev. 2020) ......................................................................13

*Mirkin v. Wasserman*,
  5 Cal. 4th 1082 (1993) .............................................................................................32

*Moss v. BMO Harris Bank, N.A.*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ......................................................................19

*Myers v. BMW of N. Am., LLC*,
  No. 16-cv-00412, 2016 WL 5897740 (N.D. Cal. Oct. 11, 2016) ...............................6

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993).........................................................................................27

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*,
  150 Cal. App. 4th 384 (2007)....................................................................................35

*Peace Software, Inc. v. Hawaiian Elec. Co., Inc.*,
  No. 09-cv-00408, 2009 WL 3923350 (D. Haw. Nov. 17, 2009) .................................7

*Perez v. Nidek Co.*,
  711 F.3d 1109 (9th Cir. 2013)....................................................................................12

*Petersen v. Roundpoint Mortg. Servicing Corp.*,
  No. EDCV 11-01201, 2012 WL 13076612 (C.D. Cal. May 7, 2012) ......................35

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105 (2014)..................................................................................34

*Puri v. Khalsa*,
   674 F. App'x 679 (9th Cir. 2017) ...................................................................8

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
   745 F. Supp. 2d 343 (S.D.N.Y. 2010)...........................................................21

*Ryan v. Salisbury*,
   382 F. Supp. 3d 1031 (D. Haw. 2019) ..........................................................25

*S. Cal. Gas Leak Cases*,
   7 Cal. 5th 391 (2019) ...............................................................................30, 31

*Shaw v. Nissan N. Am., Inc.*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016)........................................................21

*Smith v. Barrett, Daffin, Frappier, Treder & Weiss, LLP*,
   No. 18-CV-06098, 2019 WL 2525185 (N.D. Cal. June 19, 2019) ..............8

*Sound Appraisal v. Wells Fargo Bank, N.A.*,
   No. C 09-01630, 2009 WL 3353057 (N.D. Cal. Oct. 15, 2009)..................25

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................................................16

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
   313 F. Supp. 3d 1056 (N.D. Cal. 2018) .......................................................17

*Talk Radio Network Enters. v. Cumulus Media, Inc.*,
   271 F. Supp. 3d 1195 (D. Or. 2017) ..............................................................8

*Terenkian v. Republic of Iraq*,
   694 F.3d 1122 (9th Cir. 2012).......................................................................12

*Town of Mamakating v. Lamm*,
   No. 15-cv-2865, 2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015) ................22

*Trend Micro Inc. v. RPost Holdings, Inc.*,
   No. 13-cv-05227, 2014 WL 1365491 (N.D. Cal. Apr. 7, 2014) ..................6

*Turner v. Cook*,
   362 F.3d 1219 (9th Cir. 2004)......................................................................26

*U.S. ex rel. Bogina v. Medline Indus., Inc.*,
   809 F.3d 365 (7th Cir. 2016)..........................................................................8

*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2015)......................................................................................19

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988)......................................................................................21

*United States v. Green*,
   592 F.3d 1057 (9th Cir. 2010)....................................................................................25

*United States v. Turkette*,
   452 U.S. 576 (1981)...............................................................................20, 21, 22

*Vallarta v. United Airlines, Inc.*,
   No. 19-cv-05895, 2020 WL 6271151 (N.D. Cal. Oct. 26, 2020) ...........................................33

*Vess v. Ciba-Geigy Corp., USA*,
   317 F.3d 1097 (9th Cir. 2003)........................................................7, 25, 26, 32

*Voris v. Lampert*,
   7 Cal. 5th 1141 (2019) ...............................................................................33

*Warth v. Seldin*,
   422 U.S. 490 (1975).......................................................................................16

*Wash. Env't. Council v. Belton*,
   732 F.3d 1131 (9th Cir. 2013)................................................................11, 15

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000).....................................................................17

**STATUTES**

7 U.S.C. § 9......................................................................................................27

7 U.S.C. § 25....................................................................................................18

18 U.S.C. § 1343...............................................................................................25

18 U.S.C. § 1961...............................................................................................20

18 U.S.C. § 1962.................................................................................19, 24, 26

18 U.S.C. § 1964...............................................................................................17

Cal. Bus. & Prof. Code §§ 17200 et seq. ........................................................29, 35

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1

Cal. Bus. & Prof. Code § 17204 ................................................................................35

2

Cal. Pen. Code § 496..................................................................................29, 34

3

**OTHER AUTHORITIES**

4

17 C.F.R. § 180.1(a)...............................................................................................27

5

17 C.F.R. § 180.2.................................................................................................27

6

7

Fed. R. Civ. P. 8....................................................................................1, 2, 8, 13

8

Fed. R. Civ. P. 9 .............................................................................. passim

9

Fed. R. Civ. P. 12 .........................................................................6, 12, 17

10

U.S. CONST. art. III................................................................................. passim

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTION

2        Plaintiffs' 408-page, 618-paragraph, 18-exhibit Complaint is the antithesis of a "short and

3   plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  At

4   its core, this lawsuit amounts to an effort by five Plaintiffs—BMA (an entity created by Plaintiffs'

5   counsel) and four foreign nationals—to blame someone for bitcoin losses that they purportedly

6   suffered from trading leveraged bitcoin derivatives.  Having allegedly made trades that did not

7   pan out, Plaintiffs now seek to blame BitMEX's corporate owner, its subsidiary, its founders, and

8   even family members of one of the founders, asserting against various configurations of those

9   Defendants a series of claims under the Commodity Exchange Act ("CEA"), the Racketeer

10  Influenced and Corrupt Organizations ("RICO") Act, and California law.

11       Much of the Complaint, however, has nothing to do with Defendants' purported violations

12  of those laws, let alone how any such violations caused the losses Plaintiffs claim they suffered.

13  For example, Plaintiffs discuss at length the purported ways in which unrelated third parties (not

14  Plaintiffs) have circumvented BitMEX's prohibitions against trading from the United States.  *See,*

15  *e.g.*, Compl. ¶¶ 79, 103-06, 115-16.[1]  The Complaint also highlights a recent CFTC civil

16  enforcement action against the corporate defendants and a two-count indictment filed against the

17  founders—which allege (i) failure to register with the CFTC as a foreign board of trade or other

18  designated trading facility and (ii) failure as an alleged futures commission merchant to

19  implement and maintain an adequate anti-money laundering program as allegedly required by the

20  Bank Secrecy Act—even though neither of those actions is alleged to have caused Plaintiffs'

21  claimed losses.  *See id.* ¶¶ 3-4 & Exs. 4-5.  And the Complaint devotes multiple pages to accusing

22  Defendants' lawyers of "attempt[ing] to mislead courts" in other lawsuits as well as "accept[ing]

23  tainted funds as payment."  *See id.* ¶¶ 117-29.

24       When it comes to issues that actually matter—that is, alleging that any Defendant violated

25  any of the federal or state laws invoked by Plaintiffs and that such violations caused Plaintiffs'

26  claimed losses—the Complaint is devoid of properly pleaded facts.  The most that Plaintiffs can

27  

28  
---
[1] Unless otherwise specified, all references to "Compl." in this brief are to the Consolidated Complaint filed on November 25, 2020 (ECF No. 97).

muster (after multiple iterations of the Complaint) is an allegation, made only on "information and belief," that one of the Defendants executed trades on other cryptocurrency platforms in unspecified amounts which in turn somehow (no particulars are pled) caused essentially all of Plaintiffs' losses. *See id.* ¶ 254. Plaintiffs then buttress that general allegation with multiple charts, each again prepared only on "information and belief," purporting to identify ways that other Defendants facilitated those trades. *See id.* ¶¶ 375, 382. At no point, however, do Plaintiffs explain the basis for their "information and belief" or plead any facts making those allegations plausible.

Plaintiffs' blatant and unsupported speculation as to Defendants' purported conduct and how that conduct caused Plaintiffs' supposed losses is precisely the type of pleading that is prohibited under Supreme Court and Ninth Circuit case law. Indeed, while Plaintiffs' allegations fail under any pleading standard, they are particularly inappropriate here given that nearly all of Plaintiffs' claims are grounded in fraud and therefore must be pled with particularity pursuant to Rule 9(b). Nor can Plaintiffs evade even the baseline Rule 8 pleading requirements by making allegations on "information and belief." As courts in this circuit have held repeatedly, where, as here, a plaintiff makes an allegation on "information and belief," but does not otherwise allege any facts showing that belief to be plausible, the allegation should be ignored altogether.

Plaintiffs' failure to plead any plausible facts that Defendants violated any law, or that those supposed violations—as opposed to trades made by a third party or any other market factor—caused Plaintiffs' purported losses dooms Plaintiffs' Complaint in its entirety. But Plaintiffs' Complaint is also fatally deficient in multiple other, independent respects. For example, Plaintiffs' Complaint does not state a *prima facie* RICO claim, as Plaintiffs do not sufficiently allege the existence of a RICO enterprise, nor do they plausibly allege that their bitcoin losses were caused by any RICO predicate act by Defendants. Plaintiffs' CEA claim likewise fails because Plaintiffs do not plausibly allege that Defendants engaged in market manipulation. Plaintiffs also fail to allege any viable claims under California law.

If Plaintiffs' Complaint establishes anything, it is only that Plaintiffs lack a factual basis for the charges they levy at Defendants, and are instead attempting to weaponize their

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

"groundless claim[s]" to "take up the time of a number of other people … representing an *in terrorem* increment of the settlement value." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-58 (2007) (internal quotation marks omitted).  The Complaint should be dismissed.

## II.     STATEMENT OF THE ISSUES

1.     Do Plaintiffs' claims fail when the allegations made in support of fundamental aspects of those claims are made on "information and belief," and Plaintiffs do not explain the basis for that belief or plead any facts making their allegations plausible?

2.     Do Plaintiffs lack constitutional and statutory standing when they fail to allege any plausible facts tying their purported bitcoin losses to Defendants' alleged conduct and expressly admit that other market forces and third-party conduct impacted the price of the cryptocurrency derivatives purportedly traded by Plaintiffs?

3.     Do Plaintiffs' RICO claims fail when they do not identify a valid RICO enterprise or plead sufficient facts establishing that a RICO predicate act caused their losses?

4.     Do Plaintiffs fail to state a viable CEA claim when they fail to make plausible allegations that Defendants engaged in market manipulation?

5.     Do Plaintiffs' state law claims fail when their complaint is devoid of essential facts necessary to make out *prima facie* violations of any of those laws?

## III.    RELEVANT BACKGROUND

### A.     Claims Against the Founders and Corporate Owners of the BitMEX Platform

As with prior iterations, the operative Complaint brings a variety of CEA, RICO, and state law claims against five corporate Defendants:  HDR, HDR's co-founders Hayes, Delo, and Reed, and HDR's "California-based wholly owned subsidiary," ABS.[2]  *See* Compl. ¶¶ 33-34, 45.  All of

---

[2] Since Plaintiff BMA filed this lawsuit more than seven months ago in May 2020, the operative complaint has been repeatedly amended.  After BMA amended once as a matter of right and a second time with Defendants' consent, Defendants moved to dismiss in September.  In response, Plaintiffs (then consisting of BMA and Messrs. Kolchin and Dubinin) moved for leave to file a Third Amended Complaint.  ECF No. 46.  Those Plaintiffs then amended their claims yet again when their lawsuit was consolidated with the claims of Plaintiffs Dolgov and Razvan, leading to the filing of the Consolidated Complaint that is the subject of this motion.  The Consolidated Complaint thus represents at least the fifth iteration of BMA's complaint, and asserts the same theories regarding Defendants' purported conduct as those of the other Plaintiffs' complaints.  Plaintiffs have had ample opportunity to state their claims.

