Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Grape Park LLC, Mark Sweep LLC, Unknown Exchange, Arthur Hayes, Ben Delo, Samuel Reed, Agata Maria Reed (A.K.A. Agata Maria Kasza), Barbara A. Reed and Trace L. Reed,<br><br>Defendants. | Case No.  3:20-cv-3345-WHO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>**Hon. William H. Orrick**<br>**Date: February 3, 2021**<br>**Time: 2:00 PM**<br>**Crtrm.: 2, 17th Floor**<br><br>**Discovery Cutoff: None Set**<br>**Pretrial Conference Date: None Set**<br>**Trial Date: None Set** |

# **TABLE OF CONTENTS**

I.   STATEMENT OF THE RELEVANT FACTS .............................................................. 1

   A.  CC Alleges Defendants' Market Manipulation Scheme With Particularity ..................... 1

   B.  CC Alleges Clear Causation Of Plaintiffs' Losses On BitMEX and Kraken ................... 3

II.  ALLEGATIONS ON "INFORMATION AND BELIEF" ARE SUFFICIENT ..................... 5

   A.  Allegations On "Information And Belief" Are Sufficient Because "The Facts
   Are Peculiarly Within The Possession And Control Of The Defendants" ............................ 5

   B.  Allegations On "Information And Belief" Are Additionally Sufficient
   Because "The Belief Is Based On Factual Information That Makes The
   Inference Of Culpability Plausible" .................................................................................. 6

   C.  Allegations On "Information And Belief" Satisfy Requirements Of Rule 9(b) ............... 13

   D.  Plaintiffs' Claims Are Additionally Plausible Because Defendants
   And Only Defendants Possessed Means, Motive and Opportunity To
   Manipulate The .BXBT Index Of BitMEX And Cause Plaintiffs' Damages ...................... 15

      1.  Means ..................................................................................................................... 15

      2.  Motive .................................................................................................................... 16

      3.  Opportunity ............................................................................................................ 17

   E.  "Cui Bono Fuisset?" Principle Used By Law Enforcement To Identify
   Crime Suspects Also Supports Plausibility Of Defendants' Liability for Losses ................ 18

   F.  Because Defendants' Liability Is Plausibly Alleged, Alternative
   Explanations Of Plaintiffs' Losses Advanced By Defendants Are
   Irrelevant On MTD ........................................................................................................ 19

III. PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS .............. 21

   A.  Plaintiffs Have CEA Standing ..................................................................................... 21

   B.  Plaintiffs State Viable Price Manipulation Claim ......................................................... 23

1.  Ability To Influence Market Prices ....................................................... 24

2.  Existence of Artificial Price .................................................................. 25

3.  Defendants Caused The Artificial Prices ............................................... 25

4.  Defendants Intended To Cause The Artificial Price ............................. 25

C.  Plaintiffs State Viable Manipulative Device Claim ................................... 26

D.  Plaintiffs State Viable Aiding and Abetting Claims ................................... 27

E.  Plaintiffs State Viable Principal/Agent Liability Claims ........................... 29

IV.  PLAINTIFFS STATE VIABLE RICO CLAIMS ............................................... 29

A.  CC Alleges Valid RICO "Enterprise" ....................................................... 30

B.  The RICO Predicate Acts Of Wire Fraud Are Adequately Alleged .............. 31

C.  Defendants' RICO Predicate Acts Injured Plaintiffs Directly And
Proximately By Causing Liquidation Of Plaintiffs' Positions ..................... 33

V.  THE REMAINING CAUSES OF ACTION ARE ALSO VIABLE ....................... 34

VI.  CONCLUSION ................................................................................................. 36

1

## TABLE OF AUTHORITIES

2

3   **CASES**

4

*Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .............................. 20

*Arista Records LLC v. Doe* 3, 604 F.3d 110 (2d Cir. 2010). ........................................... 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 12

*Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015) ................................. 34

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................. 14

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ............................................ 33

*Codexis, Inc. v. EnzymeWorks, Inc.*, No. 3:16-cv-00826-WHO, 2017 WL 4236860 (N.D. Cal.

　 Sep. 25, 2017). ................................................................................. 12, 19, 21

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997) ...................................................... 13

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. Nov 26, 2018) ........................ 21

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .................................................... 26

*Foman v. Davis*, 371 U.S. 178 (1962) ................................................................. 36

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ........................................... 21

*Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104 (2d Cir. 2018) ........................ 22

*Hemi Grp. v. City of New York, N.Y.*, 559 U.S. 1 (2010) .............................................. 33

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844 (S.D.N.Y. Mar. 27,

　 2013) ......................................................................................... 27

*In re Amaranth Nat. Gas Commodities Litig. (Amaranth I)*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008)

　 ................................................................................................ 14

*In re Amaranth Nat. Gas Commodities Litig. (Amaranth II)*, 612 F. Supp. 2d 376 (S.D.N.Y. 2009)

　 ................................................................................................ 15

*In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104 (9th Cir. 2013) .................... 20

*In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) .................................... 23, 26

*In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y.

2013) ................................................................................................................ 35

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) ...... 21

*In re In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131

(S.D.N.Y. Sept. 20, 2016) ................................................................................... 29

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666 (S.D.N.Y.

2013) ................................................................................................................ 21

*In re London Silver Fixing, Ltd., Antitrust Litig.* No. 14-MD-2573 (VEC), 213 F. Supp. 3d 530,

2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ................................................... 21, 29

*In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) .................................... 27

*In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005) .................................... 14

*In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ........ 21

*JC v. Choice Hotels International, Inc.*, 20-CV-00155-WHO (N.D. Cal. Oct. 28, 2020) .............. 5

*Klein v. Earth Elements, Inc.*, 59 Cal.App.4th 965 (1997) ...................................................... 34

*Kraft Foods Grp., Inc., 153 F. Supp. 3d 996 (N.D. Ill. 2015)* ....................................................... 23

*Moore v. Kayport Package Express, Inc*, 885 F.2d 531 (9th Cir. 1989) ..................................... 13

*People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal.App.3d 509 (1984) ......................... 34

*Planner5D v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073 (N.D. Cal. Jul. 24,

2020) ................................................................................. 5, 6, 12, 13, 24, 25

*Reich v. Lopez*, 38 F. Supp. 3d 436 (S.D.N.Y. 2014) ................................................................ 33

*SEC v. Shuang Chen et. al*. Civil Action: 1:19-cv-12127-WGY (D. MA 2019) ........................... 9

*Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985) ................................................................ 14

*Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ...................................................... 5, 12, 24

*Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570

(S.D.N.Y. Feb. 21, 2017) .................................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................ 15

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ................................................................ 31

*United States v. Chang*, No. 16-cr-00047-EJD-1 (N.D. Cal. Sep. 24, 2020) ............................... 31

*United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000) ............................................... 31

*United States v. Namvar*, 498 F. App'x 749 (9th Cir. 2012)................................... 31, 32

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ........................................... 31, 32

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987)........................................ 5

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003). .............................. 13

*Wash. Envtl. Council v. Belton*, 732 F.3d 1131 (9th Cir. 2013) .............................. 20

*Wool v. Tandem Computers Inc.*, 818 F.2d 1433 (9th Cir. 1987)............................ 14

**STATUTES**

18 U.S.C. § 1952 ........................................................................................... 32, 33

18 U.S.C. § 1956(a) ...................................................................................... 32, 33

18 U.S.C. § 1957(a) ...................................................................................... 32, 33

18 U.S.C. § 1960(a) ...................................................................................... 32, 33

18 U.S.C. § 1962(c) ............................................................................................ 32

18 U.S.C. § 1962(d) ...................................................................................... 30, 32

18 U.S.C. § 2314 ........................................................................................... 32, 33

7 U.S.C. § 25(a)(1) ........................................................................................ 21, 26

Cal. Civ. Code §§ 17200 et seq.............................................................................. 4

Cal. Pen. Code § 496........................................................................................... 35

I.    **STATEMENT OF THE RELEVANT FACTS**

A.    **CC Alleges Defendants' Market Manipulation Scheme With Particularity**

The key facts of this market manipulation scheme ("MMS") run by Defendants are rather simple and easy to understand.  In 2014, Defendants launched the bitcoin derivatives trading platform BitMEX, which enables traders to place bets on direction of cryptocurrency prices.  In designing their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer ("KYC") or anti-money laundering ("AML") checks what so ever, see Consolidated Complaint ("CC") ¶¶ 6, 283-85, 287; Ex. 1; Ex. 4 ¶¶ 21-23.   In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked.[1]

In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way, CC ¶¶ 283-85.  The entire account registration and funding process takes about 10 minutes and no documents are even looked at.  Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, CC ¶ 7; Ex. 1 p. 2.  A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader, CC ¶ 7; Ex. 6.

Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from market manipulation.  It all has to do with anonymity, lack of trading limits, high leverage and how their .BXBT index price for bitcoin derivatives is calculated, CC ¶ 8.   Defendants deliberately designed this .BXBT index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges, CC ¶ 8.  Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, rel-

---

[1] For their actions in connection with BitMEX, Defendants Hayes, Delo and Reed have been criminally charged by the U.S. DOJ with Federal felony money laundering related offenses, see CC Ex. 4.  In addition, the DOJ indictment alleges that Hayes and Delo violated U.S. sanctions on Iran, which carries 20 year prison term, Ex. 4 ¶ 24.  Defendant Hayes refused to surrender to U.S. authorities and is currently a fugitive from U.S. law enforcement.  94% of the equity in entity Defendants HDR and ABS is owned by Hayes, Delo and Reed, two of who are fugitives and one is a prisoner (Reed was apprehended by the FBI).  Therefore, the defense of this civil action is being conducted for the benefit of and controlled by fugitives from justice.

atively small market orders will suffice, CC ¶ 8. Therefore, a relatively small market order on a thinly traded spot exchange results in a relatively large .BXBT index price move on the very liquid BitMEX, making manipulation highly profitable. CC ¶ 8; Ex. 2 pp. 2-3; Ex. 3 p. 2; Ex. 7, 16.

Defendants opened two exchange accounts – a helper account on one or more thinly traded exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and BitStamp) and a winner account on BitMEX itself. CC ¶ 9. Defendants then entered into a large leveraged derivatives position on BitMEX and immediately executed market orders from the helper account with maximum slippage to move the index price in a favorable direction, CC ¶ 9; Ex. 2, 3, 7, 16. Due to a disparity in liquidity between BitMEX and the thinly traded spot exchanges, the aforesaid deliberate design of the index price by Defendants, and the cascading liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account is multiplied greatly and translates into outsized profit in the winner account on BitMEX, CC ¶ 9; Ex. 2, 3, 7, 16. At times, the market manipulation profit in the winner account may be as high as 8000% (or 80x) of the amount spent from the helper account, CC Ex. 3 p. 4. This makes MMS immensely profitable.



Mechanics of Bitcoin Market Manipulation and Money Laundering

Because BitMEX accounts are by design anonymous and KYC-free, the ill-gotten manipulation profit cannot be traced from the helper account to the winner account, CC ¶¶ 283-85; Ex. 4 ¶¶ 21-23. Thus, the manipulation proceeds in the winner account on BitMEX appear to regulators as legitimate trading gains and the MMS achieves its purpose, CC ¶ 9. The market manipulation and other nefarious acts are well documented and take place on BitMEX almost daily, CC ¶¶ 9, 386, 388; Ex. 2, 3, 7, 16. Moreover, to exacerbate the described price manipulations and cause maximum injury to traders, Defendants intentionally lock users out of their trading accounts during manipulation times, falsely telling the users that their "system is overloaded." CC ¶¶ 9, 172.

In the described MMS, the market manipulation gains realized by Defendants in the winner account and the funds confiscated by BitMEX platform as the result of liquidations induced by Defendants themselves are generated at the expense of Plaintiffs and other cryptocurrency traders like Plaintiffs, CC ¶ 10. Notably, BitMEX deposits proceeds from the user account liquidations, which Defendants themselves intentionally caused, into its so called "Insurance Fund," which has steadily grown over the years and now amounts to over $1,300,000,000, all misappropriated from traders, including Plaintiffs, CC ¶¶ 10, 170, 203. Moreover, the above MMS was illustrated in a detailed diagram, which clearly showed all manipulation acts by Defendant Reed and how they caused liquidations on BitMEX and Kraken resulting in Plaintiffs' losses, CC ¶ 9.

