Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

BMA, LLC, et al.,                    )
                                     )
          Plaintiffs,                )
                                     )
   VS.                               )    **NO. C 20-03345 WHO**
                                     )
HDR GLOBAL TRADING LIMITED           )
(A.K.A. BitMEX, et al.,              )
                                     )
          Defendants.                )
_____)

San Francisco, California
Wednesday, February 3, 2021

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM**:

For Plaintiffs:
                    CONSENSUS LAW
                    5245 Av. Isla Verde - Suite 302
                    Carolina, Puerto Rico  00979
              BY:   **PAVEL I. POGODIN, ATTORNEY AT LAW**

For Defendants HDR Global Trading Limited and ABS Global
Trading Limited:
                    JONES DAY
                    555 California Street - 26th Floor
                    San Francisco, California  94104
              BY:   **STEPHEN D. HIBBARD, ATTORNEY AT LAW**
                    **MATTHEW J. SILVEIRA, ATTORNEY AT LAW**


              **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter

1 | **APPEARANCES VIA ZOOM:** **(CONT'D)**

2 | For Defendant Arthur Hayes:

3 |                    AKIN GUMP STRAUSS HAUER & FELD LLP
  |                    1999 Avenue of the Stars - Suite 600
4 |                    Los Angeles, California  90067
  |          BY:  **PETER I. ALTMAN, ATTORNEY AT LAW**

5 |

  | For Defendant Ben Delo:
6 |

  |                    BOIES, SCHILLER, AND FLEXNER LLP
7 |                    725 Figueroa Street - 31st Floor
  |                    Los Angeles, California  90017
8 |          BY:  **EDWARD TAKASHIMA, ATTORNEY AT LAW**

9 | For Defendant Samuel Reed, Agata M. Reed, Barbara Reed, Mark
  | Sweep, LLC, and Grape Park, LLC:
10 |

  |                    LATHAM & WATKINS LLP
11 |                    885 Third Avenue
  |                    New York, New York  10002
12 |          BY:  **DOUGLAS K. YATTER, ATTORNEY AT LAW**

13 |                    LATHAM & WATKINS LLP
  |                    140 Scott Drive
14 |                    Menlo Park, California  94025
  |          BY:  **MATTHEW RAWLINSON, ATTORNEY AT LAW**

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

| | |
|---|---|
| 1 | **Wednesday - February 3, 2021**                    **10:26 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  This is Case Number 20-3345, BMA LLC |
| 5 | versus HDR Trading Global Limited. |
| 6 | Counsel, if you would please state your appearances for |
| 7 | the record. |
| 8 | **MR. POGODIN:**  Good morning, Your Honor, Pavel Pogodin |
| 9 | for all Plaintiffs. |
| 10 | **THE COURT:**  Good morning. |
| 11 | **MR. HIBBARD:**  Good morning, Your Honor.  It is Steve |
| 12 | Hibbard appearing with my partner Matt Silveira of Jones Day |
| 13 | for Defendants HDR Global Trading Limited and ABS Global |
| 14 | Trading Limited. |
| 15 | And it looks like for some reason my video, which was |
| 16 | working moments ago, is not broadcasting.  And I will tinker |
| 17 | with is that while appearances are being made, Your Honor. |
| 18 | **THE COURT:**  Terrific.  Thank you. |
| 19 | **MR. RAWLINSON:**  This is Matt Rawlinson from Latham & |
| 20 | Watkins.  I'm with my partner Douglas Yatter on behalf of Pam |
| 21 | Reed, the Reed family members and the two LLCs that are related |
| 22 | to the Reed family. |
| 23 | **THE COURT:**  Okay. |
| 24 | **MR. ALTMAN:**  Good morning, Your Honor.  This is Peter |
| 25 | Altman from Akin and Gump on behalf of Defendant Arthur Hayes. |

1          **THE COURT:**  All right.

2          **MR. TAKASHIMA:**  Good morning, Your Honor, this is Ed

3   Takashima from Boies Schiller and Flexner for Defendant Ben

4   Delo.

5          **THE COURT:**  Terrific.

6      All right.  I think that has got everybody.  Good morning

7   to you all.

8      So, first, I'm going to say something, and this is all I'm

9   going to say publicly about this.

10     I received letters over the holidays.  I am deeply

11  concerned about the allegations.  And in this case I want to be

12  very clear that I expect civility in addition to a high level

13  of professionalism and ethical conduct.

14     There is no place in the law for using the kind of

15  offensive language that one of you referred to as sarcasm in

16  the letter.

