UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BMA LLC, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>HDR GLOBAL TRADING LIMITED, et al.,<br><br>                    Defendants. | Case No.  20-cv-03345-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS CONSOLIDATED COMPLAINT WITH LEAVE TO AMEND; DENYING PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF; SETTING CMC RE NOTICE OF RELATED ACTION**<br><br>Re: Dkt. Nos. 126, 138, 140 |

In this consolidated action, five plaintiffs—four individual traders and BMA LLC, an entity that is co-owned by multiple individual traders—bring various claims arising out of losses they suffered on a cryptocurrency derivatives trading platform called Bitcoin Mercantile Exchange ("BitMEX").  Together they allege seventeen causes of action, including claims under the Commodity Exchange Act ("CEA"), the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and California law, against BitMEX's corporate owner, its subsidiary, its founders, family members of one of the founders, and other alter ego entities.  Before me is defendants' motion to dismiss the Consolidated Complaint.

Plaintiffs' 237-page, 618-paragraph, 18-exhibit Complaint is hardly a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  Plaintiffs waste much space describing other actions brought against defendants, including an indictment filed against the founders and a recent Commodity Futures Trading Commission ("CFTC") civil enforcement suit.  But they fail to plausibly explain how the defendants have harmed them.  The limited allegations plaintiffs offer about their price manipulation theory are all alleged on information and belief, with no explanation of the basis for such beliefs or facts that would make

their allegations plausible.  This failure dooms their Complaint.  In addition to this fundamental flaw, plaintiffs fail to sufficiently plead the elements of each claim and their standing to bring them.  For these reasons, defendants' motion to dismiss is GRANTED.

Although the Complaint had multiple previous iterations, plaintiffs claim that they can allege more facts, including expert reports that could connect the dots in their price manipulation theory.  Because this is the first motion to dismiss order identifying the deficiencies in their pleading, I will grant leave to amend.  I caution plaintiffs to allege only relevant facts and to avoid conclusory assertions.[1]

That said, it is unclear how this case should proceed.  After the hearing, plaintiffs filed notice of a related action currently pending in the Southern District of New York.  *See Messieh v. HDR Global Trading Ltd.*, No. 1:20-cv-03232-ALC (S.D.N.Y. Apr. 23, 2020), Dkt. No. 1. *Messieh* was filed before this suit against substantially the same defendants and brings class claims under the CEA based on a significantly similar theory of price manipulation, albeit more detailed and supported by expert analysis.  On June 4, 2020, the court granted the *Messieh* plaintiffs' motion to appoint their counsel as interim class counsel pursuant to Rule 23(g)(3), to minimize the risk of duplicative filings and allow the court to consolidate related filings more efficiently.  *Id.*, Dkt. No. 32.  Motion to dismiss briefing on the *Messieh* plaintiffs' recently-filed amended complaint is scheduled to complete by July 14, 2021.  *Id.*, Dkt. No. 51.

Plaintiffs assert that they are "members of the putative class" in *Messieh* and request "coordination" between this suit and *Messieh* to avoid conflicts, but fail to describe the type of coordination they think is appropriate.  Notice of Related Action [Dkt. No. 140] 3.  Defendants have not responded to plaintiffs' notice.  A Case Management Conference is set for April 6, 2021 at 2 p.m. to discuss how this case should move forward in light of the *Messieh* action.  In their Joint Case Management Statement, due March 30, 2021, the parties shall address what kind of

---

[1] After the hearing, plaintiffs filed a motion for leave to file a supplemental brief in opposition to defendants' motion to dismiss to "inform [] the Court that Plaintiffs are in a process of developing new facts directly linking Defendants with the manipulative acts alleged in the Consolidated Complaint and resulting in Plaintiffs' losses."  Administrative Motion for Leave to File Supplemental Brief in Opposition to Defendants' Motion to Dismiss [Dkt. No. 138] 2.  Plaintiffs' motion is DENIED as I am granting leave to amend.

United States District Court
Northern District of California

coordination is appropriate and whether this suit should be transferred to the Southern District of New York.

## BACKGROUND

All of the claims in the Complaint are brought against five main corporate defendants: HDR Global Trading Limited ("HDR"), which owns the BitMEX platform, HDR's wholly-owned subsidiary ABS Global Trading Limited ("ABS"), and HDR's co-founders Arthur Hayes, Ben Delo, and Samuel Reed.  Consolidated Complaint ("Compl.") [Dkt. No. 97] ¶¶ 33–34, 45.  The Complaint also asserts some claims against two additional groups of defendants.  Plaintiffs bring RICO and state law claims against "Unknown Exchange", an entity used by defendants to convert bitcoins into traditional fiat currencies, and Mark Sweep LLC and Grape Park LLC, two limited liability companies that are alleged alter egos of individual defendant Reed.  *Id.* ¶¶ 20, 59, 60, 267. They assert RICO and four state law claims (civil conspiracy, unjust enrichment, constructive trust, and accounting) against Reed's wife, mother, and father: Agata Reed, Barbara Reed, and Trace Reed (the "Reed Family Members").  *Id.* ¶¶ 65–67.

## I.    MAIN CORPORATE DEFENDANTS

Plaintiffs' claims against the five corporate defendants center on those defendants' ownership and operation of the BitMEX platform.  Compl. ¶ 1.  In 2014, defendants launched the bitcoin derivatives trading platform BitMEX, which "enables traders to place bets on direction of cryptocurrency prices."  *Id.* ¶ 6.  In designing their platform, plaintiffs allege that defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any "know your customer" ("KYC") or anti-money laundering ("AML") checks.  *Id.* ¶¶ 283–85, 287; *see id.*, Exs. 4 and 5 (two-count indictment and CFTC civil enforcement complaint filed in the Southern District of New York against corporate defendants).[2]  "In other words, Defendants would open account[s] and accept

---

[2] Plaintiffs spend much time in their Complaint describing the criminal indictment and other civil lawsuits filed against the corporate defendants.  I briefly summarize what those cases are, although plaintiffs fail to explain why those cases are relevant to the claims brought in this suit.

On October 1, 2020, Hayes, Delo, Reed and Gregory Dwyer (not named in this case) were criminally indicted in the Southern District of New York for violating the Bankruptcy Secrecy Act

1    unlimited funds from anyone, without a single question asked." *Id.* ¶ 6.

2          Plaintiffs generally describe bitcoin price manipulation techniques, including "pump-and-

3    dumps," "Bart patterns," "stop loss hunting," and "liquidation cascades." *Id.* ¶¶ 150–165. They

4    allege two causal chains to describe defendants' purported price manipulation scheme – one which

5    led to plaintiffs' BMA and Dubinin losses on the Kraken exchange platform and another chain

6    with "one more link" that caused plaintiffs' BMA, Kolchin, Dolgov and Razvan losses on the

7    BitMEX platform. *Id.* ¶¶ 255–58. All of these allegations are made on information and belief.

8    The chart in paragraph 254 of the Complaint summarizes the amount of bitcoins lost by each

9    plaintiff by the causal links described below. *Id.* ¶ 254.

10          With respect to the losses on Kraken, plaintiffs contend that when Reed executed a "large

11    market SELL order from helper account on Kraken's XBTUSD/BTC order book," this large

12    market SELL order "caused an artificial downward price move on the Kraken's spot order book,"

13    "triggering a liquidation cascade and directly resulting in liquidation of Plaintiffs' BMA and

14    Dubinin XBTUSD long positions on that exchange." *Id.* ¶ 255. If Reed "did not execute a large

15    SELL market order from helper account on Kraken's XBTUSD/BTC order book," plaintiffs allege

16    that "the above sequence would not have taken place and [] plaintiffs' BMA and Dubinin

17

18    ―――――――――――――

18    ("BSA"). *See* Compl., Ex. 4 (indictment in *United States v. Hayes*, 20-cr-500 (S.D.N.Y.)). The

19    indictment alleges that defendants "willfully failed to establish, implement, and maintain an
adequate anti-money laundering ('AML') program, including adequate customer identification

20    programs, more commonly referred to as know-your-customer ('KYC') program for BitMEX, in
violation of the BSA." *Id.* at 2.

