# EXHIBIT 18

| | |
|---|---|
| J. Noah Hagey, Esq. (SBN: 262331)<br>   hagey@braunhagey.com<br>Andrew Levine, Esq. (SBN: 278426)<br>   levine@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>351 California Street, Tenth Floor<br>San Francisco, CA 94104<br>Telephone: (415) 599-0210<br>Facsimile: (415) 599-0210<br><br>Douglas Curran, Esq. (*pro hac vice*)<br>   curran@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>7 Times Square, Twenty-Seventh Floor<br>New York, NY 10036<br>Telephone: (646) 829-9403<br>Facsimile: (646) 829-9403<br><br>ATTORNEYS FOR PLAINTIFFS<br>FRANK AMATO, RGB COIN LTD.,<br>and ELFIO GUIDO CAPONE on behalf<br>of the G AND M CAPONE TRUST | ELECTRONICALLY<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**10/23/2020**<br>**Clerk of the Court**<br>BY: YOLANDA TABO-RAMIREZ<br>Deputy Clerk |

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| FRANK AMATO, RGB COIN LTD.,<br>and ELFIO GUIDO CAPONE on behalf<br>of the G AND M CAPONE TRUST,<br><br>    Plaintiffs,<br><br>    v.<br><br>HDR GLOBAL TRADING LIMITED, d/b/a<br>BITMEX; ARTHUR HAYES; ABS<br>GLOBAL TRADING LIMITED; and DOES<br>1-10,<br><br>    Defendants. | Case No: CGC-19-581267<br><br>**DECLARATION OF ELFIO GUIDO CAPONE IN SUPPORT OF PLAINTIFFS'** ***EX PARTE*** **APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER**<br><br>**<u>Hearing</u>**<br>**Date:** Monday, October 26, 2020<br>**Time:** 9:15 a.m.<br>**Dept.:** 304<br>**Judge:** The Hon. Anne-Christine Massullo<br><br>**Complaint filed:** Dec. 4, 2019<br>**FAC filed:** April 27, 2020<br>**SAC filed:** August 18, 2020<br><br>**Trial Date:** None Set<br><br>**REDACTED** |

I, Elfio Guido Capone, declare:

1. I am a Plaintiff in the above-captioned matter.

2. I make this declaration based on personal knowledge. If called as a witness, I would and would testify competently to the facts stated herein.

3. I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies. As an "angel" investor, I have made capital contributions to several business start-ups over the years. An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial moments when most other financial institutions and institutional investors are unwilling to back nascent and underfunded businesses.

**A.     My Investment in BitMEX**

4. I became acquainted with Defendant Arthur Hayes ("Hayes") near the beginning of January 2015, when he connected with me on LinkedIn and arranged a Skype conversation. In connection with this conversation, he sent me an investor presentation to solicit my investment in BitMEX. The presentation stated that BitMEX was "seeking an equity funding round $1 million." Hayes himself also told me that BitMEX was finalizing a valuation in connection with its anticipated equity financing round "in the next couple of days."

5. Between January and March 2015, I exchanged further communications with Hayes, requesting additional information regarding his estimated return on investment rates and his projected trading volumes for the BitMEX platform. Hayes explained to me that he believed his trading volumes were conservative and with cryptocurrency investments becoming more and more mainstream, BitMEX trading volumes would "skyrocket." Based on Hayes's representations, I decided to invest in BitMEX. I inquired whether I was the first investor to commit to the fundraising round, and Hayes represented that he had commitments for another $150,000 to $200,000 from other investors and was engaging lawyers to draft the investment paperwork.

6.    In March 2015, Hayes reiterated that BitMEX was looking to sell equity shares with the same rights as the founders. He also assured me that I would be purchasing preference shares that would convert 1:1 to common equity held by the founders.

7.    On March 25, 2015, Hayes wrote to me to summarize our understanding of the terms of my investment. In particular, he explained that "[b]asically you own the same type and class of equity that [Hayes] and the other two founders have" and that if I agreed with the terms, "we will get the Share Purchase Agreement drawn up" pursuant to which I "will be buying 0.50% of the Seychelles entity [HDR] for $50,000."

8.    In April and May 2015, I waited for Hayes to provide me with an agreement pursuant to which I could purchase equity, but Hayes did not provide the "standard legal agreement drawn up by his lawyers" as he previously stated he would.

9.    On July 15, 2015, Hayes sent me a proposed Simple Agreement for Future Equity ("SAFE") instead of the Share Purchase Agreement we previously discussed. He represented it as a "safer" option that, according to him, would allow me to get my money back if the business were to fail, while receiving "all the upside if the business goes well." Hayes also represented again that BitMEX planned a financing round sometime in the second half of 2015, at which point my investment would convert to preferred shares.

