Stephen D. Hibbard (State Bar No. 177865)
sdhibbard@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
Dennis F. Murphy, Jr. (State Bar No. 301008)
dennismurphy@jonesday.com
James M. Gross (Admitted *Pro Hac Vice*)
jgross@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:   +1.415.626.3939
Facsimile:   +1.415.875.5700

Attorneys for Defendants
HDR GLOBAL TRADING LIMITED and ABS
GLOBAL TRADING LIMITED

Peter I. Altman (State Bar No. 285292)
paltman@akingump.com
Marshall L. Baker (State Bar No. 300987)
mbaker@akingump.com
Jessica H. Ro (State Bar No. 329737)
jro@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:   +1.310.229.1000
Facsimile:   +1.310.229.1001

Attorneys for Defendant
ARTHUR HAYES

Edward H. Takashima (State Bar No. 270945)
etakashima@bsfllp.com
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street
31st Floor
Los Angeles, CA 90017
Telephone:   +1.213.629.9040
Facsimile:   +1.213.629.9022

Attorneys for Defendant
BEN DELO

Douglas K. Yatter (State Bar No. 236089)
douglas.yatter@lw.com
LATHAM & WATKINS, LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone:   +1.212.906.1200
Facsimile:   +1.212.751.4864

Matthew Rawlinson (State Bar No. 231890)
matt.rawlinson@lw.com
LATHAM & WATKINS, LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone:   +1.650.328.4600
Facsimile:   +1.650.463.2600

Attorneys for Defendant
SAMUEL REED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov, and Păun Gabriel-Razvan,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo, and Samuel Reed,<br><br>Defendants. | Case No. 3:20-cv-03345-WHO<br><br>(Consolidated Case Nos. 3:20-cv-07140-WHO and 3:20-cv-08034-WHO)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      August 25, 2021<br>Time:      2:00 p.m.<br>Ctrm:      2 – 17th Floor<br>Judge:    Honorable William H. Orrick |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

PLEASE TAKE NOTICE that at 2:00 p.m. on August 25, 2021, before the Honorable William H. Orrick, in Courtroom 2, 17th Floor, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, defendants HDR Global Trading Limited ("HDR"), ABS Global Trading Limited ("ABS"), Arthur Hayes, Ben Delo, and Samuel Reed (together, "Defendants"), will and hereby do move to dismiss the Second Amended Consolidated Complaint (ECF No. 153) pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds stated below.

The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support of this Motion, the Proposed Order, Defendants' Request for Judicial Notice, and the Declaration of Stephen D. Hibbard filed concurrently herewith, the pleadings and records on file in this action, and upon such other matters as may be presented to the Court at or prior to the hearing on this Motion.

## RELIEF REQUESTED

The Second Amended Consolidated Complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

DATED:  June 21, 2021

Respectfully submitted,

JONES DAY

By: */s/ Stephen D. Hibbard*
    Stephen D. Hibbard

Counsel for Defendants
HDR GLOBAL TRADING LIMITED and
ABS GLOBAL TRADING LIMITED

1

2

AKIN GUMP STRAUSS HAUER & FELD
LLP

3

4

By: */s/ Peter I. Altman*
      Peter I. Altman

5

6

Counsel for Defendant
ARTHUR HAYES

7

8

BOIES SCHILLER FLEXNER LLP

9

10

By: */s/ Edward H. Takashima*
      Edward H. Takashima

11

12

Counsel for Defendant
BEN DELO

13

LATHAM & WATKINS, LLP

14

15

By: */s/ Douglas K. Yatter*
      Douglas K. Yatter
      Matthew Rawlinson

16

17

Counsel for Defendant
SAMUEL REED

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION .................................................................................................... i

RELIEF REQUESTED ................................................................................................... i

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE ISSUES ...................................................................... 2

III.   RELEVANT BACKGROUND ......................................................................... 2

     A.    The Court Grants Defendants' Motion To Dismiss Plaintiffs' Consolidated Complaint On Multiple, Independent Grounds........................................ 2

     B.    This Court Affords Plaintiffs Leave To Amend Based On Their Representation That They Could "Allege More Facts, Including Expert Reports" In Support Of Their Price Manipulation Theories. ............................... 4

     C.    Plaintiffs File An Even Longer Amended Consolidated Complaint That Fails To Remedy The Numerous Problems Identified In The Court's Order........ 5

     D.    Plaintiffs Amend Yet Again To Delete Now-Inconvenient Allegations And To Add Irrelevant New Ones. ........................................................................... 6

IV.   ARGUMENT ..................................................................................................... 8

     A.    Plaintiffs' Core Misconduct Allegations Still Fail to State a Claim. ..................... 8

          1.    Plaintiffs Still Do Not Allege Any Plausible Facts Supporting Their Previously Rejected Market Manipulation Theory. ................................... 10

          2.    Plaintiffs New Fraudulent Inducement Theories Are Implausible. .......... 14

               (a)    Plaintiffs Fail To Plead Plausible Facts Establishing That Anything In The BitMEX Terms Of Service Was False. ............. 15

               (b)    The SACC Lacks Plausible Factual Allegations That The BitMEX Website Contained A Misrepresentation........................ 17

               (c)    Plaintiffs Still Do Not Plead A Viable Theory Of Reliance. ........ 20

     B.    Plaintiffs Still Lack Article III Standing to Pursue Their Claims. ........................ 22

          1.    Plaintiffs Still Have Not Plausibly Alleged That Defendants' Conduct Caused Their Bitcoin Losses. ..................................................... 22

            2.     Plaintiff BMA Independently Lacks Standing Because It Still Has
                   Not Demonstrated That It Suffered an "Injury In Fact." ......................... 25

     C.    Plaintiffs' Federal Claims Remain Deficient in Multiple Additional
           Respects.............................................................................................................. 25

            1.     The SACC Does Not Allege a *Prima Facie* RICO Claim. ...................... 25

            2.     The SACC Does Not Allege a *Prima Facie* CEA Claim.......................... 26

                   (a)    The Complaint Still Does Not Allege a CEA Market
                          Manipulation Claim. ................................................................ 26

                   (b)    The Complaint Does Not Allege Any *Prima Facie* CEA
                          Fraudulent-Inducement Claims.................................................. 27

                   (c)    The Complaint Still Fails to State a Claim for Aiding and
                          Abetting CEA Violations. ......................................................... 29

     D.    Plaintiffs' State Law Claims All Still Fail as a Matter of Law. ........................... 30

            1.     All Of Plaintiffs' Misrepresentation-Based Common Law Claims
                   Fail. ........................................................................................................... 30

            2.     Plaintiffs' California Statutory Claims All Fail. ....................................... 30

                   (a)    Plaintiffs Lack Standing To Pursue Their FAL, CLRA, and
                          UCL Claims. ............................................................................. 31

                   (b)    Plaintiffs' CLRA Claim Is Independently Deficient.................... 31

                   (c)    Plaintiffs' FAL Claim Likewise Fails For Additional
                          Reasons. .................................................................................... 32

                   (d)    Plaintiffs' UCL Claims Are Independently Deficient.................. 32

            3.     Plaintiffs' Negligence Claim Still Fails. ................................................... 33

            4.     Plaintiffs' Conclusory Conversion Claim Fails. ....................................... 34

            5.     Plaintiffs' Remaining State Law Claims Cannot Stand Alone. ................. 35

V.   CONCLUSION ................................................................................................................ 35

1

## <u>TABLE OF AUTHORITIES</u>

2

Page

3

CASES

4

*Aas v. Super. Ct.*,
5
  24 Cal. 4th 627 (2000), *superseded by statute on other grounds as stated in*
6
  *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070 (2003)...................................34

7
*Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*,
8
  744 F.3d 595 (9th Cir. 2014)..............................................................................9

9
*Alliance Mortg. Co. v. Rothwell*,
  10 Cal. 4th 1226 (1995) ...................................................................................30
10

11
*Anunziato v. eMachines, Inc.*,
  402 F. Supp. 2d 1133 (C.D. Cal. 2005)...........................................................32
12

13
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................8
14

15
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................8

16
*Byers v. Maricopa Cnty. Corr. Health Servs.*,
17
  No. CV1804243, 2020 WL 1000048 (D. Ariz. Mar. 2, 2020)..........................9

18
*Calderon v. Total Wealth Mgmt., Inc.*,
19
  No. 3:15-cv-01632, 2018 WL 1621397 (S.D. Cal. Apr. 4, 2018) ....................9

20
*Coates v. Newhall Land & Farming, Inc.*,
  191 Cal. App. 3d 1 (1987)...............................................................................34
21

22
*Consumer Advocs. v. Echostar Satellite Corp.*,
  113 Cal. App. 4th 1351 (2003).........................................................................32
23

24
*Daugherty v. Am. Honda Motor Co.*,
  144 Cal. App. 4th 824 (2006)...........................................................................31

25
*Dudley v. Dittmer*,
26
  795 F.2d 669 (8th Cir. 1986)...........................................................................27

27
*Elias v. Hewlett-Packard Co.*,
28
  903 F. Supp. 2d 843 (N.D. Cal. 2012) .............................................................32

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) ........................................................................................33

*Foster v. Sexton*,
    61 Cal. App. 5th 998 (2021) ...............................................................................35

*Gutierrez v. Carmax Auto Superstores Cal.*,
    19 Cal. App. 5th 1234 (2018) .............................................................................32

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018) ...............................................................................28

*Hoffman v. 162 N. Wolfe LLC*,
    228 Cal. App. 4th 1178 (2014) ...........................................................................21

*In re Amaranth Nat. Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013) ...............................................................................26

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ......................................................................22, 23

*In re Crude Oil Commodity Litig.*,
    No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .......................28

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ...............................................................33

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) .........................................................19, 20

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..............................................................................9

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ...............................................................27

*In re Neurotrope, Inc. Sec. Litig.*,
    315 F. Supp. 3d 721 (S.D.N.Y. 2018) ...............................................................29

*In re Seagate Tech. LLC Litig.*,
    233 F. Supp. 3d 776 (N.D. Cal. 2017) ...............................................................31

*Instant Brands, Inc. v. DSV Sols., Inc.*,
    No. EDCV 20-399, 2020 WL 5947914 (C.D. Cal. Aug. 20, 2020) ....................35

*Jackson v. Abernathy*,
　960 F.3d 94 (2d Cir. 2020).................................................................................29

*Khoury v. Maly's of Cal., Inc.*,
　14 Cal. App. 4th 612 (1993)................................................................................32

*Laws. Funding Grp., LLC v. Dale Alan Harris, Esq.*,
　No. CV 15-04059, 2015 WL 13298145 (C.D. Cal. Sept. 18, 2015)....................9, 18

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992)............................................................................................23

*McGee v. S-L Snacks Nat'l*,
　982 F.3d 700 (9th Cir. 2020)..............................................................................24

*Molina v. City of Maywood*,
　No. CV 08-3105, 2008 WL 4057105 (C.D. Cal. Aug. 27, 2008)...........................6

*N. Am. Chem. Co. v. Super. Ct.*,
　59 Cal. App. 4th 764 (1997)..........................................................................33, 34

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
　9 Cal. 5th 279 (2020) ........................................................................................33

*Nelson v. Am. Home Mortg. Servicing Inc.*,
　No. CV 10-4562, 2010 WL 3034233 (C.D. Cal. July 29, 2020) ...........................32

*Newton v. Am. Debt Servs., Inc.*,
　75 F. Supp. 3d 1048 (N.D. Cal. 2014) ................................................................32

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
　157 Cal. App. 4th 835 (2007)..............................................................................30

*Ox Labs Inc. v. Bitpay, Inc.*,
　848 Fed. App'x 795 (9th Cir. 2021).....................................................................35

*Parker v. Iolo Techs, LLC*,
　No. CV 12-00984, 2012 WL 4168837 (C.D. Cal. Aug. 20, 2012) ..........................5

*Ploss v. Kraft Foods Grp., Inc.*,
　197 F. Supp. 3d 1037 (N.D. Ill. 2016) .................................................................28

*Reddy v. Litton Indus., Inc.*,
　912 F.2d 291 (9th Cir. 1990)...........................................................................9, 15

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ................................................................................ 19

*Royal Primo Corp. v. Whitewater W. Indus., Ltd.*,
   No. 15-cv-04391, 2016 WL 1718196 (N.D. Cal. Apr. 29, 2016) ............................ 10, 11, 15

*Seeger v. Odell*,
   18 Cal. 2d 409 (1941) ............................................................................................ 21

*Shaeffer v. Califia Farms, LLC*,
   44 Cal. App. 5th 1125 (2020) ................................................................................ 31

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
   366 F. Supp. 3d 516 (S.D.N.Y. 2018) .................................................................... 28

*State Ready Mix, Inc. v. Moffatt & Nichol*,
   232 Cal. App. 4th 1227 (2015) .............................................................................. 33

*Steckman v. Hart Brewing Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ................................................................................. 9

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ............................................................................... 9, 28

*U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*,
   153 F. Supp. 3d 996 (N.D. Ill. 2015) ..................................................................... 27

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) .............................................................................. 9, 19

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) .......................................................................... 5, 8, 18

*Walrus Master Fund Ltd. v. Citigroup Glob. Mkts., Inc.*,
   No. 08 Civ. 2404, 2009 WL 928289 (S.D.N.Y. Mar. 30, 2009) .......................... 21, 27

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................................. 28

**STATUTES**

7 U.S.C. § 9(1) ............................................................................................................ 27

15 U.S.C. § 45(a) ....................................................................................................... 32

15 U.S.C. § 52(a) ....................................................................................................... 32

18 U.S.C. § 1964(c) ...........................................................................................25

Cal. Civ. Code § 3343 .......................................................................................30

Cal. Penal Code § 496 .......................................................................4, 8, 11, 35

California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–84 ........... passim

California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* ....... passim

California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ..... passim

Commodity Exchange Act of 1936, 7 U.S.C. §§ 1 *et seq.* ................................ passim

Federal Trade Comm'n Act of 1914, ch. 311, 38 Stat. 717 .........................31, 32

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ............... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8 .............................................................................. passim

Fed. R. Civ. P. 9(b) ......................................................................... passim

Fed. R. Civ. P. 11 ...............................................................................10

U.S. CONST. art. III .......................................................................... passim

1    **I.      INTRODUCTION**

2          Earlier this year, the Court granted a motion to dismiss by Defendants in a detailed, 31-

3    page order, allowing Plaintiffs to re-plead if they could gather plausible facts sufficient to sustain

4    their claims.  *See* ECF No. 143 (the "Order").  Plaintiffs' Second Amended Consolidated

5    Complaint ("SACC") shows that this Court was correct to be skeptical of Plaintiffs' ability to do

6    so given the numerous, dispositive problems with their lawsuit.  Plaintiffs' latest filing confirms

7    this litigation is nothing more than a cryptocurrency strike suit that should be dismissed with

8    prejudice.

