# EXHIBIT A

## (to the Declaration of Stephen D. Hibbard and Defendants' Request for Judicial Notice)

Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC, Yaroslav Kolchin,
Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan, <br><br> Plaintiffs, <br><br> v. <br><br> HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed, <br><br> Defendants. | Case No. 20-cv-03345-WHO <br><br> **SECOND AMENDED CONSOLIDATED COMPLAINT FOR FRAUDULENT SOLICITATION IN VIOLATION OF 7 U.S.C. § 9(1), MARKET MANIPULATION IN VIOLATION OF 7 U.S.C. § 9(1) (USE OF DECEPTIVE OR MANIPULATIVE DEVICE), 7 U.S.C. §§ 9(3) AND 13(a)(2) (PRICE MANIPULATION), PRINCIPAL AGENT LIABILITY, AIDING AND ABETTING PRICE MANIPULATION IN VIOLATION OF 7 U.S.C. § 25(a)(1), CONSPIRACY TO CONDUCT AND CONDUCTING ENTERPRISE'S AFFAIRS THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. §§ 1962(d) AND (c) (RICO), FRAUD, FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, NEGLIGENCE, FALSE ADVERTISING, VIOLATION OF CONSUMER LEGAL REMEDIES ACT, UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ., UNJUST ENRICHMENT (., NEGLIGENCE, RESTITUTION) UNDER QUASI-CONTRACT, CONSTRUCTIVE TRUST, ACCOUNTING, REPLEVIN, CONVERSION, AIDING AND ABETTING** |

**CONVERSION, REPLEVIN AND VIOLATION OF CAL. PEN. CODE § 496**

**DEMAND FOR JURY TRIAL**

## COMPLAINT

Plaintiffs, BMA LLC ("BMA"), Yaroslav Kolchin ("Kolchin"), Vitaly Dubinin ("Dubinin"), Dmitry Dolgov ("Dolgov") and Păun Gabriel-Razvan ("Razvan"), (collectively "Plaintiffs"), by and through their undersigned attorneys, for their Second Amended Consolidated Complaint against Defendants HDR Global Trading Limited ("HDR"), ABS Global Trading Limited ("ABS"), Arthur Hayes ("Hayes"), ~~Ben~~Benjamin Delo ("Delo") and Samuel Reed ("Reed") (collectively "Defendants") allege as follows.

## INTRODUCTION

*"It just costs more to bribe them." Defendant Arthur Hayes (about U.S. authorities).*

1.      Plaintiffs are informed and believe and thereon allege that popular cryptocurrency derivatives exchange platform called Bitcoin Mercantile Exchange or BitMEX ("BitMEX" or "BitMEX platform") owned and operated from within this District by Defendants ABS, HDR, Hayes, Delo and Reed, and each of them, in a brazenly lawless manner, was deliberately designed from ground up with the purpose to engage in, facilitate, aid, abet, counsel, induce and/or procure a myriad of illegal activities including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c) (RICO), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq. (2018) and Commodity Futures Trading Commission ("CFTC") Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2019). Defendants, and each of them, specifically designed BitMEX to financially benefit from the alleged racketeering activity and other unlawful conduct, earning Defendants billions of dollars in illicit profits, Ex. 1, 2, 3.

2.      Defendants Hayes, Delo and Reed are notorious <u>and habitual</u> fraudsters, who have been criminally charged with felony money laundering related offenses by the U.S. Department of Justice ("DOJ") and who are currently released on bail awaiting a trial on their criminal charges. Attached hereto as Ex. 4 and 5 are true and correct copies of the DOJ criminal indictment and Commodity Futures Trading Commission ("CFTC") enforcement action against Defendants and the corresponding announcements. Defendant Hayes publicly admitted to bribery of foreign government officials and bank fraud and even expressed pride in his actions, Ex. 10, 11. Ex. 17 and 18 are true and correct copies of two sworn declarations by two of the defrauded victims of the Defendants, Frank Amato and Elfio Guido Capone, attesting, under oath, how Defendants defrauded them out of millions of dollars.

3.      Defendants deliberately designed their cryptocurrency derivatives exchange platform BitMEX ("BitMEX" or "BitMEX platform") to fraudulently induce unsuspecting victims to deposit their bitcoins with Defendants and then rob them blind of all their property, Ex. 1. In reality, BitMEX was a rigged casino, set up to use sensitive insider information of its traders to automatically liquidate them and misappropriate their money, when it was particularly profitable for Defendants to do so. To entice their victims to trade on the rigged BitMEX platform and pay trading commissions to Defendants, Defendants engaged in fraudulent solicitation using a laundry list of material misrepresentations, half-truths and omissions.[1] Once victims were fraudulently induced by Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon widely-known as "revenge trading" to keep them trading on their rigged platform. Revenge trading is a natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

[1] Among other, Defendants used a fraudulent solicitation that was similar to the one in *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), where SEC charged fraudsters with claiming to be "the largest Bitcoin exchange in euro volume and liquidity." In the present case, Defendants fraudulently claimed to provide "1500% More Bitcoin/USD liquidity than any other platform," which is even more factual and capable of misleading consumers. Defendants abruptly ceased to use this fraudulent solicitation only in March of 2021, after being sued for fraud.

4.      Defendants operated an undisclosed Insider Trading Desk managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated to continuously manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of ~~Bitcoin~~bitcoin and ~~Ethereum~~ether, Ex. 1, 2, 3.

5.      The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open positions. They were also provided with automated systems, built by BitMEX, leveraging this highly sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

6.      The traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations.

7.      Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

8.      The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would

cause liquidations resulting in a profit for BitMEX. BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

9.     ~~BitMEX~~Defendants actively concealed the wrongdoing perpetrated by their Insider Trading Desk. In addition to deliberately making all BitMEX accounts anonymous, which hindered pinpointing the culprits behind the manipulative trading, and actively deleting critical records, including trader identity information, BitMEX deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for ~~its~~their Insider Trading Desk with the BitMEX ~~exchange,~~platform. This was done to cover up ~~the~~any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits ~~cannot~~of the Insider Trading Desk could not be traced back to the BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.

10.     Financially ruined by Defendants' blatant fraud, some victimized traders were driven by Defendants into taking their own lives. For example, Defendants fraudulently induced Chinese trader Hui Yi to enter into a large short position on BitMEX, which BitMEX's Insider Trading Desk subsequently deliberately liquidated using Hui Yi's confidential information, confiscating 2,000 bitcoins of Hui Yi clients' money. The trader, who was the co-founder and CEO of cryptocurrency market analysis platform BTE.TOP, died by suicide on June 5, 2019.

11.     On October 1, 2020, Defendants Hayes, Delo and Reed were indicted by United States Department of Justice on felony charges of violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at BitMEX.[2] In announcing the indictment, Ex. 4, FBI Assistant Director William F. Sweeney Jr. said: "As we allege here today, the four

---

[2] There is also a second ongoing criminal investigation against BitMEX by the U.S. federal government, entirely unrelated to the Indictment and, therefore, additional federal criminal charges may be forthcoming against Defendants.

defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements. One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time." Defendant Reed was apprehended by the FBI in Boston, Massachusetts. Defendants Hayes and Delo surrendered to the FBI in April of 2021 and are currently released on $10,000,000 and $20,000,000 bail, respectively, waiting their criminal trial which is scheduled to start on March 28, 2022.

~~Delo remain at large and are currently fugitives wanted by the U.S. Government.~~

12.    On the same day, the CFTC announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging Defendants HDR, ABS, Hayes, Delo and Reed with operating an unregistered trading platform and violating multiple CFTC Regulations, including failing to implement required anti-money laundering procedures. The CFTC complaint is attached hereto as Ex. 5 and all allegations therein are made part hereof.

13.    Among those charged were company owners Defendants Hayes, Delo, and Reed, who operate BitMEX's platform through a maze of corporate entities, including Defendants HDR and ABS. BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

14.    The key facts of the racketeering scheme run by Defendants are rather simple and easy to understand. In 2014, Defendants launched the bitcoin derivatives trading platform BitMEX, which enables traders to place bets on direction of cryptocurrency prices. In designing their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer (KYC) or anti-money laundering (AML) checks what so ever, Ex. 1. In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked.

15.     In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way. The entire account registration and funding process takes about 10 minutes and no documents are even looked at. Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, Ex. 1. A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader, Ex. 6.

16.     Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from money

laundering and market manipulation. It all has to do with anonymity, lack of trading limits, high leverage and how the index price for bitcoin derivatives is calculated. Defendants deliberately designed this index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges. Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, relatively small market orders will suffice. Therefore, a relatively small market order on a spot exchange results in a relatively large bitcoin index price move on the relatively liquid BitMEX.

17.     A money launderer (Defendant) would open two exchange accounts – a helper account on one or more "reference" spot exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and BitStamp) and a winner account on BitMEX. The money launderer would then enter into a large leveraged derivatives position on BitMEX and to use automated software tools developed by BitMEX to immediately and automatically execute market orders from the helper account with maximum slippage to move the index price in a favorable direction, Ex. 2, 3, 7, 16. Due to disparity in liquidity between BitMEX and the "reference" spot exchanges, the



aforesaid deliberate design of the index price by Defendants, and the cascading liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account is multiplied greatly and translates into outsized profit in the winner account on BitMEX, Ex. 2, 3, 7, 16. Because BitMEX accounts are by design anonymous, the laundered money cannot be



Mechanics of Bitcoin Market Manipulation and Money Laundering

traced from the helper account to the winner account. Thus, the money laundering proceeds in the winner account on BitMEX appear as legitimate trading gains and the money laundering scheme achieves its purpose. The described money laundering and other nefarious acts are well documented and take place on BitMEX almost daily, Ex. 2, 3, 7, 16. Moreover, to exacerbate the described price manipulations, BitMEX intentionally locks users out of their accounts during manipulation times, falsely telling the users that their "system is overloaded".

18.     In the described money laundering scheme, the market manipulation gains realized by the launderer in the winner account and the funds confiscated by BitMEX as the result of liquidations induced by the launderer are generated at the expense of Plaintiffs and other cryptocurrency traders like Plaintiffs. Notably, BitMEX deposits proceeds from the user account liquidations into its so called "Insurance Fund," which has steadily grown over the years and amounts to, as of May 3, 2021, 37,337 bitcoins valued at over $2,165,555,825, all misappropriated from traders, including Plaintiffs.

19.    Defendants' own Leaderboard, which lists the most profitable trading accounts on BitMEX, is replete with evidence of market manipulation and money laundering. For example, BitMEX's Leaderboard account under assumed name Quick-Grove-Mind shows multimillion-dollar profit spikes, which exactly match known market manipulation events, while entirely



avoiding any and all trading losses. Notably, Defendants' own data shows that this market manipulator generated over $30,000,000 in profit during three market manipulation events that took place on September 24, 2019, November 18-19, 2019 and March 11-12, 2020, at the expense of retail traders, including Plaintiffs. In view of the fact that to generate $30,000,000 in profit, the manipulator would need to open at least $100,000,000 leveraged position on the BitMEX platform, which only Defendants themselves can do, and know the exact position sizes and

liquidation price points as well as parameters of

stop loss orders of all the other traders on BitMEX, the information available only to BitMEX insiders, Plaintiffs are informed and believe and thereon allege that the Leaderboard account under the assumed name Quick-Grove-Mind was a market manipulation winner account used by one of the individual Defendants Hayes, Delo or Reed, who traded on BitMEX despite having a



clear conflict of interest.

20.    BitMEX directly participates in and financially benefits from the market manipulation and money laundering through its Insider Trading Desk and indirectly, by collecting increased trading commissions and also by liquidating users' accounts. Notably, because profit from liquidating traders like Plaintiffs amounts to up to a half of BitMEX revenue, Defendants are the primary financial beneficiaries of the described illegal market manipulation and money

laundering activities. In addition to trader liquidations, BitMEX knowingly collects high trading commissions for the above money laundering transactions, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from which it pays all its employees and even its attorneys (after currency conversion). Thus, the salaries of all BitMEX employees as well as legal fees paid to its lawyers are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

| Manipulation Component | Manipulative Conduct Involved | Place of Manipulative Conduct |
|---|---|---|
| Helper<br>~~Helper~~ Component | Defendants deliberately moved<br>~~Defendants deliberately moved~~ BitMEX's .BXBT index price by placing large market orders with maximum slippage from helper accounts on three illiquid exchanges that are used by BitMEX to calculate ~~.BXBT index~~<br>.BXBT index | BitStamp, Coinbase Pro and Kraken, all<br>~~BitStamp, Coinbase Pro and Kraken, all~~ located in the United States |
| ~~Winner Component~~ | The deliberate BitMEX's .BXBT index price move ~~by Defendants directly and proximately caused liquidation cascades on Kraken and BitMEX that resulted in Plaintiff's swap positions on those exchanges to be liquidated, resulting in monetary damages as alleged herein.~~<br>by Defendants ~~capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX.~~ directly and proximately caused | BitMEX, having the majority of cloud ~~service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District and Kraken, also located in this District.~~<br>~~BitMEX, having the majority of cloud~~ service providers (Paragraph 98), ~~employees, engineering and software development team and the nerve center of operations in this District.~~ |
| ~~Facilitation Component~~ | ~~Defendants freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times~~ | ~~This District, where all three site reliability engineers Jerry Aldrich, Scott H. and Armando Cerna of BitMEX, who are responsible for the trading platform uptime and server freezes, are located and who personally perpetrated the BitMEX server freezes.~~ |
| liquidation cascades on Kraken and BitMEX that resulted in Plaintiff's swap positions on those exchanges to be liquidated, resulting in monetary | | employees, engineering and software development team and the nerve center of operations in this District and |

| damages as alleged herein. | Kraken, also located in this District. |

|  |  |  |
|---|---|---|
| Winner Component | Defendants capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. | BitMEX, having the majority of cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District. |
| Facilitation Component | Defendants freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where all three site reliability engineers Jerry Aldrich, Scott H. and Armando Cerna of BitMEX, who are responsible for the trading platform uptime and server freezes, are located and who personally perpetrated the BitMEX server freezes. |

21.     Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a), see Paragraphs 115, 116, Ex. 8. This violation has been conclusively proven using BitMEX's own Leaderboard, see Paragraphs 124-125. Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. 9. In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiffs are aware of, without having any benefit of discovery, see Paragraphs 108, 109 and 114. The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a). Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions. In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions. Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty-three times). Consequently, all the funds that BitMEX collected from its trading

operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).

22.     Awash with large amounts of tainted cash and encouraged by perceived lack of any accountability, Defendants grew so brazen that they do not even hesitate to publicly admit to bribery and bank fraud, Ex. 10, 11. Despite the fact that the vast majority of personnel and managers are located in this District (Paragraph 115), to avoid being subject to United States laws, regulations and taxes, Defendants established 14 false shell companies, including Defendant ABS, with intent to create an appearance that Defendant HDR has no presence, operations or investors in regulated jurisdictions such as the United States. Some of the fraudulent shell

companies used by Defendants are listed in the table below:

|  | Company Name | Jurisdiction of Incorporation | Company Registry Number | Company Formation Date |
|---|---|---|---|---|
| 1. | HDR Global Trading Limited | Seychelles | 148707 | |
| 2. | HDR Virtual Assets Trading LTD | Seychelles | C8422837 | |
| 3. | BITMEX Securities Facility LTD | Seychelles | C8423247 | |
| 4. | BITMEX Securities Exchange LTD | Seychelles | C8423255 | |
| 5. | BITMEX Clearing Agency LTD | Seychelles | C8423256 | |
| 6. | ABS Global Trading Limited | Delaware, US | 6393256 | April 27, 2017 |
| 7. | Shine Effort Inc Limited | Hong Kong | 2129744 | August 6, 2014 |
| 8. | HDR Total proprietary trading limited | Hong Kong | 2661339 | March 5, 2018 |

| 9. | HDR BMEX limited | Hong Kong | 2668623 | March 20, 2018 |
|---|---|---|---|---|
| 10. | ABS Global trading limited | Hong Kong | 2614000 | November 27, 2017 |
| 11. | ABS Group (HK) Limited | Hong Kong | 2614515 | November 28, 2017 |
| 12. | HDR Global Services (Bermuda) Limited | Bermuda | 53775 | July 3, 2018 |
| 13. | HDR Capital Limited | Bermuda | 54557 | April 9, 2019 |
| 14. | 100x Holdings Limited | Bermuda | 55678 | June 30, 2020 |

23.     The sheer magnitude of Defendants' unlawful activity is truly staggering. In addition to being recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license, see Paragraphs 115 and 116

below, which by itself conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendant HDR[23], "[s]everal sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States. Moreover, Defendant HDR's high volume business with numerous residents of the United States and this District as alleged in detail below is vast and pervasive. Accordingly, Defendants were unquestionably on notice of the need to obtain a money transmission license in the United States, which Defendants willfully and deliberately failed to do. Therefore, according to Defendants' own data, Defendant HDR's unlicensed money transmitting business admittedly processed, on average, $3 billion of illegal and unlicensed money transfers each day, all in violation of United States federal statute 18 U.S.C. § 1960(a), which is the record volume for such unlawful activity in the entire history of the monetary regulation in the United States.

24.     Being keenly aware of the CFTC and DOJ investigations and imminently

---

[23] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions. In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions. Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

forthcoming civil and criminal charges, and while preparing to go on a lam from the U.S. authorities, Defendants Hayes, Delo and Reed siphoned about $440,308,400 of proceeds of various nefarious activities that took place on the BitMEX platform, from accounts of Defendant HDR. The looted funds were divided among Defendants and their associate substantially in accordance with the following table, prepared on information and belief of Plaintiffs:

|  | Shareholder of HDR Global Trading Limited | Equity Ownership Percentage | Amount of Distribution |
|---|---|---|---|
| 1. | Arthur Hayes | 31.67% | $139,430,993.33 |
| 2. | Benjamin Delo | 31.67% | $139,430,993.33 |
| 3. | Samuel Reed | 31.67% | $139,430,993.33 |

2 In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions. In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions. Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

| 4. | Sean O'Sullivan Ventures (SOSV) | 5%<br>~~Total:~~ | $22,015,420.01 |
|---|---|---|---|
| | | **Total:** | **$440,308,400.00** |

These distributions of money laundering proceeds were made on the following dates, <u>after</u> Defendants learned about government investigations and after receiving a draft complaint in this action:

| | **Distribution Date** |
|---|---|
| 1. | October 15, 2019 |
| 2. | November 19, 2019 |
| 3. | January 2020 |

Plaintiffs are informed and believe and thereon allege that Defendants are actively looting HDR and trying to make funds unavailable for the collection of future judgments against it. Specifically, the profit distributions at a rate of $440,308,400.00 in just three months were clearly not performed in the ordinary course of business, as they represent $1,761,233,600 annual profit distribution rate, which money HDR simply does not generate. Therefore, these extraordinarily large distributions were clearly designed to deprive Defendant HDR of its assets. Furthermore, such a remarkable surge in profit distribution may also indicate that Defendants are siphoning the ~~BitMEX Insurance Fund.~~

BitMEX Insurance Fund. Therefore, individual Defendants formed and used Defendant HDR to hide and siphon ill-gotten proceeds from various racketeering activities alleged in this Compliant to their personal bank accounts and bank accounts of their associates and relatives.

25.     As soon as Plaintiffs became aware of the evidence of siphoning of $440,308,400 of funds from Defendant HDR by other Defendants, which appeared in public court filings in another civil action against Defendants, filed in San Francisco Superior Court Case No: CGC19581267, Defendants urgently moved the Court to strike or seal the discovered evidence of asset dissipation telling the San Francisco Superior Court that the relevant documents were publicly filed in violation of a protective order in that case and that the revelations caused great damage to Defendants.

26.     A combination of providing traders with extremely high trading leverage (up to 100x), using .BXBT index price for relatively liquid ~~perpetual swap~~Perpetual Swap contracts calculated based on

prices of two or three illiquid spot exchanges, enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any KYC and AML compliance checks and without any trading and withdrawal limits, intentionally taking BitMEX platform offline during market manipulation events to exacerbate retail trader losses, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations as well as systematic deletion of evidence of manipulators' identities and trading records by Defendants, all make BitMEX an exquisite "designer" tool for unsavory actors to launder funds and manipulate cryptocurrency markets. Because of the very high derivatives trading volume on BitMEX, the artificial prices caused by the BitMEX manipulations spread, like forest fires, from BitMEX to other exchanges wreaking havoc on the entire cryptocurrency ecosystem, costing traders and investors billions of dollars in losses and resulting in a domestic injury in the United States ("Domestic Injury").

27.    Moreover, on April 30, 2018, after repeated denials, Defendants finally admitted

that BitMEX operates its own for-profit Insider Trading Desk operated by a first employee of Defendant HDR, Gregory Dwyer[34] ("Dwyer") as well as Stuart Elkington and Nick Andrianov, who, at all times relevant herein, were agents and employees of Defendants HDR, Hayes, Delo and Reed and who acted within the scope of their agency and employment with Defendant HDR. Dwyer has been also indicted by the DOJ on federal felony money laundering related offenses. The Insider Trading Desk trades against BitMEX's own customers on their own exchange, using BitMEX's inside information about its customers' existing trading positions, stop loss orders, liquidation prices and open orders and enjoys many other unfair advantages not available to other users of the BitMEX platform. While making money trading against BitMEX's own customers, this operation, which Defendants refer to as "anchor market maker," receives many special trading privileges that are not available to other exchange users. This creates even greater

---

[3] During the vast majority of the Relevant Period, Dwyer operated from New York, New York.

financial incentive for Defendants to manipulate cryptocurrency markets and financially benefit from the manipulations through the aforesaid for-profit Insider Trading Desk operation.

28.      A substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently laundered and continue to be laundered, by all Defendants, through the Unknown Exchange, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars, and by Reed, Agata Reed, Barbara Reed and Trace Reed, through a real estate investment scheme that they set up in Wisconsin and Massachusetts. For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Grape Park and Mark Sweep to disguise or conceal the true illegal nature of the funds in the Defendants' general account (bitcoin wallet), which were ultimately used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control, Ex. 12, 13. Agata Reed, Barbara Reed and Trace Reed are in possession of two real estate properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, with the aggregate market value of over $2,500,000, acquired

_4 During the vast majority of the Relevant Period, Dwyer operated from New York, New York._

using funds misappropriated from Plaintiffs and laundered by Defendants through the Unknown Exchange and their real estate investment scheme.

29.     Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States and this District. Defendant HDR's own website BitMEX.com lists San Francisco as the location of one of Defendant HDR's offices, where all the technology behind BitMEX has been and continues to be developed. Defendants use United States – based Amazon, Inc. AWS infrastructure, with offices in northern California, for storing all of its customer and trading data and for executing its order matching system and its liquidation engine. Moreover, Defendants use Redwood City, California – based SendGrid, Inc. for handling all their bulk email communications with its customers. Finally, Defendants' website BitMEX.com is a commercial website, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants HDR, Hayes, Delo and Reed conduct

high-volume derivatives trading business with numerous individuals and companies residing in the United States, State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

## NATURE OF ACTION

30.    This is an action for conspiracy to conduct and conducting enterprise's affairs through a pattern of racketeering activity, arising under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and for cryptocurrency market manipulation arising under the CEA, 7 U.S.C. §§ 1 et seq. (2018).

## PARTIES

31.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

32.    Plaintiff BMA is a limited liability company duly formed and existing under the laws of the United States territory of Puerto Rico. Plaintiff BMA is co-owned by multiple individual cryptocurrency traders and it holds the title to, and ownership in, any and all claims,

causes of action and demands of whatever kind and nature (whether sounding in tort, contract, securities laws, or otherwise) that its owner traders had against Defendants HDR, ABS, Hayes, Delo and Reed throughout the world. Plaintiff BMA is the real party in interest and seeks to vindicate its own rights by way of this Amended Consolidated Complaint.

33.     Plaintiff Kolchin is an individual, who is a citizen of Russian Federation, and who also presently resides in Russian Federation. Plaintiff Kolchin is the real party in interest and seeks to vindicate his own rights by way of this Amended Consolidated Complaint.

34.     Plaintiff Dubinin is an individual, who is a citizen of Russian Federation, and who also presently resides in Russian Federation. Plaintiff Dubinin is the real party in interest and seeks to vindicate his own rights by way of this Amended Consolidated Complaint.

35.     Plaintiff Dolgov is an individual, who is a citizen of Russian Federation, and who

also presently resides in Russian Federation. Plaintiff Dolgov is the real party in interest and seeks to vindicate his own rights by way of this Amended Consolidated Complaint.

36.     Plaintiff Razvan is an individual, who is a citizen of European Union, and who also presently resides in Bucuresti, Romania. Plaintiff Razvan is the real party in interest and seeks to vindicate his own rights by way of this Amended Consolidated Complaint.

37.     Defendant HDR was created by individual Defendants in order to perpetrate fraud and dodge regulation and taxes and purports to be a Republic of Seychelles International Business Company, company number 148707, with a registered office at Suite 23, 1st Floor, Eden Plaza, Vistra Corporate Services Centre, Eden Island, Mahe, Seychelles. Among other illegal purposes, such as perpetrating fraud and dodging regulators, Defendants Hayes, Delo and Reed formed and used Defendant HDR to hide and then siphon ill-gotten proceeds from various racketeering activities alleged in this Compliant, including fraudulent solicitations and market manipulation, to their personal bank accounts and bank accounts of their associates and relatives. Defendant HDR was organized by Defendants Hayes, Delo and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in Defendant HDR, in or about 2014. Despite being incorporated in the Seychelles, Defendant HDR

does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda. When asked about the reasons for incorporating Defendant HDR in the Republic of Seychelles, Defendant HDR's Chief Executive Officer (CEO) Defendant Hayes has publicly claimed, in July of 2019, that the government of Seychelles was cheaper to bribe than the government of the United States and when asked how much he had to pay Seychelles to bribe them, Defendant Hayes answered "a coconut", Ex. 11.

38.    When, in July of 2019, an early investor in BitMEX Elfio Guido Capone asked

Defendants Hayes, Delo and Reed about a status of his investment in the BitMEX platform,

Defendant Delo responded with a meme image, cynically suggesting that BitMEX could dodge



its legal obligations to its own investors simply by using a shell company incorporated in the

Seychelles to defeat personal jurisdiction of the United States Courts.

39.    In addition to publicly admitting to bribery of foreign government officials as

alleged in the preceding Paragraphs, Defendant Hayes has publicly admitted to perpetrating bank

fraud by falsifying his residence address on bank account application documents with the purpose of opening a bank account in China, to which he, as a resident of Hong Kong, was not entitled, Ex. 10. The Chinese bank account was admittedly opened by Defendant Hayes using a fake Chinese residence address, which he personally falsified, in order to enrich himself on 40% premium in the price of bitcoin in China compared to the rest of the world, Ex. 10. In perpetrating the admitted bank fraud, Defendant Hayes was motivated by personal greed.

40.    Admissions of multiple instances of personal greed-motivated illegal conduct as alleged in the previous Paragraphs, attempting to dodge legitimate legal obligations to its own investors using sham offshore companies as well as the alleged patently illegal manner in which

BitMEX platform operates, all establish a clear pattern of brazen lawlessness on part of all Defendants.

41.    Defendant HDR is controlled by Defendants Hayes, Delo and Reed, who all hold themselves out as co-founders of BitMEX. In fact, name "HDR" is an abbreviation composed of first letters of last names of Defendants Hayes, Delo and Reed. Defendant Hayes serves as the CEO of Defendant HDR. Defendant Reed serves as the Chief Technology Officer (CTO) of Defendant HDR.

42.    According to BitMEX's website (https://www.BitMEX.com) ("BitMEX



website"), its owner HDR Global Trading Limited maintains three offices throughout the world, located in San Francisco, Hong Kong and Singapore. BitMEX's Terms of Service ("Terms of Service"), posted on the BitMEX website, provide that: "BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based trading platform that is wholly owned by HDR Global Trading Limited."

43.     The San Francisco office of Defendant HDR is the largest of all three by both the employee headcount and technical staff headcount. Its addresses are 301 Battery Street, 4th Floor, San Francisco, California 94111, 340 Brannan Street, 2nd Floor, San Francisco, California 94107 and/or 2 Embarcadero Center, 8th Floor, San Francisco, California 94111. Defendant HDR closed its other United States offices and consolidated all of its United States personnel into an office location in San Francisco sometime in April of 2019, as confirmed by Defendant Hayes in an email to Defendant HDR's early investor Mr. Elfio Guido Capone stating, "Consolidation of people in one office in SF."

44.     Hong Kong office of Defendant HDR is located at 45/F, Cheung Kong Centre, 2

Queen's Road Central, Hong Kong Central, Hong Kong Island, Hong Kong Special Administrative Region of the People's Republic of China. The employee headcount in the Hong Kong office of Defendant HDR is about half of the headcount in Defendant HDR's San Francisco office. Singapore office of Defendant HDR is the smallest of all three.

45.     Defendant HDR's affiliates and subsidiaries, including Defendant HDR's wholly-owned subsidiary and alter ego Defendant ABS, are so organized and controlled, and their affairs are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a single unitary BitMEX enterprise. See *Las Palmas Assoc. v. Las Palmas Ctr. Assoc*., 235 Cal.App. 3d 1220, 1249 (1991). Each Defendant HDR affiliate or subsidiary is so dominated in its finances, policies, and practices that these controlled corporations have no separate mind, will, or existence of their own, and are but business conduits for their principal, Defendant HDR, such that all of the affiliated corporations may be deemed to be a single business enterprise. See *Toho-Towa Co., Ltd. v. Morgan Creek Prods.*, Inc., 217 Cal.App.4th 1096, 1107 (2013); Greenspan v. LADT LLC 191 Cal.App.4th 486, 514 (2010).

46.     On information and belief, each entity in the BitMEX enterprise functions solely to contribute to and develop the BitMEX.com commercial website, which revenues then flow solely to Defendant HDR and its owners. These entities are analogous to departments within a single corporation and are run as such. On information and belief, each sub-entity in the BitMEX

enterprise is funded solely by revenues provided by Defendant HDR.

47.    Further, as Defendant Hayes has explained in a publicly filed sworn declaration, as CEO of Defendant HDR, he is "advised by an advisory body currently comprised of twelve individuals responsible for different departments within the HDR Group." (emphasis added). Hayes labels Defendant HDR and its affiliates collectively as the "HDR Group" as opposed to the BitMEX enterprise, but in function the entities operate as a single corporate enterprise, and they may be properly held to account for each other's wrongdoing.

48.    Defendant Hayes himself has also admitted that the BitMEX enterprise entities are really a single entity. In a Monthly Report circulated on March 2, 2018, Defendant Hayes wrote

"Ben [Delo], Sam [Reed], and myself are very excited to host the entire company at our Hong Kong office from March 12th – 25th. Given the rapid and continued growth in terms of headcount in 2017 and 2018, this offsite is our first chance to bond as a company." (emphasis added).

49.    All of this notwithstanding that Defendant HDR has submitted in multiple public filings that its only offices are in the Seychelles. It claims the offices in Hong Kong belong to another BitMEX-affiliated entity.

50.    On April 11, 2018, Defendant Hayes wrote again to say that the Hong Kong "company offsite was a resounding success. Ben, Sam, and I were delighted to meet many of you for the first time. We continue to be amazed at the quality of people that work for the organization. BitMEX is a collection of individuals who are all interesting." On information and belief, employees from all of the BitMEX enterprise's entities were present at the March 2, 2018 company-wide offsite, including those from San Francisco-based Defendant ABS.

51.    Defendants' casual disregard of corporate form and their regular usage of shell companies is also apparent through their latest corporate conduct: on July 15, 2020, Defendant Hayes announced that a new entity, "100x,"[45] "will become the new holding structure for HDR Global Trading Limited" and all of BitMEX's other assets, "including the BitMEX platform." In

---

[5] The name 100x is a reference to traders' ability on the BitMEX platform to trade at 100 times the leverage of their deposited bitcoin.

turn, the "HDR Group" was also rebranded as the "100x Group." This re-labeling makes little difference to the continued functioning of the entities as a single enterprise, however; Defendant Hayes explained that "[t]he BitMEX platform, brand and legal structure remain entirely unchanged."

52.    This further demonstrates that the unitary BitMEX enterprise consists of the various affiliates and subsidiaries worldwide, and that the enterprise and each of its constituent parts are fully dominated and controlled by Defendants Hayes, Delo, Reed and the other stakeholders as a single enterprise.

53.    Defendant ABS is a California-based wholly owned subsidiary and alter ego of

---

4 The name 100x is a reference to traders' ability on the BitMEX platform to trade at 100 times the leverage of their deposited bitcoin.

Defendant HDR, which designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS purports to be a Delaware corporation, Delaware Secretary of State file number 6393256, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810. Defendant ABS was organized by Defendants Hayes, Delo and Reed on or about April 27, 2017. Name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed, who ultimately own and control Defendant ABS. Defendant Hayes asserted that Defendant HDR owns the entire issued share capital of Defendant ABS, and that Defendant ABS has an office in San Francisco, California.

54.    Specifically, Defendant ABS, which is a United State-based alter ego of Defendant HDR, has two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California. Defendants Hayes, Delo and Reed continue to control Defendant ABS with Defendant Hayes serving as the President, CEO, Secretary and Chief Financial Officer thereof and Defendant Reed serving as a Chief Technology Officer of Defendant ABS.

55.    Plaintiffs are informed and believe and thereon allege that Defendant HDR dominates and controls every aspect of Defendant ABS' operations and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations, such that

Defendant ABS is a mere instrumentality of the BitMEX enterprise. In particular, all its operations are controlled by its principal and alter ego, Defendant HDR, wherein Defendant ABS provides development, software engineering, containerized application deployment, site reliability and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions take place. Thus, Defendants ABS and HDR operate as a single business enterprise for the purpose of operating the BitMEX derivatives trading platform.

56.     Plaintiffs are informed and believe and thereon allege that Defendant HDR funds all of Defendant ABS operations, including paying for all of its employees, overhead, and lease

and rent obligations, and is Defendant ABS' sole source of income.

57.    Defendants Hayes, Delo and Reed, collectively own a controlling interest in Defendant ABS through their ownership of Defendant HDR, which wholly owns Defendant ABS. Defendant Hayes is the sole director, president, secretary, and treasurer of Defendant ABS, and executes agreements on its behalf. Defendant Hayes runs Defendant ABS's activities without regard to its corporate form and for the sole benefit of Defendant HDR.

58.    Defendants Hayes, Delo and Reed have created Defendant ABS as a false "shell" company as part of a broader United State federal and state law, regulation and tax dodge designed to tell regulators and tax authorities that BitMEX has no California or United States operations or investors.

59.    However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations. Specifically, California-based Defendant ABS handles the majority of the development of the BitMEX Platform, and it is both the heart of the BitMEX enterprise and its nerve center.

60.    Plaintiffs are informed and believe and thereon allege that Defendants intentionally and specifically targeted California when locating and developing the nerve center of the operations of the BitMEX enterprise. This is because, from the beginning of BitMEX's

existence, traders based in the United States accounted for the vast majority of the enterprise's revenues, and even presently United States and California traders, as described below, are the most active and lucrative traders on the BitMEX Platform. This is also due to the fact that California's Silicon Valley has some of the world's best engineers and developers, and as such, Defendant ABS houses the most engineering personnel out of any BitMEX entity.

61.    Defendant ABS aided and abetted, authorized, ratified and controlled Defendant HDR illegal acts described herein.

62.    Defendants HDR and Hayes relied upon their domestic agents, employees and affiliates, including without limitation ABS, to help implement and conceal the illegal acts

alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.

63.    Defendant ABS acted in the United States and abroad within the scope of its agency with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in carrying out the acts alleged herein.

64.    Defendants are individually sued as principals, participants, agents, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from each Defendant's engagement in all or part of the illegal acts alleged herein.

65.    Additional and other facts regarding Defendants' joint action, alter ego status and aiding and abetting of one another regarding the misconduct against Defendants is hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. Plaintiffs accordingly reserve the right to supplement and amend these allegations if appropriate or necessary following completion of relevant fact discovery.

66.    Defendant HDR is the sole and exclusive owner of BitMEX brand, as evidenced, for example, by the Terms of Service and by numerous trademark filings for the protection of this brand made by Defendant HDR in the United States and throughout the world.

67.    Grape Park is a State of Delaware limited liability company, Delaware Secretary of State file number 7554178, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through investments into United States real estate, Ex. 12. Defendant Reed dominates and controls every aspect of business of Grape Park and funds its operations. Grape Park is an alter ego of Defendant Reed.

68.    Mark Sweep is a State of Delaware limited liability company, Delaware Secretary of State file number 7449568, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business

and other nefarious acts taking place on the BitMEX platform through investments into United States real estate, Ex. 13. Defendant Reed dominates and controls every aspect of business of Mark Sweep and funds its operations. Mark Sweep is an alter ego of Defendant Reed. It should be noted that Defendant ABS, Grape Park and Mark Sweep share the same registered office address in the State of Delaware.

69.     Unknown Exchange is a cryptocurrency-to-fiat off-ramp exchange (over-the-counter exchange services provider). Unknown Exchange was and is being used by Defendants to launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through converting the illegally obtained bitcoins into various fiat currencies, including United States dollars and Hong Kong dollars. Plaintiffs will amend this Complaint when they ascertain the identity of the Unknown Exchange based on discovery propounded on Defendants.

70.     Defendant Hayes is an individual, who is a United States citizen. On papers filed with California Secretary of State, Defendant Hayes claimed to have resided in Kennedy Town, Hong Kong Special Administrative Region of the People's Republic of China. However, Plaintiffs are informed and ~~believes~~ believe and thereon allege that Defendant Hayes also resides in Buffalo, NY 14221-1840 and was last seen at his residence there on August 18, 2020. Defendant Hayes owns property in the U.S., and files U.S. income tax returns. During the Relevant Period,

Defendant Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S. Defendant Hayes is sued as *sui juris.*

71.    Defendant Delo is an individual, who is a citizen of United Kingdom, and who resides in Hong Kong Special Administrative Region of the People's Republic of China. Defendant Delo is sued as *sui juris.*

72.    Defendant Reed is an individual, who is a United States citizen and who resides in Milwaukee, WI 53202. Defendant Reed is sued as *sui juris.* United States residence of



Defendant Reed is further evidenced by his own professional profile on LinkedIn professional network, where he lists the United States as his country of residence. Defendant Reed maintains an office in and conducts business from Milwaukee, Wisconsin.

73.    Agata Reed is an individual, who is a citizen of the United States, and who resides in Norwell, MA 02061.

74.    Barbara Reed is an individual, who is a citizen of the United States, and who

resides in Lake Tomahawk, WI 54539.

75.     Trace Reed is an individual, who is a citizen of United States, and who resides in Lake Tomahawk, WI 54539.

76.     Plaintiffs are informed and believe and thereon allege that each of the individual Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency.

**DEFENDANTS' EXTENSIVE CONTACTS WITH THE UNITED STATES
AND THIS DISTRICT**

77.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

78.    Defendant ABS is qualified to do business in California and has appointed an agent for service of process in this State. Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States, State of California and this District.

79.    Corporate Defendants HDR and ABS were established by individual Defendants Hayes, Delo and Reed due to seed funding provided by at least two United States-based entities – Ohio-based RGB COIN LTD. and a startup accelerator SOSV with offices in San Francisco and New York.

80.    Defendant HDR is managed by Defendants Hayes, Delo and Reed with advice of an advisory board consisting of 12 members, three of which are located in the United States.

81.    Due to his role as the President, CEO, Secretary and Chief Financial Officer of Defendant ABS and his CEO position with Defendant HDR, Defendant Hayes manages and directs operations of both Defendants HDR and ABS in the United States and in this District.

82.    On the most recent California Secretary of State Statement of Information form filed by Defendant ABS with the State of California on or about August 22, 2019, Defendant Hayes's address in the State of California is listed as: 340 Brannan Street, 2nd Floor, San Francisco, California 94107.

| Names and Complete Addresses of the Following Officers (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.) | | | | |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |
| 8.  SECRETARY | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |
| 9.  CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |

83.      Due to his role as the CTO of both Defendants HDR and ABS and his supervisory involvement in the software development of the BitMEX platform, Defendant Reed, who resides in Wisconsin, manages and directs operations of both Defendants HDR and ABS in the United States and in this District, where the majority of the software developers and engineers working

on the BitMEX platform are located.

84.    As evidenced by BitMEX website, on or about April 27, 2018, Defendant Reed stated: "We serve customers <u>all over the world,</u> in five languages, and have become the premier platform for Bitcoin price discovery and liquidity" (emphasis added). This statement constitutes an admission that Defendants knowingly serve customers in the United States and the State of California.

85.    BitMEX website www.BitMEX.com/careers/ lists San Francisco as the location of one of the Defendant HDR's offices, where all the technology behind BitMEX is being



developed. Defendant HDR actively recruited individuals for this office using recruiting websites



such as GlassDoor.com, Angel.co and LinkedIn.com. According to professional network LinkedIn, BitMEX's owner Defendants HDR has at least 74 current and former employees in the United States, most of which are residents of this District.



86.    In a publicly released and publicly available video first aired on CNBC news channel, Defendant Hayes can be seen broadcasting from the San Francisco office of CNBC, on or about July 19, 2018.



or about July 19, 2018.

87.    United States residents can freely trade on BitMEX platform from the United States because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using widely available and inexpensive virtual private network (VPN) software that masks trader's geographical location. This is because Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism. Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a VPN. Defendants have exploited this loophole to avail themselves of United States and California markets. Defendant Hayes stated in a January 2019 interview that BitMEX users can mask their

**Address:** 475 Sansome St, San Francisco, CA 94111, United States

location using VPNs to assign their computer an IP address from other countries,
bypassing filters put in place. In fact, all web pages on BitMEX.com commercial website, except
for a user account page, are freely accessible from the United States without any VPN. This is
done purposefully in order to entice United States persons to trade on the BitMEX platform. If
Defendants truly wanted to exclude United States traders from their platform, they would have
blocked access to all web pages on the BitMEX.com commercial website from the United States.

88.    In fact, in an interview in January of 2019, Defendant Hayes himself publicly
taunted the fact that users from banned jurisdictions like the United States can easily bypass the
cryptocurrency exchange's geoblock by using the VPN service, thereby directly encouraging
United States traders to trade on the BitMEX platform in violation of its own Terms of Service.[56]

89.    Defendant HDR uses United States based Amazon, Inc.'s Amazon Elastic



---

[56] To the extent Defendants are attempting to rely on the provisions of BitMEX Terms of Service
to absolve themselves from liability for fraudulent, willful and negligent acts directed at their U.S.
and California customers, all such attempts are precluded by Cal. Civ. Code § 1668, which
provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone
from responsibility for his own fraud, or willful injury to the person or property of another, or
violation of law; whether willful or negligent, are against the policy of the law." Therefore, to the
extent BitMEX Terms of Service are used to exempt Defendants of liability for fraudulent, willful

and negligent acts, they are null and void as being against the policy of the law.

89.    Defendant HDR uses United States based Amazon, Inc.'s Amazon Elastic



Kubernetes Service ("Amazon EKS"), which combines Amazon Web Services ("Amazon AWS")



with managed high-availability Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data. Amazon AWS has offices in San Francisco, California. San Francisco office of Defendant HDR employs at least five Kubernetes engineers who interact with Amazon AWS in this District on a daily basis.

90.    Moreover, the recent email data leak of BitMEX has shown that Defendant HDR



uses San Francisco, California – based Twilio Inc. and its subsidiary SendGrid, Inc., with offices

at 889 Winslow St., Redwood City, California 94063, United States, for handling all of its bulk email communications with its customers. Twilio Inc. and its subsidiary SendGrid, Inc. as well as Intercom, Inc. store a database of all BitMEX users in this District, including email addresses and all other contact information of all users, which BitMEX uses for all its customer communications.

91.    Defendants use ReCAPTCHA service provided by Google, Inc., headquartered in

this District to provide human verification for the users of the BitMEX's platform.



92.      Defendants further use YubiKey device and YubiCloud service provided by

Palo Alto-based YubiKey, located in this District, to provide 2-factor authentication

capability to the users of BitMEX's platform.

93.      Defendants further use service operated by Jumio Netverify, based in Palo

Alto, California, through which Jumio collects personal data from BitMEX users directly,

including photos of user's faces and ID documents and performs identity verification of the

users for BitMEX platform.

94.      Defendants further use Freshdesk service provided by Palo Alto-based

FreshWorks, headquartered in this District, for handling all customer support queries, notes and replies associated with the BitMEX platform.

95.     Defendants further use segment.io service provided by San-Francisco based Segment.io, Inc., and Google Analytics service provided by Google, Inc., both of which are headquartered in this District, for gathering data collected on BitMEX.com servers and generating visitor statistics for BitMEX platform.

96.     Defendants further use services provided by San Francisco-based Functional Software, Inc. (Sentry.io), San Francisco-based Pagerduty and Austin, Texas-based Solarwinds (Papertrail) to monitor all site and service issues associated with the BitMEX platform.

97.     Defendants further use services provided by Google Firebase and Amazon SNS platforms, operated by Google, Inc. and Amazon Web Services, Inc., respectively, both of which are headquartered in this District, to deliver mobile push notifications to all user devices.

98.     The above-alleged facts clearly show that the vast majority of the vital services used by BitMEX platform are provided by United States vendors located in this District and that without such services of United States and California origin, BitMEX platform would not have existed in its present form. Therefore, BitMEX is able to operate its platform only due to its connections with the service providers located in the United States and this District.

| | Service Provider to BitMEX | Services Provided to BitMEX | Service Provider Location |
|---|---|---|---|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | Twilio, Inc. | Communications with all BitMEX users | San Francisco, California |
| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 4. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with | San Francisco, California |

| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
|---|---|---|---|
| 4. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with all BitMEX users | San Francisco, California |
| 11. | ProofPoint, Inc. | Hosting of BitMEX's internal corporate email accounts, outbound data loss prevention, social media, mobile devices, digital risk, email encryption, electronic discovery, and email archiving. | Sunnyvale, California |
| 12. | Slack, Inc. | Internal communications and collaboration between BitMEX employees. | San Francisco, California |

99.     Furthermore, Plaintiffs are informed and believe and thereon allege that San Francisco, California-based quant trading firm Galois Capital freely trades on BitMEX from this District generating millions of dollars of business for Defendant HDR. This trading is done with the knowledge, permission, approval, assistance and encouragement of Defendants.

100. Defendants knowingly and willfully permitted United States citizens and residents

of this District as well as United States based companies to freely trade on the BitMEX exchange

because of the lucrative business relationships between Defendants and the aforesaid individuals and companies, which financially benefitted Defendants.

101. Moreover, Defendant's HDR website BitMEX.com is a commercial website, in English language, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants conduct substantial business with the residents of the United States, the State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). Instead of performing a proper document check before allowing users to open an account on BitMEX.com, Defendants deliberately and knowingly use utterly ineffective

IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools. Using the aforesaid commercial website operated by Defendants, residents of the United States, the State of California and this District are able to place binding trading orders of virtually unlimited monetary size, enter into binding derivative purchase and sale contracts, and transfer virtually unlimited amount of funds anywhere in the world.

102. Moreover, Defendants deliberately made their commercial website BitMEX.com accessible from the United States even without using VPN software in violation of BitMEX's

> ⊘ **Note on Restricted Jurisdictions**
>
> At this time, BitMEX cannot serve customers in Puerto Rico. You may still create an account, but you will be unable to deposit or trade. If you wish to try simulated trading, please try our BitMEX Testnet. Access to the BitMEX Testnet is not for trading purposes, and is not intended as investment advice or as a solicitation to engage in any form of trading activity and should not be construed as such.

own Terms of Service ("Terms of Service") in order to entice United States residents to trade on the BitMEX's platform. Specifically, BitMEX's Terms of Service provide: "[y]ou are not

allowed to access or use the Services or the Trading Platform if you are located, incorporated or otherwise established in, or a citizen or resident of: (i) the United States of America... 'Services' means websites, applications and any services provided by any member of the HDR Group, including: a) ... the BitMEX <u>Testnet</u> Platform." However, BitMEX.com website specifically induces United States resident users to try BitMEX <u>Testnet</u> Platform, by clearly stating: "please try our BitMEX Testnet." This is not an innocent mistake; it is intentionally done by Defendants in order to entice United States traders to subsequently trade on the BitMEX Trading Platform in direct violation of the prohibition contained in its own Terms of Service. In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from

the United States without any VPN. This is purposefully done to entice United States persons to trade on the BitMEX platform. If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

103. Therefore, any and all provisions contained in the Terms of Service prohibiting United States users from using the BitMEX's platform were in fact sham provisions and lacked any meaningful enforcement by Defendants. In fact, Defendants' own actions clearly demonstrated complete disregard of the provisions of their own Terms of Service. Moreover, Defendants willfully and deliberately used IP country blocking, which has been proven utterly ineffective for its intended purpose and easily subverted, to leave a back door for the United States residents to trade on the BitMEX platform.

104. Furthermore, Defendants purposefully invoked the benefits and protections of the United States Federal laws when they filed for and obtained from the United States government official Notices of Allowance for seven (7) United States trademark applications all relating to BitMEX's platform that is the subject of this Complaint.

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

105. For example, trademark applications serial Nos. 87856272 and 87607952, both for mark "BITMEX" were filed by Defendants in connection with "[d]ownloadable software for trading crypto-products and providing crypto-currency information" and "exchanging money,

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

financial management, futures brokerage, capital investment, electronic funds transfer, providing

financial information via a website, financing services, investment of funds, business liquidation services, financial services, namely, operation and management of hedge funds, commodity pools and other collective investment vehicles, and trading for others of cryptocurrency, decentralized application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets, securities, options, futures, derivatives, debt instruments and commodities," respectively, which are BitMEX's core services. Invoking benefits and protections of the United States Federal laws clearly made it foreseeable for Defendants that they would end up in a United States Court.

106. In the aforesaid trademark filings with the United States Patent and Trademark Office, Defendant HDR swore, under penalty of perjury, that it "has a continued bona fide intention, and is entitled, to use the mark[s] in commerce [in the United States] on or in connection with all of the goods/services listed in the Notice of Allowance or as subsequently modified for this specific class."

107. In a recent legal filing, Defendant Hayes swore that: "[i]n my capacity as CEO, I am advised by an advisory body currently comprised of twelve individuals responsible for different departments within the HDR Group. A majority of the HDR Group's advisory committee has always been located in Hong Kong, and nine of the twelve members currently on the committee are located outside of the United States." Therefore, three out of 12 members of

the advisory committee of Defendant HDR are located in the United States.

108. Professional network LinkedIn, as well as other information available on the Internet, provides publicly available evidence of dozens of individuals, who reside in the United States and in this District and who identify themselves as cryptocurrency derivative traders on the BitMEX platform. Forty-three examples of the Unites States resident BitMEX traders, who trade on BitMEX through the aforesaid commercial website BitMEX.com, are provided in the below table:

| | BitMEX Trader Name | BitMEX Trader Resider |
|---|---|---|
| 1. | Scrembo Paul | Los Angeles, Californi |
| 2. | Aaron Aloyan | Greater San Diego, Califor Area |
| 3. | Christopher Smitherman | Atlanta, Georgia |
| 4. | Daniel Spivak | Greater Chicago Area |
| 5. | Harrison Davis | Greater New York City A |
| 6. | Vesko P. | Greater Los Angeles Ar |
| 7. | Matthew Wellman | Lexington, Kentucky |
| 8. | Uriel Scott | Chicago, Illinois |
| 9. | Sahand Akbari | Sacramento, California A |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City A |
| 14. | Andres Santana | Greater New York City A |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |
| 17. | Phillip James | St. Cloud, Minnesota Ar |
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell**BitMEX Trader Name** | Laguna Beach, California**BitMEX Trad Residence** |

| 1. | Scrembo Paul | Los Angeles, California |
|---|---|---|
| 2. | Aaron Aloyan | Greater San Diego, California, Area |
| 3. | Christopher Smitherman | Atlanta, Georgia |
| 4. | Daniel Spivak | Greater Chicago Area |
| 5. | Harrison Davis | Greater New York City Area |
| 6. | Vesko P. | Greater Los Angeles Area |
| 7. | Matthew Wellman | Lexington, Kentucky |
| 8. | Uriel Scott | Chicago, Illinois |
| 9. | Sahand Akbari | Sacramento, California Area |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City Area |
| 14. | Andres Santana | Greater New York City Area |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |
| 17. | Phillip James | St. Cloud, Minnesota Area |
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell | Laguna Beach, California |
| 21. | Jiale (Etta) Qin | Cupertino, California |
| 22. | Bokmoon Jung | Boise, Idaho |
| 23. | Lionel Girardin | Greater Chicago Area |
| 24. | Arijit Santra | Berkeley, California |
| 25. | Sankha Banerjee | Greater New York City Area |
| 26. | Connor Van Dorpe | Madison, Wisconsin |
| 27. | Ryan Rim | San Francisco Bay Area |
| 28. | Gianny R. Banda | Miami, Florida |
| 29. | Michael Peterson | Syracuse, New York Area |
| 30. | Anthony Agrait | Tempe, Arizona |

| 31. | Dustin G. | Burlington, Vermont Area |
|-----|-----------|--------------------------|
| 32. | Kevin Cotugno | Phoenix, Arizona |
| 33. | Calvin Leung | Santa Monica, California |
| 34. | Anthony Wittemann | Santa Monica, California |
| 35. | Catherine Wood | Greater New York City Area, New York |
| 36. | Ryan Gill | Delaware, Ohio |
| 37. | Eric J. Waidergorn | Greater Chicago Area, Illinois |
| 38. | Eric Crown | Hillsboro, Oregon |
| 39. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area |
| 40. | Edward Ornelas | Albuquerque, New Mexico |
| 41. | Richard Bae | United States |
| 42 | Roger Xu | Brooklyn, New York |
| 43. | Wen Hou | Irvine, California |

109. Professional network LinkedIn as well as other Internet resources further provide evidence of at least fourteen companies, which are incorporated and based in the United States and which trade derivatives using Defendant's HDR commercial website BitMEX.com:

| | Name of U.S. Company Trading on **BitMEX** | **Company Address** |
|---|---|---|
| 1. | CMT Capital Markets Trading60661 | 156 N Jefferson St., Suite 102, Chicago, IL |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |

| | BitMEX | |
|---|---|---|
| 1. | CMT Capital Markets Trading | 156 N Jefferson St., Suite 102, Chicago, IL 60661 |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY 12207 |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |
| 6. | Swing Trade Pros | 1600 S. Indiana Ave, Chicago, IL 60616 |
| 7. | FalconX | 66 Bovet Rd #380, San Mateo, CA 94402 |
| 8. | Cumberland DRW | 540 W Madison St Chicago, IL 60661 |
| 9. | Circle Partners | 1395 Brickel Avenue, Suite 913 Miami, FL 33131 |
| 10. | Fund3 Capital LP/Fund3 LLC | 11244 Huntley Place, Culver City, CA 90230 |
| 11. | South Lake Computers | 82 W Highway 50, Clermont, FL 34711 |
| 12. | ARK Investment Management LLC | 3 East 28th Street, 7th Floor, New York, NY 10016 |
| 13. | Coincident Capital | 310 Lake Street, Huntington Beach, CA 92648 |
| 14. | Leotank Capital | 250W 50th Street, Apt. 3d2, New York, NY 10019 |

110. Adaptive Fund I, LP, which is a Delaware limited partnership, funded primarily by investors who are United States residents, as the result of market manipulation which took place on BitMEX's platform on or about March 13, 2020, lost 60% of its equity, or roughly $12,000,000. These catastrophic monetary losses were suffered by numerous Unites States residents who invested in that fund. In communications to investors following the losses, fund manager Murad Mahmudov admitted to personally executing trades on BitMEX's platform with United States investors' money. Due to the high profile of the fund and fund managers involved,

Defendants clearly knew of the United States origin of the money that the Adaptive Fund I, LP was trading on BitMEX platform and Defendants deliberately and willfully allowed such trading to proceed.

111. Internet video portal YouTube is replete with video evidence of traders residing in the United States and in this District freely placing high dollar bets through Defendant's HDR commercial website BitMEX.com. The following table identifies just 40 examples of such video evidence:

| | BitMEX Trader's YouTube Account User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United States | 02/25/2020 | How Wales Manipulate Bitcoin U Spoofing on Bitmex (Live $400, Short Trade) |
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitco Leverage Trading - Afternoon Tra Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollb New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INT $35,000! 0.1 to 10 Bitcoin Tradi Challenge |
| 6. | Serembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutoria Beginners Bitcoin |
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Bin Futures, Bybit, & Bitmex Bitcoi Crypto |
| 8. | Crypto GnomeBitMEX Trader's | UnitedTrader | 05/14/2019Video | How to Automate Your Trades onVideo Title |

| | YouTube Account User Name | Residence | Date | |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United States | 02/25/2020 | How Wales Manipulate Bitcoin Using Spoofing on Bitmex (Live $400,000 Short Trade) |
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitcoin Leverage Trading - Afternoon Trading Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollbox + New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 6. | Scrembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutorial For Beginners Bitcoin |
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Binance Futures, Bybit, & Bitmex Bitcoin & Crypto |
| 8. | Crypto Gnome | United States | 05/14/2019 | How to Automate Your Trades on Bitmex & Deribit |
| 9. | Crypto Gnome | United States | 09/25/2019 | Goat Alerts - TradingView Bot & Shadow Trading for Bybit & Bitmex |
| 10. | Crypto Gnome | United States | 08/12/2018 | How to Set a STOP LOSS on BitMEX |
| 11. | Crypto Gnome | United States | 11/29/2018 | How to use a Trailing Stop on BitMEX - MORE PROFITS! |
| 12. | Crypto Gnome | United States | 07/25/2018 | How to Short Bitcoin on Bitmex |
| 13. | Crypto Gnome | United ~~States~~ | 08/11/2018 | How to Save on Fees When Trading on ~~BitMEX~~ |

| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United States | 07/30/2018 | Free Profit Tracking Spreadsheet for Trading on Bitmex |
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On NinjaTrader; www.SlingshotFutures.com |
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |

| | | | | |
|---|---|---|---|---|
| | | States | | BitMEX |
| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United States | 07/30/2018 | Free Profit Tracking Spreadsheet for Trading on Bitmex |
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On NinjaTrader; www.SlingshotFutures.com |
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |
| 23. | Bitcoin Trading Challenge | United States | 01/08/2019 | Scalping Bitmex Liquidations |
| 24. | Digital Millionaire | United States | 10/31/2019 | BitMEX Tutorial For Beginners - How To LONG AND SHORT Bitcoin With LEVERAGE! |
| 25. | Patrick Corsino | United States | 01/13/2020 | Beginner Method: $100-$1000/Day Passive Cryptocurrency Trading 2020! Bitcoin Bitmex, Binance, Bybit |
| 26. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading ~~Challenge~~ |

| | | | | Challenge |
|---|---|---|---|---|
| 27. | Crypto Corny | United States | 01/31/2019 | 70% DOWN, 9930% TO GO... 0.1 To 10 BITCOIN TRADING CHALLENGE – Bitmex |
| 28. | MiningTrades | United States | 01/23/2018 | My Algorithmic Trading BOT trades $XBT Bitcoin Futures LIVE! | BitMex Jan 23rd 2018 |
| 29. | Crypto Minds | United States | 09/07/2018 | How to Long and Short Bitcoin and Altcoins on Bitmex |
| 30. | Jaydn's Crypto Channel | California, United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 31. | Crypt0W1SE | Michigan, United States | 12/30/2018 | Live BitMEX trading!!! 1 to 100 btc challenge! |
| 32. | ORACLE CRYPTO AVENGER! | United States | 02/08/2020 | $100,000 1 DAY PROFIT LEVERAGE TRADING BITSEVEN BYBIT BITMEX |
| 33. | ORACLE CRYPTO AVENGER! | United States | 10/15/2018 | BITMEX WATCH A SHORT TRADE THE ENDED OVER 103% WIN! |
| 34. | ORACLE CRYPTO | United | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER |

| 34. | ORACLE CRYPTO AVENGER! | United States | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER 98% ROI -WHY YOU CAN'T DO THIS. |
| 35. | ORACLE CRYPTO AVENGER! | United States | 11/07/2018 | BCH MARKET MANIPULATION - MANIPULATE BITMEX TO PROFIT! |
| 36. | Alexander Lorenzo | Gainesville, FL, United States | 01/26/2019 | Scavenger Bot Bitmex SCAM |
| 37. | Swing Trade Pros | 1600 S. Indiana ~~Ave. Chicago, IL 60616~~ | 03/09/2020 | Live Bitcoin Trading on Bitmex with Swing Trade Pros Indicators! |

| | | Ave. Chicago, IL 60616 | | |
|---|---|---|---|---|
| 38. | Sell The Spike | Burlington, Vermont Area | 07/03/2019 | How to use a TRAILING STOPLOSS on Bitmex~~on Bitmex~~ |
| 39. | Sell The Spike | Burlington, Vermont Area | 06/09/2018 | Bitmex Tutorial - Placing Orders, Setting Stoplosses and Targets, Leverage and Margin, Walkthrough |
| 40. | Bitcoin for Beginners | United States | 12/22/2018 | How To Use BitMEX Exchange For Beginners! (BitMEX Tutorial) |

112. "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States. This number is consistent with the evidence available on YouTube and LinkedIn.

113. YouTube is also replete with dozens of videos teaching how to access Defendant's HDR commercial website BitMEX.com from the United States using inexpensive and widely available VPN software to avoid Internet protocol (IP) address blocking. Below are 11 examples of such videos:

| | BitMEX Trader's YouTube User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Crypto Gnome | United States | 08/09/2018 | How to Sign Up for BitMEX in the US |
| 2. | Bot Mentality | Atlanta United States | 03/22/2018 | How to use Bitmex in the United ~~States~~ States |
| 3. | Jaydn's Crypto Channel | California United ~~States~~ | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency ~~Walkthrough~~ |

| 4. | CryptoJunkies | United States | 08/15/2019 | How To Trade Bitmex In America! |
| 5. | Crypto Guru | United States | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator |
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? \| Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |
| 9. | Casey Watkins | United States | 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | ***MEX Millionaire*** EVERYTHING You Must Know!- ***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

| | | States | | Walkthrough |
|---|---|---|---|---|
| 4. | CryptoJunkies | United States | 08/15/2019 | How To Trade Bitmex In America! |
| 5. | Crypto Guru | United States | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator |
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? \| Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |
| 9. | Casey Watkins | United | States***MEX 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | Millionaire*** EVERYTHING You Must Know!-***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

114. Defendant HDR assigns a six-symbol alphanumeric affiliate codes to all BitMEX account holders and uses these affiliate codes to pay compensation to its users for enticing other users, including United States residents, to open accounts on BitMEX.com commercial website by posting a URL pointing to the BitMEX registration page and incorporating the aforesaid assigned affiliate code. The so assigned affiliate code uniquely identifies the corresponding account holder and its BitMEX account. Thus, presence of the affiliate code indicates that a person who invites others to register with Defendant's HDR commercial website by way of an affiliate link himself has a BitMEX account. Table below provides 22 examples of BitMEX

affiliate codes being assigned to the United States residents for receiving compensation for enticing other United States residents to join the BitMEX platform:

| | BitMEX Trader's Name or Alias | Trader Residence | BitMEX Assigned Affiliate Code (identifies trader's BitMEX account) |
|---|---|---|---|
| 1. | Tone Vays | United States | cMvHXg |
| 2. | Flood | United States | ir2Xqa |
| 3. | Crypto Corny | United States | 0rsCIx |
| 4. | Krown's Crypto Cave | Hillsboro, Oregon, United States, United States | ou4vcl |
| 5. | Crypto Hippo Trading | United States | gZ0Y10 |
| 6. | Edward Ornelas | Albuquerque, New Mexico, United States | kpdzGl |
| 7. | CryptoSailor | United States | AOIyp0 |
| 8. | MiningTrades | United States | i110zC |
| 9. | Crypto Minds | United States | OIv1fe |
| 10. | Moonin Papa | United States | GG2kor |
| 11. | Josh Olszewicz | Washington ~~DC-Baltimore~~DC-Baltimore Area, United States | s7sqNI |
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | New York, New York, United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | lf9P89 |
| 16. | ORACLE CRYPTO | United States | WXNej9 |

| | | United States | |
|---|---|---|---|
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | New York, New York, United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | If9P89 |
| 16. | ORACLE CRYPTO AVENGER! | United States | WXNej9 |
| 17. | Swing Trade Pros | New York, New York, United States | G4cfM4 |
| 18. | Bitcoin for Beginners | United States | 5i7rOb |
| 19. | Crypto Gnome | United States | EOsLBm |
| 20. | Sell The Spike | Burlington, Vermont Area | KO33NC |
| 21. | Scrembo Paul | Los Angeles, California | BlQzsA |
| 22. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area | 9e4hqj |

115. Professional network LinkedIn provides publicly available evidence of 74 individuals, who are United States residents and who identify themselves as present and former employees of Defendant HDR, located in the United States and in this District:

| | LinkedIn Member Name | Position at BitMEX | Residence |
|---|---|---|---|
| 1. | Max Shapiro | Associate at BitMEX Ventures | New York, New York |
| 2. | Kumar Dandapani | Head of BitMEX Ventures | San Francisco Bay Area |
| 3. | Alena Gilevskaya | Senior Software Engineer at BitMEX | San Francisco, California |

| | | | |
|---|---|---|---|
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |

| | | BitMEX | |
|---|---|---|---|
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |
| 8. | Niroj Shankhadev | Web Developer at BitMEX | San Francisco, California |
| 9. | Samuel Reed | Co-Founder and CTO at BitMEX | United States |
| 10. | Eric Zinnikas | Security Engineer at BitMEX | San Francisco, California |
| 11. | Molly Lubow | Talent Acquisition Specialist at BitMEX | San Francisco Bay Area, California |
| 12. | Evan Ricketts | Senior Software Engineer at BitMEX | Milwaukee, Wisconsin |
| 13. | Michael Carlson | Security Engineering Manager, Application Security at BitMEX | San Francisco, California |
| 14. | Monzer Aldimassi | Technical Program Manager (TPM) at BitMEX | Campbell, California |
| 15. | Patrick Fiscina | Vice President Of Engineering at BitMEX | San Francisco Bay Area, California |
| 16. | Allison Sommers | Security Engineer at BitMEX | San Francisco Bay Area, California |
| 17. | Conner McNicholas | Data Engineering at BitMEX | San Francisco, California |
| 18. | Brandon Schlenker | Engineering Manager at BitMEX | San Francisco, California |
| 19. | Riley Hutchinson | Director, People at BitMEX | San Francisco, California |
| 20. | Benson Wong | Senior IT Support Engineer at BitMEX | San Carlos, California |
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |

| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
|-----|---------------|-------------------------------------|---------------------|
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX | San Francisco, California |

| | | | |
|---|---|---|---|
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |
| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX (Powering the world's largest cryptocurrency trading platform with Kubernetes, at the edge of financial and infrastructure technologies. Scaling BitMEX's infrastructure, culture and practices from 10 employees to 150 employees, from $1B to $11B traded daily, and 150x more trades.) | San Francisco, California |
| 27. | Maus Stearns | Security Engineering Manager at BitMEX | San Francisco, California |
| 28. | Andrew MacPherson | Security Engineer - Detection and Response at BitMEX | San Francisco, California |
| 29. | Chris Gates | Director of Offensive Security at BitMEX | Washington, DC Metro Area |
| 30. | Supriya Premkumar | Software Engineer - Kubernetes at BitMEX (Working on building Kubernetes Infrastructure that can handle tens of thousands of low latency transactions per second at one of the world's largest crypto exchanges.) | San Francisco, California |

| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the | Palo Alto, California |

| | | the world's largest crypto exchanges.) | |
|---|---|---|---|
| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the world's highest volume Cryptocurrency exchange. Building a world class Security team to protect our customers, assets and brand.) | Palo Alto, California |
| 34. | Javier Marcos de Prado | Staff Security Engineer at BitMEX | San Francisco, California |
| 35. | Shivali Singh | Senior Manager Security Assurance at BitMEX | San Francisco, California |
| 36. | Felipe Loyola Andrade | Software Engineer at BitMEX | San Francisco, California |
| 37. | Felix Böhm | Senior Software Engineer at BitMEX (Tech lead for the institutional side of BitMEX) | San Francisco, California |
| 38. | Neel Patel | Engineering Leader, Lead Data Engineer at BitMEX | Burlingame, California |
| 39. | Taylor Hesselgrave | Senior Software Engineer at BitMEX | San Francisco, California |
| 40. | Alisa Isovic | Product Manager at Bitmex at BitMEX | San Francisco, California |
| 41. | Armando Cerna | Site Reliability Engineer at BitMEX (Primary on call in a high traffic production environment.) | San Francisco, California |
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |

| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
|---|---|---|---|
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |

| | | high traffic production environment.) | |
|---|---|---|---|
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |
| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |
| 46. | Jinny Wong | Product Designer at BitMEX | San Francisco, California |
| 47. | Claire F. | Information Technology Management at BitMEX | San Francisco, California |
| 48. | Can Selcik | Senior Software Engineer at BitMEX | San Francisco, California |
| 49. | Eoghan McKee | Threat Intelligence, Insider Threat, Incident Response at BitMEX | San Francisco, California |
| 50. | Lawson Kight | Head of User Experience at BitMEX | San Francisco, California |
| 51. | Shawhin M. | Project Manager at BitMEX | San Francisco, California |
| 52. | Ladi D. | Platform Security Engineer at BitMEX | San Francisco, California |
| 53. | Neil Eads | Quality Assurance (QA) Manager at BitMEX | San Francisco, California |
| 54. | Michael Curry | Vice President, Head of Product at BitMEX | Oakland, California |
| 55. | Joshua Philippe | Principal Visual Designer, User Experience at BitMEX | San Francisco, California |
| 56. | Tim L. | IT Infrastructure Engineer at BitMEX | San Francisco, California |
| 57. | Hunter Shaw | Communication Director and BitMEX | San Francisco, California |

| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
|---|---|---|---|
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |

| | | BitMEX | |
|---|---|---|---|
| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |
| 63. | Uday Shankar | Product Manager at BitMEX (My average week at BitMEX involves product research, market research, data analysis, scouring through support tickets, watching social channels for opportunities in terms of new features and improvements to existing features collaborating with Engineering, Program, QA, Security, Legal and Compliance teams. I manage expectations across Design, Engineering and Management orgs and ensuring the product ideas and solutions are communicated, wireframed and pitched in the right fidelity to get all stakeholders onboard and scope our short term and long term roadmaps for each projects.) | San Francisco, California |

| 64. | Victor Levasseur | Principal / Lead senior software engineer at BitMEX focused on a product driven approach with great business | San Francisco, California |
|---|---|---|---|
| 65. | Jason Bond Pratt | Former Executive Vice President of Product and Engineering ( Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a | San Francisco, California |

| | | | |
|---|---|---|---|
| | | ~~engineer at BitMEX focused on a product driven approach and with great business~~ | |
| ~~65.~~ | ~~Jason Bond Pratt~~ | ~~Former Executive Vice President of Product and Engineering ( Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a~~ team of 40 during a period of 100x growth. (BitMEX was then and remains the largest crypto exchange, by volume, in the world.)<br>• Grew product and engineering team from 1 to 40 across 5 operational groups, and hired or developed hiring managers for each of them.<br>• Established a culture that valued diversity, respect, inclusion and appreciation, emphasizing team-first principles and a humble, servant leadership ethic throughout our organization.<br>• Hired or developed global leads for Security, DevOps, Recruiting, IT, UX, Mobile, and API/Web Engineering, and led the first D&I initiatives at the <u>company. Secured long term Class A space in the FiDi.</u><br><u>• Served on the global exec team and coordinated regularly with</u><br><u>peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.)</u> | ~~San Francisco, California~~ |

| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and | New York, New York |
|---|---|---|---|

| | | company. Secured long term Class A space in the FiDi. • Served on the global exec team and coordinated regularly with peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.) |
|---|---|---|
| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and Business Development at BitMEX | New York, New York |
| 67. | Tim Tickel | Head of Security at BitMEX (Securing cryptocurrency exchange infrastructure) | San Mateo, California |
| 68. | Chenqi 'Ashley' X. | Data Science Manager at BitMEX | San Francisco, California |
| 69. | Kev Zettler | Former Senior Software Engineer at BitMEX | Oakland, California |
| 70. | Cynthia P. | Former Art Director at BitMEX (Led a cross-functional rebrand project with Marketing, Product, and Brand collaborators to build the BitMEX brand for institutional and retail audiences. Deliverables included brand and style guidelines, visual assets, content strategy, digital and print editorial campaigns.) | New York, New York |
| 71. | Natalie Case | Technical Writer at BitMEX | Walnut Creek, California |
| 72. | Deb Baratz | Former Content Manager at BitMEX | New York, New York |

| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
|---|---|---|---|
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to | Indianapolis, Indiana |

| | | integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | |
|---|---|---|---|
| | | BitMEX | |
| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | Indianapolis, Indiana |

116. Based on the publicly available LinkedIn data, while 74 of Defendant HDR employees are located in the United States, only 34 are located in Hong Kong, which is the home for second largest Defendant HDR office. Therefore, more than two thirds of Defendant HDR employees worldwide are residing in the United States and in this District. Moreover, the vast majority of the 74 United States employees of Defendant HDR are engaged in software development and engineering, while in Hong Kong, there are only six software developers and engineers employed by Defendant HDR. Moreover, all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, personally responsible for the fraudulent system overloads and server freezes, are located in this District. Therefore, the United States and, specifically, this District is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed by Defendants and where the illegal acts alleged in this Complaint took place.

117. In addition, BitMEX website lists 17 job openings for Defendant HDR San Francisco office. For comparison, the other two offices of Defendant HDR – Hong Kong and Singapore list 14 and two job openings, respectively. Furthermore, out of 17 advertised job

openings in Defendant HDR San Francisco office, 15 are openings in engineering and software

development. On the other hand, in Hong Kong office, only four job openings are in software development and engineering. This fact further supports the conclusion that the United States and, specifically, this District is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed and where the illegal acts alleged in this Complaint took place.

118. BitMEX conducts offsites for the entire company hosted at its San Francisco office location, at least one of which occurred in November of 2017, in which Defendant Hayes and the rest of BitMEX's employees globally came to San Francisco and the San Francisco office.

119. Because the vast majority of BitMEX personnel, as alleged in Paragraph 115, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, as alleged in Paragraph 116, and almost all vital external service providers to BitMEX, as alleged in Paragraph 98, are located in this District, and because Defendant ABS, which develops, operates, enables, supports and services BitMEX platform is located in this District, this District is the home base of the largest operation of Defendant ~~DHR~~HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts alleged in this complaint took place, including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the CEA, 7 U.S.C. §§ 1 et seq. (2018) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2019). Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS. Furthermore, the illegal acts alleged herein were all perpetrated by Defendants through their commercial website BitMEX.com, accessible, via widely available and inexpensive VPN software, by users located in the United States and this

District. Defendants knew that users located in the United States and this District were accessing their commercial website BitMEX.com.

120. Numerous citizens and residents of the United States and this District conducted and continue to conduct a high-volume ~~derivatives~~derivative trading on the BitMEX platform using Defendants' commercial website BitMEX.com.

121. The same commercial website BitMEX.com was used by Defendants to perpetrate all the illegal acts alleged in Paragraph 119, resulting in injuries to Plaintiffs, for which Plaintiffs seek redress in this Complaint. Accordingly, Defendants' connections with the United States and

this District through the commercial website BitMEX.com, used by the United States residents and residents of this District, are directly related to the causes of action asserted by Plaintiffs in this Complaint.

122. For the reasons stated in the previous Paragraphs of this Complaint, BitMEX is a domestic United States cryptocurrency exchange.

## U.S. TRADERS ON BITMEX LEADERBOARD

123. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.



# Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

## Top 25 Traders by Notional

| Rank | | Name | Profit | Is Real Name |
|---|---|---|---|---|
| 1 | | Mercury-Wood-Sprite | 8,161.2198 XBT | ✖ |
| 2 | | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 3 | | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 4 | 1. Sunil Shah, 310 Lake St., Unit #310, Huntington Beach, CA 92648 | Alameda Research | 5,244.5830 XBT | ✔ |
| 5 | | Hot Relic Fancier | 4,216.5159 XBT | ✖ |
| 6 | 2. Bryce Gilleland, 1400 Calle De Las Flores, San Dimas, CA 91773 | coincidentcapitalltd | 2,610.2783 XBT | ✔ $31,000,000 Exhibits: 6, 7, 8 |
| 7 | 3. Wen Hou, 2253 Martin St. Apt 113, Irvine, CA 92612 | Skitter-Peridot-Raven | 2,329.1721 XBT | ✖ |
| 8 | | Honeysuckle-South-Rib | 2,111.6555 XBT | ✖ |
| 9 | | CSW is a fraud | 2,086.7229 XBT | ✔ |
| 10 | | Tree-Surf-Dragon | 2,053.2285 XBT | ✖ |
| 11 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger-LeotankCapital | 1,764.5478 XBT | ✔ $21,000,000 Exhibits: 9, 10, 11 |
| 12 | | alamedaresearchltd@gmail.com | 1,696.7039 XBT | ✔ |
| 13 | | Jade-Platinum-Legs | 1,675.8174 XBT | ✖ |
| 14 | | Circle_Trade | 1,619.6382 XBT | ✔ |
| 15 | | Winter-Pink-Fang | 1,542.1702 XBT | ✖ |
| 16 | | daniel3 | 1,514.6067 XBT | ✔ |
| 17 | | Cream-White-Ox | 1,476.3798 XBT | ✖ |
| 18 | | xorq | 1,473.0086 XBT | ✔ |
| 19 | | Disco-Solar-Fang | 1,452.1775 XBT | ✖ |
| 20 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger_LeotankCapital | 1,441.3349 XBT | ✔ $17,000,000 Exhibits: 9, 10, 11 |
| 21 | | Ebony-Fair-Ilac | 1,390.0500 XBT | ✖ |
| 22 | | aoa | 1,386.5926 XBT | ✔ |
| 23 | | Quill-Rift-Hoof | 1,363.3790 XBT | ✖ |
| 24 | | Brown-Peat-Myth | 1,248.5080 XBT | ✖ |
| 25 | | Denim-Sun-Speaker | 1,218.5577 XBT | ✖ |

124. While Defendants and their counsel are busy disingenuously swearing to Courts that "U.S. persons are expressly prohibited from trading on BitMEX platform," Defendants' own public Leaderboard posted on Defendants' website (https://www.bitmex.com/app/leaderboard) reveals that just four U.S.-based traders who decided to reveal their real names (evidently in an

effort to assist with fundraising): Roger Xu of Leotank Capital Inc. and Bryce Gilleland, Wen

Hou and Sunil Shah of Coincident Capital (Ex. 8) generated almost $70,000,000 in trading profits

on Defendants' BitMEX platform. As attached Ex. 8 clearly shows, Bryce Gilleland, Wen Hou

and Sunil Shah reside in California, while Roger Xu resides in New York.

125. Moreover, the above staggering amount of business was conducted by Defendants

in the United States and the State of California without obtaining a money transmission license

and without complying with the mandatory FinCEN regulations in violation of 18 U.S.C.

§ 1960(a). Notably, all the above evidence was obtained from Defendants' own public website

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | | Name | Profit | | Is Real Name |
|------|---|------|--------|---|--------------|
| 1 | | Mercury-Wood-Sprite | 8,161.2198 XBT | | ✗ |
| 2 | | Quick-Grove-Mind | 8,047.8158 XBT | | ✗ |
| 3 | | Heavy-Autumn-Wolf | 7,574.4154 XBT | | ✗ |
| 4 | 1. Sunii Shah, 310 Lake St., Unit #310, | Alameda Research | 5,244.5830 XBT | | ✓ |
| 5 | Huntington Beach, CA 92648 | Hot-Relic-Fancier | 4,216.5159 XBT | | ✗ |
| 6 | 2. Bryce Gilleland, 1400 Calle De Las | coincidentcapitalltd | 2,610.2783 XBT | $31,000,000 Exhibits: | ✓ |
| 7 | Flores, San Dimas, CA 91773 | Skitter-Peridot-Raven | 2,329.1721 XBT | 6, 7, 8 | ✗ |
| 8 | 3. Wan Hou, 2253 Martin St. Apt 113, Irvine, CA 92612 | Honeysuckle-South-Rib | 2,111.6555 XBT | | ✗ |
| 9 | | CSW is a fraud | 2,086.7229 XBT | | ✓ |
| 10 | | Tree-Surf-Dragon | 2,053.2285 XBT | | ✗ |
| 11 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger-LeotankCapital | 1,764.5478 XBT | $21,000,000 Exhibits: | ✓ |
| 12 | | alamedaresearchltd@gmail.com | 1,696.7039 XBT | 9, 10, 11 | ✓ |
| 13 | | Jade-Platinum-Legs | 1,675.8174 XBT | | ✗ |
| 14 | | Circle_Trade | 1,619.6382 XBT | | ✓ |
| 15 | | Winter-Pink-Fang | 1,542.1702 XBT | | ✗ |
| 16 | | daniel3 | 1,514.6067 XBT | | ✓ |
| 17 | | Cream-White-Ox | 1,476.3798 XBT | | ✗ |
| 18 | | xorg | 1,473.0086 XBT | | ✓ |
| 19 | | Disco-Solar-Fang | 1,452.1775 XBT | | ✗ |
| 20 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger-LeotankCapital | 1,441.3349 XBT | $17,000,000 Exhibits: | ✓ |
| 21 | | Ebony-Fair-Bat | 1,390.0500 XBT | 9, 10, 11 | ✗ |
| 22 | | aoa | 1,386.5926 XBT | | ✓ |
| 23 | | Quill-Rift-Hoof | 1,363.3790 XBT | | ✗ |
| 24 | | Brown-Peat-Myth | 1,248.5080 XBT | | ✗ |
| 25 | | Denim-Sun-Speaker | 1,218.5577 XBT | | ✗ |

without any benefit of discovery. Plaintiffs are informed and believe that this is a mere tip of the iceberg and that up to third of all traders on the BitMEX Leaderboard generating half a billion dollars of profits are U.S. persons.

### ATTEMPTS TO MISLEAD COURTS REGARDING MATERIAL FACTS

*"U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." Mr. Hibbard, Defendants' counsel.*

126. It is simply inconceivable that Defendants and their litigation counsel somehow did not know that some of their top traders who generated almost $70,000,000 in profits on Defendants' own platform were U.S. persons, Ex. 8. Obviously, such high-profile traders are universally known by name. Yet, with full knowledge that some of BitMEX's top trading accounts which generated almost $70,000,000 in trading gains were in fact operated by U.S.

persons, Defendant Hayes, with the assistance and encouragement of Defendants' counsel, nevertheless disingenuously swore under the penalty of perjury in a California Superior Court proceeding, in a motion challenging Court's jurisdiction that "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform." Defendants' counsel, not to be outdone, repeated this travesty thirteen (!) more times throughout his various motions and oppositions. Various representations of material facts made by Defendant Hayes and his counsel Stephen D. Hibbard to various Courts as well as the true facts are summarized in the table below:

| Court Name, | Date | Defendant Hayes' | Defendants counsel's | The True Facts and |
|---|---|---|---|---|



| ~~Court Name,~~ ~~Case and~~ **Document** | | | of | "U.S. persons are expressly |
|---|---|---|---|---|
| N.D. Cal. 3:20-cv-3345-WHO, Defendants' Opposition to Ex Parte Application for Evidence Preservation Order [Dkt. No. 26, p. 3, 5]. | 6/12/20 | | | prohibited from accessing or trading on the BitMEX platform under the terms of service." "HDR is a holding company that |
| | 2/27/20 | MPA in Support of Motion to Quash San Francisco County Superior Court, CGC19581267, | | |
| San Francisco County Superior Court, GC19581267, Declaration in Support of Motion to Quash | 2/27/20 | | | |
| San Francisco County Superior Court, GC19581267, MPA in Support of Motion to Quash | 2/27/20 | | | |
| San Francisco County Superior Court, CGC19581267, | 2/27/20 | | | |
| | | MPA in Support | | |

"No further time and attention of this Court is warranted as there is no need for a court to order someone to do what they are already doing."

"Our clients understand their document preservation responsibilities and have acted responsibly to fulfill them. As such, there is no dispute, and there is no need for a document preservation order."

the BitMEX platform."

"Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information." Ex. 5, p. 16, ¶ 49.

Defendants also falsified records: "Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program." Ex. 5, p. 24, ¶ 90. "BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons. BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus." Ex. 5, p. 3, ¶ 3.

jurisdictions... Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program... Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other

ultimately owns the BitMEX-branded trading platform that allows the trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons.*"
"Further, U.S. persons are prohibited from accessing and trading on the BitMEX platform."

"U.S. persons are prohibited from trading on

"BitMEX even maintained an internal dashboard of open accounts from supposedly restricted

| | | | | |
|---|---|---|---|---|
| ~~Motion to~~ Quash | | | ~~derivatives) *by certain non-U.S. persons.*~~" | ~~supposedly restricted jurisdictions... Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program... Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other~~ account and transactional information for U.S. based traders. For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform." Ex. 5, p. 24, ¶ 91. |
| ~~San Francisco County Superior Court, CGC19581267, MPA in Support of~~ | ~~2/27/20~~ | | ~~"Further, U.S. persons are prohibited from accessing and trading on the BitMEX platform."~~ | |
| ~~San Francisco County Superior Court, CGC19581267, MPA in Support of~~ | ~~2/27/20~~ | | ~~"U.S. persons are prohibited from trading on the BitMEX platform."~~ | |
| San Francisco County Superior Court, CGC19581267, Declaration in Support of Motion to Quash | 6/16/20 | "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform under the terms of service." | | In addition, some of BitMEX's most profitable trading accounts openly listed on BitMEX's public Leaderboard, which generated almost $70,000,000 in trading profits, were and continue to be operated by four U.S. persons Bryce Gilleland, Wen Hou, Sunil Shah and Roger Xu. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "HDR is a holding company that ultimately owns the BitMEX-branded trading platform that allows the trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons*." | Bryce Gilleland resides at: 1400 Calle De Las Flores, San Dimas, CA 91773, Ex. 8. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | Wen Hou resides at: 2253 Martin Ct. Apt. 113, Irvine, CA 92612, Ex. 8.

Sunil Shah resides at: 310 Lake St., Unit #310, Huntington Beach, CA 92648, Ex. 8. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Plaintiffs allege that ... U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading..." | Roger Xu resides at: 250 W 50th Street, Apt. 3d2, New York, NY |

| | | | |
|---|---|---|---|
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Further, U.S. persons are prohibited from trading on the BitMEX platform." |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to | 6/16/20 | | "U.S. persons are prohibited from trading on the BitMEX platform." |
| San Francisco | 6/23/20 | | "U.S. persons are |

| County Superior Court, CGC19581267, ~~MPA in Support of~~Opposition to Motion to ~~Quash~~Compel | | | ~~are prohibited from trading on the~~ expressly prohibited from accessing and trading on the BitMEX platform." | courts regarding jurisdictional facts.~~York, NY 10019, Ex. 8. Due to the enormous sizes of the trading gains involved and the high profile of the traders, it is absolutely inconceivable for Defendants and their counsel not to have known this fact at the time Defendants and their counsel made the material representations to the courts regarding jurisdictional facts.~~ |
|---|---|---|---|---|
| ~~San Francisco County Superior Court, CGC19581267, MPA in Support of~~ | ~~6/16/20~~ | | ~~"U.S. persons are prohibited from trading on the BitMEX platform."~~ | |
| ~~San Francisco County Superior Court, CGC19581267, Opposition to~~ | ~~6/23/20~~ | | ~~"U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform."~~ | |
| San Francisco County Superior Court, CGC19581267, Opposition to Motion to Compel | 6/23/20 | | "Plaintiffs allege that ... some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective Order | 6/25/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective Order | 6/25/20 | | "Plaintiffs allege that ... some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." | |

**THE LEADERBOARD FIASCO AND HASTY "USER VERIFICATION PROGRAMME"**

127.

Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

128. Defendants' initial strategy to deal with a mounting number of civil cases against them in the United States was to argue to Courts that Defendants were not subject to personal jurisdiction in this country due to a lack of minimum contacts with the U.S. and, specifically, due to "U.S. persons [being] expressly prohibited from trading on BitMEX platform."

129. That defense strategy spectacularly imploded when, in early August 2020, Plaintiffs' counsel Pavel Pogodin stumbled upon Defendants' Leaderboard (https://www.bitmex.com/app/leaderboard, Ex. 8) and discovered that, contrary to Defendants'

denials, among top three Leaderboard traders, who meaningfully revealed their real names, all three turned out to be United States persons, generating over $70,000,000 in trading profits on Defendants' BitMEX platform. Plaintiffs' attorney put this stunning discovery into a CMC Statement, filed on August 11, 2020, Dkt. No. 33, which caused an angry response from Defendants' counsel. Defendants' counsel first demanded that Plaintiffs remove this very damaging information from the CMC statement using a CMC statement page limit as an excuse. After receiving a negative response, Defendants' counsel bitterly refused to file Plaintiffs' exhibits to the CMC statement. Moreover, in a phone call, which took place shortly thereafter, conspicuously shaken Mr. Stephen D. Hibbard uncontrollably screamed at Plaintiffs' counsel in a grossly unprofessional manner, shouting over the phone "shut your mouth."

130. After Defendants and their counsel finally came to their senses and realized that the jurisdictional genie was out of the bottle and their plot to mislead U.S. Courts has been exposed, they hastily waived jurisdictional challenges in three United States civil cases against them and instituted a "User Verification Programme"[67], designed to create an appearance that Defendants somehow did not know before that most of their leaderboard was filled with U.S. traders,[78]

---

[6] BitMEX operated for more than 5 years without any user verification what so ever. The "User Verification Programme" was instituted less than 48 hours after Plaintiffs' counsel put discovered jurisdictional evidence into CMC statement, Dkt. No. 33.

[7] The "User Verification Programme" was apparently instituted in order to avoid civil and criminal liability for knowingly operating an unlicensed money transmission business in the U.S.

**DEFENDANT REED'S PERJURY AT CFTC DEPOSITION AND MR. HIBBARD'S**
**UNTRUTHFUL STATEMENTS TO COURTS WITH RESPECT TO THE SAME FACTS**

131. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

132. As stated above, Defendants' strategy (or, more accurately, plot) to deal with civil litigation against them in the U.S. was to falsely claim to Courts that, despite having more that 85,000 trader accounts with the U.S. nexus[89], Defendants were not subject to personal jurisdiction in

---

[7] BitMEX operated for more than 5 years without any user verification what so ever. The "User Verification Programme" was instituted less than 48 hours after Plaintiffs' counsel put discovered jurisdictional evidence into CMC statement, Dkt. No. 33.

[8] The "User Verification Programme" was apparently instituted in order to avoid civil and criminal liability for knowingly operating an unlicensed money transmission business in the U.S. in violation of 18 U.S.C. § 1960(a).

[9] CFTC Complaint, Ex. 5, p. 2-3, ¶ 3.

in this country due to a lack of minimum contacts with the U.S. In furtherance of this plot to defraud U.S. and California Courts, Defendant Reed went as far as to commit perjury during his 2019 deposition before CFTC, by denying that BitMEX maintained reports identifying U.S. customers on its trading platform, see Indictment, Ex. 4, p. 13, ¶ 27. In reality, in December of 2018, Defendant Reed received a report showing trading revenue attributable to U.S. customers, see Indictment, Ex. 4, p. 13, ¶ 27.

133. Pursuant to the same plot, Defendants' counsel Mr. Stephen D. Hibbard repeatedly untruthfully told San Francisco Superior Court Judge Schulman that BitMEX serves only non-U.S. traders and, therefore, California Courts lack jurisdiction over it, see Paragraphs above.

134. All these misrepresentations are parts of the same scheme to mislead U.S. and California Courts, which Defendants and their counsel continue to pursue even today.

### ACCEPTANCE OF TAINTED FUNDS AS PAYMENT FOR MISLEADING COURTS BY DEFENDANTS' ATTORNEYS

135. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

136. Not only was Defendants' counsel eagerly willing to mislead Courts regarding material jurisdictional facts to get Defendants off the hook no matter the cost, he also gladly accepted funds tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and proceeds of operating an unlicensed money transmitting business in violation of 18

~~in violation of 18~~ U.S.C. § 1960(a) as his fee for doing so.

~~s CFTC Complaint, Ex. 5, p. 2-3, ¶ 3.~~

~~U.S.C. § 1960(a) as his fee for doing so.~~

      137. As alleged above, BitMEX knowingly collects hundreds of millions of dollars in trading commissions from the money laundering transactions taking place on its platform on a daily basis, including during each of the specific Manipulation Times ~~alleged in Paragraph 372 below~~, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from which all legal fees of BitMEX attorneys are paid (after currency conversion). Thus, BitMEX's employee salaries, office rents and even legal fees that BitMEX attorneys collect are tainted with the proceeds of money laundering in violation of 18

U.S.C. §§ 1956 and 1957.

138. Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a), Ex. 8. This violation has been conclusively proven using BitMEX's own Leaderboard, Ex. 8. Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. 9. In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiffs are aware of, see Paragraphs ~~100~~108, ~~101~~109, ~~106~~114. The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a). Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions. In *United States v. Klein*, 6:17-cr-03056 (W.D. Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions. Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty-three times).

139. Consequently, all the fees that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting

business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained in Paragraph 9 above). Legal fees for Defendants' counsel's "services" aimed at misleading Courts were paid from the same general account, which contained the tainted funds.

140. It should be further noted that the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) applies to criminal matters only, while Defendants' counsel received tainted funds for representing Defendants in civil cases. Therefore, the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) does not apply and the acceptance of tainted funds for counsel's efforts to mislead

Courts, itself constitutes money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

141. Thus, all the fees paid to Defendants' legal counsel in this and other civil matters by Defendants, including fees paid for misleading Courts regarding material jurisdictional facts as alleged in Paragraphs 115 and 116, were tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and proceeds of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a). Moreover, Defendants' counsel was clearly on notice of very serious issues with Defendant Hayes, as Mr. Hayes has previously publicly admitted to bribery of foreign government officials and bank fraud, Ex. 10, 11, of which Defendants' counsel was specifically informed. Thus, Defendants' counsel's conduct of misleading Courts about material facts and accepting tainted money as fees for doing so was clearly intentional. Notably, some of the Defendants used the same tainted funds from their general account to acquire real state in Wisconsin and Massachusetts as alleged in Paragraph 20.

### JURISDICTION AND VENUE

142. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

143. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 as well as 28 U.S.C. §§ 1331 and 1332(a). Specifically, this action arises under RICO and CEA, both of which present a federal question.

144. This Court has jurisdiction over the statutory and common law claims of violations

under California law pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

145. This Court has personal jurisdiction over Defendants, and each of them, pursuant to California long arm statute codified in Cal. Code Civ. Proc. § 410.10 as well as RICO personal jurisdiction provisions of 18 U.S.C. § 1965(a) and (b).

146. Defendant HDR conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

147. Defendant ABS conducts and has conducted a substantial, systematic, and

continuous business in the State of California as alleged hereinabove.

148. Defendant Hayes conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove. Moreover, Defendant Hayes transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least through his alter ego Defendant ABS, headquartered in this District, of which is he a founder, CEO, CFO, secretary and director. As alleged in Paragraph 45, name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed.

149. Defendant Delo conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove. Moreover, Defendant Delo transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least through his alter ego Defendant ABS, headquartered in this District, of which is he a founder. As alleged in Paragraph 45, name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed.

150. Defendant Reed conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove. Moreover, Defendant Reed transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least through his alter ego Defendant ABS, headquartered in this District, of which is he a founder and CTO. As alleged in Paragraph 45, name "ABS" is an abbreviation constructed of first letters of first names

(Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed.

151. This Court clearly has personal jurisdiction over at least one of the participants in the alleged multi-district RICO conspiracy – Defendant ABS, which is headquartered in this District. In fact, this Court also has personal jurisdiction over Defendant HDR as well as other Defendants. In a San Francisco County Superior Court case CGC19581267, Judge Schulman flatly rejected some of the same Defendants' fraudulent shell games and held that Defendants operated as a single enterprise for California law purposes. Therefore, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this district

(over 70 employees). See Systems Div., Inc. v. Teknek Elect., Ltd. 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of jurisdiction over an alter ego is compatible with due process because a corporation and its alter ego are the same entity—thus, the jurisdictional contacts of one are the jurisdictional contacts of the other for purposes of the International Shoe due process analysis."). Defendant ABS, which is an alter ego of Defendant HDR, has its headquarters and over 70 employees in California. Attributing these contacts to Defendants HDR clearly subjects it to the personal jurisdiction of this Court. Moreover, Defendants and their counsels' failed attempts to hide the fact that BitMEX's top traders generating almost $70,000,000 in trading profits are U.S. persons clearly supports holding Defendants accountable for their actions in a United States District Court.

152. There is no other District within the United States in which a Court would have a personal jurisdiction over all of the alleged RICO co-conspirators. Defendant Reed resides in Wisconsin. Therefore, it is in the interests of justice to bring all the remaining Defendants before this Court pursuant to RICO's nationwide jurisdiction provision of 18 U.S.C. § 1965(b).

153. Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(1). Venue is similarly proper pursuant to 7 U.S.C. § 25(c) in that this is a District wherein a defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.

## INTRADISTRICT ASSIGNMENT

154. Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is the proper venue because substantial part of the events or omissions, which give rise to this action has occurred in San Francisco county, where Defendants' HDR and ABS principal offices are located.

## BACKGROUND - BITCOIN

155. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

156. Bitcoin is form of cryptocurrency. It is a trustless, decentralized digital currency

without a central bank or single centralized administrator that can be sent from user to user on the peer-to-peer bitcoin network without the need for intermediaries or a trusted central authority.

157. Bitcoin was invented in or about 2008 and described in a whitepaper entitled "Bitcoin: A Peer-to-Peer Electronic Cash System" authored by an unknown person or group of people using the name Satoshi Nakamoto and started in 2009 when its source code was released as an open-source software. Bitcoins are created as a reward for a process known as mining. They can be exchanged for other currencies, products, and services.

158. Bitcoin transactions are verified by a network of nodes through cryptography and recorded in a public distributed ledger called a blockchain, which is maintained by multiple bitcoin network nodes through the use of a consensus protocol. Every bitcoin transaction starting from the very first one may be viewed and verified using the blockchain. The blockchain consists of a chronologically ordered sequence of blocks holding records of bitcoin network transactions. A new block is generated by miners every 10 minutes. The integrity of the blockchain is maintained by including a hash of each block in to the subsequent block. This way, if any block is altered (forged) after its creation, all the subsequent blocks would have to be also modified or the hash discrepancy caused by the modification will be immediately detected by all the network nodes.

159. Bitcoins are traded for United States dollars, Euros and other fiat currencies and

cryptocurrencies on centralized online marketplaces called exchanges. Usually, transactions taking place inside exchanges, such as executions of buy and sell orders are not recorded on the public blockchain and, therefore, it is hard to independently verify them using the blockchain. Most exchanges do not have internal protections against bitcoin price manipulation as well as other fraudulent behavior, which is rampant due to low trading liquidity of the bitcoin market.

160. Stablecoins are cryptocurrencies designed to minimize the volatility of the price of the stablecoin, relative to some "stable" asset or basket of assets. The value of a stablecoin can be pegged to a cryptocurrency, fiat money, or to exchange-traded commodities (such as precious metals or industrial metals). Most frequently used stablecoins are those pegged to United States

dollar, including, without limitation, Tether (USDT), USDC and the like.

161. Since at least 2015, the CFTC has maintained that bitcoin, and other virtual currencies, fit the definition of a commodity primarily through administrative actions. In re *Coinflip, Inc*., CFTC Docket No. 15-29, 2015 WL 5535736 at *3 (Sept. 17, 2015). *CFTC v. McDonnell*, *287 F. Supp. 3d* 213, *228* (E.D.N.Y. 2018) was the first time the CFTC's position was given judicial approval. The court noted that "[v]irtual currencies can be regulated by the CFTC as a commodity," because virtual currencies can be exchanged in a market for a uniform quality and value. The Court's reasoning makes clear that bitcoin and other virtual currencies fall within both the common law definition of commodity and the CEA's definition of a commodity.

## BITCOIN PRICE MANIPULATION TECHNIQUES

162. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

163. On or about September 9, 2019, Chairman of the United States Security Exchange Commission ("SEC") Jay Clayton stated: "[i]n the trading area, it troubles me that people look on these venues and think it has got the same level of protection that you'd have on an equity market in the US NASDAQ and MYSZ. Nothing could be further from the truth, we have lengthy rulebooks, all sorts of protections to make sure that prices are not manipulated in the equity markets, I don't see those in the Crypto asset markets."

164. Bitcoin derivatives and especially spot markets remain thinly traded making them particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms of market manipulation perpetrated by Defendants' Insider Trading Desk. The primary beneficiaries of such illegal manipulation are the Defendants, who are able to fill their orders at better than market prices at the expense of other traders, as well as cryptocurrency exchanges, such as BitMEX, which benefit through increased trading volumes as well as trader position liquidations. This provides very strong financial incentive for Defendants to manipulate cryptocurrency markets.

165. Pump-and-dump is the fraudulent practice of Defendants' Insider Trading Desk encouraging unwitting investors to buy an asset, such as bitcoin, to inflate its price artificially,



and then selling it when the price reaches a predetermined threshold. Pumps-and-dumps are designed to deceive the inventors as to the state of market supply and demand for the asset by means of artificially increasing the price and trading volume of the asset that is designed to entice unwitting traders to join the hype, and to buy the asset at an artificially inflated price, which they would not have done otherwise. When Defendants' Insider Trading Desk sells (dumps) their bitcoins and stop pumping it, the price plummets, and other BitMEX traders are left holding the asset that is worth significantly less than they paid for it. As the result, traders who bought the bitcoin on margin, may be subject to execution of stop losses as well as liquidations.

166. Bart patterns or simply "Barts" are a variety of pumps-and-dumps involving intense pumps or dumps occurring within a very short time frame causing price action to find a new high or low for a very short period, followed by equally violent return to the previous level. Defendants' Insider Trading Desk using this manipulation tactic benefits by having its sell/buy orders filled, and causing the unwitting investors to open positions against the trend.

167. Barts are created by Defendants' Insider Trading Desk using Momentum Ignition Algorithms, which work by creating a sharp spike in buy or sell action within a market with the



purpose of deceiving the market participants as to market-based forces of supply and demand for an asset and enticing unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed. Barts are intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded. Additionally, unsuspecting traders will place buy orders above significant zones, to catch up trends, and short sellers will place stops losses in similar areas, these are effectively buy

orders. In order for the malicious algorithm executed by the Defendants' Insider Trading Desk to be most effective it has to push price into these liquidity zones, triggering buys, and from there it can disengage. Sometimes, several hours later, a floor of buy orders is removed, and a momentum ignition may be activated in the opposite direction causing a dump.

168. Stop loss hunting is a type of market manipulation, wherein the Defendants'

Insider Trading Desk attempts to artificially move the price for an asset to a predetermined price value to force other market participants out of their positions. This type of manipulation is performed by executing one or more buy or sell orders with the purpose to drive the price of an asset to a level where many market players have chosen to set their stop-loss orders. Stop loss orders are orders that get automatically executed at market price should the price of bitcoin reach a predetermined price threshold. The Defendants' Insider Trading Desk buys or sells spot bitcoin or bitcoin derivative until the price threshold is reached. When the stop loss orders are triggered due to a stop loss hunt manipulation, the trader's asset holdings are sold at prevailing market prices causing the market to be filled with a large number of market orders, which has the ability to move the asset price even further triggering more stop loss orders and can even result in liquidations. The result is a cascading execution of a large number of market orders. The Defendants' Insider Trading Desk places its buy or sell orders such as to have them filled at the bottom or at the top of the resulting stop loss execution cascade at artificially below or artificially above market prices, respectively. After the initial market move, the price of the asset sometimes recovers and Defendants' Insider Trading Desk generates a profit due to its illicit actions.

169. Liquidation cascade is an extreme case of the stop loss hunt, when the Defendants' Insider Trading Desk pushes the price of the asset or derivative to reach position liquidations levels for multiple traders and the resulting multiple market liquidations take place in a very short time interval moving the price even further. This triggers additional liquidations causing a cascading execution of a large number of liquidation orders. Similarly to the stop loss hunt, the Defendants' Insider Trading Desk places its buy or sell orders such as to have them filled at the bottom or at the top of the resulting liquidations cascade, at artificially below or artificially above

market prices, respectively.

170. The manipulative price actions alleged hereinabove perpetrated by Defendants'
Insider Trading Desk on one cryptocurrency spot or derivatives exchange quickly propagate to
all other exchanges due to the widespread use of arbitrage bots, which are algorithms coded in
software that take advantage of the price discrepancy between exchanges by buying or selling an

asset in one market and simultaneously selling or buying it in another market at a more favorable price. Thus, a manipulative price action on one cryptocurrency exchange results in a substantially similar price action on all other exchanges.

171. Because cryptocurrency derivatives exchanges contracts are based heavily on bitcoin spot index price on a handful of relatively illiquid "reference" spot exchanges, a large bitcoin spot price move may be accomplished by executing relatively small market orders on the illiquid spot exchanges. For example, .BXBT index price used by Defendants for BitMEX's XBTUSD Perpetual Swap contract is based substantially on bitcoin prices on United States based exchanges BitStamp USA Inc., which owns and operates

cryptocurrency exchange online platform BitStamp.net ("BitStamp"), see Ex. 14; Coinbase Inc. ("Coinbase Pro") and Kraken[9] ("Kraken"), which are ~~much~~ less liquid than BitMEX itself.

172. Once initiated by Defendants' Insider Trading Desk using helper accounts on BitStamp, Coinbase Pro and/or Kraken, the aforesaid price move spreads, through the aforesaid index, to order books of very liquid derivatives exchanges, such as BitMEX and causes massive, multimillion dollar instant liquidations of derivatives positions of retail traders like Plaintiffs. Such liquidations provide a financial windfall to derivatives exchanges such as BitMEX due to the increased trading volume as well as confiscation by the exchanges of the residual collateral of the liquidated retail traders, if the exchange is able to close the traders' positions at prices better than bankruptcy price. In BitMEX, the amount of funds so confiscated from liquidated traders exceeded, as of May 3, 2021, 37,337 bitcoins valued at over $2,165,555,825, which amount is

[9] ~~Kraken is owned and operated by Payward, Inc. with offices at 237 Kearny Street Suite 102, San Francisco, CA 94108 United States.~~

stored in a winner account on the BitMEX exchange.

173. Pumps-and-dumps, Barts, stop loss hunts and liquidation cascades may be utilized by Defendants for purposes of money laundering, especially when exchanges, like BitMEX, do not require any documents to open an account. For example, in case of a liquidation cascade, a first Defendant may use automated software tools developed by BitMEX to execute a relatively small market order to trigger the liquidation cascade and a second Defendant, acting from a separate exchange account, opened on the same or different exchange, may place large buy or sell

orders, respectively, to have them filled at the artificially low or high (below or above market) prices caused by the liquidation cascade triggered by the actions of the first Defendant. The first Defendant would book a loss, while the second Defendant would book a profit. The first Defendant may be officially located in a high tax jurisdiction, such as California, while the second Defendant may be incorporated in a tax-heaven jurisdiction, such as British Virgin Islands. Furthermore, the first Defendant may <u>use automated software tools developed by BitMEX to</u> execute the order on an illiquid "reference" spot exchange, such as BitStamp, to amplify the effect of the initiating market order while the second Defendant may operate on a derivatives exchange such as BitMEX, which uses the price of the spot exchange in calculating its index.

174. In a criminal commodity derivatives market manipulation case *USA v. Smith et al.* (N.D. Il. 2019), the United States Department of Justice (DOJ) took a position that placing orders for commodity derivatives contracts in a manner that was intended to deliberately trigger or deliberately avoid triggering a specific price-based event, such an option execution, is unlawful. Consistent with that position, the all above alleged price manipulation actions are also unlawful.

175. In *SEC v. Shuang Chen et. al*. Civil Action: 1:19-cv-12127-WGY (D. MA 2019) "[t]he Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly traded stock. ~~The~~ Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price (hereinafter referred to as a "helper" account). Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper

account(s). ~~The~~ Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts." The illegal stock price manipulation technique alleged by SEC is identical to the techniques alleged hereinabove and used as well as aided and abetted by Defendants on a daily basis during the time period starting on January 1, 2017 and until October 1, 2020 ("Relevant Period") to manipulate

the prices of cryptocurrencies. According to SEC, all those techniques are illegal.

176. Spoofing is an unlawful practice of making buy or sell orders, called deceptive orders, with an intent to cancel them before execution. The deceptive orders are used by Defendants to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded.

177. Bitcoin price manipulation such as pumps-and-dumps, Barts, stop hunts, liquidation cascades, and spoofing, as well as numerous other forms of illicit market manipulation used by Defendants and their Insider Trading Desk are generally believed to be the abuses that prevent SEC from approving numerous bitcoin Exchange Traded Fund (ETF) applications that have been filed throughout the years by various cryptocurrency industry players.

### BITMEX WAS DESIGNED FROM GROUND UP TO BENEFIT FROM MANIPULATION
*"Regulatory agencies can be bought." Defendant Arthur Hayes*

178. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

179. BitMEX was launched in 2014 by Defendants Hayes, Delo and Reed. BitMEX was one of the first cryptocurrency exchanges that offered derivative products based on the price of bitcoin. At its inception, as Defendant Hayes described it, BitMEX was to serve Wall Street

institutional investors "who were going to want the same type of products" they were

used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform, including traders from Wall Street. Therefore, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" by offering "100X leverage" trades. Since then, its first-mover advantage has

paid off: it is consistently among the largest cryptocurrency derivatives traders by volume and has been for years. It now frequently trades over $3 billion worth of transaction in a single day.

180. In allowing retail customers to leverage their bets at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in derivatives trading — BitMEX positioned itself to benefit consistently, significantly, and predictably from the combination of attracting overly hopeful investors and small price fluctuations on other exchanges. This structure creates substantial incentives for Defendants to surreptitiously cause such fluctuations.

181. Implementing its business approach, Defendants deliberately based the index price of their Perpetual Swaps on spot-market exchanges that have limited liquidity and are thus relatively easy to manipulate. BitMEX would then engage in manipulative trading on those exchanges to change the price of bitcoin or ether. Even if only temporary, these price changes would then affect the prices of the Perpetual Swaps offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders.

182. Automatically liquidating contracts that were out of the money, BitMEX would cover the trader's losses but would also take all of the trader's collateral. By setting the liquidation point higher than necessary to protect against the risk of a loss greater than the trader's collateral, BitMEX consistently profited from these liquidations. BitMEX would place these profits in its insurance fund ("Insurance Fund"), marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral. Despite its name, the Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars.

183. BitMEX also acted on similar financial incentives by trading against its customers,

a secret BitMEX kept as long as it could. BitMEX employed an undisclosed Insider Trading Desk with special privileges and insights that allowed BitMEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the Insider Trading Desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As an Insider Trading Desk with access to otherwise-hidden information, it was in a perfect position to enhance

BitMEX's manipulation.

184. BitMEX has compounded the effect of these manipulative schemes by routinely



**⚠ Order Submission Error.**   7:31:01 PM   ⊗

Order could not be submitted: The system is currently overloaded. Please try again later.

freezing its servers—which BitMEX blames on technical glitches and limitations—to profit during moments of high volatility. During these freezes, customers are unable to change their positions, but the market continues to operate and BitMEX trades. BitMEX would thus prevent its customers from escaping positions until they fell to a level at which BitMEX could liquidate those positions at a profit to itself.

185. BitMEX's operations on March 13, 2020, are a recent and good example. During a period in the day with high market volatility and crashing bitcoin prices (from nearly $8,000 to $4,000 per bitcoin), resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes. As a result of the outage, BitMEX did not dip into its Insurance Fund, but rather liquated $800 million of its customers' highly leveraged positions for its own profit. This



**BitMEX** ✔
@BitMEXdotcom

Between 02:16 and 02:40 UTC 13 March 2020 we became aware of a hardware issue with our cloud service provider causing BitMEX requests to be delayed. Normal service resumed at 03:00 UTC. As a reminder, latest system updates can be found on our status page status.bitmex.com

1:04 AM · Mar 13, 2020 · Twitter Web App

server outage, in short, effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products. It should be noted that BitMEX' three Site Reliability Engineers, responsible for the bitMEX trading platform uptime, are all located in this District and the deliberated and fraudulent outage on March 13, 2020 was

perpetrated by them from this District. To cover up their fraud, Defendants first concocted a story of a hardware failure that allegedly caused the BitMEX platform outage.

186. However, Defendants soon realized that all hardware used by BitMEX platform was managed by Amazon EKS and not Defendants themselves and that such a fake excuse would



**BitMEX** ✔
@BitMEXdotcom

We have identified the root cause of two DDoS attacks at 02:16 UTC and 12:56 UTC, 13 March 2020. For a full account of what happened and how we are responding, please refer to our blog: blog.bitmex.com/how-we-are-res...

2:35 AM · Mar 17, 2020 · Twitter Web App

clearly not hold up if Amazon is asked to investigate the alleged hardware issue. Therefore, Defendants quickly changed their story and invented a fake distributed denial-of-service attack ("DDoS Attack") as an excuse for deliberately shutting down their own trading platform to avoid severe financial losses to themselves.

187. Even if the alleged DDoS Attack did in fact take place, Defendants were at least negligent in failing to prevent it, as proven industrial-grade solutions for prevending DDoS Attack are widely available in the marketplace, including one from Amazon AWS itself, which is provided free of charge to all AWS customers, including BitMEX. Specifically, Amazon AWS website explains with respect to AWS Shield and AWS Shield Advanced:

> AWS Shield is a managed Distributed Denial of Service (DDoS) protection service that safeguards applications running on AWS. AWS Shield provides always-on detection and automatic inline mitigations that minimize application downtime and latency, so there is no need to engage AWS Support to benefit from DDoS protection. There are two tiers of

AWS Shield - Standard and Advanced.

All AWS customers benefit from the automatic protections of AWS Shield Standard, at no additional charge. AWS Shield Standard defends against most common, frequently occurring network and transport layer DDoS attacks that target your web site or applications. When you use AWS Shield Standard with Amazon CloudFront and Amazon Route 53, you receive comprehensive availability protection against all known

infrastructure (Layer 3 and 4) attacks.

For higher levels of protection against attacks targeting your applications running on Amazon Elastic Compute Cloud (EC2), Elastic Load Balancing (ELB), Amazon CloudFront, AWS Global Accelerator and Amazon Route 53 resources, you can subscribe to AWS Shield Advanced. In addition to the network and transport layer protections that come with Standard, AWS Shield Advanced provides additional detection and mitigation against large and sophisticated DDoS attacks, near real-time visibility into attacks, and integration with AWS WAF, a web application firewall. AWS Shield Advanced also gives you 24x7 access to the AWS DDoS Response Team (DRT) and protection against DDoS related spikes in your Amazon Elastic Compute Cloud (EC2), Elastic Load Balancing (ELB), Amazon CloudFront, AWS Global Accelerator and Amazon Route 53 charges.

AWS Shield Advanced is available globally on all Amazon CloudFront, AWS Global Accelerator, and Amazon Route 53 edge locations. You can protect your web applications hosted anywhere in the world by deploying Amazon CloudFront in front of your application. Your origin servers can be Amazon S3, Amazon Elastic Compute Cloud (EC2), Elastic Load Balancing (ELB), or a custom server outside of AWS. You can also enable AWS Shield Advanced directly on an Elastic IP or Elastic Load Balancing (ELB) in the following AWS Regions - Northern Virginia, Ohio, Oregon, Northern California, Montreal, São Paulo, Ireland, Frankfurt, London, Paris, Stockholm, Singapore, Tokyo, Sydney, Seoul, and Mumbai.

188. Moreover, CloudFlare DDoS protection is very inexpensive, readily available and widely used on the market. This protection secures websites, applications, and entire networks while ensuring the performance of legitimate traffic is not compromised. According to CloudFlare website, CloudFlare's 51 Tbps network blocks an average of 72 billion threats per day, including some of the largest DDoS attacks in history.

189. The fact of wide availability of proven and low cost solutioins for DDoS Attack prevention makes DDoS Attack against BitMEX on March 13, 2020 very unlikely and, if the DDoS Attack did in fact occur, establishes that Defendants were at least negligent in not using the available solutions to safeguard trading on the BitMEX platform by their customers, which

Defendants had a clear duty to do.

190. Defendants and each of them have thus manipulated the price of bitcoin and ether, harming Plaintiffs and other traders who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25 (2018).

191. BitMEX's founder and CEO, Defendant Hayes, is cryptocurrency's P.T. Barnum. Describing trading on cryptocurrency as "the entertainment business," he has embraced a role as showman and promoter for the "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market in a way that is profitable for BitMEX.

192. Defendant Hayes repeatedly flaunts his wealth like this to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other cryptocurrencies. The implication of these types of promotion is clear: you too could live like this, if you trade on my platform.

193. For example, when promoting BitMEX at a large conference in New York, Hayes flaunted his arrival in an exotic Lamborghini car.

194. The BitMEX platform also has casino features built in. It promotes "winners" with a leaderboard of successful traders, just like casinos showcase their successful players. All these features are designed to serve only one purpose - entice more gamblers to place even riskier bets.

195. BitMEX also runs promotions for its products to promote gambling, providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract gets the third prize."

196. These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior.

197. Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

198. In 2018, the financial regulator for the province of Quebec, Canada, ordered

BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

199. In July 2019, according to reports, the CFTC opened an investigation to determine whether the exchange is targeting and allowing United States traders to use the platform, after

numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States - indeed one New York journalist has detailed his use of BitMEX.

200. Most recently, on March 3, 2020, the United Kingdom's Financial Conduct Authority (FCA) issued a notice that BitMEX "is not authorised by us and is targeting people in the UK. Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

201. BitMEX's flouting of financial regulators is consistent with the attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin.

202. BitMEX is not the only entity that offers swaps and futures products on bitcoin. BitMEX, however, structures its products and operations with features more akin to a casino, focusing on products that expose customers to greater volatility and an increased risk of loss.

203. One of BitMEX's earliest and still most popular products is the XBTUSD Perpetual XBTUSD Leveraged Swap ("Perpetual Swap").



204. This product allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar. If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make

a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin.

205. Unlike a typical ~~futures~~swap contract, XBTUSD Perpetual Swap has no set expiry date. Further, unlike a traditional ~~futures~~swap product, the XBTUSD Perpetual Swap price closely tracks the price of the underlying asset, bitcoin. Put differently, in a traditional ~~futures~~swap market, there are separate prices for the ~~futures~~swap product and for the underlying asset. If ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. at $120 in three months might trade for $5. Instead, XBTUSD Perpetual Swap tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX. These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice- versa. The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate. The funding rate is exchanged directly peer-to-peer among contract holders. BitMEX does not charge a fee for it.

206. Because BitMEX does not list bitcoin itself, it must look to other exchanges that do trade bitcoin to determine the price of bitcoin for products like XBTUSD. For BitMEX to function properly, the data from the other exchanges must be trustworthy. If the spot market for the underlying cryptocurrencies listed on those exchanges is thinly traded and illiquid, then the price of the cryptocurrency becomes susceptible to price manipulation, which in turn could affect the price of the products on BitMEX. BitMEX knows this. BitMEX's products are particularly sensitive to price manipulation because BitMEX allows traders to operate on substantial amounts of leverage. BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post. Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses:

if the price of the XBTUSD goes up, a buyer who is 100x leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs for very

limited money.

207. BitMEX's fees, however, are calculated based on the leveraged position, not on the underlying collateral. Thus, where BitMEX advertises a fee of 0.075 percent for bitcoin Perpetual Swaps, that percentage refers to the amount of the unleveraged position. For a 100x leveraged Perpetual Swap, BitMEX is effectively charging a fee of 7.5 percent.

208. In a leveraged trade, BitMEX limits a trader's loss to solely the posted margin. In contrast, major derivatives exchanges, such as the Chicago Mercantile Exchange, expose traders to unlimited risk. When the unrealized loss of their position exceeds the posted margins, those exchanges will ask traders to post additional collateral to supplement their margin. This is known as a margin call. For example, if you had a $10,000 position supported by $100 of margin, and the position fell 1 percent to $9,900, it would trigger a margin call.

209. To limit traders' losses to the posted margin, BitMEX uses a liquidation engine to close positions with unrealized losses close to the amount of the posted collateral and prevent losses greater than the collateral posted by the trader while ensuring that the winner receives their full profits. While the promise that a trader can only lose the minimal margin put up for a highly leveraged bet may be alluring to retail investors, in reality BitMEX uses this promise to lure them into a false sense of security. BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but takes their money in liquidations. Put differently, when BitMEX liquidates a position, there is going to be a winning trader and a losing trader, but even beyond receiving the transaction fees, BitMEX almost always takes a large part of one trader's collateral, allowing it to profit from the liquidation.

210. BitMEX's model of encouraging its users to experience volatility disproportionate to their collateral through substantial leveraging requires a mechanism that prevents those users from experiencing losses greater than they can handle—there is, after all, someone on the other

end of the transaction that expects to get paid. BitMEX achieves this through the use of an automatic liquidation system. This system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its

customers.

211. Because BitMEX allows traders to make purchases with large amounts of leverage, there is a risk that that a trader may not be able to pay the winner for his position. In order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.4 This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is the automatic-liquidation system. BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, it liquidates when the collateral is worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some his losses, however, the trader receives nothing. Instead, BitMEX keeps that recovery for itself and puts it into the Insurance Fund.

212. To use an example from BitMEX's own website, consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000. This trader is 100x leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the 1 bitcoin used as collateral would exactly cover the losses. Rather than using this bankruptcy price as the liquidation point, BitMEX

imposes a 0.5 percent "maintenance margin," such that the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of less than 1 percent in the price of bitcoin

can result in an automatic liquidation. If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-bitcoin position to another customer, while covering the gains of and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the purchase as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000.

213. It is possible for BitMEX to lose money in a liquidation if the market lacks sufficient liquidity to allow BitMEX to sell the liquidated position at the bankruptcy price. If, for example, the price of ether hits $3,980 but BitMEX is not able to find a purchaser to take over Perpetual Swap at a price above $3,920, the 1 bitcoin used as collateral will not cover BitMEX's losses. Hypothetically, the Insurance Fund would be used to cover BitMEX's losses in this scenario.

214. The profitability of the Insurance Fund is thus tied to the liquidity of the market— as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

215. Despite being described as a mechanism intended "to help ensure winners receive their expected profits, while still limiting the downside liability for losing traders" by making sure that BitMEX always has cash on hand to pay off losing trades, BitMEX's Insurance Fund shows substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough. Despite its role as an insurance backstop, it grows in value nearly every day: over the last 100 (volatile) days, it has begun only

five of them with a balance less than it began with the day before. Its largest posted one-day loss in the last 100 days has been around 20 bitcoin. In fact, on August 24, 2020, the Insurance Fund contained over 36,830 bitcoins, representing 0.2 percent of the total bitcoin in circulation and

valued over $681,355,000. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired) the portion of the Insurance Fund for that contract type is given to BitMEX as profit.

216. BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. Even independent of how these automatic liquidations can be used with market manipulation, the structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to automatically liquidate. Defendants' ability to manipulate the prices on BitMEX for their own profit and at the expense of Plaintiffs and other cryptocurrency traders was protected and enhanced by persistent issues BitMEX maintained in its server that locked out users at crucial times that enabled BitMEX to profit.

217. BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a Perpetual Swap changes. This process, although sometimes completed quickly, supposedly causes BitMEX's servers to freeze on average between two and three times a day. During these server freezes, customers lose the ability to trade until the servers unfreeze.

218. These server issues are not present in other exchanges that regularly handle far more transactions per second. While BitMEX has purposefully not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200,000,000 trades a week, purportedly taxing its system and leading to server shutdowns. This works out to an average load of around 330 trades a second. BitMEX has indicated that its peak

transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in swaps and derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more

than 100 times the peaks that purportedly cause BitMEX's servers to freeze.

219. When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the Perpetual Swap contracts are not frozen. Instead, they continue to move, processing some transactions while refusing to accept transactions from others. This means that a BitMEX trader can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they wished to transact is no longer available. They can also find that an offer they had made before the freeze but wished to retract during it has since been accepted. Any trader with the ability to have its transactions prioritized over others during this period could reap substantial profits. The digital assets on which the BitMEX Perpetual Swaps are based, such as bitcoin or the Tokens, continued to trade on other exchanges with functioning servers while BitMEX's remained frozen to most users. A privileged trader—such as those that operate BitMEX's Insider Trading Desk —could see that the price of bitcoin had risen during a freeze and arbitrage on that information before the regular traders had the ability to react. Additionally, because most traders are unable to operate during these freezes, a trader who is able to act could survey all of the items on offer during the freeze and cherry-pick whichever seemed most appealing in light of the market's movements.

220. The limitations of BitMEX's server also helps enable profitable automatic liquidations, because these liquidations continue to occur during the freeze. A customer who has a 100x leveraged position on one bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be heavily incentivized to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the capital. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of their capital when the price hits $3,980. Such a scenario profits BitMEX, which collects the capital.

221. The timing of these freezes is not random. The most important and profitable time

for BitMEX to freeze is during a period of high volatility. BitMEX's automatic liquidations exacerbate the volatility of the derivatives that BitMEX markets, particularly in periods of high volatility. Specifically, by automatically executing sell orders in response to a market decline,

BitMEX pushes prices even lower. This response could result in catastrophically cascading sell orders during a period of a rapid decline—that is, a "flash crash." BitMEX does not disclose those risks to retail investors and, instead, uses server freezes to protect its Insurance Fund and its derivatives market as a form of undisclosed "circuit breaker."

222. Moreover, high volatility and rapidly changing prices allow more customers to be liquidated. Indeed, an expert statistical analysis conducted of freeze periods reported on BitMEX's website has revealed that these server freezes occur 80 percent more often during periods of high volatility in bitcoin prices. This result is statistically significant at a 95 percent confidence level. Moreover, the statistical analysis reveals that compared to periods without a server incident, the volatility is 130 percent higher when there is a server incident. This result is also statistically significant at 95 percent confidence level.

223. BitMEX server freezes most often occurred during the highest periods of volatility when BitMEX could effectively liquidate traders' positions.

224. These server freezes are not justifiably caused by transaction volume, which would approximate server load. For example, on May 12, 2019, BitMEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

225. The interaction between BitMEX's server problems and its liquidation policy was recently demonstrated on March 13, 2020, when the price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes. This sort of event is precisely why BitMEX claims to maintain the Insurance Fund—a series of cascading liquidations in the face of such a rapid fall could prevent BitMEX from selling the liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund. Yet BitMEX's servers shut down in the middle of the crash. BitMEX first blamed the server shut down on "a hardware issue with our cloud service provider," before later claiming, without any support, that the server failure was the

result of an attack by a "botnet."

226. When the servers were restored, bitcoin's price had stabilized, preventing the need for BitMEX to dip into its Insurance Fund. The traders who had hit their margins during the

crash, however, were liquidated nonetheless. In short, a conveniently timed server outage turned a

potentially catastrophic loss for BitMEX's Insurance Fund into a profit-item.

227. BitMEX could remove the potential for these manipulative actions and prevent

users from suffering from periods of denied access to a moving market by prohibiting its system

from accepting any transactions during these freezes. Instead, BitMEX profits from the system it

employs, either by having its for-profit Insider Trading Desk manipulate the markets in such

freezes, by selling the right to do so, or by profiting from liquidations that occur while customers

are unable to escape increasingly unfavorable positions.

## BITMEX TRADES AGAINST ITS CUSTOMERS USING SENSITIVE INSIDER INFORMATION FROM EXCHANGE AND STRATEGIC SERVER FREEZES

228. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

229. BitMEX is not the only entity that offers bitcoin or ether swaps. BitMEX,

however, deliberately structures its products and operations with features more akin to a casino,

focusing on products that expose its customers to greater volatility and an increased risk of loss.

230. In order to understand how BitMEX's products were designed to expose customers

to risk and ultimately to be subject to manipulation, it is helpful to consider one of BitMEX's

earliest and still most popular product: the XBTUSD Perpetual Contract, which BitMEX

describes as "the most traded cryptocurrency product of all time," as over two trillion have been

sold. This product, with features that resemble a swap, allows traders to buy or sell a contract that

tracks the price of the exchange rate between bitcoin and the U.S. Dollar. If you buy the contract,

you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars— effectively a short sale on the price of bitcoin.

231. To determine the "price" of a given crypto-asset for the calculation of the funding rate for a perpetual contract based on it, BitMEX looks to other exchanges that allow customers to trade that crypto-asset directly. BitMEX employs an automated process that collects and weighs prices from these other exchanges to determine the BitMEX price. During most of the Relevant

Period, BitMEX used a very small number of reference exchanges, most of which are located in San Francisco, California, making the BitMEX prices more volatile and more susceptible to manipulation.

232. BitMEX allows customers to buy or sell these contracts using a number of different order types. In addition to market orders that are executed immediately, BitMEX also offers Limit Orders, Stop Orders, and Take Profit orders, all of which respond to specific pricing conditions set by the user; these orders either come into existence or are removed from the order book when a specific pricing condition is met.

233. BitMEX also allows all three of these order types to be "Hidden," meaning that they will not be visible to other users. Normal market participants cannot identify these contracts by looking at the list of open orders, but hidden orders will trigger when their conditions are met. These orders are useful to customers who do not want to signal their trading intentions to the market as a whole. For example, if a trader possesses a large number of XBTUSD contracts that they want to sell when the price reaches $1,000, public knowledge of the anticipated sale might decrease prices; by keeping this trade hidden, the trader avoids this undesirable effect.

234. BitMEX goes even further to allow its traders to hide information by allowing "iceberg orders", which are mostly hidden orders that are partially visible. Thus, a trader can issue an order that will buy 100 XBTUSD contracts with a limit price of 100, but tell the market that he will only purchase 10 such contracts. This option is appealing for traders who wish to create the illusion of activity in the event that other traders are monitoring trades as they are completed. For example, if there is a hidden order to buy up to 100 XBTUSD at $100 and 10 XBTUSD are available at that price, the XBTUSD will be purchased even though no buy order at that price was public. A very savvy trader could realize that this order had been hidden and

deduce the likely presence of additional hidden volume. An iceberg order in this situation would mask the volume of the outstanding order. This masking is thus beneficial to the trader purchasing an order because it prevents other traders from seeing the full extent of orders in the

market. BitMEX customers thus navigate a highly complicated market in which only a portion of the market activity is publicly visible.

235. To draw customers with the promise of casino-like returns, BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post. Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses: if the price of the XBTUSD goes up, a buyer who is 100X leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs at an apparently low cost.

236. One way in which BitMEX benefits from these highly leveraged trades is that its commissions are calculated based on the leveraged position, not on the underlying collateral. Thus, where BitMEX advertises a commission of 0.075 percent for the XBTUSD Perpetual Contract, that percentage refers to the amount of the unleveraged position. For a 100X leveraged derivative, BitMEX actually charges a commission of 7.5 percent.

237. BitMEX attempted to make these highly leveraged trades more appealing to its customers by promising to cap their liability. To do so, BitMEX relies on a system that limits losses to the collateral through automatic liquidation. Using a computer program known as a liquidation engine, BitMEX automatically closes any position with unrealized losses equal to half of the amount of the posted collateral.

238. BitMEX describes this policy as designed to prevent losses greater than the collateral posted by the trader and to ensure that the winner receives their full profits. But under the guise of capping losses, BitMEX uses this liquidation system to lure traders into a false sense of security. As discussed below, BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but instead takes their money in liquidations.

239. BitMEX's model encourages its users to experience volatility disproportionate to their collateral. The lynchpin to this is BitMEX's automatic liquidation system. The system is the brainchild of Delo and Dwyer, who designed and conceived it. The automatic liquidation system,

however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

240. Ostensibly, in order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale. This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is accomplished through the automatic liquidation system.

241. BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, for highly leveraged trades, it liquidates when the collateral is still worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some losses, the trader receives nothing. Instead, BitMEX pockets that recovery for itself and puts it into its "Insurance Fund."

242. To use an example derived from information available on BitMEX's website, consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000. This trader is 100X leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the one bitcoin used as collateral would exactly cover the losses. Rather than using this

bankruptcy price as the liquidation point, BitMEX imposes a "maintenance margin," commonly between 0.5 percent and 1 percent. If the margin is 0.5 percent, the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to

the amount of leverage in the position, as a change of one half of one percent in the price of bitcoin will result in an automatic liquidation.

243. If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-ether position to another customer, while covering the gains and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the position as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000.

244. The profitability of the Insurance Fund is thus tied to the liquidity of the market— as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

245. Although BitMEX calls this fund an "Insurance Fund," BitMEX has not recognized any legal obligation to maintain any particular amount in reserve or to use the reserve for only specified purposes. At any time, BitMEX can empty some or all of the Insurance Fund for any purpose it chooses.

246. The structure of BitMEX's liquidation system means that it almost always profits BitMEX to liquidate a position. For BitMEX to lose, the market has to be so illiquid that a position that is halfway to being so unprofitable that it consumes the posted collateral declines further until it completely consumes the collateral before BitMEX can sell. In the vast majority of cases in which there is sufficient liquidity, BitMEX will profit when it liquidates the position of one of its customers.

247. Accordingly, BitMEX's Insurance Fund shows consistent and substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough, providing an enormous source of profit beyond the

commissions it charges. In fact, the Insurance Fund grows in value nearly every day: over the 100 days preceding January 25, 2021, it began only 15 of them with a balance less than it began on the day before. In fact, as of March 13, 2021 the Insurance Fund contained 37,400 bitcoin, representing approximately 0.2 percent of the total bitcoin in circulation. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired), the portion of the Insurance Fund for that contract type is retained by BitMEX as profit.

248. This relationship has been established through quantitative expert analysis. By comparing the number of recent liquidated positions to the growth of BitMEX's Insurance Fund, this analysis has concluded that, on average during the period between July 26, 2019, and January 25, 2018, the growth of the Insurance Fund increased by 0.78 bitcoin for every position that was liquidated in a given day, with BitMEX liquidating an average of 311 positions a day—equating to a daily increase in the Insurance Fund of over $11,300,000, at bitcoin's current price.

249. Because BitMEX liquidates positions when they are sufficiently out of the money, even if for only a very short period, it profits from high volatility. In a highly volatile market, more traders will hit their liquidation points and be liquidated. If a market vacillates sufficiently, both long and short traders may be liquidated in a day that saw relatively little ultimate movement (i.e., a day with significant intra-day price movement). Because of the high leverage used by BitMEX traders, even transitory swings of one percent in each direction can cause liquidations. This extreme sensitivity to volatility makes the BitMEX exchange an attractive target for manipulation by its corporate insiders who can profit from liquidations through its Insurance Fund.

250. The relationship between volatility and liquidations has become evident through an expert statistical analysis of liquidations and the volatility of the popular XBTUSD Perpetual Contract. This analysis has shown that liquidations follow volatility almost in lockstep; this result is significant to a 95 percent confidence level.

251. The correlation between volatility and liquidation volume shows a high correlation coefficient of 0.84 from July 2019 to January 2021, based on available data. The result is statistically significant to a 95 percent confidence level.

252. Because liquidations are more common during periods of high volatility and because BitMEX profits from the majority of its liquidations, we would expect to see the Insurance Fund grow as volatility increases. Sure enough, expert analysis has revealed that this relationship holds. During periods of high volatility, the insurance fund grew more than 44 percent faster than it did generally, and more than twice as fast than it grew in periods of low volatility. A true "insurance fund," by contrast, if it were serving a legitimate insurance function, would generally decline in periods of higher volatility, not increase. The fact that the BitMEX Insurance Fund systematically and predictably increases in periods of higher volatility provides statistical support that it is a fraudulent device designed to enrich the owners of BitMEX at the expense of its customers.

253. The growth of the Insurance Fund cannot be justified by the increased need for insurance based on increased trading volume. As an expert quantitative analysis has revealed, the Insurance Fund has grown much faster than the trading volume on BitMEX. As it was observed, that while BitMEX's trading volume has increased, the Insurance Fund has grown far more rapidly. The ratio between the Insurance Fund and the value of the positions increased sharply since 2017. In 2017, every bitcoin in the Insurance Fund supported 240 bitcoin of daily trading volume. By 2020, the bloated Insurance Fund had one bitcoin for every 7 bitcoin of daily trading volume.

254. BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. The structure of BitMEX's automatic liquidations creates an

incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to liquidate.

255. BitMEX routinely disadvantages its customers through server "lock-outs" during which customers cannot access their accounts. Defendants claim that technical issues in BitMEX's server, not found in other exchanges, locked out users at crucial times. These lock-outs, however, enabled BitMEX to profit through its Insurance Fund by liquidating customer accounts that could not trade.

256. BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes. This process, although sometimes completed quickly, is the supposed cause of BitMEX's servers freezing on average between two and three times a day. During these server freezes, customers are locked out of their accounts and lose the ability to trade until the servers unfreeze.

257. When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the derivative contracts are not frozen — trades and liquidations occur even while customers are locked out of their accounts. BitMEX continues processing certain previously placed transactions while refusing to accept transactions from others. This means that a trader can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they sought to transact is no longer available. Traders can also find that an offer they had made before the freeze but sought to retract during it has since been accepted.

258. BitMEX's server freezes also enable automatic liquidations, which are profitable to BitMEX, because these liquidations continue to occur during the freeze. A customer who has a 100X leveraged position on 1 bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be expected to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the remaining capital of $2,500. If the frozen servers prevent this sale from

transpiring, however, the customer will lose all of her capital when the price hits $3,980. Such a scenario profits BitMEX, which pockets the capital.

259. BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system

from processing any transactions during these freezes. Instead, BitMEX has deliberately built a system that profits from the liquidations that predictably occur while its customers are unable to escape unfavorable positions.

260. BitMEX's server freezes and lock-outs are not a result of unavoidable technical limitations. Similar server issues are not present in other exchanges that regularly handle far more transactions per second.

261. While BitMEX has not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200 million trades per week, purportedly taxing its system and leading to server shutdowns. This equates to an average load of around 330 trades a second. BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze. These exchanges have not experienced the pattern of repeated and sustained freezes that have become commonplace on BitMEX, and BitMEX has provided no explanation for why its servers are supposedly so inadequate.

262. The server freezes on BitMEX are demonstrably not caused by server load, as shown by a statistical analysis of transaction volume. For example, on May 12, 2019, BitMEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

263. Expert analysis shows that the average number of trades surrounding server freezes falls below the top 23rd percentile of total trading volume relative to BitMEX's historical averages; in other words, the average volume before a freeze would not be a notably busy day for

BitMEX. Additionally, fewer than 10 percent of the server outages reported by BitMEX occurred during periods when BitMEX trading volume was in the top 5 percentile of BitMEX trading volumes. The analysis of freezes from March 1, 2018, to January 26, 2021, conclusively shows that most of BitMEX's freezes do not come at periods of high transaction volume.

264. BitMEX's servers are thus not freezing because of high volume, which would be the case if the freezes were a consequence of deficient servers. While promoting its trading platform as best-in-class, BitMEX has recklessly or intentionally failed to disclose the susceptibility of its platform to these freezes and their predictable, negative effects on customers— and beneficial effect for BitMEX.

265. In early 2019 BitMEX finally disclosed to customers, and only vaguely, that undefined system overloads might disrupt access to the trading platform. But even this disclosure failed to disclose the frequency of system overloads, their relationship to volatility, their selective effect on only certain kinds of transactions, or the likelihood that they would harm customers to BitMEX's benefit.

266. By failing to disclose the risk of these freezes during high volatility, and the likelihood of their negative impact on customers, while simultaneously touting its ever-increasing volume and supposed technical sophistication, BitMEX deceived customers into trading by recklessly making misleading statements of material facts and omitting to state material facts necessary to make BitMEX's statements not misleading.

267. Just as fundamental, with respect to its disclosures since early 2019, BitMEX has at least recklessly claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that it "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours." As to any system overloads or freezes that BitMEX may not have initiated deliberately, BitMEX failed to use reasonable or commercially reasonable efforts to avoid them, and knowingly or recklessly claimed otherwise, further deceiving customers into trading on the platform.

268. In all of these respects regarding its server freezes, and in light of BitMEX's access to the occurrences on its own servers, BitMEX has either deliberately or recklessly employed an artifice to defraud its customers.

269. At the core of BitMEX's operation, but hidden from regular customers, was BitMEX's Insider Trading Desk. This Insider Trading Desk, staffed by BitMEX employees,

exploited unique functionality that it was granted to profit in its trades against BitMEX customers. This unique and hidden functionality afforded to the Insider Trading Desk meant that customers promised a fair playing field were in fact being manipulated by BitMEX itself. BitMEX used these powers to manipulate the prices of its ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivatives.

270. Between 2015 and 2016, Hayes approached Liquidbit, an over-the-counter crypto trading platform, about the possibility of building into the BitMEX platform a hidden trading desk that would be able to utilize functionality not available to other customers. Ultimately, before 2018, BitMEX reengineered BitMEX's foundational software to empower the operation of what it internally dubbed "Risk Management" or the "Internal Trading Desk."

271. The Insider Trading Desk was managed by Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated continuously throughout the Relevant Period to manipulate BitMEX and cause artificial prices for BitMEX derivatives, include derivatives of ~~Bitcoin~~bitcoin and ~~Ethereum~~ether.

272. The traders at the Insider Trading Desk had a number of advantages that they exploited to profit BitMEX:

273. *First*, internal traders could view and exploit hidden information from other traders. As discussed above, BitMEX offered customers a number of different order types that purported to be "hidden." But these offers were not in fact hidden from BitMEX and its insiders. The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of an account, including any hidden orders and the liquidation points for all orders. They were also provided with automated systems,

built by BitMEX to enable their manipulation, that told them how the market was likely to move by assessing the impact of the hidden orders when they triggered.

274. The ability to see hidden orders was combined with the ability to see another crucial piece of hidden information: the leverage amounts and corresponding liquidation prices for customers' open positions. This information made it easy to profitably manipulate the market. If, for example, the Insider Trading Desk were to see that a number of short bitcoin derivatives

are near their liquidation point, it could enter a large buy order. This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these ~~futures~~swaps. The liquidation would create a buy order for the liquidated contract, further increasing the price. Once this chain of liquidations had caused the price to rise far beyond the price at which the Insider Trading Desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are automatic, an insider desk could execute this trade very quickly and with a high confidence of success. The traders at the Insider Trading Desk had tools that showed them what liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction.

275. The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX insiders could determine when placing a large order would cause the hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations. These liquidations would very likely be profitable to BitMEX—because the price shift would be driven by BitMEX's own manipulative trade rather than legitimate market forces, it was likely to quickly reverse in time for BitMEX to sell at a profit.

276. But access to hidden information was not the only advantage possessed by BitMEX insiders.

277. *Second*, the Insider Trading Desk was able to trade during server freezes and customer lock-outs. Even though BitMEX told its customers that these freezes were a

consequence of technical limitations, these same limitations did not apply to BitMEX's internal traders. While its customers were unable to enter or withdraw orders, the Insider Trading Desk could trade freely.

278. Even standing alone, this ability to trade during server freezes would represent a massive, unfair, and undisclosed trading advantage. While normal traders were unable to withdraw their offers and orders, BitMEX traders would be able to exploit those positions.

BitMEX traders could also look to prices on non-frozen exchanges, knowing that BitMEX prices would converge on market prices when the freeze ended.

279. For example, imagine that the servers freeze when the price of Bitcoin is $100. During the freeze, the price of Bitcoin rises to $105. The Insider Trading Desk, able to trade during the freeze, can purchase XBTUSD contracts that are valued at $100 from customers who cannot withdraw those offers in light of market movements. When the servers unfreeze, BitMEX would be holding XBTUSD contracts worth $105 to the detriment of the customers trapped in unfavorable positions during the freeze.

280. These two advantages enjoyed by the Insider Trading Desk—access to hidden information and the ability to trade during freezes—compounded each other to allow its operators to dominate the BitMEX platform. BitMEX's Insider Trading Desk exploited these advantages to profit itself at its customers' expense. During a freeze, BitMEX insiders would analyze the hidden positions of normal customers in order to determine which moves would cause profitable liquidations. These insiders could perform these calculations with a high degree of precision because other market participants were frozen; the only transactions during the freeze would result from the BitMEX insiders themselves and the triggered orders that they had analyzed. Competing against transparent customer accounts frozen in place, BitMEX was able to profit at the expense of its customers.

281. BitMEX was not able to conceal its Insider Trading Desk forever. On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special

advantages over other Bitmex users," ~~Ex. 14.~~ BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers." This was false.

282. Just two days later, on April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform," Ex. ~~17~~19. BitMEX thus revealed that it had historically maintained a for-profit desk trading on its own platform, which was trading against its

own customers. What it did not reveal, however, was that the Insider Trading Desk enjoyed massive advantages over regular customers and exploited those advantages to profit at their expense, including by inducing liquidations.

283. BitMEX also revealed that its trading desk had the monopoly on market making for its bitcoin options product. BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management."

284. Almost immediately following this announcement, both BitMEX's General Counsel and outside counsel left the company. The General Counsel announced his resignation the following day, acknowledging to other BitMEX employees that he was doing so specifically because he was troubled by BitMEX's secret trades against its own customers. Within a month, BitMEX's outside counsel, Sullivan & Cromwell, had terminated its relationship as well.

285. Even after this public revelation, BitMEX has continued to operate the Insider Trading Desk that exploited undisclosed advantages to profit at the expense of customers. In order to avoid detection, the employees of the Insider Trading Desk use anonymized "burner" email accounts through Google's "gmail" platform to create accounts on the BitMEX platform and undertake the same secret anti-customer trading. Accordingly, Defendants engaged in active concealment of the true facts and their fraud.

286. The Insider Trading Desk is not even the only insider trading on BitMEX. Hayes himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes' contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct: "The digital token trading markets like

traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

287. In addition to placing strategic trades on its own platform using the Insider Trading Desk in order to liquidate its own customers, BitMEX further manipulates the prices of its

derivatives through strategic and unlawful trading of the crypto-commodities underlying its derivatives on reference exchanges.

288. During much of the Relevant Period, BitMEX deliberately used a relatively limited number of exchanges to price bitcoin and ether. For part of 2019, for example, BitMEX determined the price of ether by referring to just three "reference" spot exchanges: Coinbase Pro, Bitstamp, and Kraken.

289. Relying on only a small number of exchanges provided BitMEX with an additional method of manipulating the prices of the derivatives it sold its customers. By making a series of orders to push the price up or down on a reference exchange, Defendants could create short-lived price fluctuations on BitMEX. Defendants actively manipulated prices on reference exchanges in order to enable its Insider Trading Desk to profit by liquidating customer accounts.

290. In order to facilitate this manipulation, BitMEX would transfer onto other exchanges bitcoins it had obtained through profitable trades on its own platform. BitMEX would then use those funds to buy or sell the referenced crypto-commodities on its reference exchanges. These purchases would then cause the price of the derivative on BitMEX to move towards the manipulated price on the reference exchange. This effect would be short-lived, however, as market forces would correct the price on the reference exchange. Defendants could thus cause short spikes or dips in the prices of BitMEX derivatives by manipulating reference exchanges.

291. BitMEX was uniquely positioned to benefit from these short fluctuations for at least two reasons. First, as discussed above, BitMEX has access to all of the hidden information of its customers and trades against them on BitMEX's platform. BitMEX can therefore calculate which market movements would be profitable, either by making BitMEX money on its internal trades or by liquidating customer accounts at a price that would be profitable for BitMEX.

Because BitMEX had unique tools that allowed it to determine which market movements would profit BitMEX by liquidating its customers' positions or advancing its trades against its customers, it alone knew exactly how to move its reference exchanges to maximize its profitability.

292. Second, BitMEX's liquidation system enables it to profit from manipulation that would not be profitable to normal traders. A normal trader will struggle to profit from a series of purchases that temporarily increase the price of a crypto-commodity because, in selling the purchased asset to take advantage of the higher prices, the seller creates downward pricing pressure that deflates the prices. But BitMEX's liquidation system means that it can benefit from short-lived fluctuations. If BitMEX's Insider Trading Desk's undisclosed access into consumer accounts indicated that there would be a profitable set of liquidations if the price of Bitcoin rose to $100 when it was currently at $95, then BitMEX could transfer funds to a reference exchange and pump the price of Bitcoin on that exchange. Even if BitMEX did not make money on the pump and dump itself, it would profit from the liquidations triggered by the price of Bitcoin briefly crossing that $100 threshold. Because BitMEX liquidates positions as soon as they cross a liquidation threshold, even short price swings can be profitable for BitMEX and harmful for its customers.

293. Defendants' manipulation can be detected through analysis of abnormal trading patterns on Bitstamp, one of the reference exchanges. It was discovered that certain suspicious trading patterns were aligned with abnormal trading on BitMEX itself. Moreover, these instances occurred on days when BitMEX itself was particularly positioned to profit from them because Kraken, another reference exchange, was down for maintenance and unavailable for pricing derivatives on BitMEX.

294. For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering. This flash crash followed a 15-minute period of particularly abnormal trading activity on Bitstamp and BitMEX. From approximately 2:55 to 3:10 AM

(UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp. In contrast, during the previous day, only 83 bitcoins were sold every 15 minutes on average.

295. This unusually large volume of sell orders caused the price of bitcoin on Bitstamp to fall precipitously from $7,730 to $6,178—a decline of 20 percent over the course of only 15 minutes. At 3:10 AM, the volume of sale orders suddenly normalized, leading to an abrupt

reversal in the price of bitcoin, in which it recovered to $7,350, an increase of 19 percent, during the following 2 to 15 minutes. This unusual trading activity on Bitstamp had an immediate and significant impact on the price of the XBTUSD Perpetual Contract on BitMEX, given that BitMEX uses Bitstamp as one of only three reference exchanges for the price of that contract.

296.  The short volume of the BitMEX XBTUSD Perpetual Contract spiked during this period, in a pattern highly similar to that observed with the Bitstamp sales volume. The volume of short sales on BitMEX began at about the same time as the aggressive sales on Bitstamp (2:55 AM), although the short volume on BitMEX was larger than on Bitstamp, and continued at that high level up until 3:10 AM. On BitMEX, however, there was an abrupt halt to the shorting activity at 3:10:49 AM, before resuming at a significantly lower level at 3:12:33 AM, as the price of bitcoin and the XBTUSD Perpetual Contract recovered. During this 104-second period with no shorting activity on BitMEX, the price of bitcoin on Bitstamp immediately recovered to above $7,000, before temporarily falling back to $6,699, when a lower volume of shorting activity resumed on BitMEX. After that time, the price of bitcoin and the XBTUSD Perpetual Contract quickly recovered again to approximately $7,350 over the following 8 to 10 minutes. This pattern demonstrates a high degree of correlation, and likely coordination, between the shorting activity on BitMEX and Bitstamp.

297.  The relative timing of the short sales on BitMEX and the sell orders on Bitstamp also supports the conclusion that the trading likely involved cross-market manipulation. During this time period, a large increase in short positions on BitMEX was often followed by a large sell volume of Bitcoin on Bitstamp.

298. The short position on BitMEX spiked at 3:08:13 AM; three seconds later, 12.5 bitcoin were sold on Bitstamp. Large volumes of BitMEX short sales also occurred at 03:08:26, 03:08:36, 03:08:47, 03:08:51, and 3:08:58. All of these sales were followed by large sell volumes of bitcoin on Bitstamp within a few seconds. This would be consistent with a trader placing short orders on BitMEX in order to profit from a drop in prices from their subsequent sales of bitcoin

on Bitstamp. Within this single minute, more than 100 bitcoins (worth more than $600,000 at the time) were sold on Bitstamp, causing the price of bitcoin to drop by 2 percent.

299. Because this manipulation led to high but short-lived volatility, most possible manipulators could not have benefitted. A regular trader, even assuming they had the resources to engineer such manipulation, would have struggled to benefit from the dip before it reversed itself.

300. Instead, they would likely have lost money, having sold at a below-market price and unable to enter new orders in time to capitalize on the dip before it recovered.

301. BitMEX, however, profited substantially from these manipulated market movements. The high volatility in the price of the XBTUSD Perpetual Contract on BitMEX resulting from this unusual trading behavior caused an unusually large volume of customers' contract liquidations on BitMEX. As a consequence, the Insurance Fund increased by 750 bitcoins, with a value (at the time) of approximately $5.4 million. In comparison, the average daily increase in the Insurance Fund was 140 bitcoins during the week before the event, and 49 bitcoins on a daily average basis during the week after.

302. BitMEX, through its Insurance Fund, was therefore uniquely positioned to earn large profits from the high volatility of bitcoin prices on Bitstamp that occurred over this 30-minute period on May 17, 2019, in addition to any trading profits that either BitMEX or its principals may have earned as a direct result of the price manipulation on the two exchanges.

303. On other days during which when Kraken was undergoing scheduled maintenance, similarly suspicious trading activity occurred on Bitstamp and BitMEX. For example, on July 14, 2019, Kraken was down for maintenance—thus increasing the weight of Bitstamp on BitMEX's derivatives products. On that day, the price of ether dropped dramatically due to the sell order on

Bitstamp by a single user, causing $164 million worth of liquidations on BitMEX. Again, only BitMEX was in a position to profit from this manipulation.

304. Indeed, BitMEX has consistently profited from suspicious Bitstamp trading that triggered volatility and liquidations on BitMEX. For example, on September 24, 2019, the price of bitcoin on Bitstamp fell 14 percent, from $9,500 to $7,998, between approximately 6:00 PM

and 7:45 PM. The fall was caused by the sudden appearance of an unusually large volume of sell orders on Bitstamp, including unusually large individual sale orders. For example, in a two second period at 6:34 PM, 88 bitcoin, worth more than $800,000, were sold on Bitstamp. This sale was followed 10 minutes later by an unusually large volume of short sales on BitMEX. After falling to a low of $7,998 at approximately 7:45 PM, the price of bitcoin rapidly recovered to $8,500 by 8:45 PM, and to $8,600 around 9:30 PM. The resulting volatility of bitcoin prices caused the BitMEX Insurance Fund to increase by 22.5 bitcoin, worth $193,000, on that day.

305. Similarly, on March 12–13, 2020, the price of bitcoin and the XBTUSD Perpetual Contract on BitMEX also exhibited an unusually high level of volatility. From 10 PM on March 12 to 2 AM on March 13, 2020, the price of bitcoin on Bitstamp dropped 38 percent from $5,800 to $3,600. At 10:27:46 PM, 401 bitcoin, worth $2.3 million, were sold within one second on Bitstamp. This sale was accompanied by an unusually large volume of short sales on BitMEX during the following hour. The XBTUSD Perpetual Contract price on BitMEX reached a low of $3,600 at 2:15:25 AM on March 13, 2020. The BitMEX trading system then experienced a complete outage between 2:33 AM and 3:00 AM, during which time the price of bitcoin rapidly increased again on Bitstamp. BitMEX liquidated an estimated $5.8 billion worth of positions during a 2.5-hour window containing this outage. By approximately 10 AM on March 13, 2020, the price of bitcoin had recovered to approximately $5,800. As a result of this volatility, and the extended outage of the BitMEX trading system during much of this volatility, the BitMEX Insurance Fund increased by over 2,600 bitcoin, worth $15 million.

306. These instances of manipulation were uniquely structured to profit BitMEX at the expense of its customers. BitMEX knew exactly what changes would cause the most liquidations,

and its liquidation system meant that it profited from even very brief periods of high volatility it generated.

307. The timing of server freezes on BitMEX is not random. The most important and profitable time for BitMEX to freeze, as shown, is during a period of high volatility; freezes during high volatility periods allow BitMEX insiders to liquidate more customers through

strategic trading. Because volatility allows it to profit from liquidations, BitMEX is incentivized to freeze its servers during periods of high volatility, allowing BitMEX to liquidate positions while customers are locked out. The evidence compels the conclusion that BitMEX has consistently acted on those incentives.

308. In particular, expert statistical analysis conducted of the freeze periods reported on BitMEX's website has revealed that the probability of outages is 876 percent higher when the volatility of Bitcoin prices is in the top one percentile. The result is statistically significant at a 95 percent confidence level.

309. Expert analysis has shown that the server freezes most often occurred during the highest periods of volatility when BitMEX could effectively liquidate positions. That the timing of its server freezes maximizes BitMEX profits is reflected in a quantitative analysis of the relationship between server freezes and the growth of the Insurance Fund. That quantitative analysis revealed that, over a three-year period, the Insurance Fund grew over three times as fast on days with a server outage than in the surrounding days without a server outage.

310. BitMEX also freezes its servers at the expense of its customers to protect itself from losses. This sort of defensive freeze was demonstrated on March 12, 2020. On that day, the price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes, and continued to fall from there, ultimately dropping below $4,000. As the price plummeted, BitMEX automatically liquidated over $700 million of its customers' positions.

311. While liquidations are generally profitable for BitMEX, rapid and sustained movement in one direction threatens major losses for the Insurance Fund. If the price of Bitcoin were to continue to fall, bid-ask spread would become so great that BitMEX could not sell the

liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund. This sort of event is exactly why BitMEX claims to maintain the Insurance Fund—BitMEX is supposed to draw from the fund to cover its losses under these circumstances.

312. As prices fell, however, BitMEX did not immediately sell the positions it obtained through liquidation orders at a loss to its Insurance Fund. Instead, it kept its newly acquired positions open, allowing it to profit from liquidations if prices rose, while also creating a new risk that further declines would exacerbate the losses. This decision created economic liability for BitMEX unless the fall in bitcoin prices stopped and began to recover. This is when BitMEX's servers froze, supposedly due to technical limitations rather than BitMEX's economic interests.

313. The servers were only restored after Bitcoin's price had stabilized, preventing the need for BitMEX to meaningfully deplete its Insurance Fund. Over the next day, BitMEX gradually resold the positions it had acquired through liquidation and the Insurance Fund had hit a new high. But this recovery was not passed along to the traders who had hit their margins during the crash, including those who were unable to exit their positions because of BitMEX's supposedly frozen servers; they received nothing to compensate them for their $700 million in liquidated assets. In short, a perfectly timed server outage substantially mitigated a potential major loss for BitMEX's Insurance Fund and helped it hit a new high the next day, while disadvantaging its own customers.

314. BitMEX first blamed the server shutdown on "a hardware issue with our cloud service provider," before Reed later claimed, with no support, that the server failure was the result of an attack by a "botnet." Mr. Reed promised to provide further explanation "in the coming days" but has yet to disclose any additional information nearly a year later.

315. This server freeze, like the others designed and intended to profit BitMEX by allowing it to liquidate customers locked in unfavorable positions, was not random or a technical glitch. It was a deliberate decision designed to protect BitMEX's Insurance Fund at the expense of its customers.

316. To cover up extensive evidence of wrongdoing committed by the BitMEX's Insider Trading Desk, instead of using their company's "official" email addresses under the @bitmex.com email domain, Defendants used numerous anonymous "burner" email addresses hosted by public email service providers, such as @gmail.com addresses hosted by Google, Inc.,

to register their own Insider Trading Desk "winner" accounts with BitMEX, in order to prevent the trading histories and associated illegal profits from being traceable back to BitMEX. Those anonymous BitMEX "winner" accounts used by the BitMEX's own Insider Trading Desk were regularly closed and all associated user identity data and trading history data containing incriminating evidence deleted by Defendants. Accordingly, Defendants engaged in active concealment of the true facts and their fraud.

317. Moreover, the BitMEX's Insider Trading Desk used numerous helper accounts registered under the names of individuals, often using fake identification documents, and "burner" email addresses, on the three reference spot exchanges (Kraken, Coinbase and BitStamp) that BitMEX used to calculate its index price for XBTUSD ~~perpetual swap~~Perpetual Swap contracts with the purpose of using those helper accounts to manipulate the .BXBT index price, which controls the price of the XBTUSD ~~perpetual swap~~Perpetual Swap contracts on BitMEX.

## DERIVATIVES TRADED BY PLAINTIFFS

318. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

319. On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD ~~perpetual swap~~Perpetual Swap" ("XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract"). BitMEX claims its XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract is "the most traded cryptocurrency product of all time."

320. Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5



trillion contracts traded on its platform. Most of that volume—more than two trillion contracts— has been in the XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract.

321. During Relevant Period, Plaintiffs BMA, Kolchin, Dolgov and Razvan directly traded (bought, sold and owned) the Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD on both U.S. based Kraken and U.S. based BitMEX exchanges. Bitcoin/U.S. Dollar Swap Contract with ticker symbol XBTUSD traded by Plaintiffs BMA, Kolchin, Dolgov and Razvan on BitMEX is priced based on the underlying price is the XBT/USD exchange rate as recorded in the .BXBT Index, which Defendants' Insider Trading Desk manipulated using automated software tools in conjunction with helper accounts on U.S. based



"reference" exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this Complaint. Both the underlying .BXBT index and the swap contract XBTUSD are quoted in USD. Margin and PNL are denominated in Bitcoin. The XBTUSD Bitcoin/U.S. Dollar Swap Contract traded by Plaintiffs BMA and Dubinin on Kraken is priced based on bitcoin spot price on that exchange, which was manipulated by Defendants by placing large market orders from helper accounts in that exchange. Both of the above derivative contracts meet the definition of a "swap" under CEA, 7 U.S.C. § 1a(47)(a)(IV), which defines "Swap" as: "(iv) ... an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." For

example, TradingView, with 15 million monthly active site users and over 40,000 publishers, brokerages, and fintechs utilizing its investing tools, is the industry standard used by about every trader out there. It lists both aforesaid XBTUSD contracts from BitMEX and Kraken as "Swaps" (https://www.tradingview.com/symbols/XBTUSD/).



322. Therefore, the traded Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD is a swap under CEA 7 U.S.C. § 1a(47)(a)(iv) (agreement, contract, or transaction that is, or in the future becomes, commonly <u>known</u> to the trade as a swap).

323. Defendant HDR itself specifically admitted that its XBTUSD contract is known to the trade as a "swap," thus meeting <u>the</u> definition <u>of a "swap"</u> under <u>the</u> CEA<del>:</del>.

324. In addition, Plaintiff Kolchin traded Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD on BitMEX, which is also a "swap" under CEA, 7 U.S.C. § 1a(47)(a)(iv). Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD traded by Plaintiff Kolchin uses the .BETH index price, which Defendants' Insider Trading Desk manipulated using automated software tools in conjunction with helper accounts on U.S. based exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this Complaint.

325. Moreover, both aforesaid XBTUSD contracts that Plaintiffs traded on BitMEX and Kraken are also "swaps" to 7 U.S.C. § 1a(47)(a)(iii)(XXII), which defines a "swap" as a "a commodity swap." Because bitcoin is commodity, both XBTUSD contracts on Kraken and

BitMEX are "commodity swaps" under 7 U.S.C. § 1a(47)(a)(iii)(XXII).

326. Yet, furthermore, according to CFTC Complaint, ¶ 125, "products that have traded on BitMEX, including "~~perpetual swaps~~Perpetual Swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47)." Therefore, Plaintiffs can pursue ~~his~~their claims under CEA, 7 USC § 25(a)(1)(D), which specifically covers "swaps."

327. Plaintiffs were enticed to trade on BitMEX through BitMEX's own advertisements specifically directed at Plaintiffs and traders like Plaintiffs.

328. Some exemplary specific money losing trades of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan and their respective amounts and causes (triggering events) are summarized in the table below, which was prepared based on information and belief of Plaintiffs:

| Plaintiff | Date | Exchange | Order Book | Trade Type | Order | Loss Amt. | Causation of Loss |
|---|---|---|---|---|---|---|---|
| Kolchin | 07/14/ 2019 | BitMEX | XBTUSD Swap | Liquidation | SELL MARKET ALL | 1.18 BTC | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper account on BitStamp's |
| | | | | | | | XBTUSD/BT ~~XBTUSD/BTC~~ C order book, causing artificial downward price move on XBTUSD  order book,  which ~~which~~ propagated, through the .BXBT index, to XBTUSD order book of |
| | | | | | | | BitMEX and triggered |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | ~~BitMEX and triggered~~ liquidation of Plaintiff's long XBTUSD position |
| Kolchin | 07/14/ 2019 | BitMEX | ETHUSD Swap | Liquidation | SELL MARKET ALL | 2.81 BTC | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper account on BitStamp ~~BitStamp~~ ETH order book, causing artificial price move, which propagated, through the .BETH index, to ETHUSD order book of BitMEX and triggered liquidation of Plaintiff's long ETHUSD position |
| Dolgov | 11/25/ 2018 | BitMEX | XBTUSD Swap | Liquidation | SELL MARKET | 3.93 BTC | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper |

| | | | | | ALL | | account on |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | Kraken's XBTUSD/~~BTC order book,~~BTC order book, |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | causing artificial price move, which propagated, through the .BXBT index, to XBTUSD order book of BitMEX and triggered liquidation of Plaintiff's long XBTUSD position |
| Dolgov | 11/15/ 2018 | BitMEX | XBTUSD Swap | Liquidation | SELL MARKET ALL | 0.27 BTC | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper account on Kraken's XBTUSD/BT ~~XBTUSD/BTC~~ C order book, causing artificial price move, which propagated, through the .BXBT index, to XBTUSD order book of BitMEX and triggered liquidation of Plaintiff's long XBTUSD position |
| Dubinin | 11/15/ | Kraken | XBTUSD | Liquidation | SELL | 97.73 | Automated software tools |

| | 2018 | | Swap | /Position | MARKET | BTC | developed by |
|---|---|---|---|---|---|---|---|
| | | | | ~~Closing~~ | ~~ALL~~ | | ~~Defendant Reed~~ |

| | | | | Closing | ALL | | Defendant Reed automatically executing a large market order (SELL MARKET NN) from helper account on ~~Kraken's~~ |
|---|---|---|---|---|---|---|---|
| | | | | | | | Kraken's XBTUSD/BT ~~XBTUSD/BT~~ ~~C~~C order book, causing artificial price move resulting in liquidation of ~~Plaintiff's~~ |
| | | | | | | | Plaintiff's XBTUSD long position |
| Dubinin | 12/23/ 2018 | Kraken | XBTUSD Swap | Liquidation /Position Closing | SELL MARKET ALL | $1882 7 USD | Automated software tools developed by Defendant Reed automatically executing a large market order (SELL MARKET NN) from helper account on ~~Kraken's~~ |
| | | | | | | | Kraken's XBTUSD/BT ~~XBTUSD/BT~~ ~~C~~C order book, causing artificial price move resulting in liquidation of ~~Plaintiff's long~~ |

| | | | | | | | XBTUSD position ~~Automated~~<u>Plaintiff's long</u> |
|---|---|---|---|---|---|---|---|
| | | | | | | | <u>XBTUSD position</u> |
| Razvan | 11/14/ | BitMEX | XBTUSD | Liquidation | SELL | 226.16 | ~~software tools~~<u>Automated</u> |

| | 2018 | | Swap | [10] | MARKET | BTC | software tools developed by |
| | | | | | ALL | | Defendant |

10 Nov 14, 2018, 6:29:23 PM XBTUSD Trade Sell 7170497 5680 1,322.9566 XBT 0.0750% 0.99221752 XBT Liquidation 7170497 0 5680 Liquidation Nov 19, 2018, 11:44:50 AM XBTUSD Trade Sell 431795 5195.5 83.5221 XBT 0.0750% 0.06264158 XBT Liquidation 431795 0 5195.5 Liquidation

| | | | | | ALL | | Defendant Reed automatically executing a large SELL market order from helper account on Kraken's XBTUSD/BT XBTUSD/BTC C order book, causing artificial price move, which propagated, through the .BXBT index, to ETHUSD order book of BitMEX and triggered liquidation of Plaintiff's long XBTUSD position |
| Razvan | 11/19/ 2018 | BitMEX | XBTUSD Swap | Liquidation | SELL MARKET ALL | 21.78 BTC | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper account on |

| | | | | | | | Kraken's |
| | | | | | | | XBTUSD/BTC order book, |

10 Nov 14, 2018, 6:29:23 PM XBTUSD Trade Sell 7170497 5680 1,322.9566 XBT 0.0750% 0.99221752 XBT Liquidation 7170497 0 5680 Liquidation Nov 19, 2018, 11:44:50 AM XBTUSD Trade Sell 431795 5195.5 83.5221 XBT 0.0750% 0.06264158 XBT Liquidation 431795 0 5195.5 Liquidation

| | | | | | | | XBTUSD/BTC order book, causing artificial price move, which propagated, through the .BXBT index, to ETHUSD order book of |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | BitMEX and triggered liquidation of ~~Plaintiff's long XBTUSD position~~ |
| | | | | | | | | Plaintiff's long XBTUSD position |
| BMA | 05/17/ 2019 | BitMEX | XBTUSD Swap | Liquidation | SELL MARKET ALL | 10 BTC | | Automated software tools developed by Defendant Reed automatically executing a large SELL market order from helper account on BitStamp's |
| | | | | | | | | XBTUSD/BT ~~XBTUSD/BTC~~ C order book, causing artificial price move, which propagated, through the .BXBT index, to XBTUSD order book of BitMEX and triggered liquidation of Plaintiff's long XBTUSD position |
| BMA | 06/26/ 2019 | Kraken | XBTUSD Swap | Liquidation | SELL MARKET | 10 BTC | | Automated software tools developed by |
| | | | | | | | | ~~Defendant~~ |

| | | | | | ALL | | Defendant Reed automatically executing a large market order (SELL MARKET NN) from helper account on ~~Kraken's~~ |
|---|---|---|---|---|---|---|---|
| | | | | | | | Kraken's XBTUSD/BT |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | ~~XBTUSD/BTCC~~ order book, causing artificial price move resulting in liquidation of ~~Plaintiff's long XBTUSD position~~ |
| | | | | | | | <u>Plaintiff's long XBTUSD position</u> |
| BMA | 03/12/ ~~2020~~ | BitMEX | XBTUSD ~~Swap~~ | Position ~~Closure~~ | BUY ~~MARKET ALL~~ | 3 BTC | Automated ~~software tools developed by BitMEX intentionally taking BitMEX platform off-line to prevent tapping Insurance Fund and, additionally or alternatively, negligently failing to prevent DDoS Attack by failing to utilize widely available industrial solutions, which resulted in Plaintiff's inability to timely close short position on XBTUSD swap order book~~ |
| | <u>2020</u> | | <u>Swap</u> | <u>Closure</u> | <u>MARKET</u> | | <u>software tools</u> |

| | | | | | ALL | | BitMEX intentionally taking BitMEX platform off-line to prevent tapping Insurance Fund and, additionally or alternatively, negligently failing to prevent DDoS Attack by failing to utilize widely available industrial solutions, which |
|---|---|---|---|---|---|---|---|

| | | | | | | | resulted in Plaintiff's inability to timely close short position on XBTUSD swap order book |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**CAUSATION CHAIN OF PLAINTIFFS' LOSSES ON KRAKEN EXCHANGE**

329. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

330. The causation chain for Plaintiffs' BMA and Dubinin losses on Kraken is very

straight forward. Specifically, when automated software tools developed by Defendant Reed



## Causation of Kraken and BitMEX Losses of Plaintiffs

executed a large SELL market order from helper account on Kraken's XBTUSD/BTC order book (step 1 in the diagram), with intent of moving the .BXBT index price in a favorable direction, this large market SELL order caused an artificial downward price move on the Kraken's spot order book (step 2 in the diagram), triggering a liquidation cascade and directly resulting in liquidation of Plaintiffs' BMA and Dubinin XBTUSD long positions on that exchange (step 3 in the diagram). This sequence repeated during each and all of the Manipulation Times.

331. If automated software tools developed by Defendant Reed did not automatically execute a large SELL market order from helper account on Kraken's XBTUSD/BTC order book, the above sequence would not have taken place and the Plaintiffs' BMA and Dubinin XBTUSD long positions on Kraken exchange would not have been

liquidated. Moreover, liquidation of Plaintiffs' BMA and Dubinin XBTUSD long positions on Kraken exchange was foreseeable consequence of the execution of the large SELL market order from helper account on Kraken's XBTUSD/BTC order book. In fact, automated execution of the aforesaid large market order by automated software tools developed by Defendant Reed was specifically intended to cause liquidation of Plaintiffs' BMA and Dubinin XBTUSD long positions on Kraken exchange.

### CAUSATION CHAIN OF PLAINTIFFS' LOSSES ON BitMEX EXCHANGE

332. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

333. Compared to causation chain for Plaintiffs' BMA and Dubinin losses on Kraken, the causation chain of Plaintiffs' BMA, Kolchin, Dolgov and Razvan losses on BitMEX includes one more link – the .BXBT price index[11] used by Defendants to price the XBTUSD Perpetual Swap on BitMEX. Specifically, when automated software tools developed by Defendant Reed automatically executed a large SELL market order from helper account on Kraken's XBTUSD/BTC order book (step 1 in the diagram), causing artificial downward price move on spot order book of that exchange (step 2 in the diagram), the aforesaid artificial price move

---

[11] As of May 20, 2019, .BXBT index was calculated as (%3 * Bitstamp + %3 * Coinbase Pro + %3 * Kraken) and .BETH index was calculated as (%3 * Bitstamp + %3 * Coinbase Pro + %3 * Kraken).

propagated, through the .BXBT index, to the XBTUSD Perpetual Swap order book of BitMEX, causing the corresponding downward price more (step 4 in the diagram) and triggered liquidation of Plaintiffs' BMA, Kolchin, Dolgov and Razvan XBTUSD long positions there (step 5 in the diagram).[12] This sequence repeated during each and all of the Manipulation Times. The same causation chain resulted when automated software tools developed by Defendant Reed automatically executed a large SELL market order from helper account on BitStamp's ETH order book, which propagated through BitMEX's .BETH index to ETHUSD order book of BitMEX and caused Plaintiff's Kolchin long ETHUSD positions there to be liquidated.

[11] As of May 20, 2019, .BXBT index was calculated as (%3 * Bitstamp + %3 * Coinbase Pro + %3 * Kraken) and .BETH index was calculated as (%3 * Bitstamp + %3 * Coinbase Pro + %3 * Kraken).
[12] In addition to propagating from the three spot exchanges to BitMEX, the price moves also propagate between spot exchanges themselves, due to the widespread use of arbitrage bots.

334. If automated software tools developed by Defendant Reed did not automatically execute a large SELL market order from helper account on Kraken's XBTUSD/BTC order book, the above sequence would not have taken place and the Plaintiffs' BMA, Kolchin, Dolgov and Razvan long positions on BitMEX exchange would not have been liquidated. Moreover, liquidation of Plaintiffs' BMA, Kolchin, Dolgov and Razvan XBTUSD long positions on BitMEX exchange was foreseeable consequence of the execution of the large SELL market order from helper account on Kraken's XBTUSD/BTC order book, which is linked to the BitMEX's XBTUSD order book via the .BXBT index. In fact, automated execution of the aforesaid large market order on Kraken by automated software tools developed by Defendant Reed was specifically intended to cause liquidation of Plaintiffs' BMA and Dubinin XBTUSD long positions on BitMEX exchange, due to the deliberate design of the .BXBT index by Defendants.

### THE RACKETEERING ENTERPRISE

335. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

336. Each of the Defendants HDR, ABS, Hayes, Delo and Reed are respective persons or entities capable of holding a legal or beneficial interest in property.

337. From at least January 2017 and until present, Defendants HDR, ABS, Defendant

---

[12] In addition to propagating from the three spot exchanges to BitMEX, the price moves also propagate between spot exchanges themselves, due to the widespread use of arbitrage bots.

Hayes, Delo and Reed have been a union or group of entities and individuals associated in fact collectively constituting a continuing "enterprise" ("Enterprise")[13] within the meaning of RICO as defined in 18 U.S.C. § 1961. Since at least January of 2017, each of HDR, ABS, Hayes, Delo and Reed has been a person separate and distinct from the Enterprise itself, while, at the same time, being a member of the Enterprise. The purpose of the Enterprise was to fraudulently solicit bitcoin deposits and trading commissions from victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and material omissions of fact and to manipulate markets on BitMEX and price-forming "reference" exchanges Bitstamp, Coinbase Pro and Kraken to misappropriate victims', including Plaintiffs', bitcoins deposited with Defendants.

338. The activity of the Enterprise and the predicate acts of racketeering alleged

hereinbelow affect interstate or foreign commerce. Specifically, the Enterprise directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce and foreign commerce, including, without limitation, very large volume (up to one trillion U.S. dollars of turnover per year) cryptocurrency derivatives trading services.

339. At various times during the Relevant Period each of the Defendants HDR, ABS, Hayes, Delo and Reed was employed in or associated with the Enterprise as alleged hereinabove.

## ROLES OF DEFENDANTS IN THE ENTERPRISE

340. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

341. Plaintiffs are informed and believe and thereon allege that individual Defendants Hayes, Delo and Reed were the masterminds behind the alleged Enterprise and the predicate criminal acts alleged hereinbelow. ~~Specifically, Plaintiffs are informed and believe and thereon allege that Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators as well as controlling bank accounts and financial flows within the Enterprise. Plaintiffs are informed and believe and thereon allege that Defendant Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with~~

~~maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 372 below, and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202. Defendant Reed was further responsible for laundering a substantial portion of the tainted bitcoin-denominated proceeds of the illegal activities on the BitMEX~~

~~platform from Defendants' general account (bitcoin wallet) through the Unknown Exchange and a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts with the purpose to conceal or disguise the nature, the location, the source, the~~

ownership, or the control of the proceeds of the unlawful activities taking place on the BitMEX platform. Grape Park and Mark Sweep are nominee shell entities that were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control, Ex. 12, 13.

342. Plaintiffs are informed and believe and thereon allege that Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and for effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. Plaintiffs are informed and believe and thereon allege that Defendant HDR was responsible for, among other things, planning the overall operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. Finally, Plaintiffs are informed and believe and thereon allege that Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.

343342. The individual roles ("Roles") of all Defendants within the Enterprise are summarized in the below table, prepared according to information and belief of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan:

---

[13] This Complaint uses three different RICO enterprise definitions (Association and Fact Enterprise, HDR Enterprise and ABS Enterprise), plead in the alternative. All the general allegations of this Complaint, the alleged RICO predicate acts and the alleged Roles of Defendants apply to all three alleged RICO enterprises.

Kolchin, Dubinin, Dolgov and Razvan, which belief was formed based on public records, public Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants and crypto market data analysis:

| Defendant | Role of Defendant |
|---|---|
| HDR | Defendant HDR is a holding company. Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Therefore, it was used by Defendants to avoid laws, regulators and private lawsuits and hide illegally acquired assets.<br><br>Defendant HDR was created by individual Defendants in order to perpetrate fraud and dodge regulation and taxes. Among other illegal purposes, such as perpetrating fraud and dodging regulators, Defendants Hayes, Delo and Reed formed and used Defendant HDR to hide and then siphon ill-gotten proceeds from various racketeering activities alleged in this Compliant, including fraudulent solicitations and market manipulation, to their personal bank accounts and bank accounts of their associates and relatives. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Defendant Reed. Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise as well as hiding income from various illegal and criminal activities and reinvesting it in the legitimate businesses and assets. |



**Role of Defendant**

Defendant HDR is a holding company. Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Defendant Reed. Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise.

Defendant ABSAn April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising,* sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, and Defendant ABS Global Trading Limited, is responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, which was used to provide the false and fraudulent solicitations to each Plaintiff. Therefore, the alleged false and fraudulent solicitations were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco. Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS was responsible for, among other things, day to day

operations of the BitMEX platform and effectuating the fraudulent solicitations and market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom automated software programs and scripts for performing market manipulation and implementing server freezes. Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise. In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairsusing sensitive insider information of Plaintiffs and other traders for estimating potential profit from liquidating BitMEX traders, including Plaintiffs, and performing

|  | of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
|---|---|
| Delo | Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund. In addition, Defendant Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |

| | |
|---|---|
| | automatic market manipulation and automatically implementing server freezes. |
| Hayes | Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise. In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the Racketeering Conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their coconspirators from scrutiny by cryptocurrency exchanges and law enforcement. In addition, Defendant Hayes personally authored (e.g. the blog post on the Insider trading Desk), approved or ratified all fraudulent solicitations alleged herein. |
| Delo | Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund. In addition, Defendant Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the |

| Reed | "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the Racketeering Conspiracy and the activities of the Defendants, and each of them, and their coconspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. In addition, Defendant Delo personally authored, approved or ratified all fraudulent solicitations alleged herein. Reed was responsible for, among other things, developing automated software tools for use by Insider Trading Desk for accessing highly sensitive BitMEX trader (including Plaintiffs') information and |

using this information for manipulating
BitMEX markets and markets on the
"reference" exchanges Kraken, Coinbase
Pro and BitStamp, planning and initiating
the deliberate server freezes and fraudulent
system overloads on BitMEX as alleged
herein as well as effective transfers of
market manipulation winnings from helper
accounts on United States based
"reference" spot exchanges Kraken,
Coinbase Pro and BitStamp to winner
accounts on BitMEX, by automatically
placing large market orders on those
exchanges with maximum slippage to
cause large artificial moves in the .BXBT
and index price and .BETH index price on
a daily basis and performance of other
illegal acts conducted by the Enterprise, by
issuing electronic wire transmissions
containing trading orders

~~Defendant Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders~~ and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202. ~~Defendant~~ Reed was further responsible for <ins>maintaining Defendants' commercial website www.bitmex.com, which was used to deliver all false advertisements and fraudulent solicitations to Plaintiffs and</ins> laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof. In addition, ~~Defendant~~ Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of ~~Defendants~~<ins>Defendant</ins> Hayes and <ins>his accomplice</ins> Delo and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed <ins>money transmissions, promoting and enhancing the Racketeering Conspiracy and the activities of the Defendants, and each of them, and their coconspirators and concealing the unlawful</ins>

activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. In addition, Defendant Reed personally authored, approved or ratified all fraudulent solicitations alleged herein.

343. Additional and other facts regarding Defendants' Roles in the Enterprise are

money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

344. Additional and other facts regarding Defendants' roles in the Enterprise are hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled. Plaintiffs accordingly reserve the right to supplement and amend these allegations, if appropriate or necessary, following completion of relevant fact discovery.

### THE RACKETEERING CONSPIRACY AND RACKETEERING ACTIVITY

345344. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

346345. Pursuant to 18 U.S.C. § 1961, "racketeering activity" for purposes of RICO means "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1343 (relating to wire fraud) ... section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), ... section 1960 (relating to illegal money transmitters), ... sections 2314 and 2315 (relating to interstate transportation of stolen property)."

347346. During the Relevant Period, the Defendants, and each of them, solely or together with other individuals, including a notorious and habitual market manipulator Ben Aabtc, being



persons employed by and associated with Enterprise they engaged in, and the activities of which

affected interstate and foreign commerce, knowingly and intentionally, conspired to conduct and participate, directly and indirectly, and actually participated in conduct of the Enterprise's affairs through a pattern of racketeering activity, as that terms is defined in 18 U.S.C. § 1961, consisting of multiple acts, which are indictable under 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a) and 18 U.S.C. § 2314.

347. In addition, during the Relevant Period, the Defendants, and each of them, solely or together with other individuals, knowingly and intentionally, conspired to use and invest income derived from a pattern of racketeering activity, as that terms is defined in 18 U.S.C. § 1961, consisting of multiple acts, which are indictable under 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a) and 18 U.S.C. § 2314, into the operation of Defendants ABS and HDR, the activities of which affected interstate and foreign commerce ("Racketeering Conspiracy").

348. It was a part of the ~~conspiracy~~Racketeering Conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise, which also constitute overt acts in furtherance of the Racketeering Conspiracy.

349. The ~~purposes~~purpose of the alleged ~~racketeering conspiracy~~Racketeering Conspiracy of the Defendants, and each of them, ~~included the following, among others: (1) maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation; (2) concealing trading gains obtained through unlawful practices from regulatory and tax authorities, including, without limitation, by means of money laundering; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators; (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement; and (6) laundering the bitcoin denominated proceeds of the market manipulation on the BitMEX platform by first converting them into fiat currencies such as United States dollars using Unknown Exchange and then reinvesting the converted fiat currency proceeds into real estate properties in Wisconsin and Massachusetts using nominee entities Grape Park and Mark Sweep (collectively "Purposes").~~was to fraudulently solicit, through a commercial website www.bitmex.com, bitcoin deposits and trading commissions from victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and material omissions of fact and to manipulate markets on BitMEX platform and price-forming "reference" exchanges Bitstamp, Coinbase Pro and Kraken to misappropriate victims', including Plaintiffs', bitcoins deposited with Defendants, to use or invest the bitcoin deposits and trading commissions so fraudulently solicited and misappropriated from victims, including Plaintiffs, in the operation of Defendants ABS and HDR, (collectively "Purpose"). It was a further Purpose of the Racketeering Conspiracy to conduct the affairs of the Enterprise using a

pattern of racketeering activities, including fraudulent solicitations, market manipulation as well as all other illegal acts alleged herein.

**OVERT ACTS IN FURTHERANCE OF RACKETEERING CONSPIRACY**

350. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

351. In furtherance of the ~~racketeering conspiracy~~Racketeering Conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in this District and elsewhere: 1) engaging in fraudulent solicitations of victims', including Plaintiffs' bitcoin deposits and trading commissions, using a laundry list of material misrepresentations, half-truths and omissions transmitted to victims using wire transmissions over the Internet; 2) operating an Insider Trading Desk with undisclosed informational and trading privileges over BitMEX traders, wherein the Insider Trading Desk was granted 'God Assess" to all BitMEX customer information; 3) developing, deploying and utilizing, on a continuous basis, automated market manipulation tools designed to use sensitive insider information of BitMEX traders to automatically liquidate them and misappropriate their bitcoin deposits, when it is particularly profitable for Defendants to do so; 4) providing traders with extremely high trading leverage (up to 100x); ~~2~~5) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; ~~3~~6) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; ~~4~~7) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept

some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; ~~5~~8) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by ~~executing~~<u>using automated software tools developed in-house to execute</u> large market orders from helper accounts on illiquid <u>"reference"</u> spot exchanges Coinbase Pro, BitStamp and Kraken in order to cause massive liquidations of traders' derivatives positions on BitMEX and capture resulting market manipulation profits using winner accounts on that exchange; ~~6~~9) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; ~~and 7~~10) knowingly, willfully and

deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 11) knowingly, willfully and deliberately using or investing the proceeds of the fraudulent solicitations, market manipulation as well as other illegal acts in the operation of Defendants ABS and HDR. For example, Ex. 3, p. 4 describes how a helper account on BitStamp was used by Defendants on May 17, 2019 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX. See also Ex. 2, pp. 2-3 describing a similar scheme that used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiffs, on BitMEX on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants ~~use~~' Insider Trading Desk used this unlawful scheme on a regular basis using helper accounts operated on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro. Additionally, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District. Therefore, these illegal acts for which Plaintiffs seek redress in this Complaint were directly related to Defendants' connections to the United States and this District through their commercial website www.BitMEX.com. Moreover, BitMEX platform is operated from this District, which also houses the three site reliability engineers of

BitMEX who personally caused the BitMEX servers to freeze during Manipulation Times.

352. In addition, in furtherance of the ~~racketeering conspiracy~~Racketeering Conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed, in this District and elsewhere, the overt acts, among others, as alleged in this Complaint.

353. Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan were injured in their property by one or more of the foregoing and other overt acts in furtherance of the alleged ~~racketeering conspiracy~~

Racketeering Conspiracy. For example, Plaintiffs BMA, Kolchin, Dolgov and Razvan were financially injured when Defendants fraudulently solicited their bitcoin deposits and trading commissions. Moreover, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan were additionally financially injured when Defendants effectively transmitted funds, which was perpetrated willfully and deliberately by Defendants through their commercial website BitMEX.com, and with full knowledge of the nature and purpose of the funds involved in the transfer, in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314 between helper and winner accounts by way of using the helper accounts to perpetrate manipulation by pumping or dumping the cryptocurrency market on the "reference" exchanges, thereby causing a liquidation cascade affecting Plaintiffs' accounts, and using the winner accounts to capture the financial benefits of the aforesaid manipulation. As the result of the actions of the Defendants alleged in this Paragraph, the positions of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan were liquidated and Plaintiffs' bitcoins were confiscated.

354. Because the vast majority of BitMEX personnel, as alleged in Paragraph 115, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 116, and almost all vital external service providers to BitMEX, as alleged in Paragraph 98, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant ~~DHR~~HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District.

355. Moreover, the aforesaid illegal acts of fraudulent solicitation and effectively

transmitting market manipulation winnings from helper accounts to winner accounts, which

resulted in the injury to

Plaintiffs, were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District.

Therefore, Defendants' illegal acts resulting in injuries to Plaintiffs, for which Plaintiffs seek redress in this Complaint, were directly related to Defendants' connections to the United States and this District through their commercial website BitMEX.com.

### DEFENDANTS OPERATED AND CONTINUE TO OPERATE AN UNLICENSED MONEY TRANSMITTING BUSINESS IN VIOLATION OF 18 U.S.C. § 1960(a)

356. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

357. Bitcoins and other cryptocurrencies are funds. *United States v. Murgio*, No. 15-cr-769, 2016 WL 5107128, at *4 (S.D.N.Y. Sep. 19, 2016); *United States v. Budovsky*, No. 15-cr-368, 2015 WL 5602853 (S.D.N.Y. Sep. 23, 2015); *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014). Therefore, bitcoins are subject to all laws and regulations applicable to fiat currency monetary transactions.

358. ~~Plaintiffs are informed and believe and thereon allege that during~~During the Relevant Period, Defendants, and each of them, engaged in conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

359. To use Defendant HDR's unlicensed money transmitting services, one creates an account by accessing the Defendant HDR's website BitMEX.com. A user does not need to provide even the most basic identifying information such as date of birth, address, or other identifiers. All that Defendant HDR requires is a name, password, and an email address.

360. Unlike legitimate payment processors or digital currency exchangers, Defendant HDR does not require its users to validate their identity information by providing official identification documents, given that Defendant HDR does not require an identity at all to open an account and start trading with up to 100x leverage. For comparison, a legitimate U.S.



cryptocurrency exchange Kraken requires email address, full name, date of birth, phone number,

and physical address to open the most basic level account.



361. Thus, a user can create and fund an HDR account with nothing more than an email address, which often has no relationship to the identity of the actual user. Accounts are therefore easily opened anonymously, including by customers in the United States within the Northern District of California. Using such anonymous account, the user is able to make unlimited deposits, unlimited trades with up to 100x leverage, as well as unlimited withdrawals. Instead of performing a proper document check before allowing users to open an account on BitMEX, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.

362. Moreover, high leverage provided by Defendant HDR to all users enables Defendants and all BitMEX users to launder unlimited funds from one account to another using market manipulation as alleged hereinabove. For example, one helper account may dump a large amount of cryptocurrency on the market using margin, triggering a liquidation cascade and booking a loss, when a separate, second winner account may buy the cryptocurrency at an artificial below market price caused by the liquation cascade. This way, unlimited amount of

funds may be laundered from the first helper account to the second winner account

virtually

anonymously in violation of 18 U.S.C. § 1956(a), which is a RICO predicate offense. Defendants themselves launder funds and enable BitMEX uses to launder funds in the alleged manner by providing high levels of leverage up to 100x and deliberately failing to conduct KYC upon account creation. In addition, the knowing, willful and deliberate effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense. Finally, the willful and deliberate money transmission from the winner account back to the helper account in order to replenish it before next manipulation cycle, with full knowledge of the nature and purpose of the funds involved in the transfer, also constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense. The same money transmission further constitutes a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and money laundering in violation of 18 U.S.C. § 1956(a), which are also RICO predicate offenses. For example, Ex. 3, p. 4 describes how a helper account on BitStamp was used by Defendants on May 17, 2020 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX. See also Ex. 7, illustrating a similar scheme, in which Defendants sold $44,000,000 over 22 separate $2,000,0000 orders of XBTUSD Perpetual Swaps on BitMEX on July 27, 2020 to get into a position and then used market orders amounting to some 1000 bitcoins on Coinbase Pro exchange to artificially move the .BXBT index price in a favorable direction in order to close his large BitMEX position at a significant profit. See also Ex. 2, pp. 2-3 describing a similar scheme that used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiffs, on BitMEX on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX.

~~Plaintiffs are informed and believe and thereon allege that~~ Defendants ~~use~~' Insider Trading Desk used this unlawful scheme on a regular basis utilizing helper

accounts on United States based "reference" spot exchanges BitStamp, Kraken and Coinbase Pro and winner accounts on BitMEX.1314

363. At all times relevant to this complaint Defendant HDR had no anti-money laundering ("AML") and/or "Know-Your-Customer" ("KYC") processes and policies in place or the existing policies lacked any meaningful enforcement, as evidenced, for example, by apparent accepting the United States - based companies, including CMT Capital Markets Trading, Eastmore Group / Eastmore Management, LLC, Clerkenwell Asset Management LLC, Adaptive Fund I, LP and Galois Capital, Swing Trade Pros, FalconX, Cumberland DRW, Circle Partners, Fund3 Capital LP/Fund3 LLC, South Lake Computers, ARK Investment Management LLC, Coincident Capital and Leotank Capital as clients, despite claiming that BitMEX is closed to United States persons. As alleged hereinabove, Defendant HDR collected and continues to collect virtually no customer data at all. Nor did Defendant HDR ever register with FinCEN or perform the required AML and KYC functions.

364. A user can fund a Defendant HDR account in numerous different ways. One way involves funding a Defendant HDR account with a user's existing digital currency. A user with existing digital currency, such as bitcoin, could fund an HDR account directly via bitcoin deposits. Defendant HDR users could also use market manipulation to launder funds from one account to another. Plaintiffs are informed and believe and thereon allege that this served as another conduit for money laundering as it allowed Defendant HDR's customers and Defendants themselves to withdraw funds from their HDR account and transfer them to other HDR users anonymously.

365. 18 U.S.C. § 1960(a) provides: "(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."

366. Pursuant to 18 U.S.C. § 1960(b)(1), "the term "unlicensed money transmitting

1314 The funds are being transmitted from one exchange to another by way of arbitrage algorithms that buy cryptocurrency on one platform and simultaneously sell on the other.

366. Pursuant to 18 U.S.C. § 1960(b)(1), "the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree" and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

367. 18 U.S.C. § 1960(a) makes it a crime to operate an unlicensed money transmitting business. The term money transmitting includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a money transmitting business with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute. Moreover, FinCEN Ruling, FIN-2014-R002, at p. 4 provides:

368. In addition, should the Company begin to engage as a business in the exchange of virtual currency against currency of legal tender (or even against other convertible virtual currency), the Company would become a money transmitter under FinCEN's regulations. Under such circumstances, the Company would have to register with FinCEN, implement an effective, risk-based anti-money laundering program, and comply with the recordkeeping, reporting, and transaction monitoring requirements applicable to money transmitters.

369. FinCEN Ruling, FIN-2014-R002, at p. 4. United States Federal District Court decision in *U.S. v. Stetkiw,* No. 18-20579 (E.D. Mich. Feb. 1, 2019) relied on this Ruling as a basis for denying defendant's motion to dismiss and holding that defendant's alleged conduct of converting fiat money into virtual currency constituted money transmitting under 18 U.S.C. § 1960. Thus, Defendant HDR is money transmitter under FinCEN's regulations and California

~~§ 1960. Thus, Defendant HDR is money transmitter under FinCEN's regulations and California law.~~

law.

370. The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States. "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States. In addition, San Francisco based Galois Capital also acts as liquidity provider on BitMEX generating millions of dollars of business for Defendants. Moreover California-based Coincident Capital actively trades on BitMEX generating over $50,000,000 in trading profits. Therefore, Defendants HDR and ABS are subject to the aforesaid federal and state money transmitter regulations due to its very substantial business in the United States. See 31 C.F.R. §§ 1010.100(ff)(5), 1022380(a)(2).

371. Defendants HDR and ABS fall under the statutory definition of the "unlicensed money transmitting business" under all of 18 U.S.C. § 1960(b)(1)(A), (B) and (C). Defendants' unlicensed money transmitting operation clearly affects interstate and foreign commerce, based at least on the high amounts (tens and even hundreds of millions of United States dollars) of funds involved in the money transmissions by Defendants.

372. With respect to 18 U.S.C. § 1960(b)(1)(A), Defendants HDR and ABS operate without an appropriate money transmitting license issued by the State of California and by any other State of the United States. Cal. Fin. Code § 2003(q)(3) defines "money transmission" as "receiving money for transmission." Defendants HDR and ABS clearly meet this definition. Defendants HDR and ABS receive funds in a form of a cryptocurrency from its customers and then transmit cryptocurrency to a wallet address. Cal. Fin. Code § 2030(a) requires persons engaged in money transmission to be licensed. Finally, Cal. Fin. Code § 2152(b) provides that a "person that knowingly engages in an activity for which a license is required under this division without being licensed or exempt from licensure under this division is guilty of a felony." Thus, Defendants HDR and ABS meet the definition set out in 18 U.S.C. § 1960(b)(1)(A).

373. With respect to 18 U.S.C. § 1960(b)(1)(B), Defendants HDR and ABS failed to

register with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C.

§ 5330

and federal regulations pursuant to that statute.

374. With respect to 18 U.S.C. § 1960(b)(1)(C), Defendants HDR and ABS facilitated and continues to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering, including, without limitation, transfer of winnings from market manipulation from the helper accounts into the winner accounts as alleged herein above. By way of example and not by way of limitation, Defendants, and each of them, during the Relevant Period, transferred proceeds from illegal price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, Kraken and BitStamp in order to replenish helper accounts on those exchanges. Such transfers were performed by Defendants, and each of them on a daily basis, including during each of the specific Manipulation Times, during the Relevant Period. Those proceeds were used by Defendants, and each of them, to perpetrate further market manipulations as alleged hereinabove. In addition, Defendants transmitted funds between different exchange accounts, including, without limitation, helper accounts and winner accounts, by way of market manipulation as alleged hereinabove.

375. Thus, Defendants HDR and ABS are clearly "unlicensed money transmitting business[es]" under 18 U.S.C. § 1960(b)(1) and, therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce in violation of 18 U.S.C. § 1960(a), which constitute the predicate acts of the Defendants, and each of them, racketeering activity under RICO.

376. Defendants have been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license. Specifically, as alleged in Paragraphs above and shown in Ex. 8, California and United States residents generated almost $70,000,000 in trading profits on the BitMEX platform, which clearly

exceeds any threshold[14][15] for Defendant HDR having been required to obtain a money transmitter

[15] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18

license in the United States and comply with the FinCEN regulations pursuant to 18 U.S.C. § 1960(a), which it knowingly and deliberately failed to do. This conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendants. Had Defendants obtained the money transmitter license from California, registered with FinCEN and complied with FinCEN regulations, as they were required by 18 U.S.C. § 1960(a) and Cal. Fin. Code § 2030(a), they would have been forced to institute the mandatory KYC and AML policies on the BitMEX platform for all traders, as they did on August 14, 2020, and file suspicious activity reports with FinCEN, which would have clearly prevented the rampant market manipulation, money laundering and other nefarious acts, which factually and proximately resulted in Plaintiffs' financial injuries as specifically alleged in this Complaint, from taking place on the BitMEX platform (as alleged in this Complaint, Plaintiffs were damaged by acts of money laundering involving effectively transmitting manipulation winnings from helper accounts on spot exchanges and winner accounts on BitMEX, which was made possible due to the fact that BitMEX accounts were anonymous, in violation of FinCEN regulations, see Paragraphs above.) If Defendants complied with FinCEN regulations, as required by 18 U.S.C. § 1960(a), this type of money laundering activity would not have been possible on BitMEX due to the fact that winner accounts would be traceable to the helper accounts, and therefore, injuries to Plaintiffs would not have occurred). Therefore, Plaintiffs' injuries alleged in this Complaint were directly and proximately caused by Defendants operating the unlicensed money transmitting business and failing to comply with FinCEN regulations in violation of 18 U.S.C. § 1960(a) and Cal. Fin. Code § 2030(a), which made BitMEX a hotbed for market manipulation and money laundering.

377. It should be noted that the sheer magnitude of Defendants' unlicensed money transmitting operation is truly staggering. According to Defendants' own data, Defendant HDR turnover averages over $3 billion per day. Thus, Defendants illegally transmitted over $3 billion

[14] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions. In *United States v. Klein*, 6:17-cr-03056 (W.D. Mo. 2017), the threshold for triggering 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions. Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

~~turnover averages over $3 billion per day. Thus, Defendants illegally transmitted over $3 billion~~ per day without the required state money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a).

378. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants, and each of them, charged their customers substantial fees for the unlicensed money transmissions generating substantial illegal income for Defendants.

379. ~~Plaintiffs are informed and believe and thereon allege that predicate~~ Predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating cryptocurrency markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

380. ~~Plaintiffs are informed and believe and thereon allege that predicate~~ Predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely over two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

381. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants, and each of them, used at least a portion of the income derived from their unlicensed money transmitting operations in violation of 18 U.S.C. § 1960(a) to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

382. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to

transmit money in violation of 18 U.S.C. § 1960(a) directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs BMA,

Kolchin, Dubinin, Dolgov and Razvan as alleged herein.

## DEFENDANTS CONSPIRED TO LAUNDER, LAUNDERED AND CONTINUE TO LAUNDER FUNDS IN VIOLATION OF 18 U.S.C. § 1956

383. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

384. 18 U.S.C. § 1956 provides that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

385. ~~Plaintiffs are informed and believe and thereon allege that, during~~During the Relevant Period, Defendants, and each of them, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), as alleged hereinabove, as well as proceeds of money laundering and unlawful cryptocurrency market manipulation, as alleged hereinbelow.

386. Defendants, and each of them, willfully and knowingly did conduct and continue

to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) as well as proceeds of

unlawful cryptocurrency market manipulation.

387. For example, Defendants, and each of them, transferred, on multiple occasions, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as proceeds from illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity or to launder those proceeds by converting them into fiat currencies or through real estate investment schemes. Those proceeds were in fact subsequently used by Defendants, and each of them, to perpetrate further market manipulation in violation of applicable laws. Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

388. As a further example, the effective transmissions of the winnings from market manipulation from the first helper account on BitStamp, Kraken or Coinbase Pro to the second winner account on BitMEX perpetrated by Defendants as described herein constitutes money laundering in violation of 18 U.S.C. § 1956(a).

389. As yet further example, a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating of unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint, were subsequently converted, by all Defendants, through the Unknown Exchange, into various fiat currencies, including United States dollars and Hong Kong dollars. All Defendants knew that these financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering,

operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint.

390. As yet further example, a substantial portion of the bitcoin-denominated proceeds

of market manipulation, money laundering and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently converted, by Defendant Reed, Agata Reed, Barbara Reed and Trace Reed, into multiple real estate investments that they set up in Wisconsin and Massachusetts. For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Grape Park and Mark Sweep to disguise or conceal the true illegal nature of the funds used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control. All Defendants knew that the aforesaid financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint. All Defendants also knew the tainted nature of the funds in the Defendants' general account (bitcoin wallet), from which the multiple real estate purchases alleged in this Complaint were ultimately funded.

391. Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1956, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

392. ~~Plaintiffs are informed and believe and thereon allege that predicate~~ Predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating cryptocurrency markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

393. ~~Plaintiffs are informed and believe and thereon allege that predicate acts alleged~~

393. Predicate acts alleged herein, namely money laundering in violation of 18 U.S.C.

§ 1956, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

394. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to launder funds between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1956, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

395. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants, and each of them, used at least a portion of the proceeds derived from their money laundering operation in violation of 18 U.S.C. § 1956 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged herein.

### DEFENDANTS ENGAGED IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S.C. § 1957

396. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

397. 18 U.S.C. § 1957 provides that "(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."

398. Pursuant to 18 USC § 1957(f)(3), the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in 18 U.S.C. § 1956.

399. ~~Plaintiffs are informed and believe and thereon allege that, during~~<u>During</u> the Relevant Period, Defendants, and each of them, willfully and knowingly attempted to engage and engaged in monetary transactions affecting interstate

commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that ~~in~~is, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful <u>fraudulent solicitation and</u> cryptocurrency market manipulation, as alleged hereinbelow.

400. Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that ~~in~~is, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful <u>fraudulent solicitation and</u> cryptocurrency market manipulation, as alleged herein.

401. For example, Defendants, and each of them, transferred, on a regular basis, proceeds from <u>fraudulent solicitations,</u> operating of the unlicensed Defendant HDR money transmission business as well as illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity. Those proceeds were in fact subsequently used by Defendants, and each of them, to perpetrate further market manipulation in violation of applicable laws. Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

402. As a further example, the effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes

violation of 18 U.S.C. § 1957. ~~The~~ Defendants were fully aware of the nature of the transferred funds

and that such funds were the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956.

403. As yet further example, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times, proceeds of the alleged illegal fraudulent solicitations and bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint, that took place on the BitMEX platform, into various fiat currencies.

404. Moreover, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on or about July 8, 2019 and August 19, 2019, at least $2,325,000 of the fiat currency converted proceeds of the alleged illegal fraudulent solicitation and bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint into real estate investments in the United States, including, without limitations properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, Ex. 12, 13. The specific purpose of the financial transactions alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and control.

405. Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1957, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

406. ~~Plaintiffs are informed and believe and thereon allege that predicate~~Predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating

cryptocurrency markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income, and concealing illegal activities

from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

407. ~~Plaintiffs are informed and believe and thereon allege that predicate~~Predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants, and each of them, is still ongoing.

408. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants', and each of them, alleged fraudulent solicitations, price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transfer funds derived from specified unlawful activity between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1957, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

409. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants, and each of them, used at least a portion of the proceeds from their transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged herein.

## DEFENDANTS ENGAGED IN WIRE FRAUD IN VIOLATION OF 18 U.S.C. § 1343

410. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

411. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise

any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means

of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both...”

412. ~~Plaintiffs are informed and believe and thereon allege that during~~During the Relevant Period, Defendants, and each of them, devised a scheme or artifice to defraud, namely a manipulative, fraudulent and deceptive scheme to fraudulently solicit Plaintiffs' bitcoin deposits and trading commissions and to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin Perpetual Swap contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin and to obtain money of other traders by way of injecting false information into markets in order to induce other traders to open highly leveraged positions on BitMEX and then cause their artificial liquidation in violation of 7 U.S.C. §§ 9(1), (3) and 13(a)(2). This scheme was devised and intended to fraudulently benefit Defendants at the expense of Plaintiffs by wrongfully charging Plaintiffs trading commissions, obtained by way of fraudulent solicitation, and by wrongfully confiscating Plaintiffs' bitcoin deposits, also obtained by way of fraudulent solicitation, by inducing artificial market price moves and using such price moves to force liquidations of Plaintiffs' positions on the BitMEX platform, while simultaneously deliberately freezing BitMEX's platform to impede Plaintiffs' efforts to salvage their funds. The funds forcibly confiscated from Plaintiffs' as the result of the liquidations were deposited into the Insurance Fund maintained by Defendants.

413. During the Relevant Period, Defendants, and each of them, used wire signals to transmit various fraudulent solicitations to Plaintiffs, containing a laundry list of material misrepresentations, half-truths and omissions, including fraudulent solicitations alleged in Paragraphs ~~484~~496-~~571~~590 below, as well as various electronic orders to multiple "reference" cryptocurrency exchanges for the specific purpose of manipulating cryptocurrency derivative markets on BitMEX and misleading traders and investors as to the cryptocurrency market's

natural forces of supply and demand and for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives on those "reference" exchanges. Those actions further constitute wire fraud in violation of 18 U.S.C. § 1343.

414. Plaintiffs are informed and believe and thereon allege that the alleged fraudulent electronic wire transmissions were performed by Defendants on a daily basis, including during each of the specific Manipulation Times, during the Relevant Period and were carried out from Defendants' offices located in San Francisco, California and Milwaukee, Wisconsin, and to respective computers of Plaintiffs, computer servers of Amazon EKS as well as computer serves of multiple other United States based "reference" cryptocurrency exchanges that Defendants used to perpetrate their manipulative and fraudulent scheme alleged hereinabove. Plaintiffs are informed and believe and thereon allege that each of Defendants HDR, ABS, Hayes, Delo and Reed used automated market manipulation software tools developed by BitMEX to issue the alleged fraudulent electronic wire transmissions on a daily basis during the Relevant Period, including during each of the specific Manipulation Times.

415. ~~Plaintiffs are informed and believe and thereon allege that some~~Some of the alleged wire transmissions contained, without limitation, fraudulent solicitations of Plaintiffs' bitcoin deposits and trading commissions using a laundry list of misrepresentations, half-truths and omissions, electronic orders designed to create artificial prices on U.S.-based "reference" exchanges in order to trigger liquidations of Plaintiffs' positions on BitMEX and confiscation of Plaintiffs' bitcoins, electronic orders designed to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. These alleged wire transmissions were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market. The false and misleading information injected by Defendants into the markets was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin Perpetual Swap or spot bitcoin at times, prices

and quantities that they otherwise would likely not have traded. Moreover, the alleged wire transmissions further contained, without limitation, electronic orders designed to induce artificial price moves in the cryptocurrency markets in order to force liquidations of traders' positions on the BitMEX exchange for the benefit of Defendants' Insurance Fund. In addition, the electronic wire transmissions included Defendants' electronic commands to deliberately freeze servers of the BitMEX platform and Defendants' electronic commands to generate the fraudulent system

overload messages alleged hereinabove. Finally, the electronic wire transmissions included Defendants' fraudulent transmissions regarding the fake hardware failure in BitMEX's servers as well as the fake distributed denial-of-service attack (DDoS attack), which took place on or about March 13, 2020.

416. Plaintiffs are informed and believe and thereon allege that pumps and dumps, Barts, liquidation cascades and spoofing alleged hereinabove are specific examples of the conduct that was specifically designed by Defendants, and each of them, to mislead Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other traders on the cryptocurrencies market.

417. Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other traders were in fact ~~mislead~~misled by Defendants', and each of them, manipulative and fraudulent acts intended to mislead and defraud, including, without limitation, by pumps and dumps, Barts and spoofing perpetrated by Defendants, and each of them, and placed orders that they would not have otherwise placed.

418. Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan, at the time of the alleged manipulative and fraudulent acts intended to mislead and defraud, including fraudulent solicitations by wire as alleged in Paragraphs ~~484~~496-~~571~~590 below, which were perpetrated by Defendants, and each of them, and at the time Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan took the trades herein alleged, were ignorant of the manipulative and fraudulent nature of conduct of the Defendants, and each of them, and believed that the apparent market conditions were in fact dictated by market forces of supply and demand and not the result of false information being injected into the markets by Defendants.

419. Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan, at the time the alleged manipulative and fraudulent acts intended to mislead and defraud were made by Defendants, and each of them, and at the time Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan took the actions herein alleged, were ignorant of secret intentions of Defendants, and each of them, to mislead and defraud Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan and other traders and Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan could not, in the exercise of reasonable

diligence, have discovered the secret intentions of Defendants, and each of them.

420. Had Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan known the actual facts, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan would not have taken such alleged actions.

421. If Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan had known of the actual intention of Defendants, and each of them, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan would not have taken the alleged trades. Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan's reliance on fraudulent and manipulative conduct of Defendants, and each of them, was justified because Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan rightfully assumed that the market conditions of spot bitcoin and bitcoin derivatives markets were due to the actual market forces of supply and demand.

422. The predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating cryptocurrency markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics. For example, the numerous wire transmissions containing fraudulent solicitations from Defendants to Plaintiffs alleged herein were all related because they had similar purposes, results, Defendants –

participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

423. ~~Plaintiffs are informed and believe and thereon allege that~~The predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, including engaging in wire transmissions containing fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely ~~two~~three years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

424. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants' hereinabove alleged use of the electronic wire signals to fraudulently solicit and defraud Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other market participants in violation of 18 U.S.C. § 1343 directly and proximately resulted in the substantial monetary cryptocurrency trading commissions damages, bitcoin loss of use damages and trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

425. Plaintiffs are informed and believe and thereon allege that Defendants, and each of

them, used at least a portion of the proceeds derived from wire fraud in violation of 18 U.S.C. § 1343 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged herein.

### DEFENDANTS ENGAGED IN INTERSTATE TRANSPORTATION OF STOLEN FUNDS IN VIOLATION OF THE NATIONAL STOLEN PROPERTY ACT 18 U.S.C. § 2314

426. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

427. 18 U.S.C. § 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined under this title or imprisoned not more than ten years, or both."

428. ~~Plaintiffs are informed and believe and thereon allege that, during~~During the Relevant Period, Defendants, and each of them, willfully and knowingly transmitted and transferred in interstate or foreign commerce cryptocurrency, including, without limitation, bitcoin and stablecoins, knowing that the transferred cryptocurrency was converted or taken by fraud from Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders as the result of fraudulent market manipulation as alleged hereinabove.

429. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants, and each of them, knowingly transferred and transmitted, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times, proceeds of the alleged illegal fraudulent solicitations and/or bitcoin Perpetual Swap contracts price manipulation from manipulation winner accounts as well as other accounts on BitMEX cryptocurrency exchange to accounts on other cryptocurrency exchanges, including, without limitation, "reference" exchanges Coinbase Pro, BitStamp and Kraken, ~~as well as~~and/or cryptocurrency off-ramp exchanges and OTC trading desks for subsequent conversion of the ill-gotten bitcoins into fiat currencies, including United States dollars and Hong Kong dollars. Moreover, Defendants, and each of them, knowingly transferred

and transmitted, in interstate or foreign commerce, on or about July 9, 2019, at least $900,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Unknown Exchange to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States. Furthermore, Defendants, and each of them, transferred and transmitted, in interstate or foreign commerce, on or about August 16, 2019, at least $1,425,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Unknown Exchange to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States. The specific purpose of the transfers of funds alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and control.

430. Coinbase Pro and Kraken are located in California, while BitStamp is located in New York City, New York. The transferred proceeds were converted or taken by fraud by

Defendants from Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders as the result of the fraudulent solicitations and market manipulation as alleged hereinabove. The Defendants were fully aware of the true nature of the transferred proceeds.

431. For example, the effective transmissions of the proceeds of the fraudulent solicitations and/or winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants as described herein constitutes a violation of 18 U.S.C. § 2314. The Defendants were fully aware of the nature of the transferred funds and that such funds were taken by fraud from Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders.

432. Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 2314, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

433. Plaintiffs are informed and believe and thereon allege that The predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating cryptocurrency

markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

434. ~~Plaintiffs are informed and believe and thereon allege that~~The predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

435. ~~Plaintiffs are informed and believe and thereon allege that~~Defendants', and each of them, alleged transfer of proceeds of the alleged illegal

fraudulent solicitations as well as bitcoin Perpetual Swap contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, in violation of 18 U.S.C. § 2314, enabling Defendants, and each of them, to engage in further market manipulation, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

436. Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the proceeds derived from the interstate transportation of stolen funds in violation of 18 U.S.C. § 2314 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged herein.

### DEFENDANTS ENGAGED IN INTERSTATE AND FOREIGN TRAVEL OR TRANSPORTATION IN AID OF RACKETEERING ENTERPRISE IN VIOLATION OF 18 U.S.C. § 1952

437. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

438. 18 U.S.C. § 1952 provides that "[w]hoever travels in interstate or foreign

commerce or uses the mail or any facility in interstate or foreign commerce, with intent to (1) distribute the proceeds of any unlawful activity; ... or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform—(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both."

439. ~~Plaintiffs are informed and believe and thereon allege that, during~~During the Relevant Period, Defendants Hayes, Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to distribute the proceeds of an unlawful activity, namely <u>fraudulent solicitations and</u> market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendants Hayes, Delo and Reed violated 18 U.S.C.

§ 1952.

440. ~~Plaintiffs are informed and believe and thereon allege that, during~~<u>During</u> the Relevant Period, Defendants Hayes, Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity namely <u>fraudulent solicitations and</u> market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendants Hayes, Delo and Reed violated 18 U.S.C. § 1952.

441. ~~Plaintiffs are informed and believe and thereon allege that, during~~<u>During</u> the Relevant Period, Defendant Reed ~~and Agata Reed, and each of them,~~ willfully and knowingly traveled between Wisconsin and Massachusetts with intent to distribute and reinvest in United States real estate property situated in Norwell, MA 02061 at least $1,425,000 of the proceeds of an unlawful activity, namely <u>fraudulent solicitations and</u> market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendant Reed violated 18

U.S.C. § 1952.

442. ~~Plaintiffs are informed and believe and thereon allege that, during~~During the Relevant Period, Defendant Reed willfully and knowingly traveled between Wisconsin and Massachusetts with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity namely <u>namely fraudulent solicitations and</u> market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendant Reed violated 18 U.S.C. § 1952.

443. Therefore, Defendants Hayes, Delo and Reed, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1952, which further constitute the predicate acts of the Defendants Hayes, Delo and Reed, and each of them, racketeering activity.

444. ~~Plaintiffs are informed and believe and thereon allege that~~<u>The</u> predicate acts alleged herein, namely engaging in interstate and foreign travel

or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and omissions, manipulating cryptocurrency markets on BitMEX and "reference" exchanges, using at least some of the proceeds of fraudulent solicitations to manipulate prices of Perpetual Swap contracts on BitMEX and "reference" exchanges, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

445. ~~Plaintiffs are informed and believe and thereon allege that~~The predicate acts alleged herein, namely engaging in interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely ~~two~~three years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

446. ~~Plaintiffs are informed and believe and thereon allege that~~ Defendants', and each of them, alleged interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, enabling Defendants, and each of them, to benefit from and

continue the fraudulent solicitations and market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as alleged hereinbelow.

### SPECIFIC TIMES OF MARKET MANIPULATION BY DEFENDANTS

447. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

448. As alleged in the Paragraphs above, the automated software tools developed by BitMEX and operated by the Insider Trading Desk, which used highly sensitive and confidential information about traders and their open positions and orders on BitMEX, automatically

manipulated cryptocurrency prices on BitMEX and its United States based "reference" exchanges, by using helper accounts on United States based "reference" spot exchanges Kraken, Coinbase and BitStamp, to place large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT index price and .BETH index price on a daily basis[15], resulting in liquidation of retail traders and profit for BitMEX, including, on information and belief and without limitation, the following specific manipulation times ("Manipulation Times")[16]:

|  | **From** | **To** |
|---|---|---|
| 1. | 7AM UTC on November 14, 2018 | 12AM UTC on November 15, 2018 |
| 2. | 12AM UTC on November 19, 2018 | 9AM UTC on November 20, 2018 |
| 3. | 4PM UTC on November 24, 2018 | 11PM UTC on November 25, 2018 |
| 4 | 6AM UTC on December 24, 2018 | 12AM UTC on December 25, 2018 |
| 5. | 4AM UTC on January 10, 2019 | 8PM UTC on January 10, 2019 |
| 6. | 12AM UTC on April 2, 2019 | 12PM UTC on April 2, 2019 |
| 7. | 2AM UTC on May 17, 2019 | 4AM UTC on May 17, 2019 |
| 8. | 7PM UTC on June 26, 2019 | 12AM UTC on June 27, 2019 |
| 9. | 4AM UTC on July 14, 2019 | 12AM UTC on July 15, 2019 |
| 10. | 4AM UTC on September 22, 2019 | 4PM UTC on September 26, 2019 |
| 11. | 12AM UTC on November 18, 2019 | 12AM UTC on November 20, 2019 |
| 12. | 4AM UTC on March 12, 2020 | 4AM UTC on March 13, 2020 |
| 13. | 9PM UTC on July 27, 2020 | 2AM UTC on July 28, 2020 |

[15] ~~These allegations are based on the very detailed information about the daily operations of the Insider Trading Desk recently provided by the former employees of Defendants as described in detail above.~~

[16] During those specific times, high volume market orders were executed on one or more "reference" exchanges during a short period of time, amounting to a relatively large fraction of the corresponding exchange's regular daily volume. Such trades would normally result in a financial loss for the trader, unless they were used with the purpose of profiting on BitMEX. Because traders trading millions of dollars are very sophisticated, these market orders were used for purposes of market manipulation on BitMEX. This forms the basis for Plaintiffs' belief as to

the specific manipulation dates and times listed in the table.

| 2. | 12AM UTC on November 19, 2018 | 9AM UTC on November 20, 2018 |
| 3. | 4PM UTC on November 24, 2018 | 11PM UTC on November 25, 2018 |
| 4 | 6AM UTC on December 24, 2018 | 12AM UTC on December 25, 2018 |
| 5. | 4AM UTC on January 10, 2019 | 8PM UTC on January 10, 2019 |
| 6. | 12AM UTC on April 2, 2019 | 12PM UTC on April 2, 2019 |
| 7. | 2AM UTC on May 17, 2019 | 4AM UTC on May 17, 2019 |
| 8. | 7PM UTC on June 26, 2019 | 12AM UTC on June 27, 2019 |
| 9. | 4AM UTC on July 14, 2019 | 12AM UTC on July 15, 2019 |
| 10. | 4AM UTC on September 22, 2019 | 4PM UTC on September 26, 2019 |
| 11. | 12AM UTC on November 18, 2019 | 12AM UTC on November 20, 2019 |
| 12. | 4AM UTC on March 12, 2020 | 4AM UTC on March 13, 2020 |
| 13. | 9PM UTC on July 27, 2020 | 2AM UTC on July 28, 2020 |
| 14. | 12AM UTC on August 2, 2020 | 6AM UTC on August 2, 2020 |

449. Additional and other facts regarding Defendants' market manipulation activities are hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled. Plaintiffs reserve the right to amend or supplement the above list of Manipulation Times after he receives discovery from Defendants.

## SPECIFIC LOCATIONS AND TIMES OF RICO OVERT ACTS OF DEFENDANTS

450. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

451. RICO overt acts perpetrated by Defendants are described in the table below. All of those overt acts take place either on United States based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken or on BitMEX itself, which has the majority of cloud service providers (Paragraph 98), employees (Paragraph 115), engineering and software development team and the nerve center of operations in this District. The below table has been prepared based on

information and belief of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan, which belief was formed based on public records, public Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, ~~information provided by former employees of Defendants~~ and crypto market data analysis:

| RICO Overt Act | RICO Conduct Involved | Place of Conduct |
|---|---|---|
| 1 ~~1~~ | Defendants transmitting electronic ~~wire signals to inject false~~ information as to market forces of ~~supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated (e.g. first leg of a Bart, see paragraphs 142-144, 153, 317-330)~~ | This District (BitMEX, having the majority of ~~This District (BitMEX, having the majority of~~ cloud service providers (Paragraph 98), employees (Paragraph 115), engineering and ~~software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States~~ |
| | supply and demand into ~~Plaintiffs entered into~~ cryptocurrency markets and mislead traders to open unfavorable ~~trading positions by executing BUY MARKET orders, after being misled by false market forces information injected by Defendants~~ | software development team and the nerve center ~~This District (BitMEX, having the majority of cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center~~ of operations in this District); BitStamp, Coinbase Pro and Kraken, ~~also~~all located in ~~this District~~the |
| ~~2~~ | ~~Defendants electronically transferring (depositing) funds to be used for manipulation into helper account(s)~~ | ~~BitStamp, Coinbase Pro and Kraken, all located in the United States~~ |
| ~~3~~ | ~~Defendants transmitting electronic wire signals to deliberately move BitMEX's .BXBT index price by placing large market orders SELL MARKET NN with maximum slippage from the helper accounts on three illiquid exchanges spot used by BitMEX to calculate its~~ | ~~BitStamp, Coinbase Pro and Kraken, all located in the United States~~ |
| | trading positions to be subsequently liquidated (e.g. first 330) | United States |

| | | |
|---|---|---|
| | ~~Liquidation cascade that resulted in some of Plaintiff's damages due to liquidation of Plaintiff's XBTUSD Swap positions takes place, directly and proximately caused by the deliberate .BXBT index price move orchestrated by Defendants~~<u>Plaintiffs entered into unfavorable trading</u> | This District (BitMEX, having the majority of ~~cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District) and Kraken, also located in this District~~ |
| 4 | ~~Defendants transmitting electronic~~ | ~~This District (BitMEX, having the majority of~~ |

| | positions by executing BUY MARKET orders, after being misled by false market forces information injected by Defendants | cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District) and Kraken, also located in this District |
|---|---|---|
| 2 | Defendants electronically transferring (depositing) funds to be used for manipulation into helper account(s) | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 3 | Defendants transmitting electronic wire signals to deliberately move BitMEX's .BXBT index price by placing large market orders SELL MARKET NN with maximum slippage from the helper accounts on three illiquid exchanges spot used by BitMEX to calculate its | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| | Liquidation cascade that resulted in some of Plaintiff's damages due to liquidation of Plaintiff's XBTUSD Swap positions takes place, directly and proximately caused by the deliberate .BXBT index price move orchestrated by Defendants | This District (BitMEX, having the majority of cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District) and Kraken, also located in this District |
| 4 | Defendants transmitting electronic wire signals to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX, using BUY LIMIT orders | This District (BitMEX, having the majority of cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District) |
| 5 | Defendants transmitting electronic wire signals to freeze BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during Manipulation Times | This District, where all three site reliability engineers of BitMEX, who were responsible for the BitMEX trading platform uptime and who personally perpetrated the server freezes, were located |
| 6 | Defendants electronically transferring (withdrawing) funds from winner account(s) into bitcoin wallet | This District (BitMEX, having the majority of cloud service providers (Paragraph 98), employees, engineering and software development team and the nerve center of operations in this District) |
| 7 | Defendants transmitting electronic wire signals to convert proceeds of market manipulation into fiat (legal tender) currencies | BitStamp, Coinbase Pro and Kraken, all located in the United States |

| 8. | Defendant Reed reinvesting ~~converted proceeds of market manipulation and money laundering into United States real estate.~~ | Wisconsin and Massachusetts |

| | converted proceeds of market manipulation and money laundering into United States real estate. |
|---|---|

452. A summary of alleged RICO predicates perpetrated by Defendants is provided in the table below, which was prepared in accordance with information and belief of Plaintiffs. All of those predicates also took place either on United States based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken and on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District:

| RICO Predicate | RICO Overt Acts | Place of Conduct |
|---|---|---|
| 18 U.S.C. § 1960 ~~Unlicensed Money Transmissions~~ | 2, 3, 4, 5, 6, ~~7~~ | This District (BitMEX, having the majority of cloud service ~~providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States~~ |
| Unlicensed Money Transmissions | 7 | providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 1956 ~~Money Laundering~~ | 2, 3, 4, 5, 6, ~~7~~ ~~8~~ | This District (BitMEX, having the majority of cloud service ~~providers, employees, engineering and software development team and the nerve center of operations in this District);~~ |
| Money Laundering | ~~7~~ 8, | providers, employees, engineering and software development team and the nerve center of operations in this District); |

| | | |
|---|---|---|
| | | BitStamp, Coinbase Pro and Kraken, all located in the United ~~States, Wisconsin and Massachusetts~~ <u>States, Wisconsin and Massachusetts</u> |
| 18 U.S.C. § 1957<br><br>Money Laundering | 2, 3, 4, 5, 6, 7, 8 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District);<br><br>BitStamp, Coinbase Pro and Kraken, all located in the United States, Wisconsin and Massachusetts |
| 18 U.S.C. § 1343<br><br>Wire Fraud | 1, 2, 3, 4, 5, 6, 7 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District);<br><br>BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 2314<br><br>Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District);<br>BitStamp, Coinbase Pro and Kraken, all located in the United States |

453. Additional and other facts regarding Defendants' RICO overt acts are hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and

control. To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled. Plaintiffs accordingly reserve the right to supplement and amend these allegations of RICO overt acts, if appropriate or necessary, following completion of relevant fact discovery.

454. A summary of certain specific times of each of the alleged RICO predicates perpetrated by Defendants is provided in the table below. The below table has been prepared based on information and belief of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan, which belief was formed based on public records, public Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data analysis:

| RICO Predicate | RICO Overt Acts | | Defendants Involved in RICO Predicate | Dates When Each RICO Predicate Occurred |
|---|---|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2 2,3,4,5,6, 7 | 3, 4, 5, 6, | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;<br>b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018;<br>c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018<br>d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018;<br>e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2019;<br>f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019;<br>g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019;<br>h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;<br>i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;<br>j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 |

| | | | | l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
|---|---|---|---|---|
| 18 U.S.C. § 1956 Money Laundering | 2 7. | 3, 4, 5, 6, 8 | HDR, ABS, Hayes, Delo, Reed, Grape | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; |

| | | | | |
|---|---|---|---|---|
| ~~Transmissions~~ | | | Park, Mark Sweep | 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2019; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. July 7, 2019; ~~i~~j. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; ~~j~~k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 ~~k~~l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 ~~l~~m. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; ~~m~~n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and ~~n~~o. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § ~~1956~~ 1957 Money Laundering | | 2, 3, 4, 5, 6, 7, 8 | HDR, ABS, Hayes, Delo, Reed, Grape Park, Mark Sweep | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2019; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. July 7, 2019; j. 4AM UTC on July 14, 2019 to 12AM |

|  |  |  |  | UTC on July 15, 2019;<br>k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019<br>m. 4AM UTC on March 12, 2020 to 4AM<br>UTC on March 13, 2020;<br>n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and<br>o. 12AM UTC on August 2, 2020 to 6AM<br>UTC on August 2, 2020. |
| --- | --- | --- | --- | --- |

| 18 U.S.C. § ~~1957~~1343 <br> Wire <br> Fraud~~Money Laundering~~ | ~~2,~~ 7, | ~~3~~1 4 ~~5~~ , 2, 3, ~~86~~ 7 , | ~~6~~4, | 5, | HDR, ABS, Hayes, Delo, Reed, ~~Grape Park, Mark Sweep~~ | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to ~~9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to~~ |
|---|---|---|---|---|---|---|
| | | | | | | <u>9AM UTC on November 20, 2018;</u> |
| | | | | | | 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2019; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; ~~i. July 7, 2019;~~ ~~j~~i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; ~~k~~j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 ~~l~~k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 ~~m~~l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; ~~n~~m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and ~~o~~n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § ~~1343~~2314 ~~Wire Fraud~~Transportation of Stolen Property | ~~1,~~ 6, | 2, 3, 4, 5, 7 | | 6, | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to <u>9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to</u> |
| | | | | | | ~~9AM UTC on November 20, 2018;~~ |
| | | | | | | 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to |

8PM
UTC on January 10, 2019;
f. 12AM UTC on April 2, 2019 to 12PM
UTC on April 2, 2019;
g. 2AM UTC on May 17, 2019 to 4AM
UTC on May 17, 2019;
h. 7PM UTC on June 26, 2019 to 12AM
UTC on June 27, 2019;
i. 4AM UTC on July 14, 2019 to 12AM
UTC on July 15, 2019;
j. 4AM UTC on September 22, 2019 to
4PM UTC on September 26, 2019
k. 12AM UTC on November 18, 2019 to
12AM UTC on November 20, 2019
l. 4AM UTC on March 12, 2020 to 4AM
UTC on March 13, 2020;
m. 9PM UTC on July 27, 2020 to 2AM
UTC on July 28, 2020; and

| | | | n. 12AM UTC on August 2, 2020 to 6AM |
|---|---|---|---|

U T C   o n   A u g u s t   2 ,   2 0 2 0 .

| | | | n. 12AM UTC on August 2, 2020 to 6AM |
|---|---|---|---|
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; 11PM UTC on November 25, 2018; 12AM UTC on December 25, 2018; UTC on January 10, 2019; UTC on April 2, 2019; UTC on May 17, 2019; UTC on June 27, 2019; UTC on July 15, 2019; 4PM UTC on September 26, 2019 12AM UTC on November 20, 2019 UTC on March 13, 2020; UTC on July 28, 2020; and UTC on August 2, 2020. |

455. Additional and other facts regarding Defendants' RICO overt acts and their timing are hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled. Plaintiffs accordingly reserve the right to supplement and amend these allegations of RICO overt acts and their timing, if appropriate or necessary, following completion of relevant fact discovery.

456. The individual Roles of all Defendants with respect to RICO predicates alleged in the Paragraphs above are incorporated by reference herein.

456. The individual roles of all Defendants with respect to RICO predicates are summarized in the below table, prepared according to information and belief of Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan, which belief was formed based on public

records, public Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data

analysis:

| Defendant | Role of Defendant |
|---|---|
| HDR | Defendant HDR is a holding company. Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Defendant Reed. Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. |
| ABS | |
| Hayes | Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and effectuating the market manipulation, including, without limitation deliberate |

server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom software programs and scripts for performing market manipulation and implementing server freezes. Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise. In addition, Defendant

Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund. In addition, Defendant Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them,

Delo

and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

Reed was responsible for, among other things, developing automated software tools for use by Insider Trading Desk for accessing highly sensitive BitMEX trader information and using this information for manipulating BitMEX markets and markets on the reference exchanges Kraken, Coinbase Pro and BitStamp, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based reference spot exchanges Kraken, Coinbase Pro and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202. Reed was further responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof. In addition, Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and his

Reed

accomplice Delo and was indispensable to the achievement of the
Enterprise's goals of maximizing profits and minimizing trading losses for
the Defendants, and each of them, and their co-conspirators, through unlawful
trading practices, including market manipulation, concealing trading gains
obtained through unlawful practices from regulatory and tax authorities
using, without limitation, money laundering, generating illicit income from
unlicensed money transmissions, promoting and enhancing the racketeering
conspiracy and the activities of the Defendants, and each of them, and their
co-conspirators and concealing the unlawful activities of the Defendants, and
each of them, and their co-conspirators from scrutiny by cryptocurrency
exchanges and law enforcement.

457. Additional and other facts regarding Defendants' rolesRoles in the
Enterprise are hidden from Plaintiffs at this time. Such information is
uniquely within Defendants' possession, custody and control. To date, Defendants provided
absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery
requests, which Defendants stonewalled. Plaintiffs accordingly reserve the right to supplement
and amend these allegations of Defendants' rolesRoles in the Enterprise, if appropriate or
necessary, following completion of relevant fact discovery.

458. Certain specific electronic wire communications alleged herein are summarized in the
following table, prepared based on information and belief of Plaintiffs BMA, Kolchin, Dubinin,
Dolgov and Razvan, which belief was formed based on public records, public Court records, U.S.
DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information
provided by former employees of Defendants and crypto market data analysis:

| Type of Comm. | Date | From | To | Content or Purpose of Communication |
|---|---|---|---|---|
| Wire | 11/14/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer |

| | | | | |
|---|---|---|---|---|
| | | | | commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/14/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders (BUY MARKET NN) to automated software tools developed by BitMEX to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 11/14/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Trading orders (BUY MARKET NN) to automated software tools developed by BitMEX to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated. |
| Wire | 11/14/2018 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for automated software tools developed by BitMEX for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken, see Paragraphs 153-155, 164, 336-348. |
| Wire | 11/14/2018 | Reed | Kraken (San | Electronic computer instruction to execute large market trading |

| | | (Wisconsin) | Francisco) | order (SELL MARKET NN) on BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price.automated software tools |
|---|---|---|---|---|

| | | (Wisconsin) | Francisco) | developed by BitMEX to execute large market trading order (SELL MARKET NN) on BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price. |
|---|---|---|---|---|
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/14/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 11/14/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | ~~Computer instruction to~~ Computer instruction to automated software tools developed by BitMEX to electronically transfer (withdraw) funds from winner |

| | | | | account(s) into bitcoin wallet. |
|---|---|---|---|---|
| Wire | 11/14/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |

| | | | | account(s) into bitcoin wallet. |
|---|---|---|---|---|
| Wire | 11/14/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction to automated software tools developed by BitMEX for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction to automated software tools developed by BitMEX to execute trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction to automated software tools developed by BitMEX for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
| Wire | 11/24/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency ~~markets and mislead traders to~~ |

| | | | | open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
|---|---|---|---|---|
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Electronic computer instruction to execute large market trading order (SELL |

| | | | | markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
|---|---|---|---|---|
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | ~~helper account with maximum~~ Electronic computer instruction to automated software tools developed by BitMEX to execute large market trading order (SELL MARKET NN) on BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price. |
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate ~~trader accounts.~~ |

| | | | | trader accounts. |
|---|---|---|---|---|
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | ~~Computer instruction to~~ Computer instruction to automated software tools developed by BitMEX to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 11/25/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction to automated software tools developed by BitMEX to for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/25/2018 | Hayes (New York) | Coinbase (San Francisco) | ~~Trading~~Computer instruction to automated software tools developed by BitMEX to execute trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/25/2018 | Hayes (New | Coinbase (San | Instruction to automated software tools developed by BitMEX to for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading |

| | | York) | Francisco) | Limited, |
|---|---|---|---|---|
| | | | | |

| | | | | ~~Trading Limited,~~ ABS Global Trading Limited, Hayes, Delo and Reed. |
|---|---|---|---|---|
| Wire | 5/16/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 5/16/2019 | Reed (Wisconsin) | BitStamp (Denver) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 5/16/2019 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction to automated software tools developed by BitMEX to for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on BitStamp. |
| Wire | 5/17/2019 | Reed (Wisconsin) | BitStamp (Denver) | Electronic computer instruction to automated software tools developed by BitMEX to execute large market trading order (SELL MARKET NN) on BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX .BXBT index price. |

| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to ~~exacerbate the price move.~~ |

| | | | | exacerbate the price move. |
|---|---|---|---|---|
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |

| | | | | ~~liquidation engine to liquidate trader accounts.~~ |
|---|---|---|---|---|
| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to ~~executed~~ automated software tools developed by BitMEX to automatically execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | ~~Computer instruction to~~ Computer instruction to automated software tools developed by BitMEX to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 5/17/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction to automated software tools developed by BitMEX for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. |

| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
|------|-----------|------------------|--------------------------|-------------|
| Wire | 7/3/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $900,000 of converted proceeds of money laundering to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States. |
| Wire | 7/3/2019 | Reed (Wisconsin) | Vilas Title Service Inc., | Electronic escrow instructions for reinvesting $900,000 of |

| | | | | |
|---|---|---|---|---|
| Wire | 7/3/2019 | Reed (Wisconsin) | Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States | Electronic escrow instructions for reinvesting $900,000 of converted proceeds of money laundering into Real Estate Property 1. |
| Wire | 7/3/2019 | Barbara Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/3/2019 | Trace L.Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 7/14/2019 | Reed | BitStamp | Trading orders (BUY MARKET |

| Wire | 7/14/2019 | Reed (Wisconsin) | BitStamp (Denver) | Trading orders (BUY MARKET NN) to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see Paragraphs 153-155, 164, 336-348. |
| Wire | 7/14/2019 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) ether funds to be used for manipulation into a helper account on BitStamp. |
| Wire | 7/14/2019 | Reed | BitStamp | Electronic computer instruction |

| Wire | 7/14/2019 | Reed (Wisconsin) | BitStamp (Denver) | Electronic computer instruction to automated software tools developed by BitMEX to execute large market trading order (SELL MARKET NN) on ETH/USD order book from helper account with maximum slippage to deliberately move BitMEX .BETH index price. |
|---|---|---|---|---|
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to executedsoftware tools developed by BitMEX to automatically execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX. |

| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to automated software tools developed by BitMEX to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
|------|-----------|------------------|----------------------------|-----------|
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | ~~Computer instruction to~~ Computer instruction to automated software tools developed by BitMEX to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 7/14/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to automated software tools developed by BitMEX to convert bitcoin proceeds of market manipulation into United States dollars. |
| ~~Wire~~ | ~~7/14/2019~~ | ~~Hayes (New~~ | ~~Coinbase (San~~ | ~~Instruction for electronically~~ |

| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
|------|-----------|------------------|--------------------------|------------------------------------------------------------------|
| Wire | 8/16/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $1,425,000 of converted proceeds of market manipulation to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States. |
| Wire | 8/16/2019 | Reed (Wisconsin) | Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States | Electronic escrow instructions for reinvesting $1,425,000 of converted proceeds of money laundering into Real Estate Property 2. |

| Wire | 08/29/2019 | Agata Reed (Massachusetts) | Secretary of the State of Delaware | Order to form Grape Park LLC and to add an officer Agata Maria Reed with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
|------|------------|----------------------------|-----------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Wire | 11/20/2019 | Reed (Wisconsin) | Agata Reed (Massachusetts) | Instructions to form Grape Park LLC in Massachusetts, a branch of Grape Park LLC, with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
| Wire | 11/20/2019 | Agata Reed (Massachusetts) | Secretary of the Commonwealth of Massachusetts | Order to form Grape Park LLC and to add an officer Agata Maria Reed with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |

| | | | | |
|---|---|---|---|---|
| | | | | ~~location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts.~~ |
| Wire | 3/12/2020 | Hayes (New York) | Reed (Wisconsin) | Direction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |
| Wire | 3/12/2020 | Reed (Wisconsin) | Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna (San Francisco) | Instruction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |

459. Plaintiffs are informed and believe and thereon allege that the electronic wire

transmission alleged in the previous Paragraph were repeated by Defendants, almost exactly, during other Manipulation Times.

460. Additional and other facts regarding Defendants' fraudulent wire communications are hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control. To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled. Plaintiffs accordingly reserve the right to supplement and amend these allegations of Defendants' fraudulent wire communications, if appropriate or necessary, following completion of relevant fact discovery.

## MARKET MANIPULATION EVENT ON AUGUST 2, 2020 AND DELETION OF EVIDENCE THEREOF BY DEFENDANTS

461. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

462. Bitcoin suffered a price drop of $1,500 within few minutes on Sunday, August 2, 2020. The sudden slide caught many traders off guard, liquidating nearly $1.4 billion worth of positions across major exchanges. The price drop triggered $144 million worth of sell

liquidations or forced closure of long positions on BitMEX.



463. Shortly after the crash, on August 2, 2020, at 8:44PM EDT, a brand new account suddenly popped up on the number one spot on the BitMEX Leaderboard showing nearly $120,000,000 in profit. Plaintiffs are informed and believe and thereon allege that the aforesaid

Leaderboard account was the winner account of Defendants Hayes, Delo and Reed, which was used by said Defendants to capture the manipulation winnings induced by said Defendants placing large market orders with maximum slippage from helper accounts on United States based exchanges Kraken, Coinbase Pro and Kraken to deliberately move the .BXBT index price, which resulted in the aforesaid August 2, 2020, $1,500 bitcoin price crash and the $144 million worth of sell liquidations of BitMEX Perpetual Swap contracts, which are priced based on the aforesaid .BXBT index price manipulated by Defendants.



Bitcoin Market Manipulation Event On August 2, 2020. Perpetrators Crashed Bitcoin Price By $1,500 In Minutes Resulting in $150,000,000 Liquidations Of Trader Positions on BitMEX

464. The aforesaid evidence of the winner manipulation account on BitMEX was deleted by Defendants just one hour later, at 9:45PM EDT. Plaintiffs are informed and believe and thereon allege that the aforesaid Leaderboard account was accidentally listed on the BitMEX Leaderboard and then, upon discovery, immediately deleted by Defendants, who tried to cover up their market manipulation acts and destroy relevant evidence. Plaintiffs are informed and believe

and thereon allege that the aforesaid amount of $120,000,000 in the winner account was Defendants' profit from perpetrating the aforesaid bitcoin market manipulation event of August 2, 2020.

465. Plaintiffs are informed and believe and thereon allege that the second highest ranked BitMEX Leaderboard account Quick-Grove-Mind with almost $100,000,000 profit is also a manipulation winner account of the Defendants that was used to capture market manipulation profits. The multimillion-dollar profit gains in that account exactly match the known bitcoin market manipulation events that took place on or about September 24, 2019, November 18-19, 2019 and March 11-12, 2020, when the .BXBT index price of bitcoin was manipulated by Defendants by placing large sell market orders on United States based Kraken, Coinbase Pro and BitStamp "reference" exchanges, the pricing data from which is used in the .BXBT index calculation, based on which the BitMEX Perpetual Swap contract traded by Plaintiffs is priced, in order to intentionally liquidate BitMEX retail traders, including Plaintiffs. Notably, this manipulation winner account also miraculously avoided any and all trading losses, posting only multimillion-dollar market manipulation gains.

466. Below is an actual photograph, publicly released by Defendant Hayes, depicting a



meeting of co-conspirators (a.k.a. "BitMEX Mafia") in furtherance of the Racketeering

Conspiracy orchestrated by Defendants as alleged herein. All individual Defendants were present in the photographed meeting of co-conspirators of the Racketeering Conspiracy and their faces are marked with red ovals in the above photograph. As shown in the photograph, Agata Reed was also present during the meeting of co-conspirators of the Racketeering Conspiracy and took part in the Racketeering Conspiracy.

467. One of the purposes of the Racketeering Conspiracy was to manipulate bitcoin spot prices on "reference" spot exchanges Kraken, BiStamp and Coinbase Pro in order to profit through large derivatives perpetual swap positions on BitMEX using anonymous trading accounts provided by Defendants-co-conspirators Hayes, Delo and Reed through the BitMEX platform. Shortly after the above photograph of the meeting of the co-conspirators was taken, and in furtherance of the Racketeering Conspiracy, the co-conspirator marked in the above photograph with a red arrow, who was a notorious and habitual market manipulator with a real name Ben and



an alias ActualAdviceBTC, and who will be referred to herein as Ben Aabtc, was knowingly and willfully assisted, encouraged, enabled and aided and abetted by Defendants-co-conspirators Hayes, Delo and Reed in opening a large $30,873,844 Perpetual Swap position in his anonymous "winner" account on BitMEX in disregard of all BitMEX position limits and limits imposed by CFTC regulations.

468. As well-documented, in furtherance of the Racketeering Conspiracy, Defendants'



co-conspirator Ben Aabtc subsequently proceeded to artificially "pump" bitcoin spot markets on "reference" spot exchanges used by BitMEX for price discovery "with all the force he had" from about $6,800 on April 8, 2018 to about $9,948 on May 4, 2018, in order to create artificially high bitcoin spot prices and profit from his $30,873,844 Perpetual Swap position on BitMEX, which used the bitcoin spot price as a reference, while being assisted, aided, abetted and encouraged by Defendants-co-conspirators Hayes, Delo and Reed.

469. The fact that, in furtherance of the Racketeering Conspiracy, Ben Aabtc "pumped" bitcoin market price from $6,800 to about $9,948 on "reference" spot exchanges while maintaining an open $30,873,844 Perpetual Swap position in his winner account on BitMEX is



well documented and this is a classic example of cross-market manipulation in violation of 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a), 18 U.S.C. § 2314, 7 U.S.C. § 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019).

**TheBoot**
@TheBootMex

RIP @ActualAdviceBTC . You are always in my memory-back in April 2018 I was ultra rekt left with only 0.6btc followed by best winning streak ever - went from 0.6 to 60btc in 10 days. At the time aabtc was trying to pump the market with all the force he had. I bought in and...

3:21 PM · May 19, 2020 · Twitter Web App



470. Ben Aabtc himself "documented position sizes upwards of $30 million on BitMEX," during his artificial "pump" manipulation of the spot bitcoin prices on "reference" exchanges. After this manipulation was successful, Ben Aabtc pocketed at least 534.3253

bitcoins in illegal cross-market manipulation profits, now valued at over $21,373,012.

471. In furtherance of the Racketeering Conspiracy, Defendants-co-conspirators Hayes,

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Hot-Relic-Fancier | 4,196.9329 XBT | ✗ |
| 2 | Heavy-Autumn-Wolf | 3,596.7630 XBT | ✗ |
| 3 | Green-Sky-Whip | 1,101.4551 XBT | ✗ |
| 4 | Cream-Whine-Ox | 906.6117 XBT | ✗ |
| 5 | Thorn-Moor-Braid | 878.7421 XBT | ✗ |
| 6 | Xzcxcxz | 828.6553 XBT | ✓ |
| 7 | Silent-Plume-Otter | 669.8737 XBT | ✗ |
| 8 | Truth-Bitter-Runner | 586.5175 XBT | ✗ |
| 9 | Almond-Cookie-Soarer | 541.1664 XBT | ✗ |
| 10 | aabtc | 534.3252 XBT | ✓ |
| 11 | Splash-Petal-Jackal | 510.5438 XBT | ✗ |
| 12 | Coffee-Brown-Thorn | 481.2309 XBT | ✗ |
| 13 | ahhereLIO | 461.2755 XBT | ✓ |
| 14 | Taylor | 452.7239 XBT | ✓ |
| 15 | Cedar-Spice-Fisher | 407.6904 XBT | ✗ |
| 16 | Rag-Equinox-Eater | 403.1834 XBT | ✗ |
| 17 | Paint-Mercury-Face | 384.9927 XBT | ✗ |
| 18 | Prism-Fate-Slicer | 370.1898 XBT | ✗ |
| 19 | daniel3 | 345.6583 XBT | ✓ |
| 20 | Marble-Hollow-Seeker | 336.6875 XBT | ✗ |
| 21 | Navy-Midnight-Servant | 335.6627 XBT | ✗ |
| 22 | Quick-Grove-Mind | 316.1076 XBT | ✗ |
| 23 | Silent-Hurricane-Guardian | 311.5210 XBT | ✗ |
| 24 | Grove-Cosmic-Bite | 307.4127 XBT | ✗ |
| 25 | Neon-Marsh-Raver | 304.3723 XBT | ✗ |

Delo and Reed listed their co-conspirator Ben Aabtc on their Leaderboard, with full knowledge of the illegal nature of his activities on BitMEX and illegal source of the funds involved in the "winnings" from the aforesaid documented cross-market manipulation activity. This was done with the purpose of encouraging other traders to follow advice of Ben Aabtc to further facilitate manipulative activity on BitMEX.

472. In furtherance of the Racketeering Conspiracy, Defendants-co-conspirators Hayes, Delo and Reed knowingly and willfully charged trading commissions on the proceeds of the above illegal cross-market manipulation and facilitated bitcoin transfer of the proceeds of the above illegal cross-market manipulation from BitMEX "winner" bitcoin wallet to the bitcoin wallet of Ben Aabtc all in violation of 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a), 18 U.S.C. § 2314, 7 U.S.C. § 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019). Moreover, Defendants-co-conspirators Hayes, Delo and Reed knowingly and willfully aided and

abetted Ben Aabtc's violation of the 7 U.S.C. § 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019).

473. Plaintiffs were informed that Ben Aabtc was a former J.P. Morgan trader who used an alias ActualAdviceBTC because he was under a non-compete agreement with J.P. Morgan. Coincidentally, several J.P. Morgan derivatives traders were charged in a criminal RICO case with cross-market manipulation of metals spot and derivative markets.

466. Plaintiffs are informed and believe that474. Moreover, Defendants engaged in systematic destruction of critical manipulation



evidence, including manipulator identities, as alleged, for example, in CFTC Complaint, Ex. 5, p. 16, ¶ 49.

467475. Moreover, after instituting KYC and AML check on or about August 14, 2020, Defendants systematically deleted evidence of market manipulation, including manipulator identities and their trading records, under the pretense of users' "right to be forgotten."

**ADDITIONAL FACTS SUPPORTING PLAINTIFFS' BELIEFCONCLUSION THAT DEFENDANTS  THEMSELVES**

**CAUSED PLAINTIFFS' INJURIES DURING MANIPULATION TIMES**

468476. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

477. Centralized crypto exchanges such as BitMEX are inherently opaque as the trading

transactions that take place on the exchange are not written on the public blockchain and take

place entirely within the computer serves of the Defendants, in contrast to decentralized crypto

469. Defendants exchanges (DEX), such as UniSwap, which record every transaction on the blockchain. Moreover, BitMEX withdrawals and deposits of funds, which are all in bitcoins, also move past traditional banking system and there are no records or AML checks what so ever. Therefore, there is no source of the information about trading orders, trading transactions and funding transactions on the BitMEX platform other than Defendants themselves. Defendants, on the other hand, have every incentive to suppress any evidence of wrongdoing by them, their Internal Trading Desk or any other parties. In addition to the described inherent lack of any transparency in centralized crypto exchanges such as BitMEX, Defendants took extraordinary additional measures to destroy or otherwise suppress evidence of their own wrongdoing and hinder detection of their market manipulation. First, BitMEX accounts were by design anonymous. Therefore, trading data that is available publicly generally does not permit identification of actors behind specific market manipulation events on BitMEX. This hinders exactly pinpointing Defendants as specific perpetrators behind specific market events. Second, as CFTC clearly stated in their Compliant its Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted and otherwise destroyed required records including critical trader identity information. Third, BitMEX generally used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its own Insider Trading Desk with BitMEX exchange, in order to cover up the tracks of wrongdoing so that the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud.

470 478. Thus, Defendants made every possible effort to suppress evidence of their own wrongdoing in order to evade liability for their market manipulation misconduct. In fact, account anonymity on BitMEX, as well as the associated lack of the required KYC and AML checks, was the exact reason Defendants were criminally charged by the DOJ with felony failing to prevent money laundering on BitMEX, Ex. 4. It cannot possibly be in the interests of justice to reward

Defendants for their own federal crimes, which crimes involved deliberately making

BitMEX

accounts anonymous and willfully failing to use KYC and AML, and which also had a side effect of suppressing the evidence of Defendants' own market manipulation conduct.

~~471~~479. Because of the BitMEX account anonymity, documented destruction of required records, including critical user identities, by Defendants, as alleged in the CFTC ~~Compliant~~Complaint, Ex. 5, p. 16, ¶ 49, and the use of the anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its own Insider Trading Desk with BitMEX exchange, Defendants are in sole and exclusive possession of facts and any and all documentary evidence relevant to their and third party market manipulation.

~~472. Plaintiffs' belief~~480. The fact that it ~~were~~was Defendants who manipulated prices on the BitMEX platform and "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times, causing alleged losses to Plaintiffs, is ~~based on~~additionally supported by two separate conclusions explained in detail below.

~~473~~481. First, ~~Plaintiffs' belief~~the fact that during Manipulation Times prices on the "reference" spot exchanges BitStamp, Kraken and Coinbase Pro were intentionally and artificially manipulated is ~~based on~~additionally supported the fact that during the Manipulation Times, high volume market orders were executed on one or more relatively thinly traded "reference" exchanges during a short period of time, amounting to a relatively large fraction of the corresponding exchange's regular daily volume. Such large trades executed on relatively illiquid or thinly traded exchanges would normally result in a significant price slippage and a consequent financial loss for the executing trader, unless they were used with the purpose of profiting on BitMEX. Because traders trading millions of dollars of cryptocurrency are very sophisticated, they would use over-the-counter (OTC) transactions in order to sell large amounts of cryptocurrency without affecting the market price and thereby avoid sustaining a financial losses due to price slippage.[17] The fact that very

[17] For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering. From approximately 2:55 to 3:10 AM (UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp, which resulted in an avoidable financial loss for ~~the trader of over $2,500~~0,000 due to price slippage. In contrast, during the previous day, only 83 bitcoins were sold every 15 minutes on average. As another example, on July 14, 2019, a sell order was placed on Bitstamp for 15,000 ETH causing the ether price to plummet from $270 to

sophisticated traders willingly sustained large and completely avoidable financial losses during Manipulation Times demonstrates that these large market orders were used for purposes of cross-market manipulation in order to benefit from the open derivatives positions on BitMEX, which uses BitStamp as one if its "reference" exchanges. This forms the basis for Plaintiffs' belief the during the Manipulation Times, the "reference" markets for bitcoin and ether were artificially manipulated.

~~474. Therefore, it is~~482. It is therefore established that market moves that took place during Manipulation Times were caused by manipulators with the purpose of cross-market manipulation and profiting on BitMEX.

~~475~~483. Second, ~~Plaintiffs' belief~~the fact that it ~~were~~was Defendants and not an unidentified third party who intentionally manipulated bitcoin and ether prices on "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times is ~~based on~~additionally supported by at least the following facts:

    a. Defendants' Insider Trading Desk ~~And~~and Its Custom Automated Market Manipulation Tools Developed ~~By~~by Bitmex. Defendants operated an undisclosed Insider Trading Desk managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated to continuously manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of ~~Bitcoin~~bitcoin and ~~Ethereum, Ex. 1, 2, 3~~ether. The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open positions. They were also provided with automated systems, built by BitMEX, leveraging this highly

$190 and leading to a flash crash on that exchange, resulting in over $600,000 loss over the OTC price. This clearly intentional dump made up around $3.5 million of ETH – some 15% of its entire ETH trading volume in just one trade. Sophisticated traders would not choose to sustain ~~such large and avoidable losses.~~

~~this highly~~ sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation. The traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations. Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted. The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX. BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders. Defendants would not develop such sophisticated automated tools for no reason or "just to have them". The

~~have them". The~~ fact that Defendants were in possession of such sophisticated automated tools clearly establishes that they did in fact use them for their intended purpose, to cross-manipulate cryptocurrency markets

and liquidate traders, including during the specific Manipulation Times.

b. Defendants' Insider Trading Desk Automated Tools Operated ~~On A~~on a 24 Hours ~~A~~a Day, 7 ~~Day A~~Days a Week Basis, Including Specific Manipulation Times. That establishes that during the times of the Plaintiffs' losses, the automated tools of the Defendants' Insider Trading Desk were up and running and automatically looking for ways to liquidate BitMEX traders, including Plaintiffs, to financially benefit Defendants.

c. Presence of Server Freezes During Manipulation Times. As stated above, the server freezes were used by BitMEX to prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time. To accomplish this purpose, BitMEX routinely froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted. Presence of server freezes and system overloads during Manipulation Times clearly indicates that, in accordance with Defendants' modus operandi, the automated tools operated by BitMEX's Insider Trading Desk already estimated potential profitability of a market manipulation, automatically executed manipulative trades on the "reference" exchanges and deployed server freezes on BitMEX to prevent traders from escaping their positions and salvaging their funds before they could be liquidated, so that BitMEX would get the exact profit that was predicted by the Insider Trading Desk.

d. Defendants' Exclusive Access to Sensitive Insider Information. Only Defendants' Insider Trading Desk and no third party had access to sensitive

insider information of the

BitMEX exchange, including all positions, leverage amounts, sizes, open orders, hidden orders, etc. This information is critical to profitably liquidating traders on BitMEX and without it, not such liquidations are possible. This again points to BitMEX as culprit behind the market moves during the Manipulation Times.

e. Defendants' Exclusive Ability to Open Large Positions on BitMEX. Moreover, *only* Defendants were able to open sufficiently large ($100,000,000+) trading positions on BitMEX in order to capture the manipulation profits. For example, during market event on May 17, 2019, $2,500,000 was lost on BitStamp due to price slippage to move the .BXBT index down by 16%. In order for the perpetrator to break even, the corresponding swap position in BitMEX's winner account would need to be at least $15,625,000 ($15,625,000 x 16% = $2,500,000). And in order to make modest 1000% profit, the corresponding swap position in BitMEX's winner account would need to be at least $156,250,000 ($156,250,000 x 16% = $25,000,000). No other persons except for Defendants were able to open such large positions on BitMEX in order to make manipulation profitable.[18] Therefore, other parties would lose money on manipulation and it ~~were~~was Defendants who caused market manipulation events during the Manipulation Times.

f. Defendants' Financial Motive. Manipulating the .BXBT index of BitMEX is

immensely profitable, with profit reaching 8000% (or 80x)~~, Ex. 3 p. 4~~. Moreover, Defendant Hayes publicly admitted to committing bank fraud in connection with bitcoin transaction where the profit was just 40%, Ex. 10. For comparison, profit from manipulation using BitMEX .BXBT index at issue ~~here is 8000%, which would be irresistible for someone who was risking jail~~

---

[18] CFTC regulations impose position limits on exchanges exactly for this reason, to prevent ~~manipulation by making it un~~profitable, see, for example, 17 C.F.R. 41.25. Defendants violated those regulations, which enabled and facilitated profitable manipulation on BitMEX.

here is 8000%, which would be irresistible for someone who was risking jail
time to make mere 40% profit. 8000% would be clearly too lucrative profit for
Defendants to pass. Moreover, *half* of BitMEX's revenue comes from
liquidations of traders like Plaintiffs, creating a very strong incentive for
Defendants to engage in a market manipulation resulting in liquidations of
retail traders in order to increase their company revenue. It should be also
noted that of all possible manipulators, BitMEX had the *highest* financial
incentive to manipulate the .BXBT index. In other words, no third party
financially benefits from the manipulation to the extent Defendants do. This is
explained by the interplay between the exchange itself, the Insurance Fund and
the trading desk, all owned by Defendants. All three of those entities owned by
Defendants benefit from trader liquidations with the exchange collecting
increased trading fees caused by spikes in trading volumes during liquidations,
the trading desk realizing profits associated with betting on the other side of
(against) Plaintiffs' trades, and the Insurance Fund collecting an excess
portion of the confiscated Plaintiffs' collateral, left after paying profits to the
trading desk. Thus, because Defendants own and control the exchange itself,
the Insurance Fund and the trading desk, they have triple incentive to engage
in market manipulation and liquidate traders. In other words, due to BitMEX's
design, when a trader is liquidated, the exchange itself, the Insurance Fund and
the trading desk divide all the trader's confiscated funds between themselves
with no third party getting a dime.

g. Defendants' Documented Conspiracy With Ben Aabtc. It is well documented
beyond any dispute that Defendants knowingly and willfully conspired with
notorious and habitual market manipulator Ben Aabtc to cross-manipulate
cryptocurrency markets, knowingly and willfully charged trading commissions
on illegal manipulation profits and knowingly and willfully listed the known

market manipulator on their own Leaderboard.

476484. Thus, for all the foregoing reasons, it werewas Defendants and not unidentified third parties, who manipulated prices on the BitMEX platform and "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times, causing specific trading losses to Plaintiffs alleged herein.

**MORE THAN HALF OF TOP BITMEX TRADERS EARNING OVER $1B IN PROFITS ENGAGED IN MONEY LAUNDERING**

477485. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

478486. On or about November 5, 2020, BitMEX updated its leaderboard after supposedly completing KYC and AML verification for all users. Below is a leaderboard from August 2, 2020, with traders who could not pass the KYC and AML verification marked. Spots on the leaderboard are very valuable and traders would not easily forgo being listed there. Thus, more

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | Name | Profit | | Is Real Name |
|---|---|---|---|---|
| 1 | Rainbow-Narrow-Rider | 11,246.8487 XBT | X | ✗ |
| 2 | Mercury-Wood-Sprite | 8,179.7823 XBT | | ✗ |
| 3 | Quick-Grove-Mind | 8,047.8158 XBT | X | ✗ |
| 4 | Heavy-Autumn-Wolf | 7,574.4154 XBT | X | ✗ |
| 5 | Alameda Research | 5,244.5830 XBT | | ✓ |
| 6 | Hot-Relic-Fancier | 4,216.5159 XBT | X | ✗ |
| 7 | coincidentcapitalltd | 2,610.2783 XBT | X | ✓ |
| 8 | Skitter-Peridot-Raven | 2,345.7226 XBT | | ✗ |
| 9 | Honeysuckle-South-Rib | 2,110.4027 XBT | | ✗ |
| 10 | CSW is a fraud | 2,086.7229 XBT | | ✓ |
| 11 | Tree-Surf-Dragon | 2,072.0510 XBT | X | ✗ |
| 12 | Roger-LeotankCapital | 1,764.5478 XBT | X | ✓ |
| 13 | alamedaresearchltd@gmail.com | 1,696.7039 XBT | | ✓ |
| 14 | Jade-Platinum-Legs | 1,675.8174 XBT | X | ✗ |
| 15 | Circle_Trade | 1,619.6382 XBT | X | ✓ |
| 16 | Winter-Pink-Fang | 1,536.7276 XBT | | ✗ |
| 17 | daniel3 | 1,514.6067 XBT | X | ✓ |
| 18 | Cream-White-Ox | 1,476.3798 XBT | X | ✗ |
| 19 | xorq | 1,467.0128 XBT | | ✓ |
| 20 | Disco-Solar-Fang | 1,452.1775 XBT | | ✗ |
| 21 | Roger_LeotankCapital | 1,441.3349 XBT | | ✓ |
| 22 | Ebony-Fair-Bat | 1,387.4639 XBT | | ✗ |
| 23 | Quill-Rift-Hoof | 1,361.3772 XBT | | ✗ |
| 24 | aoa | 1,344.3134 XBT | | ✓ |
| 25 | Brown-Peat-Myth | 1,246.6567 XBT | | ✗ |

than half of top BitMEX traders earning over $1,000,000,000 in profits were unable to pass KYC

and AML checks and, therefore, engaged in money laundering and other illegal acts. This is truly

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

## Top 25 Traders by Notional

| Rank | Name | Profit | | Is Real Name |
|------|------|--------|---|------------|
| 1 | Rainbow-Narrow-Rider | 11,246.8487 XBT | X | ✖ |
| 2 | Mercury-Wood-Sprite | 8,179.7823 XBT | | ✖ |
| 3 | Quick-Grove-Mind | 8,047.8158 XBT | X | ✖ |
| 4 | Heavy-Autumn-Wolf | 7,574.4154 XBT | X | ✖ |
| 5 | Alameda Research | 5,244.5830 XBT | | ✔ |
| 6 | Hot-Relic-Fancier | 4,216.5159 XBT | X | ✖ |
| 7 | coincidentcapitalltd | 2,610.2783 XBT | X | ✔ |
| 8 | Skitter-Peridot-Raven | 2,345.7226 XBT | | ✖ |
| 9 | Honeysuckle-South-Rib | 2,110.4027 XBT | | ✖ |
| 10 | CSW is a fraud | 2,086.7229 XBT | | ✔ |
| 11 | Tree-Surf-Dragon | 2,072.0510 XBT | X | ✖ |
| 12 | Roger-LeotankCapital | 1,764.5478 XBT | X | ✔ |
| 13 | alamedaresearchltd@gmail.com | 1,696.7039 XBT | | ✔ |
| 14 | Jade-Platinum-Legs | 1,675.8174 XBT | X | ✖ |
| 15 | Circle_Trade | 1,619.6382 XBT | X | ✔ |
| 16 | Winter-Pink-Fang | 1,536.7276 XBT | | ✖ |
| 17 | daniel3 | 1,514.6067 XBT | X | ✔ |
| 18 | Cream-White-Ox | 1,476.3798 XBT | X | ✖ |
| 19 | xorq | 1,467.0128 XBT | | ✔ |
| 20 | Disco-Solar-Fang | 1,452.1775 XBT | | ✖ |
| 21 | Roger_LeotankCapital | 1,441.3349 XBT | | ✔ |
| 22 | Ebony-Fair-Bat | 1,387.4639 XBT | | ✖ |
| 23 | Quill-Rift-Hoof | 1,361.3772 XBT | | ✖ |
| 24 | aoa | 1,344.3134 XBT | | ✔ |
| 25 | Brown-Peat-Myth | 1,246.6567 XBT | | ✖ |

staggering and it proves the truly astonishing amount of money laundering that took place on

BitMEX, as alleged herein.

479487. Moreover, the clear manipulator account Quick-Grove-Mind with $100M manipulation profits listed above, whose multi-million-dollar profit spikes exactly match known market manipulation events, magically avoiding all market losses, did not pass the KYC and AML checks instituted by BitMEX after criminal indictments of its founders, which is another indication that this is a market manipulator.

## MARKET MANIPULATION DRAMATICALLY SUBSIDED AFTER CRIMINAL INDICTMENTS AND ARRESTS OF DEFENDANTS

480488. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

481489. Shortly after individual Defendants were criminally indicted by the DOJ and Defendant Reed was arrested on October 1, 2020, the amount of market manipulation dropped



dramatically and bitcoin steadily rallied in price from under $10,000 to over $65,000. It can be clearly seen that this bitcoin rally was caused, in a large part, by Defendants being taken down by DOJ and CFTC, as well as by private party lawsuits, and by Defendant Reed being prevented

from manipulating the markets.

~~482~~490. It is the general consensus in the crypto industry that Defendants' persistent

manipulation resulted in persistent price suppression for bitcoin and ether and once Defendants'

market manipulation was abated on October 1, 2020, with arrest of Reed and criminal indictments of Hayes, Delo, Reed and Dwyer, the price of bitcoin and ether exploded, as the main bitcoins price suppression factor was removed, see the above chart.

<u>**COUNT I**</u>
**Fraudulent Solicitation in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1**
**(False Warranty and Representation) — Against All Defendants**

~~483~~491. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~484~~492. 7 U.S.C. § 9(1), makes it unlawful, in relevant part, for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, ... any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] ...

~~485~~493. Rule 180.1, 17 C.F.R. § 180.1(a) (2019), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, ... to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person ...

~~486~~494. Bitcoin and ether Perpetual Swaps traded by all Plaintiffs are "swaps" as defined

by Section 1a(47)(A) of the CEA, 7 U.S.C. § 1a(47)(A) (2018). Therefore, these ~~Bitcoin~~bitcoin and ether

Perpetual Swaps are also "swaps" within the meaning of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2019).

180.1(a).

487495. Section 22 of the CEA provides for a private right of action for a plaintiff who made "any swap" through a person or entity whose violation of the CEA resulted in actual damages to the plaintiff, 7 U.S.C. § 25(a)(1)(B), or who placed through such person or entity "an order for the purchase or sale of ... a swap," id. § 25(a)(1)(C)(iv).

488496. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiffs by fraudulently soliciting Plaintiffs through fraudulent representations, half-truths and omissions to use BitMEX to trade in swapsPerpetual Swaps and thereby pay trading commissions to Defendants and suffer trading losses to benefit BitMEX at the expense of Plaintiffs.

489497. To entice Plaintiffs to open their trading accounts, deposit their bitcoins, trade on margin on a rigged BitMEX platform and pay trading commissions to Defendants, Defendants engaged in fraudulent solicitation of Plaintiffs using a laundry list of material misrepresentations, half-truths and omissions.[19] Once victims, including Plaintiffs, were fraudulently induced by Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon known as "revenge trading" to keep them trading on their rigged platform. Revenge trading is a natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

490498. On or about May 10June 19, 2019, Defendants, and each of them, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff Kolchin with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff Kolchin to personally accept it by opening a trading account and using BitMEX

---

[19] Because Defendants Hayes, Delo and Reed controlled, directly or indirectly, the operation of the entire BitMEX Enterprise and micro-managed all important aspects of operation of the BitMEX platform and no significant undertaking could proceed without their direct and personal approval, they each personally authored or at least personally ratified and approved each and every fraudulent solicitation or, other misrepresentation or, omission or false advertisement alleged in Paragraphs 484–571496-590 and, as applicable, transmission thereof via wire communication to Plaintiffs.

written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff Kolchin to personally accept it by opening a trading account and using BitMEX platform.[20] The electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff Kolchin's personal computer. Plaintiff Razvan was similarly presented with a substantially the same electronic document on April 30, 2018 and required to accept it by continuing using BitMEX, Plaintiff BMA was similarly presented with the same electronic document on May 5, 2019 and Plaintiff Dolgov was similarly presented with a substantially the same electronic document on April 30, 2018 and required to accept it by continuing using BitMEX.

491499. The written Service Agreement incorporated the following specific Warranty and Representation expressly made by Defendants personally to each Plaintiff:[21]

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

492. This express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was, in fact, deliberately and materially false during the entire Relevant Period and constituted a fraudulent solicitation of Plaintiffs' bitcoins deposits and trading commissions by Defendants. In truth and in fact, during the entire Relevant Period, the Insider

---

[20] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in its entirety.

[21] In addition to placing the The same Warranty and Representation into the Service Agreement, Defendants placed the same representation in their was additionally posted as a blog post, which constitutes personally authored by Defendant Hayes, which constituted an advertisement, which was available, displayed by Defendants during Relevant Period, at

https://blog.bitmex.com/bitmex-market-making-desk/. and which called one of the operators of the Insider Trading Desk "a person [whose] integrity is unquestionable." The aforesaid blog post is attached hereto as Ex. 21 and made part hereof.

500. This express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was, in fact, deliberately and materially false during the entire Relevant Period and constituted a fraudulent solicitation of Plaintiffs' bitcoins deposits and trading commissions by Defendants. In truth and in fact, during the entire Relevant Period, the Insider Trading Desk of BitMEX had what BitMEX internally referred to as "God Access" to all customer, order flow, execution and open position information of the entire BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions on the entire BitMEX platform, further including all these confidential parameters of all Plaintiffs' orders and open positions. On the other hand, ~~this~~such information was not available to Plaintiffs and other platform users, with the exception of Defendants themselves. ~~The~~In fact, the Insider Trading Desk used this very sensitive information to ~~automatically~~highly successfully trade against, and liquidate customers of BitMEX, including each Plaintiff.

~~493~~501. Moreover, this express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was deliberately and materially false during the entire Relevant Period also because the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts. In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts.[22] Specifically, the automated software tools operated by the Insider Trading Desk were configured to intentionally and automatically freeze BitMEX's servers, preventing traders, including Plaintiffs, from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted earlier.

---

[22] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

494502. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX.

495503. In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, when, in reality, he was not. Thus, Defendants' false representations misleadmisled Plaintiffs into believing that they were getting

22 Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

something, namely cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, that they were not. Therefore, the false Warranty and Representation actually ~~mislead~~misled each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer." Plaintiffs did not want to use, and would not have used, cryptoderivative trading services if such services included the Insider Trading Desk that received special informational, technical and trading privileges and continuously manipulated the markets in order to liquidate Plaintiffs' positions.

~~496~~504. Each Plaintiff opened account with BitMEX platform and/or used Defendants' cryptoderivative trading services offered from California based on the reliance on the Warranty and Representation contained in Defendants' Service Agreement. When opening or, as appropriate, continuing to use their BitMEX trading accounts, depositing bitcoins therein and engaging in cryptoderivative trading on BitMEX platform, respective Plaintiffs Kolchin, Razvan, Dolgov and BMA each saw and carefully read Defendants' false Warranty and Representation and relied on the truth of the Warranty and Representation in deciding to open and/or use BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on BitMEX and pay trading commissions to Defendants.

497505. Each Plaintiff was induced to open and/or use BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on the BitMEX platform and pay trading commissions to Defendants and did, in fact, open and/or use BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants due to the reliance on the truth of the Warranty and Representation, which represented to Plaintiffs that:

> The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any

order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

~~498~~506. Each Plaintiff would not have opened and/or used BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants if he knew the true facts and, specifically, that Defendants' exchange was rigged and the Insider Trading Desk trading against Plaintiffs was provided with informational, access and trading advantages over Plaintiffs and automated tools, built by BitMEX, to facilitate manipulation.

~~499~~507. Upon opening and/or using BitMEX trading account, depositing bitcoins therein and engaging in cryptoderivative trading on Defendants' BitMEX platform, each Plaintiff was provided with cryptoderivative trading services falsely represented by Defendants' Warranty and Representation to be fair and honest, deceiving each Plaintiff and, in reality, causing him to use rigged cryptoderivative trading services he did not want. Defendants' false and fraudulent Warranty and Representation caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

~~500~~508. Each Plaintiff has suffered injury and loss of money or property as a result of Defendants' fraud and deceit, and namely as the result of the false and fraudulent Warranty and Representation provided to each Plaintiff.

~~501~~509. Plaintiffs relied upon Defendants' misrepresentations contained in the Warranty and Representation and were induced to use Defendants' cryptodetivative trading services they did not want to use and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses. Defendants' deception caused the Plaintiffs to open and/or use accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiffs suffered injury in fact and lost

money or property as a result of the alleged fraud and deception perpetrated by Defendants by means of the false Warranty and Representation.

~~502~~510. When the Defendants made the aforesaid false and fraudulent Warranty and Representation to each Plaintiff, they knew it to be materially false, as Defendants themselves created and controlled the Insider Trading Desk, and this Warranty and Representation was made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open and/or use an account with BitMEX, deposit bitcoins therein and trade Defendants' cryptoderivative products on margin, in order to wrongfully collect trading commissions from Plaintiffs and to confiscate and otherwise misappropriate each Plaintiff's property. Therefore, in making the aforesaid false and fraudulent Warranty and Representation to respective Plaintiffs, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent Warranty and Representation in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten

profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

~~503~~511. Each Plaintiff, at the time this Warranty and Representation was made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' Warranty and Representation and believed it to be true. In reliance on these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform, engaged in derivative trading therein on margin to his financial loss and detriment and paid trading commissions to Defendants. For example, in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs deposited[23] with Defendants:

---

[23] ~~The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin~~

| Kolchin | ~~May 10~~June 19, 2019 | ~~3~~1.01 bitcoins |
| Razvan | November 14, 2018 | 50 bitcoins |
| Dolgov | November 1, 2018 | 2 ~~bitcoin~~bitcoins |
| BMA | May 5, 2019 | 5 ~~bitcoin~~bitcoins |

~~504~~512. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the

---

[23] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent Warranty and Representation, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants, which was specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 14, 2019 | ~~65~~25 | ~~1.01 3~~1.01 bitcoins | 5.95% | ~~0.03178~~0.0041 bitcoins |
| Razvan | November 14, 2018 | May 3, 2019 | 170 | 50 bitcoins | 5.95% | 1.3856 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 ~~bitcoin~~bitcoins | 5.95% | 0.02811 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 ~~bitcoin~~bitcoins | 5.95% | 0.2551 bitcoins |
| | | | | | Total: | ~~1.70059~~1.67291 bitcoins |

~~505~~513. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Kolchin traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on July ~~15~~14, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day,

when its XBTUSD ~~perpetual swap~~<u>Perpetual Swap</u> long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin ~~perpetual swaps~~<u>Perpetual Swaps</u> on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD ~~perpetual swap~~<u>Perpetual Swap</u> long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's long ~~perpetual swap~~<u>Perpetual Swap</u> position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God access," in direct violation of the Warranty and Representation. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded ~~perpetual swaps~~<u>Perpetual Swaps</u>, suffered such losses and would not have paid trading commissions to Defendants.

~~506~~<u>514</u>. Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs

incurred the following monetary damages associated with trading commissions[24] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' damages associated with the trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount

_of_ [24] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

~~of~~ at least ~~0.15~~0.015 bitcoins, at the time he opened his ~~first~~initial swap position on BitMEX, in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | **Total:** | **21.05bitcoins** |

~~507~~515. Each Plaintiff's reliance on Defendants' representations was justified because Defendants took extraordinary and active measures to conceal the wrongdoing perpetrated by

[24] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

their Insider Trading Desk. ~~For example~~First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for ~~its~~their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

~~508~~516. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the

BitMEX platform includes commercial website www.bitmex.com, which was used to provide the Service Agreement containing the fraudulent Warranty and Representation to Plaintiffs.

~~509~~517. Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent Warranty and Representation, provided to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.

~~510~~518. Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in ~~swaps~~Perpetual Swaps on margin on BitMEX platform as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses of at least 249.9 bitcoins from such trading, as well as bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, as a result of their reasonable reliance on Defendants' Warranty and Representation and their

reasonable failure to know the actual facts. Thus, the total loss sustained by Plaintiffs was at least ~~272.65~~272.62 bitcoins.

~~511~~519. Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

~~512~~520. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent Warranty and Representation, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

~~513~~521. As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order

queues and not subject to lockouts, in violation of the express Warranty and Representation, by reason of which Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

~~514~~522. Defendants' false and fraudulent Warranty and Representation constituted the use of a "manipulative or deceptive device or contrivance" under 7 U.S.C. §~~§~~ 9(1), and "manipulative device, scheme, or artifice to defraud," including "untrue or misleading statement of a material fact or [omission of] a material fact necessary in order to make the statements made not untrue or misleading" and "act, practice, or course of business, which operates or would operate as a fraud or deceit upon" Plaintiffs, under Rule 180.1, 17 C.F.R. § 180.1(a) (2019). Defendants' false and fraudulent Warranty and Representation actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and ~~engaging in~~

engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore, ~~Defendants'~~

Defendants' conduct violated 7 U.S.C. §~~§~~ 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and, pursuant to 7 U.S.C. §§ 25(a)(1)(B), (C)(iv), Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least ~~272.65~~272.62 bitcoins.

<u>**COUNT II**</u>
**Fraudulent Solicitation in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1
(Misrepresentation of Liquidity on BitMEX) — Against All Defendants**

~~515~~523. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~516~~524. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiffs by fraudulently soliciting Plaintiffs through fraudulent representations, half-truths and omissions to use BitMEX to trade in swaps and thereby pay trading commissions to Defendants and suffer trading losses to benefit BitMEX at the expense of Plaintiffs.

517525. During Relevant Period, in soliciting each Plaintiff's bitcoin deposits, trading orders and trading commissions, Defendants, and each of them, personally represented to each Plaintiff, through their commercial website www.bitmex.com, which constitutes a front-end



interface of their BitMEX platform, that Defendants' BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other platform" and that "BitMEX's XBTUSD market is the most liquid in the world." The foresaid representations regarding available liquidity on BitMEX were made by Defendants, and each of them, by electronically transmitting, through a computer network, a web page document from Defendants' Serversservers in San Francisco, California directly to

respective Plaintiff's computer, displaying the above representations, front and center. For example, on ~~May 10, 11,~~ June ~~2~~19, ~~5~~20, ~~7~~21, 22, 23, 24, 25, 26, 27 and 28 and July 14, 2019, Defendants made the aforesaid representations regarding available liquidity on BitMEX to Plaintiff Kolchin. Plaintiff Razvan was similarly presented with the same representations regarding available liquidity on BitMEX on October 25, November 13, 14, and 19, 2018 and Plaintiff BMA was similarly presented with the same representations regarding available liquidity on BitMEX on May 5, 6, 7, 8, 17 and June 26, and 27, 2019. Plaintiff Dolgov was similarly presented with the same representations regarding available liquidity on BitMEX on November 10, 11, 14, 15, and 19, ~~2019~~2018.

~~518. Prior to opening trading accounts with BitMEX, each Plaintiff was specifically looking for a reputable and honest exchange with the highest liquidity in the industry to trade on, and, therefore, the~~526. The amount of liquidity on the BitMEX platform was highly material for each Plaintiff's decision to engage in cryptoderivative trading on BitMEX platform and in determining whether or not to trade on BitMEX, as the amount of available liquidity determined the potential

profits that Plaintiffs could realize from cryptoderivative trading. The higher is the available liquidity, the lower is the slippage[25] occurring upon execution of large market orders and the higher is the potential trading profit for Plaintiffs. Also, the higher is the available liquidity, the lower is the magnitude of price swings and the chance of liquidation. Therefore, each Plaintiff ~~was specifically looking for an exchange with the highest liquidity on the market and~~ made his decision to open account, make bitcoin deposit(s) and/or trade on BitMEX because of his reliance on the truth of Defendants' representations regarding the available liquidity on BitMEX being 1500% higher than competition.

~~519~~527. Each Plaintiff justifiably relied on the truth of respective representations regarding available liquidity on BitMEX platform made by Defendants and specifically on the truth of the representation that BitMEX provided "1500% more Bitcoin / USD Liquidity than any other platform." However, in truth and in fact, the aforesaid representations regarding available liquidity on BitMEX made by Defendants were intentionally and materially false during the entire portion of the Relevant Period when they were used by Defendants to solicit customers. In

---

[25] Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.

reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained its top position. For example, analysis of bid-ask spread data from the portion of the Relevant Period when Defendants were using the representations in question, provided by OKEX cryptoderivative exchange, has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%)[26]. Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX. Therefore, in truth and in fact, liquidity on BitMEX was not any

[25] Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.

[26] Liquidity on an exchange is inversely related to a bid-ask spread. The lower is the bid-ask spread, the higher is the corresponding exchange liquidity.

higher than on several competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely claimed to fraudulently solicit Plaintiffs' business. Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period.[27] In fact, the aforesaid claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were materially false even as of September or October of 2018, when they were first made by Defendants.

520528. The fact that liquidity on BitMEX was not any higher than on other competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely represented to Plaintiffs, was well known to Defendants themselves, who had a direct access to all relevant data and who nevertheless deliberately decided to use these fraudulent representations to entice unsuspecting

---

[26] Liquidity on an exchange is inversely related to a bid-ask spread. The lower is the bid-ask spread, the higher is the corresponding exchange liquidity.

[27] In a fraudulent solicitation case *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), brought by SEC under Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], SEC charged defendants with fraudulently soliciting investors to trade digital asset securities by falsely claiming that their Start Options platform was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media." These fraudulent representations that formed the basis for the SEC action were very similar to Defendants' fraudulent claims of providing "1500% More Bitcoin/USD liquidity than any other platform," the latter being even more specific and factual.

traders, including Plaintiffs, to trade on BitMEX to their financial loss and detriment. In making the false and ~~fraudulenKristijan Krstic~~fraudulent representations regarding available liquidity on BitMEX platform, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent representations regarding available liquidity on BitMEX in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

~~521~~529. In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX having the best liquidity available in the industry,

and 1500% ~~27 In a fraudulent solicitation case *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), brought by SEC under Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], SEC charged defendants with fraudulently soliciting investors to trade digital asset securities by falsely claiming that their Start Options platform was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media." These fraudulent representations that formed the basis for the SEC action were very similar to Defendants' fraudulent claims of providing "1500% More Bitcoin/USD liquidity than any other platform," the latter being even more specific and factual.~~

and 1500% higher than competition, when, in reality, he was not. Thus, Defendants' false representations mislead misled Plaintiffs into believing that they were getting something, namely cryptoderivative trading services from BitMEX having Bitcoin/USD liquidity 1500% higher than competition, that they were not getting. Therefore, Defendants' false representations regarding liquidity on BitMEX actually mislead misled each Plaintiff into believing something that was not true and were "likely to [so] mislead a reasonable consumer." Plaintiffs did not want to use, and would not have used, cryptoderivative trading services if such services did not provide the Bitcoin/USD liquidity 1500% higher than competition.

522 530. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and paid trading commissions to Defendants had he known the true facts, as the true facts meant that due to insufficient liquidity, odds of making any money on BitMEX platform were stacked heavily against each Plaintiff.

523 531. Each Plaintiff opened account with BitMEX platform and/or used Defendants' cryptoderivative trading services offered and managed by Defendants from California based on reliance on the truth of Defendants' representations regarding liquidity on BitMEX being the best

available in the industry and 1500% greater than available on any other platform. When opening and/or using their BitMEX trading accounts, depositing bitcoins therein, engaging in cryptoderivative trading on BitMEX platform and paying trading commissions to Defendants, respective Plaintiffs Kolchin, Razvan, Dolgov and BMA each saw and carefully read Defendants' false representations regarding available liquidity on BitMEX and relied on the truth of these representations in deciding to open BitMEX trading account, deposit bitcoins therein and/or engage in cryptoderivative trading on BitMEX.

524532. Each Plaintiff was deceived and fraudulently induced to open and/or use BitMEX trading account, deposit bitcoins therein and engage in cryptoderivative trading on BitMEX platform and did in fact open and/or use BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on BitMEX platform due to the reliance on Defendants' false

representations regarding available liquidity on BitMEX, which stated to Plaintiffs that BitMEX platform provided "1500% More Bitcoin/USD liquidity than any other platform."

~~525~~533. Each Plaintiff would not have opened and/or used BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on BitMEX platform if he knew the true facts and, specifically that Defendants' XBTUSD market did not provide "1500% More Bitcoin/USD liquidity than any other platform."

~~526~~534. After each Plaintiff opened BitMEX trading account and deposited bitcoins therein, Defendants provided each Plaintiff with cryptoderivative trading services having liquidity, which was below competitor exchanges Binance, Huobi and/or OKEX, which Defendants previously falsely described to Plaintiffs as providing "1500% More Bitcoin/USD liquidity than any other platform." In doing so, Defendants deceived each Plaintiff and caused him to use Defendants' cryptoderivative trading services with insufficient liquidity, which he did not want. Defendants' false representations regarding available liquidity on BitMEX caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

527535. Each Plaintiff has suffered injury and loss of valuable property, namely bitcoins, as a result of Defendants' fraud and deceit, and namely as the result of the false representations regarding available liquidity on BitMEX provided to each Plaintiff.

528536. Plaintiffs relied upon Defendants' false representations regarding available liquidity on BitMEX and were induced to use Defendants' cryptodetivative trading services they did not want and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses. Defendants' deception caused the Plaintiffs to open and/or use accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiffs suffered injury in fact and lost money or property as a result of the alleged fraud and deception perpetrated by Defendants using the false representations regarding available liquidity on BitMEX.

529537. When the Defendants made the aforesaid false representations regarding available liquidity on BitMEX to each Plaintiff, they knew them to be materially false, and these representations regarding available liquidity on BitMEX were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open an account with BitMEX, deposit bitcoins and trade Defendants' derivative products, in order to wrongfully confiscate each Plaintiff's property. Defendants had direct access to and first-hand personal knowledge of the liquidity information for their own BitMEX platform as well as for all competing platforms, including Binance, Huobi and OKEX. Therefore, they knew that their representations regarding available liquidity on BitMEX made to each Plaintiff were materially false and fraudulent. In fact, Defendants' misrepresentations were so blatant and so exaggerated, that Defendants simply could not have been ignorant about their falsity. Moreover, at the end of 2018, a former high-ranking employee of BitMEX repeatedly informed Defendants that the aforesaid representations regarding available liquidity on the BitMEX platform were in fact false and requested their removal from the front page of the BitMEX website, which Defendants deliberately refused to do, because they wanted

to continue deceiving traders by promising them liquidity they did not have. Furthermore, on or about October 3, 2019, Defendants removed words "than any other platform," evidencing the fact that Defendants deliberately tried to make the aforesaid representations regarding available liquidity on BitMEX vaguer, which further establishes that Defendants knew that they were false as written. Yet furthermore, Defendants continued to use these false representations regarding available liquidity on the BitMEX platform on the front page of their website, front and center, until as late as March of 2021, by which time BitMEX fell to the number eight spot in cryptoderivative exchange rankings, and removed those obviously false representations promising 1500% more liquidity than other exchanges only after they were mentioned in related Court cases, Ex. 20. This further establishes that Defendants' fraud was deliberate.

530538. Each Plaintiff, at the time these representations regarding available liquidity on BitMEX were made by Defendants and at the time each Plaintiff took the actions herein alleged,

was ignorant of the falsity of Defendants' representations regarding available liquidity on BitMEX and believed it to be true. In reliance on these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading therein to his financial loss and detriment. For example, in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs deposited[28] with Defendants:

| | | |
|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | ~~3~~1.01 bitcoins |
| Razvan | November 14, 2018 | 50 bitcoins |
| ~~Dolgov~~ | ~~November 1, 2018~~ | ~~2 bitcoin~~ |
| ~~BMA~~ | ~~May 5, 2019~~ | ~~5 bitcoin~~ |

~~531. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent representations regarding available liquidity on~~

---

[28] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

| Dolgov | November 1, 2018 | 2 bitcoins |
| BMA | May 5, 2019 | 5 bitcoins |

~~BitMEX,~~539. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 14, 2019 | ~~65~~25 | 1.01 ~~3~~ bitcoins | 5.95% | ~~0.03178~~0.0041 bitcoins |
| Razvan | November ~~14, 2018~~ | May 3, ~~2019~~ | 170 | 50 ~~bitcoins~~ | 5.95% | 1.3856 ~~bitcoins~~ |

| | 14, 2018 | 2019 | | bitcoins | | bitcoins |
|---|---|---|---|---|---|---|
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 ~~bitcoin~~bitcoins | 5.95% | 0.02811 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 ~~bitcoin~~bitcoins | 5.95% | 0.2551 bitcoins |
| | | | | | Total: | ~~1.70059~~1.67291 bitcoins |

~~532~~540. In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff Kolchin traded Defendants' bitcoin ~~perpetual~~

Perpetual Swaps

~~swaps~~ on July ~~15~~14, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each

Plaintiff due to wild downward swings in the price of the XBTUSD and ETHUSD ~~perpetual swap~~<u>Perpetual Swap</u> contracts of BitMEX, which resulted in liquidation of Plaintiffs' respective long positions on BitMEX, which were caused, in substantial part, by the insufficient buy (long) side liquidity on the BitMEX platform. Specifically, on those three days June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, liquidity on the buy (long) side of the market for XBTUSD and ETHUSD ~~perpetual swaps~~<u>Perpetual Swaps</u> essentially disappeared, leading to truly staggering price plunges, which precipitated liquidations of Plaintiffs' positions. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which induced Plaintiffs to trade on margin on BitMEX, were a substantial factor in causing Plaintiffs' trading losses in the amount of 249.9 bitcoins. Another substantial factor was the downward swings in the price of the XBTUSD and ETHUSD ~~perpetual swap~~<u>Perpetual Swap</u> contracts of BitMEX, which were exacerbated by the

aforesaid buy (long) side liquidity shortages. Moreover, it was foreseeable for Defendants that the insufficient liquidity on BitMEX, which was fraudulently misrepresented by Defendants as being 1500% more than on any other platform, would naturally exacerbate downward price moves and result in staggering price plunges and, consequently, in the liquidations of Plaintiffs' margined trading positions.[29] Therefore, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were within the foreseeable risk or harm created by the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. In other words, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were reasonably expected to result from the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.

541. Due to Plaintiffs' decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following monetary damages associated

---

[29] It is well-known that liquidity operates by absorbing and softening market price moves. The higher the liquidity, the more tempered price moves are. On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations.

with trading commissions[30] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.150.015 bitcoins, at the time he opened his firstinitial swap position on BitMEX, in reasonable reliance on

[29] It is well-known that liquidity operates by absorbing and softening market price moves. The higher the liquidity, the more tempered price moves are. On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations.

[30] BitMEX charges traders trading commissions (fees) in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the trading commission for opening or closing a margined position is 0.075% of the position size.

Defendants' false and fraudulent representations regarding available liquidity on BitMEX, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | **Total:** | **21.05 bitcoins** |

~~534~~542. If Defendants truly provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such high liquidity would have absorbed sell

---

[30] BitMEX charges traders trading commissions (fees) in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the trading commission for opening or closing a margined position is 0.075% of the position size.

orders and dampened the downward price moves, preventing the liquidations from taking place, and Plaintiffs would not have sustained the trading losses they did. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded perpetual swapsPerpetual Swaps on BitMEX on margin, suffered such losses and would not have paid the trading commissions to Defendants.

535543. Each Plaintiff's reliance on the truth of Defendants' representations regarding available liquidity on BitMEX platform was justified because Defendants took extraordinary measures to keep tight control of the data pertaining to all aspects of operation of BitMEX platform, including available liquidity. Similarly, operators of other crypto exchanges, such as Binance, Huobi and OKEX also kept tight control of the data pertaining to all aspects of operation of their respective trading platforms, including available liquidity.

~~536~~544. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the false and fraudulent representations regarding available liquidity on BitMEX platform to each Plaintiff.

~~537~~545. Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent representations regarding available liquidity on BitMEX platform made to each Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California. Accordingly, California law applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

~~538~~546. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*,

sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, the false and fraudulent representations regarding available liquidity on the BitMEX platform were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco.

~~539~~547. Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in ~~swaps~~Perpetual Swaps on margin on BitMEX platform as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses of 249.9 bitcoins from such trading, as well as bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, as a result of their reasonable reliance on Defendants' representations regarding available liquidity on BitMEX and their reasonable failure to know the actual facts. Thus, the total loss sustained by Plaintiffs was ~~272.65~~272.62 bitcoins.

~~540~~548. Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

~~541~~549. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent representations regarding available liquidity on BitMEX, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

~~542~~550. As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using Plaintiffs' highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation contained in the Service Agreement, by reason of which Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be

manifestly unjust due to bitcoin appreciation. The insufficient liquidity available on the BitMEX platform, which Defendants falsely and fraudulently represented to each Plaintiff as providing "1500% More Bitcoin/USD liquidity than any other platform" and "BitMEX's XBTUSD market [being] the most liquid in the world," additionally contributed to and exacerbated the above losses of Plaintiffs. If Defendants indeed provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such liquidations would not have occurred and Plaintiffs would not have sustained the trading losses they did. Therefore, Defendants' failure to provide 1500% (16x) more liquidity than any other trading platform, as they falsely and fraudulently represented to Plaintiffs, was a substantial factor in causing the trading loss of 249.9 bitcoins by Plaintiffs on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

~~543~~551. Defendants' false and fraudulent representations regarding available liquidity on BitMEX constituted the use of a "manipulative or deceptive device or contrivance" under 7 U.S.C. §~~§~~ 9(1), and "manipulative device, scheme, or artifice to defraud," including "untrue or misleading statement of a material fact or [omission of] a material fact necessary in order to make the statements made not untrue or misleading" and "act, practice, or course of business, which operates or would operate as a fraud or deceit upon" Plaintiffs, under Rule 180.1, 17 C.F.R. § 180.1(a) (2019). Defendants' false and fraudulent representations regarding available liquidity on BitMEX actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore, Defendants' conduct violated 7 U.S.C. §~~§~~ 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and, pursuant to 7 U.S.C. §§ 25(a)(1)(B), (C)(iv), Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least ~~272.65~~272.62 bitcoins.

## COUNT III
### Use of Manipulative or Deceptive Device or Contrivance by Active Concealment of Material ~~Fraudulent Solicitation~~Facts Related to BitMEX in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule
### 180.1 — Against All Defendants
### ~~(Consealment of Material Facts Related to BitMEX)   Against All Defendants~~

~~544~~552. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~545~~553. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiffs by fraudulently soliciting Plaintiffs through fraudulent representations, half-truths and omissions to use BitMEX to trade in swaps and thereby pay trading commissions to Defendants and suffer trading losses to benefit BitMEX at the expense of Plaintiffs.

~~546~~554. On or about ~~May 10~~June 19, 2019, Defendants, and each of them, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff Kolchin with an electronic document containing updated written Service Agreement for their online BitMEX trading platform and required Plaintiff Kolchin to personally accept it by opening a trading account and using BitMEX platform.[31] The

---

[31] ~~The electronic document containing the updated written Terms of Service was also located at:~~

electronic document containing the Service Agreement was transmitted from Defendants' servers

located in San Francisco, California to Plaintiff Kolchin's personal computer. Plaintiff Razvan

was similarly presented with a substantially the same electronic document on April 30, 2018 and

required to accept it by continuing using BitMEX, Plaintiff BMA was similarly presented with

the same electronic document on May 5, 2019 and Plaintiff Dolgov was similarly presented with

a substantially the same electronic document on April 30, 2018 and required to accept it by

continuing using BitMEX.

547555. The Service Agreement incorporated the following Warranty and
Representation

expressly made by Defendants personally to each Plaintiff:

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the

Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is

---

31 The electronic document containing the updated written Terms of Service was also located at:
https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in
its entirety.

organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.[32]

556. In addition, during Relevant Period, in soliciting each Plaintiff's bitcoin deposits, trading orders and trading commissions, Defendants, and each of them, made the following additional representations personally to each Plaintiff, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform:

    a. "[BitMEX] provides 100 Audits per second. BitMEX's engine constantly audits the balances and history of all accounts."

    b. "[BitMEX had] 0 Bitcoin lost through intrusion or hacking. BitMEX keeps all funds in cold storage."

    c. "[BitMEX provides] Leading Security. BitMEX employs the latest in multi-factor security, inside and out. Safety is our primary concern."

    d. "[BitMEX provides] Advanced API. Our trading engine was built using the same technology used by investment banks and hedge funds."

    e.    "[BitMEX offers] The next generation of bitcoin trading products. Up to 100x leverage. Trading without expiry dates. Industry-leading security. Welcome to Bitcoin's most advanced trading platform."

[32] The same Warranty and Representation was additionally posted as a blog post, personally authored by Defendant Hayes, which constituted an advertisement displayed by Defendants during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/ and which called one of the operators of the Insider Trading Desk "a person [whose] integrity is unquestionable." The aforesaid blog post is attached hereto as Ex. 21 and made part hereof.

557. The aforesaid additional representations were made by Defendants, and each of them, by electronically transmitting, through a computer network, a web page document from Defendants' servers in San Francisco, California directly to respective Plaintiff's computer, displaying the above additional representations, front and center. For example, on June 19, 20, 21, 22, 23, 24, 25, 26, 27 and 28 and July 14, 2019, Defendants made the aforesaid representations to Plaintiff Kolchin. Plaintiff Razvan was similarly presented with substantially the same representations on October 25, November 13, 14 and 19, 2018 and Plaintiff BMA was similarly presented with substantially the same representations on May 5, 6, 7, 8, 17 and June 26 and 27, 2019. Plaintiff Dolgov was similarly presented with substantially the same representations on November 10, 11, 14, 15 and 19, 2018.

558. All the above additional representations, the blog post as well as the Warranty and Representation used catchy buzzwords such as "security," "safety," "audits," "unquestionable integrity," "investment banks and hedge funds," which were intentionally selected by Defendants to convey an overall message that would create a lasting impression of honesty, trust, integrity and safety with objectively reasonable investors, including Plaintiffs. For example, the words "integrity," "investment banks" and "audits" are usually associated, in the minds of objectively reasonable consumers, with regulatory oversight and extensive compliance efforts. However, in truth and in fact, this impression designed to be created and actually created by Defendants with Plaintiffs was false. In truth and in fact, Defendants lacked any compliance efforts what so ever, actively worked in secret to evade regulators, and secretly engaged in highly unethical, unscrupulous, illegal and even criminal acts on their rigged BitMEX platform, which they had a duty to disclose to Plaintiffs, pursuant to the Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and Cal. Civ. Code §§ 1709 and 1710(3), in order to make the alleged overall message as well as specific representations regarding Defendants' Insider Trading Desk conveyed by Defendants to Plaintiffs not misleading. Defendants failed to fulfill this duty.

~~548~~559. ~~However~~Therefore, during the Relevant Time Period, Defendants ~~committed~~made the following fraudulent omissions of material fact to each Plaintiff, which went to the very center, very core

and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative

trading services that Defendants offered to each Plaintiff, for a fee, through the BitMEX online

trading platform and which Defendants, therefore, had a duty to disclose[32]: under Rule 180.1, 17

C.F.R. § 180.1(a) (2019), and Cal. Civ. Code §§ 1709 and 1710(3), in order to make the alleged

overall message as well as specific representations regarding Defendants' Insider Trading Desk

conveyed by Defendants to Plaintiffs not misleading[33]:

https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in
its entirety.

[32] All the alleged omissions pertain to the entire Relevant Period.

a.  Failing to disclose to each Plaintiff that Defendants were continuously operating the Insider Trading Desk, on a 24 hours a day, 7 days a week basis, which continuously manipulated prices on BitMEX and reference exchanges and enjoyed informational and trading priority privileges over each Plaintiff, by being granted "God access" to highly sensitive and confidential insider information of Plaintiffs and other BitMEX traders, including sizes and leverage amounts for all existing positions and orders, all liquidation prices, stop loss prices and even all parameters of all hidden orders.

b.  Failing to disclose to each Plaintiff that Defendants provided the Insider Trading Desk with automated systems, built by BitMEX and Defendant ABS, leveraging this highly sensitive and confidential insider information of BitMEX traders, including each Plaintiff, to enable and automate price manipulation that estimated how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

c.  Failing to disclose to each Plaintiff that the traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of

[33] All the alleged omissions pertain to the entire Relevant Period.

BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations for BitMEX.

d.   Failing to disclose to each Plaintiff that once predetermined predicted profitability for BitMEX was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations.

e.   Failing to disclose to each Plaintiff that to prevent the conditions of the BitMEX order book from changing between the profitability prediction time and actual liquidation time, BitMEX was ~~configure~~configured to intentionally freeze its servers,

preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

f.  Failing to disclose to each Plaintiff that the access to hidden information thus provided the operators of the Insider Trading Desk with a substantial, unfair and secret advantage over BitMEX customers, including Plaintiffs.

g.  Failing to disclose to each Plaintiff that, by analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX.

h. Failing to disclose to each Plaintiff that BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

i.  Failing to disclose to each Plaintiff that Defendants used secret, anonymous accounts to trade against BitMEX customers, including Plaintiffs.

j.  Failing to disclose to each Plaintiff that Defendants granted privileged access to the BitMEX platform to the anonymized accounts, while customers, including

Plaintiffs, were locked out, and by misrepresenting that the Insider Trading Desk did not have such access.

k.  Failing to disclose to each Plaintiff that Defendants' Insider Trading Desk was equipped and designed to and operated to continuously intentionally trigger automatic liquidations of trading positions of BitMEX traders, including Plaintiffs, through customer lock-outs and by manipulating prices of underlying cryprtocommodities for its swap cryptoderivative products on reference exchanges and, thus, on the BitMEX platform.

l.  Failing to disclose to each Plaintiff that Defendants continuously allowed BitMEX insiders including Hayes, Delo and Reed to freely and continuously trade on the BitMEX platform against BitMEX customers, despite their complete control of the BitMEX trading platform and their "God access" to confidential BitMEX client information, including customer positions, leverage amounts, liquidation points and orders and despite resulting clear conflict of interest, prohibited by CFTC regulations.

m.  Intentionally misrepresenting to each Plaintiff that Defendants were using and would continue to use commercially reasonable efforts to prevent customer lock-outs on the BitMEX platform, while failing to disclose to Plaintiffs that these lock-outs were intentional and specifically designed to facilitate manipulation by Defendants' Insider Trading Desk.

n.  Failing to disclose the susceptibility of the BitMEX platform to customer lock-outs and their predictable, negative effects on customers and beneficial effect for BitMEX, including through the operation of the Insurance Fund.

o.  Failing to disclose to each Plaintiff that Defendants had no rules or procedures whatsoever sufficient to ensure that: the contracts BitMEX offered to Plaintiffs were not readily susceptible to manipulation; market participants were prevented from engaging in manipulation or disruptive trading; and market participants who

engage in misconduct were subject to discipline, all in violation of CFTC regulations.

p. Failing to disclose to each Plaintiff that Defendants failed to maintain required records, and in fact has actively deleted required records including critical customer identification information, all in violation of CFTC regulations.

q. Failing to disclose to each Plaintiff that Defendants had no rules whatsoever to minimize conflicts of interest and allowed insiders, including Defendant Hayes, Delo, Reed, and numerous other BitMEX employees with access to confidential

trader insider information, including sensitive Plaintiffs' information, to continuously trade on the platform, and that BitMEX's own internal "market-making" desk was one of the largest traders on the platform.

~~549~~560. Therefore, Defendants committed fraudulent omissions during the Relevant Period in at least three main respects.

~~550~~561. *First*, Defendants committed fraudulent omissions regarding the nature and operations of the Insider Trading Desk.

    a. BitMEX's updated Service Agreement on its website revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." Defendants did not disclose, however, that the Insider Trading Desk enjoys ~~information~~informational, trading and technical advantages over BitMEX customers, described above, or that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer liquidations.

~~551~~562. Given that BitMEX trades against its own customers, each Plaintiff would want to know and reasonably and justifiably expected Defendants to disclose the facts bearing on how BitMEX conducts such trades and the extent to which BitMEX is likely to be successful in conducting such trades, as a reasonable investor would consider this information very important

in deciding whether to make an investment in Defendants' Perpetual Swaps. Pursuant to Rule 180.1, 17 C.F.R. § 180.1(a) (2019), Defendants had a common law duty to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff. In addition, Defendants had a statutory duty under California law to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff under Cal. Civ. Code § 1710(3), which defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

552563. Accordingly, pursuant to their common law duty under Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and statutory duty under Cal. Civ. Code § 1710(3) to avoid making partial, misleading representations about the activity of the Insider Trading Desk, that effectively concealed material facts from each Plaintiff, Defendants

were obligated to (but did not) disclose the ~~information~~informational, trading and technical advantages that Insider Trading Desk enjoys over each Plaintiff and other BitMEX customers and that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer, including each Plaintiff's liquidations. Therefore, Defendants' concealment of material facts from each Plaintiff actually ~~mislead~~misled each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

~~553~~564. *Second*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and scope of the customer lock-outs on BitMEX.

      a. In early 2019, BitMEX's website vaguely disclosed that undefined system overloads might disrupt access to the BitMEX platform. The website has further stated since that time that the customer lock-outs are a result of technical limitations regarding the volume of trading the platform can accommodate.

b. Defendants did not disclose, however, that any such technical limitations do not restrict the Insider Trading Desk, which remains able to trade against BitMEX customers during the lock-outs.

c. Where BitMEX trades against its own customers, a reasonable BitMEX customer would conclude that a lock-out would suspend all trading on the platform, and the Insider Trading Desk's ability to use the platform during customer lock-outs provided BitMEX with a substantial advantage in trading against BitMEX customers.

d. Accordingly, in order to avoid making partial, misleading representations that effectively concealed material facts from each Plaintiff, about the nature and scope of lock-outs, Defendants were obligated to disclose that the lock-outs do not restrict the Insider Trading Desk.

e. Since early 2019, moreover, referring to the "Services" available on its trading platform, BitMEX has at least recklessly and falsely claimed that it "shall make

reasonable efforts to ensure that the Services are available to you" and that BitMEX "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

f.    In fact, BitMEX did not intend and has failed to use reasonable or commercially reasonable efforts to avoid customer lock-outs, and in knowingly or recklessly claiming otherwise, BitMEX deceived customers into trading on the platform.

g. Indeed, on information and belief, for the reasons alleged above, Defendants knowingly or recklessly intend the customer lock-outs regularly to occur, in particular during periods of high volatility, to lock out BitMEX customers from their accounts during large market moves in order to increase the number of position liquidations.

h. Accordingly, in order to make their statements about their purported intent to use reasonable or commercially reasonable efforts to avoid such lock-outs not partial,

misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated to disclose their intent to use these lock-outs to their advantage.

~~554~~565. *Third*, Defendants made fraudulent statements and committed fraudulent omissions regarding the supposedly "hidden orders" that each Plaintiff may place on the BitMEX platform:

     a. The BitMEX website stated throughout the Relevant Period that a "Hidden Order" is an order "that is not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

     b. Defendants did not disclose to each Plaintiff, however, that these orders are not hidden from BitMEX and its insiders.

     c. Based on the information provided by Defendants, each Plaintiff reasonably concluded that no one using the BitMEX platform would be able to trade based on the details of his so-called "hidden" orders and that so-called "hidden" orders

would not provide BitMEX and its insiders with a substantial advantage in trading against each Plaintiff. This conclusion was wrong because of fraudulent omission of critical information about so-called "hidden" orders by Defendants.

~~555~~566. Accordingly, in order to make its description of a "hidden order" not partial, misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated under Rule 180.1, 17 C.F.R. § 180.1(a) (2019), to disclose to each Plaintiff that hidden orders were not in fact hidden from BitMEX, and its insiders were obligated to disclose throughout the Relevant Period that BitMEX trades against its customers with knowledge of the details of each Plaintiff's hidden orders. Defendants have failed to disclose this critical information to each Plaintiff, which Plaintiffs reasonably and justifiably expected Defendants to disclose as the facts in question went to the very core of BitMEX's operation, integrity and profit model.

~~556~~567. When the Defendants committed the aforesaid fraudulent omissions to each Plaintiff, Defendants intentionally omitted a clear disclosure of the facts stated above because giving a clear explanation of how BitMEX platform really operated would have punctured the illusion of risk-free casino-style profits that Defendants promised each Plaintiff. Defendants' fraudulent omissions to each Plaintiff were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged.

~~557~~568. Defendants knew of and intentionally perpetuated these misrepresentations, half-truths and omissions. BitMEX and the individual ~~Defendant~~Defendants Hayes, Delo and Reed concealed facts that went to the very core of BitMEX's operation, integrity and profit model and could not reasonably have been unaware of these facts. In making these misrepresentations, half-truths and omissions, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in perpetuating these misrepresentations, half-truths and omissions in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

~~558~~569. Defendants intended that each Plaintiff rely on these misrepresentations, half-truths and omissions, and each Plaintiff reasonably did so, given that these statements concerned core aspects of BitMEX's business.

~~559~~570. Each Plaintiff, at the time these fraudulent misrepresentations, half-truths and omissions were made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the material facts fraudulently omitted by Defendants. In reliance on these misrepresentations, half-truths and omissions, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading thereon

to his financial loss and detriment. For example, in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs ~~initially~~ deposited[3334] with Defendants:

| Kolchin | ~~May 10~~June 19, 2019 | ~~3~~1.01 bitcoins |
| Razvan | November 14, 2018 | 50 bitcoins |
| Dolgov | November 1, 2018 | 2 ~~bitcoin~~bitcoins |
| BMA | May 5, 2019 | 5 ~~bitcoin~~bitcoins |

~~560~~571. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' misrepresentations, half-truths and omissions, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with

---

[3334] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.000~~50052~~ bitcoins in total, of which Defendants wrongfully ~~collected from him trading~~ commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

~~market, at the time, from reputable and financially stable companies including U.S. based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' misrepresentations, half-truths and omissions, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with~~ Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 14, 2019 | ~~65~~25 | 1.01 ~~3~~ bitcoins | 5.95% | ~~0.03178~~0.0041 bitcoins |
| Razvan | November 14, 2018 | May 3, 2019 | 170 | 50 bitcoins | 5.95% | 1.3856 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 ~~bitcoin~~bitcoins | 5.95% | 0.02811 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 ~~bitcoin~~bitcoins | 5.95% | 0.2551 bitcoins |

| | |
|---|---|
| **Total:** | ~~1.70059~~1.67291 bitcoins |

~~561~~572. In further reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff Kolchin traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on July ~~15~~14, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins

in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin ~~perpetual swaps~~<u>Perpetual Swaps</u> on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day, when its XBTUSD ~~perpetual swap~~<u>Perpetual Swap</u> long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin ~~perpetual swaps~~<u>Perpetual Swaps</u> on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD ~~perpetual swap~~<u>Perpetual Swap</u> long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's ~~perpetual swap~~<u>Perpetual Swap</u> position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God Access," in direct violation of the Warranty and Representation. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded ~~perpetual swaps~~<u>Perpetual Swaps</u>, suffered such losses and would not have paid trading commissions to Defendants.

~~562~~<u>573</u>. Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs

incurred the following monetary damages associated with trading commissions[3435] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated

[35] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

to fraudulently induce Plaintiffs to pay trading commissions to Defendants. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least ~~0.15~~0.015 bitcoins, at the time he opened his ~~first~~initial swap position on BitMEX, in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | **Total:** | **21.05 bitcoins** |

~~34 BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.~~

~~563~~574. Each Plaintiff's reliance on Defendants' fraudulent misrepresentations, half-truths and omissions was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. ~~For example~~First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for ~~its~~their Insider Trading Desk with BitMEX exchange,

to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, each Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

564575. Defendants' fraudulent misrepresentations, half-truths and omissions allowed BitMEX to create the false impression with Plaintiffs that if BitMEX was trading against Plaintiffs and its own customers, it nevertheless was not doing so with substantial trading advantages over Plaintiffs and the customers; that BitMEX would not be able to, and would not, take advantage of customer lock-outs to benefit BitMEX at the expense of Plaintiffs and the customers; and that the prices of bitcoin and ether used to determine the value of Bitcoinbitcoin and Ethereumether derivative products traded on BitMEX were prices that BitMEX had not itself manipulated.

565576. With these false impressions established, Defendants were able improperly and fraudulently to induce each Plaintiff to use the BitMEX platform, to liquidate each Plaintiff's trading positions on BitMEX using each Plaintiff's very sensitive insider information about each Plaintiff's position and open orders, to use the Insider Trading Desk to orchestrate disadvantageous trades for Plaintiffs, and to manipulate the price of bitcoin and ether on "reference" exchanges to orchestrate further disadvantageous trades and position liquidations for Plaintiffs.

566577. Defendants generated ill-gotten gain from their fraud by collecting trading commissions from each Plaintiff for trading on the BitMEX platform that occurred as a result of

the fraud (each Plaintiff would each not have used the platform if he had known the truth); prevailing as the counterparty against Plaintiff with respect to trading that occurred as a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth); and increasing the size of the Insurance Fund through position liquidations that occurred as

a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth).

~~567~~579. Defendants' fraud was thus a direct and proximate cause of the injury to Plaintiffs in that Plaintiffs traded in ~~swaps and futures~~Perpetual Swaps on margin on BitMEX as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses from such trading amounting to 249.9 bitcoins, in addition to sustaining bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, as a result of their reasonable failure to know the actual facts fraudulently concealed from Plaintiffs by Defendants. Thus, the total loss sustained by Plaintiffs was ~~272.65~~272.62 bitcoins.

~~568~~579. Each Plaintiff would not have deposited his bitcoins with BitMEX and traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above, fraudulently concealed from each Plaintiff by Defendants.

~~569~~580. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' fraudulent concealment of material facts from each Plaintiff, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading losses he suffered, and that Defendants would generate the ill-gotten gains they did.

~~570~~581. As a direct and proximate result of Defendants' fraudulent misrepresentations and concealment of material facts from each Plaintiff, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential and sensitive order and position information, wherein the Insider Trading Desk had priority access to the trading order queues and not subject to lockouts, by reason of

which Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

~~571~~582. Defendants' fraudulent concealment of material facts related to the operation of BitMEX from each Plaintiff constituted the use of a "manipulative or deceptive device or contrivance" under 7 U.S.C. ~~§~~§§ 9(1), and "manipulative device, scheme, or artifice to defraud," including "untrue or misleading statement of a material fact or [omission of] a material fact necessary in order to make the statements made not untrue or misleading" and "act, practice, or course of business, which operates or would operate as a fraud or deceit upon" Plaintiffs, under Rule 180.1, 17 C.F.R. § 180.1(a) (2019). Defendants' fraudulent concealment of material facts related to the operation of BitMEX actually deceived Plaintiffs into altering their positions by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.

583. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

584. Cal. Civ. Code § 1710(3) defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

585. Defendants "[gave] information of other facts which are likely to mislead for want of communication of [the omitted] fact" by providing to Plaintiffs the false Warranty and Representation without disclosing the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs, liquidations. This made the Warranty and Representation at least misleading. Accordingly, Defendants' conduct constituted deceit under Cal. Civ. Code § 1710(3).

586. Moreover, California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2)

when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

587. Defendants had exclusive knowledge of material facts related to the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and of material fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customer, including each Plaintiffs' liquidations. These material facts were not known to Plaintiffs. Therefore, Defendants were obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

588. Additionally, Defendants engaged in an active concealment of the true facts related to the operation of the Insider Trading Desk. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the Insider Trading Desk as the origin of manipulative trading. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted critical records, including trader identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with the BitMEX platform. This was done to cover up any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits of the Insider Trading Desk could not be traced back to the BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Defendants were additionally obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

589. Furthermore, Defendants "[made] partial representations [about the Insider Trading Desk] but also suppresses some material facts" regarding informational, technical and

trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs' liquidations. Therefore, Defendants were additionally obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

590. Accordingly, by failing to disclose the above facts, as they were required to do under California law, Defendants committed fraudulent concealment and, therefore, engaged in "manipulative device, scheme, or artifice to defraud" and further engaged in "act, practice, or course of business, which operates or would operate as a fraud or deceit upon" Plaintiffs, under Rule 180.1, 17 C.F.R. § 180.1(a) (2019).

~~572~~591. Therefore, Defendants' conduct violated 7 U.S.C. §~~§~~ 9(1) (2018) and Rule 180.1 ~~and~~, 17 C.F.R. § 180.1(a) (2019), and, pursuant to 7 U.S.C. §§ 25(a)(1)(B), (C)(iv), Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least ~~272.65~~272.62 bitcoins.

## **COUNT IV**
**Use of Manipulative Device or Contrivance in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1 (Operating Insider Trading Desk With Undisclosed Informational And Trading Privileges) — Against All Defendants**

~~573~~592. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~574~~593. 7 U.S.C. § 9(1) (2018), makes it unlawful, in relevant part, for any person, directly

o r

indirectly, to:

use or employ, or attempt to use or employ, in connection with any swap, ... any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer

Protection Act] ...

~~575~~594. Rule 180.1, 17 C.F.R. § 180.1(a) (2019), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, ... to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud ...

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person ...

~~576~~595. Bitcoin and ether Perpetual Swaps traded by all Plaintiffs are "swaps" as defined

by Section 1a(47)(A) of the CEA, 7 U.S.C. § 1a(47)(A) (2018). Therefore, these ~~Bitcoin~~bitcoin and ether

Perpetual Swaps are also "swaps" within the meaning of 7 U.S.C. § 9(1) and Rule 180.1, 17

C.F.R. § 180.1(a) (2019).

~~180.1(a).~~

~~577~~596. Section 22 of the CEA provides for a private right of action for a plaintiff who

made "any swap" through a person or entity whose violation of the CEA resulted in actual

damages to the plaintiff, 7 U.S.C. § 25(a)(1)(B), or who placed through such person or entity "an

order for the purchase or sale of ... a swap," id. § 25(a)(1)(C)(iv).

~~578~~597. During the Relevant Period, Defendants used a deceptive device or contrivance

and fraudulent course of business to benefit themselves at the expense of Plaintiffs by operating

and Insider Trading Desk, which had special access to hidden customer information and priority

access to trading queues. Defendants combined these undisclosed and unlawful advantages with

algorithmic tools that ~~would display~~displayed in real time which price movements would cause the greatest

number of profitable liquidations for BitMEX. Defendants ~~would~~ then ~~use~~used their Insider Trading Desk

~~Desk~~ to place orders that ~~would move~~moved the market, harming customers and profiting themselves~~.~~ during

Relevant Period, including June 27, 2019, July 14, 2019, November 14, 2018 and November 25,

2018, when Plaintiffs suffered the alleged losses.

579598. Defendants further employed manipulative devices by inducing artificial prices and price movements on U.S.-based third-party "reference" exchanges, including Coinbase Pro, Bitstamp, and Kraken, and using such price movements to force liquidations of customer swap positions on BitMEX, including during customer lock-outs caused by server freezes while the Insider Trading Desk was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations of Plaintiffs.

Insider Trading Desk was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations of Plaintiffs.

580599. During the Revevant Period, in which Defendants persistently manipulated the prices on BitMEX for Bitcoinbitcoin and Ethereumether derivative products, Plaintiffs transacted in Bitcoin or Ethereumether derivative products on the BitMEX platform at artificial and unlawful prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these artificial prices, and as a direct result thereof suffered actual damages.

581600. Plaintiffs would not have traded on the BitMEX platform, and thus paid the fees trading commissions and suffered their net losses from such trading, if they had known the actual facts.

601. The automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

602. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of

obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[36]

603. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

~~582~~604. Defendants were fully aware of and intended these price manipulations. Defendants specifically sought and secured the creation of the technical system that gave the Insider Trading Desk its advantages and controlled the manipulation of prices on the reference exchange. Defendants' manipulation was designed to and did in fact create persistently artificial prices for ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivative products on BitMEX.

~~583. During the Revevant Period, Plaintiffs thus entered into Bitcoin and Ethereum~~ 605. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Plaintiffs thus entered into bitcoin and ether derivative products through BitMEX and suffered

[36] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

actual damages from trading such swaps as a result of Defendants' use or employment, in

connection with the swaps, of a manipulative device and contrivance in violation of the CEA and ~~Rule 180.1.~~

Rule 180.1, 17 C.F.R. § 180.1(a) (2019).

~~584~~606. Plaintiffs BMA, Kolchin, Dubinin, Dolgov, Dubinin and Razvan sustained and are

entitled to actual damages for the violations of the CEA alleged herein.

## COUNT V
### Use of Manipulative Device or Contrivance in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1 (Triggering Intentional Server Freezes and System Overloads) — Against All Defendants

~~585~~607. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~586~~608. 7 U.S.C. § 9(1), makes it unlawful, in relevant part, for any person, directly or

indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, ... any manipulative or deceptive device or contrivance, in contravention of such rules and

regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] ...

~~587~~609. Rule 180.1, 17 C.F.R. § 180.1(a) (2019), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, ... to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud ...

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person ...

~~588~~610. Bitcoin and ether Perpetual Swaps traded by all Plaintiffs are "swaps" as defined

by Section 1a(47)(A) of the CEA, 7 U.S.C. § 1a(47)(A) (2018). Therefore, these ~~Bitcoin~~bitcoin and ether

Perpetual Swaps are also "swaps" within the meaning of 7 U.S.C. § 9(1) and Rule 180.1, 17

C.F.R. § 180.1(a) (2019).

~~180.1(a).~~

~~589~~611. Section 22 of the CEA provides for a private right of action for a plaintiff who made "any swap" through a person or entity whose violation of the CEA resulted in actual damages to the plaintiff, 7 U.S.C. § 25(a)(1)(B), or who placed through such person or entity "an order for the purchase or sale of ... a swap," id. § 25(a)(1)(C)(iv).

~~590~~612. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiffs by intentionally orchestrating server freezes and system overloads on the BitMEX platform during market moves aimed at preventing traders from escaping their positions during market volatility. On June 27 ~~During Relevant Period, each of the~~, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Plaintiffs tried to place trading orders to close or hedge their open positions during ~~such~~these server freezes but

were unable to do so. As the result, Plaintiffs were unable to salvage their collateral as the proximate and natural consequence ~~was unable to do so. As the result, each Plaintiff was unable to salvage his collateral as the result~~ of the intentional server freezes and system overloads orchestrated by Defendants during periods of market volatility, including on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, when Plaintiffs sustained their losses alleged herein. Defendants froze BitMEX servers to prevent the conditions of the BitMEX order book from changing between the time when Defendants' automated manipulation tools predicted profitability of potential liquidations of Plaintiffs and the actual liquidation time, preventing Plaintiffs from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

~~of market volatility.~~

613. If Defendants did not freeze their servers on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, at least a portion of Plaintiffs' collateral would have been preserved and not confiscated from Plaintiffs. Therefore, the server freezes, intentionally orchestrated by Defendants on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 constituted a deceptive device or contrivance and fraudulent course of business, and were a substantial factor in Plaintiffs' financial losses alleged herein.

~~591~~614. Plaintiffs BMA, Kolchin, Dubinin, Dolgov, Dubinin and Razvan sustained and are entitled to actual damages for the violations of the CEA alleged herein.

## COUNT VI
**Price Manipulation in Violation of 7 U.S.C. §§ 9(~~13~~3), 25(a)(1)(B), (C)(iv), and Rule 180.1 — Against All Defendants**

~~592~~615. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~593~~616. Section 6(3) of the CEA states in relevant part that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity." 7 U.S.C. § 9(3).

~~594~~617. Section 22(a)(1)(D)(ii) of the CEA, referring back to Section 22(a)(1)(D)(i), makes unlawful the "manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D)(ii).

~~595~~618. During the Relevant Period, Defendants, using automated software tools that BitMEX specially developed for its Insider Trading Desk and which operated 24 hious a day 7 days a week, created persistently artificial prices for their bitcoin and ether ~~perpetual swap~~Perpetual Swap products. Defendants' Insider Trading Desk persistently and regularly engaged in trading on their own platform and on U.S.-based third-party "reference" exchanges, including Coinbase Pro, Bitstamp, and Kraken, that was designed to and did manipulate prices of these bitcoin and ether derivative products in order to cause liquidations and profit Defendants.

~~596~~619. Defendants' undisclosed Insider Trading Desk had special access to hidden customer information and priority access to trading queues. Defendants combined these undisclosed and unlawful advantages with algorithmic tools that would display in real time which price movements would cause the greatest number of profitable liquidations for BitMEX. Defendants would then use their Insider Trading Desk to place orders that would move the market, harming customers and profiting themselves.

~~597~~620. Defendants further manipulated prices of their derivative products by inducing

artificial prices and price movements for bitcoin and ether on U.S.-based third-party "reference"

exchanges, including Coinbase, Bitstamp, and Kraken, and using such price movements to force

liquidations of customer swap and futures positions on BitMEX, including during customer lock-

outs while the Insider Trading Desk was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations.

~~598~~621. During the Relevant Period, Defendants manipulated U.S.-based third-party "reference" exchanges and thus caused artificial prices on the BitMEX platform because, as alleged above, some of these third-party exchanges were relatively thinly traded exchanges on which relatively small market orders would cause relatively large price movements. Defendants in fact traded sufficient volumes of bitcoin and ether on these exchanges to cause price movements; and the prices of bitcoin and ether on BitMEX for ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivative products was directly tied to the prices on these third-party exchanges.

~~599~~622. During the Relevant Period, Defendants specifically intended to cause artificial prices for ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivative products on the BitMEX platform in order to liquidate their customers, including Plaintiffs. Defendants thus acted with the purpose and conscious objective of causing and affecting prices that did not reflect the legitimate forces of supply and demand.

~~600~~623. Defendants possessed the motive and opportunity to cause these artificial prices because they would benefit from them, profiting from both disadvantageous trades for BitMEX customers and from liquidations of customer trading positions resulting from these price movements, and because Defendants possessed sufficient amounts of bitcoin (over 37,300 bitcoins) and ether to cause such price movements.

~~601~~624. Strong circumstantial evidence of Defendants' conscious misbehavior exists in that, among other such evidence, BitMEX has admitted to trading against its customers for financial advantage, and large trades on the U.S.-based third-party reference exchanges, in volumes of bitcoin and ether that the overwhelming majority of traders did not use to trade, frequently caused BitMEX immediately to benefit from the resulting price movements.

~~602~~625. Defendants manipulated prices during the Relevant Period from Defendants' offices in San Francisco, California; New York, New York and Milwaukee, Wisconsin, and

transmitted wire signals from those locations to the computer servers of U.S.-based third-party "reference" exchanges.

~~603~~626. During the Relevant Period, in which Defendants persistently manipulated prices of their ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivatives, Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein.

~~604~~627. During the Relevant Period, Plaintiffs thus entered into ~~swaps and futures~~Perpetual Swaps through BitMEX, and suffered actual damages from such swaps ~~and futures~~ as a result of, in connection with the swaps ~~and futures~~, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX, in violation of the CEA.

~~605~~628. As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether ~~perpetiual swaps~~Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions.

~~606~~629. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

~~607~~630. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and

exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[35][37]

608631. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for ~~its~~their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

609632. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, took the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession and converted the same to their own use. As BitMEX ~~Enterprise~~enterprise principals, Defendants HDR and Hayes are liable for the unlawful conduct of their agents, operators of the BitMEX Insider Trading Desk Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment, when they utilized Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to artificially liquidate Plaintiffs' trading positions on BitMEX.

---

[35][37] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to artificially liquidate Plaintiffs' trading positions on BitMEX.

610633. Plaintiffs BMA, Kolchin, Dubinin, Dolgov, Dubinin and Razvan sustained and are

entitled to actual damages for the violations of the CEA alleged herein.

## <u>COUNT VII</u>
### Principal Agent Liability Under CEA — Against All Defendants

611634. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

612635. The CEA provides in relevant part that the "act, omission, or failure of any ... official, agent, or other person acting for any ...individual, association, partnership, corporation..., or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such ...individual, association, partnership, corporation..., or trust, as well as of such ...official, agent, or other person." 7 U.S.C. § 2(a)(1)(B).

636. As BitMEX Enterprise principals, Defendants HDR, Hayes, Delo and Reed are liable for the unlawful conduct of their agents, operators of the BitMEX Insider Trading Desk Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment with Defendants HDR, Hayes, Delo and Reed, when they utilized Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to artificially liquidate Plaintiffs' trading positions on BitMEX.

637. In addition, as BitMEX Enterprise principals, Defendants HDR, Hayes, Delo and Reed are liable for the unlawful conduct of their agents and employees, who acted, during Relevant Period, within the scope of their agency and employment with Defendants HDR, Hayes, Delo and Reed, when they assisted with transmitting fraudulent solicitations to Plaintiffs as alleged herein.

613638. Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the fraudulent and manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

614639. Plaintiffs BMA, Kolchin, Dubinin, Dolgov, Dubinin and Razvan sustained and are
 entitled to actual damages for the violations of the CEA alleged herein.

## COUNT VIII
**Aiding and Abetting Manipulation Of Bitcoin Swaps And Cash Bitcoin In Violation Of 7 U.S.C. § 25(a)(1) — Against All Defendants**

~~615~~640. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~616~~641. Defendants, and each of them, knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Gregory Dwyer, Stuart Elkington and Nick Andrianov, market manipulator under assumed name Quick-Grove-Mind listed on BitMEX Leaderboard as alleged above, and unknown third persons as alleged herein. In addition, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Defendants HDR, Hayes, Delo and Reed. Each Defendant did so with knowledge of

other Defendants' and unknown third persons' manipulation of cryptocurrency prices through manipulative trades, and substantially and willfully intended to assist these manipulations to cause artificial prices, during the Relevant Period, in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a) and 25(a)(1).

642. For example, Defendant HDR knowingly aided and abetted Gregory Dwyer, Stuart Elkington and Nick Andrianov and unknown third persons in violation of the CEA by enabling the price manipulators to open unlimited number of anonymous trading accounts on HDR exchange and thereby hindering detection of said manipulation. Each of the Defendants HDR, Hayes, Delo, Reed was responsible for implementing this policy on the BitMEX exchange. Moreover, Defendant HDR knowingly aided and abetted Gregory Dwyer, Stuart Elkington and Nick Andrianov and unknown third persons in violation of the CEA by providing high leverage, by deliberately designing BitMEX indexes based on price data for cryptocurrencies from just three exchanges - BitStamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX and by using deliberate server freezes and fraudulent "system overloads" events to accept some trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations to benefit Defendants. Moreover, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the

violations of the CEA by Defendants HDR, Hayes, Delo and Reed by furnishing to said Defendants software tools designed to cause deliberate server freezes alleged hereinabove using services of at least three Site Reliability Engineers: Jerry Aldrich, Scott H. and Armando Cerna, who created those tools and who all reside in and operate from this District.

617643. For example, Defendants knew that BitMEX Leaderboard trader with assumed name Quick-Grove-Mind was clearly a notorious market manipulator, who misappropriated bitcoins from Plaintiffs by way of market manipulation as alleged herein. This market manipulator could not pass the KYC and AML checks once they were instituted by Defendants on or about August 14, 2020. Defendants aided the market manipulator under the assumed name Quick-Grove-Mind in misappropriating Plaintiffs' property by, without limitation, providing the manipulator under the assumed name Quick-Grove-Mind with extremely high trading leverage

(up to 100x), using .BXBT index price for highly liquid ~~perpetual swap~~ Perpetual Swap contracts calculated based on prices of two or three illiquid spot exchanges to enhance the ability of the manipulator under the assumed name Quick-Grove-Mind to cause large market price swings, enabling the manipulator under the assumed name Quick-Grove-Mind to avoid detection by providing him with the ability to open unlimited number of anonymous document check-free trading accounts without any KYC and AML compliance checks and without any trading and withdrawal limits, intentionally taking BitMEX platform offline during market manipulation event on March 13, 2020, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations and by deleting evidence of manipulator's identity and manipulator's trading records under the pretense of "right to be forgotten." The alleged intentional actions of Defendants resulted at least in the alleged loss of 3 bitcoins by Plaintiff BMA on or about March 13, 2020.

~~618~~644. As a proximate result of the Defendants' actions as alleged herein, Plaintiffs BMA,
 Kolchin, Dubinin, Dolgov and Razvan sustained concrete monetary cryptocurrency Domestic Injury in the amount to be proven at trial.

619645. Therefore, Defendants, and each of them, are liable, jointly and severally, to

Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan under 7 U.S.C. §§ 25(a) in the amount to

be proven at trial.

**COUNT IX**
**Conduct Of, Or Participation In The Conduct Of Enterprise's Affairs Through A Pattern**
**Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(c) — Against All Defendants**
**(Association In Fact Enterprise)**

620646. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

621647. During Relevant Period, Enterprise engaged in activities that affectaffected interstate

and foreign commerce. In addition, the predicate acts of racketeering alleged herein also affected

interstate and foreign commerce. Specifically, the Enterprise directly engaged in the production,

distribution, or acquisition of goods and services in interstate commerce and foreign commerce,

including, without limitation, very large volume (up to one trillion U.S. dollars of turnover per

year) cryptocurrency derivatives trading services.

commerce. The648. During Relevant Period, the Defendants arewere employed by or
associated with the Enterprise.

Enterprise.

622649. Allegations of specific acts constituting fraudulent solicitations set forth in

Paragraphs 474496-571590 above are incorporated as if fully set forth herein. Wire transmissions
ofSpecific wire

transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute at least some predicates acts of wire fraud ~~under~~by Defendants in violation of 18 U.S.C. § 1343.

~~623~~650. Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity ~~and~~ for the unlawful purpose of intentionally fraudulently soliciting and otherwise defrauding Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders and misappropriating their cryptocurrency holdings as well as the Purposes alleged above. Specifically, Defendants engaged in continuous pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), monetary transactions in property derived from specified

unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952. The alleged acts were perpetrated by Defendants during Relevant Period on a daily basis, including during each of the Manipulation Times, and continue to take place.

624651. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterpriseEnterprise in violation of 18 U.S.C. § 1952.

625652. The acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of

racketeering ~~enterprise~~Enterprise in violation of 18 U.S.C. § 1952 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

~~626. Plaintiffs are informed and believe and thereon allege that~~653. Defendants, and each of them, took part in directing the affairs of the alleged Enterprise by engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~Enterprise in violation of 18 U.S.C. § 1952.

~~627. The~~654. Defendants have directly and indirectly conducted and participated in the conduct of the ~~enterprise's~~Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

~~628. Plaintiffs are informed and believe and thereon allege that~~655. Defendants, and each of them, (1) gave or took directions; (2) occupied a position in the "chain of command" through which the affairs of the Enterprise are conducted; (3) knowingly implemented decisions of upper management; and (4) were indispensable to the achievement of the alleged Enterprise's goals.

~~629. Plaintiffs are informed and believe and thereon allege that~~656. Defendants, and each of them, conducted or participated in the conduct of the affairs of the alleged Enterprise engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~Enterprise in violation of 18 U.S.C. § 1952.

~~630. Plaintiffs are informed and believe and thereon allege that Defendants, and each of~~

657. Defendants, and each of them, participated in a pattern of racketeering activity, which included at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~Enterprise in violation of 18 U.S.C. § 1952. Defendants, and each of them, committed the alleged predicate offenses as a part of conducting or participating in the Enterprise, and, therefore, ~~is~~are liable for the violation of the RICO, 18 U.S.C. § 1964(c).

~~631~~658. As a direct and proximate result of the Defendants', and each of them, conduct of

or participation in the long-running Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~Enterprise in violation of 18 U.S.C. § 1952, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan have been domestically injured in its business and property in the amount to be proven at trial.

659. During the Relevant Period, Defendants engaged in fraudulent solicitations of Plaintiffs' bitcoin deposits, orders and trading commissions using a laundry list of misrepresentations, half-truths and omissions and Plaintiffs suffered actual damages alleged herein as a result of their reasonable and justifiable reliance on these fraudulent solicitations. These fraudulent solicitations constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

~~632.~~660. Moreover, During the Relevant Period, in which Defendants persistently manipulated prices of their ~~Bitcoin and Ethereum derivatives~~bitcoin and ether Perpetual Swaps, Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein. The wire transmissions of the manipulative trading orders by Defendants further constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

~~633~~661. During the Relevant Period, Plaintiffs thus entered into ~~swaps and futures~~<u>Perpetual Swaps</u> through BitMEX, and suffered actual damages from such swaps ~~and futures~~ as a result of, in connection with the ~~swaps and futures~~<u>Perpetual Swaps</u>, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX, in violation of the CEA.

634662. As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein.

663. Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether perpetiualperpetual swaps and wrongfully liquidating Plaintiffs' margined positions.

635664. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information about Plaintiffs' open positions and orders, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on "reference" exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

665. In causing the alleged financial harm to Plaintiffs, the aforesaid operation of the automated software tools built by Defendants involved at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in

violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering Enterprise in violation of 18 U.S.C. § 1952.

636666. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[3638]

667. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

668. Because the vast majority of BitMEX personnel, almost the entire engineering

---

[3638] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. For example, Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin.

669. In addition, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this District (over 70 employees). Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

670. Therefore, Defendants, and each of them, are liable, jointly and severally, to Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18 U.S.C. § 1962(c) in the amount of triple of Plaintiffs' losses to be proven at trial.

### COUNT X
### Conspiracy To Conduct Or Participate In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(d) — Against All Defendants (Association In Fact Enterprise)

671. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

672. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically, Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity alleged hereinabove in the interstate Enterprise (18 U.S.C. § 1962(a)); (2) acquire or maintain interests in the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(b)); and (3) conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(c)).

673. Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that was derived from a pattern of racketeering activity, including fraudulent solicitations, market manipulation and other illegal acts in the operation of an interstate Enterprise, acquire or maintain interests in the Enterprise through a pattern of racketeering activity alleged hereinabove, and conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity alleged hereinabove. Defendants knew that their predicate acts were part of a pattern of racketeering activity alleged hereinabove and agreed to the commission of those overt acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d). For example, in furtherance of the Racketeering Conspiracy, Defendants HDR, ABS, Hayes, Delo and Reed, invested the illegal income derived from the fraudulent solicitations, market manipulation and other illegal acts perpetrated by them on the BitMEX platform into the Enterprise, by renting for its benefit an entire floor in one of the most exclusive buildings in Hong Kong, an entire floor in one of the most exclusive buildings in San Francisco and renting three Lamborghinis during the 2018 Consensus conference in New York in order to use these public stunts to attract even more innocent victims to the rigged BitMEX platform, operated by the Enterprise.

674. Allegations of specific overt acts constituting fraudulent solicitations set forth in Paragraphs 496-590 above are incorporated as if fully set forth herein. Wire transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute predicates acts of wire fraud

under 18 U.S.C. § 1343 and also constitute overt acts in furtherance of the Racketeering Conspiracy under 18 U.S.C. § 1962(d) alleged herein.

675. Defendants, and each of them, intended to further the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

676. Defendants, and each of them, intended to further the money laundering endeavor in violation of 18 U.S.C. § 1956.

677. Defendants, and each of them, intended to further the transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

678. Defendants, and each of them, intended to further the wire fraud in violation of 18 U.S.C. § 1343, including all acts of using wire transmissions for purposes of fraudulent solicitation and market manipulation alleged herein.

679. Defendants, and each of them, intended to further the interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

680. Defendants, and each of them, intended to further the interstate and foreign travel or transportation in aid of racketeering Enterprise in violation of 18 U.S.C. § 1952.

681. Defendants, and each of them, have been aware of the essential nature and scope of the alleged Enterprise and intended to participate in it.

682. Defendants, and each of them, agreed to commit, or participate in, a pattern of overt predicate acts in furtherance of the Racketeering Conspiracy, namely at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering Enterprise in violation of 18 U.S.C. § 1952.

683. In addition, in furtherance of the alleged Racketeering Conspiracy, and to achieve

its purposes, the Defendants committed and caused to be committed the following overt acts, among others, alleged in this Complaint, in this District and elsewhere in the United States: 1) engaging in fraudulent solicitations of victims', including Plaintiffs' bitcoin deposits and trading commissions, using a laundry list of material misrepresentations, half-truths and omissions transmitted to victims using wire transmissions over the Internet in violation of 18 U.S.C. § 1343; 2) operating an Insider Trading Desk with undisclosed informational and trading privileges over BitMEX traders, wherein the Insider Trading Desk was granted 'God Assess" to all BitMEX customer information, including confidential information of Plaintiffs ; 3) developing, deploying and utilizing, on a continuous basis, automated market manipulation tools designed to use sensitive insider information of BitMEX traders to automatically liquidate them and misappropriate their bitcoin deposits, when it is particularly profitable for Defendants to do so; 4) providing traders with extremely high trading leverage (up to 100x); 5) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 6) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 7) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; 8) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by using automated software tools developed in-house to execute large market orders from helper accounts on illiquid "reference" spot exchanges Coinbase Pro, BitStamp and Kraken in order to cause massive liquidations of traders' derivatives positions on BitMEX and capture resulting market manipulation profits using winner accounts on that exchange; 9) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; 10) knowingly, willfully and deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before

next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 11) knowingly, willfully and deliberately using or investing the proceeds of the fraudulent solicitations, market manipulation as well as other illegal racketeering acts into the operation of Defendants ABS and HDR.

684. As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in the amount to be proven at trial.

685. As a proximate result of the Defendants', and each of them, conspiracy to invest the proceeds of the fraudulent solicitations, market manipulation as well as other illegal racketeering acts into the operation of Defendants ABS and HDR and to conduct or participate in the long-running and continuing Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate and foreign travel or transportation in aid of racketeering Enterprise in violation of 18 U.S.C. § 1952, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts as alleged in Paragraphs 496-590 above, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan sustained concrete and certain monetary cryptocurrency trading losses in the amount to be proven at trial.

686. During the Relevant Period, Plaintiffs were harmed by overt acts, in furtherance of the Racketeering Conspiracy, of wire transmissions of fraudulent solicitations as alleged in Paragraphs 496-590 above, all in violation of 18 U.S.C. § 1343.

687. During the Relevant Period and in furtherance of the Racketeering Conspiracy, Defendants persistently manipulated prices of their bitcoin and ether Perpetual Swaps and Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices

resulting from Defendants' misconduct, and suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein.

688. During the Relevant Period, Plaintiffs thus entered into Perpetual Swaps through BitMEX, and suffered actual damages from owning and trading such Perpetual Swaps as a result of, in connection with the Perpetual Swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX.

689. As the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein, all in violation of 18 U.S.C. § 1343.

690. Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions, in violation of 18 U.S.C. § 1343.

691. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk involved multiple overt acts in furtherance of the alleged Racketeering Conspiracy and deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX

accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

692. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[39]

~~637~~693. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. ~~For example~~First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for ~~its~~their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

---

[39] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

638694. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, wrongfully took the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession and converted the same to their own use. As BitMEX Enterprise principals, Defendants HDR and Hayes are liable for the unlawful conduct of their agents, operators of the BitMEX Insider Trading Desk Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment, when they utilized Insider Trading Desk automated market manipulation tools.

695. Because the vast majority of BitMEX personnel, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. In addition, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this District (over 70 employees). Specifically, Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

696. Therefore, Defendants, and each of them, are liable, jointly and severally, to Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18 U.S.C. § 1962(d) in the amount of triple of Plaintiffs' losses to be proven at trial.

**COUNT XI**
**Conduct Of Or Participation In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(c) — Against Defendants ABS, Hayes, Delo and Reed (HDR Is The Enterprise)**

697. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

698. This Count is against Defendants ABS, Hayes, Delo and Reed only, who are RICO persons and who will be collectively referred to in this Count as "Defendants," to the exclusion of HDR, which is not, for purposes of this Count, one of the "Defendants," but a RICO Enterprise, separate and distinct from Defendants themselves. HDR is not a RICO person for purposes of this Count. Alter ego and single enterprise allegations do not apply to this Count.

699. From at least January 2017 and until present, HDR, a legal entity, constituted an "enterprise" ("HDR Enterprise") within the meaning of RICO as defined in 18 U.S.C. § 1961. Since at least January of 2017, each of Defendants ABS, Hayes, Delo and Reed has been a person separate and distinct from the HDR Enterprise itself, while, at the same time, being associated with, or employed by the HDR Enterprise. The purpose of the long-running HDR Enterprise was to use commercial website www.bitmex.com to fraudulently solicit bitcoin deposits and trading commissions from victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and material omissions of fact and to manipulate markets on BitMEX and price-forming "reference" exchanges Bitstamp, Coinbase Pro and Kraken to misappropriate victims', including Plaintiffs', bitcoins deposited with Defendants.

700. During Relevant Period, the activity of the long-running HDR Enterprise and the predicate acts of racketeering alleged herein affected interstate or foreign commerce. Specifically, the HDR Enterprise directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce and foreign commerce, including, without limitation, very large volume (up to one trillion U.S. dollars of turnover per year) cryptocurrency

derivatives trading services.

701. Allegations of specific acts constituting fraudulent solicitations set forth in Paragraphs 496-590 above are incorporated as if fully set forth herein. Specific wire

transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute at least some predicates acts of wire fraud perpetrated by Defendants in violation of 18 U.S.C. § 1343.

702. Defendants agreed to and did conduct and participate in the conduct of the long-running HDR Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders and misappropriating their cryptocurrency holdings as well as the Purposes alleged above. Specifically, Defendants engaged in continuous pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952. The alleged acts were perpetrated by Defendants during Relevant Period on a daily basis, including during each of the Manipulation Times, and continue to take place.

703. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952.

704. The acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of

racketeering HDR Enterprise in violation of 18 U.S.C. § 1952 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

705. Defendants, and each of them, took part in directing the affairs of the alleged HDR Enterprise by engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952.

706. Defendants have directly and indirectly conducted and participated in the conduct of the HDR Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

707. Defendants, and each of them, (1) gave or took directions; (2) occupied a position in the "chain of command" through which the affairs of the HDR Enterprise are conducted; (3) knowingly implemented decisions of upper management; and (4) were indispensable to the achievement of the alleged HDR Enterprise's goals.

708. Defendants, and each of them, conducted or participated in the conduct of the affairs of the alleged HDR Enterprise engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952.

709. Defendants, and each of them, participated in a pattern of racketeering activity, which included at least two acts of racketeering activity including, without limitation, at least two

acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952. Defendants, and each of them, committed the alleged predicate offenses as a part of conducting or participating in the HDR Enterprise, and, therefore, are liable for the violation of the RICO, 18 U.S.C. § 1964(c).

710. As a direct and proximate result of the Defendants', and each of them, conduct of or participation in the long-running HDR Enterprise, within the meaning of 18 U.S.C. § 1961(4), by engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan have been domestically injured in its business and property in the amount to be proven at trial.

711. During the Relevant Period, Defendants engaged in fraudulent solicitations of Plaintiffs' bitcoin deposits, orders and trading commissions using a laundry list of misrepresentations, half-truths and omissions and Plaintiffs suffered actual damages alleged herein as a result of their reasonable and justifiable reliance on these fraudulent solicitations. These fraudulent solicitations constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

712. Moreover, During the Relevant Period, in which Defendants persistently manipulated prices of their bitcoin and ether Perpetual Swaps, Plaintiffs transacted in these

derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein. The wire transmissions of the manipulative trading orders by Defendants further constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

713. During the Relevant Period, Plaintiffs thus entered into Perpetual Swaps through BitMEX, and suffered actual damages from such swaps as a result of, in connection with the Perpetual Swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX, in violation of the CEA.

714. As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein.

715. Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions.

716. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on "reference" exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX

accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

717. In causing the alleged financial harm to Plaintiffs, the aforesaid operation of the automated software tools built by Defendants involved at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering HDR Enterprise in violation of 18 U.S.C. § 1952.

718. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to ~~artificially~~ deliberately liquidate Plaintiffs' ~~trading positions on BitMEX.~~ positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[40]

719. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading

---

[40] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

accounts for their Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

639720. Because the vast majority of BitMEX personnel, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, thisthis District is the home base of the largest operation of Defendant DHRHDR, the nerve center of the operation of the BitMEX

exclusive possession of the relevant evidence.

platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. SpecificallyFor example, Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin.

640. In addition, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this District (over 70 employees). Moreover, the

721. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in

order to conduct the affairs of the HDR Enterprise.

641722. Therefore, Defendants ABS, Hayes, Delo and Reed, and each of them, are liable, jointly and severally, to
Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18

U.S.C. § 1962(c) in the amount of triple of Plaintiffs' losses to be proven at trial.

**COUNT ~~X~~XII**
**Conspiracy To Conduct Or Participate In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(d) — Against ~~All~~ Defendants ABS, Hayes, Delo and Reed (HDR Is The Enterprise)**

~~642~~723. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

724. This Count is against Defendants ABS, Hayes, Delo and Reed only, who will be collectively referred to in this Count as "Defendants," to the exclusion of HDR, which is not, for purposes of this Count, one of the "Defendants," but a RICO Enterprise, separate and distinct from Defendants themselves. HDR is not a RICO person for purposes of this Count. Alter ego and single enterprise allegations do not apply to this Count.

~~643~~725. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically, Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity alleged hereinabove in the interstate HDR Enterprise (18 U.S.C. § 1962(a)); (2) acquire or maintain interests in the HDR Enterprise through a pattern of

racketeering activity alleged hereinabove (18 U.S.C. § 1962(b)); and (3) conduct and

participate in the conduct of the affairs of the HDR Enterprise through a pattern of racketeering

activity alleged hereinabove (18 U.S.C. § 1962(c)).

644. The726. Defendants have intentionally conspired and agreed to directly and indirectly use

or invest income that iswas derived from a pattern of racketeering activity in an interstate enterprise, including fraudulent

solicitations, market manipulation and other illegal acts in the operation of an interstate HDR

Enterprise, acquire or maintain interests in the enterpriseHDR Enterprise through a pattern of racketeering

activity alleged hereinabove, and conduct and participate in the conduct of the affairs of the enterpriseHDR

Enterprise through a pattern of racketeering activity alleged hereinabove. The Defendants knew that

their predicate acts were part of a pattern of racketeering activity alleged hereinabove and agreed

to the commission of those overt acts to further the schemes described above. That conduct

constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

1962(d). For example, in furtherance of the Racketeering Conspiracy, Defendants ABS, Hayes, Delo and Reed, invested the illegal income derived from the fraudulent solicitations, market manipulation and other illegal acts perpetrated by them on the BitMEX platform into the HDR Enterprise, by renting for its benefit an entire floor in one of the most exclusive buildings in Hong Kong and renting three Lamborghinis during 2018 Consensus conference in New York in order to use these public stunts to attract even more innocent victims to the rigged BitMEX platform, operated by the HDR Enterprise.

~~645~~727. Allegations of specific acts constituting fraudulent solicitations set forth in Paragraphs ~~474~~496-~~571~~590 above are incorporated as if fully set forth herein. Wire transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute predicates acts of wire fraud under 18 U.S.C. § 1343 and also constitute acts in furtherance of the ~~racketeering conspiracy~~Racketeering Conspiracy alleged herein.

~~646. Plaintiffs are informed and believe and thereon allege that~~728. Defendants, and each of them, intended to further the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

~~647. Plaintiffs are informed and believe and thereon allege that~~729. Defendants, and each of them, intended to further the money laundering endeavor in violation of 18 U.S.C. § 1956.

~~648. Plaintiffs are informed and believe and thereon allege that~~730. Defendants, and each of them, intended to further the transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

~~649. Plaintiffs are informed and believe and thereon allege that~~731. Defendants, and each of them, intended to further the wire fraud in violation of 18 U.S.C. § 1343, including all acts of using wire transmissions for purposes of fraudulent solicitation alleged herein.

~~650. Plaintiffs are informed and believe and thereon allege that Defendants, and each of~~

732. Defendants, and each of them, intended to further the interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

651. Plaintiffs are informed and believe and thereon allege that 733. Defendants, and each of them, intended to further the interstate and foreign travel or transportation in aid of racketeering enterprise HDR Enterprise in violation of 18 U.S.C. § 1952.

652. Plaintiffs are informed and believe and thereon allege that 734. Defendants, and each of them, have been aware of the essential nature and scope of the alleged HDR Enterprise and intended to participate in it.

~~653. Plaintiffs are informed and believe and thereon allege that~~735. Defendants, and each of them, agreed to commit, or participate in, ~~the violation of two predicate offenses~~a pattern of overt acts in furtherance of the Racketeering Conspiracy, namely at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~HDR Enterprise in violation of 18 U.S.C. § 1952.

~~654~~736. In addition, in furtherance of the alleged conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following overt acts, among others, alleged in this Complaint, in this District and elsewhere:~~1~~ in the United States: 1) engaging in fraudulent solicitations of victims', including Plaintiffs' bitcoin deposits and trading commissions, using a laundry list of material misrepresentations, half-truths and omissions transmitted to victims using wire transmissions over the Internet; 2) operating an Insider Trading Desk with undisclosed informational and trading privileges over BitMEX traders, wherein the Insider Trading Desk was granted 'God Assess" to all BitMEX customer information; 3) developing, deploying and utilizing, on a continuous basis, automated market manipulation tools designed to use sensitive insider information of BitMEX traders to automatically liquidate them and misappropriate their bitcoin deposits, when it is particularly profitable for Defendants to do so; 4) providing traders with extremely high trading leverage (up to 100x); ~~2~~5) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; ~~3~~6) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; ~~4) failing to perform KYC and AML checks, as required by law; 5) failing to engage in market surveillance to detect manipulation and other illegal acts;~~ ~~6~~7) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others

during large market moves to exacerbate price fluctuations and cause the most liquidations; ~~and 7~~8) regularly

manipulating price of cryptocurrencies including, without limitation, bitcoin, by ~~executing~~using automated software tools developed in-house to execute large market orders from helper accounts on illiquid "reference" spot exchanges ~~Kraken,~~Coinbase ~~and~~Pro, BitStamp~~,~~ and Kraken in order to cause massive liquidations ~~in~~of traders' derivatives positions on BitMEX~~.~~ and capture resulting market manipulation profits using winner accounts on that exchange; 9) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 10) knowingly, willfully and deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314.

~~655~~737. As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in his business and property in the amount to be proven at trial.

~~656~~738. As a proximate result of the Defendants', and each of them, conspiracy to conduct or participate in the long-running HDR Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate and foreign travel or transportation in aid of racketeering ~~enterprise~~HDR Enterprise in violation of 18 U.S.C. § 1952, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts as alleged in Paragraphs ~~336-348, 375-378, 382~~496-590 above, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan sustained concrete and certain monetary cryptocurrency trading losses in the amount to be proven at trial.

~~657~~739. During the Relevant Period, Plaintiffs were harmed by overt acts, in furtherance of

the Racketeering Conspiracy, of wire transmissions of fraudulent solicitations as alleged in Paragraphs 484496-571590 above.

658740. During the Relevant Period, in which and in furtherance of the Racketeering Conspiracy, Defendants persistently manipulated prices of their Bitcoin and Ethereum derivatives, bitcoin and ether Perpetual Swaps and Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, and suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein.

659741. During the Relevant Period, Plaintiffs thus entered into ~~swaps and futures~~Perpetual Swaps through BitMEX, and suffered actual damages from such ~~swaps and futures~~Perpetual Swaps as a result of, in connection with the ~~swaps and futures~~Perpetual Swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX~~, in violation of the CEA~~.

742. As the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein.

660743. ~~As~~Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether ~~perpetiual swaps~~Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions.

661744. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their

respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk involved multiple overt acts in furtherance of the alleged Racketeering Conspiracy and deliberately caused automatic liquidations of Plaintiffs' respective ~~swap~~Perpetual Swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

~~662~~745. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.~~37~~41

~~37 Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in~~

~~663~~746. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. ~~For example~~First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud.

---

41 Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

664747. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, wrongfully took the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession and converted the same to their own use. As BitMEX Enterprise principals, Defendants HDR and Hayes are liable for the unlawful conduct of their agents, operators of the BitMEX Insider Trading Desk Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment, when they utilized Insider Trading Desk automated market manipulation tools.

748. Because the vast majority of BitMEX personnel, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX are located in this District, this District is the home base of the largest operation of Defendant HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the HDR Enterprise.

749. Therefore, Defendants ABS, Hayes, Delo and Reed, and each of them, are liable, jointly and severally, to Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18

U.S.C. § 1962(d) in the amount of triple of Plaintiffs' losses to be proven at trial.

**COUNT XIII**
**Conduct Of Or Participation In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(c) — Against Defendants HDR, Hayes, Delo and Reed (ABS Is The Enterprise)**

750. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

751. This Count is against Defendants HDR, Hayes, Delo and Reed only, who will be collectively referred to in this Count as "Defendants," to the exclusion of ABS, which is not, for purposes of this Count, one of the "Defendants," but a RICO Enterprise, separate and distinct from Defendants themselves. ABS is not a RICO person for purposes of this Count. Alter ego and single enterprise allegations do not apply to this Count.

752. From at least April 27, 2017 and until present, ABS constituted an "enterprise" ("ABS Enterprise") within the meaning of RICO as defined in 18 U.S.C. § 1961. Since at least April 27, 2017, each of Defendants HDR, Hayes, Delo and Reed has been a person separate and distinct from the ABS Enterprise itself, while, at the same time, being associated with, or employed by the ABS Enterprise. The purpose of the ABS Enterprise was to design and operate a website www.bitmex.com to fraudulently solicit bitcoin deposits and trading commissions from victims, including Plaintiffs, using a laundry list of misrepresentations, half-truths and material omissions of fact and to manipulate markets on the BitMEX and price-forming "reference" exchanges Bitstamp, Coinbase Pro and Kraken to misappropriate victims', including Plaintiffs', bitcoins deposited with Defendants.

753. The activity of the ABS Enterprise and the predicate acts of racketeering alleged herein affect interstate or foreign commerce. Specifically, the ABS Enterprise directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce and foreign commerce, including, without limitation, very large volume (up to one trillion U.S.

dollars of turnover per year) cryptocurrency derivatives trading services.

754. Allegations of specific acts constituting fraudulent solicitations set forth in

Paragraphs 496-590 above are incorporated as if fully set forth herein. Wire transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute at least some predicates acts of wire fraud under 18 U.S.C. § 1343.

755. Defendants agreed to and did conduct and participate in the conduct of the ABS Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan as well as other cryptocurrency traders and misappropriating their cryptocurrency holdings as well as the Purposes alleged above. Specifically, Defendants engaged in continuous pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952. The alleged acts were perpetrated by Defendants during Relevant Period on a daily basis, including during each of the Manipulation Times, and continue to take place.

756. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

757. The acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation of 18 U.S.C. § 1343, interstate transportation of stolen property in

violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

758. Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, took part in directing the affairs of the alleged ABS Enterprise by engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

759. Defendants have directly and indirectly conducted and participated in the conduct of the ABS Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

760. Defendants, and each of them, (1) gave or took directions; (2) occupied a position in the "chain of command" through which the affairs of the ABS Enterprise are conducted; (3) knowingly implemented decisions of upper management; and (4) were indispensable to the achievement of the alleged ABS Enterprise's goals.

761. Defendants, and each of them, conducted or participated in the conduct of the affairs of the alleged ABS Enterprise engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation of 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

762. Defendants, and each of them, participated in a pattern of racketeering activity,

which included at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952. Defendants, and each of them, committed the alleged predicate offenses as a part of conducting or participating in the ABS Enterprise, and, therefore, are liable for the violation of the RICO, 18 U.S.C. § 1964(c).

763. As a direct and proximate result of the Defendants', and each of them, conduct of or participation in the long-running ABS Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan have been domestically injured in its business and property in the amount to be proven at trial.

764. During the Relevant Period, Defendants engaged in fraudulent solicitations of Plaintiffs' bitcoin deposits, orders and trading commissions using a laundry list of misrepresentations, half-truths and omissions and Plaintiffs suffered actual damages alleged herein as a result of their reasonable and justifiable reliance on these fraudulent solicitations. These fraudulent solicitations constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

765. Moreover, during the Relevant Period, in which Defendants persistently manipulated prices of their bitcoin and ether Perpetual Swaps, Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein. The wire transmissions of the manipulative trading orders by Defendants further constituted predicate acts of wire fraud in violation 18 U.S.C. § 1343.

766. During the Relevant Period, Plaintiffs thus entered into Perpetual Swaps through BitMEX, and suffered actual damages from such swaps as a result of, in connection with the Perpetual Swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX, in violation of the CEA.

767. As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein.

768. Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions.

769. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on "reference" exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective Perpetual Swap positions on

BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

770. In causing the alleged financial harm to Plaintiffs, the aforesaid operation of the automated software tools built by Defendants involved at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

771. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to ~~artificially~~deliberately liquidate Plaintiffs' ~~trading positions on BitMEX.~~positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[42]

772. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email

---

[42] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

~~665~~773. Because the vast majority of BitMEX personnel, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX~~,~~ are located in this District, ~~and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR,~~ this District is the home base of the largest operation of Defendant ~~DHR~~HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. For example, Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin.

~~exclusive possession of the relevant evidence.~~

774. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the ABS Enterprise.

775. Therefore, Defendants HDR, Hayes, Delo and Reed, and each of them, are liable,

jointly and severally, to Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18 U.S.C. § 1962(c) in the amount of triple of Plaintiffs' losses to be proven at trial.

**COUNT XIV**
**Conspiracy To Conduct Or Participate In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(d) — Against Defendants HDR, Hayes, Delo and Reed (ABS Is The Enterprise)**

776. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

777. This Count is against Defendants HDR, Hayes, Delo and Reed only, who will be collectively referred to in this Count as "Defendants," to the exclusion of ABS, which is not, for purposes of this Count, one of the "Defendants," but a RICO Enterprise, separate and distinct from Defendants themselves. ABS is not a RICO person for purposes of this Count. Alter ego and single enterprise allegations do not apply to this Count.

778. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically, Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity alleged hereinabove in the interstate ABS Enterprise (18 U.S.C. § 1962(a)); (2) acquire or maintain interests in the ABS Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(b)); and (3) conduct and participate in the conduct of the affairs of the ABS Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(c)).

779. Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that was derived from a pattern of racketeering activity, including fraudulent solicitations, market manipulation and other illegal acts in the operation of an interstate ABS Enterprise, acquire or maintain interests in the ABS Enterprise through a pattern of racketeering activity alleged hereinabove, and conduct and participate in the conduct of the affairs of the ABS Enterprise through a pattern of racketeering activity alleged hereinabove. Defendants knew that

their predicate acts were part of a pattern of racketeering activity alleged hereinabove and agreed

to the commission of those overt acts to further the schemes described above. That conduct

constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d). For example, in furtherance of the Racketeering Conspiracy, Defendants HDR, Hayes, Delo and Reed, invested the illegal income derived from the fraudulent solicitations, market manipulation and other illegal acts perpetrated by them on the BitMEX platform into the ABS Enterprise, by renting for its benefit an entire floor in one of the most exclusive buildings in San Francisco in order to use this public stunt to attract even more innocent victims to the rigged BitMEX platform operated by the ABS Enterprise.

780. Allegations of specific acts constituting fraudulent solicitations set forth in Paragraphs 496-590 above are incorporated as if fully set forth herein. Wire transmissions of these fraudulent solicitations from Defendants to Plaintiffs constitute predicates acts of wire fraud under 18 U.S.C. § 1343 and also constitute acts in furtherance of the Racketeering Conspiracy alleged herein.

781. Defendants, and each of them, intended to further the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

782. Defendants, and each of them, intended to further the money laundering endeavor in violation of 18 U.S.C. § 1956.

783. Defendants, and each of them, intended to further the transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

784. Defendants, and each of them, intended to further the wire fraud in violation of 18 U.S.C. § 1343, including all acts of using wire transmissions for purposes of fraudulent solicitation alleged herein.

785. Defendants, and each of them, intended to further the interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

786. Defendants, and each of them, intended to further the interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

787. Defendants, and each of them, have been aware of the essential nature and scope of the alleged ABS Enterprise and intended to participate in it.

788. Defendants, and each of them, agreed to commit, or participate in, a pattern of overt acts in furtherance of the Racketeering Conspiracy, namely at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952.

789. In addition, in furtherance of the alleged conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following overt acts, among others, alleged in this Complaint, in this District and elsewhere in the United States: 1) engaging in fraudulent solicitations of victims', including Plaintiffs' bitcoin deposits and trading commissions, using a laundry list of material misrepresentations, half-truths and omissions transmitted to victims using wire transmissions over the Internet; 2) operating an Insider Trading Desk with undisclosed informational and trading privileges over BitMEX traders, wherein the Insider Trading Desk was granted 'God Assess" to all BitMEX customer information; 3) developing, deploying and utilizing, on a continuous basis, automated market manipulation tools designed to use sensitive insider information of BitMEX traders to automatically liquidate them and misappropriate their bitcoin deposits, when it is particularly profitable for Defendants to do so; 4) providing traders with extremely high trading leverage (up to 100x); 5) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 6) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 7) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; 8) regularly

manipulating price of cryptocurrencies including, without limitation, bitcoin, by using automated software tools developed in-house to execute large market orders from helper accounts on illiquid "reference" spot exchanges Coinbase Pro, BitStamp and Kraken in order to cause massive liquidations of traders' derivatives positions on BitMEX and capture resulting market manipulation profits using winner accounts on that exchange; 9) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 10) knowingly, willfully and deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314.

790. As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in his business and property in the amount to be proven at trial.

791. As a proximate result of the Defendants', and each of them, conspiracy to conduct or participate in the long-running and continuous ABS Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate and foreign travel or transportation in aid of racketeering ABS Enterprise in violation of 18 U.S.C. § 1952, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts as alleged in Paragraphs 496-590 above, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan sustained concrete and certain monetary cryptocurrency trading losses in the amount to be proven at trial.

792. During the Relevant Period, Plaintiffs were harmed by overt acts, in furtherance of

the Racketeering Conspiracy, of wire transmissions of fraudulent solicitations as alleged in Paragraphs 496-590 above.

793. During the Relevant Period and in furtherance of the Racketeering Conspiracy, Defendants persistently manipulated prices of their bitcoin and ether Perpetual Swaps and Plaintiffs transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, and suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein.

794. During the Relevant Period, Plaintiffs thus entered into Perpetual Swaps through BitMEX, and suffered actual damages from such Perpetual Swaps as a result of, in connection with the Perpetual Swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX.

795. As the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 272.62 bitcoins from Plaintiffs' possession by way of fraudulent solicitations using a laundry list of misrepresentations, half-truths and omissions alleged herein.

796. Moreover, as the result of Defendants' wrongful conduct alleged hereinabove, including the overt acts furtherance of the Racketeering Conspiracy, Defendants took the Plaintiffs' property amounting to 249.9 bitcoins from Plaintiffs' possession by way of creating artificial prices for bitcoin and ether Perpetual Swaps and wrongfully liquidating Plaintiffs' margined positions.

797. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their

respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk involved multiple overt acts in furtherance of the alleged Racketeering Conspiracy and deliberately caused automatic liquidations of Plaintiffs' respective Perpetual Swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

798. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[43]

799. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud.

---

[43] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

800. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, wrongfully took the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession.

801. Because the vast majority of BitMEX personnel, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, and almost all vital external service providers to BitMEX are located in this District, this District is the home base of the largest operation of HDR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein

took place. Specifically, ~~took place. In addition, Defendant HDR as well its California alter ego Defendant ABS is a~~

~~single enterprise with extensive presence in this District (over 70 employees). Specifically,~~ Plaintiffs are informed and believe and thereon allege that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during Manipulation Times, on the direction received from Defendant Reed, who was located in Wisconsin. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based "reference" cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District. Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the ABS Enterprise.

~~666~~802. Therefore, Defendants HDR, Hayes, Delo and Reed, and each of them, are liable, jointly and severally, to
Plaintiffs under 18 U.S.C. § 1964(c) for the violation of the RICO, 18

U.S.C. § 1962(d) in the amount of triple of Plaintiffs' losses to be proven at trial.

**COUNT ~~XI~~XV**
**Fraud and Deceit (Fraudulent Solicitation by False Warranty and Representation) — Against All Defendants**

~~667~~803. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~668~~804. To entice Plaintiffs to open their trading accounts, deposit their bitcoins, trade on

margin on a rigged BitMEX platform and pay trading commissions to Defendants, Defendants

engaged in fraudulent solicitation of Plaintiffs using a laundry list of material misrepresentations,

half-truths and omissions.~~38~~44 Once victims, including Plaintiffs, were fraudulently induced by

~~38 Because Defendants Hayes controlled, directly or indirectly, the operation of the entire BitMEX Enterprise and micro-managed all important aspects of operation of the BitMEX platform and no significant undertaking could proceed without his direct approval, he personally~~

Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon known as "revenge trading" to keep them trading on their rigged platform. Revenge trading is a natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

669805. On or about May 10June 19, 2019, Defendants, and each of them, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff Kolchin with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff Kolchin to personally accept it by opening a trading account and using BitMEX platform.[39][45] The electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff Kolchin's personal computer. Plaintiff Razvan was similarly presented with a substantially the same electronic document on

[44] Because Defendants Hayes, Delo and Reed controlled, directly or indirectly, the operation of the entire BitMEX Enterprise and micro-managed all important aspects of operation of the BitMEX platform and no significant undertaking could proceed without their direct and personal approval, they each personally authored or at least personally ratified and approved each and every fraudulent solicitation, other misrepresentation, omission or false advertisement alleged in Paragraphs 496-590 and, as applicable, transmission thereof via wire communication to Plaintiffs.

[45] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in its entirety.

April 30, 2018 and required to accept it by continuing using BitMEX, Plaintiff BMA was similarly presented with the same electronic document on May 5, 2019 and Plaintiff Dolgov was similarly presented with a substantially the same electronic document on April 30, 2018 and required to accept it by continuing using BitMEX.

670806. The written Service Agreement incorporated the following specific Warranty and Representation expressly made by Defendants personally to each Plaintiff:4016

> 6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform.

authored or at least personally ratified and approved each and every fraudulent solicitation or other misrepresentation or omission alleged in Paragraphs 422-514.

39 The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in its entirety.

40 In addition to placing the Warranty and Representation into the Service Agreement, Defendants placed the same representation in their blog post, which constitutes an advertisement, which was available, during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/.

Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

671807. This express Warranty and Representation made by Defendants to each Plaintiff in

 the Service Agreement was, in fact, deliberately and materially false during the entire Relevant Period and constituted a fraudulent solicitation of Plaintiffs' bitcoins deposits and trading commissions by Defendants. In truth and in fact, during the entire Relevant Period, the Insider Trading Desk of BitMEX had what BitMEX internally referred to as "God Access" to all customer, order flow, execution and open position information of the entire BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation

---

16 The same Warranty and Representation was additionally posted as a blog post, personally authored by Defendant Hayes, which constituted an advertisement displayed by Defendants during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/ and which called one of the operators of the Insider Trading Desk "a person [whose] integrity is unquestionable." The aforesaid blog post is attached hereto as Ex. 21 and made part hereof.

prices of all open positions on the entire BitMEX platform, further including all these confidential parameters of all Plaintiffs' orders and open positions. On the other hand, ~~this~~such information was not available to Plaintiffs and other platform users, with the exception of Defendants themselves. ~~The~~In fact, the Insider Trading Desk used this very sensitive information to ~~automatically~~highly successfully trade against, and liquidate customers of BitMEX, including each Plaintiff.

672808. Moreover, this express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was deliberately and materially false during the entire Relevant Period also because the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts. In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts.[47] Specifically, the automated software tools operated by the Insider Trading Desk were configured to intentionally and automatically freeze BitMEX's servers, preventing traders, including Plaintiffs, from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted earlier.[48]

~~41 Defendants have a vastly superior knowledge of the facts relevant to the automated software~~

~~673~~809. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX.

~~674~~810. In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive

---

[47] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

[48] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, when, in reality, he was not. Thus, Defendants' false representations ~~mislead~~misled Plaintiffs into believing that they were getting something, namely cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, that they were not. Therefore, the false Warranty and Representation actually ~~mislead~~misled each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer." Plaintiffs did not want to use, and would not have used, cryptoderivative trading services if such services included the Insider Trading Desk that received special informational, technical and trading privileges and continuously manipulated the markets in order to liquidate Plaintiffs' positions.

~~675~~811. Each Plaintiff opened account with BitMEX platform and/or used Defendants' cryptoderivative trading services offered from California based on the reliance on the Warranty and Representation contained in Defendants' Service Agreement. When opening or, as appropriate, continuing to use their BitMEX trading accounts, depositing bitcoins therein and engaging in cryptoderivative trading on BitMEX platform, respective Plaintiffs Kolchin, Razvan, Dolgov and BMA each saw and carefully read Defendants' false Warranty and Representation and relied on the truth of the Warranty and Representation in deciding to open and/or use

~~tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.~~

BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on BitMEX and pay trading commissions to Defendants.

~~676~~812. Each Plaintiff was induced to open and/or use BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on the BitMEX platform and pay trading commissions to Defendants and did, in fact, open and/or use BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants due to the reliance on the truth of the Warranty and Representation, which represented to Plaintiffs that:

The trading arm is organised to be separate and distinct from the business of the Trading

Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

677813. Each Plaintiff would not have opened and/or used BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants if he knew the true facts and, specifically, that Defendants' exchange was rigged and the Insider Trading Desk trading against Plaintiffs was provided with informational, access and trading advantages over Plaintiffs and automated tools, built by BitMEX, to facilitate manipulation.

678814. Upon opening and/or using BitMEX trading account, depositing bitcoins therein and engaging in cryptoderivative trading on Defendants' BitMEX platform, each Plaintiff was provided with cryptoderivative trading services falsely represented by Defendants' Warranty and Representation to be fair and honest, deceiving each Plaintiff and, in reality, causing him to use rigged cryptoderivative trading services he did not want. Defendants' false and fraudulent

Warranty and Representation caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

679815. Each Plaintiff has suffered injury and loss of money or property as a result of Defendants' fraud and deceit, and namely as the result of the false and fraudulent Warranty and Representation provided to each Plaintiff.

680816. Plaintiffs relied upon Defendants' misrepresentations contained in the Warranty and Representation and were induced to use Defendants' cryptodetivative trading services they did not want to use and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses. Defendants' deception caused the Plaintiffs to open

and/or use accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiffs suffered injury in fact and lost money or property as a result of the alleged fraud and deception perpetrated by Defendants by means of the false Warranty and Representation.

681817. When the Defendants made the aforesaid false and fraudulent Warranty and Representation to each Plaintiff, they knew it to be materially false, as Defendants themselves created and controlled the Insider Trading Desk, and this Warranty and Representation was made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open and/or use an account with BitMEX, deposit bitcoins therein and trade Defendants' cryptoderivative products on margin, in order to wrongfully collect trading commissions from Plaintiffs and to confiscate and otherwise misappropriate each Plaintiff's property. Therefore, in making the aforesaid false and fraudulent Warranty and Representation to respective Plaintiffs, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent Warranty and

Representation in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

~~682~~818. Each Plaintiff, at the time this Warranty and Representation was made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' Warranty and Representation and believed it to be true. In reliance on these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform, engaged in derivative trading therein on margin to his financial loss and detriment and paid trading commissions to Defendants. For example, in reliance on

Defendants' false and fraudulent Warranty and Representation, Plaintiffs deposited[42][49] with Defendants:

| Kolchin | ~~May 10~~June 19, 2019 | ~~3~~1.01 bitcoins |
| Razvan | November 14, 2018 | 50 bitcoins |
| Dolgov | November 1, 2018 | 2 ~~bitcoin~~bitcoins |
| BMA | May 5, 2019 | 5 ~~bitcoin~~bitcoins |

~~683~~819. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent Warranty and Representation, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants, which was specifically calculated to fraudulently induce Plaintiffs to deposit

[42][49] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully ~~collected from him trading com~~missions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

~~interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent Warranty and Representation, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants, which was specifically calculated to fraudulently induce Plaintiffs to deposit~~ their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 14, 2019 | ~~65~~25 | 1.01 ~~3~~ bitcoins | 5.95% | ~~0.03178~~0.0041 bitcoins |
| Razvan | November 14, 2018 | May 3, 2019 | 170 | 50 bitcoins | 5.95% | 1.3856 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 ~~bitcoin~~bitcoins | 5.95% | 0.02811 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 ~~bitcoin~~bitcoins | 5.95% | 0.2551 bitcoins |

| | | |
|---|---|---|
| | **Total:** | ~~1.70059~~1.67291 bitcoins |

~~684~~820. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Kolchin traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on July ~~15~~14, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants'

false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's long ~~perpetual swap~~Perpetual Swap position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God access," in direct violation of the Warranty and Representation. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded ~~perpetual swaps~~Perpetual Swaps, suffered such losses and would not have paid trading commissions to Defendants.

~~685~~821. Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs

incurred the following monetary damages associated with trading commissions[43][50] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' damages associated with the trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading

[50] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least ~~0.15~~0.015 bitcoins, at the time he opened his ~~first swap~~initial Perpetual Swap position on BitMEX, in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | Total: | 21.05 bitcoins |

~~686~~822. Each Plaintiff's reliance on Defendants' representations was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider

Trading Desk. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p~~43~~ ~~BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.~~

~~Trading Desk. For example~~. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts

and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

687823. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the Service Agreement containing the fraudulent Warranty and Representation to Plaintiffs.

688824. Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent Warranty and Representation, provided to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.

689825. Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in swapsPerpetual Swaps on margin on BitMEX platform as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses of at least 249.9 bitcoins from such trading, as well as bitcoin loss of use damages of 1.700591.67291 bitcoins, as a result of their reasonable reliance on Defendants' Warranty and Representation and their reasonable failure to know the actual facts. Thus, the total loss sustained by Plaintiffs was at least 272.65272.62 bitcoins.

690826. Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

691827. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent Warranty and Representation, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use

damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

692828. As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swapPerpetual Swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation, by reason of which Plaintiffs have been damaged in the sum of 272.65272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

693829. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

694830. Cal. Civ. Code § 1710(1) defines deceit as a "suggestion, as a fact, of that which is not true, by one who does not believe it to be true."

695831. Defendants' false and fraudulent Warranty and Representation constituted deceit under Cal. Civ. Code § 1710(1) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore,

Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least ~~272.65~~272.62 bitcoins.

~~696~~832. In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT ~~XII~~XVI
### ~~(~~Fraud and Deceit (Fraudulent Solicitation by Misrepresentation of Liquidity on BitMEX)
### — Against All Defendants~~)~~

~~697~~833. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~698~~834. During Relevant Period, in soliciting each Plaintiff's bitcoin deposits, trading orders and trading commissions, Defendants, and each of them, personally represented to each



1500%
More Bitcoin/USD liquidity than any other platform. BitMEX's XBTUSD market is the most liquid in the world.

Plaintiff, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, that Defendants' BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other platform" and that "BitMEX's XBTUSD market is the most liquid in the world." The foresaid representations regarding available liquidity on BitMEX were made by Defendants, and each of them, by electronically transmitting, through a computer network, a web page document from Defendants' ~~Servers~~servers in San Francisco, California directly to respective Plaintiff's computer, displaying the above representations, front and center. For example, on ~~May 10, 11,~~ June ~~2~~19, ~~5~~20, ~~7~~21, 22, 23, 24, 25, 26, 27 and 28 and July 14, 2019, Defendants made the aforesaid representations regarding available liquidity on BitMEX to Plaintiff Kolchin. Plaintiff Razvan was similarly presented with the same representations regarding available liquidity on BitMEX on October 25, November 13, 14~~,~~ and 19, 2018 and Plaintiff BMA

was similarly presented with the same representations regarding available liquidity on BitMEX on May 5, 6, 7, 8, and 17 and June 26, and 27, 2019. Plaintiff Dolgov was similarly presented with the same representations regarding available liquidity on BitMEX on November 10, 11, 14, 15, and 19, ~~2019~~2018.

~~699. Prior to opening trading accounts with BitMEX, each Plaintiff was specifically looking for a reputable and honest exchange with the highest liquidity in the industry to trade on, and, therefore, the~~835. The amount of liquidity on the BitMEX platform was highly material for each Plaintiff's decision to engage in cryptoderivative trading on BitMEX platform and in determining whether or not to trade on BitMEX, as the amount of available liquidity determined the potential profits that Plaintiffs could realize from cryptoderivative trading. The higher is the available liquidity, the lower is the slippage~~44~~[51] occurring upon execution of large market orders and the higher is the potential trading profit for Plaintiffs. Also, the higher is the available liquidity, the lower is the magnitude of price swings and the chance of liquidation. Therefore, each Plaintiff ~~was specifically looking for an exchange with the highest liquidity on the market and~~ made his decision to open account, make bitcoin deposit(s) and trade on BitMEX because of his reliance on the truth of Defendants' representations regarding the available liquidity on BitMEX being 1500% higher than competition.

~~700~~836. Each Plaintiff justifiably relied on the truth of respective representations regarding available liquidity on BitMEX platform made by Defendants and specifically on the truth of the representation that BitMEX provided "1500% more Bitcoin / USD Liquidity than any other platform." However, in truth and in fact, the aforesaid representations regarding available liquidity on BitMEX made by Defendants were intentionally and materially false during the entire portion of the Relevant Period when they were used by Defendants to solicit customers. In reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained

---

~~44 Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.~~

its top position. For example, analysis of bid-ask spread data from the portion of the Relevant Period when Defendants were using the representations in question, provided by OKEX cryptoderivative exchange, has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%)[51][52]. Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant

[51] Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.
[52] Liquidity on an exchange is inversely related to a bid-ask spread. The lower is the bid-ask spread, the higher is the corresponding exchange liquidity.

Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX. Therefore, in truth and in fact, liquidity on BitMEX was not any higher than on several competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely claimed to fraudulently solicit Plaintiffs' business. Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period.[46][53] In fact, the aforesaid claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were materially false even as of September or October of 2018, when they were first made by Defendants.

~~701~~837. The fact that liquidity on BitMEX was not any higher than on other competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely represented to Plaintiffs, was well known to Defendants themselves, who had a direct access to all relevant data and who nevertheless deliberately decided to use these fraudulent representations to entice unsuspecting traders, including Plaintiffs, to trade on BitMEX to their financial loss and detriment. In making the false and fraudulenKristijan Krstict representations regarding available liquidity on BitMEX platform, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent representations regarding available liquidity on BitMEX in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

~~45~~ ~~Liquidity on an exchange is inversely related to a bid-ask spread. The lower is the bid-ask spread, the higher is the corresponding exchange liquidity.~~

~~46~~53 In a fraudulent solicitation case *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), brought by SEC under Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], SEC charged defendants with fraudulently soliciting investors to trade digital asset securities by falsely claiming that their Start Options platform was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media." These fraudulent representations that formed the basis for the SEC action were very similar to Defendants' fraudulent claims of providing "1500% More Bitcoin/USD liquidity than any other platform," the latter being even more specific and factual.

~~platform, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent representations regarding available liquidity on BitMEX in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.~~

~~702~~838. In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX having the best liquidity available in the industry, and 1500% higher than competition, when, in reality, he was not. Thus, Defendants' false representations ~~mislead~~misled Plaintiffs into believing that they were getting something, namely cryptoderivative trading services from BitMEX having Bitcoin/USD liquidity 1500% higher than competition, that they were not getting. Therefore, Defendants' false representations regarding liquidity on BitMEX actually ~~mislead~~misled each Plaintiff into believing something that was not true and were "likely to [so] mislead a reasonable consumer." Plaintiffs did not want to use, and would not have used, cryptoderivative trading services if such services did not provide the Bitcoin/USD liquidity 1500% higher than competition.

~~703~~839. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and paid trading commissions to Defendants had he known the true facts, as the true facts meant that due to insufficient liquidity, odds of making any money on BitMEX platform were stacked heavily against each Plaintiff.

~~704~~840. Each Plaintiff opened account with BitMEX platform and/or used Defendants' cryptoderivative trading services offered and managed by Defendants from California based on reliance on the truth of Defendants' representations regarding liquidity on BitMEX being the best available in the industry and 1500% greater than available on any other platform. When opening and/or using their BitMEX trading accounts, depositing bitcoins therein, engaging in

cryptoderivative trading on BitMEX platform and paying trading commissions to Defendants, respective Plaintiffs Kolchin, Razvan, Dolgov and BMA each saw and carefully read Defendants' false representations regarding available liquidity on BitMEX and relied on the truth of these representations in deciding to open BitMEX trading account, deposit bitcoins therein and engage in cryptoderivative trading on BitMEX.

~~705~~841. Each Plaintiff was deceived and fraudulently induced to open and/or use BitMEX trading account, deposit bitcoins therein and engage in cryptoderivative trading on BitMEX

platform and did in fact open and/or use BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on BitMEX platform due to the reliance on Defendants' false representations regarding available liquidity on BitMEX, which stated to Plaintiffs that BitMEX platform provided "1500% More Bitcoin/USD liquidity than any other platform."

706842. Each Plaintiff would not have opened and/or used BitMEX trading account, deposited bitcoins therein and/or engaged in cryptoderivative trading on BitMEX platform if he knew the true facts and, specifically that Defendants' XBTUSD market did not provide "1500% More Bitcoin/USD liquidity than any other platform."

707843. After each Plaintiff opened BitMEX trading account and/or deposited bitcoins therein, Defendants provided each Plaintiff with cryptoderivative trading services having liquidity, which was below competitor exchanges Binance, Huobi and/or OKEX, which Defendants previously falsely described to Plaintiffs as providing "1500% More Bitcoin/USD liquidity than any other platform." In doing so, Defendants deceived each Plaintiff and caused him to use Defendants' cryptoderivative trading services with insufficient liquidity, which he did not want. Defendants' false representations regarding available liquidity on BitMEX caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

708844. Each Plaintiff has suffered injury and loss of valuable property, namely bitcoins, as a result of Defendants' fraud and deceit, and namely as the result of the false representations regarding available liquidity on BitMEX provided to each Plaintiff.

~~709~~845. Plaintiffs relied upon Defendants' false representations regarding available liquidity on BitMEX and were induced to use Defendants' cryptodetivative trading services they did not want and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses. Defendants' deception caused the Plaintiffs to open and/or use accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiffs suffered injury in fact and lost money or

property as a result of the alleged fraud and deception perpetrated by Defendants using the false representations regarding available liquidity on BitMEX.

~~710~~846. When the Defendants made the aforesaid false representations regarding available liquidity on BitMEX to each Plaintiff, they knew them to be materially false, and these representations regarding available liquidity on BitMEX were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open an account with BitMEX, deposit bitcoins and trade Defendants' derivative products, in order to wrongfully confiscate each Plaintiff's property. Defendants had direct access to and first-hand personal knowledge of the liquidity information for their own BitMEX platform as well as for all competing platforms, including Binance, Huobi and OKEX. Therefore, they knew that their representations regarding available liquidity on BitMEX made to each Plaintiff were materially false and fraudulent. In fact, Defendants' misrepresentations were so blatant and so exaggerated, that Defendants simply could not have been ignorant about their falsity. Moreover, at the end of 2018, a former high-ranking employee of BitMEX repeatedly informed Defendants that the aforesaid representations regarding available liquidity on the BitMEX platform were in fact false and requested their removal from the front page of the BitMEX website, which Defendants deliberately refused to do, because they wanted to continue deceiving traders by promising them liquidity they did not have. Furthermore, on or about October 3, 2019, Defendants removed words "than any other platform," evidencing the fact that Defendants deliberately tried to make the aforesaid representations regarding available

liquidity on BitMEX vaguer, which further establishes that Defendants knew that they were false as written. Yet furthermore, Defendants continued to use these false representations regarding available liquidity on the BitMEX platform on the front page of their website, front and center, until as late as March of 2021, by which time BitMEX fell to the number eight spot in cryptoderivative exchange rankings, and removed those obviously false representations promising 1500% more liquidity than other exchanges only after they were mentioned in related Court cases, Ex. 20. This further establishes that Defendants' fraud was deliberate.

711847. Each Plaintiff, at the time these representations regarding available liquidity on BitMEX were made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations regarding available liquidity on BitMEX and believed it to be true. In reliance on these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading therein to his financial loss and detriment. For example, in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs deposited[4754] with Defendants:

| Kolchin | May 10June 19, 2019 | 31.01 bitcoins |
|---------|---------------------|----------------|
| Razvan | November 14, 2018 | 50 bitcoins |
| Dolgov | November 1, 2018 | 2 bitcoinbitcoins |
| BMA | May 5, 2019 | 5 bitcoinbitcoins |

848. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin

---

[4754] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

712. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S. based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | May 10June 19, 2019 | July 14, 2019 | 6525 | 1.01 3 bitcoins | 5.95% | 0.031780.0041 bitcoins |
| Razvan | November 14, 2018 | May 3, 2019 | 170 | 50 bitcoins | 5.95% | 1.3856 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 bitcoinbitcoins | 5.95% | 0.02811 bitcoins |

| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 bitcoins | 5.95% | 0.2551 bitcoins |
|-----|-------------|----------------|-----|------------|-------|-----------------|
|     |             |                |     |            | **Total:** | **1.67291 bitcoins** |

| | 1, 2018 | 2019 | | | | bitcoins |
|---|---|---|---|---|---|---|
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 bitcoin | 5.95% | 0.2551 bitcoins |
| | | | | | Total: | 1.70059 bitcoins |

713849. In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff Kolchin traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on July ~~15~~14, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin ~~perpetual swaps~~Perpetual Swaps on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD ~~perpetual swap~~Perpetual Swap long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each Plaintiff due to wild downward swings in the price of the XBTUSD and ETHUSD ~~perpetual swap~~Perpetual Swap contracts of BitMEX, which resulted in liquidation of Plaintiffs' respective long positions on

BitMEX, which were caused, in substantial part, by the insufficient buy (long) side liquidity on the BitMEX platform. Specifically, on those three days June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, liquidity on the buy (long) side of the market for XBTUSD and ETHUSD ~~perpetual swaps~~<u>Perpetual Swaps</u> essentially disappeared, leading to truly staggering price plunges, which precipitated liquidations of Plaintiffs' positions. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which induced Plaintiffs to trade on margin on BitMEX, were a substantial factor in causing Plaintiffs' trading

losses in the amount of 249.9 bitcoins. Another substantial factor was the downward swings in the price of the XBTUSD and ETHUSD ~~perpetual swap~~ Perpetual Swap contracts of BitMEX, which were exacerbated by the aforesaid buy (long) side liquidity shortages. Moreover, it was foreseeable for Defendants that the insufficient liquidity on BitMEX, which was fraudulently misrepresented by Defendants as being 1500% more than on any other platform, would naturally exacerbate downward price moves and result in staggering price plunges and, consequently, in the liquidations of Plaintiffs' margined trading positions.[~~48~~55] Therefore, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were within the foreseeable risk or harm created by the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. In other words, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were reasonably expected to result from the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.

~~714~~850. Due to Plaintiffs' decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following monetary damages associated with trading commissions[~~49~~56] paid by Plaintiffs to Defendants, irrespective of any and all market

moves, market events or [~~48 It is well-known that liquidity operates by absorbing and softening market price moves. The higher the liquidity, the more tempered price moves are. On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations.~~

~~49 BitMEX charges traders trading commissions (fees) in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the trading commission for opening or closing a margined position is 0.075% of the position size.~~]

~~moves,~~ market ~~events or market~~ manipulation by Defendants. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each

55 It is well-known that liquidity operates by absorbing and softening market price moves. The higher the liquidity, the more tempered price moves are. On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations. 56 BitMEX charges traders trading commissions (fees) in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the trading commission for opening or closing a margined position is 0.075% of the position size.

Plaintiff paid at least a portion of the below trading commissions, in the amount of at least ~~0.15~~0.015 bitcoins, at the time he opened his ~~first swap~~initial Perpetual Swap position on BitMEX, in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | **Total:** | **21.05 bitcoins** |

~~715~~851. If Defendants truly provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such high liquidity would have absorbed sell orders and dampened the downward price moves, preventing the liquidations from taking place,

and Plaintiffs would not have sustained the trading losses they did. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded

Perpetual Swaps

~~perpetual swaps~~ on BitMEX on margin, suffered such losses and would not have paid the trading commissions to Defendants.

~~716~~852. Each Plaintiff's reliance on the truth of Defendants' representations regarding available liquidity on BitMEX platform was justified because Defendants took extraordinary measures to keep tight control of the data pertaining to all aspects of operation of BitMEX platform, including available liquidity. Similarly, operators of other crypto exchanges, such as

Binance, Huobi and OKEX also kept tight control of the data pertaining to all aspects of operation of their respective trading platforms, including available liquidity.

717853. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the false and fraudulent representations regarding available liquidity on BitMEX platform to each Plaintiff.

718854. Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent representations regarding available liquidity on BitMEX platform made to each Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California. Accordingly, California law applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

719855. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, the false and fraudulent representations regarding

available liquidity on the BitMEX platform were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco.

~~720~~856. Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in ~~swaps~~Perpetual Swaps on margin on BitMEX platform as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses of 249.9 bitcoins from such trading, as well as bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, as a result of their reasonable reliance on Defendants' representations regarding available liquidity on

BitMEX and their reasonable failure to know the actual facts. Thus, the total loss sustained by Plaintiffs was ~~272.65~~272.62 bitcoins.

~~721~~857. Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

~~722~~858. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent representations regarding available liquidity on BitMEX, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

~~723~~859. As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined ~~swap~~Perpetual Swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using Plaintiffs' highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation contained in the Service Agreement, by reason of which Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation. The insufficient liquidity available on the BitMEX platform, which Defendants falsely and fraudulently represented to each Plaintiff as providing

"1500% More Bitcoin/USD liquidity than any other platform" and "BitMEX's XBTUSD market [being] the most liquid in the world," additionally contributed to and exacerbated the above losses of Plaintiffs. If Defendants indeed provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such liquidations would not have occurred and Plaintiffs would not have sustained the trading losses they did. Therefore, Defendants' failure to provide 1500% (16x) more liquidity than any other trading platform, as they falsely and fraudulently represented to Plaintiffs, was a substantial factor

in causing the trading loss of 249.9 bitcoins by Plaintiffs on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

724860. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent

to induce him to alter his position to his injury or risk, is liable for any damage which he thereby

suffers."

725861. Cal. Civ. Code § 1710(1) defines deceit as a "suggestion, as a fact, of that which is

not true, by one who does not believe it to be true."

726862. Defendants' false and fraudulent representations regarding available liquidity on

the BitMEX platform constituted deceit under Cal. Civ. Code § 1710(1) and actually deceived

Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying

trading commissions to Defendants and engaging in cryptoderivative trading on margin on a

rigged BitMEX platform. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709,

pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of

at least 272.65272.62 bitcoins.

727863. In doing the wrongful acts herein alleged, Defendants, and each of them, acted

with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount

of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT XIIIXVII
### Fraud by Concealment — Against All Defendants

728864. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

865. On or about June 19, 2019, Defendants, and each of them, through their

729. On or about May 10, 2019, Defendants, and each of them, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX

platform, personally presented Plaintiff Kolchin with an electronic document containing updated

written Service Agreement for their online BitMEX trading platform and required Plaintiff

Kolchin to personally accept it by opening a trading account and using BitMEX platform.[50][57] The electronic document containing the

[57] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in

electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff Kolchin's personal computer. Plaintiff Razvan was similarly presented with a substantially the same electronic document on April 30, 2018 and required to accept it by continuing using BitMEX, Plaintiff BMA was similarly presented with the same electronic document on May 5, 2019 and Plaintiff Dolgov was similarly presented with a substantially the same electronic document on April 30, 2018 and required to accept it by continuing using BitMEX.

730866. The Service Agreement incorporated the following Warranty and Representation expressly made by Defendants personally to each Plaintiff:

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.[58]

50 The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 19 and is incorporated herein in its entirety.

867. In addition, during Relevant Period, in soliciting each Plaintiff's bitcoin deposits, trading orders and trading commissions, Defendants, and each of them, made the following additional representations personally to each Plaintiff, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform:

its entirety.

[58] The same Warranty and Representation was additionally posted as a blog post on the BitMEX commercial website, personally authored by Defendant Hayes, which constitutes an advertisement, which was available, during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/ and which called one of the operators of the Insider Trading Desk "a person [whose] integrity is unquestionable."

   f. "[BitMEX] provides 100 Audits per second. BitMEX's engine constantly audits the balances and history of all accounts."

   g. "[BitMEX had] 0 Bitcoin lost through intrusion or hacking. BitMEX keeps all funds in cold storage."

   h. "[BitMEX provides] Leading Security. BitMEX employs the latest in multi-factor security, inside and out. Safety is our primary concern."

   i.  "[BitMEX provides] Advanced API. Our trading engine was built using the same technology used by investment banks and hedge funds."

   j.  "[BitMEX offers] The next generation of bitcoin trading products. Up to 100x leverage. Trading without expiry dates. Industry-leading security. Welcome to Bitcoin's most advanced trading platform."

 868. The aforesaid additional representations were made by Defendants, and each of them, by electronically transmitting, through a computer network, a web page document from Defendants' servers in San Francisco, California directly to respective Plaintiff's computer, displaying the above additional representations, front and center. For example, on June 19, 20, 21, 22, 23, 24, 25, 26, 27 and 28 and July 14, 2019, Defendants made the aforesaid representations to Plaintiff Kolchin. Plaintiff Razvan was similarly presented with substantially the same representations on October 25, November 13, 14 and 19, 2018 and Plaintiff BMA was similarly presented with substantially the same representations on May 5, 6, 7, 8, 17 and June 26 and 27, 2019. Plaintiff Dolgov was similarly presented with substantially the same representations on November 10, 11, 14, 15 and 19, 2018.

 869. All the above additional representations, the blog post as well as the Warranty and Representation used catchy buzzwords such as "security," "safety," "audits," "unquestionable integrity," "investment banks and hedge funds," which were specifically picked by Defendants to convey an overall message that would create a lasting impression of honesty, trust, integrity and safety with objectively reasonable investors, including Plaintiffs. For example, the words "investment banks" and "audits" are usually associated, in the minds of objectively reasonable

consumers, with regulatory oversight and extensive compliance efforts. However, in truth and in fact, this impression designed to be created and actually created by Defendants with Plaintiffs was false. In truth and in fact, Defendants lacked any compliance efforts what so ever, actively worked in secret to evade regulators and secretly engaged in highly unethical, unscrupulous, illegal and even criminal acts on their rigged BitMEX platform, which they had a duty to disclose to Plaintiffs, pursuant to the Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and Cal. Civ. Code §§ 1709 and 1710(3), in order to make the alleged overall message as well as specific representations regarding Defendants' Insider Trading Desk conveyed by Defendants to Plaintiffs not misleading. Defendants failed to fulfill this duty.

731870. ~~However~~Therefore, during the Relevant Time Period, Defendants ~~committed~~made the following fraudulent omissions of material fact to each Plaintiff, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to each Plaintiff, for a fee, through the BitMEX online trading platform and which Defendants, therefore, had a duty to disclose[51]: under Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and Cal. Civ. Code §§ 1709 and 1710(3), in order to make the alleged overall message as well as specific representations regarding Defendants' Insider Trading Desk conveyed by Defendants to Plaintiffs not misleading[59]:

    a.  Failing to disclose to each Plaintiff that Defendants were continuously operating the Insider Trading Desk, on a 24 hours a day, 7 days a week basis, which continuously manipulated prices on BitMEX and reference exchanges and enjoyed informational and trading priority privileges over each Plaintiff, by being granted "God access" to highly sensitive and confidential insider information of Plaintiffs and other BitMEX traders, including sizes and leverage amounts for all existing positions and orders, all liquidation prices, stop loss prices and even all parameters of all hidden orders.

---

[59] All the alleged omissions pertain to the entire Relevant Period.

b.  Failing to disclose to each Plaintiff that Defendants provided the Insider Trading Desk with automated systems, built by BitMEX and Defendant ABS, leveraging this highly sensitive and confidential insider information of BitMEX traders, including each Plaintiff, to enable and automate price manipulation that estimated how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

c.  Failing to disclose to each Plaintiff that the traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations for BitMEX.

51 All the alleged omissions pertain to the entire Relevant Period.

d.  Failing to disclose to each Plaintiff that once predetermined predicted profitability for BitMEX was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations.

e.  Failing to disclose to each Plaintiff that to prevent the conditions of the BitMEX order book from changing between the profitability prediction time and actual liquidation time, BitMEX was ~~configure~~configured to intentionally freeze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

f.  Failing to disclose to each Plaintiff that the access to hidden information thus provided the operators of the Insider Trading Desk with a substantial, unfair and secret advantage over BitMEX customers, including Plaintiffs.

g.  Failing to disclose to each Plaintiff that, by analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when

placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX.

h. Failing to disclose to each Plaintiff that BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

i. Failing to disclose to each Plaintiff that Defendants used secret, anonymous accounts to trade against BitMEX customers, including Plaintiffs.

j. Failing to disclose to each Plaintiff that Defendants granted privileged access to the BitMEX platform to the anonymized accounts, while customers, including Plaintiffs, were locked out, and by misrepresenting that the Insider Trading Desk did not have such access.

k.  Failing to disclose to each Plaintiff that Defendants' Insider Trading Desk was equipped and designed to and operated to continuously intentionally trigger automatic liquidations of trading positions of BitMEX traders, including Plaintiffs, through customer lock-outs and by manipulating prices of underlying cryprtocommodities for its swap cryptoderivative products on reference exchanges and, thus, on the BitMEX platform.

l.  Failing to disclose to each Plaintiff that Defendants continuously allowed BitMEX insiders including Hayes, Delo and Reed to freely and continuously trade on the BitMEX platform against BitMEX customers, despite their complete control of the BitMEX trading platform and their "God access" to confidential BitMEX client information, including customer positions, leverage amounts, liquidation points and orders and despite resulting clear conflict of interest, prohibited by CFTC regulations.

m. Intentionally misrepresenting to each Plaintiff that Defendants were using and
   would continue to use commercially reasonable efforts to prevent customer lock-
   outs on the BitMEX platform, while failing to disclose to Plaintiffs that these lock-
   outs were intentional and specifically designed to facilitate manipulation by
   Defendants' Insider Trading Desk.

n. Failing to disclose the susceptibility of the BitMEX platform to customer lock-
   outs and their predictable, negative effects on customers and beneficial effect for
   BitMEX, including through the operation of the Insurance Fund.

o. Failing to disclose to each Plaintiff that Defendants had no rules or procedures
   whatsoever sufficient to ensure that: the contracts BitMEX offered to Plaintiffs
   were not readily susceptible to manipulation; market participants were prevented
   from engaging in manipulation or disruptive trading; and market participants
   who engage in misconduct were subject to discipline, all in violation of CFTC
   regulations.

p.  Failing to disclose to each Plaintiff that Defendants failed to maintain required records, and in fact has actively deleted required records including critical customer identification information, all in violation of CFTC regulations.

q.  Failing to disclose to each Plaintiff that Defendants had no rules whatsoever to minimize conflicts of interest and allowed insiders, including Defendant Hayes, Delo, Reed, and numerous other BitMEX employees with access to confidential trader insider information, including sensitive Plaintiffs' information, to continuously trade on the platform, and that BitMEX's own internal "market-making" desk was one of the largest traders on the platform.

~~732~~871. Therefore, Defendants committed fraudulent omissions during the Relevant Period in at least three main respects.

~~733~~872. *First*, Defendants committed fraudulent omissions regarding the nature and operations of the Insider Trading Desk.

a. BitMEX's updated Service Agreement on its website revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." Defendants did not disclose, however, that the Insider Trading Desk enjoys ~~information~~informational, trading and technical advantages over

BitMEX customers, described above, or that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer liquidations.

~~734~~873. Given that BitMEX trades against its own customers, each Plaintiff would want to know and reasonably and justifiably expected Defendants to disclose the facts bearing on how BitMEX conducts such trades and the extent to which BitMEX is likely to be successful in conducting such trades, as a reasonable investor would consider this information very important in deciding whether to make an investment in Defendants' Perpetual Swaps. Defendants had a common law duty to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff. In addition, Defendants had a statutory duty to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff

under Cal. Civ. Code § 1710(3), which defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

~~735~~874. Accordingly, pursuant to their common law and statutory duty under Cal. Civ. Code § 1710(3) to avoid making partial, misleading representations about the activity of the Insider Trading Desk, that effectively concealed material facts from each Plaintiff, Defendants were obligated to (but did not) disclose the ~~information~~informational, trading and technical advantages that Insider Trading Desk enjoys over each Plaintiff and other BitMEX customers and that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer, including each Plaintiff's liquidations. Therefore, Defendants' concealment of

material facts from each Plaintiff actually ~~mislead~~misled each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

~~736~~875. *Second*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and scope of the customer lock-outs on BitMEX.

      a. In early 2019, BitMEX's website vaguely disclosed that undefined system overloads might disrupt access to the BitMEX platform. The website has further stated since that time that the customer lock-outs are a result of technical limitations regarding the volume of trading the platform can accommodate.

      b. Defendants did not disclose, however, that any such technical limitations do not restrict the Insider Trading Desk, which remains able to trade against BitMEX customers during the lock-outs.

      c. Where BitMEX trades against its own customers, a reasonable BitMEX customer would conclude that a lock-out would suspend all trading on the platform, and the Insider Trading Desk's ability to use the platform during customer lock-outs provided BitMEX with a substantial advantage in trading against BitMEX customers.

d. Accordingly, in order to avoid making partial, misleading representations that effectively concealed material facts from each Plaintiff, about the nature and scope of lock-outs, Defendants were obligated to disclose that the lock-outs do not restrict the Insider Trading Desk.

e. Since early 2019, moreover, referring to the "Services" available on its trading platform, BitMEX has at least recklessly and falsely claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that BitMEX "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

f.  In fact, BitMEX did not intend and has failed to use reasonable or commercially reasonable efforts to avoid customer lock-outs, and in knowingly or recklessly claiming otherwise, BitMEX deceived customers into trading on the platform.

g.  Indeed, on information and belief, for the reasons alleged above, Defendants knowingly or recklessly intend the customer lock-outs regularly to occur, in particular during periods of high volatility, to lock out BitMEX customers from their accounts during large market moves in order to increase the number of position liquidations.

h.  Accordingly, in order to make their statements about their purported intent to use reasonable or commercially reasonable efforts to avoid such lock-outs not partial, misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated to disclose their intent to use these lock-outs to their advantage.

737876. *Third*, Defendants made fraudulent statements and committed fraudulent omissions regarding the supposedly "hidden orders" that each Plaintiff may place on the BitMEX platform:

a. The BitMEX website stated throughout the Relevant Period that a "Hidden Order" is an order "that is not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

b. Defendants did not disclose to each Plaintiff, however, that these orders are not hidden from BitMEX and its insiders.

c. Based on the information provided by Defendants, each Plaintiff reasonably concluded that no one using the BitMEX platform would be able to trade based on the details of his so-called "hidden" orders and that so-called "hidden" orders would not provide BitMEX and its insiders with a substantial advantage in trading against each Plaintiff. This conclusion was wrong because of fraudulent omission of critical information about so-called "hidden" orders by Defendants.

~~738~~877. Accordingly, in order to make its description of a "hidden order" not partial, misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated to disclose to each Plaintiff that hidden orders were not in fact hidden from BitMEX, and its insiders were obligated to disclose throughout the Relevant Period that BitMEX trades against its customers with knowledge of the details of each Plaintiff's hidden orders. Defendants have failed to disclose this critical information to each Plaintiff, which Plaintiffs reasonably and justifiably expected Defendants to disclose as the facts in question went to the very core of BitMEX's operation, integrity and profit model.

~~739~~878. When the Defendants committed the aforesaid fraudulent omissions to each Plaintiff, Defendants intentionally omitted a clear disclosure of the facts stated above because giving a clear explanation of how BitMEX platform really operated would have punctured the illusion of risk-free casino-style profits that Defendants promised each Plaintiff. Defendants' fraudulent omissions to each Plaintiff were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged.

~~740~~879. Defendants knew of and intentionally perpetuated these misrepresentations, half-truths and omissions. BitMEX and the individual ~~Defendant~~Defendants Hayes, Delo and Reed concealed facts that went to the very core of BitMEX's operation, integrity and profit model and could not reasonably have

been unaware of these facts. In making these misrepresentations, half-truths and omissions, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in perpetuating these misrepresentations, half-truths and omissions in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

741880. Defendants intended that each Plaintiff rely on these misrepresentations, half-truths and omissions, and each Plaintiff reasonably did so, given that these statements concerned core aspects of BitMEX's business.

742881. Each Plaintiff, at the time these fraudulent misrepresentations, half-truths and omissions were made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the material facts fraudulently omitted by Defendants. In reliance on these misrepresentations, half-truths and omissions, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading thereon to his financial loss and detriment. For example, in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs initially deposited[5260] with Defendants:

| | | |
|---|---|---|
| Kolchin | May 10June 19, 2019 | 31.01 bitcoins |
| Razvan | November 14, 2018 | 50 bitcoins |
| Dolgov | November 1, 2018 | 2 bitcoins |
| BMA | May 5, 2019 | 5 bitcoins |

882. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the

[5260] The deposits listed in this table are only exemplary deposits. For example, Plaintiff Kolchin deposited with Defendants over 3.00050052 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.15 bitcoins. In addition, Plaintiff Kolchin sustained net trading losses of about 0.8455 bitcoins, resulting in his net loss on BitMEX of 0.9955 bitcoins ($57,737), in addition to the bitcoin loss of use damages. As another example, Plaintiff Razvan deposited with Defendants at least 292.956 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 20 bitcoins. In addition, Plaintiff Razvan sustained net trading losses of about 252.582 bitcoins, resulting in his net loss on BitMEX of 272.582 bitcoins ($15,809,756), in addition to the bitcoin loss of use damages.

| | | |
|---|---|---|
| ~~Dolgov~~ | ~~November 1, 2018~~ | ~~2 bitcoin~~ |
| ~~BMA~~ | ~~May 5, 2019~~ | ~~5 bitcoin~~ |

~~743. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the~~ market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' misrepresentations, half-truths and omissions, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 14, 2019 | ~~65~~25 | 1.01 ~~3~~ bitcoins | 5.95% | ~~0.03178~~0.0041 bitcoins |
| Razvan | November 14, 2018 | May 3, 2019 | 170 | 50 bitcoins | 5.95% | 1.3856 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 bitcoins | 5.95% | 0.02811 bitcoins |

| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 bitcoins | 5.95% | 0.2551 bitcoins |
|-----|-------------|----------------|-----|------------|-------|-----------------|
|     |             |                |     |            | **Total:** | **1.67291 bitcoins** |

| Dolgov | November 1, 2018 | January 25, 2019 | 86 | 2 bitcoin | 5.95% | 0.02811 bitcoins |
|--------|------------------|------------------|-----|-----------|-------|------------------|
| BMA | May 5, 2019 | March 13, 2020 | 313 | 5 bitcoin | 5.95% | 0.2551 bitcoins |
| | | | | | Total: | 1.70059 bitcoins |

744883. In further reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff Kolchin traded Defendants' bitcoin perpetual swapsPerpetual Swaps on July 1514, 2019 and suffered trading losses of over 3.99 bitcoins on that day, when his XBTUSD perpetual swapPerpetual Swap long position was liquidated. In addition, Plaintiff Kolchin paid at least 0.05 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Razvan traded Defendants' bitcoin perpetual swapsPerpetual Swaps on November 14, 2018 and suffered trading losses of over 226.16 bitcoins on that day, when his XBTUSD perpetual swapPerpetual Swap long position was liquidated. In addition, Plaintiff Razvan paid at least 3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff BMA traded Defendants' bitcoin perpetual swapsPerpetual Swaps on June 27, 2019 and suffered trading losses of over 10 bitcoins on that day, when its XBTUSD perpetual swapPerpetual Swap long position was liquidated. In addition, Plaintiff BMA paid at least 0.2 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Dolgov traded Defendants' bitcoin perpetual swapsPerpetual Swaps on November 25, 2018 and suffered trading losses of over 3.93 bitcoins on that day, when its XBTUSD perpetual swapPerpetual Swap long position was liquidated. In addition, Plaintiff Dolgov paid at least 0.15 bitcoins in trading commissions to Defendants on that day. The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's perpetual swapPerpetual Swap position on BitMEX to be liquidated, using each Plaintiff's own

confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God Access," in direct violation of the Warranty and Representation. Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded ~~perpetual swaps~~<u>Perpetual Swaps</u>, suffered such losses and would not have paid trading commissions to Defendants.

~~745~~<u>884</u>. Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs

incurred the following monetary damages associated with trading commissions[~~5~~361] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to pay trading commissions to Defendants. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least ~~0.15~~0.015 bitcoins, at the time he opened his ~~first swap~~initial Perpetual Swap position on BitMEX, in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Kolchin | ~~May 10~~June 19, 2019 | July 15, 2019 | 0.15 bitcoins |
| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | **Total:** | **21.05 bitcoins** |

[~~5~~361] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

| Razvan | October 8, 2018 | May 3, 2019 | 20 bitcoins |
| Dolgov | November 1, 2018 | January 25, 2019 | 0.6 bitcoins |
| BMA | May 5, 2019 | March 13, 2020 | 0.3 bitcoins |
| | | Total: | 21.05 bitcoins |

~~746~~885. Each Plaintiff's reliance on Defendants' fraudulent misrepresentations, half-truths and omissions was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. ~~For example~~First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, each Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

~~747~~886. Defendants' fraudulent misrepresentations, half-truths and omissions allowed BitMEX to create the false impression with Plaintiffs that if BitMEX was trading against Plaintiffs and its own customers, it nevertheless was not doing so with substantial trading advantages over Plaintiffs and the customers; that BitMEX would not be able to, and would not, take advantage of customer lock-outs to benefit BitMEX at the expense of Plaintiffs and the customers; and that the prices of bitcoin and ether used to determine the value of ~~Bitcoin~~bitcoin and ~~Ethereum~~ether derivative products traded on BitMEX were prices that BitMEX had not itself manipulated.

~~748~~887. With these false impressions established, Defendants were able improperly and fraudulently to induce each Plaintiff to use the BitMEX platform, to liquidate each Plaintiff's

trading positions on BitMEX using each Plaintiff's very sensitive insider information about each

Plaintiff's position and open orders, to use the Insider Trading Desk to orchestrate disadvantageous trades for Plaintiffs, and to manipulate the price of bitcoin and ether on

"reference" exchanges to orchestrate further disadvantageous trades and position liquidations for Plaintiffs.

~~749~~888. Defendants generated ill-gotten gain from their fraud by collecting trading commissions from each Plaintiff for trading on the BitMEX platform that occurred as a result of the fraud (each Plaintiff would each not have used the platform if he had known the truth); prevailing as the counterparty against Plaintiff with respect to trading that occurred as a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth); and increasing the size of the Insurance Fund through position liquidations that occurred as a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth).

~~750~~889. Defendants' fraud was thus a direct and proximate cause as well as substantial factor of the injury to Plaintiffs in that Plaintiffs traded in ~~swaps and futures~~Perpetual Swaps on margin on BitMEX as they did, and thus paid 21.05 bitcoins in trading commissions and suffered their trading losses from such trading amounting to 249.9 bitcoins, in addition to sustaining bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, as a result of their reasonable failure to know the actual facts fraudulently concealed from Plaintiffs by Defendants. Thus, the total loss sustained by Plaintiffs was ~~272.65~~272.62 bitcoins.

~~751~~890. Each Plaintiff would not have deposited his bitcoins with BitMEX and traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above, fraudulently concealed from each Plaintiff by Defendants.

~~752~~891. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' fraudulent concealment of material facts from each Plaintiff, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading losses he suffered, and that Defendants would generate the ill-gotten gains they did.

~~753~~892. As a direct and proximate result of Defendants' fraudulent misrepresentations and concealment of material facts from each Plaintiff, each Plaintiff deposited his bitcoins and opened margined ~~swap~~Perpetual Swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential and sensitive order and position information, wherein the Insider Trading Desk had priority access to the trading order queues and not subject to lockouts, by reason of which Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

~~754~~893. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

~~755~~894. Cal. Civ. Code § 1710(3) defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

~~756~~895. Defendants "[~~give~~gave] information of other facts which are likely to mislead for want of communication of that fact" by providing to Plaintiffs the false Warranty and Representation without disclosing the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs, liquidations. This made the Warranty and Representation at least misleading. Accordingly, Defendants' conduct constituted deceit under Cal. Civ. Code §

1710(3).

~~757~~896. Moreover, California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3)

when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

~~758~~897. Defendant had exclusive knowledge of material facts related to the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and of material fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customer, including each Plaintiffs' liquidations. These material facts were not known to Plaintiffs. Therefore, Defendants were obligated to disclose ~~this~~the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

898. Additionally, Defendants engaged in an active concealment of the true facts related to the operation of the Insider Trading Desk. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the Insider Trading Desk as the origin of manipulative trading. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted critical records, including trader identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with the BitMEX platform. This was done to cover up any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits of the Insider Trading Desk could not be traced back to the BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Defendants were additionally obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

~~759. Moreover~~899. Furthermore, Defendants "[made] partial representations [about the Insider Trading Desk] but also suppresses some material facts" regarding informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX ~~customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs' liquidations. Therefore, Defendants were additionally obligated to disclose this information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to~~

~~do.~~

customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs' liquidations. Therefore, Defendants were additionally obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

760900. Defendants' misrepresentations, half-truths and omissions constituted deceit under

Cal. Civ. Code §§ 1710(1) and (3) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least 272.65272.62 bitcoins.

761901. In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT XIVXVIII
### Fraudulent Inducement — Against All Defendants

762902. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

763903. As alleged in Paragraphs above, the Service Agreement between Defendants and

each Plaintiff was induced by and procured by Defendants through the fraud, misrepresentations and fraudulent omissions of material fact by Defendants, which ultimately conferred no bona fide cryptoderivative trading opportunity or any other benefit upon Plaintiffs and thus resulted in a total failure of consideration and frustration of its purpose.

764904. Each Plaintiff entered into the Service Agreement in justifiable reliance on fraudulent misrepresentations and fraudulent omissions of material fact by Defendants as alleged in Paragraphs above.

~~765~~905. As a consequence thereof, the Service Agreement is voidable.[~~5462~~] Each Plaintiff intended and intends that his original Complaint, the ~~First~~ Amended Complaint, the Second Amended

Complaint, the Consolidated Complaint and this Amended Consolidated Complaint serve as

~~Amended Complaint and this Third Amended Compliant serve as~~ notice of voiding of the Service Agreement, equitably requiring Defendants to restore to Plaintiffs

all the bitcoin deposits transferred by Plaintiffs to Defendants as consideration for the Service

Agreement and to compensate Plaintiffs for the loss of use of their bitcoins.

~~766~~906. Plaintiffs have been damaged by fraudulent misrepresentations and fraudulent

omissions of material fact by Defendants as alleged in Paragraphs above in the sum of ~~272.65~~272.62

bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be

manifestly unjust due to bitcoin appreciation.

## COUNT XIX

~~54 In addition to being voidable for fraud in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion agreement.~~

**Negligent Misrepresentation — Against All Defendants**

~~767~~907. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~768~~908. At the time Defendants made the Warranty and Representation and representations

regarding available liquidity on BitMEX referenced above to each Plaintiff, they had no

reasonable grounds to believe that these representations were true and made them without

adequate investigation about their veracity.

~~769~~909. Cal. Civ. Code § 1710(2) defines deceit as a "assertion, as a fact, of that which is

not true, by one who has no reasonable ground for believing it to be true."

~~770~~910. Therefore, making of the Warranty and Representation and representations

regarding available liquidity on BitMEX by Defendants to Plaintiffs, for which Defendants had

no reasonable grounds to believe that these representations were true, constituted deceit under

Cal. Civ. Code § 1710(2).

---

[62] In addition to being voidable for fraud in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion agreement.

~~771~~911. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent

to induce him to alter his position to his injury or risk, is liable for any damage which he thereby

suffers."

~~772~~912. Defendants' false and fraudulent Warranty and Representation and representations

regarding available liquidity on BitMEX constituted deceit under Cal. Civ. Code § 1710(2) and

actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing

bitcoins and engaging in cryptoderivative trading on margin on a rigged BitMEX platform,

suffering trading losses, as the result, and paying trading commissions to Defendants. Therefore,

Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to

Plaintiffs for Plaintiffs' damages in the total amount of at least ~~272.65~~272.62 bitcoins.

~~773~~913. As a direct and proximate result of these negligent misrepresentations made by

Defendants to Plaintiffs, Plaintiffs have been damaged in the sum of ~~272.65~~272.62 bitcoins, which

Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly

unjust due to bitcoin appreciation.

## COUNT XX

**Rescission for Negligent Misrepresentation — Against All Defendants**

~~774~~914. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~775~~915. As alleged in Paragraphs above, the Service Agreement between Defendants and

each Plaintiff was induced and procured by Defendants through negligent misrepresentations

made by them to each Plaintiff, including the false Warranty and Representation and false

representations regarding available liquidity on BitMEX referenced above, which ultimately

conferred no bona fide cryptoderivative trading opportunity or any other benefit upon Plaintiffs

and thus resulted in a total failure of consideration and frustration of its purpose. Therefore, each

Plaintiff's consent to the Service Agreement was not real, mutual or free in that it was obtained

through negligent misrepresentations.

~~776~~916. As a direct and proximate result of the negligent misrepresentations made by

Defendants to Plaintiffs, Plaintiffs were induced to enter into the Service Agreement and further

conduct themselves as herein alleged to their detriment. As a consequence thereof, the Service

Agreement is voidable.[5563] Each Plaintiff intended and intends that his original Complaint, the

Amended Complaint, the Second Amended Complaint, the Consolidated Complaint and this

Amended Consolidated Complaint serves as notice of voiding of the Service Agreement,

equitably requiring Defendants to restore to Plaintiffs all the bitcoin deposits transferred by

Plaintiffs to Defendants as consideration for the Service Agreement and to compensate Plaintiffs

for the loss of use of their bitcoins.

777917. Plaintiffs have been damaged by negligent misrepresentations of Defendants in the

sum of 272.65272.62 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary

damages would be manifestly unjust due to bitcoin appreciation.

### COUNT XXI

ss In addition to being voidable for fraud and/or negligent misrepresentation in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion contract.

**False Advertising in Violation of Cal. Bus. & Prof. Code §§ 17500 et seq. — Against All Defendants**

~~778~~918. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~779~~919. Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to ... perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto ... to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning ... those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and

---

[63] In addition to being voidable for fraud and/or negligent misrepresentation in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion contract.

which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading... Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

~~780~~920. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant
ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco. Accordingly, Cal. Bus. & Prof. Code § 17500 applied to false advertising perpetrated by Defendants in connection with BitMEX platform.

~~781~~921. During the Relevant Period, Defendants' cryptoderivative trading services, which defendants offered through the commercial website www.bitmex.com constituted "services" within the meaning of Cal. Bus. & Prof. Code § 17500. Defendants themselves specifically referred to cryptoderivative trading services provided by BitMEX as "services" and used this specific term 94 times in the BitMEX Service Agreement, Ex. ~~17~~19.

~~782~~922. The "intent" required by Cal Bus. & Prof. Code § 17500 is the intent to perform services, and not the intent to mislead the public in the performing of such services.

~~783~~923. Defendants misled each Plaintiff and other consumers by making at least the following untrue and misleading statements:

> a. Stating on their commercial website www.bitmex.com, maintained from Defendant ABS' offices in San Francisco, that "HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading

Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user." This statement was deliberately and materially false. In truth and in fact, the Insider Trading Desk of BitMEX had "God assess" to all customer, order flow, execution and open position information of the BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions on the entire

BitMEX platform. On the other hand, this information was not available to Plaintiffs and other ordinary platform users, with the exception of Defendants themselves. The Insider Trading Desk used this very sensitive information to automatically trade against, and liquidate customers of BitMEX, including Plaintiffs. Moreover, the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts. In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts. Plaintiffs would not have deposited their ~~272.65~~272.62 bitcoins with BitMEX and would not have traded on the BitMEX platform had they known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX.

b. Stating, during Relevant Period, on their commercial website www.bitmex.com, maintained from Defendant ABS' offices in San Francisco, that Defendants' cryptoderivative trading services provided "1500% More Bitcoin/USD liquidity than any other platform" and that "BitMEX's XBTUSD market is the most liquid in the world," see Ex. 16. These statements were materially false, as prior to October of 2018, BitMEX was overtaken by other crypto exchanges, including Binance, Huobi and OKEX, in terms of liquidity and never regained its top position. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts.

~~784~~924. Defendants misled each Plaintiff and other consumers by making at least the above untrue and misleading statements and making other false statements and material omissions of fact as alleged in Paragraphs above.

785925. As a direct and proximate result of Defendants' misleading and false

advertisements, Plaintiffs have suffered injury in fact and have lost 272.65272.62 bitcoins. As such,

Plaintiffs request that this Court order Defendants to restore these 272.65272.62 bitcoins, in kind, to

Plaintiffs, and to enjoin Defendants from continuing these unfair practices in violation of the Cal

Bus. & Prof. Code § 17500 in the future. Otherwise, Plaintiffs and the broader general public, will

be irreparably harmed and/or denied an effective and complete remedy.

## COUNT ~~XVIII~~XXII
**Violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.) — Against All Defendants**

786926. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

787927. During the Relevant Period, each Plaintiff was a "consumer"[5664] as defined by Cal.

Civ. Code § 1761(d) and traded on his own personal account.

---

[64] To the extent Section 6.4 of the Service Agreement attempts to force Plaintiffs to waive provisions of the Consumer Legal Remedies Act by forcing Plaintiffs to represent that they are not "consumers," such attempt is unenforceable and void pursuant to Cal. Civ. Code § 1751, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."

~~788~~928. During the Relevant Period, Defendants' cryptoderivative trading services, which defendants offered through the commercial website www.bitmex.com constituted "services" as defined by Cal. Civ. Code § 1761(b). Defendants themselves specifically referred to cryptoderivative trading services provided by BitMEX as "services" and used this specific term 94 times in the BitMEX Service Agreement, Ex. ~~17~~19.

~~789~~929. During the Relevant Period, Defendants each constituted a "person" as defined by
Cal. Civ. Code § 1761(c).

~~790~~930. At all relevant times, each Plaintiff's acceptance of the Service Agreement as well
as the use of Defendants' cryptoderivative trading services provided by BitMEX platform for a fee constituted a "transaction" as defined by Cal. Civ. Code § 1761(e).

~~791~~931. The Cal. Civ. Code § 1770 provides that it is unlawful to: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a

---

~~56 To the extent Section 6.4 of the Service Agreement attempts to force Plaintiffs to waive provisions of the Consumer Legal Remedies Act by forcing Plaintiffs to represent that they are not "consumers," such attempt is unenforceable and void pursuant to Cal. Civ. Code § 1751, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."~~

particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

~~792~~932. Defendants' acts alleged in Paragraphs above violate at least Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14). Above-alleged Defendants' misrepresentations, half-truths and omissions constituted conduct that is "likely to mislead a reasonable consumer," and, therefore, it violated the Consumer Legal Remedies Act.

~~793~~933. Pursuant to Cal. Civ. Code § 1782(a), ~~on May 4, 2021,~~ Plaintiffs' counsel ~~notified~~ will duly notify Defendants in writing by certified mail, return receipt requested, of the particular violations of Cal. Civ. Code § 1770 and ~~demanded~~demand that Defendants rectify the problems associated with the actions detailed above.

~~794~~934. If Defendants fail to respond to Plaintiffs' counsel letter, fail to agree to rectify the problems associated with the actions detailed above within 30 days of the date of written notice, as prescribed by Cal. Civ. Code § 1782, Plaintiffs will amend this Complaint to pursue claims for

actual, punitive, and statutory damages, as appropriate against Defendants. As to this cause of action, at this time, Plaintiffs seek only injunctive relief.

### COUNT ~~XIX~~XXIII
**"Unfair" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants**

~~795~~935. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~796~~936. The Cal. Bus. & Prof. Code § 17200 et seq. defines "unfair competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising as well as any violation of Cal. Bus. & Prof. Code § 17500. Cal. Bus. & Prof. Code § 17200.

797937. The Cal. Bus. & Prof. Code § 17200 et seq. imposes strict liability. Plaintiffs need

not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent

business practices – but only that such practices occurred.

798938. According to a sworn Declaration of Defendant Hayes dated February 27, 2020,

Defendant "ABS Global Trading Limited, ... provides software development, software

engineering, and digital security services to HDR Global Trading Limited... including by

developing the front-end interface of the BitMEX platform." The front-end interface of the

BitMEX platform includes commercial website www.bitmex.com, which was used to provide the

false the fraudulent representations to Plaintiffs.

799939. Defendant ABS Global Trading Limited, responsible, within the BitMEX

Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San

Francisco, California. Therefore, the false and fraudulent statements made to Plaintiff by

Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS'

offices in San Francisco, California. Accordingly, Cal. Bus. & Prof. Code § 17200 applied to

false and fraudulent statements and omissions perpetrated by Defendants in connection with

BitMEX platform.

~~800~~940. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco. Accordingly, Cal. Bus. & Prof. Code § 17200 applied to false advertising perpetrated by Defendants in connection with BitMEX platform.

~~801~~941. A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

~~802~~942. Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive advertising that represented false and fraudulent statements as well as omissions of material fact, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to Plaintiffs, for a fee, through the BitMEX online trading platform. Defendants' acts and practices offended an established public policy of transparency in operation of financial markets, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

~~803~~943. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and ... lost money or property as a result of the unfair competition" by Defendants, because they would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained bitcoin loss of use damages of ~~1.70059~~1.67291 bitcoins, sustained trading losses in the amount of 249.9 bitcoins and paid trading commissions in the amount of 21.05 bitcoins to Defendants, but for their reasonable reliance on the truth of the alleged misleading and deceptive advertising by Defendants that incorporated false and fraudulent statements as well as omissions of material fact. The purchase of cryptoderivative trading

services that Plaintiffs would not otherwise have purchased[57][65] but for the alleged misleading and deceptive advertising by Defendants establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co.*, 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D.

---

[57] The purchase of cryptoderivative trading services by Plaintiffs from Defendants resulted in Plaintiffs' bitcoin loss of use damages of 1.70059 bitcoins and damages associated with payment of trading commissions to Defendants in the amount of 21.05 bitcoins, irrespective of, and independently from any profit or loss generated from trading and irrespective of any market events such as market manipulation.

Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp.*, 718 F. 3d 1098 (9th Cir. 2013).

~~804~~944. The misleading and deceptive advertising by Defendants included, without limitation, the false Warranty and Representation, false representations about available liquidity on BitMEX, as well as fraudulent omissions of material facts alleged above.

~~805~~945. Moreover, Defendants operating a cryptoderivative trading platform BitMEX as a rigged casino, set up to use sensitive insider information of its traders to automatically liquidate them and misappropriate their money, when it was particularly profitable for Defendants to do so, as specifically alleged in Paragraphs 2-9, 229-317 and ~~864~~1004-~~867~~1007 also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers.

~~806~~946. Furthermore, Defendants operating a clandestine and highly automated Insider Trading Desk, which enjoys informational, trading and technical advantages over BitMEX customers, described above, and which continuously artificially manipulates the prices of bitcoin and ether on BitMEX and the U.S.-based third-party reference spot exchanges, used for price discovery, as also described above, in order to make its own trades profitable and to force customer liquidations, which directly and proximately resulted in a loss of 249.9 bitcoins by ~~Plaintiffs, as~~

[65] The purchase of cryptoderivative trading services by Plaintiffs from Defendants resulted in Plaintiffs' bitcoin loss of use damages of 1.67291 bitcoins and damages associated with payment of trading commissions to Defendants in the amount of 21.05 bitcoins, irrespective of, and independently from any profit or loss generated from trading and irrespective of any market events such as market manipulation.

Plaintiffs, as alleged in Paragraphs ~~864~~1004-~~867~~1007 below on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and ... lost money or property as a result of the unfair competition" by Defendants because the automated tools operated by the Insider Trading Desk directly and proximately caused a loss of 249.9 bitcoins by Plaintiffs, as alleged in Paragraphs ~~864~~1004-~~867~~1007 below, on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

~~807~~947. Yet furthermore, Defendants intentionally and strategically deploying server freezes to prevent Plaintiffs from timely closing their open leveraged long ~~swap~~Perpetual Swap positions on

BitMEX also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and ... lost money or property as a result of the unfair competition" by Defendants because these intentional server freezes were a substantial factor in causing the loss of 249.9 bitcoins by Plaintiffs on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, due to Plaintiffs' inability to timely close ~~open~~ their open long positions.

~~808~~948. The grave financial harm to Plaintiffs outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unethical, unscrupulous, misleading and deceptive conduct described herein.

~~809~~949. By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to deprive Plaintiffs of their bitcoin holdings in the amount of ~~272.65~~272.62 bitcoins.

~~810~~950. By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been

damaged in the amount of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in

kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

**COUNT ~~XX~~XXIV**

**"Fraudulent" Business Practices in Violation of California Unfair Business Practices Act
(Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants**

~~811~~951. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~812~~952. A business act or practice is "fraudulent" under the Cal. Bus. & Prof. Code §

17200 if it is likely to deceive members of the consuming public.

813953. Allegations of specific acts constituting fraud and deceit and fraud by omission set

forth in Paragraphs above are incorporated as if fully set forth herein. These acts constitute

"fraudulent and deceptive" acts for purposes of Cal. Bus. & Prof. Code § 17200 et seq.

814954. Defendants' "fraudulent and deceptive" acts and practices alleged above constitute

fraudulent business acts or practices as they have deceived Plaintiff and are highly likely to

deceive members of the consuming public. PlaintiffPlaintiffs relied on Defendants' fraudulent and

deceptive representations and omissions regarding the functionality, integrity, profit model and

available liquidity of Defendants' cryptoderivative trading services. These misrepresentations

and omissions played a substantial role in Plaintiffs' decisions to deposit their valuable bitcoins

with BitMEX platform, engage in trading thereon, and pay trading commissions to Defendants,

and Plaintiffs would not have deposited their bitcoins, would not have traded on BitMEX and

would not have paid trading commissions without Defendants' misrepresentations and omissions.

815955. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact

and ... lost money or property as a result of the unfair competition" by Defendants, because they

would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded

derivatives on the BitMEX platform, sustained bitcoin loss of use damages of 1.700591.67291 bitcoins,

sustained trading losses in the amount of 249.9 bitcoins and paid trading commissions in the

amount of 21.05 bitcoins to Defendants, but for their reasonable reliance on the alleged fraudulent

and deceptive representations and omissions regarding the functionality, integrity, profit model

and available liquidity of Defendants' cryptoderivative trading services. The purchase of cryptoderivative trading services that Plaintiffs would not otherwise have purchased but for the alleged fraudulent and deceptive representations and omissions by Defendants, establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream,*

*Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade,*

*Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp.*,

718 F. 3d 1098 (9th Cir. 2013).

~~816~~956. By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and

other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal.

Bus. & Prof. Code § 17200 et seq. by consummating a fraudulent business practice, designed to

deprive Plaintiffs of their bitcoin holdings in the amount of ~~272.65~~272.62 bitcoins.

~~817~~957. By reason of the foregoing and as a proximate result of Defendants', and each of

them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been

damaged in the amount of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in

kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT ~~XXI~~XXV
### "Unlawful" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants

~~818~~958. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~819~~959. A business act or practice is "unlawful" under the Cal. Bus. & Prof. Code § 17200

if it violates any other law or regulation. "The 'unlawful' practices prohibited by Cal. Bus. &

Prof. Code § 17200 et seq. are any practices forbidden by law, be it civil or criminal, federal,

state, or municipal, statutory, regulatory, or court-made." *Watson Labs., Inc. v. Rhone-Poulenc*

*Rorer, Inc*., (C.D. Cal. 2001) 178 F. Supp. 2d 1099, 1120; *People v. McKale*, (1979) 25 Cal. 3d
626.

~~820~~960. Defendants' acts and practices alleged above constitute unlawful business acts or
practices as they have violated state and federal law in connection with their deceptive
scheme. The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or
practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any
false advertisements. 15 U.S.C. § 52(a).

~~821~~961. California law expressly prohibits false advertising schemes run by Defendants. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17501.

~~822~~962. Moreover, the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770 prohibits: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

~~823~~963. The violation of any law constitutes an "unlawful" business practice under the Cal. Bus. & Prof. Code § 17200.

~~824~~964. As detailed herein, Defendants' acts and practices alleged in Paragraphs above were intended to or did result in violations of the CEA, the Rule 180.1, 17 C.F.R. § 180.1(a) (2019), the RICO, the FTCA, the FAL, and the CLRA.

~~825~~965. Defendants' practices, as set forth in Paragraphs above, have misled Plaintiff and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the Cal. Bus. & Prof. Code § 17200.

~~826~~966. Defendants' violation of the Cal. Bus. & Prof. Code § 17200, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that the public will be deceived. Pursuant to the Cal. Bus. & Prof. Code § 17200, Plaintiffs are entitled to

preliminary and permanent injunctive relief and an order commanding Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiffs of all Defendants' revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

827967. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and ... lost money or property as a result of the unfair competition" by Defendants, because they would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained bitcoin loss of use damages of 1.700591.67291 bitcoins,

sustained trading losses in the amount of 249.9 bitcoins and paid trading commissions in the amount of 21.05 bitcoins to Defendants, but for their reasonable reliance on the truth of the alleged fraudulent solicitations and false advertising, which violated the CEA, the Rule 180.1, 17 C.F.R. § 180.1(a) (2019), the RICO, the FTCA, the FAL, and the CLRA and Cal. Civ. Code § 1709 et seq. The purchase of cryptoderivative trading services that Plaintiffs would not otherwise have purchased, but for the alleged fraudulent solicitations and unlawful false advertising by Defendants that violated the CEA, the Rule 180.1, 17 C.F.R. § 180.1(a) (2019), the RICO, the FTCA, the FAL, and the CLRA and Cal. Civ. Code § 1709 et seq., establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp*., 718 F. 3d 1098 (9th Cir. 2013).

828968. By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal.

Bus. & Prof. Code § 17200 et seq. by consummating an unlawful business practice, designed to

deprive Plaintiffs of their bitcoin holdings in the amount of ~~272.65~~272.62 bitcoins.

~~829~~969. By reason of the foregoing and as a proximate result of Defendants', and each of

them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been

damaged in the amount of ~~272.65~~272.62 bitcoins, which Plaintiffs demand to be returned to them in

kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

### COUNT ~~XXII~~XXVI
**Negligence — Against All Defendants**

~~830~~970. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~831~~971. The California Supreme Court recognized an exception to the economic loss rule

in *J'Aire Corporation v. Gregory*, wherein the rule does not prevent recovery in tort if a special

relationship exists between the plaintiff and the defendant. *J'Aire Corporation v. Gregory,* 24

Cal. 3d 799, 804 (1979). The exception applies to cases involving contracts for *services* "where the parties are in contractual privity." *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 783 (1997). The *J'Aire* exception is available if there is a special relationship between plaintiff and defendant.

~~832~~972. The ~~Services~~Service Agreement is one for provision of cryptoderivative trading *services* and not goods. Therefore, the *J'Aire* exception is available in the present case. Court cases have extended the application of *J'Aire* to situations where the parties are in contractual privity.

~~833~~973. California Courts examine six factors to determine whether a special relationship between plaintiff and defendant exists:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

~~834~~974. As alleged herein, and to the extent that it is determined to be applicable to certain

claims, Plaintiffs had a "special relationship with Defendants" as defined in *J'Aire Corporation v. Gregory*, 24 Cal. 3d 799, 804 (1979). Plaintiffs undoubtedly had a contract for provision of cryptoderivative trading services with Defendants where they and Defendants were in contractual privity. The services consisted of the provision of access to the BitMEX trading platform, including the ability to place orders, open and close positions and use margin.

~~835~~975. The transaction between Defendants and Plaintiffs were undoubtedly meant to benefit Plaintiffs by providing them the ability to use the cryptoderivative trading services provided by Defendants through their BitMEX platform for all of the purposes which Plaintiffs expected and which were intended by Defendants. See *J'Aire*, 24 Cal. 3d at 804.

~~836~~976. Moreover, it was entirely foreseeable to Defendants that Plaintiffs would be harmed if they would not longer to be able to access cryptoderivative trading services provided by Defendants due to a server freeze, which would result in Plaintiffs' inability to close open trading

positions and open new ones. For example, if Plaintiffs are unable to timely close their positions during a market move, their open positions would likely be liquidated, resulting in a financial loss to Plaintiffs.

~~837~~977. In the present case, Plaintiffs certainly suffered injury by being deprived of their 249.9 bitcoins, which was caused by their inability to timely close their open trading positions due to server freezes that occurred on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

~~838~~978. As required by *J'Aire*, there is also a close connection between Defendants' conduct and the injury suffered by Plaintiffs. But for Defendants' allowing the servers of BitMEX to freeze, Plaintiffs would have timely closed their positions and would not have suffered liquidations resulting in the loss of 249.9 bitcoins.

~~839~~979. Defendants' conduct also involves moral blame. Aware of the vulnerability of its customers in having their positions liquidated due to server freezes, Defendants have done nothing to prevent that practice, including providing extra server capacity or re-writing BitMEX's

high availability software to provide additional protection to its customers' trading positions during market moves. As one of the world's most profitable cryptoderivative exchanges, which generated at least billion dollars in profits for Defendants, Defendants have all the resources to do better and yet they turn an indifferent eye to the widespread server freezes resulting in devastating financial losses for their customers. Moreover, evidence summarized above shows that Defendants financially benefit from such sever freezes, which is especially reprehensible conduct in view of the financial devastation that they inflict on retail traders. Defendants are also morally culpable in failing to reign in its own employees' insider trading on the BitMEX platform using highly confidential "insider" information of Plaintiffs and other BitMEX customers.

~~840~~980. Plaintiffs' lawsuit fulfills the policy of preventing future harm. *J'Aire*. Plaintiffs' complaint against Defendants has received widespread publicity and has publicized the server freezes and other unconscionable conduct occurring on the BitMEX platform. Because the CFTC is apparently not taking an active role in policing Defendants' violations of the CEA, it is up to

private parties like Plaintiffs in this action through lawsuits to help stem Defendants'
culpable involvement in practices that is leading to widespread harm to consumers.

~~841~~981. Thus, for all the foregoing reasons, a special relationship between Defendants
and Plaintiffs existed in this case and Defendants owed a duty to Plaintiffs to maintain a
functional cryptoderivatives trading marketplace, for access to which they charged Plaintiffs
hefty trading commissions. *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986
F. Supp. 2d 428 (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders).

~~842~~982. Defendants, and each of them, failed to fulfill this duty by failing to prevent
server freezes, which occurred on June 27, 2019, July 14, 2019, November 14, 2018 and
November 25, 2018, as alleged herein above, despite BitMEX generating over a billion dollars in
profit for Defendants. Irrespective of the origin of the market events on June 27, 2019, July 14,
2019, November 14, 2018 and November 25, 2018, this negligent operation of Defendants'
BitMEX platform prevented Plaintiffs from taking a timely corrective actions on the
corresponding dates June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018,
which they

unsuccessfully attempted to take, to close their open positions, resulting in the wrongful

liquidation of Plaintiffs' leveraged long XBTUSD and ETHUSD ~~perpetual swap~~Perpetual Swap

positions by

Defendants and wrongful confiscation of Plaintiffs' 249.9 bitcoins, now valued at over

$14,494,200.

~~843~~983. Irrespective of the origin of the market events on June 27, 2019, July 14, 2019,

November 14, 2018 and November 25, 2018, Defendants' failing to properly maintain a

functional BitMEX platform www.bitmex.com was a substantial factor in causing the injury to

Plaintiffs in that Plaintiffs were prevented from taking a corrective action to timely close their

open positions, resulting in Defendants' liquidation thereof, and suffered their trading losses of

249.9 bitcoins from such liquidation.[~~58~~66] Defendants' conduct was a substantial factor in causing

Plaintiffs' trading losses of 249.9 bitcoins.

~~[58] Negligence cause of action is pleaded in the alternative to the conversion cause of action. Allegations of negligence and conversion are multiple possibilities that, even if mutually exclusive, are permitted under alternative pleading rules.~~

~~844~~984. All three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna,

personally responsible for the server freezes on the BitMEX platform, are located in California.

Therefore, California is the location where the breach of Defendants' duty to Plaintiffs to

maintain a functional cryprtoderivative trading marketplace has occurred. As BitMEX Enterprise

principals, Defendants HDR, ABS and Hayes are liable for the negligent conduct of their agents,

engineers Jerry Aldrich, Scott H. and Armando Cerna, who acted, during Relevant Period, within

the scope of their agency and employment.

~~845~~985. As a result of Defendants' negligence, Plaintiffs have been damaged in the amount

of 249.9 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages

would be manifestly unjust due to bitcoin appreciation.

### COUNT ~~XXIII~~XXVII
### Restitution Under Quasi-Contract — Against All Defendants

~~846~~986. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

---

[66] Negligence cause of action is pleaded in the alternative to the conversion cause of action. Allegations of negligence and conversion are multiple possibilities that, even if mutually exclusive, are permitted under alternative pleading rules.

~~847~~987. As a result of the unlawful actions of Defendants set forth hereinabove,

Defendants, and each of them, have received a financial benefit at the expense of Plaintiffs in the

amount of at least ~~272.65~~272.62 bitcoins.

~~848~~988. Defendants, and each of them, had knowledge of the alleged benefit.

~~849~~989. Defendants, and each of them, voluntarily accepted and retained the benefit

obtained.

~~850~~990. The circumstances render Defendants' retention of the benefit inequitable unless

Defendants, and each of them, pay to Plaintiffs the value of the benefit.

~~851~~991. Defendants, and each of them, have been unjustly enriched at the expense of

Plaintiffs.

~~852~~992. Plaintiffs are entitled to damages as a result of Defendants', and each of them,

unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants,

and each of them, from Plaintiffs.

~~853~~993. Plaintiffs are entitled to restitution from Defendants, under California quasi-contract theory, as a result of Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants, and each of them, from Plaintiffs.

~~854~~994. As a result of the actions of Defendants, and each of them, set forth hereinabove, Defendants, and each of them, became unjustly enriched, and as a result thereof, Plaintiffs are entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of the Plaintiffs factually (directly) and legally (proximately) caused by Defendants', and each of them, unlawful conduct.

## COUNT ~~XXIV~~XXVIII
### Constructive Trust — Against All Defendants

~~855~~995. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~856~~996. By reason of the fraudulent and otherwise wrongful manner in which the Defendants, or any of them, obtained their alleged right, claim or interest in and to the property of

Plaintiffs — namely ~~272.65~~272.62 bitcoins — Defendants and each of them, have no legal or equitable

right, claim or interest therein, but, instead, Defendants, and each of them are involuntary trustees

holding said ~~272.65~~272.62 bitcoins and any appreciation thereof and other profits therefrom in

constructive trust for Plaintiffs with the duty to convey the same to Plaintiffs forthwith.

## COUNT ~~XXXV~~XXXIX
### Accounting — Against All Defendants

~~857~~997. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~858~~998. As a result of the actions of Defendants, and each of them, set forth hereinabove,

Defendants, and each of them, have received cryptocurrency in the amount of ~~272.65~~272.62 bitcoins,

which is due to Plaintiffs from Defendants, and each of them, as previously alleged.

~~859~~999. The amount of cryptocurrency due from Defendants to Plaintiffs is unknown to

Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of

Defendants, and each of them, in connection with the alleged unlawful theft perpetrated by Defendants.

~~860~~1000. Plaintiffs have demanded an accounting of the aforementioned receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful theft and payment of the amount found due, but Defendants, and each of them, have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

### COUNT ~~XXVI~~XXX
**Conversion — Against All Defendants**

~~861~~1001. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~862~~1002. During Relevant Period, Plaintiffs were and still are the rightful owners and are entitled to the immediate possession of the following property, namely their valuable bitcoin holdings amounting to 249.9 bitcoins, that were deposited in Plaintiffs' respective BitMEX trading accounts.

~~863~~1003. As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the aforesaid property amounting to 249.9 bitcoins from Plaintiffs' possession by fraud and deceit and, therefore, have interfered with the Plaintiffs' right to possess and control such property, to which Plaintiffs had a superior right of possession and control at the time of the conversion.

~~864~~1004. Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective ~~swap~~Perpetual Swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX

accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs.

~~865~~1005. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery. Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[~~59~~67]

~~866~~1006. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. ~~For example~~First, Defendants

---

[67] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018.

867 1007. On June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, took the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession and converted the same to their own use. As BitMEX Enterprise principals, Defendants HDR and, Hayes, Delo and Reed are liable for the tortious conduct of their agents, operators of the

BitMEX Insider Trading Desk so Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

~~BitMEX Insider Trading Desk~~ Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during the Relevant Period, within the scope of their agency and employment, when they utilized Insider Trading Desk automated market manipulation tools on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, to artificially liquidate Plaintiffs' trading positions on BitMEX.

~~868~~1008. Plaintiffs did not consent to Defendants' taking of 249.9 bitcoins from Plaintiffs.

~~869~~1009. Defendants refused to return Plaintiffs' valuable bitcoin holdings of 249.9 bitcoins after Plaintiffs demanded their return.

~~870~~1010. As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of 249.9 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation. Defendants' conduct was a substantial factor in causing Plaintiffs' dispossession of their valuable bitcoin holdings amounting to 249.9 bitcoins.

~~871~~1011. In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT ~~XXVII~~XXXI
### Aiding and Abetting Conversion — Against All Defendants

~~872~~1012. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~873~~1013. During the Relevant Period, Plaintiffs were and still are the owners and are entitled to the immediate possession of the following property, namely their valuable bitcoin holdings amounting to 249.9 bitcoins, that were deposited in Plaintiffs' respective BitMEX trading accounts.

~~874~~1014. At various times mentioned in this Complaint, Defendants knowingly aided and abetted their co-defendants and/or the Insider Trading Desk in taking the above-mentioned property, including Plaintiffs' valuable bitcoin holdings amounting to 249.9 bitcoins deposited in

Plaintiffs' respective BitMEX trading accounts from Plaintiffs' possession and

converting the same to their own use.

~~875~~1015. Plaintiffs did not consent to Defendants' taking their valuable bitcoins from
them.

~~876~~1016. The conduct of Defendants, an each of them, was a substantial factor in causing
Plaintiffs' damages.

~~877~~1017. Defendants benefited significantly from the laundering of the converted bitcoin,
as
Defendants earned trading commissions on each transaction involving the bitcoin

converted from Plaintiffs.

~~878~~1018. As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of

249.9 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages

would be manifestly unjust due to bitcoin appreciation.

~~879~~1019. In doing the wrongful acts herein alleged, Defendants, and each of them, acted

with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount

of $50,000,000 pursuant to Cal. Civ. Code § 3294.

**COUNT ~~XXVIII~~XXXII**

**Replevin (Claim and Delivery) — Against All Defendants**

~~880~~1020. Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

~~881~~1021. During Relevant Period, Plaintiffs were and still are the rightful owners and are

entitled to the immediate possession of the following property, namely their valuable bitcoin

holdings amounting to ~~272.65~~272.62 bitcoins, that were deposited in Plaintiffs' respective BitMEX

trading accounts.

~~882~~1022. As the result of Defendants' wrongful conduct alleged hereinabove,

Defendants took the aforesaid property amounting to ~~272.65~~272.62 bitcoins from Plaintiffs'

possession by fraud and deceit and, therefore, have interfered with the Plaintiffs' right to

possess and control such property, to which Plaintiff had a superior right of possession and

control at the time of the conversion.

~~883~~1023. Plaintiffs did not consent to Defendants' taking their valuable bitcoins from them.

~~884~~1024. Defendants' conduct was a substantial factor in Plaintiffs' dispossession of their

valuable bitcoin holdings amounting to ~~272.65~~272.62 bitcoins.

~~885~~1025. Defendants are still in possession of the aforesaid property amounting to ~~272.65~~272.62

bitcoins taken from Plaintiffs' possession by fraud and deceit.

~~886~~1026. Defendants refused to return Plaintiffs' valuable bitcoin holdings of ~~272.65~~272.62

bitcoins after Plaintiffs demanded their return.

~~887~~1027. Therefore, Plaintiffs are entitled to the issuance of a Writ of Replevin for the return of the aforesaid property, namely ~~272.65~~272.62 bitcoins, taken from Plaintiffs' possession by fraud and deceit.

## COUNT ~~XXIX~~XXXIII
### Violation of Cal. Pen. Code § 496 — Against All Defendants

~~888~~1028. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

~~889~~1029. Cal. Pen. Code § 496(a) provides "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." Cal. Pen. Code § 496(c) provides that "Any person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

~~890~~1030. Defendants, an each of them, violated Cal. Pen. Code § 496(a) by receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding property stolen from the rightful owners – Plaintiffs in the form of 249.9 bitcoins, knowing the property was

stolen or obtained in a manner constituting theft by their co-defendants and/or the Insider Trading Desk.

~~891~~1031. Defendants and each of them knew that the property, in the form of 249.9 bitcoins, was stolen or had been obtained in a manner constituting theft by their co-defendants and/or the Insider Trading Desk.

~~892~~1032. As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of 249.9 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to Bitcoin appreciation.

8931033. The conduct of Defendants, an each of them, was a substantial factor in causing Plaintiffs' damages.

8941034. In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

8951035. Pursuant to SectionCal. Pen. Code § 496(c), Plaintiffs seek three times the amount of actual damages sustained, to be paid in kind, costs of suit, and reasonable attorney's fees.

## **PRAYER**

By reason of the foregoing, Plaintiffs BMA, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan respectfully request that this Court ~~respectfully request that this Court~~:

(a)    enter a judgment that Defendants, and each of them, conducted or participated in the conduct of enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(b)    enter a judgment that Defendants, and each of them, conspired to conduct or participate in the conduct of enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d);

(c)    pursuant to 18 U.S.C. § 1964(c), award Plaintiffs threefold the damages they sustained, in the amount of at least 817.86 bitcoins ($47,435,880), to be paid in kind, together with the cost of the suit, including a reasonable attorneys' fees;

(cd)    enter a judgment that Defendants, and each of them, have used deceptive or manipulative device in connection with cryptocurrencies Perpetual Swap contracts, in violation of

7 U.S.C. § 9(1);

(~~d~~e)    enter a judgment that Defendants, and each of them, have manipulated prices of Perpetual Swap contracts in violation of 7 U.S.C. §§ 9(3) and 13(a)(2);

(~~e~~f)    enter a judgment that Defendants, and each of them, have aided and abetted manipulation of prices of cryptocurrencies Perpetual Swap contracts, ~~cryptocurrencies swaps and cash cryptocurrencies~~ by the other Defendants and third persons;

(~~f~~g)    enter a judgment that Defendants, and each of them, have perpetrated deceit by fraud upon Plaintiffs in violation of Cal. Civ. Code §§ 1709 and 1710(1) and (3) by fraudulently soliciting Plaintiffs to make bitcoin deposits, pay trading commissions and engage in trading on margin on BitMEX;

(~~g~~h)    enter a judgment that Defendants, and each of them, have perpetrated deceit by negligent misrepresentation upon Plaintiffs in violation of Cal. Civ. Code §§ 1709 and 1710(2);

(~~h~~i)    enter a judgment that Defendants, and each of them, have engaged in unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.;

(~~i~~j)    enter a judgment that Defendants, and each of them, have engaged in false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq.;

(~~j~~k)    enter a judgment that Defendants, and each of them, violated Cal. Civ. Code § 1770(a), and preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of Cal. Civ. Code § 1770(a);

(~~k~~l)    enter a judgment that the Service Agreement is null and void as having been procured by fraud and deceit;

(~~l~~m)    enter a judgment that the Service Agreement is null and void as having been procured by deceit by negligent misrepresentation;

(~~m~~n)    preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of California laws;

(~~n~~o)    enter a judgment that Defendants, and each of them, because unjustly enriched at the expense of Plaintiffs;

(~~o~~p)    impose a constructive trust over Defendants, and each of them, for the benefit of Plaintiffs;

(~~p~~q)    order an accounting of the alleged receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due to Plaintiffs;

(~~q~~r)    enter judgment that Defendants, and each of them, acted with malice, fraud and oppression;

(~~r~~s)    award compensatory damages to Plaintiffs and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial;

(~~s~~t)    award to Plaintiffs BMA, Kolchin, Dolgov and Razvan and against all Defendants, and each of them, jointly and severally, damages associated with the loss of use of Plaintiffs' bitcoins, in the amount of at least ~~1.70059~~1.67291 bitcoins[60] ($97,028.78)[68], to be paid in kind, of which at least 0.03178 bitcoins should be awarded to Plaintiff Kolchin, at least ~~0.02811~~0.0041 bitcoins should be awarded to Plaintiff Dolgov, at least 1.3856 bitcoins should be awarded to Plaintiff Razvan and at least 0.2551 bitcoins should be awarded to Plaintiff BMA, or such other amounts to be determined by the Court, to be paid in kind;

(~~t~~u)    award to Plaintiffs BMA, Kolchin, Dolgov and Razvan and against all Defendants, and each of them, jointly and severally, damages associated with trading losses incurred by Plaintiffs on BitMEX, in the amount of at least 249.9 bitcoins ($14,494,200), to be paid in kind, of which at least 3.99 bitcoins should be awarded to Plaintiff Kolchin, at least 3.93 bitcoins should be awarded to Plaintiff Dolgov, at least 226.16 bitcoins should be awarded to Plaintiff Razvan and at least 10 bitcoins should be awarded to Plaintiff BMA, or such other amounts to be determined by the Court, but not less than Plaintiffs' respective net trading losses on BitMEX, to be paid in kind;

(v)    award to Plaintiff Dubinin and against all Defendants, and each of them, jointly and severally, damages associated with his trading losses incurred on Kraken, in the amount of at

---

[~~60~~68] Conversion from Bitcoin to U.S. dollar is being provided for reference only and assumes bitcoin price of $58,000 per bitcoin. Plaintiffs request the damages to be paid in kind, in bitcoin, as award of monetary damages in fiat currency would be manifestly unjust due to bitcoin appreciation.

least 97.73 bitcoins ($5,668,340), or such other amount to be determined by the Court, to be paid in kind;

(uw)    award to Plaintiffs BMA, Kolchin, Dolgov and Razvan and against all Defendants, and each of them, jointly and severally, damages associated with trading commissions wrongfully collected by Defendants from Plaintiffs, in the amount of at least 21.05 bitcoins ($1,220,900), to be paid in kind, of which at least 0.15 bitcoins ($8,700) should be awarded to Plaintiff Kolchin, at least 20 bitcoins ($1,160,000) should be awarded to Plaintiff Razvan, at least 0.6 bitcoins ($34,800) should be awarded to Plaintiff Dolgov and at least 0.3 bitcoins ($17,400) should be awarded to Plaintiff BMA, or such other amounts to be determined by the Court, to be paid in kind;

(vx)    issue a Writ of Replevin against Defendants and in favor of Plaintiffs for at least 272.65 272.62 bitcoins ($15,813,700 15,811,960), to be returned in kind;

(wy)    pursuant to Cal. Pen. Code § 496(c), award Plaintiffs three times the amount of actual damages sustained, in the amount of at least 817.95 817.86 bitcoins ($47,441,100 47,435,880), to be paid in kind;

(xz)    award reasonable attorney fees, costs and prejudgment interest, payable in kind, to Plaintiffs and against all Defendants, and each of them, jointly and severally;

(yaa) award Plaintiffs exemplary and punitive damages, pursuant to Cal. Civ. Code § 3294, against all Defendants, and each of them, jointly and severally, in the amount of $50,000,000; and

(zbb) award Plaintiffs such other relief as this Court deems just and proper.

Dated: May 426, 2021

Respectfully submitted,

By: /s/ Pavel I. Pogodin
      Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io
Attorneys for Plaintiffs BMA LLC, Yaroslav
Kolchin, Vitaly Dubinin, Dmitry Dolgov and
Păun Gabriel-Razvan

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs BMA, Kolchin, Dubinin, Dolgov and Razvan demand trial by jury of all issues triable to a jury.

Dated: May 426, 2021                         Respectfully submitted,

                                             By:  /s/ Pavel I. Pogodin
                                                   Pavel I. Pogodin

                                             CONSENSUS LAW
                                             Pavel I. Pogodin, Ph.D., Esq.
                                             5245 Av. Isla Verde
                                             Suite 302
                                             Carolina, PR 00979
                                             United States of America
                                             Telephone: (650) 469-3750
                                             Facsimile: (650) 472-8961
                                             Email: pp@consensuslaw.io
                                             Attorneys for Plaintiffs BMA LLC, Yaroslav
                                             Kolchin, Vitaly Dubinin, Dmitry Dolgov and
                                             Păun Gabriel-Razvan

Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs BMA LLC,
Yaroslav Kolchin, Vitaly Dubinin,
Dmitry Dolgov and Păun Gabriel-Razvan

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan,<br><br>Plaintiffs,<br><br>v.<br><br>HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed,<br><br>Defendants. | Case No. 20-cv-03345-WHO<br><br>**DECLARATION OF PAVEL POGODIN PURSUANT TO CIVIL CODE SECTION 1780(d)** |

I, Pavel I. Pogodin, state and declare as follows:

1.     I am an attorney of record in this action for Plaintiffs BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan. I am a member in good standing of the Bar of the State of California, and I am admitted to practice before this

Court. I have personal knowledge of the matters set forth in this declaration, except for the matters stated on information and belief, which I believe to be true, and if called upon to do so, I would willingly and competently testify as to those matters.

2. The Complaint in this action is being filed in the proper place for trial under Civil Code Section 1780(d) in that County of San Francisco is a county in which Defendant(s) reside, have principal place of business and/or are doing business.

3. On information and belief, according to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, ... provides software development, software engineering, and digital security services to HDR Global Trading Limited... including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the Service Agreement containing the fraudulent Warranty and Representation as well as other fraudulent representations and false advertisements to Plaintiffs BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan.

4. On information and belief, Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent Warranty and Representation, as well as other fraudulent representations and false advertisements, provided to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in County of San Francisco.

5. On information and belief, an April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, marketing, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Marketing generally includes advertising. Therefore, the false and fraudulent representations regarding available liquidity on the BitMEX platform as well as other false representations and

advertisements were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in County of San Francisco.

6.      On information and belief, Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent representations regarding available liquidity on BitMEX platform made to Plaintiffs BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.

7.      Accordingly, substantial portion of Defendants' fraud, false advertising and other wrongful conduct alleged in the Complaint emanated from Defendant's ABS offices located in County of San Francisco.

        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

        Executed on May 26, 2021, in Carolina, Puerto Rico.

                                        By:  /s/ Pavel I. Pogodin
                                        Pavel I. Pogodin

| Summary report: Litera® Change-Pro for Word 10.4.0.0 Document comparison done on 6/6/2021 12:38:58 PM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original filename:** 2021.05.05 - BMA - Doc. 150 - CORRECTED Amended Consolidated Complaint.pdf | |
| **Modified filename:** 2021.06.05 - BMA - Doc. 153 - Second Amended Consolidated Complaint.pdf | |
| **Changes:** | |
| Add | 2649 |
| Delete | 1960 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 239 |
| Table Delete | 165 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 31 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 5044 |