# EXHIBIT B
## (to the Declaration of Stephen D. Hibbard and Defendants' Request for Judicial Notice)

Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**05/13/2021**
**Clerk of the Court**
BY: ERNALYN BURA
Deputy Clerk

Attorneys for Plaintiffs Aleksandr Kanyshev,
Nikita Luzhbin and Miguel Villagra

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Aleksandr Kanyshev, Nikita Luzhbin and Miguel Villagra,<br><br><br>Plaintiffs,<br><br><br>v.<br><br><br>HDR Global Trading Limited (d/b/a BitMEX), ABS Global Trading Limited, Arthur Hayes and DOES 1-10,<br><br><br>Defendants. | **Case No. CGC-20-584483**<br><br>**THIRD AMENDED COMPLAINT FOR FRAUD AND DECEIT (FRAUDULENT SOLICITATION BY FALSE WARRANTY AND REPRESENTATION); FRAUD AND DECEIT (FRAUDULENT SOLICITATION BY MISREPRESENTING LIQUIDITY ON BITMEX); FRAUD BY CONCEALMENT; FRAUDULENT INDUCEMENT; NEGLIGENT MISREPRESENTATION; RESCISSION OF AGREEMENT BASED ON NEGLIGENT MISREPRESENTATION; FALSE ADVERTISING (BUS. & PROF. CODE § 17500, et seq.); VIOLATION OF CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, et seq.); VIOLATION OF UNFAIR BUSINESS PRACTICES ACT (CAL. BUS. & PROF. CODE § 17200, et seq.); NEGLIGENCE; RESTITUTION UNDER QUASI-CONTRACT; CONSTRUCTIVE TRUST; ACCOUNTING; CONVERSION; AIDING AND ABETTING CONVERSION; REPLEVIN; AND VIOLATION OF CAL. PEN. CODE § 496**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Aleksandr Kanyshev, Nikita Luzhbin and Miguel Villagra ("Plaintiffs"), by and through their undersigned attorneys, for their Third Amended Complaint against Defendant HDR Global Trading Limited ("HDR"), Defendant ABS Global Trading Limited ("ABS"), Defendant Arthur Hayes ("Hayes") and DOES 1-10 (collectively "Defendants") allege as follows:

## INTRODUCTION

*"It just costs more to bribe them." Defendant Arthur Hayes (about U.S. authorities).*

1.      Defendant Hayes and his accomplices Ben Delo ("Delo") and Samuel Reed ("Reed") are notorious fraudsters, who have been criminally charged with felony money laundering related offenses by the U.S. Department of Justice ("DOJ") and two of whom are currently fugitives from the U.S. law enforcement[1]. Attached hereto as Ex. 1 and 2 are true and correct copies of the DOJ criminal indictment and Commodity Futures Trading Commission ("CFTC") enforcement action against Defendants and the corresponding announcements. Defendant Hayes publicly admitted to bribery of foreign government officials and bank fraud and even expressed pride in his actions, Ex. 10, 11. Ex. 4 and 5 are true and correct copies of two sworn declarations by two of the defrauded victims of the Defendants, Frank Amato and Elfio Guido Capone, attesting, under oath, how Defendants defrauded them out of millions of dollars.

2.      Defendants deliberately designed their cryptocurrency derivatives exchange platform BitMEX ("BitMEX" or "BitMEX platform") to fraudulently induce unsuspecting victims to deposit their bitcoins with Defendants and then rob them blind of all their property, Ex. 3. In reality, BitMEX was a rigged casino, set up to use sensitive insider information of its traders to automatically liquidate them and misappropriate their money, when it was particularly profitable for Defendants to do so. To entice their victims to trade on the rigged BitMEX platform and pay trading commissions to Defendants, Defendants engaged in fraudulent

---

[1] There is also a second ongoing criminal investigation against BitMEX by the U.S. Federal Government, entirely unrelated to the Indictment and, therefore, additional federal criminal charges may be forthcoming against Defendants.

solicitation using a laundry list of material misrepresentations[2], half-truths and omissions.  Once victims were fraudulently induced by Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon widely-known as "revenge trading" to keep them trading on their rigged platform.  Revenge trading is a natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

3.    Defendants operated an undisclosed Insider Trading Desk managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated to continuously manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of bitcoin and ether, Ex. 14.

4.    The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open positions. They were also provided with automated systems, built by BitMEX, leveraging this highly sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

5.    The traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations.

---

[2] Among other, Defendants used a fraudulent solicitation that was similar to the one in *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), where SEC charged fraudsters with claiming to be "the largest Bitcoin exchange in euro volume and liquidity."  In the present case, Defendants fraudulently claimed to provide "1500% More Bitcoin/USD liquidity than any other platform," which is even more factual and capable of misleading consumers.  Defendants abruptly ceased to use this fraudulent solicitation only in March of 2021, after being sued for fraud.

6.      Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

7.      The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX. BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

8.      Defendants actively concealed the wrongdoing perpetrated by their Insider Trading Desk.  In addition to deliberately making all BitMEX accounts anonymous, which hindered pinpointing the Insider Trading Desk as the culprits behind the manipulative trading, and actively deleting critical records, including trader identity information, BitMEX deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with the BitMEX platform.  This was done to cover up any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits of the Insider Trading Desk could not be traced back to the BitMEX.  The "burner" accounts were periodically recycled and corresponding trading records deleted.

9.      Financially ruined by Defendants' blatant fraud, some victimized traders were driven by Defendants into taking their own lives.  For example, Defendants fraudulently induced

Chinese trader Hui Yi to enter into a large short position on BitMEX, which BitMEX's Insider

Trading Desk subsequently deliberately liquidated using Hui Yi's confidential information,

confiscating 2,000 bitcoins of Hui Yi clients' money.  The trader, who was the co-founder and

CEO of cryptocurrency market analysis platform BTE.TOP, died by suicide on June 5, 2019.

      10.    Being keenly aware of the CFTC and DOJ civil and criminal investigations and

imminently forthcoming civil and criminal charges, and while preparing to go on a lam from the

U.S. authorities, Defendant Hayes as well as his accomplices Delo and Reed siphoned about

$440,308,400 of proceeds of various nefarious activities that took place on the BitMEX platform,

from accounts of Defendant HDR, Ex. 6, 7, 8.  The siphoned funds were divided among

Defendants and their associate substantially in accordance with the following table, prepared on

information and belief of Plaintiffs, which belief was formed based on public records, Court

records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants and

information provided by former employees of Defendants:

|  | **Shareholder of HDR Global Trading Limited** | **Equity Ownership Percentage** | **Distribution Amount** |
|---|---|---|---|
| 1. | Arthur Hayes | 31.67% | $139,430,993.33 |
| 2. | Benjamin Delo | 31.67% | $139,430,993.33 |
| 3. | Samuel Reed | 31.67% | $139,430,993.33 |
| 4. | Sean O'Sullivan Ventures (SOSV) | 5% | $22,015,420.01 |
|  |  | **Total:** | **$440,308,400.00** |

      11.    These fraudulent distributions of proceeds of illegal acts were made on the

following dates, which are **after** Defendants learned about the Government investigations and

**after** receiving a draft complaint in another civil action in 2019:

|  | **Distribution Date** |
|---|---|
|  |  |

| 1. | October 15, 2019 |
| 2. | November 19, 2019 |
| 3. | January 2020 |

12.    From this information, it appears that Defendants were actively and deliberately looting Defendant HDR and trying to make its funds unavailable for the collection of future judgments against it.  Specifically, the aforesaid profit distributions at a rate of $440,308,400.00 in just three months were clearly not performed in the ordinary course of business of Defendant HDR, as they represent $1,761,233,600 annual profit distribution rate, which money Defendant HDR simply does not earn.  Therefore, these extraordinarily large distributions were clearly designed to loot Defendant HDR of its assets and hinder Plaintiffs' and Government's recovery of any future judgments.  Furthermore, such a remarkable surge in proceeds distributions may also indicate that Defendants are looting BitMEX Insurance Fund.

13.    As soon as Plaintiffs became aware of the evidence of siphoning of $440,308,400 of funds from Defendant HDR by other Defendants, which appeared in public court filings in another civil action against Defendants filed in California Superior Court, Defendants urgently moved the Court to strike or seal the discovered evidence of asset dissipation telling the California Superior Court that the relevant documents were publicly filed in violation of a protective order in that case and that the revelations caused great damage to Defendants, Ex. 9.

14.    On October 1, 2020, Defendant Hayes and his accomplices Delo and Reed were indicted by DOJ on felony charges of violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at BitMEX.  In announcing the indictment, Ex. 1, FBI Assistant Director William F. Sweeney Jr. said: "As we allege here today, the four defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements.  One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 6 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

that jurisdiction cost just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time." Reed was apprehended by the FBI in Boston, Massachusetts. Defendant Hayes and Delo remain at large and are currently fugitives wanted by the U.S. Government.

15.    On the same day, the CFTC announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging Defendants HDR, ABS, Hayes as well as accomplices Delo and Reed with operating an unregistered trading platform and violating multiple CFTC Regulations, including failing to implement required anti-money laundering procedures. The CFTC complaint is attached hereto as Ex. 2 and all allegations therein are made part hereof.

16.    Among those charged were company owners Defendant Hayes and his accomplices Delo and Reed, who operate BitMEX's platform through a maze of corporate entities, including Defendants HDR and ABS. BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

17.    The key facts of the racketeering scheme run by Defendants are rather simple and easy to understand. In 2014, Defendants launched the bitcoin derivatives trading platform BitMEX, which enables traders to place bets on direction of cryptocurrency prices. In designing their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer (KYC) or anti-money laundering (AML) checks what so ever, Ex. 1, 2, 3. In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked.

18.    In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way. The entire account registration and funding process takes about

10 minutes and no documents are even looked at.  Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, Ex. 1, 2, 3.  A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader.

19.    Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from money laundering and market manipulation.  It all has to do with anonymity, lack of trading limits, high leverage and how the index price for bitcoin derivatives is calculated.   Defendants deliberately designed this index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges.  Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, relatively small market orders will suffice.  Therefore, a relatively small market order on a spot exchange results in a relatively large bitcoin index price move on the relatively liquid BitMEX.

20.    A money launderer (Defendant) would open two exchange accounts – a helper



Mechanics of Bitcoin Market Manipulation and Money Laundering

Consensus Law
CryptoCurrency
Attorneys

account on one or more reference spot exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and BitStamp) and a winner account on BitMEX.  The money launderer would then use automated software tools developed by BitMEX to enter into a large leveraged derivatives position on BitMEX and automatically execute market orders from the helper account with maximum slippage to move the index price in a favorable direction.   Due to disparity in liquidity between BitMEX and the spot exchanges, the aforesaid deliberate design of the index price by Defendants, and the cascading liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account is multiplied greatly and translates into outsized profit in the winner account on BitMEX.  Because BitMEX accounts are by design anonymous, the laundered money cannot be traced from the helper account to the winner account.  Thus, the money laundering proceeds in the winner account on BitMEX appear as legitimate trading gains and the money laundering scheme achieves its purpose.  The described money laundering and other nefarious acts are well documented and take place on BitMEX almost daily.  Moreover, to exacerbate the described price manipulations, BitMEX intentionally locks users out of their accounts during manipulation times, falsely telling the users that their "system is overloaded".

21.    Defendants' own Leaderboard, which lists the most profitable trading accounts on BitMEX, is replete with evidence of market manipulation and money laundering.  For example, BitMEX's Leaderboard account under assumed name Quick-Grove-Mind shows multimillion-dollar profit spikes, which exactly match known market manipulation events, while entirely avoiding any and all trading losses.  Notably, Defendants' own data shows that this market manipulator generated over $30,000,000 in profit during three market manipulation events that took place on September 24, 2019, November 18-19, 2019 and March 11-12, 2020, at the expense of retail traders, including Plaintiffs.  In view of the fact that to generate $30,000,000 in profit, the manipulator would need to open at least $100,000,000 leveraged position on the BitMEX platform, which only Defendants themselves or other BitMEX insiders can do, due to applicable risk limits on BitMEX, which only Defendants themselves can override, and in view of the fact that the manipulator would need to know the exact open position sizes, leverage amounts and



liquidation price points as well as parameters of stop loss orders of all the other traders on

BitMEX, the information again available *only* to Defendants and BitMEX insiders, Plaintiffs are

informed and believe and thereon allege that the Leaderboard account under the assumed name

Quick-Grove-Mind was a market manipulation winner account used by the individual Defendant

Hayes, who traded on BitMEX despite having a clear conflict of interest and in violation of CFTC

regulations pertaining to conflict of interest.  Alternatively, this Leaderboard account was used by

the BitMEX's Insider Trading Desk.

  22. BitMEX directly participates in and financially benefits from the market

manipulation and money laundering through its Insider Trading Desk and indirectly, by collecting

increased trading commissions and also by liquidating users' accounts.  Specifically, BitMEX

knowingly collects high trading commissions for the above money laundering transactions, which

constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

THIRD AM. COMPLAINT FOR FRAUD (DEMAND FOR JURY TRIAL) - 10 - KANYSHEV ET AL. V. HDR ET AL. CASE NO. CGC-20-584483

deposited into its general account (bitcoin wallet), from which it pays all its employees and even its attorneys (after currency conversion). Thus, the salaries of all BitMEX employees as well as legal fees paid to its lawyers are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

| Manipulation Component | Manipulative Conduct Involved | Place of Manipulative Conduct |
|---|---|---|
| Helper Component | Defendants deliberately moved BitMEX's .BXBT index price by placing large market orders with maximum slippage from helper accounts on three illiquid exchanges that are used by BitMEX to calculate .BXBT index | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| | The deliberate BitMEX's .BXBT index price move by Defendants directly and proximately caused liquidation cascades on Kraken and BitMEX that resulted in Plaintiffs' swap positions on those exchanges to be liquidated, resulting in monetary damages as alleged herein. | BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California and Kraken, also located in California. |
| Winner Component | Defendants capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. | BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California. |

| Facilitation Component | Defendants freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | California, where all three site reliability engineers Jerry Aldrich, Scott H. and Armando Cerna of BitMEX, who are responsible for the trading platform uptime and server freezes, are located and who personally perpetrated the BitMEX server freezes. |

23.     In the described money laundering scheme, the market manipulation gains realized by the launderer (Defendants) in the winner account and the funds confiscated by BitMEX as the result of liquidations induced by the launderer are generated at the expense of Plaintiffs and other cryptocurrency traders like Plaintiffs.  Notably, BitMEX deposits proceeds from the user account liquidations into its so called "Insurance Fund," which has steadily grown over the years and now amounts to over 37,400 bitcoins or $2,200,000,000 dollars, all misappropriated from traders, including Plaintiffs.

24.     Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a), see Paragraph 124, Ex. 12.  This violation has been conclusively proven using BitMEX's own Leaderboard, see Paragraph 124.  Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. 13.  In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiffs are aware of, without having any benefit of discovery, see Paragraphs 109, 110, 112 and 115.  The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056

(W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty-three times).  Consequently, all the funds that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).

25.    Awash with large amounts of tainted cash and encouraged by perceived lack of any accountability, Defendants grew so brazen that they do not even hesitate to publicly admit to bribery and bank fraud, Ex. 10, 11.  Despite the fact that the vast majority of  personnel and managers are located in California, to avoid being subject to United States laws, regulations and taxes, Defendants established 12 false shell companies, including Defendant ABS, with intent to create an appearance that Defendant HDR has no presence, operations or investors in regulated jurisdictions such as the United States.

26.    The sheer magnitude of Defendants' unlawful activity is truly staggering.  In addition to being recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license, see Paragraphs 124 and 125 below, which by itself conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendant HDR[3], "[s]everal sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  Moreover, Defendant HDR's high volume business with numerous residents of the United States and California as alleged in detail below is vast and pervasive.  Accordingly, Defendants were unquestionably on notice of the need to obtain a money transmission license in the United States, which Defendants willfully and deliberately failed to

---

[3] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

do.  Therefore, according to Defendants' own data, Defendant HDR's unlicensed money transmitting business admittedly processed, on average, $3 billion of illegal and unlicensed money transfers each day, all in violation of United States federal statute 18 U.S.C. § 1960(a), which is the record volume for such unlawful activity in the entire history of the monetary regulation in the United States.

27.    A combination of providing traders with extremely high trading leverage (up to 100x), using .BXBT index price for highly liquid perpetual swap contracts calculated based on prices of two or three illiquid spot exchanges, enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations all make BitMEX an exquisite "designer" tool for unsavory actors to launder funds and manipulate cryptocurrency markets.  Because of the very high derivatives trading volume on BitMEX, the artificial prices caused by the BitMEX manipulations spread, like forest fires, from BitMEX to other exchanges wreaking havoc on the entire cryptocurrency ecosystem, costing traders and investors billions of dollars in losses and resulting in a domestic injury in the United States ("Domestic Injury").

28.    Moreover, on April 30, 2018, after repeated denials, Defendants finally admitted that BitMEX operates its own for-profit Insider Trading Desk managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov, who, at all times relevant herein, were agents and employees of Defendant HDR and who acted within the scope of their agency and employment with Defendant HDR. This desk trades against BitMEX's own customers on their own exchange, using BitMEX's inside information about its customers' existing trading positions, stop loss orders, leverage amounts, liquidation prices, open and hidden orders and enjoys many other unfair advantages not available to other users of the BitMEX platform, such as automated market manipulation tools, priority order execution and protection

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)   - 14 -   Kanyshev et al. v. HDR et al.   Case No. CGC-20-584483

against server overloads.  While making money trading against BitMEX's own customers, this operation, which Defendants misleadingly refer to as "anchor market maker," receives many *special trading privileges* that are not available to other exchange users.  This created even greater financial incentive for Defendants to artificially manipulate cryptocurrency markets and financially benefit from the manipulations through the aforesaid for-profit Insider Trading Desk operation.

29.    A substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently laundered and continue to be laundered, by all Defendants, through the Unknown Exchange, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars, and by Reed, Agata Reed, Barbara Reed and Trace Reed, through a real estate investment scheme that they set up in Wisconsin and Massachusetts.   For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Grape Park and Mark Sweep to disguise or conceal the true illegal nature of the funds in the Defendants' general account (bitcoin wallet), which were ultimately used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control.  Agata Reed, Barbara Reed and Trace Reed are in possession of two real estate properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, with the aggregate market value of over $2,500,000, acquired using funds misappropriated from Plaintiffs and laundered by Defendants through the Unknown Exchange and their real estate investment scheme.

30.    Despite all the claims to the contrary, Defendants HDR, Hayes as well as accomplices Delo and Reed maintain numerous close connections with the United States and California.  Defendant HDR's own website BitMEX.com lists San Francisco as the location of one of Defendant HDR's offices, where all the technology behind BitMEX has been and continues to be developed.  Defendants use United States – based Amazon, Inc. AWS infrastructure, with offices in northern California, for storing all of its customer and trading data

and for executing its order matching system and its liquidation engine.  Moreover, Defendants use Redwood City, California – based SendGrid, Inc. for handling all their bulk email communications with its customers.  Finally, Defendants' website BitMEX.com is a commercial website, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants HDR, Hayes as well as accomplices Delo and Reed conduct high-volume derivatives trading business with numerous individuals and companies residing in the United States, State of California and California and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

## NATURE OF ACTION

31.      This is an action for fraud and deceit (false representation and warranty); fraud and deceit (misrepresentation of liquidity on BitMEX); fraud by concealment; fraudulent inducement; negligent misrepresentation; rescission of Service Agreement for negligent misrepresentation; false advertising (Bus. & Prof. Code § 17500, et seq.); violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.); violation of Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.); negligence; restitution under quasi-contract; constructive trust; accounting; conversion; aiding and abetting conversion; replevin; and violation of Cal. Pen. Code § 496.

## PARTIES AND RELATED PERSONS

32.       Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

33.      Plaintiff Aleksandr Kanyshev is an individual, who is a citizen of Russian Federation and who currently resides in Russian Federation.

34.      Plaintiff Nikita Luzhbin is an individual, who is a citizen of Russian Federation and who currently resides in Russian Federation.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 16 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

35.    Plaintiff Miguel Villagra is an individual, who is a citizen of Russian Federation and who currently resides in California.

36.    Defendant HDR was created by individual Defendants in order to perpetrate fraud and dodge regulation and taxes and purports to be a Republic of Seychelles International Business Company, company number 148707, with a registered office at Suite 23, 1st Floor, Eden Plaza, Vistra Corporate Services Centre, Eden Island, Mahe, Seychelles.  Defendant HDR was organized by Defendant Hayes as well as accomplices Delo and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in Defendant HDR, in or about 2014.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  When asked about the reasons for incorporating Defendant HDR in the Republic of Seychelles, Defendant HDR's Chief Executive Officer (CEO) Defendant Hayes has publicly claimed, in July of 2019, that the government of Seychelles was cheaper to bribe than the government of the United States and when asked how much he had to pay Seychelles to bribe them, Defendant Hayes answered "a coconut", Ex. 11.

37.    When, in July of 2019, an early investor in BitMEX Elfio Guido Capone asked



Defendant Hayes as well as accomplices Delo and Reed about a status of his investment in the BitMEX platform, Delo responded with a meme image, cynically suggesting that BitMEX could dodge its legal obligations to its own investors simply by using a shell company incorporated in the Seychelles to evade personal jurisdiction of the United States Courts, Ex. 4 ¶ 20.

38.    In addition to publicly admitting to bribery of foreign government officials as alleged in the preceding Paragraphs, Defendant Hayes has publicly admitted to perpetrating bank fraud by falsifying his residence address on bank account application documents with the purpose of opening a bank account in China, to which he, as a resident of Hong Kong, was not entitled, Ex. 10.  The Chinese bank account was admittedly opened by Defendant Hayes using a fake Chinese residence address, which he personally falsified, in order to enrich himself on 40% premium in the price of bitcoin in China compared to the rest of the world, Ex. 10.  In perpetrating the admitted bank fraud, Defendant Hayes was motivated by personal greed.

39.    Admissions of multiple instances of personal greed-motivated illegal conduct as alleged in the previous Paragraphs, attempting to dodge legitimate legal obligations to its own investors using sham offshore companies as well as the alleged patently illegal manner in which BitMEX platform operates, all establish a clear pattern of brazen lawlessness on part of all Defendants.

40.    Defendant HDR is controlled by Defendant Hayes as well as Delo and Reed, who all hold themselves out as co-founders of BitMEX.   In fact, name "HDR" is an abbreviation composed of first letters of last names of Defendant Hayes as well as accomplices Delo and Reed. Defendant Hayes serves as the CEO of Defendant HDR.  Reed serves as the Chief Technology Officer (CTO) of Defendant HDR.

41.    According to BitMEX's website (https://www.BitMEX.com) ("BitMEX



website"), its owner HDR Global Trading Limited maintains three offices throughout the world, located in San Francisco, Hong Kong and Singapore. BitMEX's Terms of Service ("Terms of Service"), posted on the BitMEX website, provide that: "BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based trading platform that is wholly owned by HDR Global Trading Limited."

42.     The San Francisco office of Defendant HDR is the largest of all three by both the employee headcount and technical staff headcount.  Its addresses are 301 Battery Street, 4th Floor, San Francisco, California 94111, 340 Brannan Street, 2nd Floor, San Francisco, California 94107 and/or 2 Embarcadero Center, 8th Floor, San Francisco, California 94111.  Defendant HDR closed its other United States offices and consolidated all of its United States personnel into an office location in San Francisco sometime in April of 2019, as confirmed by Defendant Hayes in an email to Defendant HDR's early investor Mr. Elfio Guido Capone stating, "Consolidation of people in one office in SF."

43.     Hong Kong office of Defendant HDR is located at 45/F, Cheung Kong Centre, 2 Queen's Road Central, Hong Kong Central, Hong Kong Island, Hong Kong Special Administrative Region of the People's Republic of China.  The employee headcount in the Hong Kong office of Defendant HDR is about half of the headcount in Defendant HDR's San Francisco office.  Singapore office of Defendant HDR is the smallest of all three.

44.     Defendant HDR's affiliates and subsidiaries, including Defendant HDR's wholly-owned subsidiary and alter ego Defendant ABS, are so organized and controlled, and their affairs are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a single unitary BitMEX enterprise ("BitMEX Enterprise"). See *Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220, 1249 (1991). Each Defendant HDR affiliate or subsidiary is so dominated in its finances, policies, and practices that these controlled corporations have no separate mind, will, or existence of their own, and are but business conduits for their principal, Defendant HDR, such that all of the affiliated corporations may be deemed to be a single business enterprise. See *Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107

(2013); *Greenspan v. LADT LLC* 191 Cal. App. 4th 486, 514 (2010).  During Relevant Period, Defendant Hayes, directly or indirectly, controlled the BitMEX Enterprise.

45.    On information and belief, each entity in the BitMEX Enterprise functions solely to contribute to and develop the BitMEM.com commercial website, which revenues then flow solely to Defendant HDR and its owners. These entities are analogous to departments within a single corporation and are run as such. On information and belief, each sub-entity in the BitMEX Enterprise is funded solely by revenues provided by Defendant HDR, which belief was formed based on public records, Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants and information provided by former employees of Defendants.

46.    Further, as Defendant Hayes has explained in a publicly filed sworn declaration, as CEO of Defendant HDR, he is "advised by an advisory body currently comprised of twelve individuals responsible for different <u>departments</u> within the HDR Group." (emphasis added). Hayes labels Defendant HDR and its affiliates collectively as the "HDR Group" as opposed to the BitMEX Enterprise, but in function the entities operate as a single corporate enterprise, and they may be properly held to account for each other's wrongdoing.

47.    Defendant Hayes himself has also admitted that the BitMEX Enterprise entities are really a single entity.  In a Monthly Report circulated on March 2, 2018, Defendant Hayes wrote "Ben [Delo], Sam [Reed], and myself are very excited to host the <u>entire company</u> at our Hong Kong <u>office</u> from March 12th – 25th. Given the rapid and continued growth in terms of headcount in 2017 and 2018, this offsite is our first chance to bond <u>as a company</u>." (emphasis added).

48.    All of this notwithstanding that Defendant HDR has submitted in multiple public filings that its only offices are in the Seychelles. It claims the offices in Hong Kong belong to another BitMEX-affiliated entity.

49.    On April 11, 2018, Defendant Hayes wrote again to say that the Hong Kong "company offsite was a resounding success. Ben, Sam, and I were delighted to meet many of you for the first time. We continue to be amazed at the quality of people that work for the organization. BitMEX is a collection of individuals who are all interesting." On information and

belief, employees from all of the BitMEX Enterprise's entities were present at the March 2, 2018 company-wide offsite, including those from San Francisco-based Defendant ABS.

50.     Defendants' casual disregard of corporate form and their regular usage of shell companies is also apparent through their latest corporate conduct: on July 15, 2020, Defendant Hayes announced that a new entity, "100x,"[4] "will become the new holding structure for HDR Global Trading Limited" and all of BitMEX's other assets, "including the BitMEX platform." In turn, the "HDR Group" was also rebranded as the "100x Group." This re-labeling makes little difference to the continued functioning of the entities as a single enterprise, however; Defendant Hayes explained that "[t]he BitMEX platform, brand and legal structure remain entirely unchanged."

51.     This further demonstrates that the unitary BitMEX Enterprise consists of the various affiliates and subsidiaries worldwide, and that the enterprise and each of its constituent parts are fully dominated and controlled by Defendant Hayes, Delo, Reed and the other stakeholders as a single enterprise.

52.     Defendant ABS is a California-based wholly owned subsidiary and alter ego of Defendant HDR, which designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within California.  Defendant ABS purports to be a Delaware corporation, Delaware Secretary of State file number 6393256, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810.  Defendant ABS was organized by Defendant Hayes as well as accomplices Delo and Reed on or about April 27, 2017. Name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendant Hayes as well as accomplices Delo and Reed, who ultimately own and control Defendant ABS.  Defendant Hayes asserted that Defendant HDR owns the entire issued share capital of Defendant ABS, and that Defendant ABS has an office in San Francisco, California.

---

[4] The name 100x is a reference to traders' ability on the BitMEX platform to trade at 100 times the leverage of their deposited bitcoin.

53.    Specifically, Defendant ABS, which is a United State-based alter ego of Defendant HDR, has two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California.  Defendant Hayes as well as accomplices Delo and Reed continue to control Defendant ABS with Defendant Hayes serving as the President, CEO, Secretary and Chief Financial Officer thereof and Reed serving as a Chief Technology Officer of Defendant ABS.

54.    Plaintiffs are informed and believe and thereon allege that Defendant HDR dominates and controls every aspect of Defendant ABS' operations and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations, such that Defendant ABS is a mere instrumentality of the BitMEX Enterprise.  In particular, all its operations are controlled by its principal and alter ego, Defendant HDR, wherein Defendant ABS provides development, software engineering, containerized application deployment, site reliability and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions take place.  Thus, Defendants ABS and HDR operate as a single business enterprise for the purpose of operating the BitMEX derivatives trading platform.

55.    Plaintiffs are informed and believe and thereon allege that Defendant HDR funds all of Defendant ABS operations, including paying for all of its employees, overhead, and lease and rent obligations, and is Defendant ABS' sole source of income.

56.    Defendant Hayes as well as accomplices Delo and Reed, collectively own a controlling interest in Defendant ABS through their ownership of Defendant HDR, which wholly owns Defendant ABS. Defendant Hayes is the sole director, president, secretary, and treasurer of Defendant ABS, and executes agreements on its behalf.  Defendant Hayes runs Defendant ABS' activities without regard to its corporate form and for the sole benefit of Defendant HDR.

57.    Defendant Hayes as well as accomplices Delo and Reed have created Defendant ABS as a false "shell" company as part of a broader United State federal and state law, regulation

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 22 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

and tax dodge designed to tell regulators and tax authorities that BitMEX has no California or United States operations or investors.

58.     However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations.   Specifically, Defendant ABS handles the majority of the development of the BitMEX Platform, and it is both the heart of the BitMEX Enterprise and its nerve center.

59.     Plaintiffs are informed and believe and thereon allege that Defendants intentionally and specifically targeted California when locating and developing the nerve center of the operations of the BitMEX Enterprise. This is because, from the beginning of BitMEX's existence, traders based in the United States accounted for the vast majority of the enterprise's revenues, and even presently United States and California traders, as described below, are the most active and lucrative traders on the BitMEX Platform.  This is also due to the fact that California's Silicon Valley has some of the world's best engineers and developers, and as such, Defendant ABS houses the most engineering personnel out of any BitMEX entity.

60.     Defendant ABS aided and abetted, authorized, ratified and controlled Defendant HDR illegal acts described herein.

61.     Defendants HDR and Hayes relied upon their domestic agents, employees and affiliates, including without limitation ABS, to help implement and conceal the illegal acts alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.

62.     Defendant ABS acted in the United States and abroad within the scope of its agency with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in carrying out the acts alleged herein.

63.     Defendants are individually sued as principals, participants, agents, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from each Defendant's engagement in all or part of the illegal acts alleged herein.

64.     Additional and other facts regarding Defendants' joint action, alter ego status and aiding and abetting of one another regarding the misconduct against Defendants is hidden from Plaintiffs at this time. Such information is uniquely within Defendants' possession, custody and control.  Plaintiffs accordingly reserve the right to supplement and amend these allegations if appropriate or necessary following completion of relevant fact discovery.

65.     Defendant HDR is the sole and exclusive owner of BitMEX brand, as evidenced, for example, by the Terms of Service and by numerous trademark filings for the protection of this brand made by Defendant HDR in the United States and throughout the world.

66.     Grape Park is a State of Delaware limited liability company, Delaware Secretary of State file number 7554178, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through investments into United States real estate.  Reed dominates and controls every aspect of business of Grape Park and funds its operations.  Grape Park is an alter ego of Reed.

67.     Mark Sweep is a State of Delaware limited liability company, Delaware Secretary of State file number 7449568, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through investments into United States real estate.  Reed dominates and controls every aspect of business of Mark Sweep and funds its operations.  Mark Sweep is an alter ego of Reed.  It should be noted that Defendants ABS, Grape Park and Mark Sweep share the same registered office address in the State of Delaware.

68.     Unknown Exchange is a cryptocurrency-to-fiat off-ramp exchange (over-the-counter exchange services provider).  Unknown Exchange was and is being used by Defendants to launder funds derived from money laundering, market manipulation, operating unlicensed

money transmitting business and other nefarious acts taking place on the BitMEX platform through converting the illegally obtained bitcoins into various fiat currencies, including United States dollars and Hong Kong dollars.  Plaintiffs will amend this Complaint when they ascertain the identity of the Unknown Exchange based on discovery propounded on Defendants.

69.    Defendant Hayes is an individual, who is a United States citizen.  On papers filed with California Secretary of State, Defendant Hayes claimed to have resided in Kennedy Town, Hong Kong Special Administrative Region of the People's Republic of China.  However, Plaintiffs are informed and believes and thereon allege that Defendant Hayes also resides in Buffalo, NY 14221-1840 and was last seen at his residence there on August 18, 2020.  Defendant Hayes owns property in the U.S., and files U.S. income tax returns. During the Relevant Period, Defendant Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S.  At all times mentioned in this Complaint, Defendant Hayes was the agent of Defendant HDR, and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.  Defendant Hayes is sued as *sui juris.*

70.    Delo is an individual, who is a citizen of United Kingdom, and who resides in Hong Kong Special Administrative Region of the People's Republic of China.  At all times mentioned in this Complaint, Delo was the agent of Defendant HDR, and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.

71.    Reed is an individual, who is a United States citizen and who resides in Milwaukee, WI 53202.  United States residence of Reed is further evidenced by his own professional profile on LinkedIn professional network, where he lists the United States as his country of residence.   Reed maintains an office in and conducts business from Milwaukee, Wisconsin.  At all times mentioned in this Complaint, Reed was the agent of Defendant HDR,

and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.



72.    Agata Reed is an individual, who is a citizen of the United States, and who resides in Norwell, MA 02061.  At all times mentioned in this Complaint, Agata Reed was the agent of Defendant HDR, and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.

73.    Barbara Reed is an individual, who is a citizen of the United States, and who resides in Lake Tomahawk, WI 54539.  At all times mentioned in this Complaint, Barbara Reed was the agent of Defendant HDR, and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.

74.    Trace Reed is an individual, who is a citizen of United States, and who resides in Lake Tomahawk, WI 54539.  At all times mentioned in this Complaint, Trace Reed was the agent

of Defendant HDR, and in performing market manipulation and other wrongful acts hereinafter alleged, was acting in the scope of his authority as such agent and with the permission and consent of Defendant HDR.

75.     Plaintiffs do not know the true names of Defendants DOES 1 through 10 inclusive, and therefore sues them by those fictitious names. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of those Defendants was in some manner legally responsible for the events alleged in this complaint and for Plaintiffs' injuries and damages. The names, capacities, and relationships of Defendants DOES 1 through 10 will be alleged by amendment to this complaint when they are known.

76.     At all times mentioned in this complaint, Defendants were the agents and employees of their codefendants, and in doing the things alleged in this Complaint were acting within the course and scope of that agency and employment.

77.     At all times mentioned in this complaint, related persons Delo, Reed, Agata Reed, Barbara Reed and Trace Reed were the agents and employees of Defendants, and in doing the things alleged in this Complaint were acting within the course and scope of that agency and employment and with consent of Defendants.

**<u>DEFENDANTS' EXTENSIVE CONTACTS WITH THE UNITED STATES AND CALIFORNIA</u>**

78.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

79.     Defendant ABS is qualified to do business in California and has appointed an agent for service of process in this State.  Despite all the claims to the contrary, Defendants HDR, Hayes as well as accomplices Delo and Reed maintain numerous close connections with the United States, State of California and California.

80.     Corporate Defendants HDR and ABS were established by individual Defendant Hayes as well as accomplices Delo and Reed due to seed funding provided by at least two United

States-based entities – Ohio-based RGB COIN LTD. and a startup accelerator SOSV with offices in San Francisco and New York.

81.    Defendant HDR is managed by Defendant Hayes as well as accomplices Delo and Reed with advice of an advisory board consisting of 12 members, three of which are located in the United States.

82.    Due to his role as the President, CEO, Secretary and Chief Financial Officer of Defendant ABS and his CEO position with Defendant HDR, Defendant Hayes manages and directs operations of both Defendants HDR and ABS in the United States and in California.

83.    On the most recent California Secretary of State Statement of Information form filed by Defendant ABS with the State of California on or about August 22, 2019, Defendant Hayes' address in the State of California is listed as: 340 Brannan Street, 2nd Floor, San Francisco, California 94107.

| Names and Complete Addresses of the Following Officers (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.) | | | | |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |
| 8.  SECRETARY | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |
| 9.  CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| ARTHUR  HAYES    340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | | | |

84.    Due to his role as the CTO of both Defendants HDR and ABS and his supervisory involvement in the software development of the BitMEX platform, Reed, who resides in Wisconsin, manages and directs operations of both Defendants HDR and ABS in the United States and in California, where the majority of the software developers and engineers working on the BitMEX platform are located.

85.    As evidenced by BitMEX website, on or about April 27, 2018, Reed stated: "We serve customers all over the world, in five languages, and have become the premier platform for Bitcoin price discovery and liquidity" (emphasis added).  This statement constitutes an admission that Defendants knowingly serve customers in the United States and the State of California.

86.    BitMEX website www.BitMEX.com/careers/ lists San Francisco as the location of one of the Defendant HDR's offices, where all the technology behind BitMEX is being developed. Defendant HDR actively recruited individuals for this office using recruiting websites



such as GlassDoor.com, Angel.co and LinkedIn.com. According to professional network

LinkedIn, BitMEX's owner Defendants HDR has at least 74 current and former employees in the



United States, most of which are residents of California.

87.    In a publicly released and publicly available video first aired on CNBC news channel, Defendant Hayes can be seen broadcasting from the San Francisco office of CNBC, on



or about July 19, 2018.

88.    United States residents can freely trade on BitMEX platform from the United States because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using widely available and inexpensive virtual private network (VPN) software that masks trader's geographical location.  This is because Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism. Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a VPN. Defendants have exploited this loophole to avail themselves of United States and California markets.  Defendant Hayes stated in a January 2019 interview that BitMEX users can mask their location using VPNs to assign their computer an IP address from other countries, bypassing filters put in place.  In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN.  This is done purposefully in order to entice United States persons to trade on the BitMEX platform.  If

Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

89.     In fact, in an interview in January of 2019, Defendant Hayes himself publicly taunted the fact that users from banned jurisdictions like the United States can easily bypass the cryptocurrency exchange's geoblock by using the VPN service, thereby directly encouraging United States traders to trade on the BitMEX platform in violation of its own Terms of Service.

90.     Defendant HDR uses United States based Amazon, Inc.'s Amazon Elastic



Kubernetes Service ("Amazon EKS"), which combines Amazon Web Services ("Amazon AWS") with managed high-availability Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data. Amazon AWS has offices in San Francisco, California.  San Francisco office of Defendant HDR employs at least five Kubernetes engineers who interact with Amazon AWS in California on a daily basis.



91.     Moreover, the recent email data leak of BitMEX has shown that Defendant HDR uses San Francisco, California – based Twilio Inc. and its subsidiary SendGrid, Inc., with offices at 889 Winslow St., Redwood City, California 94063, United States, for handling all of its bulk



email communications with its customers.  Twilio Inc. and its subsidiary SendGrid, Inc. as well as

```
Received: by
filter0531p1iad2.sendgrid.net with SMTP
id filter0531p1iad2-4029-5DBBDCE6-6
         2019-11-01 07:21:10.616650033
+0000 UTC m=+26944.349590420
Received: from ODk1MzUzNw
(135-180-78-178.fiber.dynamic.sonic.net
[135.180.78.178]) by
ismtpd0001p1sjc2 sendgrid net (SG) with
HTTP id frqfqjARTVqlHIKEaRFB-g Fri, 01
Nov 2019 07:21:10.387 +0000 (UTC)
Content-Transfer-Encoding: quoted-
printable
Content-Type: text/html; charset=UTF-8
Date: Fri, 01 Nov 2019 07:21:18 +0000
(UTC)
From: BitMEX <noreply@bitmex.com>
```

Intercom, Inc. store a database of all BitMEX users in California, including email addresses and

all other contact information of all users, which BitMEX uses for all its customer

communications.

     92.    Defendants use ReCAPTCHA service provided by Google, Inc., headquartered in

California to provide human verification for the users of the BitMEX's platform.

     93.    Defendants further use YubiKey device and YubiCloud service provided by Palo

Alto-based YubiKey, located in California, to provide 2-factor authentication capability to the

users of BitMEX's platform.

     94.    Defendants further use service operated by Jumio Netverify, based in Palo Alto,

California, through which Jumio collects personal data from BitMEX users directly, including

photos of user's faces and ID documents and performs identity verification of the users for

BitMEX platform.

     95.    Defendants further use Freshdesk service provided by Palo Alto-based

FreshWorks, headquartered in California, for handling all customer support queries, notes and

replies associated with the BitMEX platform.

     96.    Defendants further use segment.io service provided by San-Francisco based

Segment.io, Inc., and Google Analytics service provided by Google, Inc., both of which are

headquartered in California, for gathering data collected on BitMEX.com servers and generating visitor statistics for BitMEX platform.

97.    Defendants further use services provided by San Francisco-based Functional Software, Inc. (Sentry.io), San Francisco-based Pagerduty and Austin, Texas-based Solarwinds (Papertrail) to monitor all site and service issues associated with the BitMEX platform.

98.    Defendants further use services provided by Google Firebase and Amazon SNS platforms, operated by Google, Inc. and Amazon Web Services, Inc., respectively, both of which are headquartered in California, to deliver mobile push notifications to all user devices.

99.    The above-alleged facts clearly show that the vast majority of the vital services used by BitMEX platform are provided by United States vendors located in California and that without such services of United States and California origin, BitMEX platform would not have existed in its present form.  Therefore, BitMEX is able to operate its platform only due to its connections with the service providers located in the United States and California.

|  | Service Provider to BitMEX | Services Provided to BitMEX | Service Provider Location |
|---|---|---|---|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | Twilio, Inc. | Communications with all BitMEX users | San Francisco, California |
| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 4. | Google, Inc. | Human verification for the users, | Mountain View, |

| | | and generating visitor statistics | California |
|---|---|---|---|
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with all BitMEX users | San Francisco, California |
| 11. | ProofPoint, Inc. | Hosting of BitMEX's internal corporate email accounts, outbound data loss prevention, social media, mobile devices, digital risk, email encryption, electronic discovery, and email archiving. | Sunnyvale, California |
| 12. | Slack, Inc. | Internal communications between employees at BitMEX | San Francisco, California |

100.    Furthermore, Plaintiffs are informed and believe and thereon allege that San Francisco, California-based quant trading firm Galois Capital freely trades on BitMEX from California generating millions of dollars of business for Defendant HDR.  This trading is done with the knowledge, permission, approval, assistance and encouragement of Defendants.

101.    Defendants knowingly and willfully permitted United States citizens and residents of California as well as United States based companies to freely trade on the BitMEX exchange

because of the lucrative business relationships between Defendants and the aforesaid individuals and companies, which financially benefitted Defendants.

102.    Moreover, Defendant's HDR website BitMEX.com is a commercial website, in English language, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants conduct substantial business with the residents of the United States, the State of California and California and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).   Instead of performing a proper document check before allowing users to open an account on BitMEX.com, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.  Using the aforesaid commercial website operated by Defendants, residents of the United States, the State of California and California are able to place binding trading orders of virtually unlimited monetary size, enter into binding derivative purchase and sale contracts, and transfer virtually unlimited amount of funds anywhere in the world.

103.    Moreover, Defendants deliberately made their commercial website BitMEX.com accessible from the United States even without using VPN software in violation of BitMEX's own Terms of Service ("Terms of Service") in order to entice United States residents to trade on the BitMEX's platform.  Specifically, BitMEX's Terms of Service provide: "[y]ou are not

> ⊘ **Note on Restricted Jurisdictions**
>
> At this time, BitMEX cannot serve customers in Puerto Rico. You may still create an account, but you will be unable to deposit or trade. If you wish to try simulated trading, please try our BitMEX Testnet. Access to the BitMEX Testnet is not for trading purposes, and is not intended as investment advice or as a solicitation to engage in any form of trading activity and should not be construed as such.

allowed to access or use the Services or the Trading Platform if you are located, incorporated or

otherwise established in, or a citizen or resident of: (i) the United States of America… 'Services' means websites, applications and any services provided by any member of the HDR Group, including: a) … the BitMEX <u>Testnet</u> Platform." However, BitMEX.com website specifically induces United States resident users to try BitMEX <u>Testnet</u> Platform, by clearly stating: "please try our BitMEX Testnet." This is not an innocent mistake, it is intentionally done by Defendants in order to entice United States traders to subsequently trade on the BitMEX Trading Platform in direct violation of the prohibition contained in its own Terms of Service. In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN. This is purposefully done to entice United States persons to trade on the BitMEX platform. If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

104.    Therefore, any and all provisions contained in the Terms of Service prohibiting United States users from using the BitMEX's platform were in fact sham provisions and lacked any meaningful enforcement by Defendants. In fact, Defendants' own actions clearly demonstrated complete disregard of the provisions of their own Terms of Service. Moreover, Defendants willfully and deliberately used IP country blocking, which has been proven utterly ineffective for its intended purpose and easily subverted, to leave a back door for the United States residents to trade on the BitMEX platform.

105.    Furthermore, Defendants purposefully invoked the benefits and protections of the United States Federal laws when they filed for and obtained from the United States government official Notices of Allowance for seven (7) United States trademark applications all relating to BitMEX's platform that is the subject of this Complaint.

**Current Search: S2: (HDR GLOBAL TRADING)[OW]** docs: 7 occ: 21

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

106.    For example, trademark applications serial Nos. 87856272 and 87607952, both for mark "BITMEX" were filed by Defendants in connection with "[d]ownloadable software for trading crypto-products and providing crypto-currency information" and "exchanging money, financial management, futures brokerage, capital investment, electronic funds transfer, providing financial information via a website, financing services, investment of funds, business liquidation services, financial services, namely, operation and management of hedge funds, commodity pools and other collective investment vehicles, and trading for others of cryptocurrency, decentralized application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets, securities, options, futures, derivatives, debt instruments and commodities," respectively, which are BitMEX's core services.  Invoking benefits and protections of the United States Federal laws clearly made it foreseeable for Defendants that they would end up in a United States Court.

107.    In the aforesaid trademark filings with the United States Patent and Trademark Office, Defendant HDR swore, under penalty of perjury, that it "has a continued bona fide intention, and is entitled, to use the mark[s] in commerce [in the United States] on or in connection with all of the goods/services listed in the Notice of Allowance or as subsequently modified for this specific class."

108.    In a recent legal filing, Defendant Hayes swore that: "[i]n my capacity as CEO, I am advised by an advisory body currently comprised of twelve individuals responsible for

different departments within the HDR Group. A majority of the HDR Group's advisory committee has always been located in Hong Kong, and nine of the twelve members currently on the committee are located outside of the United States." Therefore, three out of 12 members of the advisory committee of Defendant HDR are located in the United States.

109.    Professional network LinkedIn, as well as other information available on the Internet, provides publicly available evidence of dozens of individuals, who reside in the United States and in California and who identify themselves as cryptocurrency derivative traders on the BitMEX platform.  Forty-three examples of the Unites States resident BitMEX traders, who trade on BitMEX through the aforesaid commercial website BitMEX.com, are provided in the below table:

|     | **BitMEX Trader Name** | **BitMEX Trader Residence** |
|-----|------------------------|------------------------------|
| 1.  | Scrembo Paul | Los Angeles, California |
| 2.  | Aaron Aloyan | Greater San Diego, California, Area |
| 3.  | Christopher Smitherman | Atlanta, Georgia |
| 4.  | Daniel Spivak | Greater Chicago Area |
| 5.  | Harrison Davis | Greater New York City Area |
| 6.  | Vesko P. | Greater Los Angeles Area |
| 7.  | Matthew Wellman | Lexington, Kentucky |
| 8.  | Uriel Scott | Chicago, Illinois |
| 9.  | Sahand Akbari | Sacramento, California Area |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City Area |
| 14. | Andres Santana | Greater New York City Area |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |

| 17. | Phillip James | St. Cloud, Minnesota Area |
|---|---|---|
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell | Laguna Beach, California |
| 21. | Jiale (Etta) Qin | Cupertino, California |
| 22. | Bokmoon Jung | Boise, Idaho |
| 23. | Lionel Girardin | Greater Chicago Area |
| 24. | Arijit Santra | Berkeley, California |
| 25. | Sankha Banerjee | Greater New York City Area |
| 26. | Connor Van Dorpe | Madison, Wisconsin |
| 27. | Ryan Rim | San Francisco Bay Area |
| 28. | Gianny R. Banda | Miami, Florida |
| 29. | Michael Peterson | Syracuse, New York Area |
| 30. | Anthony Agrait | Tempe, Arizona |
| 31. | Dustin G. | Burlington, Vermont Area |
| 32. | Kevin Cotugno | Phoenix, Arizona |
| 33. | Calvin Leung | Santa Monica, California |
| 34. | Anthony Wittemann | Santa Monica, California |
| 35. | Catherine Wood | Greater New York City Area, New York |
| 36. | Ryan Gill | Delaware, Ohio |
| 37. | Eric J. Waidergorn | Greater Chicago Area, Illinois |
| 38. | Eric Crown | Hillsboro, Oregon |
| 39. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area |
| 40. | Edward Ornelas | Albuquerque, New Mexico |
| 41. | Richard Bae | United States |
| 42 | Roger Xu | Brooklyn, New York |
| 43. | Wen Hou | Irvine, California |

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 40 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

110.     Professional network LinkedIn as well as other Internet resources further provide evidence of at least fourteen companies, which are incorporated and based in the United States and which trade derivatives using Defendant's HDR commercial website BitMEX.com:

| | Name of U.S. Company Trading on BitMEX | Company Address |
|---|---|---|
| 1. | CMT Capital Markets Trading | 156 N Jefferson St., Suite 102, Chicago, IL 60661 |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY 12207 |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |
| 6. | Swing Trade Pros | 1600 S. Indiana Ave, Chicago, IL 60616 |
| 7. | FalconX | 66 Bovet Rd #380, San Mateo, CA 94402 |
| 8. | Cumberland DRW | 540 W Madison St Chicago, IL 60661 |
| 9. | Circle Partners | 1395 Brickel Avenue, Suite 913 Miami, FL 33131 |
| 10. | Fund3 Capital LP/Fund3 LLC | 11244 Huntley Place, Culver City, CA 90230 |
| 11. | South Lake Computers | 82 W Highway 50, Clermont, FL 34711 |
| 12. | ARK Investment Management LLC | 3 East 28th Street, 7th Floor, New York, NY 10016 |
| 13. | Coincident Capital | 310 Lake Street, Huntington Beach, CA 92648 |
| 14. | Leotank Capital | 250W 50th Street, Apt. 3d2, New York, NY 10019 |

111.     Adaptive Fund I, LP, which is a Delaware limited partnership, funded primarily by investors who are United States residents, as the result of market manipulation which took place

on BitMEX's platform on or about March 13, 2020, lost 60% of its equity, or roughly $12,000,000. These catastrophic monetary losses were suffered by numerous Unites States residents who invested in that fund. In communications to investors following the losses, fund manager Murad Mahmudov admitted to personally executing trades on BitMEX's platform with United States investors' money. Due to the high profile of the fund and fund managers involved, Defendants clearly knew of the United States origin of the money that the Adaptive Fund I, LP was trading on BitMEX platform and Defendants deliberately and willfully allowed such trading to proceed.

112.    Internet video portal YouTube is replete with video evidence of traders residing in the United States and in California freely placing high dollar bets through Defendant's HDR commercial website BitMEX.com. The following table identifies just 40 examples of such video evidence:

| | BitMEX Trader's YouTube Account User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United States | 02/25/2020 | How Wales Manipulate Bitcoin Using Spoofing on Bitmex (Live $400,000 Short Trade) |
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitcoin Leverage Trading - Afternoon Trading Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollbox + New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |

| 6. | Scrembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutorial For Beginners Bitcoin |
|---|---|---|---|---|
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Binance Futures, Bybit, & Bitmex Bitcoin & Crypto |
| 8. | Crypto Gnome | United States | 05/14/2019 | How to Automate Your Trades on Bitmex & Deribit |
| 9. | Crypto Gnome | United States | 09/25/2019 | Goat Alerts - TradingView Bot & Shadow Trading for Bybit & Bitmex |
| 10. | Crypto Gnome | United States | 08/12/2018 | How to Set a STOP LOSS on BitMEX |
| 11. | Crypto Gnome | United States | 11/29/2018 | How to use a Trailing Stop on BitMEX - MORE PROFITS! |
| 12. | Crypto Gnome | United States | 07/25/2018 | How to Short Bitcoin on Bitmex |
| 13. | Crypto Gnome | United States | 08/11/2018 | How to Save on Fees When Trading on BitMEX |
| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United States | 07/30/2018 | Free Profit Tracking Spreadsheet for Trading on Bitmex |
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On |

| | | States | | NinjaTrader; www.SlingshotFutures.com |
|---|---|---|---|---|
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |
| 23. | Bitcoin Trading Challenge | United States | 01/08/2019 | Scalping Bitmex Liquidations |
| 24. | Digital Millionaire | United States | 10/31/2019 | BitMEX Tutorial For Beginners - How To LONG AND SHORT Bitcoin With LEVERAGE! |
| 25. | Patrick Corsino | United States | 01/13/2020 | Beginner Method: $100-$1000/Day Passive Cryptocurrency Trading 2020! Bitcoin Bitmex, Binance, Bybit |
| 26. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 27. | Crypto Corny | United States | 01/31/2019 | 70% DOWN, 9930% TO GO... 0.1 To 10 BITCOIN TRADING CHALLENGE – Bitmex |
| 28. | MiningTrades | United States | 01/23/2018 | My Algorithmic Trading BOT trades $XBT Bitcoin Futures LIVE! \| BitMex Jan 23rd 2018 |
| 29. | Crypto Minds | United States | 09/07/2018 | How to Long and Short Bitcoin and Altcoins on Bitmex |
| 30. | Jaydn's Crypto Channel | California, United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 31. | Crypt0W1SE | Michigan, United States | 12/30/2018 | Live BitMEX trading!!! 1 to 100 btc challenge! |

| 32. | ORACLE CRYPTO AVENGER! | United States | 02/08/2020 | $100,000 1 DAY PROFIT LEVERAGE TRADING BITSEVEN BYBIT BITMEX |
| 33. | ORACLE CRYPTO AVENGER! | United States | 10/15/2018 | BITMEX WATCH A SHORT TRADE THE ENDED OVER 103% WIN! |
| 34. | ORACLE CRYPTO AVENGER! | United States | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER 98% ROI -WHY YOU CAN'T DO THIS. |
| 35. | ORACLE CRYPTO AVENGER! | United States | 11/07/2018 | BCH MARKET MANIPULATION - MANIPULATE BITMEX TO PROFIT! |
| 36. | Alexander Lorenzo | Gainesville, FL, United States | 01/26/2019 | Scavenger Bot Bitmex SCAM |
| 37. | Swing Trade Pros | 1600 S. Indiana Ave. Chicago, IL 60616 | 03/09/2020 | Live Bitcoin Trading on Bitmex with Swing Trade Pros Indicators! |
| 38. | Sell The Spike | Burlington, Vermont Area | 07/03/2019 | How to use a TRAILING STOPLOSS on Bitmex |
| 39. | Sell The Spike | Burlington, Vermont Area | 06/09/2018 | Bitmex Tutorial - Placing Orders, Setting Stoplosses and Targets, Leverage and Margin, Walkthrough |
| 40. | Bitcoin for Beginners | United States | 12/22/2018 | How To Use BitMEX Exchange For Beginners! (BitMEX Tutorial) |

113.    "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is

attributable to traders located in the United States.  This number is consistent with the evidence available on YouTube and LinkedIn.

114.    YouTube is also replete with dozens of videos teaching how to access Defendant's HDR commercial website BitMEX.com from the United States using inexpensive and widely available VPN software to avoid Internet protocol (IP) address blocking.  Below are 11 examples of such videos:

| | BitMEX Trader's YouTube User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Crypto Gnome | United States | 08/09/2018 | How to Sign Up for BitMEX in the US |
| 2. | Bot Mentality | Atlanta United States | 03/22/2018 | How to use Bitmex in the United States |
| 3. | Jaydn's Crypto Channel | California United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 4. | CryptoJunkies | United States | 08/15/2019 | How To Trade Bitmex In America! |
| 5. | Crypto Guru | United States | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator |
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? \| Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |

| 9. | Casey Watkins | United States | 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | ***MEX Millionaire*** EVERYTHING You Must Know!- ***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

115.    Defendant HDR assigns a six-symbol alphanumeric affiliate codes to all BitMEX account holders and uses these affiliate codes to pay compensation to its users for enticing other users, including United States residents, to open accounts on BitMEX.com commercial website by posting a URL pointing to the BitMEX registration page and incorporating the aforesaid assigned affiliate code.   The so assigned affiliate code uniquely identifies the corresponding account holder and its BitMEX account.  Thus, presence of the affiliate code indicates that a person who invites others to register with Defendant's HDR commercial website by way of an affiliate link himself has a BitMEX account.  Table below provides 22 examples of BitMEX affiliate codes being assigned to the United States residents for receiving compensation for enticing other United States residents to join the BitMEX platform:

| | BitMEX Trader's Name or Alias | Trader Residence | BitMEX Assigned Affiliate Code (identifies trader's BitMEX account) |
|---|---|---|---|
| 1. | Tone Vays | United States | cMvHXg |
| 2. | Flood | United States | ir2Xqa |
| 3. | Crypto Corny | United States | 0rsCIx |
| 4. | Krown's Crypto Cave | Hillsboro, Oregon, United States, United States | ou4vcl |
| 5. | Crypto Hippo Trading | United States | gZ0Y10 |
| 6. | Edward Ornelas | Albuquerque, | kpdzGl |

|  |  | New Mexico, United States |  |
|---|---|---|---|
| 7. | CryptoSailor | United States | AOIyp0 |
| 8. | MiningTrades | United States | i110zC |
| 9. | Crypto Minds | United States | OIv1fe |
| 10. | Moonin Papa | United States | GG2kor |
| 11. | Josh Olszewicz | Washington DC-Baltimore Area, United States | s7sqNI |
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | New York, New York, United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | lf9P89 |
| 16. | ORACLE CRYPTO AVENGER! | United States | WXNej9 |
| 17. | Swing Trade Pros | New York, New York, United States | G4cfM4 |
| 18. | Bitcoin for Beginners | United States | 5i7rOb |
| 19. | Crypto Gnome | United States | EOsLBm |
| 20. | Sell The Spike | Burlington, Vermont Area | KO33NC |
| 21. | Scrembo Paul | Los Angeles, California | BlQzsA |
| 22. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area | 9e4hqj |

116.    Professional network LinkedIn provides publicly available evidence of 74

individuals, who are United States residents and who identify themselves as present and former

employees of Defendant HDR, located in the United States and in California:

| | LinkedIn Member Name | Position at BitMEX | Residence |
|---|---|---|---|
| 1. | Max Shapiro | Associate at BitMEX Ventures | New York, New York |
| 2. | Kumar Dandapani | Head of BitMEX Ventures | San Francisco Bay Area |
| 3. | Alena Gilevskaya | Senior Software Engineer at BitMEX | San Francisco, California |
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |
| 8. | Niroj Shankhadev | Web Developer at BitMEX | San Francisco, California |
| 9. | Samuel Reed | Co-Founder and CTO at BitMEX | United States |
| 10. | Eric Zinnikas | Security Engineer at BitMEX | San Francisco, California |
| 11. | Molly Lubow | Talent Acquisition Specialist at BitMEX | San Francisco Bay Area, California |
| 12. | Evan Ricketts | Senior Software Engineer at BitMEX | Milwaukee, Wisconsin |
| 13. | Michael Carlson | Security Engineering Manager, Application Security at BitMEX | San Francisco, California |
| 14. | Monzer Aldimassi | Technical Program Manager (TPM) at BitMEX | Campbell, California |
| 15. | Patrick Fiscina | Vice President Of Engineering | San Francisco Bay Area, |

| | | at BitMEX | California |
|---|---|---|---|
| 16. | Allison Sommers | Security Engineer at BitMEX | San Francisco Bay Area, California |
| 17. | Conner McNicholas | Data Engineering at BitMEX | San Francisco, California |
| 18. | Brandon Schlenker | Engineering Manager at BitMEX | San Francisco, California |
| 19. | Riley Hutchinson | Director, People at BitMEX | San Francisco, California |
| 20. | Benson Wong | Senior IT Support Engineer at BitMEX | San Carlos, California |
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |
| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX (Powering the world's largest cryptocurrency trading platform with Kubernetes, at the edge of financial and infrastructure technologies. Scaling BitMEX's infrastructure, culture and practices from 10 employees to 150 employees, from $1B to $11B traded daily, and 150x more trades.) | San Francisco, California |
| 27. | Maus Stearns | Security Engineering Manager at BitMEX | San Francisco, California |
| 28. | Andrew MacPherson | Security Engineer - Detection | San Francisco, California |

| | | and Response at BitMEX | |
|---|---|---|---|
| 29. | Chris Gates | Director of Offensive Security at BitMEX | Washington, DC Metro Area |
| 30. | Supriya Premkumar | Software Engineer - Kubernetes at BitMEX (Working on building Kubernetes Infrastructure that can handle tens of thousands of low latency transactions per second at one of the world's largest crypto exchanges.) | San Francisco, California |
| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the world's highest volume Cryptocurrency exchange.  Building a world class Security team to protect our customers, assets and brand.) | Palo Alto, California |
| 34. | Javier Marcos de Prado | Staff Security Engineer at BitMEX | San Francisco, California |
| 35. | Shivali Singh | Senior Manager Security Assurance at BitMEX | San Francisco, California |
| 36. | Felipe Loyola Andrade | Software Engineer at BitMEX | San Francisco, California |
| 37. | Felix Böhm | Senior Software Engineer at BitMEX (Tech lead for the | San Francisco, California |

| | | institutional side of BitMEX) | |
|---|---|---|---|
| 38. | Neel Patel | Engineering Leader, Lead Data Engineer at BitMEX | Burlingame, California |
| 39. | Taylor Hesselgrave | Senior Software Engineer at BitMEX | San Francisco, California |
| 40. | Alisa Isovic | Product Manager at Bitmex at BitMEX | San Francisco, California |
| 41. | Armando Cerna | Site Reliability Engineer at BitMEX (Primary on call in a high traffic production environment.) | San Francisco, California |
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |
| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |
| 46. | Jinny Wong | Product Designer at BitMEX | San Francisco, California |
| 47. | Claire F. | Information Technology Management at BitMEX | San Francisco, California |
| 48. | Can Selcik | Senior Software Engineer at BitMEX | San Francisco, California |
| 49. | Eoghan McKee | Threat Intelligence, Insider Threat, Incident Response at BitMEX | San Francisco, California |
| 50. | Lawson Kight | Head of User Experience at BitMEX | San Francisco, California |
| 51. | Shawhin M. | Project Manager at BitMEX | San Francisco, California |
| 52. | Ladi D. | Platform Security Engineer at BitMEX | San Francisco, California |

| 53. | Neil Eads | Quality Assurance (QA) Manager at BitMEX | San Francisco, California |
|---|---|---|---|
| 54. | Michael Curry | Vice President, Head of Product at BitMEX | Oakland, California |
| 55. | Joshua Philippe | Principal Visual Designer, User Experience at BitMEX | San Francisco, California |
| 56. | Tim L. | IT Infrastructure Engineer at BitMEX | San Francisco, California |
| 57. | Hunter Shaw | Communication Director and BitMEX | San Francisco, California |
| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |
| 63. | Uday Shankar | Product Manager at BitMEX (My average week at BitMEX involves product research, market research, data analysis, scouring through support tickets, watching social channels for opportunities in terms of new features and improvements to existing features collaborating with Engineering, Program, QA, Security, Legal and Compliance teams. I manage expectations across Design, Engineering and | San Francisco, California |

| | | Management orgs and ensuring the product ideas and solutions are communicated, wireframed and pitched in the right fidelity to get all stakeholders onboard and scope our short term and long term roadmaps for each projects.) | |
|---|---|---|---|
| 64. | Victor Levasseur | Principal / Lead senior software engineer at BitMEX focused on a product driven approach and with great business | San Francisco, California |
| 65. | Jason Bond Pratt | Former Executive Vice President of Product and Engineering (Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a team of 40 during a period of 100x growth. BitMEX was then and remains the largest crypto exchange, by volume, in the world.)<br>• Grew product and engineering team from 1 to 40 across 5 operational groups, and hired or developed hiring managers for each of them.<br>• Established a culture that valued diversity, respect, inclusion and appreciation, | San Francisco, California |

| | | emphasizing team-first principles and a humble, servant leadership ethic throughout our organization. <br>• Hired or developed global leads for Security, DevOps, Recruiting, IT, UX, Mobile, and API/Web Engineering, and led the first D&I initiatives at the company. Secured long term Class A space in the FiDi. <br>• Served on the global exec team and coordinated regularly with peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.) | |
|---|---|---|---|
| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and Business Development at BitMEX | New York, New York |
| 67. | Tim Tickel | Head of Security at BitMEX (Securing cryptocurrency exchange infrastructure) | San Mateo, California |
| 68. | Chenqi 'Ashley' X. | Data Science Manager at BitMEX | San Francisco, California |
| 69. | Kev Zettler | Former Senior Software Engineer at BitMEX | Oakland, California |
| 70. | Cynthia P. | Former Art Director at BitMEX (Led a cross-functional rebrand project with Marketing, Product, and Brand collaborators to build | New York, New York |

| | | the BitMEX brand for institutional and retail audiences. Deliverables included brand and style guidelines, visual assets, content strategy, digital and print editorial campaigns.) | |
|---|---|---|---|
| 71. | Natalie Case | Technical Writer at BitMEX | Walnut Creek, California |
| 72. | Deb Baratz | Former Content Manager at BitMEX | New York, New York |
| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | Indianapolis, Indiana |

117.    Based on the publicly available LinkedIn data, while 74 of Defendant HDR employees are located in the United States, only 34 are located in Hong Kong, which is the home for second largest Defendant HDR office.  Therefore, more than two thirds of Defendant HDR employees worldwide are residing in the United States and in California.  Moreover, the vast majority of the 74 United States employees of Defendant HDR are engaged in software development and engineering, while in Hong Kong, there are only six software developers and engineers employed by Defendant HDR.  Moreover, all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, personally responsible for the fraudulent system overloads

and server freezes, are located in California.  Therefore, the United States and, specifically, California is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed by Defendants and where the illegal acts alleged in this Complaint took place.

118.    In addition, BitMEX website lists 17 job openings for Defendant HDR San Francisco office.  For comparison, the other two offices of Defendant HDR – Hong Kong and Singapore list 14 and two job openings, respectively.  Furthermore, out of 17 advertised job openings in Defendant HDR San Francisco office, 15 are openings in engineering and software development.  On the other hand, in Hong Kong office, only four job openings are in software development and engineering.  This fact further supports the conclusion that the United States and, specifically, California is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed and where the illegal acts alleged in this Complaint took place.

119.    BitMEX conducts offsites for the entire company hosted at its San Francisco office location, at least one of which occurred in November of 2017, in which Defendant Hayes and the rest of BitMEX's employees globally came to San Francisco and the San Francisco office.

120.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 116, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, as alleged in Paragraph 117, and almost all vital external service providers to BitMEX, as alleged in Paragraph 99, are located in California, and because Defendant ABS, which develops, operates, enables, supports and services BitMEX platform is located in California, California is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts alleged in this complaint took place, including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing,

supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the CEA, 7 U.S.C. §§ 1 et seq. (2018) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2019). Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS.  Furthermore, the illegal acts alleged herein were all perpetrated by Defendants through their commercial website BitMEX.com, accessible, via widely available and inexpensive VPN software, by users located in the United States and California.  Defendants knew that users located in the United States and California were accessing their commercial website BitMEX.com.

121.    Numerous citizens and residents of the United States and California conducted and continue to conduct a high-volume derivative trading on the BitMEX platform using Defendants' commercial website BitMEX.com.

122.    The same commercial website BitMEX.com was used by Defendants to perpetrate all the illegal acts alleged in Paragraph 120, resulting in injuries to Plaintiffs, for which Plaintiffs seek redress in this Complaint.  Accordingly, Defendants' connections with the United States and California through the commercial website BitMEX.com, used by the United States residents and residents of California, are directly related to the causes of action asserted by Plaintiffs in this Complaint.

123.    For the reasons stated in the previous Paragraphs of this Complaint, BitMEX is a domestic United States cryptocurrency exchange.

## **DISCOVERY OF U.S. TRADERS ON BITMEX LEADERBOARD**

124.    While Defendants and their counsel are busy disingenuously swearing to Courts that "U.S. persons are expressly prohibited from trading on BitMEX platform," Defendants' own public Leaderboard posted on Defendants' website (https://www.bitmex.com/app/leaderboard) reveals that just four U.S.-based traders who decided to reveal their real names (evidently in an effort to assist with fundraising): Roger Xu of Leotank Capital Inc. and Bryce Gilleland, Wen

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Mercury-Wood-Sprite | 8,161.2198 XBT | ✗ |
| 2 | Quick-Grove-Mind | 8,047.8158 XBT | ✗ |
| 3 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✗ |
| 4 | Alameda Research | 5,244.5830 XBT | ✓ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✗ |
| 6 | coincidentcapitalltd | 2,610.2783 XBT | ✓ |
| 7 | Skitter-Perdut-Raven | 2,329.1721 XBT | ✗ |
| 8 | Honeysuckle-South-Rib | 2,111.6555 XBT | ✗ |
| 9 | CSW is a fraud | 2,086.7229 XBT | ✓ |
| 10 | Tree-Surf-Dragon | 2,053.2285 XBT | ✗ |
| 11 | Roger_LeotankCapital | 1,764.5478 XBT | ✓ |
| 12 | alamedaresearchltd@gmail.com | 1,696.7039 XBT | ✓ |
| 13 | Jade-Platinum-Legs | 1,675.8174 XBT | ✗ |
| 14 | Circle_Trade | 1,619.6382 XBT | ✓ |
| 15 | Winter-Pink-Fang | 1,542.1702 XBT | ✗ |
| 16 | daniel3 | 1,514.6067 XBT | ✓ |
| 17 | Cream-White-Ox | 1,476.3798 XBT | ✗ |
| 18 | xorq | 1,473.0086 XBT | ✓ |
| 19 | Disco-Solar-Fang | 1,452.1775 XBT | ✗ |
| 20 | Roger_LeotankCapital | 1,441.3349 XBT | ✓ |
| 21 | Ebony-Fair-Bat | 1,390.0500 XBT | ✗ |
| 22 | aoa | 1,386.5926 XBT | ✓ |
| 23 | Quill-Rift-Hoof | 1,363.3790 XBT | ✗ |
| 24 | Brown-Peat-Myth | 1,248.5080 XBT | ✗ |
| 25 | Denim-Sun-Speaker | 1,218.5577 XBT | ✗ |

*Annotations (handwritten, in red):*

Next to rank 4–5: "1. Sunil Shah, 310 Lake St., Unit #310, Huntington Beach, CA 92648"
Next to rank 6–7: "2. Bryce Gilleland, 1400 Calle De Las Flores, San Dimas, CA 91773"
Next to rank 7–8: "3. Wen Hou, 2253 Martin St. Apt 113, Irvine, CA 92612"
Next to rank 6: "$31,000,000 Exhibits: 6, 7, 8"
Next to rank 11: "Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220" — "$21,000,000 Exhibits: 9, 10, 11"
Next to rank 20: "Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220" — "$17,000,000 Exhibits: 9, 10, 11"

Hou and Sunil Shah of Coincident Capital (Ex. 12) generated almost $70,000,000 in trading profits on Defendants' BitMEX platform.  As attached Ex. 12 clearly shows, Bryce Gilleland, Wen Hou and Sunil Shah reside in California, while Roger Xu resides in New York.

125.    Moreover, the above staggering amount of business was conducted by Defendants in the United States and the State of California without obtaining a money transmission license and without complying with the mandatory FinCEN regulations in violation of 18 U.S.C. § 1960(a).  Notably, all the above evidence was obtained from Defendants' own public website without any benefit of discovery.  Plaintiffs are informed and believes that this is a mere tip of the iceberg and that up to third of all traders on the BitMEX Leaderboard generating half a billion dollars of profits are U.S. persons.

### ATTEMPTS TO MISLEAD COURTS REGARDING MATERIAL FACTS

*"U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform."  Mr. Hibbard, Defendants' counsel.*

126.    It is simply inconceivable that Defendants and their litigation counsel somehow did not know that some of their top traders who generated almost $70,000,000 in profits on Defendants' own platform were U.S. persons, Ex. 12.  Obviously, such high-profile traders are universally known by name.  Yet, with full knowledge that some of BitMEX's top trading accounts which generated almost $70,000,000 in trading gains were in fact operated by U.S. persons, Defendant Hayes, with the assistance and encouragement of Defendants' counsel, nevertheless disingenuously swore under the penalty of perjury in a California Superior Court proceeding, in a motion challenging Court's jurisdiction that "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform."   Defendants' counsel, not to be outdone, repeated this travesty thirteen (!) more times throughout his various motions and oppositions.  Various representations of material facts made by Defendant Hayes and his counsel to Courts as well as the true facts are summarized in the table below:

| Court Name, Case and Document | Date | Defendant Hayes' Representations | Defendants counsel's Representations | The True Facts and Exhibits |
|---|---|---|---|---|
| N.D. Cal. 3:20-cv-3345-WHO, Defendants' Opposition to Ex Parte Application for Evidence Preservation Order [Dkt. No. 26, p. 3, 5]. | 6/12/20 | | "No further time and attention of this Court is warranted as there is no need for a court to order someone to do what they are already doing."<br><br>"Our clients understand their document preservation responsibilities and have acted responsibly to fulfill them. As such, there is no dispute, and there is no need for a document preservation order." | "Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information."  Ex. 2, p. 16, ¶ 49.<br><br>Defendants also falsified records: "Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program." Ex. 2, p. 24, ¶ 90. |
| San Francisco County Superior Court, CGC19581267, | 2/27/20 | "U.S. persons are expressly prohibited from accessing or trading | | "BitMEX operated its trading platform in large part from the United States, and engaged in transactions |

| | | | | |
|---|---|---|---|---|
| Declaration in Support of Motion to Quash | | "on the BitMEX platform under the terms of service." | | with thousands of U.S. persons. BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus." Ex. 2, p. 3, ¶ 3. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "HDR is a holding company that ultimately owns the BitMEX-branded trading platform that allows the trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons*." | "BitMEX even maintained an internal dashboard of open accounts from supposedly restricted jurisdictions… Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program… Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other account and transactional information for U.S. based traders. For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform." Ex. 2, p. 24, ¶ 91. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "Further, U.S. persons are prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "U.S. persons are prohibited from trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Declaration in Support of Motion to Quash | 6/16/20 | "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform under the terms of service." | | In addition, some of BitMEX's most profitable trading accounts openly listed on BitMEX's public Leaderboard, which generated almost $70,000,000 in trading profits, were and continue to be operated by four U.S. persons Bryce Gilleland, Wen Hou, Sunil Shah and Roger Xu. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "HDR is a holding company that ultimately owns the BitMEX-branded trading platform that allows the trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons*." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of | 6/16/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | Bryce Gilleland resides at: 1400 Calle De Las Flores, San Dimas, CA 91773, Ex. |

| | | | | |
|---|---|---|---|---|
| Motion to Quash | | | | 12. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Plaintiffs allege that … U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading…" | Wen Hou resides at: 2253 Martin Ct. Apt. 113, Irvine, CA 92612, Ex. 12.

Sunil Shah resides at: 310 Lake St., Unit #310, Huntington Beach, CA 92648, Ex. 12.

Roger Xu resides at: 250W 50th Street, Apt. 3d2, New York, NY 10019, Ex. 12.

Due to the enormous sizes of the trading gains involved and the high profile of the traders, it is absolutely inconceivable for Defendants and their counsel not to have known this fact at the time Defendants and their counsel made the material representations to the courts regarding jurisdictional facts. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Further, U.S. persons are prohibited from trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "U.S. persons are prohibited from trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Opposition to Motion to Compel | 6/23/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Opposition to Motion to Compel | 6/23/20 | | "Plaintiffs allege that … some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective | 6/25/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | |

| | | | |
|---|---|---|---|
| Order | | | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective Order | 6/25/20 | | "Plaintiffs allege that … some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." |

127.    While the conduct of Defendants and their counsel alleged in the previous paragraph may not be technically a perjury, a plain and clear attempt to mislead Courts as to very material facts critical for the jurisdictional inquiry is evident.  This speaks volumes as to the "catch me if you can" strategy adopted by all Defendants.  Defendants' counsel, on the other hand, who is an officer of the court and who is charged to act as a gatekeeper, seems to take special pride in perpetuating untruths concocted by Defendants to try to wiggle their way out of facing justice for their misdeeds.

128.    Less than 48 hours after Plaintiffs' counsel brought the above facts to the attention of the Court in the CMC Statement filed on August 11, 2020, Dkt. 33, Defendants abruptly instituted a so called "BitMEX User Verification Programme," solely intended to create an apparent excuse for previously misleading Courts regarding U.S. traders on BitMEX platform, Ex. 12, 13.  Evidently, Defendants intend to disingenuously claim to the Court that, prior to the sudden institution of the aforesaid 11th hour "BitMEX User Verification Programme," Defendants somehow did not know that U.S. persons were trading on BitMEX en masse and also did not know who their top traders were, despite maintaining an official Leaderboard for more than 4 years.  In view of all the above facts, Defendants' 11th hour firefighting efforts are clearly disingenuous.

### ACCEPTANCE OF TAINTED FUNDS AS PAYMENT FOR MISLEADING COURTS BY DEFENDANTS' ATTORNEYS

129.    Not only was Defendants' counsel eagerly willing to mislead Courts regarding material jurisdictional facts to get Defendants off the hook no matter the cost, he also gladly accepted funds tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and

1957 and proceeds of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) as his fee for doing so.

130.    As alleged above, BitMEX knowingly collects hundreds of millions of dollars in trading commissions from the money laundering transactions taking place on its platform on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph below, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from which all legal fees of BitMEX attorneys are paid (after currency conversion).  Thus, BitMEX's employee salaries, office rents and even legal fees that BitMEX attorneys collect are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

131.    Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a), Ex. 12.  This violation has been conclusively proven using BitMEX's own Leaderboard, Ex. 12.  Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. 13.  In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiffs are aware of, see Paragraphs 109, 110, 112, 115.  The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D. Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty-three times).

132.    Consequently, all the trading commissions that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).  Legal fees for Defendants' counsel's "services" aimed at misleading Courts were paid from the same general account, which contained the tainted funds.

133.    It should be further noted that the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) applies to criminal matters only, while Defendants' counsel received tainted funds for representing Defendants in civil cases.  Therefore, the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) does not apply and the acceptance of tainted funds for counsel's efforts to mislead Courts, itself constitutes money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

134.    Thus, all the fees paid to Defendants' legal counsel in this and other civil matters by Defendants, including fees paid for misleading Courts regarding material jurisdictional facts as alleged above, were tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and proceeds of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).  Moreover, Defendants' counsel was clearly on notice of very serious issues with Defendant Hayes, as Mr. Hayes has previously publicly admitted to bribery of foreign government officials and bank fraud, Ex. 10, 11, of which Defendants' counsel was specifically informed.  Thus, Defendants' counsel's conduct of misleading Courts about material facts and accepting tainted money as fees for doing so was clearly intentional.  Notably, some of the Defendants used the same tainted funds from their general account to acquire real state in Wisconsin and Massachusetts as alleged below.

## JURISDICTION AND VENUE

135.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

136.    This Court has personal jurisdiction over Defendants, and each of them, pursuant to California long arm statute codified in Cal. Code Civ. Proc. § 410.10.

137.    Defendant HDR conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

138.    Defendant ABS conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

139.    Defendant Hayes conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

140.    Venue is proper pursuant to Cal. Code Civ. Proc. § 395.

## BACKGROUND - BITCOIN

141.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

142.    Bitcoin is form of cryptocurrency.  It is a trustless, decentralized digital currency without a central bank or single centralized administrator that can be sent from user to user on the peer-to-peer bitcoin network without the need for intermediaries or a trusted central authority.

143.    Bitcoin was invented in or about 2008 and described in a whitepaper entitled "Bitcoin: A Peer-to-Peer Electronic Cash System" authored by an unknown person or group of people using the name Satoshi Nakamoto and started in 2009 when its source code was released as an open-source software.  Bitcoins are created as a reward for a process known as mining. They can be exchanged for other currencies, products, and services.

144.    Bitcoin transactions are verified by a network of nodes through cryptography and recorded in a public distributed ledger called a blockchain, which is maintained by multiple bitcoin network nodes through the use of a consensus protocol.  Every bitcoin transaction starting from the very first one may be viewed and verified using the blockchain.  The blockchain consists of a chronologically ordered sequence of blocks holding records of bitcoin network transactions. A new block is generated by miners every 10 minutes.  The integrity of the blockchain is maintained by including a hash of each block in to the subsequent block.  This way, if any block is altered (forged) after its creation, all the subsequent blocks would have to be also modified or

the hash discrepancy caused by the modification will be immediately detected by all the network nodes.

145.    Bitcoins are traded for United States dollars, Euros and other fiat currencies and cryptocurrencies on centralized online marketplaces called exchanges.  Usually, transactions taking place inside exchanges, such as executions of buy and sell orders are not recorded on the public blockchain and, therefore, it is hard to independently verify them using the blockchain. Most exchanges do not have internal protections against bitcoin price manipulation as well as other fraudulent behavior, which is rampant due to low trading liquidity of the bitcoin market.

146.    Stablecoins are cryptocurrencies designed to minimize the volatility of the price of the stablecoin, relative to some "stable" asset or basket of assets. The value of a stablecoin can be pegged to a cryptocurrency, fiat money, or to exchange-traded commodities (such as precious metals or industrial metals).  Most frequently used stablecoins are those pegged to United States dollar, including, without limitation, Tether (USDT), USDC and the like.

147.    Since at least 2015, the CFTC has maintained that bitcoin, and other virtual currencies, fit the definition of a commodity primarily through administrative actions.  *In re Coinflip, Inc*., CFTC Docket No. 15-29, 2015 WL 5535736 at *3 (Sept. 17, 2015).  *CFTC* v. McDonnell, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) was the first time the CFTC's position was given judicial approval. The court noted that "[v]irtual currencies can be regulated by the CFTC as a commodity," because virtual currencies can be exchanged in a market for a uniform quality and value. The Court's reasoning makes clear that bitcoin and other virtual currencies fall within both the common law definition of commodity and the CEA's definition of a commodity.

**BITCOIN PRICE MANIPULATION TECHNIQUES**

148.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

149.    On or about September 9, 2019, Chairman of the United States Security Exchange Commission ("SEC") Jay Clayton stated: "[i]n the trading area, it troubles me that people look on these venues and think it has got the same level of protection that you'd have on an equity market

in the US NASDAQ and MYSZ. Nothing could be further from the truth, we have lengthy rulebooks, all sorts of protections to make sure that prices are not manipulated in the equity markets, I don't see those in the Crypto asset markets."

150.    Bitcoin derivatives and especially spot markets remain thinly traded making them particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms of market manipulation perpetrated by Defendants as alleged herein.  It is the general and universal consensus in the cryptocurrency industry, that Defendants are the primary culprits behind the aforesaid price manipulation schemes, including, without limitation, pumps-and-dumps, Barts, stop loss hunts, liquidation cascades and spoofing.  The primary beneficiaries of this illegal manipulation is BitMEX's Insider Trading Desk, which is able to fill its orders at better than market prices at the expense of other traders, as well as BitMEX itself, which benefits through increased trading volumes as well as trader position liquidations.   This provides very strong financial incentive for Defendants to manipulate cryptocurrency markets.[5]

151.    Pump-and-dump is the fraudulent practice of BitMEX's Insider Trading Desk encouraging unwitting investors to buy an asset, such as bitcoin, to inflate its price artificially,



_____

[5] The FAC never stated that Barts, Pumps-and-dumps, liquidation cascades and other forms of manipulation were used by unknown third parties to the exclusion of Defendants themselves.  The term "perpetrators" used in the FAC was clearly meant to cover Defendants.  Now Plaintiffs clarified these allegations.  Therefore, there is no inconsistency with the allegations of the FAC.

and then selling it when the price reaches a predetermined threshold.  Pumps-and-dumps are designed to deceive the inventors as to the state of market supply and demand for the asset by means of artificially increasing the price and trading volume of the asset that is designed to entice unwitting investors to join the hype, and to buy the asset at an artificially inflated price, which they would not have done otherwise. When the BitMEX's Insider Trading Desk sells (dumps) its bitcoins and stops pumping it, the price plummets, and other investors are left holding the asset that is worth significantly less than they paid for it.   As the result, traders who bought the bitcoin on margin, may be subject to execution of stop losses as well as liquidations.

152.    Bart patterns or simply "Barts" are a variety of pumps-and-dumps involving intense pumps or dumps occurring within a very short time frame causing price action to find a new high or low for a very short period, followed by equally violent return to the previous level. BitMEX's Insider Trading Desk using this manipulation tactic benefits by having its sell/buy orders filled, and causing the unwitting investors to open positions against the trend.

153.    Barts are created by BitMEX's Insider Trading Desk using Momentum Ignition Algorithms, which work by creating a sharp spike in buy or sell action within a market with the



Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 69 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

purpose of deceiving the market participants as to market-based forces of supply and demand for an asset and enticing unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed.  Barts are intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded.  Additionally, unsuspecting traders will place buy orders above significant zones, to catch up trends, and short sellers will place stops losses in similar areas, these are effectively buy orders. In order for the malicious algorithm executed by BitMEX's Insider Trading Desk to be most effective it has to push price into these liquidity zones, triggering buys, and from there it can disengage.  Sometimes, several hours later, a floor of buy orders is removed, and a momentum ignition may be activated in the opposite direction causing a dump.

154.    Stop loss hunting is a type of market manipulation, when BitMEX's Insider Trading Desk attempts to artificially move the price for an asset to a predetermined price value to force other market participants out of their positions.  This type of manipulation is performed by executing one or more buy or sell orders with the purpose to drive the price of an asset to a level where many market players have chosen to set their stop-loss orders.  Stop loss orders are orders that get automatically executed at market price should the price of bitcoin reach a predetermined price threshold.  The BitMEX's Insider Trading Desk buys or sells spot bitcoin or bitcoin derivative until the price threshold is reached.  When the stop loss orders are triggered due to a stop loss hunt manipulation, the trader's asset holdings are sold at prevailing market prices causing the market to be filled with a large number of market orders, which has the ability to move the asset price even further triggering more stop loss orders and can even result in liquidations.  The result is a cascading execution of a large number of market orders.  BitMEX's Insider Trading Desk places its buy or sell orders such as to have them filled at the bottom or at the top of the resulting stop loss execution cascade at artificially below or artificially above market prices, respectively.  After the initial market move, the price of the asset sometimes recovers and BitMEX's Insider Trading Desk generates a profit due to its illicit actions.

155.    Liquidation cascade is an extreme case of the stop loss hunt, when the BitMEX's Insider Trading Desk pushes the price of the asset or derivative to reach position liquidations levels for multiple traders and the resulting multiple market liquidations take place in a very short time interval moving the price even further.   This triggers additional liquidations causing a cascading execution of a large number of liquidation orders.  Similarly to the stop loss hunt, the BitMEX's Insider Trading Desk places its buy or sell orders such as to have them filled at the bottom or at the top of the resulting liquidations cascade, at artificially below or artificially above market prices, respectively.

156.    The manipulative price actions alleged hereinabove perpetrated by BitMEX's Insider Trading Desk on one cryptocurrency reference spot exchange or BitMEX quickly propagate to all other exchanges due to the widespread use of arbitrage bots, which are algorithms coded in software that take advantage of the price discrepancy between exchanges by buying or selling an asset in one market and simultaneously selling or buying it in another market at a more favorable price.  Thus, a manipulative price action on one cryptocurrency exchange results in a substantially similar price action on all other exchanges.

157.    Because cryptocurrency derivatives exchanges contracts are based heavily on bitcoin spot index price on a handful of relatively illiquid reference spot exchanges, a large bitcoin spot price move may be accomplished by executing relatively small market orders on the illiquid spot exchanges.  For example, .BXBT index price used by Defendants for BitMEX's XBTUSD Perpetual Swap contract is based substantially on bitcoin prices on United States based reference exchanges BitStamp USA Inc., which owns and operates cryptocurrency exchange online platform BitStamp.net ("BitStamp"); Coinbase Inc. ("Coinbase Pro") and Kraken[6] ("Kraken"), which are much less liquid than BitMEX itself.

158.    Once initiated using helper accounts on reference spot exchanges BitStamp, Coinbase Pro and/or Kraken, the aforesaid price move spreads, through the aforesaid index, to

---

[6] Kraken is owned and operated by Payward, Inc. with offices at 237 Kearny Street Suite 102, San Francisco, CA 94108 United States.

order books of relatively liquid derivatives exchanges, such as BitMEX and causes massive, multimillion dollar instant liquidations of derivatives positions of retail traders like Plaintiffs. Such liquidations provide a financial windfall to BitMEX due to the increased trading volume as well as confiscation by BitMEX of the residual collateral of the liquidated retail traders, if BitMEX is able to close the traders' positions at prices better than bankruptcy price. In BitMEX, the amount of funds so confiscated from liquidated traders exceeded, as of August 24, 2020, 36,341 bitcoins valued at $427,000,000, which amount is stored in a winner account on the BitMEX exchange.

159.    Pumps-and-dumps, Barts, stop loss hunts and liquidation cascades may be utilized by Defendants for purposes of money laundering, especially with BitMEX not requiring any documents to open an account. For example, in case of a liquidation cascade, a first Defendant may execute a relatively small market order to trigger the liquidation cascade and a second Defendant, acting from a separate exchange account, opened on the same or different exchange, may place large buy or sell orders, respectively, to have them filled at the artificially low or high (below or above market) prices caused by the liquidation cascade triggered by the actions of the first Defendant. The first Defendant generally would book a loss, while the second Defendant would book a profit. The first Defendant may be officially located in a high tax jurisdiction, such as California, while the second Defendant may be incorporated or located in a tax-heaven jurisdiction, such as British Virgin Islands. Furthermore, the first Defendant may execute the order on an illiquid reference spot exchange, such as BitStamp, to amplify the effect of the initiating market order while the second Defendant may operate on a relatively liquid derivatives exchange such as BitMEX, which uses the price of the reference spot exchange in calculating its .BXBT and .BETH index.

160.    In a criminal commodity derivatives market manipulation case *USA v. Smith et al.* (N.D. IL 2019), the United States Department of Justice (DOJ) took a position that placing orders for commodity derivatives contracts in a manner that was intended to deliberately trigger or deliberately avoid triggering a specific price-based event, such an option execution, is unlawful.

Consistent with that position, the all above alleged price manipulation actions perpetrated by Defendants are also unlawful.

161.    In *SEC v. Shuang Chen et. al*. Civil Action: 1:19-cv-12127-WGY (D. MA 2019) "[t]he Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly traded stock. The Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price (hereinafter referred to as a "helper" account). Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper account(s). The Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts." The illegal stock price manipulation technique alleged by SEC is identical to the techniques alleged hereinabove and used as well as aided and abetted by Defendants on a daily basis during the time period starting on May 1, 2019 and until August 31, 2019 ("Relevant Period") to manipulate the prices of cryptocurrencies and cryproderivatives. According to SEC, all those techniques are illegal.

162.    Spoofing is an unlawful practice of making buy or sell orders, called deceptive orders, with an intent to cancel them before execution. The deceptive orders are used by Defendants to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded.

163.    Bitcoin price manipulation such as pumps-and-dumps, Barts, stop hunts, liquidation cascades, and spoofing, as well as numerous other forms of illicit market manipulation

used by Defendants on a daily basis are generally believed to be the abuses that prevent SEC from approving numerous bitcoin Exchange Traded Fund (ETF) applications that have been filed throughout the years by various cryptocurrency industry players.

## BITMEX WAS DESIGNED FROM GROUND UP TO BENEFIT FROM MANIPULATION
*"Regulatory agencies can be bought." Defendant Arthur Hayes*

164.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

165.    BitMEX was launched in 2014 by Defendant Hayes as well as accomplices Delo and Reed.  BitMEX was one of the first cryptocurrency exchanges that offered derivative products based on the price of bitcoin.  At its inception, as Defendant Hayes described it, BitMEX was to serve Wall Street institutional investors "who were going to want the same type of products" they were used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform, including traders from Wall Street.  Therefore, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" by offering "100X leverage" trades.  Since then, its first-mover advantage has paid off: it is consistently among the largest cryptocurrency derivatives traders by volume and has been for years. It now frequently trades over $3 billion worth of transaction in a single day.

166.    In allowing retail customers to leverage their bets at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in derivatives trading — BitMEX positioned itself to benefit consistently, significantly, and predictably from the combination of attracting overly hopeful investors and small price fluctuations on other exchanges. This structure creates substantial incentives for Defendants to surreptitiously cause such fluctuations.

167.    Implementing its business approach, Defendants deliberately based the index price of their Perpetual Swaps on reference spot exchanges that have limited liquidity and are thus relatively easy to manipulate. BitMEX would then engage in manipulative trading on those reference exchanges to change the price of bitcoin or ether. Even if only temporary, these price

changes would then affect the prices of the Perpetual Swaps offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders.

168.    Automatically liquidating contracts that were out of the money, BitMEX would cover the trader's losses but would also take all of the trader's collateral. By setting the liquidation point higher than necessary to protect against the risk of a loss greater than the trader's collateral, BitMEX consistently profited from these liquidations. BitMEX would place these profits in its insurance fund ("Insurance Fund"), marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral. Despite its name, the Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars.

169.    BitMEX also acted on similar financial incentives by trading against its customers, a secret BitMEX kept as long as it could. BitMEX employed an undisclosed Insider Trading Desk with special privileges and insights that allowed BitMEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As a desk with access to otherwise-hidden information, it was in a perfect position to enhance BitMEX's manipulation.

170.    BitMEX has compounded the effect of these manipulative schemes by routinely



⚠ Order Submission Error.    7:31:01 PM  ✕

Order could not be submitted: The system is currently overloaded. Please try again later.

freezing its servers—which BitMEX blames on technical glitches and limitations—to profit during moments of high volatility. During these freezes, customers are unable to change their positions, but the market continues to operate and BitMEX trades. BitMEX would thus prevent its customers from escaping positions until they fell to a level at which BitMEX could liquidate those positions at a profit to itself.

171.    BitMEX's operations on March 13, 2020, are a recent and good example. During a period in the day with high market volatility and crashing bitcoin prices (from nearly $8,000 to



**BitMEX** ✔
@BitMEXdotcom

Between 02:16 and 02:40 UTC 13 March 2020 we became aware of a hardware issue with our cloud service provider causing BitMEX requests to be delayed. Normal service resumed at 03:00 UTC. As a reminder, latest system updates can be found on our status page status.bitmex.com

1:04 AM · Mar 13, 2020 · Twitter Web App

$4,000 per bitcoin), resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes. As a result of the outage, BitMEX did not dip into its Insurance Fund, but rather liquated $800 million of its customers' highly leveraged positions for its own profit. This server outage, in short, effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products.  It should be noted that BitMEX' three Site Reliability Engineers, responsible for the bitMEX trading platform uptime, are all located in California and the deliberated and fraudulent outage on March 13, 2020 was perpetrated by them from California.  To cover up their fraud, Defendants first concocted a story of a hardware failure that allegedly caused the BitMEX platform outage.

172.    However, Defendants soon realized that all hardware used by BitMEX platform was managed by Amazon EKS and not Defendants themselves and that such a fake excuse would



**BitMEX** ✔
@BitMEXdotcom

We have identified the root cause of two DDoS attacks at 02:16 UTC and 12:56 UTC, 13 March 2020. For a full account of what happened and how we are responding, please refer to our blog: blog.bitmex.com/how-we-are-res...

2:35 AM · Mar 17, 2020 · Twitter Web App

clearly not hold up if Amazon is asked to investigate the alleged hardware issue. Therefore, Defendants quickly changed their story and invented a fake distributed denial-of-service attack (DDoS attack) as an excuse for deliberately shutting down their own trading platform to avoid severe financial losses to themselves.

173. Defendants and each of them have thus manipulated the price of bitcoin and ether, harming Plaintiffs and other traders who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25 (2018).

174. BitMEX's founder and CEO, Defendant Hayes, is cryptocurrency's P.T. Barnum. Describing trading on cryptocurrency as "the entertainment business," he has embraced a role as showman and promoter for the "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market in a way that is profitable for BitMEX.

175. Defendant Hayes repeatedly flaunts his wealth like this to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other cryptocurrencies. The implication of these types of promotion is clear: you too could live like this, if you trade on my platform.

176. For example, when promoting BitMEX at a large conference in New York, Hayes flaunted his arrival in an exotic Lamborghini car.

177. The BitMEX platform also has casino features built in. It promotes "winners" with a leaderboard of successful traders, just like casinos showcase their successful players. All these features are designed to serve only one purpose - entice more gamblers to place even riskier bets.

178. BitMEX also runs promotions for its products to promote gambling, providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract gets the third prize."

179. These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior.

180.    Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

181.    In 2018, the financial regulator for the province of Quebec, Canada, ordered BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

182.    In July 2019, according to reports, the CFTC opened an investigation to determine whether the exchange is targeting and allowing United States traders to use the platform, after numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States - indeed one New York journalist has detailed his use of BitMEX.

183.    Most recently, on March 3, 2020, the United Kingdom's Financial Conduct Authority (FCA) issued a notice that BitMEX "is not authorised by us and is targeting people in the UK. Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

184.    BitMEX's flouting of financial regulators is consistent with the attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin.

## BITMEX TRADES AGAINST ITS CUSTOMERS USING SENSITIVE INSIDER INFORMATION FROM EXCHANGE AND STRATEGIC SERVER FREEZES

185.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

186.    BitMEX is not the only entity that offers bitcoin or ether swaps. BitMEX, however, deliberately structures its products and operations with features more akin to a casino, focusing on products that expose its customers to greater volatility and an increased risk of loss.

187.    In order to understand how BitMEX's products were designed to expose customers to risk and ultimately to be subject to manipulation, it is helpful to consider one of BitMEX's earliest and still most popular product: the XBTUSD Perpetual Contract, which BitMEX

describes as "the most traded cryptocurrency product of all time," as over two trillion have been sold. This product, with features that resemble a swap, allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar. If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars— effectively a short sale on the price of bitcoin.

188.    To determine the "price" of a given crypto-asset for the calculation of the funding rate for a perpetual contract based on it, BitMEX looks to other exchanges that allow customers to trade that crypto-asset directly. BitMEX employs an automated process that collects and weighs prices from these other exchanges to determine the BitMEX price. During most of the Relevant Period, BitMEX used a very small number of reference exchanges, most of which are located in San Francisco, California, making the BitMEX prices more volatile and more susceptible to manipulation.

189.    BitMEX allows customers to buy or sell these contracts using a number of different order types. In addition to market orders that are executed immediately, BitMEX also offers Limit Orders, Stop Orders, and Take Profit orders, all of which respond to specific pricing conditions set by the user; these orders either come into existence or are removed from the order book when a specific pricing condition is met.

190.    BitMEX also allows all three of these order types to be "Hidden," meaning that they will not be visible to other users. Normal market participants cannot identify these contracts by looking at the list of open orders, but hidden orders will trigger when their conditions are met. These orders are useful to customers who do not want to signal their trading intentions to the market as a whole. For example, if a trader possesses a large number of XBTUSD contracts that they want to sell when the price reaches $1,000, public knowledge of the anticipated sale might decrease prices; by keeping this trade hidden, the trader avoids this undesirable effect.

191.    BitMEX goes even further to allow its traders to hide information by allowing "iceberg orders", which are mostly hidden orders that are partially visible. Thus, a trader can

issue an order that will buy 100 XBTUSD contracts with a limit price of 100, but tell the market that he will only purchase 10 such contracts. This option is appealing for traders who wish to create the illusion of activity in the event that other traders are monitoring trades as they are completed. For example, if there is a hidden order to buy up to 100 XBTUSD at $100 and 10 XBTUSD are available at that price, the XBTUSD will be purchased even though no buy order at that price was public. A very savvy trader could realize that this order had been hidden and deduce the likely presence of additional hidden volume. An iceberg order in this situation would mask the volume of the outstanding order. This masking is thus beneficial to the trader purchasing an order because it prevents other traders from seeing the full extent of orders in the market. BitMEX customers thus navigate a highly complicated market in which only a portion of the market activity is publicly visible.

192.     To draw customers with the promise of casino-like returns, BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post. Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses: if the price of the XBTUSD goes up, a buyer who is 100X leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs at an apparently low cost.

193.     One way in which BitMEX benefits from these highly leveraged trades is that its commissions are calculated based on the leveraged position, not on the underlying collateral. Thus, where BitMEX advertises a commission of 0.075 percent for the XBTUSD Perpetual Contract, that percentage refers to the amount of the unleveraged position. For a 100X leveraged derivative, BitMEX actually charges a commission of 7.5 percent.

194.     BitMEX attempted to make these highly leveraged trades more appealing to its customers by promising to cap their liability. To do so, BitMEX relies on a system that limits losses to the collateral through automatic liquidation. Using a computer program known as a

liquidation engine, BitMEX automatically closes any position with unrealized losses equal to half of the amount of the posted collateral.

195.    BitMEX describes this policy as designed to prevent losses greater than the collateral posted by the trader and to ensure that the winner receives their full profits. But under the guise of capping losses, BitMEX uses this liquidation system to lure traders into a false sense of security. As discussed below, BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but instead takes their money in liquidations.

196.    BitMEX's model encourages its users to experience volatility disproportionate to their collateral. The lynchpin to this is BitMEX's automatic liquidation system. The system is the brainchild of Delo and Dwyer, who designed and conceived it. The automatic liquidation system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

197.    Ostensibly, in order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale. This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is accomplished through the automatic liquidation system.

198.    BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, for highly leveraged trades, it liquidates when the collateral is still worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some losses, the trader receives nothing. Instead, BitMEX pockets that recovery for itself and puts it into its "Insurance Fund."

199.    To use an example derived from information available on BitMEX's website, consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral

while bitcoin and ether are each trading at $4,000. This trader is 100X leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the one bitcoin used as collateral would exactly cover the losses. Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a "maintenance margin," commonly between 0.5 percent and 1 percent. If the margin is 0.5 percent, the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of one half of one percent in the price of bitcoin will result in an automatic liquidation.

200.    If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-ether position to another customer, while covering the gains and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the position as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000.

201.    The profitability of the Insurance Fund is thus tied to the liquidity of the market— as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

202.    Although BitMEX calls this fund an "Insurance Fund," BitMEX has not recognized any legal obligation to maintain any particular amount in reserve or to use the reserve for only specified purposes. At any time, BitMEX can empty some or all of the Insurance Fund for any purpose it chooses.

203.    The structure of BitMEX's liquidation system means that it almost always profits BitMEX to liquidate a position. For BitMEX to lose, the market has to be so illiquid that a position that is halfway to being so unprofitable that it consumes the posted collateral declines further until it completely consumes the collateral before BitMEX can sell. In the vast majority of cases in which there is sufficient liquidity, BitMEX will profit when it liquidates the position of one of its customers.

204.    Accordingly, BitMEX's Insurance Fund shows consistent and substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough, providing an enormous source of profit beyond the commissions it charges. In fact, the Insurance Fund grows in value nearly every day: over the 100 days preceding January 25, 2021, it began only 15 of them with a balance less than it began on the day before. In fact, as of March 13, 2021 the Insurance Fund contained 37,400 bitcoin, representing approximately 0.2 percent of the total bitcoin in circulation. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired), the portion of the Insurance Fund for that contract type is retained by BitMEX as profit.

205.    This relationship has been established through quantitative expert analysis. By comparing the number of recent liquidated positions to the growth of BitMEX's Insurance Fund, this analysis has concluded that, on average during the period between July 26, 2019, and January 25, 2018, the growth of the Insurance Fund increased by 0.78 bitcoin for every position that was liquidated in a given day, with BitMEX liquidating an average of 311 positions a day—equating to a daily increase in the Insurance Fund of over $11,300,000, at bitcoin's current price.

206.    Because BitMEX liquidates positions when they are sufficiently out of the money, even if for only a very short period, it profits from high volatility. In a highly volatile market, more traders will hit their liquidation points and be liquidated. If a market vacillates sufficiently, both long and short traders may be liquidated in a day that saw relatively little ultimate movement

(i.e., a day with significant intra-day price movement). Because of the high leverage used by BitMEX traders, even transitory swings of one percent in each direction can cause liquidations. This extreme sensitivity to volatility makes the BitMEX exchange an attractive target for manipulation by its corporate insiders who can profit from liquidations through its Insurance Fund.

207.     The relationship between volatility and liquidations has become evident through an expert statistical analysis of liquidations and the volatility of the popular XBTUSD Perpetual Contract. This analysis has shown that liquidations follow volatility almost in lockstep; this result is significant to a 95 percent confidence level.

208.     The correlation between volatility and liquidation volume shows a high correlation coefficient of 0.84 from July 2019 to January 2021, based on available data. The result is statistically significant to a 95 percent confidence level.

209.     Because liquidations are more common during periods of high volatility and because BitMEX profits from the majority of its liquidations, we would expect to see the Insurance Fund grow as volatility increases. Sure enough, expert analysis has revealed that this relationship holds. During periods of high volatility, the insurance fund grew more than 44 percent faster than it did generally, and more than twice as fast than it grew in periods of low volatility. A true "insurance fund," by contrast, if it was serving a legitimate insurance function, would generally decline in periods of higher volatility, not increase. The fact that the BitMEX Insurance Fund systematically and predictably increases in periods of higher volatility provides statistical support that it is a fraudulent device designed to enrich the owners of BitMEX at the expense of its customers.

210.     The growth of the Insurance Fund cannot be justified by the increased need for insurance based on increased trading volume. As an expert quantitative analysis has revealed, the Insurance Fund has grown much faster than the trading volume on BitMEX. As it was observed, that while BitMEX's trading volume has increased, the Insurance Fund has grown far more rapidly. The ratio between the Insurance Fund and the value of the positions increased sharply

since 2017. In 2017, every bitcoin in the Insurance Fund supported 240 bitcoin of daily trading volume. By 2020, the bloated Insurance Fund had one bitcoin for every 7 bitcoin of daily trading volume.

211.    BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. The structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to liquidate.

212.    BitMEX routinely disadvantages its customers through server "lock-outs" during which customers cannot access their accounts. Defendants claim that technical issues in BitMEX's server, not found in other exchanges, locked out users at crucial times. These lock-outs, however, enabled BitMEX to profit through its Insurance Fund by liquidating customer accounts that could not trade.

213.    BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes. This process, although sometimes completed quickly, is the supposed cause of BitMEX's servers freezing on average between two and three times a day. During these server freezes, customers are locked out of their accounts and lose the ability to trade until the servers unfreeze.

214.    When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the derivative contracts are not frozen — trades and liquidations occur even while customers are locked out of their accounts. BitMEX continues processing certain previously placed transactions while refusing to accept transactions from others. This means that a trader can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they sought to transact is no longer available. Traders can also find that an offer they had made before the freeze but sought to retract during it has since been accepted.

215.     BitMEX's server freezes also enable automatic liquidations, which are profitable to BitMEX, because these liquidations continue to occur during the freeze. A customer who has a 100X leveraged position on 1 bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be expected to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the remaining capital of $2,500. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of her capital when the price hits $3,980. Such a scenario profits BitMEX, which pockets the capital.

216.     BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from processing any transactions during these freezes. Instead, BitMEX has deliberately built a system that profits from the liquidations that predictably occur while its customers are unable to escape unfavorable positions.

217.     BitMEX's server freezes and lock-outs are not a result of unavoidable technical limitations. Similar server issues are not present in other exchanges that regularly handle far more transactions per second.

218.     While BitMEX has not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200 million trades per week, purportedly taxing its system and leading to server shutdowns. This equates to an average load of around 330 trades a second. BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze. These exchanges have not experienced the pattern of repeated and sustained freezes that have become commonplace on BitMEX, and BitMEX has provided no explanation for why its servers are supposedly so inadequate.

219.     The server freezes on BitMEX are demonstrably not caused by server load, as shown by a statistical analysis of transaction volume. For example, on May 12, 2019, BitMEX

announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

220.    Expert analysis shows that the average number of trades surrounding server freezes falls below the top 23rd percentile of total trading volume relative to BitMEX's historical averages; in other words, the average volume before a freeze would not be a notably busy day for BitMEX. Additionally, fewer than 10 percent of the server outages reported by BitMEX occurred during periods when BitMEX trading volume was in the top 5 percentile of BitMEX trading volumes. The analysis of freezes from March 1, 2018, to January 26, 2021, conclusively shows that most of BitMEX's freezes do not come at periods of high transaction volume.

221.    BitMEX's servers are thus not freezing because of high volume, which would be the case if the freezes were a consequence of deficient servers. While promoting its trading platform as best-in-class, BitMEX has recklessly or intentionally failed to disclose the susceptibility of its platform to these freezes and their predictable, negative effects on customers— and beneficial effect for BitMEX.

222.    In early 2019 BitMEX finally disclosed to customers, and only vaguely, that undefined system overloads might disrupt access to the trading platform. But even this disclosure failed to disclose the frequency of system overloads, their relationship to volatility, their selective effect on only certain kinds of transactions, or the likelihood that they would harm customers to BitMEX's benefit.

223.    By failing to disclose the risk of these freezes during high volatility, and the likelihood of their negative impact on customers, while simultaneously touting its ever-increasing volume and supposed technical sophistication, BitMEX deceived customers into trading by recklessly making misleading statements of material facts and omitting to state material facts necessary to make BitMEX's statements not misleading.

224.    Just as fundamental, with respect to its disclosures since early 2019, BitMEX has at least recklessly claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that it "will use commercially reasonable efforts to avoid downtime of the

Services during anticipated peak hours." As to any system overloads or freezes that BitMEX may not have initiated deliberately, BitMEX failed to use reasonable or commercially reasonable efforts to avoid them, and knowingly or recklessly claimed otherwise, further deceiving customers into trading on the platform.

225.    In all of these respects regarding its server freezes, and in light of BitMEX's access to the occurrences on its own servers, BitMEX has either deliberately or recklessly employed an artifice to defraud its customers.

226.    At the core of BitMEX's operation, but hidden from regular customers, was BitMEX's Insider Trading Desk. Former BitMEX employees have revealed[7] that this Insider Trading Desk, staffed by BitMEX employees, exploited unique functionality that it was granted to profit in its trades against BitMEX customers. This unique and hidden functionality afforded to the Insider Trading Desk meant that customers promised a fair playing field were in fact being manipulated by BitMEX itself. BitMEX used these powers to manipulate the prices of its bitcoin and ether derivatives.

227.    As former BitMEX employees have revealed, between 2015 and 2016, Hayes approached Liquidbit, an over-the-counter crypto trading platform, about the possibility of building into the BitMEX platform a hidden trading desk that would be able to utilize functionality not available to other customers. Ultimately, before 2018, BitMEX reengineered BitMEX's foundational software to empower the operation of what it internally dubbed "Risk Management" or the "Internal Trading Desk."

228.    The Insider Trading Desk was managed by Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated continuously

---

[7] These and other revelations by former employees of BitMEX came to light after the filing of the First Amended Compliant in this action on October 23, 2020, which explains any discrepancies in the allegations relating to market manipulation by Defendants and the operation of the Insider Trading Desk. Defendants have a vastly superior knowledge of the facts relevant to market manipulation and the operation of the Insider Trading Desk and are in exclusive possession of the relevant evidence. Therefore, Plaintiffs' amendments do not violate sham pleading rules.

throughout the Relevant Period to manipulate BitMEX and cause artificial prices for BitMEX derivatives, include derivatives of bitcoin and ether.

229.    The traders at the Insider Trading Desk had a number of advantages that they exploited to profit BitMEX:

230.    *First*, internal traders could view and exploit hidden information from other traders. As discussed above, BitMEX offered customers a number of different order types that purported to be "hidden." But these offers were not in fact hidden from BitMEX and its insiders. The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of an account, including any hidden orders and the liquidation points for all orders. They were also provided with automated systems, built by BitMEX to enable their manipulation, that told them how the market was likely to move by assessing the impact of the hidden orders when they triggered.

231.    The ability to see hidden orders was combined with the ability to see another crucial piece of hidden information: the leverage amounts and corresponding liquidation prices for customers' open positions. This information made it easy to profitably manipulate the market. If, for example, the Insider Trading Desk were to see that a number of short bitcoin derivatives are near their liquidation point, it could enter a large buy order. This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these futures. The liquidation would create a buy order for the liquidated contract, further increasing the price. Once this chain of liquidations had caused the price to rise far beyond the price at which the Insider Trading Desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are automatic, an insider desk could execute this trade very quickly and with a high confidence of success. The traders at the Insider Trading Desk had tools that showed them what liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction.

232.    The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the

impact of hidden trade orders and liquidation prices, BitMEX insiders could determine when placing a large order would cause the hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations. These liquidations would very likely be profitable to BitMEX—because the price shift would be driven by BitMEX's own manipulative trade rather than legitimate market forces, it was likely to quickly reverse in time for BitMEX to sell at a profit.

233.    But access to hidden information was not the only advantage possessed by BitMEX insiders.

234.    *Second*, the Insider Trading Desk was able to trade during server freezes and customer lock-outs. Even though BitMEX told its customers that these freezes were a consequence of technical limitations, these same limitations did not apply to BitMEX's internal traders. While its customers were unable to enter or withdraw orders, the Insider Trading Desk could trade freely.

235.    Even standing alone, this ability to trade during server freezes would represent a massive, unfair, and undisclosed trading advantage. While normal traders were unable to withdraw their offers and orders, BitMEX traders would be able to exploit those positions. BitMEX traders could also look to prices on non-frozen exchanges, knowing that BitMEX prices would converge on market prices when the freeze ended.

236.    For example, imagine that the servers freeze when the price of Bitcoin is $100. During the freeze, the price of Bitcoin rises to $105. The Insider Trading Desk, able to trade during the freeze, can purchase XBTUSD contracts that are valued at $100 from customers who cannot withdraw those offers in light of market movements. When the servers unfreeze, BitMEX would be holding XBTUSD contracts worth $105 to the detriment of the customers trapped in unfavorable positions during the freeze.

237.    These two advantages enjoyed by the Insider Trading Desk—access to hidden information and the ability to trade during freezes—compounded each other to allow its operators to dominate their platform, and former BitMEX employees have revealed that BitMEX exploited

these advantages to profit itself at its customers' expense. During a freeze, BitMEX insiders would analyze the hidden positions of normal customers in order to determine which moves would cause profitable liquidations. These insiders could perform these calculations with a high degree of precision because other market participants were frozen; the only transactions during the freeze would result from the BitMEX insiders themselves and the triggered orders that they had analyzed. Competing against transparent customer accounts frozen in place, BitMEX was able to profit at the expense of its customers.

238.    BitMEX was not able to conceal its Insider Trading Desk forever. On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users," Ex. 14.  BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers." This was false.

239.    Just two days later, on April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform," Ex. 17.  BitMEX thus revealed that it had historically maintained a for-profit desk trading on its own platform, which was trading against its own customers. What it did not reveal, however, was that the Insider Trading Desk enjoyed massive advantages over regular customers and exploited those advantages to profit at their expense, including by inducing liquidations.

240.    BitMEX also revealed that its trading desk had the monopoly on market making for its bitcoin options product. BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management."

241.    Almost immediately following this announcement, both BitMEX's General Counsel and outside counsel left the company. The General Counsel announced his resignation the following day, acknowledging to other BitMEX employees that he was doing so specifically because he was troubled by BitMEX's secret trades against its own customers. Within a month, BitMEX's outside counsel, Sullivan & Cromwell, had terminated its relationship as well.

242.    Even after this public revelation, BitMEX has continued to operate the Insider Trading Desk that exploited undisclosed advantages to profit at the expense of customers. In order to avoid detection, the employees of the Insider Trading Desk use anonymized email accounts through Google's "gmail" platform to create accounts on the BitMEX platform and undertake the same secret anti- customer trading.

243.    The Insider Trading Desk is not even the only insider trading on BitMEX. Hayes himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes' contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct: "The digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

244.    In addition to placing strategic trades on its own platform using the Insider Trading Desk in order to liquidate its own customers, BitMEX further manipulates the prices of its derivatives through strategic and unlawful trading of the crypto-commodities underlying its derivatives on reference exchanges.

245.    During much of the Relevant Period, BitMEX deliberately used a relatively limited number of exchanges to price bitcoin and ether. For part of 2019, for example, BitMEX determined the price of ether by referring to just three reference spot exchanges: Coinbase Pro, Bitstamp, and Kraken.

246.    Relying on only a small number of exchanges provided BitMEX with an additional method of manipulating the prices of the derivatives it sold its customers. By making a series of orders to push the price up or down on a reference exchange, Defendants could create short-lived price fluctuations on BitMEX. Defendants actively manipulated prices on reference exchanges in order to enable its Insider Trading Desk to profit by liquidating customer accounts.

247.    In order to facilitate this manipulation, BitMEX would transfer onto other exchanges bitcoins it had obtained through profitable trades on its own platform. BitMEX would

then use those funds to buy or sell the referenced crypto-commodities on its reference exchanges. These purchases would then cause the price of the derivative on BitMEX to move towards the manipulated price on the reference exchange. This effect would be short-lived, however, as market forces would correct the price on the reference exchange. Defendants could thus cause short spikes or dips in the prices of BitMEX derivatives by manipulating reference exchanges.

248.    BitMEX was uniquely positioned to benefit from these short fluctuations for at least two reasons. First, as discussed above and revealed by former BitMEX employees, BitMEX has access to all of the hidden information of its customers and trades against them on BitMEX's platform. BitMEX can therefore calculate which market movements would be profitable, either by making BitMEX money on its internal trades or by liquidating customer accounts at a price that would be profitable for BitMEX. Because BitMEX had unique tools that allowed it to determine which market movements would profit BitMEX by liquidating its customers' positions or advancing its trades against its customers, it alone knew exactly how to move its reference exchanges to maximize its profitability.

249.    Second, BitMEX's liquidation system enables it to profit from manipulation that would not be profitable to normal traders. A normal trader will struggle to profit from a series of purchases that temporarily increase the price of a crypto-commodity because, in selling the purchased asset to take advantage of the higher prices, the seller creates downward pricing pressure that deflates the prices. But BitMEX's liquidation system means that it can benefit from short-lived fluctuations. If BitMEX's Insider Trading Desk's undisclosed access into consumer accounts indicated that there would be a profitable set of liquidations if the price of Bitcoin rose to $100 when it was currently at $95, then BitMEX could transfer funds to a reference exchange and pump the price of Bitcoin on that exchange. Even if BitMEX did not make money on the pump and dump itself, it would profit from the liquidations triggered by the price of Bitcoin briefly crossing that $100 threshold. Because BitMEX liquidates positions as soon as they cross a liquidation threshold, even short price swings can be profitable for BitMEX and harmful for its customers.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)   - 93 -   Kanyshev et al. v. HDR et al.   Case No. CGC-20-584483

250.    Defendants' manipulation can be detected through analysis of abnormal trading patterns on Bitstamp, one of the reference exchanges.  It was discovered that certain suspicious trading patterns were aligned with abnormal trading on BitMEX itself. Moreover, these instances occurred on days when BitMEX itself was particularly positioned to profit from them because Kraken, another reference exchange, was down for maintenance and unavailable for pricing derivatives on BitMEX.

251.    For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering. This flash crash followed a 15-minute period of particularly abnormal trading activity on Bitstamp and BitMEX. From approximately 2:55 to 3:10 AM (UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp. In contrast, during the previous day, only 83 bitcoin were sold every 15 minutes on average.

252.    This unusually large volume of sell orders caused the price of bitcoin on Bitstamp to fall precipitously from $7,730 to $6,178—a decline of 20 percent over the course of only 15 minutes. At 3:10 AM, the volume of sale orders suddenly normalized, leading to an abrupt reversal in the price of bitcoin, in which it recovered to $7,350, an increase of 19 percent, during the following 2 to 15 minutes.  This unusual trading activity on Bitstamp had an immediate and significant impact on the price of the XBTUSD Perpetual Contract on BitMEX, given that BitMEX uses Bitstamp as one of only three reference exchanges for the price of that contract.

253.    The short volume of the BitMEX XBTUSD Perpetual Contract spiked during this period, in a pattern highly similar to that observed with the Bitstamp sales volume. The volume of short sales on BitMEX began at about the same time as the aggressive sales on Bitstamp (2:55 AM), although the short volume on BitMEX was larger than on Bitstamp, and continued at that high level up until 3:10 AM. On BitMEX, however, there was an abrupt halt to the shorting activity at 3:10:49 AM, before resuming at a significantly lower level at 3:12:33 AM, as the price of bitcoin and the XBTUSD Perpetual Contract recovered. During this 104-second period with no shorting activity on BitMEX, the price of bitcoin on Bitstamp immediately recovered to above $7,000, before temporarily falling back to $6,699, when a lower volume of shorting activity

resumed on BitMEX. After that time, the price of bitcoin and the XBTUSD Perpetual Contract quickly recovered again to approximately $7,350 over the following 8 to 10 minutes. This pattern demonstrates a high degree of correlation, and likely coordination, between the shorting activity on BitMEX and Bitstamp.

254.    The relative timing of the short sales on BitMEX and the sell orders on Bitstamp also supports the conclusion that the trading likely involved cross-market manipulation. During this time period, a large increase in short positions on BitMEX was often followed by a large sell volume of Bitcoin on Bitstamp.

255.    The short position on BitMEX spiked at 3:08:13 AM; three seconds later, 12.5 bitcoin were sold on Bitstamp. Large volumes of BitMEX short sales also occurred at 03:08:26, 03:08:36, 03:08:47, 03:08:51, and 3:08:58. All of these sales were followed by large sell volumes of bitcoin on Bitstamp within a few seconds. This would be consistent with a trader placing short orders on BitMEX in order to profit from a drop in prices from their subsequent sales of bitcoin on Bitstamp. Within this single minute, more than 100 bitcoin (worth more than $600,000 at the time) were sold on Bitstamp, causing the price of bitcoin to drop by 2 percent.

256.    Because this manipulation led to high but short-lived volatility, most possible manipulators could not have benefitted. A regular trader, even assuming they had the resources to engineer such manipulation, would have struggled to benefit from the dip before it reversed itself.

257.    Instead, they would likely have lost money, having sold at a below-market price and unable to enter new orders in time to capitalize on the dip before it recovered.

258.    BitMEX, however, profited substantially from these manipulated market movements. The high volatility in the price of the XBTUSD Perpetual Contract on BitMEX resulting from this unusual trading behavior caused an unusually large volume of customers' contract liquidations on BitMEX.  As a consequence, the Insurance Fund increased by 750 bitcoins, with a value (at the time) of approximately $5.4 million. In comparison, the average daily increase in the Insurance Fund was 140 bitcoins during the week before the event, and 49 bitcoins on a daily average basis during the week after.

259.    BitMEX, through its Insurance Fund, was therefore uniquely positioned to earn large profits from the high volatility of bitcoin prices on Bitstamp that occurred over this 30-minute period on May 17, 2019, in addition to any trading profits that either BitMEX or its principals may have earned as a direct result of the price manipulation on the two exchanges.

260.    On other days during which when Kraken was undergoing scheduled maintenance, similarly suspicious trading activity occurred on Bitstamp and BitMEX. For example, on July 14, 2019, Kraken was down for maintenance—thus increasing the weight of Bitstamp on BitMEX's derivatives products. On that day, the price of ether dropped dramatically due to the sell order on Bitstamp by a single user, causing $164 million worth of liquidations on BitMEX. Again, only BitMEX was in a position to profit from this manipulation.

261.    Indeed, BitMEX has consistently profited from suspicious Bitstamp trading that triggered volatility and liquidations on BitMEX. For example, on September 24, 2019, the price of bitcoin on Bitstamp fell 14 percent, from $9,500 to $7,998, between approximately 6:00 PM and 7:45 PM. The fall was caused by the sudden appearance of an unusually large volume of sell orders on Bitstamp, including unusually large individual sale orders. For example, in a two second period at 6:34 PM, 88 bitcoin, worth more than $800,000, were sold on Bitstamp. This sale was followed 10 minutes later by an unusually large volume of short sales on BitMEX. After falling to a low of $7,998 at approximately 7:45 PM, the price of bitcoin rapidly recovered to $8,500 by 8:45 PM, and to $8,600 around 9:30 PM. The resulting volatility of bitcoin prices caused the BitMEX Insurance Fund to increase by 22.5 bitcoin, worth $193,000, on that day.

262.    Similarly, on March 12–13, 2020, the price of bitcoin and the XBTUSD Perpetual Contract on BitMEX also exhibited an unusually high level of volatility. From 10 PM on March 12 to 2 AM on March 13, 2020, the price of bitcoin on Bitstamp dropped 38 percent from $5,800 to $3,600. At 10:27:46 PM, 401 bitcoin, worth $2.3 million, were sold within one second on Bitstamp. This sale was accompanied by an unusually large volume of short sales on BitMEX during the following hour. The XBTUSD Perpetual Contract price on BitMEX reached a low of $3,600 at 2:15:25 AM on March 13, 2020. The BitMEX trading system then experienced a

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

THIRD AM. COMPLAINT FOR FRAUD (DEMAND FOR JURY TRIAL)    - 96 -    KANYSHEV ET AL. V. HDR ET AL.    CASE NO. CGC-20-584483

complete outage between 2:33 AM and 3:00 AM, during which time the price of bitcoin rapidly increased again on Bitstamp. BitMEX liquidated an estimated $5.8 billion worth of positions during a 2.5-hour window containing this outage. By approximately 10 AM on March 13, 2020, the price of bitcoin had recovered to approximately $5,800. As a result of this volatility, and the extended outage of the BitMEX trading system during much of this volatility, the BitMEX Insurance Fund increased by over 2,600 bitcoin, worth $15 million.

263.    These instances of manipulation were uniquely structured to profit BitMEX at the expense of its customers. BitMEX knew exactly what changes would cause the most liquidations, and its liquidation system meant that it profited from even very brief periods of high volatility it generated.

264.    The timing of server freezes on BitMEX is not random. The most important and profitable time for BitMEX to freeze, as shown, is during a period of high volatility; freezes during high volatility periods allow BitMEX insiders to liquidate more customers through strategic trading. Because volatility allows it to profit from liquidations, BitMEX is incentivized to freeze its servers during periods of high volatility, allowing BitMEX to liquidate positions while customers are locked out. The evidence compels the conclusion that BitMEX has consistently acted on those incentives.

265.    In particular, expert statistical analysis conducted of the freeze periods reported on BitMEX's website has revealed that the probability of outages is 876 percent higher when the volatility of Bitcoin prices is in the top one percentile. The result is statistically significant at a 95 percent confidence level.

266.    Expert analysis has shown that the server freezes most often occurred during the highest periods of volatility when BitMEX could effectively liquidate positions. That the timing of its server freezes maximizes BitMEX profits is reflected in a quantitative analysis of the relationship between server freezes and the growth of the Insurance Fund. That quantitative analysis revealed that, over a three-year period, the Insurance Fund grew over three times as fast on days with a server outage than in the surrounding days without a server outage.

267.    BitMEX also freezes its servers at the expense of its customers to protect itself from losses. This sort of defensive freeze was demonstrated on March 12, 2020. On that day, the price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes, and continued to fall from there, ultimately dropping below $4,000. As the price plummeted, BitMEX automatically liquidated over $700 million of its customers' positions.

268.    While liquidations are generally profitable for BitMEX, rapid and sustained movement in one direction threatens major losses for the Insurance Fund. If the price of Bitcoin were to continue to fall, bid-ask spread would become so great that BitMEX could not sell the liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund. This sort of event is exactly why BitMEX claims to maintain the Insurance Fund—BitMEX is supposed to draw from the fund to cover its losses under these circumstances.

269.    As prices fell, however, BitMEX did not immediately sell the positions it obtained through liquidation orders at a loss to its Insurance Fund. Instead, it kept its newly acquired positions open, allowing it to profit from liquidations if prices rose, while also creating a new risk that further declines would exacerbate the losses. This decision created economic liability for BitMEX unless the fall in bitcoin prices stopped and began to recover. This is when BitMEX's servers froze, supposedly due to technical limitations rather than BitMEX's economic interests.

270.    The servers were only restored after Bitcoin's price had stabilized, preventing the need for BitMEX to meaningfully deplete its Insurance Fund. Over the next day, BitMEX gradually resold the positions it had acquired through liquidation and the Insurance Fund had hit a new high. But this recovery was not passed along to the traders who had hit their margins during the crash, including those who were unable to exit their positions because of BitMEX's supposedly frozen servers; they received nothing to compensate them for their $700 million in liquidated assets. In short, a perfectly timed server outage substantially mitigated a potential major loss for BitMEX's Insurance Fund and helped it hit a new high the next day, while disadvantaging its own customers.

271.    BitMEX first blamed the server shutdown on "a hardware issue with our cloud service provider," before Reed later claimed, with no support, that the server failure was the result of an attack by a "botnet." Mr. Reed promised to provide further explanation "in the coming days" but has yet to disclose any additional information nearly a year later.

272.    This server freeze, like the others designed and intended to profit BitMEX by allowing it to liquidate customers locked in unfavorable positions, was not random or a technical glitch. It was a deliberate decision designed to protect BitMEX's Insurance Fund at the expense of its customers.

273.    To cover up extensive evidence of wrongdoing committed by the BitMEX's Insider Trading Desk, instead of using their company's "official" email addresses under the @bitmex.com email domain, Defendants used numerous anonymous "burner" email addresses hosted by public email service providers, such as @gmail.com addresses hosted by Google, Inc., to register their own Insider Trading Desk "winner" accounts with BitMEX, in order to prevent the trading histories and associated illegal profits from being traceable back to BitMEX.  Those anonymous BitMEX "winner" accounts used by the BitMEX's own Insider Trading Desk were regularly closed and all associated user identity data and trading history data containing incriminating evidence deleted by Defendants.

274.    Moreover, the BitMEX's Insider Trading Desk used numerous helper accounts registered under the names of individuals, often using fake identification documents, and "burner" email addresses, on the three reference spot exchanges (Kraken, Coinbase and BitStamp) that BitMEX used to calculate its index price for XBTUSD perpetual swap contracts with the purpose of using those helper accounts to manipulate the .BXBT index price, which controls the price of the XBTUSD perpetual swap contracts on BitMEX.

## DERIVATIVES TRADED BY PLAINTIFFS

275.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

276.    On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD perpetual swap" ("XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract").  BitMEX claims its XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract is "the most traded cryptocurrency product of all time."

277.    Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5 trillion contracts traded on its platform. Most of that volume—more than two trillion contracts— has been in the XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract.

278.    During Relevant Period, all Plaintiffs directly traded (bought, sold and owned) the Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD on U.S. based BitMEX exchange.  Bitcoin/U.S. Dollar Swap Contract with ticker symbol XBTUSD traded by



Plaintiffs on BitMEX is priced based on the underlying price is the XBT/USD exchange rate as recorded in the .BXBT Index, which Defendants manipulated using helper accounts on U.S. based reference exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this Complaint. Both the underlying .BXBT index and the swap contract XBTUSD are quoted in USD.  Margin and PNL are denominated in Bitcoin.  The XBTUSD Bitcoin/U.S. Dollar Swap Contract traded on Kraken is priced based on bitcoin spot price on that exchange, which was manipulated by Defendants by placing large market orders from helper accounts in that exchange.  Both of the above derivative contracts meet the definition of a "swap" under CEA, 7 U.S.C. § 1a(47)(a)(IV),

which defines "Swap" as:  "(iv) … an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap."  For example, TradingView, with 15 million monthly active site users and over 40,000 publishers, brokerages, and fintechs utilizing its investing tools, is the industry standard used by about every trader out there.  It lists both aforesaid XBTUSD contracts from BitMEX and Kraken as "Swaps" (https://www.tradingview.com/symbols/XBTUSD/).

279.    Therefore, the traded Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD is a swap under CEA 7 U.S.C. § 1a(47)(a)(iv) (agreement, contract, or transaction that is, or in the future becomes, commonly <u>known</u> to the trade as a swap).

280.    Defendant HDR itself specifically admitted that its XBTUSD contract is known to the trade as a "swap," thus meeting definition under CEA:



281.    In addition, Plaintiffs traded Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD on BitMEX, which is also a "swap" under CEA, 7 U.S.C. § 1a(47)(a)(iv). Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD traded by Plaintiffs uses the .BETH index price, which Defendants manipulated using helper accounts on U.S. based reference exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this Complaint.

282.    Moreover, the aforesaid XBTUSD contract that Plaintiffs traded on BitMEX is also "swap" pursuant to 7 U.S.C. § 1a(47)(a)(iii)(XXII), which defines a "swap" as "a commodity

swap." Because bitcoin is commodity, both XBTUSD contracts are "commodity swaps" under 7 U.S.C. § 1a(47)(a)(iii)(XXII).

283.    Yet, furthermore, according to CFTC Complaint, ¶ 125, "products that have traded on BitMEX, including "perpetual swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47)." Therefore, Plaintiffs can pursue their claims under CEA, 7 USC § 25(a)(1)(D), which specifically covers "swaps."

284.    Plaintiffs were enticed to trade on BitMEX through BitMEX's own advertisements specifically directed at Plaintiffs and traders like Plaintiffs.

## THE RAKETEERING ENTERPRISE

285.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

286.    Each of the Defendants HDR, ABS, Hayes as well as accomplices Delo and Reed are respective persons or entities capable of holding a legal or beneficial interest in property.

287.    From at least January 2017 and until present, Defendants HDR, ABS, Unknown Exchange, Grape Park, Mark Sweep, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed have been a union or group of entities and individuals associated in fact collectively constituting a continuing "enterprise" ("Enterprise") within the meaning of RICO as defined in 18 U.S.C. § 1961. Since at least January of 2017, each of HDR, ABS, Unknown Exchange, Grape Park, Mark Sweep, Hayes as well as accomplices Delo and Reed, Agata Reed, Barbara Reed and Trace Reed has been a person separate and distinct from the Enterprise itself, while, at the same time, being a member of the Enterprise. The purposes of the Enterprise included, among others: (1) maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices; (2) concealing trading gains obtained through unlawful practices from regulatory and tax authorities; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators; (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny

by cryptocurrency exchanges and law enforcement; and concealing or disguising the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activities by investing said proceeds into United States real estate using nominee entities.

288.    The activity of the Enterprise and the predicate acts of racketeering alleged hereinbelow affect interstate or foreign commerce.  Specifically, the Enterprise directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce, including, without limitation, cryptocurrency derivatives trading services.

289.    At various times during the Relevant Period each of the Defendants HDR, ABS, Hayes as well as accomplices Delo and Reed was employed in or associated with the Enterprise as alleged hereinabove.

### ROLES OF DEFENDANTS IN THE ENTERPRISE

290.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

291.    Plaintiffs are informed and believe and thereon allege that individual Defendant Hayes as well as accomplices Delo and Reed were the masterminds behind the alleged Enterprise and the predicate criminal acts alleged hereinbelow.  Specifically, Plaintiffs are informed and believe and thereon allege that Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators as well as controlling bank accounts and financial flows within the Enterprise.  Plaintiffs are informed and believe and thereon allege that Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based reference spot exchanges Kraken, Coinbase Pro and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis, including during each of the specific Manipulation Times alleged below, and performance of other illegal acts conducted by

the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202. Reed was further responsible, together with each of Agata Reed, Barbara Reed and Trace Reed, for laundering a substantial portion of the tainted bitcoin-denominated proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through the Unknown Exchange and a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activities taking place on the BitMEX platform. Grape Park and Mark Sweep are nominee shell entities that were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.

292.    Plaintiffs are informed and believe and thereon allege that Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within California. Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and for effectuating the market manipulation, including, without limitation, designing and implementing automated software tools used by Insider Trading Desk to manipulate BitMEX cryptoderivative markets and spot markets on three reference exchanges under by BitMEX, plan and orchestrate deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts on reference exchanges to winner accounts on BitMEX and performance of other illegal acts conducted by the Enterprise. Plaintiffs are informed and believe and thereon allege that Defendant HDR was responsible for, among other things, planning the overall operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. Finally, Plaintiffs are informed and

believe and thereon allege that Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.

293.    The individual roles of all Defendants within the Enterprise are summarized in the below table, prepared according to information and belief of Plaintiffs, which belief was formed based on public records, public Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data analysis:

| Person | Role of Person |
|--------|----------------|
| HDR | Defendant HDR is a holding company.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Reed.  Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. |
| ABS | Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within California.  Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from |

| | |
|---|---|
| | helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom software programs and scripts for performing market manipulation and implementing server freezes. |
| Grape Park | Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Reed dominates and controls every aspect of business of Grape Park and funds its operations.  Grape Park is an alter ego of Reed. |
| Mark Sweep | Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Reed dominates and controls every aspect of business of Mark Sweep and funds its operations.  Mark Sweep is an alter ego of Reed. |
| Unknown Exchange | Unknown Exchange was responsible for knowingly, willfully and deliberately laundering a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars. |
| Hayes | Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise.  In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the |

| | |
|---|---|
| | Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Delo | Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.  In addition, Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Reed | Reed was responsible for, among other things, developing automated software |

tools for use by Insider Trading Desk for accessing highly sensitive BitMEX trader information and using this information for manipulating BitMEX markets and markets on the reference exchanges Kraken, Coinbase Pro and BitStamp, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based reference spot exchanges Kraken, Coinbase Pro and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202.  Reed was further responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and his accomplice Delo and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through

| | |
|---|---|
| | unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Agata Reed | Agata Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Massachusetts with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the alleged unlawful activity taking placeon the BitMEX platform. In addition, Agata Reed gave directions to other members and took directions from Reed, occupied a fourth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law |

| | enforcement. |
|---|---|
| Barbara Reed | Barbara Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Barbara Reed gave directions to other members and took directions from Reed, occupied a fifth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Trace Reed | Trace Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Trace Reed gave directions to other members and |

took directions from Reed, occupied a sixth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

294.    Additional and other facts regarding Defendants' roles in the Enterprise are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs accordingly reserve the right to supplement and amend these allegations, if appropriate or necessary, following completion of relevant fact discovery.

## THE RACKETEERING CONSPIRACY AND RACKETEERING ACTIVITY

295.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

296.    Pursuant to 18 U.S.C. § 1961, "racketeering activity" for purposes of RICO means "any act which is indictable under any of the following provisions of title 18, United States Code: … section 1343 (relating to wire fraud) … section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 111 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

derived from specified unlawful activity), … section 1960 (relating to illegal money transmitters), … sections 2314 and 2315 (relating to interstate transportation of stolen property)."

297.    During the Relevant Period, the Defendants, and each of them, solely or together with other individuals, being persons employed by and associated with Enterprise they engaged in, and the activities of which affected interstate and foreign commerce, knowingly and intentionally, conspired to conduct and participate, directly and indirectly, and actually participated in conduct of the Enterprise's affairs through a pattern of racketeering activity, as that terms is defined in 18 U.S.C. § 1961, consisting of multiple acts, which are indictable under 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a) and 18 U.S.C. § 2314.

298.    It was a part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

299.    The purposes of the alleged racketeering conspiracy of the Defendants, and each of them, included the following, among others: (1) maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation; (2) concealing trading gains obtained through unlawful practices from regulatory and tax authorities, including, without limitation, by means of money laundering; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators; (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement; and (6) laundering the bitcoin denominated proceeds of the market manipulation on the BitMEX platform by first converting them into fiat currencies such as United States dollars using Unknown Exchange and then reinvesting the converted fiat currency proceeds into real estate properties in Wisconsin and Massachusetts using nominee entities Grape Park and Mark Sweep (collectively "Purposes").

## OVERT ACTS IN FURTHERANCE OF RAKETEERING CONSPIRACY

300.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

301.    In furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in California and elsewhere: 1) providing traders with extremely high trading leverage (up to 100x); 2) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 3) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 4) developing and executing automated market manipulation software operated by the Insider Trading desk, which used sensitive insider information of BitMEX traders to trade against and liquidate BitMEX traders, including Plaintiffs, 5) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; 6) using automated software tools developed by BitMEX to regularly manipulate price of cryptocurrencies including, without limitation, bitcoin, by executing large market orders from helper accounts on illiquid reference spot exchanges Coinbase Pro, BitStamp and Kraken in order to cause massive liquidations of traders' derivatives positions on BitMEX and capture resulting market manipulation profits using winner accounts on that exchange; 7) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 8) knowingly, willfully and deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314.  For example, a helper account on BitStamp was used on May 17, 2019 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX.  In a similar scheme, a helper account on BitStamp was used by

Defendants' Insider Trading Desk to automatically artificially induce massive liquidations of traders, like Plaintiffs, on Bitmex on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX. Plaintiffs are informed and believe and thereon allege that Defendants use this unlawful scheme on a regular basis using automated market manipulation software developed by BitMEX and operated by its Insider Trading Desk in conjunction with helper accounts operated on United States based reference spot exchanges BitStamp, Kraken and Coinbase Pro. Additionally, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and California. Therefore, these illegal acts for which Plaintiffs seek redress in this Complaint were directly related to Defendants' connections to the United States and California through their commercial website BitMEX.com. Moreover, BitMEX platform is operated from California, which also houses the three site reliability engineers of BitMEX who personally caused the BitMEX servers to freeze during manipulation times.

302.    In addition, in furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed, in California and elsewhere, the acts, among others, as alleged in this Complaint.

303.    Plaintiffs were injured in their property by one or more of the foregoing and other overt acts in furtherance of the alleged racketeering conspiracy. For example, Plaintiffs were financially injured when Defendants effectively transmitted funds, which was perpetrated willfully and deliberately by Defendants through their commercial website BitMEX.com, and with full knowledge of the nature and purpose of the funds involved in the transfer, in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314 between helper and winner accounts by way of using the helper accounts to perpetrate manipulation by pumping or dumping the cryptocurrency market, thereby causing a liquidation cascade affecting

Plaintiffs' accounts, and using the winner accounts to capture the financial benefits of the aforesaid manipulation.  As the result of the actions of the Defendants alleged in this Paragraph, the positions of Plaintiffs were liquidated.

304.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 116, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 117, and almost all vital external service providers to BitMEX, as alleged in Paragraph 99, are located in California, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, California is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in California.

305.    Moreover, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts, which resulted in the injury to Plaintiffs, were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and California.  Therefore, Defendants' illegal acts resulting in injuries to Plaintiffs, for which Plaintiffs seek redress in this Complaint, were directly related to Defendants' connections to the United States and California through their commercial website BitMEX.com.

**DEFENDANTS OPERATED AND CONTINUE TO OPERATE AN UNLICENSED MONEY TRANSMITTING BUSINESS IN VIOLATION OF 18 U.S.C. § 1960(a)**

306.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

307.    Bitcoins and other cryptocurrencies are funds.  *United States v. Murgio*, No. 15-cr-769, 2016 WL 5107128, at *4 (S.D.N.Y. Sep. 19, 2016); *United States v. Budovsky*, No. 15-cr-368, 2015 WL 5602853 (S.D.N.Y. Sep. 23, 2015); *United States v. Faiella*, 39 F. Supp. 3d 544

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 115 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

(S.D.N.Y. 2014).  Therefore, bitcoins are subject to all laws and regulations applicable to fiat currency monetary transactions.

308.    Plaintiffs are informed and believe and thereon allege that during the Relevant Period, Defendants, and each of them, engaged in conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

309.    To use Defendant HDR's unlicensed money transmitting services, one creates an



account by accessing the Defendant HDR's website BitMEX.com.  A user does not need to provide even the most basic identifying information such as date of birth, address, or other identifiers. All that Defendant HDR requires is a name, password, and an email address.

310.    Unlike legitimate payment processors or digital currency exchangers, Defendant HDR does not require its users to validate their identity information by providing official identification documents, given that Defendant HDR does not require an identity at all to open an account and start trading with up to 100x leverage.  For comparison, a legitimate U.S. cryptocurrency exchange Kraken requires email address, full name, date of birth, phone number, and physical address to open the most basic level account.

311.    Thus, a user can create and fund an HDR account with nothing more than an email address, which often has no relationship to the identity of the actual user. Accounts are therefore easily opened anonymously, including by customers in the United States within the Northern District of California.  Using such anonymous account, the user is able to make unlimited deposits, unlimited trades with up to 100x leverage, as well as unlimited withdrawals.  Instead of performing a proper document check before allowing users to open an account on BitMEX, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.

312.    Moreover, high leverage provided by Defendant HDR to all users enables Defendants and all BitMEX users to launder unlimited funds from one account to another using market manipulation as alleged hereinabove.  For example, one helper account may dump a large amount of cryptocurrency on the market using margin, triggering a liquidation cascade and booking a loss, when a separate, second winner account may buy the cryptocurrency at an artificial below market price caused by the liquation cascade.  This way, unlimited amount of funds may be laundered from the first helper account to the second winner account virtually anonymously in violation of 18 U.S.C. § 1956(a), which is a RICO predicate offense.  Plaintiffs are informed and believe and thereon allege that Defendants themselves launder funds and enable BitMEX uses to launder funds in the alleged manner by providing high levels of leverage up to 100x and deliberately failing to conduct KYC upon account creation.  In addition, the knowing, willful and deliberate effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense.  Finally, the willful and deliberate money transmission from the winner account back to the helper account in order to replenish it before next manipulation cycle, with full knowledge of the nature and

purpose of the funds involved in the transfer, also constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense. The same money transmission further constitutes a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and money laundering in violation of 18 U.S.C. § 1956(a), which are also RICO predicate offenses. For example, a helper account on BitStamp was used on May 17, 2020 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX. On July 27, 2020 a BitMEX trader sold $44,000,000 over 22 separate $2,000,0000 orders of XBTUSD Perpetual Swaps on BiMEX to get into a position and then used market orders amounting to some 1,000 bitcoins on Coinbase Pro exchange to artificially move the .BXBT index price in a favorable direction in order to close his large BitMEX position at a significant profit. A similar scheme used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiffs, on Bitmex on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX. Plaintiffs are informed and believe and thereon allege that Defendants use this unlawful scheme on a regular basis utilizing automated market manipulation software tools developed by BitMEX and operated by its Insider Trading Desk in conjunction with helper accounts on United States based reference spot exchanges BitStamp, Kraken and Coinbase Pro and winner accounts on BitMEX.[8]

313.    At all times relevant to this complaint Defendant HDR had no anti-money laundering ("AML") and/or "Know-Your-Customer" ("KYC") processes and policies in place or the existing policies lacked any meaningful enforcement, as evidenced, for example, by apparent accepting the United States - based companies, including CMT Capital Markets Trading, Eastmore Group / Eastmore Management, LLC, Clerkenwell Asset Management LLC, Adaptive Fund I, LP and Galois Capital, Swing Trade Pros, FalconX, Cumberland DRW, Circle Partners,

---

[8] The funds are being transmitted from one exchange to another by way of arbitrage algorithms that buy cryptocurrency on one platform and simultaneously sell on the other, as alleged herein.

Fund3 Capital LP/Fund3 LLC, South Lake Computers, ARK Investment Management LLC, Coincident Capital and Leotank Capital as clients, despite claiming that BitMEX is closed to United States persons.  As alleged hereinabove, Defendant HDR collected and continues to collect virtually no customer data at all.  Nor did Defendant HDR ever register with FinCEN or perform the required AML and KYC functions.

314.    A user can fund a Defendant HDR account in numerous different ways.  One way involves funding a Defendant HDR account with a user's existing digital currency.  A user with existing digital currency, such as bitcoin, could fund an HDR account directly via bitcoin deposits. Defendant HDR users could also use market manipulation to launder funds from one account to another.  Plaintiffs are informed and believe and thereon allege that this served as another conduit for money laundering as it allowed Defendant HDR's customers and Defendants themselves to withdraw funds from their HDR account and transfer them to other HDR users anonymously.

315.    18 U.S.C. § 1960(a) provides: "(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."

316.    Pursuant to 18 U.S.C. § 1960(b)(1), "the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree" and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

317.    18 U.S.C. § 1960(a) makes it a crime to operate an unlicensed money transmitting business. The term money transmitting includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a money transmitting business with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.  Moreover, FinCEN Ruling, FIN-2014-R002, at p. 4 provides:

318.    In addition, should the Company begin to engage as a business in the exchange of virtual currency against currency of legal tender (or even against other convertible virtual currency), the Company would become a money transmitter under FinCEN's regulations. Under such circumstances, the Company would have to register with FinCEN, implement an effective, risk-based anti-money laundering program, and comply with the recordkeeping, reporting, and transaction monitoring requirements applicable to money transmitters.

319.    FinCEN Ruling, FIN-2014-R002, at p. 4.  United States Federal District Court decision in  *U.S. v. Stetkiw,* No. 18-20579 (E.D. Mich. Feb. 1, 2019) relied on this Ruling as a basis for denying defendant's motion to dismiss and holding that defendant's alleged conduct of converting fiat money into virtual currency constituted money transmitting under 18 U.S.C. § 1960.  Thus, Defendant HDR is money transmitter under FinCEN's regulations and California law.

320.    The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  In addition, San Francisco based Galois Capital also acts as liquidity provider on BitMEX generating millions of dollars of business for Defendants.  Therefore, Defendant HDR is subject to the aforesaid federal and state money transmitter regulations due to its very substantial business in the United States. See 31 C.F.R. §§ 1010.100(ff)(5), 1022380(a)(2).

321.    Defendant HDR falls under the statutory definition of the "unlicensed money transmitting business" under all of 18 U.S.C. § 1960(b)(1)(A), (B) and (C).  Defendants' unlicensed money transmitting operation clearly affects interstate and foreign commerce, based at least on the high amounts (tens and even hundreds of millions of United States dollars) of funds involved in the money transmissions by Defendants.

322.    With respect to 18 U.S.C. § 1960(b)(1)(A), Defendant HDR's operates without an appropriate money transmitting license issued by the State of California and by any other State of the United States.  Cal. Fin. Code § 2003(q)(3) defines "money transmission" as "receiving money for transmission."  Defendant HDR clearly meets this definition.  Defendant HDR receives funds in a form of a cryptocurrency from its customers and then transmit cryptocurrency to a wallet address.  Cal. Fin. Code § 2030(a) requires persons engaged in money transmission to be licensed.  Finally, Cal. Fin. Code § 2152(b) provides that a "person that knowingly engages in an activity for which a license is required under this division without being licensed or exempt from licensure under this division is guilty of a felony."  Thus, Defendant HDR meets the definition set out in 18 U.S.C. § 1960(b)(1)(A).

323.    With respect to 18 U.S.C. § 1960(b)(1)(B), Defendant HDR failed to register with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.

324.    With respect to 18 U.S.C. § 1960(b)(1)(C), Defendant HDR facilitated and continues to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering, including, without limitation, transfer of winnings from market manipulation from the helper accounts into the winner accounts as alleged herein above.  By way of example and not by way of limitation, Defendants, and each of them, during the Relevant Period, transferred proceeds from illegal price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, Kraken and BitStamp in order to replenish helper accounts on those exchanges.  Such transfers were performed by Defendants, and each of them on a daily basis, including during each of the specific Manipulation Times alleged in

Paragraphs below, during the Relevant Period.  Those proceeds were used by Defendants, and each of them to perpetrate further market manipulations as alleged hereinabove.  In addition, Defendants transmitted funds between different exchange accounts, including, without limitation, helper accounts and winner accounts, by way of market manipulation as alleged hereinabove.

325.    Thus, Defendant HDR is clearly "unlicensed money transmitting business[es]" under 18 U.S.C. § 1960(b)(1) and, therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce in violation of 18 U.S.C. § 1960(a), which constitute the predicate acts of the Defendants, and each of them, racketeering activity under RICO.

326.    Defendants have been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license. Specifically, as alleged above, California and United States residents generated almost $70,000,000 in trading profits on the BitMEX platform, which clearly exceeds any threshold[9] for Defendant HDR having been required to obtain a money transmitter license in the United States and comply with the FinCEN regulations pursuant to 18 U.S.C. § 1960(a), which it knowingly and deliberately failed to do.  This conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendants.  Had Defendants obtained the money transmitter license and complied with FinCEN regulations, as they were required by law, they would have been forced to institute the mandatory KYC and AML policies on the BitMEX platform, as they did on August 14, 2020, which would have prevented at least some of the market manipulation, money laundering and other nefarious acts, which damaged Plaintiffs as alleged in this Complaint, from taking place on the BitMEX platform.  Therefore, Plaintiffs' injuries alleged in this Complaint were directly and

---

[9] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D. Mo. 2017), the threshold for triggering 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

proximately caused by Defendants operating the unlicensed money transmitting business and failing to comply with FinCEN regulations in violation of 18 U.S.C. § 1960(a).

327.    It should be noted that the sheer magnitude of Defendants' unlicensed money transmitting operation is truly staggering.  According to Defendants' own data, Defendant HDR turnover averages over $3 billion per day.  Thus, Defendants illegally transmitted over $3 billion per day without the required state money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a).

328.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, charged their customers substantial commissions for the unlicensed money transmissions generating substantial illegal income for Defendants.

329.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

330.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely over two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

331.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the income derived from their unlicensed money transmitting operations in violation of 18 U.S.C. § 1960(a) to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

332.     Plaintiffs are informed and believe and thereon allege that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transmit money in violation of 18 U.S.C. § 1960(a) directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs as alleged herein.

### DEFENDANTS CONSPIRED TO LAUNDER, LAUNDERED AND CONTINUE TO LAUNDER FUNDS IN VIOLATION OF 18 U.S.C. § 1956

333.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

334.     18 U.S.C. § 1956 provides that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

335.     Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Defendants, and each of them, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), as alleged hereinabove, as well as

proceeds of money laundering and unlawful cryptocurrency market manipulation, as alleged hereinbelow.

336.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) as well as proceeds of unlawful cryptocurrency market manipulation.

337.    For example, Defendants, and each of them, transferred, on multiple occasions, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as proceeds from illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity or to launder those proceeds by converting them into fiat currencies or through real estate investment schemes. Those proceeds were in fact subsequently used by Defendants, and each of them to perpetrate further market manipulation in violation of applicable laws.  Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

338.    As a further example, the effective transmissions of the winnings from market manipulation from the first helper account on BitStamp, Kraken or Coinbase Pro to the second winner account on BitMEX perpetrated by Defendants as described herein constitutes money laundering in violation of 18 U.S.C. § 1956(a).

339.    As yet further example, a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating of unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint, were subsequently converted, by all Defendants, through the Unknown Exchange, into various fiat currencies, including United States dollars and Hong Kong dollars.  All

Defendants knew that these financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint.

340.    As yet further example, a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently converted, by Reed, Agata Reed, Barbara Reed and Trace Reed, into multiple real estate investments that they set up in Wisconsin and Massachusetts.  For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Grape Park and Mark Sweep to disguise or conceal the true illegal nature of the funds used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control.  All Defendants knew that the aforesaid financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint.  All Defendants also knew the tainted nature of the funds in the Defendants' general account (bitcoin wallet), from which the multiple real estate purchases alleged in this Complaint were ultimately funded.

341.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1956, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

342.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and

concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

343.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

344.    Plaintiffs are informed and believe and thereon allege that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to launder funds between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1956, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

345.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the proceeds derived from their money laundering operation in violation of 18 U.S.C. § 1956 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged herein.

## DEFENDANTS ENGAGED IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S.C. § 1957

346.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

347.    18 U.S.C. § 1957 provides that "(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."

348.    Pursuant to 18 USC § 1957(f)(3), the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in 18 U.S.C. § 1956.

349.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Defendants, and each of them, willfully and knowingly attempted to engage and engaged in monetary transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged hereinbelow.

350.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged herein.

351.    For example, Defendants, and each of them, transferred, on a regular basis, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity.  Those proceeds were in fact subsequently used by Defendants, and each of them, to perpetrate further market manipulation in violation of applicable laws.  Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

352.    As a further example, the effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by

Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes violation of 18 U.S.C. § 1957. The Defendants were fully aware of the nature of the transferred funds and that such funds were the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956.

353. As yet further example, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times alleged below, proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint, that took place on the BitMEX platform, into various fiat currencies.

354. Moreover, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on or about July 8, 2019 and August 19, 2019, at least $2,325,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint into real estate investments in the United States, including, without limitations properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061. The specific purpose of the financial transactions alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and control.

355. Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1957, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

356. Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are related by having the same or similar purposes of

manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

357. Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants, and each of them, is still ongoing.

358. Plaintiffs are informed and believe and thereon allege that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transfer funds derived from specified unlawful activity between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1957, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

359. Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the proceeds from their transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged herein.

## **<u>DEFENDANTS ENGAGED IN WIRE FRAUD<br>IN VIOLATION OF 18 U.S.C. § 1343</u>**

360. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

361. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means

of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both..."

362.     Plaintiffs are informed and believe and thereon allege that during the Relevant Period, Defendants, and each of them, devised a scheme or artifice to defraud, namely a manipulative, fraudulent and deceptive scheme to fraudulently solicit Plaintiffs' bitcoin deposits and trading commissions and to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin Perpetual Swap contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin and to obtain money of other traders by way of injecting false information into markets in order to induce other traders to open highly leveraged positions on BitMEX and then cause their artificial liquidation in violation of 7 U.S.C. §§ 9(1), (3) and 13(a)(2).  This scheme was devised and intended to fraudulently benefit Defendants at the expense of Plaintiffs by wrongfully charging Plaintiffs trading commissions, obtained by way of fraudulent solicitation, and by wrongfully confiscating Plaintiffs' bitcoin deposits, also obtained by way of fraudulent solicitation, by inducing artificial market price moves and using such price moves to force liquidations of Plaintiffs' positions on the BitMEX platform, while simultaneously deliberately freezing BitMEX's platform to impede Plaintiffs' efforts to salvage their funds.  The funds forcibly confiscated from Plaintiffs as the result of the liquidations were deposited into the Insurance Fund maintained by Defendants.

363.     During the Relevant Period, Defendants, and each of them, used wire signals to transmit various fraudulent solicitations to Plaintiffs, containing a laundry list of material misrepresentations, half-truths and omissions as well as various electronic orders to multiple cryptocurrency "reference" exchanges for the specific purpose of misleading traders and investors as to the cryptocurrency market's natural forces of supply and demand and for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives on those "reference" exchanges. Those actions further constitute wire fraud in violation of 18 U.S.C. § 1343.

364.    Plaintiffs are informed and believe and thereon allege that the alleged fraudulent electronic wire transmissions were performed by Defendants on a daily basis, including during each of the specific Manipulation Times alleged below, during the Relevant Period and were carried out from Defendants' offices located in San Francisco, California and Milwaukee, Wisconsin, and to respective computers of Plaintiffs, computer servers of Amazon EKS as well as computer serves of multiple other United States based "reference" cryptocurrency exchanges that Defendants used to perpetrate their manipulative and fraudulent scheme alleged hereinabove. Plaintiffs are informed and believe and thereon allege that each of Defendants HDR, ABS, Hayes as well as accomplices Delo and Reed used automated market manipulation software tools developed by BitMEX to issue the alleged fraudulent electronic wire transmissions on a daily basis during the Relevant Period, including during each of the specific Manipulation Times alleged below.

365.    Plaintiffs are informed and believe and thereon allege that some of the alleged wire transmissions contained, without limitation, electronic orders designed to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. These alleged wire transmissions were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market. The false and misleading information injected by Defendants into the markets was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin Perpetual Swap or spot bitcoin at times, prices and quantities that they otherwise would likely not have traded. Moreover, the alleged wire transmissions further contained, without limitation, electronic orders designed to induce artificial price moves in the cryptocurrency markets in order to force liquidations of traders' positions on the BitMEX exchange for the benefit of Defendants' Insurance Fund. In addition, the electronic wire transmissions included Defendants' electronic commands to deliberately freeze servers of

the BitMEX platform and Defendants' electronic commands to generate the fraudulent system overload messages alleged hereinabove. Finally, the electronic wire transmissions included Defendants' fraudulent transmissions regarding the fake hardware failure in BitMEX's servers as well as the fake distributed denial-of-service attack (DDoS attack), which took place on or about March 13, 2020.

366.    Plaintiffs are informed and believe and thereon allege that pumps and dumps, Barts, liquidation cascades and spoofing alleged hereinabove are specific examples of the conduct that was specifically designed by Defendants, and each of them, to mislead Plaintiffs as well as other traders on the cryptocurrencies market.

367.    Plaintiffs as well as other traders were in fact mislead by Defendants', and each of them, manipulative and fraudulent acts intended to mislead and defraud, including, without limitation, by pumps and dumps, Barts and spoofing perpetrated by Defendants, and each of them, and placed orders that they would not have otherwise placed.

368.    Plaintiffs, at the time of the alleged manipulative and fraudulent acts intended to mislead and defraud, which were perpetrated by Defendants, and each of them, and at the time Plaintiffs took the trades herein alleged, was ignorant of the manipulative and fraudulent nature of conduct of the Defendants, and each of them, and believed that the apparent market conditions were in fact dictated by market forces of supply and demand and not the result of false information being injected into the markets by Defendants.

369.    Plaintiffs, at the time the alleged manipulative and fraudulent acts intended to mislead and defraud were made by Defendants, and each of them, and at the time Plaintiffs took the actions herein alleged, was ignorant of secret intentions of Defendants, and each of them, to mislead and defraud Plaintiffs and other traders and Plaintiffs could not, in the exercise of reasonable diligence, have discovered the secret intentions of Defendants, and each of them.

370.    Had Plaintiffs known the actual facts, Plaintiffs would not have taken such alleged actions.

371.    If Plaintiffs had known of the actual intention of Defendants, and each of them, Plaintiffs would not have taken the alleged trades.  Plaintiffs' reliance on fraudulent and manipulative conduct of Defendants, and each of them, was justified because Plaintiffs rightfully assumed that the market conditions of spot bitcoin and bitcoin derivatives markets were due to the actual market forces of supply and demand.

372.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are related by having the same or similar purposes of engaging in fraudulent solicitation of victims, including Plaintiffs, and manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

373.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

374.    Plaintiffs are informed and believe and thereon allege that Defendants' hereinabove alleged use of the electronic wire signals to defraud Plaintiffs as well as other market participants in violation of 18 U.S.C. § 1343 directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

**375.**    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the proceeds derived from wire fraud in violation of 18 U.S.C. § 1343 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged herein.

**DEFENDANTS ENGAGED IN INTERSTATE TRANSPORTATION OF STOLEN
FUNDS IN VIOLATION OF THE NATIONAL STOLEN
PROPERTY ACT 18 U.S.C. § 2314**

376.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

377.    18 U.S.C. § 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud … [s]hall be fined under this title or imprisoned not more than ten years, or both."

378.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Defendants, and each of them, willfully and knowingly transmitted and transferred in interstate or foreign commerce cryptocurrency, including, without limitation, bitcoin and stablecoins, knowing that the transferred cryptocurrency was converted or taken by fraud from Plaintiffs as well as other cryptocurrency traders as the result of fraudulent market manipulation as alleged hereinabove.

379.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, knowingly transferred and transmitted, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times alleged below, proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from manipulation winner accounts as well as other accounts on BitMEX cryptocurrency exchange to accounts on other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, as well as cryptocurrency off-ramp exchanges and OTC trading desks for subsequent conversion of the ill-gotten bitcoins into fiat currencies, including United States dollars and Hong Kong dollars.  Moreover, Defendants, and each of them, knowingly transferred and transmitted, in interstate or foreign commerce, on or about July 9, 2019, at least $900,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Unknown Exchange to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States.  Furthermore, Defendants, and each of them, transferred and

transmitted, in interstate or foreign commerce, on or about August 16, 2019, at least $1,425,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Unknown Exchange to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States.  The specific purpose of the transfers of funds alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and control.

380.    Coinbase Pro and Kraken are located in California, while BitStamp is located in New York City, New York.  The transferred proceeds were converted or taken by fraud by Defendants from Plaintiffs as well as other cryptocurrency traders as the result of the fraudulent market manipulation as alleged hereinabove.  The Defendants were fully aware of the true nature of the transferred proceeds.

381.    For example, the effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants as described herein constitutes a violation of 18 U.S.C. § 2314. The Defendants were fully aware of the nature of the transferred funds and that such funds were taken by fraud from Plaintiffs as well as other cryptocurrency traders.

382.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 2314, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

383.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

384.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

385.    Plaintiffs are informed and believe and thereon allege that Defendants', and each of them, alleged transfer of proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, in violation of 18 U.S.C. § 2314, enabling Defendants, and each of them, to engage in further market manipulation, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

386.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, used at least a portion of the proceeds derived from the interstate transportation of stolen funds in violation of 18 U.S.C. § 2314 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiffs as alleged herein.

### DEFENDANTS ENGAGED IN INTERSTATE AND FOREIGN TRAVEL OR TRANSPORTATION IN AID OF RACKETEERING ENTERPRISE IN VIOLATION OF 18 U.S.C. § 1952

387.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

388.    18 U.S.C. § 1952 provides that "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to (1) distribute the proceeds of any unlawful activity; … or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity, and thereafter performs or attempts to perform—(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both."

389.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Defendant Hayes as well as accomplices Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to distribute the proceeds of an unlawful activity, namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Defendant Hayes as well as accomplices Delo and Reed violated 18 U.S.C. § 1952.

390.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Defendant Hayes as well as accomplices Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendant Hayes as well as accomplices Delo and Reed violated 18 U.S.C. § 1952.

391.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Reed and Agata Reed, and each of them, willfully and knowingly traveled between Wisconsin and Massachusetts with intent to distribute and reinvest in United States real estate property situated in Norwell, MA 02061 at least $1,425,000 of the proceeds of an unlawful activity, namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Reed and Agata Reed violated 18 U.S.C. § 1952.

392.    Plaintiffs are informed and believe and thereon allege that, during the Relevant Period, Reed and Agata Reed, and each of them, willfully and knowingly traveled between

Wisconsin and Massachusetts with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Reed and Agata Reed violated 18 U.S.C. § 1952.

393.    Therefore, Defendant Hayes, as well as his accomplices Delo, Reed and Agata Reed, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1952, which further constitute the predicate acts of the Defendant Hayes, as well as his accomplices Delo, Reed and Agata Reed, and each of them, racketeering activity.

394.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

395.    Plaintiffs are informed and believe and thereon allege that predicate acts alleged herein, namely engaging in interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

396.    Plaintiffs are informed and believe and thereon allege that Defendants', and each of them, alleged interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, enabling Defendants, and each of them, to benefit from and continue the market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the

BitMEX platform as alleged in this Complaint, directly and proximately resulted in substantial

monetary cryptocurrency trading losses to Plaintiffs as alleged hereinbelow.

## SPECIFIC TIMES OF MARKET MANIPULATION BY DEFENDANTS

397.    Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

398.    As alleged in the Paragraphs above, the automated software tools developed by

BitMEX and operated by the Insider Trading Desk, which used highly sensitive and confidential

information about traders and their open positions and orders on BitMEX, automatically

manipulated cryptocurrency prices on BitMEX and its United States based "reference"

exchanges, by using helper accounts on United States based "reference" spot exchanges Kraken,

Coinbase and BitStamp, to place large market orders on those exchanges with maximum slippage

to cause large artificial moves in the .BXBT index price and .BETH index price on a daily basis[10],

resulting in forced liquidations of retail traders and profit for BitMEX, including, on information

and belief and without limitation, the following specific manipulation times ("Manipulation

Times")[11]:

| | **From** | **To** |
|---|---|---|
| 1. | 7AM UTC on November 14, 2018 | 12AM UTC on November 15, 2018 |
| 2. | 12AM UTC on November 19, 2018 | 9AM UTC on November 20, 2018 |
| 3. | 4PM UTC on November 24, 2018 | 11PM UTC on November 25, 2018 |
| 4 | 6AM UTC on December 24, 2018 | 12AM UTC on December 25, 2018 |

[10] These allegations are based on the very detailed information about the daily operations of the Insider Trading Desk recently provided by the former employees of Defendants as described in detail above.

[11] During those specific times, high volume market orders were executed on one or more "reference" exchanges during a short period of time, amounting to a relatively large fraction of the corresponding exchange's regular daily volume. Such trades would normally result in a financial loss for the trader, unless they were used with the purpose of profiting on BitMEX. Because traders trading millions of dollars are very sophisticated, these market orders were used for purposes of market manipulation on BitMEX. This forms the basis for Plaintiffs' belief as to the specific dates and times listed in the table.

| 5. | 4AM UTC on January 10, 2019 | 8PM UTC on January 10, 2020 |
|---|---|---|
| 6. | 12AM UTC on April 2, 2019 | 12PM UTC on April 2, 2019 |
| 7. | 2AM UTC on May 17, 2019 | 4AM UTC on May 17, 2019 |
| 8. | 7PM UTC on June 26, 2019 | 12AM UTC on June 27, 2019 |
| 9. | 12AM UTC on July 10, 2019 | 12PM UTC on July 11, 2019 |
| 10. | 4AM UTC on July 14, 2019 | 12AM UTC on July 15, 2019 |
| 11. | 4AM UTC on September 22, 2019 | 4PM UTC on September 26, 2019 |
| 12. | 12AM UTC on November 18, 2019 | 12AM UTC on November 20, 2019 |
| 13. | 4AM UTC on March 12, 2020 | 4AM UTC on March 13, 2020 |
| 14. | 9PM UTC on July 27, 2020 | 2AM UTC on July 28, 2020 |
| 15. | 12AM UTC on August 2, 2020 | 6AM UTC on August 2, 2020 |

399.    Additional and other facts regarding Defendants' market manipulation activities are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs reserve the right to amend or supplement the above list of Manipulation Times after they receive discovery from Defendants.

**SPECIFIC LOCATIONS AND TIMES OF RICO OVERT ACTS OF DEFENDANTS**

400.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

401.    RICO overt acts perpetrated by Defendants are described in the table below.  All of those overt acts take place either on United States based reference spot exchanges BitStamp, Coinbase Pro and Kraken or on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California.  The below table has been prepared based on information and belief of Plaintiffs, which belief was formed based on public records, U.S. DOJ indictment of Defendant Hayes,

CFTC civil complaint against Defendants, information provided by former employees of

Defendants and crypto market data analysis:

| RICO Overt Act | RICO Conduct Involved | Place of Conduct |
|---|---|---|
| 1 | Defendants transmitting electronic wire signals to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated (e.g. first leg of a Bart, see paragraphs 150-163, 362-375) | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| | Plaintiffs entered into unfavorable trading positions being mislead by false market forces information injected by Defendants | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California) and Kraken, also located in California |
| 2 | Defendants electronically transferring (depositing) funds to be used for manipulation into helper account(s) | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 3 | Defendants transmitting electronic wire signals to deliberately move BitMEX's .BXBT index price by placing large market orders with maximum slippage from the helper accounts on three illiquid exchanges used by BitMEX to calculate its .BXBT index | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| | Liquidation cascade that resulted in some of Plaintiffs' damages due to liquidation of Plaintiffs' XBTUSD Swap positions takes place, directly and proximately caused by the deliberate .BXBT index price move orchestrated by Defendants | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California) and Kraken, also located in California |
| 4 | Defendants transmitting electronic wire signals to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California) |
| 5 | Defendants transmitting electronic | California, where all three site reliability |

|   | wire signals to freeze BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | engineers of BitMEX, who were responsible for the BitMEX trading platform uptime and who personally perpetrated the server freezes, were located |
|---|---|---|
| 6 | Defendants electronically transferring (withdrawing) funds from winner account(s) into bitcoin wallet | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California) |
| 7 | Defendants transmitting electronic wire signals to convert proceeds of market manipulation into fiat (legal tender) currencies | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 8. | Reed reinvesting converted proceeds of market manipulation and money laundering into United States real estate. | Wisconsin and Massachusetts |

402.    A summary of alleged RICO predicates perpetrated by Defendants is provided in the table below, which was prepared in accordance with information and belief of Plaintiffs.  All of those predicates also took place either on United States based reference spot exchanges BitStamp, Coinbase Pro and Kraken and on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California:

| RICO Predicate | RICO Overt Acts | Place of Conduct |
|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2, 3, 4, 5, 6, 7 | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 1956 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States, Wisconsin and Massachusetts |
| 18 U.S.C. § 1957 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States, Wisconsin and Massachusetts |
| 18 U.S.C. § 1343 | 1, 2, 3, 4, 5, | California (BitMEX, having the majority of cloud service |

| | | |
|---|---|---|
| Wire Fraud | 6, 7 | providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | California (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in California); BitStamp, Coinbase Pro and Kraken, all located in the United States |

403.    Additional and other facts regarding Defendants' RICO overt acts are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs accordingly reserve the right to supplement and amend these allegations of RICO overt acts, if appropriate or necessary, following completion of relevant fact discovery.

404.    A summary of certain specific times of each of the alleged RICO predicates perpetrated by Defendants is provided in the table below.  The below table has been prepared based on information and belief of Plaintiffs, which belief was formed based on public records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data analysis:

| RICO Predicate | RICO Overt Acts | Persons Involved in RICO Predicate | Dates When Each RICO Predicate Occurred |
|---|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM |

| | | | |
|---|---|---|---|
| | | | UTC on May 17, 2019;<br>h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;<br>i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;<br>j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019<br>l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020;<br>m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and<br>n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § 1956 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | HDR, ABS, Hayes, Delo, Reed, Grape Park, Mark Sweep | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;<br>b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018;<br>c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018;<br>d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018;<br>e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020;<br>f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019;<br>g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019;<br>h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;<br>i. July 7, 2019;<br>j. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;<br>k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019<br>m. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020;<br>n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and<br>o. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § 1957 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | HDR, ABS, Hayes, Delo, Reed, Grape | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;<br>b. 12AM UTC on November 19, 2018 to |

| | | Park, Mark Sweep | 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. July 7, 2019; j. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 m. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and o. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
|---|---|---|---|
| 18 U.S.C. § 1343 Wire Fraud | 1, 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 k. 12AM UTC on November 18, 2019 to |

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 146 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

| | | | 12AM UTC on November 20, 2019 l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
|---|---|---|---|
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |

405.    Additional and other facts regarding Defendants' RICO overt acts and their timing are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs accordingly reserve the right to supplement and amend these allegations of RICO overt acts and their timing, if appropriate or necessary, following completion of relevant fact discovery.

406.    The individual roles of all Defendants with respect to RICO predicates are summarized in the below table, prepared according to information and belief of Plaintiffs, which belief was formed based on public records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data analysis:

| Person | Role of Person |
|--------|----------------|
| HDR | Defendant HDR is a holding company.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Reed.  Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. |
| ABS | Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within California.  Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom software programs and scripts for performing market manipulation and implementing server freezes. |

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 148 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

| | |
|---|---|
| Grape Park | Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Reed dominates and controls every aspect of business of Grape Park and funds its operations.  Grape Park is an alter ego of Reed. |
| Mark Sweep | Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Reed dominates and controls every aspect of business of Mark Sweep and funds its operations.  Mark Sweep is an alter ego of Reed. |
| Unknown Exchange | Unknown Exchange was responsible for knowingly, willfully and deliberately laundering a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars. |
| Hayes | Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise.  In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, |

| | |
|---|---|
| | without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Delo | Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.  In addition, Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Reed | Reed was responsible for, among other things, developing automated software tools for use by the Insider Trading Desk for accessing and using highly sensitive an confidential information of BitMEX traders for planning and initiating market manipulation, the deliberate server freezes and fraudulent |

system overloads on BitMEX to prevent traders from closing or changing their positions or orders so that BitMEX would get the exact profit as was predicted, as alleged herein above as well as automated effective transfers of market manipulation winnings from helper accounts on United States based reference spot exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by automatically placing, using automated software tools, large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by issuing automatic software-controlled electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing automatic software scripts for use by the Insider Trading Desk for perpetuating market manipulation, from his office located in Milwaukee, WI 53202.  Reed was further responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and his accomplice Delo and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through

| | |
|---|---|
| | unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Agata Reed | Agata Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Agata Reed gave directions to other members and took directions from Reed, occupied a fourth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 152 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

| | |
|---|---|
| Barbara Reed | Barbara Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Barbara Reed gave directions to other members and took directions from Reed, occupied a fifth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Trace Reed | Trace Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Trace Reed gave directions to other members and took directions from Reed, occupied a sixth position in the "chain of command" |

through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes as well as accomplices Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement.

407.    Additional and other facts regarding Defendants' roles in the Enterprise are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs accordingly reserve the right to supplement and amend these allegations of Defendants' roles in the Enterprise, if appropriate or necessary, following completion of relevant fact discovery.

408.    Certain specific electronic wire communications alleged herein are summarized in the following table, prepared based on Plaintiffs' information and belief, which belief was formed based on public records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants, information provided by former employees of Defendants and crypto market data analysis:

| Type of Comm. | Date | From | To | Content or Purpose of Communication |
|---|---|---|---|---|

| Wire | 11/14/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
|------|------------|------------------|------------------|---------------------------------|
| Wire | 11/14/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Kraken (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken, see paragraphs 150-163, 362-375. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools | Kraken (San Francisco) | Electronic computer instruction to execute large market trading order o BTC/USD order book from helper account with |

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)     - 155 -     Kanyshev et al. v. HDR et al.     Case No. CGC-20-584483

| | | | | |
|---|---|---|---|---|
| | | Developed by Reed (Wisconsin) | | maximum slippage to deliberately move BitMEX's .BXBT index price. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/14/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 11/14/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 11/14/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 11/14/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |

| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes as well as accomplices Delo and Reed. |
|------|-----------|------------------|--------------------------|---------------------------------------------------------|
| Wire | 11/24/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 11/24/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Kraken (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 11/24/2018 | Automated Insider Trading Desk Software | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation |

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 157 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

| | | Tools Developed by Reed (Wisconsin) | | into a helper account on Kraken. |
|---|---|---|---|---|
| Wire | 11/24/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Kraken (San Francisco) | Electronic computer instruction to execute large market trading order o BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price. |
| Wire | 11/25/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 11/25/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 11/25/2018 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |

| Wire | 11/25/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
|------|------------|------------------|-------------------------|---------------------------------------------------------------------------------------------------------------------------|
| Wire | 11/25/2018 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/25/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes as well as accomplices Delo and Reed. |
| Wire | 5/16/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 5/16/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitStamp (Denver) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 5/16/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on BitStamp. |
| Wire | 5/17/2019 | Automated Insider Trading Desk Software Tools Developed by | BitStamp (Denver) | Electronic computer instruction to execute large market trading order on BTC/USD order book from helper account with maximum slippage to deliberately |

| | | Reed (Wisconsin) | | move BitMEX .BXBT index price. |
|---|---|---|---|---|
| Wire | 5/17/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 5/17/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to executed orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 5/17/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 5/17/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 5/17/2019 | Hayes (New | Coinbase (San | Instruction for electronically |

| | | York) | Francisco) | transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes as well as accomplices Delo and Reed. |
|---|---|---|---|---|
| Wire | 7/3/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $900,000 of converted proceeds of money laundering to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States. |
| Wire | 7/3/2019 | Reed (Wisconsin) | Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States | Electronic escrow instructions for reinvesting $900,000 of converted proceeds of money laundering into Real Estate Property 1. |
| Wire | 7/3/2019 | Barbara Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/3/2019 | Trace L.Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 7/14/2019 | Automated | BitStamp | Trading orders to inject false |

| | | | | |
|---|---|---|---|---|
| | | Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | (Denver) | information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 150-163, 362-375. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) ether funds to be used for manipulation into a helper account on BitStamp. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitStamp (Denver) | Electronic computer instruction to execute large market trading order on ETH/USD order book from helper account with maximum slippage to deliberately move BitMEX .BETH index price. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to executed orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX. |
| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from |

| | | | | |
|---|---|---|---|---|
| | | | | trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 7/14/2019 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 7/14/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes as well as accomplices Delo and Reed. |
| Wire | 8/16/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $1,425,000 of converted proceeds of market manipulation to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States. |
| Wire | 8/16/2019 | Reed (Wisconsin) | Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States | Electronic escrow instructions for reinvesting $1,425,000 of converted proceeds of money laundering into Real Estate Property 2. |
| Wire | 08/29/2019 | Agata Reed (Massachusetts) | Secretary of the State of Delaware | Order to form Grape Park LLC and to add an officer Agata Maria Reed with the purpose to conceal or disguise the nature, the location, the source, the |

| | | | | ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
|---|---|---|---|---|
| Wire | 11/20/2019 | Reed (Wisconsin) | Agata Reed (Massachusetts) | Instructions to form Grape Park LLC in Massachusetts, a branch of Grape Park LLC, with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
| Wire | 11/20/2019 | Agata Reed (Massachusetts) | Secretary of the Commonwealth of Massachusetts | Order to form Grape Park LLC and to add an officer Agata Maria Reed with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
| Wire | 3/12/2020 | Hayes (New York) | Reed (Wisconsin) | Direction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |
| Wire | 3/12/2020 | Automated Insider Trading Desk Software Tools Developed by Reed (Wisconsin) | Automated software operated by Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna (San Francisco) | Automatic instruction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |

409.    Plaintiffs are informed and believe and thereon allege that the electronic wire transmission alleged in the previous Paragraph were repeated by Defendants, almost exactly, during other Manipulation Times.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 164 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

410.    Additional and other facts regarding Defendants' fraudulent wire communications are hidden from Plaintiffs at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiffs what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiffs accordingly reserve the right to supplement and amend these allegations of Defendants' fraudulent wire communications, if appropriate or necessary, following completion of relevant fact discovery.

## MARKET MANIPULATION EVENT ON AUGUST 2, 2020 AND DELETION OF EVIDENCE THEREOF BY DEFENDANTS

411.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

412.    Bitcoin suffered a price drop of $1,500 within few minutes on Sunday, August 2, 2020. The sudden slide caught many traders off guard, liquidating nearly $1.4 billion worth of positions across major exchanges.  The price drop triggered $144 million worth of sell liquidations or forced closure of long positions on BitMEX.

413.    Shortly after the crash, on August 2, 2020, at 8:44PM EDT, a brand-new account suddenly popped up on the number one spot on the BitMEX Leaderboard showing nearly $120,000,000 in profit.  Plaintiffs are informed and believe and thereon allege that the aforesaid Leaderboard account was the winner account of Defendant Hayes as well as accomplices Delo and Reed, which was used by them to capture the manipulation winnings induced by said Defendants placing large market orders with maximum slippage from helper accounts on United States based reference spot exchanges Kraken, Coinbase Pro and Kraken to deliberately move the .BXBT index price, which resulted in the aforesaid August 2, 2020, $1,500 bitcoin price crash and the $144 million worth of sell liquidations of BitMEX Perpetual Swap contracts, which are priced based on the aforesaid .BXBT index price manipulated by Defendants.

Bitcoin prices, August 2, 2020.

Bitcoin Market Manipulation Event On August 2, 2020. Perpetrators Crashed Bitcoin Price By $1,500 In Minutes Resulting in $150,000,000 Liquidations Of Trader Positions on BitMEX

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

Winner Account With $120,000,000 Manipulation Profit Popped up at 8:44PM EDT

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|------|------|--------|--------------|
| 1 | Rainbow-Narrow-Rider | 11,246.8487 XBT | ✖ |
| 2 | Mercury-Wood-Sprite | 8,179.7823 XBT | ✖ |
| 3 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 4 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 5 | Alameda Research | 5,244.5830 XBT | ✔ |
| 6 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |
| 7 | coincidentcapitalltd | 2,610.2783 XBT | ✔ |
| 8 | Skitter-Peridot-Raven | 2,345.7226 XBT | ✖ |
| 9 | Honeysuckle-South-Rib | 2,110.4027 XBT | ✖ |
| 10 | CSW is a fraud | 2,086.7229 XBT | ✔ |

$120,000,000

Evidence of the Winner Account With Manipulation Profit Was Deleted 1hr Later at 9:45PM EDT

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|------|------|--------|--------------|
| 1 | Mercury-Wood-Sprite | 8,179.7823 XBT | ✖ |
| 2 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 3 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 4 | Alameda Research | 5,244.5830 XBT | ✔ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |

414.    The aforesaid evidence of the winner manipulation account on BitMEX was deleted by Defendants just one hour later, at 9:45PM EDT. Plaintiffs are informed and believe and thereon allege that the aforesaid Leaderboard account was accidentally listed on the BitMEX Leaderboard and then, upon discovery, immediately deleted by Defendants, who tried to cover up



their market manipulation acts and destroy relevant evidence. Plaintiffs are informed and believe and thereon allege that the aforesaid amount of $120,000,000 in the winner account was Defendants' profit from perpetrating the aforesaid bitcoin market manipulation event of August 2, 2020. Plaintiffs are informed and believe and thereon allege that the second highest ranked BitMEX Leaderboard account Quick-Grove-Mind with almost $100,000,000 profit is also a manipulation winner account of the Defendants' Insider Trading Desk that was used to capture illegal market manipulation profits. The multimillion-dollar profit gains in that account exactly match the known bitcoin market manipulation events that took place on or about September 24, 2019, November 18-19, 2019 and March 11-12, 2020, when the .BXBT index price of bitcoin was manipulated by Defendants by placing large sell market orders on United States based reference exchanges Kraken, Coinbase Pro and BitStamp exchanges, the pricing data from which is used in the .BXBT index calculation, based on which the BitMEX Perpetual Swap contract traded by Plaintiffs is priced, in order to intentionally liquidate BitMEX retail traders, including

Plaintiffs.  Notably, this manipulation winner account also miraculously avoided any and all trading losses, posting only multimillion-dollar market manipulation gains.

415.    Plaintiffs are informed and believe that Defendants engaged in systematic destruction of critical manipulation evidence, including manipulator identities, as alleged, for example, in CFTC Complaint, Ex. 2, p. 16, ¶ 49.

416.    Moreover, after instituting KYC and AML check on or about August 14, 2020,



Defendants systematically deleted evidence of market manipulation, including manipulator identities and their trading records, under the pretense of users' "right to be forgotten."

**ADDITIONAL FACTS SUPPORTING CONCLUSION THAT DEFENDANTS THEMSELVES CAUSED PLAINTIFFS' INJURIES DURING MANIPULATION TIMES**

417.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

418.    Defendants took extraordinary measures to destroy or otherwise suppress evidence of their own wrongdoing and hinder detection of their market manipulation.  First, BitMEX accounts were by design anonymous.  Therefore, trading data that is available publicly generally

does not permit identification of actors behind specific market manipulation events on BitMEX. This hinders exactly pinpointing Defendants as specific perpetrators behind specific market events.  Second, as CFTC clearly stated in their Compliant, Ex. 2, p. 16, ¶ 49, Defendants actively deleted and otherwise destroyed required records including critical trader identity information. Third, BitMEX generally used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its own Insider Trading Desk with BitMEX exchange, in order to cover up the tracks of wrongdoing so that the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.

419.    Thus, Defendants made every possible effort to suppress evidence of their own wrongdoing in order to evade liability for their market manipulation misconduct.  In fact, account anonymity on BitMEX, as well as the associated lack of the required KYC and AML checks, was the exact reason Defendants were criminally charged by the DOJ with felony failing to prevent money laundering on BitMEX, Ex. 1.  It cannot possibly be in the interests of justice to reward Defendants for their own federal crimes, which crimes involved deliberately making BitMEX accounts anonymous and willfully failing to use KYC and AML, and which also had a side effect of suppressing the evidence of Defendants' own market manipulation conduct.

420.    Because of the BitMEX account anonymity, documented destruction of required records, including critical user identities, by Defendants, as alleged in the CFTC Compliant, Ex. 2, p. 16, ¶ 49, and the use of the anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its own Insider Trading Desk with BitMEX exchange, Defendants are in sole and exclusive possession of facts and any and all documentary evidence relevant to their market manipulation.

421.    The fact that it was Defendants who manipulated prices on the BitMEX platform and "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times, causing alleged losses to Plaintiffs, is additionally supported by two separate conclusions

explained in detail below.

422.    First, the fact that during Manipulation Times prices on the "reference" spot exchanges BitStamp, Kraken and Coinbase Pro were intentionally and artificially manipulated is additionally supported the fact that during the Manipulation Times, high volume market orders were executed on one or more relatively thinly traded "reference" exchanges during a short period of time, amounting to a relatively large fraction of the corresponding exchange's regular daily volume.  Such large trades executed on relatively illiquid or thinly traded exchanges would normally result in a significant price slippage and a consequent financial loss for the executing trader, unless they were used with the purpose of profiting on BitMEX.  Because traders trading millions of dollars of cryptocurrency are very sophisticated, they would use over-the-counter (OTC) transactions in order to sell large amounts of cryptocurrency without affecting the market price and thereby avoid sustaining a financial losses due to price slippage.[12]  The fact that very sophisticated traders willingly sustained large and completely avoidable financial losses during Manipulation Times demonstrates that these large market orders were used for purposes of cross-market manipulation in order to benefit from the open derivatives positions on BitMEX, which uses BitStamp as one if its "reference" exchanges.  This forms the basis for Plaintiffs' belief the during the Manipulation Times, the "reference" markets for bitcoin and ether were artificially manipulated.

423.    It is therefore established that market moves that took place during Manipulation Times were caused by manipulators with the purpose of cross-market manipulation and profiting

---

[12] For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering.  From approximately 2:55 to 3:10 AM (UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp, which resulted in an avoidable financial loss for the trader of over $2,5000,000 due to price slippage.  In contrast, during the previous day, only 83 bitcoins were sold every 15 minutes on average.  As another example, on July 14, 2019, a sell order was placed on Bitstamp for 15,000 ETH causing the ether price to plummet from $270 to $190 and leading to a flash crash on that exchange, resulting in over $600,000 loss over the OTC price. This clearly intentional dump made up around $3.5 million of ETH – some 15% of its entire ETH trading volume in just one trade.  Sophisticated traders would not choose to sustain such large and avoidable losses.

on BitMEX.

424.    Second, the fact that it was Defendants and not an unidentified third party who intentionally manipulated bitcoin and ether prices on "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times is additionally supported by at least the following facts:

a. Defendants' Insider Trading Desk and Its Custom Automated Market Manipulation Tools Developed by Bitmex. Defendants operated an undisclosed Insider Trading Desk managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated to continuously manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of bitcoin and ether, Ex. 3, 14. The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open positions. They were also provided with automated systems, built by BitMEX, leveraging this highly sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation. The traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations. Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in

trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.  The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX.  BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.  Defendants would not develop such sophisticated automated tools for no reason or "just to have them".  The fact that Defendants were in possession of such sophisticated automated tools clearly establishes that they did in fact use them for their intended purpose, to cross-manipulate cryptocurrency markets and liquidate traders, including during the specific Manipulation Times.

b. Defendants' Insider Trading Desk Automated Tools Operated on a 24 Hours a Day, 7 Days a Week Basis, Including Specific Manipulation Times.  That establishes that during the times of the Plaintiffs' losses, the automated tools of the Defendants' Insider Trading Desk were up and running and automatically looking for ways to liquidate BitMEX traders, including Plaintiffs, to financially benefit Defendants.

c. Presence of Server Freezes During Manipulation Times.  As stated above, the

server freezes were used by BitMEX to prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time.  To accomplish this purpose, BitMEX routinely froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.  Presence of server freezes and system overloads during Manipulation Times clearly indicates that, in accordance with Defendants' modus operandi, the automated tools operated by BitMEX's Insider Trading Desk already estimated potential profitability of a market manipulation, automatically executed manipulative trades on the "reference" exchanges and deployed server freezes on BitMEX to prevent traders from escaping their positions and salvaging their funds before they could be liquidated, so that BitMEX would get the exact profit that was predicted by the Insider Trading Desk.

d.  Defendants' Exclusive Access to Sensitive Insider Information.  Only Defendants' Insider Trading Desk and no third party had access to sensitive insider information of the BitMEX exchange, including all positions, leverage amounts, sizes, open orders, hidden orders, etc.  This information is critical to profitably liquidating traders on BitMEX and without it, not such liquidations are possible.  This again points to BitMEX as culprit behind the market moves during the Manipulation Times.

e.  Defendants' Exclusive Ability to Open Large Positions on BitMEX. Moreover, *only* Defendants were able to open sufficiently large ($100,000,000+) trading positions on BitMEX in order to capture the manipulation profits.  For example, during market event on May 17, 2019, $2,500,000 was lost on BitStamp due to price slippage to move the .BXBT index down by 16%.  In order for the perpetrator to break even, the

corresponding swap position in BitMEX's winner account would need to be at least $15,625,000 ($15,625,000 x 16% = $2,500,000). And in order to make modest 1000% profit, the corresponding swap position in BitMEX's winner account would need to be at least $156,250,000 ($156,250,000 x 16% = $25,000,000). No other persons except for Defendants were able to open such large positions on BitMEX in order to make manipulation profitable.[13] Therefore, other parties would lose money on manipulation and it was Defendants who caused market manipulation events during the Manipulation Times.

f.  Defendants' Financial Motive. Manipulating the .BXBT index of BitMEX is immensely profitable, with profit reaching 8000% (or 80x). Moreover, Defendant Hayes publicly admitted to committing bank fraud in connection with bitcoin transaction where the profit was just 40%, Ex. 10. For comparison, profit from manipulation using BitMEX .BXBT index at issue here is 8000%, which would be irresistible for someone who was risking jail time to make mere 40% profit. 8000% would be clearly too lucrative profit for Defendants to pass. Moreover, *half* of BitMEX's revenue comes from liquidations of traders like Plaintiffs, creating a very strong incentive for Defendants to engage in a market manipulation resulting in liquidations of retail traders in order to increase their company revenue. It should be also noted that of all possible manipulators, BitMEX had the *highest* financial incentive to manipulate the .BXBT index. In other words, no third party financially benefits from the manipulation to the extent Defendants do. This is explained by the interplay between the exchange itself, the Insurance Fund and the trading desk, all owned by Defendants. All three of those entities owned

---

[13] CFTC regulations impose position limits on exchanges exactly for this reason, to prevent manipulation by making it unprofitable, see, for example, 17 C.F.R. 41.25. Defendants violated those regulations, which enabled and facilitated profitable manipulation on BitMEX.

by Defendants benefit from trader liquidations with the exchange collecting increased trading fees caused by spikes in trading volumes during liquidations, the trading desk realizing profits associated with betting on the other side of (against) Plaintiffs' trades, and the Insurance Fund collecting an excess portion of the confiscated Plaintiffs' collateral, left after paying profits to the trading desk. Thus, because Defendants own and control the exchange itself, the Insurance Fund and the trading desk, they have triple incentive to engage in market manipulation and liquidate traders. In other words, due to BitMEX's design, when a trader is liquidated, the exchange itself, the Insurance Fund and the trading desk divide all the trader's confiscated funds between themselves with no third party getting a dime.

425.    Thus, for all the foregoing reasons, it was Defendants and not unidentified third parties, who manipulated prices on the BitMEX platform and "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times, causing specific trading losses to Plaintiffs alleged herein.

## MORE THAN HALF OF TOP BITMEX TRADERS EARNING OVER $1B IN PROFITS ENGAGED IN MONEY LAUNDERING

426.    On or about November 5, 2020, BitMEX updated its leaderboard after supposedly completing KYC and AML verification for all users. Below is a leaderboard from August 2, 2020, with traders who could not pass the KYC and AML verification marked. Spots on the leaderboard are very valuable and traders would not easily forgo being listed there. Thus, more than half of top BitMEX traders earning over $1B in profits were unable to pass KYC and AML checks and, therefore, engaged in money laundering and other illegal acts. This is truly staggering and it proves the truly astonishing amount of money laundering that took place on BitMEX, as alleged herein.

427.    Moreover, the clear manipulator account Quick-Grove-Mind with $100M manipulation profits listed above, whose multi-million dollar profit spikes exactly match known

market manipulation events, magically avoiding all market losses, did not pass the KYC and

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | Name | Profit | | Is Real Name |
|---|---|---|---|---|
| 1 | Rainbow-Narrow-Rider | 11,246.8487 XBT | ✗ | ✗ |
| 2 | Mercury-Wood-Sprite | 8,179.7823 XBT | | ✗ |
| 3 | Quick-Grove-Mind | 8,047.8158 XBT | ✗ | ✗ |
| 4 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✗ | ✗ |
| 5 | Alameda Research | 5,244.5830 XBT | | ✓ |
| 6 | Hot-Relic-Fancier | 4,216.5159 XBT | ✗ | ✗ |
| 7 | coincidentcapitalltd | 2,610.2783 XBT | ✗ | ✓ |
| 8 | Skitter-Peridot-Raven | 2,345.7226 XBT | | ✗ |
| 9 | Honeysuckle-South-Rib | 2,110.4027 XBT | | ✗ |
| 10 | CSW is a fraud | 2,086.7229 XBT | | ✓ |
| 11 | Tree-Surf-Dragon | 2,072.0510 XBT | ✗ | ✗ |
| 12 | Roger-LeotankCapital | 1,764.5478 XBT | ✗ | ✓ |
| 13 | alamedaresearchltd@gmail.com | 1,696.7039 XBT | | ✓ |
| 14 | Jade-Platinum-Legs | 1,675.8174 XBT | ✗ | ✗ |
| 15 | Circle_Trade | 1,619.6382 XBT | ✗ | ✓ |
| 16 | Winter-Pink-Fang | 1,536.7276 XBT | | ✗ |
| 17 | daniel3 | 1,514.6067 XBT | ✗ | ✓ |
| 18 | Cream-White-Ox | 1,476.3798 XBT | ✗ | ✗ |
| 19 | xorq | 1,467.0128 XBT | | ✓ |
| 20 | Disco-Solar-Fang | 1,452.1775 XBT | | ✗ |
| 21 | Roger_LeotankCapital | 1,441.3349 XBT | | ✓ |
| 22 | Ebony-Fair-Bat | 1,387.4639 XBT | | ✗ |
| 23 | Quill-Rift-Hoof | 1,361.3772 XBT | | ✗ |
| 24 | aoa | 1,344.3134 XBT | | ✓ |
| 25 | Brown-Peat-Myth | 1,246.6567 XBT | | ✗ |

AML checks, which is another indication that this is a market manipulator.

## MARKET MANIPULATION DRAMATICALLY SUBSIDED AFTER CRIMINAL INDICTMENTS AND ARRESTS OF DEFENDANTS

428.    Shortly after Defendant Hayes as well as Delo, Reed and Dwyer were criminally

indicted by the DOJ and Reed was arrested on October 1, 2020, the amount of market

manipulation dropped dramatically and bitcoin steadily rallied in price from under $10,000 to

over $61,000.  It can be clearly seen that this bitcoin rally was caused, in a large part, by

Defendants being taken down by DOJ and CFTC, as well as by private party lawsuits, and by

Reed being prevented from manipulating the markets.

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 176 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

429.    It is the general consensus in the crypto industry that Defendants' persistent manipulation resulted in persistent price suppression for bitcoin and ether and once Defendants' market manipulation was abated on October 1, 2020, with arrest of Reed and criminal indictments of Hayes, Delo and Dwyer, the price of bitcoin and ether exploded, as the main bitcoins price suppression factor was removed, see the above chart.

## COUNT I
**(Fraud and Deceit (Fraudulent Solicitation by False Warranty and Representation) — Against All Defendants)**

430.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

431.    To entice Plaintiffs to open their trading accounts, deposit their bitcoins, trade on margin on a rigged BitMEX platform and pay trading commissions to Defendants, Defendants engaged in fraudulent solicitation of Plaintiffs using a laundry list of material misrepresentations, half-truths and omissions.[14]  Once victims, including Plaintiffs, were fraudulently induced by Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon known as "revenge trading" to keep them trading on their rigged platform.  Revenge trading is a

---

[14] Because Defendant Hayes controlled, directly or indirectly, the operation of the entire BitMEX Enterprise and micro-managed all important aspects of operation of the BitMEX platform and no significant undertaking could proceed without his direct approval, he personally authored or at least personally ratified and approved each and every fraudulent solicitation or other misrepresentation or omission alleged in Paragraphs 422-514.

natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

432.    On May 17, 2019, Defendants, and each of them, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff Kanyshev with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff Kanyshev to personally accept it by opening a trading account and using BitMEX platform.[15]  The electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff Kanyshev's personal computer.  Plaintiff Luzhbin was similarly presented with the same electronic document on May 8, 2019 and Plaintiff Villagra was similarly presented with the same electronic document on June 2, 2019.

433.    The written Service Agreement incorporated the following specific Warranty and Representation expressly made by Defendants personally to each Plaintiff:[16]

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in

---

[15] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 17 and is incorporated herein in its entirety.
[16] In addition to placing the Warranty and Representation into the Service Agreement, Defendants placed the same representation in their blog post, which constitutes an advertisement, which was available, during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/.

the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

434.    This express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was, in fact, deliberately and materially false during the entire Relevant Period and constituted a fraudulent solicitation of Plaintiffs' bitcoins deposits and trading commissions by Defendants.  In truth and in fact, during the entire Relevant Period, the Insider Trading Desk of BitMEX had what BitMEX internally referred to as "God Access" to all customer, order flow, execution and open position information of the BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions on the entire BitMEX platform.  On the other hand, this information was not available to Plaintiffs and other platform users, with the exception of Defendants themselves. The Insider Trading Desk used this very sensitive information to automatically trade against, and liquidate customers of BitMEX, including each Plaintiff.

435.    Moreover, this express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was deliberately and materially false during the entire Relevant Period also because the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts.  In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts.[17]

436.    Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts, as the true facts meant that

---

[17] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX.

437.    In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, when, in reality, he was not. Thus, Defendants' false representations misled Plaintiffs into believing that they were getting something, namely cryptoderivative trading services from BitMEX, where the Insider Trading Desk did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiffs' positions, that they were not. Therefore, the false Warranty and Representation actually mislead each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."  Plaintiffs did not want to use, and would not have used, cryptoderivative trading services if such services included the Insider Trading Desk that received special informational, technical and trading privileges and continuously manipulated the markets in order to liquidate Plaintiffs' positions.

438.    Each Plaintiff opened account with BitMEX platform and used Defendants' cryptoderivative trading services offered from California based on reliance on the Warranty and Representation contained in Defendants' Service Agreement.  When opening their BitMEX trading accounts on May 17, May 8, and June 2, depositing bitcoins therein and engaging in cryptoderivative trading on BitMEX platform, respective Plaintiffs Kanyshev, Luzhbin and Villagra each saw and carefully read Defendants' false Warranty and Representation and relied on the truth of the Warranty and Representation in deciding to open BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on BitMEX and pay trading commissions to Defendants.

439.    Each Plaintiff was induced to open BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on BitMEX platform and pay trading commissions to Defendants and did, in fact, open BitMEX trading account, deposited bitcoins therein, engaged in

cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants due to the reliance on the truth of the Warranty and Representation, which represented to Plaintiffs that:

> The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

440.    Each Plaintiff would not have opened BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on BitMEX platform and paid trading commissions to Defendants if he knew the true facts and, specifically, that Defendants' exchange was rigged and the Insider Trading Desk trading against Plaintiffs was provided with informational, access and trading advantages over Plaintiffs and automated tools, built by BitMEX, to facilitate manipulation.

441.    Upon opening BitMEX trading account, depositing bitcoins therein and engaging in cryptoderivative trading on Defendants' BitMEX platform, each Plaintiff was provided with cryptoderivative trading services falsely represented by Defendants' Warranty and Representation to be fair and honest, deceiving each Plaintiff and, in reality, causing him to use rigged cryptoderivative trading services he did not want.  Defendants' false and fraudulent Warranty and Representation caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

442.    Each Plaintiff has suffered injury and loss of money or property as a result of Defendants' fraud and deceit, and namely as the result of the false and fraudulent Warranty and Representation provided to each Plaintiff.

443.    Plaintiffs relied upon Defendants' misrepresentations contained in the Warranty and Representation and were induced to use Defendants' cryptodetivative trading services they did not want to use and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses.  Defendants' deception caused the Plaintiffs to open accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses.  Therefore, Plaintiffs suffered injury in fact and lost money or property as a result of the alleged fraud and deception perpetrated by Defendants by means of the false Warranty and Representation.

444.    When the Defendants made the aforesaid false and fraudulent Warranty and Representation to each Plaintiff, they knew it to be materially false, as Defendants themselves created and controlled the Insider Trading Desk, and this Warranty and Representation was made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open an account with BitMEX, deposit bitcoins therein and trade Defendants' cryptoderivative products on margin, in order to wrongfully collect trading commissions from Plaintiffs and to confiscate and otherwise misappropriate each Plaintiff's property.  Therefore, in making the aforesaid false and fraudulent Warranty and Representation to respective Plaintiffs, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations.  Defendant Hayes, who owns 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent Warranty and Representation in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by him directly to his personal bank accounts as alleged in Paragraphs above.

445.    Each Plaintiff, at the time this Warranty and Representation was made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' Warranty and Representation and believed it to be true.  In reliance on

these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform, engaged in derivative trading therein on margin to his financial loss and detriment and paid trading commissions to Defendants.  For example, in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs initially[18] deposited with Defendants:

| Kanyshev | May 24, 2019 | 0.2 bitcoins |
| Luzhbin | May 9, 2019 | 3.17 bitcoins |
| Villagra | June 2, 2019 | 1   bitcoin |

446.    Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits.  Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent Warranty and Representation, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon.  Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation

---

[18] The deposits listed in this table are only initial deposits.  For example, Plaintiff Villagra deposited with Defendants over 3.2055 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.2 bitcoins.  In addition, Plaintiff Villagra sustained net trading losses of about 0.9765 bitcoins, resulting in his net loss on BitMEX of 1.1765 bitcoins ($68,273), in addition to the bitcoin loss of use damages.  As another example, Plaintiff Kanyshev deposited with Defendants at least 0.2121 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.05 bitcoins.  In addition, Plaintiff Kanyshev sustained net trading losses of about 0.09 bitcoins, resulting in his net loss on BitMEX of 0.14 bitcoins ($8,120), in addition to the bitcoin loss of use damages.

made by Defendants, which was specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kanyshev | May 24, 2019 | August 15, 2019 | 83 | 0.2 bitcoins | 5.95% | 0.0027 bitcoins |
| Luzhbin | May 9, 2019 | July 11, 2019 | 63 | 3.17 bitcoins | 5.95% | 0.03264 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 25 | 1 bitcoin | 5.95% | 0.004 bitcoins |
| | | | | | Total: | 0.0394 bitcoins |

447. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Kanyshev traded Defendants' bitcoin perpetual swaps on July 15, 2019 and suffered trading losses of over 0.38 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated. In addition, Plaintiff Kanyshev paid at least 0.02 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Luzhbin traded Defendants' bitcoin perpetual swaps on July 11, 2019 and suffered trading losses of over 6.6 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated. In addition, Plaintiff Luzhbin paid at least 0.3 bitcoins in trading commissions to Defendants on that day. In further reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff Villagra traded Defendants' bitcoin

perpetual swaps on June 27, 2019 and suffered trading losses of over 2.9 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated.  In addition, Plaintiff Villagra paid at least 0.1 bitcoins in trading commissions to Defendants on that day.  The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's long perpetual swap position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God access," in direct violation of the Warranty and Representation.  Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded perpetual swaps, suffered such losses and would not have paid trading commissions to Defendants.

448.    Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs incurred the following monetary damages associated with trading commissions[19] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants.  Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' damages associated with the trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants.  These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions.  Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.01 bitcoins, at the time he opened his first swap position on BitMEX, in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, and before any market move or other market event.

---

[19] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not.  For example, the commission for opening or closing a margined position is 0.075% of the position size.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|-----------|-----------------|---------------|------------------------------|
| Kanyshev | May 24, 2019 | August 15, 2019 | 0.05 bitcoins |
| Luzhbin | May 9, 2019 | July 15, 2019 | 0.6 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 0.2 bitcoins |
| | | **Total:** | **0.85 bitcoins** |

449.    Each Plaintiff's reliance on Defendants' representations was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk.  For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.  Therefore, Plaintiffs, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

450.    According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform."  The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the Service Agreement containing the fraudulent Warranty and Representation to Plaintiffs.

451.    Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California.  Therefore, the false and fraudulent Warranty and Representation, provided

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 186 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.

452.    Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in swaps on margin on BitMEX platform as they did, and thus paid 0.85 bitcoins in trading commissions and suffered their trading losses of 9.45 bitcoins from such trading, as well as bitcoin loss of use damages of 0.0394 bitcoins, as a result of their reasonable reliance on Defendants' Warranty and Representation and their reasonable failure to know the actual facts.  Thus, the total loss sustained by Plaintiffs was 10.3394 bitcoins.

453.    Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

454.    Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent Warranty and Representation, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

455.    As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation, by reason of which Plaintiffs have been damaged in the sum of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

456.    Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

457.    Cal. Civ. Code § 1710(1) defines deceit as a "suggestion, as a fact, of that which is not true, by one who does not believe it to be true."

458.    Defendants' false and fraudulent Warranty and Representation constituted deceit under Cal. Civ. Code § 1710(1) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least 10.3394 bitcoins.

459.    In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

<u>**COUNT II**</u>
**(Fraud and Deceit (Fraudulent Solicitation by Misrepresentation of Liquidity on BitMEX)
— Against All Defendants)**

460.    Plaintiffs repeat and re-allege the allegations contained Paragraphs 1-429 as if fully set forth herein.

461.    During Relevant Period, in soliciting each Plaintiff's bitcoin deposits, trading



orders and trading commissions, Defendants, and each of them, personally represented to each Plaintiff, through their commercial website www.bitmex.com, which constitutes a front-end

interface of their BitMEX platform, that Defendants' BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other platform" and that "BitMEX's XBTUSD market is the most liquid in the world." Ex. 16.  The foresaid representations regarding available liquidity on BitMEX were made by Defendants, and each of them, by electronically transmitting, through a computer network, a web page document from Defendants' Servers in San Francisco, California directly to respective Plaintiff's computer.  For example, on May 17, May 24 and July 15, 2019, Defendants made the aforesaid representations regarding available liquidity on BitMEX to Plaintiff Kanyshev.  Plaintiff Luzhbin was similarly presented with the same representations regarding available liquidity on BitMEX on May 8 and May 9 and July 11, 2019 and Plaintiff Villagra was similarly presented with the same representations regarding available liquidity on BitMEX on June 2 and June 27, 2019.

462.    Prior to opening trading accounts with BitMEX, each Plaintiff was specifically looking for an exchange with the highest liquidity in the industry to trade on, and, therefore, the amount of liquidity on the BitMEX platform was highly material for each Plaintiff's decision to engage in cryptoderivative trading on BitMEX platform and in determining whether or not to trade on BitMEX, as the amount of available liquidity determined the potential profits that Plaintiffs could realize from cryptoderivative trading.  The higher is the available liquidity, the lower is the slippage[20] occurring upon execution of large market orders and the higher is the potential trading profit for Plaintiffs.  Also, the higher is the available liquidity, the lower is the magnitude of price swings and the chance of liquidation.  Therefore, each Plaintiff was specifically looking for an exchange with the highest liquidity on the market and made his decision to open account, make bitcoin deposit(s) and trade on BitMEX because of his reliance on the truth of Defendants' representations regarding the available liquidity on BitMEX being 1500% higher than competition.

---

[20] Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.

463.    Each Plaintiff justifiably relied on the truth of respective representations regarding available liquidity on BitMEX platform made by Defendants and specifically on the truth of the representation that BitMEX provided "1500% more Bitcoin / USD Liquidity than any other platform."   However, in truth and in fact, the aforesaid representations regarding available liquidity on BitMEX made by Defendants were intentionally and materially false during the entire Relevant Period.  In reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained its top position.[21]  For example, analysis of bid-ask spread data from the Relevant Period provided by OKEX cryptoderivative exchange has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%)[22].  Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX.  Therefore, in truth and in fact, liquidity on BitMEX was not any higher than on several competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely claimed to fraudulently solicit Plaintiffs' business.  Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period.[23]  In fact, the aforesaid claims of providing "1500% [or 16 times] more

---

[21] Paragraph 217 of the First Amended Complaint in this action alleged that BitMEX "is the most liquid."  This is explained by the fact that when Plaintiffs filed their First Amended Complaint on October 23, 2020, they were still relying on the Defendants' fraudulent statements and false advertising, which still existed, at the time, on Defendants' website www.bitmex.com and which continued to exist and were removed by Defendants only on March 9, 2021, after amended complaints in related civil matters were filed, pointing to those false statements and false advertisements, Ex. 18.  Therefore, there is no inconsistency between this allegation and the allegations of the Paragraph 217 of the First Amended Complaint.

[22] Liquidity on an exchange is inversely related to a bid-ask spread.  The lower is the bid-ask spread, the higher is the corresponding exchange liquidity.

[23] In a fraudulent solicitation case *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), brought by SEC under Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], SEC charged defendants with fraudulently

Bitcoin / USD Liquidity than any other platform" were materially false even as of September or October of 2018, when they were first made by Defendants.

464.    The fact that liquidity on BitMEX was not any higher than on other competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely represented to Plaintiffs, was well known to Defendants themselves, who had a direct access to all relevant data and who nevertheless deliberately decided to use these fraudulent representations to entice unsuspecting traders, including Plaintiffs, to trade on BitMEX to their financial loss and detriment.  In making the false and fraudulent representations regarding available liquidity on BitMEX platform, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations.  Defendant Hayes, who owns 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent representations regarding available liquidity on BitMEX platform in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by him directly to his personal bank accounts as alleged in Paragraphs above.

465.    In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX having the best liquidity available in the industry, and 1500% higher than competition, when, in reality, he was not.  Thus, Defendants' false representations misled Plaintiffs into believing that they were getting something, namely cryptoderivative trading services from BitMEX having Bitcoin/USD liquidity 1500% higher than competition, that they were not getting.  Therefore, Defendants' false representations regarding liquidity on BitMEX actually mislead each Plaintiff into believing something that was not true and were "likely to [so] mislead a reasonable consumer."  Plaintiffs did not want to use, and

---

soliciting investors to trade digital asset securities by falsely claiming that their Start Options platform was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media."  These fraudulent representations that formed the basis for the SEC action were very similar to Defendants' fraudulent claims of providing "1500% More Bitcoin/USD liquidity than any other platform," the latter being even more specific and factual.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 191 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

would not have used, cryptoderivative trading services if such services did not provide the Bitcoin/USD liquidity 1500% higher than competition.

466.    Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and paid trading commissions to Defendants had he known the true facts, as the true facts meant that due to insufficient liquidity, odds of making any money on BitMEX platform were stacked heavily against each Plaintiff.

467.    Each Plaintiff opened account with BitMEX platform and used Defendants' cryptoderivative trading services offered and managed by Defendants from California based on reliance on the truth of Defendants' representations regarding liquidity on BitMEX being the best available in the industry and 1500% greater than available on any other platform.  When opening their BitMEX trading accounts on May 17, May 8, and June 2, 2019, depositing bitcoins therein, engaging in cryptoderivative trading on BitMEX platform and paying trading commissions to Defendants, respective Plaintiffs Kanyshev, Luzhbin and Villagra each saw and carefully read Defendants' false representations regarding available liquidity on BitMEX and relied on the truth of these representations in deciding to open BitMEX trading account, deposit bitcoins therein and engage in cryptoderivative trading on BitMEX.

468.    Each Plaintiff was deceived and fraudulently induced to open BitMEX trading account, deposit bitcoins therein and engage in cryptoderivative trading on BitMEX platform and did in fact open BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on BitMEX platform due to the reliance on Defendants' false representations regarding available liquidity on BitMEX, which stated to Plaintiffs that BitMEX platform provided "1500% More Bitcoin/USD liquidity than any other platform."

469.    Each Plaintiff would not have opened BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on BitMEX platform if he knew the true facts and, specifically that Defendants' XBTUSD market did not provide "1500% More Bitcoin/USD liquidity than any other platform."

470.    After each Plaintiff opened BitMEX trading account and deposited bitcoins therein, Defendants provided each Plaintiff with cryptoderivative trading services having liquidity, which was below competitor exchanges Binance, Huobi and/or OKEX, which Defendants previously falsely described to Plaintiffs as providing "1500% More Bitcoin/USD liquidity than any other platform."  In doing so, Defendants deceived each Plaintiff and caused him to use Defendants' cryptoderivative trading services with insufficient liquidity, which he did not want.  Defendants' false representations regarding available liquidity on BitMEX caused each Plaintiff to spend and lose the money he paid as trading commissions and trading losses.

471.    Each Plaintiff has suffered injury and loss of valuable property, namely bitcoins, as a result of Defendants' fraud and deceit, and namely as the result of the false representations regarding available liquidity on BitMEX provided to each Plaintiff.

472.    Plaintiffs relied upon Defendants' false representations regarding available liquidity on BitMEX and were induced to use Defendants' cryptodetivative trading services they did not want and which were unsatisfactory to them, paying trading commissions to Defendants and sustaining monetary losses.  Defendants' deception caused the Plaintiffs to open accounts on BitMEX platform, deposit their bitcoins with Defendants and use Defendants' cryptodetivative trading services they did not want, paying trading commissions to Defendants and sustaining monetary losses.  Therefore, Plaintiffs suffered injury in fact and lost money or property as a result of the alleged fraud and deception perpetrated by Defendants using the false representations regarding available liquidity on BitMEX.

473.    When the Defendants made the aforesaid false representations regarding available liquidity on BitMEX to each Plaintiff, they knew them to be materially false, and these representations regarding available liquidity on BitMEX were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open an account with BitMEX, deposit bitcoins and trade Defendants' derivative products, in order to wrongfully confiscate each Plaintiff's property. Defendants had direct access to and first-hand personal knowledge of the liquidity information for

their own BitMEX platform as well as for all competing platforms, including Binance, Huobi and OKEX.  Therefore, they knew that their representations regarding available liquidity on BitMEX made to each Plaintiff were materially false and fraudulent.   In fact, Defendants' misrepresentations were so blatant and so exaggerated, that Defendants simply could not have been ignorant about their falsity.  Moreover, at the end of 2018, a former high-ranking employee of BitMEX repeatedly informed Defendants that the aforesaid representations regarding available liquidity on the BitMEX platform were in fact false and requested their removal from the front page of the BitMEX website, which Defendants deliberately refused to do, because they wanted to continue deceiving traders by promising them liquidity they did not have.  Furthermore, on or about October 3, 2019, Defendants removed words "than any other platform," evidencing the fact that Defendants deliberately tried to make the aforesaid representations regarding available liquidity on BitMEX vaguer, which further establishes that Defendants knew that they were false as written.  Yet furthermore, Defendants continued to use these false representations regarding available liquidity on the BitMEX platform on the front page of their website, front and center, until as late as March of 2021, by which time BitMEX fell to the number eight spot in cryptoderivative exchange rankings, and abruptly removed those false representations promising 1500% more liquidity than other exchanges, only after they were mentioned in related Court cases.  This further establishes that Defendants' fraud was deliberate.

474.    Each Plaintiff, at the time these representations regarding available liquidity on BitMEX were made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations regarding available liquidity on BitMEX and believed it to be true.  In reliance on these representations, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading therein to his financial loss and detriment.  For example, in reliance on

Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs initially deposited[24] with Defendants:

| Kanyshev | May 24, 2019 | 0.2 bitcoins |
| Luzhbin | May 9, 2019 | 3.17 bitcoins |
| Villagra | June 2, 2019 | 1  Bitcoin |

475.    Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits.  Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon.  Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use

---

[24] The deposits listed in this table are only initial deposits.  For example, Plaintiff Villagra deposited with Defendants over 3.2055 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.2 bitcoins.  In addition, Plaintiff Villagra sustained net trading losses of about 0.9765 bitcoins, resulting in his net loss on BitMEX of 1.1765 bitcoins ($68,273), in addition to the bitcoin loss of use damages.  As another example, Plaintiff Kanyshev deposited with Defendants at least 0.2121 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.05 bitcoins.  In addition, Plaintiff Kanyshev sustained net trading losses of about 0.09 bitcoins, resulting in his net loss on BitMEX of 0.14 bitcoins ($8,120), in addition to the bitcoin loss of use damages.

damages.  These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kanyshev | May 24, 2019 | August 15, 2019 | 83 | 0.2 bitcoins | 5.95% | 0.0027 bitcoins |
| Luzhbin | May 9, 2019 | July 11, 2019 | 63 | 3.17 bitcoins | 5.95% | 0.03264 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 25 | 1 bitcoin | 5.95% | 0.004 bitcoins |
| | | | | | Total: | 0.0394 bitcoins |

476.    In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff Kanyshev traded Defendants' bitcoin perpetual swaps on July 15, 2019 and suffered trading losses of over 0.38 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated.  In addition, Plaintiff Kanyshev paid at least 0.02 bitcoins in trading commissions to Defendants on that day.  In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff Luzhbin traded Defendants' bitcoin perpetual swaps on July 11, 2019 and suffered trading losses of over 6.6 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated.  In addition, Plaintiff Luzhbin paid at least 0.3 bitcoins in trading commissions to Defendants on that day.  In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff Villagra traded

Defendants' bitcoin perpetual swaps on June 27, 2019 and suffered trading losses of over 2.9 bitcoins on that day, when his XBTUSD perpetual swap long position was liquidated.  In addition, Plaintiff Villagra paid at least 0.1 bitcoins in trading commissions to Defendants on that day.  The trading losses were sustained by each Plaintiff due to wild downward swings in the price of the XBTUSD and ETHUSD perpetual swap contracts of BitMEX, which resulted in liquidation of Plaintiffs' respective long positions on BitMEX, which were caused, in substantial part, by the insufficient buy (long) side liquidity on the BitMEX platform.  Specifically, on those three days June 27, 2019, July 11, 2019 and July 15, 2019, liquidity on the buy (long) side of the market for XBTUSD and ETHUSD perpetual swaps essentially disappeared, leading to truly staggering price plunges, which precipitated liquidations of Plaintiffs' positions.  Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which induced Plaintiffs to trade on margin on BitMEX, were a substantial factor in causing Plaintiffs' trading losses in the amount of 9.45 bitcoins.  Another substantial factor was the downward swings in the price of the XBTUSD and ETHUSD perpetual swap contracts of BitMEX, which were exacerbated by the aforesaid buy (long) side liquidity shortages.  Moreover, it was foreseeable for Defendants that the insufficient liquidity on BitMEX, which was fraudulently misrepresented by Defendants as being 1500% more than on any other platform, would naturally exacerbate downward price moves and result in staggering price plunges and, consequently, in the liquidations of Plaintiffs' margined trading positions.[25]  Therefore, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were within the foreseeable risk or harm created by the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.  In other words, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined positions on BitMEX were reasonably expected to result from the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.

---

[25] It is well-known that liquidity operates by absorbing and softening market price moves.  The higher the liquidity, the more tempered price moves are.  On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 197 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

477.    Due to Plaintiffs' decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiffs incurred the following monetary damages associated with trading commissions[26] paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants.  Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.  These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions.  Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.01 bitcoins, at the time he opened his first swap position on BitMEX, in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commission |
|---|---|---|---|
| Kanyshev | May 24, 2019 | August 15, 2019 | 0.05 bitcoins |
| Luzhbin | May 9, 2019 | July 15, 2019 | 0.6 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 0.2 bitcoins |
|  |  | **Total:** | **0.85 bitcoins** |

[26] BitMEX charges traders trading commissions (fees) in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not.  For example, the trading commission for opening or closing a margined position is 0.075% of the position size.

478.    If Defendants truly provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such high liquidity would have absorbed sell orders and dampened the downward price moves, preventing the liquidations from taking place, and Plaintiffs would not have sustained the trading losses they did.  Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded perpetual swaps on BitMEX on margin, suffered such losses and would not have paid the trading commissions to Defendants.

479.    Each Plaintiff's reliance on the truth of Defendants' representations regarding available liquidity on BitMEX platform was justified because Defendants took extraordinary measures to keep tight control of the data pertaining to all aspects of operation of BitMEX platform, including available liquidity.  Similarly, operators of other crypto exchanges, such as Binance, Huobi and OKEX also kept tight control of the data pertaining to all aspects of operation of their respective trading platforms, including available liquidity.

480.    According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform."  The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the false and fraudulent representations regarding available liquidity on BitMEX platform to each Plaintiff.

481.    Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California.  Therefore, the false and fraudulent representations regarding available liquidity on BitMEX platform made to each Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.  Accordingly, California law applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

482. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, the false and fraudulent representations regarding available liquidity on the BitMEX platform were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco.

483. Defendants' fraud and deceit was a substantial factor in causing of the injury to Plaintiffs in that Plaintiffs traded in swaps on margin on BitMEX platform as they did, and thus paid 0.85 bitcoins in trading commissions and suffered their trading losses of 9.45 bitcoins from such trading, as well as bitcoin loss of use damages of 0.0394 bitcoins, as a result of their reasonable reliance on Defendants' representations regarding available liquidity on BitMEX and their reasonable failure to know the actual facts. Thus, the total loss sustained by Plaintiffs was 10.3394 bitcoins.

484. Each Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above.

485. Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' use of the false and fraudulent representations regarding available liquidity on BitMEX, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading loss he suffered, and that Defendants would generate the ill-gotten gains they did.

486. As a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using Plaintiffs' highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation contained in

the Service Agreement, by reason of which Plaintiffs have been damaged in the sum of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.  The insufficient liquidity available on the BitMEX platform, which Defendants falsely and fraudulently represented to each Plaintiff as providing "1500% More Bitcoin/USD liquidity than any other platform" and "BitMEX's XBTUSD market [being] the most liquid in the world," additionally contributed to and exacerbated the above losses of Plaintiffs.  If Defendants indeed provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiffs, such liquidations would not have occurred and Plaintiffs would not have sustained the trading losses they did.  Therefore, Defendants' failure to provide 1500% (16x) more liquidity than any other trading platform, as they falsely and fraudulently represented to Plaintiffs, was a substantial factor in causing the trading loss of 9.45 bitcoins by Plaintiffs on June 27, 2019, July 11, 2019 and July 15, 2019.

487.    Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

488.    Cal. Civ. Code § 1710(1) defines deceit as a "suggestion, as a fact, of that which is not true, by one who does not believe it to be true."

489.    Defendants' false and fraudulent representations regarding available liquidity on the BitMEX platform constituted deceit under Cal. Civ. Code § 1710(1) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least 10.3394 bitcoins.

490.    In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT III
### (Fraud by Concealment — Against All Defendants)

491.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1-429 above as if fully set forth herein.

492.    On May 17, 2019, Defendants, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff Kanyshev with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff to personally accept it by opening account and using the BitMEX platform.[27]  The electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff Kanyshev's personal computer.  Plaintiff Luzhbin was similarly presented with the same electronic document on May 8, 2019 and Plaintiff Villagra was presented with the same electronic document on June 2, 2019.

493.    The Service Agreement incorporated the following Warranty and Representation expressly made by Defendants personally to each Plaintiff:

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

---

[27] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 17 and is incorporated herein in its entirety.

494.    However, during the Relevant Time Period, Defendants committed the following fraudulent omissions of material fact to each Plaintiff, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to each Plaintiff, for a fee, through the BitMEX online trading platform and which Defendants, therefore, had a duty to disclose[28]:

   a.    Failing to disclose to each Plaintiff that Defendants were continuously operating the Insider Trading Desk, on a 24 hours a day, 7 days a week basis, which continuously manipulated prices on BitMEX and reference exchanges and enjoyed informational and trading priority privileges over each Plaintiff, by being granted "God access" to highly sensitive and confidential insider information of Plaintiffs and other BitMEX traders, including sizes and leverage amounts for all existing positions and orders, all liquidation prices, stop loss prices and even all parameters of all hidden orders.

   b.    Failing to disclose to each Plaintiff that Defendants provided the Insider Trading Desk with automated systems, built by BitMEX and Defendant ABS, leveraging this highly sensitive and confidential insider information of BitMEX traders, including each Plaintiff, to enable and automate price manipulation that estimated how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

   c.    Failing to disclose to each Plaintiff that the traders at the Insider Trading Desk had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations for BitMEX.

---

[28] All the alleged omissions pertain to the entire Relevant Period.

d.  Failing to disclose to each Plaintiff that once predetermined predicted profitability for BitMEX was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations.

e.  Failing to disclose to each Plaintiff that to prevent the conditions of the BitMEX order book from changing between the profitability prediction time and actual liquidation time, BitMEX was configure to intentionally freeze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

f.  Failing to disclose to each Plaintiff that the access to hidden information thus provided the operators of the Insider Trading Desk with a substantial, unfair and secret advantage over BitMEX customers, including Plaintiffs.

g.  Failing to disclose to each Plaintiff that, by analyzing the impact of hidden trade orders and liquidation prices, BitMEX Insider Trading Desk could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX.

h.  Failing to disclose to each Plaintiff that BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

i.  Failing to disclose to each Plaintiff that Defendants used secret, anonymous accounts to trade against BitMEX customers, including Plaintiffs.

j.  Failing to disclose to each Plaintiff that Defendants granted privileged access to the BitMEX platform to the anonymized accounts, while customers, including Plaintiffs, were locked out, and by misrepresenting that the Insider Trading Desk did not have such access.

k.  Failing to disclose to each Plaintiff that Defendants' Insider Trading Desk was equipped and designed to and operated to continuously intentionally trigger automatic liquidations of trading positions of BitMEX traders, including Plaintiffs, through customer lock-outs and by manipulating prices of underlying cryprtocommodities for its swap cryptoderivative products on reference exchanges and, thus, on the BitMEX platform.

l.  Failing to disclose to each Plaintiff that Defendants continuously allowed BitMEX insiders including Hayes, Delo and Reed to freely and continuously trade on the BitMEX platform against BitMEX customers, despite their complete control of the BitMEX trading platform and their "God access" to confidential BitMEX client information, including customer positions, leverage amounts, liquidation points and orders and despite resulting clear conflict of interest, prohibited by CFTC regulations.

m.  Intentionally misrepresenting to each Plaintiff that Defendants were using and would continue to use commercially reasonable efforts to prevent customer lock-outs on the BitMEX platform, while failing to disclose to Plaintiffs that these lock-outs were intentional and specifically designed to facilitate manipulation by Defendants' Insider Trading Desk.

n.  Failing to disclose the susceptibility of the BitMEX platform to customer lock-outs and their predictable, negative effects on customers and beneficial effect for BitMEX, including through the operation of the Insurance Fund.

o.  Failing to disclose to each Plaintiff that Defendants had no rules or procedures whatsoever sufficient to ensure that: the contracts BitMEX offered to Plaintiffs were not readily susceptible to manipulation; market participants were prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct were subject to discipline, all in violation of CFTC regulations.

p.  Failing to disclose to each Plaintiff that Defendants failed to maintain required records, and in fact has actively deleted required records including critical customer identification information, all in violation of CFTC regulations.

q.  Failing to disclose to each Plaintiff that Defendants had no rules whatsoever to minimize conflicts of interest and allowed insiders, including Defendant Hayes, Delo, Reed, and numerous other BitMEX employees with access to confidential trader insider information, including sensitive Plaintiffs' information, to continuously trade on the platform, and that BitMEX's own internal "market-making" desk was one of the largest traders on the platform.

495.    Therefore, Defendants committed fraudulent omissions during the Relevant Period in at least three main respects.

496.    *First*, Defendants committed fraudulent omissions regarding the nature and operations of the Insider Trading Desk.

a.  BitMEX's updated Service Agreement on its website revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." Defendants did not disclose, however, that the Insider Trading Desk enjoys information, trading and technical advantages over BitMEX customers, described above, or that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer liquidations.

497.    Given that BitMEX trades against its own customers, each Plaintiff would want to know facts bearing on how BitMEX conducts such trades and the extent to which BitMEX is likely to be successful in conducting such trades. Defendants had a common law duty to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff. In addition, Defendants had a statutory duty to avoid making the above partial, misleading representations that effectively concealed material facts from each Plaintiff

under Cal. Civ. Code § 1710(3), which defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

498.    Accordingly, pursuant to their common law and statutory duty under Cal. Civ. Code § 1710(3) to avoid making partial, misleading representations about the activity of the Insider Trading Desk, that effectively concealed material facts from each Plaintiff, Defendants were obligated to (but did not) disclose the information, trading and technical advantages that Insider Trading Desk enjoys over each Plaintiff and other BitMEX customers and that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer, including each Plaintiff's liquidations.  Therefore, Defendants' concealment of material facts from each Plaintiff actually mislead each Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

499.    *Second*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and scope of the customer lock-outs on BitMEX.

  a.  In early 2019, BitMEX's website vaguely disclosed that undefined system overloads might disrupt access to the BitMEX platform. The website has further stated since that time that the customer lock-outs are a result of technical limitations regarding the volume of trading the platform can accommodate.

  b.  Defendants did not disclose, however, that any such technical limitations do not restrict the Insider Trading Desk, which remains able to trade against BitMEX customers during the lock-outs.

  c.  Where BitMEX trades against its own customers, a reasonable BitMEX customer would conclude that a lock-out would suspend all trading on the platform, and the Insider Trading Desk's ability to use the platform during customer lock-outs provided BitMEX with a substantial advantage in trading against BitMEX customers.

d.   Accordingly, in order to avoid making partial, misleading representations that effectively concealed material facts from each Plaintiff, about the nature and scope of lock-outs, Defendants were obligated to disclose that the lock-outs do not restrict the Insider Trading Desk.

e.   Since early 2019, moreover, referring to the "Services" available on its trading platform, BitMEX has at least recklessly and falsely claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that BitMEX "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

f.   In fact, BitMEX did not intend and has failed to use reasonable or commercially reasonable efforts to avoid customer lock-outs, and in knowingly or recklessly claiming otherwise, BitMEX deceived customers into trading on the platform.

g.   Indeed, on information and belief, for the reasons alleged above, Defendants knowingly or recklessly intend the customer lock-outs regularly to occur, in particular during periods of high volatility, to lock out BitMEX customers from their accounts during large market moves in order to increase the number of position liquidations.

h.   Accordingly, in order to make their statements about their purported intent to use reasonable or commercially reasonable efforts to avoid such lock-outs not partial, misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated to disclose their intent to use these lock-outs to their advantage.

500.   *Third*, Defendants made fraudulent statements and committed fraudulent omissions regarding the supposedly "hidden orders" that each Plaintiff may place on the BitMEX platform:

a.  The BitMEX website stated throughout the Relevant Period that a "Hidden Order" is an order "that is not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

b.  Defendants did not disclose to each Plaintiff, however, that these orders are not hidden from BitMEX and its insiders.

c.  Based on the information provided by Defendants, each Plaintiff reasonably concluded that no one using the BitMEX platform would be able to trade based on the details of his so-called "hidden" orders and that so-called "hidden" orders would not provide BitMEX and its insiders with a substantial advantage in trading against each Plaintiff.  This conclusion was wrong because of fraudulent omission of critical information about so-called "hidden" orders by Defendants.

501.   Accordingly, in order to make its description of a "hidden order" not partial, misleading representations that effectively concealed material facts from each Plaintiff, Defendants were obligated to disclose to each Plaintiff that hidden orders were not in fact hidden from BitMEX, and its insiders were obligated to disclose throughout the Relevant Period that BitMEX trades against its customers with knowledge of the details of each Plaintiff's hidden orders.   Defendants have failed to disclose this critical information to each Plaintiff.

502.   When the Defendants committed the aforesaid fraudulent omissions to each Plaintiff, Defendants intentionally omitted a clear disclosure of the facts stated above because giving a clear explanation of how BitMEX platform really operated would have punctured the illusion of risk-free casino-style profits that Defendants promised each Plaintiff.   Defendants' fraudulent omissions to each Plaintiff were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged.

503.   Defendants knew of and intentionally perpetuated these misrepresentations, half-truths and omissions. BitMEX and the individual Defendant Hayes concealed facts that went to the very core of BitMEX's operation, integrity and profit model and could not reasonably have

been unaware of these facts.  In making these misrepresentations, half-truths and omissions, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations.  Defendant Hayes, who owns 31.67% of the remaining Defendants had personal financial interest in perpetuating these misrepresentations, half-truths and omissions in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by him directly to his personal bank accounts as alleged in Paragraphs above.

504.    Defendants intended that each Plaintiff rely on these misrepresentations, half-truths and omissions, and each Plaintiff reasonably did so, given that these statements concerned core aspects of BitMEX's business.

505.    Each Plaintiff, at the time these fraudulent misrepresentations, half-truths and omissions were made by Defendants and at the time each Plaintiff took the actions herein alleged, was ignorant of the material facts fraudulently omitted by Defendants.  In reliance on these misrepresentations, half-truths and omissions, each Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading thereon to his financial loss and detriment.  For example, in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs initially deposited[29] with Defendants:

| Kanyshev | May 24, 2019 | 0.2 bitcoins |
| Luzhbin | May 9, 2019 | 3.17 bitcoins |

---

[29] The deposits listed in this table are only initial deposits.  For example, Plaintiff Villagra deposited with Defendants over 3.2055 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.2 bitcoins.  In addition, Plaintiff Villagra sustained net trading losses of about 0.9765 bitcoins, resulting in his net loss on BitMEX of 1.1765 bitcoins ($68,273), in addition to the bitcoin loss of use damages.  As another example, Plaintiff Kanyshev deposited with Defendants at least 0.2121 bitcoins in total, of which Defendants wrongfully collected from him trading commissions of at least 0.05 bitcoins.  In addition, Plaintiff Kanyshev sustained net trading losses of about 0.09 bitcoins, resulting in his net loss on BitMEX of 0.14 bitcoins ($8,120), in addition to the bitcoin loss of use damages.

| Villagra | June 2, 2019 | 1 bitcoin |
|---|---|---|

506.    Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs incurred the following bitcoin loss of use damages associated with the fact that Plaintiffs' bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits.  Had Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' misrepresentations, half-truths and omissions, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon.  Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages.  These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiffs as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Kanyshev | May 24, 2019 | August 15, 2019 | 83 | 0.2 bitcoins | 5.95% | 0.0027 bitcoins |
| Luzhbin | May 9, 2019 | July 11, 2019 | 63 | 3.17 bitcoins | 5.95% | 0.03264 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 25 | 1 bitcoin | 5.95% | 0.004 bitcoins |

| | | |
|---|---|---|
| **Total:** | | **0.0394 bitcoins** |

507.    In further reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff Kanyshev traded Defendants' bitcoin perpetual swaps on July 15, 2019 and suffered trading losses of over 0.38 bitcoins on that day, when his long XBTUSD perpetual swap position was liquidated.  In addition, Plaintiff Kanyshev paid at least 0.02 bitcoins in trading commissions to Defendants on that day.  In further reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff Luzhbin traded Defendants' bitcoin perpetual swaps on July 11, 2019 and suffered trading losses of over 6.6 bitcoins on that day, when his long XBTUSD perpetual swap position was liquidated.  In addition, Plaintiff Luzhbin paid at least 0.3 bitcoins in trading commissions to Defendants on that day.  In further reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff Villagra traded Defendants' bitcoin perpetual swaps on June 27, 2019 and suffered trading losses of over 2.9 bitcoins on that day, when his long XBTUSD perpetual swap position was liquidated.  In addition, Plaintiff Villagra paid at least 0.1 bitcoins in trading commissions to Defendants on that day.  The trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's perpetual swap position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God Access," in direct violation of the Warranty and Representation.  Had each Plaintiff known the actual facts, he would not have taken such actions, would not have deposited bitcoins, traded perpetual swaps, suffered such losses and would not have paid trading commissions to Defendants.

508.    Due to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiffs incurred the following monetary damages associated with trading commissions[30] paid by

_____

[30] BitMEX charges traders trading commissions in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of

Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' misrepresentations, half-truths and omissions were a substantial factor in causing Plaintiffs' damages associated with trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the Defendants' misrepresentations, half-truths and omissions, which were specifically calculated to fraudulently induce Plaintiffs to pay trading commissions to Defendants. These trading commissions paid by Plaintiffs to Defendants are separate from and do not include any trading losses suffered by Plaintiffs as the result of any market events, market manipulation or market conditions. Each Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.01 bitcoins, at the time he opened his first swap position on BitMEX, in reasonable reliance on Defendants' misrepresentations, half-truths and omissions, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading commissions Damages |
|-----------|-----------------|---------------|------------------------------|
| Kanyshev | May 24, 2019 | August 15, 2019 | 0.05 bitcoins |
| Luzhbin | May 9, 2019 | July 15, 2019 | 0.6 bitcoins |
| Villagra | June 2, 2019 | June 27, 2019 | 0.2 bitcoins |
|  |  | **Total:** | **0.85 bitcoins** |

509.   Each Plaintiff's reliance on Defendants' fraudulent misrepresentations, half-truths and omissions was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators. For example, Defendants used anonymous "burner" (e.g. @gmail.com) email

---

whether the position is profitable or not. For example, the commission for opening or closing a margined position is 0.075% of the position size.

addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, each Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' Insider Trading Desk.

510. Defendants' fraudulent misrepresentations, half-truths and omissions allowed BitMEX to create the false impression with Plaintiffs that if BitMEX was trading against Plaintiffs and its own customers, it nevertheless was not doing so with substantial trading advantages over Plaintiffs and the customers; that BitMEX would not be able to, and would not, take advantage of customer lock-outs to benefit BitMEX at the expense of Plaintiffs and the customers; and that the prices of bitcoin and ether used to determine the value of Bitcoin and ether derivative products traded on BitMEX were prices that BitMEX had not itself manipulated.

511. With these false impressions established, Defendants were able improperly and fraudulently to induce each Plaintiff to use the BitMEX platform, to liquidate each Plaintiff's trading positions on BitMEX using each Plaintiff's very sensitive insider information about each Plaintiff's position and open orders, to use the Insider Trading Desk to orchestrate disadvantageous trades for Plaintiffs, and to manipulate the price of bitcoin and ether on "reference" exchanges to orchestrate further disadvantageous trades and position liquidations for Plaintiffs.

512. Defendants generated ill-gotten gain from their fraud by collecting trading commissions from each Plaintiff for trading on the BitMEX platform that occurred as a result of the fraud (each Plaintiff would each not have used the platform if he had known the truth); prevailing as the counterparty against Plaintiff with respect to trading that occurred as a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth); and increasing the size of the Insurance Fund through position liquidations that occurred as

a result of the fraud (each Plaintiff would not have used the platform or traded as he did if he had known the truth).

513.    Defendants' fraud was thus a direct and proximate cause of the injury to Plaintiffs in that Plaintiffs traded in swaps and futures on margin on BitMEX as they did, and thus paid 0.85 bitcoins in trading commissions and suffered their trading losses from such trading amounting to 9.45 bitcoins, in addition to sustaining bitcoin loss of use damages of 0.0394 bitcoins, as a result of their reasonable failure to know the actual facts fraudulently concealed from Plaintiffs by Defendants.  Thus, the total loss sustained by Plaintiffs was 10.3394 bitcoins.

514.    Each Plaintiff would not have deposited his bitcoins with BitMEX and traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above, fraudulently concealed from each Plaintiff by Defendants.

515.    Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' fraudulent concealment of material facts from each Plaintiff, as described above, that each Plaintiff would deposit his bitcoins with Defendants, thereby sustaining bitcoin loss of use damages, pay the trading commissions he paid and suffer the trading losses he suffered, and that Defendants would generate the ill-gotten gains they did.

516.    As a direct and proximate result of Defendants' fraudulent misrepresentations and concealment of material facts from each Plaintiff, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential and sensitive order and position information, wherein the Insider Trading Desk had priority access to the trading order queues and not subject to lockouts, by reason of which Plaintiffs have been damaged in the sum of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

517.    Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

518.    Cal. Civ. Code § 1710(3) defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

519.    Defendants "[gave] information of other facts which are likely to mislead for want of communication of that fact" by providing to Plaintiffs the false Warranty and Representation without disclosing the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs, liquidations.  This made the Warranty and Representation at least misleading.  Accordingly, Defendants' conduct constituted deceit under Cal. Civ. Code § 1710(3).

520.    Moreover, California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

521.    Defendant had exclusive knowledge of material facts related to the informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and of material fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customer, including each Plaintiffs' liquidations.  These material facts were not known to Plaintiffs.  Therefore, Defendants were

obligated to disclose this information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

522.    Additionally, Defendants engaged in an active concealment of the true facts related to the Insider Trading Desk.  First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the Insider Trading Desk as the origin of manipulative trading.  Second, according to the CFTC Complaint, Ex. 5, p. 16, ¶ 49, Defendants actively deleted critical records, including trader identities.  Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their Insider Trading Desk with the BitMEX platform.  This was done to cover up any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits of the Insider Trading Desk could not be traced back to the BitMEX.  The "burner" accounts were periodically recycled and corresponding trading records deleted.  Therefore, Defendants were additionally obligated to disclose the above information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

523.    Yet furthermore, Defendants "[made] partial representations [about the Insider Trading Desk] but also suppresses some material facts" regarding informational, technical and trading privileges that the Insider Trading Desk enjoys over Plaintiffs and other BitMEX customers and the fact that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiffs' liquidations. Therefore, Defendants were additionally obligated to disclose this information to Plaintiffs under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

524.    Defendants' misrepresentations, half-truths and omissions constituted deceit under Cal. Civ. Code §§ 1710(1) and (3) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.  Therefore,

Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least 10.3394 bitcoins.

525.    In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT IV
### (Fraudulent Inducement — Against Defendants HDR and ABS)

526.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

527.    As alleged in Paragraphs above, the Service Agreement between Defendants and each Plaintiff was induced by and procured by Defendants through the fraud, misrepresentations and fraudulent omissions of material fact by Defendants, which ultimately conferred no bona fide cryptoderivative trading opportunity or any other benefit upon Plaintiffs and thus resulted in a total failure of consideration and frustration of its purpose.

528.    Each Plaintiff entered into the Service Agreement in justifiable reliance on fraudulent misrepresentations and fraudulent omissions of material fact by Defendants as alleged in Paragraphs above.

529.    As a consequence thereof, the Service Agreement is voidable.[31]  Each Plaintiff intended and intends that his original Complaint, the First Amended Complaint, the Second Amended Complaint and this Third Amended Compliant serve as notice of voiding of the Service Agreement, equitably requiring Defendants to restore to Plaintiffs all the bitcoin deposits transferred by Plaintiffs to Defendants as consideration for the Service Agreement and to compensate Plaintiffs for the loss of use of their bitcoins.

530.    Plaintiffs have been damaged by fraudulent misrepresentations and fraudulent omissions of material fact by Defendants as alleged in Paragraphs above in the sum of 10.3394

---

[31] In addition to being voidable for fraud in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable.  Specifically, it is an utterly one-sided and highly oppressive adhesion agreement.

bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT V
### (Negligent Misrepresentation — Against All Defendants)

531.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

532.    At the time Defendants made the Warranty and Representation and representations regarding available liquidity on BitMEX referenced above to each Plaintiff, they had no reasonable grounds to believe that these representations were true and made them without adequate investigation about their veracity.

533.    Cal. Civ. Code § 1710(2) defines deceit as a "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true."

534.    Therefore, making of the Warranty and Representation and representations regarding available liquidity on BitMEX by Defendants to Plaintiffs, for which Defendants had no reasonable grounds to believe that these representations were true, constituted deceit under Cal. Civ. Code § 1710(2).

535.    Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

536.    Defendants' false and fraudulent Warranty and Representation and representations regarding available liquidity on BitMEX constituted deceit under Cal. Civ. Code § 1710(2) and actually deceived Plaintiffs into altering their position by opening BitMEX accounts, depositing bitcoins and engaging in cryptoderivative trading on margin on a rigged BitMEX platform, suffering trading losses, as the result, and paying trading commissions to Defendants. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiffs for Plaintiffs' damages in the total amount of at least 10.3394 bitcoins.

537.    As a direct and proximate result of these negligent misrepresentations made by Defendants to Plaintiffs, Plaintiffs have been damaged in the sum of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT VI
### (Rescission for Negligent Misrepresentation — Against Defendants HDR and ABS)

538.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

539.    As alleged in Paragraphs above, the Service Agreement between Defendants and each Plaintiff was induced and procured by Defendants through negligent misrepresentations made by them to each Plaintiff, including the false Warranty and Representation and false representations regarding available liquidity on BitMEX referenced above, which ultimately conferred no bona fide cryptoderivative trading opportunity or any other benefit upon Plaintiffs and thus resulted in a total failure of consideration and frustration of its purpose. Therefore, each Plaintiff's consent to the Service Agreement was not real, mutual or free in that it was obtained through negligent misrepresentations.

540.    As a direct and proximate result of the negligent misrepresentations made by Defendants to Plaintiffs, Plaintiffs were induced to enter into the Service Agreement and further conduct themselves as herein alleged to their detriment. As a consequence thereof, the Service Agreement is voidable.[32] Each Plaintiff intended and intends that his Complaint serves as notice of voiding of the Service Agreement, equitably requiring Defendants to restore to Plaintiffs all the bitcoin deposits transferred by Plaintiffs to Defendants as consideration for the Service Agreement and to compensate Plaintiffs for the loss of use of their bitcoins.

---

[32] In addition to being voidable for fraud and/or negligent misrepresentation in the inducement, the Service Agreement is also unenforceable against each Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion contract.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)   - 220 -   Kanyshev et al. v. HDR et al.   Case No. CGC-20-584483

541.    Plaintiffs have been damaged by negligent misrepresentations of Defendants in the sum of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## <u>COUNT VII</u>
### (False Advertising in Violation of Cal. Bus. & Prof. Code § 17500 et seq. — Against Defendants HDR and ABS)

542.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

543.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to … perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto … to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning … those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading... Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

544.    An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco.  Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 221 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

Francisco. Accordingly, Cal. Bus. & Prof. Code § 17500 applied to false advertising perpetrated by Defendants in connection with BitMEX platform.

545.    During the Relevant Period, Defendants' cryptoderivative trading services, which defendants offered through the commercial website www.bitmex.com constituted "services" within the meaning of Cal. Bus. & Prof. Code § 17500. Defendants themselves specifically referred to cryptoderivative trading services provided by BitMEX as "services" and used this specific term 94 times in the BitMEX Service Agreement, Ex. 17.

546.    The "intent" required by Cal Bus. & Prof. Code § 17500 is the intent to perform services, and not the intent to mislead the public in the performing of such services.

547.    Defendants misled each Plaintiff and other consumers by making at least the following untrue and misleading statements:

a.    Stating on their commercial website www.bitmex.com, maintained from Defendant ABS' offices in San Francisco, that "HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user." This statement was deliberately and materially false. In truth and in fact, the Insider Trading Desk of BitMEX had "God assess" to all customer, order flow, execution and open position information of the BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts

and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions on the entire BitMEX platform. On the other hand, this information was not available to Plaintiffs and other ordinary platform users, with the exception of Defendants themselves. The Insider Trading Desk used this very sensitive information to automatically trade against, and liquidate customers of BitMEX, including Plaintiffs. Moreover, the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts. In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts. Plaintiffs would not have deposited their 10.3394 bitcoins with BitMEX and would not have traded on the BitMEX platform had they known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX.

   b. Stating, during Relevant Period, on their commercial website www.bitmex.com, maintained from Defendant ABS' offices in San Francisco, that Defendants' cryptoderivative trading services provided "1500% More Bitcoin/USD liquidity than any other platform" and that "BitMEX's XBTUSD market is the most liquid in the world," see Ex. 16. These statements were materially false, as prior to October of 2018, BitMEX was overtaken by other crypto exchanges, including Binance, Huobi and OKEX, in terms of liquidity and never regained its top position. Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts.

548.    Defendants misled each Plaintiff and other consumers by making at least the above untrue and misleading statements and making other false statements and material omissions of fact as alleged in Paragraphs above.

549.    As a direct and proximate result of Defendants' misleading and false advertisements, Plaintiffs have suffered injury in fact and have lost 10.3394 bitcoins. As such, Plaintiffs request that this Court order Defendants to restore these 10.3394 bitcoins, in kind, to Plaintiffs, and to enjoin Defendants from continuing these unfair practices in violation of the Cal Bus. & Prof. Code § 17500 in the future. Otherwise, Plaintiffs and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

## COUNT VIII
### (Violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.) — Against All Defendants)

550.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

551.    During the Relevant Period, each Plaintiff was a "consumer"[33] as defined by Cal. Civ. Code § 1761(d) and traded on his own personal account.

552.    During the Relevant Period, Defendants' cryptoderivative trading services, which defendants offered through the commercial website www.bitmex.com constituted "services" as defined by Cal. Civ. Code § 1761(b).  Defendants themselves specifically referred to cryptoderivative trading services provided by BitMEX as "services" and used this specific term 94 times in the BitMEX Service Agreement, Ex. 17.

553.    During the Relevant Period, Defendants each constituted a "person" as defined by Cal. Civ. Code § 1761(c).

---

[33] To the extent Section 6.4 of the Service Agreement attempts to force Plaintiffs to waive provisions of the Consumer Legal Remedies Act by forcing Plaintiffs to represent that they are not "consumers," such attempt is unenforceable and void pursuant to Cal. Civ. Code § 1751, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."

554.    At all relevant times, each Plaintiff's acceptance of the Service Agreement as well as the use of Defendants' cryptoderivative trading services provided by BitMEX platform for a fee constituted a "transaction" as defined by Cal. Civ. Code § 1761(e).

555.    The Cal. Civ. Code § 1770 provides that it is unlawful to: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

556.    Defendants' acts alleged in Paragraphs above violate at least Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).  Above-alleged Defendants' misrepresentations, half-truths and omissions constituted conduct that is "likely to mislead a reasonable consumer," and, therefore, it violated the Consumer Legal Remedies Act.

557.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs' counsel will notify Defendants in writing by certified mail, return receipt requested, of the particular violations of Cal. Civ. Code § 1770 and demand that Defendants rectify the problems associated with the actions detailed above.

558.    If Defendants fail to respond to Plaintiffs counsel's letter, fail to agree to rectify the problems associated with the actions detailed above within 30 days of the date of written notice, as prescribed by Cal. Civ. Code § 1782, Plaintiffs will amend this Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendants.  As to this cause of action, at this time, Plaintiffs seek only injunctive relief.

### COUNT IX
### ("Unfair" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants)

559.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

560.    The Cal. Bus. & Prof. Code § 17200 et seq. defines "unfair competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive,

untrue or misleading" advertising as well as any violation of Cal. Bus. & Prof. Code § 17500. Cal. Bus. & Prof. Code § 17200.

561.    The Cal. Bus. & Prof. Code § 17200 et seq. imposes strict liability. Plaintiffs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

562.    According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform."  The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the false the fraudulent representations to Plaintiffs.

563.    Defendant ABS Global Trading Limited, responsible, within the BitMEX Enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California.  Therefore, the false and fraudulent statements made to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.  Accordingly, Cal. Bus. & Prof. Code § 17200 applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

564.    An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco.  Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco.  Accordingly, Cal. Bus. & Prof. Code § 17200 applied to false advertising perpetrated by Defendants in connection with BitMEX platform.

565.    A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

566.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive advertising that represented false and fraudulent statements as well as omissions of material fact, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to Plaintiffs, for a fee, through the BitMEX online trading platform.  Defendants' acts and practices offended an established public policy of transparency in operation of financial markets, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

567.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because they would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained bitcoin loss of use damages of 0.0394 bitcoins, sustained trading losses in the amount of 9.45 bitcoins and paid trading commissions in the amount of 0.85 bitcoins to Defendants, but for their reasonable reliance on the truth of the alleged misleading and deceptive advertising by Defendants that incorporated false and fraudulent statements as well as omissions of material fact.  The purchase of cryptoderivative trading services that Plaintiffs would not otherwise have purchased[34] but for the alleged misleading and deceptive advertising by Defendants establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200.  *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D.

---

[34] The purchase of cryptoderivative trading services by Plaintiffs from Defendants resulted in Plaintiffs' bitcoin loss of use damages of 0.0394 bitcoins and damages associated with payment of trading commissions to Defendants in the amount of 0.85 bitcoins, irrespective of, and independently from any profit or loss generated from trading and irrespective of any market events such as market manipulation.

Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp.*, 718 F. 3d 1098 (9th Cir. 2013).

568.    The misleading and deceptive advertising by Defendants included, without limitation, the false Warranty and Representation, false representations about available liquidity on BitMEX, as well as fraudulent omissions of material facts alleged above.

569.    Moreover, Defendants operating a cryptoderivative trading platform BitMEX as a rigged casino, set up to use sensitive insider information of its traders to automatically liquidate them and misappropriate their money, when it was particularly profitable for Defendants to do so, as specifically alleged in Paragraphs 2-8, 226-258 and 627-630 also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers.

570.    Furthermore, Defendants operating a clandestine and highly automated Insider Trading Desk, which enjoys informational, trading and technical advantages over BitMEX customers, described above, and which continuously artificially manipulates the prices of bitcoin and ether on BitMEX and the U.S.-based third-party reference spot exchanges, used for price discovery, as also described above, in order to make its own trades profitable and to force customer liquidations, which directly and proximately resulted in a loss of 9.45 bitcoins by Plaintiffs, as alleged in Paragraphs 627-630 below on June 27, 2019, July 11, 2019 and July 15, 2019, also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers.  Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants because the automated tools operated by the Insider Trading Desk directly and proximately caused a loss of 9.45 bitcoins by Plaintiffs, as alleged in Paragraphs 627-630 below, on June 27, 2019, July 11, 2019 and July 15, 2019.

571.    Yet furthermore, Defendants intentionally and strategically deploying server freezes to prevent Plaintiffs from timely closing their open leveraged long swap positions on BitMEX also constitutes "unfair" business practice under the Cal. Bus. & Prof. Code § 17200, because this practice it unethical, oppressive, unscrupulous and substantially injurious to consumers.  Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants because these intentional server freezes were a substantial factor in causing the loss of 9.45 bitcoins by Plaintiffs on June 27, 2019, July 11, 2019 and July 15, 2019, due to Plaintiffs' inability to timely close their open long positions.

572.    The grave financial harm to Plaintiffs outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unethical, unscrupulous, misleading and deceptive conduct described herein.

573.    By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to deprive Plaintiffs of their bitcoin holdings in the amount of 10.3394 bitcoins.

574.    By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been damaged in the amount of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

### COUNT X
**("Fraudulent" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants)**

575.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

576.    A business act or practice is "fraudulent" under the Cal. Bus. & Prof. Code § 17200 if it is likely to deceive members of the consuming public.

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 229 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

577.    Allegations of specific acts constituting fraud and deceit and fraud by omission set forth in Paragraphs above are incorporated as if fully set forth herein. These acts constitute "fraudulent and deceptive" acts for purposes of Cal. Bus. & Prof. Code § 17200 et seq.

578.    Defendants' "fraudulent and deceptive" acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff and are highly likely to deceive members of the consuming public. Plaintiff relied on Defendants' fraudulent and deceptive representations and omissions regarding the functionality, integrity, profit model and available liquidity of Defendants' cryptoderivative trading services. These misrepresentations and omissions played a substantial role in Plaintiffs' decisions to deposit their valuable bitcoins with BitMEX platform, engage in trading thereon, and pay trading commissions to Defendants, and Plaintiffs would not have deposited their bitcoins, would not have traded on BitMEX and would not have paid trading commissions without Defendants' misrepresentations and omissions.

579.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because they would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained bitcoin loss of use damages of 0.0394 bitcoins, sustained trading losses in the amount of 9.45 bitcoins and paid trading commissions in the amount of 0.85 bitcoins to Defendants, but for their reasonable reliance on the alleged fraudulent and deceptive representations and omissions regarding the functionality, integrity, profit model and available liquidity of Defendants' cryptoderivative trading services. The purchase of cryptoderivative trading services that Plaintiffs would not otherwise have purchased but for the alleged fraudulent and deceptive representations and omissions by Defendants, establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at \*6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream,*

*Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp.*, 718 F. 3d 1098 (9th Cir. 2013).

580.     By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating a fraudulent business practice, designed to deprive Plaintiffs of their bitcoin holdings in the amount of 10.3394 bitcoins.

581.     By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been damaged in the amount of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

### COUNT XI
**("Unlawful" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.) — Against All Defendants)**

582.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

583.     A business act or practice is "unlawful" under the Cal. Bus. & Prof. Code § 17200 if it violates any other law or regulation.  "The 'unlawful' practices prohibited by Cal. Bus. & Prof. Code § 17200 et seq. are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, (C.D. Cal 2001) 178 F. Supp. 2d 1099, 1120; *People v. McKale*, (1979) 25 Cal. 3d 626.

584.     Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive scheme. The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a).

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)     - 231 -     Kanyshev et al. v. HDR et al.     Case No. CGC-20-584483

585.    California law expressly prohibits false advertising schemes run by Defendants. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17501.

586.    Moreover, the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770 prohibits: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

587.    The violation of any law constitutes an "unlawful" business practice under the Cal. Bus. & Prof. Code § 17200.

588.    As detailed herein, Defendants' acts and practices alleged in Paragraphs above were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

589.    Defendants' practices, as set forth in Paragraphs above, have misled Plaintiff and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the Cal. Bus. & Prof. Code § 17200.

590.    Defendants' violation of the Cal. Bus. & Prof. Code § 17200, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that the public will be deceived.  Pursuant to the Cal. Bus. & Prof. Code § 17200, Plaintiffs are entitled to preliminary and permanent injunctive relief and an order commanding Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiffs of all Defendants' revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

591.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs have "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because they would not have opened trading accounts, deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained bitcoin loss of use damages of 0.0394 bitcoins,

sustained trading losses in the amount of 9.45 bitcoins and paid trading commissions in the amount of 0.85 bitcoins to Defendants, but for their reasonable reliance on the truth of the alleged fraudulent solicitations and false advertising, which violated Cal. Civ. Code § 1709 et seq., the FTCA, the FAL, and the CLRA.  The purchase of cryptoderivative trading services that Plaintiffs would not otherwise have purchased, but for the alleged fraudulent solicitations and the unlawful false advertising by Defendants that violated Cal. Civ. Code § 1709 et seq., the FTCA, the FAL, and the CLRA, establishes an economic injury-in-fact for Plaintiffs' claims under Cal. Bus. & Prof. Code § 17200.  *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp*., 718 F. 3d 1098 (9th Cir. 2013).

592.    By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unlawful business practice, designed to deprive Plaintiffs of their bitcoin holdings in the amount of 10.3394 bitcoins.

593.    By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiffs have been damaged in the amount of 10.3394 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT XII
### (Negligence — Against All Defendants)

594.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

595.     The California Supreme Court recognized an exception to the economic loss rule in *J'Aire Corporation v. Gregory*, wherein the rule does not prevent recovery in tort if a special relationship exists between the plaintiff and the defendant.  *J'Aire Corporation v. Gregory,* 24 Cal. 3d 799, 804 (1979).  The exception applies to cases involving contracts for *services* "where the parties are in contractual privity." *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 783 (1997).  The *J'Aire* exception is available if there is a special relationship between plaintiff and defendant.

596.     The Services Agreement is one for provision of cryptoderivative trading *services* and not goods.  Therefore, the *J'Aire* exception is available in the present case.  Court cases have extended the application of *J'Aire* to situations where the parties are in contractual privity.

597.     California Courts examine six factors to determine whether a special relationship between plaintiff and defendant exists:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.  *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

598.     As alleged herein, and to the extent that it is determined to be applicable to certain claims, Plaintiffs had a "special relationship with Defendants" as defined in *J'Aire Corporation v. Gregory*, 24 Cal. 3d 799, 804 (1979). Plaintiffs undoubtedly had a contract for provision of cryptoderivative trading services with Defendants where they and Defendants were in contractual privity. The services consisted of the provision of access to the BitMEX trading platform, including the ability to place orders, open and close positions and use margin.

599.     The transaction between Defendants and Plaintiffs were undoubtedly meant to benefit Plaintiffs by providing them the ability to use the cryptoderivative trading services provided by Defendants through their BitMEX platform for all of the purposes which Plaintiffs expected and which were intended by Defendants. See *J'Aire*, 24 Cal. 3d at 804.

600.    Moreover, it was entirely foreseeable to Defendants that Plaintiffs would be harmed if they would not longer to be able to access cryptoderivative trading services provided by Defendants due to a server freeze, which would result in Plaintiffs' inability to close open trading positions and open new ones.  For example, if Plaintiffs are unable to timely close their positions during a market move, their open positions would likely be liquidated, resulting in a financial loss to Plaintiffs.

601.    In the present case, Plaintiffs certainly suffered injury by being deprived of their 9.45 bitcoins, which was caused by their inability to timely close their open trading positions due to server freezes that occurred on June 27, 2019, July 11, 2019 and July 15, 2019.

602.    As required by *J'Aire*, there is also a close connection between Defendants' conduct and the injury suffered by Plaintiffs.  But for Defendants' allowing the servers of BitMEX to freeze, Plaintiffs would have timely closed their positions and would not have suffered liquidations resulting in the loss of 9.45 bitcoins.

603.    Defendants' conduct also involves moral blame. Aware of the vulnerability of its customers in having their positions liquidated due to server freezes, Defendants have done nothing to prevent that practice, including providing extra server capacity or re-writing BitMEX's high availability software to provide additional protection to its customers' trading positions during market moves.  As one of the world's most profitable cryptoderivative exchanges, which generated at least billion dollars in profits for Defendants, Defendants have all the resources to do better and yet they turn an indifferent eye to the widespread server freezes resulting in devastating financial losses for their customers.  Moreover, evidence summarized above shows that Defendants financially benefit from such sever freezes, which is especially reprehensible conduct in view of the financial devastation that they inflict on retail traders.  Defendants are also morally culpable in failing to reign in its own employees' insider trading on the BitMEX platform using highly confidential "insider" information of Plaintiffs and other BitMEX customers.

604.    Plaintiffs' lawsuit fulfills the policy of preventing future harm. *J'Aire*. Plaintiffs' complaint against Defendants has received widespread publicity and has publicized the server

freezes and other unconscionable conduct occurring on the BitMEX platform. Because the CFTC is apparently not taking an active role in policing Defendants' violations of the CEA, it is up to private parties like Plaintiffs in this action through lawsuits to help stem Defendants' culpable involvement in practices that is leading to widespread harm to consumers.

605.    Thus, for all the foregoing reasons, a special relationship between Defendants and Plaintiffs existed in this case and Defendants owed a duty to Plaintiffs to maintain a functional cryptoderivatives trading marketplace, for access to which they charged Plaintiffs hefty trading commissions. *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders).

606.    Defendants, and each of them, failed to fulfill this duty by failing to prevent server freezes, which occurred on June 27, 2019, July 11, 2019, and July 15, 2019, as alleged herein above, despite BitMEX generating over a billion dollars in profit for Defendants. Irrespective of the origin of the market events on June 27, 2019, July 11, 2019, and July 15, 2019, this negligent operation of Defendants' BitMEX platform prevented Plaintiffs from taking a timely corrective actions on the corresponding dates June 27, 2019, July 11, 2019, and July 15, 2019, which they unsuccessfully attempted to take, to close their open positions, resulting in the wrongful liquidation of Plaintiffs' leveraged long XBTUSD and ETHUSD perpetual swap positions by Defendants and wrongful confiscation of Plaintiffs' 9.45 bitcoins, now valued at over $600,000.00.

607.    Irrespective of the origin of the market events on June 27, 2019, July 11, 2019, and July 15, 2019, Defendants' failing to properly maintain a functional BitMEX platform www.bitmex.com was a substantial factor in causing the injury to Plaintiffs in that Plaintiffs were prevented from taking a corrective action to timely close their open positions, resulting in Defendants' liquidation thereof, and suffered their trading losses of 9.45 bitcoins from such

liquidation.[35]  Defendants' conduct was a substantial factor in causing Plaintiffs' trading losses of 9.45 bitcoins.

608.    All three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, personally responsible for the server freezes on the BitMEX platform, are located in California. Therefore, California is the location where the breach of Defendants' duty to Plaintiffs to maintain a functional cryprtoderivative trading marketplace has occurred.  As BitMEX Enterprise principals, Defendants HDR, ABS and Hayes are liable for the negligent conduct of their agents, engineers Jerry Aldrich, Scott H. and Armando Cerna, who acted, during Relevant Period, within the scope of their agency and employment.

609.    As a result of Defendants' negligence, Plaintiffs have been damaged in the amount of 9.45 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT XIII
### (Restitution Under Quasi-Contract — Against All Defendants)

610.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

611.    As a result of the unlawful actions of Defendants set forth hereinabove, Defendants, and each of them, have received a financial benefit at the expense of Plaintiffs in the amount of at least 10.3394 bitcoins.

612.    Defendants, and each of them, had knowledge of the alleged benefit.

613.    Defendants, and each of them, voluntarily accepted and retained the benefit obtained.

614.    The circumstances render Defendants' retention of the benefit inequitable unless Defendants, and each of them, pay to Plaintiffs the value of the benefit.

---

[35] Negligence cause of action is pleaded in the alternative to the conversion cause of action. Allegations of negligence and conversion are multiple possibilities that, even if mutually exclusive, are permitted under alternative pleading rules.

615.    Defendants, and each of them, have been unjustly enriched at the expense of Plaintiffs.

616.    Plaintiffs are entitled to damages as a result of Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants, and each of them, from Plaintiffs.

617.    Plaintiffs are entitled to restitution from Defendants, under California quasi-contract theory, as a result of Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants, and each of them, from Plaintiffs.

618.    As a result of the actions of Defendants, and each of them, set forth hereinabove, Defendants, and each of them, became unjustly enriched, and as a result thereof, Plaintiffs are entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of the Plaintiffs factually (directly) and legally (proximately) caused by Defendants', and each of them, unlawful conduct.

## COUNT XIV
### (Constructive Trust –— Against All Defendants)

619.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

620.    By reason of the fraudulent and otherwise wrongful manner in which the Defendants, or any of them, obtained their alleged right, claim or interest in and to the property of Plaintiffs — namely 10.3394 bitcoins — Defendants and each of them, have no legal or equitable right, claim or interest therein, but, instead, Defendants, and each of them are involuntary trustees holding said 10.3394 bitcoins and any appreciation thereof and other profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiffs forthwith.

## COUNT XV
### (Accounting — Against All Defendants)

621.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

622.    As a result of the actions of Defendants, and each of them, set forth hereinabove, Defendants, and each of them, have received cryptocurrency in the amount of 10.3394 bitcoins, which is due to Plaintiffs from Defendants, and each of them, as previously alleged.

623.    The amount of cryptocurrency due from Defendants to Plaintiffs is unknown to Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful theft perpetrated by Defendants.

624.    Plaintiffs have demanded an accounting of the aforementioned receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful theft and payment of the amount found due, but Defendants, and each of them, have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

## COUNT XVI
### (Conversion — Against All Defendants)

625.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

626.    During Relevant Period, Plaintiffs were and still are the rightful owners and are entitled to the immediate possession of the following property, namely their valuable bitcoin holdings amounting to 9.45 bitcoins, that were deposited in Plaintiffs' respective BitMEX trading accounts.

627.    As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the aforesaid property amounting to 9.45 bitcoins from Plaintiffs' possession by fraud and deceit and, therefore, have interfered with the Plaintiffs' right to possess and control such property, to which Plaintiffs had a superior right of possession and control at the time of the conversion.

628.    Specifically, automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day,

7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 11, 2019 and July 15, 2019.   Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 11, 2019 and July 15, 2019, resulting in a cumulative loss of 9.45 bitcoins by Plaintiffs.

629.    The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 11, 2019 and July 15, 2019 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of discovery.  Plaintiffs will amend this complaint once they obtain such documentary evidence through the Court's discovery process.[36]

630.    Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their Insider Trading Desk from Plaintiffs, other traders and regulators.  For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its Insider Trading Desk with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.  Therefore, Plaintiffs, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' Insider Trading Desk automated market manipulation tools on June 27, 2019, July 11, 2019 and July 15, 2019.

631.    On June 27, 2019, July 11, 2019 and July 15, 2019, Defendants, using the automated market manipulation tools continuously executed by the Insider Trading Desk, took

---

[36] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the Insider Trading Desk, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

the above-mentioned property, including Plaintiffs' valuable bitcoin holdings of 9.45 bitcoins, deposited in respective Plaintiffs' BitMEX trading accounts from Plaintiffs' possession and converted the same to their own use.  As BitMEX Enterprise principals, Defendants HDR and Hayes are liable for the tortious conduct of their agents, operators of the BitMEX Insider Trading Desk Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment, when they utilized Insider Trading Desk automated market manipulation tools on June 27, 2019, July 11, 2019 and July 15, 2019, to artificially liquidate Plaintiffs' trading positions on BitMEX.

632.    Plaintiffs did not consent to Defendants' taking of 9.45 bitcoins from Plaintiffs.

633.    Defendants refused to return Plaintiffs' valuable bitcoin holdings of 9.45 bitcoins after Plaintiffs demanded their return.

634.    As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of 9.45 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.  Defendants' conduct was a substantial factor in causing Plaintiffs' dispossession of their valuable bitcoin holdings amounting to 9.45 bitcoins.

635.    In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT XVII
### (Aiding and Abetting Conversion — Against All Defendants)

636.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

637.    During the Relevant Period, Plaintiffs were and still are the owners and are entitled to the immediate possession of the following property, namely their valuable bitcoin holdings amounting to 9.45 bitcoins, that were deposited in Plaintiffs' respective BitMEX trading accounts.

638.    At various times mentioned in this Complaint, Defendants knowingly aided and abetted their co-defendants and/or the Insider Trading Desk in taking the above-mentioned property, including Plaintiffs' valuable bitcoin holdings amounting to 9.45 bitcoins deposited in Plaintiffs' respective BitMEX trading accounts from Plaintiffs' possession and converting the same to their own use.

639.    Plaintiffs did not consent to Defendants' taking their valuable bitcoins from them.

640.    The conduct of Defendants, an each of them, was a substantial factor in causing Plaintiffs' damages.

641.    Defendants benefited significantly from the laundering of the converted bitcoin, as Defendants earned trading commissions on each transaction involving the bitcoin converted from Plaintiffs.

642.    As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of 9.45 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

643.    In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT XVIII
### (Replevin (Claim and Delivery) — Against All Defendants)

644.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

645.    During Relevant Period, Plaintiffs were and still are the rightful owners and are entitled to the immediate possession of the following property, namely their valuable bitcoin holdings amounting to 10.3394 bitcoins, that were deposited in Plaintiffs' respective BitMEX trading accounts.

646.    As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the aforesaid property amounting to 10.3394 bitcoins from Plaintiffs'

Consensus Law
CryptoCurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 242 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

possession by fraud and deceit and, therefore, have interfered with the Plaintiffs' right to possess and control such property, to which Plaintiff had a superior right of possession and control at the time of the conversion.

647.    Plaintiffs did not consent to Defendants' taking their valuable bitcoins from them.

648.    Defendants' conduct was a substantial factor in Plaintiffs' dispossession of their valuable bitcoin holdings amounting to 10.3394 bitcoins.

649.    Defendants are still in possession of the aforesaid property amounting to 10.3394 bitcoins taken from Plaintiffs' possession by fraud and deceit.

650.    Defendants refused to return Plaintiffs' valuable bitcoin holdings of 10.3394 bitcoins after Plaintiffs demanded their return.

651.    Therefore, Plaintiffs are entitled to the issuance of a Writ of Replevin for the return of the aforesaid property, namely 10.3394 bitcoins, taken from Plaintiffs' possession by fraud and deceit.

## COUNT XIX
### (Violation of Cal. Pen. Code § 496 — Against All Defendants)

652.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

653.    Cal. Pen. Code § 496(a) provides "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." Cal. Pen. Code § 496(c) provides that "Any person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

654.     Defendants, an each of them, violated Cal. Pen. Code § 496(a) by receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding property stolen from the rightful owners – Plaintiffs in the form of 9.45 bitcoins, knowing the property was stolen or obtained in a manner constituting theft by their co-defendants and/or the Insider Trading Desk.

655.     Defendants and each of them knew that the property, in the form of 9.45 bitcoins, was stolen or had been obtained in a manner constituting theft by their co-defendants and/or the Insider Trading Desk.

656.     As a result of Defendants' conduct, Plaintiffs have been damaged in the amount of 9.45 bitcoins, which Plaintiffs demand to be returned to them in kind, as monetary damages would be manifestly unjust due to Bitcoin appreciation.

657.     The conduct of Defendants, an each of them, was a substantial factor in causing Plaintiffs' damages.

658.     In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

659.     Pursuant to Section 496(c), Plaintiffs seek three times the amount of actual damages sustained, costs of suit, and reasonable attorney's fees.

## **PRAYER**

By reason of the foregoing, Plaintiffs Aleksandr Kanyshev, Nikita Luzhbin and Miguel Villagra respectfully request that this Court:

(a)     enter a judgment that Defendants, and each of them, have perpetrated deceit by fraud upon Plaintiffs in violation of Cal. Civ. Code §§ 1709 and 1710(1) and (3) by fraudulently soliciting Plaintiffs to make bitcoin deposits, pay trading commissions and engage in trading on margin on BitMEX;

(b)     enter a judgment that Defendants, and each of them, have perpetrated deceit by negligent misrepresentation upon Plaintiffs in violation of Cal. Civ. Code §§ 1709 and 1710(2);

(c)    enter a judgment that Defendants, and each of them, have engaged in unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.;

(d)    enter a judgment that Defendants, and each of them, have engaged in false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq.;

(e)    enter a judgment that Defendants, and each of them, violated Cal. Civ. Code § 1770(a), and preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of Cal. Civ. Code § 1770(a);

(f)    enter a judgment that the Service Agreement is null and void as having been procured by fraud and deceit;

(g)    enter a judgment that the Service Agreement is null and void as having been procured by deceit by negligent misrepresentation;

(h)    preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of California laws;

(i)    enter a judgment that Defendants, and each of them, because unjustly enriched at the expense of Plaintiffs;

(j)    impose a constructive trust over Defendants, and each of them, for the benefit of Plaintiffs;

(k)    order an accounting of the alleged receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due to Plaintiffs;

(l)    enter judgment that Defendants, and each of them, acted with malice, fraud and oppression;

(m)    award compensatory damages to Plaintiffs and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial;

(n)      award to Plaintiffs and against all Defendants, and each of them, jointly and severally, damages associated with the loss of use of Plaintiffs' bitcoins, in the amount of at least 0.0394 bitcoins ($2,285[37]), to be paid in kind, of which at least 0.0027 bitcoins ($157) should be awarded to Plaintiff Kanyshev, at least 0.03264 bitcoins ($1,893) should be awarded to Plaintiff Luzhbin and at least 0.004 bitcoins ($235) should be awarded to Plaintiff Villagra, or such other amounts to be determined by the Court, to be paid in kind;

(o)      award to Plaintiffs and against all Defendants, and each of them, jointly and severally, damages associated with trading losses incurred by Plaintiffs on BitMEX, in the amount of at least 9.45 bitcoins ($548,100), to be paid in kind, of which at least 0.38 bitcoins ($22,400) should be awarded to Plaintiff Kanyshev, at least 6.6 bitcoins ($382,800) should be awarded to Plaintiff Luzhbin and at least 2.9 bitcoins ($168,200) should be awarded to Plaintiff Villagra, or such other amounts to be determined by the Court, but not less than Plaintiffs' respective net trading losses on BitMEX, to be paid in kind;

(p)      award to Plaintiffs and against all Defendants, and each of them, jointly and severally, damages associated with trading commissions wrongfully collected by Defendants from Plaintiffs, in the amount of at least 0.85 bitcoins ($49,300), to be paid in kind, of which at least 0.05 bitcoins ($2,900) should be awarded to Plaintiff Kanyshev, at least 0.6 bitcoins ($34,800) should be awarded to Plaintiff Luzhbin and at least 0.2 bitcoins ($11,600) should be awarded to Plaintiff Villagra, or such other amounts to be determined by the Court, to be paid in kind;

(q)      issue a Writ of Replevin against Defendants and in favor of Plaintiffs for at least 10.3394 bitcoins ($599,685.20), to be returned in kind;

---

[37] Conversion from Bitcoin to U.S. dollar is being provided for reference only and assumes bitcoin price of $58,000 per bitcoin.  Plaintiffs request the damages to be paid in kind, in bitcoin, as award of monetary damages in fiat currency would be manifestly unjust due to bitcoin appreciation.

Consensus Law
Cryptocurrency
Attorneys

Third Am. Complaint for Fraud (Demand for Jury Trial)    - 246 -    Kanyshev et al. v. HDR et al.    Case No. CGC-20-584483

(r)    pursuant to Cal. Pen. Code § 496(c), award Plaintiffs three times the amount of actual damages sustained, in the amount of at least 31.0182 bitcoins ($1,799,055.60), to be paid in kind;

(s)    award reasonable attorney fees, costs and prejudgment interest to Plaintiffs and against all Defendants, and each of them, jointly and severally;

(t)    award Plaintiffs exemplary and punitive damages, pursuant to Cal. Civ. Code § 3294, against all Defendants, and each of them, jointly and severally, in the amount of $50,000,000; and

(u)    award Plaintiffs such other relief as this Court deems just and proper.

Dated:  May 13, 2021                         Respectfully submitted,

By: _____
      Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io
Attorneys for Plaintiffs
Aleksandr Kanyshev, Nikita Luzhbin and
Miguel Villagra

# EXHIBIT 1

United States Department of Justice | Offices of the United States Attorneys

THE UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT of NEW YORK

**HOME**    **ABOUT**    **PRIORITIES**    **NEWS**    **RESOURCES**    **PROGRAMS**    **EMPLOYMENT**    **CONTACT**

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE                                    Thursday, October 1, 2020

# Founders And Executives Of Off-Shore Cryptocurrency Derivatives Exchange Charged With Violation Of The Bank Secrecy Act

## Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer Flouted U.S. Anti-Money Laundering Rules

Audrey Strauss, the Acting United States Attorney for the Southern District of New York, and William F. Sweeney Jr., Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced the indictment of Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, charging the four with violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at the Bitcoin Mercantile Exchange or "BitMEX." The case is assigned to United States District Judge John G. Koeltl. REED was arrested in Massachusetts this morning, and will be presented in federal court there. HAYES, DELO, and DWYER remain at large.

Acting Manhattan U.S. Attorney Audrey Strauss said: "With the opportunities and advantages of operating a financial institution in the United States comes the obligation for those businesses to do their part to help in driving out crime and corruption. As alleged, these defendants flouted that obligation and undertook to operate a purportedly 'off-shore' crypto exchange while willfully failing to implement and maintain even basic anti-money laundering policies. In so doing, they allegedly allowed BitMEX to operate as a platform in the shadows of the financial markets. Today's indictment is another push by this Office and our partners at the FBI to bring platforms for money laundering into the light."

FBI Assistant Director William F. Sweeney Jr. said: "As we allege here today, the four defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements. One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost

just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time."

According to the allegations in the Indictment[1]:

HAYES, DELO, and REED founded BitMEX in or about 2014, and DWYER became BitMEX's first employee in 2015 and later its head of business development. BitMEX, which has long serviced and solicited business from U.S. traders, was required to register with the Commodity Futures Trading Commission ("CFTC") and to establish and maintain an adequate AML program. AML programs ensure that financial institutions, such as BitMEX, are not used for illicit purposes, including money laundering.

Despite those obligations, HAYES, DELO, REED, and DWYER knew by no later than in or about September 2015 that, because BitMEX served U.S. customers, it was required to implement an AML program that included a "know your customer" or "KYC" component, but chose to flout those requirements. Indeed, each of the defendants knew of customers residing in the United States who continued to access BitMEX's trading platform through at least in or about 2018, and that BitMEX policies nominally in place to prevent such trading were toothless or easily overridden to serve BitMEX's bottom line goal of obtaining revenue through the U.S. market without regard to U.S. regulation. While knowing of BitMEX's obligation to implement AML and KYC programs because BitMEX was serving U.S. customers, HAYES, DELO, REED, and DWYER took affirmative steps purportedly designed to exempt BitMEX from the application of U.S. laws such as AML and KYC requirements. For example, the defendants caused BitMEX and its parent corporations formally to incorporate in the Seychelles, a jurisdiction they believed had less stringent regulation and from which they could still serve U.S. customers without performing AML and KYC. Indeed, in or about July 2019, HAYES bragged that the Seychelles was a more friendly jurisdiction for BitMEX because it cost less to bribe Seychellois authorities – just "a coconut" – than it would cost to bribe regulators in the United States and elsewhere.

\*            \*            \*

HAYES, 34, of Buffalo, New York and Hong Kong, DELO, 36, of the United Kingdom and Hong Kong, REED, 31, of Massachusetts, and DWYER, 37, of Australia and Bermuda, are each charged with one count of violating the Bank Secrecy Act, and one count of conspiring to violate the Bank Secrecy Act, each of which carries a maximum penalty of five years in prison. The maximum potential sentences in this case are prescribed by Congress and are provided here for informational purposes only, as any sentencing of the defendants will be determined by the judge.

Ms. Strauss praised the outstanding investigative work of the FBI's New York Money Laundering Investigation Squad, and the assistance of the FBI's Boston, Milwaukee, and Minneapolis Field Offices. Ms. Strauss also thanked the attorneys and investigators at the CFTC for offering their expertise in the development of this investigation.

The prosecution is being handled by the Office's Money Laundering and Transnational Criminal Enterprises Unit. Assistant U.S. Attorneys Jessica Greenwood and Samuel Raymond are in charge of the prosecution.

[1] As the introductory phrase signifies, the entirety of the text of the Indictment, and the description of the Indictment set forth herein, constitute only allegations, and every fact described should be treated as an allegation.

**Attachment(s):**

Download Arthur Hayes et al. indictment.pdf

**Topic(s):**

Financial Fraud

**Component(s):**

USAO - New York, Southern

**Contact:**

James Margolin, Nicholas Biase

(212) 637-2600

**Press Release Number:**

20-218

Updated October 1, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :     **SEALED**
                                        **INDICTMENT**
          - v. -                  :
                                        20 Cr. **500**
ARTHUR HAYES,                     :
BENJAMIN DELO,
SAMUEL REED, and                  :
GREGORY DWYER,
                                  :
          Defendants.             :

- - - - - - - - - - - - - - - - - - - X

**COUNT ONE**
**(Violation of the Bank Secrecy Act)**

The Grand Jury charges:

**Overview**

1.    At all times relevant to this Indictment, BitMEX, or the "Bitcoin Mercantile Exchange," has operated as an online trading platform through the website www.bitmex.com. BitMEX solicits and accepts orders for trades in, among other things, futures contracts and other derivative products tied to the value of cryptocurrencies including Bitcoin. BitMEX accepts Bitcoin to margin and guarantee its derivative products, and as of at least in or about March 2017, has offered its customers up to 100 times leverage on certain of its products.

2.    Since its launch in November 2014 and continuing up to and including the present, BitMEX has actively sought to, and

has in fact, served thousands of customers located in the United States, even after purportedly withdrawing from the U.S. market in or about September 2015.

3.     By engaging in the foregoing activities, BitMEX has at all relevant times been a futures commission merchant ("FCM") required to comply with the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* (the "BSA").

4.     From at least in or about September 2015 and continuing up to and including the present, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, in their respective roles as executives of BitMEX, willfully failed to establish, implement, and maintain an adequate anti-money laundering ("AML") program, including an adequate customer identification program, more commonly referred to as a know your customer ("KYC") program, for BitMEX, in violation of the BSA.

### BSA Requirements

5.     The Bank Secrecy Act, as amended by the Patriot Act of 2001, is designed to "prevent, detect, and prosecute international money laundering and the financing of terrorism." 31 U.S.C. § 5311. The BSA imposes reporting, recordkeeping, and controls requirements on covered "financial institutions," which include futures commission merchants that are required to

register as such under the Commodity Exchange Act (the "CEA").
31 U.S.C. § 5312(c).

6.    The CEA requires an entity to register as an FCM with
the United States Commodity and Futures Trading Commission (the
"CFTC") if it solicits or accepts orders for commodity futures
contracts, swaps, or retail commodity transactions (among other
specified products), and in or in connection with such activity
accepts any money or property to margin, guarantee, or secure
any trades or contracts that result or may result therefrom.
Bitcoin and other virtual currencies are "commodities" under the
CEA.

7.    Under the BSA, an FCM must establish an AML program
that is approved by senior management and that includes, at a
minimum: "policies, procedures, and internal controls reasonably
designed to prevent the financial institution from being used
for money laundering or the financing of terrorist activities";
independent compliance testing; ongoing training for appropriate
personnel; and "risk-based procedures for conducting ongoing
customer due diligence." *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R.
§ 1026.210.  FCMs must also file suspicious activity reports
("SARs") including for transactions involving funds or other
assets of at least $5,000 if the FCM knows, suspects, or has

3

reason to suspect, among other things, that the transaction involves funds derived from illegal activity or that the FCM is being used to facilitate criminal activity. *See* 31 C.F.R. § 1026.320.

8. As part of its AML program, an FCM must implement a written KYC program that includes "risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable." This KYC program must enable an FCM to "form a reasonable belief that it knows the true identity of each customer." At a minimum, an FCM must collect the name, date of birth, address, and government identification number of each customer prior to account opening, and must take steps to verify that information in a reasonable time. The KYC program must also include procedures for "determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency." *See* 31 U.S.C. § 5318(l); 31 C.F.R. § 1026.220.

## The Defendants' Roles at BitMEX

9. ARTHUR HAYES, BENJAMIN DELO, and SAMUEL REED, the defendants ("the Founders"), are the co-founders of BitMEX. The Founders founded BitMEX in or about January 2014. BitMEX began to support live trading in or about November 2014.

4

10.   BitMEX has at all relevant times been owned and operated by and through one or more parent companies (collectively with BitMEX, the "Company") registered in the Seychelles.  The Company also has subsidiaries and affiliates registered in the United States and elsewhere that conduct BitMEX operations and employ staff involved in BitMEX's operations.  From its founding to the present, the Company has never had a physical presence in the Seychelles.

11.   From the founding of the Company continuing up to and including at least in or about July 2019, the Founders were co-owners of the Company and collectively held an approximately 90% ownership share in the Company.

12.   The Founders have at all relevant times controlled the Company.  ARTHUR HAYES, the defendant, has been, at all relevant times, the Chief Executive Officer of the Company.  BENJAMIN DELO, the defendant, was, from at least March 2015 until at least January 2018, the Chief Operating Officer of the Company, and was the Chief Strategy Officer of the Company from at least September 2018 until May 2019.  SAMUEL REED, the defendant, has been, at all relevant times, the Chief Technology Officer of the Company.  GREGORY DWYER, the defendant, is a longtime friend and former colleague of ARTHUR HAYES, the defendant.  DWYER was

hired by the Company as its first non-Founder employee in or about late 2015.  DWYER has served a variety of functions at the Company including the Head of Business Development.

### The Company

13.  From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has offered and allowed its customers to trade "Bitcoin futures," the value of which are derived by reference to the Bitcoin/U.S. dollar exchange rate as published on a third-party cryptocurrency exchange.  At various times since its launch in or about November 2014, BitMEX expanded its product offering to include additional futures contracts based on cryptocurrencies other than Bitcoin and/or the U.S. dollar.

14.  From in or about May 2016 and continuing up to and including at least in or about September 2020, BitMEX has also offered and allowed its customers to trade a "Bitcoin perpetual swap," the value of which is derived by reference to the Bitcoin/U.S. dollar exchange rate as published on a third-party cryptocurrency exchange.

15.  From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has accepted Bitcoin to margin customer trades.  In or about 2015,

6

BitMEX offered up to 50 times leverage on certain of its products. Since at least in or about March 2017, BitMEX has offered up to 100 times leverage on certain of its products. At all relevant times, margin on BitMEX has been denominated in Bitcoin.

16. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has accepted Bitcoin to guarantee customer trades. Specifically, BitMEX operates an "Insurance Fund" that it uses to guarantee the shortfall in the event that one counter-party to a trade on BitMEX goes into bankruptcy. BitMEX pays for its Insurance Fund by charging its customers a fee on the value of positions that remain open at the end of each eight-hour trading window. Because BitMEX transacts with its customers solely in Bitcoin, this fee to guarantee trade settlement is collected in Bitcoin.

17. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has solicited and accepted offers on its cryptocurrency futures and swaps from customers located in the United States, including individual retail customers. As of in or about September 2018, for example, internal BitMEX records reflected thousands of BitMEX accounts with United States location information that

7

were enabled for trading.

18.   Because BitMEX is a derivatives exchange that offers and sells commodity futures and swaps to retail and non-retail customers in the U.S, and in connection with such offers and sales accepted property to margin, guarantee, and secure those trades and contracts, it was required to register with the CFTC as an FCM.  At no point has BitMEX registered with the CFTC as an FCM.

19.   From at least in or about 2017 through in or about early 2019, BitMEX personnel, including GREGORY DWYER and others, conducted BitMEX operations from an office in Manhattan, New York, including but not limited to customer support, business development, and marketing, involving customers located in the United States and elsewhere.

### The Defendants Deliberately Failed to Implement BSA-Compliant AML and KYC Programs at BitMEX

20.   ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, in their respective roles as executives of BitMEX, each willfully caused, aided, abetted, and conspired to commit violations of the BSA at BitMEX.

21.   At all times relevant to this Indictment, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the

defendants, have intended for BitMEX to solicit and accept

customers in the United States, and otherwise operate there,

without complying with U.S. AML and KYC requirements.  By at

least in or about September 2015, the defendants understood that

such AML and KYC requirements would in fact apply to BitMEX if

it served U.S. customers or operated within the United

States.  The defendants thus took affirmative steps purportedly

designed to exempt BitMEX from the application of U.S. laws like

AML and KYC requirements.  For example, the defendants caused

the Company to formally incorporate in the Seychelles, a

jurisdiction they believed had less stringent regulation, and

from which they could still serve U.S. customers and operate

within the United States without performing AML and

KYC.  Indeed, HAYES, the defendant, bragged in or about July

2019 that the Seychelles was a more friendly jurisdiction for

BitMEX because it cost less to bribe Seychellois authorities –

just "a coconut" – than it would cost to bribe regulators in the

United States and elsewhere.

        22.  Those affirmative steps purportedly designed to exempt

BitMEX from the application of U.S. law demonstrate that from in

or about September 2015 and continuing up to and including at

least in or about September 2020, ARTHUR HAYES, BENJAMIN DELO,

9

SAMUEL REED, and GREGORY DWYER, the defendants, willfully caused BitMEX to reject adoption or implementation of BSA-compliant AML and KYC programs. For instance, the defendants caused BitMEX to reject adoption or implementation of formal policies, procedures, and internal controls for AML; independent compliance testing for AML; and training for appropriate personnel in AML. Because BitMEX has at no relevant time had an adequate KYC program, BitMEX could not and did not monitor its customer transactions for money laundering and sanctions violations. From its launch in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX did not file any SARs reporting suspected illegal activity on BitMEX.

23. The defendants also caused BitMEX to allow customers, including individual retail customers, to register and trade without providing sufficient identifying information or documents to allow BitMEX to form a reasonable belief that it knows the true identity of its customers. Prior to in or about August 2020, customers could register to trade on BitMEX anonymously, by providing only a verified email address and without providing any identifying information or documentation. Indeed, in its initial marketing period in 2015, BitMEX's

10

website expressly advertised that "No real-name or other advanced verification is required on BitMEX."

24.  As a result of its failure to implement AML and KYC programs, BitMEX made itself available as a vehicle for money laundering and sanctions violations.  For example, in or about May 2018, ARTHUR HAYES, the defendant, was notified of claims that BitMEX was being used to launder the proceeds of a cryptocurrency hack.  BitMEX did not implement a formal AML policy in response to this notification.  Further, internal BitMEX reports identified that customers located in Iran, who are subject to U.S. sanctions, traded on the platform from at least in or about November 2017 through at least in or about April 2018.  HAYES and BENJAMIN DELO, the defendant, personally communicated with BitMEX customers who self-identified as Iranian.  BitMEX did not implement a formal AML policy in response to this Iranian customer activity.

25.  From in or about September 2015, when the CFTC issued public enforcement orders clarifying that cryptocurrencies are commodities for purposes of the CEA, and continuing up to and including at least in or about September 2020, each of the defendants knew that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements, that

11

BitMEX did not have adequate AML and KYC programs, and that BitMEX in fact continued to serve customers in the United States. Each of the defendants willfully caused BitMEX's failure fail to adopt or implement adequate AML and KYC programs, or aided and abetted that failure. Each of the defendants has at relevant times actively encouraged or allowed BitMEX to be accessed and used by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing BitMEX, as described below.

26.    For instance, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, knew that specific customers, residing in the United States, continued to access BitMEX's platform into in or about 2018, with the knowledge of HAYES, DELO, REED, and DWYER, each of whom failed to take steps to deactivate the accounts of these U.S. customers. DELO and DWYER knowingly allowed one of these customers to access BitMEX using a non-U.S. passport in the name of a third party that did not belong to this customer. DELO also allowed another customer to continue to access a BitMEX trading account despite this customer being "US based," because "[h]e's famous in Bitcoin," and falsely changed this customer's internal country of residence to a country other than the United States. REED

12

allowed a friend of his who he knew resided in the United States
to continue to access BitMEX's platform up to and including at
least in or about October 2018.

27.   ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY
DWYER, the defendants, had access to internal BitMEX reports,
which tracked and reported trading revenue by country monthly.
Each and every report from in or about November 2017 through in
or about July 2018 showed U.S. customers trading on BitMEX's
platform.  In a deposition before the CFTC in or about January
2019, REED falsely denied knowing that BitMEX maintained reports
identifying U.S. customers on the platform. In truth and in
fact, in or about December 2018, REED received a report dated in
or about October 2018 which showed trading revenue attributable
to U.S. customers.

28.   After in or about September 2015, when the CFTC issued
the public enforcement orders clarifying that cryptocurrencies
are commodities for purposes of the CEA, BitMEX announced that
it was withdrawing from the U.S. market.  BitMEX implemented an
internet protocol ("IP") address check (the "IP Address Check")
purportedly designed to identify and block customers located in
the United States from trading on BitMEX.  But as the defendants
well knew, and as the defendants intended, BitMEX applied the IP

Address Check on just a single occasion for each customer.  As a result, if a customer showed a non-U.S. IP Address for the IP Address Check, that customer could thereafter access and trade on BitMEX's platform from U.S. IP Addresses.  The defendants also caused BitMEX to further undermine the effectiveness of the IP Address Check, by among other methods, providing an anonymous means of accessing the platform, through the Tor network, a special Internet network that makes it practically impossible to physically locate the computers hosting or accessing websites on the network.  The defendants also caused BitMEX to take no steps to restrict access of BitMEX via virtual private network ("VPN") services, which the defendants knew allowed U.S. customers to circumvent the IP Address Check by making it appear as though they were accessing BitMEX from outside the United States.  The defendants also caused BitMEX to implement a policy through at least in or about September or October 2018 which exempted U.S. IP addresses – and only U.S. IP addresses – from an internal term of service rule which putatively blocked BitMEX access from IP addresses in certain restricted jurisdictions.

29.  BitMEX also engaged in marketing activities with the effect and intent of attracting U.S. customers.  ARTHUR HAYES and GREGORY DWYER, the defendants, regularly attended

14

cryptocurrency conferences in New York and elsewhere in the United States, and had meetings in the United States with potential and existing customers based in the U.S.  In or about May 2018, BitMEX rented three Lamborghinis and had them parked outside of the Consensus Bitcoin conference in Manhattan. ARTHUR HAYES, the defendant, declared this "stunt" a success based on the coverage from U.S. news media.  And in or about 2018, ARTHUR HAYES, the defendant, made repeated appearances on U.S. television shows with viewership primarily in the United States during which he promoted BitMEX.

### Statutory Allegations

30.  From at least in or about September 2015, up to and including in or about September 2020, in the Southern District of New York and elsewhere, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, did willfully cause a financial institution to violate the Bank Secrecy Act by failing to establish, implement, and maintain an anti-money laundering program that satisfies the minimum standards required by 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220, to wit, the defendants caused BitMEX, a futures commission merchant with U.S. customers, to fail to establish and implement an anti-money laundering program that includes policies,

procedures, and internal controls reasonably designed to prevent BitMEX from being used for money laundering or terrorist financing; independent compliance testing; ongoing training for appropriate personnel; and risk-based procedures for verifying the identity of each BitMEX customer to the extent reasonable and practicable.

(Title 31, United States Code, Sections 5318(h)(1) and (l), 5322(a) and (c); Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Conspiracy to Violate the Bank Secrecy Act)

The Grand Jury further charges:

31.  The allegations contained in paragraphs 1 through 29 of this Indictment are repeated and realleged as if set forth fully herein.

32.  From at least in or about September 2015, up to and including at least in or about September 2020, in the Southern District of New York and elsewhere, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, and with others known and unknown, to cause a financial institution to violate the Bank Secrecy Act, in violation of 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§

16

1026.210 and 1026.220, to wit, the defendants caused BitMEX, a

futures commission merchant with U.S. customers, to fail to

establish and implement an anti-money laundering program that

includes policies, procedures, and internal controls reasonably

designed to prevent BitMEX from being used for money laundering

or terrorist financing; independent compliance testing; ongoing

training for appropriate personnel; and risk-based procedures

for verifying the identity of each BitMEX customer to the extent

reasonable and practicable.

## Overt Acts

33.    In furtherance of the conspiracy, and to effect the

illegal objects thereof, ARTHUR HAYES, BENJAMIN DELO, SAMUEL

REED, and GREGORY DWYER, the defendants, together with others

known and unknown, committed the following overt acts, in the

Southern District of New York and elsewhere:

a.    From at least in or about 2017 through in or about

early 2019, BitMEX personnel, including DWYER and others,

conducted BitMEX operations from an office in Manhattan, New York,

including but not limited to customer support, business

development, and marketing, involving customers located in the

United States and elsewhere.

b.    From at least in or about September 2015 through at

17

least in or about October 2019, HAYES, DELO, REED, and DWYER allowed particular known customers who resided in the United States to obtain or maintain access to BitMEX in violation of its purported U.S. user ban, and DELO and DWYER and others known and unknown falsified or allowed to be falsified internal BitMEX records claiming that these customers resided outside of the United States.

c.   In or about May 2018, HAYES was notified of claims that BitMEX was being used to launder the proceeds of a cryptocurrency hack.  Neither HAYES nor any other BitMEX employee took any action to implement a formal AML policy in response.

(Title 18, United States Code, Section 371.)


FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

18

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**ARTHUR HAYES,
BENJAMIN DELO,
SAMUEL REED, and
GREGORY DWYER,**

**Defendants.**

**SEALED INDICTMENT**

20 Cr.

(31 U.S.C. §§ 5318(h)(1) and (1),
5322(a) and (c); 31 C.F.R. §§ 1026.210
and 1026.220; and 18 U.S.C. §§ 2 and
371.)

AUDREY STRAUSS
Acting United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT 2

**Release Number 8270-20**

## CFTC Charges BitMEX Owners with Illegally Operating a Cryptocurrency Derivatives Trading Platform and Anti-Money Laundering Violations

**October 01, 2020**

**Washington, D.C.** — The Commodity Futures Trading Commission today announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging five entities and three individuals that own and operate the **BitMEX** trading platform with operating an unregistered trading platform and violating multiple CFTC regulations, including failing to implement required anti-money laundering procedures. This case is brought in connection with the Division of Enforcement's Digital Asset and Bank Secrecy Act Task Forces.

Among those charged are company owners **Arthur Hayes**, **Ben Delo**, and **Samuel Reed**, who operate BitMEX's platform through a maze of corporate entities. These entities, also named as defendants in the complaint, are **HDR Global Trading Limited**, **100x Holding Limited**, **ABS Global Trading Limited**, **Shine Effort Inc Limited**, and **HDR Global Services (Bermuda) Limited (BitMEX)**. BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

"Digital assets hold great promise for our derivatives markets and for our economy," said Chairman Heath P. Tarbert. "For the United States to be a global leader in this space, it is imperative that we root out illegal activity like that alleged in this case. New and innovative financial products can flourish only if there is market integrity. We can't allow bad actors that break the law to gain an advantage over exchanges that are doing the right thing by complying with our rules."

"As the CFTC has made clear, registration requirements are a cornerstone of the regulatory framework that protects Americans and U.S. financial markets," added Division of Enforcement Director James McDonald. "Effective anti-money laundering procedures are among the fundamental requirements of intermediaries in the derivatives markets, whether in traditional products or in the growing digital asset market. This action shows the CFTC will continue to work vigilantly to protect the integrity of these markets."

In its continuing litigation against the defendants, the CFTC seeks disgorgement of ill-gotten gains, civil monetary penalties, restitution for the benefit of customers, permanent registration and trading bans, and a permanent injunction from future violations of the Commodity Exchange Act (CEA).

**Related Criminal Action**

The U.S. Attorney for the District of New York indicted Hayes, Delo, and Reed, along with Gregory Dwyer, on federal charges of violating the Bank Secrecy Act and conspiracy to violate the Bank Secrecy Act. *See United States v. Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer*, Case No. 20-CR-500 (SDNY). The indictment was unsealed today.

**Case Background**

The complaint alleges that from at least November 2014 through the present, and at the direction of Hayes, Delo, and Reed, BitMEX has illegally offered leveraged retail commodity transactions, futures, options, and swaps on cryptocurrencies including bitcoin, ether, and litecoin, allowing traders to use leverage of up to 100 to 1 when entering into transactions on its platform. According to the complaint, BitMEX has facilitated cryptocurrency derivatives transactions with an aggregate notional value of trillions of dollars, and has earned fees of more than over $1 billion since beginning operations in 2014. Yet, as alleged in the complaint, BitMEX has failed to implement the most basic compliance procedures required of financial institutions that impact U.S. markets.

The complaint charges BitMEX with operating a facility for the trading or processing of swaps without having CFTC approval as a designated contract market or swap execution facility, and operating as a futures commission merchant by soliciting orders for and accepting bitcoin to margin digital asset derivatives transactions, and by acting as a counterparty to leveraged retail commodity transactions. The complaint further charges BitMEX with violating CFTC rules by failing to implement know-your-customer procedures, a customer information program, and anti-money laundering procedures.

As alleged in the complaint, BitMEX touts itself as the world's largest cryptocurrency derivatives platform, with billions of dollars' of trading volume each day. Much of this volume, and related transaction fees, derives from the operation of the platform from the U.S. and its extensive solicitation of and access to U.S. customers, the complaint alleges. Nevertheless, BitMEX has failed to register with the CFTC, and has failed to implement key safeguards required by the CEA and CFTC's regulations designed to protect the U.S. derivatives markets and market participants.

The CFTC strongly urges the public to verify a company's registration with the Commission before committing funds. If unregistered, a customer should be wary of providing funds to that company. A company's registration status can be found using NFA BASIC.

The CFTC thanks and acknowledges the assistance of the U.S. Attorney's Office for the Southern District of New York, the Federal Bureau of Investigation, the Hong Kong Securities and Futures Commission, and the Financial Service Authority Seychelles.

The Division of Enforcement staff members responsible for this case are Joy McCormack, Carlin Metzger, Jeffrey Gomberg, Joseph Platt, Ray Lavko, Brigitte Weyls, Elizabeth N. Pendleton, Scott Williamson, and Robert T. Howell. Staff from the Division of Market Oversight, Division of Clearing and Risk, and Division of Swap Dealer and Intermediary Oversight also assisted in this matter.

**-CFTC-**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) **CIVIL ACTION NO: 20-cv-8132** |
| Plaintiff, | ) ) |
| v. | ) **Hon._____** ) |
| HDR Global Trading Limited, 100x Holdings Limited, ABS Global Trading Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited, Arthur Hayes, Ben Peter Delo, and Samuel Reed | ) **Jury Trial Demanded** ) ) ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal agency, for its Complaint against Defendants HDR Global Trading Limited ("HDR"), 100x Holdings Limited ("100x"), ABS Global Trading Limited ("ABS"), Shine Effort Inc Limited ("Shine"), and HDR Global Services (Bermuda) Limited ("HDR Services"), all doing business as "BitMEX," as well as BitMEX's co-founders Arthur Hayes ("Hayes"), Benjamin Delo ("Delo"), and Samuel Reed ("Reed") (collectively, "Defendants" or "BitMEX"), alleges as follows:

## I.     SUMMARY

1.     BitMEX touts itself as the world's largest cryptocurrency derivatives platform in the world with billions of dollars' worth of trading each day. Much of this trading volume and its profitability derives from its extensive access to United States markets and customers.

Nevertheless, BitMEX has never been registered with the CFTC in any capacity and has not

complied with the laws and regulations that are essential to the integrity and vitality of the U.S.

markets, like know-your-customer procedures to prevent money laundering, or procedures

designed to detect and prevent manipulative trading and other illicit activities.  Instead, BitMEX

has profited while illegally offering leveraged retail commodity transactions, futures, options and

swaps; operating as an unregistered futures commission merchant ("FCM"); and operating a

facility for the trading of swaps without being registered as a swap execution facility ("SEF") or

as a designated contract market ("DCM").  Therefore, the CFTC brings this action against

Defendants, the owners and operators of the BitMEX virtual currency derivatives trading

platform, to enjoin their ongoing illegal offering of commodity derivatives to U.S. persons, their

acceptance of funds to margin derivatives transactions from individuals and entities in the U.S.,

and their operation of a derivatives trading platform in the U.S. in violation of the Commodity

Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1-26 (2018), and the CFTC Regulations

("Regulations"), 17 C.F.R. pts. 1-190 (2019).

     2.     Beginning no later than November 2014 and continuing to the present (the

"Relevant Period"), Defendants have offered commodity futures, options, and swaps on digital

assets, including bitcoin, ether, and litecoin, to persons in the United States, from offices in the

United States, through the website www.bitmex.com and a mobile application, without

registering as an FCM or being designated or registered as a contract market (a DCM) by the

Commission.  Defendants also have operated a facility for the trading or processing of swaps

without being registered as a DCM or a SEF.

     3.     During the Relevant Period, BitMEX has conducted trillions of dollars in digital

asset derivatives transactions and earned fees worth more than $1 billion from transactions on its

platform.  BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons.  BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus.

4.      Throughout the Relevant Period, and through the operation of the BitMEX platform, Defendants have violated, and continue to violate, core provisions of the CEA and Regulations, including:

     i.      offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b), 7 U.S.C. § 4(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2019);

    ii.      offering, entering into, confirming the execution of, or transacting in off-exchange transactions in commodity options, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019);

   iii.      acting as an unregistered FCM, in violation of Section 4d of the Act, 7 U.S.C. § 6d (2018);

    iv.      operating a facility for the trading or processing of swaps without being registered as a SEF or as a DCM, in violation of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019);

    v.      failing to supervise, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2019); and

    vi.      failing to comply with applicable provisions of the Bank Secrecy Act, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2019).

3

5.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

6.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l (2018), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

8.     Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in the Southern District of New York, and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

### III.    PARTIES

#### A.    The CFTC

9.    Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

#### B.    Defendants

10.    **HDR Global Trading Limited** was incorporated in the Seychelles in 2014 as a Seychelles International Business Company.  Throughout the Relevant Period, HDR has owned and operated the BitMEX trading platform.  Despite being incorporated in the Seychelles, HDR does not have, and never has had, any operations or employees in the Seychelles.  HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  "HDR" derives from the first letter of the last names of Hayes, Delo, and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in HDR.

11.    **100x Holdings Limited** is a holding company recently incorporated by Hayes, Delo, and Reed in Bermuda.  In a July 15, 2020, blog post on the BitMEX website, Hayes "introduced" 100x and represented that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform."

12.    **ABS Global Trading Limited** is a Delaware limited liability company incorporated in 2017 through which BitMEX conducts some operations in the United States.  It is a subsidiary of HDR and 100x, and it is ultimately owned and controlled by Hayes, Delo, and Reed.  "ABS" derives from the first letters of the first names of Hayes, Delo, and Reed:  Arthur, Ben and Sam.

5

13.    **Shine Effort Inc Limited** is a Hong Kong corporation incorporated in 2014, and a subsidiary of HDR and 100x.  Shine is the corporate entity through which BitMEX conducts proprietary trading on its own BitMEX platform, as well as proprietary trading with other market participants on exchanges and over the counter throughout the world.  Shine is controlled by Hayes, Delo, and Reed.

14.    **HDR Global Services (Bermuda) Limited** is a Bermudian entity incorporated in 2018 that employs certain personnel performing duties for BitMEX.

15.    HDR, 100x, ABS, Shine, and HDR Services act as a single, integrated common enterprise.  They share common office space, employees and operational resources.  They advertise on a single website that does not distinguish between entities.  They share common directors.  They share common ownership.  They share common legal and compliance resources.  They share operating expenses, and report financial activities in consolidated financial statements.  BitMEX employees and executives refer to a BitMEX enterprise as opposed to distinguishing between legal entities.  Employees of the various entities have "bitmex.com" email addresses.  These entities operate as an integrated, common enterprise, and are described together in this complaint as "BitMEX."

16.    **Arthur Hayes** is a co-founder and co-owner of BitMEX, and describes himself as Chief Executive Officer of BitMEX.  He is a U.S. citizen who currently resides in Hong Kong. Hayes owns property in the U.S., and files U.S. income tax returns.  During the Relevant Period, Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S.  Hayes also owns and operates an entity named Headline Asia, through which he conducts transactions with and on the BitMEX platform, and with other cryptocurrency

exchanges and over-the-counter trading partners.  He has never been registered with the Commission in any capacity.

17.    **Ben Peter Delo** is a co-founder and co-owner of BitMEX, and during the Relevant Period he has been the Chief Operating Officer of BitMEX.  He is a U.K. citizen and, on information and belief, currently resides in Hong Kong.  He has never been registered with the Commission in any capacity.

18.    **Samuel Reed** is a co-founder and co-owner of BitMEX, and describes himself as Chief Technology Officer of BitMEX.  He is a U.S. citizen and has resided in Milwaukee, Wisconsin and Boston, Massachusetts during the Relevant Period.  During the Relevant Period, Reed has held his ownership interest in the BitMEX entities through a Wisconsin limited liability company that maintains bank accounts at banks in the United States, and owns property in the U.S.  Reed has never been registered with the Commission in any capacity.

19.    Hayes, Delo, and Reed together control the operations of the BitMEX enterprise.

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

20.    The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5 (2018).

21.     Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity.  The CEA requires that, subject to certain exemptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade, Section 4 of the Act, 7 U.S.C. § 6 (2018), and Regulation 48.3, 17 C.F.R. § 48.3 (2019); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market, 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(a) (2018), and Regulation 37.3, 17 C.F.R. § 37.3 (2019); commodity options must likewise be conducted on a board of trade designated as a contract market, Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019).

22.     A cryptocurrency or virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.

23.     Bitcoin, ether, litecoin, and other virtual currencies are distinct from "real" or "fiat" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.  Digital assets, such as bitcoin, ether, and litecoin are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).

24.     In recent years, as digital asset and virtual currency markets have evolved, the CFTC has approved the offer of futures contracts on virtual currencies by boards of trade

registered with the CFTC such as the Chicago Mercantile Exchange and Chicago Board Options Exchange.

25.    With limited exceptions, Section 5h(a) of the Act, 7 U.S.C. § 7b-3 (2018), and Regulation 37.3, 17 C.F.R. § 37.3 (2019), make it illegal for a person to operate a facility for the trading or processing of swaps unless the facility is registered as a designated contract market or a swap execution facility with the CFTC.

26.    Section 1a(47)(A)(iii) and (vi) of the Act, 7 U.S.C. § 1a(47)(A)(iii), (vi) (2018), broadly defines "swap" to include "any agreement, contract, or transaction"—

> (iii) [T]hat provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interest or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract or transaction commonly known as . . . (I) an interest rate swap; . . . (VII) a currency swap; . . . (XXII) a commodity swap . . . [or]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

27.    The provisions of the Act and Regulations that apply to DCMs and SEFs, the facilities where the trading of commodity derivatives typically occurs, establish important protections for United States derivatives markets and market participants.  For example, DCMs and SEFs must conform to core principles that are designed to achieve the prevention of market abuse, Sections 5(d)(12)(a) and 5h(f)(2)(B) of the Act, 7 U.S.C. §§ 7(d)(12)(a),  7b-3(f)(2)(B) (2018); ensure their financial stability, Sections 5(d)(21) and 5h(f)(13) of the Act, 7 U.S.C. §§ 7(d)(21), 7b-3(f)(13) (2018); protect their information security, Regulations 38.1051(a)(2)

and 37.1401(a)(2), 17 C.F.R. §§ 38.1051(a)(2), 37.1401(a)(2) (2019); and safeguard their

systems in the event of a disaster, Regulations 38.1051(a)(3) and 37.1401(a)(3), 17 C.F.R.

§§ 38.1051(a)(3), 37.1401(a)(3) (2019).  Further, DCMs and SEFS must ensure that the contracts

they list for trading are "not readily susceptible to manipulation," Sections 5(d)(3) and 5h(f)(3)

of the Act, 7 U.S.C. §§ 7(d)(3), 7b-3(f)(3) (2018); DCMs must "prevent market disruption,"

Section 5(d)(4) of the Act, 7 U.S.C. § 7(d)(4) (2018), and SEFs must monitor trading "to prevent

manipulation, price distortion, and disruptions," Section 5h(f)(4)(B) of the Act, 7 U.S.C. § 7b-

3(f)(4)(B) (2018); DCMs and SEFs must impose position limits designed to reduce the potential

threat of market manipulation or congestion, Sections 5(d)(5) and 5h(f)(6) of the Act, 7 U.S.C.

§§ 7(d)(5), 7b-3 (f)(6) (2018); DCMs and SEFs must establish and enforce rules to minimize

conflicts of interest, Sections 5(d)(16) and 5h(f)(12) of the Act, 7 U.S.C. §§ 7(d)(16), 7b-3(f)(12)

(2018); and DCMs and SEFs must maintain and retain important records and provide them to the

Commission, Sections 5(d)(18) and 5h(f)(10) of the Act, 7 U.S.C. §§ 7(d)(18), 7b-3(f)(10)

(2018).

  28. An FCM is an individual, association, partnership, corporation, or trust that is (i)

engaged in soliciting or in accepting orders for regulated transactions including futures, swaps,

commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail

commodity transactions; and which, in connection with these activities, "accepts any money,

securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any

trades or contracts that result or may result therefrom."  Section la(28)(A) of the Act, 7 U.S.C.

§ la(28)(A) (2018).

  29. Retail commodity transactions are transactions that are entered into with, or

offered to, non-eligible contract participants "on a leveraged or margined basis, or financed by

the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2018). Retail commodity transactions are subject to Section 4(a) of the Act, 7 U.S.C. §§ 6(a) (2018), "as if" they are a contract of sale of a commodity for future deliver, and therefore must be executed on a regulated exchange.

30.     An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2018).

31.     FCM's hold customer funds to margin commodity derivative transactions. They are a critical component of the U.S. financial system, and therefore must meet stringent requirements imposed by the Act and Regulations. Among the most fundamental of these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a) (2018), which makes it illegal for any person to be an FCM unless registered as such with the Commission. FCMs must establish safeguards to prevent conflicts of interest, Section 4d(c) of the Act, 7 U.S.C. § 6d(c) (2018); segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018).

32.     Regulation 166.3, 17 C.F.R. § 166.3 (2019), requires a Commission registrant such as an FCM to diligently supervise all activities of its officers, employees, and agents relating to its business as an FCM. The term "Commission registrant" as used in 17 C.F.R. § 166.3 means "any person who is registered or required to be registered with the Commission

pursuant to the Act or any rule, regulation, or order thereunder" Regulation 166.1(a), 17 C.F.R. § 166.1(a) (2019).

33.     Regulation 42.2, 17 C.F.R. § 42.2 (2019) requires, among other things, that every FCM shall comply with the applicable provisions of the Bank Secrecy Act (BSA) and the regulations promulgated by the Department of the Treasury under that Act at 31  C.F.R. chapter X, and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220, which require that a customer identification program ("CIP") be adopted as part of the firm's BSA compliance program.

34.     31 U.S.C. § 5318(l) (2018) requires, among other things, that financial institutions such as FCMs implement reasonable procedures to verify the identity of any person seeking to open an account, maintain records of information used to verify a person's identify, and consult lists of known or suspected terrorists or terrorist organizations (such as those created and distributed by the Office of Foreign Asset Control of the United States Department of Treasury ("OFAC") to determine whether a person seeking to open an account appears on any such list.

35.     The regulations promulgated by the Department of Treasury under 31 C.F.R. chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identify of each customer sufficient to enable the FCM to form a reasonable belief that it knows the true identify of each customer; (2) retain records collected pursuant to the CIP; and (3) implement procedures for determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations.

## V.    FACTS

### A.    The BitMEX Trading Platform and Products

36.    BitMEX is a peer-to-peer "crypto-products platform" that offers the trading of cryptocurrency derivatives including bitcoin, ether and litecoin.  As of September 5, 2020, BitMEX advertises that it has a transaction volume of $74.06 billion during the prior thirty days, and $956.83 billion during the past year.

37.    BitMEX offers leveraged trading of cryptocurrency derivatives to retail (non-ECP) and institutional customers in the U.S. and throughout the world through BitMEX's website, www.bitmex.com, the BitMEX mobile app, and by direct connection to its trading engine servers via the BitMEX application protocol interface ("API").  The API connection is generally used by more technologically sophisticated BitMEX customers.

38.    On its website, BitMEX advertises that "sign up takes less than 30 seconds," and that customers can "trade in minutes; deposits only require one confirmation."  BitMEX allows customers to open accounts with an anonymous email and password, and a deposit of bitcoin. BitMEX does not collect any documents to verify the identity or location of the vast majority of its users.

39.    BitMEX is a pure derivatives exchange as opposed to a spot market for the purchase or sale of virtual currencies.  BitMEX allows customers to place buy or sell orders for its various cryptocurrency derivatives with leverage of up to 100 to 1, meaning a customer with $10,000 in his or her account may execute a trade with a notional value of $1,000,000.  BitMEX does not actually deliver the cryptocurrencies underlying the contracts it offers for trading on its platform.

40.     BitMEX offers the leveraged trading of cryptocurrency derivatives; BitMEX does not actually deliver the cryptocurrencies whose prices underlie the various contracts and transactions BitMEX offers.

41.     BitMEX accepts deposits to and allows withdrawals from the platform in bitcoin. BitMEX requires customers to deposit bitcoin to margin trading positions in its various contracts. BitMEX allows customers to place buy (long) and sell (short) orders in an electronic order book, and matches customer orders in what it calls its "trading engine."

42.     To keep positions open, BitMEX customers are required to hold a percentage of the value of their trading positions on the exchange as margin.  BitMEX describes "Initial Margin" as "the minimum amount of bitcoin you must deposit to open a position."  BitMEX describes "Maintenance Margin" as "the minimum amount of bitcoin you must hold to keep a position open."  If a customer's margin balance drops below the Maintenance Margin level, BitMEX takes over the customer's trading position, the position is liquidated, and the customer's maintenance margin is lost.  If BitMEX is able to liquidate the position at above what it calls the "bankruptcy" price, the funds are added to BitMEX's "Insurance Fund."  If BitMEX is unable to liquidate the position above the bankruptcy price, BitMEX uses funds from its Insurance Fund to make up the difference, or may close out positions of other traders on the exchange in what BitMEX calls an "Auto-Deleveraging event."

43.     BitMEX acts as the counterparty to certain transactions on its platform, such as through its internal "market-making" desk, or through the BitMEX "Liquidation Engine" that can assume a customer's position under certain circumstances.

44.     In general, BitMEX makes money by charging execution fees for trades made on the BitMEX platform.  BitMEX has made more than $1 billion in fees since its inception in 2014.

45.     Hayes, Delo, and Reed launched the BitMEX trading platform for live trading in November of 2014.  Initially, BitMEX offered only two futures contracts, the "XBT" and the "XBU," both of which were based on the value of a dollar against the value of a bitcoin.  Over time, BitMEX added various virtual currency derivatives contracts to its suite of products, including futures, options and swaps on bitcoin, litecoin and ether.

46.     On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD perpetual swap."  On its website, BitMEX has described its "Perpetual Contract" (or "perpetual swap contract") as "a product similar to a traditional Futures Contract in how it trades."  BitMEX claims its "XBTUSD" perpetual swap is "the most traded cryptocurrency product of all time."

47.     Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5 trillion contracts traded on its platform.  Most of that volume—more than two trillion contracts— has been in the XBTUSD swap.

48.     Despite its significant trading volume, the varied products offered for trading, and acting in a capacity requiring designation or registration as a DCM or SEF, BitMEX has not implemented rules or procedures to achieve compliance with the core principles required of DCMs or SEFs under the CEA and Regulations.  Among other critical issues, BitMEX has failed to implement rules or procedures sufficient to ensure that: the contracts it offers are not readily susceptible to manipulation; market participants are prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct are subject to discipline.

49.     Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information.

50.     Further, BitMEX has failed to establish rules to minimize conflicts of interest. This is apparent because Hayes, Delo, Reed, and numerous other BitMEX employees trade on the platform, and BitMEX's own internal "market-making" desk has at times been one of the largest traders on the platform.

**B.    BitMEX's U.S. Operations and Offices**

51.     Throughout the Relevant Period, BitMEX has conducted major components of its business and maintained a significant presence in the U.S.

52.     During the Relevant Period, BitMEX has employed approximately half of its workforce in the U.S., including at least 9 in New York and 56 in San Francisco.

53.     BitMEX's U.S.-based employees' and agents' compensation is typically paid by ABS, a company controlled by Hayes, Delo, and Reed.  An April 27, 2017 Service Agreement between HDR and ABS renders ABS staff contractually responsible for BitMEX's business development, marketing, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco and New York.

54.     BitMEX executives based outside of the U.S. frequently visit BitMEX's San Francisco offices.  Hayes and other BitMEX sales staff have frequently traveled to the U.S. to solicit customers for BitMEX and to publicly promote BitMEX in through U.S. media outlets.

55.     Since the BitMEX San Francisco office opened in 2017, at least the following functions have been performed from that office:  Product Engineering, Incident Response, and Software and Security Engineering, Product Management, User Experience/Visual Design/UX,

Dev Ops Engineering, Data Engineering, Kubernetes Engineering, Web Development, Human

Resources, Ventures, Security and IT, Communications, Marketing, Accounting, and Recruiting.

56.     Beginning in 2014 and continuing through the Relevant Period, Reed has worked

primarily from within the U.S.  Reed was the primary architect of BitMEX's website and order

entry system.  Reed also has been responsible for BitMEX's information security management,

along with a team based primarily in BitMEX's San Francisco office.  On March 1, 2018,

BitMEX leased office space for ABS in Milwaukee, Wisconsin, where Reed performed work for

BitMEX.

57.     BitMEX's Head of Business Development was based in New York for the

majority of the Relevant Period.  This executive reported to, and continues to report to Hayes.

While residing and acting on behalf of BitMEX in the U.S., specifically in this District, this

executive has been responsible for leading BitMEX's Customer Support team, managing sales

staff worldwide, leading institutional sales, speaking publicly about BitMEX, developing

products for BitMEX, and leading BitMEX's internal "market making" desk that trades on the

BitMEX platform.

58.     BitMEX continued to increase its New York presence in 2018, hiring a Marketing

Manager in April 2018 to promote BitMEX, an Investment Associate in May 2018, an Art

Director in July 2018, and a Content Manager to write strategic marketing communications,

press releases, pitches, emails, and web content in October 2018.  Consistent with this increased

presence, on May 1, 2018, a BitMEX executive signed an agreement for office space in New

York.

59.     To respond to U.S. customer service issues and emails, BitMEX hired a Customer

Service Representative in October 2017 to work remotely from New Jersey.

60.     BitMEX recently closed its New York office, but continues to run significant

portions of its derivatives trading platform from San Francisco, and remotely from other parts of

the U.S.

61.     BitMEX uses vendors based in the United States for critical components of its

business, for example using Google products for email services, using Slack for an internal

BitMEX communications platform, and Amazon Web Services for data storage and handling.

62.     BitMEX also uses the benefits and protections of the U.S. legal system.  For

example, BitMEX has applied for various United States trademarks and service marks on the

BitMEX name and logo.  On March 29, 2018, BitMEX applied with the United States Patent and

Trademark Office for a trademark on the word "BitMEX."  The owner of record for the

"BitMEX" U.S. Word Mark is HDR.

## C.  Hayes, Delo, and Reed Have Controlled BitMEX and Operated BitMEX as a Common Enterprise

63.     Throughout the Relevant Period, Hayes, Delo, and Reed have controlled the

BitMEX common enterprise, including the various corporate entities that comprise BitMEX for

the common purpose of operating the BitMEX trading facility.  Hayes, Delo, and Reed each sign

documents on behalf of the various BitMEX corporate entities.  They control the bank and

trading accounts for the various BitMEX corporate entities.  They have the authority to hire and

fire employees.  And they ultimately control the deposits to and withdrawals from the BitMEX

platform.

64.     Hayes, Delo, and Reed incorporated HDR as a Seychelles International Business

Company on June 23, 2014.  They were the three original Directors of HDR, and each owned

approximately one third of that entity.

65.     Hayes signed many of the initial corporate documents for HDR, agreeing in documents to act "as principal agent" of the entity, and representing that HDR would not "engage in any businesses which are considered to be illegal in Hong Kong or other countries in the world."

66.     Hayes, Delo, and Reed incorporated Shine in Hong Kong on August 6, 2014.  The first Director and Chairman of the company was Hayes.  Delo was later appointed as Chairman of Shine, and in that role approved the lease of office space in the Cheung Kong Centre in Hong Kong.

67.     Hayes, Delo, and Reed incorporated ABS in Delaware on April 27, 2017, at which time Hayes was "elected as the sole director of the Corporation."  In a corporate resolution on the same date, Hayes was appointed to be the President, Secretary and Treasurer of ABS, and given authority to open and manage bank accounts on behalf of ABS.  The same resolution "authorized and directed [ABS] to borrow funds from HDR Global Trading Limited."

68.     A November 2017 ABS corporate resolution authorized Hayes and Reed as "designated signatories," able to open bank accounts on behalf of ABS.  Hayes and Reed also have held credit cards for ABS.

69.     Hayes, Delo, and Reed have shared responsibility for various aspects of the BitMEX business.  At a high level, Delo has been responsible for building and overseeing the BitMEX trading engine, Reed has been responsible for building and overseeing the BitMEX website, API and order entry system, and Hayes has been responsible for strategic decisions, business development, marketing, and management of the BitMEX enterprise.  Hayes has also been primarily responsible for representing BitMEX in public speaking engagements and

appearances, and has authored many of the posts on the BitMEX blog.  Hayes regularly appears

as a speaker at conferences throughout the world, including in the U.S., on behalf of BitMEX.

70.     Hayes, Delo, and Reed have worked together to build the BitMEX platform, and

all have been involved in the critical decisions for the enterprise, such as whether (or not) to

pursue regulatory approval for the platform, or whether (or not) to implement KYC or AML

policies and procedures.  For example, in August 2014, shortly before the launch of the platform,

Hayes wrote to Delo that BitMEX would not do any KYC, saying "Basically just valid email

address until we feel significant pressure to do otherwise."

71.     Hayes, Delo, and Reed all were involved in discussions with compliance

consultants for BitMEX, even before the launch of the platform, and all three have participated

in discussions with BitMEX's numerous lawyers to discuss legal and regulatory issues facing

BitMEX.

72.     Hayes, Delo, and Reed have made decisions on BitMEX's products, including

deciding how to structure BitMEX's futures, options and swaps contracts.  Hayes, Delo, and

Reed also have been involved with developing and managing BitMEX's internal market maker

trading algorithms.

73.     The control by Hayes, Delo, and Reed continues today.  While BitMEX has hired

employees to manage certain aspects of trading facility, those individuals all ultimately act under

the direction and control of Hayes, Delo, and Reed.  Key financial and trading decisions require

"Founder" approval, meaning approval by Hayes, Delo, and Reed.

### D.     BitMEX Solicits US Customers

74.     BitMEX has devoted significant resources to soliciting customers in the U.S.

BitMEX solicits orders from U.S.-based customers for futures, options, and swaps by advertising

on its website and on social media, including the BitMEX blog, Twitter, Reddit, Telegram,

Facebook, and a BitMEX YouTube page.  A 2015 BitMEX investor presentation prepared by

Hayes stated that a "constant presence on these media platforms ensures that . . . [when the]

Bitcoin community thinks of derivatives BitMEX comes to mind."  BitMEX also solicits

customers and advertises in the U.S. at various conferences and at meetings with individual

customers.

75.     BitMEX also solicits customers through its "affiliate" program.  BitMEX's

affiliate program allows U.S. customers to solicit other customers to trade on the platform in

exchange for compensation from BitMEX.  BitMEX provides customers with an affiliate link

which they can share, for example as many BitMEX affiliate marketers do on Twitter, and

receive compensation for customers who follow the link to open accounts and trade on the

platform.

76.     Dozens of U.S. residents publicly identify themselves on social media as traders

on the BitMEX platform, often also providing affiliate links encouraging social media followers

to open accounts and trade on the BitMEX platform.  BitMEX is aware of this because BitMEX

monitors social media platforms such as Twitter, Telegram and Reddit for references to BitMEX,

for years pulling references to BitMEX customers who participated in BitMEX's affiliate

program.

77.     In October of 2016, a senior BitMEX executive confirmed directly in response to

a customer question that U.S. persons could solicit for BitMEX in connection with the affiliate

program and be paid by BitMEX in bitcoin on the BitMEX platform, stating:  "It is fine for you

to set up the account (while being located in the US) with us if you are not trading and only

withdrawing the affiliate commissions . . . You do not need to do anything on your end to restrict

them from your marketing, if they happen to sign up with a US IP and they are not US residents

21

then we will ask them to provide alternative verification. If they sign up from a non-US IP then no need to worry."

78.    As of July 27, 2018, at least 1,100 U.S. affiliate program customers received affiliate payments from BitMEX for soliciting customers to trade on BitMEX.  In 2019, BitMEX paid out $66 million to customers in affiliate commissions.

79.    Senior executives at BitMEX have openly acknowledged the solicitation of U.S. customers through the BitMEX affiliate marketing scheme, noting in internal chats that one user "openly tells Americans on Twitter and his website to use a VPN [a Virtual Private Network] to sign up for BitMEX" providing his BitMEX affiliate link and VPN link at the same time, having "pulled in around -43 XBT from the [affiliate] program."  Hayes was in direct contact with this specific affiliate marketer, handling BitMEX's relationship with the user and communicating with him about his BitMEX affiliate pay-outs.

80.    The use by U.S. customers of VPN services, which create a private network from a public internet connection and mask the customer's internet protocol (IP) address so online actions are virtually untraceable, to access and trade on the BitMEX platform, is an open secret. For example, YouTube contains videos of U.S. customers trading on BitMEX, along with instructions on how to access BitMEX from the U.S.  Messaging applications Discord and Telegram have chat groups that instruct U.S. residents to use a VPN to access BitMEX if trading from the U.S.  Internal documents including BitMEX customer service representative emails and chats reflect regular awareness of the use by U.S. persons of VPN services to access and trade on the BitMEX platform.

81.    In addition to soliciting U.S. retail customers, BitMEX has also marketed directly to proprietary trading firms and other institutional customers based in the U.S., has held meetings

22

in the U.S., and has solicited firms to open accounts to trade on BitMEX through off-shore entities.  Internal BitMEX emails note the need to focus on "business development and marketing" to institutional customers, with a dedicated employee for "US and European markets."

82.    In 2014, BitMEX solicited a proprietary trading firm headquartered in Chicago, Illinois to be the first "lead market maker" on the BitMEX platform.  Hayes, Delo, and Reed were all directly involved in communications with the firm's executives in Chicago.

83.    BitMEX staff frequently has met with U.S. traders.  For example, BitMEX executives traveled to Chicago in July 2018 to meet with at least seven major Chicago-based trading firms.  In addition, BitMEX executives also met with prominent proprietary trading firms in New York.

84.    Throughout the Relevant Period, BitMEX's U.S. customers have been able to access the BitMEX platform from the U.S.—either via API or through the BitMEX website accessed on their own computers located in the U.S. via a VPN.

**E.    BitMEX Fails To Implement Anti-Money Laundering and Know-Your-Customer Procedures, or a Customer Information Program.**

85.    Throughout the Relevant Period, BitMEX has failed to implement any KYC procedures or a CIP that would enable it to identify U.S. persons–or the true identity of the vast majority of its customers, whether from the U.S. or elsewhere.

86.    BitMEX has not implemented any AML policies or procedures, which are required of financial institutions such as FCMs to prevent or detect, among other things, terrorist financing or other criminal activity.

87.    BitMEX has no CIP, which, like KYC procedures, is required of certain financial institutions including FCMs.

23

88.     BitMEX has also "deleted" records for numerous accounts, in certain cases explicitly because a user was found to be located in the U.S. or another "restricted jurisdiction." In a December 2018 chat involving BitMEX Customer Support personnel, a BitMEX supervisor describes the policy:  "At the moment we are deleting people's accounts once they have withdrawn if they are from a restricted jurisdiction."

89.     Throughout the Relevant Period, Hayes, Delo, and Reed have been fully aware that U.S. customers have used VPN to access the BitMEX platform.  For example, Delo and Reed regularly received email notification indicating new U.S. customers were opening accounts on BitMEX, and its self-identified "thought leader" and "visionary" Hayes has also advised U.S. customers on how to trade on BitMEX, stating, "If you have a non-US company that can open an account with us, Greg our head of business development can assist."  BitMEX even maintained an internal dashboard of open accounts from supposedly restricted jurisdictions.

90.     Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program.

91.     Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other account and transactional information for U.S. based traders.  For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform.

92.     As late as November 3, 2018, still BitMEX did not "have any rules in place" with regard to U.S. customers.  Even after BitMEX began imposing some restrictions on access to the platform by U.S. traders, Hayes, Delo, and Reed crafted exceptions for certain U.S. traders and were aware that other U.S. traders accessed the platform by using VPN.  Further, BitMEX's lack

of any KYC procedures or a CIP made BitMEX's superficial steps to block U.S. traders ineffective.

**F.    BitMEX Was Aware of U.S. Regulatory Requirements but Attempted to Evade Them**

93.    Hayes, Delo, and Reed were aware of the regulatory regime applicable to U.S. financial institutions such as FCMs, but made conscious decisions throughout the Relevant Period to avoid and evade them.

94.    For example, in a March 2015 investor presentation laying out BitMEX's business plan, Hayes wrote that:

   a.    BitMEX chose to incorporate HDR in the Seychelles because "FX exchanges do not need to register for a financial services license if they conduct all of their business offshore,"

   b.    "Bitcoin derivatives are completely unregulated worldwide.  No government regulator has come out with any definitive guidance.  Regulators are still trying to tackle the exchanging of fiat and Bitcoin.  The fact that BitMEX is Bitcoin only and does not touch and [sic] domestic fiat currency also helps shield the exchange from regulations."

   c.    "The CFTC is expected to deliver guidance on Bitcoin derivatives sometime in 2H 2015, BitMEX wants to be able to service the US market."  Attorneys for BitMEX "will be advising BitMEX on how to tackle any regulation that the CFTC plans to enact.  As it currently stands now the type of Bitcoin derivatives that BitMEX offers can be traded by US persons."

   d.    "BitMEX deals only in Bitcoin and does not transfer between two value stores.  From a regulatory standpoint, this means that BitMEX is not required to conduct

KYC or AML on any accounts.  Users can sign up with just a verified email address."

e. "BitMEX recognizes that to attacht [sic] the deepest pools of liquidity obtaining a financial license in a well respected jurisdiction is a must.  AS trading volumes and revenues grow, BitMEX will be actively looking at favorable jurisdicts [sic] from which to become a regulated derivatives exchange.  New Zealand, Islae of Man, Jersey, and Gibraltar, are some of the jurisdicitons [sic] that BitMEX and its legal team are investigating."

95.     BitMEX's co-founders were aware of the need to know the identity of BitMEX customers throughout the Relevant Period.  Around the launch of the platform, Hayes, Delo, and Reed contacted a compliance consultant who told them in November of 2014 that:

> You need to know [who] you think you are dealing with is in fact who you are dealing with. Specifically, because of the nature of your business, you require this to be a global identity dataset. You need to ensure that you do not violate countless international statutory regulations which prohibit dealing with a variety of barred entities.

Nonetheless, Hayes, Delo, and Reed decided to ignore U.S. and other countries' regulations requiring BitMEX to verify the identity of its customers.

96.     In 2015, a potential business partner for BitMEX asked Hayes about BitMEX's "regulatory compliance landscape," asking "do you have any particular licenses or registrations in any jurisdictions to conduct your business?  Such as FinCEN, BitLicense or money transmitter licenses?  Do you do business in the US (ie do you accept customers resident in the US)?"  Hayes responded, "We do not have any licenses. We are incorporated in the Seychelles, and accept customers globally except for NY State."

97.     In a blog post in May of 2015, Hayes mocked the efforts of a competitor to comply with U.S. regulatory requirements.  Hayes wrote that this exchange "Kissed the Ring and can sort of offer their services throughout the US."  Hayes noted in the same blog post a different firm in the virtual currency industry on the "wrong side of the tracks," because it had "failed to adhere to the Bank Secrecy Act."

98.     In September of 2015, the CFTC charged and settled  two matters involving violations of the CEA by two firms involved in digital asset transactions, one of which was charged with illegally operating a facility for the trading or processing of bitcoin options and swaps without being registered with the CFTC as a DCM or SEF.  Hayes recognized that "this will have an impact on" BitMEX's business, and that one of BitMEX's goals is to "obtain legal clarity as to next steps as it regards to US Bitcoin regulations and the CFTC."

99.     Yet BitMEX's efforts to evade, rather than comply with, regulations in the U.S. continued well after 2015 and even to the present.  For example, throughout the Relevant Period BitMEX executives coached U.S.-based trading firms to incorporate off-shore entities in order to open trading accounts on BitMEX through those off-shore entities.  The notes of one BitMEX executive in 2018 reflect the rationale:  "We do not service US individuals or US entities given we do not have the required licenses that fall under CFTC regulations when offering derivative products.  As such, we cannot have clients based in the US with trading functions that could give a US regulator an argument to assert jurisdiction on."  Yet, the executives at the U.S. based firms courted and regularly communicated with regarding trading on the BitMEX platform were inevitably based in the U.S.

100.    In August of 2020, BitMEX finally announced plans to begin conducting KYC on customer accounts, supposedly to begin at some point in 2021.  But Hayes, Delo, and Reed made

deliberate decisions throughout the Relevant Period to refrain from implementing KYC and

AML procedures, despite knowing other business partners and competitors were implementing

such procedures.  For example, Hayes communicated with executives of other cryptocurrency

exchanges about KYC obligations.  In fact, Hayes regularly filled out KYC forms for himself

and BitMEX's various corporate entities at other exchanges and with BitMEX trading partners,

often noting BitMEX's own decision not to implement any KYC or AML procedures.  For

example on March 17, 2016, Hayes exchanged emails with a U.S.-based exchange in response to

questions about BitMEX's policies:

> Apart from blocking US residents from using our platform we do no other KYC
> as we are not required to under Seychelles law for the products that we offer. For
> non US persons we require only a verified email address.

101.    At the time Hayes wrote that BitMEX was "blocking" U.S.-based users,

thousands of U.S. persons were in fact trading on BitMEX's platform.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2019)**

**Execution of Futures Transactions on an Unregistered Board of Trade**

102.    The allegations set forth in paragraphs 1 through 101 are re-alleged and

incorporated herein by reference.

103.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR

Services, all acting as a common enterprise and doing business as BitMEX, and through their

officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(a) by:

    a.  offering to enter into retail commodity transactions, or contracts for the purchase or

        sale of bitcoin, litecoin and ether for future delivery;

    b.   entering into retail commodity transactions, or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery;

    c.   confirming the execution of retail commodity transactions, or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery; and

    d.   conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, retail commodity transactions or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery;

without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

104.    BitMEX's retail commodity transactions are and were offered, entered into or executed on a leveraged or margined basis, or are and were financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

105.    BitMEX's retail commodity transactions are and were offered to, entered into or executed with persons who are not eligible contract participants or eligible commercial entities and who are not engaged in a line of business related to cryptocurrencies.

106.    In the alternative, during the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(b) and Commission Regulation 48.3, 17 C.F.R. § 48.3 (2019), by permitting direct access to its electronic trading and order matching system without obtaining an Order of Registration for a foreign board of trade from the Commission.

107.    Each offer to enter into, execution of, and/or confirmation of the execution of illegal off exchange futures transactions, including, without limitation, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or, alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3.

108.    During the Relevant Period, Hayes, Reed and Delo directly or indirectly controlled BitMEX, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Hayes, Reed and Delo are therefore liable for BitMEX's violations described in this Count to the same extent as BitMEX.

109.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX.

**COUNT II**

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019)**

**Illegal Off-Exchange Commodity Options**

110.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

111.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated 7 U.S.C. § 6c(b) and Regulation 32.2 by offering to

enter into, entering into, confirming the execution of, maintaining positions in, and otherwise conducting activities relating to commodity option transactions in interstate commerce.

112.    The commodity options that BitMEX offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered board of trade, nor has BitMEX sought registration as an exempt foreign board of trade.

113.    Each act in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

114.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

115.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

**COUNT III**

**Violation of Section 4d of the Act, 7 U.S.C. § 6d (2018)**

**Failure to Register as a Futures Commission Merchant**

116.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

117.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, have operated as a Futures Commission Merchant, and are continuing to operate as a Futures Commission Merchant, by:

a.    engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

b.    engaging in soliciting or accepting orders for swaps;

c.    engaging in soliciting or accepting orders for agreements, contracts or transactions described in section 2(c)(2)(D)(i) of the Act (retail commodity transactions); and/or

d.    acting as a counterparty in agreements, contracts, or transactions described in section 2(C)(2)(D)(i);

and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the BitMEX platform.

118.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as a Futures Commission Merchant.

119.     Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

120.     Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6d.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6d.

121.     The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6d.

### COUNT IV

**Violations of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019)**

**Failure to Register as a Designated Contract Market or Swap Execution Facility**

122.     Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

123.     During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3(a)(1) by operating a facility for the trading of swaps on digital assets including bitcoin, ether, and litecoin without registering with the CFTC as a DCM or a SEF.

124.    BitMEX has operated and is continuing to operate a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform, including the trading or processing of swap on digital assets including bitcoin, ether, and litcoin, without being registered as a DCM or SEF.

125.    Certain products that have traded on BitMEX, including "perpetual swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47).

126.    Each act in violation of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

127.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

128.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

**COUNT V**

**Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2019)**

**Failure to Supervise**

129.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated

herein by reference.

130.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR

Services, all acting as a common enterprise and doing business as BitMEX, and through their

officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 166.3 by

employing an inadequate supervisory system and failing to perform its supervisory duties

diligently.  More specifically, BitMEX violated and is continuing to violate 17 C.F.R. § 166.3

by, among other things, failing to implement a Customer Information Program, failing to

implement and conduct Know-Your-Customer procedures, failing to implement Anti-Money

Laundering procedures, and by failing to ensure that its partners, officers, employees, and agents,

lawfully and appropriately handled all commodity interest accounts at BitMEX.

131.    BitMEX is and has been acting as an FCM, and therefore 17 C.F.R. § 166.3

applies to BitMEX, as if it were a Commission registrant.

132.    Each act in violation of 17 C.F.R. § 166.3, including, but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation.

133.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in

good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's

violations of 17 C.F.R. § 166.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo

are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 166.3.

134.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or

agents acting for BitMEX described in this Complaint were done within the scope of their office,

employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other

officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R.

§ 166.3.

## COUNT VI

### Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2019)

### Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

135.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated

herein by reference.

136.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR

Services, all acting as a common enterprise and doing business as BitMEX, and through their

officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing

to implement a Customer Information Program, failing to implement Know-Your-Customer

policies and procedures, failing to implement an Anti-Money Laundering program, failing to

retain required customer information, and failing to implement procedures to determine whether

a customer appears on lists of known or suspected terrorists or terrorist organizations such as

those issued by OFAC.

137.    Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation.

138.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in

good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's

violations of 17 C.F.R. § 42.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo

are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 42.2.

139.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or

agents acting for BitMEX described in this Complaint were done within the scope of their office,

employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other

officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R.

§ 42.2.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section

6c of the Act, 7 U.S.C. § 13a-l (2018), and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants 100x, HDR, ABS, Shine, and HDR Services,

collectively doing business as BitMEX, and through their officers, employees, and agents,

including without limitation Hayes, Delo, and Reed, violated Section 4(a) of the Act, 7 U.S.C.

§ 6(a) (2018) (or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3,

17 C.F.R. 48.3 (2019)); Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R.

§ 32.2 (2019); Section 4d of the Act, 7 U.S.C. § 6d (2018); Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1)

(2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019); Regulation 166.3, 17 C.F.R. § 166.3 (2019);

and Regulation 42.2, 17 C.F.R. § 42.2 (2019).

B.    An order of permanent injunction prohibiting Defendants and any other person or entity

associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6, 6c(b), 6d,

and 7b-3(1), and 17 C.F.R. §§ 32.2, 37.3(a)(1), 42.2, 48.3 and 166.3.

C.    An order of permanent injunction prohibiting Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

    (i)    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § la(40) (2018));

    (ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

    (iii)    having any commodity interests traded on Defendants' behalf;

    (iv)    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    (v)    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    (vi)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

    (vii)    acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third party transferee and/or successors

thereof, to disgorge to any officer appointed or directed by the Court all benefits received

including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees

derived, directly or indirectly, from acts or practices which constitute violations of the Act as

described herein, including pre-judgment and post-judgment interest;

      E.     An order directing Defendants and any successors thereof, to rescind, pursuant to

such procedures as the Court may order, all contracts and agreements, whether implied or

express, entered into between, with , or amount Defendants and any customer or investor whose

funds were received by Defendants a result of the acts and practices that constituted violations of

the Act, as described herein;

      F.     An order requiring Defendants to make full restitution by making whole each and

every customer or investor whose funds were received or utilized by them in violation of the

provisions of the Act as described herein, including pre-judgment interest;

      G.     An order directing Defendants to pay civil monetary penalties, to be assessed by the

Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act,

7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title

VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation

of the Act, as described herein;

      H.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2) (2006); and

I.    Such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated:  October 1 , 2020                    Respectfully submitted,

                                           Commodity Futures Trading Commission
                                           By its attorneys:

                                           */s/ Carlin Metzger*

                                           Carlin Metzger (*Pro Hac Vice Pending*)
                                           Senior Trial Attorney
                                           *cmetzger@cftc.gov*
                                           312-596-0536

                                           Brigitte Weyls (*Pro Hac Vice Pending*)
                                           Senior Trial Attorney
                                           *bweyls@cftc.gov*

                                           Joseph Platt (*Pro Hac Vice Pending*)
                                           Trial Attorney
                                           *jplatt@cftc.gov*

                                           Elizabeth N. Pendleton (*Pro Hac Vice Pending*)
                                           Chief Trial Attorney
                                           *ependleton@cftc.gov*

                                           Scott R. Williamson (*Pro Hac Vice Pending*)
                                           Deputy Regional Counsel
                                           *swilliamson@cftc.gov*

                                           Robert T. Howell
                                           Deputy Director
                                           *rhowell@cftc.gov*

                                           Commodity Futures Trading Commission
                                           525 West Monroe Street, Suite 1100
                                           Chicago, Illinois 60661
                                           (312) 596-0700
                                           (312) 596-0714 (fax)
                                           *Attorneys for Plaintiff*
                                           *Commodity Futures Trading Commission*

# EXHIBIT 3

# Project Syndicate

# The Great Crypto Heist

*Jul 16, 2019* | **NOURIEL ROUBINI**

NEW YORK – There is a good reason why every civilized country in the world tightly regulates its financial system. The 2008 global financial crisis, after all, was largely the result of rolling back financial regulation. Crooks, criminals, and grifters are a fact of life, and no financial system can serve its proper purpose unless investors are protected from them.

Hence, there are regulations requiring that securities be registered, that money-servicing activities be licensed, that capital controls include "anti-money-laundering" (AML) and "know your customer" (KYC) provisions (to prevent tax evasion and other illicit financial flows), and that money managers serve their clients' interests. Because these laws and regulations protect investors and society, the compliance costs associated with them are reasonable and appropriate.

But the current regulatory regime does not capture all financial activity. Cryptocurrencies are routinely launched and traded outside the domain of official financial oversight, where avoidance of compliance costs is advertised as a source of efficiency. The result is that crypto land has become an unregulated casino, where unchecked criminality runs riot.

This is not mere conjecture. Some of the biggest crypto players may be openly involved in systematic illegality. Consider BitMEX, an unregulated trillion-dollar exchange of crypto derivatives that is domiciled in the Seychelles but active globally. Its CEO, Arthur Hayes, boasted openly that the BitMEX business model involves peddling to "degenerate gamblers" (meaning clueless retail investors) crypto derivatives with 100-to-one leverage.

To be clear, with 100-to-one leverage, even a 1% change in the price of the underlying assets could trigger a margin call and wipe out all of one's investment. Worse, BitMEX applies high fees whenever one buys or sells its toxic instruments, and then it takes another bite of the apple by siphoning customers' savings into a "liquidation fund" that is likely to be many times larger than what is necessary to avoid counter-party risk. It is little wonder that, according to one independent researcher's estimates, liquidations at times account for up to half of BitMEX's revenue.

BitMEX insiders revealed to me that this exchange is also used daily for money laundering on a massive scale by terrorists and other criminals from Russia, Iran, and elsewhere; the exchange does nothing to stop this, as it profits from these transactions.

As if that were not enough, BitMEX also has an internal for-profit trading desk (supposedly for the purpose of market making) that has been accused of front running its own clients. Hayes has denied this, but because BitMEX is totally unregulated, there are no independent audits of its accounts, and thus no way of knowing what happens behind the scenes.

At any rate, we do know that BitMEX skirts AML/KYC regulations. Though it claims not to serve US and UK investors who are subject to such laws, its method of "verifying" their citizenship is to check their IP address, which can easily be masked with a standard VPN application. This lack of due diligence constitutes a brazen violation of securities laws and regulations. Hayes even openly challenged anyone to try to sue him in the unregulated Seychelles, knowing he operates in the shadow of laws and regulations.

Earlier this month, I debated Hayes in Taipei and called out his racket. But, unbeknownst to me, he had secured exclusive rights to the video of the event from the conference organizers, and refused for a week to release it in full. Instead, he published cherry-picked "highlights" to create the impression that he performed well. I suppose this is par for the course among crypto scammers, but it is ironic that someone who claims to represent the "resistance" against censorship has become the father of all censors now that his con has been exposed. Finally, shamed in public by his own supporters, he relented and released the video.

On the same day we debated, the United Kingdom's Financial Conduct Authority proposed an outright ban on retail high-risk crypto investments. Yet, barring a concerted response by policymakers, retail investors who are lured into the crypto domain will continue to be suckered. Price manipulation is rampant across all the crypto exchanges, owing to pump-and-dump schemes, wash trading, spoofing, front running, and other forms of manipulation. According to one study, up to 95% of all transactions in Bitcoin are fake, indicating that fraud is not the exception but the rule.

Of course, it is no surprise that an unregulated market would become the playground of con artists, criminals, and snake-oil salesmen. Crypto trading has created a multi-billion-dollar industry, comprising not just the exchanges, but also propagandists posing as journalists, opportunists talking up their own financial books to peddle "shitcoin," and lobbyists seeking regulatory exemptions. Behind it all is an emerging criminal racket that would put the *Cosa Nostra* to shame.

It is high time that US and other law-enforcement agencies stepped in. So far, regulators have been asleep at the wheel as the crypto cancer has metastasized. According to one study, 80% of "initial coin offerings" in 2017 were scams. At a minimum, Hayes and all the others overseeing similar rackets from offshore safe havens should be investigated, before millions more retail investors get scammed into financial ruin. Even US Secretary of the Treasury Steven Mnuchin – no fan of financial regulation – agrees that cryptocurrencies must not be allowed to "become the equivalent of secret numbered accounts," which have long been the preserve of terrorists, gangsters, and other criminals.

## NOURIEL ROUBINI

Nouriel Roubini, Professor of Economics at New York University's Stern School of Business and Chairman of Roubini Macro Associates, was Senior Economist for International Affairs in the White House's Council of Economic Advisers during the Clinton Administration. He has worked for the International Monetary Fund, the US Federal Reserve, and the World Bank. His website is NourielRoubini.com.

https://prosyn.org/YfJc9G7

---

© Project Syndicate - 2020

# EXHIBIT 4

J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Andrew Levine, Esq. (SBN: 278426)
  levine@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone:  (415) 599-0210
Facsimile:  (415) 599-0210

Douglas Curran, Esq. (*pro hac vice*)
  curran@braunhagey.com
BRAUNHAGEY & BORDEN LLP
7 Times Square, Twenty-Seventh Floor
New York, NY 10036
Telephone:  (646) 829-9403
Facsimile:  (646) 829-9403

ATTORNEYS FOR PLAINTIFFS
FRANK AMATO, RGB COIN LTD.,
and ELFIO GUIDO CAPONE on behalf
of the G AND M CAPONE TRUST

ELECTRONICALLY
F I L E D
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN FRANCISCO

FRANK AMATO, RGB COIN LTD.,
and ELFIO GUIDO CAPONE on behalf
of the G AND M CAPONE TRUST,

    Plaintiffs,

v.

HDR GLOBAL TRADING LIMITED, d/b/a
BITMEX; ARTHUR HAYES; ABS
GLOBAL TRADING LIMITED; and DOES
1-10,

    Defendants.

Case No: CGC-19-581267

**DECLARATION OF ELFIO GUIDO
CAPONE IN SUPPORT OF
PLAINTIFFS' *EX PARTE*
APPLICATION FOR A RIGHT TO
ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY
PROTECTIVE ORDER**

**Hearing**
**Date:**  Monday, October 26, 2020
**Time:**  9:15 a.m.
**Dept.:**  304
**Judge:** The Hon. Anne-Christine Massullo

**Complaint filed:**  Dec. 4, 2019
**FAC filed:**  April 27, 2020
**SAC filed:**  August 18, 2020

**Trial Date:** None Set

**REDACTED**

I, Elfio Guido Capone, declare:

1.      I am a Plaintiff in the above-captioned matter.

2.      I make this declaration based on personal knowledge.  If called as a witness, I would and would testify competently to the facts stated herein.

3.      I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies.  As an "angel" investor, I have made capital contributions to several business start-ups over the years.  An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial moments when most other financial institutions and institutional investors are unwilling to back nascent and underfunded businesses.

**A.      My Investment in BitMEX**

4.      I became acquainted with Defendant Arthur Hayes ("Hayes") near the beginning of January 2015, when he connected with me on LinkedIn and arranged a Skype conversation.  In connection with this conversation, he sent me an investor presentation to solicit my investment in BitMEX.  The presentation stated that BitMEX was "seeking an equity funding round $1 million." Hayes himself also told me that BitMEX was finalizing a valuation in connection with its anticipated equity financing round "in the next couple of days."

5.      Between January and March 2015, I exchanged further communications with Hayes, requesting additional information regarding his estimated return on investment rates and his projected trading volumes for the BitMEX platform.  Hayes explained to me that he believed his trading volumes were conservative and with cryptocurrency investments becoming more and more mainstream, BitMEX trading volumes would "skyrocket."  Based on Hayes's representations, I decided to invest in BitMEX.  I inquired whether I was the first investor to commit to the fundraising round, and Hayes represented that he had commitments for another $150,000 to $200,000 from other investors and was engaging lawyers to draft the investment paperwork.

6.     In March 2015, Hayes reiterated that BitMEX was looking to sell equity shares with the same rights as the founders.  He also assured me that I would be purchasing preference shares that would convert 1:1 to common equity held by the founders.

7.     On March 25, 2015, Hayes wrote to me to summarize our understanding of the terms of my investment.  In particular, he explained that "[b]asically you own the same type and class of equity that [Hayes] and the other two founders have" and that if I agreed with the terms, "we will get the Share Purchase Agreement drawn up" pursuant to which I "will be buying 0.50% of the Seychelles entity [HDR] for $50,000."

8.     In April and May 2015, I waited for Hayes to provide me with an agreement pursuant to which I could purchase equity, but Hayes did not provide the "standard legal agreement drawn up by his lawyers" as he previously stated he would.

9.     On July 15, 2015, Hayes sent me a proposed Simple Agreement for Future Equity ("SAFE") instead of the Share Purchase Agreement we previously discussed.  He represented it as a "safer" option that, according to him, would allow me to get my money back if the business were to fail, while receiving "all the upside if the business goes well."  Hayes also represented again that BitMEX planned a financing round sometime in the second half of 2015, at which point my investment would convert to preferred shares.

10.     When Hayes sent me the SAFE, I explained that the agreement "was a bit legal" and requested a "common man's" explanation of the terms.  Hayes explained that "Basically you are getting a 20% discount to the next round's financing, subject to a cap on ownership" and that BitMEX was "targeting a $9mm pre money valuation by end of November" 2015.

11.     On July 16, 2015, I executed the SAFE on behalf of the G and M Capone Trust. Shortly thereafter, I wired $25,000 to Hayes's personal bank account in Hong Kong.  Hayes agreed that I could list myself as a "seed investor" in BitMEX on my LinkedIn page.  My understanding today is that my investment and Frank Amato's investment were the first two outside investments that HDR received, and together we helped BitMEX pay its bills, purchase equipment, and pay for other costs that, at the time, were necessary to keep the company afloat.

12.     Attached hereto as **Exhibit 1** is a true and correct copy of the SAFE that I executed with Defendant HDR on July 16, 2015.

13.     As of today, Hayes and HDR have not issued a single share to me and, as I explain below, I have discovered in the course of this lawsuit that they have treated me and Frank Amato as if we had never invested anything.

**B.     Repeated Inquiries About My Equity Rights**

14.     Between July 2015 and July 2019, I repeatedly asked Hayes about my equity rights under my SAFE because as time passed I began to read about BitMEX's success in the news.  In particular, I eventually learned that HDR was a 2015 participant in the Chinaccelerator program, an accelerator program run by a venture capital investment company called SOSV.  It is well-known in the venture capital investing industry, and by angel investors like myself, that participants in accelerator programs like Chinaccelerator give equity to investors in exchange for capital investments.  I believed that as a participant in Chinaccelerator, BitMEX must have issued equity in return for capital from SOSV.  I began to ask Hayes about my equity rights and questions about the November / December 2015 equity financing Hayes had told me would occur and trigger my equity rights.

15.     On November 7, 2015, I inquired about BitMEX's valuation and Hayes explained to me that "SOSV who runs the accelerator program that [HDR was] in" helped arrive at a valuation." Hayes also told me that SOSV was "placing $500k into the round," but that Hayes felt that SOSV's valuation was conservative.  I believed based on this email exchange that my SAFE had already converted, because I understood Hayes to be telling me that BitMEX had raised capital from SOSV at a fixed valuation.

16.     Accordingly, in 2016, I began asking when BitMEX would issue dividends to its shareholders.  Hayes kept answering that BitMEX had no plans to yet, but he did not attempt to correct my understanding that I was a shareholder in the entity.

17.     In November 2018, I followed up with Hayes about my equity rights under my SAFE.  Hayes told me that I was not an equity holder as he previously represented, because I had not invested additional amounts in BitMEX as part of the November / December 2015 fundraising

1  round.  Hayes also told me that my SAFE would never trigger because BitMEX did not plan to

2  raise equity and that raising equity was "never discussed" because BitMEX did not need the

3  money.

4        18.    On November 11, 2018, Hayes sent me an email stating that BitMEX's "legal team

5  is investigating all of your claims."  On November 29, 2018, I wrote to Hayes to ask if he had

6  heard anything yet from his legal team.  Hayes scheduled a call with me for January 3, 2019.

7  During this call, he told me that he had received "an opinion back from legal" that my SAFE had

8  not converted because there was no "cash component" to SOSV's investment into BitMEX.  He

9  offered me "$125,000 to tear up the contract."  I refused.  I continued to ask Hayes about my equity

10  rights, but he ignored all my subsequent attempts to reach him by email or other messaging

11  channels.

12        19.    In 2019, unable to secure any information from Hayes regarding my equity rights, I

13  engaged a lawyer at my expense to send letters to both Hayes and Sean O'Sullivan, SOSV's

14  Managing General Partner.  Hayes did not reply and SOSV instructed me to sort it out with

15  BitMEX's legal department.  BitMEX's legal department never replied.

16        20.    On September 13, 2019, I wrote to Hayes and his two BitMEX co-founders, Sam

17  Reed and Ben Delo, to ask why SOSV's investment of $30,000 for 5% equity in BitMEX did not

18  constitute a triggering event under the terms of my SAFE.  In reply, Ben Delo sent the following



image of Hayes, essentially telling me that I had no recourse against BitMEX because it is incorporated in the Seychelles:

21.     I joined in this lawsuit as a plaintiff on April 27, 2020.

**C.     SOSV's Documents Show That My Equity Rights Triggered In 2015**

22.     I understand that before I joined this lawsuit, requests for documents were sent to SOSV and that SOSV was eventually ordered to produce its documents by a New Jersey court.  I signed a certification pursuant to a protective order in this case that allowed me to review the documents that SOSV produced.

23.     In the course of my and Frank Amato's review, we ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████

24.     The timing of the ████████ was also consistent with Hayes's representations to me in 2015 when he was soliciting my investment.  Beginning in January 2015, he had repeatedly assured me that BitMEX would soon have an equity financing round.  When he presented me with a draft of the SAFE that I ultimately executed, he again assured me that there was an upcoming financing round that would trigger my SAFE.  ████████████████████████, yet Hayes represented to me for years first that HDR had never had a financing round and then later that the SOSV investment was not a qualifying equity financing.

25.     Even more astonishing to me was our discovery of a ████████████████

██████████████████████████████████████████████████

████████████████████████████ In my experience as a private investor, SAFE

holders should be listed in capitalization tables, if only so that other shareholders and investors know that the company they invested in may owe outstanding shares to SAFE holders.

26. ████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████
███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
██████████████████

**D.    Hayes And HDR Will Try to Conceal Or Transfer Assets And**

27.    On October 1, 2020, Frank Amato shared with me a Twitter news post reporting that the Commodity Futures Trading Commission ("CFTC") was bringing a lawsuit against BitMEX.  I began investigating the news and discovered that Hayes and his BitMEX co-founders were also criminally indicted by the U.S. Department of Justice.  I learned through subsequent news reports that co-founder Sam Reed was arrested in the United States, but that Hayes and Ben Delo remain at large.  My understanding is that Hayes and Delo have not been apprehended.

28.    In the days that followed, various cryptocurrency-related news outlets that I follow reported on the impact of the CFTC lawsuit and the Department of Justice indictment.  One article at https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/ reported that that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX."

29.    Another at https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm reported that BitMEX's own funds, which I understand to consist mostly of bitcoin or similar cryptocurrencies, were "held in multsig wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal."  In layman's terms, this means that BitMEX's funds are stored in electronic devices—referred to as cryptocurrency "wallets"—that are

locked behind passwords in the possession of HDR's founders. Two such passwords are required to access the cryptocurrency stored in those wallets. Coincidentally, two HDR founders holding two such passwords remain at large.

30.     As a result, Frank Amato and I are now plaintiffs in a lawsuit against a cryptocurrency derivatives trading platform whose trading volume has plummeted following a CFTC lawsuit and a DOJ indictment of the platform's founders. The loss in trading volume will undoubtedly have a profound impact on HDR's revenue, if it has not already. And of the three individuals in the world who reportedly have access to BitMEX's cryptocurrency-based funds, two are effectively fugitives of the U.S. government.

31.     I believe that in light of these recent developments and my own experience with Defendants—who openly flout their disregard for the law and legal rights—Defendants will transfer their assets outside of the United States and into what the CFTC described as their "maze of corporate entities," making it impossible for Frank Amato and I to collect a judgment against them. I implore this court to grant the relief we request and secure our recovery.

[Signature page to follow]

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 23, 2020

By: _____

Elfio Guido Capone

# EXHIBIT 5

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
        levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone:  (415) 599-0210
5   Facsimile:  (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
        curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Times Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone:  (646) 829-9403
9   Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

12

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                      **COUNTY OF SAN FRANCISCO**

15

16  FRANK AMATO, RGB COIN LTD.,            Case No: CGC-19-581267
    and ELFIO GUIDO CAPONE on behalf
17  of the G AND M CAPONE TRUST,           **DECLARATION OF FRANK AMATO IN**
                                           **SUPPORT OF PLAINTIFFS' *EX PARTE***
18          Plaintiffs,                    **APPLICATION FOR A RIGHT TO**
                                           **ATTACH ORDER, WRIT OF**
19          v.                             **ATTACHMENT, AND TEMPORARY**
                                           **PROTECTIVE ORDER**
20  HDR GLOBAL TRADING LIMITED, d/b/a
    BITMEX; ARTHUR HAYES; ABS             **Hearing**
21  GLOBAL TRADING LIMITED; and DOES      **Date:**  Monday, October 26, 2020
    1-10,                                  **Time:** 9:15 a.m.
22                                         **Dept.:** 304
            Defendants.                    **Judge:** The Hon. Anne-Christine Massullo
23
                                           **Complaint filed:** Dec. 4, 2019
24                                         **FAC filed:**  April 27, 2020
                                           **SAC filed:** August 18, 2020
25
                                           **Trial Date:** None Set
26
                                           **REDACTED**
27

28
                                                Case No. CGC-19-581267
─────────────────────────────────────────────────────────────────────────
DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

I, Frank Amato, declare:

1.    I am a Plaintiff in the above-captioned matter.

2.    I make this declaration based on personal knowledge.  If called as a witness, I would and would testify competently to the facts stated herein.

3.    I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies.  As an "angel" investor, I have made capital contributions to several business start-ups over the years.  An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial stage when most other financial institutions and investors are not prepared to back these businesses.

4.    I became acquainted with Defendant Arthur Hayes ("Hayes") on August 18, 2014 when he wrote to me via a LinkedIn message that he was seeking equity investors for BitMEX, a cryptocurrency derivatives trading platform.

5.    Hayes and his co-founders Sam Reed and Ben Delo created and operate an online cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the largest trading platforms of its type in the world, with billions of dollars in trades taking place daily.  BitMEX publicly posts its daily, monthly, and yearly trading volume on its website, found at www.bitmex.com.

6.    Beginning on September 11, 2014 and through April 16, 2015, Hayes communicated with me repeatedly to solicit my investment in BitMEX.  Having read later interviews with Hayes, including the interview available at https://www.cryptoglobe.com/latest/2018/09/800-billion-the-story-of-crypto-derivatives-exchange-bitmex-and-its-ceo-arthus-hayes/, I now know that BitMEX was struggling greatly at the time, with Hayes calling the Platform's trading volumes "pathetic."

7.    During our initial communications, I was told that I would receive 0.50% of BitMEX for a $50,000 investment.  For example, on March 20, 2015, Hayes wrote to me to "make sure we are on the same page," saying that he was "looking to sell common equity shares, so you will have same right as us [the founders]."  After I requested that I lower my investment, I was told

1  that I would receive 0.50% of BitMEX for $30,000.  I was told that my investment would be made

2  pursuant to a Republic of Seychelles Share Purchase Agreement.

3        8.    In May 2015, Hayes told me that instead of a Share Purchase Agreement, he wanted

4  me to invest through a "convertible financing structure" in which my investment would "convert to

5  preferred shares at [BitMEX's] next round of financing."  Hayes sent me a Simple Agreement for

6  Future Equity ("SAFE") pursuant to which I would invest in BitMEX.  Given the change, I

7  requested time to review the agreement and confirmed with Hayes that I was investing in the initial

8  round, "pre-Series A" financing round.  Hayes assured me that my "shares will convert at the next

9  financing round, which will be our first financing round."

10        9.    In response to my inquiry concerning the terms of the investment, Hayes wrote back

11  to me that "the relevant terms" are that "investment will convert to preference shares at our next

12  equity financing round," that "shares will convert at a 20% discount to the per share price," and

13  that "after converting your ownership stake is capped at 0.50% based on a $30,000 USD

14  investment."

15        10.    The SAFE contained a provision under which HDR was required to automatically

16  issue shares to me upon an "Equity Financing" event.  When such an event occurred, the SAFE

17  contained a formula for determining the number of shares HDR would issue, with a cap for my

18  ownership interests at 0.50% of the entity.

19        11.    Based on my experience as an angel investor, it is not unusual for SAFEs to be

20  triggered extremely quickly.

21        12.    Relying on Hayes's representations that my investment would convert into equity at

22  the next financing round which HDR was going to raise, I executed the SAFE on June 15, 2015 and

23  wired Hayes $30,000 on June 26, 2015. Attached hereto as **Exhibit 1** is a true and correct copy of

24  the SAFE that I executed with Defendant HDR on June 15, 2015.

25        13.    I later discovered that HDR was a 2015 participant in the Chinaccelerator program,

26  an accelerator program run by a venture capital investor called SOSV.  Participants in accelerator

27  programs like Chinaccelerator give equity to investors in exchange for capital investments.  After

28  discovering that HDR had participated in Chinaccelerator, in November 2018 I emailed Hayes to

1  inquire about my equity rights, as I believed that SOSV's investment into HDR should have

2  triggered my SAFE.  Hayes informed me that my SAFE had not converted into equity because "no

3  equity financing has occurred."

4      14.    Between November 2018 and February 2019, I repeatedly inquired about my equity

5  rights, but Hayes continued to invent new reasons why my equity rights had not triggered.  For

6  example, on January 2, 2019, Hayes told me that the reason why SOSV's investment into HDR had

7  not triggered was because SOSV did not give any money to HDR in exchange for HDR's equity.  I

8  only have very recently have discovered, though discovery from SOSV, that this representation

9  was false.

10     15.    I initiated this lawsuit on December 4, 2019 to hold Defendants to account for their

11  wrongful conduct.

12     16.    I understand that in the course of this lawsuit, SOSV was ordered by a New Jersey

13  Court to produce documents.  Under the Protective Order that I has been entered between the

14  parties in this case, I understand SOSV agreed to allow me and co-Plaintiff Mr. Capone to review

15  the documents that they produced.

16     17.    During my review of SOSV's production, I saw ███████████████

17  ███████████████████████████████████████

18  ███████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████

21     18.    ████████████████████████████████

22  ███████████████████████████████████

23  ██████████████████████████████████

24  ████████████████████████████████████

25  ████████

26     19.    ████████████████████████████████

27  ████████████████████████

28

20. 

21.

In other words, it appeared as if Mr. Capone and I had never made any investment in HDR.

22.

23.     My equity rights in HDR have never been acknowledged, nor have I ever received a dividend payment.

24.     I now know that ever since I invested in June of 2015, Hayes and BitMEX embarked on a campaign to cheat me out of my ownership rights, including millions of dollars of dividends that BitMEX has issued to its shareholders.

25.     Further, recent events concerning HDR and its founder Hayes have caused me concern regarding my ability to collect the funds that HDR owes to me.

26.     I saw on twitter and online news sources on October 1, 2020 that Hayes and his co-founders in BitMEX, Sam Reed and Ben Delo, and another BitMEX employee, Greg Dwyer, were criminally indicted by the U.S. Department of Justice.  I understand that although Sam Reed was arrested in the United States and then posted bail, the other two founders of BitMEX, Hayes and Ben Delo, remain at large.

27.     I also saw that on the same day, the Commodity Futures Trading Commission had launched a complaint against Defendants HDR, Hayes, and ABS, as well as other BitMEX-

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

1   affiliates and its founders, for a wide variety of regulatory violations.  I have reviewed the DOJ

2   indictment and the CFTC complaint.

3        28.    Since I stay current on cryptocurrency- and BitMEX-related news sources and

4   articles, I read various news reports, including the article accessible at

5   https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/, which states that "money began leaving the

6   BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins]

7   (~$431 million) had been withdrawn from BitMEX."

8        29.    Moreover, I also saw other news stories, including the article available at

9   https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm, that

10  disclosed that BitMEX's own funds, which I understand to consist mostly of bitcoin, were "held in

11  multi[-signature] wallets that require a signature from multiple private keys in order to be

12  unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must

13  sign each withdrawal."  In short, BitMEX's substantial cryptocurrency-based assets are accessible

14  only by its founders who are facing criminal charges, two of whom remain at large.

15       30.    Such conduct is disturbing, especially in connection with Hayes's and HDR's

16  apparent willingness to regularly disregard the law.  I saw a video showing a debate between Hayes

17  and another guest concerning BitMEX's practices, dated July 15, 2019, titled "The Tangle in

18  Taipei with Arthur Hayes and Nouriel Roubini," which is available at

19  https://www.youtube.com/watch?v=qlZukhN_C6c&t=9m52s, in which Hayes was asked by a

20  debate moderator how the Seychellois authorities compare to other global regulators. Hayes stated

21  "it just costs more to bribe them," and, when pressed by the moderator about "that not being an

22  answer," Hayes responded that "it is an answer" and that he pays "a coconut" to bribe the

23  Seychellois authorities.

24

25

26

27

28

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

1        I swear under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3

4    Dated:  October 23, 2020                By:  _____

5                                                Frank Amato

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

# EXHIBIT 6

1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Andrew Levine, Esq. (SBN: 278426)
       levine@braunhagey.com
3  BRAUNHAGEY & BORDEN LLP
   351 California Street, Tenth Floor
4  San Francisco, CA 94104
   Telephone:  (415) 599-0210
5  Facsimile:  (415) 599-0210

6  Douglas Curran, Esq. (*pro hac vice*)
       curran@braunhagey.com
7  BRAUNHAGEY & BORDEN LLP
   7 Times Square, Twenty-Seventh Floor
8  New York, NY 10036
   Telephone:  (646) 829-9403
9  Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**10/23/2020**
**Clerk of the Court**
**BY: YOLANDA TABO-RAMIREZ**
**Deputy Clerk**

12

13

14            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                      **COUNTY OF SAN FRANCISCO**

16

17

18  FRANK AMATO, RGB COIN LTD.,           Case No: CGC-19-581267
    and ELFIO GUIDO CAPONE on behalf
19  of the G AND M CAPONE TRUST,          **DECLARATION OF J. NOAH HAGEY**

20            Plaintiffs,               **Hearing**
                                        **Date:**  Monday, October 26, 2020
21            v.                        **Time:** 9:15 a.m.
                                        **Dept.:** 304
22  HDR GLOBAL TRADING LIMITED, d/b/a    **Judge:** The Hon. Anne-Christine Massullo
    BITMEX; ARTHUR HAYES; ABS
23  GLOBAL TRADING LIMITED; and DOES     **Complaint filed:**  Dec. 4, 2019
    1-10,                                **SAC filed:**  August 18, 2020
24            Defendants.
                                        **Trial Date:** None Set
25
                                        **REDACTED**
26

27

28

                                                      Case No. CGC-19-581267

1       I, J. Noah Hagey, Esq., declare:

2       1.    I am an attorney duly admitted to practice in the State of California.  I am a named

3   partner at the law firm BraunHagey & Borden LLP, counsel of record for Plaintiffs Frank Amato,

4   RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust in the above-

5   captioned action (together, "Plaintiffs"), and I provide this declaration in accordance with

6   California Rule of Court 3.1202.  I base this declaration on facts within my personal knowledge

7   and from my discussions with other attorneys at BraunHagey & Borden LLP who have worked on

8   this case, and if called upon to testify, I could and would testify competently thereto.

9       2.    On October 22, 2020, at 3:04 p.m. PT, via email, I informed Jones Day, counsel of

10  record for Defendants HDR Global Trading Limited ("HDR") and ABS Global Trading Limited

11  ("ABS"), and Akin Gump Strauss Hauer & Feld LLP, counsel of record for Defendant Arthur

12  Hayes ("Hayes"), that Plaintiffs would be moving for *ex parte* relief at 9:15 a.m. on October 26,

13  2020, in Dept. 304 of the Superior Court of California, County of San Francisco, in connection

14  with the above-captioned action.  I further informed Defendants that Plaintiffs' *ex parte* application

15  sought a temporary protective order in aid of attachment and related relief, and inquired whether

16  Defendants would oppose such application.  Defendants stated that they would.

17      3.    I and Douglas Curran, another partner at BraunHagey & Borden LLP working on

18  this case, have repeatedly asked Defendants' counsel for information regarding their clients'

19  expatriation and dissipation of assets.  Defendants' counsel has so far refused to provide any

20  substantive information at all.

21      4.    Attached hereto as **Exhibit 1** is a true and correct copy of the Department of

22  Justice's indictment against Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, captioned

23  *United States v. Hayes, et al.*, 20-cr-500 (S.D.N.Y.), released on October 1, 2020.

24      5.    Attached hereto as **Exhibit 2** is a true and correct copy of the Commodity Futures

25  Trading Commission's complaint against HDR, ABS, Hayes, 100x Holdings Limited, Shine Effort

26  Inc Limited, HDR Global Services (Bermuda) Limited, Ben Peter Delo, and Samuel Reed, filed on

27  October 1, 2020, styled *CFTC v. HDR Global Trading Ltd., et al.* 20-cv-8132 (S.D.N.Y.), filed on

28  October 1, 2020.

DECLARATION OF J. NOAH HAGEY

6.     On October 15, 2020, following (i) SOSV's production of documents showing a clear and plain right to Plaintiffs' recovery, and (ii) the filing of the CFTC and DOJ actions, Mr. Curran emailed a series of questions to Defendants' counsel in an effort to determine whether Defendants were, in fact, expatriating assets.  Attached hereto as **Exhibit 3** is a true and correct copy of Mr. Curran's October 15 email to Defendants.

7.     Defendants' counsel refused to provide those answers promptly, and instead suggested the parties meet and confer about those matters on October 19, 2020.

8.     During the October 19 meet and confer, Defendants' counsel simply stated they were "not prepared" to discuss the issues, and claimed they needed additional time to confer with their clients.

9.     The parties then conferred again on October 21; this time, Defense counsel declared that the questions posed in Plaintiffs' October 15 email were "intrusive" and again refused to provide any substantive information.  Defense counsel stated, however, that they would continue to confer with their clients and would consider providing some undefined information on October 23.

10.     Plaintiffs then followed up on October 21 with an email that boils down to a single, basic request: "[P]lease provide a simple schedule or summary of all distributions of any sort – whether dividends or otherwise – that HDR made to its shareholders from June 2015 to the present, including the dates and amounts of those distributions."  Attached hereto as **Exhibit 4** is a true and correct copy of an email chain between counsel for Plaintiffs and Defendants dated October 21, 2020.

11.     Defendants did not respond.

12.     Plaintiffs thereafter informed Defendants that their inability to provide even the most basic information about the improper movement of assets only added to Plaintiffs' well-founded concerns, and left them no choice but to seek this relief.

13.     In response to Plaintiffs' subpoena, third-party SOSV has produced several unitized PDF files bearing bates stamps between SOSV - 1 through SOSV – 6895.   Following Plaintiffs' second motion to enforce litigants' rights, which was granted by Judge Anklowitz sitting in New Jersey on October 16, 2020, SOSV has produced 6,109 native documents without bates stamps.

1  Plaintiffs are still reviewing those native documents, but a preliminary review has already shed a

2  significant amount of light on the communications between SOSV and HDR since 2015.  In my

3  review of the documents, ███████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████████████

5  ██████████████████

6       14.    Attached hereto as **Exhibit 5** is a true and correct copy of an email that appears to

7  have been sent by ████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ███████████████████████████████████████  This email thread was produced by

13 SOSV and is bates stamped SOSV - 2671–72.

14       15.    Attached hereto as **Exhibit 6** is a true and correct copy of a document titled ████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████  and is bates stamped SOSV - 134–39

17 ███████████████████.

18       16.    Attached hereto as **Exhibit 7** is a true and correct copy of an email that appears to

19 have been sent by ████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████████

21 This email thread was produced by SOSV and is bates stamped SOSV - 1506–10.

22       17.    Attached hereto as **Exhibit 8** is a true and correct copy of an email that appears to

23 have been sent by ████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████

28

1    ████████████    This email thread was produced by SOSV and is bates stamped SOSV -

2    2136–37.

3         18.    Attached hereto as **Exhibit 9** is a true and correct copy of an email within an email

4    chain that appears to have been sent by ████████████████████████████

5    ██████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ██████████████████████████████████████

9    ██████████████████████████████████████  This

10    email thread was produced by SOSV and is bates stamped SOSV - 2138–39.

11         19.    I have also reviewed text messages and whatsapp messages between ████████

12    ████████████████████████████████████████

13    ██████████████████████    These messages were produced as screenshots from the

14    mobile device of ██████████ and were not produced with bates numbers.

15         20.    Attached hereto as **Exhibit 10** is a true and correct copy of a text message chain

16    between ████████████████████████████████████

17    ██████████████████████████████████████

18    ████████████████████████████████

19    ████████████████████████████████████

20    ████████████████████████████████████████

21         21.    Attached hereto as **Exhibit 11** is a true and correct copy of a text message chain

22    between ████████████████████████████████████

23    ██████████████████████████████████

24    ██████████████████████████████████████

25    ████████████████████████████████████████

26    ██████████████████████████████████

27    ██████████████████████████████████████

28

1 ███████████████████████████████████████████

2 ████████████

3       22.     Attached hereto as **Exhibit 12** is a true and correct copy of the CFTC's press release

4 on October 1, 2020 regarding its complaint against BitMEX and its founders, available at

5 https://www.cftc.gov/PressRoom/PressReleases/8270-20.

6       23.     Attached hereto as **Exhibit 13** is a true and correct copy of an email that appears to

7 have been sent from ████████████████████████████████

8 ███████████████████████████████████████████

9 ████   This email thread was produced by SOSV and is bates stamped SOSV - 2641.

10       24.     Attached hereto as **Exhibit 14** is a true and correct copy of an email that appears to

11 have been sent from ██████████████████████████████

12 ███████████████████████████████████████████

13 ████████████████████████████   This email thread was produced by SOSV and

14 is bates stamped SOSV - 2670.

15

16

17       I swear under penalty of perjury under the laws of the United States that the foregoing is

18 true and correct.

19 Dated:  October 23, 2020                    By: _____

20                                                  J. Noah Hagey, Esq.

21

22

23

24

25

26

27

28

DECLARATION OF J. NOAH HAGEY

# EXHIBIT 7

1  J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
2  Andrew Levine, Esq. (SBN: 278426)
     levine@braunhagey.com
3  BRAUNHAGEY & BORDEN LLP
   351 California Street, Tenth Floor
4  San Francisco, CA 94104
   Telephone:  (415) 599-0210
5  Facsimile:  (415) 599-0210

6  Douglas Curran, Esq. (*pro hac vice*)
     curran@braunhagey.com
7  BRAUNHAGEY & BORDEN LLP
   7 Time Square, Twenty-Seventh Floor
8  New York, NY 10036
   Telephone:  (646) 829-9403
9  Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                        **COUNTY OF SAN FRANCISCO**

14

15

16                                          Case No: CGC-19-581267
    FRANK AMATO, RGB COIN LTD.,
17  and ELFIO GUIDO CAPONE on behalf       **DECLARATION OF PLAINTIFFS'**
    of the G AND M CAPONE TRUST,           **INDUSTRY EXPERT TODD ANTONELLI**
18                                          **IN SUPPORT OF PLAINTIFFS' *EX***
        Plaintiffs,                         ***PARTE* APPLICATION FOR A RIGHT TO**
19                                          **ATTACH ORDER, WRIT OF**
            v.                              **ATTACHMENT, AND TEMPORARY**
20                                          **PROTECTIVE ORDER**
    HDR GLOBAL TRADING LIMITED, d/b/a
21  BITMEX; ARTHUR HAYES; ABS             **Hearing**
    GLOBAL TRADING LIMITED; and DOES      **Date:**  Monday, October 26, 2020
22  1-10,                                  **Time:**  9:15am
                                           **Dept.:**  304
23      Defendants.                        **Judge:** The Hon. Anne-Christine Massullo

24                                          **Complaint filed:**  Dec. 4, 2019
                                           **FAC filed:**  April 27, 2020
25                                          **SAC filed:**  August 18, 2020

26                                          **Trial Date:** None Set

27                                          **REDACTED**

28

                                                        Case No. CGC-19-581267

I, Todd Antonelli, declare:

1.     I make this declaration based on personal knowledge.  If called as a witness, I could and would testify competently to the facts stated in this Declaration.

2.     I am a Managing Director at Berkeley Research Group in Chicago and serve as a leading financial and strategic advisor to companies in all stages of growth, from venture startups to Global 100 publicly traded companies, including well-known businesses such as Intel, HP, Goldman Sachs, ArcelorMittal, Caterpillar, Stanley Black & Decker, Blackstone, Agilent, Allstate, State Farm, and Starbucks.  A substantial part of my work involves analyzing and advising such clients on all stages of financings, acquisitions and investment, including venture and seed investment and the use of Simple Agreements for Future Equity ("SAFE"), such as those at issue in this case.  I hold an M.B.A. in Finance from New York University and routinely advise clients regarding venture investing, startups, mergers and acquisition, divestitures, IPOs, spin-outs, going private for acquisitive companies, and everything in between.  My curriculum vitae is attached as **Exhibit 1.**

### A.     Summary of Opinions

3.     I have been asked by Plaintiffs Frank Amato and RGB Coin Ltd. (together, "Amato"), and Elfio Guido Capone on behalf of the G and M Capone Trust ("Capone") (collectively, "Plaintiffs") to provide opinions on (1) whether Amato's and Capone's SAFEs in HDR Global Trading Limited ("HDR") were triggered by HDR's fundraising activities in 2015; and (2) if so, the total amount of dividends that Amato and Capone should have received through their equity rights.

4.     As detailed below, the SAFEs entered by Amato and Capone were triggered upon HDR's ███████████████████████████████ with venture capital investor, SOSV.  ████████████████████████████████████████ ████████████████████████████████[1]  Amato should have received ███ shares (representing **0.50% of HDR**) and Capone should have received ███ shares (representing **0.41%**

---

[1] On the same date, ████████████████████████████████████

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**of HDR**).  Thereafter, Amato and Capone were entitled to participate in dividends distributed to shareholders of the company.

5.  ████████████████████████  ████████████  ████████

Of that amount, Amato should have received ███████ and Capone should have received

██████.  The table below summarizes the key inputs and results of my analysis; for clarity, I present only the shareholders required to conduct my analysis.

| Shareholder | Ownership Percentage | Shares | Dividends |
|---|---|---|---|
| HDR Founders | ████ | ████ | ████ |
| SOSV | | | ████ |
| Amato | 0.50% | ████ | ████ |
| Capone | 0.41% | ████ | ████ |

6.  I understand that Plaintiffs requested from Defendants a schedule or summary of all distributions, dividends or otherwise, that HDR has made to its shareholders from June 2015 to the present.  I further understand that Defendants have not provided this information to Plaintiffs.  Accordingly, my opinions and analysis are based solely on the evidence produced thus far in the case, which likely understates the amount of money owed to Plaintiffs.

7.  I accordingly reserve the right to supplement and/or amend my opinions and analysis in the event that Defendants produce additional relevant documents or information.

**B.    Material Reviewed**

8.  I have been provided with the evidence identified in **Appendix 1** relating to Plaintiffs' SAFE investments, including without limitation:  (a) each SAFE instrument; (b) investment transactions entered by SOSV; (c) business records of SOSV reflecting the accounting and receipt of dividends from HDR; (d) correspondence regarding SOSV's investments and dividends; and (e) the pleadings in this matter.  These materials are the same type of business records I routinely obtain, review, and rely upon in my professional work as a strategic advisor to business and investors.

### C.     Analysis

9.     The Amato and Capone SAFEs are among the more straightforward SAFEs that I have reviewed and advised on.  Below I describe the features of each SAFE, then discuss the SOSV triggering event, and finally provide the mathematical computation showing the amount of dividends Plaintiffs are owed.

### 1.     Plaintiffs' SAFEs

10.     The Amato SAFE contains, in relevant part, a provision requiring HDR to automatically issue shares to Amato upon an "Equity Financing" event.  Upon that trigger, the SAFE uses a formula for calculating the number of shares to be issued, with a cap of "0.50% of [HDR's] issued and outstanding share capital on a fully-diluted and as converted basis":

---

**1.  *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.50% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

---

(**Amato Exhibit 1** § 1(a).)

11.     The Capone SAFE is nearly identical and contains a similar provision, but with the number of shares issued capped at "0.41% of [HDR's] issued and outstanding share capital on a fully-diluted and as converted basis."

---

**1.  *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.41% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

---

(**Capone Exhibit 1** § 1(a).)

12.     Both SAFEs define an "Equity Financing" as follows:

3

Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

> "**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation.

(**Amato Exhibit 1** at 3; **Capone Exhibit 1** at 3.)

13.    The SAFEs do not define the term "Preferred Shares."  (*See generally*, **Amato Exhibit 1; Capone Exhibit 1**.)

14.    Based on my experience, the correct interpretation of these provisions is that Plaintiffs' equity rights would trigger once three conditions were satisfied: (1) there is a "bona fide transaction or series of transactions with the principal purpose of raising capital"; (2) the transaction or series of transactions are transactions "pursuant to which [HDR] issues and sells Preferred Shares"; and (3) HDR sells the shares "at a fixed pre-money valuation."

**2.    SOSV's ▮▮▮▮▮▮▮▮▮▮ Triggered the SAFEs**

15.    On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On its face, the ▮▮▮▮▮ is a bona fide transaction with the principal purpose of raising capital. ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SOSV's Chinaccelerator Program.[2]  (*See* **Exhibit 2** at SOSV - 293.)  Accelerator programs, such as SOSV's Chinaccelerator Program, enable startup companies to compete with one another for funding from venture capital investors such as SOSV, *i.e.*, they are competitions through which startup companies raise capital.[3]  Thus, the ▮▮▮▮▮, under which HDR (as a participant in Chinaccelerator) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, is a bona fide transaction with the principal purpose of raising capital.  (*See id*. § 1(a).)

16.    **The ▮▮▮▮▮▮▮▮▮▮** The ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] In fact, Chinaccelerator touts its investment in HDR and BitMEX to attract investors for its funds.  For instance, it states that it "invested in BitMEX through Batch 8 which later became a Fintech unicorn."  (*See* https://chinaccelerator.com/10th-anniversary/.)

[3] For instance, Chinaccelerator markets itself to startups by advertising that it offers a "$150,000 Investment" of which "US$55,000 is cash investment."  (*See* https://chinaccelera1tor.com/offerings/.)

4

Case No. CGC-19-581267

1    17.    *First,* ███████████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ███████████████    (*See id*. § 2.)  In my experience, █████████████

4    █████████████████████████

5    18.    *Second,* ████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    █████    (*See id*. § 6.)  In my experience, ████████████████████

9    ██████

10    19.    *Third,* ██████████████████████████████████████████

11    ████████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████████

13    ██████████████████████████████████████████████████

14    ████████████████████████████████    (*See id*. § 8.)  By

15    its own terms, ███████████████████████████████████████

16    ██████████████████████    (*Id*.)

17    20.    In my experience, ███████████████████████████████

18    ██████████████████████████████████████████████████████████

19    ███████████████████    In my opinion, ███████████████████████

20    ████████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████

22    under a reasonable and commercially standard interpretation of that term as used in SAFEs.

23    21.    ████████████████████████████████████    Pursuant to the ████

24    █████████████████████████████████████████████████████████

25    ███████████████████████████████████████████████████

26    ████████████████████████████████    (**Exhibit 2** § 1(a).)  This represents a

27

28

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3     22.    Therefore, ████████████████████████████████████

4 ████ an "Equity Financing" event under Plaintiffs' SAFEs, which triggered their equity rights.

**3.    Computation of Plaintiffs' Triggered Shares**

23.    Amato and Capone invested amounts into HDR ($30,000 and $25,000, respectively)

████████████████████████████████████████ (*Compare* **Amato Exhibit 1** at 1

*and* **Capone Exhibit 1** at 1 *with* **Exhibit 2** § 1(a).)  The Amato SAFE, however, limited the

number of shares HDR would issue to Amato to "0.50% of the Company's issued and outstanding

share capital on a fully-diluted and as converted basis."  (**Amato Exhibit 1** § 1(a).)  The Capone

SAFE, likewise limited the number of shares HDR would issue to Capone to "0.41% of the

Company's issued and outstanding share capital on a fully-diluted and as converted basis."

(**Capone Exhibit 1** § 1(a).)

24.    The ████████████████████████████, when Amato and Capone

invested in HDR, ████████████████████████████████████████████

(**Exhibit 3** at 1.)  Therefore, the number of shares HDR should have issued to Amato and Capone is

a straightforward calculation based on the caps in their respective SAFEs.  Amato's right to 0.50%

of HDR's issued and outstanding share capital on a fully diluted and as converted basis equates to

████ shares.  Capone's right to 0.41% of HDR's issued and outstanding share capital on a fully

diluted and as converted basis equates to ████ shares.

25.    In my opinion, it is unusual and contrary to industry practice for HDR to treat

Amato's and Capone's SAFEs as if they simply did not exist.  Amato's and Capone's equity rights

do not appear to have been included ████████████████████████████, which is contrary to

industry practice, *even if the SAFEs had not been triggered.*  (**Exhibit 3** at 22; **Exhibit 4** at SOSV -

135.)  In my long experience working with company capital tables, including with Y Combinator

companies and advising on acquisitions involving outstanding SAFEs, I have never seen a

company wholesale disregard and ignore its SAFE holders in this manner.  Such conduct not only

6

1  acts to deprive Plaintiffs of their investment status, but conceals their existence from other

2  investors and is a strong indication that HDR and Hayes intended to deprive Plaintiffs of their

3  equity, no matter what transpired.

4      26.    ████████████████████████████████████████████

5  ████████████████████████████████████████ **(Exhibit 5**

6  ██████████████████████████████████████████████████

7  ████████████████████████ **Exhibit 6** ████████████████

8  ████████████████████████████████████

9          **4.    Computation of Plaintiffs' Outstanding Dividends**

10     27.    The computation of Plaintiffs' outstanding dividends is easily performed by using

11  the methodology applied to ████████████

12     28.    ████████████████████████████████████████████

13  ████████ **(Exhibit 4** at SOSV - 135.) ████████████████████████

14  ████████████████████████████████████████████████

15  ████████ (*Id.* at SOSV - 137; **Exhibit 7** ████████████████████

16  ████ ████████████████████████████████████

17     29.    Accordingly, by operation of simple math, Amato would have received ████████

18  ████, and Capone would have received ████████████████.

19     30.    ████████████████████████████████. Thus, ████████

20  ████████████████████████████████████████████████

21  ████████████████ **(Exhibit 3** at 22.)  Arthur Hayes and Samuel Reed, who I understand ████

22  ██████████████████████████████████████████████████

23  ██████████████████████████████████████ (*Id.* at 1, 22.)

24  Ben Delo ██████████████████████████████████ (*Id.* at 22.)

25  Together the HDR founders ████████████████████████████████

26  ████████████

Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**D.    Conclusion**

31.    I have worked with companies and investors for almost my entire career and cannot ever recall a case such as this:  where seed investors were deprived of their investment notwithstanding such an obvious triggering event and such obvious success from the use of their capital.  Amato and Capone should receive their past-due dividends, along with all other incidents of share ownership.

32.    I reserve the right to supplement and amend my opinions, particularly as HDR reveals additional payments and distributions to which Plaintiffs are entitled a share.

8

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing matters are true and correct.

3

4  Dated:  October 23, 2020                    By:  _____

5                                                        Todd Antonelli

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

# EXHIBIT 8

1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Andrew Levine, Esq. (SBN: 278426)
       levine@braunhagey.com
3  BRAUNHAGEY & BORDEN LLP
   351 California Street, Tenth Floor
4  San Francisco, CA 94104
   Telephone:  (415) 599-0210
5  Facsimile:  (415) 599-0210

6  Douglas Curran, Esq. (*pro hac vice*)
       curran@braunhagey.com
7  BRAUNHAGEY & BORDEN LLP
   7 Time Square, Twenty-Seventh Floor
8  New York, NY 10036
   Telephone:  (646) 829-9403
9  Facsimile:  (646) 829-9403

10 ATTORNEYS FOR PLAINTIFFS
   FRANK AMATO, RGB COIN LTD.,
11 and ELFIO GUIDO CAPONE on behalf
   of the G AND M CAPONE TRUST

12

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13

14          **COUNTY OF SAN FRANCISCO**

15

16 |                                          | Case No: CGC-19-581267
17 FRANK AMATO, RGB COIN LTD.,
   and ELFIO GUIDO CAPONE on behalf   **MEMORANDUM OF POINTS AND**
   of the G AND M CAPONE TRUST,       **AUTHORITIES IN SUPPORT OF**
18                                     **PLAINTIFFS' *EX PARTE* APPLICATION**
       Plaintiffs,                    **FOR A RIGHT TO ATTACH ORDER,**
19                                     **WRIT OF ATTACHMENT, AND**
           v.                          **TEMPORARY PROTECTIVE ORDER**
20
   HDR GLOBAL TRADING LIMITED, d/b/a   **Hearing**
21 BITMEX; ARTHUR HAYES; ABS
   GLOBAL TRADING LIMITED; and DOES    **Date:**     Monday, October 26, 2020
22 1-10,                               **Time:**     9:15 a.m.
                                       **Dept.:**    304
23     Defendants.                     **Judge:**    Hon. Anne-Christine Massullo

24                                     **Complaint filed:**  Dec. 4, 2019
                                       **FAC filed:**        April 27, 2020
25                                     **SAC filed:**        August 18, 2020
                                       **Trial Date:**       None Set
26
                                       **REDACTED**
27

28

Case No. CGC-19-581267

1

**TABLE OF CONTENTS**

2  PRELIMINARY STATEMENT ................................................................. 1

3  BACKGROUND .................................................................................. 2

4     A.    Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights ................. 2

5     B.    ███████████████████████████████████████████████████

6     C.    Simple Computation of Plaintiffs' Implied Dividends........................................... 4

7     D.    Plaintiffs' Attempts to Gather Information and Avoid Motion Practice ............... 5

8  ARGUMENT....................................................................................... 6

9  I.    *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE

10          NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY .......................... 7

11 II.   PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY
         THE CCP'S GROUNDS FOR ATTACHMENT ............................................... 10

12    A.    Plaintiffs Have Established the Probable Validity of Their Claims .................... 11

13    B.    Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery ........... 14

14    C.    Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted ................. 14

15    D.    The Amount to Be Secured By the Attachment Is Greater than Zero ................. 15

16 III.  PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED

17          DISCOVERY ........................................................................... 15

18 CONCLUSION.................................................................................... 15

19

20

21

22

23

24

25

26

27

28

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

## TABLE OF AUTHORITIES

## CASES

*Bank of Am. v. Salinas Nissan, Inc.*,
207 Cal. App. 3d 260 (1989) ........................................................................... 7

*CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*,
115 Cal. App. 4th 537 (2004) ......................................................................... 11

*Goldstein v. Barak Constr.*,
164 Cal. App. 4th 845 (2008) ......................................................................... 11

*Halstead v. Halstead*,
72 Cal. App. 2d 832 (1946) ............................................................................ 14

*Loeb & Loeb v. Beverly Glen Music, Inc.*,
166 Cal. App. 3d 1110 (1985) ........................................................................ 14

*Richman v. Hartley*,
224 Cal. App. 4th 1182 (2014) ........................................................... 12, 13, 14

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**PRELIMINARY STATEMENT**

Plaintiffs respectfully submit this memorandum in support of their request for an emergency temporary protective order ("TPO") and an order of attachment to ensure the availability of assets within the jurisdiction to secure a final judgment. Discovery very recently produced in this matter by one of Defendants' investors, SOSV, proves that Plaintiffs' Simple Agreements for Future Equity ("SAFEs") were triggered, that Plaintiffs' equity interests have vested, and that Plaintiffs are owed an easily calculable share of the more than ███████████████████████████ ██████████

Plaintiffs seek relief on an expedited basis to prevent irreparable harm and preserve the status quo. Defendants' principals were indicted by the U.S. DOJ just weeks ago on money-laundering charges. Defendant Hayes himself is now an international fugitive from the U.S. government, along with two his co-defendants. Defendants have substantial offshore resources, accounts, property and other means by which to hide, transfer, other insulate assets. Despite repeated requests, Defendants have refused to provide concrete information or binding assurances regarding the status of California-based assets. Instead, Defendants have withheld evidence of their personal dividend payments and other transfers, the existence of which was only revealed in the last few weeks when SOSV was compelled to produce those documents after multiple court orders from a court in New Jersey.[1] Defendants' ████████████████████████ were made despite the pendency of CFTC and DOJ investigations of which Defendants appear to have been keenly aware.

While attachment is an extraordinary remedy, Plaintiffs readily satisfy the CCP requirements for interim relief of a TPO and an *ex parte* attachment of assets in the amount of $4,006,806.19, representing the amount of dividends Plaintiffs should have been paid during the

---

[1] Defendants themselves have failed to produce any documents at all with information regarding dividend distributions, despite the fact that they go to the heart of the parties' dispute and Plaintiffs have repeatedly requested them. ████████████████████████████████████████████████████████████ ██████████████████████████████████████ (*E.g.*, Declaration of J. Noah Hagey ("Hagey Decl.") Ex. 10, April 28, 2020 text from ████████████████████████ ██████████████████████████████ (emphasis added))).

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1    period.  Plaintiffs also have identified numerous assets and bank accounts in California for which

2    attachment can easily be made, and there is virtually no risk of prejudice to Defendants, whose

3    business recently had hundreds of millions of dollars in cash on hand.

4                                    **BACKGROUND**[2]

5          This case involves a fraudulent worldwide shell game that HDR Global Trading ("HDR"),

6    ABS Global Trading Ltd. ("ABS"), and Hayes (collectively, "BitMEX") have been orchestrating at

7    Plaintiffs' expense for more than five years.  Defendants created and operate an online

8    cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the

9    largest trading platforms of its type in the world, with billions of dollars in trades taking place

10   daily.  (Amato Decl. ¶ 5.)  In 2015, Hayes solicited investments in BitMEX from Plaintiffs Amato

11   and Capone, two private investors active in the cryptocurrency space.  (*Id*. ¶ 6; Capone Decl. ¶ 4.)

12   In exchange for their investments, BitMEX and Plaintiffs executed "SAFEs"—meaning a "Simple

13   Agreement for Future Equity"—which permit so-called "angel investors" to make investments at

14   an early stage when it is difficult to value a nascent company.  (Amato Decl. ¶ 3.)  Under the terms

15   of the SAFEs, when a future triggering investment is secured, the SAFEs automatically convert

16   into equity.  (*Id*. ¶ 1, Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a).)

17         Shortly after Plaintiffs made their investments in June and July 2015, BitMEX received

18   triggering investments from third-party investor SOSV, as recently confirmed by documents SOSV

19   produced.  (Amato Decl. ¶ 19.)  But despite SOSV's investments, Hayes and BitMEX embarked on

20   a years-long campaign to cheat Plaintiffs out of the ownership rights they are entitled to—including

21   millions in dividends—by repeatedly and fraudulently misrepresenting to Plaintiffs that their

22   SAFEs had not converted, that SOSV had not invested money into BitMEX, and that Plaintiffs

23   were not entitled to any ownership interest in the now multi-billion-dollar company.  (*Id*. ¶ 24.)

24         **A.    Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights**

25

26

27   [2]  This application is presented upon the sworn declarations of Plaintiffs Frank Amato (the "Amato Decl.") and Guido
     Capone ("Capone Decl."), as well as respected industry expert Todd Antonelli (the "Antonelli Decl."), a leading

28   financial and strategic advisor to companies in all stages of growth and an expert in venture capital, early-stage
     investing, and SAFE agreements.

2                                                    Case No. CGC-19-581267

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1   Plaintiff Amato executed a SAFE with HDR on June 15, 2015. (*Id.* ¶ 12, Ex. 1.) Plaintiff

2   Capone executed a SAFE with HDR on July 16, 2015. (Capone Decl. Ex. 1.) Both SAFEs contain

3   a provision under which HDR was required to automatically issue shares to Plaintiffs upon an

4   "Equity Financing" event. (Amato Decl. ¶ 10, Ex. 1 § 1(a), Capone Decl. Ex. 1 § 1(a); Declaration

5   of Todd Antonelli ("Antonelli Decl.") ¶¶ 10–11.) The SAFEs include a formula for determining

6   the number of shares HDR would issue, with a percentage cap of HDR's outstanding share capital:

7   0.50% for Amato and 0.41% for Capone. (Amato Decl. ¶ 10, Ex. 1 § 1(a); Capone Decl. Ex. 1 §

8   1(a); Antonelli Decl. ¶¶ 10–11.) Both SAFEs define an "Equity Financing" event as "a bona fide

9   transaction or series of transactions with the principal purpose of raising capital, pursuant to which

10  [HDR] issues and sells Preferred Shares at a fixed pre-money valuation." (Amato Decl. Ex. 1 at 3;

11  Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.)

12  A triggering "Equity Financing" event occurred on July 18, 2015, when HDR entered a

13  Stock Purchase Agreement with SOSV (the "SOSV SPA"). (Antonelli Decl. ¶¶ 15–22, Ex. 2.)

14  HDR was selected to be a participant in SOSV's Chinaccelerator program, which provides early

15  funding to startup companies in return for equity. (*Id.* ¶ 15.) ███████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████ (*Id.* ¶ 21, Ex. 2 § 1(a).) ████

18  ██████████████████████████

19  Although labeled "Ordinary Shares" in the document, ███████████████

20  ████████████████████████████████████████████████████████

21  ████████ as do shares that are typically referred to as "preferred" within the industry. (*Id.* ¶¶ 16–

22  20.) In particular, ████████████████████████████████:

23  •   ████████████████████████████████████

24      ████████████████ (*Id.* ¶ 17 (quoting *id.* Ex. 2 § 2));

25  •   ████████████████████████████████████████

26      ██████████████████████████████████ (*Id.* ¶ 18

27      (quoting *id.* Ex. 2 § 6)); and

28  •   ████████████████████████████████████████



(*Id*. ¶ 19 (quoting *id*. Ex. 2 § 8).)

According to Mr. Antonelli, who frequently advises companies regarding the use of, and analyzes financial instruments like SAFEs, anti-dilution and pro rata rights "are commonly associated with preferred shares." (*Id*. ¶¶ 17–18.)

(*Id*. Ex. 2 § 8.)  A liquidation preference is also "a hallmark benefit of preferred shares." (*Id*. ¶ 20.)

that are equivalent to preferred shares at a specified price and in exchange for a specified ownership percentage was an "Equity Financing" event that triggered automatic issuance of Plaintiffs' shares. (*Id*.)  But, to date, Defendants have refused to issue any shares to Plaintiffs at all. (Amato Decl. ¶ 23.)

**B.    Defendants Issued Millions in Dividend Payments, But None to Plaintiffs**

Plaintiffs discovered through the produced SOSV documents

—all while the government investigations against it were pending. (Antonelli Decl. ¶ 30.)                                    (*Id*. Ex. 3 at 22; Ex. 5 at SOSV - 135.)

(*Id*. Ex. 4 at SOSV - 137.)

(*Id*. Ex. 7.)

(*Id*. ¶ 28.)

**C.    Simple Computation of Plaintiffs' Implied Dividends**

Based on the information produced by SOSV, a simple calculation shows the *bare minimum* amount that Plaintiffs are entitled to recover from HDR in the form of unpaid dividends.  This is to say nothing of Plaintiffs' other claims in this case or any other, presently unknown, distributions that HDR has made.  The step-by-step calculation is as follows:

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER



**Step 1:** ███████████████████████ (shown by SOSV documents).

**Step 2:** ███████████████████████████████ (shown by SOSV documents).

**Step 3:** ███████████████████████████████████

**Step 4:** Amato *should* have been issued ████████ of HDR (shown by the triggering of his SAFE, which entitles him to 0.50% of the ████████████████████).

**Step 5:** Amato therefore was entitled to $2,201,542 in dividends (shown by ███████████████████).

**Step 6:** Capone *should* have been issued ████████ of HDR (shown by the triggering of his SAFE, which entitles him to 0.41% of the ████████████████████).

**Step 7:** Capone therefore was entitled to $1,805,264 in dividends (shown by ███████████████████████).

(*Id.* ¶¶ 28–29.)  Adding together the minimum amounts that Amato and Capone should have received results in a total of **$4,006,806.19**, which is the amount that Plaintiffs now seek to attach.

### D.    Plaintiffs' Attempts to Gather Information and Avoid Motion Practice

Plaintiffs have taken steps to negotiate with Defendants a stipulated resolution to this matter, in an effort to avoid involving the Court.  In particular, in the wake of the SOSV document production and the criminal and regulatory lawsuits filed by the government, Plaintiffs' counsel repeatedly asked Defendants' counsel for information regarding their clients' dissipation of assets. (Hagey Decl. ¶ 3.)  But, as with nearly every other request in this case—whether through formal discovery or otherwise—Defendants' counsel has so far refused to provide any substantive information at all.[3]  On October 15, Plaintiffs' counsel emailed questions to Defendants' counsel in an effort to determine whether Defendants were, in fact, expatriating assets.  (*Id.* ¶ 6.)  Plaintiffs wrote:

> Recently revealed information causes Plaintiffs substantial concern regarding their ability to collect upon final judgment. News reports and court documents show that HDR's principals, including Arthur Hayes, were indicted on October 1 by the U.S. Department of Justice and removed from their positions within [BitMEX] shortly thereafter. The company has also been sued by the CFTC for an array of regulatory violations. . . .
>
> In view of these developments, we pose the following questions regarding whether BitMEX and its agents are taking any steps to transfer assets outside of the jurisdiction or to otherwise dissipate those assets:

---

[3] Indeed, the information in question here likewise bears directly on HDR's ties to this forum, such that it should have been produced in connection with Plaintiffs' jurisdictional discovery requests that were served in <u>February 2020</u>.

1  (*Id.* Ex. 3 at 1.)  The questions included requests for basic information like "Is Mr. Hayes presently

2  making financial decisions on behalf of BitMEX?" and "Has anyone at HDR or its affiliated

3  companies . . . taken any steps to remove assets from California, other than in the ordinary course

4  of business?" and "Was BitMEX aware that it was the subject of government investigation prior to

5  October 1?"  (*Id.*)  Defendants' counsel refused to provide answers promptly, and instead suggested

6  the parties meet and confer about those matters on October 19, 2020.  (Hagey Decl. ¶ 7.)  But

7  during that call, Defendants' counsel stated they were "not prepared" to discuss the issues, and

8  claimed they needed additional time to confer with their clients.  (*Id.* ¶ 8.)  The parties conferred

9  again on October 21; this time, defense counsel declared that the questions posed in Plaintiffs'

10  October 15 email were "intrusive" and again failed to provide any substantive information.  (*Id.*

11  ¶ 9.)  They claimed, though, that they would consider providing some unspecified information on

12  October 23.  (*Id.*)  Plaintiffs then followed up on October 21 with an email that boils down to a

13  single, basic request: "[P]lease provide a simple schedule or summary of all distributions of any

14  sort – whether dividends or otherwise – that HDR made to its shareholders from June 2015 to the

15  present, including the dates and amounts of those distributions."  (*Id.* Ex. 4.)  Defendants did not

16  respond.  (*Id.* ¶ 11.)  Plaintiffs thereafter informed Defendants that their inability to provide even

17  basic information about the movement of assets only added to Plaintiffs' well-founded concerns,

18  and left them no choice but to seek this relief.  (*Id.* ¶ 12.)

19  <u>**ARGUMENT**</u>

20  California law permits a Court to issue a right to attach order on an *ex parte* basis if it finds

21  that: (1) the claim upon which the attachment is based is one upon which an attachment may be

22  issued; (2) the plaintiff has established the probable validity of the claim upon which the

23  attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the

24  claim upon which the attachment is based; (4) the property sought to be attached is not exempt

25  from attachment; (5) the plaintiff will suffer great or irreparable injury if issuance of the order is

26  delayed until the matter can be heard on notice; and (6) the amount to be secured by the attachment

27  is greater than zero.  § 485.220(a).  Attachment can issue in connection with a contract claim, so

28

1    long as the claim is "a fixed or readily ascertainable amount," § 483.010(a)–(b), and it may issue

2    regardless of "whether or not other forms of relief are demanded." § 483.010(d).[4]

3          The irreparable injury requirement is satisfied if a plaintiff offers facts showing that such

4    injury would result if issuance of the attachment order were delayed until the matter could be heard

5    on notice. §§ 485.010(a), 485.220. Such a showing is made if, "[u]nder the circumstances of the

6    case, it may be inferred that there is a danger that the property sought to be attached would be

7    concealed, . . . or otherwise made unavailable to levy if issuance of the order were delayed until the

8    matter could be heard on notice." § 485.010(b)(1).

9          A plaintiff may also apply for a TPO at the time of applying for a right to attach order,

10   § 486.010(a), which requires the same showing of great or irreparable harm. *Id*. Where a court

11   finds that a TPO is more appropriate, it may grant the TPO and treat the *ex parte* application for

12   attachment as one filed under noticed hearing procedure. § 486.030. Plaintiffs would not object to

13   the Court proceeding in such a manner in these circumstances.

14         Plaintiffs' application satisfies each of these requirements, and a TPO and *ex parte*

15   attachment relief is appropriate for the reasons set forth below.

16   **I.    *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE
           NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY**

17         As an initial matter, Plaintiffs satisfy the statutory requirements for *ex parte* relief. As

18   noted in the preceding section, such relief is appropriate where great or irreparable injury would

19   result to the plaintiff if issuance of the order were delayed until the matter could be heard on notice.

20   § 485.010(a). A TPO requires the same showing. § 486.010(a). The circumstances in this case

21   warrant *ex parte* relief and issuance of a TPO, as Plaintiffs have legitimate concerns that

22   Defendants will soon conceal, expatriate, or otherwise make unavailable the assets that Plaintiffs

23

24

---

25   [4] An *ex parte* application for a right to attach must also include the following, all of which are in the form application
     submitted herewith: (i) a statement that the attachment is sought to secure the recovery on a claim upon which an

26   attachment may be issued, (ii) a statement of the amount to be secured, (iii) a statement that the attachment is not
     sought for a purpose other than the recovery on the claim, (iv) a statement that the applicant has no information or

27   belief that the claim is subject to bankruptcy proceedings, (v) a description of the property to be attached, and (vi) a
     statement that the plaintiff is informed and believes that such property is subject to attachment. §§ 485.210, 484.020.

28   For defendant corporations, a broad description such as "all corporate property which is subject to attachment" is a
     sufficient description. *Bank of Am. v. Salinas Nissan, Inc.*, 207 Cal. App. 3d 260, 267 (1989); § 484.020(e).

1  seek to attach—and ████████████████████████████████████████

2  ████████████████████████████████████████████████ .

3      On October 1, Defendant Hayes and other HDR co-founders were indicted by the DOJ in

4  the Southern District of New York for violations of and conspiracy to violate the Bank Secrecy

5  Act.  (Hagey Decl. Ex. 1.)  The indictment alleges that Hayes "willfully failed to establish,

6  implement, and maintain an adequate anti-money laundering ('AML') program, including an

7  adequate customer identification program, more commonly referred to as a know your customer

8  ('KYC') program, for BitMEX, in violation of the BSA." (*Id.* at 2).  The same day, the CFTC filed

9  a civil enforcement action against Defendants for operating an unregistered futures trading platform

10 in the United States and failing to comply with AML regulations.  (Hagey Decl. Ex. 2.)

11     Cryptocurrency news sources reported that "money began leaving the BitMEX exchange in

12 exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had

13 been withdrawn from BitMEX."  (Amato Decl. ¶ 28)  Moreover, BitMEX's own funds are

14 reportedly "held in multi[-signature] wallets that require a signature from multiple private keys in

15 order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three

16 partners must sign each withdrawal," meaning that BitMEX's substantial cryptocurrency assets are

17 accessible and controlled *solely* by its founders, all of whom are facing criminal charges, and two

18 of whom are fugitives.  (*Id*. ¶ 29.)

19     Plaintiffs' fears are not speculative.  Defendants are serial offenders when it comes to

20 disregard for the rule of law, as they have demonstrated both by their fraudulent misconduct in

21 their dealings with Plaintiffs and their brazen indifference towards the authority of courts and

22 regulators.  For instance, when Mr. Capone inquired about his equity rights in September 2019,

23 HDR co-founder Ben Delo responded to him with an image of Hayes overlaid with text conveying

24 Defendants' belief that they could evade liability because they incorporated HDR as a Seychellois

25 shell company.  (Capone Decl. ¶ 17; SAC ¶¶ 168–69.)  Delo's email contained the following:

26

27

28

Ben Delo's response to Mr. Capone came shortly after a July 3, 2019 statement made by Hayes, captured on video, in which he was asked by a debate moderator about the differences between various global regulatory authorities and the Seychellois regulatory authorities. Hayes stated "it just costs more to bribe them," and, when pressed by the moderator about "that not being an answer," Defendant Hayes responded, "it is an answer" and claimed he pays "a coconut" to pay off the Seychellois authorities. The DOJ included this same exchange in its indictment, alleging that Hayes "bragged in or about July 2019 that the Seychelles was a more friendly jurisdiction for BitMEX because it cost less to bribe Seychellois authorities - just 'a coconut' - than it cost to bribe regulators in the United States and elsewhere." (Hagey Decl. Ex. 1 ¶ 21.)

Defendants are also no newcomers to shifting funds to evade potential liability. ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And as the CFTC observed, Hayes and HDR's other founders "operate BitMEX's platform through a maze of corporate entities." (Hagey Decl. Ex. 12.)

Further, documents recently produced to Plaintiffs reveal that Defendants long began to spirit away their funds. Defendants knew by no later than January 2019 that they were under investigation by U.S. regulatory agencies because co-founder Reed was deposed by—and allegedly made false representations to—the CFTC. (Hagey Decl. Ex. 2 ¶ 27.) Around that same time, ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ███████████████████████████████████████ (Hagey Decl. ¶ 13, Ex. 13.)  In

2  early 2019, after Reed's deposition, ████████████████████████████████

3  ████████████████████████████████ (Hagey Decl. Ex. 14 ████████

4  ████████████████████████████████████████████████████

5  ██████████); Ex. 5 █████████████████████████████████████████

6  ████████████████████████  █████████████████████████████████

7  ████, only two months before the DOJ revealed its criminal indictments.   (Hagey Decl. Ex. 7.)

8         Adding to the urgency of the motion and the indicia of obstructionism is Defendants'

9  counsel's ongoing failure to provide even the most basic information about their clients' finances

10  and movement of assets.  As set forth above in Part D of the Background section, in the wake of the

11  SOSV document production and the federal lawsuits, Plaintiffs' counsel have repeatedly asked

12  such basic questions as "Is Mr. Hayes presently making financial decisions on behalf of BitMEX?"

13  and "Has anyone at HDR or its affiliated companies (collectively, 'BitMEX') taken any steps to

14  remove assets from California, other than in the ordinary course of business?"  (Hagey Decl. Ex.

15  3.)  Defendants have stalled and stonewalled, repeatedly indicating that they would confer further

16  with their clients and assuring Plaintiffs that information would be forthcoming.  But, to date, they

17  have provided nothing.

18         The bottom line is that, in total, ████████████████████████████

19  ████████████████████████ (Antonelli Decl. ¶ 28.) ████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████ (*Id*. ¶ 30.)  It is imperative that they not be allowed to

22  make off with more.  The Court should grant a TPO and *ex parte* relief to secure at least the

23  approximately $4 million of dividend payments that should have been distributed to Plaintiffs.[5]

24  **II.    PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY THE CCP'S
         GROUNDS FOR ATTACHMENT**

25         In addition to showing that they will suffer irreparable harm, Plaintiffs also readily satisfy

26  the remaining statutory attachment requirements.  To start, Plaintiffs' claims are "claims upon

27  _____

28  [5] Plaintiffs' request is narrowly tailored, as they seek to attach only a small amount of their overall claimed damages,
limited to that amount that is "readily ascertainable" based on their present knowledge and information.

1  which attachment may be issued," *see* § 485.220(a), because they are contract claims seeking a

2  "fixed or readily ascertainable" amount that is more than five hundred dollars and not secured by

3  real property.  § 483.010(a)–(b).  A claimed amount meets this standard if it is "readily

4  ascertainable by reference to the contract" and "the basis of the computation of [the attachment

5  amount] appears to be reasonable and definite."  *CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*, 115

6  Cal. App. 4th 537, 540 (2004).[6]  Although "the contract sued on must furnish a standard by which

7  the amount due may be clearly ascertained," "it is not necessary that the amount owed appear on

8  the face of the contract."  *Id.*  Indeed, courts recognize that "it often happens that the amount due

9  under a contract does not appear on the contract itself."  *Id.*

10       Plaintiffs' claims here are based on Defendants' breaches of their SAFEs.  (*See* SAC ¶¶

11  235–40.)  And the amounts Plaintiffs claim for attachment—$4,006,806.19 of unpaid dividends—

12  are "readily ascertainable by reference to" those SAFEs, and the computation of the dividend

13  amounts is both reasonable and definite.  *See CIT Grp.*, 115 Cal. App. 4th at 540.  The SAFEs

14  "furnish a standard by which the amount due may be clearly ascertained" by explicitly enumerating

15  Plaintiffs' ownership percentages in HDR.  *Id.*  The amount of dividend payments that Plaintiffs

16  are owed is directly calculable ██████████████████████████████████████████████

17  ██████████████████████  As explained there, Amato was entitled to $2,201,542 in dividends,

18  and Capone was entitled to $1,805,264.  Adding these amounts together results in $4,006,806.

19  (Antonelli Decl. ¶ 29.)

20       **A.      Plaintiffs Have Established the Probable Validity of Their Claims**

21       The next statutory attachment requirement is that a plaintiff seeking attachment must

22  establish "the probable validity of the claim upon which the attachment is based."  § 492.030(a)(2).

23  "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a

24  judgment against the defendant on that claim."  § 481.190; *Goldstein v. Barak Constr.*, 164 Cal.

25  App. 4th 845, 852 (2008).  Plaintiffs readily meet this standard, as their claims against Defendants

26  stem from Defendants' failure to perform their obligations under Plaintiffs' SAFEs.  The elements

27  to a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance of the

28

---

[6] All internal quotation marks and citations omitted unless otherwise noted.

1   contract or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damage to the

2   plaintiff.  *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

3       There is no question that contracts—the SAFEs—are valid and were executed by Plaintiffs

4   and HDR.  (*See* Amato Decl. Ex. 1; Capone Decl. Ex. 1.)  Although Hayes fabricated a variety of

5   false explanations for why Plaintiffs' equity rights never triggered, he has never disputed that the

6   SAFEs are valid and enforceable.  (Capone Decl. ¶¶ 15-16.)  There is likewise no dispute that

7   Plaintiffs each performed under their SAFEs: Plaintiff Amato wired $30,000 to Defendants on June

8   26, 2015 and Plaintiff Capone wired $25,000 to Defendant Hayes's personal bank account on July

9   16, 2015.  (Amato Decl. ¶ 12; Capone Decl. ¶ 11.)  There is also no question that Plaintiffs have

10  been damaged because they have been deprived of the benefit of their investments: approximately

11  1% equity in the world's largest cryptocurrency derivatives trading platform ███████████████

12  ████████, and millions of dollars in dividend payments, as explained in Part B of the Background

13  section above.

14      Defendants' refusal to issue Plaintiffs their shares in HDR constitutes breach of Plaintiffs'

15  SAFEs.  Both SAFEs required HDR to "automatically issue to the Investor a number of shares"

16  based on a set formula, "[i]f there is an Equity Financing" event.  (Amato Decl. Ex. 1 § 1(a);

17  Capone Decl. Ex. 1 § 1(a); Antonelli Decl. ¶¶ 10-11.)  Both SAFEs also define an "Equity

18  Financing" as "a bona fide transaction or series of transactions with the principal purpose of raising

19  capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money

20  valuation."  (Amato Decl. Ex. 1 at 3; Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.)  In other

21  words, HDR was obligated to issue shares to Plaintiffs "once three conditions were satisfied: (1)

22  there is a 'bona fide transaction or series of transactions with the principal purpose of raising

23  capital'; (2) the transaction or series of transactions are transactions 'pursuant to which [HDR]

24  issues and sells Preferred Shares'; and (3) HDR sells the shares 'at a fixed pre-money valuation.'"

25  (Antonelli Decl. ¶ 14.)

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ██████████████████████████████████████████

1    ███████████████    (*Id.* ¶¶ 15–20, Ex. 2.)  This transaction satisfied all three conditions to

2    trigger automatic issuance of Plaintiffs' shares, as the Declaration of Mr. Antonelli, an industry

3    expert in the areas of venture capital, finance, early-stage investing, and SAFE agreements, readily

4    demonstrates:

5        *First*, SOSV is a venture capital investor that runs an accelerator program called

6    Chinaccelerator, a program through which startup companies (like HDR circa 2015) compete for

7    funding.  (*Id.* ¶ 15.)  In SOSV and Chinaccelerator's own words, they "invested in BitMEX through

8    Batch 8 which later became a Fintech unicorn." (*Id.* ¶ 15 n.1.) ███████████████

9    ███████████████████████████████ was therefore a bona fide

10    transaction with the principal purpose of raising capital for HDR.  (*Id.* ¶ 15.)

11        *Second*, ███████████████████████████████████

12    ███████████ "Preferred Shares" is not a defined term in Plaintiffs' SAFEs, (*id.* ¶ 13), and

13    Plaintiffs allege that Defendants leveraged this ambiguity to "deliberately structur[e] subsequent

14    rounds of capital financing in order to avoid triggering the SAFEs"—for example, by labeling the

15    shares HDR sold to raise funding as something other than "Preferred Shares."  (SAC ¶ 245.)  The

16    SOSV documents confirm Plaintiffs' allegations: ████████████████████

17    ██████████████████████████████ (Antonelli Decl. ¶

18    16, Ex. 2 § 1(a).) ████████████████

19    ██████████████████████ (*Id.* ¶ 16.)

20    ██████████████████████████████

21    ██████████████████, as set forth above in Part C of the Background

22    section and explained in Mr. Antonelli's declaration.  (*Id.* ¶¶ 17-19.) ██████████████

23    ████████████████████████████ (*Id.* Ex. 2 §

24    8.) ████████████████████

25    ██████████ (*Id.* ¶¶ 17-18.) ████████████████████

26    ████████████ under a reasonable and commercially standard interpretation of that

27    term as used in Plaintiffs' SAFEs." (*Id.* ¶ 20.)

28



1

2  (*Id.* ¶ 21.)

3  (*Id.* Ex. 2 § 1(a).)

4  (*Id.*)

5

6  (*Id.*)

7

8

9  (*Id.* ¶ 22.)  Today, more than

10  five years later, HDR has yet to issue any shares to Plaintiffs, which plainly breaches the SAFEs,

11  such that Plaintiffs will prevail on their breach of contract claim.

12  **B.    Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery**

13  Plaintiffs also satisfy the next statutory requirement of § 485.220(a) because they seek

14  attachment in order to secure their recovery. The purpose of attachment "is to secure and insure the

15  payment of any judgment that may be recovered in the successful prosecution of an action in order

16  that the ends of successful litigation are not fruitlessly pursued or frustrated." *Loeb & Loeb v.*

17  *Beverly Glen Music, Inc.*, 166 Cal. App. 3d 1110, 1118 (1985) (citing *Halstead v. Halstead*, 72 Cal.

18  App. 2d 832, 836 (1946)).  As discussed above in Part I of the Argument section, Defendants'

19  years-long campaign to deprive Plaintiffs of their equity rights, liberal misuse of shell corporations,

20  and the targeting of Defendants by government investigations, give rise to a legitimate concern that

21  Defendants will attempt to frustrate judgment by expatriating or secreting funds.  Plaintiffs seek

22  attachment only to prevent such misconduct and secure their recovery.  § 492.030(a)(5).

23  **C.    Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted**

24  Plaintiffs can also readily show that they will suffer irreparable injury if a temporary

25  protective order is not issued, for the reasons set forth above in Part I of this Argument section.

26  The bottom line is that if a TPO is not issued, Defendants would be free to continue expatriating

27  and otherwise dissipating assets while a motion on ordinary notice is pending, such that Plaintiffs

28  may never be able to recover the substantial funds owed to them.

### D.    The Amount to Be Secured By the Attachment Is Greater than Zero

Plaintiffs likewise satisfy this final statutory requirement, as they seek attachment in an amount greater than zero.  They seek $4,006,806.19 in dividend payments they were entitled to under their SAFEs, and there is no basis to reduce this amount.  §§ 492.030(a)(6), 483.015(b).

### III.    PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED DISCOVERY

Finally, to the extent the Court declines to grant a TPO or *ex parte* relief, it should order expedited discovery regarding all matters relating to asset expatriation and dissipation, including, at a minimum: (1) the amounts and dates of all distributions and/or transfers to shareholders; (2) all documents concerning amounts transferred following the filing of this lawsuit; and (3) Defendants' knowledge of the government investigations.  For the reasons explained throughout, Plaintiffs have real and pressing concerns that Defendants are taking steps to impair their ability to collect the funds they are entitled to. Defendants' lack of candor on these matters to date, as set forth in Part D of the Background section, has only exacerbated Plaintiffs' concerns. Expedited discovery would permit Plaintiffs to obtain the information they need.[7]

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an *ex parte* right to attach order, a writ of attachment against HDR Global Trading Limited, and a temporary protective order.  Plaintiffs are prepared to file an undertaking for the writ, pursuant to § 489.210.

Dated: October 23, 2020                          Respectfully Submitted,

                                                 BRAUNHAGEY & BORDEN LLP

                                                 By: *s/ J. Noah Hagey*                
                                                     J. Noah Hagey

                                                 *Attorneys for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust*

---

[7] Plaintiffs reserve the right to seek additional attachment, as appropriate, following the production of such discovery.

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

# EXHIBIT 9

1  Stephen D. Hibbard (State Bar No. 177865)
    sdhibbard@jonesday.com
2  Matthew J. Silveira (State Bar No. 264250)
    msilveira@jonesday.com
3  Dennis F. Murphy, Jr. (State Bar No. 301008)
    dennismurphy@jonesday.com
4  JONES DAY
    555 California Street, 26th Floor
5  San Francisco, CA 94104
    Telephone: +1.415.626.3939
6  Facsimile: +1.415.875.5700

7  Attorneys for Defendants
    HDR GLOBAL TRADING LIMITED and
8  ABS GLOBAL TRADING LIMITED

9  Peter I. Altman (State Bar No. 285292)
    paltman@akingump.com
10  Marshall L. Baker (State Bar No. 300987)
    mbaker@akingump.com
11  Shelly A. Kim (State Bar No. 322231)
    shelly.kim@akingump.com
12  Jessica H. Ro (State Bar No. 329737)
    jro@akingump.com
13  AKIN GUMP STRAUSS HAUER & FELD LLP
    1999 Avenue of the Stars, Suite 600
14  Los Angeles, CA 90067
    Telephone:   +1.310.229.1000
15  Facsimile:   +1.310.229.1001

16  Attorneys for Defendant
    ARTHUR HAYES

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**11/02/2020**
**Clerk of the Court**
BY: SANDRA SCHIRO
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| FRANK AMATO, RGB COIN LTD., and ELFIO GUIDO CAPONE on behalf of the G AND M CAPONE TRUST, | Case No: CGC-19-581267 |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO SEAL OR STRIKE PLAINTIFFS' EX PARTE APPLICATION** |
| v. | |
| HDR GLOBAL TRADING LIMITED, d/b/a BITMEX; ARTHUR HAYES; ABS GLOBAL TRADING LIMITED; and DOES 1-10, | Assigned for All Purposes to: Hon. Anne-Christine Massullo, Dept. 304 |
| Defendants. | Date: December 18, 2020 Time: 10:00 a.m. |
| | Second Am. Compl. filed: Aug. 18, 2020 |

**CASE NO. CGC-19-581267**

**MPA ISO DEFS.' MOT. TO SEAL OR STRIKE PLS.' EX PARTE APP.**

I.      INTRODUCTION

Defendants file this motion to resolve a dispute that never should have arisen and that they believed had already been resolved.  On the morning of October 23, Plaintiffs filed an ex parte application for a right to attach order, writ of attachment, and temporary protective order (the "Ex Parte Application") notwithstanding Defendants' proposal of a negotiated resolution that would avoid the need for motion practice.  The next business day, the parties agreed to substantially the same proposal that Defendants had proposed before the Ex Parte Application was filed, and notified the Court that the Ex Parte Application could be taken off calendar without prejudice to its renewal.  The Court did just that, and confirmed that it would dispose of the courtesy copies of the Ex Parte Application, which it had never reviewed.

Despite the resolution of the dispute underlying the Ex Parte Application and the fact that the Court never considered, let alone ruled on that application, Plaintiffs refuse to withdraw those papers.  Instead, Plaintiffs are requiring that Defendants move to seal the extensive confidential material submitted in connection with the Ex Parte Application.  Moreover, Plaintiffs insist on this needless expenditure of Court, party, and third-party resources despite the fact that Plaintiffs violated the protective order in filing the Ex Parte Application.  Withdrawing the Ex Parte Application from the public record is the most efficient means to end Plaintiffs' violation.

Because Plaintiffs have refused to minimize the work required of the parties and the Court, notwithstanding their protective order violation, Defendants move to strike the Ex Parte Application in its entirety.  That remedy is well within the Court's inherent authority given that the Court never even considered, let alone decided, the Ex Parte Application and because such a remedy is the most efficient way to limit the needless expenditure of resources and stem the damage flowing from Plaintiffs' protective order violation.  In the alternative, the Court should strike or permanently seal all of the material initially lodged confidentially under seal, and the entirety of certain documents containing confidential information that were initially filed on the public docket in violation of the protective order.  Defendants reserve their right to seek further remedies related to Plaintiffs' violation of the protective order.

1    ## II.    BACKGROUND

2    On Friday October 16, the Court held the first Case Management Conference ("CMC") in

3    this matter.  At the CMC, Plaintiffs suggested that they might seek a writ of attachment, noting

4    that they had sent an email to Defendants the previous evening asking questions related to that

5    form of relief.  The Court explained that a writ of attachment is an extraordinary remedy with a

6    high bar, but did not address the substance of Plaintiffs' assertions, which had not been raised in

7    the parties' case management statements filed just two days prior, and encouraged the parties to

8    "work it out" short of motion practice.  *See* 10/16/20 Tr. at 24:3-25:13, 37:5-6.

9    The Court also addressed the topic of sealing at the CMC.  In addition to directing the

10   parties to "deal with the sealing motions at the time" of the underlying motion addressing

11   confidential material, *id.* at 46:16-25, the Court asked the parties "to be judicious in terms of what

12   you attach" and to "be mindful, when you are attaching documents, about the sealing

13   requirements and the work," *id.* at 47:5-17.  Moreover, the Court assured the parties that it would

14   provide guidance if it found a motion to seal unsatisfactory, rather than "automatically just

15   unseal[ing] confidential documents." *Id.* at 46:26-47:4.

16   On Friday October 23 at 10:21 a.m., Plaintiffs filed the Ex Parte Application, set for

17   hearing the following Monday at 9:15 a.m.  At an informal discovery conference later that day,

18   Defendants explained that they had been in contact with Plaintiffs both before and after the filing

19   of the Ex Parte Application and had made a proposal before the Ex Parte Application was filed

20   that would have mooted the relief sought in that application and avoid unnecessary motion

21   practice.  The Court noted that it had not seen the papers, but encouraged the parties to work

22   cooperatively to resolve the issue without motion practice.  To that end, the Court continued the

23   ex parte hearing from Monday, October 26 to Tuesday, October 27, and directed the parties to

24   notify the Court by Monday at 1:00 p.m. if they were able to reach an agreement that would avoid

25   the need for Tuesday's hearing.

26   On Monday, October 26, the parties called the Court to report that they had been able to

27   reach an agreement such that the Ex Parte Application could be taken off calendar, without

28   prejudice to Plaintiffs' renewing that application if they thought it necessary.  As a result, the

1  Court took the hearing off calendar.  In addition, the Court stated that it had not read the Ex Parte

2  Application and would dispose of the courtesy copies Plaintiffs had delivered.

3       On Thursday, October 29, Defendants directly proposed that the parties stipulate to the

4  removal of the Ex Parte Application from the Court's record.  Defendants explained that removal

5  from the record would avoid the need for the parties, third parties whose confidential information

6  was filed with the Ex Parte Application, and the Court to expend resources addressing the sealing

7  of materials that were never considered, let alone addressed by the Court.  Defendants also

8  explained that removal of the papers from the docket would be the simplest and least intrusive

9  method of removing confidential information that Plaintiffs had included on the public docket

10  without lodging that information conditionally under seal, in violation of the protective order in

11  this case.  Plaintiffs asked for Defendants to identify the portions of the submitted documents

12  filed in violation of the protective order.  Plaintiffs then stated that their response to this request

13  for removal of the papers would be tied to Defendants accommodating *other*, distinct requests

14  regarding expedited discovery and relief beyond a writ of attachment, which Plaintiffs had raised

15  in a letter earlier that day.

16       On Friday, October 30, the parties met and conferred again.  Defendants renewed their

17  request that Plaintiffs agree to remove the Ex Parte Application from the Court's records.

18  Defendants further identified specific portions of that application that had been filed in violation

19  of the Protective Order.  Plaintiffs, however, declined to stipulate to removal of the Ex Parte

20  Application from the Court's record.  Instead, in a purported effort to compromise, Plaintiffs

21  offered to stipulate that (i) Defendants' time to submit any sealing motion be extended by two

22  weeks (or so) under CRC 2.551(b)(3)(B); and (ii) the parties will promptly replace the documents

23  you identify below with versions that redact the additional information you request.  Plaintiffs

24  later agreed to replace the entirety of three documents filed in support of the Ex Parte Application

25  with conditionally under seal versions.  *See generally* Silveira Decl.[1]

26

27      [1] Consistent with the Court's guidance at the CMC to avoid unnecessary sealing issues,
Defendants have limited their submission of factual material underlying this motion to relevant,
non-confidential information to avoid the need for still further expenditure of party, third-party,

28  and Court resources on sealing issues that are ancillary to the merits of this dispute.

1    **III.    ARGUMENT**

2        **A.    The Court Should Strike the Entire Ex Parte Application From Its Files.**

3        A Superior Court has the "inherent and plenary [power]" to "strike from its files" material

4    that "was in no sense essential to decision of the question before the court." *Warner v. Warner*,

5    135 Cal. App. 2d 302, 304–305 (1955), *cited approvingly by Overstock.com, Inc. v. Goldman*

6    *Sachs Group, Inc.*, 231 Cal. App. 4th 471, 500 (2014).  Where a court strikes such materials, they

7    "have effectively been removed from the court's file, eliminating the need to address any sealing

8    issues as to these materials." *Overstock.com*, 231 Cal. App. 4th at 500; *cf. Mercury Interactive*

9    *Corp. v. Klein*, 158 Cal. App. 4th 60, 105 (2007) (holding that the "sealed records rules did not

10    apply" to documents that "consisted of discovery material that was not admitted at trial or used as

11    a basis of the court's adjudication of a substantive matter").

12        Plaintiffs' Ex Parte Application—more than 250 pages, including exhibits—is full of

13    confidential material designated as such under the protective order.  Plaintiffs attached entire

14    contracts and emails that have been designated confidential and discussed those confidential

15    materials at length in their memorandum of points and authorities and expert declaration.  While

16    Plaintiffs lodged much of this confidential material under seal and made redactions to the

17    documents summarizing that material, their redaction efforts were insufficient.  Plaintiffs

18    included confidential material even in their redacted versions of documents and filed them in the

19    public file, in violation of the protective order.  Plaintiffs' initial proposal to remedy these

20    protective order violations by replacing the public documents with further-redacted versions

21    would just exacerbate the damage to Defendants given that litigants in other proceedings have

22    already downloaded the documents and placed them in other public court files and on the internet.

23    Placing new versions in the public file would only draw more attention to the confidential

24    material placed in the public file in violation of the protective order, as third parties would be able

25    to compare improperly and properly redacted versions and identify the very material that never

26    should have been made public.

27        Shortly before this motion was filed, Plaintiffs stated that they agreed to replace the as-

28    submitted versions of three documents that Defendants had identified as disclosing confidential

1  information with conditionally under seal versions.  Assuming Plaintiffs follow through with that

2  course of action, the Court should nonetheless strike the entire Ex Parte Application from the

3  public file.  Not only is such a remedy proper under California precedent—no part of the Ex Parte

4  Application is "essential to decision of the question before the Court," *Warner*, 135 Cal. App. 2d

5  at 304–305, because the Court never considered, let alone decided, the questions presented by

6  those papers—but there is also no prejudice to Plaintiffs.  The parties reached an interim

7  agreement that moots the Ex Parte Application and agreed to finalize the agreement by the end of

8  November.  And the removal of the Ex Parte Application from the Court's calendar does not

9  prejudice the renewal of that request.  The Court should thus exercise its inherent authority to

10  mitigate the damage that Plaintiffs' violation of the protective order has caused and continues to

11  cause Defendants by striking the entirety of Plaintiffs' Ex Parte Application from the file.

12       **B.    Alternatively, the Court Should Strike the Portions of the Ex Parte**
        **Application Lodged Confidentially Under Seal and the Entirety of Documents**
13       **That Include Material Filed in Violation of the Protective Order.**

14       Subsumed within the Court's inherent authority to strike the entire Ex Parte Application

15  from its files is the power to strike portions of those papers.  *See Overstock*, 231 Cal. App. 4th at

16  500 ("when a party submits a tsunami of discovery materials subject to a protective order, the trial

17  court should welcome a well-honed motion to strike to winnow down the material to that which is

18  *relevant* to the contentions advocated by the proffering party").  "The public's right of access to

19  court records … does not extend to irrelevant materials submitted to the court out of laziness in

20  reviewing and editing evidentiary submissions, or worse, out of a desire to overwhelm and harass

21  an opponent."  *Id.*  Here, as noted above and discussed in more detail below, none of the

22  confidential materials are relevant because there was no legitimate issue in dispute in the first

23  instance.  Therefore, all of those materials should be stricken, including the entirety of the

24  documents containing information that Plaintiffs filed publicly in violation of the protective order.

25       Two days before the Ex Parte Application was filed, the parties met and conferred about a

26  potential negotiated resolution.  Defendants expressed optimism about the ability to resolve

27  Plaintiffs' concerns and followed up with an email targeting that Friday for further feedback.  The

28  next morning, notwithstanding their acquiescence to further negotiations, Plaintiffs gave ex parte

1   notice that they intended to seek a temporary protective order.  Defendants responded by saying

2   that motion practice was unwarranted, asked Plaintiffs to hold their application, and confirmed

3   that they still intended to provide an update that following morning that would move the parties

4   toward the ultimate goal of a prompt negotiated resolution of the issue.  Defendants also

5   requested that Plaintiffs provide the set of papers they were planning to file as soon as possible,

6   which would provide further opportunity to reach a resolution without motion practice.  The next

7   morning, within a 15-minute period starting at 9:15 a.m., Plaintiffs provided copies of the Ex

8   Parte Application they intended to file and Defendants notified Plaintiffs of their proposal that

9   would moot the requested relief.  Plaintiffs nevertheless filed their Ex Parte Application at 10:21

10  a.m.  By Monday, the parties agreed on a framework that would allow the Ex Parte Application to

11  be taken off calendar and notified the Court of that agreement, leading the Court to take the Ex

12  Parte Application off calendar without prejudice to its renewal.  The Court also informed the

13  parties that it had never considered the courtesy copies and would be disposing of them.

14          Under these circumstances, Plaintiffs should never have filed the Ex Parte Application.

15  And they certainly should not have filed reams of confidential material without first giving

16  Defendants an opportunity to minimize or eliminate the amount of confidential material being

17  publicized.  Whether out of "laziness," "a desire to overwhelm and harass" Defendants, or any

18  other motivation, Plaintiffs' filing of an Ex Parte Application that was quickly mooted by the

19  parties' mutual agreement renders the application irrelevant to any decision required from the

20  Court.  Indeed, the Court did not consider the Ex Parte Application.  There is no reason to place

21  confidential materials in support of that irrelevant Ex Parte Application into the public file.

22          Because Plaintiffs have already placed into the public file confidential material in

23  violation of the protective order, it is also proper for the Court to strike the documents containing

24  that confidential material to avoid drawing attention to them.  Thus, if the Court is not inclined to

25  strike the entire Ex Parte Application from the file, it should strike the Memorandum of Points

26  and Authorities, the Hagey Declaration, and the Antonelli Declaration, all of which disclose

27  Defendants' confidential information, either directly or indirectly.

28

**C.    At a Minimum, the Court Should Place the Ex Parte Application Under Seal.**

The sealed records rules do not apply to all motions and records filed or lodged with the Court.  For example, rule 2.550 expressly provides that the "rules do not apply to discovery motions and records filed or lodged in connection with discovery motions or proceedings."  Cal. Rules of Ct., rule 2.550(a)(3).  Thus, discovery papers can be filed under seal and remain under seal without the holder of the confidential information making any type of showing.  In explaining the distinction between discovery proceedings and substantive matters, the Advisory Committee Comment to rule 2.550 notes that the sealed record rules "recognize the First Amendment right of access to documents used at trial or *as a basis of adjudication*," but not to discovery matters.  *Id.*, Advisory Committee Comment (emphasis added).  While the First District has recognized that documents "submitted as a basis of adjudication" are subject to the sealed records rules, it did so in the context of a fully briefed and decided motion for summary judgment.  *See Overstock*, 231 Cal. App. 4th at 492-97.  And in doing so, that court narrowly held that this phrase "embraces discovery materials submitted in support of and opposition to substantive pretrial motions, regardless of *the ground on which the trial court ultimately rules*." *Id.* at 497 (emphasis added).  Because the Court here did not rule on the Ex Parte Application at all, it should place those papers under seal in their entirety.

To be clear, there is no dispute that the Court never ruled on the Ex Parte Application.  To the contrary, at the parties' request, the Court specifically took the application off calendar, without prejudice to its renewal, in light of the parties' negotiated resolution.  Thus, the sealed record rules should not apply to the Ex Parte Application.  The material lodged confidentially under seal should remain under seal.  Moreover, the Memorandum of Points and Authorities, the Hagey Declaration, and the Antonelli Declaration, all of which disclose Defendants' confidential information, either directly or indirectly, should also be placed under seal.[2]  Treatment of these papers, which were never considered or ruled upon by the Court, is consistent with rule 2.550 and the precedents upon which that rule is based.  *See, e.g.*, *Matter of Krynicki*, 983 F.2d 74, 75–76

---

[2] Assuming Plaintiffs have swapped out those three documents in their entirety for slip sheets indicating that they have been filed provisionally under seal, as Plaintiffs stated they would do shortly before this motion was filed, those three documents should remain under seal.

1  (7th Cir. 1992) (explaining that "[i]nformation that is used at trial or otherwise becomes the basis

2  of decision enters the public record," and that "[s]ecrecy persists only if the court does not use the

3  information to reach a decision on the merits"), *cited approvingly in NBC Subsidiary (KNBC-TV),*

4  *Inc. v. Superior Court*, 20 Cal. 4th 1178, 1209 n.25 (1999).

5       Finally, if the Court declines to grant any of the foregoing relief, Defendants request that

6  the parties and non-parties that produced the confidential information at issue be given leave to

7  make a further showing under rule 2.551 of the California Rules of Court, consistent with the

8  Court's guidance at the CMC that it would not "automatically" unseal confidential documents.

9  10/16/20 Tr. at 46:16-47:17.

10  **IV.**    **CONCLUSION**

11       For these reasons, the Court should (1) strike the entire Ex Parte Application from the

12  record, (2) strike all material lodged confidentially under seal and the entire Memorandum of

13  Points and Authorities, Hagey Declaration, and Antonelli Declaration; or (3) permanently seal the

14  portions of the Ex Parte Application lodged confidentially under seal, and the entirety of the

15  Memorandum of Points and Authorities, the Hagey Declaration, and the Antonelli Declaration.

16  Dated:  November 2, 2020        JONES DAY

17

18                    By:  */s/ Stephen D. Hibbard*

19                        Stephen D. Hibbard

20                   Attorneys for Defendants
                 HDR GLOBAL TRADING LIMITED and ABS

21                   GLOBAL TRADING LIMITED

22  Dated:  November 2, 2020        AKIN GUMP STRAUSS HAUER & FELD LLP

23

24                    By:  */s/ Peter I. Altman*

25                        Pater I. Altman

26                   Attorneys for Defendant
                 ARTHUR HAYES

27

28

# EXHIBIT 10

PARTIAL TRANSCRIPT OF YOUTUBE VIDEO

"Bitmex CEO Arthur Hayes Crypto Millionaire Explains How He Created A Multi Million Dollar Company"

November 5, 2018

https://www.youtube.com/watch?v=Ljw9ulT2NHE



| Time | Speaker | Audio Transcript |
|------|---------|------------------|
| 5:45 | Arthur Hayes | At that time bitcoin started to rally quite aggressively and in China you could actually sell bitcoin at a 40% premium to what you can buy it for on the international market outside of China. So, I got on a bus to Shenzhen, with my passport, and I faked an address and I got a bank account in China. And I opened exchange accounts all across China on major exchanges. |

# EXHIBIT 11

PARTIAL TRANSCRIPT OF YOUTUBE VIDEO

"The Tangle in Taipei with Arthur Hayes and Nouriel Roubini"

July 15, 2019

https://www.youtube.com/watch?v=qlZukhN_C6c





| Time | Speaker | Audio Transcript |
|------|---------|------------------|
| 9:15 | Arthur Hayes | Maybe U.S.-centric Roubini thinks that New York DFS and New York AG is the only game in town and we need to bow down and take [expletive] from the U.S. government, just because it is regulated … that is really not my game, I did not want to sit on a bottom bunk with bobo all day, so I got out of that situation... |
| 9:41 | Andrew Neil | No, but you will understand that in the scale of global regulation: the SEC, New York, the regulatory authorities in London of in Frankfurt, are on a slightly different scale than regulatory authorities in the Seychelles. |

| 9:55 | Arthur Hayes | It just costs more to bribe them. |
|---|---|---|
| 9:57 | Andrew Neil | Costs more to bribe them?  …  So, how much are you paying to bribe the Seychelles authorities? |
| 10:07 | Arthur Hayes | A coconut. |

# EXHIBIT 12

# Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

## Top 25 Traders by Notional

| Rank | | Name | Profit | | Is Real Name |
|------|---|------|--------|---|--------------|
| 1 | | Mercury-Wood-Sprite | 8,161.2198 XBT | | ✗ |
| 2 | | Quick-Grove-Mind | 8,047.8158 XBT | | ✗ |
| 3 | | Heavy-Autumn-Wolf | 7,574.4154 XBT | | ✗ |
| 4 | 1. Sunil Shah, 310 Lake St., Unit #310, | Alameda Research | 5,244.5830 XBT | | ✓ |
| 5 | Huntington Beach, CA 92648 | Hot-Relic-Fancier | 4,716.5159 XBT | | ✗ |
| 6 | 2. Bryce Gilleland, 1400 Calle De Las | coincidentcapitalltd | 2,610.2783 XBT | $31,000,000 Exhibits: | ✓ |
| 7 | Flores, San Dimas, CA 91773 | Skitter-Peridot-Raven | 2,329.1721 XBT | 6, 7, 8 | ✗ |
| 8 | 3. Wen Hou, 2253 Martin St. Apt 113, Irvine, CA 92612 | Honeysuckle-South-Rib | 2,111.6555 XBT | | ✗ |
| 9 | | CSW is a fraud | 2,086.7229 XBT | | ✓ |
| 10 | | Tree-Surf-Dragon | 2,053.2285 XBT | | ✗ |
| 11 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger-LeotankCapital | 1,764.5478 XBT | $21,000,000 Exhibits: | ✓ |
| 12 | | alamedaresearchltd@gmail.com | 1,696.7039 XBT | 9, 10, 11 | ✓ |
| 13 | | Jade-Platinum-Legs | 1,675.8174 XBT | | ✗ |
| 14 | | Circle_Trade | 1,619.6382 XBT | | ✓ |
| 15 | | Winter-Pink-Fang | 1,542.1702 XBT | | ✗ |
| 16 | | daniel3 | 1,514.6067 XBT | | ✓ |
| 17 | | Cream-White-Ox | 1,476.3798 XBT | | ✗ |
| 18 | | xorq | 1,473.0086 XBT | | ✓ |
| 19 | | Disco-Solar-Fang | 1,452.1775 XBT | | ✗ |
| 20 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger_LeotankCapital | 1,441.3349 XBT | $17,000,000 Exhibits: | ✓ |
| 21 | | Ebony-Fair-Bat | 1,390.0500 XBT | 9, 10, 11 | ✗ |
| 22 | | aoa | 1,386.5926 XBT | | ✓ |
| 23 | | Quill-Rift-Hoof | 1,363.3790 XBT | | ✗ |
| 24 | | Brown-Peat-Myth | 1,248.5080 XBT | | ✗ |
| 25 | | Denim-Sun-Speaker | 1,218.5577 XBT | | ✗ |

 Coincident Capital

Home    Our Team    Blog    Contact Us

# Our Team







## Bryce Gilleland

Chief Executive Officer

Bryce is a high energy business veteran and cryptocurrency expert. He has fulfilled various roles in Fortune 500 companies as a senior manager in investor relations and corporate strategy giving him the breadth and vision to guide Coincident. He also founded a cryptocurrency trading firm serving as its CEO

## Wen Hou

Chief Investment Officer

Wen is a trading, finance, and cryptocurrency expert and enthusiast. Wen boasts over a decade of trading experience and an amazing six year track record in cryptocurrency. Wen is currently ranked on multiple exchange leaderboards and prides himself on making strategic, patient, and disciplined trades. Wen

## Sunil Shah

Chief Operating Officer

Sunil is an electrical and software engineer. Coming from various renewable energy startups he brings experience in software design, predictive analytics, economic forecasting, finance, and operations. He previously founded a company that used artificial intelligence to optimize battery energy storage operations.

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.    ✕

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

LLC-12

**FILED**

In the office of the Secretary of State
of the State of California

**JUL 10, 2020**

**This Space For Office Use Only**

**IMPORTANT** — *Read instructions* before completing this form.

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, *see instructions*.)

COINCIDENT CAPITAL GP, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201928710184 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |
| b. Mailing Address of LLC, **if different than item 4a**<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (*see instructions*).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Sunil | | Shah | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 225 Copa De Oro Dr. | Brea | CA | 92823 |

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Sunil | | Shah | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Managing Firm |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 07/10/2020 | Sunil Shah | Managing Partner | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. *SEE INSTRUCTIONS* BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

| **Attachment to Statement of Information** (Limited Liability Company) | **LLC-12A Attachment** | 20-C75659 |
|---|---|---|

**A.  Limited Liability Company Name**

COINCIDENT CAPITAL GP, LLC

This Space For Office Use Only

| **B.   12-Digit Secretary of State File Number** | **C.   State or Place of Organization** (only if formed outside of California) |
|---|---|
| 201928710184 | CALIFORNIA |

**D.  List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address.   If the manager/member is an entity, enter the entity's name and address.  Note:  The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Bryce | | Gilleland | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1400 Calle De Las Flores | San Dimas | CA | 91773 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Wen | | Hou | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2253 MARTIN APT 113 | Irvine | CA | 92612 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| Entity Name | | | |
|---|---|---|---|

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

8/25/2020                                                    SEC FORM D/A

> The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
> The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)          Previous Names    [X] None          Entity Type

0001794657                                                          [ ] Corporation
Name of Issuer                                                      [X] Limited Partnership
**Coincident Capital, LP**                                         [ ] Limited Liability Company
Jurisdiction of Incorporation/Organization                         [ ] General Partnership
**DELAWARE**                                                       [ ] Business Trust
Year of Incorporation/Organization                                 [ ] Other (Specify)
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2019
[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
**Coincident Capital, LP**
Street Address 1                              Street Address 2
**310 LAKE STREET**                          **UNIT #310**
City                State/Province/Country    ZIP/PostalCode      Phone Number of Issuer
**HUNTINGTON BEACH**    **CALIFORNIA**        **92648**           **949-633-6491**

---

### 3. Related Persons

Last Name                First Name              Middle Name
**GILLELAND**            **BRYCE**
Street Address 1         Street Address 2
**310 Lake Street**      **Unit #310**
City                    State/Province/Country    ZIP/PostalCode
**Huntington Beach**    **CALIFORNIA**            **92648**
Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

**Manager of General Partner**

---

### 4. Industry Group

[ ] Agriculture                Health Care              [ ] Retailing

SEC FORM D/A

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [X] Pooled Investment Fund
  - [X] Hedge Fund
  - [ ] Private Equity Fund
  - [ ] Venture Capital Fund
  - [ ] Other Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?
  - [ ] Yes    [X] No
- [ ] Other Banking & Financial Services
- [ ] Business Services

Energy
- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care
- [ ] Manufacturing

Real Estate
- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

- [ ] 
- [ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [X] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)

- [ ] Investment Company Act Section 3(c)
- [ ] Section 3(c)(1)    [ ] Section 3(c)(9)

8/25/2020                                          SEC FORM D/A

☐ Rule 504 (b)(1)(ii)                    ☐ Section 3(c)(2)          ☐ Section 3(c)(10)
☐ Rule 504 (b)(1)(iii)                   ☐ Section 3(c)(3)          ☐ Section 3(c)(11)
☒ Rule 506(b)                            ☐ Section 3(c)(4)          ☐ Section 3(c)(12)
☐ Rule 506(c)                            ☐ Section 3(c)(5)          ☐ Section 3(c)(13)
☐ Securities Act Section 4(a)(5)         ☐ Section 3(c)(6)          ☐ Section 3(c)(14)
                                         ☐ Section 3(c)(7)

---

**7. Type of Filing**

☐ New Notice    Date of First Sale 2020-02-01   ☐ First Sale Yet to Occur
☒ Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

---

**9. Type(s) of Securities Offered (select all that apply)**

☐ Equity                                                    ☒ Pooled Investment Fund Interests
☐ Debt                                                      ☐ Tenant-in-Common Securities
☐ Option, Warrant or Other Right to Acquire Another Security   ☐ Mineral Property Securities
☐ Security to be Acquired Upon Exercise of Option, Warrant   ☐ Other (describe)
  or Other Right to Acquire Security

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction,
such as a merger, acquisition or exchange offer?          ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $100,000 USD

---

**12. Sales Compensation**

Recipient                                    Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None         (Associated) Broker or Dealer CRD    ☒ None
                                             Number

Street Address 1                             Street Address 2

City                                         State/Province/Country                ZIP/Postal
                                                                                   Code

State(s) of Solicitation (select all that    ☐ All      ☐ Foreign/non-US
apply)                                         States
Check "All States" or check individual
States

---

**13. Offering and Sales Amounts**

Total Offering Amount          USD  or ☒ Indefinite

SEC FORM D/A

Total Amount Sold          $2,700,000 USD

Total Remaining to be Sold          USD   or [X] Indefinite

Clarification of Response (if Necessary):

---

## 14. Investors

[X]   Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.    | 22 |

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    | 45 |

---

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD  [ ] Estimate

Finders' Fees $0 USD  [ ] Estimate

Clarification of Response (if Necessary):

---

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  [ ] Estimate

Clarification of Response (if Necessary):

---

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

8/25/2020                                                          SEC FORM D/A

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Coincident Capital, LP | /s/Bryce Gilleland | Bryce Gilleland | Manager of General Partner | 2020-08-10 |

***Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.***

\* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

CIK (Filer ID Number)          Previous Names    [X] None          Entity Type

[0001794657](#)

Name of Issuer                                                    [ ] Corporation
**Coincident Capital, LP**                                       [X] Limited Partnership
Jurisdiction of Incorporation/Organization                       [ ] Limited Liability Company
**DELAWARE**                                                     [ ] General Partnership
Year of Incorporation/Organization                               [ ] Business Trust
[ ] Over Five Years Ago                                          [ ] Other (Specify)
[X] Within Last Five Years (Specify Year) 2019
[ ] Yet to Be Formed

---

## 2. Principal Place of Business and Contact Information

Name of Issuer
**Coincident Capital, LP**

Street Address 1                          Street Address 2
**2 ANCHOR DR**

City                     State/Province/Country    ZIP/PostalCode    Phone Number of Issuer
**EMERYVILLE**           **CALIFORNIA**            **94608**         **949-633-6491**

---

## 3. Related Persons

Last Name                First Name                Middle Name
**GILLELAND**            **BRYCE**

Street Address 1         Street Address 2
**2 ANCHOR DR**

City                     State/Province/Country    ZIP/PostalCode
**EMERYVILLE**           **CALIFORNIA**            **94608**

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

**Manager of General Partner**

---

## 4. Industry Group

[ ] Agriculture                    Health Care              [ ] Retailing

Banking & Financial Services
☐ Commercial Banking
☐ Insurance
☐ Investing
☐ Investment Banking
☒ Pooled Investment Fund
  ☒ Hedge Fund
  ☐ Private Equity Fund
  ☐ Venture Capital Fund
  ☐ Other Investment Fund

  Is the issuer registered as
  an investment company under
  the Investment Company
  Act of 1940?
  ☐ Yes     ☒ No

☐ Other Banking & Financial Services
☐ Business Services
Energy
☐ Coal Mining
☐ Electric Utilities
☐ Energy Conservation
☐ Environmental Services
☐ Oil & Gas
☐ Other Energy

☐ Biotechnology
☐ Health Insurance
☐ Hospitals & Physicians
☐ Pharmaceuticals
☐ Other Health Care
☐ Manufacturing
Real Estate
☐ Commercial
☐ Construction
☐ REITS & Finance
☐ Residential
☐ Other Real Estate

☐
☐ Restaurants
Technology
☐ Computers
☐ Telecommunications
☐ Other Technology
Travel
☐ Airlines & Airports
☐ Lodging & Conventions
☐ Tourism & Travel Services
☐ Other Travel
☐ Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | | ☒ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))
☐ Rule 504 (b)(1)(i)

☐ Investment Company Act Section 3(c)
☐ Section 3(c)(1)    ☐ Section 3(c)(9)

8/7/2020                                SEC FORM D

- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(6)
- [ ] Section 3(c)(7)

- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)
- [ ] Section 3(c)(14)

---

**7. Type of Filing**

- [X] New Notice    Date of First Sale   [X] First Sale Yet to Occur
- [ ] Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   [X] Yes [ ] No

---

**9. Type(s) of Securities Offered (select all that apply)**

- [ ] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

- [X] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   [ ] Yes [X] No

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $100,000 USD

---

**12. Sales Compensation**

Recipient                                                 Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None                   (Associated) Broker or Dealer CRD Number   [X] None

Street Address 1                                          Street Address 2

City                                                      State/Province/Country                      ZIP/Postal Code

State(s) of Solicitation (select all that apply) Check "All States" or check individual States   [ ] All States   [ ] Foreign/non-US

---

**13. Offering and Sales Amounts**

Total Offering Amount    USD  or [X] Indefinite

8/7/2020                                                          SEC FORM D

Total Amount Sold          $0 USD

Total Remaining to be Sold       USD   or  [X] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:  | 0 |

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD  [ ] Estimate

Finders' Fees $0 USD  [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  [ ] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Coincident Capital, LP | /s/ Bryce Gilleland | Bryce Gilleland | Manager of General Partner | 2019-11-20 |

***Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.***

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.







# EXHIBIT 13

# Announcing the BitMEX User Verification Programme

**BitMEX**   14 Aug 2020

We will be launching our User Verification Programme at 00:00 UTC on 28 August 2020, where all customers will be asked to complete ID checks within the next 6 months. These new controls will enable us to create a more trusted and secure trading environment for all BitMEX users.

As part of this new initiative, we will also be unveiling details of a significant Trading Tournament in the coming weeks where users who have completed verification will be eligible to compete for sizable prizes.

**What new requirements can users expect?**

The User Verification Programme will require individual users to go through a four step process similar to ID checks on many other cryptocurrency exchanges. Individual users will be prompted to upload a photo ID and proof of address, take a selfie, as well as answer a few multiple choice questions about source of funds and trading experience. **It should take about five minutes to complete from start to finish.**

Corporate accounts will continue to go through the existing verification process, with our team ready to guide them through as quickly and efficiently as possible.

**When will the User Verification Programme kick off?**

The User Verification Programme will go live from 00:00 UTC on 28 August 2020. It will be mandatory for all BitMEX users to have completed identity verification by 12 February 2021 at 00:00 UTC in order to continue trading on our platform.

**Why the need for verification?**

Cryptocurrencies have come a long way in their 10 years of existence. Today, user identity verification is increasingly expected in order to meet evolving international regulatory standards, and is an important part of building trust in the cryptocurrency ecosystem. Practical customer security is greatly enhanced by identity verification, allowing BitMEX support personnel to reliably verify the actual owner of an account in the event of a dispute, hack, or incapacitation.

Further information will be made available on 28 August 2020 at the time of the User Verification Programme going live. If you have any questions in the meantime, please contact Support.

---

## Platform Status

| Status | Name |
| --- | --- |

| Status | Name |
|--------|------|
| ✅ Operational | BitMEX.Com |
| ✅ Operational | Testnet |
| ✅ Operational | Blog |
| ✅ Operational | E-Mails & Notifications Delivery |

View Status Page ↗

## Crypto Trader Digest:

### Bitcoin's most in-depth market analysis, commentary, and insights

Sign-up to receive the latest articles delivered straight to your inbox.

| Email | | Subscribe |

# EXHIBIT 14



Get started     Open in app

# Matthew Collins

264 Followers    ·    About      Follow

## BitMEX insiders caught in a web of lies

 Matthew Collins  May 20, 2018  ·  7 min read



*Update May 24*

*Thanks to the 15k+ readers for for sharing tips and content. This story about greed and scandal is now getting picked up by mainstream media and translated into Russian, Japanese, and Korean.*

After months of rumours about misconduct behind the scenes, BitMEX founders Arthur Hayes, Samuel Reed and Ben Delo have finally admitted (well, not quite) to giving unfair trading advantages to insiders, a practice they had previously denied.

They have also been engaging in unprofitable trading to artificially inflate exchange volumes (aka wash trading), outlined below.

To understand how unscrupulous actors try to squeeze every extra buck out of retail customers and fool potential investors in the (unregulated) Wild West of crypto, read on…



Ain't that the truth

## Admission of guilt

Last week marked 2018's marquee cryptocurrency gathering / giant circle-jerkathon, Consensus. Arthur Hayes, BitMEX CEO, was snapped posing in front of a bright orange Lamborghini. Later that week, he was the face of CNBC's Fast Money.



BitMEX's rented Lambo / PR stunt

Two weeks earlier, the BitMEX team were in a huddle discussing how to slip under the radar an admission they'd been engaging in unethical and probably illegal activity.

On April 30, a groundbreaking post surfaced on the BitMEX blog, admitting that the exchange operates its own (previously undisclosed) for-profit trading arm. This subsidiary trades against customers on their own exchange, and enjoys unfair advantages not available to other customers.

**BitMEX Market Making Desk**

We have recently updated our Terms of Service to explicitly clarify the relationship between BitMEX the trading...

blog.bitmex.com

The in-house trading arm and 'anchor market maker' vaguely referenced in the past, is staffed by their long-term friend and employee, Nick Andrianov.

## Who Runs The Desk?

The head trader is Nick Andrianov. He is a former Deutsche Bank equity flow and exotics options trader. Nick and I have known each other for over ten years. His integrity is unquestionable.

Nick's LinkedIn profile pegs him as the current BitMEX Business Development Manager.





TFW 'Business Development' is actually privileged insider trading

And of course we all remember Nick from back in November 2017 as part of the 'Deutsche Bank Connection'.

## Special trading privileges when you're on the inside

### The Deutsche Bank Connection

While making money trading against BitMEX's own customers, the anchor market maker received many *special trading privileges* that aren't available to other exchange users.

Bankers are flocking to the cryptocurrency industry as both principals and employees of related companies; from *blog.bitmex.com*

Below are 3 concrete examples of this:

1. **Off-exchange cash kickbacks disguised as 'service fees'**

*Bit* ***MEX*** *...*

> **Nick Andrianov**, Risk Management at BitMEX, member of the 2007 graduate class. He worked on the Flow and Exotic Index Volatility trading desk.

**How Do We Align Incentives?**

The trading entity is a for-profit operation. However, ==their earnings are comprised of a service fee paid by the business,== that is the BitMEX trading platform. In terms of trading PNL, the

*The truth is:*

If the BitMEX market maker loses money, the BitMEX exchange backdoors them cash payments (the economic equivalent of fee-free trading). This encourages the market maker to participate in unprofitable trading to artificially inflate exchange volume.

## 2. Unique status allowing them to short-sell options

*BitMEX claims:*

> Because no leverage is offered to sellers, it is very expensive from a capital perspective to make a market. In order to guarantee tight spreads at sufficient size, ==the BitMEX affiliated anchor market maker will be the only entity allowed to sell options initially.==
>
> Many of you may have concerns that the BitMEX affiliated entity is the sole market maker, however here are some points to consider:

*The truth is:*

They are indeed the only market participant allowed to short sell the new UP and DOWN option contracts. This is a hugely profitable advantage (in the order of tens of thousands of $$$ per day according to one source).

A recent newsletter from Deribit (competing crypto options exchange) outlined that the BitMEX options are 5–10x the fair market price. The insider market maker (the only person allowed to sell) is one plump hog!

## 3. Additional API request bandwidth denied to competitors

*BitMEX claims:*

**Does BitMEX have any market makers?**

BitMEX has an anchor market maker who continuously quotes large sizes on contracts that BitMEX offers. No special privileges are given to any of the market makers.

https://www.bitmex.com/app/faq

*The truth is:*

A large market-maker and trading firm informed me that BitMEX repeatedly denied them increased API request allowances (how many orders-per-second their algo is allowed to send). Meanwhile, the privileged BitMEX market maker probably operates with far fewer order limit restrictions.

With all these special benefits, the BitMEX subsidiary and in-house market maker is in a fantastic position to fleece the exchange's customers. This Nick Andrianov guy (Arthur's old friend and BitMEX insider) is sitting on a gold mine! But at least we can rest easy knowing '[h]is integrity is unquestionable'.

## But why male models?

All of the information in the April 30 blog post is a revelation that runs contrary to the party line, which has always been a deny, deny, deny.

So naturally, we have to wonder what prompted the truth to spill out after months (years) of deceiving market participants.

## 2 days earlier...

It was a rainy afternoon in the Principality of Sealand when an anonymous tipster contacted me.

He was a young CS student trying to put his programming skills into practice by writing code to run a trading bot on BitMEX. But he noticed something odd in the data. There appeared to be another bot that was making consistently unprofitable trades, and could get orders in the market faster than anyone else during those dreadful exchange overloads.



The infamous '503 error'

I decided to dig a little deeper and hear what BitMEX had to say on the issue.



The initial request for truth

Straight from the horse's mouth…



Well, except for those pesky off-exchange cash payments. And the ability to go short. And increased throttle. Although technically, their own trading subsidiary isn't a 'customer'…

Given the timing of this email (2 days before the blog post), we have to wonder if BitMEX staffers were spooked (and / or obliged to consult legal counsel), thus leading to

their admission of guilt.

## The plot thickens

Yet more behaviour by BitMEX suggests they didn't want to bring attention to this blog post.

For example, the post did *not* appear on the RSS feed like most other posts. it also did *not* appear as an 'exchange announcement', which would alert users.



Additionally, while the April 30 blog post claims BitMEX have 'updated our Terms of Service', there is no mention of the privileged for-profit insider market making subsidiary anywhere on the ToS page.

**Terms of Service - BitMEX**

BitMEX is the world's most advanced P2P crypto-products trading platform and API. Trade with up to 100x leverage with...

www.bitmex.com

## Outrage on reddit

Understandably, angry posts have started appearing on reddit. Nettlesome 'customers' are asking for the same trading privileges as the BitMEX internal market-making desk... the nerve!

## Anchor Market Maker?

how does one become this on bitmex?

r/BitMEX  •  icedoutdopefiend  •  2y ago
6 points  •  5 comments



Our lead outside counsel is fully aware of the operation and advises us on best practices to ensure that we place the interests of BitMEX customers first.



This guy fucks
Wash trading illustrated. Without the special off-exchange 'service fee' kickbacks, this behaviour would be wildly unprofitable after fees

## Wrapping up

After the truth about the ethical standards of the BitMEX founders has been exposed, the CFTC / SEC will need to dig deeper before even considering US approval of the exchange.

*An immediate and obvious corrective action by BitMEX would be to remove all unfair trading privileges given to their friends and business partners*. Further, BitMEX should discontinue deceiving their customers, and discontinue entertaining the conflict-of-interest between the exchange vs in-house, for-profit trading arm.

*Please forward any further tips / info to mattcollburner@gmail.com*

*I've recently received information about BitMEX's market-making desk front-running OTC orders. More in the next article. @ BitMEX if you would like to respond on record, please get in touch.*

---

BitMEX running insider trading division for a privileged few (market making)

r/CryptoCurrency • The4ker • 2y ago
85 points • 27 comments

---

Read more about stop hunting here

Blockchain      Cryptocurrency      Bitcoin      Crypto      Trading

About   Help   Legal

BitMEX insiders caught in a web of lies | by Matthew Collins | Medium                    https://medium.com/@mattcollburner/bitmex-insiders-caught-in-a...

Get the Medium app

 

# EXHIBIT 15

Terms of Service

Definitions

BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based virtual trading platform that is wholly owned by HDR Global Trading Limited. HDR Global Trading Limited (hereinafter referred to as BitMEX) was incorporated under the International Business Companies Act of 1994 of the Republic of Seychelles with a company number of 148707.

Use of this BitMEX website ("Website") and the service offered on the Website ("Service") are governed by the terms contained on this Terms and Conditions page ("Terms"). This agreement entirely constitutes the agreement between the parties. All other information provided on the Website or oral/written statements made are excluded from this agreement; the exchange policy is provided for guidance only and does not constitute a legal agreement between the parties.

By accessing, viewing or downloading information from the Website and using the Service provided by BitMEX you acknowledge that you have read, understand, and unconditionally agree to be bound by these Terms. BitMEX may at any time, without notice, amend the Terms. You agree to continue to be bound by any amended terms and conditions and that BitMEX has no obligation to notify you of such amendments. You acknowledge that it is your responsibility to check these Terms periodically for changes and that your continued use of the Website and Services offered by BitMEX following the posting of any changes to the Terms indicates your acceptance of any such changes.

The Website and the copyright in all text, graphics, images, software and any other materials on the Website is owned by BitMEX including all trademarks and other intellectual property rights in respect of materials and Service on the Website. Materials on this Website may only be used for personal use and non-commercial purposes.

You may display on a computer screen or print extracts from the Website for the above-stated purpose only provided that you retain any copyright and other proprietary notices or any BitMEX trademarks or logos, as shown on the initial printout or download without alteration, addition or deletion. Except as expressly stated herein, you may not without BitMEX's prior written permission alter, modify, reproduce, distribute or use in any other commercial context any materials from the Website.

You acknowledge that 'BitMEX' and the BitMEX logo are trademarks of HDR Global Trading Limited. You may reproduce such trademarks without alteration on material downloaded from this Website to the extent authorised above, but you may not otherwise use, copy, adapt or erase them.

You shall not in any circumstances obtain any rights over or in respect of the Website (other than rights to use the Website pursuant to these Terms and any other terms and conditions governing a particular service or section of the Website) or hold yourself out as having any such rights over or in respect of the Website.

Definitions
"Agreement"

means the Terms and Conditions of Use herein.

"BitMEX"

means HDR Global Trading Limited, a company founded in the Republic of Seychelles.

"Data"

means any data input by you or with your authority into the Website.

"Intellectual Property Rights"

means any registered or unregistered design rights, patents, copyright, database rights, data protection rights, trade marks, service marks, moral rights, know-how and any other intellectual or industrial property rights, anywhere in the world.

"Member"

means any current registered user of BitMEX.

"Service"

means all services made available (as may be changed or updated from time to time by BitMEX) via the Website.

"Website"

means any of the images, written material, databases, software or other material available on any website owned or operated by BitMEX.

1. Access Conditions
1.1: You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password.

1.2: When accessing and using the Service, You must:

a) not attempt to undermine the security or integrity of BitMEX's computing systems or networks or, where the Services are hosted by a third party, that third party's computing systems and networks;

b) not use, or misuse, the Services in any way which may impair the functionality of the Services or Website, or other systems used to deliver the Services or impair the ability of any other user to use the Services or Website;

c) not attempt to gain unauthorised access to the computer system on which the Website is hosted or to any materials other than those to which you have been given express permission to access;

d) not transmit or input into the Website any files that may damage any other person's computing devices or software; content that may be offensive; or material or Data in violation of any law (including Data or other material protected by copyright or trade secrets which you do not have the right to use);

e) not attempt to modify, copy, adapt, reproduce, disassemble, decompile or reverse engineer any computer programs used to deliver the Services or to operate the Website except as is strictly necessary to use either of them for normal operation.

f) You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password;

1.3: Use of the Service may be subject to limitations, including but not limited to transaction volumes and the number of calls permitted to be made against BitMEX's application programming interface. Any such limitations will be advised.

1.4: By registering as a Member you represent and warrant:

a) that you have accepted the Terms; and

b) that you are at least 18 years of age and have the capacity to accept the Terms;

c) that you are the legal owner of the funds you add to your account with BitMEX and that the same funds derive from a legitimate source;

d) that using BitMEX services does not constitute a breach of your home jurisdictions' laws;

e) that you are aware of the risks in using the services provided by BitMEX. These risks include the high volatility risk of bitcoin itself, the fact that you may lose all of the funds in your trading account if the market moves against you;

f) that you will not be involved or initiate any form of market manipulation, including spoofing orders or otherwise;

3

g) that the information or documents you provide as part of any ID verification process are correct, genuine and up-to-date;

h) that any bitcoin withdrawal address you provide is your own and that you have full control over this address;

i) that you are not a resident of the United States of America or any other jurisdiction where the services offered by BitMEX are restricted. If it is determined that you have given false representation as to your place of residence, BitMEX reserves the right to close your account immediately and liquidate any open positions at the prevailing market price.

1.5: You can open an initial account by providing your email address and full name (Initial Account).

1.6: BitMEX reserves the right at any time to verify your identity for the purposes of complying with the Seychelles' Anti-Money Laundering Act 2006.

1.7: We impose certain trading limits before you are required to conduct Customer Due Diligence (CDD). You agree to cooperate with us in this process and will provide all documentation/information that we may require to satisfy ourselves of your identity and the purpose of the business relationship.

1.8: We may freeze any Account in the event that we suspect or have reason to believe you are engaged in suspicious trading or other activity or have breached any of the above warranties. This may result in the unwinding of any trades you have entered into. We expressly exclude any losses or profits you would have made as a result of us closing your trade positions early or you not being able to trade on BitMEX and you agree to indemnify us completely against any third party action resulting from your conduct or us having to close your positions early. Whilst your Account is frozen we will conduct an investigation and may require you to cooperate with our enquiries. During the investigation stage you will not be able to make deposits or withdrawals to your Account nor will you be able to trade. At the end of the investigation we may, at our own discretion, decide to close your Account for which we are not required to provide you with any reasons for the same.

1.9: We reserve the right at our own discretion to close your Account with 7 days notice. You will therefore have 7 days in which to close your positions. If at the expiry of that period your positions are still open we will force close them and return to you any remaining bitcoin left in your Account.

1.10: It is your responsibility entirely to provide us with correct details including your withdrawal address. We accept no liability resulting in you not receiving the bitcoin withdrawn due to you providing incorrect or out-of-date details.

1.11: It is our responsibility to maintain an orderly market and as such we may at our own discretion halt trading on the Website due to market disruption or other relevant external events. We exclude all liability for any claimed losses or profits lost as a result of us halting trading.

2. Intellectual Property Rights

2.1: All intellectual property rights relating to all the material used on the Website including, but not limited to, design, structure, layouts, graphical images and underlying source code belongs to BitMEX. All rights are reserved.

2.2: You acknowledge that, except as otherwise agreed between the parties in writing, all intellectual property rights of BitMEX and the Website shall remain with BitMEX.

2.3: By submitting content to any public area of the Website, including blogs, message boards, and forums, you grant BitMEX a royalty-free, perpetual, irrevocable, non-exclusive right and licence to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, communicate to the public, perform and display the content (in whole or in part) worldwide and to incorporate it in other works in any form, media, or technology now known or later developed, for the full term of any rights that may exist in such content. You also permit any subscriber to access, display, view, store and reproduce such content for personal use.

2.4: By submitting any content to the Website you warrant that you are entitled to and have all necessary intellectual property rights over that content.

3. Privacy Policy

3.1: Please see our separate Privacy Policy, which forms part of these terms.

4. Data Protection

4.1: BitMEX may place information concerning you on a database of internal use only. BitMEX will not disclose your details to any third party unless required by law, unless specifically instructed to the contrary by you.

5. Third Party Websites

5.1: BitMEX links to third party websites that are not affiliated or associated with BitMEX (although BitMEX branding, advertisements or links may appear on these websites) and BitMEX may send e-mail messages to you containing advertisements or promotions including links to third parties. BitMEX makes no representation as to the quality, suitability, functionality or legality of the material on third party websites that are linked to, or to any goods and services available from such websites. The material is only provided for your interest and convenience. BitMEX does not monitor or investigate such third party websites and BitMEX accepts no responsibility or liability for any loss arising from the content or accuracy of this material and any opinion expressed in the material should not be taken as an endorsement, recommendation or opinion of BitMEX.

5.2: Under no circumstances are you to create a hyperlink to any of the pages on the Website, unless BitMEX provides you with its prior consent to do so. If you do create a link to any of the pages on the Website, you acknowledge that you are responsible for all direct or indirect consequences of the link, and you indemnify BitMEX for all loss, liability, costs or expense arising from or in connection with the link.

6. Warranties and Representations
6.1: You acknowledge that:

a) You are authorised to access and use the Website; In particular, the jurisdiction where you reside, hold citizenship, or conduct business allows you to utilize BitMEX's services;

b) If you are using the Website on behalf of or for the benefit of any organisation then it is assumed that you have the right to do so. The organisation will be liable for your actions including any breach of these Terms;

c) Your use of the Website and the Service is at your own risk. You agree that BitMEX is not liable for any damage or harm arising out of your use of the Website and Service;

d) The information provided on the Website is for general information purposes only and is given in good faith. However, the information is selective and BitMEX may not verify all information, which may not be complete or accurate for your purposes and should not be relied upon without further enquiry. The information should not be construed as a recommendation to trade or engage the Service provided by BitMEX in a particular manner; and

e) BitMEX does not warrant that the use of the Website will be uninterrupted or error free. Among other things, the operation and availability of the systems used for accessing the Website, including public telephone services, computer networks and the Internet, can be unpredictable and may from time to time interfere with or prevent access to the Website. BitMEX is not in any way responsible for any such interference that prevents your access or use of the Website and the Service.

6.2: BitMEX gives no warranty about the Website. Without limiting the foregoing, BitMEX does not warrant that the Website will meet your requirements or that it will be suitable for your purposes. To avoid doubt, all implied conditions or warranties are excluded insofar as is permitted by law including, without limitation, warranties of merchantability, fitness for purpose, title and non-infringement.

6.3: You warrant and represent that you are acquiring the right to access and use the Website and agreeing to these Terms for the purposes of a business and that, to the maximum extent permitted by law, any statutory consumer guarantees or legislation intended to protect non-business consumers in any jurisdiction does not apply to the supply of the Website or these Terms.

6

7. Service Performance

7.1: BitMEX denies all liability for the timely operation of the Website when used within an Internet environment, where you or a third party is providing the computer equipment upon which the product is depend upon for any part of its functionality.

7.2: By using this service you confirm your understanding that the timely operation of the Internet and the World Wide Web is governed by constraints beyond the control of BitMEX. You accept that BitMEX is not liable for any perceived slow operation of the Website.

7.3: By using this service you accept that all trade executions are final and irreversible.

7.4: By using this service you accept that BitMEX reserves the right to liquidate any trades at any time regardless of the profit or loss position.

8. Indemnification

8.1: You agree to indemnify and hold harmless BitMEX, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to out of your violation this Agreement.

9. Limitation of Liability

9.1: In no event will BitMEX, or its suppliers or licensors, be liable with respect to any subject matter of this agreement under any contract, negligence, strict liability or other legal or equitable theory for: * i) any special, incidental or consequential damages; (ii) the cost of procurement or substitute products or services; (iii) for interruption of use or loss or corruption of data; or (iv) for any amounts that exceed the fees paid by you to BitMEX under this agreement during the twelve (12) month period prior to the cause of action. BitMEX shall have no liability for any failure or delay due to matters beyond their reasonable control. The foregoing shall not apply to the extent prohibited by applicable law.

10. Calculations

10.1: All calculations performed by the BitMEX trading engine and as verified by BitMEX are final. Our methodology is outlined here. As noted in clause 6.1, BitMEX does not warrant that the use of the Website will be uninterrupted or error free.

11. Termination & Remedies for Breach of these Terms by You

a) BitMEX reserves the right to seek all remedies available at law and in equity for violations of these Terms, including without limitation, the right to restrict, suspend or terminate your account or deny you access to the Website without notice; and

b) BitMEX shall be entitled to disclose your user identity and personal details if required or requested by a court of law, governmental agency or any other law enforcement authority in

such circumstances as BitMEX in its sole discretion considers reasonably necessary or appropriate.

12. Absence of Waiver

12.1: Any failure or delay by BitMEX to enforce any of the Terms or to exercise any right under the Terms will not be construed as a waiver to any extent of our rights.

13. Force Majeure

13.1: Neither party is liable for delay in meeting its obligations due to any cause outside its reasonable control including acts of god, riot, war, malicious acts of damage, fires, electricity supply failure, Government authority.

14. Survival

14.1: Should any provision of these Terms be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected. If any provision is determined to be unenforceable, you agree to an amendment by BitMEX of such provision to provide for enforcement of the provisions intent, to the extent permitted by applicable law.

15. Governing Law

The Terms are governed by and construed in accordance with English common law. The International Business Companies Act 1994 is the principal legislation that governs corporates in the Republic of Seychelles.

# EXHIBIT 16



# EXHIBIT 17

Terms of Service

Definitions

BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based virtual trading platform that is wholly owned by HDR Global Trading Limited. HDR Global Trading Limited (hereinafter referred to as BitMEX) was incorporated under the International Business Companies Act of 1994 of the Republic of Seychelles with a company number of 148707.

Use of this BitMEX website ("Website") and the service offered on the Website ("Service") are governed by the terms contained on this Terms and Conditions page ("Terms"). This agreement entirely constitutes the agreement between the parties. All other information provided on the Website or oral/written statements made are excluded from this agreement; the exchange policy is provided for guidance only and does not constitute a legal agreement between the parties.

By accessing, viewing or downloading information from the Website and using the Service provided by BitMEX you acknowledge that you have read, understand, and unconditionally agree to be bound by these Terms. BitMEX may at any time, without notice, amend the Terms. You agree to continue to be bound by any amended terms and conditions and that BitMEX has no obligation to notify you of such amendments. You acknowledge that it is your responsibility to check these Terms periodically for changes and that your continued use of the Website and Services offered by BitMEX following the posting of any changes to the Terms indicates your acceptance of any such changes.

The Website and the copyright in all text, graphics, images, software and any other materials on the Website is owned by BitMEX including all trademarks and other intellectual property rights in respect of materials and Service on the Website. Materials on this Website may only be used for personal use and non-commercial purposes.

You may display on a computer screen or print extracts from the Website for the above-stated purpose only provided that you retain any copyright and other proprietary notices or any BitMEX trademarks or logos, as shown on the initial printout or download without alteration, addition or deletion. Except as expressly stated herein, you may not without BitMEX's prior written permission alter, modify, reproduce, distribute or use in any other commercial context any materials from the Website.

You acknowledge that 'BitMEX' and the BitMEX logo are trademarks of HDR Global Trading Limited. You may reproduce such trademarks without alteration on material downloaded from this Website to the extent authorised above, but you may not otherwise use, copy, adapt or erase them.

You shall not in any circumstances obtain any rights over or in respect of the Website (other than rights to use the Website pursuant to these Terms and any other terms and conditions governing a particular service or section of the Website) or hold yourself out as having any such rights over or in respect of the Website.

1

Definitions
"Agreement"

means the Terms and Conditions of Use herein.

"BitMEX"

means HDR Global Trading Limited, a company founded in the Republic of Seychelles.

"Data"

means any data input by you or with your authority into the Website.

"Intellectual Property Rights"

means any registered or unregistered design rights, patents, copyright, database rights, data protection rights, trade marks, service marks, moral rights, know-how and any other intellectual or industrial property rights, anywhere in the world.

"Member"

means any current registered user of BitMEX.

"Service"

means all services made available (as may be changed or updated from time to time by BitMEX) via the Website.

"Website"

means any of the images, written material, databases, software or other material available on any website owned or operated by BitMEX.

1. Access Conditions
1.1: You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password.

1.2: When accessing and using the Service, You must:

a) not attempt to undermine the security or integrity of BitMEX's computing systems or networks or, where the Services are hosted by a third party, that third party's computing systems and networks;

2

b) not use, or misuse, the Services in any way which may impair the functionality of the Services or Website, or other systems used to deliver the Services or impair the ability of any other user to use the Services or Website;

c) not attempt to gain unauthorised access to the computer system on which the Website is hosted or to any materials other than those to which you have been given express permission to access;

d) not transmit or input into the Website any files that may damage any other person's computing devices or software; content that may be offensive; or material or Data in violation of any law (including Data or other material protected by copyright or trade secrets which you do not have the right to use);

e) not attempt to modify, copy, adapt, reproduce, disassemble, decompile or reverse engineer any computer programs used to deliver the Services or to operate the Website except as is strictly necessary to use either of them for normal operation.

f) You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password;

1.3: Use of the Service may be subject to limitations, including but not limited to transaction volumes and the number of calls permitted to be made against BitMEX's application programming interface. Any such limitations will be advised.

1.4: By registering as a Member you represent and warrant:

a) that you have accepted the Terms; and

b) that you are at least 18 years of age and have the capacity to accept the Terms;

c) that you are the legal owner of the funds you add to your account with BitMEX and that the same funds derive from a legitimate source;

d) that using BitMEX services does not constitute a breach of your home jurisdictions' laws;

e) that you are aware of the risks in using the services provided by BitMEX. These risks include the high volatility risk of Bitcoin itself, the fact that you may lose all of the funds in your trading account if the market moves against you;

f) that you will not be involved or initiate any form of market manipulation, including spoofing orders or otherwise;

3

g) that the information or documents you provide as part of any ID verification process are correct, genuine and up-to-date;

h) that any Bitcoin withdrawal address you provide is your own and that you have full control over this address;

i) that you are not a resident of the United States of America, Cuba, Crimea and Sevastopol, Iran, Syria, North Korea, Sudan, or any other jurisdiction where the services offered by BitMEX are restricted. If it is determined that you have given false representation as to your place of residence, BitMEX reserves the right to close your account immediately and liquidate any open positions at the prevailing market price.

1.5: You can open an initial account by providing your email address and full name (Initial Account).

1.6: BitMEX reserves the right at any time to verify your identity for the purposes of complying with the Seychelles' Anti-Money Laundering Act 2006.

1.7: We impose certain trading limits before you are required to conduct Customer Due Diligence (CDD). You agree to cooperate with us in this process and will provide all documentation/information that we may require to satisfy ourselves of your identity and the purpose of the business relationship.

1.8: We may freeze any Account in the event that we suspect or have reason to believe you are engaged in suspicious trading or other activity or have breached any of the above warranties. This may result in the unwinding of any trades you have entered into. We expressly exclude any losses or profits you would have made as a result of us closing your trade positions early or you not being able to trade on BitMEX and you agree to indemnify us completely against any third party action resulting from your conduct or us having to close your positions early. Whilst your Account is frozen we will conduct an investigation and may require you to cooperate with our enquiries. During the investigation stage you will not be able to make deposits or withdrawals to your Account nor will you be able to trade. At the end of the investigation we may, at our own discretion, decide to close your Account for which we are not required to provide you with any reasons for the same.

1.9: We reserve the right at our own discretion to close your Account with 7 days notice. You will therefore have 7 days in which to close your positions. If at the expiry of that period your positions are still open we will force close them and return to you any remaining Bitcoin left in your Account.

1.10: It is your responsibility entirely to provide us with correct details including your withdrawal address. We accept no liability resulting in you not receiving the Bitcoin withdrawn due to you providing incorrect or out-of-date details. It is also your responsibility to ensure transactions sent to BitMEX are well-formatted and denominated in the correct currency.

BitMEX excludes all liability for any incorrect transactions, including but not limited to Litecoin sent to Bitcoin addresses.

1.11: It is our responsibility to maintain an orderly market and as such we may at our own discretion halt trading on the Website due to market disruption or other relevant external events. We exclude all liability for any claimed losses or profits lost as a result of us halting trading.

2. Intellectual Property Rights

2.1: All intellectual property rights relating to all the material used on the Website including, but not limited to, design, structure, layouts, graphical images and underlying source code belongs to BitMEX. All rights are reserved.

2.2: You acknowledge that, except as otherwise agreed between the parties in writing, all intellectual property rights of BitMEX and the Website shall remain with BitMEX.

2.3: By submitting content to any public area of the Website, including blogs, message boards, and forums, you grant BitMEX a royalty-free, perpetual, irrevocable, non-exclusive right and licence to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, communicate to the public, perform and display the content (in whole or in part) worldwide and to incorporate it in other works in any form, media, or technology now known or later developed, for the full term of any rights that may exist in such content. You also permit any subscriber to access, display, view, store and reproduce such content for personal use.

2.4: By submitting any content to the Website you warrant that you are entitled to and have all necessary intellectual property rights over that content.

3. Privacy Policy

3.1: Please see our separate Privacy Policy, which forms part of these terms.

4. Data Protection

4.1: BitMEX may place information concerning you on a database of internal use only. BitMEX will not disclose your details to any third party unless required by law, unless specifically instructed to the contrary by you.

5. Third Party Websites

5.1: BitMEX links to third party websites that are not affiliated or associated with BitMEX (although BitMEX branding, advertisements or links may appear on these websites) and BitMEX may send e-mail messages to you containing advertisements or promotions including links to third parties. BitMEX makes no representation as to the quality, suitability, functionality or legality of the material on third party websites that are linked to, or to any goods and services available from such websites. The material is only provided for your interest and convenience. BitMEX does not monitor or investigate such third party websites and BitMEX accepts no responsibility or liability for any loss arising from the content or accuracy of this material and

any opinion expressed in the material should not be taken as an endorsement, recommendation or opinion of BitMEX.

5.2: Under no circumstances are you to create a hyperlink to any of the pages on the Website, unless BitMEX provides you with its prior consent to do so. If you do create a link to any of the pages on the Website, you acknowledge that you are responsible for all direct or indirect consequences of the link, and you indemnify BitMEX for all loss, liability, costs or expense arising from or in connection with the link.

6. Warranties and Representations
6.1: You acknowledge that:

a) You are authorised to access and use the Website; In particular, the jurisdiction where you reside, hold citizenship, or conduct business allows you to utilize BitMEX's services;

b) If you are using the Website on behalf of or for the benefit of any organisation then it is assumed that you have the right to do so. The organisation will be liable for your actions including any breach of these Terms;

c) Your use of the Website and the Service is at your own risk. You agree that BitMEX is not liable for any damage or harm arising out of your use of the Website and Service;

d) The information provided on the Website is for general information purposes only and is given in good faith. However, the information is selective and BitMEX may not verify all information, which may not be complete or accurate for your purposes and should not be relied upon without further enquiry. The information should not be construed as a recommendation to trade or engage the Service provided by BitMEX in a particular manner; and

e) BitMEX does not warrant that the use of the Website will be uninterrupted or error free. Among other things, the operation and availability of the systems used for accessing the Website, including public telephone services, computer networks and the Internet, can be unpredictable and may from time to time interfere with or prevent access to the Website. BitMEX is not in any way responsible for any such interference that prevents your access or use of the Website and the Service.

6.2: BitMEX gives no warranty about the Website. Without limiting the foregoing, BitMEX does not warrant that the Website will meet your requirements or that it will be suitable for your purposes. To avoid doubt, all implied conditions or warranties are excluded insofar as is permitted by law including, without limitation, warranties of merchantability, fitness for purpose, title and non-infringement.

6.3: BitMEX has a for profit trading business that, among other things, transacts in products traded on the BitMEX platform. The trading business primarily trades as a market maker. The

trading business is organised to be separate and distinct from the platform business. Specifically, no front office personnel are shared between the trading business and the platform, the trading business operates from a separate physical location, and the trading business does not have access to any platform order flow, execution, customer or other information on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific BitMEX product, the trading business receives access and trading privileges only on the same terms as are available to any other user.

6.4: You warrant and represent that you are acquiring the right to access and use the Website and agreeing to these Terms for the purposes of a business and that, to the maximum extent permitted by law, any statutory consumer guarantees or legislation intended to protect non-business consumers in any jurisdiction does not apply to the supply of the Website or these Terms.

7. Service Performance

7.1: BitMEX denies all liability for the timely operation of the Website when used within an Internet environment, where you or a third party is providing the computer equipment upon which the product is depend upon for any part of its functionality.

7.2: By using this service you confirm your understanding that the timely operation of the Internet and the World Wide Web is governed by constraints beyond the control of BitMEX. You accept that BitMEX is not liable for any perceived slow operation of the Website.

7.3: By using this service you accept that all trade executions are final and irreversible.

7.4: By using this service you accept that BitMEX reserves the right to liquidate any trades at any time regardless of the profit or loss position.

7.5: BitMEX does not warrant that the Service will meet your requirements; that the Service will be uninterrupted, timely, secure, or error-free; that the information provided through the Service is accurate, reliable or correct; that any defects or errors will be corrected, or that the Service will be available at any particular time or location. You assume full responsibility and risk of loss resulting from your use of the Service.

8. Indemnification

8.1: You agree to indemnify and hold harmless BitMEX, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to your violation of this Agreement.

9. Limitation of Liability

9.1: In no event will BitMEX, or its suppliers or licensors, be liable with respect to any subject matter of this agreement under any contract, negligence, strict liability or other legal or equitable theory for: * i) any special, incidental or consequential damages; (ii) the cost of

procurement or substitute products or services; (iii) for interruption of use or loss or corruption of data; or (iv) for any amounts that exceed the fees paid by you to BitMEX under this agreement during the twelve (12) month period prior to the cause of action. BitMEX shall have no liability for any failure or delay due to matters beyond their reasonable control. The foregoing shall not apply to the extent prohibited by applicable law.

10. Calculations
10.1: All calculations performed by the BitMEX trading engine and as verified by BitMEX are final. Our methodology is outlined here. As noted in clause 6.1, BitMEX does not warrant that the use of the Website will be uninterrupted or error free.

11. Termination & Remedies for Breach of these Terms by You
a) BitMEX reserves the right to seek all remedies available at law and in equity for violations of these Terms, including without limitation, the right to restrict, suspend or terminate your account or deny you access to the Website without notice; and

b) BitMEX shall be entitled to disclose your user identity and personal details if required or requested by a court of law, governmental agency or any other law enforcement authority in such circumstances as BitMEX in its sole discretion considers reasonably necessary or appropriate.

12. Absence of Waiver
12.1: Any failure or delay by BitMEX to enforce any of the Terms or to exercise any right under the Terms will not be construed as a waiver to any extent of our rights.

13. Force Majeure
13.1: Neither party is liable for delay in meeting its obligations due to any cause outside its reasonable control including acts of god, riot, war, malicious acts of damage, fires, electricity supply failure, Government authority.

14. Survival
14.1: Should any provision of these Terms be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected. If any provision is determined to be unenforceable, you agree to an amendment by BitMEX of such provision to provide for enforcement of the provisions intent, to the extent permitted by applicable law.

15. Governing Law
The Terms are governed by and construed in accordance with English common law. The International Business Companies Act 1994 is the principal legislation that governs corporates in the Republic of Seychelles.

# EXHIBIT 18

# March 6, 2021

# March 10, 2021

# EXHIBIT 19

# BitMEX Market Making Desk

Arthur Hayes   30 Apr 2018

We have recently updated our Terms of Service to explicitly clarify the relationship between BitMEX the trading platform, and an affiliated entity that engages in market making.

## ToS Update

*BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform.  The trading business primarily trades as a market maker. The trading business is organised to be separate and distinct from the platform business. Specifically, no front office personnel are shared between the trading business and the platform, the trading business operates from a separate physical location, and the trading business does not have access to any platform order flow, execution, customer or other information on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific BitMEX product, the trading business receives access and trading privileges only on the same terms as are available to any other user.*

## Why Market Make?

Early on we discovered that market makers are very fickle. They only want to invest the time connecting to a trading platform that already has flow. What they don't want to do is try out a new exchange where they must expend resources connecting only to have no takers. Given trades must be collateralised, this reduces their returns.

In order to entice others to provide liquidity, we funded an entity that would quote as soon as a new product listed. As the product became more liquid, this entity would scale back it's quotes and focus on another product with lower liquidity on the BitMEX platform.

Right now the activity of this affiliated entity is concentrated on the altcoin contracts. XBTUSD and the quarterly Bitcoin / USD futures contracts have plenty of liquidity, and new market makers join every day to beef up those orderbooks. Mission accomplished … for now.

Being able to immediately support a new and illiquid product allows us to experiment with products that other platforms without an anchor market maker cannot. It also speeds up the process to obtaining other 3rd party liquidity providers.

## How Do We Align Incentives?

The trading entity is a for-profit operation. However, their earnings are comprised of a service fee paid by the business, that is the BitMEX trading platform. In terms of trading PNL, the market making desk's goal is to be breakeven.

If the desk is making too much trading PNL, the business will instruct them to tighten spreads and increase size. As a franchise, BitMEX succeeds because of greater trading volumes, not because of the market making desk's trading PNL.

The market making desk earns the most if the exchange earns the most. That also means that dishonest and manipulative behaviour on the part of the market making desk is not tolerated. As you saw mentioned, the desk sits in a separate physical location. They also have no better information or access than any other trader on BitMEX. If traders feel that the platform is not fair, they will leave, and no one will get paid.

Our lead outside counsel is fully aware of the operation and advises us on best practices to ensure that we place the interests of BitMEX customers first.

## What Activities Does The Desk Engage In?

The primary trading activity is providing two-sided liquidity on selected BitMEX products. The desk's current focus is on increasing the liquidity on the altcoin contracts. The desk will also be the anchor market maker for the UPs and DOWNs products.

The desk also trades OTC with various counterparties globally.

As mentioned earlier, the desk does not engage in manipulative behaviour. The desk does not front-run customers. The desk does not manipulate either the market on BitMEX or the underlying exchanges for the purposes of stop loss hunting, or causing cascading margin calls.

None of this behaviour has occurred in the past, and if such behaviour is discovered, those responsible will be terminated immediately for cause.

## Who Runs The Desk?

The head trader is Nick Andrianov. He is a former Deutsche Bank equity flow and exotics options trader. Nick and I have known each other for over ten years. His integrity is unquestionable.

Nick receives the business objectives from various senior members of BitMEX. The business and the market making desk work closely with the express goal to make every single BitMEX product as liquid as possible.

## Financial Risks

Trading losses incurred by the market making desk will not affect the solvency of the BitMEX trading platform.

As stated above, the market making desk sits within a separate entity. Their goal is to provide liquidity to BitMEX and the wider crypto capital markets.

– Arthur Hayes, CEO and co-founder

———

**Related**



The BitMEX Insurance Fund
11 Feb 2019
In "Posts"

BitMEX Technology Scaling, Part 2:
The Road to 100x
23 May 2019
In "Engineering"



When Options? Part 1
13 Jan 2020
In "Crypto Trader Digest"

---

## Platform Status

| Status | Name |
|--------|------|
| ✅ Operational | BitMEX.Com |
| ✅ Operational | Testnet |
| ✅ Operational | Blog |
| ✅ Operational | E-Mails & Notifications Delivery |

View Status Page ↗

## Crypto Trader Digest:

## Bitcoin's most in-depth market analysis, commentary, and insights

Sign-up to receive the latest articles delivered straight to your inbox.

| Email |

Subscribe