Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs
BMA LLC, Yaroslav Kolchin,
Vitaly Dubinin, Dmitry Dolgov
and Păun Gabriel-Razvan

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan, <br><br> Plaintiffs, <br><br> v. <br><br> HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo and Samuel Reed, <br><br> Defendants. | Case No. 3:20-cv-3345-WHO <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO LIFT DISCOVERY STAY IN VIEW OF NEW FACTS AND OVERWHELMING "SMOKING GUN" EVIDENCE OF MARKET MANIPULATION AND MONEY LAUNDERING CONSPIRACY BETWEEN DEFENDANTS, A REED FAMILY MEMBER AND PROLIFIC AND BRAZEN MARKET MANIPULATOR BEN AABTC** <br><br> **Hon. William H. Orrick** <br> **Date: July 14, 2021** <br> **Time: 2:00 PM** <br> **Crtrm.: 2, 17th Floor** <br><br> **Discovery Cutoff: None Set** <br> **Pretrial Conference Date: None Set** <br> **Trial Date: None Set** |

## I. PLAINTIFFS ESTABLISHED PLAUSIBILITY OF THEIR CORE MARKET MANIPULATION CLAIMS

Cross-market manipulation occurs when a trader trades in one market for the purpose of manipulating the price of an asset in another market, capitalizing off the price-moving effects thus generated, instead of with the bona fide intent of profiting off the trade itself.

For example, in *SEC v. Lek Securities Corp*., 276 F. Supp. 3d 49, 57 (S.D.N.Y. 2017) SEC alleged a cross-market manipulation scheme, wherein "Avalon purchased and sold U.S. stock at a loss to move the prices of corresponding options, so that Avalon could make a profit by trading those options at prices that it would not otherwise have been able to obtain. The profits that Avalon achieved through its options trading more than offset the losses it sustained on its allegedly manipulative trading of stock. The SEC alleges that Avalon engaged in over 600 instances of cross-market manipulation through Lek between August 2012 and December 2015. The complaint describes in detail a specific example of Avalon's cross-market manipulation activity." *Id*.

A similar cross-market manipulation scheme was described by CFTC in the *In re Davis Ramsey*, CFTC No. 18-49, 2018 WL 4772228 (Sept. 27, 2018) (consent order) ("*Ramsey*"). *Ramsey* stated: "During the Relevant Period, Ramsey routinely purchased and sold Binary Contracts that referenced Futures as the Underlying through an account he held with Nadex, as well as through a second account that was held by a family member (the "Second Nadex Account" and collectively "Nadex Accounts"). In the Nadex Accounts, Ramsey traded, among other products, the US 500 Binary Contract, the Tech 100 Binary Contract, the Gold Binary Contract, and the Silver Binary Contract… On hundreds of occasions, Ramsey, while holding a position in one or more Binary Contracts, just prior to a Binary Contract Expiration, also placed trades in the corresponding Underlying Futures on CME. Ramsey entered into these transactions with the intent to influence the Futures prices that would be used to calculate the relevant Binary Contract Expiration Value."

Despite the current discovery stay and all evidence suppression efforts by Defendants, Plaintiffs have obtained undeniable evidence that an identical cross-market manipulation scheme

> **Oliver Knight** @KnightCoinRivet
>
> Sad to hear that @ActualAdviceBTC has passed away at such a young age. One of the few personalities on crypto Twitter I enjoyed following over the past five years.
>
> **His orchestrated pump from $6,800 in 2018 while posting $30m positions on BitMEX was heroic.**
>
> What a great shame.
>
> > **Romano** @RNR_0 · May 19, 2020
> > I'll miss you @ActualAdviceBTC
> >
> > You left your footprints here with glory.
> > You were a legend & real cult figure in crypto.
> > Show this thread
> >
> > My best friend here @ActualAdviceBTC died today.
> >
> > He was a legend & a real cult figure in crypto. But he was also like the older brother I never had.
> >
> > We've been friends since 2013, back when I was 16/17-year-old nobody, and things instantly clicked when I met him in real life in 2017 in Amsterdam.
>
> 4:28 PM · May 19, 2020 · Twitter Web App

was executed on BitMEX of a continuous basis. SACC ¶ 466-471. Defendants' co-conspirator Ben Aabtc engaged in cross-market manipulation on BitMEX (first market) and price-forming

> **Romano** @RNR_0 · Apr 30, 2020
> In the end surely BTC is programmed to go up. But price can be manipulated
>
> **I was in Thailand, sitting in @ActualAdviceBTC room and actually see him pump BTC up several hundred dollars, liquidating bears and laughing**
>
> All that while knowing he had to attend a funeral in few hours

"reference" spot exchanges (second market). Specifically, Ben Aabtc "pumped" bitcoin price on reference "spot exchanges" while holding multiple open $30,000,0000 perpetual swap positions on BitMEX.

