Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Ave Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BMA LLC, Yaroslav Kolchin, Vitaly Dubinin, Dmitry Dolgov and Păun Gabriel-Razvan, <br><br> Plaintiffs, <br><br> v. <br><br> HDR Global Trading Limited (A.K.A. BitMEX), ABS Global Trading Limited, Arthur Hayes, Ben Delo, Samuel Reed, <br><br> Defendants. | Case No.  3:20-cv-3345-WHO <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT** <br><br> **Hon. William H. Orrick** <br> **Date: August 25, 2021** <br> **Time: 2:00 PM** <br> **Crtrm.: 2, 17th Floor** <br><br> **Discovery Cutoff: None Set** <br> **Pretrial Conference Date: None Set** <br> **Trial Date: None Set** |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. STATEMENT OF THE RELEVANT FACTS ................................................................. 1

III. LEGAL STANDARD ........................................................................................................ 1

IV. ANALYSIS ......................................................................................................................... 2

   A. Defendants' Improper Use of Extrinsic and Even False Facts and Evidence ..................... 2

   B. Defendants' Improper Challenges To Plaintiffs' Factual Allegations, Which Must Be
Taken As True At MTD Stage ............................................................................................. 6

   C. Defendants' False Characterization Of Plaintiffs' Direct, Positive Allegations As Having
Been Made On "Information And Belief" ........................................................................... 7

   D. Defendants' Improper References To Perceived Inconsistencies With Prior Pleadings ... 10

   E. Defendants' Mischaracterization Of Plaintiffs' Damages As "Benefit Of The Bargain"
Damages ............................................................................................................................. 11

   F. Defendants' Baseless Attacks On Integrity Of Plaintiffs' Counsel ................................. 12

   G. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent
Solicitation By False Warranty and Representation ......................................................... 12

      1. Material Misrepresentation ........................................................................................ 13

      2. Scienter ...................................................................................................................... 14

      3. Connection with purchase of a swap .......................................................................... 15

      4. Reliance (transactional causation) ............................................................................. 15

      5. Economic Loss ........................................................................................................... 15

      6. Loss causation (proximate causation) ........................................................................ 16

   H. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent
Solicitation By Misrepresenting Liquidity on BitMEX ................................................... 18

      1. Material Misrepresentation ........................................................................................ 18

2. Scienter ..................................................................................................... 19

3. Connection with purchase of a swap .......................................................... 19

4. Reliance (transactional causation) ............................................................. 20

5. Economic Loss ......................................................................................... 20

6. Loss causation .......................................................................................... 20

I. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent Solicitation By Fraudulent Omission ................................................................................. 21

1. Scienter ..................................................................................................... 21

2. Reliance .................................................................................................... 22

3. Loss causation .......................................................................................... 22

J. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Price Manipulation ............................................................................................................................ 22

K. SACC Alleges A Viable Cause Of Action For Aiding and Abetting ................................ 25

L. SACC Alleges Viable Causes Of Action For Violation Of RICO ..................................... 26

M. SACC Alleges A Viable Cause Of Action For Fraud Based On False Warranty And Representation ......................................................................................................................... 27

1. Misrepresentation ..................................................................................... 28

N. SACC Alleges A Viable Cause Of Action For Fraud Based On Misrepresentation Of Liquidity On BitMEX ............................................................................................................. 29

1. Misrepresentation ..................................................................................... 29

O. SACC Alleges A Viable Cause Of Action For Fraud Based On Concealment Of Material Facts ....................................................................................................................................... 33

P. SACC Alleges Viable Causes Of Action For Unfair Competition And False Advertising ............................................................................................................................... 34

Q. The Remaining Causes Of Action Are Also Viable ......................................................... 36

V. CONCLUSION ................................................................................................................... 36

# TABLE OF AUTHORITIES

**CASES**

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741

    (1972) ......................................................................................................................... 22

*Alliance Mortg. Co. v. Rothwell* (1995) 10 Cal. 4th 1226 ..................................................... 11, 12

*Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"),

2011 WL 2111796 (N.D. Cal. May 26, 2011) ...................................................................... 36

*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039 ........................................................................ 28

*Bock v. Hansen* (2014) 225 Cal.App.4th 215 ............................................................................. 27

*Burton v. Label, LLC*, 344 F. Supp. 3d 680 (S.D.N.Y. 2018)......................................... 2, 7, 29, 33

*Careau & Co. v. Security Pacific Business Credit* (1990) 222 Cal.App.3d 1371 ....................... 28

*Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381 (N.D. Cal. Jan. 10, 2011)........... 36

*Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001) ........................................................ 26

*CFTC v. Eox Holdings, L.L.C.*, 405 F. Supp. 3d 697 (S.D. Tex. 2019) ...................................... 21

*Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111 (N.D.Cal.2010) ............................ 14, 19, 35

*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217................................................. 27, 28, 34, 35

*Chaves v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359 (9th Cir. 2009)........................ 36

*Coto Settlement v. Eisenberg*, 593 F.3d 1031 (9th Cir. 2010) ...................................................... 3

*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951 ..................................... 27, 34

*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498 .................................................... 33

*Hinojos v. Kohl's Corp.*, 718 F. 3d 1098 (9th Cir. 2013)........................................................... 36

*In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................. 25

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .......................... 25

*In re Chrysler-Dodge-Jeep Ecodiesel Marketing*, 295 F.Supp.3d 927 (N.D. Cal. 2018)............. 15

*In re Commodity Exch.*, Inc., 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ......................................... 22

*In re Nat. Gas Commodity Litig.*, 358 F.Supp.2d 336 (S.D.N.Y. 2005)....................................... 23

*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ............................... 25

*In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ... 23

*In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020)... 24

*In re Tobacco II Cases* (2009) 46 Cal.4th 298 ............................................................................ 34

*In re Tracht Gut, LLC*, 836 F.3d 1146 (9th Cir. 2016) ......................................................... 1, 6, 9

*Karedes v. Ackerly Grp., Inc.*, 423 F.3d 107 (2d Cir. 2005)........................................ 2, 7, 29, 33

*Kashin v. Hershey Co.*, 2012 WL 5471153 (N.D. Cal. Nov. 9, 2012 .......................................... 36

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ......................................... 3, 4

*Klein & Co. Futures, Inc. v. Bd. of Trade of the City of New York*,

464 F.3d 255 (2d Cir. 2006)....................................................................................................... 21

*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310 ............................................................ 28

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ............................................................. 1

*LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326 ............................................................... 21, 33

*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 ............................................................................. 33

*Montich v. Miele USA, Inc.,* 849 F. Supp. 2d 439 (D.N.J. 2012)................................................ 33

*Odom v. Microsoft Corp.,* 486 F.3d 541 (9th Cir. 2007) ............................................................ 26

*PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856 (9th Cir. 2007) ........................................ 10

*PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856 (9th Cir. 2007) ........................................ 10

*Reddy v. Litton Indus., Inc.*, 912 F.2d 291 (9th Cir. 1990) ....................................................... 10

*Ross v. Bank S., N.A.*, 885 F.2d 723 (11th Cir. 1989) ............................................................... 22

*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167 .............................................................. 27

*Stout v. Turney* (1978) 22 Cal.3d 718 ........................................................................................ 11

*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153....................................... 27

*U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.,*

894 F.3d 1313 (11th Cir. 2018)................................................................................................. 16

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ................................................................. 3

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.2003) ........................................ 13

*Waters v. Int'l Precious Metals Corp.*, 172 FRD 479 (S.D. Fla. 1996) ................................... 16, 22

*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 ................................ 27

*Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428 (9th Cir.1985) ....................................... 32

**STATUTES**

17 C.F.R. § 180.1 ......................................................................................... 21

18 U.S.C. § 1961 ........................................................................................... 26

7 U.S.C. § 25 .......................................................................................... 21, 25

Cal. Bus. & Prof. Code § 17200 ........................................................... 34, 35

Cal. Bus. & Prof. Code § 17204 ................................................................. 35

Cal. Bus. & Prof. Code § 17500 ................................................................. 34

Cal. Civ. Code § 1709 ................................................................................. 35

Fed. R. Civ. P. 12 .......................................................................................... 1

Fed. R. Evid. 201 ....................................................................................... 4, 5

# I.    INTRODUCTION

In their Motion to Dismiss ("MTD") Defendants: 1) improperly seek to introduce extrinsic and even false facts and evidence prohibited on the MTD stage; 2) improperly challenge Plaintiffs' version of facts, which must be taken as true on the MTD stage; 3) falsely mischaracterize to the Honorable Court Plaintiffs' *direct*, *positive* allegations as having been made on "information and belief"; 4) continuously use improper references to the inapplicable "sham pleadings" doctrine to try to undermine Plaintiffs' plausible allegations; 5) improperly mischaracterize Plaintiffs' damages as "benefit of the bargain" damages; and 6) baselessly attack integrity of Plaintiffs' counsel.  Thus, Defendants' MTD is entirely without merit and must be denied.

# II.    STATEMENT OF THE RELEVANT FACTS

For the statement of the relevant facts, Plaintiffs respectfully refer the Honorable Court to the Second Amended Consolidated Complaint ("SACC") ¶¶ 1-13 and 228-317 (describing market manipulation activities, informational and trading advantages and automated software tools of Defendants' Insider Trading Desk).

As before, Defendants continue to argue that Plaintiffs "got the wrong guys" and Plaintiffs' losses were caused by "market moves."  This argument is meritless.  Ex. A summarizes overwhelming evidence conclusively proving that Defendants and their co-conspirators deliberately engaged in illicit cross-market manipulation (e.g. "pumps and dumps") on BitMEX that resulted in Plaintiffs' losses.  Thus, Defendants' "you got the wrong guys" argument is false.

