1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    BMA LLC, et al.,

8                    Plaintiffs,

9           v.

10   HDR GLOBAL TRADING LIMITED, et
     al.,
11
                     Defendants.
12

Case No.  20-cv-03345-WHO


**ORDER GRANTING MOTION TO
DISMISS SECOND AMENDED
CONSOLIDATED COMPLAINT WITH
PREJUDICE**

Re: Dkt. Nos. 155, 174

13           BMA LLC, an entity that is co-owned by multiple individual traders, along with individual

14   traders Vitaly Dubinin, Yaroslav Kolchin, Dmitry Dolgov, and Paun Gabriel Razvan, bring this

15   consolidated action asserting market manipulation and fraudulent inducement theories, among

16   other claims, against five defendants: HDR Global Trading Limited ("HDR"), which owns a

17   cryptocurrency derivatives trading platform called Bitcoin Mercantile Exchange ("BitMEX");

18   HDR's wholly-owned subsidiary ABS Global Trading Limited ("ABS"); and, HDR's co-founders

19   Arthur Hayes, Ben Delo, and Samuel Reed.  When I granted defendants' motion to dismiss the

20   Consolidated Complaint with leave to amend in March, I explained why plaintiffs' claims were

21   not plausible and warned that the 237-page, 618-paragraph, 18-exhibit, 17-count Consolidated

22   Complaint was hardly a "short and plain statement of the claim showing that the pleader is entitled

23   to relief."  *See* Order Granting Motion to Dismiss Consolidated Complaint with Leave to Amend

24   ("MTD Order") [Dkt. No. 143]; Fed. R. Civ. P. 8.  Yet despite the guidance provided in the MTD

25   Order, plaintiffs responded with a 378-page, 1,035-paragraph, 21-exhibit, 33-count Second

26   Amended Consolidated Complaint ("SACC") with the same deficiencies.

27           The size and prolix nature of the SACC alone are grounds for dismissal.  But I have also

28

searched for a plausible claim and cannot find one.[1]

To amend their price/market manipulation theory, plaintiffs largely copy and paste from a complaint in *Messieh v. HDR Global Trading Ltd.*, No. 1:20-cv-03232-ALC, currently pending in the Southern District of New York.  *Messieh* was brought by different plaintiffs and different plaintiffs' counsel against the same defendants.  I will not consider those copied allegations, for which the *Messieh* court will determine plausibility.  Plaintiffs' other allegations are insufficient for the same reasons identified in my previous order.

The new fraudulent inducement theory, which now appears to be the main focus of the SACC, is not supported by sufficient plausible facts either.  Plaintiffs contend that they were fraudulently induced into participating on the BitMEX platform based on misstatements about BitMEX's alleged insider trading desk and the liquidity of its trading products.  The first collapses with the insufficiently alleged market manipulation theory.  It lacks specific facts showing that the Terms of Service's statement about the insider trading desk were false—that the alleged insider trading desk was engaging in manipulative conduct.  Plaintiffs similarly fail to allege with particularity that the liquidity statement on the BitMEX website—"1500% More Bitcoin / USD liquidity than any other platform.  BitMEX's XBTUSD market is the most liquid in the world"— was false.  Not only have plaintiffs failed to plausibly allege the falsity of the challenged statements, they do not plausibly connect their reliance on the alleged misrepresentations to their claimed bitcoin losses.

Failure to plausibly plead underlying misconduct—market manipulation and fraudulent inducement—dooms the SACC.  In addition to this fundamental flaw, plaintiffs fail, again, to sufficiently plead the elements of each claim and their standing to bring them.  After multiple iterations of the complaint and the benefit of my previous ruling, coupled with filing an unwieldly

---

[1] Plaintiffs move to file a sur-reply on grounds that defendants made three new arguments for the first time in their reply brief.  Plaintiffs' Administrative Motion for Leave to File Sur-Reply in Opposition to Defendants' Reply [Dkt. No. 174]; Proposed Sur-Reply [Dkt. No. 174-1].  None of the identified arguments are new.  They are responsive to arguments plaintiffs raised in the opposition, which is exactly what a reply brief is supposed to do.  Nevertheless, I GRANT their request and consider the sur-reply, which ultimately does not save the SACC for reasons discussed in this order.

United States District Court
Northern District of California

SACC that remains conclusory and copies allegations from another case, I find that leave to amend is not warranted.  Defendants' motion to dismiss is GRANTED with prejudice.[2]

## BACKGROUND

### I.   PROCEDURAL BACKGROUND AND SIMILAR LAWSUITS

Plaintiff BMA originally filed this suit on May 16, 2020.  After BMA amended once as a matter of right and a second time with defendants' consent (adding plaintiffs Kolchin and Dubinin), defendants moved to dismiss.  That motion was denied as moot when this case was consolidated with another lawsuit plaintiffs' counsel filed in this District on October 14, 2020, *Dolgov v. HDR Global Trading Ltd.*, No. 20-cv-07140.  Plaintiffs were ordered to file a consolidated complaint, adding claims made by plaintiff Dolgov.  Before doing so, plaintiffs' counsel filed another lawsuit in this District on November 13, 2020, *Gabriel-Razvan v. HDR Global Trading Ltd.*, No. 3:20-cv-08034.  I granted the parties' stipulation to allow plaintiffs to file a consolidated complaint that also included claims made by plaintiff Razvan.  The Consolidated Complaint that was dismissd in the MTD Order in March 2021 included claims by all five plaintiffs.

On August 13, 2021, after briefing on defendants' motion to dismiss the SACC was complete, plaintiffs moved to relate yet another lawsuit their counsel filed in this District on May 12, 2021, about two months after I issued the MTD Order in this case, *Sorokin v. HDR Global Trading Ltd.*, No. 21-cv-03576.  Defendants did not oppose.  The complaint in *Sorokin* is substantially similar to the SACC here.  The *Sorokin* matter was related to this case on August 18, 2021.[3]

The above only reflects the cases that plaintiffs' counsel has filed in this District. Plaintiffs' counsel also filed a substantially similar lawsuit in San Francisco County Superior

---

[2] On September 2, 2021, after the motion was fully briefed and heard, plaintiffs filed a notice of voluntary dismissal without prejudice of all claims pursued by plaintiffs Dubinin, Dolgov and Razvan.  *See* Notice of Voluntary Dismissal [Dkt. No. 185].  This order covers claims pursued by plaintiffs BMA and Kolchin.

[3] The parties in *Sorokin* have stipulated to allow the filing of an amended complaint and agreed to a motion to dismiss briefing schedule that is triggered by the date this order.

United States District Court
Northern District of California

1   Court on May 19, 2020, a few days after this case was filed, *Kanyshev v. HDR Global Trading*

2   *Ltd.*, CGC-20-584483.  The Hon. Anne-Christine Massullo issued a first demurrer order in

3   *Kanyshev* on February 25, 2021 and a second demurrer order on August 27, 2021, giving the

4   *Kanyshev* plaintiffs leave to amend again.  Like the plaintiffs here, the *Kanyshev* plaintiffs added a

5   new fraudulent inducement theory after the first demurrer order was issued.

6          The Southern District of New York *Messieh* suit was brought to my attention after the first

7   motion to dismiss hearing in this case.  Plaintiffs requested "coordination" between this suit and

8   *Messieh* to avoid conflict, claiming that they are "members of the putative class" in *Messieh*.