1    those claims center on those Defendants' alleged ownership and operation of the "popular

2    cryptocurrency derivatives exchange platform … BitMEX."  *Id.* ¶ 1.

3        According to its website, "Bitmex is a Peer-to-Peer Trading Platform that offers leveraged

4    contracts that are bought and sold in Bitcoin."  *See* BitMEX, Trading on BitMEX,

5    https://www.bitmex.com/app/tradingOverview (last visited Dec, 23, 2020).[3]  All "profit and loss"

6    accrued on BitMEX is reflected in bitcoin (as opposed to a government-backed currency, such as

7    the U.S. Dollar), regardless of whether a trader is "buying and selling" contracts related to other

8    cryptocurrencies.  *Id.*  Bitcoin itself is not purchased, sold, or traded on BitMEX.  Compl. ¶ 194.

9    Rather, BitMEX offers for trading derivative contracts whose value is determined with reference

10   to the price of underlying cryptocurrencies.  *Id.*  As Plaintiffs acknowledge, BitMEX's Terms of

11   Service expressly prohibit United States citizens and United States residents from trading on the

12   platform.  Compl. ¶ 94 ("Specifically, BitMEX's Terms of Service provide:  '[y]ou are not

13   allowed to access or use the Services or the Trading Platform if you are located, incorporated or

14   otherwise established in, or a citizen or a resident of:  (i) the United States of America.").

15       Plaintiffs assert that Defendants engaged in a whole host of different conduct that they

16   claim constitutes RICO "predicate acts," CEA market manipulation, fraud, or violations of

17   California law.  But Plaintiffs do not tie the vast majority of that conduct to the only alleged

18   losses they identify.  Instead, Plaintiffs allege on "information and belief" that essentially all of

19   their claimed losses were caused by purported trades executed by one of the Defendants, Sam

20   Reed, on other cryptocurrency platforms involving unspecified, though allegedly "large,"

21   amounts of various cryptocurrencies.  *See id.* ¶ 254.  Plaintiffs then attempt to tie this vague

22   allegation to the other corporate Defendants through charts—again, prepared only on information

23   and belief—purportedly showing actions taken by the other founders to help facilitate those

24   trades.  *See id.* ¶¶ 375, 382.

25       At no point anywhere in the Complaint, however, do Plaintiffs allege any facts

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [3] BitMEX's website is cited throughout the complaint and therefore incorporated by
     reference, and is otherwise subject to judicial notice as a publicly available document.  *See*
28   *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   establishing the basis for the "information and belief" underlying those allegations or otherwise

2   rendering those allegations plausible.  At the same time, Plaintiffs specifically allege that market

3   manipulation is routinely committed by *other*, unidentified third parties in the cryptocurrency

4   space (an inherently volatile marketplace)—including on some of the very same dates Plaintiffs

5   contend they suffered the bitcoin losses at issue in this lawsuit.  *Id.* ¶¶ 152-65, 230-33, 254.

6       **B.    Claims Against Grape Park, Mark Sweep, and the Reed Family Members**

7       The Complaint also asserts claims against two other groups of defendants.  First, the

8   Complaint brings RICO and state law claims against Mark Sweep and Grape Park, two LLCs that

9   Plaintiffs allege are the "alter ego of Defendant [Sam] Reed."  *Id.* ¶¶ 59, 60, 267.  Plaintiffs also

10  asserts claims against Mr. Reed's wife, mother, and father:  Agata Reed, Barbara Reed, and Trace

11  Reed (the "Reed Family Members").  *Id.* ¶¶ 65-67.  Plaintiffs' claims against the Reed Family

12  Members, however, are limited to four state law theories pleaded as independent causes of action:

13  civil conspiracy, unjust enrichment, constructive trust, and accounting.  *Infra* Part. IV.E.5.

14      Unlike the corporate defendants, Plaintiffs do not assert that Grape Park, Mark Sweep, or

15  the Reed Family Members engaged in any conduct that impacted the price of their cryptocurrency

16  derivatives or otherwise caused their purported losses.  Indeed, Plaintiffs do not allege that these

17  defendants had any involvement in BitMEX or the companies that own and operate BitMEX.

18  Instead, Plaintiffs allege that these defendants used "laundered" funds from the corporate

19  defendants' purported violations to purchase real estate using "tainted" money.  *See* Compl.

20  ¶¶ 20, 129.  The only fact that Plaintiffs assert in support of that general allegation, however, is

21  that the Reed Family Members "are in possession of two real estate properties … with the

22  aggregate market value of over $2,500,000."  *Id.* ¶¶ 20, 577, 594.

23      **C.    Purported Damages**

24      Plaintiff BMA, a Puerto Rico company "co-owned by multiple individual cryptocurrency

25  traders," claims to hold "the title to, and ownership in, any and all claims, causes of action and

26  demands … that its owner traders had against" Defendants.  *Id.* ¶ 24.  The Complaint does not

27  identify BMA's purported "owner traders," but official records reveal that Plaintiffs' counsel,

28  Pavel Pogodin, formed BMA in March 2019—initially named TransPacific IP Group LLC and

1   later Bitcoin Manipulation Abatement LLC—and is himself listed as its sole authorized person.[4]

2   While BMA initially alleged it sustained losses "directly or indirectly" on some unspecified

3   cryptocurrency exchange, *see* ECF No. 32, SAC ¶¶ 295-97, 336, 359, BMA now asserts that it

4   sustained bitcoin losses directly both on BitMEX and on the Kraken exchange.  Compl. ¶ 254.

5   BMA, however, still has not alleged facts sufficient to establish that it, as opposed to its

6   unidentified members or shareholders, suffered losses from trading directly on BitMEX.

7        The Complaint also asserts claims on behalf of four foreign nationals:  Yaroslav Kolchin,

8   Vitaly Dubinin, Dmitry Dolgov, and Paun Gabriel-Razvan.  *Id.* ¶¶ 25-28.  Kolchin, Dolgov, and

9   Razvan claim to have suffered bitcoin losses from trading on BitMEX.  *See id.* ¶ 254.  Dubinin,

10   by contrast, claims only to have lost bitcoins from trading on Kraken.  *Id.*

11   **IV.    ARGUMENT**

12        Motions to dismiss are governed by the familiar standards of Federal Rule of Civil

13   Procedure 12(b).  On a Rule 12(b)(1) challenge, the plaintiff "bears the burden of establishing that

14   the court has the requisite subject matter jurisdiction to grant the relief requested."  *Trend Micro*

15   *Inc. v. RPost Holdings, Inc.*, No. 13-cv-05227, 2014 WL 1365491, at *4 (N.D. Cal. Apr. 7, 2014).

16   To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a

17   claim to relief that is plausible on its face."  *Fanaro v. Cnty. of Contra Costa*, No. 3:19-cv-03247,

18   2020 WL 95568, at *1 (N.D. Cal. Jan. 8, 2020) (quoting *Twombly*, 550 U.S. at 570).

19        As explained further below, to satisfy that plausibility requirement, "a plaintiff must

20   allege facts sufficient to 'raise a right to relief above the speculative level.'"  *Id.* (quoting

21   *Twombly*, 550 U.S. at 555).  "[A]llegations that are merely conclusory, unwarranted deductions of

22   fact, or unreasonable inferences" fall well short of this standard.  *Id.* (quoting *In re Gilead Scis.*

23   *Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).  The bar is even higher for complaints alleging

24   "fraud or mistake."  *Myers v. BMW of N. Am., LLC*, No. 16-cv-00412, 2016 WL 5897740, at *2

25

26        [4] *See* Corporations Search, Registry of Corporations and Entities, Department of State of
    Puerto Rico, https://prcorpfiling.f1hst.com/CorporationSearch.aspx (register number 424234).
27   TransPacific Law Group is identified in Plaintiffs' counsel's mailing and email addresses on the
    California State Bar website.  *See* California Attorney Licensee Profile, The State Bar of
28   California, http://members.calbar.ca.gov/fal/Licensee/Detail/206441.

(N.D. Cal. Oct. 11, 2016).  Consistent with Rule 9(b)'s particularity requirements, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged."  *Id.* (quoting *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)); *Peace Software, Inc. v. Hawaiian Elec. Co., Inc.*, No. 09-cv-00408, 2009 WL 3923350, at *2 (D. Haw. Nov. 17, 2009) ("A plaintiff must plead these evidentiary facts and must explain why the alleged conduct or statements are fraudulent.").

Applying those familiar standards here, Plaintiffs' complaint is facially deficient in multiple, independent respects and should be dismissed in full.

**A.   Plaintiffs' Core Misconduct Allegations Are Implausible, Requiring Dismissal of the Complaint in Its Entirety.**

At its core, Plaintiffs' lawsuit amounts to an attempt by a group of cryptocurrency traders who, having lost bitcoin trading leveraged cryptocurrency derivatives, now seek to blame someone for those losses.  Plaintiffs accuse Defendants of carrying out a laundry list of fraudulent conduct—laid out in charts prepared on "information and belief" in Paragraphs 254, 378, 380, and 382 of the Complaint—on the specific days that each Plaintiff purports to have suffered trading losses.  But Plaintiffs do not purport to have any factual basis for alleging that any of the Defendants carried out any of the actions of which they are now accused on those dates.  Instead, Plaintiffs allege only that they are "informed and believe" that certain Defendants made fraudulent wire transmissions or committed other so-called RICO predicate acts during the "Manipulation Times" when Plaintiffs claim they suffered losses.  *See* Compl. ¶ 383.  From those charts—comprised solely of "facts" made up out of whole cloth in a transparent effort to survive a pleading challenge—flow all of Plaintiffs' claims, each of which is rooted in Plaintiffs' theory that Defendants engaged in fraudulent conduct.[5]  At no point, however, do Plaintiffs state the factual basis for any of these "information and belief" allegations.

Plaintiffs' attempt to predicate the core of their lawsuit on facts pleaded on "information

---

[5] Plaintiffs' allegations of market manipulation—repeated in every cause of action—are fundamentally fraud allegations.  *See infra* Part IV.C.2.  Even Plaintiffs' negligence claim is expressly predicated on alleged "conduct that was clearly fraudulent, unlawful and was motivated purely by personal greed."  Compl. ¶ 520.

1    and belief" but without any accompanying facts establishing the basis for that belief fails under

2    Rule 8, much less Rule 9(b). Even under Rule 8, when a plaintiff makes an allegation based on

3    information and belief that "is purely conclusory and does not establish any basis for their

4    belief[,] it is not 'based on factual information that makes the inference of culpability plausible."

5    *B.R. v. Beacon Health Options*, No. 16-CV-04576, 2017 WL 5665667, at *5 (N.D. Cal. Nov. 27,

6    2017) (allegations insufficient because "while specific facts" supporting plaintiff's claim "might

7    be facts peculiarly within [defendant's] possession and control," none "of the well-pleaded factual

8    allegations in the TAC support this conclusory allegation"); *Smith v. Barrett, Daffin, Frappier,*

9    *Treder & Weiss, LLP*, No. 18-CV-06098, 2019 WL 2525185, at *5 (N.D. Cal. June 19, 2019)

10   ("Since the FAC provides no factual allegations to support Plaintiffs' conclusion beyond

11   'information and belief,' it is insufficient to satisfy the pleading requirements of Rule 8(a)(2).");

12   *Talk Radio Network Enters. v. Cumulus Media, Inc.*, 271 F. Supp. 3d 1195, 1207 (D. Or. 2017)

13   ("In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is

14   insufficient to survive a motion to dismiss for failure to state a claim.").[6] "The mere fact that

15   someone believes something to be true does not create a plausible inference that it is true." *In re*

16   *Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014).