It should be further noted that the above allegations of the MMS easily meet the *relaxed* requirements of Rule 9(b), applicable to market manipulation cases, as will be explained below.

**B.    CC Alleges Clear Causation Of Plaintiffs' Losses On BitMEX and Kraken**

CC ¶¶ 245-55 alleges that all Plaintiffs traded XBTUSD perpetual swap contact on BitMEX, which Defendants advertised as the most traded crypto product ever. The causation chain for Plaintiffs' losses on BitMEX is very straightforward, CC ¶¶ 254-58. Specifically, when Defendant Reed executed a large market SELL order from helper account on thinly traded Kraken's XBTUSD/BTC thinly traded order book (step 1 in the diagram of CC ¶ 256), causing artificial downward price move on the spot order book of that exchange (step 2), the aforesaid artificial price move caused liquidations of Plaintiffs' positions on Kraken (step 3), and then propagated, through the .BXBT index, to the XBTUSD perpetual swap order book of BitMEX, causing the

corresponding downward price more (step 4) and triggered liquidation of Plaintiffs' XBTUSD long positions on BitMEX (step 5). CC ¶¶ 254-58. This sequence repeated daily, including each and all of the Manipulation Times, CC ¶ 372. Thus, contrary to Defendants' groundless arguments, the causation of Plaintiffs' losses is straightforward and is clearly tied to Defendants' own manipulative actions, described above, which actions constitute: 1) a manipulation under CEA; 2) predicate acts under RICO; and 3) overt acts in furtherance of RICO conspiracy. CC ¶¶ 254-58.

The above causation clearly satisfies both the "but for" and "proximate cause" tests. Specifically, if Defendant Reed did not execute a large market SELL order from helper account on Kraken's thinly traded XBTUSD/BTC order book, the above sequence would not have taken place and the Plaintiffs' long positions on the very liquid BitMEX exchange would not have been liquidated. CC ¶¶ 254-58. Moreover, liquidation of Plaintiffs' XBTUSD long positions on Bit-MEX exchange was foreseeable consequence of the execution of the large market SELL order from helper account on Kraken's thinly traded XBTUSD/BTC order book, which is linked to the BitMEX's XBTUSD order book via the .BXBT index that Defendants themselves designed to be easily and profitably manipulable. CC ¶ 8. In fact, Defendant Reed's execution of the aforesaid large market SELL order on the thinly traded Kraken was specifically *intended* to enrich Defendants at the expense of Plaintiffs, by artificially causing liquidations of Plaintiffs' XBTUSD long positions on BitMEX, due to the deliberate design of the .BXBT index by Defendants and wrongful confiscation of bitcoins used as collateral from Plaintiffs' accounts on BitMEX. CC ¶¶ 8-9. Moreover, actions of Defendants in executing the large market SELL order from helper account on Kraken's thinly traded XBTUSD/BTC order book were directly aimed at Plaintiffs, who traded on BitMEX and Kraken and whose bitcoins Defendants wanted to confiscate for themselves.

Contrary to Defendants' faulty arguments, which they repeat again and again, the above-illustrated *clear* causation *directly* tying Plaintiffs' losses to Defendants' manipulative conduct applies to *all* causes of action alleged in the CC, including violations of CEA, RICO, California's unfair competition law ("UCL") (Cal. Civ. Code §§ 17200 et seq.), as well as negligence, fraud, conversion, etc. This clearly establishes Plaintiffs' standing to sue under *all* applicable statutes and common law. In view of the above clear and detailed allegations of the CC, with respect to

both the elaborate MMS run by Defendants and *how* it caused Plaintiffs' losses, it becomes plainly obvious that the detailed allegations of the CC easily defeat the Motion to Dismiss ("MTD").[2]

## II.    ALLEGATIONS ON "INFORMATION AND BELIEF" ARE SUFFICIENT

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

Contrary to Defendants' arguments, both the Ninth Circuit and this Court have repeatedly held, that "[t]he *Twombly* standard permits allegations on information and belief where: (1) "the facts are peculiarly within the possession and control of the defendants"; or (2) "the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records LLC v. Doe* 3, 604 F.3d 110, 120 (2d Cir. 2010)).  Both circumstances are present here." *Planner5D v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020).  In *JC v. Choice Hotels International, Inc.*, 20-CV-00155-WHO, at 9 (N.D. Cal. Oct. 28, 2020) this Court held:

> Defendants take issue with these allegations based on "information and belief". The Ninth Circuit has held that the Iqbal/Twombly plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief. See *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citing *Arista Records*, 604 F.3d at 120). An allegation made on information and belief is sufficient "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Id.*

As explained in detail below, just like in *Planner5D v. Facebook, Inc.* and *JC v. Choice Hotels International, Inc.*, both circumstances are *also clearly* present in the present case.

### A.    Allegations On "Information And Belief" Are Sufficient Because "The Facts Are Peculiarly Within The Possession And Control Of The Defendants"

With respect to the first prong of the above test, if "the facts are peculiarly within the possession and control of the defendants," then the allegations made by Plaintiffs based on "information and belief" are proper.  Here, the details of the market manipulation perpetrated by Defendants, including the prices, sizes and other parameters of specific trades made by Defendants

---

[2] In the MTD, Defendants again attempt to question allegations of losses sustained by Plaintiff BMA.  This challenge is meritless, as CC adequately alleges exemplary specific losses sustained by that Plaintiff, see CC ¶ 254, which should be taken as true on MTD.  See also Pogodin Decl. ¶¶ 2-4, attesting that Plaintiffs' counsel offered to provide information on BMA to Defendants.

in order to manipulate the .BXBT index and liquidate Plaintiffs and other retail traders, like Plaintiffs, on the BitMEX and Kraken trading platforms are "peculiarly within the possession and control of the defendants." Therefore, the first prong of the test is satisfied in the present case and the "information and belief" allegations of Plaintiffs are proper under *Planner5D v. Facebook, Inc*., No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020) and *Soo Park*, 851 F.3d at 928 (the two test prongs are connected with "or" and the test is satisfied when either prong is met). Therefore, Defendants' arguments should be rejected for this reason alone.

**B.     Allegations On "Information And Belief" Are Additionally Sufficient Because "The Belief Is Based On Factual Information That Makes The Inference Of Culpability Plausible"**

With respect to the second prong of the above test, as illustrated in detail below, "the belief [of Plaintiffs]" is *clearly and unmistakably* based on *overwhelming* "factual information that makes the inference or culpability plausible." *Planner5D v. Facebook, Inc*., No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020). Below table lists 50 specific factual information items contained the CC[3] that provide a clear and *overwhelming* basis for "information and belief" allegations in the CC. There should be no doubt in the mind of *any* trier of fact that the 50 facts from the CC listed below not only make the alleged Defendants' culpability in causing Plaintiffs' damages plausible, but, in fact, highly probable.

| No. | Explanation Of Specific Factual Information Contained In The CC That Makes The Inference Of Defendants' Culpability Plausible | Citation to CC |
|---|---|---|
| 1. | A specific design of the .BXBT index wherein the price of swaps on an exchange with very high liquidity depends on a spot price on an exchange with very low liquidity clearly demonstrates that it was intended to facilitate manipulation, as it does not cost much money to move the index price, making manipulation highly profitable (8000% profitable). Defendants were the ones who designed this .BXBT index in the described manner and, therefore, they intended to manipulate the bitcoin price | CC ¶¶ 8, 9, 18, 159-60, 169, 194, 227-28, 235, Ex. 2 pp. 2-3; Ex. 3 pp. 2, 4 |
| 2. | Half of BitMEX's revenue comes from liquidations of retail traders like Plaintiffs, creating a massive financial incentive for Defendants to cause market swings resulting in liquidations. No third party benefits from manipulation to the extent Defendants do. Thus, "cui bono fuisset?" rule points to Defendants as the most likely culprits behind frequent manipulation events | CC ¶¶ 12, 228, 236, Ex. 1, p. 1, Ex. 2, p. 3 |
| 3. | BitMEX operates internal for-profit trading desk trading against Plaintiffs and customers like Plaintiffs, in violation of CFTC regulations prohibiting conflicts of interest. Trading desk uses inside knowledge from exchange not available to other traders. Head of the trading desk Gregory Dwyer has been | CC ¶¶ 12, 19, 171, 207, 218, 220-22, 228, |

---

[3] Three factual information items out of 50 listed in the table were newly discovered and will be included in a further amended complaint, see Pogodin Decl. ¶ 7-9.

| | | | |
|---|---|---|---|
| | | charged with federal felony money laundering related offenses. Operating internal desks by exchanges is prohibited by CFTC regulations, due to conflict of interest, which were brazenly disregarded by defendants | 237, Ex. 1, p. 2, Ex. 2, p. 2, Ex. 5 |
| | 4. | Defendant Hayes publicly admitted to bribery of government officials and expressed pride in his actions, showing brazen contempt for the rule of law | CC ¶¶ 2, 14, 29; Ex. 11 |
| | 5. | Manipulating using .BXBT index generates up to 8000% return on investment for BitMEX, which is too lucrative to pass, especially in view of the clear pattern of greed and brazen disregard of the rule of law by Defendants | CC ¶¶ 275, 286; Ex. 3 p. 4 |
| | 6. | Defendant Hayes publicly admitted to committing bank fraud in connection with a bitcoin transaction where the profit was just 40%. For comparison, profit from manipulation using BitMEX .BXBT index at issue here is 8000%, which would be irresistible for someone who was risking jail time to make just 40% profit. 8000% would be clearly too lucrative profit to pass | CC ¶¶ 2, 14, 31; Ex. 3 p. 4; Ex. 10 |
| | 7. | Instead of surrendering and clearing his name in a court of law, Defendant Hayes went on a lam from the FBI after being charged by DOJ with felony money laundering related offenses and became a fugitive from justice | CC ¶¶ 2, 3 |
| | 8. | Defendant Hayes defrauded early investors Amato and Capone out of millions of dollars by falsely telling them, for over 5 years, that their investments did not convert to equity in BitMEX due to SOSV investment not having a "cash component". Only when investors' attorneys came across highly incriminating evidence provided by SOSV, did Hayes quietly settle with Amato and Capone for tens of millions of dollars and moved to expunge incriminating evidence from court records. Amato v. HDR, CGC-19-581267 | CC ¶ 2; Ex. 17, 18 |
| | 9. | Defendants are serial offenders when it comes to disregard for the rule of law, as they have demonstrated both by their fraudulent misconduct in their dealings with their own early investors and their brazen indifference towards the authority of courts and regulators. When defrauded investor Capone emailed Defendants about status of his equity rights in BitMEX, Defendant Delo responded with a meme, overlaid over a photo of smiling Hayes and reading "incorporated in Seychelles, come at me bro," cynically implying Defendants' belief that they could avoid financial obligations to own investors using a fraudulent shell company incorporated in Seychelles | CC ¶ 30; Ex. 17; Ex. 18 ¶ 20 |
| | 10. | Defendants Hayes, Delo and Reed have been charged by DOJ with federal felony money laundering related offenses punishable by 5 years prison term | CC ¶¶ 2, Ex. 4 |
| | 11. | BitMEX is the main financial beneficiary of the market manipulation on Kraken, Bitstamp or Coinbase due to the deliberate design of .BXBT index of BitMEX, as well as its ownership of the trading desk and insurance fund | CC ¶¶ 12, 222, 228 |
| | 12. | Defendants actively destroyed critical trading and user identity records. Destruction of records is an *overt act* suggestive of other illegal activity | CC Ex. 5 p. 16, ¶ 49 |
| | 13. | Defendants falsified critical records. Falsification of records is an *overt act* suggestive of other illegal activity | CC Ex. 4 p. 12, ¶ 26 |
| | 14. | Defendants completely deleted manipulator accounts with all trading and identity records under the false pretense of the "right to be forgotten." Destruction of records is an *overt act* suggestive of other illegal activity | CC ¶ 389, 390 |
| | 15. | Defendant Hayes' business partner and CTO of Defendant HDR, Defendant Samuel Reed committed perjury during his deposition before CFTC. Perjury is an *overt act* suggestive of other illegal activity | CC Ex. 4 p. 13, ¶ 27 |
| | 16. | Defendants Hayes and Delo violated U.S. sanctions against Iran by allowing Iranian traders on BitMEX and may face up to 20 years in federal prison, when they are extradited to the U.S., pursuant to 50 U.S.C. § 1705(c) | CC Ex. 4, p. 11, ¶ 24 |
| | 17. | Defendants used anonymous "burner" (e.g. gmail) email addresses to open trading accounts for their own internal trading desk to cover up the tracks of wrongdoing. Using "burner" emails is an *overt act* suggestive of other illegal activity. Thus, Defendants' trading desk likely engaged in manipulation | Pogodin Decl., ¶ 7 |
| | 18. | Defendants periodically deleted their own trading desk "burner" trading ac- | Pogodin |