17     And no lawyer in this case may contact lawyers in another

18  firm in this case unless they are on the pleadings, unless they

19  are involved in the case itself.

20     So I hope I have made myself clear about that.  And so now

21  I'm going to go on to the issue before me.

22     And, Mr. Pogodin, I'm inclined to dismiss the Complaint.

23  And one of the pieces I'm going to ask you to argue about is

24  whether leave is appropriate.  Let me tell why you why I'm

25  thinking that.

1    The criminal prosecution in New York and the allegations

2    of bad acts unrelated to market manipulation tell me that there

3    is a problem that you are trying to address.

4    But in the 237 pages of the Complaint there is a lack of

5    specificity about how your clients were damaged by these

6    Defendants.

7    And so I'm trying to figure out whether the problems that

8    you have identified are related specifically to your clients.

9    And that's what I can't find because everything is alleged when

10   it comes to your clients on information and belief.

11   So the issue in this case is whether the Plaintiff -- your

12   clients were harmed by the Defendants' alleged market

13   manipulation scheme on the specific dates where your clients

14   lost money.

15   And that's the connective tissue that I'm looking for.

16   And in this Complaint, besides the other bad acts that the

17   Defendants may have done and the motive, means, and

18   opportunity, there is nothing else that is alleged.

19   So, for example, could you have gotten information from

20   Kraken and BitStamp platforms that address, if not specifically

21   these Defendants' trades, the date and time of trades, the

22   price of trades, the volume traded?

23   Can you -- is there more information that is available to

24   you that you can allege so that you can tie these -- these

25   Defendants into the losses that your client suffered?

1        In addition, with respect to the RICO claim -- and I'm not
2   going to go through all of the causes of action because I think
3   this is the fundamental issue.
4        In addition to the RICO claim regarding the Reed family
5   members and the LLCs, the only connection to the two real
6   estate properties they owned is -- is information and belief on
7   misappropriation -- misappropriated funds, and that is not
8   sufficient basis.
9        It is just -- it seems very speculative to me, what you
10  have alleged.
11       And without those Defendants, then you don't have a RICO
12  claim because there is no enterprise.
13       So I'm not going to walk through the rest of the
14  complaint.  So I want you to focus on why you can't allege more
15  facts.
16       I know that you discussed the HDR Insider in your
17  briefing, but that is more unrelated bad acts.  And I think you
18  need to get closer to these Defendants.
19       And then the secondary question is:  Given that you have
20  amended once as of right, second by stipulation and then
21  consolidated with -- with other Plaintiffs, is there -- can you
22  allege more?
23       Is there something that should make this Complaint
24  survive?  So with all of that, Mr. Pogodin, go ahead.
25       Tell me what more you can tell me or why what you have

 1     told me is enough.

 2          **MR. POGODIN:**  Thank you, Your Honor.

 3          Let's start from the beginning.  This case I don't believe

 4     it is even close judgment.  I believe we have so much

 5     information, so many allegations that they should be -- there

 6     is no problem in this case.

 7          So we are dealing here with three Defendants, two of whom

 8     are fugitives and two entities who are basically fugitive-owned

 9     establishments.

10          After indictment, I received information that they hired a

11     new person in the company but nothing really changed, so the

12     same Defendants are still running the company.  They basically

13     made a sham CO appear as if he is running the company.

14          So turning to the allegations of the Complaint, I think

15     it's really important to look at the CFTC Complaint against

16     Defendants.  It is not only -- I'm sorry -- it is not only

17     criminal case but also CFTC case.

18          And paragraph 48 of the CFTC Complaint, which is attached

19     as Exhibit 5 to the Consolidated Complaint, clearly states that

20     BitMEX has failed to implement rules and procedures sufficient

21     to ensure that the contracts it offers are not readily

22     susceptible to manipulation; market participants are prevented

23     from engaging in manipulation or disruptive trading; and market

24     participants who engage in misconduct are subject to

25     discipline.

1      So CFTC in its Complaint essentially is telling us that

2    there are no procedures, and the contracts the Defendants sold

3    to Plaintiffs and to everybody else are readily subject to

4    manipulation; 48 paragraph on the CFTC action.

5      So CFTC here agrees with me.  It is on the Plaintiffs'

6    side; that --

7          **THE COURT:**  Mr. Pogodin, let me stop -- may I stop you

8    here because I really -- you will help me if -- I'm thinking

9    small and then you can go large.

10     But I'm thinking about your clients and the specific

11   allegations that tie these Defendants, the facts that you can

12   allege or information that you can't -- that you need to get

13   and you can't get because it is just impossible for -- you need

14   to tell me with respect to your individual clients why these

15   Defendants were the ones who damaged you as opposed to any

16   other actors?