21    Also on October 1, 2020, the CFTC filed a civil action in the Southern District of New York

22    against HDR, ABS, Hayes, Delo and Reed. *See id.*, Ex. 5 (complaint in *CFTC v. HDR Global
Trading Ltd.*, 20-cv-8132 (S.D.N.Y.)). The CFTC alleges that defendants' profitability derives

23    from U.S. markets and customers, but "BitMEX has never been registered with the CFTC in any
capacity and has not complied with the laws and regulations that are essential to the integrity and

24    vitality of the U.S. markets, like know-your-customer procedures to prevent money laundering, or
procedures designed to detect and prevent manipulative trading and other illicit activities." *Id.* at

25    2.

26    In December 2019, two early investors of BitMEX, Frank Amato and Elfio Guido Capone, sued
defendants in San Francisco Superior Court to recoup over $500 million. *See id.*, Exs. 17 and 18.

27    Defendants sought dismissal of the investor suit on personal jurisdiction grounds, arguing that
BitMEX is incorporated in the Republic of Seychelles. Plaintiffs here devote multiple pages of

28    their Complaint arguing that personal jurisdiction is proper, but defendant do not seek dismissal of
this suit on personal jurisdiction grounds. The investor suit was recently settled.

United States District Court
Northern District of California

1    XBTUSD long positions on Kraken exchange would not have been liquidated." *Id.* ¶ 256.

2    Liquidation of their positions was also a "foreseeable consequence" of the large SELL market

3    order.  *Id.*

4         The causation chain of plaintiffs' BMA, Kolchin, Dolgov and Razvan losses on BitMEX

5    "includes one more link"—"the .BXBT price index used by Defendants to price the XBTUSD

6    Perpetual Swap on BitMEX." *Id.* ¶ 257.  Plaintiffs contend that the .BXBT index price used by

7    defendants for BitMEX's XBTUSD Perpetual Swap contract is based substantially on bitcoin

8    prices on U.S.-based exchanges BitStamp, Coinbase, and Kraken; these platforms are allegedly

9    "much less liquid than BitMEX itself." *Id.* ¶ 159 & Ex. 14.  Thus, plaintiffs allege, "Kraken's

10   XBTUSD/BTC order book" is "linked to the BitMEX's XBTUSD order book via the .BXBT

11   index." *Id.* ¶ 258

12        "[W]hen Defendant Reed executed a large SELL market order from helper account on

13   Kraken's XBTUSD/BTC order book," "causing artificial downward price move on spot order

14   book of that exchange," "the aforesaid artificial price move propagated, through the .BXBT index,

15   to the XBTUSD Perpetual Swap order book of BitMEX, causing the corresponding downward

16   price more," "and triggered liquidation of Plaintiffs' BMA, Kolchin, Dolgov and Razvan

17   XBTUSD long positions [on BitMEX]." *Id.* ¶ 257.  "The same causation chain resulted when

18   Defendant Reed executed a large SELL market order from helper account on BitStamp's ETH

19   order book, which propagated through BitMEX's .BETH index to ETHUSD order book of

20   BitMEX and caused Plaintiff's Kolchin long ETHUSD positions there to be liquidated." *Id.*

21   Plaintiffs allege, on information and belief, that this sequence repeated daily, including each

22   alleged "Manipulation Times," which include dates on which plaintiffs sustained bitcoin losses.

23   *Id.* ¶ 372.

24        Plaintiffs allege that BitMEX further facilitates manipulation by trading against its

25   customers, as revealed in its terms of service, and by "using [the] fraudulent 'system overloads'

26   excuse to accept some trading orders and reject others during large market moves in order to

27   exacerbate the artificial prices and increase the number of liquidations with the purpose to

28   financially benefit therefrom." *Id.* ¶¶ 218, 239.  They contend that, on information and belief,

United States District Court
Northern District of California

5

BitMEX deposits proceeds from the user account liquidations into its so-called "Insurance Fund," which has steadily grown over the years. *Id.* ¶ 236. The Insurance Fund is marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral, but plaintiffs allege that [d]espite its name, the Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars." *Id.* ¶ 170.

In addition to defendants' direct participation in a market manipulation scheme, plaintiffs bring claims against certain defendants for aiding and abetting market manipulation perpetrated by a third party, a BitMEX trader with the username Quick-Grove-Mind. For instance, they allege that defendants assisted Quick-Grove-Mind by taking the BitMEX platform offline, which ultimately caused plaintiff BMA to suffer bitcoin losses on March 13, 2020. *See, e.g.*, *id.* ¶¶ 508–09, 608.[3] In connection with their negligence claims, they allege that defendants failed to provide traders with a functional cryptocurrency trading marketplace by, among other things, recklessly or negligently manipulating the prices of bitcoin and bitcoin derivatives and negligently failing to prevent attacks from third parties. *Id.* ¶¶ 523, 526–27.

## II.      OTHER DEFENDANTS

Unlike the corporate defendants, plaintiffs do not assert that Grape Park LLC, Mark Sweep LLC, the Unknown Exchange, or the Reed Family Members engaged in any conduct that impacted the price of their cryptocurrency derivatives or otherwise caused their purported losses. Instead, they allege that corporate defendants "laundered" funds from their purported violations "through the Defendant Unknown Exchange, by means of converting bitcoins into various traditional ("fiat") currencies." Compl. ¶ 20. The funds were also allegedly laundered by the

---

[3] Plaintiffs make several contradictory allegations regarding the identity of Quick-Grove-Mind. At the outset of the Complaint, they allege that they are "informed and believed" that "Quick-Grove-Mind was a market manipulation winner account used by one of the individual Defendants Hayes, Delo or Reed." Compl. ¶ 11. But later, they claim that Hayes, Delo, and Reed aided and abetted CEA violations by Nick Andrianov, a Ukrainian national and HDR employee who was a "market manipulator under assumed name Quick-Grove-Mind listed on BitMEX Leaderboard." *Id.* ¶¶ 19, 508. And still later, they appear to claim that Quick-Grove-Mind is an unnamed third party, alleging that Defendants knew this user "was clearly a notorious market manipulator." *Id.* ¶ 509.

United States District Court
Northern District of California

Reed Family Members "through a real estate investment scheme that they set up in Wisconsin and Massachusetts." *Id.*  Grape Park LLC and Mark Sweep LLC were "shell companies" used to "disguise or conceal the true illegal nature of the funds in the Defendants' general account (bitcoin wallet), which were ultimately used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control," *Id.*; *see also id.*, Exs. 12 and 13 (copies of quitclaim deeds).  Plaintiffs contend that the Reed Family Members "are in possession of two real estate properties … with the aggregate market value of over $2,500,000." *Id.* ¶¶ 20, 577, 594.

## III.    CAUSES OF ACTION

Based on the allegations above, plaintiffs bring the following seventeen causes of action:

- Count 1 – RICO, 18 U.S.C. § 1962(c);
- Count 2 – RICO, 18 U.S.C. § 1962(d);
- Count 3 – use of manipulative/deceptive device in violation of the CEA, 7 U.S.C. § 9(1);
- Count 4 – manipulation of bitcoin in violation of the CEA, 7 U.S.C. §§ 9(3), 13(a)(2);
- Count 5 – principal-agent liability under the CEA, 7 U.S.C. § 2(a)(1)(B);
- Count 6 – aiding and abetting market manipulation in violation of the CEA, 7 U.S.C. § 25(a)(1);
- Count 7 – negligence;
- Count 8 – fraud;
- Count 9 – civil conspiracy;
- Count 10 – violation of California Business & Professions Code § 17200 ("UCL");
- Count 11 – unjust enrichment;
- Count 12 – constructive trust;
- Count13 – accounting;
- Count 14 – conversion;
- Count15 – aiding and abetting conversion;
- Count 16 – aiding and abetting fraud;

United States District Court
Northern District of California

1     •   Count 17 – violation of California Penal Code § 496.