10.    When Hayes sent me the SAFE, I explained that the agreement "was a bit legal" and requested a "common man's" explanation of the terms. Hayes explained that "Basically you are getting a 20% discount to the next round's financing, subject to a cap on ownership" and that BitMEX was "targeting a $9mm pre money valuation by end of November" 2015.

11.    On July 16, 2015, I executed the SAFE on behalf of the G and M Capone Trust. Shortly thereafter, I wired $25,000 to Hayes's personal bank account in Hong Kong. Hayes agreed that I could list myself as a "seed investor" in BitMEX on my LinkedIn page. My understanding today is that my investment and Frank Amato's investment were the first two outside investments that HDR received, and together we helped BitMEX pay its bills, purchase equipment, and pay for other costs that, at the time, were necessary to keep the company afloat.

12. Attached hereto as **Exhibit 1** is a true and correct copy of the SAFE that I executed with Defendant HDR on July 16, 2015.

13. As of today, Hayes and HDR have not issued a single share to me and, as I explain below, I have discovered in the course of this lawsuit that they have treated me and Frank Amato as if we had never invested anything.

### B. Repeated Inquiries About My Equity Rights

14. Between July 2015 and July 2019, I repeatedly asked Hayes about my equity rights under my SAFE because as time passed I began to read about BitMEX's success in the news. In particular, I eventually learned that HDR was a 2015 participant in the Chinaccelerator program, an accelerator program run by a venture capital investment company called SOSV. It is well-known in the venture capital investing industry, and by angel investors like myself, that participants in accelerator programs like Chinaccelerator give equity to investors in exchange for capital investments. I believed that as a participant in Chinaccelerator, BitMEX must have issued equity in return for capital from SOSV. I began to ask Hayes about my equity rights and questions about the November / December 2015 equity financing Hayes had told me would occur and trigger my equity rights.

15. On November 7, 2015, I inquired about BitMEX's valuation and Hayes explained to me that "SOSV who runs the accelerator program that [HDR was] in" helped arrive at a valuation." Hayes also told me that SOSV was "placing $500k into the round," but that Hayes felt that SOSV's valuation was conservative. I believed based on this email exchange that my SAFE had already converted, because I understood Hayes to be telling me that BitMEX had raised capital from SOSV at a fixed valuation.

16. Accordingly, in 2016, I began asking when BitMEX would issue dividends to its shareholders. Hayes kept answering that BitMEX had no plans to yet, but he did not attempt to correct my understanding that I was a shareholder in the entity.

17. In November 2018, I followed up with Hayes about my equity rights under my SAFE. Hayes told me that I was not an equity holder as he previously represented, because I had not invested additional amounts in BitMEX as part of the November / December 2015 fundraising

round.  Hayes also told me that my SAFE would never trigger because BitMEX did not plan to raise equity and that raising equity was "never discussed" because BitMEX did not need the money.

18. On November 11, 2018, Hayes sent me an email stating that BitMEX's "legal team is investigating all of your claims."  On November 29, 2018, I wrote to Hayes to ask if he had heard anything yet from his legal team.  Hayes scheduled a call with me for January 3, 2019.  During this call, he told me that he had received "an opinion back from legal" that my SAFE had not converted because there was no "cash component" to SOSV's investment into BitMEX.  He offered me "$125,000 to tear up the contract."  I refused.  I continued to ask Hayes about my equity rights, but he ignored all my subsequent attempts to reach him by email or other messaging channels.

19. In 2019, unable to secure any information from Hayes regarding my equity rights, I engaged a lawyer at my expense to send letters to both Hayes and Sean O'Sullivan, SOSV's Managing General Partner.  Hayes did not reply and SOSV instructed me to sort it out with BitMEX's legal department.  BitMEX's legal department never replied.

20. On September 13, 2019, I wrote to Hayes and his two BitMEX co-founders, Sam Reed and Ben Delo, to ask why SOSV's investment of $30,000 for 5% equity in BitMEX did not constitute a triggering event under the terms of my SAFE.  In reply, Ben Delo sent the following



image of Hayes, essentially telling me that I had no recourse against BitMEX because it is incorporated in the Seychelles:

21. I joined in this lawsuit as a plaintiff on April 27, 2020.

**C. SOSV's Documents Show That My Equity Rights Triggered In 2015**

22. I understand that before I joined this lawsuit, requests for documents were sent to SOSV and that SOSV was eventually ordered to produce its documents by a New Jersey court. I signed a certification pursuant to a protective order in this case that allowed me to review the documents that SOSV produced.

23. In the course of my and Frank Amato's review, we ███████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████

24. The timing of the ████████ was also consistent with Hayes's representations to me in 2015 when he was soliciting my investment. Beginning in January 2015, he had repeatedly assured me that BitMEX would soon have an equity financing round. When he presented me with a draft of the SAFE that I ultimately executed, he again assured me that there was an upcoming financing round that would trigger my SAFE. ████████████████████████, yet Hayes represented to me for years first that HDR had never had a financing round and then later that the SOSV investment was not a qualifying equity financing.