9          Plaintiffs did not heed the Court's instruction "to allege only relevant facts and to avoid

10   conclusory assertions … connect[ing] the dots in their price manipulation theory."  Order 2.

11   Instead, yet at even greater length, Plaintiffs continue to traffic in rank speculation as they now

12   seek to alter fundamentally their core theory of liability.  After repeating their deficient, prior

13   market manipulation claims (still predicated on conclusory and naked "information and belief"

14   allegations), Plaintiffs claim—for the first time—that they were fraudulently induced to trade on

15   BitMEX through misrepresentations on BitMEX's website.

16         The new allegations are no more plausible than the old ones.  As with Plaintiffs' prior

17   market manipulation theory, Plaintiffs' new misrepresentation theories not only are unsupported

18   by any plausible facts, but also are expressly contradicted by Plaintiffs' own pleadings, the

19   sources upon which Plaintiffs rely, or other judicially noticeable materials.  In fact, by now

20   alleging that purported misrepresentations on the BitMEX website regarding its high liquidity

21   fraudulently induced them to deposit bitcoin on BitMEX, Plaintiffs fundamentally undermine

22   their price manipulation theory, which is premised on BitMEX having high liquidity.  And

23   Plaintiffs' supposed "smoking gun" allegations offered to support their claim that the BitMEX

24   Terms of Service misrepresented the nature of HDR's internal trading arm show only that

25   Plaintiffs have *no* basis for making any of the core allegations underlying their lawsuit.

26         After nine separate iterations of the operative complaint, Plaintiffs have alleged little more

27   than that they lost bitcoin on leveraged trading positions when their predictions proved

28   unsuccessful.  (And Plaintiff BMA's allegations remain lacking on even this basic point.)  No

amount of internet scouring by Plaintiffs' counsel can fill in the numerous, dispositive gaps that exist in all of Plaintiffs' claims.  It is time this baseless and harassing lawsuit is brought to an end.

## II.     STATEMENT OF THE ISSUES

1.     Whether Plaintiffs' fraud claims—and thus, nearly the entirety of Plaintiffs' complaint—fail when the SACC lacks any plausible facts establishing that Defendants engaged in any fraudulent conduct, let alone that Plaintiffs relied on that conduct to their detriment?

2.     Whether Plaintiffs lack constitutional standing when they allege no plausible facts tying their purported bitcoin losses to any allegedly fraudulent conduct by Defendants?

3.     Whether Plaintiffs fail to adequately plead federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and Commodity Exchange Act ("CEA") claims when the SACC does not remedy the multiple, dispositive defects identified by this Court's prior order?

4.     Whether Plaintiffs fail to adequately plead state law claims when Plaintiffs offer no plausible allegations setting forth *prima facie* violations of any of those laws?

## III.    RELEVANT BACKGROUND

### A.     The Court Grants Defendants' Motion To Dismiss Plaintiffs' Consolidated Complaint On Multiple, Independent Grounds.

The SACC marks Plaintiffs' latest attempt to plead CEA, RICO, and California claims relating to the ownership and operation of the "popular cryptocurrency derivatives exchange platform … BitMEX."  SACC ¶ 1.  Plaintiff BMA filed this lawsuit in May 2020 against corporate defendants HDR; HDR's co-founders Hayes, Delo, and Reed; and HDR's wholly-owned subsidiary, ABS.  ECF No. 1.  In the months that followed, BMA twice amended the complaint to add new plaintiffs and allegations (ECF Nos. 6, 32), Defendants moved to dismiss (ECF No. 42), Plaintiffs mooted that motion with further attempted amendments (ECF Nos. 45, 73-2), and Plaintiffs' counsel filed several similar lawsuits on behalf of additional plaintiffs. After this Court consolidated all of these lawsuits (*see* ECF Nos. 94 & 98), Plaintiffs finally settled on a 237-page, 618-paragraph, 18-exhibit Consolidated Complaint ("CC") asserting myriad claims against the aforementioned corporate defendants and three of Defendant Reed's family members.  ECF No. 97.  All of those claims were predicated on Plaintiffs' assertions,

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   made on "information and belief," that the corporate defendants manipulated the price of

2   cryptocurrency derivatives by trading on other cryptocurrency platforms when Plaintiffs claimed

3   to have suffered trading losses on BitMEX.

4        On March 12, 2021, this Court granted Defendants' motion to dismiss the CC, finding that

5   Plaintiffs' complaint was fatally deficient in multiple respects.  First, the Court held that Plaintiffs

6   "fail[ed] to plausibly explain how the defendants have harmed them."  Order 1.  The Court

7   observed that the CC "waste[d] much space describing other actions brought against defendants,"

8   *id.*, but when it came to Plaintiffs' core theory—that Defendants engaged in "price manipulation"

9   to Plaintiffs' detriment—"[t]he limited allegations plaintiffs offer … are all alleged on

10  information and belief, with no explanation of the basis for such beliefs or facts that would make

11  their allegations plausible."  *Id.* at 1–2; *see also id.* at 9–15 (detailing the implausibility of

12  Plaintiffs' allegations).  As the Court explained, "[a]bsent additional facts rendering plaintiffs'

13  beliefs plausible, the allegations fail under Rule 8, let alone under Rule 9(b)."  *Id.* at 10.

14       While Plaintiffs' failure to allege plausible facts supporting their price manipulation

15  theory alone "doom[ed] [Plaintiffs'] Complaint," the Court also found that "plaintiffs fail[ed] to

16  sufficiently plead the elements of each claim and their standing to bring them."  *Id.* at 2.  In

17  particular, all Plaintiffs lacked both Article III and statutory standing because they failed to plead

18  plausible facts establishing that their "claimed losses are 'fairly traceable' to *defendants'* alleged

19  conduct."  *Id.* at 16 (Article III); *see also id.* at 16–18 (statutory standing).  Plaintiff BMA—an

20  entity created by Plaintiffs' counsel—also lacked Article III standing for the independent reason

21  that Plaintiffs failed to satisfy their burden of proving that "BMA is seeking to vindicate its *own*

22  rights, instead of those of its members."  *Id.* at 16.  Further, the Court held that Plaintiffs' RICO

23  claims failed for the additional reasons that Plaintiffs did not plead plausible facts establishing

24  (i) the existence of an "enterprise" distinct from the "corporate owners and officers of BitMEX,"

25  or (ii) that Defendants committed wire fraud or any other RICO predicate.  *Id.* at 18–21.

26  Plaintiffs' CEA claims likewise failed because Plaintiffs did not plead plausible facts establishing

27  that Defendants (i) engaged in "manipulation" prohibited by the CEA, (ii) "specifically intended

28  to cause the artificial prices," or (iii) "aided and abetted any market manipulation" by a third-

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

party trader known as Quick-Grove-Mind. *Id.* at 21–24.

As for Plaintiffs' state-law claims, the Court held that Plaintiffs "fail[ed] to establish causation or adequately plead the existence of a 'special relationship' giving rise to an actionable duty of care," as required for their negligence claim. *Id.* at 24–27.  The Court dismissed Plaintiffs' fraud claim because "the Complaint fail[ed] to allege plausible facts with respect to defendants' false representation and intent to defraud, particularly when the allegations are held up against Rule 9(b)'s more stringent standards," and "fail[ed] to specifically allege plaintiffs' 'justifiable reliance' on a misrepresentation by defendants." *Id.* at 27.  Plaintiffs' conversion claim similarly failed because Plaintiffs' "[a]llegations that defendants unlawfully dispossessed them of their property rely entirely on the fraud-based market manipulation allegations that plaintiffs have failed to plead with particularity." *Id.* at 29.  And in the absence of a viable prima facie direct tort claim, Plaintiffs' remaining claims—for violating California's Unfair Competition Law ("UCL"), for aiding and abetting fraud and conversion, for violating California Penal Code § 496, and for civil conspiracy, unjust enrichment, constructive trust, and accounting—failed as well. *Id.*  Each of those rulings accords with the February 25, 2021 decision of Judge Massullo of the San Francisco County Superior Court sustaining the demurrer to a complaint (also filed by Plaintiffs' counsel) asserting the same California claims predicated on substantially similar allegations against Defendants HDR, ABS, and Hayes. *Kanyshev v. HDR Global Trading Ltd.*, No. CGC-20-584483 (Cal. Super. Ct. Feb. 25, 2021) ("*Kanyshev* Order").

**B.   This Court Affords Plaintiffs Leave To Amend Based On Their Representation That They Could "Allege More Facts, Including Expert Reports" In Support Of Their Price Manipulation Theories.**

After finding that each and every one of the 17 causes of action asserted in Plaintiffs' CC was quadruply deficient—due to implausibility, lack of Article III standing, lack of statutory standing, and failure to allege a prima facie claim—this Court granted Plaintiffs "leave to amend to the extent that they have a good faith basis to do so."  Order 30.  The Court did so following Plaintiffs' counsel's representations that Plaintiffs had received "'substantial additional information relevant to this case' … from a 'former high-ranking employee of Defendant HDR," and "that they can better explain the basis of their alleged price manipulation scheme and support

1   it with reports from experts who would look at the data and say to a high degree of certainty as to

2   what happened." *Id.* at 29–30; *see also* ECF No. 138 (motion for leave to amend).

3        In granting leave to amend, however, the Court provided guidance:  "[P]laintiffs must

4   keep their focus on how defendants have harmed them and explain why their theory of price

5   manipulation is plausible" instead of Plaintiffs' previous "kitchen sink approach."  Order 30

6   (noting that Plaintiffs' sprawling pleadings "frustrate Rule 8's objective").  The Court further

7   instructed Plaintiffs to "allege facts that show what that defendant did and how that establishes

8   elements of a claim."  *Id.*  That directive applied with particular force to Plaintiffs' claims

9   grounded in fraud, which require Plaintiffs to "'state with particularity the circumstances

10  constituting fraud or mistake, including the 'who, what, when, where, and how of the misconduct

11  charged.'"  *Id.* at 8, 27 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.

12  2003)).  "For allegations made on information and belief, [Plaintiffs] must allege with

13  particularity all facts upon which their belief is based."  *Id.* at 30.

14       **C.**     **Plaintiffs File An Even Longer Amended Consolidated Complaint That Fails**
15             **To Remedy The Numerous Problems Identified In The Court's Order.**

16       Plaintiffs ignored the Court's guidance altogether when they filed their 328-page, 895-

17  paragraph, 20-exhibit Corrected Amended Consolidated Complaint ("CACC") on May 5, 2021.

18  ECF No. 150.[1]  As before, Plaintiffs' CACC takes a "kitchen sink approach" to pleading,

19  retaining scores of the paragraphs and exhibits from the CC—including those regarding "other

20  actions brought against defendants"—that this Court deemed a "waste [of] space."  Order 1, 3 n.2,

21  30; *cf., e.g.*, CACC Ex. 4 (DOJ indictment); CACC Ex. 5 (CFTC complaint); CACC ¶¶ 2, 11, 12,

22  13, 24, 451, 454, 456, 458, 470, 481 (discussing same).  In fact, the CACC *adds* nearly 100

23  paragraphs (CACC ¶¶ 229–315) copied almost verbatim from an amended complaint filed by

24  other counsel in the CEA class action pending in *Messieh v. HDR Global Trading Ltd.*, No. 1:20-

25  cv-03232, ECF No. 53, ¶¶ 65–154 (S.D.N.Y. Feb. 12, 2021).[2]

26  _____

27       [1] Plaintiffs titled this the "Corrected Amended Consolidated Complaint" to distinguish it
    from an "Amended Consolidated Complaint" filed a few hours earlier.  *See* ECF No. 149.