> **Thread**
>
> **TheBoot**
> @TheBootMex
>
> RIP @ActualAdviceBTC . You are always in my memory- back in April 2018 I was ultra rekt left with only 0.6btc followed by best winning streak ever – *went from 0.6 to 60btc in 10 days. At the time aabtc was trying to pump the market with all the force he had. I bought in and...*
>
> 3:21 PM · May 19, 2020 · Twitter Web App

The use of trading strategies similar to that employed by Respondents in the above-cited SEC and CFTC actions as well as Defendants and Ben Aabtc, i.e., engaging in a significant amount of trading activity (e.g. pumping bitcoin price on "reference" spot exchanges), at a specific time, for the purpose of benefitting a related position (e.g. multiple open $30,000,0000 perpetual swap positions on BitMEX), has been previously recognized as a manipulative device. See, e.g., *In re Total Gas & Power North America, Inc.*, CFTC No. 16-03, 2015 WL 8296610, at *9 (Dec. 7, 2015) (consent order) (finding "Respondents intentionally employed a manipulative device by purchasing and/or selling large volumes of fixed-price natural gas at the relevant hubs before and during bid-week that were intended to benefit . . . related financial positions"); *In re JPMorgan Chase Bank, N.A.*, CFTC Docket No. 14-01, 2013 WL 6057042, at *11 (Oct. 16, 2013) (consent order) (finding respondents used a manipulative device where "[t]he size and timing of [the] traders' transactions during [a] concentrated period was calculated to defend the position of [a portfolio] just prior to [a] month-end review"); *DiPlacido*, 2008 WL 4831204, at *46 (affirming ALJ findings that respondent engaged in manipulation and attempted manipulation in violation of Sections 6(c) and 9(a)(2) of the act by trading of electricity futures contracts during the settlement period to influence the settlement price of the contracts and benefit a related position.); *In re Davis Ramsey*, CFTC No. 18-49, 2018 WL 4772228 (Sept. 27, 2018) (consent order) (finding respondent used a manipulative device where to achieve his ultimate goal of causing certain binary contract expiration values (first market) to be calculated in his favor, respondent engaged in trading activity on CME (second market) with the objective and specific intent to cause a favorable price impact in the futures market).

As plausibly alleged in the Second Amended Consolidated Complaint ("SACC"), Defend-



ants undeniably knew of and actively participated in this cross-market manipulation scheme.

First, all individual Defendants provably closely interacted with Ben Aabtc face to face and even considered him to be a "true friend" and a legend. This clearly shows that this market manipulator was part of their "inner circle." SACC ¶ 466-471.

Second, Defendants opened multiple $30,000,000 perpetual positions for him, which



CONSENSUS LAW
CRYPTOCURRENCY ATTORNEYS

would necessarily require approval at the very top of BitMEX, in disregard all position limits. This shows that Defendants clearly knew exactly what he was doing.

Third, Defendants placed Ben Aabtc on their leaderboard advertising him to the public as one of BitMEX's top traders with full knowledge that his remarkable "trading success" was actually the result of the illegal cross-market manipulation.