# III.    LEGAL STANDARD

"At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff."  *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).  Court may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). When "matters outside the pleading are presented to and not excluded by the court," the 12(b)(6) motion converts into a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Then, both parties must have the opportunity "to present all the material that is pertinent to the motion." *Id.*

Proving falsity "typically requires discovery" and is not resolved at the pleading stage. See, e.g., *Karedes v. Ackerly Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (citation omitted); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699-700 (S.D.N.Y. 2018) ("Whether the statements are in fact false remains to be seen, and must await discovery.").

## IV.    ANALYSIS

Being unable to fight fairly and on the merits, Defendants are using six highly improper and sneaky litigation tactics to try to fight very detailed and complete allegations of the SACC. These techniques include: 1) improper introduction of extrinsic facts and evidence prohibited on the MTD stage; 2) improperly challenging Plaintiffs' version of facts, which must be taken as true on the MTD stage, no matter how unlikely; 3) falsely mischaracterizing to the Honorable Court Plaintiffs' *direct*, *positive* allegations as having been made on "information and belief"; 4) continuously using improper references to the inapplicable "sham pleadings" doctrine to try to undermine Plaintiffs' plausible allegations; 5) falsely mischaracterizing Plaintiffs' damages as "benefit of the bargain" damages; and 6) baselessly attacking the integrity of Plaintiffs' counsel.  The instances of use of these highly improper arguments in Defendants' MTD are so numerous, that Plaintiffs will address them first, such that each of these improper tactics will be discussed in turn, and then specific clauses of action will be analyzed based on the applicable legal standards.

### A.    Defendants' Improper Use of Extrinsic and Even False Facts and Evidence

Throughout their MTD, Defendants are using loads of improper and even false facts and evidence to try to challenge Plaintiffs' well-pleaded factual allegations.  This is, of course, highly improper.  For example, at page 17 of the MTD, Defendants state the following facts: "'BitMEX's XBTUSD market is the most liquid in the world'—appeared directly below figures reflecting the platform's daily, monthly, and annual trading volume, another and more widely used measure of liquidity. See SACC Ex. 20… Furthermore, users had, at all times, real-time access to 24-hour volume figures for each derivative product available on BitMEX via the trading interface, as well as other indicators of market liquidity, including 24-hour open interest, the order book, and order book depth, all of which allowed users to constantly assess the market's liquidity as they traded. SACC Ex. 20. Plaintiffs cannot plead a material misrepresentation when they had

full access and information to assess the statement themselves." The above facts are found no-where in the SACC and are completely extrinsic and, in fact, largely false. For example, contrary to Defendants' false assertion, trading volume is not a "more widely used measure of liquidity." SACC Ex. 20 relied upon by Defendants does not show what Defendants claim. In reality, Plain-tiffs did not have access to any of the information that Defendants claim. Thus, all these facts cannot be considered by the Court and must be stricken from the MTD. In any event, Defend-ants' arguments are directed at reasonableness of Plaintiffs' reliance, which is a question of *fact* and which cannot be decide on MTD stage.

As another example, at page 19 of the MTD, Defendants argue that "bid-ask spread data ... provided by OKEX cryptocurrency derivative exchange" that Plaintiffs rely upon, and thus in-corporate by reference, in the SACC. See SACC ¶ 527; Ritchie, 342 F.3d at 908. The data refer-enced by the SACC comes from marketing materials published by OKEx on October 11, 2019. See Hibbard Decl., Ex. C." This is again false, as SACC does not have any such incorporation by reference and does not even mention the above blog post that Defendants are trying to sneak in. Defendants fail to explain how they found it and why they think Plaintiffs relied on it. Accord-ingly, these facts and the blog post "OKEx vs. BitMEX: Perpetual Swap Trading Liquidity," Hib-bard Decl., Ex. C, cannot be considered by the Court and must be stricken from the MTD.

In *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003), the case Defendants appear to re-ly upon, Ninth Circuit said that a defendant may seek to incorporate a document into the com-plaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 907. In *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018) the Court explained: "[h]ow "extensively" must the complaint refer to the document? This court has held that "the mere mention of the existence of a document is insuf-ficient to incorporate the contents of a document" under *Ritchie*. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *Ritchie*, 342 F.3d at 908-09). A more difficult ques-tion is whether a document can ever "form[] the basis of the plaintiff's claim" if the complaint does not mention the document at all." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018).

Here, the SACC never even mentions the blog post, Hibbard Decl., Ex. C, that Defendants seek to introduce. Moreover, this blog post clearly does *not* form *basis* of the Plaintiffs' claims, which are directed at completely different activities not described in the subject blog post at all. Therefore, incorporation by refence of the blog post "OKEx vs. BitMEX: Perpetual Swap Trading Liquidity," Hibbard Decl., Ex. C, under these circumstances is inappropriate. *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018).

In connection with the same blog post "OKEx vs. BitMEX: Perpetual Swap Trading Liquidity," Hibbard Decl., Ex. C, Defendants continue on to argue: "That post acknowledges 'BitMEX's dominance in' the perpetual swap trading market space, that 'BitMEX is leading the crypto derivatives market,' and that BitMEX's trading volume was more than 15 times higher than OKEx's during the time period evaluated. OKEx, Oct. 11, 2019 ('BitMEX beats OKEx with a remarkably high average of $159M ...; while OKEx's volume averaged at $10M'). The post also touted that an analysis of the '6-mins-bid/ask-spread data from Aug. 15–21, 2019 of OKEx and BitMEX' showed that 'BitMEX's spread varies from -5.5 to -0.5, and the average is -0.51; while OKEx's spread varies from -8.8 to 0, with an average of -0.14'—the precise numbers alleged in Plaintiffs' SACC. But these numbers reflect the bid-ask spread for August 15–21, 2019 (dates which post-date all of Plaintiffs' deposits, SACC ¶ 475, and losses, id. ¶ 476), not for the Relevant Period identified in this case (or in BMA)." But Defendants are seeking to use the improperly introduced blog post for its truth, relying on the specific numbers stated therein. On the other hand, the numbers that Defendants are seeking to use are not "generally known within the trial court's territorial jurisdiction" and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," making the blog post not judicially noticeable under Fed. R. Evid. 201. Thus, the corresponding portion of the MTD must be disregarded.

At page 19 of the MTD, Defendants again improperly argue that: "those exchanges did not even begin offering perpetual swap contracts like those allegedly traded by Plaintiffs here until after [October 2018]." This fact never appears anywhere in the SACC and, therefore, Defendants are seeking to improperly introduce two blog posts, Hibbard Decl., Ex. D and Ex. E. containing the purported launch dates for the corresponding products. This is a textbook impropriety.

The dates that Defendants are seeking to use are not "generally known within the trial court's territorial jurisdiction" and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Therefore, judicial notice of those dates is inappropriate under Fed. R. Evid. 201. Thus, the corresponding portion of the MTD must be disregarded.

Moreover, Defendants' false claim of providing 1500% more liquidity did not limit itself to just perpetual swaps, but simply referred to "Bitcoin / USD liquidity", which covers liquidity in futures as well as spot bitcoin markets, both of which were offered by all the industry players at the relevant time. Therefore, Defendants' argument with the respect to the perpetual swaps launch date on other exchanges is largely irrelevant and was designed to distract the Honorable Court.

At page 23 of the MTD, Defendants argue that "SACC still alleges that third parties engaged in price manipulation. E.g., SACC ¶ 643 ('Defendants knew that BitMEX Leaderboard trader with assumed name Quick-Grove-Mind was clearly a notorious market manipulator,' and that 'Quick-Grove-Mind ... cause[d] large market price swings')." Thus, Defendants are again arguing that it was third parties who engaged in market manipulation, forgetting that SACC ¶ 19 clearly alleges: "Plaintiffs are informed and believe and thereon allege that the Leaderboard account under the assumed name Quick-Grove-Mind was a market manipulation winner account used by one of the individual Defendants Hayes, Delo or Reed, who traded on BitMEX despite having a clear conflict of interest." Thus, Quick-Grove-Mind *is* Defendants and Defendants' argument is again without merit. The same goes for Ben Aabtc, SACC ¶¶ 468–469, who was alleged to have been a co-conspirator and agent of Defendants, who acted in furtherance of the conspiracy and whose actions are thus attributable to Defendants themselves. Moreover, Defendants are charged with aiding and abetting Ben Aabtc in Counts VIII and XXXI.

Finally, at page 20, Defendants claim that SACC alleges that "BitMEX was the 'largest crypto exchange, by volume, in the world.'" SACC ¶ 115. But from reading its context, it is apparent that this self-serving statement came from an old LinkedIn profile of one of BitMEX's own employees and, as such, it carries no weight and must be also disregarded.

## B. Defendants' Improper Challenges To Plaintiffs' Factual Allegations, Which Must Be Taken As True At MTD Stage

Defendants also appear to challenge Plaintiffs' factual allegations contained in the SACC, which is again improper because in ruling on MTD, the "Court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

For example, at page 28 of the MTD, Defendants argue that: "Plaintiffs' claim that they suffered these losses because of Defendants' conduct is entirely implausible. Indeed, just paragraphs before Plaintiffs claim that they would have deposited their bitcoins "in interest-bearing accounts" if they did not trade on BitMEX, Plaintiffs expressly allege that they were looking to "profit[] ... from cryptoderivative trading." SACC ¶ 526 (emphasis added)."

This argument implies that Plaintiffs' allegation in SACC ¶ 526 that had "Plaintiffs not deposited their valuable bitcoins with BitMEX, as they did in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, they would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon" is not true. But in ruling on MTD, the Court must accept as *true* all facts alleged in the complaint and draw all reasonable inferences in *favor* of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). Accordingly, Defendants' argument is improper. In any event, question of how Plaintiffs would have used their bitcoins, absent Defendants' fraud is a question of fact, individual to each Plaintiff, and not suitable to adjudication at the MTD stage. Factual disputes cannot be resolved on MTD.