9   MTD Order at 2.  The *Messieh* action "was filed before this suit against substantially the same

10   defendants and brings class claims under the [Commodity Exchange Act] based on a significantly

11   similar theory of price manipulation, albeit more detailed and supported by expert analysis." *Id.*

12   After granting defendants' motion to dismiss the Consolidated Complaint with leave to amend, I

13   scheduled a case management conference on April 6, 2021 to discuss how this case should move

14   forward in light of *Messieh*.  *Id.*

15          Considering the parties' positions at the case management conference, I found that "the

16   related *Messiah* matter appears narrower and less advanced than this case, and that at least for the

17   moment coordination does not appear to be appropriate."  Minute Entry [Dkt. No. 146].  Now,

18   several months later, motions to dismiss the *Messieh* Amended Complaint are fully briefed and

19   ripe for decision by the Hon. Andrew L. Carter, Jr. of the Southern District of New York.  That

20   motion challenges the market manipulation allegations plaintiffs have copied here on several

21   grounds, including plausibility.

22   **II.      THE OPERATIVE SACC**

23          Plaintiffs filed an Amended Consolidated Complaint [Dkt. No. 149], followed by a

24   Corrected Amended Consolidated Complaint ("CACC") a few hours after the amendment

25   deadline [Dkt. No. 150].  The parties then stipulated to allow plaintiffs to file the operative SACC

26   (Second Amended Consolidated Complaint) [Dkt. No. 153].  *See* Declaration of Stephen D.

27   Hibbard in Support of Defendant's Motion to Dismiss Plaintiffs' Second Amended Consolidated

28   Complaint ("Hibbard Decl.") [Dkt. No. 155-1], Ex. A (redline comparison between CACC and

United States District Court
Northern District of California

United States District Court
Northern District of California

1   SACC).[4]

2     Plaintiffs' market manipulation theory is summarized in my previous order, which largely

3   stays the same in the SACC except for the copied *Messieh* allegations that I discuss below.  The

4   new fraudulent inducement allegations are summarized below as well.  Plaintiffs drop their claims

5   against the family members and associated companies of individual defendant Samuel Reed

6   (Agata Maria Reed, Trace Reed, Barbara Reed, Mark Sweep LLC, Grape Park LLC, and

7   "Unknown Exchange") and now allege a total of thirty-three causes of action against the

8   remaining five defendants (HDR, ABS, Hayes, Delo, and Reed): (i) violations of the Commodity

9   Exchange Act ("CEA") (Counts 1 through 8); (ii) violations of the Racketeer Influenced and

10  Corrupt Organizations ("RICO") Act (Counts 9 through 14); (iii) common law fraud and negligent

11  misrepresentation claims (Counts 15 through 20); (vi) statutory claims under California's False

12  Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, Consumers Legal Remedies

13  Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus.

14  & Prof. Code §§ 17200, *et seq.* (Counts 21 through 25); (v) negligence (Count 26); and (vi)

15  various other state law claims for restitution, constructive trust, accounting, conversion, aiding and

16  abetting conversion, replevin, and violation of California Penal Code section 496 (Counts 27

17  through 33).

18              **LEGAL STANDARD**

19    Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim

20  fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

21  dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its

22  face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

23  the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

24  is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [4] Defendants' request for judicial notice of redline comparisons of a plaintiff's operative and
previous complaints is GRANTED.  *Kim v. Shellpoint Partners, LLC*, No. 15CV611-LAB (BLM),
2016 WL 1241541, at *3 (S.D. Cal. Mar. 30, 2016) (taking judicial notice of redline comparison

28  of plaintiff's operative and previous complaints); *In re Hypercom Corp. Sec. Litig.*, No. CV-05-
0455-PHX-NVW, 2006 WL 1836181, at *2 (D. Ariz. Jul. 5, 2006) (same).

omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*
While courts do not require "heightened fact pleading of specifics," a claim must be supported by
facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555,
570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the
circumstances constituting fraud or mistake," including "the who, what, when, where, and how of
the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)
(internal quotation marks omitted).  However, "Rule 9(b) requires only that the circumstances of
fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule
8."  *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).  In deciding
a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as
true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*,
828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that
are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead
Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a
challenge to the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  "Federal courts are
courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited
jurisdiction."  *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  The party
invoking the jurisdiction of the federal court bears the burden of establishing that the court has the
authority to grant the relief requested.  *Id*.  A challenge pursuant to Rule 12(b)(1) may be facial or
factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the
jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v.
Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The challenger asserts that the allegations in the
complaint are insufficient "on their face" to invoke federal jurisdiction.  *See Safe Air Safe Air for
Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve this challenge, the court
assumes that the allegations in the complaint are true and draws all reasonable inferences in favor
of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

# DISCUSSION

## I.    UNDERLYING MISCONDUCT

### A.    Market Manipulation

In the previous round of motions to dismiss, defendants argued, and plaintiffs did not dispute, that their "entire lawsuit rises and falls with allegations, made only on 'information and belief,' that one defendant executed trades on other cryptocurrency platforms as part of an intricate market manipulation conspiracy on the exact dates that plaintiffs suffered their losses."  MTD Order at 9.  Plaintiffs now add a new fraudulent inducement theory but they spent little effort correcting the deficiencies identified regarding their market manipulation theory.

What plaintiffs described was "simply allegedly manipulative and fraudulent conduct that, on information and belief, defendants performed," but without allegations that "would allow me to 'draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged.'" *Id.* at 10 (quoting *Iqbal*, 556 U.S. at 678).  "[S]omething more" was needed to support the plausibility of their allegations.  *Id.* at 11.  Defendants pointed to information that plaintiffs could have collected from Kraken and BitStamp ("reference" bitcoin exchanges on which BitMex's XBTUSD Perpetual Swap contract is based) to support the theory that defendants executed a "large trade orders" to manipulate the price.  *Id.* at 11.  Plaintiffs also sought leave to amend "considering the 'substantial additional information relevant to this case' received from a 'former high-ranking employee of Defendant HDR'" and "reports from experts who would look at the data and say to a high degree of certainty as to what happened." *Id.* at 30.  I granted "leave to amend to the extent that they have a good faith basis to do so." *Id.*

Instead of doing what they said they would, plaintiffs copy-pasted paragraphs from the Amended Complaint currently pending before Judge Carter in *Messieh.*  In their opposition, plaintiffs argue that the SACC adds "substantial additional information about manipulative operation, undisclosed automated software tools, informational and trading privileges of Defendants' Insider Trading Desk in order to 'explain why [the alleged] theory of price manipulation is plausible.'"  Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Consolidated Complaint ("Oppo.") [Dkt. No. 169] 12 (quoting MTD Order at 30 and

United States District Court
Northern District of California

1    citing SACC ¶¶ 269– 317).  Those paragraphs are copied almost verbatim from the *Messieh*

2    Amended Complaint, drafted by other lawyers.[5]

3         Defendants point this out in their briefing, yet plaintiffs make no acknowledgement of it in

4    their opposition.  They simply cite the copied paragraphs and leave it at that.  *See* Oppo. 1 (citing

5    SAC ¶¶ 228–317 as describing market manipulation activities); *id.* at 8 (arguing allegations are not

6    made on information and belief given allegations in SACC ¶¶ 228–317); *id.* at 23 (arguing CEA

7    price manipulation claim is pleaded in SACC ¶¶ 228–317); *id.* at 26 (arguing RICO predicate acts

8    are pleaded in SAC ¶¶ 228–317).  Their failure to explain why this is nothing more than

9    plagiarism is telling.