17        Such allegations are even more plainly deficient under Rule 9(b). *See Puri v. Khalsa*, 674

18   F. App'x 679, 688 (9th Cir. 2017) (affirming dismissal of RICO and fraud claims against

19   defendants where complaint made numerous allegations on "information and belief" but failed to

20   "explain[] the basis for the belief"); *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1433-

21   34 (N.D. Cal. 1988) (finding pleading defective even where plaintiffs purported to offer "the

22   specific time, place and date" of alleged misconduct because fraud allegations on information and

23   belief must include "sufficient detail to demonstrate that the claim is grounded in some facts," not

24   mere labels that the conduct was "false and misleading"). "Allegations based on 'information and

25   belief' won't do in a fraud case—for 'on information and belief' can mean as little as 'rumor has

26   it that ....'" *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016).

27        Here, Plaintiffs fail under either pleading standard because they claim, only on

28   _____

          [6] Citations, quotations, and alterations omitted unless otherwise indicated.

"information and belief" and without any support, that (1) one of the Defendants carried out alleged (but unspecified) trades on other cryptocurrency exchanges, and (2) Defendants sent a variety of unidentified "wire communications" at the exact dates and times that Plaintiffs claim the price of cryptocurrencies and derivatives were "manipulated" to Plaintiffs' detriment.  Compl. ¶¶ 254, 382.  With the exception of one theory (that fails for other reasons, *infra* n.7), Plaintiffs insist those trades and supposed "wire communications" caused all of Plaintiffs' cryptocurrency losses.  Specifically, Plaintiffs characterize the unidentified "wire communications" as trades by the Defendants on other platforms that "inject[ed] false information into [the] markets" (though what information or why it was false is never specified), which in turn caused the price of the cryptocurrencies underlying the derivatives Plaintiffs held on BitMEX and Kraken to drop and their holdings to be liquidated.  *See* Compl. ¶ 336; *see also id.* ¶ 254 (detailing "causation" for Plaintiffs' losses).  Those allegations are a linchpin of Plaintiffs' entire Complaint:  If the Defendants did not make any such "wire communications," there is no basis (even under Plaintiffs' theories) to hold Defendants liable for Plaintiffs' purported trading losses based on the liquidation of their trading positions.[7]

Yet nowhere in the Complaint do Plaintiffs explain the basis for their "information and belief" that any Defendant made any trades or otherwise took any action that Plaintiffs now assert caused their cryptocurrency losses.  Nor do Plaintiffs allege any other facts that make their newly asserted "information and belief" allegations plausible.  To the contrary, the Complaint confirms the utter *implausibility* of Plaintiffs' allegations that one of the Defendants, Sam Reed, executed various unspecified trades on other cryptocurrency platforms on behalf of "BitMEX" to "inject" unspecified "false information as to market forces of supply and demand into cryptocurrency markets."  *Id.* ¶¶ 254, 382.  Not only do these "allegations" amount to vague and conclusory

---

[7] In connection with Plaintiffs' negligence and aiding and abetting claims, the Complaint alleges a single loss that is not attributed to alleged trades by Defendants—BMA alone alleges it lost 3 bitcoin on March 12, 2020 due to "Defendants intentionally taking BitMEX platform offline" or "negligently failing to prevent DDoS Attack," allegedly preventing BMA from closing out a short position.  Compl. ¶ 254; *accord id.* ¶¶ 509, 525-530, 600, 608, 617.  But the circumstances surrounding that alleged loss are no more sufficiently articulated than Plaintiffs' allegations regarding losses attributed to Defendants' purported fraudulent trades that allegedly triggered the liquidation of Plaintiffs' long positions.  *See infra* Parts IV.D.3 & IV.E.1.

1    assertions that Plaintiffs admit are based on nothing more than "information and belief," they also

2    contradict more specific allegations found in the Complaint.  Plaintiffs repeatedly allege that

3    BitMEX "trades against its customers" by operating its "own-for-profit trading desk" through

4    which Plaintiffs claim BitMEX could "potentially view the leverage amounts for previously

5    created positions and the price at which its liquidation will be triggered" and execute trades

6    pursuant to that information.  *Id.* ¶ 220.  According to the Complaint, however, BitMEX's "own

7    for-profit trading desk" is "operated by an employee of Defendant HDR, a Ukrainian national

8    Nick Andrianov," *id.* ¶ 19, *not* by Sam Reed, who Plaintiffs allege was "the CTO [Chief

9    Technology Officer] of both Defendants HDR and ABS," responsible for supervising "the

10   software development of the BitMEX platform."  *Id.* ¶ 75.[8]  In other words, while Plaintiffs' bare

11   reliance on information and belief is fatal in and of itself, Plaintiffs' incorporation of other

12   allegations that directly undermine the plausibility of the alleged wire communications reinforces

13   the defective nature of the Complaint.

14        Plaintiffs' inability to allege *any* facts sufficient to plead plausible claims against

15   Defendants—let alone to do so with the requisite Rule 9(b) particularity—confirms that this

16   lawsuit consists of "groundless claim[s]" designed to extract a settlement.  *See Twombly*, 550

17   U.S. at 558.  The entire Complaint should be dismissed for this reason alone.

18        **B.    Plaintiffs Lack Article III Standing to Pursue Their Claims.**

19        Plaintiffs have also failed to cure the standing deficiencies presented in their earlier

20   complaints.  Defendants' motion to dismiss the Second Amended Complaint in the lead *BMA*

21   case identified two constitutional deficiencies:  (1) Plaintiffs failed to plausibly allege a "causal

22   connection" between their bitcoin losses and "the conduct complained of," and (2) Plaintiff BMA

23

24   [8] Indeed, prior to Defendants' first motion to dismiss, no Plaintiff alleged that Mr. Reed
     traded on other exchanges.  That Plaintiffs now allege (and merely on "information and belief")
25   that trades that caused their losses were executed by Sam Reed—the only HDR co-founder
     resident in the U.S., and someone who was not previously alleged to have had any role in
26   trading—strongly suggests he was targeted not because Plaintiffs actually have any basis to
     believe he engaged in any trades, but rather in a transparent effort to overcome the
27   extraterritoriality arguments Defendants raised in their first motion to dismiss.  *See* ECF No. 42 at
     15-20.  These belated "information and belief" allegations were plainly added in an attempt to
28   circumvent the extraterritoriality problems in the prior complaints, and they are belied by the
     more specific allegations in the Complaint.  *See* Compl. ¶¶ 19, 508.

1  failed to establish that it—as opposed to any of its members or shareholders (which appear to

2  include Plaintiff's counsel in this lawsuit)—suffered an "injury in fact." *See* ECF No. 42 at 6-9.

3      Each of those constitutional defects persists in the Complaint.  As detailed in the exhibits

4  attached to the Complaint, the "novel market structures" of cryptocurrency derivatives are

5  reflected in a particularly volatile market place. *See* Compl. Ex. 3.  In light of those market

6  forces, Plaintiffs contend that the relevant cryptocurrency derivatives "remain thinly traded" and

7  are therefore "particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation

8  cascades, spoofing, as well as other forms of market manipulation"—all of which Plaintiffs allege

9  (in page after page of their own pleading) are carried out by third-party "perpetrators," not by

10 Defendants.  Compl. ¶ 152; *see also id.* ¶¶ 153-61.  Because Plaintiffs have not plausibly alleged

11 any specific facts establishing that their alleged losses resulted from Defendants' alleged conduct,

12 as opposed to that of third parties or any other market factor, Plaintiffs lack Article III standing.

13 BMA also lacks Article III standing for the additional, independent reason that—despite ample

14 opportunity to do so—BMA still has yet to sufficiently allege that it suffered an "injury in fact."

15 Thus, Plaintiffs' failure to meet the "irreducible constitutional minimum of standing" requires

16 dismissal of their entire lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

17
    **1.   Plaintiffs Lack Article III Standing Because They Have Not Plausibly
         Alleged That Defendants' Conduct Caused Their Purported Bitcoin
18       Losses.**

19     To possess Article III standing, Plaintiffs must allege "a causal connection between the

20 injury and the conduct complained of." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  That means

21 Plaintiffs' injury "must be fairly traceable to the challenged action of the defendant, and not the

22 result of the independent action of some third party not before the court." *Id.*; *see also Maya v.*

23 *Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("To survive a motion to dismiss for lack of

24 constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action

25 and their alleged harm that is more than 'attenuated.'" (quoting *Allen v. Wright*, 468 U.S. 737,

26 757 (1984)).  "[W]here the causal chain involves numerous third parties whose independent

27 decisions collectively have a significant effect on plaintiffs' injuries, the causal chain is too weak

28 to support standing." *Wash. Env't. Council v. Belton*, 732 F.3d 1131, 1142 (9th Cir. 2013).

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    As with all allegations, a plaintiff must point to the facts showing the requisite plausible

2  "causal connection" between alleged injuries and the defendants' alleged conduct. *Id.*

3  Plausibility requires a plaintiff to do more than "engage in an ingenious academic exercise in the

4  conceivable to explain how defendants' actions caused his injury." *Maya*, 658 F.3d at 1068.

5  Courts must also consider an "obvious alternative explanation" for a plaintiff's losses. *In re*

6  *Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). "When faced with two

7  possible explanations, only one of which can be true and only one of which results in liability,

8  plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but

9  are also consistent with the alternative explanation." *Id.* "Something more is needed, such as

10  facts tending to exclude the possibility that the alternative explanation is true, in order to render

11  plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.*

12    The Ninth Circuit's decision in *Century Aluminum* is instructive of how the "plausibility"

13  requirement operates in cases involving purported investment losses.[9]  There, a plaintiff brought a

14  securities lawsuit against a company for losses allegedly suffered as a result of "a materially false

15  or misleading registration statement." *Id.* at 1106.  But the company there had issued shares

16  "under more than one registration statement" (only the second of which was alleged to be

17  misleading), and the plaintiffs alleged only that "they 'purchased Century Aluminum common

18  stock directly traceable to the Company's Secondary Offering.'" *Id.* at 1107.