| | | | |
|---|---|---|---|
| | | counts and destroyed corresponding trading records and identities. Frequently deleting "burner" trading accounts is an *overt act* suggestive of illegal activity. Thus, Defendants' trading desk likely engaged in manipulation | Decl, ¶ 8 |
| | 19. | Being keenly aware of government investigations and forthcoming indictments and while preparing to go on a lam from the FBI, Defendants siphoned $440,000,000 out of Defendant HDR, with last distribution taking place just two months before criminal indictments. Siphoning large amount of money after finding out about government probes is an *overt act* suggestive that the funds were derived from deliberate illegal activity | CC ¶¶ 16, 17 |
| | 20. | Only Defendants had access to information on specific parameters of Plaintiffs' trading positions on BitMEX including stop loss orders and liquidation price points, which is necessary to profitably manipulate BitMEX order book and liquidate traders. No third party had access to this information | CC ¶¶ 11, 228 |
| | 21. | Only Defendants were able to open sufficiently large trading positions on BitMEX to capture the market manipulation profits, as large positions require personal approvals from Defendants. Positions over $10M require approvals from Defendants and opening smaller positions will not be profitable for a market manipulator, as explained in detail below | CC ¶ 11 |
| | 22. | Defendants deleted evidence of a manipulator account with over $120,000,000 profit just 1 hour after it popped up soon after a market manipulation event on August 2, 2020, making it likely that this was the "winner" manipulator account belonging to Defendants themselves that contained proceeds of market manipulation on August 2, 2020, resulting in liquidations of retail trader positions in the amount of $150,000,000 | CC ¶¶ 385-87 |
| | 23. | BitMEX leaderboard lists trading accounts with multimillion-dollar profits spikes perfectly matching market manipulation events. Probability of a trader correctly guessing these market moves is less than 12.5%, see below | CC ¶¶ 11, 388 |
| | 24. | Amount of market manipulation greatly subsided after criminal indictments of individual Defendants and arrest of Defendant Reed by the FBI | CC ¶ 393 |
| | 25. | Defendant Reed and Defendant Hayes traded on BitMEX despite having a conflict of interest and unfair informational advantage and order execution priority in violation of CFTC rules and regulations | CC Ex. 5 p. 16, ¶ 50 |
| | 26. | Defendants intentionally froze BitMEX servers to exacerbate market moves and prevent traders from closing their positions early during market manipulation events in order to inflict maximum losses on unsuspecting traders and confiscate maximum collateral funds from victims | CC ¶¶ 12, 172, 205-12, 240, 375 |
| | 27. | "BitMEX applies high fees whenever one buys or sells its toxic instruments, and then it takes another bite of the apple by siphoning customers' savings into a "liquidation fund" that is likely to be many times larger than what is necessary to avoid counter-party risk. It is little wonder that, according to one independent researcher's estimates, liquidations at times account for up to half of BitMEX's revenue." (source: Nouriel Roubini, tenured Professor of Economics at New York University's Stern School of Business and Chairman of Roubini Macro Associates, was Senior Economist for International Affairs in the White House's Council of Economic Advisers during the Clinton Administration. He has worked for the International Monetary Fund, the US Federal Reserve, and the World Bank) | CC Ex. 1 p. 1 |
| | 28. | "BitMEX insiders revealed to me that this exchange is also used daily for money laundering on a massive scale by terrorists and other criminals from Russia, Iran, and elsewhere; the exchange does nothing to stop this, as it profits from these transactions." (source: Prof. Nouriel Roubini, see above) | CC Ex. 1 p. 2 |
| | 29. | "As if that were not enough, BitMEX also has an internal for-profit trading desk (supposedly for the purpose of market making) that has been accused of front running its own clients." (source: Prof. Nouriel Roubini, see above) | CC Ex. 1 p. 2 |
| | 30. | "Last Sunday 14th July, someone placed a sell order on Bitstamp for 15,000 | CC Ex. 2 p. |

| | | |
|---|---|---|
| | ETH causing the price to plummet from $270 to $190 and leading to a flash crash on the exchange. Since Bitstamp is a far less liquid exchange than Binance or BitMEX, this dump made up around $3.5 million of ETH--some 15% of its entire ETH trading volume in just one trade.  You may wonder what this has to do with everyone's favorite futures exchange. Well, it doesn't take too long to put two and two together. You see, BitMEX pulls its price data for its contracts from just three exchanges; Kraken, Coinbase Pro, and Bitstamp. Since BitMEX contracts are based heavily on Bitstamp's price, this dump caused a mass of instant liquidations--over $164 million worth that spread over to Bitcoin and lead to Sunday's plunge. Why would BitMEX do something like this? Simple. Because it makes money a lot of money out of liquidating its traders" (directly pointing to BitMEX as culprit) | 2, 3 |
| 31. | "Let's be honest, the evidence against [Defendant] Arthur [Hayes] and his penchant for liquidating retail traders is piling up. Ever since it emerged that BitMEX actively trades against its customers you have to wonder what kind of ethics the company has in place." (directly pointing to BitMEX as culprit) | CC Ex. 2 p. 2 |
| 32. | "The BitMEX Insurance Fund builds up ad infinitum with virtually no daily drawdowns of any significance over a period of years--even during periods of high volatility. In fact, you can see that the insurance fund balance has increased 99 days out of the last 100 days.<br>Liquidations on BitMEX in fact, at times, account for as much as HALF of all the exchange's revenue. Add this massive incentive to liquidate traders to the fact that the exchange has proprietary traders actively trading against its own customers for profit, and you've got a pretty hostile environment to trade in. Utterly cut-throat, unforgiving, and set up for traders to fail." | CC Ex. 2 p. 3 |
| 33. | "Of the possible manipulators, BitMEX is the best positioned to take advantage of the consequences of these [market manipulation] schemes. First, BitMEX operates its own proprietary trading desk that can take long and short positions and engage in a pump and dump scheme, like the hypothetical trader described above. Second, beyond profiting from any positions it takes, BitMEX alone profits greatly from liquidations, even during severe price movements. Third, BitMEX *alone* knows the trading positions of its users and can precisely tailor its manipulation to generate mass liquidations with minimal effort and risk. Fourth, as a large institution, BitMEX would be one of the entities with sufficient resources to engage in pump schemes that require a lot of capital in traditional currency to buy the underlying commodity.  Unsurprisingly, for these reasons numerous commentators, including a tenured professor at NYU's Stern Business School, point to BitMEX as the culprit behind these price movements." (emphasis added) | CC ¶¶ 228-29 |
| 34. | "Further, BitMEX has failed to establish rules to minimize conflicts of interest. This is apparent because Hayes, Delo, Reed, and numerous other BitMEX employees trade on the platform, and BitMEX's own internal "market-making" desk has at times been one of the *largest traders* on the platform." | CC Ex. 5 p. 16, ¶ 50 |
| 35. | Defendants and their counsel made numerous material misrepresentations of jurisdictional facts to Judge Schulman of San Francisco Superior Court, showing utter indifference for the rule of law and authority of courts.  Defendants repeatedly told the Court that BitMEX did not serve U.S. customers, when in truth and in fact, "BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons. BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus." | CC ¶¶ 115-123; Ex. 5 p. 2 ¶ 3 |
| 36. | Defendants' MMS is similar to a well-known stock price manipulation scheme described in *SEC v. Shuang Chen et. al.* Civil Action: 1:19-cv-12127-WGY (D. MA 2019) ("[t]he Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly | CC ¶ 163 |

| | | |
|---|---|---|
| | traded stock. The Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price (hereinafter referred to as a "helper" account). Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper account(s). The Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts.") | |
| 37. | "In all [suspected manipulation] cases thousands of Bitcoin were bought or sold within minutes although there was not enough liquidity in the exchanges to contain such volumes.<br>The SPOT volumes in each pump or dump was higher by up to 10 times than the average volume in the exchange, as such, the outcome was a sharp increase or decline in BTC price." | CC Ex. 16 p. 2 |
| 38. | "As evidenced in the analysis there are many cases that can be suspected to be manipulative. It seems that the Bitcoin price is manipulated by sophisticated traders who use several exchanges (regulated and unregulated) in parallel to impact the Bitcoin price by buying or selling huge amounts of Bitcoin in the SPOT market. They use this manipulative activity to make huge profits in the derivatives markets [e.g. BitMEX]— Futures or Options." | CC Ex. 16 p. 6-7 |
| 39. | "In my analysis, I found that many times there was an increase in futures positions before the dump or the pump. It seems that there is a connection between the 3 assets (SPOT, Futures and options).<br>Due to the fact that many times there is an increase in futures positions before the dump or the pump, my guess is that traders sell the BTC SPOT at a loss but on the other hand, make huge profits in options (long put) and futures (short position). It is important to note that some exchanges allow leverage of up to 125 times.<br>Why would someone sell amounts that range from 5000–20000 BTC within minutes? Holders of such large amounts of BTC are very sophisticated and if these transactions were legit they would go to an OTC broker to buy or sell such significant amounts, the transaction would cost 10–50 bps depending on the amount and would be executed in a TWAP algorithm. Had it been done in such a manner, the transactions wouldn't impact the market at the same magnitude<br>The fact that huge amounts of BTC are executed in exchanges that have a scarcity of liquidity already implies that a manipulation of the market is happening, leading to a quick profit. The manipulators exploit the fact that the order book is thin hence they sell massive amounts in the SPOT market and this has a huge impact on the underlying asset which fluctuates to the upside (if the manipulator buys huge amounts) or to the downside (if the manipulator sells huge amounts)" | CC Ex. 16 p. 3 |
| 40. | "Sell 44 million over 22 separate orders on [Bit]mex. Get into position. Then, market dump 1000 coins on Coinbase with max slippage to move [.BXBT] index price.<br>I think we just saw someone do some crazy s**t and make a ton of money." | CC Ex. 7 p. 1 |
| 41. | "In case you didn't know, the entire selloff yesterday was triggered by market manipulation.<br>A market dump of 15,000 ETH on the illiquid Bitstamp exchange caused a sell-off on Bitmex and from there the rest of the markets via contagion." | CC Ex. 7 p. 2 |
| 42. | "The fact that Bitmex btc trading volume is 25 times a big as that of it's underlying value (50% coinbase/50% bitstamp) is quite concerning to me. Imagine what you can do as a whale when you open a big leveraged position on bitmex and use a coinbase/bitstamp account to buy/dump." (only BitMEX | CC Ex. 7 p. 3, CC ¶ 11 |

| | | | |
|---|---|---|---|
| 1 | | insiders and people known to them can open large enough leveraged positions on BitMEX to benefit from this manipulation scheme) | |
| 2 | 43. | "Nor is the trading desk the only inside entity trading on BitMEX. Defendant Hayes has admitted that he himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."" | CC ¶ 223 |
| 6 | 44. | "These server issues [that Defendants are likely faking to exacerbate price moves and inflict maximum financial damage on traders] are not present in other exchanges that regularly handle far more transactions per second [than BitMEX]. While BitMEX has purposefully not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200,000,000 trades a week, purportedly taxing its system and leading to server shutdowns. This works out to an average load of around 330 trades a second. BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in swaps and derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze" | CC ¶ 206 |
| 13 | 45. | "These server freezes are not justifiably caused by transaction volume, which would approximate server load. For example, on May 12, 2019, Bit-MEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day." | CC ¶ 212 |
| 15 | 46. | BitMEX also acted on similar financial incentives by trading against its customers, a secret BitMEX kept as long as it could. BitMEX employed an undisclosed trading desk with special privileges and insights that allowed Bit-MEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As a desk with access to otherwise-hidden information, it was in a perfect position to enhance BitMEX's manipulation | CC ¶ 171 |
| 19 | 47. | The fact that Defendants have been proven to engage in a first type of manipulation by freezing servers and faking server overloads in order to exacerbate price moves and inflict maximum damage on traders, also makes it likely that Defendants engaged in the second type of manipulation by manipulating the .BXBT index to liquidate traders and confiscate collateral, as both manipulation strategies are parts of common design to rob traders | CC ¶¶ 12, 172, 205-12, 240, 375 |
| 22 | 48. | BitMEX tried to conceal the existence of its own internal trading desk. Bit-MEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. Hiding existence of its own trading desk is an *overt act* that suggests that the latter engaged in illegal activities, such as manipulation<br>BitMEX hid the role of its trading desk by misleadingly labeling the employee in charge of the desk as part of "Risk Management." | CC ¶¶ 171, 218 |
| 25 | 49. | Defendants Hayes and Delo and their accomplice Dwyer, who was also criminally indicted by the DOJ, laughed and cheered when their victim retail traders with large positions were liquidated by them and their bitcoin misappropriated, resulting in a devastating financial ruin to the victims | Pogodin Decl, ¶ 9 |
| 27 | 50. | "[M]ore than half of top BitMEX traders earning over $1B in profits were unable to pass KYC and AML checks" once they were implemented in 2020, | CC ¶ 391 |

| making it likely that the anonymous top trading accounts with over $1B in trading profits, which did not pass KYC belonged to Defendants themselves | |