17     I understand that they lost money.  But proving that it

18   came from these guys to start your Complaint, that's what I

19   want to find out about.  Okay.

20         **MR. POGODIN:**  Absolutely, Your Honor.  Yeah, thank you

21   for pointing this out.

22     Several factors went directly at the Defendants to the

23   exclusion of anybody else.

24     So the first factor of this is access to information.

25   Defendants run the exchange.  They know my clients' positions,

1   so they know the size of my clients' position.  They know

2   liquidation point, and they know the parameters of stock

3   losses.

4        No third-party, except for Defendants who ran this

5   exchange, know this information.  And this information is

6   absolutely necessary to perpetrate the market manipulation.

7        This is clearly alleged in the Complaint, and that

8   basically points to Defendants directly to the exclusion of

9   anybody else who could have done it.  So, that's first.

10        And it's also stated in CFTC Complaint, paragraph 50,

11   which states basically that the Defendants engaged in trading

12   in their own platform and used non-public information, and that

13   presents conflicts of interest that CFTC regulations prohibit.

14        So they have a fact which was directed to the Defendants

15   to the exclusion of everybody else.  So that's first one.

16        Second one is position size.  It is alleged in the

17   Complaint -- it is really expensive to move the market for

18   Bitcoin, two and a half million dollars, one example I think in

19   paragraph -- in -- I'm sorry -- Exhibit 3 of the Complaint,

20   page 4 -- three and a half million dollars it cost to move

21   Bitcoin price by 20 percent down on the 17th of May 2019.  So

22   there was a calculation there in that exhibit.

23        So to basically make manipulation profitable, Defendants

24   have to open position big enough to recoup this loss and make

25   money.  And BitMEX has $10 million position limit.  Only

1    Defendants themselves could have opened a big enough position

2    to basically give this money back to recoup this loss and make

3    money on that manipulation making it profitable.

4         Again, CFTC rules, they mandate position limits.  And the

5    CFTC Complaint again says that Defendants failed to implement

6    those limits.

7         So that's the second -- second factor that points directly

8    at Defendants.  Only they could have opened big enough

9    positions limits on BitMEX to make the manipulation profitable.

10        So there is a third factor is pointing, again, to the

11   Defendants is server freezes.

12        So when Defendants manipulate the market, they won't bring

13   on any other third-party from interfering with the

14   manipulation.

15        For example, when Defendants make a market dump,

16   (inaudible) market, they dump it on the market; and they don't

17   want somebody else to come and place a big buy order and

18   swallow the whole dump.

19        So what will happen is that Defendants will spend two and

20   a half million dollars to move the market price on the

21   third-party exchange, and somebody else will get the benefit of

22   the liquidity that this dump paid.

23        So that's the way they freeze servers.  So server freeze

24   is another factor which points that the Defendants did it.

25        So they freeze servers when the manipulation happens to

 1   prevent third parties from interfering with manipulations and

 2   from taking advantage of manipulation.  So that's three

 3   basically.

 4       If you look at 55 that I listed, there are about five or

 5   six facts that point directly at the -- five or six

 6   publications that point directly to Defendants as the culprits.

 7       For example, senior professor of New York University who

 8   was White House advisor and very, very honorable person, he

 9   directly points to Defendants as the culprit behind those

10   market moves.

11       So another factor is that no other party benefits from

12   manipulation to the extent Defendants do.  So they have the

13   highest financial incentive to manipulate.

14       Why?  Because they own exchange.  They own trading desk,

15   and they own insurance fund.

16       So when BitMEX takes your money, they split it three ways.

17   So part of it goes to exchange as trading fees.

18       Part of it goes to insurance fund.  It is like whatever

19   was left on the table.

20       And part of it goes to the trading desk.  And essentially

21   they get everything and not a third-party, any third-party,

22   gets a nickel.  They get -- they keep everything.

23       So that's another factor.  So they have the highest

24   financial incentive of all the people in the world to

25   manipulate this, and this has been pointed out in the

1   Complaint, I think, those 55, I include as well.

2       It match very well actually with the CFTC Complaint which

3   says that Defendants violated all this litany of CFTC

4   regulations.

5       Regarding the additional information, so they suggested

6   that Kraken and BitStamp has the data available.  However, this

7   data would not have identifying information.

8       So they admitted themselves in their motion that data has

9   no -- so what I will get is -- I don't know, like, 50 trades

10  in, like, a table and which there is no -- you know, 1101,

11  1102, 1103 and Bitcoin and the price.