2 *See* Compl. ¶¶ 394–618.

3 **LEGAL STANDARD**

4       Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim

5 fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

6 dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its

7 face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when

8 the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

9 is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

10 omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

11 While courts do not require "heightened fact pleading of specifics," a claim must be supported by

12 facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555,

13 570.

14       Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the

15 circumstances constituting fraud or mistake," including "the who, what, when, where, and how of

16 the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

17 (internal quotation marks omitted). However, "Rule 9(b) requires only that the circumstances of

18 fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule

19 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). In deciding

20 a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as

21 true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*,

22 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that

23 are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead*

24 *Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

25       A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a

26 challenge to the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are

27 courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited

28 jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party

*United States District Court*
*Northern District of California*

8

United States District Court
Northern District of California

invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *Id.* A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. S*ee Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

## DISCUSSION

Defendants move to dismiss on grounds that plaintiffs' core misconduct allegations are implausible, requiring dismissal of the Complaint in its entirety. *See* Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint ("MTD") [Dkt. No. 126]. In addition, they argue that the Complaint suffers from other deficiencies that independently warrant dismissal, including lack of Article III and statutory standing and failure to sufficiently plead the required elements of each claim.

## I.   IMPLAUSIBILITY

Defendants argue that plaintiffs' entire lawsuit rises and falls with allegations, made only on "information and belief," that one defendant executed trades on other cryptocurrency platforms as part of an intricate market manipulation conspiracy on the exact dates that plaintiffs suffered their losses. MTD 7–10. Those purported trades form plaintiffs' sole basis for alleging that defendants caused their injuries—a required element to establish Article III standing and a required element for each of plaintiffs' causes of action, including RICO, CEA, negligence, fraud, and conversion.

Plaintiffs concede that their entire lawsuit depends on the viability of their allegations regarding the purported trading activity by individual defendant Reed. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Complaint ("Oppo.") [Dkt. No. 129] 4. They also acknowledge that all of these allegations are made on "information and belief." But they argue

United States District Court
Northern District of California

that the allegations are sufficient because (i) the information regarding whether defendants traded to plaintiffs' detriment is peculiarly within the possession and control of the defendants and (ii) plaintiffs have pleaded other facts making those allegations plausible. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

Even if, as plaintiffs argued at the hearing, the cryptocurrency market is uniquely opaque and may cater to greater levels of anonymity that make it harder to trace actions by price manipulators, they must allege more. What they have described is simply allegedly manipulative and fraudulent conduct that, on information and belief, defendants performed. But nothing is alleged that would allow me to "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Absent additional facts rendering plaintiffs' beliefs plausible, the allegations fail under Rule 8, let alone under Rule 9(b). *See Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-CV-00933-MMC, 2020 WL 1877707, at *4 n.10 (N.D. Cal. Apr. 15, 2020) ("Although the Court, in evaluating allegations made on information and belief, may consider whether 'facts are peculiarly within the possession and control of the defendant,' such latitude 'does not mean that conclusory allegations are permitted.'") (quoting *Menzel v. Scholastic, Inc.*, No. 17-CV-05499-EMC, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018)).

Defendants contend that the information is far from being "peculiarly within the possession or control" of defendants; the vast majority of information is publicly available and plaintiffs should be able to get information about the alleged "large trade order" made on Kraken or Bitstamp from those third-party exchanges. Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Consolidated Complaint ("Reply") [Dkt. No. 130] 4; *see Del Castillo v. Comm. Child Care Council of Santa Clary Cnty., Inc.*, No. 17-cv-07243, 2019 WL 6841222, at *7 (N.D. Cal. Dec. 16, 2019) ("information and belief" allegations regarding "unreasonable compensation (e.g., market rates for comparable services)" not "peculiarly within the possession and control" of defendants when "Plaintiffs could have accessed such public information and alleged relevant facts accordingly").

Plaintiffs respond that information available from Kraken and BitStamp does not include

the identity of the traders who executed each trade.  Plaintiffs' Objection To Defendants' Evidence In Reply Brief On Motion To Dismiss Consolidated Complaint [Dkt. No. 133] 1.  It only includes the exact date/time of each trade, the price at which each trade occurred, and the amount of volume that was traded.  *Id.*  Because the identity of the trader who executed each trade is missing from the publicly accessible information, they contend that "it is impossible to determine if a single market manipulator executed a large number of SELL orders to influence the .BXBT index or if the same large number of SELL orders were executed by a large number of separate bona fide traders."  *Id.*

Regardless of whether Kraken and Bitstamp offer trader identity information, the time and sales data to which defendants refer is not, as plaintiffs argue, "absolutely useless".  It could be part of the "something more" they need for their information and belief allegations.  What they allege now is rank speculation.

Plaintiffs contend that they have already put forth "50 specific factual information items" in the Complaint that "provide a clear and overwhelming basis" for their information and belief pleadings.  Oppo. 6–12.  Relatedly, they contend that their claims are "plausible because Defendants and only Defendants possessed [the] means, motive, and opportunity to manipulate the .BXBT index of BitMEX and cause Plaintiffs' Damages."  Oppo. 15–18.  Both arguments fail.

Much of plaintiffs' purported "factual information" consists of allegations regarding defendants' and defendants' lawyers' purported conduct in other lawsuits.   They fail to explain how defendants' purported "bad acts" elsewhere serve as a basis for believing that defendants committed the market manipulation scheme alleged in this case.  To the extent that plaintiffs point to any allegations touching upon market manipulation, those allegations are themselves conclusory or made on "information and belief" and do not provide any basis for plaintiffs' contention that defendants executed market-moving trades on the specific dates coinciding with their losses.

For example, defendants point to the following assertions from plaintiffs' chart in their opposition brief:

- "Half of BitMEX revenues comes from liquidations of retail traders like Plaintiffs"

11

(No. 2);

- "Manipulating using .BXBT index generates 8000% return on investment for BitMEX" (No. 5);

- "Defendants completely deleted manipulator accounts with all trading and identity records under the false pretense of the 'right to be forgotten'" (No. 14);

- "Defendants deleted evidence of a manipulator account with over $120,000,000 profit just 1 hour after it popped up soon after a market manipulation event" (No. 22);

- "BitMEX leaderboard lists trading accounts with multimillion-dollar profit spikes perfect matching market manipulator events" (No. 23).