25. Even more astonishing to me was our discovery of a ███████████████
███████████████████████████████████████
███████████████████████████████ In my experience as a private investor, SAFE

holders should be listed in capitalization tables, if only so that other shareholders and investors know that the company they invested in may owe outstanding shares to SAFE holders.

26. ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████

**D.     Hayes And HDR Will Try to Conceal Or Transfer Assets And**

27. On October 1, 2020, Frank Amato shared with me a Twitter news post reporting that the Commodity Futures Trading Commission ("CFTC") was bringing a lawsuit against BitMEX. I began investigating the news and discovered that Hayes and his BitMEX co-founders were also criminally indicted by the U.S. Department of Justice. I learned through subsequent news reports that co-founder Sam Reed was arrested in the United States, but that Hayes and Ben Delo remain at large. My understanding is that Hayes and Delo have not been apprehended.

28. In the days that followed, various cryptocurrency-related news outlets that I follow reported on the impact of the CFTC lawsuit and the Department of Justice indictment. One article at https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/ reported that that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX."

29. Another at https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm reported that BitMEX's own funds, which I understand to consist mostly of bitcoin or similar cryptocurrencies, were "held in multsig wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal." In layman's terms, this means that BitMEX's funds are stored in electronic devices—referred to as cryptocurrency "wallets"—that are

locked behind passwords in the possession of HDR's founders. Two such passwords are required to access the cryptocurrency stored in those wallets. Coincidentally, two HDR founders holding two such passwords remain at large.

30. As a result, Frank Amato and I are now plaintiffs in a lawsuit against a cryptocurrency derivatives trading platform whose trading volume has plummeted following a CFTC lawsuit and a DOJ indictment of the platform's founders. The loss in trading volume will undoubtedly have a profound impact on HDR's revenue, if it has not already. And of the three individuals in the world who reportedly have access to BitMEX's cryptocurrency-based funds, two are effectively fugitives of the U.S. government.

31. I believe that in light of these recent developments and my own experience with Defendants—who openly flout their disregard for the law and legal rights—Defendants will transfer their assets outside of the United States and into what the CFTC described as their "maze of corporate entities," making it impossible for Frank Amato and I to collect a judgment against them. I implore this court to grant the relief we request and secure our recovery.

[Signature page to follow]

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 23, 2020          By: _____
                                       Elfio Guido Capone

# EXHIBIT 1

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## HDR GLOBAL TRADING LIMITED

### SAFE
(Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by The G and M Capone Trust (the "**Investor**") of $25,000 USD (the "**Purchase Amount**") on or about July 16, 2015, HDR Global Trading Limited, a limited liability corporation incorporated in the Republic of Seychelles (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's share capital, subject to the terms set forth below.

The "**Discount Rate**" is 20%.

See **Section 2** for certain additional defined terms.

1. *Events*

    (a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.41% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

    In connection with the issuance of Safe Preferred Shares by the Company to the Investor pursuant to this Section 1(a)(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided*, that such documents are the same documents to be entered into with the purchasers of Standard Preferred Shares, with appropriate variations for the Safe Preferred Shares if applicable, and

    (b) **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Shares equal to the Purchase Amount divided by the Liquidity Price, if the Investor fails to select the cash option.

    In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Shares equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free

reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Shares equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Share Capital by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of shares to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2. **Definitions**

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Discount Price**" means the price per share of the Standard Preferred Shares sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Shares Capital by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Shares payable in Common Shares, or the purchase or redemption of Share Capital by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Shares held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Share Capital in connection with the settlement of disputes with

any shareholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Shares pursuant to a registration statement filed under the Securities Act.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to: the fair market value of the Common Shares at the time of the Liquidity Event, as determined by reference to the purchase price payable in connection with such Liquidity Event, multiplied by the Discount Rate.

"**Safe**" means an instrument containing a future right to shares of Share Capital, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Shares**" means the shares of a series of Preferred Shares issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Shares, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Discount Price; and (ii) the basis for any dividend rights, which will be based on the Discount Price.

"**Share Capital**" means the share capital of the Company, including, without limitation, the "**Common Shares**" and the "**Preferred Shares**."

"**Standard Preferred Shares**" means the shares of a series of Preferred Shares issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3. *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which

the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Share Capital issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5. *Miscellaneous*

(a) Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b) Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail

with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Share Capital for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a shareholder of the Company or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d) Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**HDR GLOBAL TRADING LIMITED**

By:
Arthur Hayes
Director

Address:
2nd Floor Capital City,

Independence Avenue

P.O. Box 1008 Victoria

Mahe, Seychelles

Email: arthur@bitmex.com

**INVESTOR:**

By: G+M CAPONE TRUST

Name: ELISO GUIDO CAPONE

Title: DIRECTOR

Address: ███

Email: ███