28       [2] Plaintiffs' insistence on "copying and pasting of allegations from one complaint to
    another," of course, "is disfavored … and undermines [their] claims for relief."  *Parker v. Iolo*

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1       Yet nowhere in the hundreds of pages and paragraphs added in the CACC do Plaintiffs

2    include an "expert report," "additional information relevant to this case … from a former high-

3    ranking employee of Defendant HDR," or any other facts on which Plaintiffs premised their

4    request for leave to amend to "explain why their theory of price manipulation is plausible."  Order

5    30.  In fact, although the CACC repeats Plaintiffs' previously central allegations that Defendants

6    harmed Plaintiffs by engaging in price manipulation, that theory is no longer the focus of the

7    CACC.  Instead, Plaintiffs now ground nearly their entire lawsuit in a new theory, predicated on

8    new allegations, that "Defendants deliberately designed their cryptocurrency derivatives

9    exchange platform BitMEX … to fraudulently induce unsuspecting victims to deposit their

10    bitcoins with Defendants" by "engag[ing] in fraudulent solicitation using a laundry list of material

11    misrepresentations, half-truths and omissions."  *E.g.*, CACC ¶ 3.

12       Specifically, Plaintiffs assert that various representations in the BitMEX Terms of Service

13    (regarding Defendants' purported trading activities) and on the BitMEX website (regarding the

14    platform's "Bitcoin / USD liquidity") were false, and that Plaintiffs relied upon these purported

15    misrepresentations when depositing bitcoin to trade on BitMEX.  Plaintiffs claim that because of

16    those misrepresentations, Plaintiffs suffered both trading losses and two previously unmentioned

17    categories of damages:  (1) "loss of use" damages from Plaintiffs' purported inability to deposit

18    their bitcoin "in interest-bearing accounts," *id.* ¶ 504, and (2) "trading commissions damages"

19    allegedly suffered from executing trades—including profitable ones—on BitMEX, *id.* ¶ 506.

20       **D.**    **Plaintiffs Amend Yet Again To Delete Now-Inconvenient Allegations And To**

21            **Add Irrelevant New Ones.**

22       Immediately upon filing the CACC, Plaintiffs' counsel informed Defendants that

23    Plaintiffs intended to amend their complaint yet again, and continued to propose additional

24    "tweaks" in the following weeks.  ECF No. 151.  To expedite the final resolution of this case,

25    Defendants stipulated to the filing of the SACC.  *Id.*; *see also* ECF No. 153 (SACC).

26    *Techs, LLC*, No. CV 12-00984, 2012 WL 4168837, at *3 (C.D. Cal. Aug. 20, 2012); *see also*
*Molina v. City of Maywood*, No. CV 08-3105, 2008 WL 4057105, at * 2 (C.D. Cal. Aug. 27,

27    2008) ("[T]he fact that Plaintiff's counsel has cut and pasted the same insufficient allegations in
all nine of the related Maywood cases, without tailoring any of them to the unique facts of each

28    case, completely undermines the credibility and genuine nature of his client's claims.").

But the SACC, like the CACC, does not include an "expert report," "additional information relevant to this case … from a former high-ranking employee of Defendant HDR," or other allegations establishing "why [Plaintiffs'] theory of price manipulation is plausible."  Order 30.  To the contrary, the SACC confirms that Plaintiffs have *no* basis for suing Defendants, whether under a price manipulation theory, their new fraudulent inducement theory, or otherwise.

For instance, the SACC simply deletes the phrase "Plaintiffs are informed and believe" from dozens of paragraphs, without adding any new allegations or otherwise explaining why Plaintiffs suddenly claim to have personal knowledge of their allegations.  *See* Hibbard Decl., Ex. A (Redline between FACC and SACC) ¶¶ 351, 358, 362, 378–82, 385, 392–95, 399, 406–09, 412, 415, 423, 424, 428, 429, 433–36, 439–42, 444–46, 474, 653, 655–57, 728–32, 734, 735.  Moreover—contrary to their representations that Plaintiffs received information "from a former high-ranking employee of Defendant HDR"—the SACC no longer claims that Plaintiffs' remaining "information and belief" allegations are based upon "information provided by employees of Defendants."  *Id.* ¶¶  448, 451, 454, 458.  And directly contradicting their allegations that "*only* Defendants" could benefit from market manipulation, *cf.* SACC ¶ 483, Plaintiffs add new allegations based upon a tweet from May 2020 that a now-deceased third party named "Ben Aabtc 'pumped' bitcoin market price … on 'reference' spot exchanges while maintaining an open $30,873,844 Perpetual Swap position in his winner account on BitMEX."  *Id.* ¶ 469; *id.* ¶¶ 466–70.  That third-party conduct, however, is alleged to have occurred in April and May 2018—months before any Plaintiff claims to have deposited bitcoin with BitMEX, *id.* ¶¶ 511–12.  While Plaintiffs claim that Defendants "aided and abetted" that purported conduct, Plaintiffs offer only an undated photograph that Plaintiffs claim shows the individual Defendants and "Ben Aabtc" together.  *Id.* ¶ 466.

On the basis of both these new theories and the already-rejected allegations repeated in the SACC, Plaintiffs assert thirty-three causes of action under the CEA (Counts I-VIII), RICO (Counts IX-XIV), California's False Advertising Law ("FAL") (Count XXI), Consumers Legal Remedies Act ("CLRA") (Count XXII), UCL (Counts XXIII-XXV), and California common law (Counts XV-XVIII (Fraud), Counts XIX-XX (Negligent Misrepresentation), Count XXVI

(Negligence), Count XXVII (Restitution), Count XXVIII (Constructive Trust), Count XXIX (Accounting), Counts XXX-XXXIII (Conversion, Replevin, and Cal. Pen. Code § 496)).

## IV.    ARGUMENT

Despite adding nearly 100 pages to the CC and fundamentally altering Plaintiffs' core theory of fraud, the SACC falls far short of satisfying the Ninth Circuit's pleading requirements. Plaintiffs still have not alleged any plausible facts establishing that Defendants engaged in any fraudulent conduct, whether by engaging in market manipulation (as Plaintiffs initially claimed) or by fraudulently inducing Plaintiffs to trade via alleged misrepresentations (as Plaintiffs now assert).  *See infra* Part IV.A.  Moreover, as before, Plaintiffs lack standing to bring any of their claims, as they fail to adequately plead that any purported misrepresentations (or any other alleged conduct by Defendants) caused the losses they now claim.  *See infra* Part IV.B.  And in all events, Plaintiffs' SACC remains devoid of the facts necessary to establish a prima facie claim under any pleading standard, let alone under the heightened pleading requirements applicable to nearly all of Plaintiffs' claims.  *See infra* Parts IV.C-IV.D.

### A.    Plaintiffs' Core Misconduct Allegations Still Fail to State a Claim.

Plaintiffs still fail to allege plausible facts to support that Defendants engaged in fraudulent conduct causing Plaintiffs' alleged bitcoin losses.  For Plaintiffs to survive a motion to dismiss, they "must allege 'enough facts to state a claim to relief that is plausible on its face.'" Order 8 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That baseline standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To satisfy Rule 8, the plaintiff must "plead[] facts that 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft*, 556 U.S. at 678).

More is required where, as here, a plaintiff brings claims sounding in fraud.  Under Rule 9(b), "a party must 'state with particularity the circumstances constituting fraud or mistake,' including 'the who, what, when, where, and how of the misconduct charged.'"  Order 8 (quoting *Vess*, 317 F.3d at 1106).  Plaintiffs must make these allegations as to each defendant:  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to

1   differentiate their allegations when suing more than one defendant … and inform each defendant

2   separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG*

3   *LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).  "[G]eneral allegations that the 'defendants' engaged

4   in fraudulent conduct' with only specific allegations as to some, 'patently fail[s] to comply with

5   Rule 9(b).'"  *Calderon v. Total Wealth Mgmt., Inc.*, No. 3:15-cv-01632, 2018 WL 1621397, at *2

6   (S.D. Cal. Apr. 4, 2018) (quoting *Swartz*, 476 F.3d at 765).

7       When determining whether a complaint satisfies those standards, a "court is not required

8   to accept as true 'allegations that are merely conclusory, unwarranted deductions of fact, or

9   unreasonable inferences.'"  Order 8 (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055

10  (9th Cir. 2008)).  Nor is a court "'required to accept as true conclusory allegations which are

11  contradicted by documents referred to in the complaint' or documents that are proper subjects of

12  judicial notice."  *Laws. Funding Grp., LLC v. Dale Alan Harris, Esq.*, No. CV 15-04059, 2015

13  WL 13298145, at *5 (C.D. Cal. Sept. 18, 2015) (quoting *Steckman v. Hart Brewing Inc.*, 143 F.3d

14  1293, 1295–96 (9th Cir. 1998)).[3]  And a plaintiff cannot avoid the requirements of Rule 8 (let

15  alone of Rule 9(b)) by adding the phrase "information and belief" to otherwise conclusory

16  allegations.  "For allegations made on information and belief, [plaintiffs] must allege with

17  particularity all facts upon which their belief is based."  Order 30.

18      Finally, where, as here, a plaintiff seeks to amend a complaint in response to an order

19  granting a motion to dismiss, the "amended complaint may only allege other facts consistent with

20  the challenged pleading."  *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990); *see*

21  *also Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595,

22  600 (9th Cir. 2014) ("A party cannot amend pleadings to directly contradict an earlier assertion

23  made in the same proceeding.").[4]  At a minimum, "a court may look to prior pleadings in

24

25      [3] Even "if a document is not attached to a complaint," if a "plaintiff refers extensively to
     the document or the document forms the basis of the plaintiff's claim," the "defendant may offer

26   such a document" and the district court may consider it on a motion to dismiss.  *United States v.
     Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

27      [4] Defendants acknowledge that there is "intra-circuit confusion" as to whether a plaintiff
     can "amend his complaint to allege facts that contradict factual allegations in prior complaints."

28   *Byers v. Maricopa Cnty. Corr. Health Servs.*, No. CV1804243, 2020 WL 1000048, at *2 (D.
     Ariz. Mar. 2, 2020).  Defendants respectfully submit that *Reddy* was correctly decided, and that

1    determining the plausibility of an amended complaint." *Royal Primo Corp. v. Whitewater W.*

2    *Indus., Ltd.*, No. 15-cv-04391, 2016 WL 1718196, at *3 (N.D. Cal. Apr. 29, 2016).

3           These standards must be applied with an eye to Plaintiffs' repeated representations (in

4    both signed pleadings governed by Rule 11 (ECF No. 138) and in open court) that they could

5    provide facts to support their insufficient "information and belief" allegations that Defendants

6    manipulated the price of cryptocurrency derivatives to Plaintiffs' detriment. *See* Order 1–2, 29–

7    30.  None of that promised "substantial information" appears in the SACC.  In fact, while the

8    SACC repeats Plaintiffs' prior "information and belief" allegations that (1) one Defendant

9    executed unspecified trades on other cryptocurrency exchanges, and (2) Defendants sent

10   unidentified 'wire communications' at the exact dates and times that Plaintiffs claim the price of

11   cryptocurrencies and derivatives were "manipulated" to Plaintiffs' detriment, *see* SACC ¶¶ 342,

12   448; *see also infra* Part IV.A.1, those allegations are no longer the focus of Plaintiffs' lawsuit.

13   Instead, Plaintiffs now primarily assert that Defendants harmed them by inducing them to trade

14   via misrepresentations on the BitMEX website, including in the BitMEX Terms of Service.

15          Even if Plaintiffs' about-face were a legitimate pleading tactic—and it is not—Plaintiffs

16   do not offer *any* plausible facts establishing that Defendants engaged in any fraudulent conduct

17   that caused Plaintiffs' bitcoin losses.  To the contrary, documents integral to Plaintiffs' complaint

18   and other judicially noticeable documents confirm that Plaintiffs' new fraudulent inducement

19   allegations are entirely *im*plausible, and that the SACC is merely a cryptocurrency strike suit.

20                    **1.      Plaintiffs Still Do Not Allege Any Plausible Facts Supporting Their
                              Previously Rejected Market Manipulation Theory.**
21

22          The Court dismissed Plaintiffs' CC because (among other reasons) Plaintiffs failed to

23   allege plausible facts to support their core theory of misconduct:  "that one defendant executed

24   trades on other cryptocurrency platforms as part of an intricate market manipulation conspiracy

25   on the exact dates that plaintiffs suffered their losses."  Order 9.  In doing so, the Court rejected

26   Plaintiffs' claim that "information regarding whether defendants traded to plaintiffs' detriment is

27

28   applying that decision is particularly appropriate under the circumstances here.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

peculiarly within the possession and control of the defendants," noting that publicly available information on third-party cryptocurrency exchanges Kraken and Bitstamp "could be part of the 'something more' [plaintiffs] need for their information and belief allegations." *Id.* at 10, 11. The Court also disagreed that Plaintiffs' so-called "means, motive, and opportunity" allegations provided a basis for their core allegations made on "information and belief" regarding Defendants' purported misconduct, holding that such allegations, "without more, [are] not enough to cross the plausibility line." *Id.* at 14–15. Absent factual allegations tying Defendants' alleged "bad acts" to "the alleged market manipulation theory at hand," this Court held that Plaintiffs' CC amounted to nothing more than "rank speculation." *Id.* at 11, 14.