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Hot-Relic-Fancier | 4,196.9329 XBT | ✗ |
| 2 | Heavy-Autumn-Wolf | 3,596.7630 XBT | ✗ |
| 3 | Green-Sky-Whip | 1,101.4551 XBT | ✗ |
| 4 | Cream-White-Ox | 906.6117 XBT | ✗ |
| 5 | Thorn-Moor-Braid | 878.7421 XBT | ✗ |
| 6 | Xzcxcxz | 828.6553 XBT | ✓ |
| 7 | Silent-Plume-Otter | 669.8737 XBT | ✗ |
| 8 | Truth-Bitter-Runner | 586.1175 XBT | ✗ |
| 9 | Almond-Cookie-Soarer | 541.1664 XBT | ✗ |
| 10 | aabtc | 534.3252 XBT | ✓ |
| 11 | Splash-Petal-Jackal | 510.5438 XBT | ✗ |
| 12 | Coffee-Brown-Thorn | 481.2309 XBT | ✗ |
| 13 | ahhereLIO | 461.2755 XBT | ✓ |
| 14 | Taylor | 452.7239 XBT | ✓ |
| 15 | Cedar-Spice-Fisher | 407.6904 XBT | ✗ |
| 16 | Rag-Equinox-Eater | 403.1834 XBT | ✗ |
| 17 | Paint-Mercury-Face | 384.9927 XBT | ✗ |
| 18 | Prism-Fate-Slicer | 370.1898 XBT | ✗ |
| 19 | daniel3 | 345.6583 XBT | ✓ |
| 20 | Marble-Hollow-Seeker | 336.6878 XBT | ✗ |
| 21 | Navy-Midnight-Servant | 335.6627 XBT | ✗ |
| 22 | Quick-Grove-Mind | 316.1076 XBT | ✗ |
| 23 | Silent-Hurricane-Guardian | 311.5210 XBT | ✗ |
| 24 | Grove-Cosmic-Bite | 307.4127 XBT | ✗ |
| 25 | Neon-Marsh-Raver | 304.3723 XBT | ✗ |

In view of this overwhelming evidence, Defendants' denials of the knowledge of and participation in the cross-market manipulation run by Ben Aabtc is simply implausible. In fact, the entire Twitter knew that Ben Aabtc was "heroically" pumping and dumping markets on BitMEX, while being called a "legend" and "true friend" by Defendants. It shakes the conscience and stretches credibility to argue that Defendants suspected nothing illegal.

What Plaintiffs have discovered is a classic example of a cross-market manipulation scheme. See, for example: *In re Avista Energy, Inc.*, CFTC Docket No. 01-21, 2001 WL 951736 (Aug. 21, 2001) (Avista Energy held over-the-counter derivative contracts, the value of which was based on the settlement price of electricity futures contracts on the last day of options trading

for the contracts. The CFTC alleged that Avista Energy created artificial settlement prices in the futures contracts in order to benefit its holdings by (i) placing large orders to sell futures contracts at prices less than the prevailing bids during the last two minutes of trading on the last day of options trading for the contracts and (ii) placing large orders to buy futures contracts at prices higher than the prevailing offers during the last two minutes of trading on the last day of options trading. Avista Energy agreed to a settlement based on charges of attempted manipulation, manipulation, non-competitive trading, and recordkeeping violations (neither admitted nor denied), pursuant to which it paid a civil monetary penalty of $2.1 million.); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F.Supp. 2d 523 (S.D.N.Y. 2008) (The CFTC sued a hedge fund that traded both natural gas futures contracts and over-the-counter natural gas swaps, alleging that the defendant sought to profit from large short positions on natural gas swaps – the prices of which depended on the closing price of natural-gas futures – by manipulating the closing price of natural-gas futures. The defendant allegedly purchased a substantial number of futures contracts leading up to the closing range on expiration day and then sold those contracts several minutes before the close. The goal was to create artificial prices of natural-gas futures contracts by deliberately selling a substantial number of futures contracts during the close on expiration day. Amaranth agreed to a settlement based on charges of attempted manipulation and making material misrepresentations in violation of CEA §§ 6(c), 6(d) and 9(a)(2) without admitting nor denying and to pay a civil monetary penalty of $7.5 million.).

    The above facts clearly establish plausibility of Plaintiffs' price manipulation claims alleged in the SACC and need the discovery to prove their case.  This is exactly what the Honorable Court asked of Plaintiffs in its last ruling and Plaintiffs have delivered it in earnest.  SACC ¶ 466-471.