At pages 17-20 of the MTD, Defendants appear to take an issue with Plaintiffs' factual allegation in the SACC ¶ 527 that the representation of providing "1500% More Bitcoin/USD liquidity than any other platform" was false during the entire relevant period, SACC ¶ 527. Specifically, SACC ¶ 527 alleges:

> However, in truth and in fact, the aforesaid representations regarding available liquidity on BitMEX made by Defendants were intentionally and materially false during the entire Relevant Period. In reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained its top position. For example, analysis of bid-ask spread data from the Relevant Period provided by OKEX cryptoderivative exchange has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask

spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%). Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX. Therefore, in truth and in fact, liquidity on BitMEX was not any higher than on several competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely claimed to fraudulently solicit Plaintiffs' business. Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period.

SACC ¶ 537 further alleges:

Moreover, at the end of 2018, a former high-ranking employee of BitMEX repeatedly informed Defendants that the aforesaid representations regarding available liquidity on the BitMEX platform were in fact false and requested their removal from the front page of the BitMEX website, which Defendants deliberately refused to do, because they wanted to continue deceiving traders by promising them liquidity they did not have. Furthermore, on or about October 3, 2019, Defendants removed words "than any other platform," evidencing the fact that Defendants deliberately tried to make the aforesaid representations regarding available liquidity on BitMEX vaguer, which further establishes that Defendants knew that they were false as written. Yet furthermore, Defendants continued to use these false representations regarding available liquidity on the BitMEX platform on the front page of their website, front and center, until as late as March of 2021, by which time BitMEX fell to the number eight spot in cryptoderivative exchange rankings, and abruptly removed those false representations promising 1500% more liquidity than other exchanges, only after they were mentioned in related Court cases. This further establishes that Defendants' fraud was deliberate.

Without citing a single Court decision, Defendants frivolously claim that these allegations are not sufficient to plead falsity of Defendants' liquidity representation.  Defendants are wrong.  The above allegations, made *positively*, *directly* and not "on information and belief" must be taken as true, and, as such, establish the falsity of the Defendants' representation of providing "1500% More Bitcoin/USD liquidity than any other platform" for MTD purposes.  Therefore, Defendants' improper challenge of Plaintiffs' factual allegation of falsity of Defendants' liquidity representation must be also rejected by the Honorable Court.   Moreover, proving falsity "typically requires discovery" and is not resolved at the pleading stage. See, e.g., *Karedes v. Ackerly Grp., Inc*., 423 F.3d 107, 113 (2d Cir. 2005) (citation omitted); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699-700 (S.D.N.Y. 2018) ("Whether the statements are in fact false remains to be seen, and must await discovery.").

### C.    Defendants' False Characterization Of Plaintiffs' Direct, Positive Allegations As Having Been Made On "Information And Belief"

Throughout their MTD, desperate to undermine Plaintiffs' well-pleaded factual allegations, Defendants are falsely characterizing Plaintiffs' direct, positive allegations as having been

made on "information and belief."[1]  For example, at page 16 of the MTD, Defendants argue to the Court: "These allegations [regarding informational and trading privileges of the Insider Trading Desk] amount to little more than a reframing of the same allegations, made entirely on "information and belief" and without any particular facts providing the basis for that belief, of the "price manipulation theory" discussed above in Part IV.A.1."  This is false.  All the relevant allegations with respect to the activities, information and software tools used by "Insider Trading Desk" are made *directly* and *positively* and not on "information and belief."  SACC ¶¶ 2-12, 228-317, 500, 501.  Moreover, SACC ¶¶ 500, 513 also *directly* and *positively* allege that the "Insider Trading Desk" operated during entire Relevant Period and that Plaintiffs' "trading losses were sustained by each Plaintiff due to Defendants' Insider Trading Desk having caused each Plaintiff's long Perpetual Swap position on BitMEX to be liquidated, using each Plaintiff's own confidential information, to which Insider Trading Desk had what BitMEX internally referred to as "God access," in direct violation of the Warranty and Representation."  SACC ¶ 513.  It is notable that Defendants could not even cite to the specific paragraph of the SACC to support their deliberately false assertion.

At page 1 of the MTD, Defendants again falsely argue that "After repeating their deficient, prior market manipulation claims (still predicated on conclusory and naked "information and belief" allegations)," again without citing to any specific "information and belief" allegations of the SACC.  This is of course highly improper because, in truth and in fact, the relevant allegations of the SACC are made *directly* and *positively* and not "on information and belief."

At page 12 of the MTD, Defendants similarly falsely assert: "[i]nstead, the SACC largely leaves the CC's 'information and belief' allegations unchanged, adding only a few conclusory assertions that still fail to 'allege with particularity all facts upon which [Plaintiffs'] belief is based,'" again without citing any specific "information and belief" allegations.

At page 16 of the MTD, Defendants similarly falsely assert: "Indeed, to the extent the Plaintiffs offer any additional allegations in support of their allegations, made on "information

---

[1] To the extent there are any "information and belief" allegations, SACC provides ample facts supporting those.  SACC ¶¶ 228-317, 483.

and belief," that Defendants' trading activities caused Plaintiffs' bitcoin losses, those allegations are either conclusory, duplicative of the "means, motive, and opportunity" arguments previously rejected by this Court, or both. See supra Part IV.A.1," again without citing any specific "information and belief" allegations.

At page 25 of the MTD, Defendants similarly falsely argue: "Like the CC, the SACC's "allegations about defendants' trader-based manipulative conduct are made almost exclusively on 'information and belief' without explanation of the basis for such beliefs or facts that would make their allegations plausible," again without citing any specific "information and belief" allegations.

On the other hand, in truth and in fact, SACC ¶ 1004 *directly* and *positively* alleges that "automated software tools built by Defendants and operated by Defendants' Insider Trading Desk, using Plaintiffs' highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiffs on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiffs suffered their respective bitcoin losses, and namely June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018. Operation of these automated tools by Defendants' Insider Trading Desk deliberately caused automatic liquidations of Plaintiffs' respective Perpetual Swap positions on BitMEX platform and confiscation of Plaintiffs' respective collateral from their respective BitMEX accounts on June 27, 2019, July 14, 2019, November 14, 2018 and November 25, 2018, resulting in a cumulative loss of 249.9 bitcoins by Plaintiffs." The above allegations are *direct* and *positive* and not made "on information and belief." These allegations are detailed in SACC ¶¶ 228-317, which are also made *directly* and *positively* and not "on information and belief." Therefore, they all must be taken as true and they are sufficient to overcome the MTD. "At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). Thus, Defendants' arguments that Plaintiffs are relying "on information and belief" allegations are without merit.

## D. Defendants' Improper References To Perceived Inconsistencies With Prior Pleadings

Defendants' MTD is peppered with highly improper references to "sham pleadings" doctrine. This doctrine is inapplicable in Federal Courts and to the case at hand. Inconsistency — even direct contradiction — between a current complaint and an earlier one is not a basis for dismissal under Rule 12(b). *PAE Gov't Servs., Inc. v. MPRI, Inc*., 514 F.3d 856, 859 (9th Cir. 2007). The fact that the earlier complaint is inconsistent may have collateral consequences in the litigation, including possible sanctions under Rule 11 or undermining the plaintiff's credibility, id. at 859 n. 2, but it does not render the current complaint legally insufficient under Rule 12(b), id. at 860 ("The short of it is that there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations. Unless there is a showing that the party acted in bad faith—a showing that can only be made after the party is given an opportunity to respond under the procedures of Rule 11—inconsistent allegations are simply not a basis for striking the pleading.").

Here, Defendants did not file the Rule 11 motion and, therefore, the Honorable Court cannot strike or even discredit any of Plaintiff's allegedly inconsistent allegations. Defendants' reliance on authority (*Reddy v. Litton Indus., Inc*., 912 F.2d 291, 296–97 (9th Cir. 1990)) which predates 2007 is unavailing in light of the Ninth Circuit's clear guidance in *PAE Government Services*. The Honorable Court can — and must — take Plaintiff's new allegations as true. *PAE Gov't Servs., Inc. v. MPRI, Inc*., 514 F.3d 856, 860 (9th Cir. 2007).

For example, on page 20 of MTD, Defendants argue that: "Plaintiffs' claim that Defendants misrepresented BitMEX's "liquidity" with regards to other exchanges is directly at odds with Plaintiffs' own pleadings, including the exhibits attached thereto. Notwithstanding their new allegations that BitMEX was "overtaken" by other cryptocurrency exchanges by "no later than October of 2018" (SACC ¶ 527), the SACC continues to allege facts establishing that during the time Plaintiffs claim to have traded, BitMEX "remains the largest crypto exchange, by volume, in the world." This is plain false, because the claim of providing 1500% (16x times) more liquidity than competition is not the same as being the most liquid exchange (an exchange can provide just 1% more liquidity and be the most liquid). It is quite possible to be the most liquid exchange, but

still not provide 1500% (16x times) more liquidity than the closest competitor. Thus, there is absolutely no conflict between the falsity of the promise to provide "1500% More Bitcoin/USD liquidity than any other platform" and being the most liquid exchange and the invocation of the "sham pleading" doctrine by Defendants' MTD is highly improper.

### E. Defendants' Mischaracterization Of Plaintiffs' Damages As "Benefit Of The Bargain" Damages

There are two measures of damages for fraud: out of pocket and benefit of the bargain. (*Stout v. Turney* (1978) 22 Cal.3d 718, 725.) The "out-of-pocket" measure of damages "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. *Alliance Mortg. Co. v. Rothwell* (1995) 10 Cal. 4th 1226, 1240. The `benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive." (Ibid.; *Salahutdin v. Valley of California*, Inc., supra, 24 Cal. App.4th at p. 564; *Overgaard v. Johnson* (1977) 68 Cal. App.3d 821, 823.) "In California, a defrauded party is ordinarily limited to recovering his `out-of-pocket' loss...." (*Kenly v. Ukegawa* (1993) 16 Cal. App.4th 49, 53.)