10        When I gave plaintiffs leave to amend the Consolidated Complaint, I told them to do so in

11   good faith.  MTD Order at 30.  Copying the allegations of another complaint filed by different

12   counsel does not show good faith.  The allegations they have copied are based on expert analysis

13   and/or reports that they do not produce, let alone say that they have first-hand knowledge of.  It is

14   for Judge Carter to decide whether the properly made allegations before him state a plausible

15   market manipulation theory.  *See McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL

16   5264750, at *3 (N.D. Cal. Sept. 9, 2015) ("[W]hen evaluating an amended complaint, '[t]he court

17   may also consider the prior allegations as part of its 'context-specific' inquiry based on its judicial

18   experience and common sense to assess whether' an amended complaint 'plausibly suggests an

19   entitlement to relief.'") (quoting *Cole v. Sunnyvale*, No. C–08–05017–RMW, 2010 WL 532428, at

20   *4 (N.D. Cal. Feb. 9, 2010).

21        Other than the copied allegations, plaintiffs do not materially change their pleading to

22   support a market manipulation theory.  For instance, they simply delete the phrase "information

23   and belief" from their previous allegations and now argue that those allegations are made "directly

24   and positively."  *See* Oppo 8; Hibbard Decl., Ex. A (redline showing deletion of "information and

25   belief" phrase in SACC ¶¶ 341–42 , 358, 362, 378–82, 385, 392–95, 399, 406–09, 412, 415, 423,

26

27   ---
     [5] A comparison of the complaints reveals that plaintiffs have copied the bulk (over 80 paragraphs)
     of the *Messieh* Amended Complaint.  *Compare* SAC ¶¶ 228-315 *with Messieh*, Dkt. No. 53 ¶¶ 65-
28   154.  The SACC does not include the graphs produced by expert analysis in the *Messieh* Amended
     Complaint).  *Compare* SACC ¶¶ 269–317 *with Messieh*, Dkt. No. 53 ¶¶ 109–154.

United States District Court
Northern District of California

424, 428, 429, 433–36, 439–42, 444–46, 474, 653, 655–57, 728–32, 734, 735).  Obviously,

removing the phrase does not fix the issue.  *See* MTD Order at 30 ("For allegations made on

information and belief, they must allege with particularity all facts upon which their belief is

based.").  Plaintiffs alternatively argue that to the extent that there are any "information and

belief" allegations left in the SACC, the SACC "provides ample facts supporting those."  Oppo. 8

n.1.  For that they cite paragraphs 228 through 317 of the SACC, *i.e.*, the copied paragraphs from

*Messieh*.  Their allegations remain conclusory and implausible for the reasons stated in the MTD

Order.

    Plaintiffs contend that they have added "smoking gun" evidence of alleged market

manipulation.  The evidence is largely derived from a series of tweets remembering "Ben Aabtc,"

who passed away on May 19, 2020.  The tweets mention that "Ben Aabtc" manipulated the bitcoin

market sometime in April and May 2018.  *See* Oppo., Ex. A at 2–3 (tweets stating "[h]is

orchestrated pump from $6,800 in 2018 while posting $30m positions on BitMEX was heroic" and

"back in April 2018 I was ultra rekt left with only 0.6 btc followed by best winning streak ever").[6]

Based on the tweets, plaintiffs allege that Ben Aabtc was a co-conspirator with defendants who

"pumped" the bitcoin market price on the "reference" spot exchanges while maintaining open

positions in his winner account on BitMEX.    SACC ¶ 469.  To support that allegation, they

provide an undated photograph of a man they identify as Ben Aabtc with individual defendants

Hayes, Delo and Reed, arguing that "[t]his clearly shows that this well-known, open and notorious

market manipulator was part of their 'inner circle' or so called 'BitMEX cartel,' as Defendants

referred [sic] to themselves."  Oppo., Ex. A at 4 (citing SACC ¶ 466-471).  Plaintiffs also allege

that "Defendants opened multiple $30,000,000 perpetual swap positions for him" and placed Ben

Aabtc "on their leaderboard advertising him to the public . . . with full knowledge that his

---

[6] Plaintiffs were given a 35-page limit for their opposition.  *See* Dkt. Nos. 152, 167.  Their attempt
to evade the page limitation in briefing, by attaching a 13-page "Exhibit A" to their opposition, is
a flagrant violation of the rules.  *See* Oppo. 1 (claiming "Exhibit A" summarizes "overwhelming
evidence conclusively proving that Defendants and their co-conspirators deliberately engaged in
illicit cross-market manipulation (e.g. 'pumps and dumps') on BitMEX that resulted in Plaintiffs'
losses").  Nonetheless, I have still considered it.  "Exhibit A" mostly repeats allegations in the
SACC that are implausible for the reasons stated above.

remarkable 'trading success' was actually the result of illegal cross-market manipulation." *Id.* at 5.

None of these speculative allegations amount to plausible and specific facts. Even if I take the conclusory premise as true (that Ben Aabtc was defendants' co-conspirator), the alleged "pump" orchestrated by Ben Aabtc occurred in April and May 2018, several months before any plaintiff in this suit (including those recently voluntarily dismissed) claims to have deposited bitcoin with BitMEX or to have sustained bitcoin losses. *See* SACC ¶ 511 (alleging deposit in November 2018, May 2019, and June 2019); *id.* ¶ 328 (alleging bitcoin loss in November 2018, December 2018, May 2019, June 2019, July 2019, and March 2020).

Plaintiffs seek leave to amend the SACC on grounds that they have additional information to support their market manipulation theory. *See* Plaintiffs' Request for Leave to Amend SACC ("Request for Leave to Amend") [Dkt. No. 180]. That is what they said last time. For instance, plaintiffs requested leave on grounds that they received information from a "former high-ranking employee of Defendant HDR." MTD Order at 30. Yet in the SACC, they remove some allegations that were previously made based upon "information provided by employees of Defendants." *See* Hibbard Decl., Ex. A (redline comparison showing deletion in SACC ¶¶ 448, 451, 454, 458). This case has been pending since May 16, 2020. I have to rule on the matter before me, not ones that are proceeding in other courts.[7] The SACC makes clear that plaintiffs have never had the information necessary to support their allegations.

### B.    Fraudulent Inducement

Plaintiffs were given leave to amend their market manipulation theory, not to add new ones. *See* MTD Order at 30 ("In conjunction with the instructions provided above, plaintiffs must keep their focus on how defendants have harmed them and explain why their *theory of price*

---

[7] Judge Massullo has allowed narrow discovery on BitMEX's insider trading desk limited to three dates (June 26–27, 2019, July 10–11, 2019, and July 14–15, 2019) that do not line up across the board with the dates plaintiffs allege losses in this case, save one plaintiff, Kolchin, who allegedly suffered losses on July 14, 2019. *See Kanyshev v. HDR Global Trading Ltd.*, No. CGC-20-584483 (Cal. Super. Ct. Aug. 27, 2021) ("*Kanyshev* Motion to Compel Order") at 4–5; SACC ¶ 328 (chart summarizing dates of plaintiffs' losses). In light of the rulings in this Order, it does not seem plausible that such discovery would help Kolchin state a claim for relief here.