19    The Ninth Circuit concluded that this allegation failed to satisfy the post-*Iqbal/Twombly*

20  requirement that "the complaint's allegations must now suggest that the claim has at least a

21  plausible chance of success." *Id.*  Although the complaint alleged that the plaintiffs' losses came

22

23    [9] Although *In re Century Aluminum* applied the plausibility standard to issues of statutory
   standing on a Rule 12(b)(6) motion to dismiss for failure to state a claim, rather than
24  constitutional standing on a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Ninth
   Circuit applies the *Twombly/Iqbal* pleading standard to allegations made in support of
25  constitutional and statutory standing alike.  *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131
   (9th Cir. 2012) ("Where a defendant claims only that the allegations contained in a complaint are
26  insufficient on their face to invoke federal jurisdiction, … we treat the challenge as 'any other
   motion to dismiss on the pleadings for lack of jurisdiction,' … determin[ing] whether the
27  complaint alleges 'sufficient factual matter, accepted as true, to state a claim to relief that is
   plausible on its face.'"); *see also Perez v. Nidek Co.*, 711 F.3d 1109, 1113 (9th Cir. 2013)
28  (applying *Iqbal* to a challenge to federal subject matter jurisdiction based on Article III standing).

from the allegedly misleading secondary offering, "the 'obvious alternative explanation' is that they could instead have come from the pool of previously issued shares." *Id.* at 1108.  Thus, "Plaintiffs' allegations [were] consistent with their shares having come from either source." *Id.* When there are "two possible explanations … [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true." *Id.*  To hold otherwise would permit a plaintiff to satisfy Rule 8's plausibility requirement by offering an explanation that is "merely *possible* rather than plausible"—the very approach that the Supreme Court rejected in *Iqbal* and *Twombly*.  *Id.*  Other courts have held similarly in other contexts.[10]

Even ignoring all of Plaintiffs' pleading deficiencies and giving them every benefit of the doubt, the Complaint does nothing to establish that it is *plausible* that Defendants' alleged conduct, as opposed to any other market factor or third-party trades, caused their losses. Paragraph 254 of the Complaint purports to identify each Plaintiff's supposed bitcoin losses, the date of that loss, the exchange where loss occurred, and what caused each loss.  *See* Compl. ¶ 254.  All but one of those "causation" events are cryptocurrency trades, alleged on mere "information and belief" to have been executed by one of the Defendants on *other* cryptocurrency exchanges which Plaintiffs claim impacted the price of cryptocurrency derivatives owned by Plaintiffs on BitMEX or Kraken that were ultimately liquidated.[11]

Yet at the same time that Plaintiffs claim these purported trades in unspecified amounts on other exchanges caused their bitcoin losses on BitMEX and elsewhere, Plaintiffs expressly concede that the "[b]itcoin derivatives and especially spot markets" that they traded are inherently volatile.  According to the exhibits attached to the Complaint, the "novel market structures"

---

[10] *See, e.g.*, *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1036 (N.D. Cal. 2019) (dismissing data breach claims for lack of Article III standing where the facts pled "do not trace to the data breach at all or are so common the infinite possibilities forecloses plausibility"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1191 (C.D. Cal. Nov. 30, 2011) (complaint's general allegations that "Toyota" caused their loss, unaccompanied by "specific factual allegations about either Defendant's involvement" failed to satisfy Article III); *Miller v. 4Internet, LLC*, 433 F. Supp. 3d 1188, 1199 (D. Nev. 2020) (dismissing claims where "the facts show at best that it is merely possible that [defendants'] use of [a web service], as opposed to a third party's use, is what took down [the plaintiff's] server").

[11] As noted above, *supra* note 7, the final March 12, 2020 event is only alleged to have caused a loss to BMA, and those allegations fail for the reasons stated below.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   present in the cryptocurrency derivatives space—which include a "shallow" market depth that is

2   "fragmented among dozens of the largest exchanges"—make that market place particularly

3   volatile, with even a "large-ish order" able to "move the price." Compl. Ex. 3. Plaintiffs claim

4   that those inherent market features make cryptocurrency derivatives "particularly susceptible to

5   pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms

6   of market manipulation." Compl. ¶ 152. As Plaintiffs allege, those manipulative techniques are

7   utilized by unidentified third party "perpetrators," resulting in the very liquidations of

8   cryptocurrency derivatives complained of here. *See id.* ¶¶ 153-61.

9        Notably, the only two "examples" of market manipulation alleged with any detail and

10   which occurred on a date that a Plaintiff allegedly suffered a loss were carried out by a third party

11   "perpetrator or group of perpetrators" not named as defendants here. Plaintiff Kolchin alleges

12   that he suffered two separate losses on July 14, 2019 while trading XBTUSD and ETHUSD

13   Swaps, respectively, due to unspecified trades one of the Defendants allegedly executed on

14   Kraken and Bitstamp. Compl. ¶ 254. But in Paragraphs 232-33, Plaintiff alleges that on that

15   same date, July 14, 2019, an unidentified "perpetrator or group of perpetrators collectively acted

16   to crash the market by putting in a massive sell order of 15,000 ETH, valued [at] $4 million, on

17   BitStamp," causing a temporary decrease in the value of ETH "from $270 to $190" and resulting

18   in the liquidation of derivatives. *Id.* ¶¶ 232-33.

19        Likewise, Plaintiff BMA alleges that it suffered a loss of 10 bitcoin on May 17, 2019 due

20   to "Defendant Reed executing a large SELL market order from helper account on Kraken's

21   XBTUSD/BTC order book." *Id.* ¶ 254. But the Complaint simultaneously alleges that on May

22   17, 2019 "one or more perpetrators launched a trading software algorithm configured to sell about

23   3600 bitcoin, valued at the time at about $28 million on a United States based bitcoin spot

24   exchange BitStamp." *Id.* ¶ 230. That trade—executed on that day on a *different* exchange

25   (BitStamp) than the one that Plaintiffs claim Mr. Reed traded on (Kraken)—allegedly caused the

26   "bitcoin price on Bitstamp" to drop "from $7,838 all the way down to $6,178," which in turn "led

27   to a liquidation of $250 million (about 10x times the size of the BitStamp sell order) long

28   positions on the BitMEX derivatives exchange." *Id.* ¶¶ 230-31.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    Plaintiffs' Complaint, by contrast, provides no such details regarding the trades that

2    Plaintiffs claim—again, only on "information and belief" and without any facts establishing the

3    basis for that belief—that Mr. Reed made to their detriment.  Indeed, unlike the third-party trades

4    alleged to have occurred on May 17, 2019 and July 14, 2019, Plaintiffs provide no information

5    regarding the value of Defendants' purported trades (an essential factor to assess whether a trade

6    could impact a market).  Nor do Plaintiffs provide any other information, let alone specify what

7    effect (if any) those alleged trades supposedly had on the market price for the various

8    cryptocurrencies and derivatives.  *See id.* ¶ 254 (repetitively alleging "large" trades on third-party

9    exchanges that "triggered liquidation of Plaintiff's … position" on BitMEX or Kraken).

10    Simply put, the *only* times that Plaintiffs allege any details regarding conduct that could

11    conceivably have caused their losses is when they are describing trades executed by third parties,

12    not Defendants.  Because Plaintiffs' own pleadings demonstrate that it is implausible that their

13    losses were caused by Defendants' purported conduct, as opposed to the inherent volatility of a

14    "thinly traded" market and/or an unidentified third party "perpetrator or group of perpetrators,"

15    all of Plaintiffs' claims should be dismissed for lack of constitutional standing.[12]  *See, e.g.*,

16    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the "plausibility standard … asks for more than a

17    sheer possibility"); *Wash. Env't Council*, 732 F.3d at 1142 (rejecting as insufficient plaintiffs'

18    "vague, conclusory statements" that defendants' conduct "contributes to greenhouse gas

19    emissions, which in turn, contribute to climate-related changes that result in [plaintiffs']

20    purported injuries").

21              **2.    Plaintiff BMA Also Lacks Standing Because It Has Not Plausibly
                        Suffered an "Injury In Fact."**
22

23    Plaintiff BMA's claims are also independently deficient because BMA has once again

24

---

25    [12] While all of Plaintiffs' claims fail due to their failure to allege facts making it plausible
      that their losses were caused by the Defendants, as opposed to any market factor or third-party
26    conduct, those arguments apply with particular force to BMA's and Dubinin's claims seeking to
      recover for losses they purport to have sustained from trades made on Kraken, a *different*
27    exchange that is not alleged to have any affiliation with BitMEX.  *See* Compl. ¶ 254.  Because
      Dubinin solely alleges losses on Kraken, his claims should be dismissed regardless of how the
28    Court rules on the other Plaintiffs' claims alleging losses on BitMEX.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    failed to establish it suffered an "injury in fact."  To establish an "injury in fact, a plaintiff must

2    show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and

3    particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*,

4    136 S. Ct. 1540, 1548 (2016).  "For an injury to be 'particularized,' it 'must affect the plaintiff in

5    a personal and individual way.'"  *Id.*  This means "that the plaintiff generally must assert his own

6    legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

7    parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  "Nondescript and conclusory allegations of

8    injury … are insufficient to meet the plaintiff's burden of alleging an injury in fact that is concrete

9    and particularized."  *Bihari v. Cross Roads of the W. Gun Show*, No. SACV 16-0718, 2016 WL

10   11000618, at *2 (C.D. Cal. July 18, 2016).[13]

11       Defendants' prior papers emphasized that BMA is apparently seeking to vindicate the

12   rights of its members—potentially including its sole authorized person, Plaintiffs' counsel in this

13   lawsuit—rather than its own rights.  Notwithstanding those objections, BMA has yet to allege any

14   specific facts addressing that fundamental defect.  Indeed, while Plaintiff Kolchin produced an

15   exhibit purporting to show trades he made on BitMEX in response to Defendants' questions as to

16   his standing, *see* Compl. Ex. 15, BMA still has not identified the accounts under which it

17   purportedly traded or any information that would allow Defendants to identify such accounts.

18   Instead, the Complaint continues to allege summarily that "BMA is co-owned by multiple

19   individual cryptocurrency traders and it holds the title to, and ownership in, any and all claims,

20   causes of action and demands" possessed by those unidentified traders.  Comp. ¶ 24.

21       It is, of course, BMA's burden to "demonstrate standing for each claim [it] seeks to

22   press."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  And where, as here with

23   respect to BMA's standing, a defendant makes a "factual Rule 12(b)(1) attack," a court "need not

24   presume the truthfulness of the plaintiffs' allegations."  *White v. Lee*, 227 F.3d 1214, 1242 (9th

25   ────────────────

26   [13] *See also, e.g.*, *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 930 (N.D.
     Cal. 2015) ("To satisfy the 'injury in fact' element, 'the plaintiff must show that he personally has
27   suffered some actual or threatened injury as a result of the putatively illegal conduct of the
     defendant.'"); *Mellow v. Josephine Cnty.*, No. 1:19-cv-01230, 2019 WL 3769950, at *2 (D. Or.
28   Aug. 9, 2019) (dismissing for lack of standing where it was not "clear that [the plaintiff] is
     seeking to vindicate his own rights by bringing this case").

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    Cir. 2000).  Given BMA's conspicuous and repeated refusal to confirm that it is seeking to

2    vindicate its own rights, as opposed to those of its purported members or shareholders (whose

3    identities have not been revealed, and who seemingly include Plaintiffs' counsel), BMA has

4    failed to satisfy its burden of establishing that it suffered a cognizable "injury in fact."

5            **C.      Plaintiffs Lack Statutory Standing to Pursue Their Federal Claims.**

6            Even if Plaintiffs' allegations were somehow sufficient to establish causation for Article

7    III purposes—and they are not—Plaintiffs' allegations (or more appropriately, the lack thereof)

8    are plainly insufficient to satisfy the "more stringent proximate cause requirements" of RICO and

9    the plausibility requirements for "actual damages" required under the CEA.  *Gibson v. Credit*

10   *Suisse AG*, 787 F. Supp. 2d 1123, 1133 (D. Id. 2011) (RICO); *Harry v. Total Gas & Power N.*

11   *Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018) (CEA).

12           **1.      Plaintiffs Lack Standing to Assert Their RICO Claims.**

13           "To have standing under § 1964(c), a civil RICO plaintiff must show (1) that his alleged

14   harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the

15   RICO violation, which requires the plaintiff to establish proximate causation."  *Canyon Cnty. v.*

16   *Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  As to the first element, Plaintiffs must

17   "allege more than they were 'damaged' by the RICO conduct," with facts "show[ing] how and

18   why those assertions are plausible given the information currently available to" the claimant.

19   *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1079 (N.D. Cal. 2018).  And as

20   to the second element, Plaintiffs must allege facts establishing "a 'direct relation' between the

21   injury asserted and the conduct alleged," which "cannot be 'too remote,' 'purely contingent,' or

22   'indirect.'"  *Id.* at 1078 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)).