At MTD 2, 5, 7, 8, 9, 10, 15, 25, 27 Defendants keep repeating the same faulty argument that "Plaintiffs [do not] offer any proper factual basis for the conclusion that Defendants intentionally manipulated prices."  In fact, based on the number of times Defendants repeat it in their MTD, this argument appears to be the main theme of Defendants' MTD.  On the other hand, the 50 facts listed in the table above and pleaded in the CC, collectively provide *overwhelming* factual basis for the allegation that Defendants *themselves* manipulated the .BXBT index of BitMEX on a *daily basis*, including specific exemplary manipulation times alleged in the CC ¶ 372 (during these exemplary times alleged in CC ¶ 372, clearly suspicious market moves and oversized liquidations immensely benefitting Defendants took place).  CC Ex. 16 pp. 1-2.  In addition, the below "means, motive and opportunity" analysis and "cui bono fuisset?" law enforcement rule for identifying crime suspects, squarely pointing to Defendants as the most likely culprits, additionally provide such *overwhelming* basis.  Thus, Defendants' chief argument in their MTD clearly fails.

In *Soo Park*, 851 F.3d at 928, Ninth Circuit stated that: "Park's complaint alleged facts that are "suggestive" of an agreement to engage in "illegal conduct."… When the entire factual context is considered, it is clear that Park has "nudged [her] claim[]" that Thompson conspired to orchestrate Ayala's unavailability "across the line from conceivable to plausible,"" quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).  Here, too "[w]hen the *entire* factual context [including the 50 facts listed in the table] is considered, it is clear that" Plaintiffs "nudged their claims … across the line from conceivable to plausible."  *Soo Park*, 851 F.3d at 928; *Ashcroft*, 556 U.S. at 680.  Therefore, Defendants' contention that Plaintiffs are merely "speculating" that Defendants engaged in market manipulation and that this manipulation caused Plaintiffs' losses is groundless.  *Planner5D v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul 24, 2020).  Accordingly, Plaintiffs' core claims alleged in the CC are clearly plausible under the controlling Ninth Circuit's and this Court's law.

Moreover, "[a]t the pleading stage, … courts do not analyze which party's explanation is more plausible."  *Codexis, Inc. v. EnzymeWorks, Inc.*, No. 3:16-cv-00826-WHO, 2017 WL 4236860, at *7 (N.D. Cal. Sep. 25, 2017).  Because Plaintiffs' claims clearly met the plausibility

1  requirement, alternative explanations proffered by Defendants, such as that *some unknown third*

2  *party* manipulated the .BXBT index on BitMEX, are simply irrelevant at the pleading stage.  *Id.*

3      Therefore, because the 50 factual information items listed in the table above and alleged in

4  the CC provide *overwhelming* factual information that "makes the inference of culpability [of De-

5  fendants for causing Plaintiffs' injuries] plausible," the second prong of the test is also met and

6  Plaintiffs' core allegations made "on information and belief" are clearly plausible.  Therefore, De-

7  fendants' groundless argument should be rejected for this *additional* reason as well.  *Planner5D*

8  *v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020).

9      **C.      Allegations On "Information And Belief" Satisfy Requirements Of Rule 9(b)**

10      "Rule 9(b) demands that, when averments of fraud are made, the circumstances constitut-

11  ing the alleged fraud be specific enough to give defendants notice of the particular misconduct . . .

12  so that they can defend against the charge and not just deny that they have done anything wrong."

13  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "Averments of fraud must

14  be accompanied by `the who, what, when, where, and how' of the misconduct charged." *Id.* (quot-

15  ing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

16      Here, Defendants argue that Plaintiffs' allegations are insufficient to meet the Rule 9(b)

17  standard because they are grounded on "information and belief." "However, the rule [9(b)] may

18  be relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Ex-*

19  *press, Inc*, 885 F.2d 531, 540 (9th Cir. 1989). This is particularly true in cases of corporate fraud,

20  where plaintiffs do not have personal knowledge of all the underlying facts. *Id.* "In such cases, the

21  particularity requirement may be satisfied if the allegations are accompanied by a statement of the

22  facts on which the belief is founded." *Id.*  In the present case, which is also a case of corporate

23  fraud by Defendants HDR and ABS, the details of the manipulative conduct of Defendants are

24  clearly within the opposing party's (Defendants') knowledge and the 50 facts listed in the table

25  above clearly constitute "a statement of the facts on which the belief is founded," rendering Plain-

26  tiffs' allegations on "information and belief" sufficient for meeting the particularly requirement of

27  Rule 9(b).  *Id.*  Therefore, the 50 facts in the table above clearly provide basis for the allegations

28  made by Plaintiffs on "information and belief" with respect to the Defendants' MMS.  *Id.*

1    Moreover, the exceedingly precisely alleged manipulative acts by Defendants, including

2    very specific wire transmissions alleged in CC ¶ 382, containing specific electronic orders and/or

3    instructions, which Defendants *necessarily* transmitted between specific parties in order to perpe-

4    trate market manipulation on a daily basis, including the specific dates alleged in CC ¶ 372, are

5    sufficient to give Defendants notice of the circumstances constituting the allegation of fraud for

6    Defendants to defend against the charge. See *Semegen v. Weidner*, 780 F.2d 727, 735 (9th Cir.

7    1985) ("[A] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting

8    fraud so that the defendant can prepare an adequate answer from the allegations."). The fact that

9    the fraud is alleged based on "information and belief" is not dispositive. *Wool v. Tandem Com-*

10   *puters Inc.*, 818 F.2d 1433, 1439-40 (9th Cir. 1987) (finding that the plaintiff's complaint satisfied

11   Rule 9(b) despite relying on "information and belief" where the allegations were "precise").  In

12   present case, the "information and belief" allegations of CC ¶ 382 clearly satisfy this "precision

13   test" of *Wool v. Tandem Computers Inc.* as they precisely identify "the circumstances constituting

14   fraud so that the defendant can prepare an adequate answer from the allegations." *Id*.  Therefore,

15   they clearly meet the particularity requirements of Rule 9(b).  *Id.*  The same applies to very de-

16   tailed and "precise" allegations in CC ¶¶ 254-258 and 375-378, which also satisfy Rule 9(b).

17   Furthermore, contrary to Defendants' groundless arguments, the Rule 9(b) standard is

18   generally *relaxed* in the context of market manipulation-based claims sounding in fraud, *ATSI*

19   *Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  In all such cases, the com-

20   plaint must simply specify "what manipulative acts were performed, which defendants performed

21   them, when the manipulative acts were performed, and what effect the scheme had on the market

22   for the securities at issue." *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y.

23   2005); see also *In re Amaranth Nat. Gas Commodities Litig. (Amaranth I)*, 587 F. Supp. 2d 513,

24   535 (S.D.N.Y. 2008); see also *Comm. Exch., Inc.*, 213 F. Supp. 3d 631, 668 (S.D.N.Y. 2016) (If

25   the claim sounds in fraud, the Rule 9(b) standard is "generally relaxed," and "the complaint must

26   simply specify what manipulative acts were performed, which defendants performed them, when

27   the manipulative acts were performed, and what effect the scheme had on the market for the secu-

28   rities at issue.) Defendants intentionally ignore these *relaxed* Rule 9(b) requirements in the MTD.

1    The CC easily meets this *relaxed* Rule 9(b) standard in connection with all alleged market

2    manipulation claims.  CC clearly alleges that Defendant Reed executed specific large market

3    SELL orders on the Kraken exchange, CC ¶¶ 9, 372-82, with maximum slippage, on a daily basis,

4    CC ¶ 372, including the specific exemplary dates alleged in *Id*., which resulted in the downwards

5    movement of the .BXBT index (CC ¶ 254-58), which is substantially (1/3) based on the Kraken

6    exchange price, causing liquidations of Plaintiffs' long XBTUSD swap positions (CC ¶ 254) on

7    BitMEX.  These allegations are clearly sufficient to satisfy the *relaxed* Rule 9(b) standard for

8    market manipulation cases. *ATSI*, 493 F.3d at 102; *Comm. Exch., Inc.*, 213 F. Supp. 3d at 668.

9    Moreover, the 50 facts listed in the table above as well as the "means, motive and oppor-

10   tunity" analysis and the application to the present case of the "cui bono fuisset?" law enforcement

11   principle for identifying crime suspects squarely pointing at Defendants as the most likely culprits

12   behind market manipulation, the latter two being discussed in detail below, clearly provide suffi-

13   cient evidence that "give[s] rise to a strong inference of scienter." *In re Amaranth Nat. Gas Com-*

14   *modities Litig. (Amaranth II)*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (quoting *Tellabs, Inc. v.*

15   *Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007) (emphasis in Amaranth II)).

16   **D.    Plaintiffs' Claims Are Additionally Plausible Because Defendants And Only
         Defendants Possessed Means, Motive and Opportunity To Manipulate The
17       .BXBT Index Of BitMEX And Cause Plaintiffs' Damages**

18   Contrary to Defendants' groundless arguments, the 50 facts listed in the table above clear-

19   ly establish that Defendants and *only* Defendants possessed *means, motive and opportunity* to

20   manipulate the .BXBT index of BitMEX and cause Plaintiffs' damages, as explained next.

21       **1.    Means**

22   CC alleges that in order to manipulate the .BXBT index of BitMEX and make profit liqui-

23   dating traders, the manipulator needs access to the information about specific parameters of other

24   trader position on BitMEX.  These parameters include 1) trading position sizes; 2) trading posi-

25   tion liquidation triggering price points; and 3) trading position stop loss order triggering price

26   points.  CC ¶¶ 11, 223, 228-29.  As the CC clearly alleges, BitMEX and *only* BitMEX had access

27   to this information.  *Id*.  No third party is able to obtain this data.  *Id*. Therefore, it is a reasonable

28   inference that it were Defendants who profitably manipulated the .BXBT index and caused Plain-

tiffs' damages, based on their exclusive access to the critical trader position information.[4]  *Usher,*

828 F.2d at 561 (In deciding whether the plaintiff has stated a claim upon which relief can be

granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in

favor of the plaintiff.)

Moreover, CC ¶ 11 further alleges that *only* Defendants were able to open sufficiently

large ($100,000,000+) trading positions on BitMEX in order to capture the manipulation profits.