12      You can't really tell from this data if a single party,

13  single person, caused this market dump to change the price and

14  basically rob my clients or if it was just a market move and

15  hundred different users executed those trades separately

16  because those --

17          **THE COURT:**  Let me ask you about that because I have

18  no idea what these records would look like.  But is -- would

19  they not be able to show that different trades of -- that

20  caused losses or were sort of major moves, that even if they

21  don't have the identity information, would at least help tie in

22  the fact that something bad happened on the days that your

23  client suffered market losses?  Are you saying that you

24  wouldn't be able to tell?  Nobody would be able to tell?

25          **MR. POGODIN:**  I believe -- we have a couple of

1    exhibits, Your Honor.  Exhibit 2 and 3, if you look at those,

2    and those are exhibits -- and I think Exhibit 16 as well --

3    those exhibits are by analysts who looked at those specific

4    dates and who suffered losses on those specific dates.  And

5    they clearly state there was manipulation on those dates.

6         For example -- I go to Exhibit 2 -- relates to market

7    events from May 17th, 2019, when a large market holder was

8    executed -- large market seller was executed on BitStamp, and

9    there was exactly parameters of that all -- everything is in

10   Exhibit, I'm sorry, 2.

11        And we suffered -- I mean, Plaintiffs suffered loss on

12   that specific date.  So I believe we tied Plaintiffs' losses on

13   May 17th, 2019, to that specific market manipulation again.

14        And there was complete analysis, as I said; and there was

15   a software program actually which was running to basically wipe

16   out the entire buy or their book by exhibiting small trades, so

17   you won't be able to say that this was a huge trade that

18   basically moved the market.

19        No.  It was a software executing a little bit at a time.

20   And the way it's done -- it is really hard to -- Your Honor, I

21   mean, the market manipulations can (inaudible).  So Defendants

22   have every single incentive to hide their actions.

23        And I download, you know, seven complaints today, this

24   morning; and they all made information belief.  Why?  Because

25   Defendants have every single incentive to hide their actions.

1   And it is really impossible to find evidence of how they hide

2   (inaudible).

3       So BitMEX accounts are completely anonymous.  So you

4   cannot tie market manipulation on one exchange to accounts on

5   BitMEX, and this was done on purpose.

6       Then they use burner accounts.  The burner accounts is

7   simple, like, Gmail.  They use anonymous Gmail accounts.  And

8   you cannot trace this activity by this burner account back to

9   BitMEX.  So it is another way that -- how they hide; how they

10  hide the -- basically, manipulation activity.

11      There are other ways as well.  So they use multiple

12  accounts, multiple exchanges.

13      CFTC Complaint in paragraph 50 alleges that they -- I'm

14  sorry 49 -- that they destroyed records.

15      So given all this hiding and all the incentive to hide

16  information and lack of (inaudible) information and publicly

17  available information, so it is hard to allege BitStamp hire --

18  and I have several experts who can write expert reports.

19      So that would be one way of probably doing that.  So the

20  expert will look -- the leading expert, who has, you know, over

21  30 years of experience -- will look at the oldest data and say

22  to a high degree of certainty that this is what happened.

23      But given all this incentive to hide this information and

24  lack of identifying information in the evidence that they

25  pointed, it is really hard to -- it will be really hard to

1    tell, for example, if a software program executed a hundred

2    small trades, 0001 BTC, to move the market price or if those

3    small trades were executed by a hundred different people.  It

4    is really tough to make a distinction.

5              THE COURT:  Okay.  So what you are telling me at the

6    end of the day is that given the sophistication and the lack of

7    transparency of what is involved, there is really nothing more

8    that you would be able to allege than what you have already put

9    in the Complaint; that the Kraken and the BitStamp platform

10   information is -- would not provide any sort of connective

11   tissue; and that until you get into discovery, you are not

12   going to be able to do more than what you have done; is that

13   fair?

14             MR. POGODIN:  We might be able to get an expert

15   report.  The person who would look at the corrected and

16   BitStamp data and make educated expert opinion, what he thinks

17   happen with high probability.  That would be one way of doing

18   it.

19        But, as you probably see, the arguments are highly

20   technical, so they require technical knowledge; how trading

21   works; how markets work.  And I believe we alleged -- I mean,

22   the market manipulation is -- the scheme that we alleged is

23   really clear.  So they used -- as the CFTC Complaint states,

24   they specifically designed this product to be easily subject to

25   manipulation, to very profitable manipulation.

1    **THE COURT:**  And you did -- you allege that.

2    I'm trying to get to the next level, and what you are

3    telling me is that you really can't get there without

4    discovery.