Oppo. 6–8. The paragraphs from the Complaint cited in support of each of those statements are wholly conclusory accusing defendants of violating federal statutes (Compl. ¶¶ 12, 275), duplicative of their implausible "means, motives, and opportunity" allegations addressed below (*Id.* ¶ 228), or themselves proffered on information and belief (*Id.* ¶¶ 11, 236, 286, 385–90).[4]

Plaintiffs' alleged price manipulation scheme is not made more plausible by allegations that only defendants possessed the means, motive, and opportunity to manipulate the .BXBT index of BitMEX. They contend that "[n]o other persons except for Defendants are able to open such large positions on BitMEX in order to make market manipulation profitable" and that defendants "had the *highest* financial incentive to manipulate the .BXBT index." Oppo. 16–17. Plaintiffs in *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213 RPP, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012) made a similar argument, asking the court to "infer that [b]ecause JPMorgan held such a large dominant short position, it is difficult to imagine anyone else, working alone, who had the ability to cause such large declines in prices which,

---

[4] Some of online articles attached to plaintiffs' Complaint similarly accuse BitMEX of executing large sell orders that cause the bitcoin price to drop and lead to mass liquidations. *See, e.g.*, Compl., Ex. 2 (July 19, 2019 article titled "Blatant Market Manipulation Highlights the Need for Provably Fair Exchanges" on hackernoon.com, alleging that "[l]ast Sunday 14th July, someone placed a sell order on Bitstamp for 15,000 ETH causing the price to plummet from $270 to $190 and leading to a flash crash on the exchange," and accusing BitMEX for propagating the conduct because it makes the platform "a lot of money out of liquidating its traders"). While this shows that there may be others who share in plaintiffs' theory, it does not sufficiently explain the basis for that theory.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  clearly, benefitted JPMorgan at least three times more than it benefitted any other trader."  The

2  court declined to make such an inference because "the 'imagination' required to link these

3  conditions, without corroborating factual allegations as to trades, sworn affidavits, or other

4  evidence is tantamount to impermissible speculation on the basis of sheer possibility."  *Id.*  I have

5  the same problem here because plaintiffs fail to offer sufficient factual allegations that would

6  move their allegations from speculative to plausible.

7       Plaintiffs contend that the price manipulation techniques alleged in this lawsuit are

8  "identical" to the illegal stock price manipulation techniques alleged by the Securities and

9  Exchange Commission ("SEC") in *SEC v. Shuang Chen et. al.*, No. 1:19-cv-12127-WGY (D.

10  Mass.).  Compl. ¶ 163.  The SEC alleged a lot more in that case, including twelve detailed and

11  specific examples of who executed trades, how large the sell orders were, when the orders were

12  executed and for how much, and how those purported trades impacted the price index.  *See*

13  Complaint, *Shuang Chen et. al.*, No. 1:19-cv-12127-WGY (D. Mass. Oct. 15, 2019), Dkt. No. 1 at

14  ¶¶ 49–61 (available at https://www.sec.gov/litigation/complaints/2019/comp24648.pdf).[5]

15       Plaintiffs' argument that they are incapable to allege with a similar level of specificity as

16  other price manipulation lawsuits is undermined in light of some the details they are able to

17  provide about trades executed by unidentified "perpetrators."[6]  For example, they allege that on

18  May 17, 2019 "one or more perpetrators launched a trading software algorithm configured to sell

19  about 3600 bitcoin, valued at the time at about $28 million on a United States based bitcoin spot

20

21  [5] Plaintiffs also compare their allegations in this case to the information and belief allegations I
  allowed in in *Planner5D v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020 WL 426073, at *13

22  (N.D. Cal. Jul. 24, 2020) and *J.C. v. Choice Hotels International, Inc.*, 20-CV-00155-WHO, at 9
  (N.D. Cal. Oct. 28, 2020).  *Planner 5D* and *J.C.* are very different cases than the one at hand.  Nor

23  do they stand for the proposition that a plaintiff can predicate his entire lawsuit on information and
  belief allegations absent facts making those allegations plausible.  Unlike *Planner 5D* and *J.C.*,

24  where a single element was alleged based on "information and belief," the entire market
  manipulation scheme underlying all of plaintiffs' causes of action is made on information and

25  belief.

26  [6] Plaintiffs contend that they were referring to defendants when using the term "perpetrator" in the
  Complaint.  Oppo. 19.  As defendants argue, the contention appears disingenuous given that the

27  Complaint alleges that on May 17, 2019 "one or more perpetrators" executed a trade valued at $28
  million on *Bitstamp* that led to liquidations of "long positions on the BitMEX derivatives

28  exchange," while alleging that BMA's bitcoin loss on that same day was caused by defendant
  Reed trading on *Kraken*, a different exchange.  *Compare* Compl. ¶¶ 230–31, *with* ¶ 254.

exchange BitStamp." Compl. ¶ 230.  That trade allegedly caused the "bitcoin price on Bitstamp" to drop "from $7,838 all the way down to $6,178," which in turn "led to a liquidation of $250 million (about 10x times the size of the BitStamp sell order) long positions on the BitMEX derivatives exchange." *Id.* ¶¶ 230–31.  Likewise, they allege that on July 14, 2019, a "perpetrator or group of perpetrators collectively acted to crash the market by putting in a massive sell order of 15,000 ETH, valued [at] $4 million, on BitStamp," causing a temporary decrease in the value of ETH "from $270 to $190" and resulting in the liquidation of derivatives.  *Id.* ¶¶ 232–33.

By contrast, plaintiffs provide little to no information regarding the value of defendants' purported trades that caused them harm and the effect those alleged trades had on the market price for the various cryptocurrencies, and correspondingly for derivatives held by plaintiffs, details that would help make their alleged price manipulation scheme plausible.  *See id.* ¶ 254 (chart prepared on "information and belief" and vaguely alleging "large" trades on third-party exchanges that "triggered liquidation of Plaintiff's … position" on BitMEX or Kraken); *see, e.g.*, *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *17 (rejecting theory that "JPMorgan caused artificial prices by making large uneconomic trades on June 26, 2007, August 14–15, 2008, and at other times during the Class Period" because "without more specific factual allegations as to the amounts and to the timing of certain trades, Plaintiffs' claim that JPMorgan submitted an unknown number of 'sell orders' when silver prices were high and an unknown number of 'purchase orders' when prices fell . . . indicates no more than normal, rational market participation by JPMorgan").

In sum, the Complaint "merely pleads facts that might be 'consistent with' [d]efendants' liability and 'stops short of the line between possibility and plausibility of entitlement to relief.'" *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *18 (quoting *Iqbal*, 556 U.S. at 678)   I recognize that plaintiffs may not know all the facts surrounding defendants' alleged market manipulation scheme.  But pointing to other bad acts, untethered to the alleged market manipulation theory at hand, does not help the plausibility of their claims.  If those other bad acts are somehow tied to the alleged market manipulation theory, then plaintiffs must explain how.  Simply pointing to possible motive, means, and opportunity, without more, is not

United States District Court
Northern District of California

enough to cross the plausibility line.  As it stands now, most if not all of the allegations that refer to plaintiffs' alleged market manipulation theory are pleaded on information and belief, with no explanation of the basis for such beliefs or of facts that would make their allegations plausible.

Defendants' motion to dismiss on implausibility grounds is GRANTED.

## II.   ARTICLE III STANDING

To possess Article III standing, plaintiffs must demonstrate three elements: (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  An injury in fact must be "concrete and particularized" and "actual or imminent" as opposed to "conjectural or hypothetical."  *Id.* (internal quotation marks and citation omitted).  To show a causal connection, the injury must be "fairly traceable" to the challenged conduct of the defendant and "not the result of independent action of some third party not before the court."  *Id.*

Assuming that plaintiffs properly allege facts suggesting that Reed traded on a different cryptocurrency exchange on the precise dates that plaintiffs suffered losses, defendants argue that nothing in the Complaint makes it plausible that those trades, as opposed to any other market factor or third-party trades, caused plaintiffs' losses.  MTD 11–15.  The Complaint recognizes that cryptocurrency markets are inherently volatile and that the "novel market structure" present in the cryptocurrency derivatives space makes that marketplace particularly volatile, and thus "particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms of market manipulation."  Compl. ¶ 152.  Because those manipulative techniques could have been utilized by anyone, including the unidentified "preparators" mentioned in the Complaint, defendants argue that the claim that they caused plaintiffs' losses is implausible.  MTD 14.