Nothing in Plaintiffs' SACC remedies those dispositive defects. Although Plaintiffs have altered their core fraud theories (discussed below in Part IV.A.2), as before, the SACC alleges on "information and belief" that Defendants caused Plaintiffs' losses "by using helper accounts on United States based 'reference' spot exchanges Kraken, Coinbase and Bitstamp, to place large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT index price and .BETH index price on a daily basis, resulting in liquidation of retail traders and profit for BitMEX."[5] SACC ¶ 448; *see also* SACC ¶ 342 (summarizing the "individual roles of all Defendants within the Enterprise" in the purported market manipulation scheme in a table "prepared according to information and belief"). And as before, Plaintiffs allege "on information and belief" that Defendants engaged in this conduct during "specific manipulation times," which include the dates that each Plaintiff claims to have suffered trading losses. SACC ¶ 448. For that purported "market manipulation," Plaintiffs continue to assert a series of claims under the CEA, RICO, and California law. *See, e.g.*, SACC Counts IV-VIII (CEA); IX-X (RICO); XXVI-XXVIII (Conversion, Replevin, and Cal. Penal Code § 496 claims).

---

[5] Plaintiffs previously claimed that one of the individual defendants, Mr. Reed, executed these trades on Defendants' behalf. Order 9. Plaintiffs have abandoned that allegation in the SACC, now claiming instead that they are "informed and believe" that "BitMEX" (e.g., SACC ¶¶ 17, 173, 414) or Mr. Reed (e.g., SACC ¶ 328) developed automated trading software which Defendants then used to execute the trades that Plaintiffs claim (still on "information and belief") caused their losses. SACC ¶¶ 328, 414. That unexplained shift signifies all the more that Plaintiffs are simply continuing to speculate about their bitcoin losses in a transparent effort to survive a motion to dismiss.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1     Yet, as before, Plaintiffs offer *no* facts, let alone facts pled with the requisite particularity,

2     providing the basis for their belief that Defendants executed trades via other cryptocurrency

3     exchanges on June 27, 2019, July 14, 2019, November 14, 2018, and November 25, 2018 that

4     caused Plaintiffs' purported losses on BitMEX.  *Cf.* Order 30.  Nowhere in the SACC do

5     Plaintiffs include the publicly accessible "time and sales data" from other cryptocurrency

6     exchanges that this Court noted may assist Plaintiffs in grounding "their information and belief

7     allegations."  *Id.* at 11.  Nor does the SACC offer any other "additional information" which

8     Plaintiffs represented could "cure the deficiencies identified in this order."  *Id.* at 30.  Indeed, the

9     SACC lacks any allegations predicated on disclosures "from a former high-ranking employee of

10    Defendant HDR" tying trades on other platforms to Plaintiffs' losses, or "reports from experts"

11    examining "the data" and concluding "to a high degree of certainty as to what happened"—the

12    very sources of information that Plaintiffs claimed entitled them to further amend their complaint.

13    *Id.*  In fact, the SACC *deletes* Plaintiffs' allegations made in their CACC that Plaintiffs'

14    "information and belief" claims are "formed based on … information provided by former

15    employees of Defendants."  *Cf.* Hibbard Decl., Ex. A ¶¶ 451, 454, 458; *see also id.* (deleting

16    former footnote 15, which asserted that Plaintiffs' allegations "are based on the very detailed

17    information about the daily operations of the Insider Trading Desk recently provided by the

18    former employees of Defendants").

19    Instead, the SACC largely leaves the CC's "information and belief" allegations

20    unchanged, adding only a few conclusory assertions that still fail to "allege with particularity all

21    facts upon which [Plaintiffs'] belief is based."  Order 30.  For instance, Plaintiffs assert that their

22    "information and belief" allegations regarding Defendants' purported price manipulation on the

23    specific days Plaintiffs claim to have suffered losses are "formed based on public records, public

24    court records, U.S. DOJ indictment of Defendant[s] Hayes[, Delo, and Reed], CFTC civil

25    complaint against Defendants, and crypto market data analysis."  SACC ¶¶ 342, 451, 454, 458.

26    Those statements are entirely conclusory.  They are also simply a repackaging of the "means,

27    motive, and opportunity" argument that Plaintiffs offered in support of their "information and

28    belief" allegations in the CC —an argument which both this Court and Judge Massullo already

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    rejected as insufficient to satisfy baseline pleading standards.  Order 9–15; *Kanyshev* Order 9.

2           Plaintiffs also allege in footnote 16 that "[b]ecause traders trading millions of dollars are

3    very sophisticated, these market orders were used for purposes of market manipulation on

4    BitMEX," which in turn "forms the basis for Plaintiffs' belief as to the specific manipulation

5    dates and times listed in the table."  SACC ¶ 448 n.16.  That is the definition of a "conclusory,

6    unwarranted deduction[] of fact" that falls well short of the heightened pleading requirements

7    applicable here.  Order 8.  And while Plaintiffs assert that "*only* Defendants were able to open

8    sufficiently large ($100,000,000+) trading positions on BitMEX in order to capture the

9    manipulation profits," SACC ¶ 483(e), Plaintiffs offer no plausible facts in support of that

10   statement.  Contradicting themselves, Plaintiffs allege that third parties "Ben Aabtc" and "Quick

11   Grove Mind" manipulated the price of cryptocurrencies on other exchanges and "capture[d] the

12   manipulation profits" in their own BitMEX accounts.  SACC ¶¶ 346, 467–70 ("Ben Aabtc"); *id.*

13   ¶¶ 19, 465, 487, 643 ("Quick-Grove-Mind").[6]  And Plaintiffs acknowledge that other individuals

14   and entities executed trades on BitMEX netting them tens of millions of dollars in profits.  SACC

15   ¶ 124 (alleging that third parties "generated almost $70,000,000 in trading profits on Defendants'

16   BitMEX platform"); SACC ¶¶ 463, 486 (purporting to show BitMEX's "Leaderboard" from

17   August 2, 2020 reflecting multiple users with trading profits exceeding tens of millions of

18   dollars).

19          To the extent Plaintiffs' changes in the SACC establish anything, it is that Plaintiffs have

20   *no* basis for claiming that Defendants damaged them by trading to Plaintiffs' detriment on

21   specific dates.  That is apparent from Plaintiffs' systematic deletion in the SACC of the phrase

22   "informed and believe" from allegations made in the CACC.  *See supra* Part III.D.  And it is

23

24          [6] As with the CC, Plaintiffs continue to "make several contradictory allegations regarding
     the identity of Quick-Grove-Mind."  Order 6 n.3.  At the beginning of the SACC, Plaintiffs allege

25   that they are "informed and believe" that "Quick-Grove-Mind was a market manipulation winner
     account used by one of the individual Defendants Hayes, Delo or Reed."  SACC ¶ 19.  Later,

26   however, Plaintiffs allege that Quick-Grove-Mind is a third party manipulator whom Defendants
     purportedly enabled by "providing the manipulator under the assumed name Quick-Grove-Mind

27   with extremely high trading leverage."  SACC ¶ 643.  That Plaintiffs *still* have not clarified their
     allegations regarding Quick-Grove-Mind's identity is yet further evidence that the SACC is little

28   more than blind speculation.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   confirmed by Plaintiffs' addition of what they claim to be "'smoking gun' evidence" of

2   Defendants' supposed market manipulation—allegations derived from a May 2020 tweet that a

3   *third party*, "Ben Aabtc" (whose real name Plaintiffs do not know) manipulated bitcoin market

4   prices in April and May 2018, months before any Plaintiff traded on BitMEX.  Those allegations

5   are rank speculation stemming from a photograph supposedly showing the individual Defendants

6   with that third party at some unspecified time.  SACC ¶¶ 466–70.  But even if Plaintiffs alleged

7   plausible facts suggesting that Defendants "assisted, aided, abetted, and encouraged" that third

8   party's purported conduct in April and May 2018—and the SACC does no such thing—those

9   allegations have no bearing on Plaintiffs' naked "information and belief" allegations that

10   Defendants *themselves* executed trades on other cryptocurrency platforms on specific dates

11   months later that caused Plaintiffs' losses.

12                    **2.      Plaintiffs New Fraudulent Inducement Theories Are Implausible.**

13          Apparently recognizing that they lack any basis for asserting that Defendants caused

14   Plaintiffs' losses by executing trades on other platforms on specific dates, Plaintiffs pivot to a

15   new theory:  that Plaintiffs suffered losses because Defendants fraudulently induced them to trade

16   on BitMEX.  Specifically, Plaintiffs now claim—for the first time—that they were misled in two

17   respects.  First, Plaintiffs claim that Section 6.3 of the BitMEX Terms of Service contained

18   misstatements and omissions regarding BitMEX's so-called "Insider Trading Desk."  *See, e.g.*,

19   SACC ¶¶ 499–501 (Count I); 555–57 (Count III); 806–08 (Count XV); 866–68 (Count XVII).

20   Second, Plaintiffs assert that BitMEX's website misrepresented material facts about BitMEX's

21   "liquidity" as compared to other platforms.  SACC ¶ 525 (Count II); 834 (Count XVI).  These

22   new fraudulent inducement allegations now form the basis of nearly all of Plaintiffs' claims.[7]

23          These new theories fail.  As a threshold matter, Plaintiffs' pivot to a fraudulent

24

25          [7] Counts I-III and X-XII of the SACC assert CEA and RICO claims expressly predicated
     on these purported misrepresentations.  And the vast majority of Plaintiffs' California claims are
26   either predicated on these purported misrepresentations (Counts XV-XVIII (Fraud and Negligent
     Misrepresentation), Count XXI (California False Advertising Law), Counts XXII (California
27   Consumers Legal Remedies Act), Counts XXIII-XXV (California UCL)) or are entirely
     derivative of those direct, misrepresentation-based claims (Count XXVII (Restitution under
28   Quasi-Contract), Count XXVIII (Constructive Trust), Count XXIX (Accounting)).

1    inducement theory only after this Court rejected as implausible their prior market manipulation

2    theory—the theory that served as the foundation for at least five iterations of Plaintiff BMA's

3    complaint—shows that Plaintiffs are running a shell game with this litigation.  The Court granted

4    Plaintiffs leave to amend based on Plaintiffs' representations that they could allege additional

5    facts "explain[ing] the basis of their *alleged price manipulation scheme*," not for Plaintiffs to

6    reimagine the foundation of their lawsuit altogether.  Order 30 (emphasis added).  By misleading

7    the Court as to their basis for seeking leave to amend, Plaintiffs have only underscored that they

8    are not operating in good faith in this case.  Moreover, Plaintiffs' bait-and-switch pleading tactics

9    are expressly prohibited by the sham pleading doctrine, *see Reddy*, 912 F.2d at 296–97, and at the

10   very least, raise serious questions about the plausibility of Plaintiffs' new allegations, *see Royal*

11   *Primo Corp.*, 2016 WL 118196, at *3.

12           But even setting those problems aside, Plaintiffs fail to offer *any* plausible facts—let alone

13   facts with the requisite particularity under Rule 9(b), *see* Order 8—supporting their newfound

14   claims that they were induced to trade on BitMEX by misrepresentations contained on the

15   BitMEX website (including in the Terms of Service).  In fact, Plaintiffs' own complaint, the

16   materials upon which Plaintiffs rely, and other judicially noticeable documents confirm that these

17   allegations are entirely *im*plausible.  As a result, Plaintiffs' fraudulent inducement claims—and

18   with them nearly Plaintiffs' entire complaint (Plaintiffs' negligence claim suffers from other

19   defects, *see supra* at Part IV.D.3)—must be dismissed.

20                  **(a)      Plaintiffs Fail To Plead Plausible Facts Establishing That**
                               **Anything In The BitMEX Terms Of Service Was False.**
21

22           Plaintiffs first claim that the BitMEX Terms of Service contained misstatements and

23   omissions about what they archly label an "Insider Trading Desk."  Plaintiffs acknowledge that

24   when they deposited bitcoin with the BitMEX platform in late 2018 and mid-2019, Section 6.3 of

25   the Terms of Service disclosed that "HDR has a trading arm that, amongst other things, transacts

26   in products traded on the Trading Platform."  SACC ¶¶ 499, 555, 806, 866; *see also id.* Ex. 19

27   § 6.3.  Plaintiffs nonetheless claim that this "express Warranty and Representation made by

28   Defendants … was, in fact, deliberately and materially false during the entire Relevant Period and

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

constituted a fraudulent solicitation of Plaintiffs' bitcoins deposits and trading commissions by Defendants." SACC ¶¶ 500, 556, 807, 867. For instance, Plaintiffs claim that while Section 6.3 of the Terms of Service stated that HDR's trading arm was "organised to be separate and distinct from the business of" the BitMEX platform, *id.* ¶ 505, in reality, the trading arm possessed what Plaintiffs call "God Access," by which the trading arm had access to "all customer, order flow, execution and open position information of the entire BitMEX Trading Platform," *id.* ¶ 500. Plaintiffs also claim that while the Terms of Service represented that HDR's trading arm "receives access and trading privileges only on the same terms as are available to any other user," *id.* ¶ 505, in reality, the trading arm "was not subject to server overload freezes and lockouts" that occasionally occurred on the site, *id.* ¶ 501. And Plaintiffs otherwise claim that Defendants failed to disclose alleged characteristics of HDR's trading arm. *Id.* ¶¶ 559, 870.