    In their Opposition, Defendants inaptly argue that the above evidence is not tied to the specific Plaintiffs' losses.  This argument is without merit.  The fact that a thief stole on Friday clearly makes it plausible that he also stole on Monday.  Plaintiffs clearly "nudged their claims … across the line from conceivable to plausible" and are in need of a discovery device to determine the full extent of the misconduct that took place on the BitMEX and to prove their case with hard

data. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

## II. REMAINING ARGUMENTS IN DEFENDANTS' MOTION TO DISMISS ARE MERITLESS

### A. Fraudulent Solicitation Claims By Misrepresenting Liquidity

To lure unsuspecting traders, for nearly three years Defendants falsely advertised their trading services as providing "1500% More Bitcoin/USD liquidity than any other platform" ("Liquidity Representation.") SACC ¶ 525. After this lie was exposed by Plaintiffs' counsel in a related matter, Defendants hastily changed their website to simply read "Highly Liquid Markets," which confirmed that the original statement was false, SACC ¶ 537, Ex. 20. By the time of the removal of the Liquidity Representation, BitMEX was number eight (!) among exchanges by both the trading volume and open interest, which makes it clear that the accuracy of that statement was never monitored or even checked by Defendants. SACC ¶ 537, Ex. 20. Just as Defendants intended, Plaintiffs relied on this falsehood when deciding to trade on BitMEX, deposit their bitcoins, and pay trading commissions to Defendants.

In their Motion to Dismiss, Defendants grew so desperate to fight these very plausible allegations of the SACC that they try to improperly sneak in a blog post "OKEx vs BitMEX: Perpetual Swap Trading Liquidity", which was referenced absolutely *nowhere* in the SACC. Motion to Dismiss, p. 19. Defendants fail to explain where this post came from and how they found it, except stating that "Attached hereto as Exhibit C is a true and correct copy of a blog post posted by OKEx on October 11, 2019 entitled OKEx vs. BitMEX: Perpetual Swap Trading Liquidity. This blog post is publicly available at https://medium.com/okex-blog/okex-vs-bitmex-perpetual-swaptrading-liquidity-c0b864cc8e3e (last visited June 21, 2021)." Hibbard Decl. ¶ 4. It is axiomatic that on a Motion to Dismiss no extrinsic evidence is permitted. Defendants have evidently forgotten this basic rule.

Moreover, Defendants are trying to use hearsay statements contained in that article for their truth (e.g. that BitMEX's trading volume was more than 15x higher than OKEx's), which is again highly improper. Motion to Dismiss, pp. 19-20. "While the Court took judicial notice of

the website attached to the Declaration of Stephen Paffrath, it cannot take judicial notice that the content of the website is true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). To accept the content for the truth of the matter asserted would be improper hearsay. See Fed. R. Evid. 801(c)(2), 802; *DMC Closure Aversion Comm. v. Goia*, No. 14-CV-03636-WHO, 2014 WL 4446831, at *8 n.12 (N.D.Cal. Aug. 29, 2014) ("[P]laintiffs' attempt to request judicial notice of newspaper articles and other media accounts a[re] improper hearsay.").

Furthermore, in their argument to the Court, Defendants try to sneak in yet another highly improper and, in fact, extrinsic and materially false fact that "platform's daily, monthly, and annual trading volume, [is] another and more widely used measure of liquidity." Motion to Dismiss, p. 17.  This improper and, in fact, false fact appears nowhere in the SACC.  In fact, even the blog post Defendants are seeking to improperly introduce says exactly the opposite, by stating: "Bid/Ask Spread … is the de facto measure of market liquidity," as opposed to the trading volume, as Defendants falsely tell the Court without any support from the record what so ever. Hibbard Decl., Ex. C.  Thus, Defendants have no other choice but to misrepresent to the Court what the blog posts actually says.

Additionally, in desperately trying to find at least some plausible facts supporting their clearly false liquidity claim, in their Motion to Dismiss, Defendants hinted that HDR used *trading volume* to calculate the relative liquidity by arguing that "BitMEX's XBTUSD market is the most liquid in the world"—appeared directly below figures reflecting the platform's daily, monthly, and annual trading volume, *another and more widely used measure of liquidity*." Motion to Dismiss, p. 17.  Setting aside the improper introduction of this false and completely extrinsic fact into the Motion to Dismiss, this eleventh hour theory does not explain the fact that HDR kept the liquidity representation on its website until March 9, 2021, by which time BitMEX was number eight among exchanges by both the trading volume and open interest. SACC ¶ 537, Ex. 20.  In other words, if BitMEX acted honestly (even though incompetently) and indeed used trading volume (bad measure of liquidity) for its liquidity calculations, then the Liquidity Representation