To confuse and mislead the Honorable Court, Defendants falsely characterize Plaintiffs' damages as "benefit of the bargain" damages. This is false. Plaintiffs are not seeking to receive the benefit (e.g. profits) that they would have received if Defendants in fact provided the fair, honest and liquid cryptoderivative trading services that they promised. To the contrary, Plaintiffs are suing for the rescission of the Service Agreement and the *return* of bitcoin that they deposited with BitMEX out of their pocket *in reliance* on Defendants' false representations and fraudulent solicitations. Thus, Plaintiffs are *not* seeking to receive the benefit they bargained for, but to simply *recoup* their out-of-pocket trading commissions paid and trading losses incurred due to Defendants' fraud. In other words, Plaintiffs are seeking to return to the same economic state that

they enjoyed prior to depositing bitcoins on BitMEX. These types of damages are classic out-of-pocket damages. *Alliance Mortg. Co. v. Rothwell* (1995) 10 Cal. 4th 1226, 1240 ("The "out-of-pocket" measure of damages "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received."). Accordingly, Defendants' argument that Plaintiffs are suing for unallowable "benefit of the bargain" damages is without merit and Plaintiffs' damages are fully recoverable under CEA and California law.

### F. Defendants' Baseless Attacks On Integrity Of Plaintiffs' Counsel

Being unable to fight plausible and complete allegations of the SACC, Defendants are left with only one option – mount bitter, baseless personal attacks on Plaintiffs' counsel. Specifically, at p. 6 of the MTD, Defendants argue: "Yet nowhere in the hundreds of pages and paragraphs added in the CACC do Plaintiffs include an "expert report," "additional information relevant to this case ... from a former high-ranking employee of Defendant HDR," or any other facts on which Plaintiffs premised their request for leave to amend to "explain why their theory of price manipulation is plausible." This is plain false. Various new statistical information obtained from extensive expert analysis that provides substantial support for Plaintiffs' allegations of Defendants' liability is summarized in SACC ¶¶ 247-253, 263, 294-298, 308-309. Moreover, SACC did add substantial additional information about manipulative operation, undisclosed automated software tools, informational and trading privileges of Defendants' Insider Trading Desk in order to "explain why [the alleged] theory of price manipulation is plausible." This new information appears in SACC ¶¶ 269-317. Thus, Defendants' bitter attacks on the integrity of Plaintiffs' counsel are utterly baseless.

### G. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent Solicitation By False Warranty and Representation

Turning now to specific causes of action pleaded in the SACC, to state a cause of action for violation of anti-fraud provisions of the CEA, Plaintiff must allege: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; (3) a connection with the purchase or sale of a swap; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation (proximate causation). Contrary to Defendants' baseless contention, SACC adequately

alleges all these elements. Accordingly, the SACC alleges a viable cause of action for violation of the anti-fraud provisions of the CEA.

### 1. Material Misrepresentation

Federal Rule of Civil Procedure 9(b) provides that a party alleging causes of action sounding in fraud "must state with particularity the circumstances constituting" the fraud. "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged," such that defendants are given sufficient "notice of the particular misconduct" to enable them to "defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation marks omitted). Plaintiffs' Complaint satisfies these requirements:

**Who**: The SACC specifically alleges that the misrepresentation in question was delivered to Plaintiffs via Defendant HDR's commercial website www.bitmex.com, maintained by Defendant ABS for Defendant HDR. SACC ¶¶ 29, 101, 498, 516, 517. SACC further alleges that each of individual Defendants Hayes, Delo and Reed *personally* authored or at least personally ratified and approved this misrepresentation. SACC ¶ 497 n.19.

**What**: The SACC ¶¶ 499-501 identifies and describes that Section 6.3 of Defendants' Service Agreement falsely stated to Plaintiffs that "the [Insider Trading Desk] does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the [Insider Trading Desk] receives access and trading privileges only on the same terms as are available to any other user."

**When**: Plaintiffs allege they Defendants made the misrepresentations to respective Plaintiffs on April 30, 2018, May 5, 2019 and June 19, 2019. SACC ¶ 498.

**Where**: Plaintiffs allege that the misrepresentation was transmitted from Defendants' servers located in San Francisco, California to Plaintiffs' respective personal computers. SACC ¶¶ 498, 517, see also Pogodin Decl. attached to the SACC.

**How**: The SACC ¶¶ 500, 501 allege that Defendants' conduct was false and misleading because:

In truth and in fact, during the entire Relevant Period, the Insider Trading Desk of Bit-MEX had what BitMEX internally referred to as "God Access" to all customer, order flow, execution and open position information of the entire BitMEX Trading Platform, in-cluding, without limitation, all order sizes, leverage amounts and liquidation prices, all pa-rameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions on the entire BitMEX platform, further including all these con-fidential parameters of all Plaintiffs' orders and open positions. On the other hand, such information was not available to Plaintiffs and other platform users, with the exception of Defendants themselves. In fact, the Insider Trading Desk used this very sensitive infor-mation to highly successfully trade against, and liquidate customers of BitMEX, including each Plaintiff. Moreover, this express Warranty and Representation made by Defendants to each Plaintiff in the Service Agreement was deliberately and materially false during the entire Relevant Period also because the Insider Trading Desk was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiffs, who were frequently subject to server overload freezes and lockouts. In fact, the Insider Trading Desk used the server overload lockouts offensively to liquidate traders including Plaintiffs, while itself not being subject to such freezes and lockouts. Specifically, the automated software tools operated by the Insider Trading Desk were configured to intentionally and automatically freeze BitMEX's serv-ers, preventing traders, including Plaintiffs, from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted earlier.

**Materiality**: SACC ¶¶ 502, 504, 506 allege that misrepresentation was material.

These allegations are sufficient to give Defendant ample notice of the particular circum-stances underlying Plaintiffs' claims against it. *Chacanaca v. Quaker Oats Co*., 752 F.Supp.2d 1111, 1126 (N.D.Cal.2010) ("[P]laintiffs have identified the particular statements they allege are misleading, the basis for that contention, where those statements appear ..., and the relevant time period in which the statements were used. As such, they have satisfied the requisite who, what, when, where, and how of the misconduct charged.") (internal quotation marks omitted).

Thus, SACC has alleged those facts with the requisite specificity to satisfy Rule 9(b).

## 2. Scienter

SACC ¶ 510 alleges:

When the Defendants made the aforesaid false and fraudulent Warranty and Representa-tion to each Plaintiff, they knew it to be materially false, as Defendants themselves created and controlled the Insider Trading Desk, and this Warranty and Representation was made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged and specifically to open and/or use an account with BitMEX, deposit bitcoins therein and trade Defendants' cryptoderiva-tive products on margin, in order to wrongfully collect trading commissions from Plain-tiffs and to confiscate and otherwise misappropriate each Plaintiff's property. Therefore, in making the aforesaid false and fraudulent Warranty and Representation to respective Plaintiffs, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in

making the aforesaid false and fraudulent Warranty and Representation in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

These allegations satisfy the pleading requirements. As Honorable Judge Edward M. Chen of this Court explained in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing*, 295 F.Supp.3d 927, 978 (N.D. Cal. 2018) (J. Chen):

> While Pirnik is notable given that the securities-fraud claims there are predicated on the same factual events at issue here, the decision is not particularly persuasive on the issue of intent. As a securities-fraud case, Pirnik is governed by the Private Securities Litigation Reform Act, which requires scienter to be pled with "particularity." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). This heightened pleading standard does not apply in the context of RICO, where only "general allegations" of a defendant's state of mind are required. Odom, 486 F.3d at 554. Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A general allegation of scienter does not require the level of specificity (e.g., specific allegations that the defendant received actual test results) required in Tellabs.

### 3. Connection with purchase of a swap

SACC ¶ 513 alleges that "in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff[s] traded Defendants' bitcoin Perpetual Swaps."

### 4. Reliance (transactional causation)

SACC ¶ 502 alleges that "[e]ach Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX." See also SACC ¶¶ 503-509. These allegations are sufficient for "but for" or "transactional" causation.

### 5. Economic Loss

SACC ¶¶ 511-514 alleges that each Plaintiff suffered three different categories of monetary damages caused by Plaintiffs' reasonable and justifiable reliance on the false Warranty and Representation: 1) bitcoin loss of use damages; 2) trading commissions damages; and 3) actual trading losses. In their MTD, Defendants baselessly argue that "trading commissions" and "loss of use" damages are "benefit of the bargain" damages that are not recoverable in a California

fraud action.  As discussed above, this is false.  All three kinds of damages suffered by Plaintiffs are "out-of-pocket" damages and are recoverable by Plaintiffs under the law.

### 6.     Loss causation (proximate causation)

"[I]n an action under the CEA, a plaintiff may satisfy the loss causation requirement that the loss be directly related to the misrepresentation or omission by showing that the decision to invest was induced by the misrepresentation or omission and that the investment that was so induced resulted in the losses complained of." *Waters v. Int'l Precious Metals Corp.*, 172 FRD 479, 490 (S.D. Fla. 1996).  The Eleventh Circuit clarified the proximate cause element of the CEA "does not mean ... that the fraud must be the sole and exclusive cause of the loss; it means only that the fraud must be a substantial or significant contributing cause." *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018).

Allegations of the SACC clearly satisfy this requirement.  With respect to the proximate causation of loss of use damages, SACC ¶ 512 clearly alleges that "Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' bitcoin loss of use damages, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants, which was specifically calculated to fraudulently induce Plaintiffs to deposit their bitcoins with Defendants, thereby causing the loss of use damages." SACC ¶ 512.

With respect to the proximate causation of trading commissions damages, SACC ¶ 514 clearly alleges that "[d]ue to Plaintiffs' decision to trade on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiffs incurred the following monetary damages associated with trading commissions paid by Plaintiffs to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiffs' damages associated with the trading commissions paid by Plaintiffs to Defendants, which were also a natural and foreseeable result of the false and fraudulent Warranty and Representation made by Defendants."  SACC ¶ 514.

Finally, with respect to the proximate causation of the trading losses, SACC ¶ 521 alleges: "[a]s a direct and proximate result of Defendants' fraud and deceit and the facts herein alleged, each Plaintiff deposited his bitcoins and opened margined swap positions on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation, by reason of which Plaintiffs have been damaged in the sum of 272.62 bitcoins." SACC ¶ 521. Therefore, Defendants' violation of the warranty and representation was the proximate cause of the Plaintiff's trading losses. The above allegations of causation clearly satisfy the proximate loss causation requirements of the law.

The bitcoin loss of use and trading commission damages are entirely caused by Plaintiffs' justifiable reliance on the Defendants' false and fraudulent warranty and representation and there are no other intervening causes, such as market moves or market manipulation. In other words, Plaintiffs would have incurred these damages irrespective of any market moves or market manipulation by Defendants or third parties. Accordingly, Plaintiffs' justifiable reliance on Defendants' false and fraudulent warranty and representation was the sole and exclusive cause of these damages and there is no intervening causation problem.

With respect to the trading losses damages, the market moves or market manipulation may constitute the intervening cause, but SACC ¶ 521 *positively* and *directly* alleges, not "on information and belief", that "Plaintiffs' margined swap positions on BitMEX platform, … were subsequently deliberately and wrongfully liquidated by the Insider Trading Desk operated by Defendants using each Plaintiff's highly confidential order and position information, wherein the Insider Trading Desk had a priority access to the trading order queues and not subject to lockouts, in violation of the express Warranty and Representation, by reason of which Plaintiffs have been damaged in the sum of 10.3394 bitcoins." SACC ¶ 521. Thus, to the extent the trading losses damages were caused by market moves or market manipulation, SACC adequately alleges such moves and manipulation were perpetrated by Defendants. Therefore, there is again no interven-

ing causation and Plaintiffs' trading losses were caused directly and proximately by Defendants and solely by them.

Thus, contrary to Defendants' baseless contention, SACC adequately alleges all the above elements. Accordingly, the SACC alleges a viable cause of action for violation of the anti-fraud provisions of the CEA based on false Warranty and Representation.

### H. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent Solicitation By Misrepresenting Liquidity on BitMEX

#### 1. Material Misrepresentation

**Who**: The SACC specifically alleges that the misrepresentation in question was delivered to Plaintiffs via Defendant HDR's commercial website www.bitmex.com, maintained by Defendant ABS for Defendant HDR. SACC ¶¶ 29, 101, 525, 544, 545. SACC further alleges that each of individual Defendants Hayes, Delo and Reed *personally* authored or at least personally ratified and approved this misrepresentation. SACC 497 n.19.

**What**: The SACC ¶ 525 alleges that Defendants falsely represented to Plaintiffs that Defendants' BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other platform."

**When**: Plaintiffs allege they Defendants made the misrepresentations to respective Plaintiffs on specific days listed in SACC ¶ 525.

**Where**: Plaintiffs allege that the misrepresentation was transmitted from Defendants' servers located in San Francisco, California to Plaintiffs' respective personal computers. SACC 525, 544, 545, see also Pogodin Decl. attached to the SACC.

**How**: The SACC ¶ 527 alleges that Defendants' representations were false and misleading because:

> in truth and in fact, the aforesaid representations regarding available liquidity on BitMEX made by Defendants were intentionally and materially false during the entire portion of the Relevant Period when they were used by Defendants to solicit customers. In reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained its top position. For example, analysis of bid-ask spread data from the portion of the Relevant Period when Defendants were using the representations in question, provided by OKEX cryptoderivative exchange, has shown that Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask

spread of -0.51%)26. Moreover, analysis of bid-ask spread data from other exchanges further showed that, during the Relevant Period, Bitcoin / USD liquidity on other bitcoin trading platforms such as Binance was at least as high as liquidity on BitMEX. Therefore, in truth and in fact, liquidity on BitMEX was not any higher than on several competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely claimed to fraudulently solicit Plaintiffs' business. Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period.27 In fact, the aforesaid claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were materially false even as of September or October of 2018, when they were first made by Defendants.

**Materiality**: SACC ¶¶ 526, 530, 531 allege that misrepresentation was material.

These allegations are sufficient to give Defendant ample notice of the particular circumstances underlying Plaintiffs' claims against it. *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111, 1126 (N.D.Cal.2010) ("[P]laintiffs have identified the particular statements they allege are misleading, the basis for that contention, where those statements appear ..., and the relevant time period in which the statements were used. As such, they have satisfied the requisite who, what, when, where, and how of the misconduct charged.") (internal quotation marks omitted).

Thus, SACC has alleged those facts with the requisite specificity to satisfy Rule 9(b).

## 2. Scienter

SACC ¶ 528 alleges that:

The fact that liquidity on BitMEX was not any higher than on other competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely represented to Plaintiffs, was well known to Defendants themselves, who had a direct access to all relevant data and who nevertheless deliberately decided to use these fraudulent representations to entice unsuspecting traders, including Plaintiffs, to trade on BitMEX to their financial loss and detriment. In making the false and fraudulent representations regarding available liquidity on BitMEX platform, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in making the aforesaid false and fraudulent representations regarding available liquidity on BitMEX in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

See also SACC ¶ 537 for additional scienter allegations.

## 3. Connection with purchase of a swap

SACC ¶ 540 alleges that "In further reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, Plaintiff[s] traded Defendants' bitcoin Perpetual Swaps…"

### 4. Reliance (transactional causation)

SACC ¶ 530 alleges that:

Each Plaintiff would not have deposited his bitcoins with BitMEX and would not have
traded on the BitMEX platform and would not have sustained trading losses and paid trad-
ing commissions to Defendants had he known the true facts, as the true facts meant that
due to insufficient liquidity, odds of making any money on BitMEX platform were
stacked heavily against each Plaintiff.

### 5. Economic Loss

SACC ¶¶ 538-542 alleges that each Plaintiff suffered three different categories of mone-

tary damages caused by Plaintiffs' reasonable and justifiable reliance on the false liquidity repre-

sentation: 1) bitcoin loss of use damages; 2) trading commissions damages; and 3) actual trading

losses. In their MTD, Defendants baselessly argue that "trading commissions" and "loss of use"

damages are "benefit of the bargain" damages that are not recoverable. As discussed above, this

is false. All three kinds of damages suffered by Plaintiffs are "out-of-pocket" damages and are

fully recoverable by Plaintiffs under the law.

### 6. Loss causation

Regarding proximate causation of the loss, SACC ¶ 540 alleges that:

The trading losses were sustained by each Plaintiff due to wild downward swings in the
price of the XBTUSD and ETHUSD Perpetual Swap contracts of BitMEX, which resulted
in liquidation of Plaintiffs' respective long positions on BitMEX, which were caused, in
substantial part, by the insufficient buy (long) side liquidity on the BitMEX platform.
Specifically, on those three days June 27, 2019, July 14, 2019, November 14, 2018 and
November 25, 2018, liquidity on the buy (long) side of the market for XBTUSD and
ETHUSD Perpetual Swaps essentially disappeared, leading to truly staggering price
plunges, which precipitated liquidations of Plaintiffs' positions. Therefore, Defendants'
false and fraudulent representations regarding available liquidity on BitMEX, which in-
duced Plaintiffs to trade on margin on BitMEX, were a substantial factor in causing Plain-
tiffs' trading losses in the amount of 249.9 bitcoins. Another substantial factor was the
downward swings in the price of the XBTUSD and ETHUSD Perpetual Swap contracts of
BitMEX, which were exacerbated by the aforesaid buy (long) side liquidity shortages.
Moreover, it was foreseeable for Defendants that the insufficient liquidity on BitMEX,
which was fraudulently misrepresented by Defendants as being 1500% more than on any
other platform, would naturally exacerbate downward price moves and result in staggering
price plunges and, consequently, in the liquidations of Plaintiffs' margined trading posi-
tions. Therefore, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' mar-
gined positions on BitMEX were within the foreseeable risk or harm created by the De-
fendants' false and fraudulent representations regarding available liquidity on BitMEX. In
other words, Plaintiffs' trading losses incurred from liquidations of Plaintiffs' margined
positions on BitMEX were reasonably expected to result from the Defendants' false and
fraudulent representations regarding available liquidity on BitMEX.

Thus, contrary to Defendants' baseless contention, SACC adequately alleges all the above

elements.  Accordingly, the SACC alleges a viable cause of action for violation of the anti-fraud provisions of the CEA based on false representation of available liquidity on BitMEX.

## I.   SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Fraudulent Solicitation By Fraudulent Omission

With respect to misleading omissions, the duty to disclose may arise by statute or regulation.  The CEA and Rule 180.1(a)(2) impose such a duty by making it unlawful "to omit to state a material fact necessary in order to make the statements made not untrue or misleading." 17 C.F.R. § 180.1(a)(2); accord *CFTC v. Eox Holdings, L.L.C.*, 405 F. Supp. 3d 697, 709 (S.D. Tex. 2019). But BitMEX need not have been a registered entity to be liable under the CEA for fraud. To the contrary, "[a]ny person (other than a registered entity or registered futures association) who violates this chapter" with respect to an enumerated transaction may liable. 7 U.S.C. § 25(a)(1). That is, "Section 22(a) relates to claims against persons other than registered entities and registered futures associations." *Klein & Co. Futures, Inc. v. Bd. of Trade of the City of New York*, 464 F.3d 255, 259 (2d Cir. 2006). Thus, BitMEX is not immune from liability under the CEA for fraudulent omissions. Defendants knowingly breached this duty under the CEA by failing to disclose to Plaintiffs highly material facts alleged in SACC ¶¶ 559-560.

Moreover, California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 336.  SACC clearly alleges facts establishing Defendants' duty to disclose facts under (2), (3) and (4) above, see SACC ¶¶ 587-590.  Defendants also knowingly breached this duty under California law by failing to disclose to Plaintiffs highly material facts alleged in SACC ¶¶ 559-566.

### 1.   Scienter

With respect to the scienter element SACC ¶¶ 567-568 allege:

When the Defendants committed the aforesaid fraudulent omissions to each Plaintiff, Defendants intentionally omitted a clear disclosure of the facts stated above because giving a

clear explanation of how BitMEX platform really operated would have punctured the illusion of risk-free casino-style profits that Defendants promised each Plaintiff. Defendants' fraudulent omissions to each Plaintiff were made by Defendants with the intent to defraud and deceive each Plaintiff and with the intent to induce each Plaintiff to act in the manner herein alleged.

Defendants knew of and intentionally perpetuated these misrepresentations, half-truths and omissions. BitMEX and the individual Defendants Hayes, Delo and Reed concealed facts that went to the very core of BitMEX's operation, integrity and profit model and could not reasonably have been unaware of these facts. In making these misrepresentations, half-truths and omissions, Defendants were motivated by profit, including Plaintiffs' bitcoin deposits, trading commissions paid by Plaintiffs to Defendants, and Plaintiffs' bitcoins confiscated by Defendants as the result of liquidations. Each of the Defendants Hayes, Delo and Reed who each own 31.67% of the remaining Defendants had personal financial interest in perpetuating these misrepresentations, half-truths and omissions in order to fraudulently solicit Plaintiffs' business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in Paragraphs above.

### 2. Reliance

Materiality of the omitted facts is clearly alleged in SACC ¶ 579. "In a case based on the omission of material facts ... reliance is presumed." *Waters v. Int'l Precious Metals Corp.*, 172 FRD 479, 485 (SD Fla. 1996) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)); see also *Ross v. Bank S., N.A.*, 885 F.2d 723, 728 (11th Cir. 1989) (holding "in the case of an omission rather than a misstatement, reliance may be presumed when the plaintiffs could justifiably expect that the defendants would have disclosed the material information." (citation omitted)).

### 3. Loss causation

SACC ¶¶ 571-573 clearly allege proximate loss causation for all three types of losses.

Thus, contrary to Defendants' baseless contention, SACC adequately alleges a viable cause of action for violation of CEA based on fraudulent solicitation by material omission.

### J. SACC Alleges A Viable Cause Of Action For Violation Of CEA Based On Price Manipulation

To state a price manipulation claim, Plaintiffs must allege that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Commodity Exch.*, Inc., 213 F. Supp. 3d 631, 668 (S.D.N.Y. 2016) (quotation marks omitted). Where Plaintiffs base these claims on "a manipulative trading strategy," the "more permissive" pleading

standards of Rule 8(a) govern. *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *9–10 (S.D.N.Y. Dec. 20, 2013) (applying Rule 8(a) where "Plaintiffs' manipulation claim is based solely on Defendants' market behavior"). To the extent Rule 9(b) applies, moreover, this standard is "generally relaxed in the context of manipulation-based claims." *Commodity Exch.*, 213 F. Supp. 3d at 668. "[T]he complaint must simply specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" Id. (quoting *In re Nat. Gas Commodity Litig.*, 358 F.Supp.2d 336, 343 (S.D.N.Y. 2005).

Plaintiffs satisfy the elements of these claims by alleging that each Defendant participated in a scheme to use the Insider Trading Desk and employ trades on third-party reference exchanges to manipulate the prices for swaps on BitMEX in a cross-market manipulation scheme. SACC ¶¶ 228-317, 1004.

Plaintiffs satisfy the first element (Defendants' ability to influence market prices) through their allegations the Defendants deliberately created and operated an Insider Trading Desk. SACC ¶¶ 270, 271. In particular, SACC alleges:

1. The Insider Trading Desk had what BitMEX internally referred to as "God Access" to customer accounts, which allowed BitMEX to see information that it had misled its customers into believing was private. SACC ¶¶ 5, 273-275, 351.
2. The Insider Trading Desk used software to determine which market movements would liquidate the highest number of customers. SACC ¶¶ 5, 273-275, 351.
3. The Insider Trading Desk could trade while customers were locked out from trading, allowing it to move prices while other traders were frozen. SACC ¶¶ 277-279.

Plaintiffs satisfy the second element (the existence of artificial prices) by alleging that Defendants used the Insider Trading Desk to create artificial prices. See, e.g., *Commodity Exch.*, 213 F. Supp. 3d at 673 (manipulation shown if trading impacts a market which "relies on transaction to signal true, rather than manipulative, demand" (quotation marks omitted)). In particular, Plaintiffs allege:

1. The Insider Trading Desk routinely used its "God Access" to influence market prices in a manner designed to liquidate BitMEX customer positions. SACC ¶¶ 5, 273-275.
2. The Insider Trading Desk would freeze the servers and manipulate prices during freezes when customers were unable to react. SACC ¶¶ 277-279.
3. Defendants traded on thinly traded third-party reference exchanges to cause artificial prices in the commodities underlying the swaps and futures traded on BitMEX, and thus to cause artificial prices for those derivatives. SACC ¶¶ 8, 231, 287-295.
4. These prices were artificial because they were driven by BitMEX's manipulative trades "rather than legitimate market forces." SACC ¶¶ 7, 275.

Plaintiff's allegations also satisfy the third element (Defendants caused the artificial prices) by demonstrating that Defendants could and did cause artificial prices. A plaintiff may show such causation by alleging that the defendant's conduct "had an immediate effect on pricing." Commodity Exch., 213 F. Supp. 3d at 671. Here, Plaintiffs have alleged:

1. BitMEX used its insider access to its platform to assess what trades would be needed to influence pricing and then entered those trades, immediately affecting prices. SACC ¶¶ 5, 8, 273, 275.
2. BitMEX intentionally froze its servers while the Insider Trading Desk made manipulative trades, as well as during moments of high volatility. SACC ¶¶ 277-279.
3. Several illustrative days of abnormal trading patterns on Bitstamp, one of the reference exchanges, aligned with abnormal trading on BitMEX itself. This alignment occurred, moreover, on days when BitMEX was particularly positioned to profit from such abnormal trading because Kraken, another reference exchange, was down for maintenance and unavailable for pricing derivatives on BitMEX. These patterns were uncharacteristic of and extraneous from historical price movements, demonstrating "a high degree of correlation, and likely coordination, between the shorting activity on BitMEX and Bitstamp," including because the "relative timing" of the trading "supports the conclusion that the trading likely involved cross- market manipulation." SACC ¶¶ 293-298.

While Defendants argue that other factors may have affected the prices at issue, but Plaintiffs "plausibly allege," at a minimum, that BitMEX's trading on the reference exchanges was "at least one cause of the alleged artificial pricing" resulting from the price swings. *Commodity Exch.*, 213 F. Supp. 3d at 671. Whether it was "possible" that some price movements resulted from other forces, a motion to dismiss is not the occasion to decide which explanation will ultimately prevail. Id. at 669; see also id. at 670 (court "may not pick and choose among plausible explanations and must assume that Plaintiff's well-plead allegations are true"). This causation inquiry is "generally a jury question." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *33 (S.D.N.Y. Sept. 30, 2020) (quotation marks omitted).

Plaintiffs have also satisfied the fourth element (Defendants specifically intended to cause the artificial price). A defendant participates in a manipulative scheme with scienter by acting knowingly or recklessly in helping to affect the trading at issue. "Specific intent to manipulate prices can be pled by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Commodity Exch.*, 213 F. Supp. 3d at 670 (internal quotation marks omitted).

1. Defendants had motive because they would substantially profit through manipulating

market prices.

2. Defendants had opportunity because, as shown, they had the means to affect prices on the BitMEX platform, and because BitMEX was "uniquely positioned to benefit" from artificial price fluctuations on the referenced exchanges given the customer information it has and the way it benefits from automatic liquidations. SACC ¶ 291.

3. Defendants possessed a clear understanding of how they would benefit from automatic liquidations and of how shifting prices on the BitMEX platform would result in such liquidations. SACC ¶¶ 5, 8, 273, 275.

4. Defendants did in fact profit substantially from the market movements on the reference exchanges. SACC ¶¶ 301, 302.

5. Defendants worked to enable and create the Insider Trading Desk and deliberately and misleadingly failed to publicly to disclose the full nature and operation of the desk. SACC ¶¶ 270, 281-284.

6. Defendants intentionally triggered customer lockouts and server freezes to benefit from automatic liquidations and to enable their market manipulation, underscoring their appreciation of how to benefit from such liquidations and their intent to do so. SACC ¶¶ 26, 221, 224, 260, 262, 264.

7. Defendants used anonymized accounts to trade on the BitMEX platform.

8. Defendant Hayes traded anonymously on the BitMEX platform against BitMEX customers. SACC ¶ 286.

Thus, for all the foregoing reasons, SACC alleges viable price manipulation claim under CEA.

### K.   SACC Alleges A Viable Cause Of Action For Aiding and Abetting

Even if Plaintiffs have not adequately alleged direct liability under the CEA against some Defendants, those Defendants remain liable for aiding and abetting the other Defendants. As to such liability, under 7 U.S.C. § 25(a)(1), Plaintiffs must allege that Defendants "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). "[I]n evaluating a complaint alleging the aiding and abetting of a violation of the CEA, allegations about the defendant's knowledge, intent, and actions should not be evaluated in isolation, but rather in light of the complaint as a whole." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013).

Plaintiffs allege each Defendant's scienter and actions in furtherance of the fraudulent and manipulative scheme integral to the BitMEX platform. This states a claim for aiding and abetting a CEA violation. See London Silver Fixing, 213 F. Supp. 3d at 571 (holding that allegations of scheme suffice to plead CEA aiding and abetting claim); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 543 (S.D.N.Y. 2008) (complaint suffices in alleging scheme where the individual controlling the corporate entities "must have known" about repeated and profitable manipulative transactions and intended their success). See, for example, SACC ¶¶ 19, 466-472,

641-643.

**L.     SACC Alleges Viable Causes Of Action For Violation Of RICO**

The Racketeer Influenced and Corrupt Organizations Act (RICO or Act), 18 U. S. C. § 1961 et seq., makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs" through the commission of two or more statutorily defined crimes—which RICO calls "a pattern of racketeering activity." § 1962(c).  "The language suggests, and lower courts have held, that this provision foresees two separate entities, a 'person' and a distinct 'enterprise.'"  *Cedric Kushner Promotions v. King*, 533 U.S. 158, 160 (2001).

In *Odom v. Microsoft Corp.,* 486 F.3d 541, 548 (9th Cir. 2007) (en banc), the Ninth Circuit explained: "[t]he definition of 'enterprise' in the text of RICO is fairly straightforward. In its entirety, the definition is as follows: ''enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' 18 U.S.C. § 1961(4). As is evident from the text, this definition is not very demanding. A single 'individual' is an enterprise under RICO. Similarly, a single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal entity' are all enterprises."

At MTD p. 26, Defendants are inaptly arguing that "Plaintiffs' allegations amount to "a corporation carrying out its own activities (even fraudulent ones) only through its agents and employees—the precise circumstance that does not constitute a RICO enterprise."  This argument is meritless.  While separateness requirement exists for the association in fact enterprises, in *Cedric Kushner Promotions v. King*, 533 U.S. 158, 163 (2001), the U.S. Supreme Court held in that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that."  Therefore, distinction between RICO persons and RICO enterprises is sufficiently alleged in the SACC.

Defendants' next contention that RICO predicate acts are alleged exclusively "on information and belief" is false.  SACC alleges RICO predicates *directly, positively* (and not on "in-

formation and belief") and, therefore, these allegations must be taken as true by the Honorable Court. SACC ¶¶ 228-317, 664, 683, 691, 716, 1004.

Defendants' last contention that "Plaintiffs' attempts to tie those misrepresentations to their supposed bitcoin losses fail to satisfy Article III's baseline requirements, let alone "proximate causation under the heightened RICO standard" is also utterly false, as Defendants' fraudulent solicitations and price manipulations both directly and proximately resulted in Plaintiffs' out-of-pocket losses, as described in detail above in connection with the CEA causes of action.

**M.  SACC Alleges A Viable Cause Of Action For Fraud Based On False Warranty And Representation**

The elements of a cause of action for intentional misrepresentation in California are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231 (*Chapman*).)  In addition, representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of intentional misrepresentations. *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.  The elements of a claim for negligent misrepresentation are nearly identical. Only the second element is different, requiring the absence of reasonable grounds for believing the misrepresentation to be true instead of knowledge of its falsity. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 231; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173-174 (*Small*).).

Causes of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity. (*Chapman*, supra, 220 Cal.App.4th at p. 231; *Small*, supra, 30 Cal.4th at p. 184.) "The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made..." (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 (*West*).) However, "the requirement of specificity is relaxed when the allegations indicate that `the defendant must necessarily possess full information concerning the facts of the controversy' [citations] or `when the facts lie more in the knowledge of the'" defendant. (*Tarmann v. State Farm Mut. Auto. Ins. Co.*

(1991) 2 Cal.App.4th 153, 158.) The specificity requirement serves two purposes: "to apprise the defendant of the specific grounds for the charge and enable the court to determine whether there is any basis for the cause of action." (*Chapman*, supra, 220 Cal.App.4th at p. 231.). Each of the required elements will now be addressed in turn.

Two such controlling cases, with facts nearly identical to the present case are *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217 (*Chapman*) and *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322, 326 (*Kwikset*). In *Chapman*, plaintiff alleged causes of action against Skype for fraud, negligent misrepresentation, as well as violations of the UCL, FAL and CLRA, based on Skype's advertising of its calling plan as "unlimited," while, in truth and in fact, the plan was subject to certain "fair use" limitations, which were disclosed in a footnote and in Skype's User Agreement. On a demurrer, Skype made almost identical arguments that Defendants in the present case are trying to make to this Court. All these arguments were flatly rejected by the California Court of Appeal.

With respect to the fraud cause of action, Skype challenged the misrepresentation and justifiable reliance elements. The Court of Appeal rejected Skype's arguments and held that "Chapman adequately alleges a misrepresentation of fact based on Skype's use of the word "Unlimited" to describe calling plans that were not unlimited." The Court did so even though the limits were disclosed in the Skype's User Agreement. With respect to the justifiable reliance, the Court held that to "allege actual reliance on misrepresentations with the required specificity for a fraud count, "'[t]he plaintiff must plead that he believed the representations to be true ... and that in reliance thereon (or induced thereby) he entered into the transaction." (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063.) Chapman requests leave to amend her complaint to allege that she would not have purchased a subscription if she had known that the calling plan was limited and is entitled to leave to so amend. (*Careau & Co. v. Security Pacific Business Credit* (1990) 222 Cal.App.3d 1371, 1386)… We reject the argument that Chapman cannot satisfy the element of actual reliance." *Chapman*, 220 Cal.App.4th at 232.

### 1. Misrepresentation

The particularity requirement of the fraud allegations necessitates pleading of facts which

"show how, when, where, to whom, and by what means the representations were tendered."
(*Lazar v. Superior Court*, supra, 12 Cal.4th at p. 645).  Proving falsity "typically requires discov-
ery" and is not resolved at the pleading stage. See, e.g., *Karedes v. Ackerly Grp., Inc.*, 423 F.3d
107, 113 (2d Cir. 2005) (citation omitted); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699-700
(S.D.N.Y. 2018) ("Whether the statements are in fact false remains to be seen, and must await
discovery.").

　　All these elements were already discussed above in connection with the corresponding
cause of action under CEA.  In their MTD, Defendants try to cast doubt on the above clear allega-
tion of the SACC by arguing that the falsity of the warranty and representation is insufficiently
alleged because it is alleged "on information and belief."  This is not true.  SACC's allegation of
the falsity of the warranty and representation is made *directly*, *positively* and not "on information
and belief" and, therefore, it must be taken as true at the MTD stage.

　　Moreover, proving falsity "typically requires discovery" and is not resolved at the plead-
ing stage. See, e.g., *Karedes v. Ackerly Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (citation
omitted); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699-700 (S.D.N.Y. 2018) ("Whether the
statements are in fact false remains to be seen, and must await discovery.").

### N.　SACC Alleges A Viable Cause Of Action For Fraud Based On Misrepresentation Of Liquidity On BitMEX

#### 1.　Misrepresentation

　　SACC specifically alleges that to lure unsuspecting traders, for nearly three years Defend-
ants falsely advertised their trading services as providing "1500% More Bitcoin/USD liquidity
than any other platform" ("Liquidity Representation.")  SACC ¶ 525.  After this lie was exposed
by Plaintiffs' counsel in a related matter, Defendants hastily changed their website to simply read
"Highly Liquid Markets," which confirmed that the original statement was false, SACC ¶ 537,
Ex. 20.  By the time of the removal of the Liquidity Representation, BitMEX was number eight
(!) among exchanges by both the trading volume and open interest, which makes it clear that the
accuracy of that statement was never monitored or even once checked by Defendants.  SACC ¶

537, Ex. 20.  Just as Defendants intended, Plaintiffs relied on this falsehood when deciding to trade on BitMEX, deposit their bitcoins, and pay trading commissions to Defendants.

In their argument to the Court, Defendants try to sneak in s highly improper and, in fact, extrinsic and materially false fact that "platform's daily, monthly, and annual trading volume, [is] another and more widely used measure of liquidity."  MTD, p. 17.  This improper and, in fact, false fact appears nowhere in the SACC.  In fact, even the blog post Defendants are seeking to improperly introduce, Hibbard Decl., Ex. C, says exactly the opposite, by stating: "Bid/Ask Spread … is the de facto measure of market liquidity," as opposed to the trading volume, as Defendants falsely tell the Court without any support from the record what so ever.  Hibbard Decl., Ex. C.  Thus, Defendants have no other choice but to misrepresent to the Court even what the improperly introduced blog posts actually says.

In their MTD p.18, Defendants try to cast further doubt on the clear allegation of the SACC by arguing that "Plaintiffs fail to allege particular facts establishing that any representations on Defendants' website were false when Plaintiffs claim to have deposited bitcoin with BitMEX."  On the other hand, SACC *directly* and *positively* (and not "on information and belief") alleges that the liquidity representation was false during the entire relevant period, which obviously covers the dates of Plaintiffs' deposits of bitcoins with Defendants.  SACC ¶ 527.  These allegations are sufficient to establish falsity and must be taken as true at this stage.

The below two charts drive the final nail in the coffin of Defendants' desperate attempts in their MTD to argue that if the liquidity is calculated based on trading volume (an improper extrinsic and false fact, not found anywhere in the SACC), BitMEX did in fact provide "1500% [or 16x] More Bitcoin/USD liquidity than any other platform."  SACC ¶¶ 527, 537.  Specifically, in their MTD, Defendants argued to the Court that the phrase "BitMEX's XBTUSD market is the most liquid in the world"—appeared directly below figures reflecting the platform's daily, monthly, and annual trading volume, *another and more widely used measure of liquidity*."  MTD, p. 17.

But despite this improper argument that seeks to introduce a false and clearly extrinsic fact into Court's consideration on a MTD, the actual trading volume numbers from BitMEX and competing exchanges clearly establish that the liquidity representation was false even if liquidity

was measured based on the trading volume, as Defendants appear to have suggested on page 17



of their MTD.

The first chart shows comparative bitcoin derivatives trading volume of BitMEX and competing exchanges from March of 2019 to December of 2019. As can be clearly seen, the trading volume of individual BitMEX's competitors was *never* below one half (50%) of BitMEX's trading volume[2] and actually overtook BitMEX's bitcoin derivative trading volume by the second half of 2019. For comparison, if the liquidity representation was true, the competitors' trading volume would have never exceeded 6.25% (100% divided by 16 (same as 1500%)) of BitMEX's



---

[2] As stated in the CFTC Complaint, SACC Ex. 5, ¶ 50, the Insider Trading Desk of HDR was often ten times the largest trader on the BitMEX platform by trading volume. Thus, much of BitMEX's claimed trading volume was self-generated and cannot be reliably used for relative liquidity calculations. But even using this inflated volume due to self-trading, the chart shows that the Liquidity Representation was false.

trading volume, which is clearly not the case as demonstrated by the above chart. Thus, the Liquidity Representation was false by a factor of 8x (50% divided by 6.25%).

The second chart shows bitcoin spot trading volume from December of 2018 to November of 2020. This trading volume was also within the scope of the liquidity representation, which simply referred to "Bitcoin/USD liquidity," without specifying spot or derivative liquidity.[3] As can be clearly seen, OKEX's and Binance's bitcoin/U.S. dollar trading volumes during 2019 were on par with bitcoin/U.S. dollar trading volume of BitMEX shown in the first chart. For example, OKEX's spot trading volume for May of 2019 was close to $100B, on par with $100B of BitMEX trading volume in the first chart. Similarly, OKEX's spot trading volume for April of 2019 was close to $65B, on par with $65B of corresponding BitMEX volume in the first chart. On the other hand, if the Liquidity Representation was true, the competitors' trading volume would have never exceeded 6.25% (100% divided by 16) of BitMEX's trading volume, which is clearly not true, as demonstrated by the above chart. Thus, the second chart showing spot trading volume additionally proves that the Liquidity Representation was false.

Moreover, Defendant HDR kept the liquidity representation on its website until March 9, 2021, by which time BitMEX was number eight among exchanges by both the trading volume and open interest. SACC ¶ 537, Ex. 20. In other words, if BitMEX acted honestly (even though incompetently) and indeed used trading volume (bad measure of liquidity) for its liquidity calculations, then the Liquidity Representation should have been removed from BitMEX's website much, much earlier than when BitMEX fell to number eight by trading volume and open interest and been sued for fraud based on this very Liquidity Representation, SACC ¶ 537, Ex. 20. This did not happen. Thus, the most likely explanation for all the above facts is that HDR *never* calculated any liquidity and the aforesaid Liquidity Representation was made by HDR with at least reckless disregard for its truth or falsity, or more likely fraudulently. This is the reasonable inference that Court is obligated to draw from all the above facts and Defendants' inapt arguments. *Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir.1985) ("On a motion to

---

[3] Bitcoin spot can be also traded with leverage on margin, achieving similar financial results for the trader as trading bitcoin derivatives, such as perpetual swaps.

dismiss for failure to state a claim, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party.")

Thus, all Defendants' arguments are meritless and Plaintiffs' allegations of the falsity of the liquidity representation are sufficient and must be taken as true. Finally, proving falsity "typically requires discovery" and is not resolved at the pleading stage. See, e.g., *Karedes v. Ackerly Grp., Inc*., 423 F.3d 107, 113 (2d Cir. 2005) (citation omitted); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699-700 (S.D.N.Y. 2018) ("Whether the statements are in fact false remains to be seen, and must await discovery."). The remaining elements of this cause of action were already discussed above in connection with the corresponding cause of action under CEA. They are adequately alleged in the SACC.

### O. SACC Alleges A Viable Cause Of Action For Fraud Based On Concealment Of Material Facts

California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 336. "[The] heightened [pleading] standard [under Rule 9(b)] is somewhat relaxed in a case based on a fraudulent omission." *Montich v. Miele USA, Inc.,* 849 F. Supp. 2d 439, 451 (D.N.J. 2012). SACC clearly alleges facts establishing Defendants' duty to disclose facts under (2), (3) and (4) above, see SACC ¶¶ 521-523. Defendants knowingly breached this duty by failing to disclose to Plaintiffs highly material facts alleged in SACC ¶¶ 494-501.

Reliance can be proved in a fraudulent omission case by establishing that "had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently." *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1093). SACC alleges exactly that at ¶ 514: "Each Plaintiff would not have deposited his bitcoins with BitMEX and traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts, as stated above, fraudulently concealed from each Plaintiff by Defend-

ants."  Generally, the question of whether reliance is justifiable is one of fact, which cannot be decided on MTD. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239; see also *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503.

"In a fraud case, justifiable reliance is the same as causation, thus `[a]ctual reliance occurs when a misrepresentation is "`an immediate cause of [a plaintiff's] conduct, which alters his legal relations,'" and when, absent such representation,' [the plaintiff] `"`would not, in all reasonable probability, have entered into the contract or other transaction."'"" (*Hall v. Time, Inc.* (2008) 158 Cal.App.4th 847, 855, n.2.) "`It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct . . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing [the plaintiff's] decision.'" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976-977.). Therefore, because Plaintiffs adequately pleaded the justifiable reliance on the fraudulently omitted facts, they also sufficiently alleged the causation of Plaintiffs' damages.

### P.  SACC Alleges Viable Causes Of Action For Unfair Competition And False Advertising

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and any act prohibited by the false advertising law. (Bus. & Prof. Code § 17200.) The false advertising law generally prohibits advertising that contains "any statement... which is untrue or misleading, and which is known, or ... should be known, to be untrue or misleading ...." (Bus. & Prof. Code § 17500.).

Moreover, actual reliance, or causation, is inferred from the misrepresentation of a material fact. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 229, quoting *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 327.) To satisfy the requirement of pleading actual reliance, or causation, in connection with false advertising for purposes of the UCL and the false advertising law, a plaintiff need only allege a misrepresentation of a material fact. The materiality of a misrepresentation is generally a question of fact unless the misrepresentation was so obviously unimportant that the trier of fact could not reasonably conclude that a reasonable person would have been in-

fluenced by it. (46 Cal.4th at p. 327.) Here, SACC clearly alleges that Defendants' false warranty

and representation, the liquidity representation and the omitted facts were material. SACC ¶¶

502, 504, 506, 526, 530, 531, 579. Therefore, by alleging material misrepresentation, SACC ade-

quately alleges actual reliance and causation for purposes of the UCL and the false advertising

law. *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231.

*Kwikset*, supra, 51 Cal.4th 310, involved allegations of false advertising in violation of the

UCL and the false advertising law. The plaintiffs alleged that they would not have purchased the

product if not for the false representation that it was "Made in U.S.A." (*Kwikset*, supra, 51 Cal.4th

at pp. 327-328.). *Kwikset* concluded that this "but for" allegation was sufficient to allege both

causation and economic injury and, therefore, standing as required under Bus. & Prof. Code §

17204. (51 Cal.4th at p. 330.). SACC alleges exactly that in ¶¶ 567, 579, 591. These allegations

are sufficient for establishing statutory standing to bring a claim under the UCL. *Chapman v.

Skype Inc.* (2013) 220 Cal.App.4th 217, 228.

Pursuant to Bus. & Prof. Code § 17204, Plaintiffs here have "suffered injury in fact and ...

lost money or property as a result of the unfair competition" by Defendants, and, therefore have a

statutory standing to sue under the UCL, because they would not have opened trading accounts,

deposited their valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sus-

tained bitcoin loss of use damages of 0.0394 bitcoins, sustained trading losses in the amount of

9.45 bitcoins and paid trading commissions in the amount of 0.85 bitcoins to Defendants, but for

their reasonable reliance on the truth of the alleged fraudulent solicitations, false advertising, as

well as alleged fraudulent and deceptive representations and omissions regarding the functionali-

ty, integrity, profit model and available liquidity of Defendants' cryptoderivative trading services,

which violated Civ. Code § 1709 et seq., the FTCA, the FAL, and the CLRA. The purchase of

cryptoderivative trading services that Plaintiffs would not otherwise have purchased, but for the

alleged fraudulent solicitations, the unlawful false advertising as well as alleged fraudulent and

deceptive representations and omissions regarding the functionality, integrity, profit model and

available liquidity of Defendants' cryptoderivative trading services by Defendants that violated

Civ. Code § 1709 et seq., the FTCA, the FAL, and the CLRA, establishes an economic injury-in-

fact for Plaintiffs' claims under Bus. & Prof. Code § 17200. *Chapman*, supra 220 Cal. App. 4th at p. 228; *Kwikset Corp. v. Superior Court* (2011) 51 Cal. 4th 310, 328; *Chacanaca v. Quaker Oats Co.,* 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co.*, 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011); *Hinojos v. Kohl's Corp.*, 718 F. 3d 1098 (9th Cir. 2013).

### Q. The Remaining Causes Of Action Are Also Viable

Defendants' MTD to Plaintiffs' remaining causes of action is based on the selective interpretation of facts described above. As a result, Defendants continue to highlight issues of fact to be decided by the trier of fact and not issues of law needed to sustain a MTD. The Court's denial of Defendants' MTD to the remaining causes of action is therefore appropriate.

## V. CONCLUSION

As described above, the Second Amended Consolidated Complaint in this matter is detailed and complete. Defendants' reinterpretation of past events creates clear issues of fact that should be decided on their merits rather than inappropriate technical challenges to the pleadings. Accordingly, this Court should deny Defendants' MTD. In the event the MTD is granted, Plaintiffs should be given a leave to amend.

Dated: July 21, 2021

Respectfully submitted,

By: _____

Pavel I. Pogodin

Attorney for Plaintiffs