United States District Court
Northern District of California

United States District Court
Northern District of California

*manipulation is plausible*.") (emphasis added).  They now allege, for the first time, that defendants

fraudulently induced them into participating on the BitMEX platform through misrepresentations

made on the BitMEX website and in its Terms of Service.  Alleging a completely new theory—

particularly after multiple iterations of the complaint, a successful motion to dismiss, and a theory

that could have been pleaded at the outset—raises serious questions about the plausibility of

plaintiffs' new allegations.  *See Royal Primo Corp. v. Whitewater W. Indus., Ltd*, No. 15-CV-

04391-JCS, 2016 WL 1718196, at *3 (N.D. Cal. Apr. 29, 2016) (holding that although "Ninth

Circuit precedent is inconsistent as to whether amended pleadings may ever contradict earlier

allegations," the court may at the very least "consider the prior allegations as part of its context-

specific inquiry based on its judicial experience and common sense to assess whether an amended

complaint 'plausibly suggests an entitlement to relief.") (internal quotation marks and citations

omitted).  With that lens, I review the new claim.

### 1.    Misrepresentation in BitMEX's Terms of Service

Section 6.3 of the Terms of Service states:

> 6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. *The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform.* Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and *the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user.* In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

SACC ¶ 499 (emphasis added); *id.*, Ex. 19.  Plaintiffs allege that the express warranty and

representation defendants made in Section 6.3 was "in fact, deliberately and materially false

during the entire Relevant Period and constituted a fraudulent solicitation of Plaintiffs' bitcoins

deposits and trading commissions by Defendants."  *Id.* ¶ 500.  In reality, they allege, the trading

arm possessed "God Access," by which the trading arm had access to "all customer, order flow,

execution and open position information of the entire BitMEX Trading Platform."  *Id.*  While the

Terms of Service represented that HDR's trading arm "receives access and trading privileges only

11

on the same terms as are available to any other user," plaintiffs contend that the trading arm "was not subject to server overload freezes and lockouts" that occasionally occurred on the site. *Id.* ¶¶ 499, 501. Altogether, they allege that defendants failed to disclose alleged characteristics of HDR's trading arm and that they "would not have deposited [their] bitcoins with BitMEX and would not have traded on the BitMEX platform had [they] known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiffs and in favor of the Insider Trading Desk of BitMEX." *Id.* ¶¶ 503, 559, 870.

This portion of their fraudulent inducement theory collapses with the insufficiently alleged market manipulation theory (without taking the copied *Messieh* allegations into account). *See e.g.*, SACC ¶ 414 ("Plaintiffs are informed and believe and thereon allege that each of the Defendants HDR, ABS, Hayes, Delo and Reed used automated market manipulation software tools developed by BitMEX[.]"); *id.* ¶ 448 (alleging "on information and belief . . . manipulation times" in which the "Insider Trading Desk" supposedly "used highly sensitive and confidential information about traders" to "automatically manipulat[e] cryptocurrency prices"). Plaintiffs essentially argue that they were fraudulently induced into participating on the BitMEX platform because defendants did not reveal the manipulative nature of the alleged insider trading desk. Without specific facts showing that the Terms of Service were false—that defendants' insider trading desk was in fact engaging in manipulative conduct—plaintiffs' fraudulent inducement theory fails.

Plaintiffs' reliance on *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217 (2013) and *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310 (2011) does not save their claims either. In *Chapman*, the court held that a representation of an "Unlimited" calling plan could be viewed as false where it was objectively contradicted by a written policy that imposed limits. *Chapman*, 220 Cal. App. 4th at 228. In *Kwikset*, plaintiffs adequately alleged that they were deceived into buying a product labeled "Made in the U.S.A." by plausibly showing how that label was false. *Kwikset*, 51 Cal. 4th at 317–18. Here, plaintiffs allege no contradiction in any written policy (as in *Chapman*), nor any plausible facts demonstrating falsity (as in *Kwikset*). What they allege is conclusory "information and belief" assertions to suggest that the trading desk operated in a way that rendered the Terms of Service false at the time plaintiffs opened their BitMEX accounts. The suggestion is speculative

at best.

### 2.  Misrepresentation Regarding Liquidity on BitMEX

Plaintiffs allege that defendants fraudulently solicited them into participating on the BitMEX platform based on the following statement on BitMEX's website: "1500% More Bitcoin / USD liquidity than any other platform.  BitMEX's XBTUSD market is the most liquid in the world."  SACC ¶ 525.  They claim that they relied on the representation and that it was material to their decision to engage on the BitMEX platform because the higher the available liquidity, the lower the price slippage (*i.e.*, diminished profits due to inability to fill market orders at the current market price) and the lower the "magnitude of price swings and the chance of liquidation."  *Id.* ¶ 526.

Plaintiffs contend that the representation was false because "[i]n reality, by no later than October of 2018, BitMEX was overtaken by other crypto exchanges including Binance, Huobi and/or OKEX in terms of Bitcoin / USD liquidity and never regained its top position."  *Id.* ¶ 527.  For example, a data analysis provided by OKEX cryptoderivative exchange showed that "Bitcoin / USD liquidity, as determined by the average bid-ask spread, customarily used for measuring liquidity on exchanges, was higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -0.51%)."  *Id.*  "In other words, each Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX having the best liquidity available in the industry, and 1500% higher than competition, when, in reality, he was not."  *Id.* ¶ 529.  Because of those misrepresentations, plaintiffs claim that they suffered both trading losses (measured in lost bitcoins) and two new categories of damages: (i) "loss of use" damages from their inability to deposit their bitcoin "in interest-bearing accounts," *id.* ¶ 504, and (ii) "trading commissions damages" suffered from executing trades on BitMEX, *id.* ¶ 506.

As a preliminary matter, defendants argue that plaintiffs' new theory of fraud (premised on low liquidity on BitMEX) runs directly counter to the market manipulation theory (premised on high liquidity on BitMEX) that they originally pleaded, and this contradiction renders their claims implausible.  See *Royal Primo Corp.*, 2016 WL 1718196, at *3 ("[A] court may look to prior pleadings in determining the plausibility of an amended complaint."); *Airs Aromatics, LLC v.*

1    *Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) ("A party cannot

2    amend pleadings to directly contradict an earlier assertion made in the same proceeding.").

3    Plaintiffs contend that there is no contradiction because it is possible that BitMEX was the most

4    liquid exchange but still did not provide 1500% (16x times) more liquidity than the closest

5    competitor, as reflected in the alleged misrepresentations at issue.

6         Whether or not the new allegations are contradictory, they are not sufficient to state a

7    claim.  The falsity of the liquidity representation hangs on one vague allegation: "data analysis

8    provided by OKEX cryptoderivative exchange" that shows "Bitcoin / USD liquidity . . . was

9    higher on OKEX (with bid-ask spread of -0.14%) than on BitMEX (with bid-ask spread of -

10   0.51%)."  *Id.*  Plaintiffs fail to cite where they got the OKEX "data analysis" from, specify what

11   time period the analysis covers, or adequately explain why that shows falsity.  Merely alleging a

12   higher "average" bid-ask spread (an alleged measure of liquidity) on another platform for an

13   unspecified time period does not plausibly show that BitMEX's liquidity statement amounts to a

14   misrepresentation.  And comparing the average bid-ask spread from an unspecified time period to

15   the alleged "Relevant Period," which runs for more than three and a half years from January 1,

16   2017 until October 1, 2020, does not meet Rule 9(b) particularity standards.  *See* SACC ¶ 175.

17   Plaintiffs also fail to show that the alleged liquidity statement was false on the specific dates they

18   allegedly relied on it to their detriment.  *See* SACC ¶ 511 (Kolchin deposited 1.01 bitcoins on June

19   19, 2019 and BMA deposited 5 bitcoins on May 5, 2019).

20        Defendants cite a similar amended complaint that plaintiffs' counsel filed in the *Kanyshev*

21   state court case following Judge Massullo's first demurrer order.[8]  The amended complaint in

22   *Kanyshev* asserts the same California claims predicated on substantially similar allegations against

23   defendants HDR, ABS, and Hayes.  *See* Hibbard Decl., Ex. B (*Kanyshev* Third Amended

24   Complaint).  The *Kanyshev* amended complaint repeats almost verbatim the allegations contained

25   _____

26   [8] Defendants' request for judicial notice of the Third Amended Complaint in *Kanyshev* is
     GRANTED.  "[C]ourt filings and other matters of public record" are judicially noticeable under
27   Federal Rule of Evidence 201(b)(2).  *In re Icenhower*, 755 F.3d 1130, 1142 (9th Cir. 2014)
     (quoting *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006))
28   (granting judicial notice of documents filed in other courts).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    in the SACC about the liquidity statement, yet the "Relevant Period" in *Kanyshev* is years shorter

2    than in this case. *Compare* SACC ¶ 175 (defining Relevant Period to be January 1, 2017 until

3    October 1, 2020) with *Kanyshev* TAC ¶ 161 (defining Relevant Period to be May 1, 2019 until

4    August 31, 2019). That plaintiffs allege identical "liquidity averages" in both *BMA* and *Kanyshev*

5    for two different time periods reflects that the allegations here are not tethered to any well-pleaded

6    facts. Plaintiffs make no rebuttal of this point in their opposition or sur-reply. This too

7    undermines the plausibility of their theory.[9]

8         For the first time in their opposition, plaintiffs present two new charts to show the falsity of

9    the liquidity statement. *See* Oppo. at 30–32. After submitting an enormous pleading (totaling

10   1,035 paragraphs), they cannot squeeze in new information in their opposition. Even if these

11   charts were pleaded in the SACC, plaintiffs provide absolutely no factual basis for these charts or

12   even explain where they came from. This does not help their claim.

13        Plaintiffs request leave to amend the falsity of the liquidity statement on grounds that they

14   now "have very detailed bid-ask spread and trading volume data sufficient to show, beyond any

15   doubt, that Liquidity Representation alleged in Counts II and XVI of the SACC was materially

16   false on the specific days when Plaintiffs made deposits with Defendants and made their trades."

17   Request for Leave to Amend at 2. They also argue that because this is the first time these new

18   allegations have been tested on a motion to dismiss, they should have the opportunity to fix any

19   pleading deficiencies. *Id.* at 3. In light of the length of time this case has been pending, the

20

---

21   [9] Defendants contend that the bid-ask spread data referenced by the SACC comes from marketing
     materials published by OKEX on October 11, 2019, which analyzed "6-mins-bid/ask-spread data
22   from Aug. 15–21, 2019 of OKEX and BitMEX" to show that "BitMEX's spread varies from -5.5
     to -0.5, and the average is -0.51; while OKEX's spread varies from -8.8 to 0, with an average of
23   0.14"—the same numbers recited in the SACC. *See* Hibbard Decl., Ex. C. Because the blog post
     shows that the bid-ask spread analysis plaintiffs rely on cover only August 15–21, 2019,
24   defendants argue that this too undermines plaintiffs' allegations. Plaintiffs respond that I cannot
     consider the OKEX blog post because they never cited to it in the SACC and thus it cannot be
25   brought in through the incorporation by reference doctrine (even though the figures cited in the
     SACC are the same). Regardless of whether the OKEX data came from that blog post, the point is
26   that plaintiffs have not adequately pleaded the falsity of the liquidity statement based on bid-ask
     spread data analysis *from an unspecified period* by another exchange. Because I need not rely on
27   the OKEX blog post, and the other blog posts defendants provide to undermine plaintiffs'
     allegations, request for judicial notice of those documents is DENIED. *See* Hibbard Decl., Exs.
28   C–E.

1    number of iterations of the complaint, and the lack of plausibility of the claims, Leave to amend is

2    not warranted.

3         Both fraudulent inducement theories fail to pass the muster of Rule 8, let alone Rule 9(b)

4    specificity.

5    **II.     ARTICLE III STANDING AND CAUSATION**

6         With respect to the market manipulation theory, I told plaintiffs that "[w]ithout factual

7    allegations that [their] claimed losses are 'fairly traceable' to defendants' alleged conduct, as

8    opposed to acts by third parties or inherent market forces, Article III standing is insufficiently

9    pleaded." MTD Order at 16.  Deleting references to "third party perpetrators" in the SACC does

10   not fix the problem. *Compare* SACC ¶¶ 374, 387, 401 *with* Consolidated Complaint [Dkt. No. 97]

11   ¶ 298, 311, 325.  As I said before, even if plaintiffs think that no third party perpetrators were

12   involved, they must "plausibly explain why they think that *defendants* were the perpetrators."

13   MTD Order at 15 (emphasis in original).

14        The SACC also continues to allege misconduct by a particular BitMEX trader with the

15   username Quick-Grove-Mind.  The Consolidated Complaint contained "several contradictory

16   allegations regarding the identity of Quick-Grove-Mind," as plaintiffs alleged both that Quick-

17   Grove-Mind was a market manipulation winner account used by one of the individual defendants

18   and elsewhere that Quick-Grove-Mind is an unnamed third party that individual defendants aided

19   and abetted.  MTD Order at 6 n.3.  In their opposition, plaintiffs now argue that Quick-Grove-

20   Mind *is* a defendant.  Oppo. 5 (citing SACC ¶ 19).  In paragraph 19, plaintiffs allege that Quick-

21   Grove-Mind made large profits on specific dates and because only defendants are capable of

22   making such large profits they "are informed and believe and thereon allege that . . . Quick-Grove-

23   Mind was a market manipulation winner account used by one of the individual Defendants Hayes,

24   Delo or Reed, who traded on BitMEX despite having a clear conflict of interest." SACC ¶ 19.

25        Without a plausible explanation of the premise that only defendants are capable of making

26   such large profits, this allegation is conclusory and speculative.  To the extent plaintiffs copy from

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

the *Messieh* complaint to connect those dots, I will not allow it for the reasons stated above.[10]

Plaintiffs have not plausibly alleged Article III standing for their new fraudulent inducement theory either, for which they seek "loss of use" and "trading commissions" damages. Plaintiffs claim that if they had not been fraudulently induced to trade on BitMEX by defendants' misrepresentations, they would have deposited their bitcoins "in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits." SACC ¶ 512. Plaintiffs also assert that due to alleged misrepresentations, they paid BitMEX "trading commissions," which "BitMEX charges traders … in connection with opening, maintaining and closing trading positions, irrespective of market moves or other events and irrespective of whether the position is profitable or not."  SACC ¶ 512 n.24.

Because plaintiffs fail to allege plausible facts establishing that defendants made false representations regarding the insider trading desk (in BitMEX's Terms of Service) or relative liquidity (on BitMEX's website), they cannot point to "loss of use" or "trading commissions" as a valid "injury in fact" for Article III purposes.  Even if falsity is adequately alleged (or could be based on "new" bid/ask spread and trading volume data they claim to have in their possession, *see* Request for Leave to Amend at 2), they have not adequately connected the misrepresentations to their alleged damages because their damages only occurred once their positions were liquidated, which, as discussed above, could have been due to the acts by third parties or inherent market forces.

Defendants separately argue, as they did before, that plaintiff BMA lacks standing for the additional reason that it has not plausibly suffered an "injury in fact" because BMA does not identify the accounts under which it allegedly traded or any information that would allow defendants to identify such accounts.  Because it was unclear from the Consolidated Complaint whether BMA was seeking to vindicate its own rights, instead of those of its members, I gave it

---

[10] Plaintiffs also point to another individual—Ben Aabtc—alleging that he "'pumped' bitcoin market price" in 2018 by trading on "'reference' spot exchanges while maintaining an open $30,873,844 Perpetual Swap position" on BitMEX.  SAC ¶¶ 468–69.  As discussed above, allegations with respect to Ben Aabtc do not cross the plausibility threshold.

leave to amend to establish Article III standing.  MTD Order at 16.  Despite the opportunity to fix

that pleading flaw, it simply repleads the same inadequate allegation in the SACC and fails to

address the problem in both the opposition and sur-reply.  *See* SACC ¶ 32 (conclusorily alleging

"BMA is co-owned by multiple individual cryptocurrency traders and it holds the title to, and

ownership in, any and all claims, causes of action and demands" possessed by those unidentified

traders).  All of BMA's claims are dismissed with prejudice for this additional reason.

### III.   FEDERAL CLAIMS

#### A.   CEA (Counts 1 through 8)

##### 1.   Market Manipulation

The CEA prohibits "manipulation of the price of any commodity or commodity future."  *In*

*re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citation omitted).

Plaintiffs bring three market manipulation claims under the CEA (Counts 4 through 6).  Count 4,

based on the alleged operation of an insider trading desk, and Count 5, based on the alleged

intentional server freezes and system overloads, are brought under section 6(c)(1) of the CEA,

which provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ,

or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity

in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any

manipulative or deceptive device or contrivance." 7 U.S.C. § 9(1).  Count 6 brings the same

allegations under section 6(c)(3) of the CEA, which prohibits the manipulation or attempted

manipulation "of any swap, or of any commodity in interstate commerce, or for future delivery on

or subject to the rules of any registered entity."  7 U.S.C. § 9(3).

A court will find manipulation where "(1) Defendants possessed an ability to influence

market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4)

Defendants specifically intended to cause the artificial price."  *In re Amaranth Nat. Gas*

*Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citation omitted).  While it is unclear

whether the "relaxed" Rule 9(b) standard "extend[s] . . . to the commodities context," plaintiffs

here have not even crossed the "more relaxed standard of Rule 8(a)(2)."  MTD Order at 22

(quoting *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 181).  *See supra* section I.A.

1    Nor have they alleged "facts that 'give rise to a strong inference of scienter.'" *In re Commodity*

2    *Exch., Inc.*, 213 F. Supp. 3d 631, 668 (S.D.N.Y. 2016) (quotation omitted).  As discussed above,

3    the conclusory allegations plaintiffs offer for specific intent are not at least as strong as competing

4    inferences that their losses were caused by natural market forces or manipulation by third parties.

5    *See supra* section II.

6                            **2.      Fraudulent Inducement**

7           The SACC adds three CEA claims based on alleged "fraudulent representations, half-truths

8    and omissions" that induced plaintiffs to invest their bitcoins with BitMEX (Counts 1 through 3).

9    To the extent these claims are cognizable under 7 U.S.C. § 9(1), plaintiffs must allege: "(1) a

10   material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of

11   security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation."  *U.S.*

12   *Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1011 (N.D.

13   Ill. 2015) (explaining that certain fraud claims may involve false statements or omissions, and

14   other fraud claims may involve fraudulent manipulation or misconduct in the marketplace).

15   Because the SACC fails to plead a misrepresentation or loss causation with the Rule 9(b)

16   particularity required, plaintiffs fail to plead their CEA claims based on fraudulent inducement.

17   *See supra* sections I.B. and II.

18          Plaintiffs also fail to adequately plead facts supporting an inference of scienter as to each

19   defendant.  *See Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 552

20   (S.D.N.Y. 2018) ("The factual allegations in the complaint must give rise to a strong inference of

21   scienter.")  Where multiple defendants are alleged to have committed fraud, Rule 9(b) requires

22   plaintiffs to specifically allege the acts perpetrated by each defendant instead of "merely lump[ing]

23   defendants together."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *In re Crude Oil*

24   *Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *6, *9 (S.D.N.Y. Jun. 28, 2007)

25   (dismissing CEA claims against corporate and individual defendants because "'lumping' all

26   defendants together" failed to satisfy Rule 9(b)).  The SACC broadly claims that "defendants"

27   made the alleged misrepresentations regarding the insider trading desk and liquidity, without

28   alleging facts that would support an inference that any of the individual defendants knew specific

facts that would render the alleged misrepresentations or omissions false or misleading.

To the extent the SACC attempts to plead a "collective corporate scienter," those allegations are insufficient as well. The Second Circuit recently explained that "the 'most straightforward' way to raise strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Like the allegations in *Jackson*, the SACC "provides no connective tissue" between any individual defendant and the alleged fraudulent representations and omissions. *Id.* at 99 (finding allegations that three employees knew of the problems with surgical gown product at issue but "no connective tissue" between "those employees and the alleged misstatements to shareholders regarding the quality of the surgical gown). Nor does the SACC allege any facts that make this an "exceedingly rare instance[]" where a "statement may be so 'dramatic' that collective scienter may be inferred." *Id.*

Plaintiffs cite *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., and Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 978 (N.D. Cal. 2018) to argue that they need not plead the scienter elements of their CEA claims with specificity. *Chrysler* did not involve CEA claims. The court held that the "heightened pleading standard does not apply *in the context of RICO*, where only 'general allegations' a defendant's state of mind are required." *Id.* (citing *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (emphasis added)). Plaintiffs alternatively claim that they have adequately pleaded scienter because they alleged facts "showing that the defendants had both motive and opportunity to commit the fraud" and showing "conscious misbehavior or recklessness." Oppo. 24–25 (citation omitted). The allegations they cite for that argument are the *Messieh*-coped allegations discussed above. Stripped of those allegations, the SACC is left with what I found implausible before. *See* MTD Order at 12–15 (rejecting "means, motive, and opportunity" allegations in the Consolidated Complaint).

### 3.   Principal-Agent Liability and Aiding and Abetting

Plaintiffs' claim for principal-agent liability (Count 7) is based on their insufficiently alleged market manipulation and fraudulent-inducement theories. That claim falls with the rest. *See Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554

1   (S.D.N.Y. 2018) (principal-agent liability claims viable only where an underlying primary

2   violation of the CEA can survive a motion to dismiss) (citing cases).

3       In addition to their direct market manipulation claims, plaintiffs assert a claim against all

4   defendants for aiding and abetting market manipulation perpetrated by a third party (Count 8).  To

5   plead an aiding and abetting claim, plaintiffs must allege that defendants "(1) had knowledge of

6   the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed

7   some act in furtherance of the principal's objective." *In re Nat. Gas Commodity Litig.*, 337 F.

8   Supp. 2d 498, 511 (S.D.N.Y. 2004).  Plaintiffs allege that defendants aided and abetted each other,

9   third parties "Gregory Dwyer, Stuart Elkington and Nick Andrianov, market manipulator under

10  assumed name Quick-Grove-Mind," and other "unknown third persons" and that "[e]ach

11  Defendant did so with knowledge of other Defendants' and unknown third persons' manipulation

12  of cryptocurrency prices through manipulative trades, and substantially and willfully intended to

13  assist these manipulations to cause artificial prices."  SACC ¶¶ 641–42.

14      The allegations of aiding and abetting between defendants are conclusory and speculative

15  for the reasons stated above.  *See supra* section I.  The summary argument in plaintiffs' opposition

16  does not save their claim either.  *See* Oppo. 25 ("Plaintiffs allege each Defendant's scienter and

17  actions in furtherance of the fraudulent and manipulative scheme integral to the BitMEX platform.

18  This states a claim for aiding and abetting a CEA violation.").

19      Allegations with respect to aiding and abetting Quick-Grove-Mind remain insufficient too.

20  As a preliminary matter, plaintiffs appear to abandon the theory that defendants aided and abetted

21  Quick-Grove-Mind; they now argue that Quick-Grove-Mind *is* defendants.  This just doubles

22  down on the same allegations I found insufficient before.  *See* MTD Order 23–24 (finding

23  plaintiffs "fail to offer anything concrete to back up" the theory that "Quick-Grove-Mind's large

24  profits demonstrate that the trader was engaging in market manipulation" and "[e]ven if its

25  plausible that defendants would generally know the BitMEX users that end up on their

26  Leaderboard, plaintiffs fail to explain why it would be plausible for defendants to also know *how*

27  particular users earned their Leaderboard status and *what* defendants did to aid and abet in that

28  venture") (emphasis in original); *see, e.g.*, SACC ¶¶ 19, 465.  Plaintiffs have not provided more

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1   detailed and plausible allegations in the SACC to sustain an aiding and abetting violation under

2   the CEA.[11]

3       Defendants' motion to dismiss the CEA claims (Counts 1 though 8) is GRANTED with

4   prejudice.

5       **B.    RICO (Counts 9 through 14)**

6       To prevail on their section 1962(c) claim, "[p]laintiffs must plausibly allege that each

7   defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate

8   commerce, (3) through a pattern, (4) of racketeering activity." *Eclectic Props. E., LLC v. Marcus*

9   *& Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)).  To proceed on

10  their section 1962(d) claim, plaintiffs must plausibly allege a substantive violation of RICO (under

11  section 1962(c)), and that each defendant was "aware of the essential nature and scope of the

12  enterprise and intended to participate in it." *United States v. Christensen*, 828 F.3d 763, 780 (9th

13  Cir. 2015).

14      Plaintiffs' RICO claims under sections 1962(c) and 1962(d) were previously dismissed

15  because of the implausibility problem discussed above, as well as the failure to plausibly allege (i)

16  standing under section 1964(c); (ii) the existence of a distinct enterprise, separate and apart from

17  the general business of BitMEX; and (iii) racketeering activity.  *See* MTD Order 16–21.  None of

18  these deficiencies has been cured.

19      "To have standing under [section] 1964(c), a civil RICO plaintiff must show (1) that his

20  alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason

21  of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon*

22  *Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  As discussed above, plaintiffs'

23  attempt to connect defendants' alleged misconduct to their bitcoin losses fails to satisfy Article

24

25  _____

    [11] Though not explicitly stated under this cause of action, to the extent that plaintiffs allege that
26  defendants aided and abetted Ben Aabtc in manipulating the market in violation of the CEA, that
    theory fails because they do not allege that the April and May 2018 market manipulation events
27  involving Ben Aabtc caused them any harm nor do they plausibly explain how defendants were
    involved in Ben Aabtc's alleged misconduct.  Plaintiffs also add a market manipulation event from
28  August 2, 2020, but fail to allege that any of them sustained losses due to that event.  *See* SACC ¶¶
    461–64.

III's baseline, let alone the proximate causation under the heightened RICO standard.   They fail to allege plausible facts establishing that their supposed bitcoin losses are directly related to RICO violations allegedly committed by any defendant.

To show the existence of an enterprise, plaintiffs must plead that the enterprise has (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose.  *Eclectic Properties*, 751 F.3d at 997.  I rejected their previous attempt to allege an enterprise consisting of defendants along with Reed's family members and associated companies owned by Reed.  *See* MTD Order at 19–20.  "Without plausible allegations about the Reed Family Members, Grape Park LLC, Mark Sweep LLC, and 'Unknown Exchange' and their purported role in the enterprise, the only other defendants are the corporate owners and officers of BitMEX, an entity that is not "distinct" from the alleged enterprise."  *Id.* at 20.

Plaintiffs remove the Reed Family Members, Grape Park LLC, Mark Sweep LLC, and "Unknown Exchange" from the SACC but now, through a kitchen-sink approach, allege three kinds RICO enterprises: (i) an "association and fact" enterprise consisting of all named defendants (SACC ¶¶ 337, 648); (ii) the "HDR Enterprise" consisting of all defendants except HDR (SACC ¶ 698); and (iii) the "ABS Enterprise" consisting of all defendants except ABS (SACC ¶ 751).  The underlying problem still exists.  Plaintiffs' allegations amount to a "corporation carrying out its own activities (even fraudulent ones) only through its agents and employees"—the precise circumstance that does not constitute a RICO enterprise.  MTD Order at 19 (quoting *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2016 WL 3920353, at *12 (S.D.N.Y. Jul. 15, 2016)).

In their sur-reply, plaintiffs argue that no allegations of separateness are required for their claim that HDR is the enterprise or ABS is the enterprise because it was not required in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2021 WL 1391540 (N.D. Cal. Apr. 13, 2021).  *JUUL* is a very different case.  Plaintiffs there offered "detailed allegations regarding the RICO defendants' achievement of the goals that were primarily sought to advance their self-interests, and not necessarily or primarily to advance JLI's interests," that were "adequate to support the plausibility of the theory that JLI was the separate RICO

Enterprise." *Id.* at *7.  Plaintiffs' barebone allegations here do not suffice.

Even if an enterprise was adequately alleged, plaintiffs' RICO claims would still fail for failure to allege racketeering activity.  Plaintiffs assert that "[d]efendants engaged in continuous pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952." SACC ¶ 650.  All of those allegations depend on their claims that defendants either engaged in market manipulation or fraudulent inducement.  Those theories are insufficiently alleged for the reasons discussed above.

Defendants' motion to dismiss the RICO claims in Counts 9 through 14 is GRANTED with prejudice.

## IV.    STATE LAW CLAIMS

### A.    Common Law Fraud and Negligent Misrepresentation (Counts 15 through 20)

Plaintiffs bring several common law fraud and misrepresentation claims based on the alleged misrepresentations regarding the insider trading desk and BitMEX liquidity (Counts 15 through 20).  Under California law, the "indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Vess*, 317 F.3d at 1105.  To adequately allege a claim sounding in fraud under Rule 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Id.* at 1106 (internal quotation marks omitted).

The SACC fails to allege plausible facts with respect to defendants' fraud and misrepresentation, particularly when the allegations are held up against Rule 9(b)'s more stringent standards.  Notwithstanding my previous order explaining that plaintiffs cannot use a "fraud on the market" theory of reliance because that theory has been rejected by the California Supreme Court, they replead the same allegation in the SACC for their market manipulation theory.  *See In re*

*GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995) (California Supreme Court rejected the "fraud on the market" theory in *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1108 (1993), requiring instead "actual reliance on the alleged misrepresentations and omissions"); *see, e.g.*, SACC ¶¶ 418, 421.  Though reliance is adequately pleaded for the fraudulent inducement theory, all claims under that theory fail due to the inadequately alleged elements of falsity and causation.

### B.      California Statutory Claims (Counts 21 through 25)

Plaintiffs alleged one UCL claim under the unlawful prong in the Consolidated Complaint. Because they failed to state a claim as to each of those underlying offenses under RICO, CEA and various other statutes, the UCL claim failed.  MTD Order at 28.  Plaintiffs now expand their UCL claim (Counts 23 through 25) and add claims under the FAL and CLRA based on the insider trading desk and liquidity misrepresentations (Counts 21 and 22).

As a threshold matter, plaintiffs fail to establish standing to bring their UCL, FAL, and CLRA claims because they fail to adequately plead that their reliance on the misrepresentations caused their losses. *See supra* section II.  Instead, they only allege that they were harmed when their positions were liquidated based on the price of bitcoin at the time.  Plaintiffs also fail to plead the elements of those claims because they have not adequately alleged that the insider trading desk and liquidity representations were false.  *See supra* section I.B.[12]

The three separate causes of action under the UCL fail for additional reasons.  For the unlawful prong, plaintiffs predicate their UCL claim on violations of RICO, the CEA, the CLRA, and the FAL described above, as well as violations of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 45(a)(1) and 52(a).  *See* SACC ¶¶ 960–64.  Because plaintiffs do not allege a prima facie claim under RICO, the CEA, the CLRA, and the FAL, their claims predicated on those statutes necessarily fail.  As for the remaining statute, the FTCA "does not provide individuals with a private right of action" and cannot be used as a predicate for a UCL claim. *Nelson v. Am. Home Mortg. Servicing Inc.*, No. CV 10-4562, 2010 WL 3034233, at *2 (C.D. Cal.

---

[12] Defendants argue that the liquidity statement ("1500% More Bitcoin/USD liquidity than any other platform") is non-actionable because it is a generalized, vague, and unspecified assertion that constitutes mere puffery.  I need not reach that argument given the pleading deficiencies discussed in this order.

United States District Court
Northern District of California

July 29, 2020); *see Schmitt v. SN Servicing Corp.*, No. 21-CV-03355-WHO, 2021 WL 3493754, at *10 (N.D. Cal. Aug. 9, 2021) (finding for purposes of alleging an unlawful business practice, "plaintiffs cannot predicate their UCL claim on the FTC Act").  Judge Massullo in the *Kanyshev* state court case also recognized that the FTCA cannot be a UCL predicate.  *See Kanyshev v. HDR Global Trading Ltd.*, No. CGC-20-584483 (Cal. Super. Ct. Aug. 27, 2021) ("*Kanyshev* Second Demurrer Order") at 26 (citing *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1058 (N.D. Cal. 2014)).  Plaintiffs' claims under the "unfair" and "fraudulent practices" likewise fail because they are entirely dependent on the insufficient allegations discussed above.

Defendants' motion to dismiss the FAL, CLRA, and UCL claims (Counts 21 through 25) is GRANTED with prejudice.

### C.     Negligence (Count 26)

In the Consolidated Complaint, plaintiffs alleged that defendants enticed them to trade on their platform by advertising the BitMEX Perpetual Swap contract as "the most traded cryptocurrency product of all time" and owed them a duty to maintain a functional cryptocurrency marketplace and prevent economic harm to them.  MTD Order at 24.  I dismissed the claim to the extent that it was based on the insufficiently alleged "unlawful market manipulation" and because plaintiffs failed to establish causation or adequately plead the existence of a "special relationship" giving rise to an actionable duty of care under the circumstances.  *Id.* at 24–27.

In their negligence claim in the SACC (Count 26), plaintiffs repeat the same insufficient allegations for "special relationship" giving rise to a duty to "maintain a functional crypto-derivatives trading marketplace" that I rejected before.  *See* SACC ¶¶ 974, 982.  They also appear to suggest that defendants are liable for negligence because they breached the Terms of Service by failing to provide plaintiffs with "the ability to place orders, open and close positions and use margin."  SACC ¶ 974.  Plaintiffs do not explain why that would amount to a tort claim as opposed to a breach of contract (to the extent that is a viable claim here).  The California Court of Appeals has held that "conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law.  An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal

duty." *State Ready Mix, Inc. v. Moffatt & Nichol*, 232 Cal. App. 4th 1227, 1231 (2015).

Plaintiffs' argument that *N. Am. Chem. Co. v. Super. Ct.*, 59 Cal. App. 4th 764, 774 (1997) permits

liability for "negligent breach of contractual duties owed directly to plaintiffs" has been squarely

rejected by *Aas v. Super. Ct.*, 24 Cal. 4th 627, 643 (2000), which found "[t]he argument is not

persuasive." *superseded by statute on other grounds as stated in Rosen v. State Farm Gen. Ins.*

*Co.*, 30 Cal. 4th 1070, 1079–80 (2003).  And, like everything else, the negligence claim fails

because the underlying misconduct and causation is implausibly alleged.  *See supra* sections I and

II.

Defendants' motion to dismiss the negligence claim (Count 26) is GRANTED with

prejudice.

### D.    Remaining State Law Claims (Counts 27 through 33)

Plaintiffs' opposition neglects to specifically address many of the remaining state law

claims, which they try to salvage in their proposed sur-reply.  *See* Oppo. 36 (arguing that "The

Remaining Causes of Action Are Also Viable" and that defendants only raise fact issues);

Proposed Sur-Reply 5–7 (arguing that plaintiffs did not waive those claims and largely reciting

allegations from SACC without explaining why the allegations are sufficient).  None of those

arguments save their claims.

The SACC allegations for restitution (Count 27), constructive trust (Count 28) and

accounting (Count 29) are for the most part identical to those in the Consolidated Complaint,

except that the claim for restitution has been retitled "Quasi-Contract" instead of "Unjust

Enrichment."  These claims fail because of the implausible market manipulation allegations.

Plaintiffs do not clarify whether these claims are related to the new fraudulent inducement theory,

but to the extent that it is, the fraudulent inducement theory is insufficiently pleaded as well.

The conversion (Count 30) and replevin (Count 32) claims fail for lack of causation

reasons discussed above.  Moreover, as Judge Massullo recognized in the first demurrer order in

*Kanyshev*, there is "no case law suggesting that a plaintiff can bring a conversion suit anytime a

freely-undertaken, high-risk, high-reward investment turns out to be unsuccessful."  *Kanyshev v.*

*HDR Global Trading Ltd.*, No. CGC-20-584483, 2021 WL 3545176, at *8 (Cal. Super. Feb. 25,

2021).  The new "writ of replevin" claim collapses into the conversion claim.  *See Foster v. Sexton*, 61 Cal. App. 5th 998, 1020 (2021) ("Under current California law, the common law forms of action named replevin, detinue and trover are addressed by the tort of conversion of tangible personal property.").  To the extent that plaintiffs seek bitcoin as the remedy for replevin, bitcoin cannot be recovered in a conversion action because it is not tangible property.  *See Ox Labs Inc. v. Bitpay, Inc.*, 848 Fed. App'x 795, 796 (9th Cir. 2021) (finding district court correctly denied plaintiff specific recovery of its 200 bitcoins because "the converted property here, cryptocurrency, is intangible").  Plaintiffs' aiding and abetting conversion (Count 31) and violation of California Penal Code section 496 (Count 33) are predicated on defendants' alleged facilitation of conversion and fraud by other co-defendants.  The claims fail as dependent on the inadequately pleaded conversion claim.

## CONCLUSION

Defendants' motion to dismiss the SACC is GRANTED with prejudice.

**IT IS SO ORDERED.**

Dated: September 7, 2021



William H. Orrick
United States District Judge