23           Plaintiffs' RICO claims do not satisfy those requirements.  As detailed above in Part

24   IV.B.1, Plaintiffs fail to allege plausible facts establishing that their supposed bitcoin losses are

25   directly related to RICO violations allegedly committed by any Defendant.  Indeed, Plaintiffs

26   expressly acknowledge that "Bitcoin derivatives and especially spot markets … [are] particularly

27   susceptible" to manipulative actions carried out by other unnamed entities, and that unnamed

28   perpetrators engaged in that conduct on some of the exact same dates that Plaintiffs claim they

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    sustained losses.  Compl. ¶ 152; *accord id.* ¶¶ 230-231, 254.  Given that Plaintiffs have not

2    alleged a plausible connection between their purported bitcoin losses and Defendants generally,

3    they certainly fail to allege a plausible connection between those losses and any conduct by

4    Defendants that allegedly ran afoul of RICO.  *See Eclectic Props. E., LLC v. Marcus & Millichap*

5    *Co.*, 751 F.3d 990, 997 (9th Cir. 2014) ("Applying *Twombly*, *Iqbal*, … and [*In re Century*

6    *Aluminum*] to the complaint at issue … Plaintiffs have not made the kind of factual allegations

7    that 'nudg[e] their [RICO] claims across the line from conceivable to plausible.'").

8                    **2.       Plaintiffs Also Lack Standing to Assert Their CEA Claims.**

9              Plaintiffs' CEA claims fail for a similar reason as their RICO claims.  Section 22 of the

10   CEA provides liability "'for *actual damages* resulting from' one of four types of violations,

11   including, as relevant here, market manipulation."  *Harry*, 889 F.3d at 111, 116 (quoting 7 U.S.C.

12   § 25(a)(1)) (affirming dismissal of CEA claim for lack of statutory standing).  While this "'actual

13   injury' analysis looks very similar to the 'injury in fact' analysis used to determine constitutional

14   standing," because "it is an element of a substantive cause of action," the "[i]njury must be

15   *plausible*, not just colorable."  *Id.* at 111–12 (emphasis added).  That is particularly true where, as

16   here, Plaintiffs allege CEA claims predicated upon fraud-based market manipulation, because

17   such claims are also subject to Rule 9(b)'s heightened pleading requirements.  *CFTC v. Monex*

18   *Credit Co.*, No. SACV 17-1868, 2020 WL 1625808, at *5 (C.D. Cal. Feb. 12, 2020).

19             Regardless of which pleading standard applies, "if a plaintiff is to successfully plead that a

20   defendant's market manipulations have injured her under the CEA, she must plausibly allege

21   (1) that she transacted in at least one commodity contract at a price that was lower or higher than

22   it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated

23   prices were to the plaintiff's detriment."  *Harry*, 889 F.3d at 112 (citing 7 U.S.C. § 25(a)(1)(D)).

24   Absent "plausible" allegations "mak[ing] the connection between a defendant's manipulation and

25   a plaintiff's actual injury," the CEA claims must be dismissed.  *Id.* at 113–14, 115-16 (dismissing

26   for failure to plead facts tying loss in one type of derivatives to contracts allegedly manipulated).

27             Here again, Plaintiffs' causation allegations fall well short of what the CEA requires.  As

28   detailed above, the complaint not only fails to plausibly tie Plaintiffs' alleged bitcoin losses to

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

manipulative conduct by Defendants, it expressly acknowledges that "Bitcoin derivatives and especially spot markets … [are] particularly susceptible" to manipulation, and that *other* unidentified perpetrators with no connection to BitMEX or Defendants routinely carry out those actions and specifically did so on dates that Plaintiffs claim they suffered bitcoin losses.  Compl. ¶ 152; *accord id.* ¶¶ 230-231, 254.  Under any pleading standard, let alone the heightened scrutiny required by Rule 9(b), Plaintiffs fail to allege plausibly that they suffered an "actual injury" because of any purported market manipulation by Defendants.

### D.      Plaintiffs' Federal Claims Are Deficient in Multiple Additional Respects.

Even if Plaintiffs could clear the threshold hurdles identified above, dismissal is required because Plaintiffs fail to allege facts stating prima facie RICO and CEA claims.

### 1.      The Complaint Does Not Allege a *Prima Facie* RICO Claim.

"[A]lthough civil RICO may be a 'potent weapon,' plaintiffs wielding RICO claims almost always miss the mark."  *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017).  Plaintiffs' RICO claims are no different.

To prevail on their Section 1962(c) claim (Count I), "Plaintiffs must plausibly allege that each defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity."  *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 19-md-02913, 2020 WL 6271173, at *18 (N.D. Cal. Oct. 23, 2020).  "A plaintiff asserting a private cause of action for a RICO violation must also satisfy a causation requirement:  the plaintiff must plausibly allege at the pleading stage that the RICO violation was a 'but for' cause and proximate cause of its asserted injuries."  *Id.* at *20. Likewise, to proceed on their Section 1962(d) claim (Count II), Plaintiffs must plausibly allege a substantive violation of RICO (under Section 1962(c)), plus "that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'"  *Id.* (quoting *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015)).  Plaintiffs' RICO claims fall well short of meeting those baseline pleading requirements.

### (a)      The Complaint Fails to Allege a Valid "Enterprise."

"A plaintiff may not simply string together various defendants and label them an

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

enterprise." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019).  Instead, Plaintiffs must plausibly allege the existence of an enterprise, which is defined to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The existence of an enterprise at all times remains a separate element which must be proved.").  To survive a motion to dismiss, the complaint must allege facts establishing that the enterprise shared "(1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose."  *In re JUUL Labs*, 2020 WL 6271173, at *18.

The Complaint here seeks to impose RICO liability only on Defendants HDR, ABS, Grape Park, Mark Sweep, "Unknown Exchange," Hayes, Delo, and Reed; it does not allege any such claims against the Reed Family Members.  Compl. ¶ 422.  But the Complaint nonetheless contends that *all* Defendants—regardless of whether they are named as RICO Defendants— comprised the "enterprise" at the center of Plaintiffs' RICO claims.  Compl. ¶ 261 ("From at least January 2017 and until present, Defendants HDR, ABS, Defendant Unknown Exchange, Grape Park, Mark Sweep, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed have been a union or group of entities and individuals associated in fact collectively constituting a continuing enterprise ('Enterprise') within the meaning of RICO as defined in 18 U.S.C. § 1961.").

Plaintiffs' inclusion of the Reed Family Members, Grape Park, Mark Sweep, and "Unknown Exchange" in the purported "enterprise" confirms that there is no "enterprise" at all, as nothing in the Complaint suggests those defendants shared a common "purpose" with the other RICO Defendants.  But if those Defendants are removed from the enterprise, all that would be left is a "corporation carrying out its own activities (even fraudulent ones) only through its agents and employees"—the precise circumstance that does *not* constitute a RICO enterprise.  *In re JUUL Labs*, 2020 WL 6271173, at *24.  Either way, Plaintiffs' RICO claims fail.

        (i)      *All of Plaintiffs' RICO Claims Fail Because They Do Not Allege That Defendants Shared A "Common Purpose."*

The members of an association-in-fact enterprise must be "associated together for a

common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  This element "require[s] a showing of common purpose" via "'evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit.'"  *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988) (quoting *Turkette*, 452 U.S. at 583)).  "Individuals or [entities] that do not share a common purpose cannot be considered part of a RICO enterprise as a matter of law."  *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F. Supp. 2d 343, 351 (S.D.N.Y. 2010); *see Heffernan v. HSBC Bank USA*, No. 99-cv-7981, 2001 WL 803719, at *5 (E.D.N.Y. Mar. 29, 2001) ("An association-in-fact enterprise is not created every time a combination of individuals or entities acts in concert to commit racketeering acts.").

A RICO plaintiff cannot satisfy this "common purpose" requirement "through conclusory allegations or legal characteristics."  *E.g.*, *Chagby v. Target Corp.*, No. 08-cv-4425, 2008 WL 5686105, at *2, *3 (C.D. Cal. Oct. 27, 2008), *aff'd*, 358 F. App'x 805 (9th Cir. 2009) ("Although Plaintiff states that a common purpose existed, Plaintiff provides *no* facts to show that it was Plaintiff's advertising agency's intent to associate with Defendants to sell beverages…."); *see also Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1056 (C.D. Cal. 2016) (rejecting allegations that defendants "shared a common fraudulent purpose" without allegations of "plausible facts that satisfy the common purpose requirement").  Where a plaintiff "allege[s] only a series of disconnected incidents, each involving a subset of the overall group of defendants, with no clear indication of a unified agenda," dismissal is required.  *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1175 (E.D. Cal. 2017); *see also Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 79 (E.D.N.Y. 2011) (dismissing RICO claim when plaintiff attempted to show a common purpose by "[l]umping [] disparate functions" carried about by different defendants "together in the same descriptive sentence").

Here, the Complaint does not even attempt to allege that Defendants shared a "common purpose."  Instead, Plaintiffs allege that the Enterprise had at least six different "purposes," including "maximizing profits and minimizing trading losses for the Defendants … through unlawful trading practices," "concealing the unlawful activities of the Defendants … from

1   scrutiny by cryptocurrency exchanges and law enforcement," and "concealing or disguising the

2   nature, the location, the source, the ownership, or the control of the proceeds of unlawful

3   activities by investing said proceeds into United States real estate."  Compl. ¶ 261.

4        That gets it exactly backwards.  The test is whether every *member* of the so-called

5   enterprise shares a "common purpose" such that they "function as a continuing unit," *Turkette*,

6   452 U.S. at 583, not whether the purported enterprise serves the various purposes of its individual

7   members.  Indeed, Plaintiffs' allegation that the enterprise serves at least six different purposes

8   confirms that what Plaintiffs are attempting to do here is "string together various defendants and

9   label them an enterprise."  *E.g.*, *Town of Mamakating v. Lamm*, No. 15-cv-2865, 2015 WL

10  5311265, at *9 (S.D.N.Y. Sept. 11, 2015); *Dem. Nat'l Comm.*, 392 F. Supp. 3d at 440 (same).

11       Nor could the Complaint plausibly allege that the members of the associated-in-fact

12  enterprise shared a common purpose, because the Complaint suggests that Grape Park, Mark

13  Sweep, and the Reed Family Members possessed a *different* purpose than the rest of the RICO

14  Defendants.[14]  In a lengthy chart in Paragraph 380, again "prepared according to information and

15  belief," Plaintiffs allege that Grape Park and Mark Sweep are alter egos of Sam Reed "used by

16  the Enterprise to conceal or disguise the true source[s] of funds used for acquiring the real estate

17  properties and their true ownership and control," whereas Agata Reed, Barbara Reed, and Trace

18  Reed allegedly "gave directions to other members" and "occupied a … position in the 'chain of

19  command' through which the affairs of the Enterprise are conducted."  *See* Compl. ¶ 380.  But the

20  Complaint pleads no facts in support of those assertions.  Indeed, all Plaintiffs can muster against

21  the Reed Family Members is that they "are in possession of two real estate properties … with the

22  aggregate market value of over $2,500,000," which Plaintiffs claim were "acquired using funds

23  deceitfully misappropriated from Plaintiffs through market manipulation."[15]  Compl. ¶¶ 20, 577,

24  594.

25       [14] The same is true of "Unknown Exchange," which as its name indicates, is not identified
26  or alleged to have functioned as part of a common unit, but is nonetheless summarily alleged to
    be "responsible for knowingly, willfully and deliberately laundering a substantial portion of the
27  bitcoin-denominated proceeds" of the disparate conduct alleged.  Compl. ¶ 380.

         [15] Plaintiffs concede that this allegation is insufficient to sustain any direct claims against
28  the Reed Family Members.  *See infra* Section IV.E.5.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    Those barebone allegations fail to establish that the Reed Family Members, Grape Park, or

2    Mark Sweep engaged in any culpable conduct, let alone conduct that was part of a RICO

3    enterprise.  Even setting that blatant pleading deficiency aside, the Complaint acknowledges that

4    those Defendants' involvement with the so-called enterprise was limited to a *different* purported

5    scheme (real estate) than the one that Plaintiffs allege against the remaining Defendants (market

6    manipulation).  Because "[P]laintiffs allege only a series of disconnected incidents, each

7    involving a subset of the overall group of defendants, with no clear indication of a unified

8    agenda," Plaintiffs fail to establish that the alleged "association-in-fact" enterprise had a

9    "common purpose."  *Comm. to Protect our Agric. Water*, 235 F. Supp. 3d at 1173, 1175.

10
11                   (ii)      *Once the Reed Family Members and Entities Are Removed, the Complaint Fails to Allege an Enterprise "Distinct" from HDR.*

12    The above establishes that while all of Plaintiffs' RICO claims fail as a matter of law

13   because they fail to plead a viable "enterprise," Plaintiffs' attempt to include the Reed Family

14   Members, Grape Park, and Mark Sweep in that "enterprise" is particularly deficient.  And once

15   those Defendants are removed from the equation, all that is left are the corporate owners and

16   officers of BitMEX—an entity that is not "distinct" from the alleged enterprise.

17    "To show a common purpose," as is required to plead a viable enterprise, "plaintiffs must

18   allege that the group engaged in enterprise conduct distinct from their own affairs."  *Comm. to*

19   *Protect Our Agric. Water*, 235 F. Supp. 3d at 1173.  In the context of RICO claims alleged

20   against a company, "[t]o constitute an [association-in-fact] enterprise, the presence of some third-

21   party, separate and apart from the company and its officers and employees, is necessary."  *In re*

22   *JUUL Labs*, 2020 WL 6271173, at *24.  That is because a "corporation carrying out its own

23   activities (even fraudulent ones) only through its agents and employees does not constitute an

24   enterprise."  *Id.*  Accordingly, when "Plaintiffs merely allege that the Defendants are associated in

25   a manner directly related to their own primary business activities," that "is insufficient to state a

26   claim under § 1962(c)."  *In re Toyota Motor Corp.*, 826 F. Supp. 2d at 1202-03 (complaint that

27   "alleges no more than that Defendants' primary business activity—the design, manufacture, and

28   sale or lease of Toyota vehicles—was conducted fraudulently" was "incompatible with the types

1   of conduct RICO was enacted to prevent").

2           That is all that Plaintiffs allege here.  Plaintiffs' core allegation is that BitMEX "was

3   deliberately designed from [the] ground up with the purpose to" engage in RICO predicate acts.

4   Compl. ¶ 1.  In support of that overarching claim, Plaintiffs purport to identify various actions

5   taken by BitMEX's owner (HDR), HDR's "wholly-owned subsidiary" and alleged "alter ego"

6   (ABS), and HDR's three co-founders (Hayes, Delo, and Reed).[16]  *Id.* ¶¶ 33, 37.  While Plaintiffs

7   also attempt to lump in the Reed Family Members with the BitMEX defendants, those allegations

8   are plainly deficient for the reasons articulated above.  And in the absence of the Reed Family

9   Member Defendants, Grape Park, and Mark Sweep, the purported RICO enterprise here consists

10  solely of "the company and its officers and employees."  *In re JUUL Labs*, 2020 WL 6271173, at

11  *24.  Because that is the precise circumstance in which RICO does not apply, Plaintiffs' RICO

12  claims against the BitMEX corporate defendants fail.

13              (b)    Plaintiffs Do Not Adequately Allege That Their Losses Were
                       Caused by a RICO Predicate Act.
14

15          "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO

16  predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as

17  well." *Hemi Grp.*, 559 U.S. at 9 (quoting *Holmes v. SIPC*, 503 U.S. 258, 268 (1992)).  While that

18  does not mean Plaintiffs must "show that each individual predicate act caused them an injury," *In*

19  *re JUUL Labs,* 2020 WL 6271173 at *38, "[a]t least one of the defendant's predicate acts must

20  have been the proximate cause of the plaintiff's injuries," *Mattel, Inc. v. MGA Ent., Inc.*, 782 F.

21  Supp. 2d 911, 1023 (C.D. Cal. 2011); *see also Ryan v. Salisbury*, 382 F. Supp. 3d 1031, 1056 (D.

22  Haw. 2019) ("[P]laintiffs must show that their injury flows directly from the defendants'

23  commission of the predicate acts.").

24          Although the complaint purports to identify a host of RICO predicate acts committed by

25  _____

26          [16] "[W]holly owned subsidiaries are not distinct from their parent company for purposes
    of alleging a RICO enterprise."  *E.g.*, *Crabhouse of Douglaston*, 801 F. Supp. 2d at 78.
27  Moreover, to the extent Plaintiffs contend Defendants Grape Park and Mark Sweep are part of the
    Enterprise because they are "alter ego[s] of Defendant Reed," they cannot allege that these
28  Defendants are separate for purposes of making the Enterprise distinct from HDR and its
    cofounders.  Compl. ¶ 267.

1   Defendants, *see* Compl. ¶ 375, the only acts that Plaintiffs allege actually caused their losses are

2   the trades accomplished by "wire communications"—alleged only on "information and belief"

3   and without any corresponding facts establishing the basis for that "belief"—executed on other

4   cryptocurrency exchanges.  *See* Compl. ¶¶ 254, 382, 407-15.  Plaintiffs assert they are "informed

5   and believe" that these trades were made "for the specific purpose of misleading traders and

6   investors as to the cryptocurrency market's natural forces of supply and demand for manipulating

7   prices of spot cryptocurrencies and cryptocurrency derivatives," and therefore "constitute wire

8   fraud in violation of 18 U.S.C. § 1343," Compl. ¶ 382—a predicate act under RICO.

9        Defendants have already explained how these allegations, all of which are made on

10  "information and belief," are so conclusory and devoid of factual information that they fail to

11  state any claim—including a claim for wire fraud—under any pleading standard.  *See supra* Part

12  IV.A. But Plaintiffs allegations are also insufficient to make out a *prima facie* wire fraud claim

13  because they fail to allege that those trades contained any misrepresentations or false statements.

14       "The 'scheme to defraud' element" of wire fraud "requires 'an affirmative, material

15  misrepresentation.'"  *In re JUUL*, 2020 WL 6271173, at *19 (quoting *United States v. Green*, 592

16  F.3d 1057, 1064 (9th Cir. 2010).  To satisfy that element, "a plaintiff must set forth *more* than the

17  neutral facts necessary to identify the transaction."  *Vess*, 317 F.3d at 1106 (emphasis in original).

18  Instead, the "plaintiff must set forth what is false or misleading about a statement, and why it is

19  false."  *Id.*  And as with all claims grounded in fraud, Plaintiffs must make those allegations with

20  the particularity required by Rule 9(b).  *See Sound Appraisal v. Wells Fargo Bank, N.A.*, No. C

21  09-01630, 2009 WL 3353057, at *4 (N.D. Cal. Oct. 15, 2009).

22       Here, Plaintiffs do not attempt to identify the misrepresentation or false statement that

23  they claim gives rise to their wire fraud claims, let alone allege facts as to those

24  misrepresentations with the specificity required by Rule 9(b).  Plaintiffs repeatedly assert that

25  they are "informed and believe" that by making trades on other exchanges, Defendant Reed

26  "inject[ed] false information as to market forces of supply and demand into cryptocurrency

27  markets."  Compl. ¶¶ 336, 339, 342, 375, 382.  But Plaintiffs never actually identify what this

28  false information is or "why it is false."  *See Vess*, 317 F.3d at 1106.  Plaintiffs also claim (again,

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    on "information and belief") that the purported trades "deceive[d] other participants in the market

2    into believing something untrue, namely that the visible order book accurately reflected market-

3    based forces of supply and demand." Compl. ¶¶ 339, 375, 382.  But again, Plaintiffs fail to

4    identify the actual statement that they claim deceived those market participants or explain why it

5    is false.  And to the extent Plaintiffs complain that they were misled as to whether BitMEX

6    maintains its own trading desk (which is not alleged to be operated by Mr. Reed in any event),

7    Plaintiffs admit that fact is plainly disclosed to all traders in BitMEX's Terms of Service, and was

8    disclosed when Plaintiffs claim to have sustained losses.  *Id.* ¶ 218; *accord id.* ¶ 254.

9         Because Plaintiffs' losses are predicated entirely on their baseless allegations that one

10    Defendant engaged in trades that constitute wire fraud, and because those wire fraud claims are

11    deficient in themselves, Plaintiffs fail to state a civil RICO claim.  *See Hemi Grp.*, 559 U.S. at 9.

12                    (c)    Plaintiffs' RICO Conspiracy Allegations Also Fail.

13         Count II of the Complaint purports to bring a claim against the RICO Defendants pursuant

14    to 18 U.S.C. § 1962(d) for "agree[ing] and conspir[ing] to violate 18 U.S.C. § 1962 (a), (b), and

15    (c)."  Compl. ¶ 423.  To the extent Plaintiffs' conspiracy claim is predicated on their Count I

16    Section 1962 claim, that claim fails for the same reasons as Count I.  *See Turner v. Cook*, 362

17    F.3d 1219, 1231 n.17 (9th Cir. 2004).  And to the extent Plaintiffs are now claiming that

18    Defendants conspired to violate RICO's other subdivisions (such as Sections 1962(a) and

19    1962(b)), Plaintiffs make no attempt to make out prima facie claims under those statutes, as is

20    necessary to ground a RICO conspiracy claim, *Henriks v. Moritz*, 304 F. App'x 491, 493 (9th Cir.

21    2008), let alone explain how those purported violations caused them any harm.

22                    **2.    The Complaint Does Not Allege a Prima Facie CEA Market
                              Manipulation Claim.**
23

24         Plaintiffs also fail to plead a prima facie CEA claim.  Section 6(c)(1) of the CEA, on

25    which Plaintiffs purport to rely (Count III), provides that "[i]t shall be unlawful for any person,

26    directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap,

27    or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject

28    to the rules of any registered entity, any manipulative or deceptive device or contrivance."  7

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    U.S.C. § 9(1); *accord* 17 C.F.R. § 180.1(a).  Section 6(c)(3) (Count IV) likewise prohibits the

2    manipulation or attempted manipulation "of any swap, or of any commodity in interstate

3    commerce, or for future delivery on or subject to the rules of any registered entity."  7 U.S.C.

4    § 9(3); *accord* 17 C.F.R. § 180.2.[17]

5           Plaintiffs fail to allege "manipulation" of any transactions covered by these provisions.

6    "While the CEA itself does not define the term, a court will find manipulation where

7    '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed;

8    (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the

9    artificial price.'"  *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013).

10   Fraud-based market manipulation claims, such as those at issue here, are subject to Rule 9(b)'s

11   heightened pleading requirements.  *See Monex Credit Co.*, 2020 WL 1625808, at *5.  But

12   Plaintiffs' allegations fail even to meet ordinary pleading standards, much less the heightened

13   standard applicable here.  For example, Plaintiffs simply take for granted—and do not actually

14   allege facts to support—that trades allegedly executed by Defendant Reed had the ability to

15   influence cryptocurrency markets.  *See supra* Part IV.B.1.  As demonstrated above in Part IV.A,

16   Plaintiffs fail to support their claim that Defendants' alleged conduct caused their losses with

17   anything more than information-and-belief conclusions.  *See Neubronner v. Milken*, 6 F.3d 666,

18   672 (9th Cir. 1993) ("[A] plaintiff who makes [fraud] allegations on information and belief must

19   state the factual basis for the belief.").  Nor do Plaintiffs offer any proper factual basis for the

20   conclusion that Defendants intentionally manipulated prices.  Such unsubstantiated conclusions

21   cannot support Plaintiffs' claims.

22          **3.      The Complaint Also Fails to State a Claim for Aiding and Abetting
                       Market Manipulation.**

23

24          In addition to their direct market manipulation claims, Plaintiffs also assert a claim (Count

25   VI) against certain Defendants for aiding and abetting market manipulation perpetrated by a third

26   party on March 13, 2020.  Plaintiffs claim that on that date, a BitMEX user named Quick-Grove-

27

28   _____
     [17] Because Plaintiffs do not allege viable market manipulation claims, Plaintiffs' attendant
     claim for Principal-Agent Liability (Count V) also fails.

1   Mind "cause[d] large market price swings."[18]  Compl. ¶ 509.  Plaintiffs contend that Defendants

2   "aided and abetted" those market swings by making available "extremely high trading leverage

3   (up to 100x)," allowing Quick-Grove-Mind to "avoid detection by providing him with the ability

4   to open unlimited number of anonymous document check-free trading accounts," and "taking

5   BitMEX platform offline during market manipulation event on March 13, 2020."  *Id.* ¶¶ 508-09.

6          Although the Complaint purports to bring this claim on behalf of all Plaintiffs, Compl.

7   ¶ 510, the only Plaintiff alleged to have sustained a loss on March 13, 2020 is BMA, *see id.*

8   ¶¶ 254, 509.  As detailed above in Part IV.A.2, BMA lacks standing because it has not established

9   that is seeking to vindicate its own rights, as opposed to those of its unidentified members.  Thus,

10  Plaintiffs' aiding and abetting CEA claim should be dismissed for lack of standing.

11         Plaintiffs' aiding-and-abetting claim also fails for several additional reasons.  *First*,

12  Plaintiff BMA's claim that it suffered a loss of 3 bitcoin is implausible in light of its allegation

13  that it possessed a "short XBTUSD position" on March 13, 2020, when the price of bitcoin

14  dropped precipitously.  Compl. ¶¶ 213, 529.  If Quick-Grove-Mind placed trades that triggered

15  the liquidation of long positions on the BitMEX Perpetual Swap contract, as Plaintiffs claim for

16  every other alleged loss (*see id.* ¶¶ 254, 388), those alleged trades would have *benefitted* BMA as

17  a holder of a short position, not harmed it.  In effect, Plaintiffs are claiming that BMA was

18  harmed not because its position was liquidated, but rather because it was prevented from profiting

19  from alleged market manipulation.  In any event, Plaintiffs offer no allegations regarding timing

20  that is critical to the allegation that BMA was unable "to timely close" a position.  *Id.* ¶ 254.

21         *Second*, the Complaint fails to allege any facts to support that Quick-Grove-Mind engaged

22  in market manipulation.  In fact, the only thing that the Complaint alleges (once again, on naked

23

24  ───────────────
    [18] Plaintiffs make a number of contradictory allegations regarding the identity of Quick-
25  Grove-Mind.  At the outset of the complaint, Plaintiffs allege that they are "informed and
    believed" that "Quick-Grove-Mind was a market manipulation winner account used by one of the
26  individual Defendants Hayes, Delo or Reed."  Compl. ¶ 11.  But later, Plaintiffs claim that Hayes,
    Delo, and Reed aided and abetted CEA violations "by Andrianov, market manipulator under
27  assumed name Quick-Grove-Mind listed on BitMEX Leaderboard."  Compl. ¶ 508.  And still
    later, Plaintiffs appear to claim that Quick-Grove-Mind is an unnamed third party, alleging that
28  Defendants knew this user "was clearly a notorious market manipulator."  Compl. ¶ 509.  Those
    inconsistences further demonstrate that Plaintiffs' repeated resort to "information and belief"
    evidences nothing other than Plaintiffs' propensity for wild and baseless speculation.

1    "information and belief") is that Quick-Grove-Mind made a "$100,000,000 profit" during so-

2    called "market manipulation events."  Compl. ¶ 388.  Plaintiffs immediately contradict that

3    allegation with a chart (that Plaintiffs themselves appear to have prepared) purportedly showing a

4    "profit" of 250 bitcoin over the course of several months—an amount that, even at today's value

5    of $20,000 per bitcoin, equates to roughly $5,000,000.  In any event, Plaintiffs acknowledge that

6    there are necessarily winners and losers on swap contracts, Compl. ¶ 197; the mere fact of

7    winning does not plausibly make one a market manipulator.

8         *Third*, Plaintiffs do not plead any facts that would plausibly allege that Defendants aided

9    and abetted any market manipulation by Quick-Grove-Mind.  "Generally stated, to recover on an

10   aiding and abetting claim under the CEA, a plaintiff must prove the defendant (1) had knowledge

11   of the principal's intent to violate the CEA; (2) intended to further that violation; and

12   (3) committed some act in furtherance of the principal's objective."  *In re Amaranth Nat'l Gas*

13   *Commodities Litig.*, 587 F. Supp. 2d 513, 531 (S.D.N.Y. 2008).  Given that the Complaint fails to

14   explain who Quick-Grove-Mind is, let alone how that trader engaged in market manipulation, the

15   Complaint certainly fails to plausibly allege facts establishing those three additional elements.

16        **E.      Plaintiffs' State Law Claims All Fail as a Matter of Law.**

17        Plaintiffs also assert a variety of purported claims under California state law:  Negligence

18   (Count VII), Fraud (Count VIII), Civil Conspiracy (Count IX), Unfair Business Practices in

19   Violation of Cal. Bus. & Prof. Code §§ 17200 et seq. (Count X), Unjust Enrichment (Restitution)

20   (Count XI), Constructive Trust (Count XII), Accounting (Count XIII), Conversion (Count XIV),

21   Aiding and Abetting Conversion (Count XV), Aiding and Abetting Fraud (Count XVI), and

22   Violation of Cal. Pen. Code § 496 (Count XVII).  Like their federal claims, Plaintiffs' state law

23   claims are uniformly meritless and should be dismissed.

24             **1.      Plaintiffs' Negligence Claim Fails.**

25        Plaintiffs fail to state a valid negligence claim for three reasons.

26        *First*, Plaintiffs fail to establish that Defendants' alleged negligence—as opposed to any

27   other factor—caused their purported losses.[19]  It is axiomatic that a "plaintiff seeking to recover

28   ───────────────

     [19] Although the Complaint is less than clear, it appears that Plaintiffs' negligence claim is

1   damages from a negligent defendant must allege a causal connection between the negligence and

2   the plaintiff's injury." *E.g.*, *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 900 (1991).  In cases

3   "where the pleaded facts of negligence and injury do not naturally give rise to an inference of

4   causation the plaintiff must plead specific facts affording an inference the one caused the others."

5   *Id.* at 900-01.  But as already detailed above, the only "specific facts" alleged here establish that it

6   is equally possible that general market activity and/or unnamed third parties, *not* Defendants,

7   caused Plaintiffs' bitcoin losses.  And Plaintiffs' allegation that Defendants either deliberately

8   caused, or negligently failed to prevent, a 25-minute server outage on March 13, 2020 is not

9   plausibly tied to BMA's alleged loss of 3 bitcoin on an unidentified short XBTUSD position at

10   some unidentified time that day.  Compl. ¶¶ 525-30; *see also supra* Part IV.D.3.

11        *Second*, Plaintiffs fail to establish the existence of any "special relationship" between

12   themselves and Defendants that would give rise to a duty of care.  Cognizant of the potentially

13   unlimited scope of liability for nonphysical harm flowing from a negligence claim, the California

14   Supreme Court has recognized that "purely economic losses flowing from a financial transaction

15   gone awry … are primarily the domain of contract and warrant law or the law of fraud, rather

16   than of negligence." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 402 (2019).  Such economic losses

17   are recoverable under a negligence theory, if at all, only in cases "where the plaintiff and the

18   defendant have a 'special relationship,'" such that "the plaintiff was an intended beneficiary of a

19   particular transaction but was harmed by the defendant's negligence in carrying it out." *Id.* at

20   400.

21        *Berk v. Coinbase, Inc.*, No. 18-cv-01364, 2019 WL 3561926 (N.D. Cal. Aug. 6, 2019),

22   cited in the Complaint (¶ 515), does not hold otherwise.  There, a plaintiff who attempted to

23    

24   limited solely to losses purportedly suffered on March 13, 2020 when BitMEX was "tak[en]
offline" following a DDoS attack.  Compl. ¶¶ 525-27.  As already detailed above in Part IV.D.3,

25   that meritless claim applies only to BMA and is deficient in multiple respects.  In any event, to
the extent BMA is now claiming that it can prevail on the theory that Defendants failed to prevent

26   a third-party attack, BitMEX's terms of service expressly informed all users that "access to the
Services may be disrupted from time to time due to necessary maintenance, technical issues,

27   network and system overloads or events outside of HDR's control," and that while "HDR will use
commercially reasonable efforts to avoid [any] downtime," it "assumes no liability (whether for

28   trading-losses or otherwise) if the Services or any party thereof are unavailable at any time or for
any period."  BitMEX Terms of Service, Sec. 7.3, https://www.bitmex.com/app/terms.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    purchase a cryptocurrency (Bitcoin Cash) directly on an exchange operated by the defendant

2    (Coinbase) sued that exchange for negligence when the price represented to him by Coinbase

3    differed from the actual market price. *See* Am. Compl. ¶¶ 23–25, *Berk v. Coinbase, Inc.*, No. 18-

4    cv-01364 (N.D. Cal. July 20, 2018), ECF No. 33. The district court concluded that, based on the

5    allegations in the complaint, the "exchange-trader relationship" identified by the plaintiff imposed

6    a duty on Coinbase to "maintain a functional marketplace." *Berk*, 2019 WL 3561926, at *2. The

7    district court reached that conclusion in light of the plaintiff's allegations that: (1) "Coinbase

8    encouraged traders to enter the market following its *launch of trading in Bitcoin Cash*, so

9    Coinbase's actions were aimed at the traders as a class"; (2) "the *negligent launch of a digital*

10   *currency* foreseeably impacts those who trade in the resulting dysfunctional market"; and (3) the

11   plaintiff's "injury is directly tied *to the allegedly negligent launch*." *Id.* (emphases added)

12        Plaintiffs do not provide any such allegations in their Complaint. Unlike in *Berk*, which

13   centered on the negligent launch of a digital currency, Plaintiffs do not plausibly allege that

14   Defendants enticed them to trade any specific products on BitMEX, let alone to take the specific

15   leveraged positions that were ultimately liquidated.[20] Nor do Plaintiffs claim that Defendants, by

16   purportedly executing trades on other cryptocurrency exchanges which allegedly impacted the

17   price of various cryptocurrencies and derivatives across the marketplace, "aimed" their actions at

18   Plaintiffs. To the contrary, taking even Plaintiffs' most conclusory allegations as true, any

19   purported price manipulation impacted the *entire* market, triggering stop loss orders and

20   liquidations of positions on BitMEX and other cryptocurrency platforms alike. Nothing in

21   California law imposes an actionable duty owed to Plaintiffs in such circumstances.

22        *Third*, Plaintiffs' references to "negligence per se" do not salvage their negligence claims.

23   Compl. ¶ 531. "[T]he doctrine of negligence per se is not a separate cause of action, but creates

24   an evidentiary presumption that affects the standard of care in a cause of action for negligence."

25   *Dent v. Nat'l Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) (quoting *Johnson v.*

26

27        [20] Plaintiffs' conclusory allegation that they were "enticed to trade on BitMEX due to
     Defendants' own predatory advertising tactics," Compl. ¶ 515, offers none of the detail that was
     essential to the holding in *Berk*. And the only specific loss that Plaintiffs allege in their complaint
28   relates to BMA's 3-bitcoin loss, *id.* ¶ 529, which is implausible for the reasons stated above.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

*Honeywell Int'l Inc.*, 179 Cal. App. 4th 549, 555 (2009)). "To invoke the negligence per se doctrine, a plaintiff must allege that: (1) the defendant violated a statute, ordinance, or regulation; (2) the violation proximately caused the injury; (3) the injury resulted from an occurrence that the enactment was designed to prevent; and (4) the plaintiff fits within the class of persons for whose protection the enactment was adopted." *Coppola v. Smith*, 935 F. Supp. 2d 993, 1017 (E.D. Cal. 2013). As already detailed above, Plaintiffs do not plausibly allege that Defendants violated any of the statutes invoked by the Plaintiffs. Nor do Plaintiffs establish that they "fit within the class of persons" that each of those statutes is designed to protect. And in all events, Plaintiffs' inability to link their purported bitcoin losses to any of Defendants' alleged conduct dooms their negligence per se claim. *See Johnson*, 179 Cal. App. 4th at 558 (in negligence per se case, the "plaintiff still has the burden of proving causation").

### 2. Plaintiffs Do Not Allege a Prima Facie Claim for Fraud.

To prevail on a California common law fraud claim, a plaintiff must allege facts sufficient to satisfy Rule 9(b) establishing, among other elements, "a false representation, … justifiable reliance, and damages." *Vess*, 317 F.3d at 1105. Defendants have already shown that the complaint fails to allege any plausible facts with regard to a "false representation" or "damages," particularly when Plaintiffs' allegations are held up against Rule 9(b)'s more stringent standards. Allegations regarding Plaintiffs' "justifiable reliance" on a misrepresentation by Defendants, too, are absent from the Complaint. Indeed, it appears that Plaintiffs are attempting to proceed on a "fraud-on-the-market" theory of reliance. The California Supreme Court has explicitly rejected that theory in common law fraud claims like this one. *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995) (noting that the California Supreme Court rejected the "fraud on the market" theory in *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1108 (1993), requiring instead "actual reliance on the alleged misrepresentations and omissions").

### 3. Plaintiffs' Conclusory Conversion Claim Fails.

Plaintiffs' conversion claim fails due to similar causation deficiencies. A conversion claim has three elements: "(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights,

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1  and (c) resulting damages." *Voris v. Lampert*, 7 Cal. 5th 1141, 1150 (2019). Plaintiffs pay lip

2  service to these first two elements, alleging that Defendants "took the above-mentioned property,

3  including Plaintiffs' valuable bitcoin holdings deposited in Plaintiffs' respective BitMEX trading

4  accounts from Plaintiffs' possession and converted the same to their own use." Compl. ¶ 593; *id.*

5  ¶ 592 (referencing "bitcoin holdings deposited in Plaintiff's BitMEX and Kraken trading

6  accounts"). And the only allegations in the Complaint regarding bitcoin lost by Plaintiffs is their

7  claim that those losses occurred not because Defendants converted them, but rather because the

8  purported trading of unnamed cryptocurrencies or cryptocurrency derivatives on other platforms

9  caused the value of Plaintiffs' holdings to decrease. Indeed, Plaintiffs allege only that "[a]s a

10  proximate result of Defendants' conversion alleged herein, [Plaintiffs] are entitled to damages in

11  the amount to be proven at trial, which constitutes a certain and concrete financial loss of

12  [Plaintiffs] factually (directly) and legally (proximately) caused by Count XIV Defendants, and

13  each of them, conversion." Compl. ¶ 595. That is insufficient to state a claim for conversion.

14      In any event, Plaintiffs' conversion claim fails because they do not allege that Defendants

15  unlawfully dispossessed them of their property. "[T]he law is well settled that there can be no

16  conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or

17  disposition of his property." *Vallarta v. United Airlines, Inc.*, No. 19-cv-05895, 2020 WL

18  6271151, at *12 (N.D. Cal. Oct. 26, 2020) (quoting *Farrington v. A. Teichert & Son, Inc.*, 59 Cal.

19  App. 2d 468, 474 (1943)). Here, Plaintiffs suggest in conclusory fashion that Defendants

20  dispossessed them of their property (bitcoin) when a market decline resulted in the liquidation of

21  their highly leveraged positions. Even if it were true that Plaintiffs' investment losses somehow

22  equate to a "disposition" by Defendants (and they do not), Plaintiffs assented to the taking, use, or

23  disposition of their bitcoin when they agreed to trade on BitMEX in the first place. Because

24  Plaintiffs assumed the risk of a loss of their investment when they opted to make the "high risk,

25  high reward" trades at issue here, Plaintiffs' conversion claim fails.

26      **4.    Plaintiffs Do Not Allege Viable Aiding-And-Abetting Claims or a Violation of Cal. Pen. Code § 496.**

27

28  Plaintiffs' aiding and abetting (Counts XV and XVI) and California Penal Code § 496

1    (Count XVII) claims fail for the same reasons as detailed above in Part IV.D.3.[21]  Each of these

2    claims is predicated on the Defendants' purported facilitation of conversion and fraud by the

3    unidentified third party, Quick-Grove-Mind.  *See* Compl. ¶¶ 600, 608, 617.  But as explained

4    above, Plaintiffs do not adequately allege that Quick-Grove-Mind engaged in any improper

5    conduct at all; Plaintiffs claim only that Quick-Grove-Mind profited significantly during the so-

6    called "market manipulation events."  Compl. ¶ 388.  And in any event, every Plaintiff except

7    BMA fails to allege any facts—plausible or otherwise—to support that they suffered any harm on

8    the dates Quick-Grove-Mind purportedly traded, and all Plaintiffs fail to allege that Defendants

9    aided and abetted the improper actions of that unidentified third party.

10          **5.      Plaintiffs' Remaining State Law Claims—and the Only Claims
                       Asserted Against the Reed Family Members—Are Meritless.**

11

12          Plaintiffs' remaining state law causes of action are plainly deficient for the following

13    reasons.

14    •    **Civil Conspiracy (Count IX)**.  "Under California law, there is no separate and
           distinct tort cause of action for civil conspiracy."  *Ent. Rsch. Grp., Inc. v. Genesis*
15         *Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997).  Thus, where, as here, "no
           underlying tort exists," a civil conspiracy claim also necessarily fails.  *Id.*  In any
16         event, where, as here, "fraud is alleged to be the object of the conspiracy," Plaintiffs
           must plead all three elements—"(1) the formation and operation of the conspiracy and
17         (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the
           common design"—"with particularity."  *E.g.*, *Prakashpalan v. Engstrom, Lipscomb &*
18         *Lack*, 223 Cal. App. 4th 1105, 1136 (2014).  For the reasons already discussed above,
           Plaintiffs fail to plead facts sufficient to satisfy any of those elements, let alone with
19         the requisite particularly.

20    •    **Unfair Business Practices (Count X)**.  Plaintiffs' unfair business practices claim is
21         predicated upon their allegations that Defendants committed fraud and violated RICO
           (including the underlying predicate acts alleged in the complaint), the CEA, and
22         various statutes identified in their negligence claim.  Compl. ¶¶ 560–70.  Because
           Plaintiffs have failed to state a claim as to each of those underlying offenses, their
23         unfair business practices claim under Cal. Bus. & Prof. Code § 17200 necessarily fails.
           Plaintiffs also lack standing under that statute for the reasons stated above.  *See id.*
24         § 17204 (requiring "injury in fact" and a loss "as a result of the unfair competition").
25

26          [21] The "[l]egislative history and intent" behind California Penal Code § 496 confirms that
27    this statute was "solely intended to create civil liability for the receipt or withholding of stolen
      property."  *Instant Brands, Inc. v. DSV Sols., Inc*, No. EDCV 20-399, 2020 WL 5947914, at *4
      (C.D. Cal. Aug. 20, 2020).  As detailed above, because Plaintiffs do not allege a viable
28    conversion claim, their Penal Code Section 496 claim necessarily fails for that additional reason.

- **Unjust Enrichment (Count XI).** "[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Plaintiffs' unjust enrichment claim thus necessarily fails with its other claims.

- **Constructive Trust (Count XII).** Similarly, a "constructive trust [] is an equitable *remedy*, not a substantive claim for relief." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 398 (2007) (rejecting "circular" argument that the supposed existence of a constructive trust is sufficient to plead the requisite wrongful conduct).

- **Accounting (Count XIII).** Like Plaintiffs' additional remaining claims, "a right to an accounting is derivative; it must be based on other claims." *Petersen v. Roundpoint Mortg. Servicing Corp.*, No. EDCV 11-01201, 2012 WL 13076612, at *5 n.6 (C.D. Cal. May 7, 2012) (quoting *Janis v. Cal. State Lottery Comm'n*, 68 Cal. App. 4th 824, 833 (1998)).

In short, it is well settled under California law that none of these claims constitutes a cause of action or claim in its own right, and all should be dismissed based on Plaintiffs' failure to plead a RICO, CEA, or fraud claim. Moreover, four of the remaining state law "causes of action"— civil conspiracy, unjust enrichment, constructive trust, and accounting—are the only claims that Plaintiffs bring against the Reed Family Members, who are Sam Reed's wife, mother, and father. Put otherwise, the Reed Family Members are not named as Defendants to any of the claims of actual misconduct (nor could they be in light of the complete absence of any supporting factual allegations). While Plaintiffs cannot proceed on their derivative "causes of action" against any of the Defendants, the allegations—and indeed this entire lawsuit—are particularly misplaced as to the Reed Family Members. Indeed, the sole fact alleged in the Counts against the Reed Family Members is that they "are in possession of two real estate properties … with the aggregate market value of over $2,500,000" purportedly acquired with funds by others. Compl. ¶ 577. There is no plausible basis for the Reed Family Members to remain Defendants to this litigation.

## V.    CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' Complaint.

1   DATED:  December 23, 2020              Respectfully submitted,

2                                          JONES DAY

3

4                                          By: /s/ Stephen D. Hibbard
                                               Stephen D. Hibbard

5                                          Counsel for Defendants
6                                          HDR GLOBAL TRADING LIMITED and
                                           ABS GLOBAL TRADING LIMITED

7
                                           AKIN GUMP STRAUSS HAUER & FELD
8                                          LLP

9

10                                         By: /s/ Peter I. Altman
                                               Peter I. Altman
11

12                                         Counsel for Defendant
                                           ARTHUR HAYES
13

14                                         BOIES SCHILLER FLEXNER LLP

15

16                                         By: /s/ Edward H. Takashima
                                               Edward H. Takashima
17
                                           Counsel for Defendant
18                                         BEN DELO

19
                                           LATHAM & WATKINS, LLP
20

21
                                           By: /s/ Douglas K. Yatter
22                                             Douglas K. Yatter
                                               Matthew Rawlinson
23
                                           Counsel for Defendants
24                                         SAMUEL REED, AGATA MARIA REED,
                                           BARBARA A. REED, TRACE REED,
25                                         GRAPE PARK LLC, MARK SWEEP LLC

26

27

28

NOTICE OF MOT. AND MOT. TO DISMISS
                                           3:20-cv-03345-WHO

18

1  I, Stephen D. Hibbard, am the ECF User whose ID and password are being used to file

2  this Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Consolidated Complaint;

3  Memorandum of Points and Authorities in Support Thereof.  In compliance with Civil L.R. 5-

4  1(i)(3), I hereby attest that all signatories concur in this filing.

5  DATED:  December 23, 2020

6  _/s/ Stephen D. Hibbard_
   STEPHEN D. HIBBARD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 23, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the Electronic Mail Notice List.

*/s/ Stephen D. Hibbard*
STEPHEN D. HIBBARD
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:  +1.415.626.3939
Facsimile:  +1.415.875.5700
E-mail: sdhibbard@jonesday.com