For example, as alleged in CC Ex. 3 p. 4, during market event on May 17, 2019, perpetrators

spent (lost) $2,500,000 on BitStamp to move the .BXBT index down by 21%.  In order for the

perpetrator to break even, the corresponding swap position in BitMEX's winner account would

need to be at least $11,904,761 ($11,904,761 x 21% = $2,500,000).  And in order to make modest

1000% profit, the corresponding swap position in BitMEX's winner account would need to be at

least $119,047,610 ($119,047,610 x 21% = $25,000,000).  No other persons except for Defend-

ants are able to open such large positions on BitMEX in order to make manipulation profitable.[5]

Therefore, it is again a *plausible* inference that it were Defendants who profitably manipulated the

.BXBT index due to their *exclusive* ability to open sufficiently large positions on BitMEX and

cause Plaintiffs' damages, based on the above information.  *Usher,* 828 F.2d at 561 (In deciding

whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the

plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.)

### 2.    Motive

As alleged in the CC, manipulating the .BXBT index of BitMEX is immensely profitable,

with profit reaching 8000% (or 80x), CC ¶¶ 275-86; Ex. 3 p. 4.  Moreover, CC alleges that Hayes

publicly admitted to committing bank fraud in connection with bitcoin transaction where the prof-

it was just 40%, CC Ex. 10.  For comparison, profit from manipulation using BitMEX .BXBT

---

[4] The fact that an access to information on: 1) trading position sizes; 2) trading position liquida-
tion triggering price points; and 3) trading position stop loss order triggering price points enables
profitable price manipulation is the exact reason why CFTC regulations prohibit exchanges from
operating their own internal trading desks.  BitMEX operated its own trading desk, in violation of
CFTC regulations that were specifically designed to prevent price manipulation.

[5] CFTC regulations also impose position limits on exchanges exactly for this reason, to prevent
manipulation by making it unprofitable, see, for example, 17 CFR 41.25.  Defendants violated
those regulations, which enabled and facilitated profitable manipulation on BitMEX.

index at issue here is 8000%, which would be irresistible for someone who was risking jail time to make mere 40% profit.  8000% would be clearly too lucrative profit for Defendants to pass. CC further alleges that *half* of BitMEX's revenue comes from liquidations of traders like Plaintiffs, creating a very strong incentive for Defendants to engage in a market manipulation resulting in liquidations of retail traders in order to increase their company revenue, CC ¶¶ 12, 236, Ex. 1 p. 2.

It should be also noted that of all possible manipulators, BitMEX had the *highest* financial incentive to manipulate the .BXBT index. CC ¶¶ 222, 228-29.  In other words, no third party financially benefits from the manipulation to the extent Defendants do.  *Id*.  This is explained by the interplay between the exchange itself, the Insurance Fund and the trading desk, all owned by Defendants.  All three of those entities owned by Defendants benefit from trader liquidations with the exchange collecting increased trading fees caused by spikes in trading volumes during liquidations, the trading desk realizing profits associated with betting on the other side of (against) Plaintiffs' trades, and the Insurance Fund collecting an excess portion of the confiscated Plaintiffs' collateral, left after paying profits to the trading desk. *Id*. Thus, because Defendants own and control the exchange itself, the Insurance Fund and the trading desk, they have triple incentive to engage in market manipulation and liquidate traders.  *Id*. In other words, due to BitMEX's design, when a trader is liquidated, the exchange itself, the Insurance Fund and the trading desk divide all the trader's confiscated funds between themselves with no third party getting a dime. *Id*.

### 3. Opportunity

CC ¶¶ 245-54 clearly allege that Plaintiffs traded perpetual swaps on BitMEX and Kraken.  Defendants completely control BitMEX and clearly had an ability to trade there using "winner" accounts. Moreover, CC ¶¶ 9, 372-82 allege that Defendants opened and used "helper" accounts on thinly traded Kraken, Coinbase Pro and BitStamp to execute large market orders to cause artificial price moves of the .BXBT index.  Therefore, Defendants clearly had an opportunity to manipulate the .BXBT index and harm Plaintiffs, who also traded on BitMEX and Kraken.

Thus, for all the foregoing reasons, Defendants and *only* Defendants had *means, motive and opportunity* to manipulate the .BXBT index of BitMEX and cause Plaintiffs' damages.  This clearly makes the core allegations of the CC, that Defendants *themselves* manipulated the .BXBT

index of BitMEX and *themselves* caused Plaintiffs' damages not only plausible, but highly proba-ble.  Therefore, it is a reasonable inference that profit-hungry and brazenly lawless Defendants, who are serial offenders when it comes to disregard for the rule of law, as they have demonstrated both by their fraudulent misconduct in their dealings with early investors Amato and Capone and their brazen indifference towards the authority of courts and regulators, in fact manipulated .BXBT index and caused Plaintiffs' damages.  *Usher,* 828 F.2d at 561 (In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's alle-gations as true and draws all reasonable inferences in favor of the plaintiff.)  Thus, the core alle-gations of the CC are clearly plausible and, as such, survive Defendants' groundless MTD.

E.    **"Cui Bono Fuisset?" Principle Used By Law Enforcement To Identify Crime Suspects Also Supports Plausibility Of Defendants' Liability for Losses**

The famous Lucius Cassius, whom the Romans regarded as a very honest and wise judge, was in the habit of asking during court proceedings, "cui bono fuisset?"[6] which can be translated from Latin as: "who stands to benefit?"  This is a Latin phrase conveying an important principle of criminal investigations universally used for identifying crime suspects.  It expresses the time-proven rule, used by law enforcement for thousands of years, that crimes are more often than not committed to benefit their perpetrators, especially financially.  For example, a recently purchased insurance policy on a life of a murder victim makes the beneficiary thereof a suspect in a murder investigation.  In other words, the "cui bono fuisset?" principle states that the financial benefit derived from a crime makes the culpability of a financial beneficiary of the crime *plausible*.

This concept clearly applies in the present case.  Because it is undisputed that Defendants are the *primary* financial beneficiaries of the manipulation of the .BXBT index on their platform (CC ¶ 228), earning half of their revenue from liquidations of retail traders like Plaintiffs (CC ¶ 12, 236, Ex. 1, p. 1), the famous and time-proven "cui bono fuisset?" rule clearly points to De-fendants as the prime suspects and makes Defendants' liability for manipulation of the .BXBT index and causing artificial liquidations of Plaintiffs' trading positions clearly *plausible* by reason of the very substantial financial benefit derived by Defendants from the illegal manipulative acts.

---

[6] Karl Felix Halm, John Eyton Bickersteth Mayor (ed.), Cicero's Second Philippic, p. 87 (London, 1861).

1    **F.    Because Defendants' Liability Is Plausibly Alleged, Alternative Explanations Of Plaintiffs' Losses Advanced By Defendants Are Irrelevant On MTD**

2        This Court has held that "[a]t the pleading stage, … courts do not analyze which party's

3    explanation is more plausible." *Codexis, Inc. v. EnzymeWorks, Inc.*, No. 3:16-cv-00826-WHO,

4    2017 WL 4236860, at *7. Defendants are asking this Court to do exactly the opposite, by twist-

5    ing and turning terms, such as "perpetrators" used throughout the CC and narrowly interpreting

6    them to cover only "*other, unidentified third parties,*" which Defendants say could have caused

7    Plaintiffs' losses. This long-shot argument is baseless and must be rejected for multiple reasons.

8        Specifically, throughout their MTD, Defendants keep repeating the same faulty argument

9    – that "Plaintiffs specifically allege that market manipulation is routinely committed by *other,*

10   *unidentified third parties* in the cryptocurrency space." To support this contention, Defendants

11   cite background section of the CC ¶¶ 152-65, which explains, in layman terms, how cryptocur-

12   rency markets function and common techniques used for manipulating them. It is true that CC, at

13   times, uses broad terms such as "perpetrators," which Defendants narrowly interpret in their favor

14   to mean "*other, unidentified third parties.*" This narrow, twisted interpretation of a very broad

15   term is clearly baseless for several reasons. First, nowhere does the CC use terms like "*other, un-*

16   *identified third parties.*" The term "perpetrator", which ordinarily means "a person who carries

17   out a harmful, illegal, or immoral act," is clearly broad enough to cover Defendants themselves.

18   Second, in "deciding whether the plaintiff has stated a claim upon which relief can be granted, the

19   court accepts the plaintiff's allegations as true and draws all reasonable inferences in *favor* of the

20   plaintiff." *Usher,* 828 F.2d at 561. Thus, it is a reasonable interpretation of the term "perpetra-

21   tor" to cover Defendants themselves and, at the pleadings stage, this term should be interpreted in

22   Plaintiffs' favor. Third, while artificially narrowing the term "perpetrators" to "*other, unidenti-*

23   *fied third parties,*" Defendants overlook inconvenient to them more specific allegations appear-

24   ing, for example, in CC ¶ 237, which specifically state that the "May 17, 2019 and July 14, 2019

25   events … were in fact perpetrated by Defendants Hayes, Delo and Reed in order to achieve finan-

26   cial gain for themselves." Therefore, Defendants' twisted, narrow interpretation of broad terms,

27   such as "perpetrators" is groundless. Moreover, Rule 8(e) specifically provides that "[p]leadings

28

1  must be construed so as to do justice," which is clearly requires the term "perpetrators" to be in-

2  terpreted broadly, within its ordinary meaning, encompassing Defendants themselves.

3       Moreover, Defendants' last resort argument that "the causal chain is too weak to support

4  [Plaintiffs'] standing" due to the general susceptibility of the crypt market to manipulation is sim-

5  ilarly laughable. *Wash. Envtl. Council v. Belton*, 732 F.3d 1131, 1142 (9th Cir. 2013), which De-

6  fendants cite is simply inapplicable to the present case, as the causal chain alleged in the CC does

7  not involve many "third parties whose independent decisions collectively have a significant effect

8  on plaintiffs' injuries." CC specifically alleges that Defendants themselves <u>directly</u> caused Plain-

9  tiffs' injuries, without any required action by third parties, which allegation must be taken as true,

10  CC ¶¶ 9, 10, 237, 254-58, 286, 326, 372, 407-416, 437-445. *Usher,* 828 F.2d at 561.

11       Defendants' reliance on *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104

12  (9th Cir. 2013) does not help them either. Defendants fail to cite to the Court the language of that

13  opinion that is of particular relevance here: "[i]f there are two alternative explanations, one ad-

14  vanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's

15  complaint survives a motion to dismiss under Rule 12(b)(6)." *In re Century Aluminum*, 729 F.3d

16  at 1104. In the present case, the 50 facts listed in the table above, as well as the above "means,

17  motive and opportunity" analysis and the "cui bono fuisset?" law enforcement rule for identifying

18  crime suspects, squarely pointing to Defendants as the most likely culprits, clearly "nudged

19  [Plaintiffs] claims … across the line from conceivable to plausible." Therefore, "plaintiff's com-

20  plaint survives a motion to dismiss under Rule 12(b)(6)." *Id*.[7]

21       Moreover, "[t]he choice between two plausible inferences that may be drawn from factual

22  allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News,*

23  *LLC v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). The Court cannot dismiss a

24  complaint that alleges "plausible version of the events merely because the court finds a different

25  version more plausible." *Id.* "At the pleading stage, … courts do not analyze which party's ex-

26  planation is more plausible." *Codexis, Inc. v. EnzymeWorks, Inc.*, No. 3:16-cv-00826-WHO,

27  ---

28  [7] In *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1105 (9th Cir. 2013), the plaintiffs' explanation was merely *possible* rather than plausible, which is not the case here.

2017 WL 4236860, at *7.  Thus, CC adequately alleges facts plausibly establishing both constitu-

tional and statutory standing for all causes of action and Defendants' arguments must be rejected.

### III.    PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS

#### A.    Plaintiffs Have CEA Standing

A plaintiff who bought or sold a commodities swap has standing to sue under Section

22(a) of the CEA if the defendant's manipulation caused the plaintiff "actual damages." 7 U.S.C.

§ 25(a)(1).  As Courts have held, a plaintiff may do so by alleging she purchased contracts during

a period in which defendants persistently manipulated the market, as in the manipulation of

LIBOR. *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666,

718 (S.D.N.Y. 2013), vacated and remanded on other grounds. *Gelboim v. Bank of Am. Corp.*,

823 F.3d 759 (2d Cir. 2016). A plaintiff need not allege the details of each contract purchased or

estimate losses with precision, because the information necessary to ascertain those losses — e.g.,

in the *LIBOR* manipulation context, the spread between LIBOR's "true" level and its level when

plaintiffs sold their contracts — "might be in the possession of defendants" and "could not be

known by plaintiffs" before discovery. *Id.* at 719; see also *In re Platinum & Palladium Antitrust

Litig.*, 2017 WL 1169626, at *29 (S.D.N.Y. Mar. 28, 2017), on reconsideration, 449 F. Supp. 3d

290 (S.D.N.Y. 2020) (recognizing that plaintiffs who allege persistent manipulation "need not

match specific trades with days on which they alleged" manipulation occurred); *In re Foreign

Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (rejecting ar-

gument that a complaint need "allege facts that, if proven, would establish ... actual harm in real

trades in specific currencies on particular days"); See also *In re London Silver Fixing, Ltd., Anti-

trust Litig.*, 213 F. Supp. 3d 530, 559-60 (S.D.N.Y. Oct. 3, 2016) (rejecting argument that "buyers

and sellers who traded at various times" lacked standing because "there is no way to conclude

that Plaintiffs sustained any loss as a result of Defendants'" manipulation); see also *Dennis v.

JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. Nov 26, 2018) (same).

This principle confirms that Plaintiffs have adequately pleaded CEA standing.  For exam-

ple, Plaintiff Razvan alleges that he bought 7,170,497 long XBTUSD swap contracts on BitMEX

on or about November 14, 2018 — during a time period when Defendants persistently manipulat-

ed the .BXBT index on a daily basis.  CC ¶¶ 254, 372.  The swaps he purchased were liquidated at

6:29:23 PM on November 14, 2018 and he lost about 226.16 bitcoins of his collateral, as a result

of artificially low price of the .BXBT index caused by Defendants' manipulation.  This is more

than enough.  Plaintiff Razvan cannot be expected to know now, at the pleadings stage, the more

precise amount of his damages. *LIBOR I*, 935 F. Supp. 2d at 719 ("[P]laintiffs have adequately

alleged actual damages by alleging that they purchased their contracts at an inflated price, that the

degree of LIBOR artificiality later changed, and that they suffered damages as a result."); *Sulli-*

*van v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *31 (S.D.N.Y. Feb. 21,

2017) (plaintiffs pleaded CEA standing by alleging "a years-long conspiracy to secretly manipu-

late the Euribor" and that they made trades within that time, even though they did not trace the

dates of that manipulation to each of their individual transactions). Similarly, Plaintiffs cannot

ascertain the true level of bitcoin prices and the total amount of their damages without discovery.

In the MTD, Defendants incorrectly assert that Plaintiffs allege only episodic and not per-

sistent manipulation.  CC specifically alleged that the Defendants' MMS was executed on a *daily*

*basis* commencing on January 1, 2017, CC ¶¶ 125, 265, 267, 298, 327, 338, 353, 372, 380, 398.

The MMS was designed to, and succeeded in, creating artificial price moves that resulted in per-

sistent liquidations of retail trader positions, including Plaintiffs'.  CC ¶¶ 9, 10, 254.

Defendants are not helped (MTD 17, 18) by *Harry v. Total Gas & Power North America,*

*Inc.*, 889 F.3d 104 (2d Cir. 2018). In *Harry*, plaintiffs lacked CEA standing because they did not

allege a connection between defendants' manipulation of prices at four regional natural gas hubs

and prices on the separate hub where plaintiffs traded. *Id.* at 114–15. But the Second Circuit held

that plaintiffs would have had standing if they had alleged "trad[ing] (at a detriment) in a contract

the price of which was tied ... to the price of a contract that a defendant was plausibly manipulat-

ing." *Id.*  The present case is just like that hypothetical.  Plaintiffs have alleged that the price of

the XBTUSD swap contract that Plaintiffs traded to their detriment on BitMEX was tied, through

the .BXBT index, to the bitcoin spot prices on three thinly traded exchanges that Defendants ma-

nipulated by executing large market SELL orders from their "helper" accounts on those exchang-

es, CC ¶¶ 159, 169, 247.  This link (the .BXBT index) also resembles those between LIBOR rates

and the contracts referencing those rates, *Gelboim*, 823 F.3d at 765–66, and between gold prices

and gold futures, *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 644–46 (S.D.N.Y. 2016),

both of which were sufficient to plead CEA standing.  *Harry*, 889 F.3d at 113 (citing both cases).

Accordingly, Plaintiffs' allegations of CEA standing are sufficient as a matter of law.  *Id.*

### B.    Plaintiffs State Viable Price Manipulation Claim

To state a price manipulation claim, Plaintiffs must allege that: "(1) Defendants possessed

an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the arti-

ficial prices; and (4) Defendants specifically intended to cause the artificial price." *Comm. Exch.,*

*Inc.*, 213 F. Supp. 3d at 668. If the claim sounds in fraud, the Rule 9(b) standard is "generally re-

laxed," and "the complaint must simply specify what manipulative acts were performed, which

defendants performed them, when the manipulative acts were performed, and what effect the

scheme had on the market for the securities at issue.'" *Id.* at 668; *ATSI*, 493 F.3d at 102.

Ignoring this *relaxed* the Rule 9(b) standard and inconvenient for them allegations of the

CC, Defendants baselessly argue that Plaintiffs' allegations of MMS do not meet the pleading re-

quirements of Rule 9(b).  This argument is without merit.  First, the Rule 9(b) standard does not

apply to claims for violations of CEA Sections 9(a)(2), 6(c)(3) and Regulation 180.2 (Count IV).

*Foods Grp., Inc.,* 153 F. Supp. 3d 996, 1007 (N.D. Ill. 2015).  Second, even if it applied, the CC

easily meets this *relaxed* Rule 9(b) standard applicable to the market manipulation claims.  CC

clearly alleges that Defendant Reed executed specific large market SELL orders on the Kraken

exchange, CC ¶¶ 9, 372-82, with maximum slippage, on a daily basis, CC ¶ 372, including the

specific exemplary dates alleged in *Id.*, which resulted in the artificial downwards movement of

the .BXBT index (CC ¶ 254-58), which is substantially (1/3) based on the Kraken exchange price,

causing liquidations of Plaintiffs' long XBTUSD swap positions (CC ¶ 254) on BitMEX.  These

allegations are clearly sufficient to satisfy the *relaxed* Rule 9(b) standard for market manipulation

cases. *ATSI*, 493 F.3d at 102; *Comm. Exch., Inc.*, 213 F. Supp. 3d at 668 (to satisfy Rule 9(b),

"the complaint must simply specify what manipulative acts were performed, which defendants

performed them, when the manipulative acts were performed, and what effect the scheme had on

the market for the securities at issue.").  Therefore, Defendants' argument is without merit.

1    Moreover, "the facts [of market manipulation by Defendants] are peculiarly within the

2    possession and control of the defendants."  Therefore, the "information and belief" allegations

3    with respect to the market manipulation are proper under *Soo Park*, 851 F.3d at 928 and *Plan-*

4    *ner5D v. Facebook, Inc*., No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24,

5    2020).  The "information and belief" allegations of market manipulation are additionally proper

6    in view of the 50 facts listed in the table above as well as the "means, motive and opportunity"

7    analysis and the application of the "cui bono fuisset?" law enforcement rule for identifying crime

8    suspects, squarely pointing to Defendants as the most likely culprits, to the present case, which

9    provide overwhelming "factual information that makes the inference of [Defendants'] culpability

10   plausible." *Soo Park*, 851 F.3d at 928 (quoting *Arista Records*, 604 F.3d at 120); *Planner5D v.*

11   *Facebook, Inc*., No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020).

12              **1.    Ability To Influence Market Prices**

13   In the MTD, Defendants further inaptly argue that CC does not allege "that trades alleged-

14   ly executed by Defendant Reed had the ability to influence cryptocurrency markets."  This argu-

15   ment is also without merit.  Plaintiffs specifically plead this element by alleging that Defendants,

16   including Defendant Reed, amassed a stack of over 36,830 bitcoins, valued over $681,355,000

17   dollars, CC ¶ 10, which is clearly sufficient to move bitcoin spot prices on Coinbase Pro, Kraken

18   and Bitstamp (CC also alleges that it takes only about 3600 bitcoins to move bitcoin spot price on

19   BitStamp by 21%, CC ¶ 230, making 36,830 bitcoins valued at $681,355,000 amassed by De-

20   fendants more than excessive for such a manipulative act).  See also CC ¶ 228 ("as a large institu-

21   tion, BitMEX would be one of the entities with sufficient resources to engage in pump schemes

22   that require a lot of capital in traditional currency to buy the underlying commodity").  Therefore,

23   CC plainly alleges that Defendants, including Defendant Reed, had sufficient resources (over

24   36,830 bitcoins, valued over $681,355,000 dollars) to influence bitcoin spot market price on spot

25   exchanges (it takes only around 3600 bitcoins to move bitcoin spot price by 21%, CC ¶ 230).  See

26   also CC ¶ 477 ("Defendants, and each of them, possessed an ability to influence market prices of

27   spot bitcoin and bitcoin derivatives, including Perpetual Swaps. Specifically, as Count IV De-

28   fendants, and each of them, accumulated hundreds of millions of dollars in bitcoin. With such a

large amount of bitcoin available for trading, Count IV Defendants have had and continue to have the ability to move bitcoin market price and the price of Perpetual Swaps very substantially.") Moreover, CC ¶ 9 alleges that Defendants opened and used "helper" accounts on thinly traded Kraken, Coinbase Pro and BitStamp and, therefore, had the ability to execute large market SELL orders on those illiquid exchanges, selling some of the 36,830 bitcoins they amassed, in order to cause artificially low prices and liquidate Plaintiffs.  The above allegations clearly suffice to establish Defendants' ability to influence the spot market prices for bitcoin as well as the .BXBT index price, which is calculated based thereon.

### 2.    Existence of Artificial Price

In their MTD, Defendants do not appear to challenge (or even address) the existence of the artificial price.  Therefore, any argument in connection with this element is waived.

### 3.    Defendants Caused The Artificial Prices

Plaintiffs further specifically alleged that the artificial price was *caused* by Defendant Reed's conduct, CC ¶ 254 ("Defendant Reed executing a large market SELL order from helper account on Kraken's XBTUSD/BTC order book, causing *artificial* downward price move on XBTUSD order book, which propagated, through the .BXBT index, to XBTUSD order book of BitMEX and triggered liquidation of Plaintiff's long XBTUSD position").  See also CC ¶¶ 8, 480 ("Count IV Defendants, and each of them, caused an artificial price of spot bitcoin and bitcoin derivatives in order to trigger a specific price-based market event, such as a liquidation cascade or execution of stop loss orders of other traders").  Even though these allegations are made on "information and belief," they are entirely proper for the reasons stated above.  *Planner5D v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073, at *13 (N.D. Cal. Jul. 24, 2020).

### 4.    Defendants Intended To Cause The Artificial Price

At MTD 27, Defendants argue that "Plaintiffs [do not] offer any proper factual basis for the conclusion that Defendants intentionally manipulated prices."  This argument is also without merit.  Plaintiffs explicitly allege Defendants' specific intent to manipulate the crypto-commodities market, see CC ¶ 481.  This allegation is sufficient.  Moreover, "[s]pecific intent to manipulate prices can be pled by alleging facts (1) showing that the defendants had both motive

and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of con-scious misbehavior or recklessness." *Comm. Exch*., 213 F. Supp. 3d at 670.  Allegations of the CC meet both of the above prongs.  The above "means, motive and opportunity" analysis clearly establishes, based on the allegations of the CC, that Defendants "had both motive and opportunity to commit" the market manipulation harming Plaintiffs.  Therefore, the first prong is met.  More-over, the 50 facts listed in the table above clearly "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness."  Therefore, the second prong is also met.  Accordingly, CC sufficiently alleges the "[s]pecific intent to manipulate prices."  *Comm. Exch*., 213 F. Supp. 3d at 670.  "[S]cienter may be established by showing that defendants had both motive and oppor-tunity," *LIBOR-I*, 935 F. Supp. 2d at 715, which Plaintiffs abundantly alleged in the CC.  Defend-ants do not make any other arguments with respect to both CEA market manipulation and manip-ulative device claims, which they improperly lump together.  Therefore, Defendants waived any such additional arguments and these CEA claims clearly overcome Defendants' MTD.

### C.    Plaintiffs State Viable Manipulative Device Claim

Plaintiffs plead a manipulative device claim under 7 U.S.C. § 25(a)(1)(D)(i), which pro-vides remedies for the use of "any manipulative device or contrivance," and under CFTC Rule 180.1, which prohibits the use of "any manipulative device, scheme, or artifice to defraud," by alleging that Defendants engaged in a MMS to manipulate BitMEX's .BXBT index, artificially causing massive trader liquidations on BitMEX, by executing strategically timed large market SELL trades on Kraken, Coinbase and BitStamp, which were used by Defendants in calculating the .BXBT index price.  These allegations are sufficient, see *Comm. Exch*., 213 F. Supp. 3d at 672–73 (plaintiffs pleaded manipulative device claims by alleging defendants engaged in a scheme to suppress gold prices through coordinated trading). A "contrivance" is a "scheme, plan, or artifice." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 n.20 (1976). The participation in a scheme thus may constitute the employment of a manipulative contrivance, regardless of whether the defendant had a "manipulative purpose." *U.S. Envtl., Inc*., 155 F.3d at 111–12. Plaintiffs have adequately alleged standing and scienter for this claim, and have adequately alleged each Defend-ants' conduct, for the same reasons as for the price manipulation claim discussed above.

The MTD asserts that CC does not allege that their trades contained any misrepresenta-tions or false statements.  On the other hand, courts look to Section 10(b) of the 1934 Securities Exchange Act for guidance in interpreting the phrase "manipulative or deceptive device or con-trivance" in the CEA, *Comm. Exch.,* 213 F. Supp. 3d at 672, and Section 10(b) "prohibits not only material misstatements but also manipulative acts"—including "a transaction [that] sends a false pricing signal to the market," *ATSI*, 493 F.3d at 100; see also *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013) ("One can be held liable in connection with such a [manipulative] scheme even if he did not himself make a material mis-statement in connection with it"). The Defendants, as explained above, participated in a scheme that sent false pricing signals to the market and caused artificial prices. CC ¶¶ 112– 38, 193–258, 204–07, 259–79; see, e.g., *Comm. Exch*., 213 F. Supp. 3d at 673 (manipulation shown where "the market relies on the transactions to signal true, rather than manipulative, demand"). Plaintiffs al-lege a manipulative device because they allege Defendants' roles in that MMS. CC ¶¶ 380, 382.

### D.    Plaintiffs State Viable Aiding and Abetting Claims

Even if Plaintiffs had not adequately alleged direct liability under the CEA against some Defendants, those Defendants would be liable for aiding and abetting the other Defendants as well as third parties.  To plead an aiding and abetting claim, Plaintiffs must allege that Defendants "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that viola-tion; and (3) committed some act in furtherance of the principal's objective." *In re Nat. Gas Commodity Litig*., 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004).

CC ¶¶ 506–11 alleges four types of aiding and abetting claims: 1) Defendants HDR, ABS, Hayes, Delo and Reed aided and abetted violations of the CEA by Andrianov; 2) Defendants HDR, ABS, Hayes, Delo and Reed aided and abetted violations of the CEA by market manipula-tor under assumed name Quick-Grove-Mind listed on BitMEX Leaderboard; 3) Defendants HDR, ABS, Hayes, Delo and Reed aided and abetted violations of the CEA by unknown third persons; and 4) Defendant ABS aided and abetted violations of the CEA by Defendants HDR, Hayes, Delo and Reed.  Of these four aiding and abetting claims, MTD only addresses number 2.  Therefore, Defendants' waived all arguments with respect to the remaining aiding and abetting claims 1), 3)

1    and 4) and these claims all survive Defendants' MTD.[8]

2         With respect to aiding and abetting claim 2), the complaint *plausibly* alleges that trader

3    under assumed name Quick-Grove-Mind is a market manipulator, CC ¶ 11.   For example, Bit-

4    MEX's Leaderboard shows three multimillion-dollar profit spikes of that trader, which exactly

5    match three known market manipulation events, while entirely avoiding any and all trading loss-

6    es.   Assuming that bitcoin price moves in a sideways market are random (50% chance of bitcoin

7    price going up and 50% chance of bitcoin price going down), the probability of Quick-Grove-

8    Mind correctly guessing three market moves in a row is 50% x 50% x 50% = 12.5% and, conse-

9    quently, the probability of him being a manipulator is 100% - 12.5% = 87.5%, which makes it not

10   only *plausible*, but very *probable* allegation.   Moreover, at the pleading stage, Plaintiffs' allega-

11   tions are taken as true and all reasonable inferences are drawn in favor of the plaintiff.   *Usher,*

12   828 F.2d at 561.   Thus, the allegation that Quick-Grove-Mind is a manipulator is *plausible*.[9]

13        The fact that Quick-Grove-Mind is listed on the Leaderboard as the second highest ranked

14   trader and generated a profit of 8047.82 bitcoins (currently valued at $329,960,620) also makes it

15   plausible that Defendants knew him personally and also knew of his manipulation activities, CC

16   ¶¶ 11, 116, 509. CC ¶ 509 further alleges numerous specific aiding and abetting overt acts by De-

17   fendants.   These allegations, taken collectively, are clearly sufficient to satisfy the (2) intent to

18   further that violation; and (3) commission of some act in furtherance of the principal's objective

19   elements of the aiding and abetting claim.   Therefore, CC ¶¶ 506–11 sufficiently allege aiding

20   and abetting claim under the CEA.   *Amaranth I*, 587 F. Supp. 2d at 542 (aiding and abetting

21   where highly suspicious trading activity by natural gas trader made it "reasonable to infer" that

22   the defendant-broker "may have suspected that manipulation was occurring"), aff'd, 730 F.3d 170

23

---

24   [8] In MTD, Defendants are admitting that the market is being manipulated, but blame third parties.
     [9] Defendants even attempt to incorrectly argue at MTD 29 that manipulator's Quick-Grove-Mind
25   profit during the shown time period was only 250 bitcoins as opposed to 2,500 bitcoins (currently
     valued at $102,500,000), as indicated by a vertical scale on a profit chart of CC ¶ 11.   However,
26   Robert Carroll, the developer of the software, confirmed that the vertical scale values on the chart
     of CC ¶ 11 need to be multiplied by 10x, to arrive at the correct profit values, consistent with the
27   8047.8 bitcoins total profit. Pogodin Decl. ¶¶ 14-17. Thus, Defendants' argument is again without
     merit and said manipulator in fact generated over $102,500,000 in illicit profits, which would be
28   impossible to achieve without the knowledge, approval, and aiding and abetting by Defendants.

(2d Cir. 2013).  Similarly, CC ¶ 11 also alleges "highly suspicious trading activity," making it "reasonable to infer" that Defendants "may have suspected that manipulation was occurring." Accordingly, aiding and abetting claims under CEA are plausibly alleged and survive the MTD.

### E.    Plaintiffs State Viable Principal/Agent Liability Claims

To plead a claim for principal-agent liability under the CEA, Plaintiffs must allege that "[an] agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 571.

Plaintiffs meet that standard for Defendants Hayes, Delo and Reed by alleging they worked as agents of Defendants HDR and ABS and served as corporate officers of and acted for the benefit of those corporations. CC ¶¶ 33-57, 68.  Hayes, acting as CEO of HDR, was involved in creation and management of HDR and ABS, CC ¶¶ 33, 44, 45.  Reed, acting as CTO of HDR and ABS, was also involved in the creation and management of HDR and ABS, even committing perjury at CFTC deposition to protect HDR and ABS from regulatory scrutiny, CC Ex. 4 ¶ 27. These individual Defendants were thus "engaged in the management, direction, control or transaction of business or affairs of the Defendants." *London Silver Fixing*, 213 F. Supp. 3d at 571.

Plaintiffs' allegations also necessarily suggest the involvement of other employees of the corporate Defendants, as yet unknown to Plaintiffs, for whose actions those corporate Defendants are liable. Because there is "no indication, at this stage, that these employees acted on a lark or in any way outside the scope of their employment," this claim should be sustained. *Id.* (sustaining principal-agent liability claims where allegations of silver fixing necessarily implied the involvement of as-yet unnamed traders and defendant employees); see also *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131, at *25 (S.D.N.Y. Sept. 20, 2016) (sustaining principal-agent liability claims based on allegations of foreign exchange rate manipulation where "nothing in the [complaint] suggests that any trader was operating outside the scope of his employment when engaging in" the alleged manipulation).

## IV.    PLAINTIFFS STATE VIABLE RICO CLAIMS

CC sufficiently alleges every element of RICO claims and Defendants do not even chal-

1  lenge allegations of a domestic RICO injury and of RICO conspiracy under 18 U.S.C. § 1962(d).

2      **A.**    **CC Alleges Valid RICO "Enterprise"**

3      Defendants argue that CC fails to allege the "enterprise" because its individual members

4  do not share a "common purpose." This argument is without merit. As before, Defendants read

5  selectively from the CC and ignore inconvenient for them allegations, such as that the purpose of

6  the RICO enterprise was "concealing trading gains obtained through unlawful practices from reg-

7  ulatory and tax authorities." CC ¶¶ 261. This clearly alleged purpose is clearly shared by all al-

8  leged members of the RICO enterprise, including Defendants HDR, ABS, Unknown Exchange,

9  Grape Park, Mark Sweep, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed.

10      CC alleges ample specific facts that support this allegation. For example, it is alleged that

11  Defendants HDR, ABS, Hayes, Delo, Reed achieved this common purpose through acts of ille-

12  gally transacting, transmitting and laundering of bitcoin from helper exchange accounts on Kra-

13  ken, Coinbase Pro and BitStamp to winner exchange accounts on BitMEX, such that the laun-

14  dered bitcoin cannot be traced back to the helper accounts in order to conceal their illegal origin

15  (due to BitMEX anonymity, the funds in the winner accounts appear as legitimate trading gains,

16  as opposed to illegal manipulation profits), see the diagram in CC ¶ 9. The *same* laundered

17  bitcoin funds were then taken from the BitMEX accounts and converted by Defendant Unknown

18  Exchange from bitcoin to fiat money, which was, in turn, used by Defendants Grape Park, Mark

19  Sweep, Reed, Agata Reed, Barbara Reed and Trace Reed to acquire multiple real estate properties

20  in the U.S. and further conceal the illegal origin of funds used to acquire them, as well as their

21  true ownership and/or control, by way of using nominee entities, see the same diagram in CC ¶ 9.

22  As alleged in the CC, all enterprise members were necessary links and participated in handing of

23  the *same* flow of funds illustrated in the diagram in CC ¶ 9, representing the illegally derived

24  market manipulation proceeds, from helper accounts on Kraken, Coinbase Pro and BitStamp to

25  U.S. real estate properties, thus working towards a shared, common purpose of "concealing trad-

26  ing gains obtained through unlawful [trading] practices from regulatory and tax authorities."

27      Therefore, *all* members of the RICO enterprise shared the aforesaid common purpose of

28  "concealing trading gains obtained through unlawful [trading] practices from regulatory and tax

authorities."  This is exactly what RICO enterprise's "common purpose" element requires.  Every member of the alleged "enterprise" worked towards this goal by handing the same flow of illegal funds.  This common purpose is also consistent with the roles of the individual members of the RICO enterprise alleged in the CC ¶¶ 265–67.   Thus, CC properly alleged the RICO enterprise.

## B.    The RICO Predicate Acts Of Wire Fraud Are Adequately Alleged

At MTD 25 Defendants argue that "Plaintiffs allegations are also insufficient to make out a prima facie wire fraud claim because they fail to allege that those trades contained any misrepresentations or false statements."  This argument is also without merit.  Specifically, Defendants' contention that the "'scheme to defraud' element" of wire fraud "requires 'an affirmative, material misrepresentation'" is meritless and based on misreading of the law.  This requirement applies to only a subset of cases, where the scheme to defraud is rooted in fraudulent misrepresentations.  On the other hand, both the Ninth Circuit and this Court have repeatedly held that to establish a case for wire fraud, "the government is not required to prove any particular false statement was made" so long as the evidence shows that the scheme as a whole "was reasonably calculated to deceive." *United States v. Chang*, No. 16-cr-00047-EJD-1, at 4, 7 (N.D. Cal. Sep. 24, 2020), quoting *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003); accord *United States v. Namvar*, 498 F. App'x 749, 751 (9th Cir. 2012) ("We also reject the argument that the district court erred in its instructions on the elements of wire fraud, because so long as "'a scheme is devised with the intent to defraud,'" it is immaterial that "there is no misrepresentation of a single existing fact.")  As the Ninth Circuit made clear in *Woods*, 335 F.3d at 998:

> If a scheme is devised with the intent to defraud, and the mails [or wires] are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail [or wire] service of the United States was used and intended to be used in the execution of the scheme… Put another way, [t]he fraudulent nature of the `scheme or artifice to defraud' is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."

See also *United States v. Ali*, 620 F.3d 1062, 1070-71 (9th Cir. 2010) (quoting *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2000)) ("Under the mail fraud statute the government is not required to prove any particular false statement was made. Rather, there are alterna-

1   tive routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which

2   may or may not involve any specific false statements.")

3       This is exactly what happened in the present case.  Defendants concocted the MMS, CC

4   ¶¶ 6-10, which was designed to lure unsuspecting traders, including Plaintiffs, onto the BitMEX

5   exchange, have them open highly leveraged positions and then induce artificial .BXBT index

6   price moves in order to liquidate their trading positions and rob Plaintiffs of all their bitcoins.

7   This MMS clearly "fail[s] to measure up to the reflection of moral uprightness, of fundamental

8   honesty, fair play and right dealing in the general and business life of members of society" under

9   *Woods*, 335 F.3d at 998.  Moreover, as stated above in connection with the CEA claims, this

10  "scheme [was] reasonably calculated to deceive" and was "devised with the intent to defraud"

11  Plaintiffs and, therefore, constitutes a "scheme to defraud" for purposes of the wire fraud statute

12  under *Namvar*, 498 F. App'x at 751 and *Woods*, 335 F.3d at 998.  This Defendants' MMS is al-

13  leged, in great detail, as explained above in connection with the CEA claims, in CC ¶¶ 6-10, 254-

14  58, 372-82 and diagram in ¶ 9, which clearly satisfies the requirements of Rules 8(a) and 9(b).[10]

15      Furthermore, Defendants do not even address the remaining RICO predicate offenses al-

16  leged in the CC ¶¶ 281-333, 351-70, which include, besides wire fraud, violations of 18 U.S.C. §

17  1956(a) (money laundering); 18 U.S.C. § 1957(a) (transactions in property derived from unlawful

18  activity); 18 U.S.C. § 1960(a) (unlicensed money transmissions); 18 U.S.C. § 2314 (interstate

19  transportation of stolen property) and 18 U.S.C. § 1952 (transportation in aid of RICO enterprise).

20  Therefore, Defendants waived all arguments with respect to sufficiency of allegations of those

21  RICO predicates, which do not involve fraud and are not subject to Rule 9(b) standard. This pro-

22  vides an additional reason why all RICO causes of action survive Defendants' MTD.  Moreover,

23  because the RICO claim under 18 U.S.C. § 1962(c) is viable, the RICO conspiracy claim under

24  18 U.S.C. § 1962(d) is also viable, as the same Defendants' manipulative acts constituting the al-

25  leged MMS that injured Plaintiffs and which constitute RICO predicate offenses also constitute

26  overt acts in furtherance of RICO conspiracy, which Defendants do not challenge in their MTD.

27  _____

28  [10] Defendants again argue that Plaintiffs' allegations made on "information and belief" are im-
    proper, which argument is without merit for the reasons stated above.

1

### C. Defendants' RICO Predicate Acts Injured Plaintiffs Directly And Proximately By Causing Liquidation Of Plaintiffs' Positions

2

3

Proximate cause "is a flexible concept that does not lend itself to a black-letter rule that

4

will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654

5

(2008). Courts assess whether there is "some direct relation between the injury asserted and the

6

injurious conduct alleged." *Id.* The injurious conduct, for purposes of proximate cause, is the

7

RICO predicate acts, and thus the "compensable injury flowing from a RICO violation necessari-

8

ly is the harm caused by the predicate acts." *Hemi Grp. v. City of New York, N.*Y., 559 U.S. 1, 13

9

(2010). Plaintiffs need only allege injury from one of the predicate acts at issue here to survive a

10

motion to dismiss. *Reich v. Lopez*, 38 F. Supp. 3d 436, 449 (S.D.N.Y. 2014) ("Plaintiffs do not

11

need to suffer injury from each of the predicate acts underlying their RICO claim; direct injury

from one is enough.").  Plaintiffs' allegations clearly satisfy this standard.

12

CC ¶¶ 6-10, 254-58 allege that Defendants executed large market orders from helper ac-

13

counts on thinly traded Kraken, Coinbase Pro and BitStamp with the purpose of artificially mov-

14

ing the .BXBT index price down and causing Plaintiffs' liquidations on BitMEX, which resulted

15

in up to 8000% profit generated, at the expense of Plaintiffs, in Defendants' winner accounts on

16

BitMEX.  Moreover, Defendants' immense profit in the winner accounts by design could not be

17

traced to the helper accounts due to BitMEX's anonymity as well as use of "burner" accounts by

18

BitMEX's trading desk and, therefore, appears to authorities as legitimate trading gains.  *Id.* The-

19

se specific acts clearly violate 18 U.S.C. § 1956(a) (money laundering); 18 U.S.C. § 1957(a)

20

(monetary transactions in property derived from specified unlawful activity); 18 U.S.C. § 1960(a)

21

(unlicensed money transmissions); 18 U.S.C. § 2314 (interstate transportation of stolen property)

22

and 18 U.S.C. § 1952 (foreign transportation in aid of racketeering enterprise) and, as such, con-

23

stitute RICO predicate offenses alleged in the CC.[11]  Defendants do not even dispute this.

24

*Exactly the same* specific acts directly and proximately caused Plaintiffs' damages, as they

25

involved liquidations of Plaintiffs' trading positions and misappropriation of Plaintiffs' collateral,

26

CC ¶¶ 6-10, 254.  Accordingly, it were the Defendants' RICO predicate acts described above, that

27

---

28

[11] As stated above, Defendants do not even address these predicate offenses in the MTD, waiving all their arguments to the contrary.

1  injured Plaintiffs directly and proximately, by causing liquidation of Plaintiffs' trading positions.

2  Therefore, CC adequately alleges causation of Plaintiffs' losses due to Defendants' RICO

3  predicate offenses, clearly establishing RICO standing (that Plaintiffs' harm was 'by reason of'

4  the RICO violation). Defendants do not make any other challenges to the RICO causes of action.

5  ## V.    THE REMAINING CAUSES OF ACTION ARE ALSO VIABLE

6      The Defendants' MMS satisfies not one, but all three prongs of UCL ("unfair", "unlaw-

7  ful" and "fraudulent") for the same reasons it satisfies the "scheme to defraud" prong of the wire

8  fraud RICO predicate, as explained above. *In People v. Casa Blanca Convalescent Homes, Inc*.,

9  159 Cal.App.3d 509 (1984), California Court of Appeals concluded "an `unfair' business practice

10 occurs when it offends an established public policy or when the practice is immoral, unethical,

11 oppressive, unscrupulous or substantially injurious to consumers." *Id.* at p. 530. "In general the

12 `unfairness' prong `has been used to enjoin deceptive or sharp practices....'" *Klein v. Earth Ele-*

13 *ments, Inc*., 59 Cal.App.4th 965, 970 (1997). Defendants' MMS clearly meets this standard,

14 making it also "unfair" and it similarly violates multiple statutes listed in CC ¶¶ 564-567, making

15 it "unlawful". As stated above, allegations of the CC as to the MMS meet the requirements of

16 Rule 9(b). CC also adequately alleges direct and proximate causation of Plaintiffs' losses due to

17 execution of the MMS by Defendants. Therefore, UCL claim easily survives the MTD. *Id.*

18      As to the conversion claim, the act of taking of the collateral from Plaintiffs' accounts by

19 Defendants as the result of the MMS constituted an act of conversion because the MMS was

20 wrongful and Plaintiffs clearly did not consent to become victims of such MMS. It is a reasona-

21 ble inference that could be drawn from the allegations of the CC, that Plaintiffs did not consent to

22 become victims of Defendants' MMS alleged in the CC. Accordingly, CC adequately alleges a

23 cause of action for conversion, as the lack of consent should be reasonably inferred. Rule 8(e).

24      With respect to the restitution cause of action, Ninth Circuit stated that "[w]hen a plaintiff

25 alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim

26 seeking restitution." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).

27 CC alleges this cause of action as a quasi-contract claim under California law. Specifically, as

28 the result of the MMS, Defendants owe restitution to Plaintiffs. Such causes of action are univer-

1  sally recognized as viable. Therefore, the restitution cause of action also survives the MTD. *Id*.

2  CC also plausibly alleges facts that support the cause of action for fraud. As alleged in the

3  CC ¶¶ 336-348, 375, 382, injection of false market information by Defendants clearly constituted

4  "conduct that is designed to mislead" under *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal-*

5  *ifornia*, 245 Cal.App.4th 821, 839 (2016). Moreover, Plaintiffs properly plead reliance on De-

6  fendants' misleading conduct. After Plaintiffs opened leveraged positions on BitMEX in reliance

7  on Defendants' misleading actions, Defendants caused artificial liquidation of Plaintiffs' positions

8  as described in connection with the MMS above and converted Plaintiffs' bitcoin. Accordingly,

9  Plaintiffs were injured as the direct and proximate result of reliance on the misleading conduct of

10  Defendants, *Id.* at 839. Thus, Defendants actions alleged in the CC ¶¶ 336-348, 375, 382 consti-

11  tute fraud under *Tenet, Id.* at 839. These allegations satisfy Rule 9(b) as explained above.

12  With respect to the negligence cause of action, Defendants enticed Plaintiffs to trade on

13  their platform, CC ¶¶ 253, 515, and buy their swap product, by advertising it as the most traded

14  crypto product ever. CC ¶ 245. Thus, Defendants owed Plaintiffs a duty to maintain a functional

15  cryptocurrency marketplace and prevent economic harm to Plaintiffs, which they breached by

16  recklessly or negligently taking offline the BitMEX platform on or about March 13, 2020, which

17  prevented Plaintiffs from timely closing a short swap position, resulting in a 3 bitcoin loss, CC ¶

18  529. *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428

19  (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders). Defendants fail to

20  even address this claim in their MDT. Therefore, negligence claim also survives the MTD.

21  Aiding and abetting and violation of Cal. Pen. Code § 496 claims are also viable because

22  CC plausibly alleges that trader Quick-Grove-Mind is a manipulator and Defendants knowingly

23  aided and abetted her, as explained in detail in connection with the aiding and abetting claim un-

24  der the CEA. In addition, in their MTD, Defendants seem to admit that there are *unknown third*

25  *party* manipulators, who Defendants repeatedly blame for some of Plaintiffs' losses, which were

26  also clearly aided and abetted by Defendants as specifically alleged in the CC and explained in

27  detail above in connection with CEA aiding and abetting claim. Therefore, aiding and abetting

28  and violation of Cal. Pen. Code § 496 claims are viable against Defendants for this reason as well.

**VI.    CONCLUSION**[12]

    Thus, the Defendants' MTD should be denied in its entirety.  In addition, in view of the Ninth Circuit's clear direction and Rule 15(a)'s mandate that leave to amend be freely given, Plaintiffs respectfully request a leave to amend the CC, as Plaintiffs received substantial new information from a former HDR insider. Pogodin Decl.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated:  January 13, 2021                          Respectfully submitted,

                                                  By:    /s/ Pavel I. Pogodin
                                                        Pavel I. Pogodin

                                                  Attorney for Plaintiffs

---

[12] Plaintiffs also oppose all the remaining Defendants' arguments including those related to the state causes of action and reserve the right to cite any appropriate supporting authority during the oral argument on the MTD.  All those arguments appear to be without merit.