5    So let me turn it over to the Defendants.  I don't know

6    who is -- whether Mr. Hibbard or Mr. Rawlinson, I don't know

7    who is going to start.

8    **MR. HIBBARD:**  Your Honor, this is Mr. Hibbard and I

9    will start but apparently not start my camera.  So apologies

10   for that.

11   **THE COURT:**  That's all right.

12   **MR. HIBBARD:**  Your Honor, I think your remarks at the

13   start indicated that you have read and grasped the essence of

14   the arguments that we have made, and we think that those are

15   the correct legal arguments here.

16   It really is a question of -- in this case of whether a

17   case may proceed if it is not supported by credible facts that

18   give rise to a plausible conclusion that a claim exists.

19   And as our papers show, Your Honor, this is -- these are

20   allegations that are built on speculation, speculation piled on

21   speculation, speculation built upon extraneous matters,

22   fantastical leaps of logic, circular reasoning, naked

23   conclusions and conspiracy theories found on the Internet.

24   But none of these are sufficient under the law to support

25   a judicially cognizable claim for relief.

1        At bottom, Your Honor, what you have here are conclusions

2   that do not flow from well-pled fact allegations.

3        It is the other way around.  As Mr. Pogodin has evolved

4   this Complaint, he has started with the conclusion and worked

5   backwards asking:  What allegations do I need to make to say

6   so?

7        And so what is here lacks any of the patina of

8   plausibility that the Court found that existed in the other

9   cases that you have dealt with on information and belief such

10  as the *Choice Hotel* case matter and the *Facebook* matter.

11       **THE COURT:**  It is a different case.  But, Mr. Hibbard,

12  take on what Mr. Pogodin was saying is that he -- given the

13  kind of scheme that is involved and the opacity of this

14  industry -- or I'm not sure how I would describe it -- and --

15  that there is no way to get further connective tissue at the

16  outset without having some discovery.

17       And certainly your clients would all know the answer to

18  this question.  They would have the ability to respond to it

19  relatively easily.  So why -- why isn't that a good argument?

20       **MR. HIBBARD:**  It is not a good argument, Your Honor,

21  because market manipulation cases go forward all the time; and

22  the situations are, in effect, no different.

23       In every one of those market manipulation cases that find

24  its way through the courts, there is a Plaintiff who feels

25  challenged about information that is uniquely within the

1    possession of Defendants and says so.

2       Here, Your Honor, what we are talking about is a situation

3    where everything is on information and belief; not just the

4    question of intent or knowledge that might be particularized.

5    The conduct at root is all based on speculation.

6       There is -- it is more plausible that fundamentally

7    than -- that this is a case of market losses.  The market goes

8    up.  The market goes down.  It is thinly traded, volatile

9    instrument on a relatively nascent emerging exchange.  There is

10   movement all the time.

11      So, secondarily, as Plaintiff himself has alleged and has

12   just said to the Court now, supposedly this is in a way where

13   it is easy to manipulate in which case there may be many other

14   actors who are manipulating it.

15      And in his Complaint he has talked about Barts and other

16   different tactics and techniques, and he has talked about other

17   perpetrators and so on.

18      There is just nothing to suggest, first of all, that

19   anything actually happened here.  Secondly, that if it happened

20   here, it wasn't done by third parties.

21      But instead, what you have Plaintiff alleging is that the

22   only possible scenario that could make any sense conceivably at

23   all is that this is a master conspiracy concocted by Defendants

24   to actually abuse the market on which they make money by taking

25   a profit as people buy and sell over the exchange.

1      What is far-fetched here is the theory that is before us.

2   And so what I would say is, again, cart before the horse.

3      And the real question is:  How are all the other cases of

4   market manipulation that go forward in this country able to do

5   so if the challenge is as great as Mr. Pogodin says it is here.

6      **THE COURT:**  Well, he does have the added advantage of

7   the -- of painting a background which includes a criminal

8   prosecution and a Complaint by the FTC.  So it is not as if he

9   is grabbing names out of thin air; right.

10      **MR. HIBBARD:**  Well, Your Honor, again, we made the

11   point in the papers that evidence of supposed bad acts -- and

12   these are all matters that are unproven; matters that are

13   subject to great challenge -- first of all, they don't bear on

14   this.

15      And, secondly -- and it is important -- the allegations in

16   those other matters do not involve market manipulation.  They

17   involve matters such as in the -- in the criminal matters -- as

18   I understand it, and other Counsel can add to this as

19   appropriate -- one is a, you know, failure to comply with BSA

20   requirements.  It is of a regulatory nature in effect.

21      And then the second count is conspiracy to not comply with

22   that.  It is not a market manipulation count.

23      And so those issues will be dealt with, and they will be

24   dealt with separately.  But they don't -- as a result of the

25   extensive investigations that went on by the CFTC or the DOJ,

in neither case have there have been claims of market
manipulation.

So I don't think that the leap from those other matters
unrelated to the conduct he alleges here support an inference
that the conduct he suggests happen did, in fact, happen.

**MR. POGODIN:**  Your Honor, may I speak to this, please?

**THE COURT:**  You will have a chance, but I do want to
get -- let the Defendants figure -- finish what they have to
say.

So, Mr. Hibbard, is there -- would you point Mr. Pogodin
to any particular sources of information that would be where
that connective tissue might be found for his Complaint, where
it would be public information?

**MR. HIBBARD:**  Well, considering that we don't believe
any such connective tissue exists or that the conduct that is
alleged occurred, the answer is no.

But we have pointed out in terms of the trading on other
platforms that data for Kraken and BitStamp is, in fact,
publicly available in many instances.

**THE COURT:**  Would it be helpful -- would -- in
establishing -- for me -- I don't care about for Mr. Pogodin or
for you -- but if I looked at the Kraken and BitStamp
information, would it tell me anything that was useful for this
case?

**MR. HIBBARD:**  At the end of the day, Your Honor, I

 1   think the answer is no, I'm guessing, because I have not looked

 2   at that data.  But I do not believe that that data is data that

 3   will specifically track back by itself to any particular entity

 4   who made the trade.

 5       So although it might be possible to look at trade data and

 6   trade volume and so on, it doesn't follow that that necessarily

 7   are trades that can be attributed properly to Defendants here.

 8       **THE COURT:**  Okay.  All right.

 9       Thank you.  Any other Defendant want to -- make any

10   argument before I let Mr. Pogodin back in?

11       **MR. RAWLINSON:**  Your Honor, this is Matt Rawlinson on

12   behalf of the Reed family and Reed family entities, we just

13   ask, Your Honor, that in considering whether to allow Plaintiff

14   to re-plead, particularly with respect to the Reed family, that

15   you consider whether any of this new information that is being

16   discussed today relates to them at all; right.

17       As we pointed out in the papers, there is no allegations

18   against any of these individuals.  There is no cause of action

19   that is even a standalone action.

20       Even if this matter were to be re-plead, with sort of

21   additional connective tissue, none of the material I have heard

22   today relates at all to the Reed family members or the Reed

23   family entities, the LLCs.

24       So I would ask, Your Honor, to consider that carefully

25   when you consider the next step, whether there is any realistic

```
 1   reason those people should be in this case.

 2        We strongly believe there isn't, and so we would ask you

 3   to consider that, Your Honor.

 4             THE COURT:  Thank you.  Okay.  All right, Mr. Pogodin.

 5             MR. POGODIN:  Thank you so much, Your Honor.

 6        So the uniqueness of this case -- and I think Mr. Hibbard

 7   pointed how come there is no information here and there was

 8   information before?

 9        All the counts on BitMEX are anonymous, and that's why

10   they got criminally charged.  And I pointed out this in my --

11   every single paper, that when a user opens an account on

12   BitMEX, they don't have to provide any identifying information.

13        So you get this enormous exchange with absolutely

14   anonymous accounts.  Not a single account has any ID.  You

15   understand that; right?

16        And that's the problem with the market manipulation.  So

17   you cannot trace the activity from those accounts to the people

18   who did them.  And this was done on purpose to enable the

19   manipulation.

20        And that's why we have this Bank Secrecy Act criminal

21   charges, and it is felony charges and the people -- the

22   Defendants are on the run.

23        So given this fact and given the fact that the data that

24   we will get from BitStamp and Kraken on this stage with our

25   benefit of discovery, public data, we also have zero
```

1   identifying information.

2       You can tell that Defendants planned all this.  They

3   planned to make it very hard to trace, and that's why they

4   hired all these people who just, you know, saying:  There is no

5   data.

6       That was the intent.  The intent was to make it anonymous,

7   and the intent was to get away with this.  And let's look -- I

8   mean, that is what CFTC is saying in paragraph 48.

9       And then in paragraph 49 we know that they failed to

10  maintain records, and they destroyed records of user

11  identities, it says 49.

12      That's why it was by intent so there would be no data and

13  the case would be dismissed.  So that was the Defendants'

14  strategy from the beginning.

15      I believe also that this case is identical to the Facebook

16  (inaudible).  I give you Facebook.  There, the trade secret

17  claim was hinged -- was hinging, like, on a single issue, If

18  the misappropriation of data from 5G servers was wrongful or

19  not.

20      So that was the single issue that was important for the

21  trade secret misappropriation claims.

22          **THE COURT:**  Mr. Pogodin, let me stop you there.

23      Any time somebody starts explaining to me how to

24  distinguish cases that I have decided from other cases, I

25  usually either have forgotten it completely and it is not

1    helpful or more likely, I remember it pretty well.

2         And *Planner 5D* is a very different case.  The allegations

3    in the complaint were far more specific, and there were just a

4    couple that were important on information and belief where you

5    couldn't get to them; but there was a lot of connective tissue.

6         Here, there -- it is -- it is hard to find.  And I

7    recognize the concern that you have that the information isn't

8    available to you, and I will go back through the Complaint one

9    more time.

10        I'm not sure if there is an expert report that doesn't

11   have more facts.  I would assume that the expert report would

12   be based on the information that you have provided in the 237

13   pages.

14        So I'm not sure that that gets you over the hump if you

15   are not already there.  So I will take another look and to try

16   to go through this and sort it out.

17        **MR. POGODIN:**  Your Honor, may I just make one last

18   point, please.

19        The leaderboard, they have traders who are listed on the

20   leaderboard, and those traders re-plotted the profit -- things

21   of those traders -- and they exactly correspond to the market

22   manipulation events.  So you find at least one trader like this

23   in the Complaint.  And with high degree of confidence, we can

24   say that this was the manipulator.

25        And that's a perfect case for aiding and abetting that

1    manipulator.  They knew him because they distanced him on the

2    leaderboard.

3         And then paragraph 48 of CFTC says -- CFTC Complaint says

4    that they enabled manipulation by not implementing those

5    policies and by basically designing the contract readily

6    available for manipulation.

7         Even if the Defendants did not manipulate themselves,

8    there is enough evidence -- there is ample evidence that they

9    aided and abetted that specific trader and others in the --

10   basically in the market manipulation.

11        And paragraph 48 of CFTC Complaint says exactly that.

12   They failed to implement procedures to basically to -- failed

13   to ensure that the contract is not susceptible to market

14   manipulation; that participants prevented from engaging in

15   manipulation.

16        So how they did it, they failed to implement position

17   limits.  They failed to implement conflict of interest, and

18   they designed the contract the other way.  They designed it to

19   be susceptible to be manipulation -- to profitable

20   manipulation.

21        How?  Because they used (inaudible) exchanges to calculate

22   the price on a very different exchange.  That was the idea that

23   was done intentionally.

24        And even if you are saying that I cannot connect my

25   specific loss to the specific action of the Defendants, we do

1   have -- absolutely we do have proven case for aiding and

2   abetting market manipulation.

3          **MR. HIBBARD:**  Your Honor, may I speak to that?

4          **THE COURT:**  Yeah, in a moment, Mr. Hibbard.

5       Mr. Pogodin, what I understand from all of your argument,

6   though, is that you have alleged as much as you can; that there

7   is nothing more with the exception of the -- the insider

8   information that you described in the brief, that you would be

9   able to add to the Complaint just given all the factors that we

10  have talked about.  Is that fair?

11         **MR. POGODIN:**  No.  I can allege probably another 200

12  exhibits with different manipulation patterns.  That is

13  available.

14      I can allege 200 more exhibits basically connecting

15  specific market manipulation events on other exchanges to

16  events on BitMEX, and that's available.

17      And I would like to request, Your Honor, leave to amend so

18  I can attach additional information.  And that I'm more -- by

19  now more analysis of manipulative conduct, so we can allege a

20  lot more factual information.  We can.

21         **THE COURT:**  Mr. Pogodin, when I started practicing,

22  the rule on complaints was that -- that there would be a short

23  and plain statement that would express relief.

24      Now, I know that over time things have changed.  237

25  pages, the size of what I'm -- the books that I'm reading in

1   this case are plenty.  But they are not focused.

2       And that's the -- that's the problem -- that's part of

3   what I have to sort through.

4       Mr. Hibbard, go ahead.

5           **MR. HIBBARD:**  Briefly, Your Honor, and it is only

6   because it has been mentioned a couple of times in the context

7   of document destruction.

8       I would just say that Mr. Pogodin is not informed and does

9   not understand the leaderboard, which is essentially something

10  that a user would opt in or opt out of appearing on.

11      And so when a user doesn't appear, it is because of that

12  user's own choice to opt out of being publicly displayed for

13  their wins or losses.

14      And I say this, Your Honor, because there have been more

15  than enough instances of accusations of document destruction

16  where we have repeatedly assured Mr. Pogodin and this Court

17  that that has not been the case.

18      And so given that it has been raised again, I think it is

19  appropriate to just note that Plaintiffs' Counsel is mistaken

20  in his understanding and his view and that what -- his comments

21  about the leaderboard do not support any of the speculation

22  that he puts forward.

23      And I would just say that the notion of another 200

24  reports -- from whatever sources found wherever they found --

25  sound, again, like more speculation piled on speculation.

```
 1          And the issue really turns to our mind on the lack of

 2     allegations that demonstrate that these Defendants specifically

 3     acted to cause harm that led to the losses that Plaintiffs

 4     claim that they have incurred.

 5          And I would just note, Your Honor, that at this moment the

 6     issue of standing by BMA remains outstanding because to this

 7     day Plaintiff has never pled what losses BMA itself has

 8     occurred.

 9               MR. POGODIN:  Your Honor, could I --

10               THE COURT:  Go ahead.  I will give you the last word,

11     Mr. Pogodin.  Go ahead.

12               MR. POGODIN:  Sure.

13          Okay.  I think Mr. Hibbard completely confused the issues.

14     He confused the issues so that a $100-million account, which

15     popped up -- I don't know -- for about one hour after market

16     dumped and another completely different leaderboard trader --

17     but he likes to accuse me of things -- but there is a

18     completely different leaderboard account under the name

19     Quick-Grove-Mind, which didn't go there.  There is no

20     destruction of evidence.

21          It is sitting there right now for several months.  And if

22     you pull up the profit of that person, you will see that his

23     profit spikes perfectly match every single market manipulation,

24     I don't know, for six months.

25          And I don't (sic) have an expert who will say it is
```

1   impossible -- it is -- it is mathematically impossible to

2   achieve this without manipulation.

3        And I think this will go to help the case.  And I believe

4   this will definitely move the case from possible to plausible

5   if the expert will say:  Based on that specific data pointed

6   out on the website of Defendants, themselves, I conclude that

7   it is impossible -- statistically impossible to achieve this

8   kind of profit profile without manipulating the market.

9        That would be an absolute (inaudible) case for HDR

10  litigation because they listed the trader as, like, number one

11  account on the leaderboard.  And they obviously did not get it.

12       So this case, I think it is even proven.  They can go for

13  summary judgment in that case, even as it stands now, because

14  the expert will say that it is impossible -- statistically

15  impossible to achieve in a normal market.  It has to

16  manipulate.

17       **THE COURT:**  And if summary judgment was being

18  determined today, I think your legal analysis is not correct,

19  Mr. Pogodin.

20       **MR. POGODIN:**  That's why I'm offering the expert

21  report.

22       **THE COURT:**  All right.

23       Thank you-all very much for your argument.  I am going to

24  go back through this one more time.  It is the first time that

25  I have actually had to go through the Complaint.

1          I usually do give people a chance to amend after I point

2     out what I find are the deficiencies, but I will look again to

3     see whether my mind has changed about this.  And I will get an

4     order out as soon as I can.

5          **MR. POGODIN:**  Your Honor, can I just mention --

6     because two of the Plaintiffs never got the chance to amend.

7     So they have been dragged through this case.

8          And Mr. Hibbard filed a motion to consolidate; never

9     giving -- essentially taking -- from these Plaintiffs the

10    chance to respond under Rule 15.

11         So he did it intentionally so they would never be able to

12    use the statutory right.  I think I believe those Plaintiffs

13    entitled to brief on them.

14         **THE COURT:**  Okay.  Well, I will take a look.  I am --

15    I'm leaning towards doing that just because -- just because of

16    the liberal amendment rules and -- but -- the thing that I'm

17    not looking forward to if I go through the Complaint again is

18    wading through things to try to figure out what -- why you

19    think that these Defendants are responsible.

20         And that's the -- that's going to be the -- that's my

21    goal.  And I hope it is your goal as well, Mr. Pogodin, if I

22    give you a chance to amend.

23         So thank you-all very much.  And I will get an order out

24    as soon as I can.

25         **MR. HIBBARD:**  Thank you, Your Honor.

1        **MR. POGODIN:**  Thank you, Your Honor.

2        **THE COURT:**  Thank you.

3            (Proceedings adjourned at 11:15 a.m.)

4                  ---oOo---

5

6              <u>**CERTIFICATE OF REPORTER**</u>

7        We certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10  DATE:   Saturday, February 6, 2021

11

12

13

14               _____

15               Marla F. Knox, RPR, CRR
                   U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25