Even if plaintiffs were referring to defendants when using the term "perpetrators," *see supra* n.6, they do not plausibly explain why they think that *defendants* were the perpetrators.  *See, e.g.*, Compl. ¶ 237 (conclusorily alleging that "Plaintiffs are informed and believe and thereon allege that BitMEX's internal trading desk is the second major financial benefactor of the

United States District Court
Northern District of California

United States District Court
Northern District of California

catastrophic market manipulation events, such as May 17, 2019 and July 14, 2019 events, alleged hereinabove, which were in fact perpetrated by Defendants Hayes, Delo and Reed in order to achieve financial gain for themselves").  Without factual allegations that plaintiffs' claimed losses are "fairly traceable" to *defendants'* alleged conduct, as opposed to acts by third parties or inherent market forces, Article III standing is insufficiently pleaded.

Defendants separately argue that plaintiff BMA lacks standing for the additional reason that it has not plausibly suffered an "injury in fact."  MTD 15.  Defendants contend that BMA fails to identify the accounts under which it purportedly traded or any information that would allow defendants to identify such accounts.   Instead, the Complaint only contains a conclusory allegation that "BMA is co-owned by multiple individual cryptocurrency traders and it holds the title to, and ownership in, any and all claims, causes of action and demands" possessed by those unidentified traders. Comp. ¶ 24.  Because it is unclear whether BMA is seeking to vindicate its *own* rights, instead of those of its members, defendants argue that BMA has failed to establish Article III standing.

Instead of pointing to allegations in the Complaint that purportedly show BMA's Article III standing, plaintiffs simply assert that their counsel has on "numerous occasions" offered to provide information about all cryptocurrency trader members of BMA to defense counsel. Declaration of Pavel Pogodin in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Complaint ("Pogodin Decl.") [Dkt. No. 129-1] ¶ 2.  In the email exchange attached to his declaration, plaintiffs' counsel only offered to "exchange the names of BMA members for the names of HDR and ABS shareholders," which defense counsel refused.  *Id.,* Ex. 1.  It is, of course, BMA's burden to demonstrate standing to bring this suit.  An "offer" to exchange information does not relieve BMA of its burden.

Defendants' motion to dismiss for lack of Article III standing is GRANTED.

## III.   STATUTORY STANDING

Not only are plaintiffs' allegations insufficient to establish causation for Article III purposes, defendant argue that the allegations (or lack thereof) are plainly insufficient to satisfy proximate causation under the heightened RICO standard and the plausibility requirements for

"actual damages" required under the CEA.  MTD 17–19; *see In re JUUL Labs, Inc., Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2020 WL 6271173, at *38 (N.D. Cal. Oct. 23, 2020) (citing *Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1248–49 (9th Cir. 2019)) (RICO); *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018) (CEA).

"To have standing under [section] 1964(c), a civil RICO plaintiff must show (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  Plaintiffs' RICO theory is based on the same allegations discussed above – *i.e.*, Reed executed trades on other cryptocurrency exchanges which plaintiffs claim impacted the price of cryptocurrency derivatives owned by plaintiffs on BitMEX or Kraken that were ultimately liquidated.  They fail to allege plausible facts establishing that their supposed bitcoin losses are directly related to RICO violations allegedly committed by any defendant.

Plaintiffs cite *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 718 (S.D.N.Y. 2013), *vacated and remanded on other grounds Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) in support of their standing under the CEA.  Oppo. 21. There, the court found that the "showing plaintiffs must make to demonstrate actual damages . . . depends on the type of manipulation involved."  *Id.* at 717.  Because the plaintiffs alleged a "persistent suppression theory" of manipulation, the court "did not require plaintiffs to allege the specific days on which they traded because LIBOR, and consequently Eurodollar futures prices, was allegedly artificial throughout the Class Period."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013).  However, when the *LIBOR* plaintiffs alleged "trader-based" "episodic" manipulation in their amended complaint— meaning prices were only "artificial for certain discrete days"—the court required more detailed allegations to make a plausible showing of actual damages based on alleged manipulation.  *Id.* at 620–22.

Plaintiffs argue that their allegations fit under the "persistent suppression theory," with a

17

relaxed actual damages requirement, because they allege that defendants' market manipulation scheme was executed "on a daily basis." Oppo. 22. Based on the *LIBOR* court's description of "persistent suppression theory" versus "trader-based manipulation theory," plaintiffs' allegations are more like the latter than the former because they describe a "category of isolated (though repeated) manipulative activity." *LIBOR II*, 962 F. Supp. 2d at 622. As such, plaintiffs must sufficiently allege "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct, and that the artificiality was adverse to their position." *Id.* Plaintiffs fail to do that. As discussed above, the overarching problem is that allegations about defendants' trader-based manipulative conduct are made almost exclusively on "information and belief" without explanation of the basis for such beliefs or facts that would make their allegations plausible.

Defendants' motion to dismiss for lack of statutory standing is GRANTED.

## IV.   FEDERAL CLAIMS

### A.   RICO

To prevail on their section 1962(c) claim, "[p]laintiffs must plausibly allege that each defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). To proceed on their section 1962(d) claim, plaintiffs must plausibly allege a substantive violation of RICO (under section 1962(c)), and that each defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015).

Rule 9(b) applies to the fraudulent conduct relevant to both the common purpose of the enterprise and the underlying predicate acts, and requires a heightened showing of the circumstance of fraudulent acts, including "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distribg. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Rule 9(b) "does not allow a complaint to merely lump multiple defendants together" but requires plaintiffs

18

to "differentiate" their allegations to "inform" each defendant separately of the allegations particular to that defendant's alleged participation in the fraud. *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'" *Id.* (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

### 1.    Enterprise

To show the existence of an enterprise under the second element, plaintiffs must plead that the enterprise has (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose. *Eclectic Propertie*s, 751 F.3d at 997. "Identification of a string of individuals . . . is not sufficient to plead an enterprise." *Opong-Mensah v. Stracener*, No. C-01-0958 VRW, 2001 WL 311239, at *1 (N.D. Cal. Mar. 22, 2001)

Plaintiffs allege that all defendants comprised an "enterprise" with the common purpose of "concealing trading gains obtained through unlawful practices from regulatory and tax authorities." Compl. ¶ 261. Defendants argue that plaintiffs' inclusion of the Reed Family Members, Grape Park LLC, Mark Sweep LLC, and "Unknown Exchange" in the purported enterprise confirms that there is no enterprise at all, as nothing in the Complaint suggests those defendants shared a "common purpose" with the other RICO Defendants. MTD 20. If those defendants are removed from the enterprise, all that would be left is a "corporation carrying out its own activities (even fraudulent ones) only through its agents and employees"—the precise circumstance that does not constitute a RICO enterprise. *In re JUUL Labs*, 2020 WL 6271173, at *24 (quoting *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2016 WL 3920353, at *12 (S.D.N.Y. Jul. 15, 2016)).

The barebone allegations plaintiffs purport against the Reed Family Members, Grape Park LLC, Mark Sweep LLC, and "Unknown Exchange" are not enough to sustain a RICO enterprise. In paragraph 380 of the Complaint, which includes a chart "prepared according to information and belief," plaintiffs allege that Grape Park LLC and Mark Sweep LLC were alter egos of individual defendant Reed "used by the Enterprise to conceal or disguise the true source[s] of funds used for

19

acquiring the real estate properties and their true ownership and control," whereas the Reed Family Members allegedly "gave directions to other members" and "occupied a … position in the 'chain of command' through which the affairs of the Enterprise are conducted."  Compl. ¶ 380. Plaintiffs plead no facts in support of those assertions.  All they can muster against the Reed Family Members is that they "are in possession of two real estate properties … with the aggregate market value of over $2,500,000," which plaintiffs speculate were "acquired using funds deceitfully misappropriated from Plaintiffs through market manipulation."  Compl. ¶¶ 20, 577, 594.  That is not enough to establish a "common purpose."

Without plausible allegations about the Reed Family Members, Grape Park LLC, Mark Sweep LLC, and "Unknown Exchange" and their purported role in the enterprise, the only other defendants are the corporate owners and officers of BitMEX, an entity that is not "distinct" from the alleged enterprise.  As a result, plaintiffs have not plausibly alleged the existence of a distinct enterprise, separate and apart from the general business of BitMEX.

### 2.    Predicate Acts

"[R]acketeering activity" is any act indictable under several provisions of Title 18 of the United States Code; it includes the predicate acts of mail fraud, wire fraud and obstruction of justice, each of which is alleged in this case.  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing 18 U.S.C. § 1961(1)).  The only acts that plaintiffs allege caused their losses are the trades accomplished by "wire communications" executed on other cryptocurrency exchanges.  *See* Compl. ¶¶ 254, 382, 407–15.  Plaintiffs assert that they are "informed and believe" that these trades were made "for the specific purpose of misleading traders and investors as to the cryptocurrency market's natural forces of supply and demand for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives," and therefore "constitute wire fraud in violation of 18 U.S.C. § 1343"—a predicate act under RICO.  Compl. ¶ 382

In addition to the plausibility and specificity problems addressed above, defendants argue that plaintiffs' RICO allegations are insufficient to make out a prima facie wire fraud claim because they fail to allege that those trades contained any misrepresentations or false statements.  MTD 25; *see In re JUUL*, 2020 WL 6271173, at *19 ("The 'scheme to defraud' element" of wire

United States District Court
Northern District of California

United States District Court
Northern District of California

1    fraud "requires 'an affirmative, material misrepresentation.'") (quoting *United States v. Green*,

2    592 F.3d 1057, 1064 (9th Cir. 2010)).  Plaintiffs repeatedly assert that they are "informed and

3    believe" that by making trades on other exchanges, Reed "inject[ed] false information as to market

4    forces of supply and demand into cryptocurrency markets."  Compl. ¶¶ 336, 339, 342, 375, 382.

5    But plaintiffs never identify what this false information is or "why it is false."  *Vess*, 317 F.3d at

6    1106.  In their opposition, plaintiffs simply reiterate the alleged market manipulation theory that

7    is, again, insufficiently alleged on information and belief.  Oppo. 31–32.

8         Plaintiffs contend that even if their wire fraud claim fails, they have alleged other "RICO

9    predicate offenses," which include besides wire fraud, violations of 18 U.S.C. § 1956(a) (money

10   laundering); 18 U.S.C. § 1957(a) (transactions in property derived from unlawful activity); 18

11   U.S.C. § 1960(a) (unlicensed money transmissions); 18 U.S.C. § 2314 (interstate transportation of

12   stolen property) and 18 U.S.C. § 1952 (transportation in aid of RICO enterprise).  Oppo. 33–34.

13   But as plaintiffs concede, these "other RICO predicate offenses" are based on the "same specific

14   acts" as their wire fraud claims, all of which are insufficiently alleged.  *Id.* at 33.

15        Defendants' motion to dismiss the RICO claims in Counts 1 and 2 is GRANTED.

16   **B.    CEA**

17        **1.    Prima Facie Market Manipulation**

18        The CEA prohibits "manipulation of the price of any commodity or commodity future."  *In*

19   *re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citation omitted).

20   Section 6(c)(1) of the CEA (Count 3), provides that "[i]t shall be unlawful for any person, directly

21   or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a

22   contract of sale of any commodity in interstate commerce, or for future delivery on or subject to

23   the rules of any registered entity, any manipulative or deceptive device or contrivance." 7 U.S.C. §

24   9(1).  Section 6(c)(3) of the CEA (Count 4) prohibits the manipulation or attempted manipulation

25   "of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to

26   the rules of any registered entity." 7 U.S.C. § 9(3).  Defendants argue that plaintiffs fail to allege

27   "manipulation" of any transactions covered by these provisions.  MTD 27.

28        While the CEA itself does not define the term, a court will find manipulation where "(1)

Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citation omitted). Plaintiffs claim that their market manipulation allegations are entitled to a "relaxed" Rule 9(b) standard and that the Complaint "easily meets this relaxed Rule 9(b) standard" because it "clearly alleges that Defendant Reed executed specific large market SELL orders on the Kraken exchange, with maximum slippage, on a daily basis, including the specific exemplary dates alleged … causing liquidations of Plaintiffs' long XBTUSD swap positions on BitMEX." Oppo. 23 (citing *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007)).

It is unclear whether the "relaxed" Rule 9(b) standard discussed in *ATSI*, a securities manipulation case, "extend[s] . . . to the commodities context." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 181. I need not reach that issue given that the Complaint "fails to state a claim against [defendants] even under the more relaxed standard of Rule 8(a)(2)." *Id.*; *see ATSI*, 493 F.3d at 102–04 ("[G]eneral allegations not tied to the defendants or resting upon speculation are insufficient"; "The inference ATSI asks us to draw is too speculative even on a motion to dismiss. [citation omitted]. Nowhere does ATSI particularly allege what the defendants did—beyond simply mentioning common types of manipulative activity—or state how this activity affected the market in ATSI's stock.").

Moreover, the CEA requires that plaintiffs allege "facts that 'give rise to a strong inference of scienter.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 668 (S.D.N.Y. 2016) (quotation omitted). That means the allegations must "give rise to an inference of scienter *at least as strong as any competing inference*." *In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (emphasis added). As discussed above, the conclusory allegations plaintiffs offer for specific intent are not at least as strong as competing inferences that their losses were caused by natural market forces or manipulation by third parties. They must offer more to support allegations that defendants caused the artificial prices and specifically intended to cause the artificial prices.

Plaintiffs do not allege a viable market manipulation claim under the CEA. Their attendant

United States District Court
Northern District of California

claim for principal-agent liability also fails.  *See Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018) (principal-agent liability claims viable only where an underlying primary violation of the CEA can survive a motion to dismiss) (citing cases)

Defendants' motion to dismiss Counts 3, 4 and 5 under the CEA is GRANTED.

### 2.    Aiding and Abetting

In addition to their direct market manipulation claims, plaintiffs also assert a claim (Count 6) against certain defendants for aiding and abetting market manipulation perpetrated by a third party.  To plead an aiding and abetting claim, plaintiffs must allege that defendants "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004).

Plaintiffs allege that on March 13, 2020, a BitMEX user named Quick-Grove-Mind "cause[d] large market price swings" and that defendants "aided and abetted" those market swings by making available "extremely high trading leverage (up to 100x)."  Compl. ¶¶ 508–09.  This allowed Quick-Grove-Mind to "avoid detection by providing him with the ability to open unlimited number of anonymous document check-free trading accounts," and resulted in "taking BitMEX platform offline during market manipulation event on March 13, 2020."  *Id.*

As an initial matter, defendants argue that the aiding and abetting claim should be dismissed for lack of standing as the only plaintiff alleged to have sustained a loss on March 13, 2020 is BMA, Compl. ¶¶ 254, 509.  Plaintiffs have not adequately pleaded BMA's standing as it is unclear whether it is seeking to vindicate its own rights as opposed to the rights of its members. *See supra* section II.

Defendants further argue that the Complaint fails to allege any facts to support that Quick-Grove-Mind engaged in market manipulation or that defendants aided and abetted any market manipulation by Quick-Grove-Mind.  MTD 29.  I agree.  Plaintiffs insist that Quick-Grove-Mind's large profits demonstrate that the trader was engaging in market manipulation because it is unlikely that a user could successfully predict bitcoin market moves.  Oppo. 28.  They fail to offer anything concrete to back up that theory.  They also point out that Quick-Grove-Mind is listed on

23

United States District Court
Northern District of California

1   the Leaderboard as the second highest ranked trader and generated a profit of 8047.82 bitcoins

2   (currently valued at $329,960,620), which "makes it plausible that Defendants knew the trader

3   personally and also knew of the user's manipulation activities." *Id.* (citing Compl. ¶¶ 11, 116,

4   509). Even if its plausible that defendants would generally know the BitMEX users that end up on

5   their Leaderboard, plaintiffs fail to explain why it would be plausible for defendants to also know

6   *how* particular users earned their Leaderboard status and *what* defendants did to aid and abet in

7   that venture. Without more, these allegations cannot sustain an aiding and abetting violation

8   under the CEA.

9       Defendants' motion to dismiss the CEA aiding and abetting claim (Count 6) is

10  GRANTED.

11  **V.   STATE LAW CLAIMS**

12      Plaintiffs assert a variety of claims under California state law. *See* Compl. ¶¶ 512–618.

13  Their opposition brief fails to respond to many of defendants' arguments on these claims,

14  improperly stating that they "oppose all the remaining Defendants' arguments" and "reserve the

15  right to cite any appropriate supporting authority during the oral argument on the MTD." Oppo.

16  36 n.12. The few responses they offer, discussed below, are inadequate.

17      **A.   Negligence**

18      Under California law, "[t]he determination whether in a specific case the defendant will be

19  held liable to a third person not in privity is a matter of policy and involves the balancing of

20  various factors," including: "[1] the extent to which the transaction was intended to affect the

21  plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered

22  injury, [4] the closeness of the connection between the defendant's conduct and the injury

23  suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing

24  future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

25      Plaintiffs allege that defendants enticed them to trade on their platform by advertising the

26  BitMEX Perpetual Swap contract as "the most traded cryptocurrency product of all time." Compl.

27  ¶¶ 245, 515. Therefore, they contend, defendants owed them a duty to maintain a functional

28  cryptocurrency marketplace and prevent economic harm to them. *Id.* ¶ 515. Defendants allegedly

24

breached that duty through the "unlawful market manipulation" described above and by the "fake distributed denial-of-service attack (DDoS attack), which took place on or about March 13, 2020," when defendants took the BitMEX platform offline. *Id.* ¶¶ 339, 519, 525. Alternatively, even if defendants did not deliberately take the platform offline, plaintiffs allege, on information and belief, that defendants "failed to utilize widely available industry solutions, including, without limitation, CloudFlare, AWS Shield and AWS Shield Advanced to prevent the DDoS Attacks, including the DDoS Attack that allegedly took place on or about March 13, 2020." *Id.* ¶ 526. Because defendants breached their legal duty to maintain a functional cryptocurrency market, plaintiffs allege that all five of them "sustained certain and concrete monetary cryptocurrency trading losses in the amount to be proven at trial." *Id.* ¶ 528.

To the extent that plaintiffs' negligence claim is based on the insufficiently alleged "unlawful market manipulation," the claim fails for the reasons I have already described. In addition, defendants argue that plaintiffs have failed to establish causation or adequately plead the existence of a "special relationship" giving rise to a duty of care. MTD 30.

Plaintiffs disagree, citing *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) in support of their negligence claim. Oppo. 35. The court in *In re Facebook* concluded that the defendant exchange platform had a duty of care under New York law when it "was aware of, promoted, and profited from the widespread public interest in the Facebook IPO and accepted the trade orders for processing and execution," but failed to properly process those particular IPO trade orders it enticed traders to make. 986 F. Supp. 2d at 460–61. In relevant part, the court found that "[w]hen initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market," and that "[t]his created a 'relationship so close as to approach that of privity.'" *Id.* at 461 (citation omitted).

*In re Facebook* does not help plaintiffs. It does not address how plaintiffs' negligence claims survive under California law, let alone explain how plaintiffs have shown a special relationship existed between them and defendants outside the IPO context. Plaintiffs fail to allege any facts supporting the conclusion that privity, or the functional equivalent of privity, existed

between them and defendants such that there was a special relationship that would give rise to a duty of care.

Although not directly argued in their opposition brief, plaintiffs cite another case, *Berk v. Coinbase, Inc.*, No. 18-cv-01364, 2019 WL 3561926 (N.D. Cal. Aug. 6, 2019), in their Complaint. *See* Compl. ¶ 515.  A plaintiff who attempted to purchase a cryptocurrency (Bitcoin Cash) directly on an exchange operated by defendant Coinbase sued that exchange for negligence when the price represented differed from the actual market price.  "Although California courts have not decided whether the exchange-trader relationship satisfies the *Biakanja* test," the court found that "the best interpretation of California law – and the interpretation that the California Supreme Court would be most likely to adopt – is that Coinbase indeed had a duty to maintain a functional marketplace." *Id.* at *2.  The court denied dismissal of plaintiffs' negligence claim in light of the allegations that: (i) "Coinbase encouraged traders to enter the market following its launch of trading in Bitcoin Cash, so Coinbase's actions were aimed at the traders as a class"; (ii) "the negligent launch of a digital currency foreseeably impacts those who trade in the resulting dysfunctional market"; and (iii) the plaintiff's "injury is directly tied to the allegedly negligent launch." *Id.*  The court also denied Coinbase's motion to compel arbitration, finding the dispute did not arise under the User Agreement between Coinbase and the plaintiffs.  *Id.* at *1.

*Berk* does not support plaintiffs' position.  Unlike *Berk*, which centered on the negligent launch of a digital currency, plaintiffs fail to plausibly allege that defendants enticed them to trade any specific products on BitMEX or take the specific leveraged positions that were ultimately liquidated.  The conclusory allegation that they were "enticed to trade on BitMEX due to Defendants' own predatory advertising tactics," Compl. ¶ 515, offers none of the detail that was essential to the holding in *Berk*.

The Ninth Circuit's recent reversal of *Berk* also undermines plaintiffs' position.  Coinbase appealed the district court's order denying its motion to compel arbitration on grounds that surviving negligence claim is subject to mandatory arbitration pursuant to the arbitration clause contained in Coinbase's User Agreement.  The Ninth Circuit agreed, finding that the surviving negligence claim "arises under" the User Agreement. *Berk v. Coinbase, Inc.*, No. 19-16594, 2020

26

WL 7658357, at *1 (9th Cir. Dec. 23, 2020).  Notably, the Ninth Circuit disagreed with the plaintiffs' contention that their claim sounds in tort under California law because Coinbase owed an independent duty of care to ensure a functioning marketplace for Bitcoin Cash pursuant to *Biakanja*.  *Id.* at *2.  It found that "[a]s a general rule, California law provides 'a business entity has no duty to prevent financial loss to others with whom it deals directly.'"  *Id.* (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26 (1998)).  "Quite unlike the parties in *Biakanja*," "Coinbase and the plaintiffs are not strangers—they are in privity via the User Agreement," and because "[p]laintiffs' alleged injuries resulted from their direct, arms-length dealings with Coinbase," the Ninth Circuit was "persuaded that the California Supreme Court *would not* extend a special duty of care between Coinbase and plaintiffs."  *Id.* (emphasis added).

Because plaintiffs fail to establish causation or adequately plead the existence of a "special relationship" giving rise to an actionable duty of care under the circumstances, defendants' motion to dismiss the negligence claim (Count 7) is GRANTED.

### B.     Fraud

Under California law, the "indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages."  *Vess*, 317 F.3d at1105.  To adequately allege a claim sounding in fraud under Rule 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged."  *Id.* at 1106 (internal quotation marks omitted).

As discussed above, the Complaint fails to allege plausible facts with respect to defendants' false representation and intent to defraud, particularly when the allegations are held up against Rule 9(b)'s more stringent standards.  The Complaint also fails to specifically allege plaintiffs' "justifiable reliance" on a misrepresentation by defendants.  Plaintiffs contend that defendants' alleged injection of false market information constituted "conduct that is designed to mislead," upon which plaintiffs relied.  Oppo. 35.  To the extent that plaintiffs rely on a "fraud on the market" theory of reliance, that theory has been rejected by the California Supreme Court.  *See In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995) (California Supreme Court

United States District Court
Northern District of California

rejected the "fraud on the market" theory in *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1108 (1993), requiring instead "actual reliance on the alleged misrepresentations and omissions").

Defendants' motion to dismiss the fraud claim (Count 8) is GRANTED.

### C.   UCL Claim

California's UCL provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent.  Cal. Bus. & Prof. Code § 17200.  The unlawful prong of the UCL "borrows violations of other laws and treats them as unlawful practices, which the UCL then "makes independently actionable." *Cel–Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999).  To support their theory of liability under the UCL's unlawful prong, plaintiffs rely upon defendants' alleged fraud violation and violations of RICO, CEA, and various other statutes identified in their Complaint.  Compl. ¶¶ 560–70; Oppo. 34.  Because plaintiffs have failed to state a claim as to each of those underlying offenses, their UCL claim necessarily fails.

Defendants' motion to dismiss the UCL claim (Count 10) is GRANTED.

### D.   Remaining State Law Claims

Plaintiffs bring civil conspiracy, unjust enrichment, constructive trust and accounting claims on the theory that all defendants conspired among themselves to defraud traders by perpetrating a price manipulation scheme, and as a result of those unlawful actions, defendants have received a financial benefit at the expense of plaintiffs.  *See* Compl. ¶¶ 553, 573, 584, 589. These are the only claims that are asserted against the Reed Family Members, on grounds that they possess two real estate properties allegedly acquired using the misappropriated funds.  *See id.* ¶¶ 577, 584.  All of these claims are based on the implausible price manipulation allegations discussed above, and necessarily fail.  Nothing in plaintiffs' opposition brief convinces me to conclude otherwise.[7]

_____

[7] Defendants also argue that these claims are forms of equitable relief and not cognizable stand-alone claims.  MTD 34–35.  The Ninth Circuit has clarified the law regarding unjust enrichment in California, holding that while "there is not a standalone cause of action for unjust enrichment, which is synonymous with restitution . . . [w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Khasin v. R. C. Bigelow, Inc.*, No. 12-CV-02204-WHO, 2015 WL 4104868, at *2 (N.D. Cal. Jul. 7, 2015) (quoting *Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762 (9th Cir. 2015)).

United States District Court
Northern District of California

Plaintiffs' conversion claim, alleged against the five corporate defendants (HDR, ABS, Hayes, Delo and Reed), is based on the theory that they "are entitled to the possession of . . . their valuable bitcoin holdings deposited in [their] BitMEX and Kraken trading accounts," property which defendants took and "converted [] to their own use." Compl. ¶¶ 591–93. Allegations that defendants unlawfully dispossessed them of their property rely entirely on the fraud-based market manipulation allegations that plaintiffs have failed to plead with particularity.

Plaintiffs' claims for aiding and abetting fraud and conversion and violation of California Penal Code section 496 are alleged against the five corporate defendants (HDR, ABS, Hayes, Delo and Reed). Compl. ¶¶ 597, 604, 612.[8] These claims are predicated on defendants' purported facilitation of conversion and fraud by the third party, Quick-Grove-Mind. *Id.* ¶¶ 600, 608, 617. As explained above, plaintiffs do not adequately allege that Quick-Grove-Mind engaged in any improper conduct and that defendants aided and abetted the improper actions of that party. Plaintiff BMA also fails to plausibly allege that it has standing to sue for the bitcoin loss suffered by its members on the dates Quick-Grove-Mind purportedly traded. *See supra* sections II, IV.B.2.

Defendants' motion to dismiss the remaining state law claims (Counts 9, 11–17) is GRANTED.

## VI.   LEAVE TO AMEND

Defendants contend that the Consolidated Complaint represents at least the fifth iteration of BMA's complaint, and asserts the same theories regarding defendants' purported conduct as those of the other plaintiffs' complaints.[9] Because plaintiffs have had ample opportunity to state

---

[8] California Penal Code section 496(c) "permits victims of crimes defined in [section] 496(a)," including theft and extortion under certain circumstances, "to initiate a civil lawsuit to recover treble the amount of actual damages, costs, and reasonable attorneys' fees." *Allure Labs, Inc. v. Markushevska*, 606 B.R. 51, 57 (N.D. Cal. 2019).

[9] After BMA amended once as a matter of right and a second time with defendants' consent (adding plaintiffs Kolchin and Dubinin), defendants moved to dismiss the Second Amended Complaint. That motion was denied as moot when this case was consolidated with another lawsuit plaintiffs' counsel filed on October 14, 2020, *Dolgov v. HDR Global Trading Ltd.*, No. 20-cv-07140. Plaintiffs were ordered to file a consolidated complaint, adding claims made by plaintiff Dolgov. Before doing so, plaintiffs' counsel filed yet another lawsuit on November 13, 2020, *Gabriel-Razvan v. HDR Global Trading Ltd.*, No. 3:20-cv-08034. I granted the parties' stipulation to allow plaintiffs to file a consolidated complaint that also included claims made by plaintiff Razvan. The operative Consolidated Complaint includes claims by all five plaintiffs.

United States District Court
Northern District of California

their claims, they argue that the Complaint should be dismissed with prejudice.

Plaintiffs request leave to amend considering the "substantial additional information relevant to this case" received from a "former high-ranking employee of Defendant HDR." Pogodin Decl. ¶ 5; *see id.* ¶¶ 7–11 (describing additional information, including allegations that defendants used "burner" accounts for their internal trading desk on the BitMEX platform and frequently deleted those "burner" accounts).[10]  At the hearing, plaintiffs added that they can better explain the basis of their alleged price manipulation scheme and support it with reports from experts who would look at the data and say to a high degree of certainty as to what happened.

Given that this is the first dismissal order assessing plaintiffs' pleading and the possibility that they may be able to cure the deficiencies identified in this order, I will give them leave to amend to the extent that they have a good faith basis to do so.  In conjunction with the instructions provided above, plaintiffs must keep their focus on how defendants have harmed them and explain why their theory of price manipulation is plausible.  For allegations made on information and belief, they must allege with particularity all facts upon which their belief is based.  They cannot take a kitchen sink approach to pleading their claims.  Such complaints frustrate Rule 8's objective.  If plaintiffs wish to bring a particular claim, they must plead with particularity the elements of that claim and how the facts establish a violation of that specific statute or state law. They must allege facts that show what that defendant did and how that establishes elements of a claim.  For instance, if plaintiffs choose to replead claims against the Reed Family, they should only do so if they can, in good faith, allege more than the barebone allegations offered in the Complaint.

---

[10] I note that in the context of securities fraud cases, courts have required such confidential source allegations to be pleaded with more detail.  *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1052–53 (N.D. Cal. 2019) (A securities fraud complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the Private Securities Litigation Reform Act's pleading requirements: first, the confidential witnesses whose statements are introduced to establish scienter must be described "with sufficient particularity to establish their reliability and personal knowledge"; second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter").

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Defendants' motion to dismiss the Consolidated Complaint is GRANTED with leave to amend.  Plaintiffs' deadline to amend is STAYED until the Case Management Conference on April 6, 2021 at 2 p.m.  In their Joint Case Management Statement, due March 30, 2021, the parties shall address what kind of coordination is appropriate with the *Messieh* suit and whether this suit should be transferred to the Southern District of New York.

**IT IS SO ORDERED.**

Dated: March 12, 2021



William H. Orrick
United States District Judge