These allegations amount to little more than a reframing of the same allegations, made entirely on "information and belief" and without any particular facts providing the basis for that belief, of the "price manipulation theory" discussed above in Part IV.A.1. Indeed, while Plaintiffs have reframed their core fraud allegations with regards to the BitMEX Terms of Service, the basis for those claims—that Defendants executed trades to Plaintiffs' detriment on specific dates and times—remains the same. For example, Plaintiffs appear to derive most of their allegations regarding the trading arm's purported "God Access" from Exhibits 1-3. *See* SACC ¶¶ 4–5, 17, 351, 362. But nothing in those exhibits—three blog posts from 2019 discussing how the lack of regulation in the cryptocurrency space can result in price manipulation by *third parties*, all of which were attached as Exhibits to the CC—supports Plaintiffs' assertions in the SACC that the operation of the trading arm did not accord with what was disclosed in the Terms of Service at any time, let alone during the times Plaintiffs now claim they suffered losses. Indeed, to the extent the Plaintiffs offer *any* additional allegations in support of their allegations, made on "information and belief," that Defendants' trading activities caused Plaintiffs' bitcoin losses, those allegations are either conclusory, duplicative of the "means, motive, and opportunity" arguments previously rejected by this Court, or both. *See supra* Part IV.A.1.

1

          **(b)**      **The SACC Lacks Plausible Factual Allegations That The BitMEX Website Contained A Misrepresentation.**

2         Plaintiffs' next theory of misrepresentation—that Defendants misled Plaintiffs because the

3   BitMEX website stated that BitMEX provides "1500% More Bitcoin / USD liquidity than any

4   other platform.  BitMEX's XBTUSD market is the most liquid in the world."—fares no better.

5   SACC ¶ 525.  According to Plaintiffs, "by no later than October of 2018, BitMEX was overtaken

6   by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD

7   liquidity."  SACC ¶ 527.  In support of that new claim, Plaintiffs allege the following:

8

9

10

11

12

> For example, analysis of bid-ask spread data from the portion of the Relevant Period when Defendants were using the representations in question, provided by OKEX cryptoderivative exchange has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%).  Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX.

13   *Id*.  Thus, according to Plaintiffs, "Defendants' claims of providing '1500% [or 16 times] more

14   Bitcoin / USD Liquidity than any other platform' were grossly, materially and deliberately false

15   during the entire Relevant Period," including "as of September or October of 2018, when they

16   were first made by Defendants."  *Id.*  Plaintiffs' newfound focus on this statement on the BitMEX

17   website—allegations absent from any prior iterations of Plaintiffs' complaints—does nothing to

18   save Plaintiffs' SACC for at least four reasons.

19         *First*, Plaintiffs plead no facts to support that the statement on the BitMEX website

20   referred to "bid-ask spread."  Rather, the statement—"1500% More Bitcoin / USD liquidity than

21   any other platform.  BitMEX's XBTUSD market is the most liquid in the world"—appeared

22   directly below figures reflecting the platform's daily, monthly, and annual trading volume,

23   another and more widely used measure of liquidity.  *See* SACC Ex. 20.  Indeed, nothing on the

24   BitMEX website during May and June 2019 made any reference to "bid-ask" spread or any other

25   metric in connection with the statement that BitMEX offered "1500% More Bitcoin/USD

26   liquidity than any other platform."  And Plaintiffs' own exhibits acknowledge that "[l]iquidity is a

27   subjective term."  SACC Ex. 3.  Furthermore, users had real-time access to 24-hour volume

28   figures for each derivative product available on BitMEX via the trading interface, as well as other

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    indicators of market liquidity, including 24-hour open interest, the order book, and order book

2    depth, all of which allowed users to constantly assess the market's liquidity as they traded.  *See*

3    SACC Ex. 20.  Plaintiffs cannot plead a material misrepresentation when they had full access and

4    information to assess the statement themselves.

5         *Second*, Plaintiffs fail to allege particular facts establishing that any representations on

6    Defendants' website were false when Plaintiffs claim to have deposited bitcoin with BitMEX.

7    *See Vess*, 317 F.3d at 1106.  The crux of Plaintiffs' claim that BitMEX's website contained a

8    falsity is that the "average bid-ask spread" was "higher on OKEX (with bid-ask spread of -0.14%)

9    than on BitMEX" during the "Relevant Period."  SACC ¶ 527.  But even if the website's

10   representation regarding liquidity was a reference to the "bid-ask spread," as Plaintiffs claim—

11   and they plead no facts to support that supposition—the allegation that another platform's

12   *average* bid-ask spread was higher than BitMEX's for some period of time does not speak to

13   whether it was higher on the specific dates that Plaintiffs claim to have made deposits on

14   BitMEX.  Here, despite claiming to have deposited bitcoin on BitMEX on just four dates over a

15   seven-month period—specifically, November 1, 2018 (Dolgov), November 14, 2018 (Razvan),

16   May 5, 2019 (BMA), and June 19, 2019 (Kolchin), *see* SACC ¶ 511— Plaintiffs' "Relevant

17   Period" runs for more than *three and a half years*, from January 1, 2017 until October 1, 2020,

18   *see* SACC ¶ 175.  Thus, even taking Plaintiffs' new allegations regarding the "bid-ask spread" on

19   other exchanges during the Relevant Period as true, Plaintiffs still fail to plead any facts with the

20   requisite particularity establishing that any statement on the BitMEX website was false on the

21   specific dates Plaintiffs allege they were induced to deposit bitcoin or traded on BitMEX.

22        *Third*, and relatedly, this Court should *not* take Plaintiffs' new allegations at face value

23   because they are directly contradicted by other judicially noticeable materials and the source upon

24   which Plaintiffs rely, and should therefore be disregarded.  *See Laws. Funding Grp.*, 2015 WL

25   13298145, at *5.  As a first example, Plaintiffs claim that "by no later than October of 2018,

26   BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in

27   terms of Bitcoin / USD liquidity and never regained its top position," but those exchanges did not

28

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1  *begin* offering perpetual swap contracts like those Plaintiffs allegedly traded until after that date.[8]

2         Moreover, as the Court is aware, Plaintiffs' counsel is bringing claims based on

3  substantially similar allegations to those at issue here in *Kanyshev*.  After Judge Massullo

4  dismissed Plaintiffs' amended complaint in that case, Plaintiffs' counsel filed another amended

5  pleading—the quintessential example of a document subject to judicial notice, *see Reyn's Pasta*

6  *Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)—containing numerous

7  allegations that are nearly identical to those made in Plaintiffs' SACC, including allegations

8  regarding OKEx's "bid-ask spread" during the "Relevant Period."  Hibbard Decl., Ex. B

9  (*Kanyshev* TAC).  Yet, despite repeating almost verbatim the allegation contained in SACC

10 ¶ 527, the *Kanyshev* TAC's "Relevant Period" is *years* shorter than in this case.  *Compare* SACC

11 ¶ 175 (defining Relevant Period to be January 1, 2017 until October 1, 2020) *with Kanyshev* TAC

12 ¶ 161 (defining Relevant Period to be May 1, 2019 until August 31, 2019).  The fact that

13 Plaintiffs allege identical so-called liquidity averages in both *BMA* and *Kanyshev* for two

14 drastically different time periods reflects that Plaintiffs' allegations here are not tethered to any

15 well-pleaded facts and are instead based upon unsupported speculation.

16        That conclusion is bolstered by a review of the very "bid-ask spread data … provided by

17 OKEX cryptocurrency derivative exchange" that Plaintiffs rely upon, and thus incorporate by

18 reference, in the SACC.  *See* SACC ¶ 527; *Ritchie*, 342 F.3d at 908.  The data referenced by the

19 SACC comes from marketing materials published by OKEx on October 11, 2019.  *See* Hibbard

20 Decl., Ex. C; *see In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 831 (N.D. Cal. 2019)

21 (taking judicial notice of blog post).  That post acknowledges "BitMEX's dominance in" the

22 perpetual swap trading market space, that "BitMEX leads the crypto derivatives market in terms

23 of trading volume," and that, during the time period evaluated, ***BitMEX's trading volume was***

24

---

25 ⁸ *See, e.g.*, Hibbard Decl., Ex. C (noting that "OKEx Perpetual swap is one of the most
popular derivative products that hit the market this year"—*i.e.*, 2019); Hibbard Decl., Ex. D
26 (describing Huobi's 2020 product launch); Hibbard Decl., Ex. E (describing Binance's August
10, 2020 launch of "Perpetual Futures contracts margined with Bitcoin," and explaining that these
27 products "will complement Binance's broad variety of derivatives, including its first product,
USDT-margined perpetual futures" which it "[l]aunched nearly a year" prior in 2019).  All of
these online posts are subject to judicial notice for the reasons set forth in Defendants'
28 accompanying Motion for Judicial Notice.

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   ***more than 15x higher than OKEx's***.  *Id.* ("In terms of trading volume, BitMEX beats OKEx

2   with a remarkably high average of $159M, ranging from $29M to $682M; while OKEx's volume

3   averaged at $10M, ranging from $1M to $46M.").  But the post also touted that an analysis of the

4   "6-mins-bid/ask-spread data from Aug. 15– 21, 2019 of OKEx and BitMEX" showed that

5   "BitMEX's spread varies from -5.5 to -0.5, and the average is -0.51; while OKEx's spread varies

6   from -8.8 to 0, with an average of -0.14"—the precise numbers reflected in Plaintiffs' SACC.

7         These numbers, however, reflect the bid-ask spread for *only* August 15–21, 2019 (dates

8   which post-date the end-date for all of Plaintiffs' deposits, SACC ¶ 512, and all but BMA's

9   losses, *id.*), *not* for the Relevant Period identified in this case (or in *Kanyshev*).  Plaintiffs'

10   assertions to the contrary in the SACC should therefore be disregarded.

11         *Fourth*, Plaintiffs' claim that Defendants misrepresented BitMEX's "liquidity" with

12   regards to other exchanges is directly at odds with Plaintiffs' own pleadings, including the

13   exhibits attached thereto.  Notwithstanding their new allegations that BitMEX was "overtaken"

14   by other cryptocurrency exchanges by "no later than October of 2018" (SACC ¶ 527), the SACC

15   continues to allege facts establishing that during the time Plaintiffs claim to have traded, BitMEX

16   "remains the largest crypto exchange, by volume, in the world."  SACC ¶ 115; *see also id.* ¶ 179

17   (alleging that BitMEX "is consistently among the largest cryptocurrency derivatives traders by

18   volume and has been for years").  Those allegations are supported by Plaintiffs' own exhibits,

19   including those published well after October 2018.  For instance, Plaintiffs' Exhibit 2—a blog

20   post published on July 19, 2019—touts BitMEX as "the king of crypto futures and one of the

21   most liquid exchanges on the market," and acknowledges that "despite CME, Binance, OKEx,

22   and a handful of others, BitMEX still dominates the market."  SACC Ex. 2.

23                    **(c)      Plaintiffs Still Do Not Plead A Viable Theory Of Reliance.**

24         Finally, Plaintiffs' fraud claims—and thus, nearly Plaintiffs' entire complaint—fail

25   because Plaintiffs do not allege plausible facts establishing that they relied on any

26   misrepresentation or omission attributable to Defendants.  As this Court observed, the CC's

27   allegation (at ¶ 345) that Plaintiffs "rightfully assumed that the market conditions of spot bitcoin

28   and bitcoin derivatives markets were due to the actual market forces of supply and demand" was

1   predicated on a "fraud on the market theory" of reliance that has been rejected by the California

2   Supreme Court.  Order 27–28.  Yet, Plaintiffs repeat that allegation in the SACC (at ¶¶ 418, 421).

3   That allegation thus fails to establish reliance for the same reasons already articulated.

4          Plaintiffs' new theory of reliance fares no better.  Nowhere in the CC did Plaintiffs allege

5   that they relied on either the Terms of Service (including as to HDR's trading arm) or the

6   website's statements regarding liquidity.  Only after the Court rejected Plaintiffs' "fraud on the

7   market" theory of reliance did Plaintiffs allege, for the first time, that they relied on purported

8   misstatements from the BitMEX Terms of Service and website.  SACC Counts I, III, XI, XIII.

9          Regardless, the SACC fails to set forth facts establishing that Plaintiffs reasonably relied

10  on the newly-alleged purported misrepresentations.  The "reliance" element for a fraud claim

11  under both California and federal law is not satisfied "[i]f the conduct of the plaintiff in the light

12  of his own intelligence and information was manifestly unreasonable." *Hoffman v. 162 N. Wolfe*

13  *LLC*, 228 Cal. App. 4th 1178, 1194 (2014) (quoting *Seeger v. Odell*, 18 Cal. 2d 409, 415 (1941));

14  *see also Walrus Master Fund Ltd. v. Citigroup Glob. Mkts., Inc.*, No. 08 Civ. 2404, 2009 WL

15  928289, at *3 (S.D.N.Y. Mar. 30, 2009) (dismissing CEA claim on the pleadings when plaintiff

16  failed to "adequately plead[] justifiable reliance").  As noted, Plaintiffs' allegations that

17  Defendants made misrepresentations regarding HDR's trading arm are predicated upon blog posts

18  from 2019 and statements from unidentified "former employees" who worked at BitMEX during

19  unspecified time periods.  While Defendants deny the existence of any misrepresentations,

20  Plaintiffs cannot demonstrate reasonable reliance when Plaintiffs simultaneously allege that the

21  "true nature" of the trading arm was publicly known long before Plaintiffs claim to have traded.

22         The same is true of Plaintiffs' allegations regarding the statements on the BitMEX

23  website.  Although Plaintiffs repeatedly allege that BitMEX did not offer "1500% more Bitcoin /

24  USD liquidity than any other platform," Plaintiffs do not allege any facts showing that they relied

25  upon that statement prior to depositing bitcoin with BitMEX.  Instead, Plaintiffs claim only that at

26  the time they deposited bitcoin, the "amount of available liquidity" was "highly material for each

27  Plaintiff's decision" because that liquidity "determined the potential profits that Plaintiffs could

28  realize from cryptoderivative *trading*."  SACC ¶ 526 (emphasis added).  In other words, Plaintiffs

1    relied upon the website's statement that "BitMEX's XBTUSD market is the most liquid in the

2    world"—a statement which Plaintiffs do not appear to challenge as inaccurate and which the

3    materials relied upon in Plaintiffs' SACC confirm to be true.  *See supra* Part IV.A.2.b.  In any

4    event, as noted above, Plaintiffs had real-time access to multiple indicators of liquidity on

5    BitMEX at all times and were free to compare that information to that provided by any other

6    exchange before depositing, let alone trading, on BitMEX.  *See supra* Part IV.A.2.b.  Plaintiffs'

7    fraud claims therefore independently fail for lack of justifiable reliance.

8              **B.       Plaintiffs Still Lack Article III Standing to Pursue Their Claims.**

9              The Court dismissed Plaintiffs' CC because Plaintiffs failed to demonstrate that they

10   possessed Article III standing.  Order 15–16.  The SACC suffers from that same defect.

11                        **1.       Plaintiffs Still Have Not Plausibly Alleged That Defendants' Conduct**
                                    **Caused Their Bitcoin Losses.**
12

13             Defendants previously showed that even if Plaintiffs pled facts to support that Defendants

14   executed trades on other platforms on the precise dates Plaintiffs claim to have suffered losses—

15   something that Plaintiffs still fail to do, *see supra* Part IV.A.1—"nothing in the Complaint makes

16   it plausible that those trades, as opposed to any other market factor or third-party trades, caused

17   plaintiffs' losses."  Order 15.  The Court agreed.  "Even if plaintiffs were referring to defendants

18   when using the term 'perpetrators'"—a claim that the Court deemed "disingenuous" in light of

19   Plaintiffs' third-party focused allegations in the CC, *id.* at 13 n.6—"they do not plausibly explain

20   why they think that *defendants* were the perpetrators."  *Id.* at 15.  "Without factual allegations that

21   plaintiffs' claimed losses are 'fairly traceable' to *defendants'* alleged conduct, as opposed to acts

22   by third parties or inherent market forces, Article III standing is insufficiently pleaded."  *Id.* at 16;

23   *see also, e.g.*, *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)

24   ("When faced with two possible explanations, only one of which can be true and only one of

25   which results in liability, plaintiffs cannot offer allegations that are merely consistent with their

26   favorite explanation but are also consistent with the alternative explanation.").  Plaintiffs' SACC

27   attempts to address that ruling in two ways, neither of which satisfies Article III.

28             *First*, instead of adding "factual allegations" buttressing their claims that Defendants'

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

actions caused their losses, Plaintiffs simply delete some (but not all) of their prior allegations regarding the conduct of third party perpetrators.  *See* Hibbard Decl. Ex. A ¶¶ 164–69, 173, 176 (replacing "perpetrators" with "Defendants' Insider Trading Desk"); ¶¶ 374, 387, 401, 721, 773 (deleting references to "third party perpetrators"); ¶ 328 (altering allegations regarding platforms where Defendants purportedly traded to address the inconsistencies noted by the Court's Order (at 13 n.6)).  Those changes do nothing to address the pleading deficiencies identified in the Court's Order.  Indeed, the Court has already held that "[e]ven if plaintiffs were referring to defendants when using the term 'perpetrators'"—just as the SACC now claims—Plaintiffs still must plead plausible facts supporting that conclusion.  Order 15–16.  The SACC fails to do so.

Regardless, even after deleting references to the trading activities of other "perpetrators," the SACC continues to plead facts acknowledging that Plaintiffs' losses are "the result of independent action of some third party not before the court."  Order 15 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Like the CC, the SACC and its exhibits still acknowledge that cryptocurrency derivatives are "highly leveraged and volatile products," SACC ¶ 185, and that "manipulators [] have incentives" to exploit "the market structure that has evolved around bitcoin."  SACC Ex. 3.  And like the CC, the SACC still alleges that third parties engaged in price manipulation.  *E.g.*, SACC ¶ 643 ("Defendants knew that BitMEX Leaderboard trader with assumed name Quick-Grove-Mind was clearly a notorious market manipulator," and that "Quick-Grove-Mind … cause[d] large market price swings"); *id.* ¶¶ 468–69 ("Ben Aabtc" "'pumped' bitcoin market price" in 2018 by trading on "'reference' spot exchanges while maintaining an open $30,873,844 Perpetual Swap position" on BitMEX).  Because the SACC still does not allege "facts tending to exclude the possibility that the alternative explanation"—that market forces or third party conduct caused their losses—"is true," Plaintiffs lack Article III standing to pursue their claims.  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108.

*Second*, Plaintiffs attempt to trace their losses to Defendants' alleged conduct by adding two brand new categories of damages:  "loss of use" and "trading commissions."  Specifically, Plaintiffs claim that if they had not been fraudulently induced to trade on BitMEX by Defendants' misrepresentations, they would have deposited their bitcoins "in interest-bearing accounts widely

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    available on the market, at the time, from reputable and financially stable companies including

2    U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits."  SACC ¶ 512.

3    Plaintiffs also assert that because of Defendants' so-called misrepresentations, they paid BitMEX

4    "trading commissions," which they claim "BitMEX charges traders … in connection with

5    opening, maintaining and closing trading positions, irrespective of market moves or other events

6    and irrespective of whether the position is profitable or not."  SACC ¶ 512 n.24.

7         These newly claimed categories of "damages" do nothing to establish that Plaintiffs

8    possess Article III standing and only confirm that this lawsuit is nothing more than an effort to

9    turn Plaintiffs' decision to trade famously volatile derivatives into a risk-free proposition.  Even if

10   "loss of use" damages were recoverable under the causes of action asserted by Plaintiffs—and

11   they are not, *see infra* Part IV.D.1—Plaintiffs' claim that they suffered these losses because of

12   Defendants' conduct is entirely implausible.  Indeed, just paragraphs before Plaintiffs claim that

13   they would have deposited their bitcoins "in interest-bearing accounts" if they did not trade on

14   BitMEX, Plaintiffs expressly allege that they were looking to "profit[] … from cryptoderivative

15   *trading*."  SACC ¶ 526 (emphasis added).

16        Plaintiffs' so-called "trading commissions" damages fare no better, as they amount to a

17   "benefit of the bargain theory" of economic loss, *i.e.*, that Plaintiffs "bargained for a product

18   worth a given value [here, trading cryptocurrency derivatives in exchange for a certain

19   commission] but received a product worth less than that value."  *McGee v. S-L Snacks Nat'l*, 982

20   F.3d 700, 705–06 (9th Cir. 2020).  But Ninth Circuit law is clear that to establish Article III

21   standing under a "benefit of the bargain" theory, the "plaintiff must show that she did not receive

22   a benefit for which she actually *bargained*."  *Id.* at 706 (dismissing claim for lack of Article III

23   standing because "[a]bsent some allegation that [defendant] made false representations about [the

24   product], [plaintiff's] benefit of the bargain theory falls short").  And here, Plaintiffs offer no

25   plausible facts establishing that they received anything other than what they were promised when

26   they were charged "trading commissions."  Rather, Plaintiffs sued because their positions were

27   liquidated on certain dates, allegedly due to Defendants' trading on those same dates.  Absent

28   those trading losses, they have no cause to complain.  Yet, they fail to connect those trading

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

losses to Defendants.  Plaintiffs simply have not pled any plausible facts establishing that Defendants made any misrepresentation regarding what Plaintiffs label as BitMEX's "Insider Trading Desk" or relative "liquidity."  Plaintiffs therefore cannot point to the trading commissions they paid to trade on BitMEX as a valid "injury in fact" for Article III purposes.

> **2.      Plaintiff BMA Independently Lacks Standing Because It Still Has Not Demonstrated That It Suffered an "Injury In Fact."**

This Court previously held that Plaintiff BMA lacked Article III standing because it failed to demonstrate that it "is seeking to vindicate its *own* rights, instead of those of its members." Order 16.  Despite being put on notice of this deficiency by the Court's prior Order, and despite having filed *nine* different iterations of its complaint (including proposed complaints, *see* ECF Nos. 1, 6, 32, 45, 73-2, 97, 149, 150, 153), BMA *still* has not made any effort to remedy this dispositive defect.  All of BMA's claims therefore fail for lack of Article III standing.

**C.      Plaintiffs' Federal Claims Remain Deficient in Multiple Additional Respects.**

Even if Plaintiffs could clear the threshold hurdles identified above, Plaintiffs' federal claims fail because Plaintiffs still do not plead *prima facie* RICO and CEA claims.

> **1.      The SACC Does Not Allege a *Prima Facie* RICO Claim.**

The Court previously held that Plaintiffs' RICO claims failed for three separate reasons: Plaintiffs (1) lacked standing under Section 1964(c); (2) failed to plausibly allege "the existence of a distinct enterprise, separate and apart from the general business of BitMEX"; and (3) failed to allege plausible facts establishing that Defendants committed any RICO predicate offense.  Order 16–21.  All three of those deficiencies remain in the SACC.

*First*, Plaintiffs still do not allege plausible facts establishing that they possess statutory standing under Section 1964(c).  Like the CC, the SACC's "allegations about defendants' trader-based manipulative conduct are made almost exclusively on 'information and belief' without explanation of the basis for such beliefs or facts that would make their allegations plausible."  *Id.* at 16–18; *see supra* Part IV.A.1.  And while Plaintiffs also now assert RICO claims based upon the purported misrepresentations on BitMEX's website, as explained, Plaintiffs' attempts to tie those misrepresentations to their supposed bitcoin losses fail to satisfy Article III's baseline

1    requirements, let alone "proximate causation under the heightened RICO standard."  Order 16.

2          *Second*, the SACC confirms that Plaintiffs cannot allege the existence of a valid RICO

3    enterprise.  The SACC now purports to identify three separate RICO enterprises (SACC ¶ 337

4    n.13):  an "association and fact" [sic] enterprise (consisting of all named Defendants, SACC

5    ¶¶ 337, 648), an "HDR Enterprise" (consisting of all Defendants except HDR, SACC ¶ 698), and

6    an "ABS Enterprise" (consisting of all Defendants except ABS, SACC ¶ 751).  But no matter

7    which of these formulations is used, Plaintiffs' allegations amount to "a corporation carrying out

8    its own activities (even fraudulent ones) only through its agents and employees—the precise

9    circumstance that does not constitute a RICO enterprise."[9]  Order 19.

10          *Third*, as before, Plaintiffs do not allege plausible facts establishing that Defendants

11   committed any RICO predicate offenses.  While Plaintiffs assert that Defendants violated a wide

12   array of RICO predicates, all of those allegations depend on their claims that Defendants either

13   (a) engaged in market manipulation or (b) fraudulently induced them to trade on BitMEX.  As

14   detailed *supra*, those overarching "specific acts … are insufficiently alleged."  Order 21.

15                   **2.      The SACC Does Not Allege a *Prima Facie* CEA Claim.**

16                        **(a)      The Complaint Still Does Not Allege a CEA Market
                                     Manipulation Claim.**
17

18          Plaintiffs' SACC also still fails to plead a prima facie CEA claim for market manipulation

19   under Sections 6(c)(1) and 6(c)(3) of the CEA (Counts IV–VI).  To make a prima facie case for

20   CEA market manipulation, Plaintiffs must plausibly plead that "(1) Defendants possessed an

21   ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the

22   artificial prices; and (4) Defendants specifically intended to cause the artificial price.'"  *In re*

23   *Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013); *see also* Order 21–22.

24

25          [9] While Plaintiffs suggest elsewhere that Defendants acted "solely or together with other
     individuals, including a notorious and habitual market manipulator Ben Aabtc," who "participated
26   in conduct of the Enterprise's affairs through a pattern of racketeering activity," SACC ¶ 346,
     Plaintiffs offer no facts in support of that conclusion.  In any event, Plaintiffs do not even identify
27   Ben Aabtc as a member of any enterprise or allege that Ben Aabtc shared a common purpose with
     any enterprise, confirming that all of the purported "enterprises" here are not "separate and apart
28   from the general business of BitMEX."  Order 20.

1    Plaintiffs' SACC contains the same shortcomings as the CC, and therefore cannot meet

2    even the pleading burden imposed by Rule 8—much less Rule 9(b).[10]  As detailed above,

3    Plaintiffs still do not allege facts to support the conclusion that Defendants made any trades that

4    had the ability to move cryptocurrency markets, let alone that Defendants intended to or did cause

5    any artificial prices.  And Plaintiffs still fail to support with anything more than information-and-

6    belief conclusions their claim that Defendants' alleged conduct caused their trading losses.

7                    **(b)      The Complaint Does Not Allege Any *Prima Facie* CEA
                              Fraudulent-Inducement Claims.**
8

9    Plaintiffs' SACC adds three CEA claims based on alleged "fraudulent representations,

10   half-truths and omissions" that purportedly induced them to invest their money with BitMEX

11   (Counts I–III).  To the extent these claims are even cognizable under 7 U.S.C. § 9(1), Plaintiffs

12   must allege:  "(1) a material misrepresentation (or omission); (2) scienter; (3) a connection with

13   the purchase or sale of security; (4) reliance (transaction causation); (5) economic loss; and (6)

14   loss causation."  *E.g.*, *U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F.

15   Supp. 3d 996, 1011 (N.D. Ill. 2015).  And because fraudulent misrepresentation or omission

16   claims are subject to Rule 9(b), Plaintiffs' allegations must "'state with particularity' … the who,

17   what, when, where, and how of the misconduct alleged."  Order 8.

18   Plaintiffs do not meet their burden.  The SACC premises its CEA fraudulent inducement

19   claims on (1) the adequacy of the BitMEX Terms of Service's disclosure of the alleged "Insider

20   Trading Desk," SACC Counts I & III; and (2) statements on the BitMEX website regarding

21   market liquidity, SACC Count II.  But the SACC fails to plead a misrepresentation, reliance, or

22   loss causation with the particularity required.  *See supra* Parts IV.A.2, IV.B.1.  Plaintiffs'

23   fraudulent inducement CEA claims fail for each of these reasons.  *See Dudley v. Dittmer*, 795

24   F.2d 669, 672–73 (8th Cir. 1986) ("An action for fraud under the CEA requires a false

25   representation of material fact."); *Walrus Master Fund Ltd.*, 2009 WL 928289, at *3 (dismissing

26

27        [10] Because Plaintiffs' market manipulation claims sound in fraud (*see, e.g.*, SACC ¶¶ 597,
     612), they must be pleaded with particularity under Rule 9(b).  *In re London Silver Fixing, Ltd.,*
28   *Antitrust Litig.*, 332 F. Supp. 3d 885, 921 (S.D.N.Y. 2018) (noting that "[m]arket manipulation
     claims sounding in fraud must be pleaded with particularity in accordance with Rule 9(b)").

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1   CEA claim on the pleadings when plaintiff failed to "adequately plead[] justifiable reliance");

2   *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018) (plaintiff must

3   establish "actual damages" to possess statutory standing under CEA).

4          Additionally, Plaintiffs fail to adequately plead facts supporting an inference of scienter as

5   to each Defendant.  To adequately plead scienter under the CEA, Plaintiffs must allege "concrete

6   facts to support [the] contention that [the defendant] intentionally and knowingly deceived the

7   market."  *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1059 (N.D. Ill. 2016).  "The

8   factual allegations in the complaint must give rise to a strong inference of scienter."  *Sonterra*

9   *Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 552 (S.D.N.Y. 2018).  And

10  where multiple defendants are alleged to have committed fraud, Rule 9(b) requires Plaintiffs to

11  specifically allege the acts perpetrated by each defendant; they cannot "merely lump defendants

12  together."  *Swartz*, 476 F.3d at 764; *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007

13  WL 1946553, at *6, *9 (S.D.N.Y. June 28, 2007) (dismissing CEA claims against corporate and

14  individual defendants because "'lumping' all defendants together" failed to satisfy Rule 9(b)).

15         Here, the SACC does not specify with any factual detail which Defendants had a role in

16  the misrepresentations or omissions alleged.  Instead, Plaintiffs merely claim that "Defendants,"

17  generally, made these misrepresentations or omissions, and fail to allege facts that would support

18  an inference that any of the individual Defendants knew specific facts that would render the

19  alleged misrepresentations or omissions false or misleading.  When stripped of its impermissible

20  information-and-belief and group-pleading allegations, the SACC does not contain any well-

21  pleaded factual detail supporting an inference that any of the individual Defendants committed

22  fraud, much less at the level of scienter required to satisfy Rule 9(b).[11]

23         This pleading defect further serves to negate any strong inference of collective corporate

24  scienter.  As the Second Circuit recently observed, "the 'most straightforward' way to raise a

25  ---

26  [11] Plaintiffs' vague claim that "a former high-ranking employee of BitMEX repeatedly
    informed Defendants that the aforesaid representations regarding available liquidity on the
27  BitMEX platform were in fact false," SACC ¶ 537, offers none of the detail required to plead
    fraud with particularity, as it is devoid of any specificity regarding the role of the employee, the
    specific timing of the alleged statements, or the individuals who allegedly heard them.  *See* Order
28  18 n.10; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996–98 (9th Cir. 2009).

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

1    strong inference of corporate scienter is to impute it from an individual defendant who made the

2    challenged misstatement."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020); *see also In re*

3    *Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 736 (S.D.N.Y. 2018) (similar).  Like the

4    allegations in *Jackson*, the SACC "provides no connective tissue" between any individual

5    Defendant and the alleged fraudulent representations and omissions.  *See* 960 F.3d at 99.  Nor

6    does the SACC allege any facts that make this an "exceedingly rare instance[]" where a

7    "statement may be so 'dramatic' that collective scienter may be inferred."  *Id.*  Plaintiffs' CEA

8    fraud claims therefore fail.[12]

9                          **(c)    The Complaint Still Fails to State a Claim for Aiding and
                                  Abetting CEA Violations.**
10

11          Although Plaintiffs continue to assert a claim (Count VIII) against Defendants for aiding

12   and abetting market manipulation perpetrated by a third party on March 13, 2020, they have done

13   nothing to correct the deficiencies that this Court identified in the CC.  Just as in the CC,

14   Plaintiffs claim that on March 13, 2020, a BitMEX user named Quick-Grove-Mind "cause[d]

15   large market price swings."  SACC ¶ 643.  And, just as in the CC, Plaintiffs further contend that

16   Defendants "aided and abetted" those market swings by (1) making available "extremely high

17   trading leverage," (2) allowing Quick-Grove-Mind to "avoid detection by providing him with the

18   ability to open unlimited number of anonymous document check-free trading accounts," and (3)

19   "taking BitMEX platform offline during market manipulation event on March 13, 2020."  *Id.*

20          Those allegations fail for the reasons this Court already identified.  *See* Order 23–24.

21   *First*, BMA—the only Plaintiff who allegedly suffered a loss on March 13, 2020—lacks standing.

22   *See supra* Part IV.B.2.  *Second*, Plaintiffs still fail to allege any facts to support their claim that

23   Quick-Grove-Mind engaged in market manipulation and instead continue to rely solely on the

24   "information and belief" allegation that Quick-Grove-Mind made a "$100,000,000 profit" during

25   so-called "market manipulation events"—an allegation of profitable trading that does not give

26   rise to a plausible inference of market manipulation.  SACC ¶ 465; *see also* Order 23.  *Third*,

27

28   _____
     [12] Because Plaintiffs do not allege viable market-manipulation or fraudulent-inducement
     claims, Plaintiffs' claim for principal-agent liability (Count VII) also fails.  Order 21–23.

1   Plaintiffs still do not plead any facts that raise a plausible inference that Defendants aided and

2   abetted Quick-Grove-Mind's supposed market manipulation.  Instead, Plaintiffs leave

3   unanswered questions raised with respect to the CC—namely who Quick-Grove-Mind is, *see*

4   *supra* note 6, how that trader engaged in market manipulation, what Defendants knew about that

5   trader, and what Defendants did to aid in the trader's purported wrongdoing.  Order 24.[13]

6           D.      **Plaintiffs' State Law Claims All Still Fail as a Matter of Law.**

7                   1.      **All Of Plaintiffs' Misrepresentation-Based Common Law Claims Fail.**

8           As noted, all of Plaintiffs' common law fraud and misrepresentation claims fail because

9   Plaintiffs have not plausibly alleged that they justifiably relied on any misrepresentation by

10  Defendants.  Those claims also fail for lack of causation.  It is well settled that under California

11  law, if a plaintiff's "damages do not flow from the concealment" or misrepresentation, "but rather

12  from some other extrinsic factor," the plaintiff has failed to establish proximate causation." *OCM*

13  *Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 871

14  (2007).  That is the case here.  As already explained, Plaintiffs have failed to allege facts

15  establishing that their trading losses were caused by Defendants' purported conduct, as opposed

16  to third party conduct or other market factors.  In any event, both Plaintiffs' "loss of use" and

17  "trading commissions" damages are implausible.  *See supra* Part IV.B.  And the latter are also

18  unrecoverable "benefit of the bargain" damages under California law.  *See* Cal. Civ. Code § 3343;

19  *see also Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995).

20                  2.      **Plaintiffs' California Statutory Claims All Fail.**

21          Plaintiffs' SACC adds new California statutory claims not found in prior iterations of the

22  complaint.  Plaintiffs now allege standalone violations of both the FAL (Bus. & Prof. Code

23  § 17500) and the CLRA (Civ. Code § 1750) based on purported misstatements from the BitMEX

24  website.  SACC Counts XXI & XXII.  Plaintiffs also continue to assert UCL claims, although

25

26          [13] Plaintiffs allege in passing that Defendants aided and abetted Ben Aabtc in manipulating the market in violation of the CEA.  SACC ¶ 472.  This perfunctory allegation—not
27  expressly referenced in Count VIII—is insufficient because it (1) fails to connect any alleged manipulation to Plaintiffs' alleged damages, (2) does not allege that Defendants knew about this
28  purported manipulation, and (3) fails to explain how each of Defendants supposedly aided.

those claims are now predicated on violations of the CLRA and FAL, the Federal Trade

Commission Act ("FTCA"), and their claims that Defendants engaged in "unfair," "fraudulent,"

and "unlawful" business practices.  *See* SACC XXIII–XXV.  All of those claims fail.

(a)  <b>Plaintiffs Lack Standing To Pursue Their FAL, CLRA, and UCL Claims.</b>

To obtain relief under the CLRA, FAL, and UCL, a plaintiff must allege facts showing

that she suffered harm because of the defendant's statutory violation.  *See, e.g.*, *Shaeffer v. Califia*

*Farms, LLC*, 44 Cal. App. 5th 1125, 1137 (2020).  Plaintiffs here do not satisfy this threshold

element.  Like their fraud claims, Plaintiffs' statutory claims are predicated upon purported

misrepresentations and omissions from the BitMEX Terms of Service, website, or otherwise.  But

Plaintiffs offer no facts establishing that their purported reliance on those misrepresentations was

the cause of their purported losses.  *See supra* Parts IV.A.2.  Instead, the "gravamen" of

Plaintiffs' claims is that, at some point, the price of bitcoin underlying the derivatives traded by

Plaintiffs decreased to an extent that caused Plaintiffs' holdings to be liquidated.  Thus, even if

the SACC could satisfy the other elements necessary to proceed on their statutory claims,

Plaintiffs' failure to tie their bitcoin losses back to any conduct by Defendants bars those claims.

(b)  <b>Plaintiffs' CLRA Claim Is Independently Deficient.</b>

To prevail on a CLRA claim, a plaintiff must allege that the defendant represented that a

good or service "had any characteristic they do not have, or are of a standard or quality they are

not"—*i.e.*, a misrepresentation or omission.  *See, e.g.*, *Daugherty v. Am. Honda Motor Co.*, 144

Cal. App. 4th 824, 834 (2006).  Plaintiffs' CLRA claim here is predicated upon the same

purported misrepresentations underlying their fraud claims—that Defendants misrepresented facts

regarding HDR's trading arm in its Terms of Service and BitMEX's liquidity on its website.

SACC ¶¶ 926–34.  As detailed above in Part IV.A.1, Plaintiffs fail to establish that Defendants

made any such misrepresentation.  *See also In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776,

790 (N.D. Cal. 2017) ("Plaintiffs must plead the falsity of affirmative representations with

specificity," such as by identifying "other source[s] of information" revealing the true facts).

Moreover, "[g]eneralized, vague, and unspecified assertions constitute 'mere puffery' upon which

1    a reasonable consumer could not rely, and hence are not actionable" under the CLRA.  *Elias v.*

2    *Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854–55 (N.D. Cal. 2012).  Particularly as to

3    BitMEX's liquidity, Plaintiffs have not established that those statements are anything more than

4    nonactionable puffery, let alone that they reasonably relied upon them.  *See supra* Parts IV.A.2.

5                   **(c)     Plaintiffs' FAL Claim Likewise Fails For Additional Reasons.**

6            As with the CLRA, a plaintiff cannot prevail under the FAL if the representation was true,

7    *see Consumer Advocs. v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003), or was

8    mere "puffery" upon which a consumer could not reasonably rely, *Anunziato v. eMachines, Inc.*,

9    402 F. Supp. 2d 1133, 1139–41 (C.D. Cal. 2005).  Plaintiffs' FAL claims are again predicated on

10   the same purported "untrue and misleading statements" regarding HDR's trading arm and

11   BitMEX's liquidity.  SACC ¶ 923.  Because Plaintiffs have not shown that those statements were

12   false or that Plaintiffs reasonably relied upon them, Plaintiffs' standalone FAL claim fails.

13                  **(d)     Plaintiffs' UCL Claims Are Independently Deficient.**

14           Plaintiffs allege a UCL violation in three separate counts, each predicated on one of the

15   statute's prohibitions against "unlawful," "unfair," and "fraudulent" business practices.  *See*

16   SACC Counts XXIII–XXV.  Those claims fail for lack of standing, as discussed above.

17   Plaintiffs' UCL claims are also independently deficient for the following reasons:

18       •   **"Unlawful" UCL Claim.**  When a plaintiff bases a UCL claim on "unlawful
             practices," she must plead the predicate statutory violation with "reasonable
19           particularity."  *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234,
             1261 (2018); *Khoury v. Maly's of Cal., Inc.*, 14 Cal. App. 4th 612, 619 (1993) (same).
20           Plaintiffs purport to identify five such statutory predicates here:  violations of RICO,
             the CEA, the CLRA, and the FAL described above, as well as violations of the FTCA,
21           15 U.S.C. §§ 45(a)(1) and 52(a).  SACC ¶¶ 960–64.  But none of those statutes gives
             rise to a valid UCL claim.  As Plaintiffs do not allege prima facie claims under RICO,
22           the CEA, the CLRA, or FAL, their UCL claims predicated on those statutes
             necessarily fail.  And the FTCA "does not provide individuals with a private right of
23           action."  *Nelson v. Am. Home Mortg. Servicing Inc.*, No. CV 10-4562, 2010 WL
             3034233, at *2 (C.D. Cal. July 29, 2020).  It therefore cannot serve as the statutory
24           predicate for a UCL claim, as Judge Massullo recognized.  *Kanyshev* Order 11 (citing
             *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1058 (N.D. Cal. 2014)).
25
         •   **"Fraudulent Business Practices" UCL Claim.**  As in their CC, Plaintiffs also claim
26           a violation of the UCL's "fraudulent business practices" prong that is entirely
             dependent on the "[a]llegations of specific acts constituting fraud and deceit and fraud
27           by omission" set forth elsewhere in the complaint.  SACC ¶ 953.  Judge Massullo
             previously rejected a substantially similar UCL claim on the grounds that plaintiffs
28           "have not adequately pleaded their fraud cause of action."  *Kanyshev* Order 12.  That

is the case here.  Because Plaintiffs do not allege a valid cause of action for fraud, *see supra* Part IV.A, and because Plaintiffs' "fraudulent business practices" UCL claim is predicated on that same conduct, SACC ¶ 953, Plaintiffs' UCL claim fails.

- **"Unfair" UCL Claim.**  Finally, Plaintiffs fail to assert a UCL claim predicated on that statute's "unfair" prong.  A practice is "unfair" under the UCL only when it is "'tethered' to specific constitutional, statutory or regulatory provisions." *Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 303 n.10 (2020).  For the reasons discussed above, Plaintiffs do not satisfy that standard.  Regardless, because the only "unfair" conduct purportedly engaged in by Defendants is either unconnected to Plaintiffs' purported losses or alleged solely on "information and belief" without any allegations supporting those beliefs, Plaintiffs' "unfair" UCL claim fails.[14]

### 3.   Plaintiffs' Negligence Claim Still Fails.

Plaintiffs now appear to advance two separate theories of negligence, neither of which has any merit.  Plaintiffs first repeat the argument this Court has already rejected—that Plaintiffs and Defendants had a "special relationship" giving rise to a duty to "maintain a functional crypto-derivatives trading marketplace."  SACC ¶¶ 974, 981; *cf. Order* 24–27; *Kanyshev Order* 13.  Plaintiffs have not pled any new facts warranting a different outcome.  Indeed, Plaintiffs simply repeat their prior claim (still citing to *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 461 (S.D.N.Y. 2013)) that "a special relationship between Defendants and Plaintiffs existed in this case and Defendants owed a duty to Plaintiffs to maintain a functional cryptoderivatives trading marketplace."  SACC ¶ 981.  That argument should be rejected for the same reasons already explained by this Court in its prior Order and by Judge Massullo.

Plaintiffs also appear to suggest that Defendants are liable for negligence because they breached the Terms of Service offered on BitMEX by failing to provide Plaintiffs with "the ability to place orders, open and close positions and use margin."  SACC ¶ 974.  But California law is clear that "conduct amounting to a breach of contract becomes tortious only when it also violates a duty *independent of the contract* arising from principles of tort law.  An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."  *State Ready Mix, Inc. v. Moffatt & Nichol*, 232 Cal. App. 4th 1227, 1231 (2015).[15]  And

---

[14] Appellate courts are divided as to the proper test for evaluating the "unfair" prong of the UCL.  *See Nationwide Biweekly Admin.*, 9 Cal. 5th at 303 n.10.  Regardless of the test applied, Plaintiffs' claim fails because they do not adequately allege that Defendants' conduct caused their alleged losses.

[15] *See also Erlich v. Menezes*, 21 Cal. 4th 543, 554 (1999) ("If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless…."); *N. Am. Chem. Co. v.*

NOTICE OF MOT. AND MOT. TO DISMISS
3:20-cv-03345-WHO

Plaintiffs' argument that *North American Chemical* permits liability for "negligent breach of contractual duties owed directly to plaintiffs" has been squarely rejected. *Aas v. Super. Ct.*, 24 Cal. 4th 627, 643 (2000) ("The argument is not persuasive."), *superseded by statute on other grounds as stated in Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1079–80 (2003). As noted, Plaintiffs have not identified a duty independent from Defendants' contractual obligations to maintain a functional marketplace. Nor could they, since BitMEX's Terms of Service expressly state that "[i]t is [BitMEX's] responsibility to maintain an orderly market." SACC Ex. 15 § 1.11; Ex. 19 § 1.11. Thus, any tort claim based upon the failure to perform an obligation set forth in the Terms of Service necessarily fails.[16]

Plaintiffs also fail to allege facts establishing that Defendants' purported conduct caused Plaintiffs' losses. Plaintiffs' SACC alleges for the first time that they sustained losses not because of Defendants' trading activity on other platforms on those three dates (as they claim elsewhere), but instead because of "server freezes that occurred on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018." SACC ¶ 977. Whatever the SACC means by "server freezes," this allegation directly contradicts other causation allegations in the SACC and in prior complaints without any explanation for that about face. Regardless, Plaintiffs plead no factual allegations regarding server outages on those specific dates, let alone that Defendants were to blame for those outages. In fact, the SACC alleges that "all hardware used by BitMEX platform was managed by Amazon EKS and not Defendants themselves." SACC ¶ 186.

### 4.  Plaintiffs' Conclusory Conversion Claim Fails.

Plaintiffs again allege that on the dates they purportedly suffered losses, Defendants executed other trades on other platforms that impacted the price of Plaintiffs' cryptocurrency

---

*Super. Ct.*, 59 Cal. App. 4th 764, 774 (1997) (same).

[16] Moreover, HDR expressly disclaims liability for service interruptions and warns users that the website is dependent on technical systems that may intermittently prevent access. The Terms of Service specifically provide that no warranties exist as to users' trading activity or use of the platform, including related service interruptions, and that users "assume full responsibility and risk of loss resulting from your use of the Service." SACC Ex. 19 § 7.5. "By contractually agreeing to assume all the risks of" trading on BitMEX, including the risk that Service may be interrupted, Plaintiffs "consented to certain acts or omissions … which [may] otherwise be negligent." *Coates v. Newhall Land & Farming, Inc.*, 191 Cal. App. 3d 1, 10 (1987).

derivatives, which Plaintiffs claim resulted in Defendants taking Plaintiffs' bitcoin and "convert[ing] the same to their own use." SACC ¶¶ 632, 1007. But Plaintiffs' "[a]llegations that defendants unlawfully dispossessed them of their property rely entirely on the fraud-based market manipulation allegations that plaintiffs have failed to plead with particularity." Order 29. That holding applies with equal force to the SACC. Moreover, as Judge Massullo recognized, there is "no case law suggesting that a plaintiff can bring a conversion suit anytime a freely-undertaken, high-risk, high-reward investment turns out to be unsuccessful." *Kanyshev* Order 14. Regardless, Plaintiffs' conversion theory fails for lack of causation for the reasons already detailed above.

**5.   Plaintiffs' Remaining State Law Claims Cannot Stand Alone.**

Plaintiffs' claims for Restitution (Count XXVII), Constructive Trust (Count XXVIII), and Accounting (Count XXIX) are nearly identical to those in the CC, except that the claim for restitution has been retitled "Quasi-Contract" instead of "Unjust Enrichment." As before, these claims depend on the "implausible price manipulation" and fraudulent inducement theories discussed above. *See* Order 28. Plaintiffs' claims for aiding and abetting conversion (Count XXXI) and under California Penal Code § 496 (Count XXXIII) likewise depend, by their own terms, on Plaintiffs' already dependent conversion claim.[17] Plaintiffs' supposed claim for a "Writ of Replevin" (Count XXXII), SACC ¶ 1022, also collapses into the claim for conversion. *See Foster v. Sexton*, 61 Cal. App. 5th 998, 1020 (2021). And finally, bitcoin—the remedy sought via replevin—cannot be recovered in a conversion action because it is not tangible property. *See Ox Labs Inc. v. Bitpay, Inc.*, 848 Fed. App'x 795, 796 (9th Cir. 2021).

**V.   CONCLUSION**

For the foregoing reasons, this Court should dismiss the SACC with prejudice.

---

[17] California Penal Code § 496(a) requires that the defendant purchased or received "property that *has been* stolen or that *has been* obtained in any manner constituting theft or extortion." (emphasis added); *see Instant Brands, Inc. v. DSV Sols., Inc.*, No. EDCV 20-399, 2020 WL 5947914, at *4 (C.D. Cal. Aug. 20, 2020) (The "legislative history and intent" behind California Penal Code § 496 confirms that this statute was "solely intended to create civil liability for the receipt or withholding of stolen property."). Here, not only was there no conversion, but Plaintiffs allege Defendants converted their bitcoin, not that Defendants received that property from others.

1    DATED: June 21, 2021                    Respectfully submitted,

2                                            JONES DAY

3

4                                            By: /s/ Stephen D. Hibbard
                                                  Stephen D. Hibbard
5

6                                            Counsel for Defendants
                                             HDR GLOBAL TRADING LIMITED and
7                                            ABS GLOBAL TRADING LIMITED

8                                            AKIN GUMP STRAUSS HAUER & FELD
                                             LLP
9

10

11                                           By: /s/ Peter I. Altman
                                                  Peter I. Altman
12
                                             Counsel for Defendant
13                                           ARTHUR HAYES

14                                           BOIES SCHILLER FLEXNER LLP

15

16                                           By: /s/ Edward H. Takashima
                                                  Edward H. Takashima
17
                                             Counsel for Defendant
18                                           BEN DELO

19

20                                           LATHAM & WATKINS, LLP

21

22                                           By: /s/ Douglas K. Yatter
                                                  Douglas K. Yatter
23                                                Matthew Rawlinson

24                                           Counsel for Defendant
                                             SAMUEL REED
25

26

27

28

                                                      NOTICE OF MOT. AND MOT. TO DISMISS
                                                      3:20-cv-03345-WHO

1          I, Stephen D. Hibbard, am the ECF User whose ID and password are being used to file

2    this DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'

3    SECOND AMENDED CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND

4    AUTHORITIES IN SUPPORT THEREOF.  In compliance with Civil L.R. 5-1(i)(3), I hereby

5    attest that all signatories concur in this filing.

6    DATED:  June 21, 2021

7

8                                    */s/ Stephen D. Hibbard*
                                     STEPHEN D. HIBBARD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28