should have been removed from BitMEX's website much, much earlier than when BitMEX fell to number eight by trading volume and open interest and been sued for fraud based on this very Liquidity Representation, SACC ¶ 537, Ex. 20.  This did not happen.  Thus, the most likely expla-



nation for all the above facts is that HDR *never* calculated any liquidity and the aforesaid Liquidity Representation was made by HDR with at least reckless disregard for its truth or falsity, or more likely fraudulently.  This is the reasonable inference that Court is obligated to draw from all the above facts and Defendants' inapt arguments.  *Western Reserve Oil & Gas Co. v. New*, 765

1  F.2d 1428, 1430 (9th Cir.1985) ("On a motion to dismiss for failure to state a claim, the court
2  must presume all factual allegations of the complaint to be true and draw all reasonable inferences
3  in favor of the nonmoving party.")
4      Moreover, this conclusion is completely consistent with the trading volume data from the
5  Relevant Period, on which Defendants appear rely in their Motion to Dismiss, which shows the
6  relative trading volume between BitMEX and competing exchanges during Relevant Period.
7  Based on this data, BitMEX trading volume was on par with the competition during the Relevant



19  Period and there is simply no way BitMEX could have provided 1500% (or 16 times) more li-
20  quidity than competition during the Relevant Period, even if the liquidity was calculated using the
21  trading volume data, as Defendants appear to have suggested.  Based on the above information,
22  the falsity of Defendants representation of providing 1500% more liquidity than competing ex-
23  changes is obvious.
24      Yet furthermore, CFTC Complaint, SACC Ex. 5, ¶ 50, alleges that the Insider Trading
25  Desk of HDR was often times the largest trader on the BitMEX platform by trading volume.
26  Thus, simply relying on the aggregate trading volume in determining the relative exchange liquid-
27  ity, as Defendants themselves suggested in their Motion to Dismiss they did, without telling the
28  public that much of that trading volume was self-generated, would clearly amount to intentionally

misleading the public.  Thus, if Defendants simply used the trading volume to calculate liquidity, as they suggested in their own Motion to Dismiss, without making appropriate adjustments for the self-generated volume attributable to its trading desk, this would constitute further acts of fraud.

Thus, it would be very helpful to the resolution of the Motion to Dismiss to obtain from Defendants through discovery their actual calculations of liquidity that they supposedly used in support of their suspect liquidity claims.

### B. Fraudulent Solicitation Claims By False Warranty and Representation and Omission

Defendants essentially fail to challenge Plaintiffs' fraudulent solicitation by false warranty and representation claims by only arguing that "to the extent the Plaintiffs offer any additional allegations in support of their allegations, made on "information and belief," that Defendants' trading activities caused Plaintiffs' bitcoin losses, those allegations are either conclusory, duplicative of the "means, motive, and opportunity" arguments previously rejected by this Court, or both." Motion to Dismiss, p. 16.  This superficial and undeveloped argument is meritless as "[o]n a motion to dismiss for failure to state a claim, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir.1985).

Moreover, Defendants completely fail to address the fraudulent solicitation by omission claims, waiving all their arguments.  The remaining Defendants' arguments are cursory and undeveloped and therefore waived.

### III.   CONCLUSION

The new and very detailed factual allegations of the SACC and the above clear facts of cross-market manipulation by Defendants and prolific market manipulator Ben Aabtc, together with very detailed allegations explaining exactly how Defendants' undisclosed Insider Trading Desk used automated software tools, sensitive insider information of Plaintiffs and other traders and strategic server freezes to automatically manipulate markets on BitMEX and "reference" spot exchanges and intentionally liquidate traders, including Plaintiffs, SACC ¶¶ 229-317, makes even

partial success of Defendants' motion to dismiss highly doubtful.  Accordingly, for all the foregoing reasons, Plaintiffs respectfully request the Honorable Court to lift the current discovery stay and allow the discovery to proceed.

Dated:  June 29, 2021

Respectfully submitted,

By: _____
Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io
Attorneys for Plaintiffs
BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan